UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNA POPLAR,

    Plaintiff,

v

GENESEE COUNTY ROAD
COMMISSION and FRED F. PEIVANDI, in
his individual Capacity,

    Defendants.

CASE NO: 2:21-cv-12568-VAR-JJCG

HON. VICTORIA A. ROBERTS

Charis Lee (P84127)
LEE LEGAL GROUP, PLLC
Attorney for Plaintiff
117 W. Flint Park Blvd.
Flint, MI 48505
(810) 513-9257
charis@leebusinesslaw.com

Julie A. Gafkay (P53680)
GAFKAY LAW, PLC
Co-Counsel for Plaintiff
604-A S. Jefferson Ave.
Saginaw, MI 48607
(989) 652-9240
jgafkay@gafkaylaw.com

Andrew A. Cascini (P76640)
HENN LESPERANCE PLC
Attorneys for Defendants
32 Market Ave., SW, Suite 400
Grand Rapids, MI 49503
(616) 551-1611
aac@hennlesperance.com

## STATEMENT OF MATERIAL FACTS

    Defendant Genesee County Road Commission and Defendant Fred Peivandi submit the following Statement of Material Facts, which is intended to accompany their Motion for

Summary Judgment in the above-captioned case.

1. Defendant Genesee County Road Commission is the governmental entity that maintains its county's roads and bridges. (Peivandi 27).

2. The GCRC is led by its Board, which holds authority to contract business, and which provides strategic direction to the GCRC and establishes its policies. (Mandelaris 6, 10; MCL 224.9(1)).

3. The Board indirectly manages the GCRC through its appointment and supervision of the GCRC's Managing Director, who controls the GCRC's day-to-day operations and has sole authority to hire, fire, and discipline employees. (Mandelaris 7, 54; Peivandi 26, 52).

4. Defendant Fred Peivandi has served as the GCRC's Managing Director since the Board unanimously appointed him to the position in July 2018. (Peivandi 15; **Ex. 6**).

5. Plaintiff Donna Poplar was hired by the GCRC in October of 2016 as its HR Director. (Poplar 27).

6. She had prior served as the Executive Director for the Genesee County Community Action Agency ("GCCAA") and the HR Director for the City of Flint, Michigan. (*Id.* 9, 14-16).

7. She was ultimately terminated from each position – from the GCCAA in 1999 for an "unknown" reason (Poplar 16; **Ex. 7**), and from Flint in 2011 by the then-incoming emergency manager. (*Id.* 10-12).

8. Poplar's termination from the GCCAA occurred around the time she was convicted of a felony – later expunged – for "receiving money under false pretenses" based on acts which occurred in her final days with the GCCAA. (Poplar II 104-111).

9. Poplar spent five years unemployed and seeking work after her employment was terminated from the City of Flint. (Poplar III 70-73, 150; Poplar 17-20; **Ex. 10**).

10. Poplar filed an unsuccessful age discrimination lawsuit against the City of Flint based on allegations related to the end of her employment with the City. (Poplar III 70-73, 150; Poplar 17-20; **Ex. 10**).

11. When Poplar interviewed with Daly for the GCRC's HR Director job, she disclosed her visual disability to him. (Poplar 124).

12. Reading and computer screen work are each essential functions of the HR Director job. (**Ex. 41**).

13. Poplar spoke with Daly on her first day at work about getting a closer parking spot, adjusting her office lighting, purchasing an enlarged computer screen, and hiring an administrative assistant to help her. (Poplar 125).

14. Poplar admits she knew of her alleged need for an administrative assistant in 2016. (Poplar 125-127).

15. Poplar stressed that her primary motivation in asking for the assistant on her first day was for disability accommodation purposes. (Poplar 127).

16. In January of 2017, Poplar and Daly submitted documentation to the Board requesting funding for a HR assistant. (**Ex. 13**). The documents do not mention Poplar's need for an accommodation. (Poplar 128-129, 132, 134).

17. Daly testified he'd received complaints from employees about Peivandi "being unreasonable and unfair with some of his requirements," but had never seen any evidence Peivandi held animus towards African-Americans despite directly supervising him for 12 years. (Daly 13, 32).

18. Poplar raised the issue of hiring an HR administrative assistant with Peivandi by emailing him on August 27, 2018 and asking for an administrative assistant as an accommodation for her disability. (**Ex. 17**). Peivandi replied by asking her for additional information. (**Ex. 18**).

19. Poplar met twice with Peivandi to discuss the administrative assistant position after August 27, 2018, but secretly recorded the second meeting. In the recording, Poplar attempts to get Peivandi to admit he'd made the offensive comment she'd said he did. (**Ex. 19**, 2-3, 13). Peivandi denies making the comment and insists he said the GCRC was "not going to hire somebody that's going to take one and a half persons to do the job or two people to do the job." (Id., 4-5). He assures Poplar he supported creation of a part-time position and would perform a needs study. (Id., 11, 14-15).

20. In December 2018, Peivandi asked the Board to create a part-time position for Poplar, but he and she disagreed about its starting wage. (**Exs. 20, 21**).

21. Poplar asked the Board in a public meeting to override Peivandi's recommendation about the wage rate. (**Ex. 22**).

22. On February 4, 2019, Poplar filed an EEOC charge against the GCRC, alleging Peivandi discriminated against her because of her disability and her race, including claims that Peivandi had denied her an accommodation. (**Ex. 2**). She received her right to sue letter on August 5, 2021. (Ex. 39).

23. Three months later, Poplar informed Peivandi she'd ask the Board for a full-time assistant. (**Ex. 24**; Poplar 145). On August 8, 2019, Peivandi told her that he'd reviewed her request but could not support it. (*Id.*) Poplar again asked the Board to intervene, and on August 27, 2019, the Board voted 3-2 to expand the position to full-time. (**Exs. 25**, **26**).

24. Poplar's deposition was taken on September 21 and October 8 of 2020 in the Anthony Branch lawsuit against the GCRC. (Poplar II).

25. Poplar asked to begin by making an opening "statement for the record" in which she said she was "reluctantly participating" in the deposition because she feared "being subjected to reprisal" and "possible termination of employment" from her testimony. (Poplar II 7).

26. Poplar's testimony included:

- "…Fred has made it known to me that he didn't trust me, and he has made numerous references to wanting me fired… I do know that Fred has pretty much let me know in many ways that he doesn't want me here." (Poplar II 101, 103).
- "…Fred has a very retaliatory personality; I am very concerned… as Fred is watching this deposition, that he would take everything that I'm saying personally and that he's going to be very revengeful towards it." (*Id.* 101-102).

- "I think Fred feels... he can do what he wants. He often says he's the Managing Director… I think Fred's anger and dislike towards African-American people, especially African-American men, is predicated around his cultured beliefs... [and] the fact that he resents that his daughter had two children by an African-American man that he despised... He'll talk about their Iranian side, but he won't talk about their black side." (*Id.* 102-103).
- "…I have [] stated my concerns because <u>I do not believe that the Board that is sitting now is prepared to make the decision that they need to make concerning Fred Peivandi</u>." (*Id.*).

27. Poplar testified that Peivandi spoke with her after her deposition, when she claimed Peivandi "felt that I was lying on him" and "took it personal," which made Poplar "quite upset." (Poplar 211). Peivandi admitted he was "[p]ersonally upset because she brought up my personal [life]… [a]bout my daughter [and] my grandkids" during her deposition despite their irrelevance to that case, but stressed he "didn't mix that with my professional side" towards Poplar. He told Poplar he didn't appreciate her testimony about of his family. (Peivandi 48).

28. Poplar filed her first complaint with the Board on January 28, 2021, alleging Peivandi subjected her to a "hostile atmosphere in her working environment" that had begun in "early 2018." (**Ex. 4**). In the complaint, she asked the Board to investigate Peivandi, before concluding: "<u>Today, I feel like I am the George Floyd of GCRC, and Fred Peivandi has his knee on my neck, and I am crying out "I Can Not Breath[e]</u>." (*Id.*) (emphasis added).

29. The Board voted unanimously for attorney Craig Lange to investigate the circumstances behind Poplar's complaint. (**Ex.28**.).

30. Lange investigated for two months, interviewed thirteen GCRC employees, and reviewed of thousands of documents, many of which came from Poplar. (Poplar 212; Peivandi

43; **Ex. 1**, 3-4). Poplar admitted she had no reason to believe Lange held any bias against her, African-Americans, or employees who might engage in protected activity. (Poplar 217-218).

31. Poplar filed her second EEOC charge against the GCRC on May 10, 2021, claiming discrimination and retaliation. (**Ex. 3**).

32. Lange released his report through MCRCSIP to the Board on April 26, 2021. (**Ex. 1**).

33. Elkins and Dickerson gave Poplar a letter summarizing the investigation's conclusions. (Poplar 218; **Ex. 30**).

34. Peivandi felt he "had to do something" based on Lange's conclusions about the conflict. (Peivandi 44). So he drafted five directives and gave them to Poplar, instructed Poplar to: (1) raise concerns about work-related matters with him before discussing them with others; (2) keep him informed whenever she spoke with Commissioners about work-related matters; (3) perform work as assigned; (4) defer all final hiring and firing decisions to the Managing Director; and (5) implement the Managing Director's budget decisions. **(Ex. 31)**. Peivandi presented Poplar with the directives on July 1, 2021. Poplar claims she is "not sure" if the directives are lawful or valid. (Poplar 228-231). Poplar stated she complied to the "best of her ability." (Id., 231).

35. On August 16, 2021, Poplar emailed Peivandi and recommended the GCRC reimpose masking requirements. (**Ex. 32**).

HENN LESPERANCE PLC

36. Peivandi responded that he did "not wish to mandate that GCRC staff and visitors wear masks" at that time, but that Poplar should make staff "aware of the risk level… so that they can make their own personal protection decision." (*Id.*).

37. Poplar wrote and sent out a memorandum entitled "MIOSHA Recommendations." (**Ex. 33**). Poplar sent this memorandum pursuant to her job duties as HR Director. (Poplar 281).

38. Peivandi suspended Poplar for two weeks "because she did not follow my directives" on August 19, 2021, with Poplar to return to work September 6, 2021. (*Id.;* **Ex. 34**).

39. Poplar filed a second complaint with the Board on August 26, 2021, again alleging discrimination, harassment, and retaliation from Peivandi. (**Ex. 5**). She asked for "an unbiased investigation of the situation," reiterated her complaints, baselessly suggested "[t]ampering" occurred with Lange's investigation, and accused the Board of "grossly failed to protect" her from Peivandi. (*Id.*).

40. Peivandi issued the Poplar a Notice of Administrative Leave on September 6, 2021. (Ex. 35).

41. On September 28, 2021, the GCRC received correspondence from Poplar's legal counsel asking to hold settlement discussions. (**Ex. 36**).

42. At the Board's October 6, 2021 meeting, the Board granted Poplar's request and met with Poplar and her attorney on October 13. (**Ex. 37**).

HENN LESPERANCE PLC

43. Legal counsel for Poplar and the GCRC corresponded to negotiate peace, but they hit impasse in early November. On November 2, 2021, the Board voted for Poplar was to return to work, but with Poplar reporting directly to Dellaposta (who'd already been appointed to directly supervise the other directors in the new year anyway) instead. (**Ex. 38**; Poplar 182).

44. In October 2021, Peivandi and Dellaposta promoted Monica Pearson to Benefit Coordinator. They modified the Benefit Coordinator job description to require Pearson to continue helping Poplar in her new role. (Peivandi 64; Dellaposta 25; Pearson 38).

Dated:  November 21, 2022               /s/ Andrew A. Cascini
                                        Andrew A Cascini
                                        HENN LESPERANCE PLC
                                        32 Market Ave SW, Ste. 400
                                        Grand Rapids, Michigan 49503
                                        (616) 551-1611
                                        aac@hennlesperance.com