UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DONNA POPLAR,

       Plaintiff,

vs.                       Case No. 2:21-cv-12568-VAR-JJCG
                            Hon. Victoria A. Roberts

GENESEE COUNTY ROAD COMMISSION
and FRED F. PEIVANDI, in his
individual capacity,

       Defendants.



DEPOSITION OF FRED PEIVANDI, taken on Thursday,

July 14, 2022, at 211 West Oakley Street, Flint, Michigan,

noticed for 10:00 A.M.



APPEARANCES:

For the Plaintiff:  LEE LEGAL GROUP, PLLC
                   BY:  CHARIS LEE, J.D. (P84127)
                   117 West Flint Park Boulevard
                   Flint, Michigan 48505
                   (810) 513-9257
                   charis@leebusinesslaw.com
                          and
                   GAFKAY LAW, PLC
                   BY:  JULIE A. GAFKAY, J.D. (53680)
                   604-A South Jefferson Avenue
                   Saginaw, Michigan 48607
                   (989) 652-9240
                   jgafkay@gafkaylaw.com

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-3, PageID.303   Filed 11/21/22   Page 2 of 39
Donna Poplar v. Genesee County Road Commission
Fred Peivandi

2 (2)

APPEARANCES (CONTINUED)

For the Defendant:  HENN LESPERANCE, PLC
                    BY:  ANDREW A. CASCINI, J.D. (P76640)
                    32 Market Avenue, SW, Suite 400
                    Grand Rapids, Michigan 49503
                    616) 551-1611
                    aac@hennlesperance.com

Court Reporter:  Cynthia Lathrop, CSR-2474

ALSO PRESENT:

Ms. Maddy Sides


          *     *     *     *


INDEX TO EXAMINATION

WITNESS:  FRED PEIVANDI

Examination by Ms. Gafkay              Page    7
Examination by Mr. Cascini             Page  133
Reexamination by Ms. Gafkay            Page  142
Reexamination by Mr. Cascini           Page  146

          *     *     *     *


INDEX TO EXHIBITS

Deposition Exhibit No. 21              Page  122
  GCRC Board Meeting Minutes 8/17/21

          *     *     *     *

Page 3

1    Flint, Michigan
2    Thursday, July 14, 2022
3    10:04 a.m.
4    R E C O R D
5    COURT REPORTER:  Do you solemnly swear
6    or affirm to tell the whole truth in this matter so
7    help you God?
8    THE WITNESS:  I do.
9    MS. GAFKAY:  Let the record reflect
10   that this is the date and time set for the deposition
11   of the individual Defendant, Fred Peivandi, to be
12   taken for any and all purposes under the Federal Rules
13   of Civil Procedure.
14   Good morning, Mr. Peivandi.  I just
15   introduced myself off the record.  My name is Julie
16   Gafkay.  I'm an attorney, and I'm here with my
17   co-counsel -- lead counsel Charis Lee, but I am her
18   co-counsel.
19   Have you ever had your deposition taken
20   before?
21   THE WITNESS:  No.
22   MS. GAFKAY:  And have you sat through
23   depositions before?
24   THE WITNESS:  Yes.
25   MS. GAFKAY:  How many depositions have

Page 4

1    you sat through?
2    THE WITNESS:  Probably seven to eight.
3    MS. GAFKAY:  Seven to eight; okay.
4    THE WITNESS:  Seven to eight
5    depositions.
6    MS. GAFKAY:  Did you sit through
7    depositions in the Branch versus Genesee County Road
8    Commission case?
9    THE WITNESS:  That's correct.
10   MS. GAFKAY:  All right.  And are those
11   all of the depositions you've sat through, the seven
12   to eight?
13   THE WITNESS:  Yes, with all the
14   commissioners and all the witnesses we had, I think
15   seven to eight, I believe it was.
16   MS. GAFKAY:  Right.  In other words, is
17   there a different case or situation --
18   THE WITNESS:  No.
19   MS. GAFKAY:  -- where you sat through a
20   deposition?
21   THE WITNESS:  No.
22   MS. GAFKAY:  I'm going to go through
23   the instructions, even though you've sat through seven
24   to eight depositions; one reason is, I want to
25   instruct you about us not talking at the same time,

Page 5

1    like we just did, and I know you didn't do that on
2    purpose, but that is one of the instructions I do
3    give.
4    There is a record being made.  After
5    the deposition is done, there'll be a transcript of
6    everything that was being said.  So one important
7    thing to know is to answer audibly with a yes or no
8    versus a nod or shake of the head; okay?
9    THE WITNESS:  Got it.
10   MS. GAFKAY:  Also, try to avoid um-hum,
11   uh-huh.  If you say that, everybody does at one time
12   or another, your attorney or I may say is that a yes,
13   or is that a no.  We're not trying to be rude, we're
14   just trying to make sure we get a clear record; okay?
15   THE WITNESS:  Okay.
16   MS. GAFKAY:  In addition, when I ask
17   questions, sometimes I pause when I'm asking a
18   question before I'm even done; so if you could just
19   bear with me and wait till I'm done asking the full
20   question before you begin to answer, that will allow
21   us to have a clearer record; and, likewise, I will try
22   to wait until you're done fully answering a question
23   before I ask the next question, again, so we have a
24   clear record.  If we do at times talk over each other,
25   I may remind you.  Again, I'm not trying to be rude,

Page 6

1    I'm just trying to make sure we get a clear record;
2    okay?
3    THE WITNESS:  Okay.
4    MS. GAFKAY:  We probably will take
5    several hours, I'm not sure exactly how long it will
6    take, a lot depends on different circumstances that I
7    don't control necessarily.  So you may want to take a
8    break.  You can take a break at any time.  Your
9    attorney may ask for a break, I may want to break, but
10   the only thing that I ask is, if you want a break,
11   that you answer any question pending.  Can you do that
12   for me?
13   THE WITNESS:  Sure.
14   MS. GAFKAY:  All right.  Finally, it's
15   very important that if you don't understand a question
16   I ask you because I asked it poorly, for instance, or
17   it's just not understandable, maybe I asked several
18   questions all at once, and I'm not doing that
19   intentionally, but maybe I have done that, it's
20   important that you tell me if my question is not
21   understandable to you.  Can you do that for me?
22   THE WITNESS:  Sure.
23   MS. GAFKAY:  If you do answer the
24   question, it will reflect, at least for me and for the
25   jury when we do go to trial in this matter, that you

Page 7

1 understood the question when you answered it, if you
2 answer it; okay?
3        THE WITNESS:  Okay.
4        MS. GAFKAY:  Do you have any questions
5 about the procedure?
6        THE WITNESS:  No.
7        MS. GAFKAY:  All right.
8               EXAMINATION
9 BY MS. GAFKAY:
10 Q.  What is your date of birth?
11 A.  7/23/1959.
12 Q.  Okay.  And are you married?
13 A.  No.
14 Q.  Have you ever been married?
15 A.  Yes.
16 Q.  So are you divorced or are you widowed?
17 A.  Divorced.
18 Q.  And what year were you divorced?
19 A.  2019 or 2020 officially.
20 Q.  So the judgment of divorce was entered?
21 A.  Right, but I was separated for -- since 2010.
22 Q.  What is your ex-wife's name?
23 A.  Jasmine.
24 Q.  And did she have your last name?
25 A.  No.

Page 8

1 Q.  What is her last name?
2 A.  Minai, M-i-n-a-i.
3 Q.  Okay.  How many times have you been married?
4 A.  Twice.
5 Q.  So Jasmine is the last marriage, I assume?
6 A.  Correct.
7 Q.  And what county were you divorced in?
8 A.  Ingham County.  Is Lansing Ingham County?
9 Q.  Yes, it is.  I think that would be -- judicial notice
10 would be taken on that, I think.
11        And is that -- do you live in Lansing?
12 A.  No.
13 Q.  Do you live in Ingham County?
14 A.  No.
15 Q.  What county do you live in?
16 A.  Genesee County.
17 Q.  Okay.  And who do you reside with, if anyone else?
18 A.  Currently, I reside with my sister.
19 Q.  Okay.  What is your sister's name?
20 A.  Frahnaz, F-a -- no.  F-r-a-h-n-a-z, last name is.
21 Q.  What was -- and did your first marriage end in divorce
22 as well?
23 A.  Correct.
24 Q.  What year was that?
25 A.  1999.

Page 9

1 Q.  And what county was that?
2 A.  Genesee.
3 Q.  And what is your first wife's name?
4 A.  Annette.
5 Q.  What is her last name?
6 A.  Jensen.
7 Q.  J-e-n-s-o-n?
8 A.  s-e-n.
9 Q.  s-e-n, okay.  And do you have children?
10 A.  Two.
11 Q.  And what are their names?
12 A.  Sheena and Derek.
13 Q.  Okay.  And are they both over 18?
14 A.  Yes.
15 Q.  Do they live in Genesee County?
16 A.  My daughter lives -- Sheena lives in Genesee County,
17 yes.
18 Q.  Where is your daughter currently employed?
19 A.  I believe she's self-employed.
20 Q.  And what does she do?
21 A.  She does DoorDash and -- I don't know, I don't know
22 all the details, but I know she does a lot of
23 DoorDash.
24 Q.  Okay, fair enough.  At some point in time, did Sheena
25 work for the city of Flint?

Page 10

1 A.  Yes.
2 Q.  Do you recall when that was?
3 A.  Not exactly.
4 Q.  Okay.  Was it within the last five years?
5 A.  Yes.
6 Q.  Last three years?
7 A.  Yes.
8 Q.  Last two years?
9 A.  I don't remember.
10 Q.  So your best estimate is between two and three years
11 ago she worked for the city of Flint?
12 A.  She worked there for two years up until the mayor --
13 until they got the new mayor, whenever that was.
14 Q.  And what was the last position she held?
15 A.  I think she was Human Resources generalist.
16 Q.  And at the time that she no longer worked for
17 Genesee -- or excuse me -- for the city of Flint as a
18 human resource generalist, your daughter, were you in
19 the position of managing director for Genesee County
20 Road Commission at the time?
21 A.  Yes.
22 Q.  Okay.  And Donna Poplar a subordinate of yours at that
23 time?
24 A.  Yes.
25 Q.  Did you request that Donna write a letter on behalf of

Page 11

1    Sheena to the city of Flint?

2 **A.**   Yes.

3 **Q.**   And why did you do that?

4 **A.**   I wanted her to stay with the city employed.

5 **Q.**   You wanted Sheena to stay employed?

6 **A.**   Yes.

7 **Q.**   So you asked Donna, your subordinate at the Road

8    Commission, to write a letter from Donna to the city

9    of Flint or from your daughter?

10 **A.**   To help my daughter to craft a letter so she could

11    send it to the city.

12 **Q.**   Okay. And when you requested Donna do that, Donna did

13    that; correct?

14 **A.**   Correct.

15 **Q.**   And, I mean, did you believe that Donna would be a

16    useful resource as far as what to say in a letter to

17    try to be reinstated?

18 **A.**   At the time, yes.

19 **Q.**   And I assume -- this sounds like it was -- it was a

20    favor to you, something that would be favorable for

21    you; correct?

22 **A.**   I suppose so.

23 **Q.**   Yeah. And was that successful when your daughter sent

24    the letter?

25 **A.**   No.

Page 12

1 **Q.**   Did you blame Donna at all for what she recommended to

2    put in the letter as the reason?

3 **A.**   Absolutely not.

4 **Q.**   Okay. Was Donna helpful? In your opinion, did she

5    help at all in Sheena becoming employed with the city

6    of Flint?

7 **A.**   That's what she said.

8 **Q.**   That's what who said?

9 **A.**   That's what Donna told me.

10 **Q.**   Tell me what Donna said in that regard.

11 **A.**   That she helped her to get in with the city.

12 **Q.**   Do you know how Donna helped?

13 **A.**   No, I don't.

14 **Q.**   And do you believe that Sheena was qualified to work

15    for the city of Flint?

16 **A.**   I hope so.

17 **Q.**   Okay. I mean, you wanted your daughter to have a job

18    with the city of Flint, I assume?

19 **A.**   I wanted her to have a job, yes, a professional job.

20 **Q.**   And do you believe the city of Flint human resource

21    generalist --

22 **Q.**   Was a good start. I'm sorry.

23 **Q.**   That's okay. Human resource position was a

24    professional job?

25 **A.**   Yes.

Page 13

1 **Q.**   All right. So I assume you were happy for Sheena?

2 **A.**   Yes.

3 **Q.**   Do you have any reason to believe that Donna Poplar

4    did anything inappropriate with regard to helping

5    Sheena get the job?

6 **A.**   No.

7 **Q.**   Now, we were talking about your background, and I went

8    off into a different direction, so I'm going to pull

9    us back into your background a little bit.

10    Tell me about your educational

11    background, please.

12 **A.**   Well, I have a master's degree in civil engineering, a

13    bachelor's, master's. I'm a licensed professional

14    engineer since 1988, State of Michigan. Have been

15    doing this type of work for decades, about three, and

16    I've been part-time professor of universities for

17    almost 20 years.

18 **Q.**   Okay. Since you started with the master's, we'll

19    start there. Where did you get your master's?

20 **A.**   Wayne State University.

21 **Q.**   What year?

22 **A.**   1998.

23 **Q.**   And you got your bachelor's degree where?

24 **A.**   Louisiana State University, MSU 1981.

25 **Q.**   Okay. Where were you born and raised?

Page 14

1 **A.**   I was born in Iran.

2 **Q.**   And what year did you come to the United States?

3 **A.**   January of 1977.

4 **Q.**   So when you were 18?

5 **A.**   Seventeen.

6 **Q.**   Okay, 17 years old. Did you come with your parents?

7 **A.**   No.

8 **Q.**   Came on your own?

9 **A.**   Only me.

10 **Q.**   And what was the reason you came?

11 **A.**   To go to college.

12 **Q.**   To go to Louisiana State?

13 **A.**   Well, I started at George Washington University when I

14    first came, and I was at that university for a year

15    and a half, past 36 credit hours, and I transferred

16    down to Louisiana State University in 1978.

17 **Q.**   Any other educational -- higher education other than

18    what you've already testified to, the master's and

19    bachelor's?

20 **A.**   No. I mean, tons of training that I've been through

21    in the past 40 years.

22 **Q.**   Okay. You said you're licensed since 1988. Is that

23    current?

24 **A.**   Yes.

25 **Q.**   Has that ever lapsed at any time in that time frame?

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-3, PageID.307   Filed 11/21/22   Page 6 of 39
Donna Poplar v. Genesee County Road Commission
Fred Peivandi

6 (15 - 18)

Page 15

1 A. No.
2 Q. Have there ever been any complaints with regard to
3    your license?
4 A. Not at all.
5 Q. What universities or colleges have you taught at?
6 A. I taught at Baker College for 17 years, and I taught
7    at Wayne State University for two years.
8 Q. All right. And we've established -- I've asked about
9    you being managing director at Genesee County Road
10   Commission. I understand that is your current
11   position; is that true?
12 A. That's true.
13 Q. Tell me when you became the managing director.
14 A. August 1st, 19 -- 2018, I'm sorry.
15 Q. That's okay. And were you employed with the Genesee
16   County Road Commission before that?
17 A. Yes. I've been here almost 20 -- 30 years.
18 Q. All right. What was your position before?
19 A. Director of Engineering, and county highway engineer
20   for 13 years in that position; and I was 10 years in
21   the Design Department, I was Design Department
22   manager; and I was two years as construction engineer
23   when I first started, so back in 1993.
24 Q. That's what I was going to ask you. Do you know what
25   your exact date of hire is or just 1993?

Page 16

1 A. I'm in my 30th year, so it had to be, like, June of
2    1993; but I don't know the exact date, but I believe
3    it's in June.
4 Q. All right, fair enough. Have you been continuously
5    employed from June 1993 to the present?
6 A. Yes; in fact, I've been employed ever since I started
7    this career with a private company.
8 Q. Let's talk about Genesee County Road Commission.
9    Always full time?
10 A. Always full time.
11 Q. How many lapses in employment, any --
12 A. None.
13 Q. -- leave of absences --
14 A. None.
15 Q. -- anything like that?
16 A. Zero, none.
17 Q. All right. So let's go to the director of Engineering
18   and county highway engineer; is that what you said?
19 A. Correct.
20 Q. And you said you held that position, it sounds like,
21   approximately 13 years before you became managing
22   director?
23 A. Correct.
24 Q. Let's see if we can figure out the years. Can you
25   tell me --

Page 17

1 A. I believe I --
2 Q. -- the years?
3 A. I'm sorry. I start too quick.
4 Q. That's okay. Was it 2004?
5 A. I believe it was 2005 when I started as director of
6    Engineering at the county here.
7 Q. And you held that position until you became managing
8    director, so it would've been until --
9 A. 2018.
10 Q. Okay. And were the job duties, were they generally
11   the same in that position, in the director of
12   Engineering and county highway engineer position, the
13   job duties, were they essentially the same for the --
14 A. Oh, for the 13 years?
15 Q. Yes.
16 A. Yes.
17 Q. I'm just trying to figure out, was there any big
18   change in --
19 A. Yeah, there --
20 Q. -- job duties during that 13 year time period.
21 A. Yes, there was.
22 Q. Let's talk about toward the end, in 2018, before you
23   took the managing director position, generally tell me
24   what your job duties were as director of Engineering
25   and county highway engineering.

Page 18

1 A. To give advice to the Maintenance Department, to order
2    work for our Sign Shop, go out there and apply for
3    grant money, federal money, state money, to get some
4    projects funded; basically program all of our
5    construction projects in Genesee County. Any
6    activities in this county went to me.
7 Q. Okay. And did you have individuals who reported to
8    you?
9 A. Yes.
10 Q. In other words, did you have direct reports?
11 A. What do you mean?
12 Q. People who directly reported to you.
13 A. Yes.
14 Q. And how many people reported directly to you,
15   approximately, if you don't know the exact number?
16 A. Directly reported to me, probably five; one, two,
17   three, four -- about five directly reported to me, but
18   I had -- my department consisted of over 25, 30 people
19   at one time.
20 Q. Okay. And what department is that?
21 A. Engineering Department.
22 Q. And how many departments are there at the Genesee
23   County Road Commission?
24 A. Five.
25 Q. Go ahead and list those for me.

Page 19

1  A.  Human Resources, Engineering, Maintenance, Finance. I
2      guess there's four -- and Administration, that's the
3      five.
4  Q.  All right. So let's talk about when you took over
5      the -- well, let me ask you this first: When you went
6      from director of Engineering and county highway
7      engineer to managing director, was that a promotion?
8  A.  Yes, it was.
9  Q.  Do you know how much you were making at the end of
10     July of 2018, the highest wage you ever made as
11     director of Engineering, the salary?
12 A.  I can't give you the exact number, but it was around
13     104,000 a year.
14 Q.  And then when you accepted the Genesee County Road
15     Commission managing director position, what was your
16     salary?
17 A.  A hundred thirty thousand.
18 Q.  And what is it today?
19 A.  A hundred forty-three thousand, roughly.
20 Q.  Okay. So in four years, your salary has increased
21     approximately 13,000; is that right?
22 A.  Four years of being managing director?
23 Q.  Um-hum.
24 A.  That's correct.
25 Q.  Do you currently have an employment contract as

Page 20

1      managing director?
2  A.  Yes, I do.
3  Q.  And when did you enter into any type of employment
4      contract with regard to the terms and conditions of
5      your position as managing director?
6  A.  When I first became managing director. It wasn't a
7      contract, it was an agreement that was approved by the
8      Board.
9  Q.  Okay. Do you think -- do you agree that an agreement
10     is -- do you believe an agreement is the same as a
11     contract?
12 A.  No, I don't.
13 Q.  Okay. So let me ask the question again. Have you
14     ever been under a contract, an employment contract, as
15     managing director?
16 A.  No.
17 Q.  All right. Are there terms and conditions of your
18     position that are in writing that have been approved
19     by Genesee County Road Commission and yourself?
20 A.  Yes.
21 Q.  All right. So there's been an agreement?
22 A.  Correct.
23 Q.  Is that your understanding?
24 A.  Correct.
25 Q.  All right. And the terms and conditions are specific;

Page 21

1      right?
2  A.  Correct.
3  Q.  Why do you not believe that's a contract?
4  A.  Because I was told by an attorney.
5          MR. CASCINI: And I'm going to caution
6      you, please don't discuss anything about legal advice.
7      I'd also place an objection of, you
8      know, asked and answered. He's an engineer, he's not
9      an attorney. I don't know if that distinction is lost
10     on him.
11 Q.  (BY MS. GAFKAY) I appreciate your attorney's
12     objection and instruction, and I will also echo that.
13     I apologize if I ask you anything that interferes or
14     asks you to disclose anything that's confidential
15     between you and your attorney that was discussed.
16     That's not my intent, and I will let your attorney
17     intervene if I do ask a question that requires that;
18     okay?
19 A.  Okay.
20 Q.  Before we leave this subject, though, let me just ask
21     you this: Are your terms and conditions of employment,
22     which have been agreed upon between Genesee County
23     Road Commission and yourself, in writing in some form?
24 A.  Yes.
25 Q.  And signed by you?

Page 22

1  A.  And the Board.
2  Q.  Okay. And where is that?
3  A.  It's in my file.
4  Q.  And that's been in existence since you started?
5  A.  Correct.
6  Q.  All right.
7          MR. CASCINI: To the extent you want a
8      copy of that, I don't believe it's been requested or
9      disclosed in discovery, but we can do that --
10         MS. GAFKAY: Sure, that and any
11     amendments or any additional ones.
12         MR. CASCINI: Maddy, can you make a
13     note of that, please.
14         MS. GAFKAY: Okay. Thank you.
15 Q.  (BY MS. GAFKAY) Okay. So let's talk about the
16     different departments. You told me the five.
17 A.  Um-hum.
18 Q.  So let's start with -- let me ask you this first:
19     When you became managing director in August of 2018,
20     did the departments each have a director?
21 A.  Yes.
22 Q.  Okay. So tell me who the directors were at that time.
23 A.  Anthony Branch was the director of Maintenance. I'm
24     sorry. When I came onboard, I'm sorry, director of
25     Engineering was not there because he came in after I

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-3, PageID.309   Filed 11/21/22   Page 8 of 39
Donna Poplar v. Genesee County Road Commission
Fred Peivandi

8 (23 - 26)

Page 23

1  hired in.
2  Q.  Oh, I understand, okay, but --
3  A.  Just so you know.
4  Q.  So let's talk about that.  You were the Engineering
5      director; is that right?
6  A.  And managing director at the same time for at least a
7      month or two before I hired somebody --
8  Q.  Okay.
9  A.  -- to take that position.
10 Q.  But there was still, I assume -- let me ask you:  When
11     you became managing director, was there still a slot
12     for a director for the Engineering Department?
13 A.  Yes.
14 Q.  So tell me who was the first person that filled that
15     position?
16 A.  Eric Johnston.
17 Q.  With a "t"?
18 A.  "t," yeah.
19 Q.  And then --
20 A.  And then Coetta Adams was the Finance director, and
21     then Donna Poplar was the HR director.
22 Q.  And Administration, would that be the managing
23     director, yourself?
24 A.  Correct.  And also, I'm sorry, Randy Dellaposta was
25     the director of Fleet Maintenance and Facilities.

Page 24

1  Actually I have six departments, then; right?  Yeah.
2  Q.  And that would -- so that department, the sixth one,
3      is the --
4  A.  Fleet Maintenance and Facilities.
5  Q.  So from the time that you assumed the managing
6      director position to the present, if there's been any
7      changes in those director positions, can you tell me
8      what those have been?
9  A.  Changes we've made was, we made director of Fleet
10     Maintenance and Facilities, changed his position to be
11     a director of Operations for a couple years; and then
12     ultimately, he became deputy managing director, and
13     that's what his current position is.
14 Q.  Are all the other directors the same currently?
15 A.  Correct.
16 Q.  All right.  When you went from -- we talked about the
17     fact that it was a promotion to go from director of
18     Engineering to managing director; correct?
19 A.  Correct.
20 Q.  So did you have to apply for that position?
21 A.  Yes.
22 Q.  Did you apply for that position?
23 A.  Yes.
24 Q.  Did you interview for that position?
25 A.  Yes.

Page 25

1  Q.  Did you have any letters of recommendation from any
2      individuals at the Genesee County Road Commission that
3      you submitted in support of your promotion?
4  A.  I have numerous supports from various entities in
5      Genesee County.
6  Q.  Okay.  So my question specifically is relating to
7      employees of the Genesee County Road Commission.
8  A.  No -- well, yes, as a matter of fact.
9  Q.  And who provided a letter of support who was a current
10     Genesee County Road Commission employee?
11 A.  Current, I don't exactly remember, but I know I had
12     support from the supervisors in the Maintenance
13     Department and all the folks in the Engineering
14     Department.
15 Q.  And did all those people --
16 A.  As a whole, they -- I'm sorry, go ahead.
17 Q.  That's okay.  Did all of those people submit a letter
18     of support?
19 A.  Not individually; as a team, as a group.
20 Q.  They all signed on to some type of letter?
21 A.  Yes, to my knowledge.
22          MS. GAFKAY:  Can I have that letter as
23 well?  Okay.
24          THE WITNESS:  Letter of support from
25 many supervisors.

Page 26

1  Q.  (BY MS. GAFKAY)  Okay.  I imagine that there was at
2      least one supervisory employee in the Maintenance
3      Department who did not sign the letter --
4          MR. CASCINI:  Objection; lack of
5  foundation.
6  Q.  (BY MS. GAFKAY)  -- is that right?
7  A.  I don't know.  I'm not aware of it.
8  Q.  Was Anthony Branch a supervisor in --
9  A.  No, Anthony Branch was a director.
10 Q.  Okay.  But you don't consider him a supervisory --
11 A.  No.
12 Q.  -- employee?
13 A.  No.
14 Q.  I see; higher because he's --
15 A.  He's higher than a supervisor, yes.
16 Q.  Did he sign on to any type of letter to support you
17     for the managing director position?
18 A.  Not that I know of.
19 Q.  So as managing director, can you tell me what your
20     general job duties are?
21 A.  To oversee the total operation of this organization.
22 Q.  And tell me, the organization is Genesee County Road
23     Commission?
24 A.  What's the question again?
25 Q.  I'm just -- there's some things I ask you that seem

Page 27

1   obvious, but I try to get it out for the record, okay.
2   So the organization, is it Genesee County Road
3   Commission?
4   **A.**   That's correct.
5   **Q.**   And what is the function of the Genesee County Road
6   Commission, in your own words?
7   **A.**   To take care of our county roads and bridges.
8   **Q.**   Now, we talked about the fact that Donna Poplar was
9   the director of Human Resources when you became the
10  managing director; correct?
11  **A.**   Correct.
12  **Q.**   All right.  So were you involved at all in the hire of
13  Donna Poplar to the Genesee County Road Commission?
14  **A.**   No.
15  **Q.**   Who did you replace as managing director?
16  **A.**   John Daly.
17  **Q.**   Had John Daly been your supervisor, your -- did you
18  report to John Daly before he left and you assumed
19  that role of --
20  **A.**   Correct.
21  **Q.**   -- managing director?  Okay.
22          Before you became managing director,
23  did you know Donna Poplar?
24  **A.**   Yes.
25  **Q.**   And how did you know her?

Page 28

1   **A.**   When she was hired in.
2   **Q.**   And I was going to ask, and I'll just ask you for
3   completeness, did you know Donna Poplar before she
4   became an employee of Genesee County Road Commission?
5   **A.**   No, I did not.
6   **Q.**   Do you recall that she began her employment, Donna
7   began her employment, in October of 2006?
8   **A.**   Sometime 2006.
9   **Q.**   I'm sorry, 2016, excuse me.
10  **A.**   2016, yeah.
11  **Q.**   All right.  But at some point you had met her in her
12  role as director of Human Resources; true?
13  **A.**   True.
14  **Q.**   From the time that Donna was hired until you became
15  managing director, did you have any problems with
16  Donna Poplar?
17  **A.**   No.
18  **Q.**   And Donna, we've established, was the director of
19  Human Resources, and that's still her role today;
20  true?
21  **A.**   Correct.
22  **Q.**   And so when you assumed the managing director
23  position, what was your understanding as to generally
24  what her responsibilities as director of Human
25  Resources were?

Page 29

1   **A.**   To handle employment issues that we have in this
2   organization.
3   **Q.**   Okay.  And were you familiar with Donna Poplar's
4   background, that she had human resource experience in
5   the past?
6   **A.**   I've heard of it.
7   **Q.**   And we already talked about the fact that when you
8   were managing director, you asked Donna to assist your
9   daughter with creating or drafting a letter to the
10  city of Flint; correct?
11  **A.**   Correct.
12  **Q.**   And so Ms. Poplar is certainly qualified to be the
13  director of Human Resources for Genesee County Road
14  Commission; true?
15  **A.**   I don't know.
16  **Q.**   Well, she meets the qualifications for the director of
17  Human Resources, doesn't she?
18  **A.**   I haven't seen her resume.  I really don't know.
19  **Q.**   When Donna Poplar -- excuse me, strike that.
20          When you first became the managing
21  director, Donna Poplar was someone who reported
22  directly to you as director of Human Resources; is
23  that right?
24  **A.**   After I became managing director?
25  **Q.**   Yes.

Page 30

1   **A.**   Yes.
2   **Q.**   Okay.  And you certainly wouldn't have retained Donna
3   Poplar at the time that you assumed the managing
4   director role if she was not qualified, would you?
5          MR. CASCINI:  Objection; foundation and
6   assumes facts not in evidence.
7          THE WITNESS:  I had no choice.
8   **Q.**   (BY MS. GAFKAY)  Why do you say that?
9   **A.**   Because she was already an HR director.
10  **Q.**   Okay.  But she was going to report directly to you --
11  or she did report directly to you when you became
12  managing director?
13  **A.**   Right, she did.
14  **Q.**   Okay.  Let me ask you this way:  Is there any reason
15  to believe, when you assumed the managing director
16  role and Donna Poplar was in the director of Human
17  Resources role, do you have any basis or reason to
18  believe that she was not qualified for the director of
19  Human Resources for Genesee County Road Commission?
20          MR. CASCINI:  Objection as to form.
21  When he became managing director, Julie?  Is that what
22  you're asking, that time frame?
23          MS. GAFKAY:  Yes, yes.
24          THE WITNESS:  Say it again, ask your
25  question again.

Case 2:21-cv-12568-VAR-JJCG ECF No. 23-3, PageID.311 Filed 11/21/22 Page 10 of 39
Donna Poplar v. Genesee County Road Commission
Fred Peivandi

10 (31 - 34)

Page 31

1  Q.  (BY MS. GAFKAY)  Sure.  Any reason to believe that
2      Donna Poplar was not qualified to be the director of
3      Human Resources for Genesee County Road Commission?
4  A.  No.
5  Q.  I'll have you look at Exhibit 4, which has been
6      previously marked as an exhibit.  Have you ever seen
7      what's been marked as Exhibit 4 before?
8  A.  Yes.
9  Q.  It appears to be an employment agreement for Ms.
10     Poplar with regard to her employment with Genesee
11     County Road Commission dated December 15th, 2017; is
12     that right?
13 A.  Correct.
14 Q.  Now, Ms. Poplar, if you know, in December of 2017, was
15     she a member of a union?
16 A.  I'm sorry?
17 Q.  Was Ms. Poplar a member of a union in December of
18     2017?
19 A.  No, she was not.
20 Q.  Okay.  Is she a member of a union now?
21 A.  No, she's not.
22 Q.  All right.  In December of 2017 when this employment
23     agreement between Ms. Poplar and Genesee County Road
24     Commission was entered into, were you the managing
25     director?

Page 32

1  A.  No.
2  Q.  And according to this agreement, it is renewed year to
3      year; is that your understanding?
4  A.  Yes.
5  Q.  And so, to your knowledge, had this employment
6      agreement between Donna Poplar and the Genesee County
7      Road Commission ever not been renewed since it was
8      entered into?
9  A.  Correct.  My understanding, this agreement is not
10     between Donna Poplar and Genesee County Road
11     Commission.  It's between Donna Poplar and managing
12     director.
13 Q.  All right.  Well, let's look at the employment
14     agreement language.  The first paragraph of this, do
15     you agree it says, "This Employment Agreement is
16     entered into this the 14th day of December, 2017,
17     between the Genesee County Road Commission hereinafter
18     'Commission' and Mrs. Donna Poplar"?  Do you see that?
19 A.  Yes.
20 Q.  So contrary to what you just said in your testimony,
21     the agreement actually says it's between Donna Poplar
22     and the Genesee County Road Commission, doesn't it?
23     MR. CASCINI:  Objection, it
24     misconstrues his prior testimony; and objection,
25     argumentative.  If you want to debate whether or not

Page 33

1      the contract is valid, it's for the judge, not this
2      witness.
3      MS. GAFKAY:  I'm not asking the
4      validity.  I'm asking what it says on its face.
5      THE WITNESS:  That's what it says on
6      its face, yes.
7  Q.  (BY MS. GAFKAY)  According to this agreement, are you
8      aware that, under the agreement, Ms. Poplar's
9      employment can only be terminated with just cause
10     according to paragraph four?
11 A.  To be honest with you, I've never read this agreement.
12 Q.  Do you know it exists?
13 A.  I know it exists, but I never saw it to read it.
14 Q.  And did you know it existed when you were her --
15 A.  It existed --
16 Q.  -- when she directly reported to you?
17 A.  Yes.  But existed between her and the previous
18     managing director.
19 Q.  Okay.  I understand that you weren't the managing
20     director at the time; you've already established that
21     for the testimony.
22     So let me ask you this:  As far as Ms.
23     Poplar, we testified -- we talked about the fact that
24     she was one of your direct reports when you became
25     managing director.  Did you have any problems with --

Page 34

1      have you had any problems with regard to her
2      performance since becoming her supervisor?
3  A.  Yes.
4  Q.  And any problems with regard to Ms. Poplar's
5      employment, I assume you would -- would you reduce
6      those issues to writing?
7  A.  No, I did not.
8  Q.  All right.  Have you ever?
9  A.  We've talked about it verbally.
10 Q.  Have you ever provided Ms. Poplar with any form of
11     written discipline?
12 A.  Only once.
13 Q.  Okay.  And was that in August of 2021?
14 A.  I don't remember.
15 Q.  All right.  Go ahead and look at what's been marked as
16     Exhibit 16, and I will ask you about this in more
17     detail later; but my question is, you testified that
18     one time you provided Ms. Poplar with written
19     discipline.  Is this, Exhibit 16, dated August 19,
20     2021, the one time that you gave Ms. Poplar a written
21     disciplinary notice?
22 A.  If this is the two-week suspension, yes.
23 Q.  Well, you're welcome to read it.  I want to make sure
24     you're clear in your testimony.
25 A.  (Reviewing document)  Yes.

Page 35

1  Q.  Just for the record, what is your race?
2  A.  What is my race?
3  Q.  Yes.
4  A.  Iranian-American, I guess.
5  Q.  And let's talk about Ms. Poplar's employment as
6      director of Human Resources.  During her employment --
7      or during the time that she's been the director of
8      Human Resources while you've been the managing
9      director, has she initiated different ways in which
10     the Road Commission can save money?
11 A.  Not to my knowledge.
12 Q.  Has she proposed ways in which the Road Commission can
13     save money?
14 A.  Absolutely not.
15 Q.  So you don't believe at any time Ms. Poplar has ever
16     proposed cost savings for the Road Commission?
17 A.  Not at all.
18 Q.  In either 2020 or 2021, was there a time that Donna
19     asked to do a presentation to the Genesee County Road
20     Commission Board about the Human Resources Department
21     and where things stood?  Do you recall her asking
22     you --
23 A.  I believe so.
24 Q.  Do you recall when that was?
25 A.  No.

Page 36

1  Q.  Do you recall declining her request to speak to the
2      Board about the state of affairs of the Human Resource
3      Department?
4  A.  Yes.
5  Q.  And why did you reject Donna's request to speak to the
6      Board about the Human Resource Department?
7  A.  Because I didn't have any -- we didn't have anything
8      like this from other directors that wanted to present
9      it to the Board.  So this was the only one that she
10     wanted to do to present to the Board, and I declined.
11 Q.  Had that been something -- do you recall that before
12     Covid, Donna had been approved to speak directly to
13     the Board about the Human Resources Department?  Do
14     you have knowledge of that?
15 A.  I don't remember.
16 Q.  So in Donna Poplar's Complaint in this case, she
17     alleges that she initiated numerous cost savings
18     initiatives resulting in more than 300,000 in yearly
19     savings to the Genesee County Road Commission.  Do you
20     agree with that?
21 A.  No.
22 Q.  In fact, your testimony is, she has done nothing to
23     initiate or propose any type of cost savings?
24 A.  Correct.
25 Q.  Did Randy Dellaposta ever do any type of presentation

Page 37

1      to the Genesee County Road Commission regarding roads
2      to bridges?
3  A.  No, not to my knowledge.  We do a lot of presentation
4      to Roads and Bridges Committee, which is an hour
5      before the Board meeting starts.  We typically have
6      some sort of presentation to make to all the
7      supervisors in this county once a month, but never to
8      the Board as a full -- to the full Board.
9  Q.  Is every member of the Commission a member of the
10     Roads and Bridges Committee, if you know?
11 A.  No.
12 Q.  Do you recall Randy Dellaposta -- you're saying he may
13     have done a presentation to the Roads and Bridges
14     Committee.  Do you recall that all the Commission was
15     present when he did that?
16 A.  Typically they are present.  You're talking about Road
17     Commission?
18 Q.  Yes, the Road --
19 A.  Yes, they --
20 Q.  -- Commission Board?
21 A.  -- typically are present at the Roads and Bridges
22     meeting that we have.  It starts at 9:00, and it ends
23     at 10:00, and that's when our Board starts, at 10:00.
24 Q.  Okay.  Is there a human resource committee with the
25     Genesee County Road Commission?

Page 38

1  A.  Not that I know of.
2  Q.  I mean, sometimes boards or commissions have a
3      separate human resource committee.
4  A.  No, no.
5  Q.  What other committees does the Commission have?
6  A.  We have Safety Committee, and we just formed a DEI
7      Committee, which is diversity -- help me out --
8      inclusion.  Those are the two committees that I'm
9      aware of, Safety and DEI.
10 Q.  You said DEI.  Do you know what the "E" is?
11 A.  Equity; Diversity, Equity, Inclusion.
12 Q.  When was that formed?
13 A.  DEI was formed, I want to say, couple, three months
14     ago.
15 Q.  Any --
16 A.  I'm guessing, please.
17 Q.  Any other committees that you're aware of?
18 A.  No.
19 Q.  Do you know any of the reasons why the DEI Committee
20     was created by the Board?
21 A.  It was requested by HR, and then we agreed to that.
22 Q.  So was it -- you've testified Donna is the director of
23     HR.  Did Donna Poplar request the DEI Committee be
24     formed?
25 A.  Correct, yeah.

Page 39

1  Q.  Do you agree or disagree or do you not have an opinion
2      regarding the formation of the DEI Committee?
3  A.  I definitely agree.
4  Q.  Have there, since you've been managing director to the
5      present, have there been complaints from African-
6      American employees regarding discrimination at the
7      Road Commission?
8  A.  I've heard of it, but I didn't know it came to me
9      directly.
10 Q.  Okay.  Who have you heard of making complaints of
11     racial discrimination?
12 A.  Well, one of the HR directors.  That's all she talks
13     about; and I've heard some comments about the county
14     commissioners, that we have some racial issues at this
15     Road Commission.
16 Q.  Anyone else?
17 A.  And one of our Board member, Mr. Dickerson.
18 Q.  Mr. Dickerson, what did you hear regarding that?
19 A.  He always complains to me that we need to take care of
20     the racial issues that we have at this Road
21     Commission.
22 Q.  So you testified that all she talks about, you're
23     talking about Donna Poplar, is race discrimination?
24 A.  Well, I mean, a lot of discussion she has is about
25     race-related issues.

Page 40

1  Q.  And have you told her to shut up?
2  A.  No.
3  Q.  Have you told her to do what you tell her to do?
4  A.  No.
5  Q.  Ms. Poplar testified that you told her to shut up and
6      do what you told her to do?
7  A.  That's a big lie.
8  Q.  Have you ever pointed at Donna when you were telling
9      her something?
10 A.  Absolutely not.
11 Q.  You haven't pointed your finger in any way at any time
12     when you've talked to her?
13 A.  Nobody.
14 Q.  You don't point your finger at anybody at any time --
15 A.  At this organization.
16 Q.  Never?
17 A.  Never.
18 Q.  How would you describe your relationship with Donna
19     Poplar?
20 A.  Not good.
21 Q.  And when do you believe that the relation -- has it
22     always not been good?
23 A.  Pretty much, yes.
24 Q.  So since you became or -- since you became employed?
25     At what point would you say that that is when it began?

Page 41

1  A.  When I became managing director.
2  Q.  Okay.  And in part, do you agree that the relationship
3      is not good because of her belief and her talking
4      about the fact that she believes there's racial
5      discrimination?
6          MR. CASCINI:  Objection; compound
7      question.
8          THE WITNESS:  No, it's not just about
9      that, no.
10 Q.  (BY MS. GAFKAY)  Okay.  But in part about that?
11 A.  No.
12         MR. CASCINI:  Objection; misconstrues
13     prior testimony.
14 Q.  (BY MS. GAFKAY)  When you became managing director,
15     did Donna Poplar make complaints of race
16     discrimination?
17 A.  Don't remember.
18 Q.  Has Donna Poplar made complaints of race
19     discrimination, to your knowledge, since you became
20     managing director?
21 A.  I don't remember.
22 Q.  Okay.  So my question is asking you generally, and
23     then we can talk more specifically about who the
24     complaints relate to.
25         So is it your testimony that you don't

Page 42

1      remember Donna Poplar making any type of racial
2      discrimination complaints since you became managing
3      director?
4  A.  You mean from her directly?
5  Q.  Yes, her making complaints of racial discrimination.
6  A.  Well, yes.  I mean, she complained about that, yes.
7  Q.  All right.  So from the time you became managing
8      director to today, has Donna Poplar made complaints of
9      race discrimination?
10 A.  Correct.
11 Q.  When was the first time that you recall her making a
12     complaint of race discrimination?
13 A.  I believe it was January of 2020 --
14 Q.  Okay.
15 A.  -- but I'm not sure.  It was sometime early part of
16     2020.
17 Q.  All right.  And you understood that that -- that she
18     was complaining about race discrimination in January
19     of 2020; true?
20 A.  Yes.
21 Q.  And that you had -- that specifically she was
22     complaining that you had discriminated against her
23     based on her race?
24 A.  Absolutely not.
25 Q.  Okay.  My question is, do you understand that Donna

Page 43

1  Poplar was making a complaint about you discriminating
2  against her?
3  A.  Yes.
4  Q.  All right.  Do you deny that?
5  A.  Yes.
6  Q.  Did you agree with Ms. Poplar's complaint?
7      MR. CASCINI:  Objection; vague, agree
8  with it?
9      THE WITNESS:  No.
10 Q.  (BY MS. GAFKAY) Were you upset with it?
11 A.  Well, I was upset personally, yeah.
12 Q.  Was that investigated?
13 A.  Yes.
14 Q.  And who -- let me ask you this:  Were you involved in
15 who would -- who would conduct the investigation?
16 A.  No; that was the Board's decision.
17 Q.  And did you talk to anybody during the investigation?
18 A.  I interviewed the attorney who was doing the
19 investigation.
20 Q.  And who was present during the time that you
21 interviewed with the attorney?
22 A.  It was Mr. Craig Lange; he was the attorney
23 investigating the complaint.
24 Q.  Just you and him?
25 A.  Correct, in my office.

Page 44

1  Q.  Did you give him any documents?
2  A.  Probably.  I don't remember, but I'm pretty sure I
3  have, but I don't remember what documents I gave him.
4  Q.  Okay.  To your knowledge, did Mr. Lange or anybody
5  else have any conclusion as to the investigation or
6  the results of the investigation?
7  A.  Can you ask that question again?
8  Q.  Sure.  What was the result, if any, of the
9  investigation, to your knowledge?
10 A.  The allegation was not sustained.
11 Q.  And how did you feel about the results?
12 A.  I feel good about it.
13 Q.  Did that make you feel as though -- well, strike that.
14     When you got those -- that result that
15 it was not sustained, according to your testimony, did
16 you believe that Donna Poplar was wrong for making the
17 complaint?
18 A.  Yes.
19 Q.  And did you issue her directives because you felt she
20 was wrong to make that complaint?
21 A.  I felt like I had to do something; that's why I came
22 up with those directives --
23 Q.  Well, you testified --
24 A.  -- based on the result that we received from the
25 attorney.

Page 45

1  Q.  Okay.  So my question was, you've testified you felt
2  she was wrong for bringing the complaint.  Is that a
3  reason you issued the directives to her?
4  A.  Not --
5      MR. CASCINI:  I think that misconstrues
6  the prior testimony.  The objection has been placed on
7  the record.  I'm not sure I got it in on time.
8      THE WITNESS:  Not completely, no.
9  Q.  (BY MS. GAFKAY) Would you characterize the directives
10 as being a form of corrective action?
11 A.  Yes.
12 Q.  And an employee gets corrective action as a form of
13 discipline; true?
14 A.  No.
15 Q.  What action were you correcting?
16 A.  I wanted to have something in writing for her to
17 understand who is the boss here.
18 Q.  And who is the boss?
19 A.  Me, Fred Peivandi, managing director.
20 Q.  And do you believe that she did not appreciate that
21 you were the boss?
22 A.  Correct, absolutely.
23 Q.  Because she complained about you to the Board of -- to
24 the Board of Commissioners?
25     MR. CASCINI:  Objection; that

Page 46

1  misconstrues prior testimony.
2      THE WITNESS:  She was against my
3  appointment as managing director from day one, August
4  1st, when she came down to my office.
5  Q.  (BY MS. GAFKAY) What did she do or say that makes you
6  believe she was against it?
7  A.  She tried to rally support from other directors
8  against me.
9  Q.  Did Ms. Poplar believe, to your knowledge, that there
10 may have been discrimination in your selection?
11     MR. CASCINI:  Objection; speculation,
12 calls for speculation.
13 Q.  (BY MS. GAFKAY) If you know.
14 Q.  Selection, what selection?
15 Q.  As managing director.
16 A.  What do you mean by that, discrimination by my
17 selection?
18 Q.  Did Ms. Poplar believe that there was racial
19 discrimination with regard to you being selected over
20 Anthony Branch?
21 A.  Yes.
22     MR. CASCINI:  Same objection.
23     THE WITNESS:  I believe so, yeah.
24 Q.  (BY MS. GAFKAY) And you knew that, when you assumed
25 the position of managing director, that Donna had that

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-3, PageID.315   Filed 11/21/22   Page 14 of 39
Donna Poplar v. Genesee County Road Commission
Fred Peivandi

14 (47 - 50)

Page 47

1   belief, that there was discrimination because you were
2   selected over Anthony Branch?  You knew that; right?
3 A.   Not at first.  Then it became very -- after Anthony
4   Branch filed a lawsuit against the Road Commission.
5 Q.   And as part of that lawsuit, Ms. Poplar was a witness;
6   is that true?
7 A.   She was deposed.
8 Q.   Right.  I mean, she was a witness for Anthony Branch,
9   wasn't she?
10 A.   Correct.
11 Q.   And it became abundantly clear to you that Ms. Poplar
12   believed that there was discrimination, race
13   discrimination, with regard to Anthony Branch not
14   being selected?
15          MR. CASCINI:  Objection; foundation.
16          THE WITNESS:  Yes.
17          MR. CASCINI:  Misconstrues his prior
18   testimony.
19 Q.   (BY MS. GAFKAY)  And you were upset with Ms. Poplar,
20   weren't you?
21 A.   No, not really.
22 Q.   You were upset with her after she testified under oath
23   in the Anthony --
24 A.   No, I was not.
25 Q.   -- Branch matter?

Page 48

1 A.   No, I was not.
2 Q.   Were you upset with her testimony?
3 A.   Personally upset because she brought up my personal
4   issues at the deposition.
5 Q.   What personal issues?
6 A.   About my daughter, my grandkids, so on and so forth.
7   That's what I was upset about personally; but I didn't
8   mix that with my professional side of things.
9 Q.   Go on.
10 A.   That's all.
11 Q.   Do you recall talking to Ms. Poplar about her
12   testimony in the Anthony Branch case after her
13   testimony, after her deposition?
14 A.   I remember telling her, I don't -- I didn't appreciate
15   that you brought up my personal family members in that
16   deposition.
17 Q.   Okay.  So there was a conversation after Donna Poplar
18   testified in her deposition between you and her about
19   what she testified to; true?
20 A.   Yes.
21 Q.   And you told her you didn't appreciate what she
22   testified about; right?
23 A.   About my family members in that deposition, yes.
24 Q.   And you used the term, you did not appreciate what she
25   said; true?

Page 49

1 A.   Correct.
2 Q.   So you testified that you object that she, Donna
3   Poplar, objected to you being managing director from
4   day one.  Do you recall that testimony?
5 A.   Yes.
6 Q.   So other than what you've already testified to, is
7   there anything else that leads you to believe that she
8   objected to you as managing director from day one?
9 A.   I remember she made a comment.  The first day I was
10   appointed managing director, she came down to my
11   office and said, "Oh, you're going to stay another
12   three years, huh?"; just like that, and I'll never
13   forget it.
14 Q.   Other than those words, did she use any other words
15   that led you to believe she objected to you being
16   managing director?
17 A.   No.
18 Q.   So let's talk about what she actually said or what
19   you're testifying she said.  Tell me what that meant
20   to you?
21 A.   It meant to me that, you're going to be retiring with
22   your last best three years at the Road Commission in
23   terms of salary.
24 Q.   I see.
25 A.   That's why she brought up, "Oh, you're going to be

Page 50

1   here another three years, huh?"  I remember that
2   vividly.
3 Q.   Okay.  Did you say to her --
4 A.   No.
5 Q.   Did you respond to her in any way?
6 A.   No.
7 Q.   I mean, it's true, you make more now as managing
8   director than you did as director of Engineering;
9   correct?
10 A.   Yes.
11 Q.   So, I mean, did you think that -- were you offended by
12   the comment?
13 A.   Not really.
14 Q.   Why has it had such an impact on you?
15 A.   It didn't.  I'm still here after four years.
16 Q.   And at the time that she made the comment -- when you
17   first became managing director, had you already been
18   at the Road Commission over three decades, so 30 years?
19 A.   Twenty-five years.
20 Q.   Okay.  Are you part of the defined benefit plan?
21 A.   Correct.
22 Q.   And under the defined benefit plan, after how many
23   years can you retire?
24 A.   Twenty-five.
25 Q.   Okay.  So when you became managing director, you were

Page 51

1  eligible to retire under the defined benefit plan?
2  **A.**  Correct.
3  **Q.**  And you chose not to?
4  **A.**  Correct.
5  **Q.**  And I also assume -- well, I don't want to assume
6  anything.
7  Under that defined benefit plan, does
8  the calculation as to what you get as your pension
9  benefit, is that based on your last best three years?
10 **A.**  That's correct.  No; last three best years?  The best
11 three years of your salary.
12 **Q.**  And has the last three years been your best three
13 years?
14 **A.**  That's correct.
15 **Q.**  Will that have, to your knowledge, a positive effect
16 on your pension if you ever do decide to retire?
17 **A.**  Of course.
18 **Q.**  And as the HR director, is Donna familiar with the
19 pension plan?
20 **A.**  I hope so.
21 **Q.**  I mean, is that one of her duties and responsibilities
22 administering that or having knowledge of the pension?
23 **A.**  I believe so, yes.
24 **MR. CASCINI:**  If we're about to move on
25 to the next line of questioning, if we can do just a

Page 52

1  really quick break, that would be great.
2  **MS. GAFKAY:**  Sure.
3  **MR. CASCINI:**  When there's a natural
4  break.  I don't want to interrupt --
5  **MS. GAFKAY:**  Let me just ask one
6  follow-up question.
7  **Q.**  (BY MS. GAFKAY)  We touched on the directives that
8  were issued to Ms. Poplar after her complaint of race
9  discrimination was investigated.
10 Were there ever any type of directives,
11 anything issued to you by your supervisor?
12 **A.**  Never, ever, in my entire career.
13 **Q.**  And your supervisor, just for the record is, who or
14 what?
15 **A.**  Right now?
16 **Q.**  We can start with now.
17 **A.**  The Board is my boss.
18 **Q.**  How about in August of 2021?
19 **A.**  The Board.
20 **Q.**  How about since you became managing director, who has
21 been your supervisor?
22 **A.**  It's been the Board --
23 **Q.**  Okay.
24 **A.**  -- at all times.
25 **Q.**  The way you answered that, I thought maybe it changed.

Page 53

1  But the Board has always been your supervisor --
2  **A.**  As managing director.
3  **Q.**  -- and they have never issued any directives to you at
4  any time?
5  **A.**  Absolutely not.
6  **MS. GAFKAY:**  We can take a quick break
7  or how ever long you want to.
8  (Recess taken.)
9  **MS. GAFKAY:**  We're back on the record.
10 Do you understand that you're still under oath?
11 **THE WITNESS:**  Yes.
12 **Q.**  (BY MS. GAFKAY)  Okay.  All right.  Just so I'm clear,
13 do you recall that Anthony Branch brought a lawsuit
14 against Genesee County Road Commission after you
15 became managing director for race discrimination?
16 **A.**  Yes.
17 **Q.**  Did Donna Poplar testify -- you testified already that
18 she did, but I just want to make sure, my
19 understanding is that she testified in a deposition in
20 that case; is that right?
21 **A.**  Correct.
22 **Q.**  And do you recall that she testified, Donna Poplar
23 testified, that she believed there was race
24 discrimination?
25 **A.**  Yes.

Page 54

1  **Q.**  Other than Anthony Branch and Donna Poplar, since you
2  became managing director, have any other African-
3  American employees made complaints of race
4  discrimination, to your knowledge?
5  **A.**  Not to my knowledge.
6  **Q.**  And going back, were you present at the deposition of
7  Donna Poplar during the Anthony Branch matter?
8  **A.**  I believe so, through Zoom meeting, though.
9  **Q.**  I understand, you were present by Zoom?
10 **A.**  By Zoom.
11 **Q.**  All right.  Was there anything that Donna Poplar
12 testified to during the deposition in the Anthony
13 Branch matter that was not truthful, in your opinion?
14 **A.**  Yes.
15 **Q.**  What did she testify to that was not truthful?
16 **A.**  I don't remember.
17 **Q.**  Is there anything you remember her testifying to that
18 was not truthful?
19 **A.**  Well, the truth is that Anthony Branch didn't get
20 hired in because of race discrimination.
21 **Q.**  Well, were you involved in that hiring decision?
22 **A.**  No, I was not.
23 **Q.**  So how do you know that race wasn't a factor in that
24 decision?
25 **A.**  'Cause I have a lot more qualification than he does.

Page 55

1  Q.   Does that offend you to suggest that discrimination
2       played a part in the decision to promote you over
3       Anthony Branch?
4  A.   Ask me that question again.
5  Q.   Sure.  Does it offend you --
6  A.   To see that he is filing race discrimination against
7       not being selected managing director, yes.
8  Q.   At the time of the promotion, were you and Anthony
9       Branch co-managing directors?
10 A.   Yes.
11 Q.   Okay.  You kind of chuckled.
12 A.   Well, the answer is yes.
13 Q.   Is that --
14 A.   I did all the work, that's why.
15 Q.   I see, okay.  You and Anthony Branch both held the
16      title of co-managing director, but your testimony is
17      you did all the work; right?
18 A.   Right.
19 Q.   You did all the work that -- all what work?
20 A.   Well, in terms of identifying who's going to do what,
21      what he's going to do versus what I'm going to do.  In
22      fact, I created and developed two organizational
23      charts, one under his direction and one under me.
24 Q.   What is your relationship like with Anthony Branch?
25 A.   Good.

Page 56

1  Q.   Has it always been good?
2  A.   Yes, to my knowledge.
3  Q.   Any plans to demote or eliminate his position?
4  A.   Not -- not as long as he works here, no.
5  Q.   As long as who works here?
6  A.   Anthony Branch.
7  Q.   Oh, as long as he works here, there's no plan to
8       demote or change his position?
9  A.   Absolutely not.
10 Q.   Is there any plan to reduce the Maintenance Department
11      or restructure?
12 A.   We have plans to restructure this organization, yes.
13 Q.   Would the restructure affect Anthony Branch's
14      position?
15 A.   Yes.
16 Q.   Would the restructure affect Donna Poplar's position?
17 A.   Yes.
18 Q.   Would the restructure affect any other director other
19      than those two?
20 A.   Yes.
21 Q.   What other director would it affect?
22 A.   They will take more responsibilities.
23 Q.   Who will take more responsibilities?
24 A.   The Finance director and ultimately the director of
25      Engineering.

Page 57

1  Q.   Will the Finance and the -- well, let me just ask you
2       because the record to me is unclear.  Let me ask you
3       this:  What is the plan with regard to restructuring
4       Maintenance, the Maintenance Department?
5  A.   Well, I'm basically removing the Sign Shop and giving
6       it to Engineering, and that's where they belong.
7  Q.   In the 30 years that you've been at the Road
8       Commission, has the Sign Shop ever been under
9       engineering?
10 A.   Yes.
11 Q.   When?
12 A.   When we had Department 40, Traffic Engineering and
13      Special Services.
14 Q.   How long ago was that?
15 A.   I have the dates in my office.  It's been probably 10,
16      15 years ago.
17 Q.   All right.  So there would be employees -- so would
18      employees in the Sign Shop -- those employees
19      currently report to Anthony Branch; true?
20 A.   Correct.
21 Q.   Those employees would no longer be reporting to
22      Anthony Branch; is that true?
23 A.   Correct.
24 Q.   How many employees are we talking about?
25 A.   Probably six or seven.

Page 58

1  Q.   And how would the director of -- or the Human Resource
2       Department, how would that be restructured?
3  A.   It will be under Finance Department.
4  Q.   Has the Human Resources Department, to your knowledge,
5       always been a separate department on its own with the
6       Genesee County Road Commission?
7  A.   As long as I've been here.
8  Q.   So for 30 years, to your knowledge, Human Resources
9       has been a separate standalone department; right?
10 A.   Correct.
11 Q.   And under your plans, you want to put the Human
12      Resource Department under Finance Department?
13 A.   Under my plan and also the committee's plan.  It
14      wasn't all my decision alone.
15 Q.   You're a major player in that decision; true?
16 A.   Well, as the managing director, I'm assuming, yes.
17 Q.   Well, I don't want you to assume anything.  Have you
18      been a major part of the proposal --
19 A.   I've been a major part of all the major decision-
20      making at the Road Commission.
21 Q.   Okay.  So if there's a proposal on the table to move
22      Human Resources under Finance, you have been a major
23      part of that?
24      MR. CASCINI:  Objection; asked and
25      answered.

Page 59

1    THE WITNESS:  I answered the question.
2    I'm the managing director; I will make the decision
3    here at this organization.  I mean, these are the
4    recommendations that I made to the committee, and they
5    accepted it.
6    Q.   (BY MS. GAFKAY)  So your recommendation was to move
7    Human Resources to be under the Finance Department?
8    A.   Correct.
9    Q.   When did you make that decision?
10   A.   It's not approved yet.  I'm proposing to do this.
11   Q.   Recommending, proposal, when did you make the
12   proposal?
13   A.   Oh, about three months ago.
14   Q.   Prior to three months ago, had you ever, in writing,
15   made a proposal to move Human Resources under Finance?
16   A.   No.
17   Q.   Any other restructuring plans other than those major
18   components that you discussed prior?
19   A.   Yes.
20   Q.   What other major component does the restructuring plan
21   have?
22   A.   The safety coordinator is being moved from HR to
23   Administration; and the receptionist -- one of the
24   receptionists is being moved from HR to
25   Administration.  So you have the Sign Shop being moved

Page 60

1    from Maintenance to Engineering, and HR is being moved
2    to Finance.
3    Q.   So two directors that you listed, Human Resources
4    director and Maintenance director, under your
5    proposal, are losing employees; true?
6    A.   Yes.
7    Q.   Other than those two directors -- or departments, are
8    there any other departments that you are proposing
9    lose employees?
10   A.   No.  They will have more employees.
11   Q.   Is Donna Poplar and Anthony Branch the only African-
12   American directors that you have at the Genesee County
13   Road Commission?
14   A.   At the current time, yes; but we will have another
15   African-American female who is going to be promoted to
16   be a director of Fleet Maintenance and Facilities as
17   part of this reorganizational structure.
18   Q.   Okay.  I was asking you current; but since you brought
19   that up, who is that?
20   A.   Kendra Love.
21   Q.   Is she a current employee?
22   A.   Yes.
23   Q.   What's her current position?
24   A.   Manager of that department.
25   Q.   In your position with the Genesee County Road

Page 61

1    Commission, are you involved with the budget?
2    A.   Yes.
3    Q.   Okay.  And what is your fiscal year?
4    A.   October 1st through September 30th of each year.
5    Q.   So in the current fiscal year that we're in, 2021 to
6    2022, is there an administrative assistant budgeted
7    for the Human Resources Department?
8    A.   I believe so.
9    Q.   And currently is there a person, an employee, who is
10   filling the role of administrative assistant?
11   A.   Part time, yes.
12   Q.   Who is that?
13   A.   Monica Pearson.
14   Q.   Does she hold any other role with the Road Commission?
15   A.   Yes.
16   Q.   What is her other role?
17   A.   Other role is benefits coordinator.
18   Q.   Let's talk about the budget a second.  You testified
19   that there is a budget item for an administrative
20   assistant with the Genesee County Road Commission in
21   Human Resources; true?
22   A.   I believe so, yes.
23   Q.   And that administrative assistant position that is
24   budgeted is for a full-time position; true?
25   A.   Yes.

Page 62

1    Q.   So is it true that currently there is not a full-time
2    administrative assistant person in Human Resources; is
3    that true?
4    A.   True.
5    Q.   All right.  And it's also true that that is budgeted
6    for but just not being filled; true?
7    A.   True.
8    Q.   Okay.  And has Donna Poplar, who is the director of
9    Human Resources, requested that the full-time
10   administrative assistant position be filled?
11   A.   Not to me.
12   Q.   To anybody, to your knowledge?
13   A.   Deputy managing director.
14   Q.   Who is the current deputy managing director?
15   A.   Randy Dellaposta.
16   Q.   Okay.  And does Randy Dellaposta report to you?
17   A.   Yes.
18   Q.   And is that the proper chain of command; in other
19   words, currently, is the director of Human Resources
20   supposed to be reporting to the deputy managing
21   director, who then reports to you?
22   A.   Correct.
23   Q.   So has Randy Dellaposta asked you about filling the
24   administrative assistant role in Human Resources with
25   a full-time person?

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-3, PageID.319   Filed 11/21/22   Page 18 of 39
Donna Poplar v. Genesee County Road Commission
Fred Peivandi

18 (63 - 66)

Page 63

1 A.  No; he indicated that she asked him after her
2     deposition.
3 Q.  Okay.  He indicated that to you?
4 A.  Correct.
5 Q.  And what was your response?
6 A.  My response is, I'm not going to.
7 Q.  And you have knowledge that Ms. Poplar wants the
8     position of administrative assistant filled full time,
9     at least in part, to accommodate her disability; you
10    know that?
11 A.  Yes.
12 Q.  So you know that a full-time administrative assistant
13    for the Human Resources Department is a requested
14    accommodation for Donna Poplar?
15 A.  That's what she wants, yes.
16 Q.  And you, as the managing director, you have rejected
17    her request for that accommodation; true?
18 A.  True.
19 Q.  And have you engaged in any type of discussions with
20    Donna Poplar about how she can otherwise be
21    accommodated, if there is some other accommodation
22    that could be made?
23       MR. CASCINI:  Objection as to form.
24    When?
25       THE WITNESS:  Yes.  When I promoted

Page 64

1  Monica Pearson to become the managing coordinator, I
2  met with her --
3 Q.  (BY MS. GAFKAY)  Met with who?
4 A.  With Monica Pearson and also Randy Dellaposta,
5     explained to her, this is what we want to do, that
6     even though you're going to take that position of
7     benefit coordinator, but you also will be responsible
8     to be the assistant to the HR director for her reading
9     and writing.  And as a consequence, we revised the job
10    description to include all those extra
11    responsibilities for Monica Pearson, and she accepted
12    that.
13 Q.  Let me ask you this:  In early 2019, you were managing
14    director?
15 A.  Correct.
16 Q.  And Donna Poplar reported directly to you at that
17    time?
18 A.  Correct.
19 Q.  And in or about February of 2019, do you recall that
20    Donna Poplar filed a charge of discrimination with the
21    Equal Employment Opportunity Commission?
22 A.  I think so.
23 Q.  You kind of chuckled.
24 A.  I mean, I don't know dates or anything, but I know she
25    filed two EEOC's and two lawsuits in the past five

Page 65

1  years; that, I know.
2 Q.  And do you recall that the one in February of 2019,
3     the charge of discrimination to the EEOC, related to
4     the fact that she has a disability and believes she
5     was not being accommodated?  Do you recall that?
6 A.  I believe so.  2019?  Yes.
7 Q.  Okay.  Well, we can look at it.  So let's look at
8     Exhibit 9.
9 A.  Yeah, I've seen this.
10 Q.  And did you see -- have you ever seen a copy of this?
11 A.  Yes.
12 Q.  Did you see a copy of it in February of 2019?
13 A.  I'm not sure about February 19th, but I've received
14    this document probably a few days after it was filed.
15 Q.  Okay.  So in February 2019, you believe you would have
16    seen a copy of this?
17 A.  Correct.
18 Q.  Looking at it, you can see from the document that
19    Donna Poplar, in February of 2019, is alleging race
20    and disability discrimination.  Do you see that?
21 A.  That first paragraph?
22 Q.  You can see it from the boxes she's checked --
23 A.  Oh, yes, yes, I do.
24 Q.  And so as of February of 2019, you would've known that
25    Donna believed she was being discriminated against

Page 66

1  based on race; right?  You knew that?
2 A.  She alleges that, yes.
3 Q.  Okay.  And that she alleges disability discrimination?
4 A.  Correct.
5 Q.  So looking at the actual charge of discrimination, it
6     indicates that the Genesee County Road Commission
7     Board approved in the budget to hire an administrative
8     HR assistant.  Do you see that?
9 A.  Yes.
10 Q.  And I believe you said that the administrative HR
11    assistant is in the budget?
12       MR. CASCINI:  Objection; misconstrues
13    prior testimony.  You're asking about then; this is
14    back in 2019.
15 Q.  (BY MS. GAFKAY)  Well, at the time, in 2019, did you
16    have knowledge that it was in the budget as well, an
17    HR assistant?
18 A.  I don't remember.
19 Q.  Let me ask this.  You say that Monica Pearson is --
20    what is her title currently?
21 A.  Benefit coordinator.
22 Q.  Okay.  Is there a line item in the budget for a
23    benefit coordinator?
24 A.  Yes.
25 Q.  Is she the only benefit coordinator?

Donna Poplar v. Genesee County Road Commission

Fred Peivandi

Page 67

1  A.   Yes.
2  Q.   And is that line item in the budget for a benefit
3       coordinator a full-time position?
4  A.   Yes.
5  Q.   And that's what she has; correct?
6  A.   Correct.
7  Q.   All right.  Continuing on in this charge of
8       discrimination, she says "my supervisor" -- when she
9       says "my supervisor," you realize she's referring to
10      you; correct?  You know that?
11 A.   I suppose, yeah.
12 Q.   It says, "has refused to hire an assistant."  Do you
13      agree that you had refused to hire an assistant prior
14      to February 4, 2019?
15 A.   I really don't remember.
16 Q.   Okay.  And stated she's -- Donna Poplar is alleging
17      that you said, "Why should I hire an assistant for you
18      when I can hire someone that does not have a
19      disability?"  Did you say that?
20 A.   No.
21 Q.   Did you say anything like that?
22 A.   I might have said that why should I hire two people to
23      do one job.  I may have said that, yes; in fact,
24      that's exactly what I said.
25 Q.   Did you tell Donna Poplar not to attend a meeting with

Page 68

1       other directors on or about December 6th, 2018?
2  A.   Absolutely not.
3  Q.   So you disagree that you told her not to attend a
4       meeting with other directors?
5  A.   Yes.
6  Q.   Was there a meeting in December of 2018 that she did
7       not attend?
8  A.   I don't remember.
9            MR. CASCINI:  I'm going to place a
10      relevance objection on the record.  Julie, the reason
11      for my relevance objection as to this charge, anything
12      that's brought on behalf of this currently is now
13      going to be time-barred, by a significant margin, too.
14           MS. GAFKAY:  Okay.  All right.  Well,
15      relevancy, obviously, preserves --
16           MR. CASCINI:  I'm just making it for
17      the record.
18           MS. GAFKAY:  Relevancy objections do
19      not need to be made in a deposition.  You can bring it
20      in some type of motion if you want.  We can disagree
21      on whether it's relevant or not.
22           MR. CASCINI:  We can certainly disagree
23      on whether it's relevant or not, but I am entitled to
24      place objections on the record during a deposition.
25           MS. GAFKAY:  Okay.  I don't think

Page 69

1       relevance is a proper objection; but I'll continue.  I
2       understand your objection, and I don't think you're
3       barred from bringing this up to the court even whether
4       you object or not.
5  Q.   (BY MS. GAFKAY)  At any time since you've been the
6       managing director to the present, have you ever told
7       Donna Poplar that she was not to attend a meeting with
8       other directors?
9  A.   No.
10 Q.   Have you held director meetings that you have not
11      invited her to also attend?
12 A.   No.
13 Q.   Have you held meetings with the other directors and
14      she wasn't there?
15 A.   Correct.
16 Q.   Okay.  Tell me about that.
17 A.   She was absent for that day that we had the meeting
18      set up; it was scheduled.
19 Q.   When was that?
20 A.   I don't remember.
21 Q.   Are you saying it only happened one time?
22 A.   I don't know.
23 Q.   Could it have happened more than once?
24 A.   It wasn't very often, because I send the e-mail out to
25      all directors, this is a scheduled meeting, certain

Page 70

1       date, certain time.
2  Q.   So did you ever tell her she wasn't needed to attend a
3       directors meeting?
4  A.   No.
5  Q.   So is it -- strike that.
6            Has there ever been a meeting you've
7       held with the directors, other directors, that you
8       told Donna Poplar not to come to?
9  A.   Not that I remember.
10 Q.   In early -- or January of 2019, did you pull a
11      Sonitrol report to see what times Donna Poplar arrived
12      at work and when she left?
13 A.   I might've.
14 Q.   Did you do that with any other employee at any time,
15      to your knowledge?
16 A.   No; didn't have any reason to do it.
17 Q.   What reason did you have to pull a Sonitrol report for
18      Donna Poplar?
19 A.   Because I believe she said she came in Saturday and
20      wanted to take off a few hours early one day;
21      something like that.
22 Q.   Okay.
23 A.   And that's when I decided to look at probably the
24      Sonitrol video for that Saturday.
25 Q.   Because she worked on a Saturday?

Page 71

1  A.  I believe so, yeah.

2  Q.  I mean, do directors get comp time if he or she works

3      on a Saturday?

4  A.  No.

5  Q.  Is there some type of -- or is the director able to

6      make up hours not worked during the week on a Saturday

7      or Sunday at times?

8  A.  No. I expect all of them to be here during business

9      hours, every one of them. In fact, I made that clear

10     to the deputy managing director just not too long ago.

11 Q.  Well, do you have a problem with directors working on

12     a Saturday or Sunday?

13 A.  No.

14 Q.  Okay. So you just wanted to see if Donna was actually

15     here when she said she was here?

16 A.  Correct.

17 Q.  Just because she said she'd be here on a Saturday and

18     no other reason?

19 A.  Correct, probably.

20 Q.  Are there other directors or supervisors who have come

21     in on a Saturday or a Sunday?

22 A.  I think so, yeah.

23 Q.  And told you, hey, I came in on a Saturday or Sunday

24     or I'm coming in on a Saturday or Sunday?

25 A.  No, they didn't tell me, but I know the director of

Page 72

1      Engineering came in Saturday a couple times, and I

2      came in on Saturday a few times myself.

3  Q.  And you've already testified you never pulled a

4      Sonitrol report on anybody else other than Donna?

5  A.  Correct.

6  Q.  Do you recall that Coetta Adams has worked on

7      Saturdays and Sundays in the past?

8  A.  She might've.

9  Q.  And we've already talked about the fact that you never

10     pulled a report on Coetta?

11 A.  Because I never -- she never told me that she was

12     going to take a few hours off during her regular

13     hours; in other words, she came in five days, and then

14     she came in Saturday to complete her project probably.

15     And I'm not aware of those days, either.

16 Q.  Was there ever a time that you approved comp time?

17 A.  No.

18 Q.  For any employee?

19 A.  No.

20 Q.  So after -- let me ask you this: Prior to February

21     2019, was there an administrative assistant providing

22     Donna Poplar with assistance?

23 A.  Don't remember. I'd have to go back in my record to

24     see when we hired the part-time administrator -- admin

25     -- part-time help for her, because she started with

Page 73

1      part time administrative something, I don't remember,

2      to receive assistance. She started with part time,

3      and then this part time evolved into a full-time

4      through the Board of Road Commissioners, which I never

5      agreed to.

6  Q.  And that was Monica? Was it Monica?

7  A.  No -- well, it was Monica, yes, I'm sorry.

8  Q.  All right. Do you remember that it was only after

9      Donna Poplar made a complaint with the Equal

10     Employment Opportunity Commission that she was

11     provided with a full-time administrative assistant?

12 A.  Ask that question again.

13 Q.  Sure. Let me ask you this way just so it's easier for

14     you to follow the timeline: You said that at some

15     point there was a full-time administrative assistant;

16     is that right in the HR?

17 A.  No.

18 Q.  There never was?

19 A.  Never, ever.

20 Q.  Oh, I thought you said it evolved into full time.

21 A.  We had a part-time. I think that part time started

22     back in 2019 or 2018, shortly after I became managing

23     director because of her ADA disability. That's the

24     only time we had administrative assistant in the HR

25     Department.

Page 74

1  Q.  I thought you said, and maybe you can explain it to

2      me, I guess, but you said it evolved into full time.

3  A.  Correct.

4  Q.  Do you know when -- so at some point in time, Monica

5      moved from Human Resources to -- administrative

6      assistant to benefit coordinator, according to your

7      testimony. Do you recall when that was?

8  A.  That was -- I believe it was last year, 2021.

9  Q.  Okay. Do you recall it being after Donna Poplar was

10     suspended?

11 A.  I think it was after her administrative leave -- or

12     during her administrative leave.

13 Q.  Okay. And after -- and you probably already said, but

14     I just want to establish for the record. After Monica

15     was moved from administrative assistant under HR to

16     benefit coordinator, you have not since replaced

17     anybody to be the administrative assistant; true?

18 A.  Not full time, no.

19 Q.  And there's nobody designated as administrative

20     assistant in Human Resources, is there?

21 A.  I believe she is.

22 Q.  You believe --

23 A.  I believe Monica Pearson is still her administrative

24     assistant if she needs writing or reading assistance.

25     That's in her job description.

Page 75

1  Q.  But previously -- strike that.
2        Despite your belief that sometimes
3        Monica, when she's not doing the benefits, can help
4        with the reading for Ms. Poplar, you know that Ms.
5        Poplar has indicated to her supervisor, Randy
6        Dellaposta, that she still needs accommodations for
7        her disability.  You know that; true?
8  A.  Yes.
9  Q.  Do the other -- does the Human Resources Department
10       have an administrative assistant at all now in that
11       position title?
12  A.  Not full time, no.
13  Q.  Well, anybody desig -- who's --
14  A.  I would have to look at the job description for Monica
15       Pearson.  It clearly indicates what their
16       responsibilities are.
17  Q.  Does the Engineering Department have an administrative
18       assistant?
19  A.  Yes.
20  Q.  Is it full or part time?
21  A.  Full.
22  Q.  Does the Maintenance Department have an administrative
23       assistant?
24  A.  Yes.
25  Q.  Is that full or part time?

Page 76

1  A.  Full.
2  Q.  Does the Finance Department have an administrative
3        assistant?
4  A.  No.
5  Q.  Does the Administrative Department have an
6        administrative assistant?
7  A.  Yes.
8  Q.  In the Finance Department, are there clerks or
9        assistants of any kind?
10  A.  No.
11  Q.  Is there an assistant financial director?
12  A.  We have a finance manager.
13  Q.  Below the director?
14  A.  Correct.
15  Q.  Okay.  Is that finance manager full time?
16  A.  Correct.
17  Q.  Is one of the -- earlier you talked about Donna
18       testifying to personal issues involving you in the
19       Branch lawsuit at her deposition.  Did one of those
20       involve testimony relating to you having a personal
21       relationship with an employee?
22  A.  Did she -- I don't know.  I don't remember if she
23       brought that up at the deposition or not.
24  Q.  Okay.  Have you had a personal relationship with any
25       employees?

Page 77

1  A.  Yes.
2  Q.  Okay.  Which employees have you had a personal
3        relationship with?
4        MR. CASCINI:  Objection as to form,
5        vague.  Personal relationship?
6  Q.  (BY MS. GAFKAY)  Well, dating or intimate
7        relationship.
8  A.  It was the executive assistant.
9  Q.  And who was that?
10  A.  Vicki Bechakes.
11  Q.  And is Vicki Bechakes still employed with the Genesee
12       County Road Commission?
13  A.  No.
14  Q.  When did she leave?
15  A.  September 30th, 2021.
16  Q.  Are you still in a relationship with Vicki Bechakes?
17  A.  Yes.
18  Q.  Do you live with her?
19  A.  Yes.
20  Q.  And how long have you lived with her?
21  A.  Well, I don't officially live with her, but I'm
22       spending most of my time over there.
23  Q.  And when did your relationship begin?
24  A.  Summer of 2020; yeah, 2020.
25  Q.  And at the time, you were managing director; correct?

Page 78

1  A.  Correct.
2  Q.  And she was an executive assistant?
3  A.  In the Engineering Department.
4  Q.  And she -- you said you were the boss of the whole --
5  A.  Correct.
6  Q.  -- Genesee County Road Commission; right?
7  A.  Yes.
8  Q.  So you ultimately would've been her boss; true?
9  A.  You could say that.
10  Q.  Is there any policy against dating subordinates at the
11       Genesee County Road Commission?
12  A.  I don't believe so.
13  Q.  Is that something you disclosed to the Board?
14  A.  Well, I think it was an opinion rendered by the
15       attorney.
16        MR. CASCINI:  And we're going to ask
17       that we don't discuss anything and rendered in an
18       attorney's opinion based on legal privilege.  So,
19       Fred, I'm going to ask you not to address that.
20  Q.  (BY MS. GAFKAY)  I'll just ask the question.  I'm not
21       asking you for the substance of the opinion, but was
22       that opinion made public, in other words, at a Road
23       Commission meeting --
24  A.  No.
25  Q.  -- Board meeting?

Page 79

1  A.  No. It was made -- that recommendation was made to
2  our Board.
3  Q.  Okay. At a public meeting?
4  A.  No, I don't believe so.
5  Q.  Okay. So in your opinion, in your opinion, I'm not
6  asking you about any attorney's opinion, did you feel
7  there was anything inappropriate about you dating a
8  subordinate?
9  A.  She wasn't my direct subordinate.
10  Q.  Okay. Did you believe there was anything
11  inappropriate about dating an employee of the Genesee
12  County Road Commission?
13  A.  No.
14  Q.  And when she was executive assistant, would you and
15  her have communications by e-mail?
16  A.  Very seldom.
17  Q.  Did you have communications -- but there were times
18  when you had communications by e-mail; true?
19  A.  Business-related only, yes.
20  Q.  Right, that's what I'm talking about.
21  A.  Yes.
22  Q.  What type of business would you have to communicate
23  with her about?
24  A.  About the projects, bid tabulations of projects, to-
25  date costs for all the construction projects that was

Page 80

1  going on at the Road Commission, stuff like that. I
2  mean, I don't know. You can pull the e-mails. The
3  e-mails are available if you want to look at it.
4  Q.  Did you ever tell anybody to delete e-mails between
5  you and Vicki Bechakes?
6  A.  Only when she reminded me after a few days, after she
7  retired, she said, I forgot to delete all my e-mails
8  at the Road Commission. So I told her, I'll let Mike
9  Lewis know, take care of it for her; and that's when I
10  asked Mike to delete them.
11  Q.  Did you ever ask anybody to delete e-mails between you
12  and Vicki Bechakes at the Road Commission?
13  A.  No. Like I said --
14  Q.  I'm just looking for yes or no at this juncture.
15  A.  I asked --
16      MR. CASCINI:  Objection; asked and
17  answered.
18      THE WITNESS:  -- Mike Lewis to delete
19  after she told me, few days after she retired, that
20  she forgot to delete all of her e-mails, and I told
21  her I will take care of it.
22  Q.  (BY MS. GAFKAY) According to your testimony, you
23  asked Mike Lewis to delete e-mails between you and
24  Vicki Bechakes; true?
25  A.  All of her e-mails, not just between me and her; all

Page 81

1  of her e-mails.
2  Q.  Which would include e-mails between you and her?
3  A.  Correct.
4  Q.  And at the time that you asked Mike Lewis to delete
5  e-mails, you knew that there was potential litigation
6  that may occur between Donna Poplar and the Genesee
7  County Road Commission; true.
8  A.  I never thought of it that way.
9  Q.  Well, by September of 2021, you knew that Ms. Poplar
10  had retained legal counsel, didn't you?
11  A.  Was it September? I guess. I don't know, no. I
12  don't know the exact date.
13  Q.  Okay. You said Vicki retired September 30th, 2021?
14  A.  Correct.
15  Q.  So I'll show you what we've marked as Exhibit 18. Did
16  you receive a copy of what's been marked as Exhibit
17  18, a letter dated September 28, 2021 from Charis Lee
18  to the Genesee County Road Commission?
19  A.  Yes. I received this ten days after, though.
20  Q.  On the third page, the third paragraph under Genesee
21  County Road Commission Evidence Preservation
22  Obligations, do you see where it begins "This letter"?
23  Do you see that?
24  A.  I'm sorry.
25  Q.  I'm just directing your attention so we can read the

Page 82

1  same portion --
2  A.  This one?
3  Q.  Yes. You see where it says, "This letter
4  additionally"?
5  A.  Um-hum.
6  Q.  It says, "This letter additionally notifies the Road
7  Commission of its duty to preserve evidence in
8  anticipation of litigation." Do you see that?
9  A.  Yes.
10  Q.  All right. And according to your testimony, it was
11  sometime after Ms. Bechakes actually retired that she
12  said to you, "Oh, by the way, my e-mails should all be
13  deleted." That was sometime after the retirement;
14  correct?
15  A.  That's true.
16  Q.  And you can't tell me the date that that occurred?
17  A.  No, I don't (sic). Mike Lewis could.
18  Q.  And you're saying within ten days, within ten days,
19  you knew about the Lee Legal Group letter?
20  A.  Yes.
21  Q.  And you need to preserve evidence?
22  A.  No.
23  Q.  Well, you read the letter, right, when you received
24  it?
25  A.  What evidence? I mean --

Donna Poplar v. Genesee County Road Commission

Fred Peivandi

23 (83 - 86)

Page 83

1  Q.   Okay.  Well, you needed to preserve documents.
2  A.   The evidence is still there.  Go look at it.  That's
3       all I can tell you, go look at it.
4  Q.   So you told Mike Lewis -- subsequently, you told Mike
5       Lewis to delete e-mails?
6  A.   After she mentioned that she forgot to delete all of
7       the e-mails; then I asked Mike to delete all of her
8       e-mails, not just e-mails between me and her.
9  Q.   Okay, I understand.  But you received, you know, the
10      letter that we've identified as Exhibit 18, and then
11      sometime after, you asked Mike Lewis to delete the
12      e-mails?
13 A.   That deletion of e-mails, I'll have to check with
14      Mike, but it was before, before I received this.
15 Q.   Well, you've already testified it was sometime after
16      Ms. Bechakes retired that you had the conversation
17      with her, and then you went to Mike Lewis; right?
18 A.   Correct.
19 Q.   So that would've been --
20 A.   The day after, two days after, I don't know.
21 Q.   You don't know?
22 A.   I don't know.
23 Q.   Is there anything that would refresh your memory?
24 A.   No.
25 Q.   Okay.  So what we do know is, it was after the

Page 84

1       retirement, and some time after the retirement that
2       she told you that?
3  A.   Exactly.
4  Q.   All right.  And are you saying that the e-mails
5       between you and Ms. Bechakes still exist or were they
6       eliminated?
7  A.   It can be retrieved, I assume.
8  Q.   Well, is your assumption -- what we know is that you
9       requested that e-mails be removed from the system;
10      true?
11 A.   True.
12 Q.   You don't know whether those are retrievable or not,
13      do you?
14 A.   They are retrievable.
15 Q.   How do you know?
16 A.   Because they just retrieved some of my e-mails that
17      went back and forth between me and my chairperson as
18      part of FOIA.
19 Q.   Did you ask Mike Lewis to delete e-mails between you
20      and Mr. Elkins?
21 A.   Absolutely not.
22 Q.   Okay.  But the e-mails you did request be deleted were
23      e-mails between you and Ms. Bechakes or all e-mails
24      relating to Ms. Bechakes, which would include e-mails
25      between you and Ms. Bechakes; right?

Page 85

1  A.   Correct.
2  Q.   And have you been able to retrieve those since you
3       asked for them to be removed?
4  A.   The e-mails from Ms. Bechakes?
5  Q.   Yes.
6  A.   No.
7  Q.   And to your knowledge, did Mr. Lewis follow your
8       directive to delete those e-mails?
9  A.   Yes.
10 Q.   All right.  Did you ask for a list of employees with
11      the employees' corresponding race to be listed?
12 A.   I was offered that, yes.  I was offered that list with
13      the race information on it.
14 Q.   Who offered it to you?
15 A.   Donna Poplar.
16 Q.   What did she say?
17 A.   "Do you want the race to be on there, too?"  I said,
18      "Sure, that's just information for me to know."
19 Q.   And do you recall when that was?
20 A.   No, I don't.
21 Q.   What did you do with the list?
22 A.   I just kept it.  I looked at the titles, I looked at
23      the date of hire, and that's pretty much what I did to
24      it.
25 Q.   Okay.  I guess --

Page 86

1  A.   It was --
2  Q.   -- the better question would be to tell me what you
3       recall was on the list.  What do you recall was on the
4       list?
5  A.   Yeah.  It was title, name, date of hire, and then they
6       provided me with the race column.
7  Q.   Race column?
8  A.   Race column.
9  Q.   Okay.
10 A.   And then after that, I was accused of racial profiling.
11 Q.   By who?
12 A.   The African-American community in this entire Genesee
13      County.
14 Q.   Did you get some form of -- I mean, how do you know
15      that?
16 A.   By having people coming to the Road Commission,
17      including county commissioners of the county, accusing
18      me of racial profiling, yes.  Made-up story, that's
19      what it is.
20 Q.   What's the made-up story?
21 A.   Racial -- that I racially profile people.
22 Q.   Where did you put the list?
23 A.   I probably have it in my file someplace.  It's in my
24      -- I've got several folders; I just have to look for
25      it.

Page 87

1 Q. Did you ever post it?

2 A. No.

3 Q. So you believe you still have it?

4 A. I believe so; I'll have to look for it for you.

5 Q. Okay. And is that something you provided to your

6  attorney?

7 A. I don't know. No.

8 Q. So you should provide a copy to your attorney so he

9  can turn it over.

10     MR. CASCINI: I agree, for what it's

11 worth, Fred.

12     MS. GAFKAY: I didn't see that it had

13 been produced; but certainly, please produce it.

14 Q. (BY MS. GAFKAY) Were there times that you would --

15  you have referenced the list?

16 A. For what reason?

17 Q. Well, I'm asking you.

18 A. No.

19 Q. So why did you want the list?

20 A. Because I wanted to know how many equipment operators

21  we'll have, how many engineer aides we'll have, how

22  many finance people we have. I just wanted to know

23  the titles of all the people that we have at the Road

24  Commission and the date of hire.

25 Q. And have you referenced that list when you made

Page 88

1  different employment decisions?

2 A. No.

3 Q. Your testimony is that putting the race was offered to

4  you by Donna Poplar; is that your testimony?

5 A. Yes, it is.

6 Q. Okay. And I think we've established that you're the

7  boss of Donna Poplar; right?

8 A. Correct.

9 Q. You certainly could have told her, no; right?

10 A. I could've, yeah.

11 Q. But instead, you're saying that she offered it, and

12  you said, yes, go ahead and put the race; right?

13 A. Yeah.

14 Q. If you thought there was anything wrong with putting

15  the corresponding race with the name of the employee,

16  you could have told her; right?

17 A. If I knew, yeah, I would've told her not to put race

18  on there.

19 Q. You didn't tell her not to put race, did you?

20 A. No, 'cause I was new on the job, like, first month as

21  managing director.

22 Q. Did you think there was anything wrong with --

23 A. No, I didn't.

24 Q. -- putting corresponding race?

25 A. No, because that's the report we gave to the State of

Page 89

1  Michigan on a yearly basis to let them know what the

2  percentage of minority employees we have at this

3  organization.

4 Q. Who did you give it to?

5 A. The HR reports to the state.

6 Q. No. I mean, you personally, you got the list, it has

7  the corresponding race. You put it in a file, you

8  believe you still have a copy?

9 A. I believe so, yeah.

10 Q. I'm talking about the copy, and it's in your office?

11 A. Yeah. I also have a copy from 2010 where they

12  described me as a Pacific Islander. That's what I

13  wanted to see. That's very insensitive, because I'm a

14  minority myself, just for your information, okay. I

15  came in as an immigrant, and look where I'm at now,

16  okay. So you can't tell me I'm discriminating against

17  minorities, because I've been discriminated against

18  many times -- numerous times in this country.

19 Q. At the Road Commission?

20 A. Not at the Road Commission -- even at the Road

21  Commission, yes.

22 Q. By who?

23 A. By John Daly, my previous supervisor.

24 Q. How did he discriminate against you?

25 A. How? Because I was county highway engineer for 15

Page 90

1  years. This organization used to get $10,000 money

2  from the state to have a licensed county engineer on

3  board. I never saw any of it. I've requested

4  numerous times to see it. They never gave it to me.

5     You tell me, that's not discrimination?

6  That's a funded position that I didn't get any of that

7  money; but yet I was the county engineer responsible

8  for all construction activities in this Genesee

9  County.

10 Q. Was there a county engineer that was not a minority

11  that was getting paid something you weren't getting

12  paid?

13 A. At this organization?

14 Q. Yes.

15 A. I don't remember. No, there was no minority here at

16  this organization that was county engineer besides me.

17 Q. You were the only one?

18 A. I was the only one.

19 Q. Okay. Going back to the list, there's a list in your

20  office. You say you believe it's still there. It's

21  in a file. It's got names of employees, corresponding

22  races.

23     Here's my question. That list, have

24  you ever used that specific list -- ever submitted

25  that specific list that's in your office to the State

Page 91

1 of Michigan?

2 **A.** You have to ask HR.

3 **Q.** No, I'm asking you.

4 **A.** I did not personally, no.

5 **Q.** And do you have any knowledge that your specific list

6 that's in your office in a folder --

7 **A.** I have no knowledge of it.

8 **Q.** No knowledge if that has ever been submitted to the

9 State of Michigan, do you?

10 **A.** No knowledge of that.

11 **Q.** Okay, fair enough.

12 **A.** But I will give you the list that they described me as

13 Pacific Islander on there, and that's the list they

14 submitted to the State of Michigan. In fact, this

15 list needs to come before the Board.

16 **Q.** I want to know about the list in your office, not some

17 list that was previously identified -- misidentified

18 you; that's not what I'm talking about. But I

19 appreciate that, that you told me about there.

20 So let me ask you this: In your

21 position as managing director, you assumed that

22 position in August of 2018?

23 **A.** Correct.

24 **Q.** March of 2020 comes. What responsibilities, if any,

25 do you have to the organization regarding Covid-19

Page 92

1 protocols?

2 **A.** What responsibilities do I have?

3 **Q.** (Nodding head affirmatively).

4 **A.** I guess I have to make the final decision of how we're

5 going to handle the face masks and some of the things

6 that we follow based on MIOSHA or Genesee County

7 Health Department.

8 **Q.** Okay. Now, with regard to -- I mean, obviously there

9 was a lot of moving parts after March -- or in March

10 of 2020 as to, you know, how to handle employee issues

11 concerning Covid-19. Do you agree?

12 **A.** Um-hum.

13 **Q.** "Yes?"

14 **A.** Yes.

15 **Q.** Was a lot of those responsibilities, how to handle

16 those employment issues relating to Covid-19, did that

17 fall on Donna Poplar because she was the director of

18 Human Resources?

19 **A.** Yes.

20 **Q.** Okay. Obviously, initially, the governor was issuing

21 some executive orders. Do you recall that?

22 **A.** Yes.

23 **Q.** For the State of Michigan?

24 **A.** Yes.

25 **Q.** And the federal government was issuing guidelines

Page 93

1 through the CDC. Do you acknowledge that?

2 **A.** Yes.

3 **Q.** And then at some point, the directives came from the

4 department, for Michigan, came from the Department of

5 Health and Human Services or MIOSHA; do you recall

6 that?

7 **A.** Yes.

8 **Q.** Okay. And the county, Genesee County, there were

9 times that the county would issue orders regarding

10 Covid-19 safety protocols; is that true?

11 **A.** True.

12 **Q.** All right. So, I mean, in your position, you're aware

13 these are all different levels of government,

14 different entities that are issuing different types of

15 mandates to keep people safe relating to Covid-19;

16 true?

17 **A.** True.

18 **Q.** Was the safety of your employees and visitors relating

19 to Covid-19 important to you?

20 **A.** Of course.

21 **Q.** Were you concerned in August of 2021 when the

22 transmission rate in Genesee County became -- there

23 was a substantial transmission rate that was found to

24 be in Genesee County?

25 **A.** I don't remember.

Page 94

1 **Q.** Okay. Now, in August of 2021, there was some back and

2 forth e-mails between you and Donna about masks,

3 whether visitors and employees should wear masks;

4 right?

5 **A.** I believe so, yeah.

6 **Q.** And what is your understanding as to the reason for

7 the mask wearing?

8 **A.** Safety of employees and the public.

9 **Q.** And do you believe it's important for employees and

10 the public to be safe?

11 **A.** Absolutely.

12 **Q.** Let's go to what's been marked as Exhibit 14. Let's

13 start at the back, the e-mail chain goes up from the

14 back. It looks like on August 13th, there was an

15 e-mail from a Lori Friedlis. Is that something you

16 received?

17 **A.** I believe so, yes.

18 **Q.** Okay. It looks like she's talking about -- it looks

19 like she's from, you know, the Road Commission

20 insurance pool; is that right?

21 **A.** Correct.

22 **Q.** And she's sending out maybe an e-mail to all the road

23 commissions in the pool just giving an update on the

24 MIOSHA statement encouraging following CDC guidelines.

25 Do you see that?

Page 95

1   A.   Um-hum.

2   Q.   Is that a "yes"?

3   A.   Yes.  I'm sorry.

4   Q.   And you understand the CDC is with the federal

5        government?

6   A.   Correct.

7   Q.   And MIOSHA is with the state government?

8   A.   Correct.

9   Q.   And I don't think that in her e-mail she addresses any

10       mandate or guideline from the county?

11  A.   Correct.

12  Q.   So then, do you, then, forward that e-mail to Donna

13       Poplar and Monica Pearson?

14  A.   Um-hum.

15  Q.   Is that a "yes"?

16  A.   Yes.

17  Q.   What was the reason you did that, was the reason you

18       forwarded it to Donna?

19  A.   So this is the updated information that I received

20       from MCRCSIP.

21  Q.   And then did she respond to your e-mail?

22  A.   According to this, yes, she did.

23  Q.   Okay.  And it looks like in her e-mail to you, she's

24       telling you that Genesee County is unfortunately

25       ranked as a substantial transmission risk county.  Do

Page 96

1        you see that?

2   A.   Yes.

3   Q.   Any reason to dispute that what she was telling you

4        was true; in other words, are you aware that in August

5        of 2021, the transmission risk was substantial for

6        Genesee County?

7   A.   Don't know.

8   Q.   Any reason to dispute that?

9   A.   I have no reason to dispute it, no.

10  Q.   Okay.  And Donna makes a recommendation that Genesee

11       County Road Commission implement a course of action to

12       follow the CDC mask wearing.  Do you see that?

13  A.   Um-hum.

14  Q.   Is that a "yes"?

15  A.   Yes.  I'm sorry.

16  Q.   By making it mandatory that Genesee County Road

17       Commission vaccinated and unvaccinated employees and

18       visitors wear face masks that meets CDC standards.  Do

19       you see that?

20  A.   Yes.

21  Q.   So did you take from what she was recommending that

22       she thought that visitors and employees should be

23       wearing masks?

24  A.   But I disagreed.

25  Q.   I know.  I'm just trying to establish, did she make

Page 97

1        that recommendation?

2   A.   According to this, she did.

3   Q.   And did you disagree with it?

4   A.   Yes.

5   Q.   All right.  So it looks like you then reply -- let's

6        look at your reply.  Is your reply at the top from

7        Fred Peivandi, sent Monday, August 16, 2021, 3:42 p.m.,

8        to Donna Poplar?

9   A.   Yes.

10  Q.   Did you send this e-mail to Donna?

11  A.   Yes.

12  Q.   Okay.  So in your e-mail, you say, "... I do not wish

13       to mandate that GCRC staff and visitors wear

14       masks..."; right?

15  A.   Right.

16  Q.   "... but I do want staff to be aware of the risk level

17       in Genesee County ..."  Do you see that?

18  A.   Yes.

19  Q.   Okay.  So based on your e-mail, you want employees to

20       know of the risk level; right?

21  A.   Yes.

22  Q.   Then you say, "If at a later time MIOSHA issues a

23       mandate, GCRC will need to comply with the guidance of

24       requiring all staff and visitors to wear masks."  You

25       wrote that?

Page 98

1   A.   Yes.

2   Q.   So in other words, if MIOSHA requires it, through some

3        type of mandate, then you'll require your staff and

4        employees?

5   A.   Absolutely.

6   Q.   You go on and say, "It is a good time to remind staff

7        about social distancing, hand washing, and the

8        availability of masks and hand sanitizer."  So you

9        want employees to be reminded of those things; correct?

10  A.   Correct.

11  Q.   And then there's a response, a reply to your e-mail

12       from Donna on August 16th, 2021 at 5:26 p.m., isn't

13       there?  Did you get an e-mail from her in reply?

14  A.   I suppose so, yeah.  It is from her to me, so

15       obviously I got it.

16  Q.   Well, the first page of Deposition Exhibit 14 is an

17       e-mail from her to you dated August 16th, 2021 at 5:26

18       p.m.  Did you get it, did you get this e-mail?

19  A.   I believe so.  I mean . . .

20  Q.   Okay.  And she reiterates that it's serious that the

21       Covid-19 has an increasing rate, and it is at a

22       substantial transmission risk level.  And I'm

23       paraphrasing, we can read it verbatim, but we do have

24       the exhibit as part of the record.  Do you agree that

25       I paraphrased that correctly?

Page 99

1  **A.**  Um-hum, yes.

2  **Q.**  All right. And in the second paragraph, Donna is

3  telling you about learning that the Genesee County

4  Board of Commissioners is requiring all county

5  vaccinated and nonvaccinated employees and visitors to

6  wear a face mask. She tells you that in the second

7  paragraph; right?

8  **A.**  That's a false statement.

9  **Q.**  Well, let's read it. What I said she's saying or what

10  it says?

11  **A.**  No. That she says all employees in the county are

12  wearing masks. That's a false statement.

13  **Q.**  All right. We need clarity on the record, so let me

14  ask you this: In her e-mail, does Donna tell you,

15  "... the Genesee County Board of Commissioners on last

16  week requires all county vaccinated and non-vaccinated

17  employees and visitors to wear face mask..." Does she

18  tell you that in the e-mail? Does it say that?

19  **A.**  Yes, it does. But that's false, that's what I'm

20  saying.

21  **Q.**  At the end of her e-mail, she tells you, "... I will

22  have Monica to send a memo out to all GCRC employees

23  relative to your decision." Do you see that?

24  **A.**  Yes.

25  **Q.**  Okay. Did you ever reply to this e-mail that Donna

Page 100

1  sent to you on August 16th at 5:26 p.m. to tell Donna,

2  don't send any memo out to all employees?

3  **A.**  I don't believe I responded to this at all.

4  **Q.**  Okay. If you want to look at what's been marked as

5  Exhibit 13. Have you ever seen this, 13? Have you

6  ever seen this directive issued by the Genesee County

7  Health Department on August --

8  **A.**  Probably.

9  **Q.**  -- 4, 2021?

10  **A.**  Probably.

11  **Q.**  Is this something you received as a course of -- in

12  your employment as the managing director, you would

13  receive the directives from the county on a regular

14  basis relating to Covid-19?

15  **A.**  I didn't.

16  **Q.**  Who did?

17  **A.**  HR.

18  **Q.**  Okay. But you said I probably saw it. Why do you say

19  you probably saw this? Why do you say you probably

20  saw it? Because you remember it?

21  **A.**  Because, I mean, whenever these are received, they

22  shared with me.

23  **Q.**  Let's go to the second page. The middle of the

24  document, it says, "When the transmission in Genesee

25  County of Covid-19" -- do you see where I'm reading?

Page 101

1  **A.**  Yes.

2  **Q.**  "based on the number of cases per one million and case

3  positive rate using the Michigan Start Map Risk

4  Calculator, meets the level of 'Substantial

5  Transmission' or 'High Transmission' per CDC

6  guidelines, then the use of face masks for everyone

7  five years of age and older within indoor public

8  spaces is reasonable and necessary to reduce the risk

9  for Covid-19 transmission." Do you see that?

10  **A.**  Yes.

11  **Q.**  Based on the e-mails we just read, Donna Poplar is

12  telling you that Genesee County is at substantial

13  transmission; right?

14  **A.**  Yes.

15  **Q.**  And then the next paragraph says, "This directive

16  applies to indoor spaces that are open to the public,

17  including retail, grocery stores, government

18  buildings, and other businesses and places where

19  members of the public can enter freely." Do you see

20  that?

21  **A.**  Yes.

22  **Q.**  So Genesee County Road Commission certainly would be

23  covered as a government building; right?

24  **A.**  Yes.

25  **Q.**  Okay.

Page 102

1  **A.**  What's the date on this?

2  **Q.**  August 4th, 2021. So according to Genesee County, if

3  this rate was substantial transmission, then the

4  employees and visitors at Genesee County Road

5  Commission should've been wearing masks?

6  MR. CASCINI: Objection; assumes facts

7  not in evidence. That's not what the document states.

8  **Q.**  (BY MS. GAFKAY) According to what we just read, how

9  about that --

10  **A.**  I have some other documents in my e-mails --

11  **Q.**  Let me ask you this question: In August of 2021, were

12  you aware that Genesee County had issued a mask

13  mandate?

14  **A.**  I mean, I can't say yes or no. I mean, probably by

15  seeing this, yes.

16  **Q.**  Okay. And Donna Poplar was telling you on August 16th

17  the rate is at substantial transmission --

18  **A.**  Okay.

19  **Q.**  -- and she's telling you that all county employees and

20  visitors must wear face masks?

21  **A.**  That's not true, it was not true.

22  MR. CASCINI: I renew my objection.

23  THE WITNESS: It's not true.

24  **Q.**  (BY MS. GAFKAY) Okay. Why are you saying it's not

25  true?

Page 103

1  A.   Because I contacted the county, the Board
2       Administrator, Josh Freeman, via e-mail, and I also
3       contacted my friend, Derek Bradshaw, director of
4       Planning Commission at the county, and they both
5       indicated that this only applies to healthcare workers
6       and some other -- schools maybe; but they are not
7       required to wear face masks when they go to work.
8  Q.   Well, as Donna said she would do on August 16th, 2021
9       e-mail to you, a memo to employees relative to your
10      decision about the face masks was issued; right?
11           We're going to look at it.  Here's my
12      question, I'm not asking you to look at the document,
13      on August 16th, 2021, the e-mail you never respond to,
14      Donna says, "I'm going to have a memo issued to all
15      employees regarding your decision."  That's how she
16      ends her e-mail; right?
17 A.   I guess, yes.
18 Q.   Well, we just looked at it.
19 A.   Yes.  Why are you asking me again?
20 Q.   Well, you don't respond to it.
21 A.   No, I don't respond, correct.
22 Q.   And she does issue a memo; right?
23 A.   Right.
24 Q.   And she --
25 A.   Without my authorization, without my authorization.

Page 104

1  Q.   Let's talk about that.
2  A.   Okay, let's talk about it.
3  Q.   But my question just on the table is, she tells you
4       she's going to issue a memo based on your directive,
5       and there is a memo that is issued the next day;
6       right?  We can go to it, Exhibit 15.  The next day --
7  A.   Um-hum.
8  Q.   -- on August 17th, there is a memo issued by Donna,
9       just as she tells you she's going to do based on your
10      directive; right?
11 A.   Which directive?
12 Q.   Donna tells you in her e-mail and conclusion to her
13      e-mail that she's going to issue a memo based on your
14      directive; she writes that memo?
15 A.   I did not -- based on my directive?
16 Q.   Well, let's look at it again, because I want the
17      record to be clear.  Donna tells you, "I will have
18      Monica to send a memo out to all GCRC employees
19      relative to your decision."  That's what she concludes
20      within her e-mail on August 16th.
21 A.   Okay.
22 Q.   All right?
23 A.   Um-hum.
24 Q.   You don't respond to that?
25 A.   Correct.

Page 105

1  Q.   The next day, she does as she tells you she was going
2       to do, she has a memo regarding your directives issued
3       to all employees; right?
4  A.   Correct.
5  Q.   All right.  And she tells the employees the risk level
6       is substantial transmission; right?
7  A.   Yes.
8  Q.   You wanted employees to know that the risk level was
9       substantial; right?
10 A.   Yes.
11 Q.   All right.  She tells employees that they're not
12      required to wear a face mask at this time?
13 A.   By throwing me under the bus.
14 Q.   I just want to talk about the e-mail.  But in the
15      e-mail, she tells employees they're not required to
16      wear masks at that time.
17           MR. CASCINI:  You just said e-mail, not
18      memo.
19           MS. GAFKAY:  I'll read the e-mail
20      exactly as you said.
21           MR. CASCINI:  I think that's the
22      confusion source.
23           MS. GAFKAY:  Oh, that's true.  It is a
24      memo.  It might've been issued by an e-mail.
25           MR. CASCINI:  Well, it --

Page 106

1            MS. GAFKAY:  No, I don't know if it
2       was.  It's a memo.  I don't know how it was issued to
3       employees, but it's to all employees.
4            MR. CASCINI:  We're just talking about
5       Exhibit 15?
6            MS. GAFKAY:  Oh yeah, right.
7            MR. CASCINI:  Okay.
8  Q.   (BY MS. GAFKAY)  In the memo, which is Exhibit 15, it
9       says, "The GCRC managing director, Fred Peivandi, has
10      decided not to require employees or visitors to wear a
11      face mask at this time."  She tells employees that;
12      right?
13 A.   It wasn't necessary to mention my name.
14 Q.   Okay.  Well, is it true or false that employees or
15      visitors were not required to wear a face mask at that
16      time?
17 A.   At that time, correct.
18 Q.   Was that true?
19 A.   That they did not require?  Correct.
20 Q.   Right.
21 A.   Yes.
22 Q.   Was that your decision?
23 A.   Yes.
24 Q.   Did you tell Donna that was your decision?
25 A.   Based on this e-mail, that's in there, yeah.

Page 107

1  Q.   And Donna recommended that employees and visitors wear
2       face masks prior to August 17; right?  She made that
3       recommendation; right?
4  A.   Okay, yeah.
5  Q.   Did she?  Did she make that recommendation to you?
6  A.   To visitors and employees wear face masks?
7  Q.   No.  Did Donna Poplar make a recommendation to you
8       prior to August 17, 2021, hey --
9  A.   Yes, she did.
10 Q.   -- the risk is high, let's have the employees and
11      visitors wear masks?
12 A.   She did.
13 Q.   All right.  And you rejected that?
14 A.   Correct.
15 Q.   And she told employees that they could still not wear
16      masks; right?
17 A.   It wasn't necessary to mention my name on this, though.
18 Q.   Well, it's true that you --
19 A.   That's like throwing me under the bus.
20 Q.   But it's true you made that decision, didn't you?
21 A.   But she didn't have to mention my name on this thing,
22      and I was not the author of this memo; I was not the
23      author of this memo going out.
24 Q.   Was it true or false that the managing director's
25      position is to wait for the State of Michigan to

Page 108

1       impose a mandate for employees and visitors to wear a
2       face mask?  Was that true?
3  A.   No, it's not true.
4  Q.   All right.  In your e-mail to her the prior day, you
5       said, "If at later time MIOSHA issues a mandate, GCRC
6       will need to comply with the guidance of requiring all
7       staff and visitors to wear masks."  You said that?
8  A.   Correct.
9  Q.   Were there prior memos issued to staff during Covid-19
10      relating to safety protocols?
11 A.   Yes, yes.
12 Q.   Probably many; is that right?
13 A.   Probably, yeah.
14 Q.   And do you recall that Donna would list you and her on
15      the memo to employees relating to Covid-19 protocols?
16 A.   Well, she would always send me a draft copy of the
17      memo for my review and approval before the memo went
18      out.
19 Q.   You're saying --
20 A.   This one did not.
21 Q.   You're saying every time?
22 A.   Every time, yes.
23 Q.   But going back to my -- what I was asking you was, you
24      say in your e-mail to her, "If a later time MIOSHA
25      issues a mandate, GCRC will need to comply with the

Page 109

1       guidance of requiring all staff and visitors to wear
2       masks."  And in her memo to employees she says your
3       position is to wait for the State of Michigan to
4       impose a mandate.  Isn't that what you told her?
5            MR. CASCINI:  Objection --
6            THE WITNESS:  No.
7            MR. CASCINI:  -- asked and answered.
8  Q.   (BY MS. GAFKAY)  So tell me why what she put in the
9       memo is different than what you put in your e-mail?
10 A.   Because I did not get a chance to read the text of
11      this memo, and I didn't like what she said in this
12      paragraph.
13 Q.   You didn't like how she said it?
14 A.   That's correct.
15 Q.   But what she said was true; right?
16 A.   No, it's not true.
17 Q.   Tell me what's not true about that --
18 A.   Because I checked with the county, and the county
19      employees are not required to wear masks.
20 Q.   Where does she say in the memo that county employees
21      are required to wear masks?
22 A.   Well, you tell me, is it necessary, my name is
23      necessary to be on here?  Doesn't it sound like
24      throwing me under the bus?  I have a subordinate here
25      that time and time again is trying to throw me under

Page 110

1       the bus, whether it's at the Board meeting or having
2       the whole community of Genesee County to come into the
3       Board and criticize me about racism and all of that,
4       and now I get this.  It's embarrassing.  When I see
5       this, it says Genesee County managing director Fred
6       Peivandi has decided.  What do you mean by that?  Why
7       do you say that?  This paragraph could be completely
8       eliminated.  If you want to require not -- for the
9       employees not to wear masks, this paragraph is not
10      necessary to be there.  But this never came to me for
11      review and approval.
12 Q.   But there were discussions before the memo was
13      issued --
14 A.   But it never came to me for a final approval.
15 Q.   Okay.  I wasn't done yet.  But there were
16      communications between you and Donna about what she
17      wanted communicated to the staff, wasn't there?
18 A.   She never said that.  She doesn't have to put my name
19      on there.  I'm telling the staff not to wear masks.
20      If she would've said this in that previous e-mail, I
21      would've -- I would've responded to that e-mail, if I
22      knew that this memo was going to be like this, that
23      she's going to tell me -- tell all the employees that
24      I decided to require employees and visitors not to
25      wear masks.

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-3, PageID.331   Filed 11/21/22   Page 30 of 39
Donna Poplar v. Genesee County Road Commission
Fred Peivandi

30 (111 - 114)

Page 111

1  Q.  And were prior memos provided to you, a copy provided
2      to you before they were issued to the employees?
3          MR. CASCINI:  Objection; asked and
4      answered.
5          THE WITNESS:  Say that question again.
6  Q.  (BY MS. GAFKAY)  Were all prior Covid-19 protocol
7      memos from Donna that had you and Donna's name on it
8      always provided to you first before being issued to
9      the employees?
10         MR. CASCINI:  Same objection.
11         THE WITNESS:  Yes.
12 Q.  (BY MS. GAFKAY)  What evidence do you have of that?
13     Let me ask you this:  How would she -- would she
14     e-mail it to you?
15 A.  Yes.
16 Q.  All right.  So for every Covid-19 memo that was issued
17     prior to August 17th, there will be a corresponding
18     e-mail with a draft?
19 A.  I believe so, yes.
20 Q.  Would you agree that the issue surrounding Covid-19
21     and safety protocols was an important matter?
22 A.  Of course.
23 Q.  It was a matter of public concern?
24 A.  Absolutely.
25 Q.  And the next paragraph, "All GCRC employees should be

Page 112

1      aware of the risk level in Genesee County and make
2      protection decisions accordingly.  In addition, GCRC
3      employees are encouraged to be cooperative to social
4      distancing, handwashing, and using hand sanitizer
5      available when soap and water are not available
6      (sic)."  Do you see that?
7  A.  Yes.
8  Q.  And those are things that you said, employees should
9      be reminded of these things?
10 A.  I agree with that paragraph, yes.
11         MS. GAFKAY:  We can take a break.
12         (Recess taken.)
13         MS. GAFKAY:  We're back on the record.
14     You understand you're still under oath?
15         THE WITNESS:  Yes.
16 Q.  (BY MS. GAFKAY)  So earlier we were talking about the
17     list with the corresponding race of employees.  Do you
18     recall our discussion regarding that?
19 A.  Yes.
20 Q.  All right.  And you had told me or you testified under
21     oath that Donna Poplar is the one who offered that?
22 A.  Correct.
23 Q.  So my question is this:  Do you recall that there were
24     some written communications between you and others,
25     including some Board members, about that list with the

Page 113

1      corresponding race?
2  A.  You mean Genesee County Board?
3  Q.  Yes, with Genesee County Board, Genesee County Road
4      Commission Board, anybody else.
5  A.  I had some communication with Genesee County Board,
6      not Board as a whole, individual Board members.
7  Q.  That's what I mean, yeah.  Generally I'm just asking
8      you --
9  A.  I will have to look for it.  I mean, I'm sure I have
10     it on my computer.
11 Q.  Generally I'm asking, do you recall that you had
12     written communications about this list with the
13     corresponding race of employees?
14 A.  I had communication with Commissioner Brian Nolden.
15 Q.  Okay.  And is there in any written communication that
16     you had about the list being questioned, about why you
17     needed the list, why you have the list?
18 A.  And I answered that.
19 Q.  You answered it.  Did you say anything at all in any
20     written communication that you had the list with
21     corresponding race, you had the corresponding race of
22     employees because Donna Poplar had offered it?
23 A.  Don't remember, I don't know.
24 Q.  I mean, you agree that that would be pretty important
25     to include if she did, in fact, offer it; right?

Page 114

1  A.  I possibly said that in my e-mail somewhere.
2  Q.  Okay.  So I imagine the organization, Genesee County
3      Road Commission, it's a large organization; right?
4  A.  Correct.
5  Q.  How many employees?
6  A.  One hundred fifty-seven, including Board commissioners.
7  Q.  And are there policies and practices that the Road
8      Commission has?
9  A.  Yes.
10 Q.  And do they publish those in written form?
11 A.  Yes.
12 Q.  Are there equal employment opportunity policies?
13 A.  I believe so.
14 Q.  Are there anti-retaliation policies?
15 A.  Probably.
16 Q.  Are there open door policies?
17 A.  I believe so.
18 Q.  Are you aware that those policies, complaint policies,
19     under EEO policies and the open door policies, that
20     those policies provide that if an employee has a
21     complaint, he or she is encouraged to make a
22     complaint, formal complaint?
23 A.  There's procedures in there, yes, you have to follow.
24 Q.  And the procedures provide that if an employee's
25     complaint relates to his or her immediate supervisor

Page 115

1  that the employee has a right to go above his or her
2  supervisor?
3  A.  Correct.
4  Q.  And you agree it's important for all employees, in
5  order to have equal employment in the -- at the
6  Genesee County Road Commission, that the policies
7  apply uniformly to all employees?
8  A.  Absolutely.
9  Q.  Were there employees -- after you became managing
10  director to the present, were there -- was there ever
11  a time that employees received some type of discipline
12  that Donna Poplar was involved in as the director of
13  Human Resources that you later requested to be
14  reversed?
15  A.  Probably.
16  Q.  Do you recall any of the employees that you requested
17  his or her discipline be reversed?
18  A.  Yes.
19  Q.  Who?
20  A.  Don't remember.
21  Q.  You don't remember any employee you requested that?
22  A.  It had to be more than one employee.
23  Q.  Okay.  But my question is, do you remember the name of
24  any employee --
25  A.  I do not.

Page 116

1  Q.  -- that requested his or her discipline be reversed?
2  A.  I do not.
3  Q.  In your position, are you -- we talked about the
4  budget a little bit earlier.  So you have involvement
5  with the budget; right?
6  A.  Correct.
7  Q.  Do you make recommendations to the Board as to
8  budgetary items on a year-to-year basis?
9  A.  Absolutely.
10  Q.  Before the last fiscal year budget was approved, did
11  you make recommendations to the Genesee County Road
12  Commission as to raises for the different directors?
13  A.  Yes.
14  Q.  Do you recall that you did not recommend the same
15  raise for all the directors?
16  A.  Correct.
17  Q.  Do you recall that you recommended a one percent
18  increase for Anthony Branch?
19  A.  Correct.
20  Q.  Do you recall that you recommended a two percent
21  increase for Donna Poplar?
22  A.  I believe so.
23  Q.  Do you recall that you requested a 13 percent increase
24  for Randy Dellaposta?
25  A.  Because of promotion.

Page 117

1  Q.  Did you request a 13-percent increase for Randy
2  Dellaposta?
3  A.  Because of pro -- yes.
4  Q.  Did you request a 10-percent increase for the Finance
5  director, Tracy Kahn?
6  A.  Yes.  I have reason for all of that, though.
7  Q.  Did you request a $4,000 increase for the director of
8  Engineering?
9  A.  Correct.  You want to know the reasons?
10  Q.  I'm just asking, I just want to establish --
11      MR. CASCINI:  She'll ask the questions,
12  Fred.
13      THE WITNESS:  All right.
14  Q.  (BY MS. GAFKAY)  And so the lowest increases in pay
15  for directors for the last fiscal year that you
16  recommended, which would've been prior to September --
17  or prior to October 1st, 2021, the lowest increases
18  were for directors Donna Poplar and Anthony Branch;
19  true?
20  A.  If you look at percentage, yes.
21  Q.  At the time that --
22  A.  Did you look at the --
23  Q.  At the time that you made those recommendations,
24  Anthony Branch and Donna Poplar were the only African-
25  American directors; true?

Page 118

1  A.  Yes, they are, yes.
2  Q.  And those recommendations and increases, would they
3  have been made in September of 2021 or October --
4  September?
5  A.  No; we start our budget workshop, our discussion, from
6  mid June, and it goes on until probably the first week
7  of September before we can go to the Board and adopt a
8  budget for the following year.
9  Q.  So let me ask you a little differently.  So do you go
10  to the Board -- did you go to the Board with the
11  recommendation as far as the increases in pay for the
12  directors for the 2021-2022 budget in September of
13  2021?
14  A.  Yes, I did.
15  Q.  We talked about director meetings, and was there ever
16  a meeting with -- with Board members that you told
17  Donna Poplar not to attend?
18  A.  No, not to my knowledge.
19  Q.  Or a single Board member, either the Board or Board --
20  either an individual Board member, a committee or the
21  whole Board, was there ever a meeting you told Donna
22  Poplar not to attend?
23  A.  I don't remember.
24  Q.  We talked a little bit about the disciplinary action.
25  If you can turn to page 16 -- or Exhibit 16, excuse

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-3, PageID.333   Filed 11/21/22   Page 32 of 39
Donna Poplar v. Genesee County Road Commission

Fred Peivandi

32 (119 - 122)

Page 119

1  me. And you've already testified, but I'll just for
2  foundation reasons, repeat it. On or about August 19,
3  2021, you issued a disciplinary action to Donna
4  Poplar; correct?
5  A.  Correct.
6  Q.  And with this action, you also -- there was also a
7  two-week unpaid suspension given to Ms. Poplar; true?
8  A.  Correct.
9  Q.  And you agree that that was an adverse action against
10  Ms. Poplar, wouldn't you?
11  A.  I guess.
12  Q.  I mean, she did not get paid for two weeks; right?
13  A.  Correct.
14  Q.  She was disciplined; true?
15  A.  Correct.
16  Q.  In there, in this discipline, let's turn to page two,
17  first full paragraph says, you talk about, "... you
18  continued to advocate before the Board in support of
19  your position concerning this issue and in spite of my
20  clear, unambiguous, and final decision to implement
21  the Covid-19 response policy ..." Do you see that?
22  A.  Um-hum.
23  Q.  So at the August 17th, 2021, Genesee County Road
24  Commission, Board of Commissioner meeting, did Donna
25  Poplar say anything about the Covid-19 mask mandate or

Page 120

1  not wearing masks at the Genesee County Road
2  Commission?
3  A.  I don't remember.
4  Q.  The last sentence of this paragraph says, "This
5  conduct mirrored several historical examples when you
6  had asked the Board to intervene and overturn
7  strategic decisions I made for the GCRC within the
8  scope of my authority." Do you see that?
9  A.  Um-hum.
10  Q.  Can you tell me any example, historical example, of
11  when that supposedly happened?
12  A.  Give an example, you said?
13  Q.  I just want you to tell me -- let me repeat that.
14      Tell me each and every historical
15  example when you asked -- when she, when Donna Poplar,
16  asked the Board to intervene and overturn strategic
17  decisions made by you?
18  A.  You will have to go back to the Board minutes and pull
19  all that information.
20  Q.  So I'm asking you --
21  A.  I can't remember.
22  Q.  You don't know of any sitting here right now?
23  A.  Yeah, one time she -- yeah, I remember her calling
24  Commissioner Nolden. She actually went out and then
25  asked Commissioner Nolden to come back to this room

Page 121

1  and explained to the Board that the county employees
2  are wearing masks, which was a false statement she was
3  making to our Board, thinking that I was going to
4  change my mind, because I knew the employees at the
5  county level were not required or mandated to wear
6  masks.
7  Q.  This would have been in mid August of 2021?
8  A.  Sometime, yes, sometime last -- I don't remember the
9  date. But that's just one example, that was just one
10  example.
11  Q.  That related to what -- the reason you were
12  disciplining her in -- in this disciplinary notice
13  dated August 19, 2021; right?
14  A.  Well, I was disciplining her because she did not
15  follow my directives.
16  Q.  Okay. Who authored what's been marked as Exhibit 16,
17  the disciplinary action?
18  A.  This?
19  Q.  Yeah.
20  A.  I did.
21  Q.  Was anybody else involved in issuing the disciplinary
22  action notice and suspension to Donna Poplar other
23  than you?
24      MR. CASCINI: I'm just going to place
25  an objection on the record to just notify the

Page 122

1  witness -- there's a word I forgot in my mind all of
2  sudden. I'm going to notify the witness not to answer
3  any questions that would implicate attorney/client
4  privilege. Privileged communications should remain
5  excluded from the answer; otherwise, though, you can
6  answer.
7      THE WITNESS: I had our labor attorney
8  review it before I implemented this.
9      MR. CASCINI: Again, I would ask you to
10  please exclude any references that would implicate
11  attorney/client privilege in your answers, Fred.
12      THE WITNESS: I drafted this.
13  Q.  (BY MS. GAFKAY) Other than any discussions with
14  counsel, did you talk to anybody at Genesee County
15  Road Commission, including any Genesee County
16  Road Commission members, Board members, about the
17  disciplinary action before issuing it?
18  A.  No, I did not.
19      MS. GAFKAY: I want to show you a
20  document maybe my first and only exhibit, 21.
21      (Document marked Plaintiff's
22      Deposition Exhibit No. 21.)
23  Q.  (BY MS. GAFKAY) Go ahead and look at Exhibit 21.
24  A.  (Reviewing document).
25  Q.  In my review of the minutes for August 17th, 2021, I

Page 123

1    don't see anything relating to Donna Poplar advocating
2    a position with the Board about Covid-19 protocols.
3    Is there anything in the minutes, to your knowledge?
4 A. What was the question?
5 Q. I didn't see anything about Donna Poplar raising
6    anything during that meeting with the Genesee County
7    Road Commission. Do you see anything?
8 A. Do I see anything about what?
9 Q. About Donna Poplar raising any issues about Covid-19
10   protocols at that meeting.
11 A. This --
12 Q. Yeah.
13 A. I believe the argument that they made that we heard
14   and Commissioner Nolden was asked at the public
15   meeting was closed. The public meeting was adjourned,
16   and Mr. Nolden actually left this room, or left this
17   building, and she went out there and asked him to come
18   back and explain to the Board; but it was after the
19   Board of Commissioners meeting was adjourned.
20 Q. When he came back -- did he come back?
21 A. Yep.
22 Q. What did he say to the Board?
23 A. He told them that the county employees are mandated to
24   wear masks.
25 Q. Is he in any way related to the Department of Health

Page 124

1    and Human Services for Genesee County, to your
2    knowledge?
3 A. I don't know.
4 Q. If he was, do you think that he would be a good
5    resource for that information?
6        MR. CASCINI: Objection; speculation.
7        THE WITNESS: I would say so, yeah; but
8    I did my own research.
9 Q. (BY MS. GAFKAY) So a commissioner, one of the Board
10   members, Mr. Nolden --
11 A. Yes.
12 Q. -- told the Board on August 17th that the county
13   mandated mask wearing?
14 A. Something like that.
15 Q. Okay. That's what you remember.
16 A. Yes, that's what I remember.
17 Q. And if the county did, in fact, require mask wearing
18   of employees and visitors, would the Genesee County
19   Road Commission also require it?
20 A. If it was true, yes.
21 Q. But you're saying it's not true?
22 A. Correct.
23 Q. Your reason --
24 A. Absolutely correct.
25 Q. Your resource is who, again?

Page 125

1 A. Josh Freeman, director of Genesee County Board, and
2    Derek Bradshaw, was the director of Metropolitan
3    Planning Commission.
4 Q. Those are the two people you talked to?
5 A. Yes.
6 Q. So if MLives -- there was an article in MLive in
7    August of 2021 saying there was a mask mandate for
8    Genesee County, that's fake news, according to you?
9 A. No, I didn't say that.
10 Q. Did any other director, other than Anthony Branch --
11   well, strike that.
12       Has Anthony Branch ever made complaints
13   about you at all?
14 A. Not that I know of.
15 Q. Any other director make any complaints about you?
16 A. Absolutely not.
17 Q. Any other employee at all make any complaints about
18   you, other than Donna Poplar?
19 A. Yes.
20 Q. Who else has made a complaint about you in your
21   conduct or behavior?
22 A. Not because of my behavior, no. It wasn't my
23   behavior.
24 Q. Because of employment decisions made by you, because --
25 A. Coetta, director of Finance, she wanted more money,

Page 126

1    and I said no, and she put in a complaint.
2 Q. She was a director?
3 A. She was a director, but she wanted to get all the way
4    to the top of the scale. I had Ron -- Ron Lattimer,
5    our trunk line supervisor, he put in a complaint
6    because -- claiming that I was harassing him. What I
7    was doing is, I was trying to correct the tasks that
8    they did in Maintenance Department, if there was
9    estimating projects and the schedule of projects and
10   the accountability of those projects. He thought it
11   was harassment towards him.
12 Q. Anybody else that you're aware of?
13 A. Let's see. Sue Charnesky, because I asked her -- she
14   was spending excessive time talking to other employees
15   instead of being at her station doing her work. So
16   she complained that to HR.
17 Q. Anybody else that you're aware of?
18 A. I'm thinking. I think that's about it.
19 Q. Okay. So --
20 A. Unless you know somebody. Mention the name, and I'll
21   tell you yes or no.
22 Q. I don't have it in front of me if there was somebody
23   else. I don't know.
24       So you testified to disciplining Donna,
25   putting her on two-week suspension. Do you recall --

Page 127

1  and that was sometime in mid August; right?

2  A.  Yes.

3  Q.  And then did Donna Poplar, did you receive what's been

4  marked as Exhibit 17, which is a complaint from Donna

5  Poplar regarding retaliation, continued race

6  discrimination, harassment, differential treatment and

7  hostile work environment against you?

8  A.  Okay.

9  Q.  Did you know she made that complaint on August 26th,

10  2021?

11  A.  I did not know that until two weeks after.

12  Q.  Okay.

13  A.  This -- I believe this went to Chairperson Dickerson,

14  and I think he kept it for at least ten days before he

15  released it to other commissioners; and once this was

16  released to the commissioners, that's when I received

17  it, I believe it was ten days after.

18  Q.  Well, was Donna, then, put on administrative leave

19  after her two-week suspension?

20  A.  Yes, yes, she was.

21  Q.  Why was Donna Poplar -- was that a decision made by

22  you?

23  A.  It was a decision made by me, correct.

24  Q.  Anybody else?

25  A.  No, just me.

Page 128

1  Q.  Why was the reason Donna was put on administrative

2  leave?

3  A.  Because I wanted to know how to handle this complaint.

4  This was another sort of complaint that came through,

5  and I just -- I needed a cooling off period between me

6  and her.  So I wanted to turn this over to the Board

7  to decide what they wanted to do with it.  So in the

8  meantime, I put her on administrative leave with pay.

9  Q.  So Exhibit 19, you gave her -- did you give her this

10  notice of administrative leave on September 6th, 2021?

11  A.  Yes.

12  Q.  So because she made the complaint that we just went

13  over for retaliation, continued race discrimination,

14  harassment, differential treatment and hostile work

15  environment, instead of being reinstated after the

16  two-week disciplinary suspension, she was placed on

17  involuntary administrative leave; true?

18  A.  I would agree.

19      MR. CASCINI:  I object; that

20  misconstrues the prior testimony.

21  Q.  (BY MS. GAFKAY)  Is that true?

22  A.  Yes, because I wanted the Board of Road Commissioners

23  to deal with this complaint.  I wanted this to be out

24  of my hands.

25  Q.  Because she made the complaint, she was put on

Page 129

1  administrative leave?

2  A.  So that I had the time to deal with this complaint.

3      MR. CASCINI:  Same objection.

4      THE WITNESS:  I wanted the Board to

5  deal with this complaint.  If they wanted to

6  investigate, I don't know.  They can do what they want

7  to do with it.  So in the meantime, I wanted her to be

8  on administrative leave while the Board decides what

9  to do with this complaint.

10  Q.  (BY MS. GAFKAY)  All I'm trying to establish is, she

11  made the complaint 'cause she was put on

12  administrative leave?

13  A.  It wasn't a discipline.

14      MR. CASCINI:  Same objection.

15  Q.  (BY MS. GAFKAY)  I didn't say that.  Those words

16  didn't come out of my mouth.  I just asked you if --

17  A.  Administrative leave with pay so our Board can have

18  the time to decide how to deal with this other

19  complaint that came in to them.

20  Q.  Are you aware of any other employee who's made a

21  complaint that has been placed on administrative

22  leave?

23  A.  I'm not aware of anybody.

24  Q.  Okay.  So while you're telling her, in Exhibit 19,

25  while you're on administrative leave, you are -- you

Page 130

1  don't tell her how long she's going to be on

2  administrative leave, do you?

3  A.  Correct.

4  Q.  You tell her that she is fully relieved from all her

5  job duties.  Do you tell her that?

6  A.  Correct.

7  Q.  Do you tell her that she's not permitted to enter any

8  commission facility?

9  A.  Yes.

10  Q.  Do you tell her that she's prohibited from using any

11  GCRC property?

12  A.  Yes.

13  Q.  Do you tell her not to interfere with the external

14  investigation in any way?

15  A.  Whatever it say in here is true.  I mean, this is what

16  I said.

17  Q.  Do you tell her that she's expected to fully cooperate

18  with the investigation and respond to any

19  communications; right?

20  A.  Exactly.

21  Q.  Sounds like she did something wrong.  What did she do

22  wrong?

23  A.  What she did, this complaint again.  I mean, she filed

24  a complaint in January, and I give her a directive so

25  we can maybe fix our working relationship, to let her

Page 131

1  know who the boss is in this organization instead of
2  giving me a pushback with every decision I want to
3  make, and then I put her on suspension, and during
4  that two-week suspension, I see this. And then, I
5  mean, I didn't know how to handle this. So I figured,
6  the best thing to do is put her on administrative
7  leave and turn this over to the Board and let them
8  decide how to handle this case, and that's exactly
9  what happened here.
10 Q.  Was there ever an investigation done?
11 A.  Don't know, don't know. Was there? No, I don't think
12     so. The investigation was already done from the first
13     complaint that she submitted back in January of 2021.
14 Q.  So Donna is the complainant; right?
15 A.  Um-hum.
16 Q.  She's complaining about you; right? She's complaining
17     about you?
18 A.  Okay.
19 Q.  You weren't placed -- were you placed on administrative
20     leave?
21 A.  No.
22 Q.  Was all Donna Poplar's access restricted?
23 A.  Yes.
24 Q.  You didn't anticipate that she was going to ever come
25     back to work after this administrative leave?

Page 132

1  A.  Don't know.
2  Q.  Well, that's why you restricted all her access; right?
3         MR. CASCINI: Objection; assumes facts
4      not in evidence --
5         THE WITNESS: And I didn't want --
6         MR. CASCINI: -- and misconstrues prior
7      testimony.
8         MS. GAFKAY: And Mr. Peivandi was
9      saying something. Go ahead.
10        THE WITNESS: I didn't want her to have
11     access to any information to this organization.
12 Q.  (BY MS. GAFKAY) Because she had made the complaint?
13 A.  No; because I put her on administrative leave.
14 Q.  And when she returned, her reporting relationship
15     changed; right?
16 A.  Correct.
17 Q.  And she was only returned after she filed the lawsuit;
18     true?
19        MR. CASCINI: Objection; assumes facts
20     not in evidence.
21        THE WITNESS: I don't know.
22 Q.  (BY MS. GAFKAY) Well, she wasn't returned -- to your
23     knowledge, the investigation never ended, did it?
24 A.  About this second complaint?
25 Q.  Yes.

Page 133

1  A.  Correct.
2  Q.  All right. So what happened that she was returned?
3  A.  What happened when she returned?
4  Q.  No, no. Why was she returned if the investigation
5      wasn't done?
6  A.  It was a decision the Board made to bring her back.
7  Q.  And you have knowledge that was because she had filed
8      the lawsuit?
9  A.  I don't know.
10        MS. GAFKAY: Let's take a quick recess
11     and talk to lead counsel here, and we may be close to
12     being done.
13            (Recess taken.)
14        MS. GAFKAY: I don't have any further
15     questions at this time.
16        MR. CASCINI: Okay.
17            EXAMINATION
18 BY MR. CASCINI:
19 Q.  Fred, as you know, my name is Andrew Cascini. I'm
20     here today representing both the Road Commission, and
21     I understand the Road Commission is identifying you,
22     so you in your individual capacity, with respect to
23     individual claims filed against you.
24        I'm just going to ask you a couple of
25     questions here on cross. I don't think it should take

Page 134

1  me very long at all.
2      I believe we had some testimony that as
3  the managing director, you report directly to and only
4  to the Board of Road Commissioners; right?
5  A.  That's correct.
6  Q.  Did they ever give you instructions or tell you to do
7      specific things with respect to your job?
8  A.  Yes, they do.
9  Q.  And you, as the managing director, you are the direct
10     supervisor of Randy Dellaposta, the deputy managing
11     director; correct?
12 A.  That's correct.
13 Q.  And Randy is the deputy managing director of -- he's
14     deputy managing director, and he's the direct
15     supervisor for all the other directors; right?
16 A.  Correct.
17 Q.  Do you ever give Randy work instructions, tell him
18     what to do?
19 A.  Yes, I do.
20 Q.  And does Randy ever give work instructions to all the
21     subordinate directors under him, tell them what to do?
22 A.  Yes, he does.
23 Q.  Anthony Branch, the maintenance director, does he ever
24     tell his crews what to do?
25        MS. GAFKAY: Objection; lack of

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-3, PageID.337   Filed 11/21/22   Page 36 of 39
Donna Poplar v. Genesee County Road Commission
Fred Peivandi

36 (135 - 138)

Page 135

1  foundation.
2       THE WITNESS:  Yes, he does.
3  Q.   (BY MR. CASCINI)  And would you describe those
4       instructions -- could a word, could the word directive
5       be used to describe instructions or orders or
6       directions to do certain tasks --
7            MS. GAFKAY:  Object to the form.
8  Q.   (BY MR. CASCINI)  -- do a certain job?
9  A.   Yes.
10 Q.   Now, I heard a little bit earlier, though -- you
11      testified that you've never received directives before
12      from anybody in the performance of your job at any
13      point in time; but I heard you just say and just gave
14      testimony that you have received directives from the
15      Board of Road Commissioners.  Why did you give that
16      inconsistent answer?
17 A.   I misunderstood the question, I believe.  I've never
18      given this type of directive that I had to give Donna
19      Poplar, and that directive was designed to repair our
20      relationship between myself and her.
21 Q.   Okay.
22 A.   I never had any directives from anybody else for
23      repair our rela -- my relationship with anybody else.
24 Q.   Got it, okay.
25 A.   That's the difference.

Page 136

1  Q.   Now, one of the things that -- now, prior to your time
2       as the managing director, you served for about 13
3       years as the engineering director; is that correct?
4  A.   And county highway engineer.
5  Q.   And the county highway engineer; right?
6  A.   Yes.
7  Q.   During any period during any of these years, did you
8       ever receive any complaints from any of your
9       subordinate employees that you supervised alleging
10      that you had discriminated against them on the basis
11      of their race?
12 A.   Not at all.
13 Q.   So the first time that you ever received a complaint
14      that you mistreated an employee, allegedly, because of
15      his or her race was after you became managing
16      director?
17 A.   Correct.
18 Q.   Now, I want to ask you some questions.  Julie had an
19      opportunity to ask you about a proposed reorganization
20      that may be occurring here at the Road Commission.
21      You mentioned that that was a proposed reorganization,
22      right, but hasn't yet been finalized?
23 A.   Correct.
24 Q.   Now, with respect to that proposed reorganization, one
25      of the -- with respect to that proposed

Page 137

1       reorganization, you mentioned that there was going to
2       be the creation of a new director level position; is
3       that correct?
4  A.   Correct.
5  Q.   And what is that new position going to be or that new
6       position proposed to be, I should say?
7  A.   That would be the director of Fleet Maintenance and
8       Facilities.
9  Q.   And who is the person who's going to be promoted into
10      that slot?
11 A.   Kendra Love, who is currently the manager for that
12      department.
13 Q.   Who is currently the director who's responsible for
14      performing the functions that this new department will
15      take care of once it's created?
16 A.   That responsibility is under the deputy managing
17      director.
18 Q.   And the deputy managing director is Randy Dellaposta;
19      is that correct?
20 A.   Correct.
21 Q.   So under the proposed reorganization plan, all those
22      fleet responsibilities are going to be taken away from
23      his responsibility and delegated into their own
24      department?
25 A.   Yes.

Page 138

1  Q.   And placed under the leadership of Kendra Love, you
2       mentioned?
3  A.   Correct.
4  Q.   Got it.  Earlier we also heard testimony from you
5       about different raises that were recommended as part
6       of the most recent budgeting process.
7            You mentioned, when Julie was asking
8       some questions, that you had explanations for why
9       different departmental directors were recommended for
10      raises at different amounts.  Can you describe some of
11      those reasons for the record?
12 A.   Sure.  For Randy Dellaposta, who became the deputy
13      managing director, that was a promotion, so that's why
14      I believe he got the biggest raise.
15           And then for Finance director,
16      basically, as of last year, I was able to put her on
17      directors scale level because she was well-below our
18      directors scale wages at this Road Commission.  So
19      after two years of performance, seeing her
20      performance, I finally decided to put her on the
21      director scale, which she is basically -- the director
22      scales have four phases; they've got first year,
23      second year, third year and fourth year.  So I put her
24      on the first year of the director rate scale, and
25      that's why there's an extra increase for Finance

Page 139

1   director.
2   Q.   And that 10-percent increase that we were talking
3   about?  Was it a 10-percent increase?
4   A.   I believe so.
5   Q.   I understand.
6   A.   And then for the director of Engineering, I appointed
7   him to be the county highway engineer, with the Board
8   approval.  So I decided that he deserves an extra pay
9   to carry that title.
10  Q.   And the county highway engineer, that's a separate
11  position than director of Engineering?
12  A.   Correct.
13  Q.   Now, earlier you also gave some testimony, talking
14  about how you thought there was a chance that maybe in
15  the past you may have been discriminated against based
16  on your race --
17  A.   I sure have.
18  Q.   -- because you didn't receive any extra pay for being
19  the county highway engineer?
20  A.   Correct.
21  Q.   Now, is the extra amount of money that you provided or
22  that you recommended be provided to the Engineering
23  director, was that the pay increase that you felt you
24  were entitled to back when you were the engineering
25  director?

Page 140

1   A.   Yes; and, again, that increase is totally funded by
2   State of Michigan.
3   Q.   Got it.  Got it.  So that's a separate source of funds
4   that --
5   A.   Yes.  We get $10,000 a year for having a licensed
6   professional highway engineer on board.
7   Q.   Got it.  And, again, let me complete my questions.
8            It's a different source of funds than
9   the normal Act 52 funds --
10  A.   Yes, Act 51.
11  Q.   -- than the normal Act 51 funds that serve everything
12  else; is that correct, Fred?
13  A.   Yes.
14  Q.   Different source of funds.
15            We also heard testimony that a one
16  percent pay increase was recommended for Anthony and a
17  two percent pay increase was recommended for Donna.
18            To the best of your knowledge, was
19  there ever any sort of comparison to see where Donna
20  and Anthony's pay ranked when compared with other HR
21  directors or maintenance directors across the State of
22  Michigan in county road commissions?
23  A.   Yes, I have done some research on that, yes.
24  Q.   Okay.  As compared with other directors of
25  maintenance, how does Anthony's salary stack up?

Page 141

1   A.   I can tell you, he is one of the highest paid
2   maintenance directors in the State of Michigan out of
3   the 83 counties that we have.
4   Q.   And what about for Donna?
5   A.   Donna's already at the end of the director's scale,
6   and I thought that was an adequate compensation for a
7   HR director.
8   Q.   So is it safe to say that one of the reasons that the
9   percentage increases were smaller for Donna and
10  Anthony is because they didn't fall into any of those
11  special circumstances, and they were already receiving
12  prior to that --
13  A.   Correct.
14  Q.   -- extremely high and appropriate salaries?
15  A.   Yes.  And to this day, they still making more, both
16  the Maintenance director and the county high
17  engineer still -- excuse me -- Maintenance director
18  and HR director still makes more than the Finance
19  director, the Engineering director and the Fleet
20  Maintenance and Facilities director.
21  Q.   Okay.  If we're thinking back in time to 2019, around
22  the time of the creation of the HR administrative
23  assistant position, did you eventually approve and
24  recommend the creation of a part-time position
25  partially to serve as a reasonable accommodation for

Page 142

1   Donna Poplar's visual disability?
2   A.   Yes, I did.
3   Q.   And you voiced that recommendation to the Board;
4   correct?
5   A.   Correct.
6   Q.   But you pushed back and opposed it when she proposed
7   making it into a full-time position; is that right?
8   A.   Correct.
9            MR. CASCINI:  I have nothing further.
10           REEXAMINATION
11       BY MS. GAFKAY:
12  Q.   So what is the reason that you're proposing the Human
13  Resource director fall under Finance?
14  A.   Because most road commissions in state of Michigan,
15  they have a combined HR and finance as one department.
16  Q.   Does the Finance director, to your knowledge, have any
17  human resource experience, the current one?
18  A.   Not that I know of.
19  Q.   So if you were going to combine -- if you were going
20  to propose to combine director of -- if you were going
21  to combine the departments of Human Resources and
22  Finance, Donna Poplar could be the director of that
23  department, couldn't she?
24  A.   No, because every decision HR makes has financial
25  impact, okay, but not all financial impact --

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-3, PageID.339   Filed 11/21/22   Page 38 of 39
Donna Poplar v. Genesee County Road Commission
Fred Peivandi

38 (143 - 146)

Page 143

1  financial decisions have HR impact. So anything that
2  happens financially in this organization has impact to
3  Finance director, the Finance Department.
4  Q.  Well, really anything --
5  A.  Any --
6  Q.  -- any decision?
7  A.  -- that's correct.
8  Q.  So should all departments be under Finance?
9  A.  No.
10 Q.  Why, then, does HR have to be under Finance?
11      MR. CASCINI: Objection; asked and
12  answered.
13      THE WITNESS: Well, I've been thinking
14  about this, you know, even when I was director of
15  Engineering. Why do we need HR director. This is,
16  like I said, I've researched all of the road
17  commissions in state of Michigan, the HR and finance
18  are combined into one.
19 Q.  (BY MS. GAFKAY) Do you think that the Human Resources
20  Department, the Human Resources function is important
21  for the employees to have somebody to go to with
22  complaints, concerns, policy issues, things like that?
23 A.  That's why I'm keeping that title of HR director
24  within the Finance Department.
25 Q.  I mean, do you agree that Human Resources is about

Page 144

1  people and employees as opposed to money? You've said
2  that.
3  A.  Correct, yes.
4  Q.  But you don't value that enough to keep the people
5  separate from the money?
6  A.  No. I'm looking at the picture that I see in the
7  State of Michigan with all the road commissions.
8  Q.  So if that happened, if the combination like you want
9  or propose, would there be a director of Human
10  Resources?
11 A.  Yes.
12 Q.  That would be the title?
13 A.  That would be title as is proposed for being effective
14  this year, when we go into our new fiscal year; but
15  future proposed, that position will be reduced to HR
16  manager.
17 Q.  Okay. And you would eliminate the director position?
18 A.  Correct.
19      MS. GAFKAY: Anything else?
20      (Ms. Gafkay and Ms. Lee
21      left room and
22  returned.)
23 Q.  (BY MS. GAFKAY) Just for clarification, if your
24  proposal goes through and the director of -- and the
25  Human Resources Department falls under Finance

Page 145

1  Department, would the director of Human Resources be,
2  he or she, be reporting to the director of Finance?
3  A.  Correct.
4  Q.  Immediately?
5  A.  Correct.
6  Q.  And so if that did happen and Donna Poplar was still
7  in the position, she would now have to report to who?
8  A.  Through Finance director.
9  Q.  And that's who right now?
10 A.  Tracy Kahn.
11 Q.  And then Tracy Kahn reports to who?
12 A.  Randy Dellaposta.
13 Q.  And then Randy reports to you?
14 A.  Correct.
15 Q.  So now there would be more -- even more levels between
16  you and Ms. Poplar; right?
17 A.  You could say that, yeah.
18 Q.  I mean, is that one of the factors, is because you
19  want more levels between you --
20 A.  No.
21 Q.  -- and Donna Poplar?
22 A.  That's not it at all. That's not the reason.
23      MS. GAFKAY: I don't have any further
24  questions.
25      MR. CASCINI: I think I have one, and I

Page 146

1  actually mean it.
2      REEXAMINATION
3  BY MR. CASCINI:
4  Q.  Fred, you gave testimony that said that in a future
5  time you may want to, under the proposed plan at
6  least, change the HR director position into a HR
7  manager position. When would you -- when would, under
8  the proposal, when would that occur?
9  A.  It would occur when HR director retire.
10 Q.  And the current HR director is the Plaintiff in this
11  case, Donna Poplar?
12 A.  Absolutely.
13      MR. CASCINI: No further questions.
14      MS. GAFKAY: I don't have any
15  questions.
16      (Deposition concluded at
17      2:30 p.m.)
18      (END OF RECORD)
19
20
21
22
23
24
25

Page 147

STATE OF MICHIGAN   )
                    ) SS:
COUNTY OF SHIAWASSEE )

        I, Cynthia A. Lathrop, Court Reporter and
Notary Public in and for the above county and state, acting
in the County of Genesee, do hereby certify that the
aforegoing deposition was taken before me at the time and
place hereinbefore set forth.
        I further certify that said witness was by
me sworn in said cause and the testimony then given was
reported by me stenographically and subsequently
transcribed and that the aforegoing is a full, true and
correct transcript of my original shorthand notes.
        IN TESTIMONY WHEREOF, I set my hand and
notarial seal at Shiawassee County, Michigan, this 5th day
of August 2022.




                Cynthia A. Lathrop (CSR-2474)
                Notary Public in and for the
                County of Shiawassee,
                State of Michigan
                My Commission Expires:  2/2/26