# *In The Matter Of*:

## Anthony Branch v. Genesee County Road Commission

## Donna Poplar

## September 22, 2020



Donna Poplar
September 22, 2020

## Page 1

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

ANTHONY BRANCH,
    Plaintiff,
vs.    Case No. 19-113700-CD
    Hon. Celeste D. Bell
GENESEE COUNTY ROAD COMMISSION
AND MICHIGAN SOCIETY OF ASSOCIATION
EXECUTIVES, a domestic non-profit
corporation,
    Defendants.

The Video Conference Deposition of DONNA POPLAR
Taken via Zoom Video
Commencing at 10:10 a.m.
Tuesday, September 22, 2020
Before Maureen Collier, CSR-7422.

## Page 3

1  ALSO PRESENT:
2  Fred Peivandi
3  Brittany Martin
4  Monica Pearson
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 2

1  APPEARANCES
2
3  CARL R. EDWARDS P24952
4  Edwards & Jennings, P.C.
5  65 Cadillac Square, Suite 2710
6  Detroit, Michigan 48226
7  (313) 961-5000
8  cedwards@edwardsjennings.com
9    Appearing on behalf of the Plaintiff.
10
11  ANDREW A. CASCINI P76640
12  Henn Lesperance, P.L.C.
13  32 Market Ave SW, Suite 400
14  Grand Rapids, Michigan 49503
15  (616) 940-5164
16  aac@hennlesperance.com
17    Appearing on behalf of the Defendant, Genesee CRC.
18
19  ALEX L. ALEXOPOULOS P40547
20  Starr, Butler, Alexopoulos & Stoner, P.L.L.C.
21  20700 Civic Center Drive, Suite 290
22  Southfield, Michigan 48076
23  (248) 864-4931
24  ala@starrbutler.com
25    Appearing on behalf of the Defendant, MSAE.

## Page 4

1
2
3  WITNESS    PAGE
4  DONNA POPLAR
5
6  EXAMINATION BY MR. EDWARDS:  6
7  EXAMINATION BY MR. CASCINI:  108
8
9    EXHIBITS
10
11  EXHIBIT    PAGE
12  (Exhibits attached to transcript.)
13
14  DEPOSITION EXHIBIT 1  83
15  (Letter)
16  DEPOSITION EXHIBIT 2  87
17  (Resume)
18  DEPOSITION EXHIBIT 5  126
19  (March 6, 2018 Minutes)
20  DEPOSITION EXHIBIT 6  189
21  (E-mail Chain)
22  DEPOSITION EXHIBIT 7  189
23  (Genesee County Road Commission Job
24  Description)
25

TABLE OF CONTENTS

1 (Pages 1 to 4)

Donna Poplar
September 22, 2020

Page 5

| | |
|---|---|
| 1 | DEPOSITION EXHIBIT 8          189 |
| 2 | (Genesee County Road Commission Job |
| 3 | Description) |
| 4 | DEPOSITION EXHIBIT 9          189 |
| 5 | (Genesee County Road Commission Board |
| 6 | Meeting Minutes - May 15, 2018) |
| 7 | DEPOSITION EXHIBIT 10          206 |
| 8 | (May 14, 2018 E-mail) |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 6

1  Via Zoom Video
2  Tuesday, September 22, 2020
3  10:10 a.m.
4
5          DONNA POPLAR,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10          EXAMINATION
11  BY MR. EDWARDS:
12  Q. Good morning, Ms. Poplar. I'm Anthony Branch's
13      attorney. My name is Carl Edwards.
14  A. Good morning.
15  Q. And I'm going to be questioning you. When I'm done
16      your attorney, Mr. Cascini, will likely question you.
17      And I'm not sure if the attorney for MSAE will
18      question you, but I'm sure he probably will. In any
19      event, there are three attorneys here today.
20          If at any time you need to take a break,
21      you mentioned you have a medical condition, if you
22      need to take a break for any time, just let me know or
23      let them know when they're questioning you. And we'll
24      be happy to accommodate you. Is that fair?
25  A. That is fair.

Page 7

1  Q. If at any time you don't understand my question and
2      you have to ask me to repeat it, feel free to do that.
3      Because if you answer a question, we're going to
4      assume you -- if you answered the question, you
5      understood the question. Is that fair?
6  A. That is fair.
7  Q. Okay. Let's start by getting some background
8      information on you.
9  A. Excuse me. Before you get started.
10  Q. Yes.
11  A. I would like to make a statement for the record.
12  Q. Okay.
13  A. I'm reluctantly participating in today's deposition
14      process; and that reluctancy is because I fear and
15      have concerns about retaliation, being subjected to
16      reprisal, possible termination of employment on what I
17      may say in today's deposition.
18          I also want to state for the record that
19      because of my physical disability, I am eligible and I
20      do have an assistant that assists me. There may be
21      some documents or what have you you may put on the
22      screen that my assistant may have to help me to read
23      those documents. So I want to make sure that we can
24      agree to those terms.
25          And again, because of my physical

Page 8

1      condition, there may be times that I will have to take
2      periodic breaks. And if we can agree to that, I'm
3      willing to entertain your questions.
4  Q. I don't have a problem. And knowing what I know, even
5      with limited knowledge of my two co-counsel or
6      opponents, I'm sure that we will accommodate.
7  A. Thank you.
8  Q. What is your age?
9  A. I am 65 years of age.
10  Q. And I understand that you are employed as the human
11      resources director for Genesee County Road Commission?
12  A. That is correct.
13  Q. What year were you hired?
14  A. I was hired in October of 2014.
15  Q. And who hired you?
16  A. Former managing director, John Daly.
17  Q. And have you operated continuously as the human
18      resources director since 2014?
19  A. That is correct.
20  Q. Can you summarize what your background was prior to
21      being hired by Genesee -- go ahead.
22  A. I have a master's degree and a concentration in human
23      resources. Prior to coming to work with GCRC, I held
24      the position with the City of Flint as their HR and
25      labor relations director. And prior to that, I worked

2 (Pages 5 to 8)

Donna Poplar
September 22, 2020

## Page 9

1   for the Center for Banking Education, which name was
2   then changed to Progressive Learning Center, as their
3   HR director.
4        Prior to that I worked for General Motors.
5   I'm sorry. I worked for Genesee County as the
6   executive director for Genesee County Community Action
7   Agency Department, a division of the County. And
8   prior to that, I worked for General Motors as an
9   operations manager and then later promoted to a higher
10  position in GM.
11       In-between my positions with the Center for
12  Education or Progressive Banking Center, I worked as a
13  consultant and did some other jobs in terms of helping
14  other agencies get started.
15  Q.  Thank you.
16  A.  You're welcome.
17  Q.  Do you know Anthony Branch?
18  A.  I do.
19  Q.  And who is Anthony Branch, my client?
20  A.  Anthony Branch is the GCRC director of maintenance.
21  Q.  And have you known Anthony Branch since you've been
22      employed with Genesee County Road Commission as human
23      resource director?
24  A.  That is correct.
25  Q.  When John Daly was employed as managing director, the

## Page 10

1   person that hired you, did he ever share with you that
2   there were members of the Genesee County Board of
3   Commissioners who wanted Anthony Branch fired?
4   A.  That is correct.
5   Q.  And did he share with you that there were members of
6       the Genesee County Board of Commissioners who were
7       racist?
8   A.  That is correct.
9   Q.  And did he share with you that members of the Genesee
10      County Board of Commissioners did not like Anthony
11      Branch in part because of his race?
12  A.  That is correct.
13  Q.  How many conversations did you have with Mr. Daly
14      dealing with the fact that there were members of the
15      Genesee County Board of Commissioners who wanted
16      Anthony Branch removed because of his race?
17  A.  I've had numerous conversations with Mr. Daly.
18  Q.  Do you recall how far back they go in terms of the
19      year?
20  A.  Those conversations would have started when I got
21      hired, sometime shortly after, in 2016. And that
22      conversation continued up until the time at which John
23      Daly retired.
24  Q.  Do you have any recollection of the first
25      conversations you had with former managing director

## Page 11

1   John Daly that there were members of the Genesee
2   County Board of Commissioners who wanted Mr. Branch
3   removed because of his race?
4   A.  My first encounter with Mr. Daly, in reference to your
5       question, would have been sometime in, I want to say
6       sometime in mid part of 2016, when he shared with me
7       the culture of what Anthony was being subjected to by
8       a commissioner, Ted Henry, and the reasons
9       Commissioner Ted Henry wanted Anthony Branch removed.
10      And he felt that Ted Henry was a racist and that his
11      attacks against Anthony was racially motivated in many
12      ways.
13      And Ted Henry was infuriated of the fact
14      that Mr. Daly had hired a black man to serve as the
15      director of maintenance in lieu of Mr. Ted Henry's
16      nephew, who also was employed at GCRC, that Mr. Ted
17      Henry wanted John Daly to hire as the maintenance
18      director. And when Mr. Daly did not do that and hired
19      Anthony Branch, Mr. Ted Henry wanted Mr. Daly to then
20      have Anthony Branch to consider his nephew to serve as
21      his deputy.
22  Q.  What year was this?
23  A.  I would say that was probably some months after I
24      hired in in 2016.
25  Q.  And did Anthony Branch agree to hire his nephew?

## Page 12

1   A.  To my understanding, no.
2   Q.  And were there subsequent conversations that you had
3       with John Daly, the ramifications or the effect of
4       Anthony Branch not hiring Ted Henry's nephew?
5   A.  Well, from that particular point, it seemed like it
6       was an all out war between Mr. Daly and Anthony
7       Branch. And whatever Commissioner Ted Henry could do
8       to make Anthony Branch and/or Mr. Daly's world
9       uncomfortable, that's what Mr. Ted Henry was doing.
10  Q.  Do you remember a commissioner by the name of Dave
11      Miller?
12  A.  I do.
13  Q.  Were you at the December 21st, 2017 board meeting when
14      Mr. Miller resigned or announced his resignation?
15  A.  I was.
16  Q.  And what do you recall him saying?
17  A.  I recall Mr. Miller, one, being extremely upset on
18      that particular meeting. I recall him saying that he
19      was not going to support the corruption at the hands
20      of the Genesee County Board of Commissioners, and he
21      was not going to support the back deals that were
22      being cut by the members of the GCRC Board. And as a
23      result of him being unwilling to compromise his level
24      of integrity, that he was going to resign and that he
25      would move forward in terms of filing a complaint and

3  (Pages 9 to 12)

Donna Poplar
September 22, 2020

## Page 13

1      ask for an investigation by law officials.
2    Q.   This was published in the local newspapers, was it
3      not, his resignation and his charges?
4    A.   It was.
5    Q.   It was a big deal in Genesee County, wasn't it?
6    A.   It was a big deal.
7    Q.   And did the Genesee Board of Commissioners choose a
8      replacement once Mr. Miller resigned?
9    A.   They did.
10    Q.   And who was it?
11    A.   Shirley Kautman-Jones.
12    Q.   And when she first became a commissioner, were you
13      aware that she was voted to become chairperson of the
14      Genesee County Road Commission?
15    A.   That took place shortly after she came to serve on the
16      Board in terms of the time in which the Genesee County
17      Road Commissioners make their officers choice.
18    Q.   Mr. Cloyce Dickerson, are you aware of that name?
19    A.   I am.
20    Q.   He said he opposed it because it had never happened
21      before. Are you aware of that?
22    A.   I am.
23    Q.   And once you became chairperson, shortly after that
24      Mr. Daly resigned; is that true?
25    A.   That is correct.

## Page 14

1    Q.   And then a search was undertaken for a replacement for
2      the managing director, John Daly's position, was it
3      not?
4    A.   That is correct.
5    Q.   And were you involved with or did you have any
6      involvement in the selection of the search firm that
7      was used to search for a candidate to replace
8      Mr. Daly?
9    A.   I had no involvement. And I want to clarify that. I
10      had no involvement in terms of saying what my
11      preference would be between the two firms that
12      presented a presentation.
13      I did state my concerns about the firm that
14      was selected, and the firm that was selected was MSAE.
15      The president of that at the time was Cheryl Ronk.
16      And I stated my concerns in terms of the things that I
17      was not comfortable with.
18    Q.   How many firms were solicited or interviewed to be
19      chosen as the firm to conduct the search for the new
20      managing director?
21    A.   There was two firms. One of the firms was -- the
22      other firm was Hiring Solutions. Both firms were
23      allowed to come in and do presentations.
24      And one of the issues that I raised was the
25      date in which Hiring Solutions was to do their

## Page 15

1      presentation, they did that presentation early
2      afternoon but after the Board had been in a meeting
3      with supervisors, a workshop. And after that Hiring
4      Solutions did their presentation.
5      The next day is when MSAE was allowed to do
6      their presentation. And what I found disturbing to me
7      was that MSAE was the only one on the agenda. So they
8      had full attention of the Board at that time, which I
9      didn't feel that Hiring Solutions had the same equal
10      attention on the day before.
11    Q.   Were there any policies that were violated when the
12      Genesee County Road Commission selected MSAE to do the
13      search for managing director position?
14    A.   At the point in which the GCRC board became aware of
15      the cost for the service that would be rendered by
16      MSAE, they entered into a violation of our purchasing
17      policy which states $15,000 or more would have to go
18      out for an RFP and for a bid. That was not done in
19      this particular process.
20      The only two firms that was allowed to do a
21      presentation was the two that I mentioned: Hiring
22      Solutions and MSAE.
23    Q.   After Mr. Daly left the Genesee County Road
24      Commission, was a search then undertaken for his
25      replacement?

## Page 16

1    A.   Yes.
2    Q.   Were you involved at all in the search to replace
3      managing director John Daly?
4    A.   My involvement was extremely limited; that was only to
5      provide certain documents that Cheryl Ronk requested
6      from the HR department. And the other thing that I
7      was involved in was to provide what I felt some
8      criteria would be for the managing director, and that
9      was asked of all the staff.
10    Q.   Did you think that the -- let me lay a foundation.
11      After John Daly retired, was my client,
12      Mr. Branch, made co-interim managing director?
13    A.   He was.
14    Q.   And was there another individual that was also made
15      co-interim managing director?
16    A.   Yes, Mr. Peivandi.
17    Q.   And what had Mr. Branch's job been prior to co-interim
18      managing director?
19    A.   He was the director of maintenance.
20    Q.   And what had Mr. Peivandi's job been?
21    A.   Director of engineering.
22    Q.   We have had testimony that Mr. Branch, in the absence
23      of Mr. Daly, was the primary person who served as
24      managing director. Were you aware of that?
25    A.   Yes, and that also was reflected in his job

4 (Pages 13 to 16)

Donna Poplar
September 22, 2020

Page 17

1 description.
2 Q.  There were times though that Mr. Peivandi also
3 performed the task of managing director in Mr. Daly's
4 absence.  Were you aware of that?
5 A.  I'm aware that there may have been a couple times
6 which Mr. Peivandi represented Mr. Daly at a board
7 meeting.
8 Q.  Was there a similar provision in Mr. Peivandi's job
9 description when he was director of engineering that
10 he would serve as managing director in the absence of
11 Mr. Daly?
12 A.  No.  The only director that had that provision in the
13 job description was the managing director's position.
14 Q.  And during the times that Mr. Branch had served --
15 A.  Excuse me.  I'm sorry.  I'm sorry.  I meant to say the
16 maintenance director's position, which would have been
17 Anthony Branch.
18 Q.  All right.  During the times that Anthony Branch
19 served in Mr. Daly's absence, during the times at
20 least you were employed as HR, human resources
21 director, did you ever hear any complaints concerning
22 his job performance?
23 A.  No.
24 Q.  Did you ever hear any accolades given to him
25 concerning his job performance when he served in that

Page 18

1 role in the acting capacity?
2 A.  Yes.
3 Q.  What did you hear?
4 A.  I heard John Daly said that he was pleased with
5 Anthony's performance and how Anthony represents him
6 in his absence, and that Anthony Branch was the go-to
7 person, and he was very proud of how Anthony was able
8 to carry and conduct himself with media and with
9 outside vendors and with the staff.
10 Q.  Did you ever have any conversations with Anthony
11 Branch that he was going to apply for the position of
12 managing director after John Daly left?
13 A.  He specified he had interest.
14 Q.  All right.  Did you have any conversations with Fred
15 Peivandi that he was going to apply for the managing
16 director's position after John Daly left?
17 A.  Well, there was several conversations with Fred
18 Peivandi --
19 Q.  What were they?
20 A.  -- in staff meetings that he was going to apply for
21 the managing director's position because he didn't
22 want anyone who was not qualified to have that
23 position.
24        And during the time in which he made these
25 statements, he made these statements in the presence

Page 19

1 of Anthony Branch of to whom he was also aware that
2 there was a strong possibility Anthony was going to
3 apply for the position.
4 Q.  During the period of the search, did Mr. Peivandi ever
5 say in a staff meeting that he had been solicited to
6 apply for the position?
7 A.  Yes, he did.  Solicited by some of the board members,
8 members from the Genesee County Board of
9 Commissioners, and from some of the Township
10 supervisors.
11 Q.  So three entities:  The Genesee County Road Commission
12 Board members, the Board of Commissioners of Genesee
13 County, and Township supervisors?
14 A.  That is correct.
15 Q.  Did he ask for the support of the persons including
16 yourself in the staff meetings once he had applied for
17 the position of managing director after John Daly
18 left?
19 A.  I would say once Fred Peivandi either went to or was
20 getting prepared for his first interview is when he
21 asked the staff right before that he needed our
22 support.
23        He was confident that he was going to get
24 the position based on information that had been shared
25 with him, and he wanted us to support him and to help

Page 20

1 him in the areas where he probably didn't have the
2 knowledge in terms of what it was that we did
3 individually as directors.  And he asked for that
4 support several times amongst the staff.
5 Q.  And who was present at these staff meetings?
6 A.  Randy Dellaposta.  At this particular time, Anthony
7 Branch.  Coetta Adams would have been present, and I
8 want to say Eric Johnston.
9 Q.  Who was Eric --
10 A.  No, no.  Strike that.  Eric Johnston wasn't hired at
11 that time, so it wouldn't have been Eric Johnston.
12 Q.  All right.  And what job did Randy Dellaposta have?
13 A.  At that particular time, Randy Dellaposta would have
14 been the director of fleet and equipment.
15 Q.  And Coetta Adams, what job did she have at the time?
16 A.  Director of finance.
17 Q.  Once the search was underway for a new managing
18 director, did there come a time where you expressed
19 concerns about how the search was being conducted?
20 A.  I did.
21 Q.  And tell us what you did or said.
22 A.  Well, one of the things that I was really concerned
23 with, and I'd like to say I was concerned with the
24 fact that I had some reservations about MSAE.  I felt
25 that there was some kind of connect there that didn't

Donna Poplar
September 22, 2020

Page 21

1   really resonate well with me.
2           When Cheryl Ronk did her presentation, I
3   was concerned because I asked the specific questions
4   of her in terms of her company's record in searching
5   out African Americans for higher positions.  And she
6   couldn't give me that information.  And then I asked
7   her what would be some of her placement links that she
8   would use to search out African Americans, and she
9   didn't have that information.  And so I agreed that I
10  would provide that information to her where she could
11  begin to look for African American people to be
12  considered for the managing director's position.
13          The other concerns that I had would have
14  came in terms of an evaluation -- not evaluation.  I'm
15  sorry.  An anonymous survey that was taken amongst our
16  employees.  I was very concerned and disturbed that we
17  would use such a tool to try to help to identify the
18  search for a managing director.
19          One of the things that was more disturbing
20  to me is that the information that was provided in
21  those anonymous surveys ended up leading to an FBI
22  investigation that was being conducted on Anthony
23  Branch, an investigation that I was informed by Fred
24  Peivandi that there was a company -- I'm sorry, a law
25  firm by the name of Zach, and then later a local law

Page 22

1   firm by the name of Swift, I believe, and I could have
2   those names wrong but I could confirm it later, that
3   was involved as a result of these anonymous surveys.
4           And then I was concerned that if we are
5   doing an investigation on Anthony Branch prior to the
6   completion of the search and selection of the managing
7   director, then by all means we have set the stage for
8   Anthony Branch to be discriminated against.  And I
9   felt that that discrimination was predicated around
10  Anthony Branch being African American.  And so I would
11  raise some concerns about that.
12          And then the other thing that I was
13  concerned with was that the prior week before the
14  actual, I think it was the May 15th meeting, we
15  received a board package.  And in that board package,
16  there was a job description.  And that job description
17  raised some significant red flags for me and --
18  Q.  Why?  Why?
19  A.  I clearly noted that the only major area in the job
20     description was the education requirement, and the
21     education requirement clearly eliminated Anthony
22     Branch from the way in which it was written.
23          And I made it very clear in that meeting
24     that -- everyone in that meeting was fully aware that
25     Anthony Branch did not have a college education nor a

Page 23

1   degree.  And to eliminate the equivalency clause that
2   so stated that professional experience could be
3   substituted on a year-to-year basis, and to take that
4   out I felt that was a deliberate attempt to keep
5   Anthony Branch out of the lineup, if you will, to be a
6   candidate for that position and was clearly giving
7   Fred Peivandi the advantage.  I felt that that job
8   description was shaped deliberately to favor Fred
9   Peivandi over Anthony Branch.
10          And from that May 15th meeting, there was
11  much discussion.  And the discussion was quite heated
12  from time to time throughout that discussion about
13  that matter.  And I felt that if GCRC moved forward
14  and did not make those changes, then we would be
15  subjecting ourselves to a possible lawsuit.
16  Q.  Did you say that in the meeting?
17  A.  I did.
18  Q.  What was the response of the Board?
19  A.  Well, at that particular time, the whole entire
20     dynamics changed.  There was focus put on that job
21     description.
22          And Cloyce Dickerson was a very vocal
23     person in that meeting, and he said that he would not
24     support anything that would prohibit Anthony Branch
25     from being interviewed.

Page 24

1           At that particular point in time, I believe
2   John Mandelaris also was in agreement.  Shirley
3   Kautman-Jones, on the other hand, was very reluctant
4   to making any changes to that job description.  She so
5   stated that they had spent quite a bit of time
6   together working on that job description, and she felt
7   that the job description was reflective of what the
8   Board had -- members had agreed to, and so she was not
9   in support of making changes.
10          Arceo was quite adamant on the fact that he
11  wanted someone with an engineer degree, and he wasn't
12  going to change his mind.
13          My point was I wasn't arguing about what
14  they wanted.  I was arguing the fact that if you
15  eliminate the equivalency clause, you are deliberately
16  discriminating Anthony Branch because he's African
17  American, and that's how it's going to be perceived.
18  Q.  Did John Daly ever tell you that Board Member Arceo
19     was a racist?
20  A.  John Daly did tell me that Arceo was a racist, and Bob
21     Johnson also told me that Arceo was a racist.  And
22     Cloyce Dickerson also told me that based on
23     information he had, that he strongly believed that
24     Arceo was a racist.
25          And based on some of the treatment that I

6  (Pages 21 to 24)

Donna Poplar
September 22, 2020

Page 25

1  received in some of the board meetings and some of the
2  forcefulness of Arceo at times, I also felt that he
3  had some issues with African American people.
4  Q.  I want to read something to you that we discussed with
5  Mr. Dickerson at his deposition.  It's Exhibit 9 to
6  his deposition.  It's an e-mail from John Mandelaris
7  that was dated Thursday, May 3rd, 2018.  And it was
8  sent to Shirley Kautman-Jones, who was at that time
9  chairperson of the Genesee County Road Commission or
10  GCRC.
11           And it says re:  GCRC Executive Search
12  Draft Press Release.  And this is what John Mandelaris
13  said:  Quote, Shirley, just some thoughts.  Aren't
14  they requesting us to review the draft and then we
15  make what comments we think need to be made, and
16  return the draft to MSAE, and then in parenthesis, as
17  just one document with all the comments thereon?  Did
18  we require a BA degree?  What about five current years
19  of civil engineering experience?  Experience in verbal
20  communications with other units of government (very
21  important)?  What are the stakeholders?  Proven
22  leadership experience with installment of lifelong
23  learning?  Press release needs fine tuning.  If we
24  revise the job description.
25           So in this May 3rd e-mail, Genesee County

Page 26

1  Road Commission Board Member John Mandelaris is
2  actually stating did we require a BA degree and what
3  about five current years of civil engineering
4  experience.  Didn't he know that this would eliminate
5  Anthony Branch if these were the qualifications for
6  the new managing director?
7  A.  He did.
8        MR. ALEXOPOULOS:  Objection.  Foundation.
9  BY MR. EDWARDS:
10  Q.  He knew having five years of civil engineering
11  experience, Anthony Branch didn't have that, didn't
12  he?
13  A.  He did know that.
14        MR. ALEXOPOULOS:  Same objection.
15  BY MR. EDWARDS:
16  Q.  And how did he know that?
17  A.  Because John Mandelaris was fully aware of the years
18  in which he served on that Board or served on this
19  Board that Anthony Branch did not have a degree.  That
20  was no secret to anyone.
21        John Mandelaris also knew that the person
22  internally who had a civil engineer degree that would
23  possibly apply for this position was that of Fred
24  Peivandi.  And that to me held him true to what Fred
25  was saying:  That there were certain members on the

Page 27

1  GCRC Board who wanted him to apply for that position.
2        So when I looked at that job description
3  that you're referencing to on May the 3rd, I seen it
4  the week before the May 15th meeting, those are things
5  that I highlighted.  Because I felt the meeting, as I
6  spoke to early in my testimony, that that job
7  description was deliberately shaped for Fred Peivandi
8  and to deliberately discriminate against Anthony
9  Branch as a result of Anthony Branch's race.
10        Now, the other thing that I'm going to
11  highlight:  If you go back into the job description,
12  prior to the May 3rd draft that you're referencing,
13  you will see from the 18 years by which John Daly has
14  served as a managing director, there was an
15  equivalency clause in there that stated again
16  professional experience can be substituted on a
17  year-to-year basis.
18        So regardless of what it is that they
19  wanted to put in that job description, I did not feel
20  that they had the right to deliberately try to rewrite
21  a job description for the purpose of eliminating
22  Anthony Branch.
23  Q.  Have you seen the minutes, the board minutes that were
24  typed up of the May 15th, 2018 board meeting --
25  A.  I have.

Page 28

1  Q.  -- of the Road Commission?
2  A.  I have.
3  Q.  And when you reviewed those board minutes, did they
4  reflect this intense discussion that you were having
5  with Arceo and Shirley Kautman-Jones over the job
6  description?
7  A.  Absolutely not.
8  Q.  Did you ever have any conversations with John Daly
9  that the person who was taking the minutes, Linda
10  Kossak, had came to him complaining because Shirley
11  Kautman-Jones had asked her to keep certain things out
12  of the official board minutes?
13  A.  I had a discussion with John Daly.  He shared with me
14  that Linda had contacted him and said that Shirley
15  Kautman-Jones wanted her to take something out of
16  minutes that I had stated in a board meeting that
17  Shirley Kautman-Jones was in disagreement with.
18        So Linda contacted John Daly, and John Daly
19  told her that it would be unlawful for her to make any
20  changes to those minutes without going before the
21  Board or to amend the minutes in the proper board
22  setting.  And so that did not take place.
23        I don't know for sure what it was that
24  Shirley wanted out of those minutes based on what I
25  said.  He didn't share that with me, but he did say he

7 (Pages 25 to 28)

Donna Poplar
September 22, 2020

Page 29

1    told Linda not to do it.
2    Q.  We recently took Linda Kossak's deposition, and she
3         denied ever having this conversation that you're
4         describing with John Daly.  If she testified under
5         oath that she never had such a conversation, would
6         that be truthful testimony?
7    A.  Not based on what John Daly shared with me, no.
8    Q.  You said that --
9    A.  Excuse me.
10   Q.  Yes.
11   A.  I think it's also important to know that there was a
12        communication via e-mail between Shirley Kautman-Jones
13        and Mandelaris, where Mandelaris is telling her in
14        this e-mail that in essence he was not able to get
15        those changes corrected in that e-mail that was
16        concerning what John Daly had shared with me; that he
17        wasn't able to do that.  In that e-mail he said sorry.
18   Q.  You have testified that in your opinion, based on
19        everything that came before you, that Fred Peivandi
20        was the person preselected to replace John Daly.  Is
21        that your testimony?
22   A.  That is correct.
23   Q.  Can you tell the Court why you are of that opinion?
24   A.  I'm of that opinion, one, when you look at when they
25        made Fred Peivandi and Anthony Branch co-interim

Page 30

1    directors, one of the things that disturbed me was
2    that they did not allow Anthony Branch to carry out
3    the duties given to him in the job description that
4    had been there at least for the 15 years that Anthony
5    Branch was the director of maintenance.
6         Also I was concerned that immediately upon
7    making both Anthony Branch and Fred Peivandi
8    co-interim directors, on that same day Fred Peivandi
9    moved his vehicle about 12 feet from where he would
10   normally park into the managing director's parking
11   space.  For me that sent a very strong message that
12   Fred Peivandi was moving in the direction of being the
13   next managing director for GCRC.
14        There was no justified reason for him to
15   utilize the managing director's parking space,
16   something that Anthony Branch had not requested and
17   something that had not been discussed amongst the
18   Board and/or Anthony Branch for approval for him to do
19   that.
20        Also I was very concerned that Fred
21   Peivandi was given the opportunity to serve on all the
22   committees by which the previous managing director
23   John Daly served on.  And in addition to that, Fred
24   Peivandi pretty much was the one that had contact with
25   a lot of the elected officials and township

Page 31

1    supervisors as though he was the only person in
2    charge.  And Fred Peivandi took complete control over
3    all staff meetings, and he established the agenda.
4         And the other thing that concerned me was
5    that there was times when Fred Peivandi would be
6    meeting with certain members of the GCRC board,
7    specifically John Mandelaris, Shirley Kautman-Jones
8    and Dave Arceo, that Anthony Branch was not privy to.
9         There was times in which Fred Peivandi was
10   meeting with employees who reported directly to Fred
11   Peivandi, for example, and those would be supervisors
12   that report directly to Fred Peivandi that Anthony
13   wasn't even aware he was having a meeting with.
14        And the other thing that concerned me was
15   that the same supervisors that reported directly to
16   Anthony Branch were the same supervisors that wrote a
17   letter of recommendation for Fred Peivandi to be hired
18   as the managing director and some of the same
19   supervisors who also made many complaints, verbal
20   complaints concerning Anthony Branch.
21        So those are some of the things that I
22   found to be disturbing that set the stage and
23   certainly sent a message that the Board was moving in
24   the direction of favoring Fred Peivandi.
25        Again, I find it interesting that on

Page 32

1    numerous occasions that Fred Peivandi would have a
2    lunch engagement with Shirley Kautman-Jones and Dave
3    Arceo that Anthony Branch was not privy to.  And then
4    to know that Shirley Kautman-Jones along with Ted
5    Henry was two of the persons who met with the FBI on
6    this -- about these allegations made against Anthony
7    Branch of which some of these supervisors was a part
8    of those allegations.
9         So yes, I clearly felt that Fred Peivandi
10   was given the advantage over Anthony Branch, and
11   certainly there was a perception put in place for the
12   employees to feel that Fred Peivandi was going to be
13   the guy.  And also I felt that had that perception not
14   been created, that there probably would have been
15   others inside of the Road Commission who may have felt
16   they were qualified to apply for that position of
17   managing director and would have made application for
18   that position.
19   Q.  Are you aware that Anthony Branch was denied an
20        interview for the managing director's position?
21   A.  I am.
22   Q.  And did anyone ever tell you what the reasons were why
23        he was denied an interview?
24   A.  When Anthony Branch was denied the interview, he came
25        to HR to discuss his concerns about his denial.  And

8 (Pages 29 to 32)

Donna Poplar
September 22, 2020

| Page 33 | Page 35 |
|---|---|

**Page 33**

1  one of the things that I found disturbing in what he
2  shared with me was that Cheryl Ronk shared with him
3  that he was not going to advance to the first round
4  because there were those employees who -- on the Board
5  who wanted to go in a different direction.  And then
6  after that then I became aware that Cheryl Ronk denied
7  Anthony Branch access to be advanced to the first
8  round of interviews because she felt he was not
9  passionate enough or did not exhibit any excitement or
10  enthusiasm about the position.
11            And what I found interesting in what
12  Anthony Branch was sharing with me is that as I begin
13  to look at some of the articles that was written about
14  John Daly, that John Daly himself also stated that he
15  was told by the Board, a board member that they wanted
16  to go in a different direction and that was what led
17  to his retirement.
18  Q.  So after the May 15th board meeting, was the formal
19      qualifications of having an engineering background and
20      degree, and a bachelor's degree, were they taken out
21      of the requirements, the education requirements for
22      the job?
23  A.  What you would have to do is put that job description
24      before me and let me see what you're referencing.
25      Because one of the things I don't want to get

**Page 34**

1  conflicted is there was a couple job descriptions
2  going back and forth.  So I need to know what job
3  description are you referencing.
4  Q.  I think the easier way will be there are notes that
5      have been given us, and we'll take a break and I'll
6      find them.  There are notes that have been given us
7      that actually have the qualifications on an interview
8      sheet that Cheryl Ronk developed.
9  A.  Okay.
10  Q.  Let's take a break, and I'll find those and then we'll
11      proceed.
12            (Off the record at 10:53 a.m.)
13            (Back on the record at 10:59 a.m.)
14  BY MR. EDWARDS:
15  Q.  Mr. Cascini put up on the screen, Ms. Poplar,
16      Exhibit 9 from Cheryl Ronk's deposition.  And it
17      reads:  Qualities for Genesee County Road Commission
18      Managing Director.  And then underneath that it says
19      rate on a scale of 1 through 10 with 10 being the
20      highest.  And this appears to be the interview sheet
21      that Mark Riley's interview was conducted because it
22      says Mark A. Riley on the top.
23            But my specific question is under education
24      and work experience, it says the following:  Bachelor
25      degree related to job function is desired, prefers

**Page 35**

1  civil engineering degree, master's degree an asset.
2  And then if you look under the rest of the sentences
3  under education/work experience, it doesn't say what
4  you said was agreed upon at that May 15th, 2018 board
5  meeting, that is either education or experience so
6  that it didn't exclude Anthony Branch.
7            But if the interviews that took place were
8  conducted using the criteria that's in this exhibit
9  that is Exhibit 9 from Cheryl Ronk's deposition, and
10  I'll repeat, quote, bachelor's degree related to job
11  function is desired, prefer civil engineering degree,
12  master's degree an asset, does that support your
13  earlier testimony that this whole process was designed
14  in favor of Fred Peivandi?
15  A.  That is correct.
16            MR. ALEXOPOULOS:  The document speaks for
17      itself.
18            MR. CASCINI:  I join in the objection.
19            MR. ALEXOPOULOS:  -- of the testimony
20      regarding this document by other individuals and what
21      the document itself says.
22            MR. CASCINI:  I so join.
23  BY MR. EDWARDS:
24  Q.  In other words, here's the second sentence under
25      education and work experience.  In fact, let's deal

**Page 36**

1  with the first.  Bachelor's degree related to job
2  function is desired.  If you desire in your job search
3  a person with a bachelor's degree and Anthony Branch
4  doesn't have one, doesn't that effectively exclude him
5  in your opinion?
6  A.  That is correct.
7  Q.  Second requirement or sentence in this document,
8      qualities that they were looking for of a Genesee
9      County Road Commission managing director:  Prefer
10      civil engineering degree.  Master's degree an asset.
11            In your opinion, would that qualification
12      disqualify Anthony Branch?
13  A.  That is correct.
14            MR. ALEXOPOULOS:  I'm going to object.
15      She's a layperson, and her opinion doesn't matter.
16      It's facts as they are.  And so I think that's
17      improper testimony.
18  BY MR. EDWARDS:
19  Q.  Are you a subject matter expert in hiring?
20  A.  I am.
21            MR. ALEXOPOULOS:  I'm going to object.  I
22      don't believe you've laid a foundation that would
23      qualify this person to provide expert testimony.
24            MR. CASCINI:  I'm going to make an
25      objection for the limited definition of expert

9  (Pages 33 to 36)

Donna Poplar
September 22, 2020

Page 37

1    testimony.  I agree with that.
2    BY MR. EDWARDS:
3    Q.  Are you a subject matter expert in hiring in salaried
4        job responsibilities?
5    A.  That is correct.
6    Q.  Are you a subject matter expert in hiring persons in
7        supervisory roles in job functions?
8            MR. ALEXOPOULOS:  Same objection.
9            MR. CASCINI:  Same objection.
10   BY MR. EDWARDS:
11   Q.  You can answer.
12   A.  That is correct.
13   Q.  And are you a subject matter expert in hiring of
14       management people in job positions in the workforce?
15           MR. ALEXOPOULOS:  Same objection.
16   BY MR. EDWARDS:
17   Q.  You can answer.
18   A.  That is correct.
19   Q.  Why do you say you're a subject matter expert in
20       hiring of employees whether they be salary,
21       supervisory, or management employees in the workforce?
22   A.  Because of my years of experience serving as an
23       executive director and also serving as HR, I have
24       hired an uncountable amount of individuals and hired
25       them in positions as directors.  I've hired middle

Page 38

1    level managers.  I've hired first level managers.
2    I've hired laborers.
3            So my experience in hiring individuals has
4        gone as high as hiring those who serve in high level
5        positions and those who serve in all levels of
6        management, and I've done that for many years
7        throughout my career and have been properly trained.
8            And I have trained individuals on some of
9        the characteristics and qualifications that is needed
10       to actually effectively write approvement of job
11       descriptions.  And that was one of the other concerns
12       that I had is that had I been involved in the
13       development of the job description, I do not believe
14       that we would be faced with the lawsuit that we're
15       faced with today because I would have, as I've done in
16       the May 15th meeting, be able to highlight some things
17       that I felt that was totally inappropriate and a
18       discriminatory nature.  So I do consider myself to be
19       qualified and have a proven track record of hiring
20       people of all levels in all positions.
21   Q.  And how many years -- well, let me start all over.
22           Have you developed job descriptions in any
23       of your capacities, employment capacities?
24   A.  That is correct.
25   Q.  And over how many years have you developed job

Page 39

1    descriptions?
2    A.  Probably at least a minimum of 15 years.
3    Q.  Have you developed job description for executives?
4    A.  That is correct.
5    Q.  And can you tell us where you worked when you
6        developed job descriptions for executives?
7    A.  For the City of Flint, General Motors, and for Genesee
8        County Road Commission, and also for Genesee County.
9    Q.  Have you been consulted by others for your expertise
10       in developing job descriptions?
11   A.  I have.
12   Q.  Can you give us some examples?
13   A.  City of Flint, other local agencies.  And since I've
14       left, I want to say it was GCCARD, it's now called,
15       I've also been asked to help to give some pointers.
16   Q.  And what educational background do you have that gave
17       you the knowledge to develop job descriptions?
18   A.  I have a master's degree and concentration in human
19       resources.
20   Q.  The Exhibit 9 from Cheryl Ronk's deposition that we
21       have on the screen, the qualities of a Genesee County
22       Road Commission managing director, those first two
23       paragraphs that I read to you:  Bachelor degree
24       related to job function is desired.  And then the
25       second one:  Prefer civil engineering degree.

Page 40

1    Master's degree an asset.  Were those the requirements
2    that were agreed upon at the end of the May 15th, 2018
3    meeting after you raised concerns that the job
4    description as it was proposed would exclude Anthony
5    Branch?
6    A.  I do not recall seeing any agreement that dealt with
7        the prefer civil engineering, a degree.  I don't
8        recall seeing that.
9    Q.  All right.  So if that is in the requirement for the
10       position, that is not what was agreed at the May 15th,
11       2018 meeting by the Genesee County Board of Road
12       Commissioners.
13   A.  No.  I would also like to point, if I'm able to,
14       because I want to make sure that I'm answering your
15       question very clearly, had the clause, the equivalency
16       clause been reflected here on the education and work
17       experience, that would have been the tool needed that
18       would still qualify Anthony Branch to be considered --
19   Q.  All right.
20   A.  -- for a candidate to be interviewed if that clause
21       that we agreed to on the May 15th was reflective in
22       the job description that apparently was used for the
23       screening process.
24   Q.  I took Cheryl Ronk's deposition.  On Page 53 I ask her
25       why was Anthony Branch not given an interview, and

10  (Pages 37 to 40)

Carroll Court Reporting
586-468-2411

Donna Poplar
September 22, 2020

Page 41

1  this was her answer.  Well, here was my question at
2  Line 21, Page 53:  And at some point you decided, did
3  you not, that Mr. Branch was not qualified to be one
4  of the candidates to be interviewed by the Road
5  Commission Board of Commissioners; correct?  Her
6  answer at Line 25 was correct.
7       And then on Page 54 it continues:  Why did
8  you decide that, was my question.  Her answer:  So
9  looking at the criteria, I would have presented to the
10  Commission the very best top candidate.
11       And then my next question was:  And my
12  question is different.  Why did you decide that he,
13  meaning Anthony Branch, did not meet the criteria.
14  She said I don't know.  I don't recall.
15       So Ms. Ronk testified that what's here on
16  the screen was the criteria that she used to eliminate
17  Mr. Branch, and her testimony was that this was the
18  criteria that had been agreed to by the Board of
19  Genesee County Road Commission.  And it's your
20  testimony that this criteria was not agreed to by the
21  Genesee County Road Commission Board of Commissioners;
22  isn't that true?
23  **A.  That is true.**
24       MR. EDWARDS:  Thank you, Andrew.  You can
25  take it down for me.

Page 42

1  BY MR. EDWARDS:
2  Q.  Ms. Poplar, when we took Linda Kossak's deposition
3  last week, she agreed that she was the person that had
4  taken notes of some of the meetings.  And specifically
5  I directed her to Exhibit 16 from Mr. Cloyce
6  Dickerson's deposition.  And I asked her were these
7  her notes, and she said yes.
8       And I have a question, but I want to read
9  to you what her notes reflect that she said she took
10  down at that meeting.
11       It begins, quote:  CR, that's Cheryl Ronk
12  speaking, regarding AB, that's Anthony Branch, not
13  giving an interview.  Ms. Ronk did not hear any
14  enthusiasm or energy, passion, to be managing director
15  by Anthony Branch.  Cloyce stated he did not know why
16  he was not interviewed based on the Board's criterion.
17  Cheryl said it was her decision not to interview.
18       MR. ALEXOPOULOS:  It says based on phone
19  interview.
20       MR. EDWARDS:  Yeah.  Go ahead.
21       MR. ALEXOPOULOS:  If you're going to read
22  it, read what's written there so we can all --
23       MR. EDWARDS:  Alex, please.  Let's keep it
24  civil.
25       MR. ALEXOPOULOS:  Well, you're not

Page 43

1  testifying.
2       MR. EDWARDS:  I have no problem with you
3  interrupting me to correct the record, but let's keep
4  it civil, please.
5       MR. ALEXOPOULOS:  I am.
6       MR. EDWARDS:  No, you're not.
7       MR. ALEXOPOULOS:  Carl.
8       MR. EDWARDS:  No, you're not.
9       MR. ALEXOPOULOS:  You didn't read it.  You
10  read everything else.
11       MR. EDWARDS:  Alex, all you had to do was
12  say that.  I have no problem.  I'm 73.  I told you I'm
13  an old man.  I have no problem being corrected, but
14  there's a way to be courteous; that's all I'm saying
15  to you, Alex.
16       MR. ALEXOPOULOS:  Okay.  And I was
17  courteous but --
18       MR. EDWARDS:  You weren't.  You weren't.
19  You weren't.  I have no problem with you making the
20  record accurate.  But please, let's stay courteous.
21       MR. ALEXOPOULOS:  Let's move forward.
22       MR. EDWARDS:  Thank you.
23  BY MR. EDWARDS:
24  Q.  Were you at the meeting when Cheryl Ronk said what
25  Linda Kossak has recorded here?

Page 44

1  **A.  No.**
2  Q.  Did Anthony Branch ever tell you that Cheryl Ronk told
3  him why she didn't give him an interview?
4  **A.  He did.  And I shared with him that I found that to be**
5  **disturbing in a sense.**
6  Q.  What did he tell you?
7  **A.  That she said he -- that there was those who wanted to**
8  **go -- he said there was the commissioners and others,**
9  **like employees, who wanted to go in another direction.**
10  Q.  Okay.
11  **A.  And my response to him was this:  When a criteria has**
12  **been established, that criteria, whatever that**
13  **criteria may or may not have been, there were things**
14  **in Anthony Branch's resume that qualified him for a**
15  **phone, telephonic screening interview.  So whatever**
16  **qualified him for the phone, telephonic screening**
17  **interview had to fall in line with whatever this**
18  **criteria may or may not have been.  And so I told**
19  **Anthony Branch that what his issue should be is to try**
20  **to find out what was it that qualified him, based on**
21  **the minimum qualifications that got him to the phone,**
22  **telephonic interview.**
23       **And so for you to have just said that**
24  **Cheryl Ronk didn't know why in essence that he was not**
25  **past to the first round of interviews, I find that to**

11  (Pages 41 to 44)

Carroll Court Reporting
586-468-2411

Donna Poplar
September 22, 2020

## Page 45

1  be disturbing in that the question becomes what
2  disqualified him during the course of that phone,
3  telephonic interview that qualified Fred Peivandi and
4  the other candidates to be advanced to the first round
5  but denied Anthony Branch that right when he met
6  what's based on a criteria. Something happened. He
7  was, he was given a telephonic screening interview.
8  And so that was the issue.
9       Anthony wanted to have me look into his
10  concerns, and I began to ask questions. Because I was
11  in total disagreement because I felt that the same
12  mindset that led to the GCRC board members and Cheryl
13  Ronk to eliminate Anthony Branch from being
14  discriminated based on that May 3rd draft job
15  description that was before the GCRC Board on May the
16  15th, I felt that same mindset. That mindset was also
17  carried on all the way through the process.
18       So whatever changes was agreed upon in the
19  May 15th meeting to that job description, the job
20  description did not change the mindset. What happened
21  with the mindset was that they maneuvered in my
22  opinion to keeping out of advancing him through the
23  of interviews by eliminating him through the phone,
24  telephonic screening process.
25       And I did ask Anthony Branch to ask certain

## Page 46

1  questions of which I was going to ask was there a
2  questionnaire scoreboard -- scorecard used in that
3  telephonic process that was approved by the Board that
4  was created by Cheryl Ronk, and was there any notes
5  taken by Cheryl Ronk from that telephonic interview.
6  Those would be some of the things that I was thinking
7  that he should make sure he asked questions on because
8  to me he had a right to see those things.
9       And so I later discover from what I
10  inquired there was no such thing as a questionnaire
11  scorecard and there was no notes taken from that, so
12  you don't have any form of mechanism that was used
13  that he can be evaluated to make sure that there was
14  not a discriminatory process used during the
15  telephonic screening process.
16       And when I reached out to MSAE, they didn't
17  have any records reflecting what was used in that
18  telephonic screening process. And for those of us who
19  are in HR and consider ourselves to be experienced in
20  what we do, those are things that we use. And
21  anything you do to judge whether or not a person's
22  going to be qualified to be interviewed for a position
23  or to be considered for a position, you need to have
24  something tangible by which you make that decision and
25  by which you make that measurement. It's the same

## Page 47

1  thing as when she began to wean out from the number of
2  people who applied, something happened that she got
3  down to the 25 people that later got down to whatever
4  she ended up with that went to the actual rounds of
5  interviews. So something had to be used to do that.
6       So what we do in HR, we first look to see
7  if you meet the minimum qualifications. And if you
8  don't meet the minimum qualifications, then we set
9  those aside. And then for those who meet the minimum
10  qualifications, then we begin to look closely at the
11  criteria, and then we can go -- in our case here, we
12  don't do telephonic screening. We do actual
13  interviews.
14       So again, I told Anthony that he should
15  inquire what tool was used for Cheryl Ronk to
16  disqualify him from the telephonic interview and what
17  tool was used that qualified him for the telephonic
18  interview.
19  Q.  How did you learn that Cheryl Ronk did not have any
20  notes that she had taken concerning her interview of
21  Anthony Branch? Because she testified that the same
22  sheet that I just had up on the screen that
23  Mr. Cascini put on the screen that had Mark Riley's
24  name on it, she used that for every interview
25  including the phone interview with Mr. Branch. So how

## Page 48

1  did you learn that there were no notes concerning her
2  interview with Mr. Branch?
3       MR. ALEXOPOULOS: Objection. Assumes facts
4  not in evidence.
5       MR. CASCINI: I join in that objection.
6  BY MR. EDWARDS:
7  Q.  How did you learn that there were no notes that were
8  taken by Cheryl Ronk concerning her interview with
9  Anthony Branch?
10       MR. ALEXOPOULOS: Same objection. You can
11  answer.
12       THE WITNESS: Oh, I'm sorry. I had
13  communication sometime after in terms of looking into
14  the complaints that Anthony was making with me, I
15  talked with a young lady. I believe it had to be a
16  couple months later after the selection process. I
17  want to say her last name might have been Turner. And
18  I don't want to be held to that, but I think her last
19  name might have been Turner. And it seems like to me
20  she was a young lady who replaced Cheryl Ronk after
21  Cheryl Ronk retired.
22       And I do have e-mails where we requested
23  that information, and Fred Peivandi was a part of that
24  e-mail exchange. And from her response to us, that
25  they didn't have the information, they felt there was

12 (Pages 45 to 48)

Donna Poplar
September 22, 2020

Page 49

1  something that Cheryl Ronk had kept or did on her own.
2  But it was not in any of their files, and Cheryl Ronk
3  had retired.
4  BY MR. EDWARDS:
5  Q. Was this an e-mail that you sent, a telephonic
6  conversation?  How did it occur?
7  A. It was e-mail, an e-mail exchange.
8  Q. So you have an e-mail exchange chain --
9  A. That is correct.
10  Q. -- concerning the request for the notes that Cheryl
11  Ronk took when she interviewed Anthony Branch and what
12  the response was from the young lady at MSAE?
13  A. That is correct.
14  Q. Do you have any idea -- I imagine you don't know the
15  exact date, but the approximate date that this e-mail
16  exchange occurred?
17  A. It would certainly have been after Mr. Peivandi was
18  named director, and it would have been -- it certainly
19  would have had to have been after Cheryl Ronk retired,
20  so whatever that was.  Because I remember the young
21  lady saying that Cheryl had retired.
22  Q. Okay.  Did you have concerns based on how you saw
23  Shirley Kautman-Jones treating Anthony Branch, whether
24  or not he was going to get a fair shake or fair
25  opportunity to apply for this or be considered for

Page 50

1  this managing director position?
2  A. I did.
3  Q. Why?
4  A. From the offset of Cheryl Ronk being appointed by the
5  Genesee County Road Commissioners to the GCRC Board,
6  she did several things that I felt rise to the level
7  of a person with a discriminatory mindset.
8  One, there was a storm that took place
9  probably in December of 2017 or sometime in January of
10  2018, shortly before Shirley Kautman-Jones was
11  appointed to the Board.  And there was some complaints
12  that was lodged by two of the Genesee County Board of
13  Commissioners, one -- well, one for sure I should say
14  was Mark Young, Commissioner Mark Young, who stated
15  that he had a few residents that had lodged some
16  complaints about how they felt the storm, as far as
17  Anthony Branch's maintenance department in terms of
18  their services was handled.  Then I noticed that
19  Shirley Kautman-Jones had a few complaints about a
20  couple people who raised some issues about the service
21  during that particular point in time.
22  And what disturbed me was right before she
23  come on board, we had already began to, me and John
24  Daly, engage in conversations about how to better
25  handle some of the complaints that we were receiving

Page 51

1  here at the GCRC Board.
2  So in a board meeting, Mandelaris -- and
3  this would be shortly before Shirley come on board,
4  recommended that we bring on board a person who could
5  oversee, have the responsibility of overseeing our
6  complaints from the community.  And from that John
7  Daly put together a plan that he would like to move
8  forward with, and the Board approved that plan.  And
9  one of those plans was to hire a customer service
10  complaint representative on behalf of GCRC to run
11  on that responsibility.  And before Shirley Kautman-Jones
12  attended the very first meeting, she sent an e-mail to
13  John Daly demanding that we put that position on hold.
14  What I found that was disturbing for me:
15  The position had been posted, we had went through the
16  process that we normally go through, and we did the
17  interview, and we had selected a candidate.  And I was
18  asked after Shirley Kautman-Jones began to raise
19  concerns about not wanting us to move forward, what
20  race was that person that we had selected.  And I
21  shared with Mr. Daly that he was an African American.
22  And from that point, John Daly was instructed to put
23  that position on hold.
24  Shirley Kautman-Jones began to hold
25  workshops with township supervisors, some of our

Page 52

1  staff, and she invited some of the commissioners who
2  did not attend the workshops to talk about some of the
3  concerns with complaints.
4  And I had to write a letter to the
5  gentleman who was selected rescinding our job offer
6  after he had accepted the job offer, had been given a
7  date and time and salary by which he would be earning
8  and benefits here at the Road Commission.  And that
9  individual had turned in his letter of resignation and
10  ready to work for us.
11  When I begin to push back and challenge her
12  on that position, and I did it via e-mail, I can tell
13  that she was quite irate with me.  And I believe that
14  began what I considered to be a downfall in the
15  relationship between Shirley Kautman-Jones.  Because
16  what I really seen in that, she didn't care about
17  these African Americans' livelihood.  All she cared
18  about was what she wanted.
19  And to this day, we have yet to hire a
20  customer service complaint representative for that
21  position.  And we've heard no more about the
22  complaints.
23  So there was an e-mail that I received
24  from -- I want to say that e-mail came via John Daly
25  to my attention because he was concerned about the

13  (Pages 49 to 52)

Donna Poplar
September 22, 2020

Page 53

1 contents in this e-mail. And the e-mail was from
2 Shirley Kautman-Jones that sort of like said that
3 there was people in the public who wanted Anthony
4 Branch's head on a platter next to him, and that she
5 personally felt that Anthony Branch was a failure on
6 all sides, referred to the maintenance director was a
7 failure on all sides. And he was extremely concerned
8 about that type of language being shared, especially
9 by a person who was just newly appointed to the Board,
10 very newly appointed in January.
11 Q. I don't want to interrupt you, but you said he. Who
12 are you referring to?
13 A. Mr. Daly.
14 Q. Okay.
15 A. So I looked at that e-mail. And I believe that e-mail
16 was shared with other individuals, and it was also
17 shared with certain members of that Board.
18       And from that there was a meeting, a board
19 meeting whereby many community activists showed at
20 this meeting and protest, one, the Board wanting to
21 terminate John Daly; and the other was concerns about
22 Anthony Branch's head being put on a silver platter.
23       So two weeks later, I believe it was, that
24 Shirley Kautman-Jones extended an apology. And I felt
25 very disappointed in Shirley Kautman-Jones. One, she

Page 54

1 was a Chairman of the Board. To share such an e-mail
2 from an anonymous person without names led me to
3 believe that she subscribed to that type of language.
4 And through the African American community, we see
5 that language as language that's used by white
6 supremacists, hate groups, and individuals who take
7 pleasure in discriminating against African American
8 people.
9       And so I told John Daly what I was more
10 concerned with -- I was concerned with that, but I was
11 also concerned that Shirley Kautman-Jones did not seem
12 to be concerned about Anthony Branch's safety or John
13 Daly's safety. Because when people use that kind of
14 language, oftentimes that can become very violent.
15 And those kind of people can have a mindset of taking
16 a person's life because they could hate individuals so
17 badly because of the color of their skin.
18       I also felt that that was a message being
19 sent to John Daly for people who resented the fact
20 that he was in a position and he was helping African
21 Americans get into key positions here at the Road
22 Commission, especially a Road Commission where it's
23 pretty much all white until John
24 Daly became managing director and began to open doors
25 of opportunity for people of color. And so those are

Page 55

1 the things that concerned me. Then when I looked at
2 her --
3 Q. Before you go on with your thought, because I want to
4 stay on this frame that you're discussing.
5       If John Daly and Anthony Branch both are
6 included by this anonymous person that their heads
7 should be on a platter, how do you interpret race from
8 that, that this was something racial against Anthony
9 Branch?
10 A. Because in my studies and in my involvement in the
11 things that I'm involved in, civil rights activities
12 and what have you, people who send that type of
13 deplorable messages, they send it to white people out
14 of resentment that white folks are courting black
15 people and helping them. And so I didn't see the
16 language used against John Daly because he was a white
17 man. I seen that language attacking John Daly because
18 he was a white man helping a black man.
19 Q. I see. I see. He was a nigger lover.
20 A. Yes, yes. And so throughout our history, we know that
21 those who are labeled as that, that the consequences
22 to that sometimes can be lynching. And white people
23 are prohibited from that.
24       So I found that to be very disturbing, but
25 most importantly I found it to be more disturbing that

Page 56

1 Shirley Kautman-Jones never denounced the conscience
2 of the message that she felt necessary to send to John
3 Daly. She made it personal to go on and say she
4 personally felt that Anthony Branch was a failure on
5 all sides. So she made it personal.
6       And in her apology she never denounced that
7 type of language and said that she didn't subscribe to
8 that kind of language. She only apologized for the
9 way in which she presented the language. She did not
10 apologize for the contents of that language.
11       And I was concerned because it took her two
12 weeks to extend an apology to Anthony Branch, and it
13 could have been done in the same day that she gave
14 that e-mail to John Daly.
15       The other thing that I felt that Shirley
16 Kautman-Jones had some racial issues is because the
17 person she targeted was Anthony Branch. She not once
18 targeted anyone else other than that of Anthony
19 Branch. That was the snow storm that was the worst
20 storm in our history. And there is over 400,000
21 residents that make up Genesee County. And for them
22 to have been in the worst storm in our history, not
23 one resident came to a board meeting during that time
24 and to this day forward complaining about the way in
25 which they received services during that horrific snow

Carroll Court Reporting
586-468-2411

Donna Poplar
September 22, 2020

---

Page 57

1  storm, not one.
2          And for her to attack Anthony in the way
3  she attacked him, I felt that he was singled out. And
4  the other thing I felt was very important in that:
5  She sent a list requesting -- Anthony gave that
6  information to me -- requesting a laundry list of
7  things she wanted from Anthony, even questioning has
8  he ever been trained and what type of training have
9  you had. And I thought that was pretty interesting
10  because you're talking about a man that's been your
11  director of maintenance for 15 years, been an employee
12  for 30 years, working in the same capacity and dealing
13  with these roads, and you question whether he's ever
14  been trained. I found that interesting. The same man
15  that was later made the co-interim director of this
16  operation, the same man that in his job description
17  was the managing -- acted in the absence of the
18  managing director. So I found those things to be
19  interesting. But her attack was very, very personal.
20  She so said so in her e-mail when she said personally.
21          And the other thing that I find
22  interesting: She never took the time to meet with
23  Anthony Branch or John Daly as to what happened during
24  that time period. She didn't request any information
25  concerning Fred Peivandi or what role his department

---

Page 58

1  might play as it relates to the roads, the bridges, et
2  cetera. She never questioned Randy Dellaposta, who
3  was our fleet and equipment coordinator -- I mean
4  director. Never questioned any of that. It was all
5  focused on Anthony Branch.
6          And so it was my belief, and I shared this,
7  that with the negative feelings that she personally
8  had against Anthony Branch, I never felt that Anthony
9  Branch would get a fair shot from Shirley
10  Kautman-Jones. It wasn't going to happen. And it
11  seemed like to me she was on a mission. And that
12  mission, he was singled out, no doubt, and unfairly
13  and I believe strongly it was based on his race.
14  Q.  One of the things that the law requires, as I'm sure
15      you know being an HR director, in a case like this is
16      that the person who is claiming that they were
17      racially or otherwise discriminated against in
18      violation of the civil rights law be subjected to
19      different treatment.
20          In your opinion was Anthony Branch
21      subjected to different treatment as compared to his
22      co-interim managing director Fred Peivandi with
23      respect to being able to compete for the managing
24      director's position that John Daly vacated?
25          MR. ALEXOPOULOS:  Objection. Calls for a

---

Page 59

1  legal conclusion.
2          MR. CASCINI:  Same objection. I join.
3  BY MR. EDWARDS:
4  Q.  You may answer.
5  A.  Based on my experience as an HR director and my
6      understanding of differential treatment in the
7      workplace, Anthony Branch was indeed treated different
8      from that of Fred Peivandi.
9  Q.  How so?
10  A.  In many ways. One, he was not respected. There was
11      meetings that was being held and conducted that he
12      should have been in that was relative to his
13      department that he was not privy to.
14          There was information that was withheld
15      from Anthony Branch that he should have had. If
16      Anthony Branch said that -- described the situation or
17      gave opinions about what he thinks should happen in
18      his own department, then they would turn to Fred
19      Peivandi about how Fred Peivandi felt about it. And
20      Fred Peivandi never ran or operated the department of
21      maintenance.
22          So the level of respect, the level of
23      respect was totally different. And it was clear that
24      Anthony Branch was perceived differently from that of
25      Fred Peivandi. And I believe it was clear that there

---

Page 60

1  had probably been some previous established
2  relationship that Fred had with Shirley Kautman-Jones
3  according to Fred Peivandi, and there was some
4  previous relationship that was built between Fred
5  Peivandi and Dave Arceo for sure. And so that along
6  with the fact that Fred Peivandi, it seemed like he
7  took on the role of being the top guy in charge.
8  Q.  You gave examples earlier of the different treatment
9      from the moment they were both made co-interim acting
10      managing directors, Fred Peivandi and Anthony Branch,
11      that the treatment of Anthony Branch was different.
12      Would you repeat that, please.
13  A.  Sure. The very first day again when Anthony Branch
14      and Fred Peivandi became co-interim director, Fred
15      Peivandi immediately took on that leadership role as
16      being the managing director when he parked from where
17      he normally parks to parking in the managing
18      director's designated parking spot.
19          Fred Peivandi was put on -- at every
20      committee that John Daly served on, Fred Peivandi took
21      lead in what the meeting agendas would be. Fred
22      Peivandi was the go-to person relative to the media
23      and other outside sources. And Fred Peivandi took
24      more of a role of being the ultimate decision-maker
25      and not that of Anthony Branch. And so those are some

15 (Pages 57 to 60)

Donna Poplar
September 22, 2020

Page 61

1   of the things that really stood out like a sore thumb.
2   Q.   And was Anthony Branch qualified since he had
3        performed the job and served in a role during John
4        Daly's absence to serve (technical interruption) in
5        all of the capacities that he was left out that Fred
6        Peivandi was allowed to serve in when they were both
7        co-interim managing directors?
8   A.   I need you to repeat that. Because when you were
9        talking, there was a pause there. So I couldn't hear
10       your complete question.
11  Q.   Sure. Was Anthony Branch qualified to serve in all
12       those capacities that Fred Peivandi was assigned to
13       once John Daly left the Road Commission since
14       Mr. Branch had served as acting managing director in
15       John Daly's absence?
16  A.   Sure. And that's a yes.
17  Q.   Regarding Shirley Kautman-Jones, has it ever come to
18       your attention from any source that she wanted Anthony
19       Branch fired?
20  A.   Yes.
21  Q.   Who told you?
22  A.   Fred Peivandi.
23  Q.   Can you tell us the circumstances that he told you?
24  A.   Fred Peivandi, I was in his office, and he made this
25       comment numerous times. There was some heated

Page 62

1   exchanges going on between Fred Peivandi and Anthony
2   Branch that would take place periodically. And in a
3   meeting that I was in his office with, he told me that
4   Dave Arceo and Ted Henry and Shirley Kautman-Jones
5   wanted both me and Anthony fired. And he made that
6   comment on several different occasions. And I did
7   share that information with members of the Board, and
8   I also shared that information with our legal team.
9   Q.   The time frame?
10  A.   From the time which Fred became the managing director,
11       it would have been -- I believe Fred became that
12       sometime in July. I would say sometime in 2000 -- the
13       latter part of 2018, several times in 2019.
14  Q.   Okay. Why don't we take a ten-minute break.
15            (Off the record at 11:42 a.m.)
16            (Back on the record at 12:02 p.m.)
17  BY MR. EDWARDS:
18  Q.   I want to go to the time period when Mr. Anthony
19       Branch informed you that he had been denied an
20       interview for the managing director position. What
21       did you do with that information?
22  A.   Well, I wanted to get more information from Anthony
23       directly, and then I began to have some dialogue with
24       some of the commissioners, and that would be the GCRC
25       Board of Commissioners. And I recall talking with

Page 63

1   John Mandelaris, Bob Johnson, and Mr. Dickerson.
2   Q.   Can you break them down separately beginning with the
3        last one, Dickerson? And as best you can recall, tell
4        us your discussions with him, what they consisted of.
5   A.   Well, I told him that Anthony Branch felt that he was
6        discriminated against in the search process and that
7        he felt that there was a conspiracy to prevent him
8        from being able to come before the full board to be
9        interviewed.
10            In my conversations with them, I shared
11       what I felt that I thought was being conspired from
12       the offset of the search. And in talking with
13       Mr. Johnson, I recall him very clearly telling me that
14       he was not aware that Anthony Branch wasn't going to
15       be interviewed.
16  Q.   Okay. I want to take them one at a time,
17       Mr. Dickerson, Mr. Johnson, Mr. Mandelaris.
18  A.   Okay.
19  Q.   So as best you can recall, let's stick with
20       Mr. Dickerson. What did your conversations consist of
21       concerning the fact that -- after Anthony Branch came
22       to you and complained that he had not been
23       interviewed?
24  A.   He shared with me -- no. I shared with him exactly
25       what I began to tell you about Anthony's concerns

Page 64

1   about not being interviewed, how he felt that he was
2   discriminated against. He felt that the decision to
3   not interview him was made prior to the search.
4        He felt that Fred Peivandi had already been
5   singled out to be the next managing director for GCRC.
6   And in that conversation with Mr. Dickerson, he began
7   to explain to me what actions took place with some of
8   the interviews and how he raised an issue as to why
9   Fred Peivandi advised Anthony Branch was not being
10  interviewed. And he also shared with me how he felt
11  that some of the other candidates did not even rise to
12  a level that he thought Anthony Branch did.
13       And I told him that, one, we need to get
14  involved because I believe that the only alternative
15  that Anthony Branch would have in this particular
16  situation is he's going to file an EEOC complaint.
17  And Mr. Dickerson was concerned about that, and so he
18  said he was going to talk to other commissioners to
19  see what their position was, how much did they know
20  that he felt that -- he felt uncomfortable, some of
21  the things that took place in the interview.
22       And I told him that Anthony Branch is not a
23  person, to my understanding and certainly under my
24  tenure, as a person who do a lot of complaining. I
25  felt that what he was feeling was just, and he sort of

Donna Poplar
September 22, 2020

Page 65

1　like confirmed some of the things that I felt in the
2　initial stages of the search.
3　　　　I pretty much shared -- and then
4　Mr. Dickerson began to share with me somewhat about
5　the history of this organization and how it's been
6　very difficult, you know, down the years in terms of
7　how African Americans are being treated.  And so he
8　began to express his concerns about that.  And as the
9　HR director, my job is, one, is to safeguard the
10　rights of our employees and to do what I need to do to
11　try to safeguard GCRC from being subjected to
12　lawsuits.
13　　　　And in that conversation, we also began to
14　talk about some of the other concerns that I had as it
15　related to not just Anthony Branch but some of the
16　other complaints that was coming in when Fred Peivandi
17　was director of engineering and some of the concerns
18　about his biases.  And if Anthony Branch was
19　determined not to have passion, I shared with
20　Mr. Dickerson then how could Fred Peivandi be
21　considered when he stated on numerous occasions that
22　he only applied for the job because he didn't want
23　someone who wasn't qualified to have that position.
24　　　　And so Mr. Dickerson stated his concerns
25　about that, and he said that he was a little

Page 66

1　frustrated and fed up with the complaints that he
2　known to have been hearing are complaints lodged
3　against people that look like him, and what he was
4　referencing to was African American people.  And so I
5　told him that based on my conversations with Anthony
6　Branch, that Anthony wasn't going to let this go.
7　Q.　You're African American, by the way.  We didn't put
8　　　that on the record.  Aren't you?
9　A.　That is correct.
10　Q.　Robert Johnson, can you tell us what you said to him
11　　　after you learned from Anthony Branch that he had not
12　　　been allowed to interview for the managing director's
13　　　position?
14　A.　I said basically the same that I said to
15　　　Mr. Dickerson.  And on a couple occasions,
16　　　Mr. Dickerson and Bob Johnson was in my office when we
17　　　had some of these discussions concerning Anthony
18　　　Branch.
19　　　　And one of the things, again, that
20　　　Mr. Johnson shared with me was that he was not aware
21　　　that Anthony Branch was not going to be interviewed.
22　　　And he was not, he was not -- it was not his intent to
23　　　not support or stop Anthony from being interviewed.
24　　　So he, in that particular discussion, began to express
25　　　his concerns.  And he began to talk about -- and

Page 67

1　that's one of the reasons that he shared right here in
2　my office with Anthony Branch present and
3　Mr. Dickerson talk about Anthony's issue that Arceo
4　was a racist.  And so he shared that with me in that
5　particular meeting and --
6　Q.　That's Commissioner Arceo?
7　A.　No, that was Commissioner Johnson who stated in my
8　　　office in the presence with Anthony Branch and
9　　　Commissioner Dickerson that Arceo was a racist.
10　Q.　Yeah.  Commissioner Arceo.
11　A.　That is correct.
12　Q.　Okay.
13　A.　And Mandelaris and I had numerous conversations to the
14　　　point where I recall -- and it was basically the same
15　　　thing that I had been sharing with the other two
16　　　commissioners.  I also shared the same conversation
17　　　with Mandelaris.  And he led me to believe that he did
18　　　not know Anthony Branch wasn't going to be
19　　　interviewed, and it was his belief that he thought
20　　　Anthony Branch was not interested in the position when
21　　　he didn't see his name on the list, is what he shared
22　　　with me.
23　　　　And so in some of the exchanges, and I
24　　　can't give you the time frame but certainly it was
25　　　through e-mail exchanges that I expressed some of my

Page 68

1　concerns with John Mandelaris.  And one of the things
2　he said to me and some of the questions that was asked
3　of him by Genesee County Board of Commissioners, in
4　one of the responses he said that as he moved forward,
5　he's going to not entertain some of the questions
6　that -- or concerns that the Genesee County Board of
7　Commissioners has about Anthony, what's going on, and
8　that he felt that Anthony Branch and I were doing a
9　great job.
10　Q.　Okay.  And so did you learn that the Genesee County
11　　　Road Commission Commissioners had an opportunity
12　　　before they approved Fred Peivandi as the new managing
13　　　director to revisit the entire process?
14　　　　We have notes that there was a discussion
15　　　on the day that they approved Fred Peivandi.  They
16　　　knew Anthony Branch hadn't been interviewed.  Cloyce
17　　　Dickerson references Anthony Branch's name to be
18　　　managing director, and yet they don't do anything.
19　　　They know he didn't get interviewed.  They know Fred
20　　　Peivandi is the person who is -- now he's been asking
21　　　for more money, yet they do nothing to reverse the
22　　　process.
23　　　　Did you ever have any discussions with them
24　　　why once they learned that Anthony Branch hadn't been
25　　　interviewed, that they didn't revisit it and just

17  (Pages 65 to 68)

Donna Poplar
September 22, 2020

## Page 69

1  scrap the whole process and start all over or take
2  some other action so Anthony Branch wouldn't be
3  excluded from being interviewed for the position or
4  applying for the position?
5  **A.  Well, when Commissioner Cloyce Dickerson shared what**
6  **he shared with me, and it was again here in my office**
7  **and I believe Johnson was still present at the time,**
8  **one of the things I told Mr. Dickerson:  When you**
9  **became aware, both of you — I remember the**
10 **conversation now -- became aware that Anthony Branch**
11 **was not going to be interviewed, why didn't you stop**
12 **the process.**
13 Q.  What did they say?
14 A.  Cloyce Dickerson said that he felt that he didn't have
15 the support; that he was only one vote.
16         And I said at the time in which you did not
17 stop that process, and the intent of the — the
18 purpose for the May 15th meeting was to ensure that
19 Anthony Branch would get an interview, and you did not
20 stop the process or you didn't put that to the floor
21 to stop that process.  I felt that all of you, all
22 five of you were guilty of discriminating against
23 Anthony Branch and that the discrimination was
24 predicated on his race.
25         And so I told Cloyce Dickerson, and I don't

## Page 70

1  think he had that much of an appreciation for it, that
2  he was just as guilty, him and Johnson and Mandelaris,
3  as Shirley Kautman-Jones and Dave Arceo.
4  Q.  All right.  I want to move to another subject, Mark
5  Riley.  Are you familiar with that name?
6  A.  I am.
7  Q.  And how are you familiar with Mark Riley?
8  A.  Shortly after Fred Peivandi became managing director,
9  he gave me Mark Riley's resume to look at.  And he
10 wanted me to hire Mark Riley.
11 Q.  This is after the search and the decision was made for
12 the managing director to replace John Daly and Fred
13 Peivandi had been selected?
14 A.  That is correct.
15 Q.  So before that time, did you know that Mark Riley had
16 been a candidate that Cheryl Ronk had passed on to be
17 interviewed by the Genesee County Board of
18 Commissioners for the managing director position?
19 A.  I didn't become aware of that until after Fred
20 Peivandi became managing director when he called me
21 into his office to give me Mark Riley's resume that he
22 had received from Cheryl Ronk, and I think he said she
23 also gave him some notes that she had taken from some
24 of Mark Riley's references.
25 Q.  Why didn't that go through you or your office as HR or

## Page 71

1  human resources director?
2  A.  You would have to ask Cheryl Ronk that question.
3  Q.  What happened next after he called you into his office
4  and gave you Mark Riley's resume?
5  A.  Well, he wanted me to hire Mark Riley as the
6  operations manager.  I told him that that position
7  would have to be posted, and we would have to allow
8  candidates, internal and external candidates, to apply
9  for the position.
10 Q.  Had there been the position of operations manager
11 during the period of time that John Daly was managing
12 director?
13 A.  No.
14 Q.  So this was a new position?
15 A.  That is correct.
16 Q.  Did you ask Fred Peivandi why he wanted to create a
17 new position of operations manager?
18 A.  Well, he said that the — the commissioners he
19 referenced, Shirley Kautman-Jones and John Mandelaris,
20 felt that he needed help.
21 Q.  What do you mean by that?
22 A.  He needed someone to come in and assist him to help
23 him to run his operations.
24 Q.  John Daly did not require anyone to help him run it,
25 did he?

## Page 72

1  A.  No.
2  Q.  And the job description was very clear on what the
3  duties were of the managing director, were they not?
4  A.  That is correct.  And one of the things that took
5  place is that I did inform the commissioners about
6  Fred's request to bring on Mark Riley and that we had
7  to go through the proper process is what we should
8  follow.  And then there was much controversy amongst
9  the commissioners of Cloyce Dickerson and Bob Johnson
10 was not in a support of that position because they
11 didn't feel that they should pay another person to
12 come in and help do what Fred Peivandi couldn't do.
13         And I recall both Johnson and Dickerson
14 making comments about the amount of money that they
15 agreed to pay -- that Fred Peivandi was getting paid,
16 and he should be able to do that position without
17 having an operations manager or a deputy, if you will.
18 And that Fred Peivandi had just gotten hired as a
19 managing director.  And within a matter of days, he
20 was asking for, you know, an assistant.
21         So that fight took place for a while, for a
22 long time, a few months.  And then at some point the
23 decision was made to post the position and to go
24 through the screening process and the selection
25 process for an operations manager position.

18  (Pages 69 to 72)

Donna Poplar
September 22, 2020

Page 73

1  Q.  Prior to Fred Peivandi being selected by the Genesee
2      County Road Commission Board as the new managing
3      director to replace John Daly, had you formed a
4      conclusion who would have been the best person to
5      replace John Daly between Anthony Branch and Fred
6      Peivandi?
7  A.  I did.
8  Q.  And what was your opinion?
9  A.  I felt that Anthony Branch should have been the
10     managing director.
11  Q.  Why?
12  A.  One, because Fred Peivandi had some serious issues
13     with racial biases, and he also had some serious
14     issues with gender biases.  And there have been
15     several complaints lodged against Fred in his capacity
16     as the director of engineering that we actually
17     conducted investigations in concerning Fred Peivandi
18     and complaints that was made against him by females
19     within his operation.
20        I felt that Fred Peivandi, although he
21     appeared to be a, well, a good fit for the director of
22     engineer position, because of his inability to
23     communicate effectively with people of different
24     culture backgrounds, of different races, and that was
25     going to create a problem.  He was not an effective

Page 74

1     communicator by far, and he certainly did not come
2     across as a person who exhibits the type of leadership
3     needed to lead this organization.
4        And also that they -- by the numerous times
5     that we would sit in board meetings and Fred Peivandi
6     and John Daly would really have some serious verbal
7     fights within our staff meetings that certainly led me
8     to believe that Fred did not have respect for Mr. Daly
9     and that was posing a problem.  So I just felt that
10     Anthony Branch displayed that, one, he had been doing
11     it for 15 years.
12  Q.  Doing what for 15 years?
13  A.  15 years serving in the absence of the managing
14     director.  And Anthony Branch had a good record of
15     being able to communicate effectively with people.
16        And also I was highly impressed with his
17     abilities to work with our unions of which Fred
18     Peivandi had never had any union experience.  And I
19     felt that Anthony Branch had already given an
20     undeniable performance to the GCRC, and he came up in
21     the ranks starting from what we considered to be
22     equipment operator and made his way up to the director
23     and also serving again in the absence of the managing
24     director.
25        And I felt that his dedication to the road

Page 75

1     commissioners was unquestionable.  And most
2     importantly, I felt it was -- very impressed upon
3     Anthony Branch was even when John Daly was even
4     present, Anthony Branch was the go-to person in terms
5     of communicating with the media of all different media
6     sources, where Fred Peivandi to this day has
7     difficulty with his communications.
8        So I just felt that Anthony Branch would be
9     a better fit for the climate that we have here in
10     GCRC, and I felt that he would embrace diversity
11     differences that exist throughout GCRC and be a good
12     person to help move us forward in attacking some of
13     the issues that we are faced with as relates to
14     systemic racism.  And Fred Peivandi didn't appear to
15     have that level of compassion as related to people who
16     were different from himself.
17  Q.  Systemic racism is a term that we hear a lot today,
18     and I hear it all the time in the media, that this is
19     one of the issues confronting our country, America, a
20     country that we love.  We want to see better.
21        What is your definition of systemic racism
22     if you have one?
23  A.  Systemic racism for me -- and people have different
24     interpretations of it.  My interpretation of systemic
25     racism is a form of discrimination of practices that

Page 76

1     have been allowed, in this case, by this institution
2     here.  And so people of color have been allowed to be
3     treated differently, and it's been acceptable.
4     They've been allowed to be overlooked for promotional
5     opportunities, and it's been acceptable.  And all of
6     that has been based simply on individuals'
7     discriminatory beliefs and mindsets about people who
8     don't look like them, especially among African
9     Americans.
10        And that holds true within this
11     organization that I care to speak of because this is
12     the organization by which I've been given the charge
13     to try to undo some of what I consider to be system
14     racism and some of the things that led to that and the
15     fact that we have an 80/20 racial here and --
16  Q.  80/20 racial.  What do you mean by that?
17  A.  80 percent of our population is white.  20 percent of
18     our population is black.
19        And there have been this what I consider to
20     be unspoken language that African Americans should not
21     be working here at this Road Commission, and I've
22     experienced those things, and that African Americans
23     should not be promoted.  And when African Americans
24     are promoted, then there's a hidden agenda.
25        I just want to make sure to clarify this.

19 (Pages 73 to 76)

Donna Poplar
September 22, 2020

Page 77

1   We happen to be, Genesee County and the Genesee
2   County, the Township by which we serve, especially in
3   more of our rural areas, are predominantly all white.
4   So here as a part of people being led to believe
5   through the institutional practices that they're
6   entitled or indeed privileged, has created some
7   serious significant problems within this organization
8   that John Daly was trying to resolve and move GCRC in
9   a different direction as it relates to its diversity
10  and inclusion here within GCRC.
11          That's how I see systemic racism. And
12  again, other people have different interpretations
13  about how they see it because it's an acceptable
14  behavior.
15  Q. 50 years ago I started my career in HR.
16  A. Uh-hmm.
17  Q. And ultimately was HR director of the largest
18  automobile insurance company in the State of Michigan
19  at age 24. And one of the things that I was tasked
20  with was desegregating the company from the entire
21  workforce from top to bottom.
22  A. Sure.
23  Q. And one of the experiences that led me to go to law
24  school, in fact, was the fact that oftentimes whites
25  who were in positions of authority would discriminate

Page 78

1   against African Americans but not be racist and not
2   consider themselves racist.
3          Have you experience a similar phenomenon?
4   This is 50 years later.
5   A. It still exists. And I think what's happening in that
6   area is this: You have what is called implicit biases
7   and explicit biases. I don't need to explain that to
8   you based on your experience. And then you have what
9   is called unconscious biases and conscious bias.
10          What I've seen within this
11  organization, especially now since Mr. Daly is no
12  longer here, I see deliberate explicit biases. I see
13  deliberate discrimination. That is a challenge for me
14  here, especially with certain members of this
15  particular -- of the GCRC board. And so my challenge
16  is great because no one wants to engage in dialogue
17  that talks about racism and how we treat individuals
18  different.
19          So when I came on board, I contracted with
20  the Civil Rights Commission to come in and provide
21  that diversity training. What I found interesting, if
22  I may, that would have been the first -- when Shirley
23  Kautman-Jones came on board, I was preparing for the
24  diversity training. She did not want me to do the
25  diversity training.

Page 79

1   Q. She did not?
2   A. No.
3   Q. Did she say why?
4   A. Because she wanted me to contract with a company, I
5   think the name is Rig Training (ph) or something like
6   that. They train in customer service. And she felt
7   that that was more important than that of diversity
8   training.
9          And so I had communications with Rig
10  Training under her instructions and found it
11  interesting that Rig Training was more into the food
12  industry type kind of training versus what we do here
13  at the Road Commission.
14          So then I was informed that we have to do
15  diversity training here because of the class action
16  lawsuit that took place because of -- that was filed
17  by African American employees because of the way they
18  were being treated, and they were being denied proper
19  training, and they were being denied training that
20  would enable them to be considered for supervisory
21  positions if you will.
22  Q. This was a class action lawsuit filed against Genesee
23  County Road Commission?
24  A. That is correct.
25  Q. All right.

Page 80

1   A. And so as a result of that, we were to put in place a
2   diversity training program. That program is supposed
3   to be offered on a yearly basis to the Road
4   Commission.
5          So I explained that to her. And that was
6   another thing that made her very furious with me
7   because she thought I was again not trying to carry
8   out any instructions that she gave, but I don't report
9   to Shirley Kautman-Jones.
10          And so we did have that diversity training.
11  She did come to that particular diversity training,
12  but she didn't come to the other diversity training
13  the year after.
14          So one of the things I find interesting
15  from some of the board members here, they would come
16  but wouldn't stick through the entire diversity
17  training. And so that led me to believe that some of
18  them was very uncomfortable with some of the topics
19  that was going to be discussed. Because when you've
20  not been subjected to racial discrimination, you are
21  very uncomfortable when you're in an environment where
22  those topics are being discussed.
23          Individuals think that when we're talking
24  about diversity, that we're highlighting or putting a
25  spotlight on people who may be racist. And so that is

20  (Pages 77 to 80)

Donna Poplar
September 22, 2020

Page 81

1  still a challenge that we have today here within the
2  organization.
3        So now, this week starting, I think it's
4  Wednesday and Thursday this week, we will be doing
5  systemic training.  We have a company coming by the
6  name of ERACCE that's going to come in and begin to
7  train us on systemic racism.  That's how serious I
8  think it is right now across not just the country but
9  across the world and the results of what happens when
10  you don't focus in on things such as diversity,
11  equality, and inclusion along with systemic racism.
12        And so again, I've taken on that challenge.
13  But there is people here who are very reluctant to
14  even wanting to deal with issues such as diversity and
15  don't want to participate.  So I have to make that
16  training mandatory in order to get them to
17  participate.  But for my leadership, it's the first
18  time that the diversity training has been made
19  mandatory.
20  Q.  All right.  Going back to your meeting with Fred
21  Peivandi, and he gave you Mark Riley's resume.  Can we
22  go back to that discussion?
23  A.  Sure.
24  Q.  What did he say?  What did Fred say to you after he
25  gave you Mark Riley's resume?

Page 82

1  A.  He gave me his resume and said he wanted to hire this
2  guy.  He said I want to hire this guy and want to hire
3  him as the operations manager.
4  Q.  And what happened next, if anything?
5  A.  That's when -- to go back to what I previously said,
6  that's when the Board started making some issue.
7  Cloyce Dickerson and Commissioner Bob Johnson, they
8  wasn't going to support that position.  And so it
9  became a controversy for months and months.  And then
10  at some point it was agreed upon that we would move
11  forward in hiring an operations manager.
12  Q.  And what happened with Mark Riley?
13  A.  Well, in that meeting I recall Cloyce Dickerson said
14  if you wanted Mark Riley, you had a chance to hire him
15  as the managing director and you didn't.  So that was
16  an exchange that was going back and forth with him and
17  his colleagues, which would be the main board members.
18        After that we set the interviews up, and we
19  established a panel of which Fred Peivandi was on that
20  panel and Anthony Branch was on the panel, Rachel
21  Mullin was on that panel and Eric Johnston, the
22  director of engineering, was on that panel.
23  Q.  So Eric Johnston had subsequently been hired to fill
24  the position that Fred Peivandi had vacated, director
25  of engineering?

Page 83

1  A.  That is correct.
2  Q.  All right.  And so what happened in the interview with
3  Mark Riley?
4  A.  Well, in the interview with Mark Riley, how we set it
5  up, each panelist is given a question that they were
6  asked.  And every candidate is asked the same
7  questions.  The only time the candidate is not asked
8  the same question is if we are addressing something
9  that may be on their resume.  Other than that, the
10  questions are the same.
11        When it was my turn to ask questions of
12  Mark Riley, one of the things that I raised concern
13  about with him was to -- I wanted him to walk me
14  through his resume and be able to show me the
15  positions that he held that was administrative
16  positions or high level positions as he reflected in
17  his summary of his resume.  And so when we walked
18  through each position, he admitted that those
19  positions were not positions of any high management
20  positions.
21  Q.  Hold your thought right there.
22        MR. EDWARDS:  Maureen, I've marked Exhibit
23  1.  Would you put it on the screen?
24        MARKED FOR IDENTIFICATION:
25        DEPOSITION EXHIBIT 1

Page 84

1        (Letter)
2  BY MR. EDWARDS:
3  Q.  Ms. Poplar, we have marked a letter that Mark Riley
4  sent to Cheryl Ronk applying for the position as
5  managing director because he outlines some of his
6  accomplishments.
7        MR. ALEXOPOULOS:  Carl, can I stop you
8  right there?
9        MR. EDWARDS:  Sure.
10        MR. ALEXOPOULOS:  The first line, it says
11  it's for the position of operations manager.
12        MR. EDWARDS:  I'm sorry.
13        MR. ALEXOPOULOS:  It doesn't say managing
14  director.
15        MR. EDWARDS:  I'm sorry.  I'm behind
16  myself.  Thank you.  And as I said, I need all the
17  help I can get, Alex, so thank you.
18        MR. ALEXOPOULOS:  We all do, Carl.
19  BY MR. EDWARDS:
20  Q.  So let me retract that, Ms. Poplar, and thank Alex for
21  his correction for this old man.
22        But this here is the letter for operations,
23  not managing director.  I'm a little ahead of myself.
24  The resume that follows was for both positions.  But
25  this letter will do since we're talking about the

Carroll Court Reporting
586-468-2411

Donna Poplar
September 22, 2020

Page 85

1  operations director or manager position.  He talked
2  about --
3  A.  I need to stop you for one minute.  I'm going to turn
4  the light out.
5  Q.  Okay.
6  A.  So I can try to see your document.
7  Q.  Okay.
8  A.  And Monica's going to be assisting me to a point.  So
9  where are you leading me to?  I see your document.
10 Q.  The second paragraph.  It begins with my primary
11 managing responsibilities.  And I'll read it.
12        Quote:  My primary managing
13 responsibilities are the leadership direction,
14 coordinate and track various projects, monitor the
15 department's budget, develop the long-term and
16 short-term goals/planning and administer programs,
17 policies, and procedures, and administration of all
18 the functions within a union workforce environment.
19 Duties include management of all Department of Public
20 Works, capital improvement projects, engineering
21 functions, maintenance and operations including water,
22 sewer, streets, storm water, buildings and grounds,
23 solid waste, snow and ice removal and maintenance.
24        Did you do a background check of Mr. Riley
25 at all while he was applying for this operations

Page 86

1  manager position?
2  A.  What I did with Mr. Riley, when I seen this job
3  description here.
4  Q.  Yes.
5  A.  At that particular time, I did not do a, what do you
6  call it, background check.  But I did call the
7  companies that he said he worked for to try to get a
8  better understanding of the duties under the titles by
9  which he said he held.
10 Q.  What did you find?
11 A.  And one of the things I found:  That some of the
12 responsibilities that he put in there was not
13 accurate.
14 Q.  Such as?
15 A.  Well, when he talked about he had responsibilities of
16 all the functions within a union workforce
17 environment, that was not accurate.
18        With his position, I believe, I want to say
19 it was the, the Toledo Public Works or something like
20 that.
21 Q.  Yes.
22 A.  They have a public works director that's head of it
23 all.  And the way he had this written, you would think
24 that that was him.  And he was not the public works
25 director, and I clarified that.  Nor did he say he was

Page 87

1  on his job description.  It's just that what he said
2  he did as a manager I thought was not accurate, and I
3  wanted to make sure that what he was saying was true.
4        **MARKED FOR IDENTIFICATION**
5        **DEPOSITION EXHIBIT 2**
6        **(Resume)**
7  BY MR. EDWARDS:
8  Q.  This is Page 1 of the resume of Mark Riley.  It says
9  Mark A. Riley and has his address, telephone number,
10 and e-mail address and then professional profile.
11        Do you recall reviewing his resume?
12 A.  Yes.
13 Q.  And did you find that he had committed fraud in his
14 resume?
15 A.  Yes.
16 Q.  And tell us what you found in that regard.
17 A.  Well, if you go to the first paragraph, and he talks
18 about he has over 20 years of executive management
19 level leadership experience.
20 Q.  Yes.
21 A.  When you go down and start looking at -- if you can
22 scroll down.  Professional experience.
23 Q.  Yes.
24 A.  Let's go to Job Number 1.  You've got to go back up.
25 Okay.  I can see it.

Page 88

1        When it talks about division manager, City
2  of Dayton, Ohio.
3  Q.  Yes.
4  A.  And you see it was in 2015 to 2018?
5  Q.  Yes.
6  A.  He says Public Works Department, Division of Street
7  Maintenance.
8  Q.  Yes.
9  A.  If you look at what he put in his summary piece at the
10 top.
11 Q.  Yes.
12 A.  You don't see any of those type of skills or duties
13 really specified here in this particular paragraph.
14 Q.  What did you conclude?
15 A.  Well, for me that means that I wanted to ask him a
16 question about the scope of responsibility with this
17 particular, in this case, municipality.
18 Q.  Did you do that?
19 A.  I didn't do that until the time of the actual -- I did
20 this during the time of the actual interview.
21        And so if you go down further.  And so when
22 you go to this particular position, supervisor of the
23 City of Dublin in Ohio, when you look at that
24 particular job duties, you don't see any of the high
25 level, executive level experience duties within this

22  (Pages 85 to 88)

Donna Poplar
September 22, 2020

Page 89

1  particular paragraph that he has written here.
2       And if you go down to the next position,
3  street investigator.  So when you look at those duties
4  within the street investigator, you certainly know --
5  and because I come from a municipality and I
6  understand some of the various departments, one of the
7  things you see here is these duties does not rise to a
8  level of, a high level of executive level duties and
9  responsibilities.  And so the same holds true with the
10  next.
11       And when I began to ask him questions, I
12  asked him, I says if I were to look at your
13  organizational chart, based on the positions that you
14  have here, would we see you on any of these
15  organization charts as being a part of a high
16  executive level team.  And he admitted no.
17       So then I asked him a question that, one,
18  that could he point out to me any positions that he
19  held over his course of time through his work history
20  that rise to the level of, the high level executive
21  administrative experience.  For example, I wanted him
22  to explain to me what does a street investigator do.
23       So when you look at some of the stuff that
24  he have in here what a street investigator does, a
25  street investigator is basically somebody who goes out

Page 90

1  and -- like a meter maid, just -- and he couldn't
2  really explain that.  I'm going like so there's things
3  that you have here, and obviously some of this stuff
4  appears to me to be somewhat exaggerated.  And so he
5  admitted that I was accurate.
6       So if you go down to the general foreman
7  position, if you look at what's here --
8  Q.  Excuse me.  Is that general foreman on the resume,
9  City of Toledo?
10  A.  That is correct.  So if you look at what he has
11  here -- and again, I understand municipalities and the
12  various departments.  If you look at what he has here,
13  basically this particular position here is nothing but
14  like a supervisor of one of our equipment operators of
15  maintenance.  So that's the level of a person who
16  supervised equipment operators here.  So it's the same
17  kind of function worded a little different, but it
18  certainly doesn't rise to the level of high level
19  executive administrative position.
20       So if you go down -- there should have been
21  something else on here.
22       COURT REPORTER:  That's the last page of
23  the exhibit.
24       THE WITNESS:  Okay.  So when I looked at
25  all the positions that he said he held, there's not a

Page 91

1  position here that rises to a level of executive level
2  experience.
3       And then I questioned with the exception of
4  him having a bachelor's degree and having some levels
5  of experience that was lower than that of even Anthony
6  Branch in this case, because he never got to the
7  director's level, how did he qualify to be through the
8  screening process that allowed him to be advanced in
9  the first round of interviews and the second round of
10  interviews and Anthony Branch was denied that
11  opportunity.
12       So this right here was very eye opening for
13  me to the point that I began to discuss it with some
14  of the commissioners.
15  BY MR. EDWARDS:
16  Q.  All right.
17  A.  And I felt that this guy here, based on what I've seen
18  here, is that he was nothing but a person put in that
19  they could be able to say that they interviewed a
20  person of color.
21  Q.  He was African American?
22  A.  That is correct.
23  Q.  So he was in effect just a token put in to say we
24  weren't racist or we didn't discriminate against
25  Anthony Branch because we had an African American that

Page 92

1  made the cut that got interviewed by the Board.
2  A.  That is correct.
3  Q.  Is that a common practice in your experience with
4  diversity and inclusion issues?
5  A.  That is some of the issues that we have, but that
6  should not be a common practice in terms of companies
7  that are sincere about not discriminating against
8  people because of their race, gender, or disability.
9  Q.  Did he discuss that he had any background in
10  engineering at all in your interview with him?
11  A.  No.  If you go back up to the top part of this
12  paragraph when he put in there that he had -- was
13  responsible for engineering.
14  Q.  Yeah.
15  A.  He had no engineering background.
16  Q.  None?
17  A.  No.
18  Q.  Is this something that should have been uncovered by
19  Cheryl Ronk in her investigation?
20  A.  Absolutely.
21  Q.  Why do you say that?
22  A.  Because when you -- especially for those of us who are
23  trained in terms of identifying high level --
24  candidates for high level positions, we're very
25  detailed in terms of what we look for in resumes.  And

23  (Pages 89 to 92)

Donna Poplar
September 22, 2020

Page 93

1  so one of the things you look for is a form of
2  consistency. And when you look at that, one, he's a
3  supervisor. The other one was, if she had done her
4  homework, the street investigator, she would have
5  known what that meant. When you go down to the
6  general, I think it was the general foreman, if she
7  went down here, she would have known that that was
8  nothing but a person who served as a supervisor for --
9  like we do here, with the equipment operator
10  supervisors.
11      And I don't think that they balanced off
12  what he was actually saying the scope of his
13  responsibilities and duties were. Because the jobs
14  itself as listed don't reflect that. And so that was
15  another thing that was disturbing to me when I finally
16  seen this job description and asking the question as
17  to how would this guy get interviewed and Anthony
18  Branch didn't. So I brought this to the attention of
19  members of that Board. I said this right here
20  confirms my suspicion that what you did was -- through
21  Cheryl Ronk was put an African American in the lineup
22  to justify not having Anthony Branch.
23      And then the other thing I found
24  interesting was I wanted information on the applicants
25  who applied for the managing director's position, how

Page 94

1  many of them were African Americans. Was Mark Riley
2  the only African American.
3  Q. What did you find?
4  A. I never got that question answered because the
5  gentleman that I talked to said that they didn't have
6  Cheryl Ronk's record.
7      The other thing that was later brought to
8  my attention, just a matter of going through some of
9  the e-mails that when I received -- I don't know if
10  Fred knew what he was giving me. He gave me some
11  resumes or whatever it was concerning Mark Riley; that
12  what I found interesting, one of those -- some of
13  those resumes were on candidates who had applied for
14  this position, who applied for the management
15  director's position. And some of those individuals
16  had engineering degrees. And one individual had a
17  Ph.D. in civil engineering, but that person did not
18  make it to the final round.
19  Q. What significance was that in your mind?
20  A. Well, the significance of that is if we go back to
21  they wanted someone with a civil engineer, why was
22  this person who had a Ph.D. in civil engineering did
23  not make it to the third -- the second round and Mark
24  Riley did.
25      And so when you look at who made it to the

Page 95

1  third round, based on what you had discussed earlier,
2  that they were looking for a civil engineering, the
3  only person that they allowed to make it to the second
4  round with a civil engineering degree was Fred
5  Peivandi. And so that held -- that confirmed again
6  that I felt that the job description and its criteria
7  was predicated around Fred Peivandi.
8      So when you look at the three people who
9  made it to the final round, one being Mark Riley, one
10  being --
11  Q. Ms. Gillis? Ms. Gillis?
12  A. That sounds familiar.
13  Q. Who was director over at Oakland County?
14  A. Well, I don't know where she's at now, but I do know
15  that she was -- at one time she was a managing
16  director for one of the road commissions.
17  Q. Yes, at Oakland County. Okay.
18  A. And then the third person would have been Fred.
19      But even she had an engineering degree. So
20  how did Mark Riley get in that lineup other than the
21  fact that he was African American, an African American
22  who really didn't have the level of qualifications
23  that they say they were looking for.
24  Q. Had she done her job.
25  A. She would have seen that.

Page 96

1  Q. Yeah.
2  A. And so in my capacity as the HR director, whether I'm
3  perceived as qualified to answer some of the questions
4  that have been put before me, this is one thing I do
5  know: I understand that this person, with the
6  exception of having a master's degree, I don't know
7  how he could have been considered.
8  Q. By this person, you mean Mark Riley?
9  A. That is correct.
10  Q. When we started the questioning of your deposition --
11  and by the way, Maureen, you can take this down now.
12  Thank you.
13      When we started the questioning, you said
14  you fear retaliation, possible retaliation. Why is
15  that?
16  A. Under the leadership of Fred Peivandi and Shirley
17  Kautman-Jones, whenever anyone makes a complaint
18  against Fred Peivandi, he has demanded them to be
19  fired. Naturally I did not follow those instructions.
20  I discussed my concerns with our labor attorney, Tom
21  Derderian, on many occasions.
22      When Anthony Branch filed his EEOC
23  complaint, Fred Peivandi took offense to that. But
24  more importantly, when Anthony Branch filed his
25  lawsuit, Anthony Branch -- Fred Peivandi called me to

24  (Pages 93 to 96)
Carroll Court Reporting
586-468-2411

Donna Poplar
September 22, 2020

Page 97

1    his office.  He was outraged about that lawsuit and
2    the fact that he had been implemented in it.
3    Q.   Why do you say he was outraged?
4    A.   Because that's how he acted.  He was angry.  He wanted
5    him fired.  He had some choice words to say about
6    Anthony Branch.  And that's one of the things Fred
7    does:  When he gets to that point where he feels
8    people are going against him, he becomes very verbal
9    and a very negative connotation and so --
10   Q.   Excuse me.  What were the choice words?
11   A.   Well, he felt that Anthony was a liar.  He outright
12   called him a liar and then -- and in many meetings in
13   front of staff and in front of the Board, before and
14   after this election, Anthony Branch has stood before
15   the Board on numerous occasions and said it better
16   stop.  He's had enough of how he's being treated.  It
17   better stop.  He had already began to forewarn them
18   about he was getting to the breaking point of not
19   being able to take anymore.
20   Q.   Forewarn who?  I'm sorry.
21   A.   The Board.  The Board.
22   Q.   The Genesee County Road Commission Board?
23   A.   That is correct.  And he was quite adamant in his
24   expression, very angry, and said it was
25   discrimination.  And he called Shirley Kautman-Jones

Page 98

1    out.
2    Q.   How so?
3    A.   In terms that he felt that she was a part of a plot
4    and he knew who sent her, and it better stop.  And he
5    can go back and tell them, tell her and that Board if
6    they did not stop discriminating against him,
7    harassing him, what he was going to do.  He was going
8    to take the next step.
9        In many staff meetings Fred Peivandi and
10   Fred -- Anthony Branch would literally have a very
11   aggressive exchange of -- a verbal exchange to the
12   point where Fred Peivandi would tell Anthony Branch I
13   don't trust you.  He would tell Anthony Branch that
14   you do what I tell you to do with a dictatorship tone
15   of voice, of which he told me you do what I told you
16   to do.  That goes back to that level of systemic
17   racism that we talked about early.
18       Then there was a time not long ago that
19   Randy Dellaposta, because Fred falsely accused Anthony
20   Branch, it got heated.  And Fred -- Anthony Branch let
21   Fred know how he felt about it, let him know that he
22   was a racist, he discriminated against black people,
23   that he was siding with Anthony Branch's supervisors,
24   the same supervisors who wrote a letter of
25   recommendation that Fred Peivandi get the job, who

Page 99

1    later when Fred got the job, he expunged their
2    disciplinary records.
3    Q.   Who expunged their disciplinary records?
4    A.   Fred Peivandi did.
5    Q.   Did what?
6    A.   The supervisors who wrote the letter of recommendation
7    to the Board about them wanting Fred to be the
8    managing director, when they had some disciplinary
9    issues, and Anthony and I gave them -- took
10   disciplinary actions against them leading up to some
11   time off of work, all of their records were expunged.
12   Fred Peivandi took away that disciplinary action.
13   Q.   Were these supervisors white?
14   A.   All of them are white, yes.
15   Q.   Did they work for Fred or Anthony?
16   A.   They worked for Anthony and so -- beg your pardon?
17   Q.   I want to just make sure the record is clear.  Six
18   white supervisors that Anthony Branch felt he had to
19   take disciplinary action against went over his head to
20   Fred Peivandi?
21   A.   Yes.
22   Q.   And then what happened?
23   A.   Their record was expunged.
24   Q.   By who?
25   A.   By Fred Peivandi.

Page 100

1    Q.   Were the disciplines justified, you being the HR
2    director?
3    A.   Absolutely.
4    Q.   What had they done?
5    A.   Well, one was -- they're required to make themselves
6    available in emergency situations to be called in for
7    overtime.  They did not do it.  The other was -- for
8    Ms. Diggs (ph), the other one was not responding to an
9    emergency call.  So it was a different variety of
10   different things, but that was cleared off their
11   record.
12   Q.   By Fred.
13   A.   By Fred.
14   Q.   Did you think what he did was justified?
15   A.   Absolutely not.
16   Q.   Did you support what he did as HR rep?
17   A.   No.  In addition to that, there was a meeting that
18   Fred and Anthony -- Fred Peivandi and Anthony Branch
19   had this exchange.  And Fred accused Anthony of being
20   partial towards white supervisors, the ones that he
21   expunged their record.  And the exchange got quite
22   heated.  They both stood to their feet, and Director
23   Randy Dellaposta had to come between them.
24   Q.   You mean stop a physical confrontation from occurring?
25   A.   Well, what could have been a physical confrontation, I

Carroll Court Reporting
586-468-2411

Donna Poplar
September 22, 2020

Page 101

1 would say.
2 Q. Okay.
3 A. And then Fred has made it known to me that he didn't
4 trust me, and he has made numerous references to
5 wanting me fired.
6 Shirley Kautman-Jones on many occasions,
7 according to Fred Peivandi, have shared her concerns
8 about wanting me fired and felt that I didn't know
9 what I was doing.
10 Fred Peivandi actually communicated with an
11 employee here, a white employee, and shared with that
12 white employee that Anthony Branch and I did not know
13 what we were doing. And when Anthony wants things
14 done a certain way within his own department, Fred
15 goes to others that don't work in Anthony's department
16 to get their opinion about what Fred is saying. And
17 then he makes a decision based on not what Anthony is
18 saying but based on what someone was saying about
19 Anthony's department.
20 So those are some of the things. But the
21 fact that Fred has a very retaliatory personality, I
22 am very concerned. Even right now I am extremely
23 concerned that as Fred is watching this deposition,
24 that he would take everything that I'm saying
25 personally and that he's going to be very revengeful

Page 102

1 towards it.
2 And I think Fred is very upset, the fact
3 that he holds Cloyce Dickerson and some others
4 responsible for his daughter losing her job at the
5 City of Flint. He wanted me to intervene and write a
6 letter to the interim HR director there at the City of
7 Flint to encourage them to rehire his daughter. And
8 that didn't happen, so I think he feels that I didn't
9 make any effort to get that done on his behalf. And I
10 do have the letter that he had me write to the interim
11 HR director at the time.
12 I think Fred's anger and dislike towards
13 African American people, especially African American
14 men, is predicated around his cultured beliefs. And
15 it's also predicated around the fact that he resents
16 that his daughter had two children by an African
17 American man that he despised. He would often say
18 that he has African American grandchildren. He'll
19 talk about their Iranian side, but he won't talk about
20 the black side.
21 And so I don't think Fred -- I think Fred
22 feels that because he's Fred Peivandi, that he can do
23 what he wants. He often says he's the managing
24 director. But the mistreatment that he gives to women
25 here and the mistreatment he gives to African

Page 103

1 Americans here is unacceptable. Whether I'm an HR
2 director or whether I'm just a private citizen, it's
3 unacceptable.
4 And then the other thing, the difference
5 that -- what I find interesting is that, that makes me
6 very concerned about what Fred does is that one time
7 he ordered an investigation on Anthony Branch because
8 he thought Anthony Branch was involved with an
9 employee here by the name of Kim Day (ph) because
10 Anthony Branch's truck was seen several times at her
11 place of residency. And he wanted an investigation
12 done on that. And I conducted that investigation to
13 discover that during the times in question, which was
14 a few minutes that he would be at her home, he was
15 actually picking up food that she had prepared for the
16 crew here. And he would go get it and bring it here.
17 And I shared that with Fred. But Fred,
18 during the time he requested that investigation, he
19 wanted Anthony Branch fired. And so I find that to be
20 interesting because here recently Fred has entered
21 into a romantic relationship with a person Vicki
22 Bachakes, who used to be his executive secretary. And
23 I told him that I -- and I informed the Board of such
24 a relationship. And I felt that, one, that was a
25 relationship that should not exist because Fred has

Page 104

1 input on all employees here. And I felt that it
2 looked like as Vicki would be treated different from
3 other people. And I also felt that such a
4 relationship could eventually, be possible to lead us
5 into a possible lawsuit if the relationship went bad.
6 The Board has done absolutely nothing
7 concerning that, and that's one of the problems that I
8 have, is that the Board has really protected Fred in a
9 lot of his discriminatory practices, his gender
10 biases, some of the decisions that he's making that is
11 not in favor of certain people, and the way in which
12 he treats individuals differently. And I have so
13 stated my concerns because I do not believe that the
14 Board that is sitting now is prepared to make the
15 decision that they need to make concerning Fred
16 Peivandi. The problems are not getting any better.
17 They're getting worse. And I do know that Fred has
18 pretty much let me know in many ways he doesn't want
19 me here.
20 And the other thing is that we were doing a
21 salary analysis of our workforce here, and Fred could
22 not agree with what the consultants felt that the
23 range should be. And so he redid the range so that
24 Anthony Branch would become the second lowest paid
25 director here. Position would become the second

Donna Poplar
September 22, 2020

Page 105

1  lowest paid. But Anthony Branch, the way the scale
2  would be, there would be no way that Anthony Branch's
3  salary would ever increase short of Fred deciding to
4  give him some form of bonus.
5        Anthony Branch stood before the Board
6  of -- our Board to specify his concerns and said that
7  he was not going to support anything that was going to
8  stop him from being paid fair and equitably.
9        To this day, because Fred did not want to
10  make the decision to do the right thing, we have not
11  approved a wage scale. And yet we have paid
12  consultants to do the work. He no longer wanted to
13  deal with the consultants because they wouldn't agree
14  with what he wanted done.
15  Q.  Who didn't?
16  A.  Fred did not want to agree to the recommendations of
17  the consultants, so he fought this thing for over a
18  year. And we still have not resolved even after the
19  commissioners have instructed Fred to meet with me to
20  bring it to a resolve. And Fred's resolve is only
21  Fred's way. That does not work in the favor of some
22  of these employees here, and certainly it does not
23  work in the favor of Anthony Branch.
24        So yes, I am extremely concerned, and I
25  want to re-emphasize that to the utmost because I know

Page 106

1  that Fred can be a very -- him and Shirley
2  Kautman-Jones can be very vindictive, and I'm really
3  concerned about reprisal here. And I'm concerned that
4  the things that I've said thus far could lead to
5  termination of employment. But because I am an HR
6  director properly trained and understand some of the
7  details in what I'm supposed to stand for, I have to
8  speak truth to the facts, whether it shakes out in the
9  favor of the employer or the employees.
10        Unlike you as an attorney or attorneys,
11  your job is to prove that your client is either
12  innocent, whether they're guilty or not, or you have
13  to prove that your client was wrongfully discriminated
14  against. But I have to deal with the facts as I see
15  them to be. So I can't manipulate the facts when it
16  comes to the employees here at GCRC because it's my
17  responsibility to safeguard their rights.
18  Q.  During Anthony Branch's deposition, I believe
19  Mr. Cascini stated to him that he was making more
20  money than Fred Peivandi. Is that true?
21  A.  That is not true. That is not at all true.
22  Q.  Why do you say that?
23  A.  Anthony Branch makes approximately, around 117,000 or
24  more because maybe he got another increase. Fred
25  Peivandi makes $130,000 or more. And so that's not

Page 107

1  true.
2        Now, one of the things that posed a lot of
3  problems when I first came on board was Fred Peivandi
4  raised issue that he resented the fact that Anthony
5  Branch, making as much -- the same amount of money
6  that he made at the time prior to Fred becoming the
7  managing director. He resented that and --
8  Q.  When␣was␣director␣of␣engineering?
9  A.  Yeah, that is correct. And I shared that with John
10  Daly. Because I hadn't been here but probably a
11  matter of a month or two at that time.
12        And so Fred wanted me to convince John Daly
13  to pay him more than what Anthony Branch made. And I
14  was very uncomfortable with that. Because what I
15  sensed out of that particular meeting, you had a man
16  that really had a problem with African American men,
17  Number 1. And you had a man that had a problem with
18  people who didn't have a degree.
19  Q.  I'm about done. Do you need to take a lunch break
20  or --
21  A.  Yes. I do need to take a lunch break.
22        MR. EDWARDS:  Okay. Gentlemen, Alex and
23  Andrew, how long do you want to take?
24        MR. CASCINI:  I have no objection to a
25  break. Carl, are you saying you're going to terminate

Page 108

1  your questioning here and hand it on over to me?
2        MR. EDWARDS:  I am. Yes, sir.
3        MR. CASCINI:  Well, I was going to say I
4  would need to prepare exhibits anyway.
5        MR. EDWARDS:  Okay.
6        MR. CASCINI:  I am comfortable with a half
7  hour, 45 minutes.
8        (Off the record at 1:05 p.m.)
9        (Back on the record at 1:55 p.m.)
10        EXAMINATION
11  BY MR. CASCINI:
12  Q.  All right, Ms. Poplar. You know who I am. My name is
13  Andrew Cascini. I'm the attorney representing the
14  Genesee County Road Commission in this present case.
15  And I do have some questions that I would like to ask
16  in follow up on what Mr. Edwards asked earlier in your
17  dep.
18        I'd like to kind of just go through first,
19  earlier you said you self-identify as an African
20  American; correct?
21  A.  That is correct.
22  Q.  And Anthony Branch also -- you perceive him to be an
23  African American as well.
24  A.  That is correct.
25  Q.  What race do you perceive the five board members of

Donna Poplar
September 22, 2020

## Page 109

1  the Genesee County Road Commission to be?
2  A. With the exception of one, white. And Commissioner
3  Dickerson, I perceive him as being African American.
4  Q. You mentioned the individual by the name of Ted Henry
5  on a couple of times during Mr. Edwards' examination
6  of you. Who is Ted Henry?
7  A. Ted Henry is a member of the Genesee County Board of
8  Commissioners.
9  Q. You said member of the Board of Commissioners for the
10  County, not the Road Commission; right?
11  A. That is correct. And if I may backtrack here, you
12  asked me a question about the racial makeup of the
13  Board. I do perceive Commissioner Arceo as being
14  Hispanic.
15  Q. Okay. Thank you for your clarification. I appreciate
16  that.
17      What race do you perceive Mr. Peivandi to
18  be?
19  A. White.
20  Q. And what race do you perceive Mr. Henry to be?
21  A. White. And for clarification, I perceive Mr. Peivandi
22  as being white because that's what he indicates
23  himself as being on his application. And in some of
24  the communications, he leans more on the white side.
25  Q. Okay. Regardless of how he may self-identify, is

## Page 110

1  that -- and I appreciate the clarification. Is that
2  also the race that you perceive him to be?
3  A. I perceive him to be Iranian.
4  Q. I'd like to ask you some questions about the, quote,
5  unquote, head on a platter e-mail that we had
6  referenced a couple times during Mr. Edwards'
7  examination. And I'd like to ask some general
8  questions first.
9  A. Okay.
10  Q. So who sent this e-mail that we've been alluding to
11  here?
12  A. Shirley Kautman-Jones in this e-mail was the author
13  and the sender of the e-mail, and that e-mail was
14  directed to the former managing director, John Daly.
15  Q. And at some point in time, you received a copy of this
16  e-mail; correct?
17  A. That is correct.
18  Q. And you weren't a recipient from Ms. Kautman-Jones.
19  You received it from Mr. Daly; is that right?
20  A. That is correct.
21  Q. Okay. Do you know whether Mr. Daly gave that e-mail
22  to anyone else?
23  A. I can't say with certainty. But based on some
24  discussions that was taking place, it appeared to me
25  that that e-mail had been shared with other people,

## Page 111

1  yes.
2  Q. Did you ever provide a copy of that e-mail to anyone
3  else?
4  A. No.
5  Q. Did you ever discuss that e-mail with anyone after you
6  received it from Mr. Daly?
7  A. I did.
8  Q. With whom did you discuss that e-mail?
9  A. I discussed it with Commissioner Cloyce Dickerson. I
10  discussed it with -- I believe that I discussed that
11  with Anthony Branch in putting some confirmation to
12  some things that he was thinking and believing. And I
13  don't recall having that discussion with anyone else
14  at that time.
15  Q. Now, without disclosing any communication you may have
16  had with counsel regarding either the e-mail or search
17  for documents in general, have you attempted to make a
18  diligent search to try to see if you still have a copy
19  of that e-mail?
20  A. Yes. Based on my conversation with you yesterday, I
21  went and --
22  Q. I ask you please not to disclose the details of any
23  conversation you and I had. And I apologize if I was
24  imprecise in my question. So I will restate it.
25  A. Okay.

## Page 112

1  Q. Exclusive of any conversations, so omit those, any
2  conversations that are privileged that you may have
3  had with counsel involving either the e-mail or
4  involving the search for documents related to this
5  case, had you ever had an opportunity to search your
6  own records to see if you had a copy of the e-mail?
7  A. Yes.
8  Q. And did that search yield and produce that e-mail?
9  A. As of yesterday, yes.
10  Q. As of yesterday you were able to produce a copy of
11  that e-mail?
12  A. I was not able to produce a copy of that e-mail.
13  Q. Okay.
14  A. I don't know if your sound is off. It's just, I'm not
15  hearing you as clear as I would like to hear you.
16  Q. Okay.
17  A. I don't know if --
18  Q. Let me see if I can adjust that. I have a different
19  setting. Is that any better, Ms. Poplar?
20  A. Yes, slightly better. Thank you.
21  Q. Okay. All right. Please tell me if at any point in
22  time you can't hear me. I'll restate the question. I
23  will take zero offense to that.
24  A. Okay.
25  Q. During your direct examination testimony, you said

28  (Pages 109 to 112)

Donna Poplar
September 22, 2020

Page 113

1 that there was language contained within that e-mail
2 that the African American community found to be
3 offensive.
4 A.  That is correct.
5 Q.  What language are you referring to there from that
6 e-mail?
7 A.  In the e-mail where it was stating that there were
8 people who wanted Anthony Branch's head on a platter
9 next to Mr. Daly was quite offensive, not just to the
10 public at large that came, it was also offensive to me
11 as an African American; and that language of course
12 was offensive to Mr. Anthony Branch himself.
13 Q.  You mentioned earlier that --
14 A.  Okay.  You're fading out again.  You're fading out
15 again.
16 Q.  You mentioned earlier that that language was similar
17 to language used by hate groups, white supremacists,
18 and persons with discriminatory intent; is that
19 correct?
20 A.  That is correct.
21 Q.  What hate groups, white supremacists, and persons with
22 discriminatory intent specifically have used language
23 like that in the past to the best of your knowledge?
24 A.  Well, throughout our history as African American
25 people and certainly during our slavery time, that was

Page 114

1 language that was used against white individuals who
2 embraced the support of African Americans.  So if you
3 study our history, if you study the history dealing
4 with racism and some of the racial derogatory language
5 that was used, it was often said that they wanted our
6 heads on a platter.  And in those days, not only did
7 they try to put our heads on a platter, they hung us
8 on trees.  And in some situations our heads were
9 actually literally cut off, you know, put a hood over
10 our face and cut our heads off.
11       So when we see language like that, as
12 African American people, we automatically go back into
13 the sadness of our history whereby we were abused,
14 tortured, humiliated and killed in some of that same
15 fashion.  And oftentimes there was situations where
16 African Americans' heads and other parts of their
17 limbs were actually cut off.
18       So being a person who probably is not of an
19 African American culture, oftentimes white folks may
20 not understand what some of those words mean to
21 African American people and how sensitive we become to
22 that type of language and how offensive we find that
23 language to be to the point that I think resulted in
24 the discussions that took place predicated around that
25 type of language.

Page 115

1       And certainly being that Mr. Dickerson is
2 of a senior age and probably has experienced a lot of
3 knowledge as it relates to those types of situations,
4 took offense to it.  And anyone who would not
5 subscribe to that type of treatment that we as African
6 Americans feel that we've been subjected to, certainly
7 would not embrace that type of language but certainly
8 would denounce it in the sense that you as a, I would
9 assume it's safe to call you a white male, that if you
10 were to hear a white counterpart call an African
11 American a nigger, excuse the expression, what would
12 your reaction be.  Would you endorse that use of
13 language or would you denounce that use of language as
14 being something that you don't subscribe to.
15       So yes, naturally that would rise to a
16 level of frustration, disappointment, and outcry that
17 that e-mail caused amongst the African American
18 community and those who are not necessarily African
19 Americans but certainly don't subscribe to that type
20 of language.
21 Q.  And I appreciate a lot of the insight there and
22 certainly the invocation of America's shameful, racial
23 history is always appropriate to discuss.
24       But my question much more specifically,
25 Ms. Poplar, was you mentioned that hate groups and

Page 116

1 white supremacists and persons with discriminatory
2 intent had a history of using that phrase.  And you
3 mentioned -- a couple things that were mentioned there
4 was that it is a term from slavery times.  Is that
5 your testimony?
6 A.  And a term that we're using now in terms of what we're
7 faced with in terms of what some of those same groups
8 are doing when they depict African Americans in terms
9 of the slaughter they want to put us through.
10       So we can go and look at it in this sense,
11 Andrew:  The individuals who subscribe to that type
12 of language often hide behind closed doors and things
13 anonymously.  That's why that letter or that e-mail
14 that she received that she said she got from some
15 people who wanted Mr. Branch's head on a platter,
16 that's why they did not identify themselves.
17       And so for people like me who come from a
18 culture that experience these types of situations,
19 most times people who have those type of attitudes
20 hide behind the scenes or they hide behind their
21 hoods, you know.  And they hide behind masks.  And
22 they sit in high seats and hide behind their power and
23 do things like that.
24       At this point I can't identify other than
25 what I have seen because they don't identify

29 (Pages 113 to 116)

Donna Poplar
September 22, 2020

## Page 117

1  themselves.  So I identify them as white supremacists,
2  and I'm sure they have leaders.  Some leaders have
3  been identified.  I can't tell you their leaders today
4  by name, and I can't tell you any of their members by
5  name.  And that holds true to the white supremacists,
6  those who are what I call to be rednecks, those who
7  are people who hate individuals because of the color
8  of their skin.  I can't give you their names.
9  Oftentimes they don't reveal it.
10  Q.  Is the language and the context of the phrase head on
11  a platter necessarily to you indicate a racial animus?
12  A.  Absolutely.
13  Q.  It is in your mind unequivocal.
14  A.  Unequivocally.
15  Q.  You mentioned a little bit earlier that people from
16  other cultures who are not African American who do not
17  belong to the African American culture, this again was
18  your testimony just a moment ago, may not understand
19  the implication of that language.
20  A.  I still agree to that statement.  And the reason why
21  they may not understand it, because oftentimes when we
22  have hidden biases inside of us, there's -- you go
23  back to that testimony.  I said I dealt with conscious
24  and unconscious biases, implicit and explicit biases.
25  And so I feel that in this particular case, the

## Page 118

1  persons who use that type of language did it
2  deliberately and clearly understand what he or she or
3  them or they were actually doing and implicating when
4  they sent that message via to Shirley Kautman-Jones in
5  whatever form they did it in.  So yes, I do stick to
6  my testimony.
7  Q.  Do you believe that Shirley Kautman-Jones had --
8      MR. ALEXOPOULOS:  Andrew, I can't hear you.
9      (Off the record at 2:09 p.m.)
10      (Back on the record at 2:10 p.m.)
11  BY MR. CASCINI:
12  Q.  I'm going to repeat the last question that I had
13  because I believe a technical glitch cut it off.
14      Do you believe that Ms. Kautman-Jones knew
15  of the racial history of that term when she made
16  that -- or wrote that term in the e-mail?
17  A.  I do.
18  Q.  And is it your testimony that she intentionally used
19  that language in a sign of racial animus towards
20  Mr. Anthony Branch and Mr. John Daly?
21  A.  I believe she used it towards Anthony Branch.  I do.
22  Q.  She also in the e-mail, however, said that she wanted
23  Anthony Branch's head on a platter alongside of John
24  Daly's; correct?
25  A.  She didn't say that.  She said that's what the people

## Page 119

1  were saying.  She didn't say that's what she was
2  saying.
3  Q.  And I appreciate the clarification.  That's an
4  important point.
5      And my question very precisely was the
6  e-mail itself, as you can recall it, because we don't
7  have the document in front of us, that e-mail said --
8  the comment in the e-mail was head on a -- Anthony
9  Branch's head on a platter alongside of John Daly's?
10  A.  Head on the platter next to John Daly's.  I think
11  that's what it says.
12  Q.  Next to John Daly's.  I see.  Okay.
13  A.  And in that she wouldn't have used the word, name John
14  Daly.  She would have said on a platter next to yours
15  in that particular e-mail.
16  Q.  Yours referring to John Daly because it's being
17  directed to John; right?
18  A.  That's correct.
19  Q.  I get it.  What makes you think that the motivation
20  for using that phrase, Ms. Kautman-Jones using that
21  phrase and directing it toward John Daly had anything
22  to do with Mr. Daly's support for hiring and
23  advancement of African American employees?
24  A.  Based on the challenges that John Daly had been
25  subjected to down through the years in terms of

## Page 120

1  advancing African American people that went against
2  the grain of many internal and external people, I
3  think that John Daly was targeted and ridiculed for
4  his involvement and his insistency in terms of trying
5  to give African Americans fair opportunity for
6  advancement.
7  Q.  So my question is a little bit different, Ms. Poplar.
8      What is the evidence that you have to
9  support your belief that that statement in the e-mail
10  was directed to John Daly because John Daly supported
11  the advancement of African American candidates?
12  A.  Based on what I just said.  I don't have any specific
13  direct response to that other than what John Daly has
14  shared with me as it relates to some of his struggles
15  and some of the pushback he gets relative to African
16  Americans, and the history that he shared with me with
17  this organization, and the information that Anthony
18  Branch has shared with me about the struggles of
19  African Americans being treated differently and the
20  pressure that this organization has been subjected to
21  as a result of helping African Americans or trying to
22  move in the direction of giving fair and equal
23  opportunity to African Americans that led to the class
24  action lawsuit.
25  Q.  You mentioned --

30  (Pages 117 to 120)

Donna Poplar
September 22, 2020

Page 121

1   A.  Let me finish answering that question, too.  Always
2       got to give me a minute or two because it will come
3       like that.
4           Also there was numerous conversations I've
5       had with African American people who felt that they
6       were being discriminated against and felt that the
7       things that John Daly was trying to do in an attempt
8       to help them, that John Daly was a good guy but being
9       ridiculed by white folks who resented him helping
10      African American people within this organization that
11      he managed.
12          And then I want to also add this:  There
13      was a board member by the name of Bonita Lapeer (ph)
14      White who was the first female and -- African American
15      female or female to serve on this Board.  I happen to
16      know Bonita Lapeer White very well because I was the
17      person that helped her get on this Board at that time.
18      And I can recall some of the things that she shared as
19      her concerns about some of the struggles that John
20      Daly was being faced with because of some of the
21      things that he wanted to do, again, to help enhance
22      African Americans.
23          And then I think it's very important for me
24      to share with you, Andrew, the challenges and the
25      criticism that John Daly was subjected to when he

Page 122

1       hired, or I should say promoted Anthony Branch as the
2       director of maintenance.
3   Q.  And we maybe can talk about those topics in a couple
4       of moments, but I do actually want to make sure that I
5       get an answer to this question that I'm asking here,
6       which is setting aside -- assuming for the facts of
7       just this discussion that it is true that John Daly
8       had come under a lot of criticism for his advancement
9       of African American candidates, assuming arguendo that
10      is true for this discussion, what was it about the
11      e-mail that made you feel that comment had been
12      directed toward Mr. Daly because of his support for
13      African American candidates as opposed to it being a
14      criticism about his handling of the winter storm?
15  A.  My answer to that would be this:  The people who did
16      not want John Daly to advance African American people
17      because of their racial biases and hatred towards
18      African American people resented the fact that John
19      Daly indeed was advancing African Americans.
20          Now, you may not comprehend what I'm trying
21      to say, but I'm going to tell you how I feel because
22      that's exactly what led me to this decision.  And the
23      fact that the e-mail only addressed John Daly and did
24      not address any of the members sitting on the Board
25      helped me to formulate that opinion.

Page 123

1           And again, and thirdly, the fact that
2       Shirley Kautman-Jones did not once denounce it and
3       make it an issue overall in that particular e-mail
4       about the services or lack of services, she kept up on
5       the negativity about how these people felt about
6       Anthony Branch's head being on a silver platter or
7       being on a platter.  And that's the best by which I
8       can respond to your question.
9   Q.  Okay.  So in order to ensure that I'm understanding
10      your answer correctly, I'm going to attempt -- I'm
11      going to ask you if the following summary is correct:
12      Because of the history that you are aware of that may
13      or may -- because of the -- strike the question.  Let
14      me ask this a different way.
15          Do you believe it is possible that some
16      individuals may not know about the racial history that
17      you've testified to with regard to that term, head on
18      a platter?
19  A.  That's a fair analysis, that everybody -- that
20      everyone on the face of the earth may not know what
21      that means.
22  Q.  Okay.  A little more specifically:  Do you think that
23      it is likely that a person may not know about the
24      history of that particular term as you've testified to
25      it?

Page 124

1   A.  That's a possibility.
2   Q.  Do you have any evidence that Ms. Kautman-Jones
3       understood at the time that she used it that that was
4       a term that conveyed racial animus?
5   A.  I do.
6   Q.  And what is that evidence?
7   A.  The evidence is the fact that she did not denounce it.
8       She embraced it.  In my opinion, she supported that.
9       And I believe that she used that e-mail to depict how
10      she was feeling about her frustrations and her
11      personal feelings of Anthony Branch being a failure.
12          I would like to see in that e-mail her
13      saying that based on this anonymous comment by people
14      in this community, that her and Anthony could sit down
15      and have some discussion in terms of what she felt led
16      to that type of defiling comment that she shared.
17          And, Andrew, I want to say this, too:
18      Technically if Shirley Kautman-Jones was not a person
19      who subscribes to that type of language, the question
20      that I would have:  Why does she deem it necessary to
21      share it with John Daly and she didn't deem it
22      necessary to share it in a sense that she was
23      concerned about their safety, especially Anthony
24      Branch's safety in a time -- in a period in our time
25      in our history where African Americans are still being

31  (Pages 121 to 124)

Donna Poplar
September 22, 2020

**Page 125**

1      bitterly attacked in the worst way.

2    Q. Okay. So because she directed it to Mr. Daly and

3      because she did not later denounce the comment, those

4      are the pieces of evidence that you have that make you

5      suspect that Ms. Kautman-Jones knew about the racial

6      animus behind the term when she used that term in the

7      e-mail to John.

8    A. I believe that, and I believe that she's a person who

9      supports that type of language.

10   Q. Now, when you mentioned that she never denounced the

11      language, she did actually give a public apology

12      regarding that e-mail, didn't she?

13   A. She gave a public apology about how she presented that

14      e-mail; and that's what she said in her letter of

15      public apology, about the way in which she presented

16      it.

17         She did not denounce or apologize for the

18      content of that e-mail including the part where she

19      said she personally find it to be a failure of a

20      maintenance director.

21        MR. CASCINI: Okay. Alex and Carl, I'm

22      going to be sharing an exhibit with you right now.

23        (Off the record at 2:21 p.m.)

24        (Back on the record at 2:22 p.m.)

25        MARKED FOR IDENTIFICATION:

**Page 126**

1        DEPOSITION EXHIBIT 5

2        (March 6, 2018 Minutes)

3 BY MR. CASCINI:

4    Q. Now, Ms. Poplar, I'm going to be showing you a

5      document here. And as I stated at the beginning of

6      the deposition, I understand you have a visual

7      disability. Please tell me if there's anything I can

8      do to make this clearer or to make sure that you can

9      see it.

10   A. I have Monica right here, so she can --

11   Q. Perfect. Are you able to see a document on the screen

12      currently that has Genesee County Road Commission

13      Board Meeting March 6th, 2018 minutes at the top?

14   A. Yes.

15   Q. And just for the purpose of the record, this has been

16      marked as Document Defendant GCRC Production Number 1,

17      Number 73.

18        I'm going to go to the second page of this

19      document. There is a large paragraph that starts at

20      this time, Chairperson Kautman-Jones would like to

21      share something with her fellow Road Commissioners.

22      Do you see that section of this document?

23   A. I do.

24   Q. I'm going to read to you -- let me ask this question

25      first: Ms. Poplar, were you present at the meeting,

**Page 127**

1      at this March 6th meeting?

2    A. If you go back to the first page and you will see

3      where it says present, you see my name Donna Poplar

4      there. I was present.

5    Q. And you were, in fact, there, at that meeting. That

6      is accurate in that respect.

7    A. Yes.

8    Q. Okay. Now, I'm going to read the section here of the

9      paragraph that began with that line, and I want you to

10      tell me whether the description as depicted in the

11      meeting minutes is consistent with your memory and

12      recollection of what Ms. Kautman-Jones said.

13        At this time, Chairperson Kautman-Jones

14      would like to share something with her fellow Road

15      Commissioners, staff, and the residents of Genesee

16      County. It has come to her attention that the way she

17      presented complaints to Mr. John Daly,

18      manager-director of the Genesee County Road

19      Commission regarding the January 2018 snow events has

20      given the wrong impression to the our residents, I

21      assume it's an error, and staff of the GCRC. Because

22      of that, she would like to apologize for the way she

23      presented it. As a Board, we received numerous

24      complaints about the Genesee County Road

25      Commission's response to the January 2018 snow event.

**Page 128**

1      In her frustration, she jumped to conclusions as to

2      where the ultimate blame should be placed upon the

3      ability to identify the defects in the leadership of

4      this organization, the manager-director subsequently

5      retired. Mr. Anthony Branch was appointed as an

6      interim co-manager-director of the Genesee County

7      Road Commission. This was an action that she strongly

8      endorsed and supported based on Mr. Branch's

9      experience, knowledge, and years of service to the

10      GCRC. She has full faith in the abilities of

11      Mr. Branch to co-lead the Road Commission through this

12      transition period. She would like to personally

13      apologize to Mr. Branch, staff at the Road Commission,

14      residents, and my fellow Road Commissioners for her

15      comments and any concerns her comments may have

16      caused.

17        First, Ms. Poplar, did I read that section

18      correctly?

19    A. Based on what it says, that is correct, yes.

20    Q. And as described in the paragraph that I just read to

21      you, were Ms. Kautman-Jones' comments consistent with

22      what you recall her comments at that meeting to be?

23    A. Yes.

24    Q. And it says action taken: Commissioner Arceo would

25      like to place this correspondence, which was read and

32 (Pages 125 to 128)

Donna Poplar
September 22, 2020

Page 129

1   written by Chairperson Kautman-Jones, into the Board
2   minutes correspondence.  And then Mr. Dickerson
3   seconds the motion; correct?
4   A.  Yes.
5   Q.  And let me ask this question now:  What does seconding
6   a motion mean?
7   A.  Support for that motion.
8   Q.  Okay.  Got it.  Now, it does say at the bottom there
9   that she would like to personally apologize to
10  Mr. Branch, staff at the Road Commission, residents,
11  my fellow Road Commissioners for her comments and any
12  concerns her comments may have caused; right?
13  A.  Yes.
14  Q.  You did not regard that as denouncing her comments and
15  the concerns her comments may have caused?
16  A.  Absolutely not.  And I will explain to you why.  If
17  she is saying that she's aware of the concerns that
18  was raised by her comments, then one of the things I
19  would have liked to have seen in this apology, and the
20  African American community would like to have seen, is
21  that I denounce the language that was used for Anthony
22  Branch's head to be put on a platter, Number 1.
23  Number 2, if you go back to the date on
24  this, if you will, please.
25  Q.  March 6th, 2018.

Page 130

1   A.  March 6th.  And then if you can share the date by
2   which the e-mail was sent to Mr. Daly was when?
3   Q.  We do not have that e-mail in front of us but --
4   A.  It is safe to say that this e-mail was sent to
5   Mr. Daly prior to this apology letter.  And if you go
6   back -- could you go back into a document where before
7   this meeting there was a meeting held by the public,
8   where the public came in pretty sizeable numbers for
9   those who could get in the boardroom.  And this
10  document came or this apology came two weeks after
11  that particular board meeting.
12  And so if Ms. Kautman-Jones wanted to give
13  the impression that this is a sincerely written
14  apology, then she didn't have to wait two weeks,
15  Number 1, to ask Anthony Branch -- to apologize to
16  Anthony Branch for something that was shared that was
17  perceived as very horrific amongst African American
18  people and others.
19  And then when you look at her apology,
20  again I'll make it very clear, that at no time in this
21  apology is she apologizing for even sharing such
22  information, such an e-mail when she didn't have no
23  names to attach to it.  And nor is she apologizing in
24  this e-mail, I apologize for sharing this e-mail and
25  ignoring the fact that I should have been concerned

Page 131

1   about your safety as a result of this type of language
2   being used in the e-mail that was sent to John Daly.
3   And so when you talk to some of those
4   individuals who became aware of this apology -- and
5   what I find interesting is that in this particular
6   e-mail, there is only -- apparently when you go down
7   to the motion carried below that, I guess it looks
8   like it was -- the people that was there, I think
9   Arthur Woodson was in that meeting.  Well, Arthur
10  Woodson is a very well known community activist who
11  fights against the injustices in our political system
12  and injustices in our society.  And so not one time
13  did she decide to give this apology with the public
14  present.  There was no one here present from the
15  public except for two people.
16  But again, the mere fact that she neglected
17  to meet with Anthony Branch versus doing it in a
18  public setting when she could have done it immediately
19  afterwards and be able to say in her apology letter to
20  the public I have already apologized to Anthony Branch
21  for the language that was used and shared in this
22  e-mail that I, Shirley Kautman-Jones, do not subscribe
23  to.
24  And so I as an African American person, as
25  the HR director of this organization, I do not feel at

Page 132

1   all that this apology was a sincere apology.  And then
2   it was shared with me that I believe Commissioner Bob
3   Johnson and others told her she needs to make an
4   apology.  Prior to that, she was not going to make an
5   apology.
6   And so I take offense to this apology as an
7   African American person and as an HR director who's
8   given a charge to deal with issues that is predicated
9   around discrimination and racisms and biases.  That's
10  my job to talk about those kind of things; that's what
11  I do.
12  And so yes, I do not, I do not feel that
13  this is a genuine apology.  And that's the same
14  sentiments that I know Anthony Branch has and
15  Commissioner Cloyce Dickerson and others throughout
16  this African American community that's cared enough to
17  come down to this GCRC board meeting to state their
18  feelings and concerns as much as they're allowed to
19  talk and still discussing it to this day.
20  Q.  Now, Ms. Poplar, and again, I appreciate the response,
21  and I appreciate many of the issues that you raised
22  there.  But I really do need you to answer my
23  question, which was regardless of the sincerity,
24  regardless of whether you interpret it as sincere or
25  genuine, when it says in the last sentence she would

33  (Pages 129 to 132)

Donna Poplar
September 22, 2020

## Page 133

1  like to personally apologize to Mr. Branch for her
2  comments and any concerns her comments may have
3  caused, why do you feel -- regardless of whether she
4  is being sincere in her heart when she is saying it,
5  why do you not feel that that is a denouncement of
6  those earlier comments?
7  A.  Because it's not a denouncement, Andrew.  It's clearly
8  not a denouncement.
9       When something is being denounced, one of
10  the things is the things that hurts a person the most,
11  you're going to denounce that language.  I denounce,
12  do not support, do not engage, do not advocate
13  language being used as putting anyone's head on a
14  platter.  That's a sign of murder.  I can't imagine
15  anyone's head being cut off and still allowed to have
16  light.  So she didn't do that.
17       And we can go back and forth with this,
18  Andrew, but my position is this:  She did not at all
19  denounce that language, and that's the only thing I --
20  I may not be saying what you want me to say, but I'm
21  saying what I feel on the inside; and that's what
22  you're asking me.  And so I'm responding according to
23  how I feel about her apology.
24  Q.  Very respectfully, Ms. Poplar, I'm not looking for any
25  particular answer.  What I'm doing is just asking a

## Page 134

1  question.  And what I need from you and what all the
2  other attorneys need from you and what you have
3  provided very faithfully so far today is just an
4  answer to the question that I'm asking.
5       So when I asked you, you know, why do you
6  feel that that isn't a denouncement, that's not me
7  necessarily arguing that you should or anything at
8  all.
9  A.  Sure.
10  Q.  I'm just asking what are the reasons that you felt
11  that wasn't a denouncement, and I feel that you've
12  answered that question now.
13       I do want to ask you, this was a public
14  meeting; correct?
15  A.  That is correct.
16  Q.  Members of the public could choose to attend?
17  A.  That is correct.
18  Q.  Okay.  And in fact, you mentioned a little bit
19  earlier, if we go to the first page here, at least two
20  members of the public did attend, Mr. Arthur Woodson
21  and Ms. Mary Laetz?
22  A.  If I'm not mistaken, from what you're showing me, it
23  looks like Ms. Mary Laetz is from the Genesee County
24  Clerk's Office, so she's one of the persons that the
25  Clerk John Gleason sends over to sit in and take notes

## Page 135

1  on behalf of the Genesee County Clerk's Office in
2  these meeting settings.  So she would not be
3  considered a member of the public.  So therefore, the
4  only person that I see based on what you're showing me
5  that's a member of the public would be Arthur Woodson.
6  Q.  And Arthur Woodson, he is a member of the public.
7  He's not attached in any official capacity such that
8  his presence at the Board has an official function.
9  A.  No.
10  Q.  Okay.  Got it.  Now, we talked a great deal about the
11  term that the African American community would view as
12  offensive being in that e-mail.  Was that the only
13  term in that e-mail that was viewed or could be viewed
14  or construed as being offensive or tinted with racial
15  animus?
16  A.  Can you go back to the document?
17  Q.  The March 6th meeting minutes?
18  A.  Yeah, in terms of her -- oh, I'm sorry.  So that's
19  okay.  Because you don't have the document.
20       In that document that she sent to John
21  Daly, one of the things that she did, she made it
22  personal.  She represented it was her personal
23  feelings that Anthony Branch was a failure, a failure.
24       So here you have a white woman newly
25  appointed to the Board that characterized a director

## Page 136

1  that had been the director of maintenance for about,
2  what, 15 years, who had lots of responsibilities in
3  operating the largest department that we have here at
4  the GCRC and have probably maybe 60 percent of the
5  employees here that works up under his leadership, and
6  you have a commissioner, Shirley Kautman-Jones, a
7  white woman, that looks at -- personally, personally
8  looks at his performance as a failure.
9  Q.  Go ahead.  I'm sorry.
10  A.  And to me that would be what I consider to be
11  offensive based on what merits, what does she judge
12  that on.  And the fact that in that same e-mail, she
13  never said any of Anthony Branch's white colleagues,
14  that she personally felt that they were a failure.
15  She only identified Anthony Branch.
16       And the other thing that's interesting, in
17  that same e-mail, Andrew, she never categorized John
18  Daly, a white man who had been the managing director
19  of this GCRC operation, as a failure.  She never said
20  she personally seen him as a failure.  The only person
21  in this entire operation during the time of that
22  particular e-mail exchange that she seen personally as
23  a failure was Anthony Branch, an African American.
24  Q.  The term failure independently doesn't have any racial
25  context to it necessarily, does it, independently on

34  (Pages 133 to 136)

Carroll Court Reporting
586-468-2411

Donna Poplar
September 22, 2020

Page 137

1     its own?
2     A.  It depends on the mindset of who's using that word.
3     There — well, you asked the question.  Let me answer.
4            Historically white people who have these
5     racial biases against African American people sees us
6     as failures and treat us accordingly.
7     Q.  So your testimony is that the use of the term failure
8     when levied against an African American individual by
9     a white individual is thus imbued with some sort of
10    racial animus.
11    A.  Sure.  And especially in this e-mail when you tie it
12    to — let's look at the total e-mail.  Yes, I do, to
13    answer your question.
14           But to tie it to the e-mail, when you look
15    at here you have an e-mail that's using offensive
16    language about putting an African American's head on a
17    platter, and then you go into the next part of that
18    e-mail that's now personalizing it.  I see Anthony
19    Branch as a failure.
20           Now, watch the e-mail.  The e-mail doesn't
21    say anything about she sees his — that she sees the
22    service he did as a failure.  She said she sees the
23    maintenance director as a failure.  That's different,
24    Andrew.  So that leads me to believe that that type of
25    communication or exchange comes from a person who have

Page 138

1            a very low expectation of black people.  And to this
2     day —
3     Q.  I apologize.  I don't mean to cut off if you want to
4     continue your answer but —
5     A.  And just to further answer your question, to this day,
6     Andrew, she has yet characterized anyone white as a
7     failure.
8     Q.  Were there any other comments in the e-mail?  So, so
9     far we've described there were two particular
10    provisions of the e-mail that are imbued with racial
11    animus which are, your testimony was that the term
12    head on a platter did and then the testimony was that
13    the term failure did.
14    A.  The word failure but associated with I personally see
15    the maintenance director as a failure.  So I want to
16    make sure we got that clear.
17           The only other thing I can recall in that
18    e-mail was I think she asked for Anthony's job
19    description, I believe it was.  And those are the
20    things that — no.  There was nothing racially
21    intended for asking for his — a copy of his job
22    description.
23    Q.  Okay.  So as best you can recall the details of the
24    e-mail, the two comments that were conveyed within it
25    that we've just described and we've just talked about,

Page 139

1     those were, the two comments, the only sources in your
2     opinion of any perceived racial animus coming from
3     Ms. Kautman-Jones.
4     A.  In that particular e-mail, yes.
5     Q.  In that particular e-mail.  And did you share this
6     e-mail with Mr. Anthony Branch?
7     A.  I believe that Anthony Branch may have received that
8     e-mail himself from Mr. Daly.  But yes, I did share it
9     with him.
10    Q.  I'm sorry?
11    A.  I did discuss the e-mail with Anthony.
12    Q.  And what did you tell Anthony about that e-mail?
13    A.  I let him read the e-mail that I had.  I felt he
14    needed to know, and let him know that I was concerned
15    about his safety and wanted to make sure that — make
16    sure that he was protected here.
17           And I told John Daly I was concerned about
18    Anthony's safety here, especially with the climate
19    that's existing in our country at that time and even
20    now.  Things are really beginning to escalate, and I
21    wanted to make sure he was safe.
22    Q.  When John Daly brought the e-mail to you, did he
23    understand the e-mail to be containing a physical
24    threat directed towards Mr. Anthony Branch?
25    A.  I think that — yes, that was the reason why he wanted

Page 140

1     to raise it, to bring it to my attention as an HR
2     director, because he was concerned about that type of
3     language and being that there was so much hostility
4     that was permeating during that time as it relates to
5     this white versus black and the hostility that we had
6     in this workplace.
7            We had already had I think an employee that
8     said that he wanted to — he was going to go to his
9     truck and get a gun and shoot the MF heads off, and he
10    was referring to black people.  So we had some
11    situations that was going on during that particular
12    time that certainly raised to the level of concern.
13    Q.  Your testimony though — I want to make sure that we
14    get the question answered.  John Daly specifically
15    said to you when he brought you the e-mail that he was
16    concerned about Mr. Branch's physical safety as a
17    result of the e-mail.
18    A.  He was concerned about the content of that e-mail.
19    That led me to say we should be concerned about
20    Mr. Branch's safety, yes.
21    Q.  Well, I want to make sure that I understand the
22    distinction, Ms. Poplar.  And I apologize.  I'm not
23    trying to split a hair here, but I do need to know.
24           Did Mr. Daly bring to your attention that
25    he perceived — he read the e-mail and he felt as a

35  (Pages 137 to 140)

Donna Poplar
September 22, 2020

Page 141

1  result of the e-mail that Mr. Branch's physical safety
2  was in danger?  Or was it you that felt that way after
3  Mr. Daly brought it to your attention?
4  A.  My memory of that conversation is that Mr. Daly stated
5  we had a serious problem here, and that's when he
6  presented that e-mail.  And based on that e-mail,
7  based on our conversation, we both concluded that we
8  had an issue, a concern with safety.
9      Now, whether he initiated the conversation
10  of the safety or whether I initiated it, I can't say.
11  I can say we both agreed that there was a safety
12  concern; and therefore, I felt it necessary that
13  Anthony Branch be aware of that particular e-mail,
14  which is my duty as HR director.
15  Q.  Now, you said that -- earlier you said that you
16  believed Mr. Branch had received the e-mail from
17  Mr. Daly.
18  A.  I believe he received a copy of that e-mail from
19  Mr. Daly, I do.
20  Q.  Okay.  And you also mentioned that you had discussion
21  with Mr. Branch about the e-mail, but I believe your
22  previous testimony was you didn't provide Mr. Branch
23  with that e-mail.
24  A.  No, I didn't.
25  Q.  Did you initiate -- I apologize.  I didn't hear the

Page 142

1  last term, Ms. Poplar.  I'm sorry.
2  A.  Anthony and I discussed the e-mail.
3  Q.  Okay.
4  A.  And clarification:  I can't recall if I gave Anthony a
5  copy of the e-mail, and I believe that I could have.
6  So I'm not going to say I did or didn't.  But I
7  believe there's a strong possibility that I did.
8  Q.  Okay.  I understand.  Thank you for clarifying.
9  A.  You're welcome.
10  Q.  Who initiated the conversation between you and
11  Mr. Branch regarding the e-mail to the best of your
12  recollection?
13  A.  I did.
14  Q.  And did Mr. Branch express to you that he was
15  concerned about his physical safety as a result of
16  having received -- or having read that e-mail?
17  A.  He was concerned.  And yes, he was concerned about his
18  safety at that point.
19  Q.  His physical safety or the safety and security of his
20  employment and his job?
21  A.  No, his physical safety.  And rightly so.
22  Q.  Did he ever raise that concern, to the best of your
23  knowledge, with any of the other road commissioners?
24  A.  I believe there was discussion.  Because the meeting
25  that we had with the public coming out and expressing

Page 143

1  their concerns about that particular e-mail, I believe
2  Anthony may have made some comments to some of the
3  commissioners.  And I can't say that with certainty,
4  but I'm led to believe that's the case just based on
5  some of the dialogue that I had seen taking place in
6  that particular meeting.
7  Q.  Do you believe that Ms. Kautman-Jones intended to make
8  a threat regarding his physical safety when she used
9  that term?
10  A.  I believe she intended to raise an issue about how she
11  felt about him as an African American person, as
12  indicated in that letter when she said she personally
13  seen him as a failure.  I believe that was part of her
14  intent.
15  Q.  The question though I'm asking is slightly different.
16  I do appreciate the insight, and I appreciate the
17  information.  That's useful in our case.
18      But I do need to know, do you believe that
19  Ms. Kautman-Jones intended to make a threat to Anthony
20  Branch's physical safety when she composed that
21  e-mail?
22  A.  No.  I don't believe she intended to make that threat
23  because, according to her, that e-mail, she was not
24  the author of the threat.  She was the author of the
25  e-mail in terms of sharing it with John Daly.

Page 144

1  Q.  Do you believe that Ms. Kautman-Jones understood and
2  interpreted that language to constitute a physical
3  threat to Mr. Anthony Branch when she conveyed it from
4  a third party?
5  A.  No.
6  Q.  What evidence do you have to support your belief that
7  she intended to convey or knew she was conveying, I
8  should say, a physical threat when she made that
9  comment?
10  A.  The mere fact that she shared that e-mail with John
11  Daly, and the mere fact that she did not care to
12  discuss how as a commissioner and the chair
13  commissioner that this is something that we should be
14  concerned with relative to Anthony Branch's safety.
15  She didn't discuss that in that e-mail.
16      Frankly I believe the fact that she shared
17  it and she didn't raise no concerns about Anthony's
18  safety, I felt that she wasn't concerned about what
19  that e-mail could have resulted into.
20  Q.  What other evidence do you have that she intended to
21  convey a physical threat by using that term in the
22  e-mail?
23  A.  Her lack of action.  The lack of taking appropriate
24  action.
25  Q.  Do you mean appropriate remedial action after sending

36 (Pages 141 to 144)

Donna Poplar
September 22, 2020

Page 145

1    it?
2    A. Yes, sir.
3    Q. Okay. Is there any other evidence that you have
4    regarding her --
5    A. **The fact that she did not raise that as an issue with**
6    **her colleagues on something that could have resulted**
7    **in something very dangerous and could have led to**
8    **something fatal, she didn't discuss that with her**
9    **colleagues in a board session, in a closed session, or**
10   **anything. She shared that e-mail with John Daly, and**
11   **in her mind that was as far as she was willing to take**
12   **it, when she should have took it further just on the**
13   **nature of what was said and the possibility of what**
14   **could have happened.**
15   Q. I'm going to ask you a question next, and I'm going to
16   be quoting a portion of a question that Mr. Edwards
17   directed your way during the direct examination
18   testimony. It uses an unfortunate term. And I
19   understand he was using it in a proper sense. I
20   intend to use it only as a reference.
21        We were talking earlier and Mr. Edwards
22   asked if Mr. Daly had a perception as being a, this is
23   a quote now, nigger lover. Have you ever heard any of
24   the Genesee County Board of Road Commissioners, have
25   you ever heard any of the commissioners refer to

Page 146

1    Mr. Daly as, again I use it as a quote, a quote,
2    unquote, nigger lover?
3    A. **In reality those who think that white folks are nigger**
4    **lovers because they do positive things for African**
5    **Americans, they would never allow an African American**
6    **to hear them say John Daly is a nigger lover. So no,**
7    **I've never heard a GCRC board member say to me or**
8    **anyone in my presence that John Daly is a nigger**
9    **lover.**
10        **But what I do know, based on our history**
11   **and our understanding of certain language and the use**
12   **of certain language in certain content, that that is**
13   **normally things that are said to white people and**
14   **about white people by white people for those that**
15   **think that people like John Daly could be nigger**
16   **lovers. But I don't think anyone on this Board would**
17   **publically stand up and say John Daly is a nigger**
18   **lover.**
19   Q. So the answer to my question is no, you've --
20   A. No.
21   Q. -- never heard any of them say that term.
22   A. No, no.
23   Q. Okay. Have you ever had anyone report to you that any
24   of the board members used that term about Mr. Daly or
25   anyone frankly?

Page 147

1    A. No.
2    Q. And certainly there's no allegation that that term
3    was -- you don't have any recollection. That term
4    wasn't in the e-mail; right?
5    A. No.
6    Q. Okay. Have you ever seen any correspondence in which
7    any member of the Genesee County Board of Road
8    Commissioners used that term, either by electronic
9    correspondence, written correspondence, text message,
10   anything?
11   A. No.
12   Q. During your direct examination, I believe that you
13   testified that Mr. Johnson at one time told you
14   Mr. David Arceo, one of the commissioners on the
15   Genesee County Road Commission, was a racist; is that
16   correct?
17   A. **That is correct.**
18   Q. When did he make that comment to you as best you can
19   recall?
20   A. **It certainly would have been after Anthony Branch did**
21   **not get the job. I can't give you the month and time,**
22   **but I do recall it very clearly.**
23        **Mr. Johnson -- I'm sorry. Anthony Branch,**
24   **myself, and Commissioner Dickerson along with**
25   **Commissioner Johnson was in our office, and we were**

Page 148

1    talking about some of the issues that came about
2    concerning Anthony Branch and some of the other
3    concerns that we had here at the Road Commission. And
4    it seemed like we were talking also about the pushback
5    that Shirley Kautman-Jones and Dave Arceo had and Fred
6    Peivandi concerning my administrative assistant and my
7    need for a full-time assistant because of my
8    disability.
9        And we were exchanging about the struggle
10   that we're having with those two particular
11   commissioners. And that's when Johnson said well, you
12   know, Arceo is a racist. And that was not the first
13   time I heard that Dave Arceo was a racist.
14        I heard that several times from Mr. John
15   Daly. I heard it from a member of the Genesee County
16   Board of Commissioners, Commissioner Brian Nolden, and
17   that has had -- I'm trying to think. Then again I
18   heard Commissioner Dickerson share again what he had
19   been hearing about Commissioner Dave Arceo.
20        And I believe before that particular date,
21   I heard Anthony Branch share it was shared with him by
22   John Daly and some others that that -- and Bob Johnson
23   had shared with him prior that Dave Arceo was a
24   racist.
25   Q. Again, I appreciate a lot of the detail in there. But

Donna Poplar
September 22, 2020

Page 149

1  what I'm asking very specifically, Donna, is are you
2  able to tell us with any more precision or clarity
3  about when Mr. Johnson made that comment to you other
4  than to know it was at some point in time after Fred
5  became a managing director?
6  A.  I cannot give you the date or the month.  I just know
7     that it was after Fred Peivandi had became the
8     managing director.
9  Q.  Was it recently?
10 A.  Well, if you look at Fred became the managing director
11    back in probably July of 2018.
12 Q.  2018.  Correct.
13 A.  Okay.  I would assume that that conversation probably
14    took place maybe somewhere in August or so.
15       And that was not the first time.  I do
16    recall visiting Mr. Johnson while he was in the
17    hospital, and I recall him then again referring to
18    Mr. Arceo as a racist.  Now, you would have to ask
19    Mr. Johnson what time was he in the hospital.  I
20    recall him saying it then as well.
21 Q.  Would it surprise you if under oath Mr. Johnson had
22    prior testified in this case that he had never heard
23    Mr. Arceo make a racist or racially tinged comment?
24 A.  That would not surprise me what he did not hear
25    because he didn't tell me that he was a racist based

Page 150

1  on what he heard.  So I can't say what he said in that
2  deposition based on what you just stated because he
3  never told me that Dave Arceo never made any racist
4  comments.  He said that Dave Arceo was a racist.  Now,
5  on what grounds he based that on, I don't know.  You
6  would have to get that information from him.
7     But I do know that in that particular
8  meeting that you're questioning, it was the three of
9  us — Arceo, Anthony Branch, Cloyce Dickerson, and
10 Mr. Johnson in this meeting.  So what he based that
11 on, he never told me.
12 Q.  No one asked any questions to try to substantiate why
13    Mr. Johnson allegedly believed that Mr. Arceo was a
14    racist?
15 A.  I did not ask the question because it wasn't the first
16    time that I heard it so — and based on some of my
17    experiences with Arceo, I'd already formulated that
18    opinion myself.
19 Q.  Now, you also mentioned that you had heard Anthony
20    Branch had referred to Mr. David Arceo as a racist.
21    Is that your testimony?
22 A.  That is correct.
23 Q.  On what occasion did Anthony Branch refer to
24    Mr. Johnson as a racist?
25 A.  Based on what he said he had heard years prior from

Page 151

1  Mr. Daly and what he had heard from Mr. Johnson, and I
2  think some years back Mr. Johnson shared with him that
3  Mr. Arceo was a racist.
4     MR. EDWARDS:  Andrew, I don't want to
5  interrupt, but I must.  You said Mr. Johnson was a
6  racist.
7     THE WITNESS:  No, that Anthony
8  Branch shared --
9     MR. EDWARDS:  No, no.  Not you, Ms. Poplar.
10 In the question to you, I know Andrew didn't mean to
11 say Mr. Johnson, but I heard him say Mr. Johnson.
12    MR. CASCINI:  If I did, I apologize.  Let
13 me clarify in case it is a misunderstanding.
14    MR. EDWARDS:  Yes.
15 BY MR. CASCINI:
16 Q.  We had been talking about whether or not Anthony
17    Branch had ever accused Mr. Arceo of being a racist.
18    Was that the question you were responding to in your
19    previous answer?
20 A.  Yes.
21    MR. CASCINI:  Okay.  Thank you, Carl.  I
22 appreciate the clarification.
23    MR. EDWARDS:  Yes.
24 BY MR. CASCINI:
25 Q.  Would it surprise you that if Mr. Daly did a sworn

Page 152

1  statement in a deposition that said the only time he
2  had ever heard that there was in actuality one
3  occasion where he had ever heard Mr. Arceo do or say
4  anything that could be perceived as racist, and it was
5  a comment that he made?
6  A.  That would surprise me.
7  Q.  That would surprise you?
8  A.  You said -- repeat the question.  I don't understand
9     it.
10 Q.  Sure.  No.  I appreciate that.
11       Would it surprise you to learn that
12    Mr. Daly in a sworn deposition said that only on one
13    occasion had he ever heard Mr. Arceo say anything that
14    could be perceived as racist and had never had any
15    knowledge of him doing anything that could be
16    perceived as racist?
17 A.  No, that wouldn't surprise me, Andrew, because
18    sometimes that only takes -- you only need to see
19    something once.  You don't need to see it repeated.
20    Sometimes once is just enough to give you the feeling
21    or the belief that somebody's racist.
22 Q.  In your opinion, is John Daly a truthful man?
23 A.  He is.
24 Q.  In your opinion, is Mr. Johnson a truthful man?
25 A.  He is.

Carroll Court Reporting
586-468-2411

Donna Poplar
September 22, 2020

Page 153

1  Q.  And in your opinion, is Mr. Branch a truthful man?
2  A.  He is.  Has not given me any reasons to believe that
3      any three of those that you just mentioned are
4      dishonest people.
5  Q.  What about Mr. Mandelaris?  Do you consider him to be
6      a truthful person?
7  A.  I do.  He's not given me any reasons to believe that
8      he's not.
9  Q.  Mr. Dickerson?
10 A.  Not given me any reasons to believe that he's not.
11 Q.  I want to switch topics now to the discussion about
12     the selection of the search firm, MSAE, that was
13     retained to assist in the managing director job search
14     in 2018.
15 A.  Okay.
16 Q.  You testified earlier, if I'm not mistaken, that MSAE
17     was the only entity that had ever been listed as being
18     subject to an interview on any sort of board agenda;
19     is that correct?
20 A.  Let me explain what I meant.  Back during the time,
21     and I want to say may have been in the month of March,
22     there was two dates scheduled for a presentation.  And
23     be a little patient with me as I try to bring it back
24     to the forefront.
25         The day in which Hiring Solutions was to do

Page 154

1      their presentation or did do their presentation was on
2      the day that we had a very lengthy workshop with
3      supervisors to discuss the direction of what they
4      wanted -- complaints.  I'm sorry.  Complaints.
5          And at the time we went to, I think it
6      might have been about two, maybe two hours or so in
7      that particular workshop.  Immediately after that,
8      probably within a half an hour or an hour, Hiring
9      Solutions gave their presentation.  And then on that
10     next day -- I don't know the days.  But on that next
11     day, MSAE was on the agenda to do their presentation.
12     What I found interesting was that there was nothing
13     else on the agenda but MSAE.  So the Board was and the
14     staff was -- had not sat through almost a two to three
15     hour workshop and then expected to give their
16     undivided attention to Hiring Solutions.  At that
17     point many of us was tired and probably not quite
18     willing to be as attentive.
19         But on the date in which MSAE did theirs,
20     again, that was the only thing on the agenda.  So we
21     were quite attentive, prepared for that presentation.
22     And that person in the form of Cheryl Ronk was allowed
23     to give that presentation.  That was my point I was
24     making.
25 Q.  And Ms. Poplar, I'm sorry.  The question I was asking

Page 155

1      you though is the interview with Hiring Solutions was,
2      in fact, on the agenda, wasn't it?
3  A.  Oh, sure.
4  Q.  Okay.  But your earlier testimony was that it was not,
5      and only MSAE had been present on the agenda; correct?
6  A.  You misunderstood what I was telling you or
7      misconveyed what I was saying.
8          What I was trying to say, exactly what I
9      said:  There was two presentations on two separate
10     days.  But on the day that MSAE did theirs, they were
11     the only one on the agenda.  I never intended to say
12     Hiring Solutions was not on the agenda.  They were on
13     the agenda the day before MSAE.
14 Q.  Because, in fact, their interview occurred that day
15     before; correct?
16 A.  Beg your pardon?
17 Q.  The interview of Hiring Solutions, to the best of your
18     recollection, it occurred the day before MSAE was
19     interviewed; correct?
20 A.  It was a presentation.  It was not an interview.
21     There were presentations done.
22 Q.  The presentation by Hiring Solutions took place the
23     day before the presentation by MSAE; correct?
24 A.  That is correct.
25 Q.  And in each instance, the agenda for that day had an

Page 156

1      entry that said we're going to get a presentation from
2      Hiring Solutions that would be on March 8th, and then
3      we're going to get a presentation from MSAE on
4      March 9th; right?
5  A.  That is correct.
6  Q.  Okay.  Now, earlier in your testimony you said that
7      you believe there was, quote, unquote, some kind of
8      connection between MSAE and the one or more of the
9      road commissioners; correct?
10 A.  That is correct.
11 Q.  When you say some kind of connection, to what are you
12     referring?
13 A.  I'm referring to the fact that when Cheryl Ronk came
14     in from MSAE, she gave me the impression that she was
15     quite confident that MSAE was going to be selected.
16         I also base that on the fact that when
17     Cheryl Ronk -- not Cheryl.  Shirley Kautman-Jones
18     referenced to Hiring Solutions, she referenced in such
19     a way that they would probably be good to hire
20     clerical people, not taking under consideration the
21     history that they had in hiring high level or filling
22     high level positions.  She appeared to be more
23     complimentary verbally, that's probably not reflected
24     in those minutes, in MSAE.  So it was almost like
25     Shirley Kautman-Jones had already predetermined that

39  (Pages 153 to 156)

Donna Poplar
September 22, 2020

Page 157

1  MSAE was going to be the selected candidate.
2        Then because I was so concerned about that,
3  I began to ask questions and try to get information
4  how did Shirley Kautman-Jones become aware of both
5  Hiring Solutions and MSAE that she -- in the one
6  meeting before we brought them on that she said that
7  she was going to reach out to two consulting firms,
8  and that raised an interest for me.
9        And then I later discovered that when it
10  came to MSAE, it looked like, I want to say his name
11  might have been Kohler (ph) who was probably at one
12  time connected to County Road Authority, I can't
13  remember, but also that someone from the Genesee
14  County 911 Board recommended MSAE, I'm believing. And
15  I believe that our own attorney, Tom Derderian, had
16  recommended Hiring Solutions from an e-mail exchange,
17  which I did read.
18        And so my only concern was it looked like
19  that, because the Hiring Solutions did their
20  presentation immediately after us being in a workshop
21  that lasted for a long period of time, I just didn't
22  feel like they got the proper consideration that MSAE
23  got on the day when MSAE was allowed to do it and
24  there was nothing else on the agenda. Does that
25  answer your question?

Page 158

1  Q.  It does. And I want to make sure that I understand a
2      comprehensive list of the reasons that you felt there
3      would be some kind of connection.
4        So one thing that you mentioned was a
5      comment that was made to you that someone was, quote,
6      unquote, quite confident MSAE would be selected. Who
7      was it that made that comment to you?
8  A.  No. I felt that Cheryl Ronk in her presentation, the
9      way she conducted herself, that she had that level of
10      confidence that MSAE was going to be the selected firm
11      to do our search.
12  Q.  So it was your perception based on her demeanor and
13      presentation style?
14  A.  Precisely.
15  Q.  Okay. And you also mentioned that somebody had a
16      comment that Hiring Solutions had a history of
17      performing job search functions for lower level
18      employees; is that right?
19  A.  That is not accurate the way I conveyed it.
20  Q.  Okay. I apologize. Please clarify.
21  A.  Shirley Kautman-Jones shared with me that she felt
22      that Hiring Solutions would be better suited to hire
23      clerical people versus high executives. And I found
24      that to be somewhat interesting in looking at Hiring
25      Solutions' track record and the fact that they were

Page 159

1  recommended by our own attorney, Tom Derderian, who
2  would not recommend a firm that is only qualified to
3  hire clerical staff knowing that we were looking for a
4  management director position to be filled.
5  Q.  When did Ms. Kautman-Jones make that comment to you
6      about that Hiring Solutions would be more appropriate
7      for clerical staff?
8  A.  She did, yes. And that came about when we were
9      beginning to look for -- going in the direction of
10      looking for an administrative position or clerical
11      person for the HR department is when she made that
12      comment.
13  Q.  And around what time was that job search performed?
14  A.  It wasn't a job search at that time. It was just a
15      discussion of looking for clerical people, and that's
16      when she made that statement.
17  Q.  Fair enough. Approximately when in terms of time,
18      even if we just need to orient it around other events?
19      When was that discussion?
20  A.  A couple months, 90 days.
21  Q.  90 days before now? 90 days --
22  A.  90 days after the presentation. Somewhere within that
23      time. Up to 90 days.
24  Q.  So it was after the Board had made the decision to
25      fire MSAE.

Page 160

1  A.  That's correct.
2  Q.  Okay. And what other pieces of evidence did you have
3      that suggested that there was, quote, unquote, some
4      kind of connection? I believe that you mentioned
5      something about a 911 operator-director having been
6      hired through MSAE.
7  A.  The only point that I made about the 911 operator was
8      the fact that MSAE was the firm that searched out
9      Genesee County's 911 director. And so that holds true
10      when the recommendation came from a member of a 911
11      board to consider MSAE; that was my main point.
12  Q.  I see. So no one ever told you that there was some
13      sort of connection between either Cheryl Ronk or
14      anybody else at MSAE and any of the board members?
15  A.  No. The only other thing that I can remember is that,
16      I believe it was Coetta Adams had went to, I believe
17      it was a CREATE conference. And one of the things
18      about the CREATE conference, John Mandelaris was at
19      that conference. And during that particular time,
20      they talked about how they were able to get John
21      Mandelaris to meet and sit with Cheryl Ronk at that
22      particular conference.
23        So I don't know what that discussion was.
24      I just do know that they were at the same CREATE
25      conference, and John Mandelaris was introduced to

Donna Poplar
September 22, 2020

Page 161

1  Cheryl Ronk prior to her presentation or shortly
2  after.  I can't remember when that conference was.
3  But those dates can easily be checked out.
4  Q.  But it's important for the purpose of my question, did
5  that meeting that allegedly took place between
6  Mr. Mandelaris and Ms. Ronk, as you understand the
7  facts, occur before or after MSAE was selected by the
8  Genesee County Road Commission to conduct the job
9  search for managing director?
10  A.  Before the selection.  And I want to make it clear.
11  I'm not saying that Cheryl Ronk and John Mandelaris
12  had a meeting.  I'm saying that Cheryl Ronk and John
13  Mandelaris were at the CREATE conference; and during
14  that particular time, they ended up sharing, I believe
15  it was the same table, and was able to have whatever
16  form of a discussion.  And she was able to meet and
17  have dialogue with John Mandelaris during that
18  particular time.  And that was before, before the
19  selection process.
20  Q.  How did you come to learn of that knowledge?
21  A.  Through our former finance director, Coetta Adams, who
22  was at that particular conference.
23  Q.  Okay.  So Mr. Mandelaris and Ms. Ronk -- Ms. Adams
24  told you that Mr. Mandelaris and Ms. Ronk had sat at a
25  table together during a conference presentation?

Page 162

1  A.  That is correct.  And at that time, they were at the
2  same table.
3  Q.  Okay.  Do you have any other evidence that Ms. Ronk
4  had any personal interaction with any of the
5  commissioners prior to the selection of MSAE as the
6  executive search firm?
7  A.  No.
8  Q.  Okay.  Have you ever seen any documents that suggested
9  that there were any communications between any of the
10  commissioners and Ms. Ronk prior to the selection of
11  MSAE as the search firm?
12  A.  Prior to the selection of MSAE, there was an e-mail
13  exchanged between Shirley Kautman-Jones and Cheryl
14  Ronk.  I believe it was on the same date that John
15  Mandelaris retired.  Not John -- John Daly retired.
16  And I believe that correspondence in that e-mail is
17  where I think Cheryl Ronk reached out to Shirley
18  Kautman-Jones to submit a proposal for consideration
19  to be the search firm that would come and conduct our
20  search for the managing director position.
21  So yes, there is an e-mail correspondence
22  on that.  And that took place on the same date again.
23  And I don't know the exact date, but it was the same
24  exact date that John Daly retired.
25  Q.  Do you have any other evidence that there was, quote,

Page 163

1  unquote, some kind of connection between Cheryl Ronk
2  and any of the commissioners prior to the selection of
3  MSAE as the executive search firm?
4  A.  No.
5  Q.  You mentioned that one component of the search was an
6  anonymous survey.  And I believe you mentioned, and
7  please correct me if this is wrong, Ms. Poplar, that
8  it resulted in an FBI investigation.  Tell me about
9  that FBI investigation.  What did that investigation
10  concern?
11  A.  I can't tell you about that FBI investigation.  You
12  are going to have to get that answer from Fred
13  Peivandi.
14  But I can tell you this:  Fred Peivandi
15  provided me a document that he received from Zach Law
16  Firm that also is -- that represents our Road
17  Commission.  And I believe within that there was also
18  a response from a law firm, I want to say the last
19  name by the name of Swift.  But in that document that
20  he gave me, and I still have those documents, on one
21  of the questions Fred Peivandi in his own handwriting
22  wrote FBI investigation.
23  And one of the things I found interesting
24  is that Anthony Branch had raised issues about Fred
25  Peivandi telling him that there was an FBI

Page 164

1  investigation being conducted, and it was shared
2  that -- and I can't say who shared it.  I'm only
3  saying that Shirley Kautman-Jones and County
4  Commissioner Ted Henry met with the FBI on these
5  allegations that was made in these anonymous surveys
6  that was done during the time of the search.
7  Also what I find interesting, there was
8  another document, and I believe I came across that
9  document via the -- when we were looking through the
10  disks that we -- and I shouldn't say this, so I'll
11  take that off.
12  But anyway we came across a document that
13  was sent to Cheryl Ronk by a company called People
14  Matter.  And they were chiming in on some of the
15  accusations that was made in these anonymous surveys,
16  and they felt it important for GCRC to conduct an
17  investigation.  And they were willing to put together
18  proposals to what they would charge to do such an
19  investigation.
20  So those two documents I do have.  And I
21  think those documents was important because all of
22  that was taking place during the time of the search,
23  so that meant that Cheryl Ronk had information on
24  allegations made against Anthony Branch that could
25  have been used to hinder his opportunity to be

41 (Pages 161 to 164)

Donna Poplar
September 22, 2020

Page 165

1    considered for an interview. And in my opinion, that
2    was putting him at a great disadvantage.
3         And to this day, nothing that I know of
4    came out of such an investigation. I don't know the
5    extent and the length of that. But Fred Peivandi is
6    very familiar with it. Again, he gave me the reports
7    from the attorney that was looking into this matter
8    and gave recommendations. And if I'm not mistaken, I
9    believe that Fred Peivandi can speak to you and give
10   you further information on that.
11   Q.  And the only thing that -- you know, the only thing
12   you can testify to, Ms. Poplar, is what you know and
13   what you understand and what you've heard.
14        But I do -- I am a little confused. When
15   we say FBI, we're referring to the Federal Bureau of
16   Investigation, the Federal Law Enforcement Agency;
17   correct?
18   A.  That is correct.
19   Q.  Okay. And when you told me earlier that you couldn't
20   tell me the subject of the investigation, are you
21   saying that something is preventing you from telling
22   me? Or are you saying that you don't know?
23   A.  Well, one of the things is that when -- and you can
24   cut me off when you get ready. Object, whatever.
25   Anthony Branch's attorney asked for all correspondence

Page 166

1    concerning Anthony Branch during the time of this
2    search that led to his being disqualified to be
3    interviewed.
4         I do not believe that a part of the
5    information that you sent Anthony Branch's attorney is
6    inclusive of this legal document that I had that was
7    presented to me by Fred Peivandi.
8    Q.  Okay.
9    A.  Beg your pardon?
10   Q.  I would ask after the deposition is complete that you
11   share that document with me. I don't frankly know the
12   document you're talking about, but I want to make sure
13   that I understand what the reference is here.
14        There's a document in which Mr. Peivandi
15   had written the term FBI investigation in his own
16   handwriting next to some other information; is that
17   correct?
18   A.  That is correct.
19   Q.  Okay. Do you have -- and I don't mean to cut you off.
20   Do you have any other knowledge or information about
21   an FBI investigation occurring? And I'm asking you
22   personally, Donna. Do you know of any information
23   about an FBI investigation resulting from -- resulting
24   from the MSAE solicitation for anonymous feedback?
25   A.  The only information that I -- the only information

Page 167

1    that I have personally would be the documents that I
2    have in my possession that is from People Matter, who
3    they sent the information to Cheryl Ronk as a result
4    of some allegations that was being made by employees,
5    GCRC employees during their response during the search
6    period prior to a selection who would be our managing
7    director. So I do have that document that was
8    addressed to Cheryl Ronk and later addressed to
9    Shirley Kautman-Jones.
10   Q.  So let me ask you I guess this. I'm sorry to keep
11   harping on it, but I'm still very confused about what
12   we're talking about.
13        So explain how -- other than Fred's note,
14   explain how you know that the FBI was involved in this
15   investigation.
16   A.  That was shared with me by Anthony Branch who had a
17   discussion with Fred Peivandi who on numerous
18   occasions told him that he was being investigated by
19   the FBI. And so you would have to get those answers
20   from Fred Peivandi and/or Anthony Branch or both.
21        What I have in my possession is the actual
22   Zach response to these allegations made by some of our
23   GCRC employees; that for some kind of way People
24   Matter, whatever this group is, shared with Cheryl
25   Ronk and sent her information requesting to do a

Page 168

1    proposal and asked her had she talked with the Board
2    yet about these concerns or Shirley Kautman-Jones.
3         And in that e-mail exchange, Cheryl Ronk is
4    telling the person from People Matter that she would
5    be sharing the information with Shirley Kautman-Jones,
6    and she would be giving Shirley Kautman-Jones her
7    phone number and to expect a call from Shirley
8    Kautman-Jones.
9         Now, in my discussion with Commissioner
10   Dickerson, he was not aware of any investigation by
11   the FBI being conducted on Anthony Branch at any
12   level. And Anthony Branch, to my understanding, also
13   had that conversation. And again, that was another
14   conversation that him and Fred Peivandi were having as
15   well.
16   Q.  It sounds like Cloyce is as confused as I am regarding
17   this.
18   A.  I think everyone at this point would be confused
19   because nothing was shared with the GCRC Board that an
20   investigation was taking place as a result of
21   anonymous e-mails to my understanding so -- but this
22   is what we do know: Is that based on this document
23   that I have, and you'll see, there was some form of
24   investigation whereby Shirley Kautman-Jones and Ted
25   Henry met with the FBI.

42 (Pages 165 to 168)

Donna Poplar
September 22, 2020

Page 169

1   Q.  Okay.  Again, I would ask at the conclusion of our
2       deposition that you share those documents with me.
3       And to the extent they are responsive to any of the
4       discovery requests made by any party in this case and
5       they're not privileged, we will be of course sharing
6       them so --
7   A.  Let me do this:  If you don't mind, I can have Monica
8       retrieve the documents and send them to you now.  Are
9       you able to get them?
10  Q.  That's great.  And I won't be able to review them
11      though until after the deposition's complete.  So I
12      mean, unfortunately that won't do us an awful lot of
13      good right now.
14  A.  Okay.
15  Q.  After MSAE was selected by the Board of Road
16      Commissioners to be the executive search firm, you
17      mentioned that you had concerns about the degree of
18      minority outreach experience Ms. Ronk had; is that
19      correct?
20  A.  That is correct.
21  Q.  Did you ever raise that concern with her?
22  A.  I mean, in the actual board meeting when she did her
23      presentation -- if you don't mind, my throat's getting
24      a little dry.
25  Q.  I understand.

Page 170

1   A.  I asked her the question as to their experience in
2       placing African Americans into high profile executive
3       positions.  And I also asked Mrs. Ronk what would be
4       some of the sites that she would search for in terms
5       of trying to identify African American people.
6           She could not respond to that.  But this is
7       what she asked me to do; she asked me if I could
8       identify some sites for her and share them with her.
9       At a later date I did that, and I do have that e-mail
10      exchange that took place between her and I concerning
11      that matter.
12          And so when she finalized the list of the
13      posting sites that they had, I sent her another e-mail
14      and recommended and told her that I was -- I didn't
15      have any concerns about the posting site that was
16      agreed upon; however, I would like to add some
17      additional sites that will help her to identify
18      African American candidates for the position.
19  Q.  And the Board, whether it was through Cheryl or of
20      their own initiative, by some means the Board did
21      incorporate the suggestion that you had made and
22      posted the job on those sites; right?
23  A.  I can't say the Board incorporated that.  Because at
24      that point, after that there was discussion between
25      Cheryl Ronk and I.  And I cannot say whether or not if

Page 171

1   Cheryl Ronk actually posted all -- the position on all
2   the sites.  But I do know I got an e-mail from her
3   explaining some of the sites that she was able to post
4   on and some of the sites that she was not able to post
5   on.
6       I do not believe that the Genesee County
7   Board -- sorry, the GCRC Board of Commissioners was
8   aware of the e-mail dialogue that Cheryl Ronk and I
9   were having at that time because I wasn't copying them
10  in.  And I couldn't see if Cheryl Ronk was copying
11  them in either, so I don't know if she had any
12  discussion.  I didn't.
13  Q.  Fair enough.  But my question, Donna, is -- and I
14  understand now you're saying the Board didn't have a
15  hand in approving that.  But my question, Donna,
16  Cheryl Ronk responded by the information you provided
17  and was receptive to the suggestions that you gave;
18  right?
19  A.  Sure.
20  Q.  Now, you also gave some testimony that you had
21  correspondence with someone at MSAE.  I think you
22  believed the individual's last name was Turner, in
23  which you tried to get interview questions from MSAE.
24  And I believe your testimony was they didn't provide
25  them to you; is that correct?

Page 172

1   A.  That's not correct.  They did provide the interview
2   questions.  They had those.  What they did not have
3   was the scorecard and the questionnaire card that was
4   used during the telephonic interview screen.  They did
5   not have that information.
6       So they provided to both Fred Peivandi and
7   I, as requested, the interview questions from both
8   round one and round two.  But they could not provide
9   anything concerning relative to the telephonic screen.
10  Q.  I understand now.  Thank you for the clarification.
11  A.  Not a problem.
12  Q.  You were able to, however -- so they did end up
13  sending you the interview questions.  They were not
14  able to send you the screening questions.  Correct?
15  A.  That is correct.
16  Q.  And you did specifically ask them for the screening
17  questions in that e-mail exchange?
18  A.  During my telephone conversation with, I want to say
19  her name was Turner, because I actually talked with
20  her on the phone, I did request that information.
21  Q.  So you requested the interview questions via e-mail.
22  You received a response via e-mail.  You requested the
23  screening questions via phone, and that's your
24  testimony; is that right?
25  A.  And I requested both in a phone conversation.  In an

43 (Pages 169 to 172)

Donna Poplar
September 22, 2020

Page 173

1  e-mail I also requested about the actual interview
2  questions because there was two different
3  conversations going on:  One, the first thing we
4  wanted was the interview questions.  And the first
5  thing she sent back was the interview questions for
6  the first interview.
7          Then there was other communications that we
8  needed the interview questions from the second
9  interview.  Then there was questions asked as to did
10  she have any information concerning the actual
11  telephonic interview questions.
12          I would have to go back in and see if that
13  was put in an e-mail.  But I know we certainly talked
14  about it on the phone, and it's reflected in her
15  response to me via e-mail that they didn't have that
16  information.  Is that clear?
17  Q.  Yeah.  I understand now.
18  A.  Thank you.
19  Q.  Next I'd like to ask you some questions about the job
20  description and the change to the job description that
21  was made in the May 15th meeting.
22          I'm going to ask a general question first,
23  and I'm not trying to hide the ball here.  Who was it
24  who had the final authority to be able to make the
25  decision about who they would hire as the managing

Page 174

1  director?  It was the Board; right?
2  A.  Yes.
3  Q.  Okay.  And you would also agree with me, wouldn't you,
4  that the Board has the authority to be able to
5  determine what criteria they want to use in deciding
6  who would be qualified for that job; right?
7  A.  I agree.
8  Q.  Okay.  And you also agree with me -- I mean, you know,
9  like I know you're a longtime HR professional.  We've
10  got a bunch of labor employment attorneys in the room.
11          You would also agree with me, wouldn't you,
12  that they can make whatever criteria they want to make
13  as the ones they want to choose of course so long as,
14  you know, that we don't have the situation that's
15  alleged in this case where there is discriminatory
16  treatment resulting from that; right?
17  A.  That is correct.
18  Q.  So they get to pick any qualifications they want to so
19  long as they're not discriminatory in their intent.
20  A.  That's correct.
21  Q.  Now, you would agree with me -- and like I said,
22  please rely on, you know, your longstanding HR
23  experience that I know you have.  There are a lot of
24  jobs that contain education requirements; right?
25  A.  That is correct.

Page 175

1  Q.  And sometimes you have jobs that require a degree.
2  A.  That is correct.
3  Q.  Right?  So that's not uncommon in any way; right?
4  A.  That's correct.
5  Q.  And would you say that there's anything unusual about
6  educational requirements for jobs in the Genesee
7  County Road Commission?
8  A.  Yes.  There is some things that's unusual about the
9  education requirement.  Am I to respond to that?
10  Q.  Absolutely.  Please.
11  A.  Within the GCRC, our job descriptions are designed in
12  such a way that identifies specific jobs that require
13  unequivocally some level of education, certifications,
14  or licensing.  And so we do, we take under
15  consideration what those jobs may be.
16          In the event that we're dealing -- and let
17  me give you a for example.  Fred Peivandi could not be
18  the director of engineering if he didn't have an
19  engineering degree.  And so you have mechanics who
20  could not be mechanics if they were not properly
21  licensed.  Does that make sense?
22  Q.  It does.
23          (Technical interruption.)
24  A.  It's required either by law or by the position itself
25  that you must possess a certain degree.  We don't too

Page 176

1  much waiver upon that.
2          But what we do for the positions such as
3  the managing director that does not necessarily
4  require you to have a specific degree in a specific
5  area -- for example, the managing director of the GCRC
6  does not necessarily depict that you should have a
7  civil engineering degree to be the managing director.
8  And so what we do in these situations, we create what
9  is called an or category and/or an equivalency clause
10  which is equivalent to the or category for those of
11  you who understand HR.  So we put that clause in.
12          That's very important to understand,
13  Andrew, because we operate on the philosophy that we
14  want to give our internal employees opportunities for
15  advancement.  We think that's a tool that allows us to
16  maintain our employees, taking under consideration the
17  amount of monies that we invest in certain trainings,
18  et cetera, to get our employees at a level where we
19  need them to be so they can give us undeniable
20  performance and contribution.
21          And so in answering your question, yes, we
22  try to carefully craft job descriptions.  And one of
23  my jobs since I've been employed here is to revamp all
24  job descriptions, and that's the reason why we hired
25  Sage Consulting to come in to help us with that very

44  (Pages 173 to 176)

Donna Poplar
September 22, 2020

Page 177

1  lengthy process to try to get these job descriptions
2  properly lined. Because the job descriptions have not
3  been modified in probably 40, 50, 60 years or so. And
4  so that's the task that I've taken on as the director
5  here of GCRC.
6          So I'm hoping that I'm not tiring you out
7  with my responses. It's just that I'm trying to be
8  very clear and concise so we can get a clear
9  understanding of how we look at job descriptions here
10  at GCRC.
11  Q.  You're not tiring anybody else out. We're just tired
12  because it's so late in the afternoon. I appreciate
13  your response and the thoroughness of it.
14          Now, my question though is certainly if the
15  Board of Road Commissioners had decided that they
16  wanted to make an educational requirement that was
17  firm, the managing director position, they could have
18  done that. They had the authority to do that; right?
19  A.  Sure. And at any given point in time, we can modify
20  our job descriptions. I mean, that's kind of like
21  common sense HR-101 dealing with job descriptions.
22  That happens all across the country.
23          What we don't do is what you said earlier:
24  We don't change job descriptions to take certain
25  things out and to put certain things in for the sole

Page 178

1  purpose of deliberately trying to hinder one's
2  opportunity to be considered.
3  Q.  And that makes sense to me. But my only question here
4  is they certainly have the authority to say, in fact,
5  they could have required a Doctorate of Engineering
6  had they wanted to; right? There wouldn't have been
7  anything unlawful about that; correct?
8  A.  Absolutely.
9  Q.  Okay. And I want to try to summarize this testimony
10  so we can kind of get to the heart of the matter here.
11          You testified earlier that there was a
12  meeting in which the changes to the manager-director
13  job description were finally approved by the Board;
14  right?
15  A.  That is correct.
16  Q.  And it was on May 15th of 2018. Is that consistent
17  with your understanding?
18  A.  That's correct.
19  Q.  And it's my understanding that there was a change
20  during that meeting. The version that was coming in
21  to be approved was not the same version that left and
22  was approved; right?
23  A.  Repeat that for me, Andrew, please.
24  Q.  My understanding, that there was a change that
25  occurred to the managing director job description as a

Page 179

1  result of that meeting, which is to say they came in
2  with one version, a proposal was discussed to change
3  it, then they came out with a version incorporating
4  that change; right?
5  A.  Let me respond to that. There was a proposal that was
6  apparently prepared prior to -- job description, I'm
7  sorry, prior to the May 15th meeting.
8          In that May 15th meeting, there was -- I
9  raised concerns about that particular job description.
10  And from raising that concern, there was some changes
11  that was supposed to be made to the job description.
12  Now, I did not become aware of whether or not those
13  changes was actually implemented until some time after
14  that.
15          I do know that had the changes been made,
16  then HR would have gotten the job description for my
17  signature and the signature of the Board Chair on that
18  particular job. Although it was a managing director's
19  position, HR still have to put their seal of approval
20  on that job description.
21          And regardless of the fact that the Board
22  can make whatever criteria or put whatever they want
23  to put in the job descriptions, that's normally
24  approved, if you will, by the HR director. That's why
25  it requires the HR director's signature. But the

Page 180

1  final approval to whatever changes, the Board
2  naturally will have the final say-so.
3          So I've never seen -- I'm aware of the
4  changes that was supposed to be made, but I've never
5  seen the actual document until some time recently.
6  Does that answer your question?
7  Q.  I think that my question was actually just a little
8  bit simpler than that.
9          The only thing I'm trying to establish here
10  is there was discussion on the May 15th meeting about
11  changing the proposed version of the job description
12  that they came into the meeting with; right?
13  A.  Yes.
14  Q.  And, in fact, I believe it was you who raised that
15  concern at that board meeting; right?
16  A.  That is correct.
17  Q.  And do you remember what concern you raised?
18  A.  I raised the concern in that meeting, I brought to the
19  attention of the Board that I was in -- I opposed the
20  job description as written. Because it was clear that
21  the only changes that was made in that job description
22  that was of any significance was the change of taking
23  out of the job description professional experience to
24  be substituted on a year-to-year basis.
25          And I made it very known that Anthony

45 (Pages 177 to 180)

Donna Poplar
September 22, 2020

Page 181

1  Branch, as we all knew, is what I said, did not have a
2  degree.  And if we take out that clause, that's going
3  to eliminate Anthony Branch from being interviewed.
4         And from that statement, a lot of
5  conversation began to transpire.  And it became a,
6  somewhat of a heated meeting based on that.  Because
7  there was some, Shirley Kautman-Jones and Dave Arceo,
8  who did not want to make changes to that job
9  description.  They wanted to keep the job description
10 as written.  As Shirley so stated, that they had spent
11 a lot of time on that job description and that she
12 felt that the Board had agreed to that job
13 description.  However, Cloyce Dickerson said he did
14 not agree to anything that was going to stop Anthony
15 Branch from being interviewed.
16        So again, there was some changes were made,
17 Tom Derderian did make some suggestions; and from that
18 the Board agreed to adopt those changes, if you will,
19 or make those changes I should say.  And from that
20 point, I never seen the job description until recently
21 after.
22 Q.  Now, I have two questions, and they're tangentially
23     related.  They're very specific questions.
24        The first one is does the Board have the
25     ultimate and final authority to make whatever changes

Page 182

1  they want to the job description even absent your
2  approval if it's the managing director job?
3  A.  Well, I think the Board have the authority technically
4      to do whatever they want to do.
5  Q.  I mean, I understand why they would consult with you.
6      But if they had wanted to, they could say yeah, well,
7      you know, this is the one we want.  And we vote on it.
8      And if majority voted, it would be adopted; right?
9  A.  That's in any situation.  You're correct.
10 Q.  In terms of this situation; correct?
11 A.  Sure.
12 Q.  Okay.  My other question is that related to that:
13     Take Anthony Branch out of the equation.  This is a
14     hypothetical now.  Pretend for this purpose he doesn't
15     exist.
16 A.  Okay.
17 Q.  There's nothing unlawful about removing the option to
18     substitute experience for education on its face, is
19     there?
20 A.  There's nothing unlawful how you write your job
21     descriptions as long as you're not in violation of any
22     of the HR laws by which you are governed.  But it is
23     unethical for any organization, either as GCRC, your
24     law firm or anything else, to create job descriptions
25     that will keep certain people that you have identified

Page 183

1  you don't want to have the position internally or
2  externally.  And to make those changes I think is
3  unethical, and it certainly does not rise to the level
4  of what we declare our equal opportunity policy to be.
5         And so whether it's Anthony Branch, whether
6  it was Monica Pearson or anyone within this
7  organization, when we start taking out clauses that we
8  know -- because we know our operation, Andrew.  We
9  know our employees.  So when we start making and
10 developing job descriptions that would prohibit them,
11 disqualify them from even standing a chance, creates
12 some significant problems.
13        So again, to your question -- I hope I'm
14 answering it.  And I like to be as detailed as I can
15 because this is probably the only opportunity I'm
16 going to get a chance to really talk to you on this
17 matter.  I just want to make sure that it is
18 understood that past practices have always been that
19 the HR director plays a very key and vital role
20 whether we have the last say-so or not in making sure
21 that our job descriptions do not discriminate or
22 prohibit any of our employees or external candidates
23 from being considered.  That's a part of our job.
24 Q.  Right.  And I appreciate again the response that you
25     gave.  You gave a lot of very valuable information.

Page 184

1  But my question is a little bit different because it
2  involves a hypothetical.
3  A.  Sure.
4  Q.  With Anthony Branch out of the equation, there is no
5      Anthony Branch in this new world we're about to
6      consider, if you had seen a proposal that would have
7      been -- let's get rid of the option to substitute
8      experience for education and instead just render
9      education a hard and firm requirement for the job.
10     There's nothing facially unlawful about that, is
11     there, in that hypothetical world?
12 A.  I would not have supported such a job description.
13 Q.  I --
14 A.  No, there's nothing unlawful about it.  There's
15     nothing unlawful about changing your job descriptions.
16     But I would not have supported that.  I would still
17     raise the same issue.  It's just that Anthony Branch
18     would not have been the target.  The target would have
19     been that we're hurting our employees regardless if
20     it's Anthony Branch or not.
21 Q.  And I understand that you wouldn't have supported it,
22     and thank you for saying that there's nothing
23     unlawful.  I appreciate the honest answer.
24 A.  It's not unlawful.
25 Q.  That also would be within the full authority of the

46 (Pages 181 to 184)

Donna Poplar
September 22, 2020

## Page 185

1       Board; right?
2    **A. That's correct.**
3    Q. They could do that if they wanted to.
4    **A. Oh, sure.**
5    Q. And obviously they would value your input. To the
6       extent that you were to stand up and say hey, I don't
7       support this, they might consider it. And, in fact,
8       they did.
9           But ultimately they have the discretion to
10      say well, you know, understood, Donna, but we don't
11      care. I mean, hypothetically they could say that.
12      And they would have the option to be able to remove
13      that requirement; right?
14    **A. That is correct.**
15    Q. And their say-so would be final on it, right, because
16       they're the ones that make the decision. Right?
17    **A. That is correct.**
18    Q. Okay. And on its face, there is nothing racially
19       discriminatory about removing an experience or
20       education requirement and instead having a firm
21       education requirement, right, for the managing
22       director job?
23    **A. Now, you say there's nothing racial?**
24    Q. There's no racially discriminatory intent necessarily
25       behind that just on its face; right?

## Page 186

1    **A. If that's not your motive, my answer to that would be**
2       **correct, if that's not the motive or the intent.**
3    Q. Understood. And I also understand the scope of this
4       lawsuit is about answering that question that you've
5       identified. But all I'm asking is there's nothing
6       inherently racially discriminatory about requiring a
7       degree in order to be the managing director of the
8       Road Commission; right?
9    **A. No.**
10    Q. Okay. Do you happen to know -- I didn't mean to cut
11      you off. I apologize, Donna.
12    **A. Again, I'm going to answer the question the way I see**
13      **it. And no, there's no racial intent to change any**
14      **criteria in a job description if the motive for**
15      **changing it is not predicated around racial biases or**
16      **a racial mindset.**
17       **And so again, and I'm going to say it**
18      **repeatedly, that you know as well as I know, Andrew,**
19      **that job descriptions can be modified for a variety of**
20      **reasons. But we would like to modify our job**
21      **descriptions without any racial motivated intent. And**
22      **so my answer to your question is just that.**
23    Q. Okay. So I just want to make sure that I understand
24      your answer. I promise I'm not trying to badger you.
25    **A. I know.**

## Page 187

1    Q. And I also understand the perspective you're sharing.
2       But on its face, there's nothing racially
3       discriminatory about a requirement that you have to
4       have a college degree to get a certain job; right?
5    **A. No.**
6    Q. Now, you testified earlier that everybody knew Anthony
7       Branch did not have a college degree; is that correct?
8    **A. That's correct.**
9    Q. What evidence do you have that each of the individual
10      board members had knowledge that Anthony Branch did
11      not have a college degree?
12    **A. Well, I know that it has been said in terms of people**
13      **who have -- especially John Daly and others, who**
14      **highly speaks of Anthony Branch, they use Anthony**
15      **Branch as a model of this organization as a person who**
16      **came up through the ranks and became the director of**
17      **maintenance without a degree. So that has often been**
18      **spoke of.**
19       **And so I don't know of any except for**
20      **perhaps the newcomer, which would have been Shirley**
21      **Kautman-Jones, that was not aware that Anthony Branch**
22      **did not have a degree, especially if they were tuned**
23      **in to how we praise our employees and especially those**
24      **like Anthony Branch who came up the ranks. That's**
25      **something we brag on as we begin to inspire our new**

## Page 188

1    **hires who come in without degrees. And we use Anthony**
2      **Branch as an example of how far you can go in this**
3      **organization.**
4    Q. So the basis for you saying that everybody knew that
5       Anthony Branch did not hold a college degree was it's
6       something that John Daly used to say and talk about
7       quite frequently. He held it up as kind of an
8       example, like look how far this guy has advanced in
9       our organization.
10    **A. Sure.**
11    Q. Okay.
12    **A. And during that time, with the exception of one board**
13      **commissioner, which would be Shirley Kautman-Jones,**
14      **the other commissioners was present during the time of**
15      **John Daly's tenure.**
16    Q. Absolutely. Do you have any evidence, however, that
17      they had actual or constructive knowledge that
18      Mr. Branch did not have a college degree?
19    **A. No.**
20      MR. CASCINI: Now, what I'm going to do is
21      I'm going to -- and Alex and Carl, I've already shared
22      this with you. I've already sent you an e-mail.
23      Maureen, I believe you received it as well, enclosing
24      some exhibits. I'm going to label them as Exhibits 6,
25      7, 8, and 9. Because sometimes we change things on

Carroll Court Reporting
586-468-2411

Donna Poplar
September 22, 2020

Page 189

1  the fly, we're going to be ignoring Exhibit 6 right
2  now.  But have you guys received at least Exhibit 7,
3  8, and 9 by e-mail?
4      MR. ALEXOPOULOS:  I have.
5      MR. EDWARDS:  I have.
6      MARKED FOR IDENTIFICATION:
7      DEPOSITION EXHIBIT 6
8      (E-mail Chain)
9      MARKED FOR IDENTIFICATION:
10     DEPOSITION EXHIBIT 7
11     (Genesee County Road Commission
12     Job Description)
13     MARKED FOR IDENTIFICATION:
14     DEPOSITION EXHIBIT 8
15     (Genesee County Road Commission
16     Job Description)
17     MARKED FOR IDENTIFICATION:
18     DEPOSITION EXHIBIT 9
19     (Genesee County Road Commission
20     Board Meeting Minutes - May 15, 2018)
21  BY MR. CASCINI:
22  Q.  The first one I want to take a look at here, and I'll
23     pull it up here in just a moment, Donna.  And again,
24     the same rules apply.  If you have any difficulty
25     reading it, just tell me and we'll fix it.

Page 190

1          The first document I'm going to pull up
2  here has been marked as Exhibit Number 9.  I'm going
3  to share the screen now.  I'm going to try to.
4          All right, Donna.  Are you able to see this
5  on the screen?
6  A.  Yes.
7  Q.  It says Genesee County Board Commission Board Meeting
8     Minutes, May 15th, 2018.  At the bottom it says
9     Defendant GCRC Production Number 1, Document 126.  Is
10    that right?
11 A.  Yes.
12 Q.  Okay.  It's a nine-page document.  I'm just saying
13    that for the record.
14         And I'm going to take you on down here to
15    the bottom of Page 6 at the top of Page 7.  So you can
16    see that the view right now is straddling those two
17    pages.  Do you see where it says GCRC manager-director
18    job description near the top of the page?
19 A.  Yes.
20 Q.  And it says Board approval of the manager-director job
21    description for the Genesee County Road Commission; is
22    that right?
23 A.  Yes.
24 Q.  On the next page it says the job description of the
25    GCRC manager-director was discussed with the Board and

Page 191

1  Attorney Tom Derderian during this morning's board
2  meeting, and the Board made the following changes to
3  the job description.  And it has four bullet points
4  afterward; correct?
5  A.  Uh-hmm.  That's correct.
6  Q.  Regardless, let's ignore for a moment what happened
7     or what got decided as a result of this motion.  But
8     my question is limited to this:  Is this motion
9     depicted in this portion of the meeting minutes
10    responsive to the concern you raised about the job
11    description?
12 A.  As it relates to the bullets, Andrew?  These bullets
13    that start with change education and experience to
14    education or experience?
15 Q.  My question is only is this motion at least responsive
16    to the concern you raised?  Whether or not it fully
17    addresses it, whether it was satisfactory in the way
18    that it addressed it, was this motion made as a result
19    of the discussion you kicked off at that May 15th
20    meeting we talked about before?
21 A.  Yes.  There was a motion made as a result of that
22    discussion.
23 Q.  Okay.  Now, we have four bullet points on there.  It
24    says change education and experience to education or
25    experience.  Change the word required to desired.

Page 192

1  Possession of a bachelor's degree in a field related
2  to job functions is desired.  Add should have in front
3  of prior five plus years experience.  Should have
4  prior five plus years experience in supervisory role
5  and experience.  Change must establish permanent
6  residence to preferred to establish residency in
7  Genesee County within 18 months of employment.
8          Is your recollection that those were some
9  of the changes that were discussed at that meeting?
10 A.  These were some, but not all.
11 Q.  What else was discussed at that meeting that you can
12    recall?
13 A.  One of the key things that's missing, if you go back
14    to what -- unfortunately these minutes don't show the
15    conversation that had took place leading up to these
16    changes.
17          My main concern that I raised was they had
18    removed the equivalency clause professional experience
19    to be substituted on a year-to-year basis.  That is
20    not a part of these bullets.
21 Q.  So you raised a concern, you said hey, there is this
22    line -- and we'll cut to the chase here.  It was in
23    the previous version of the job description, the one
24    that existed when John Daly was there, the equivalency
25    clause that you can substitute in education for years

48  (Pages 189 to 192)

Donna Poplar
September 22, 2020

Page 193

1 of experience or the other way around.  Your concern
2 was hey, we should return this line to the job
3 description being considered here today.  That was
4 your concern?
5 A.  That is correct.
6 Q.  Okay.  And then --
7 A.  Andrew, if I may, that was correct because that was
8 the only major -- and again, I would hope not to be
9 frustrating you, but that -- I can see you're moving,
10 and I get a little concerned.  I don't want to be
11 frustrating you.
12       The main concern in the entire change of
13 the draft job description that you're talking about
14 right now, the main change was removing that clause,
15 what we call the equivalency clause, that I felt
16 necessary to put back in there.  Had they put that
17 clause in, they didn't have to do any of the other
18 things.  That clause would have opened the door for
19 Anthony Branch or anyone else that didn't have a
20 degree to be interviewed.  So that was my main point,
21 was the equivalency clause that was taken out based on
22 that language.
23       So when I look at this, I don't see that
24 there.  So this is not all inclusive of what we
25 discussed in the meeting in the way in which the job

Page 194

1 description should look.
2       And when I seen that job description, I
3 believe if you go to that job description, at some
4 point I'm sure you will, the word change education and
5 experience to education or experience, that was a
6 heading.  That was an actual heading.
7 Q.  I'm sorry.  I didn't mean to step on you.  Go ahead.
8 A.  No, that's it.  I just want to make that point clear,
9 that that particular equivalency clause is not amongst
10 the four bullets.
11       And if you don't mind, we can stay here
12 before you take the next question.  I just need to
13 take a minute break.  I need to put some drops in my
14 eyes.  Is that okay?
15 Q.  As long as the answer's complete, absolutely.  Yeah.
16 We can take any break you need, Donna.  That's okay.
17 A.  You can stay right there.
18       (Off the record at 3:52 p.m.)
19       (Back on the record at 4:01 p.m.)
20 BY MR. CASCINI:
21 Q.  We took a break there, but we were answering some
22 questions about the May 15th meeting.  And we're
23 taking a look at the meeting minutes that's been
24 marked as Exhibit Number 9, and we're right in the
25 middle of Pages 6 and 7.

Page 195

1       Donna, we already read through the four
2 bullet points that are listed on that page.  And you
3 mentioned that there was also discussion about an
4 equivalency clause that had been in the prior job
5 description; is that right?
6 A.  That is correct.
7 Q.  Okay.  The equivalency clause is not listed as one of
8 these changes.
9 A.  That's correct.
10 Q.  Now, again, I want you to consider the hypothetical
11 world we were talking about before.  Anthony Branch is
12 not a part of this hypothetical world.
13       Is there anything that is racially
14 discriminatory on the face of any of those four
15 bullets as they stand alone?
16 A.  No.
17 Q.  And would you also agree that the impact of those four
18 changes is to change education from being a hard
19 requirement and turn it into a desired attribute for
20 the job?
21 A.  Can you repeat your question for me, Andrew?
22 Q.  Would you agree that the impact of those four bullet
23 points, the function that those four bullet points
24 serve, especially influenced by the discussion that
25 the Board was having that day, do you agree that they

Page 196

1 transform holding a four-year degree from being a hard
2 requirement and transform it into something that is
3 merely desired for the job?
4 A.  When you look at the content of this, when it says
5 possession of a bachelor's degree in a field related
6 to job functions is desired, I think that brings us to
7 a level of a person who has it should be given more
8 consideration than the person who did not have it in
9 this context.
10 Q.  And I appreciate your answer, and you're saying in
11 this context.  So your interpretation of this
12 particular change is that a person who had one might
13 be more favorably situated to receive this managing
14 director job, but a person who didn't have it wouldn't
15 be disqualified from even applying; right?
16 A.  No.  It would not disqualify a person from applying
17 for the position.  But when you use words such as
18 desired and preferred, it often discourages people who
19 don't have a degree from applying for a position.  So
20 that's why we kind of try to stay away from those
21 words as much as we possibly can because we want to
22 encourage people who may be qualified but don't have
23 the desired degrees of choices to still be able to
24 apply for the position.  So this would be very
25 discouraging to those who don't have the desired

49  (Pages 193 to 196)

Donna Poplar
September 22, 2020

Page 197

1   degrees.
2   Q.   Prior to making these changes, would Anthony Branch
3        have been eligible to become the managing director
4        before these changes are adopted?
5   A.   Absolutely.
6   Q.   And so your testimony is before these changes are
7        adopted -- and I want to make sure that I ask the
8        question correctly -- Anthony Branch would have been
9        able to get the managing director job if a bachelor's
10       degree in a field related to job functions was
11       required?
12  A.   This is what I want to say to you.  Let's keep it
13       apples to apples.  You said before these changes,
14       would Anthony Branch have been qualified for the
15       position.  Before these changes, Anthony Branch would
16       not have been able to qualify for the position because
17       they took out the equivalency clause which was
18       professional experience could be substituted on a
19       year-to-year basis.
20            So even when they presented to the Board
21       for its Board approval that job description in the
22       contents by which it was written, Anthony Branch would
23       not have qualified to be considered for an interview.
24  Q.   So the version that they came in -- and I'm not trying
25       to hide the ball here.  I just want to make sure that

Page 198

1   I have this clear.
2            The version they came into the meeting
3        with, the one that had the bachelor's degree as a
4        requirement, that would have rendered Anthony
5        ineligible to become the managing director; right?
6   A.   That is correct.
7   Q.   Okay.  And then that's the concern that you raised.
8        And you go forward and you say hey, we need to make
9        changes here.  There's discussion about various
10       topics.  And then changes are, in fact, made.  There's
11       a motion, it's seconded, and then that motion carries;
12       right?
13  A.   That is correct.
14  Q.   As a result of those four bullet points having been
15       modified -- first it came in where Anthony was
16       ineligible.  Those four bullet points were added.  Is
17       Anthony Branch eligible for the job after those four
18       bullet points had been added into the job description?
19  A.   Sure.  If you look at change education and experience
20       to education or experience, Anthony Branch should
21       have, would have been able -- should have qualified
22       for an interview just like Fred Peivandi.
23            But that's what made me raise my concern is
24       that when Anthony said -- even looking at this job
25       description, if this is to be held that this was

Page 199

1   changed in a manner by which to open that door for
2   Anthony Branch or anyone else who didn't have a
3   particular degree to be considered for an interview,
4   then the question becomes then how or why was not
5   Anthony Branch actually advanced to the first round of
6   interviews if we are to believe that this change
7   opened that door for him to have that opportunity.
8   That opportunity was not given to him based on this
9   job description.
10  Q.   And I understand all that.  And all of that has, you
11       know, been described in the Complaint.  And we've gone
12       through that, and we've addressed those allegations in
13       a lot of different ways.
14            My question's more limited here, which is
15       just very simply:  As a result of these changes, what
16       the Board voted, Anthony Branch became eligible for
17       the job with the version of the job description that
18       was approved; right?
19  A.   Sure.
20  Q.   Okay.  The Board listened to your concerns and then
21       actually adopted it and made change based on it;
22       right?  You're the one who pitched it; right?
23  A.   Not true.  The change that I was fighting for was to
24       put back in the equivalency clause of professional
25       experience could be substituted on a year-to-year

Page 200

1   basis.  And let me explain why that's important.
2            If you look on the job description, you
3        only see the change -- you see the -- I wish you would
4        put up the job description itself because I'm trying
5        to go on my memory.
6            The point that I'm trying to make here,
7        Andrew, that I think is very important is that if you
8        look on the job description, the experience or
9        education is not a bullet.  It's a heading.  So having
10       the equivalency clause in there explains that
11       education or experience.
12            For example, it's saying that if you don't
13       have this type of education and if you have
14       professional experience could be substituted on a
15       year-to-year basis, that identifies that experience
16       that we're talking about.  So the way that job
17       description is set up, they only use -- they only use
18       education or experience as a heading as you would look
19       at it in this sense on a job description requirement,
20       then they list it.
21            To my eyes I only see it as a heading.  But
22       looking at the wording, I will give you -- I will
23       again still say education or experience should have
24       opened that door.  But what would have secured it, if
25       they kept the equivalency clause there.  And I don't

Donna Poplar
September 22, 2020

Page 201

1  know what else to say to you, but I want to say the
2  fact that the HR director -- I'm not going to back
3  down on what my issue was in terms of taking it before
4  the Board.
5       So when they made the education or
6  experience as a heading, now I'm looking for what type
7  of education do I have to have. They list that as a
8  bullet. I'm now looking for the type of experience I
9  have to have that is listed as a bullet. You don't
10  see that in the heading. You don't -- that's why the
11  professional equivalency clause was significant.
12       Now, you see it out of the eyes of an
13  attorney. I see it out of the eyes of an HR director.
14  I'm saying if I would have done this, if I had had
15  this as a heading, I expect you to list what qualifies
16  me for the eduction category, what qualifies me for
17  the experience category. I don't see that on that job
18  description is what I'm saying. Had I seen
19  professional, and I'm going to repeat it, professional
20  experience can be substituted on a year-to-year basis,
21  then I would be willing to say that the Board reacted
22  based on my concerns.
23  Q. Okay. I do understand. And your testimony is this is
24  not the change that you would have preferred, and it's
25  not the way that you would have worded implementing

Page 202

1  the change that you were trying to address the Board
2  on May 15th; right?
3  A. It's not the change that I preferred. It's not the
4  change that I asked for.
5  Q. Got it.
6  A. This is not what I was requesting. So there's a
7  difference in preferring something versus asking for
8  something. I was specifically asking for them to do
9  one thing: Put back into that job description
10  professional experience could be substituted on a
11  year-to-year basis.
12       And the job description that was in a draft
13  form that went before the Board to be approved, it had
14  a heading that said education and experience. This
15  heading was changed to education or experience. But
16  you're still not giving me the bullets to substantiate
17  what is your education requirements and what is
18  experience requirements.
19       If you look at -- watch this, Andrew. If
20  you look at education, here they're telling you what
21  kind of education they want you to have. Got it?
22       If you look at experience, they're telling
23  you to put prior five plus years experience; right?
24  But they're not listing also as part of your
25  experience, that you can have professional experience,

Page 203

1  on other words, in lieu of that education.
2  Q. I understand.
3  A. Did I make myself clear? Because I want to make sure
4  I'm making myself clear.
5  Q. I completely understand your answer and --
6  A. It means a lot to me.
7  Q. I apologize. I didn't hear the last thing.
8  A. Clarification on this, Andrew, and I want to make it
9  very clear to all three of you, my job is not to be
10  argumentative. But I take my responsibilities as an
11  HR director very seriously because we're dealing with
12  the livelihoods of GCRC employees.
13       And I'm making my points and references the
14  way that I'm making them because I don't want any
15  misunderstanding of how I interpret what I see in
16  front of me. I can't be responsible for how any of
17  you interpret this. I can only be responsible for how
18  I interpret it. And how I interpret it is that this
19  is not reflecting what I was requesting.
20       I never talked about words desired or
21  preferred. That was never my issue. I never talked
22  about specific degrees. That's not my issue. My
23  issue was the equivalency clause. I want that very
24  clear.
25  Q. Understood. And that is coming across. And I also

Page 204

1  want to piggyback on something that you recommended
2  earlier. Let's shoot the gap here and pull up the job
3  description.
4  A. Okay.
5  Q. I'm going to turn off the screen sharing here in hopes
6  that I can get the version of the job description up
7  on the screen. Let's see how successful I'll be at
8  that.
9       Now, Ms. Poplar, I'm going to be sharing
10  with you documents that I have labeled Exhibit 7 and
11  Exhibit 8. You'll see Exhibit 7 on the right side of
12  the screen and Exhibit 8 on the left side of the
13  screen. I'll share those with you now, or at least
14  I'll try and share them with you now.
15  A. Okay.
16  Q. All right. Are you able to see it looks like two job
17  descriptions that are side by side?
18  A. Yes.
19  Q. Okay. The one on the left says education and
20  experience as the header. The one on the right says
21  education or experience in the header.
22  A. Sure.
23  Q. Now, if you need to flip back to Exhibit 9 that we
24  were just taking a look at, please let me know.
25  A. I will.

Carroll Court Reporting
586-468-2411

Donna Poplar
September 22, 2020

Page 205

1  Q.  But the transition from Exhibit 8 to Exhibit 7, does
2      that reflect the changes that were adopted by the
3      Board in that motion that we were just taking a look
4      at in the meeting minutes?
5  A.  The one on -- did you say the far right?
6          MR. ALEXOPOULOS:  Andrew, just for
7      clarification purposes, Exhibit 8 is the December '09
8      job description.  I don't think that's the one --
9          THE WITNESS:  The '09 is on my left.  When
10     you just scrolled that down, I see that one on the
11     left.  And then the other one with education or
12     experience is on my right.
13         MR. CASCINI:  And Alex, thank you for the
14     clarification because that's not the document I was
15     trying to show you.  So I appreciate that you nabbed
16     that, Alex.  So hold on just one brief moment here,
17     gentlemen.
18         Maureen, can we go off the record for a
19     quick second.
20         (Off the record at 4:16 p.m.)
21         (Back on the record at 4:17 p.m.)
22         MR. CASCINI:  Alex and Carl, I will be
23     sharing a document with you via e-mail.  Maureen, you
24     will also receive a copy of it.  Please let me know
25     when you have it.  It's a document that I've marked

Page 206

1      Exhibit 10.
2          MARKED FOR IDENTIFICATION
3          DEPOSITION EXHIBIT 10
4          (May 14, 2018 E-mail)
5  BY MR. CASCINI:
6  Q.  First I'm going to show you a document that I have
7      marked as Exhibit 10.  It's a three-page document.  Go
8      to the top.  The first one has, for the record, Bates
9      Number MSAE334.  The second page, 335.  The third
10     page, 336.  And I'm going to go to the third page of
11     that document.
12         And Ms. Poplar, it may be a little bit
13     difficult to see.
14  A.  Yeah.
15  Q.  Can you see at the top it says GCRC Board Meeting,
16     5/15/2018, and it says discussion A8 under there?
17  A.  Can you get closer on this or something?
18  Q.  That would probably help, wouldn't it?
19  A.  Yeah.
20  Q.  Let me take a look at that.  I've zoomed in a
21     particular section, and it's very zoomed in because I
22     just want to make sure that you'll be able to both see
23     it and read it.
24         It says GCRC Board Meeting, 5/15/2018.
25     Discussion, A8.

Page 207

1  A.  That's very blurry for me.  Monica, can you read that?
2          MS. PEARSON:  It does say that.
3          THE WITNESS:  Okay.  She says it says that.
4      Okay.
5  BY MR. CASCINI:
6  Q.  Do you recognize why it says that at the top?  Why
7      does it say discussion A8?
8  A.  I can't answer that.
9  Q.  Okay.
10  A.  That would be something that the board package, that
11     normally they're numbered as what the document might
12     be.  So that's something that come from Linda.
13         When we do discussion items, we have like
14     A1, A2, A3.  It's like discussion item number eight,
15     meaning that there are seven other discussion items
16     that took place before number eight.
17  Q.  The fact that it says A8 means this was a document
18     that was part of a Board's discussion packet so they
19     could talk about it; right?
20  A.  That is correct.
21  Q.  Okay.  And the time that they talked about the job
22     description was during the May 15th meeting; right?
23  A.  That is correct.
24  Q.  So now I'm going to zoom out and --
25  A.  I've just got one thing.  This is really, really

Page 208

1      blurry for me, and it's affecting my eyes.  If you can
2      just take me out of this.
3  Q.  Sure.  Sure.  And I apologize.  I don't want to --
4  A.  This is better right here.  This is better.  Thank
5      you.
6  Q.  Let me take a look here and see if I can bring that up
7      even more.
8          Okay.  So I'm going to go to the second
9      page of the document.  And do you see where it says
10     education and experience there?
11  A.  Yes.
12  Q.  Okay.  Now, were you able to see a copy of the
13     document that the Board came into the May 15th meeting
14     with that they were going to discuss for their
15     approval?
16  A.  Yes.  That was part of the board package that we get a
17     week prior to the actual board meeting.
18  Q.  And is -- I'm not trying to hide the ball here.  To
19     the best of your recollection, is the document
20     depicted in Exhibit 10, is that a copy of that job
21     description that they brought into the meeting for
22     discussion approval?
23  A.  Yes.
24  Q.  Okay.  Now, I'm going to try to do -- or I'm going to
25     do what I tried to do before, where I'm going to show

52  (Pages 205 to 208)

Donna Poplar
September 22, 2020

Page 209

1  you two documents that are side by side here.  And
2  what I'm going to show you are Exhibit 7 and
3  Exhibit 10 side by side.
4  A.  Okay.
5  Q.  The document on the left is Exhibit 10.  The document
6  on the right is Exhibit 7.  Can we see that?  Does
7  everybody --
8  A.  Yes.
9        MR. EDWARDS:  Yes.
10 BY MR. CASCINI:
11 Q.  Now, they came into the meeting with Exhibit 10.  And
12 my question for you, Donna, and you can take a look at
13 Exhibit 9, the meeting minutes again if you want to,
14 but does Exhibit 7 depict the changes that the Board
15 made a motion on and then approved?  Does Exhibit 7
16 show those changes?
17 A.  Well, the problem that I have with your exhibit
18 here --
19 Q.  And if you need to go back to Exhibit 9 to take a
20 look, hey, what were the changes and then check to
21 make they're there, I totally get it.  I'm not trying
22 to hide the ball.  In fact, I'd like to do them all
23 three side by side, but I can't.
24 A.  Okay.  The problem that I have with your -- I can't
25 see the number of this.  I think you said -- what's

Page 210

1  the one to my right, Monica?  What exhibit is this?
2  This is seven?
3        The problem that I have, Andrew, with the
4  one to the right as written:  You see at the top, and
5  this is what you hear me talk about when I talk about
6  headings.  You see the education or experience?
7  Q.  Yes.
8  A.  You see that's a heading.
9  Q.  Uh-hmm.
10 A.  Make sense?  And then when you see down physical
11 demands and then it tells you what it is?  Make sense?
12 Do it tell you anywhere up under the heading for
13 education or experience that professional experience
14 on a year-to-year basis can be substituted for in lieu
15 of education?  Do you see that there?
16 Q.  Well, just for the purpose of the record, that's not
17 listed anywhere on there.  But Ms. Poplar, my
18 question's a little different.
19       Regardless of whether Exhibit 7 represents
20 a document that has the language that you prefer that
21 you would have drafted, does the document that has
22 been marked as Exhibit 7 represent the document
23 incorporating the changes the Board actually did make?
24 That's the only question I'm asking.
25 A.  My answer to that, Andrew, is going to be no.  Because

Page 211

1  you keep using the word what I would prefer if I wrote
2  it.  That's not the issue.
3        The issue was in that particular meeting in
4  question that led to these supposedly changes, it does
5  not reflect what they voted for.  It doesn't reflect
6  that.  What they voted for was those bullets you seen
7  listed and professional experience can substitute on a
8  year-to-year basis.  So it doesn't reflect that.
9        I don't know any kind of way other to
10 answer that.  My answer to your question would be
11 this:  No, it does not reflect what I believe the
12 Board voted for.  It do reflect what Linda put as her
13 bullets that don't include all of the bullets that
14 should have been reflected.
15 Q.  Got it.  So --
16 A.  Wait.  This is my point.  If the Board was to have
17 seen and take under consideration what we were
18 changing, if they zoomed into that, I don't think
19 they would admit that this is reflective of what we
20 was agreeing to.  And I use the word because I was
21 a part of that process, although I'm not a board
22 member.
23 Q.  Okay.  So --
24 A.  So my answer's no.  My answer's no.
25 Q.  Understood.  And all you can do is you can give me,

Page 212

1  you know, the testimony as you've experienced it.  I
2  think you said that succinctly earlier.
3        But I guess my question then is would it
4  surprise you if upon looking at Exhibit 7 and upon
5  looking at the May 15th meeting minutes, some of the
6  board commissioners said and they testified to say
7  yeah, that was what we voted on?
8  A.  It wouldn't surprise me at all, Andrew.  Because this
9  is what I do know:  Of the Board, they do not have a
10 clue as to what it's like to do job descriptions.  So
11 they wouldn't know what to really tune into.  And then
12 unfortunately, for whatever reason, we don't have the
13 actual discussions that really took place that reflect
14 what should be in these changes.
15       So no, I would not be surprised that you
16 had lay board members who are not HR experts, and this
17 is the first time at their tenure as a board member
18 here that they ever had to participate in a job
19 description development because they've never done
20 that for a managing director before.  I'm not at all
21 surprised.
22 Q.  So despite, however, you know, whatever paucity of
23 experience they may have, I mean, you did testify
24 earlier and I think it's correct, the Board ultimately
25 does have the discretion to make the final judgment;

53  (Pages 209 to 212)

Donna Poplar
September 22, 2020

Page 213

1　right?
2　A.　The Board — in any industry, any company has that,
3　Andrew.　You already know the answer to that.
4　　　But this is what most boards depend on.
5　They normally depend on their HR directors to guide
6　them through the process to help them to make the
7　decisions that they don't understand.　That's why they
8　hire people like me to help lead and guide them in
9　making these decisions.
10　　　Had I had that opportunity to review this
11　job description when it was drafted to reflect the
12　changes, I would have said this is not what we agreed
13　to.　And I use the word we because I was a part of
14　that decision-making, although I'm not a, what you
15　would consider to be the final decision-maker as a
16　board member.
17　　　So no, this does not reflect that, Andrew.
18　And no, I would not be surprised that they would agree
19　that these were the actual changes.
20　Q.　Okay.　So it may not have been a wise decision.　It
21　may not have been an effective decision.　But it
22　wouldn't surprise you if the board members took a look
23　at Exhibit 7, and they were to say yeah, I mean, yeah,
24　sure, that did what we wanted to do.　They might be
25　wrong, but that might be what they -- it is not

Page 214

1　unreasonable to you that that's what they could have
2　thought; is that correct?
3　A.　That's correct.
4　Q.　Okay.　And would it surprise you to learn that Linda
5　Kossak, when we took her deposition, that she
6　testified and said hey, the four bullet points that
7　were listed on the May 15th meeting notes, that was
8　what was presented to the Board and that was what they
9　voted on?
10　A.　That surprises me.　Because Linda is the keeper of the
11　minutes.
12　Q.　Yes.
13　A.　And so the Board, although she's not a board member,
14　they depend on her to be accurate in her minute taking
15　in terms of what she's transcribing. (Technical
16　interruption.)
17　　　So when I look at these minutes, you would
18　assume that the only person that really had any input
19　outside of the Board on these minutes was Tom
20　Derderian.　You would not assume that Donna Poplar had
21　any input because my comments or my concerns has not
22　been mentioned nowhere in these minutes.　So I would
23　be extremely surprised that Linda would say that this
24　is all inclusive of what should be in these changes
25　because that is not at all accurate.

Page 215

1　Q.　So if Linda says that those four bullet points were
2　　　the things the Board --
3　A.　Did I lose your volume there?
4　Q.　You may have.　I apologize.　I can re-ask.
5　A.　That's okay.
6　Q.　If Linda testifies that the four bullet points
7　　　depicted on Exhibit 9 that represented what the Board
8　　　did, she says that's correct, that's right, that's
9　　　what they did, she's either wrong or she's lying.
10　A.　She is not -- she's not all inclusive.
11　　　My point is this:　When you look at some of
12　the things that's put here, the Board did talk about
13　that.　The Board did agree.　So we talked about things
14　that we know they agreed upon.　But let's talk about
15　the things that was agreed upon that don't reflect in
16　these changes.　Let's talk about that.　Because that's
17　not what's here.　And I'm not going to sit here,
18　Andrew, and pretend that I see what I don't see.
19　Q.　Absolutely.　I wouldn't ask --
20　A.　I'm not going to do that.　So all I'm saying to you,
21　that regardless of what Linda says or regardless of
22　what a board member says, I am the person who raised
23　the issue.　So there's no doubt in my mind that I know
24　exactly on what points by which I was raising the
25　issue.　And what I was raising the issue was to put

Page 216

1　back the equivalency clause back in the job
2　description.
3　　　No one doubts that.　No one's denying that
4　that was the purpose of the conversation.　But this is
5　what I don't see.　So all these bullets I see here,
6　they're in bullet forms in the actual document, these
7　things are things that was discussed.　But they're not
8　the all-inclusive changes.
9　Q.　Got it.　Understood.
10　A.　So when you ask the question do this reflect what was
11　discussed, naturally they would say yes, because that
12　part is true.
13　　　All I'm saying is it is not all inclusive.
14　So I can't say that this reflects 100 percent of what
15　was discussed for the changes.　That's all I'm saying.
16　Q.　But without putting too fine a point on that, I mean,
17　to the extent that Linda Kossak's opinion is that that
18　was a comprehensive list, then she's either wrong or
19　she's lying.
20　A.　That's correct.
21　Q.　Are you still able to see Exhibit 10 on the left and
22　Exhibit 7 on the right?
23　A.　Okay.　Monica's out of the room.　What am I looking at
24　on the left?　Talk to me.
25　Q.　Exhibit 10 is the document that says education and

54 (Pages 213 to 216)

Donna Poplar
September 22, 2020

Page 217

1   experience.  Exhibit 7 is the document that says
2   education or experience.  I didn't change the screen
3   at all.  I just want to make sure that --
4   A.  That's correct.  That's correct.
5   Q.  Is Anthony Branch -- imagine that both of these --
6   these are hypothetical questions I'm about to ask you.
7   There are two of them.
8       Imagine that Exhibit 10, the version on the
9   left, was the final ironclad version of the job
10  description.  Would Anthony Branch be eligible to be
11  the managing director under that job description?
12  A.  No.
13  Q.  Why not?
14  A.  Because it does not take under consideration that
15  Anthony Branch does not have -- let me take you to the
16  top where it says education and experience.  Anthony
17  Branch does not possess a bachelor's degree in a field
18  related to job functions as required.  Anthony Branch
19  does not have the preference that the Board is saying
20  they want in this job description as a civil engineer
21  or in a similar discipline.  Anthony Branch does not
22  have a master's degree that would be considered an
23  asset.  So he don't have any of that.
24      Now, so let's look at what other
25  opportunity would Anthony Branch have to be

Page 218

1   interviewed.  When you look at the second paragraph,
2   it says display proven leadership experience
3   motivating teams with vital functions and duties.
4   Prior five plus years in supervisory role and
5   experience reporting to a board of directors.
6       What that is telling me in this particular
7   situation, we want you to have this education here.
8   And also the experience that we want you to have with
9   this education is the displaying of proven leadership
10  experience motivating teams with vital functions and
11  duties, prior five plus years in a supervisory role
12  and experience reporting to a board of directors.
13      Also what we want you to have in addition
14  to having these certain degrees, we want you to have a
15  Michigan valid driver's license, et cetera, et cetera.
16  And the willingness to, if you are not a county
17  resident, to move in the Genesee County area within 18
18  months.
19      So what you don't see on the left side,
20  Andrew, is anything that's giving Anthony Branch the
21  or.  If you don't have a degree, Anthony Branch, in
22  any of these categories, whether we prefer it or not,
23  if you don't have any of these degrees, then we're
24  going to look at your professional experience that
25  could be substituted on a year-to-year basis because

Page 219

1   you don't have a degree.
2   Q.  Okay.
3   A.  That's how I read this document.
4   Q.  And I completely understand.  So again, just to
5   summarize -- and that was a little bit of a lengthy
6   answer.  I just want to make sure I understand the
7   gist.  Under Exhibit 10, Anthony Branch is not
8   eligible for that job.  Why?  Because he doesn't meet
9   the requirements of the first paragraph even though he
10  does meet the requirements of the bottom three
11  paragraphs.
12  A.  Well, this is how you have to read the job
13  description:  Education and experience.
14  Q.  I just want to say, so your testimony is --
15  A.  He don't.
16  Q.  He doesn't.  Got it.
17  A.  No, absolutely not.
18  Q.  And then when we look over in Exhibit 7, same
19  paragraph.  I want to take a look at the same section
20  there.  Is Anthony Branch eligible if that is the
21  finalized version of the job description?
22  A.  No.
23  Q.  Why not?
24  A.  Because the same scenario.  When you go over to the
25  first paragraph, it says education or experience.

Page 220

1   Possession of bachelor's degree in a field -- I don't
2   need to repeat that again.  Display leadership
3   experience, whatever.  That's in conjunction with this
4   first sentence.  It still don't give you the
5   professional experience can be substituted on a
6   year-to-year basis.
7       So where is it in here that's telling me
8   that -- I don't have the education; right?  And this
9   display proven leadership and experience motivating
10  teams, that is tied into for individuals who have this
11  first set of requirements.  This is connected.  That's
12  why in the previous, if you go back to the job
13  description that was developed up under John Daly, you
14  will see that you have the word used as or.
15  Q.  And I just want to make this point of clarification:
16  Donna, did you write the job description that was
17  present when John Daly was the managing director?
18  A.  Did I write the managing director's job description?
19  Q.  Yes.
20  A.  Absolutely not.  John Daly was up under the managing
21  director job description that was developed in, what,
22  in 19 -- what was that?  You had it on one of the ones
23  when you put the wrong --
24  Q.  From 2009 but --
25  A.  I wasn't here in 2009.

55 (Pages 217 to 220)

Donna Poplar
September 22, 2020

Page 221

1  Q.  Got it.  And that makes sense.  You weren't with the
2     Road Commission at the time.
3         Were you involved at all in the process of
4     generating it?
5  A.  **The job description?**
6  Q.  That 2009 job description.
7  A.  **No, but I was involved in screening the applicants who**
8     **applied for the managing director during the time.**
9         MR. ALEXOPOULOS:  Andrew, can we go off the
10    record real quick?
11        MR. CASCINI:  Absolutely.
12        (Off the record at 4:38 p.m.)
13        (Back on the record at 4:39 p.m.)
14 BY MR. CASCINI:
15 Q.  So under Exhibit Number 7, Donna, your testimony is if
16    that's the version that the Board finalizes -- again,
17    I ask you a hypothetical.
18        If that is the version that the Board
19    approved and finalized, and that was the managing
20    director job description that was in effect when the
21    job search occurred, Anthony Branch is not eligible
22    for that job?  That's your testimony?
23 A.  **That is correct.**
24 Q.  Okay.  To the best of your recollection, and we do not
25    have the resumes up in front of us here, were any of

Page 222

1     the individuals who were interviewed before the Board,
2     so that's any of the second or the third round of
3     interviews, the round of 7/6 and the round of 3, would
4     any of them have been ineligible if that's the final
5     version of the job description?
6  A.  **I can't answer that, Andrew, because I do not have**
7     **their resumes to be able to talk to them.**
8  Q.  Okay.  If Anthony Branch was not qualified under the
9     changed, modified May 15th job description, why do you
10    believe that he was interviewed by Cheryl Ronk on a
11    telephone line?
12 A.  **Well, that was my question.  You can't have it both**
13    **ways.  You can't say that job description qualified**
14    **him to be interviewed, what we call telephonic**
15    **interview screen, and disqualify him to advance to the**
16    **first round.  So that was my question.  That's my**
17    **point.**
18        **Had, had there been an equivalency clause**
19    **put back in place as I had requested, then Anthony**
20    **Branch unequivocally without a doubt would have been**
21    **qualified to go to the first round of interviews.**
22    **Anthony Branch was not -- and I'm going to make this**
23    **very clear.  You had two internal candidates.  One was**
24    **Fred Peivandi.  One was Anthony Branch.**
25        **With the exception of this job description,**

Page 223

1     there was no reason why both of them should not have
2     advanced to the first round of interviews, absolutely
3     no reason, had the professional equivalency clause
4     been put back into the job description that was
5     previously up under the job description with John
6     Daly.
7  Q.  Okay.
8  A.  **So Cheryl Ronk would have to answer the question what**
9     **was it in Anthony's resume based on that job**
10    **description that she felt Anthony Branch was qualified**
11    **for the telephonic screening, and what took place in**
12    **that telephonic -- at the time in which both Anthony**
13    **Branch and Fred Peivandi were given an invitation to**
14    **the telephonic phone screening interview, she must**
15    **have deemed them both qualified.  So how was it that**
16    **one advances and the other don't.**
17 Q.  So the answer to the question, and again, a lot of
18    that insight's very valuable, but the answer to the
19    question I asked -- or I should say the question that
20    I asked was, you know -- well, let me just ask the
21    question directly.
22        Do you know if Cheryl Ronk regarded Anthony
23    Branch as meeting the requirements of Exhibit Number
24    7?
25 A.  **Cheryl Ronk would have to answer that question.**

Page 224

1  Q.  So the answer to my question is you don't know; right?
2  A.  **No, I don't know.  Because based on what you just**
3     **said, Andrew, you asked me the question if Anthony**
4     **Branch was not qualified based on the job description**
5     **that was approved on May 15, 2018, if he didn't meet**
6     **those qualifications, how did he get the telephonic**
7     **invitation for the telephonic interview.  And my**
8     **question is, the concern that I raised, if that -- if**
9     **he qualified based on his resume and based on the**
10    **criteria of that job description, then the question**
11    **becomes how could he make it to the telephonic**
12    **interview and not make it to the first round of**
13    **interviews.**
14        **And so the person who is really eligible to**
15    **answer that question would be Cheryl Ronk.  Because if**
16    **I answered that question, that would be the point by**
17    **which I raised as that point of concern.  Because I couldn't**
18    **understand what could have possibly happened.**
19        **In one sense, you can't make it to that**
20    **telephonic interview in the capacity of Anthony**
21    **Branch, and then there had to be a reason given as to**
22    **why he did not advance to that first round.  Because**
23    **it certainly couldn't have been his education.**
24 Q.  So the answer is, you know, you don't know what Cheryl
25    was looking at when she decided you're eligible for

56 (Pages 221 to 224)

Donna Poplar
September 22, 2020

| Page 225 |
|---|
| 1    the screener, but we're not going to be advancing. |
| 2    A.   That answer would have to come from Cheryl Ronk |
| 3         herself. |
| 4    Q.   Okay.  All I'm trying to do, Donna -- I'm not trying |
| 5         to badger you here.  All I'm trying to make sure is |
| 6         that your testimony is that you don't know. |
| 7    A.   I do not know. |
| 8    Q.   Is that correct?  All right. |
| 9    A.   And for the record, Andrew, I don't want you to think |
| 10        you're doing anything to badger me. |
| 11   Q.   Okay. |
| 12   A.   I know you're doing your job, and I'm doing mine.  And |
| 13        I'm going to do as you suggested that I do, and I will |
| 14        do anyway in any deposition:  I'm just telling you the |
| 15        facts of how I see it.  But I can't speak out of |
| 16        Cheryl Ronk's mind what she was looking for. |
| 17        I do feel, since you posed the question, I |
| 18        do feel that when Cheryl Ronk contacted Anthony |
| 19        Branch, she had already formulated some negative |
| 20        opinions about Anthony Branch based on what employees |
| 21        were saying and based on an investigation in those |
| 22        anonymous surveys that she felt the need to push forth |
| 23        for investigation. |
| 24        So I feel that when she went and |
| 25        communicated with Anthony Branch, it was based on some |

| Page 226 |
|---|
| 1         biases; and that might be one of the reasons why |
| 2         Anthony Branch did not advance to that first round of |
| 3         interviews, because he was scarred. |
| 4    Q.   I think this is a great time, considering I'm going to |
| 5         transition to a new topic, to end for the day.  And I |
| 6         wish that we were able to wrap it up today, Donna. |
| 7         I'm sorry to have to drag you through it again.  But |
| 8         actually even if Alex hadn't had the hard stop, I |
| 9         would have had one right behind it. |
| 10   A.   Okay.  I want to say I'm not available for Wednesday |
| 11        or Thursday of this week.  I do not work on Friday. |
| 12        So whatever you guys set up is going to have to be |
| 13        sometime next week or after. |
| 14   Q.   Okay.  I can circulate new dates, and Carl and Alex |
| 15        will come to a conclusion about what date we want to |
| 16        pick then.  Okay? |
| 17   A.   Not a problem. |
| 18        MR. EDWARDS:  Very well. |
| 19        (The deposition was adjourned at 4:47 p.m. |
| 20        Signature of the witness was not requested by |
| 21        counsel for the respective parties hereto.) |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 227 |
|---|
| 1                  CERTIFICATE |
| 2    STATE OF MICHIGAN |
| 3    COUNTY OF MACOMB |
| 4 |
| 5         I, MAUREEN COLLIER, a Notary Public in |
| 6    and for the above county and state, do hereby certify |
| 7    that this deposition was taken before me at the time |
| 8    and place hereinbefore set forth; that the witness was |
| 9    by me first duly sworn to testify to the truth; that |
| 10   this is a true, full and correct transcript of my |
| 11   stenographic notes so taken; and that I am not |
| 12   related, nor of counsel to either party, nor |
| 13   interested in the event of this cause. |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20   _____ |
| 21   MAUREEN COLLIER, CSR-7422 |
| 22   Notary Public |
| 23   Macomb County, Michigan |
| 24   My commission expires:  February 9, 2021 |
| 25 |

Carroll Court Reporting
586-468-2411