UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DONNA POPLAR,

                    Plaintiff,

vs.                                    Case No. 2:21-cv-12568-VAR-JJCG
                                       Hon. Victoria A. Roberts

GENESEE COUNTY ROAD COMMISSION
and FRED F. PEIVANDI, in his
individual capacity,

                    Defendants.



            DEPOSITION OF JOHN MANDELARIS, taken on Tuesday,

July 19, 2022, at 211 West Oakley Street, Flint, Michigan,

noticed for 1:00 P.M.



APPEARANCES:

For the Plaintiff:  LEE LEGAL GROUP, PLLC
                    BY:  CHARIS LEE, J.D. (P84127)
                    117 West Flint Park Boulevard
                    Flint, Michigan 48505
                    (810) 513-9257
                    charis@leebusinesslaw.com
                            and
                    GAFKAY LAW, PLC
                    BY:  JULIE A. GAFKAY, J.D. (53680)
                    604-A South Jefferson Avenue
                    Saginaw, Michigan 48607
                    (989) 652-9240
                    jgafkay@gafkaylaw.com



```
 1   APPEARANCES (CONTINUED)

 2   For the Defendant:  HENN LESPERANCE, PLC
                              BY:   ANDREW A. CASCINI, J.D. (P76640)
 3                            32 Market Avenue, SW, Suite 400
                              Grand Rapids, Michigan 49503
 4                            616) 551-1611
                              aac@hennlesperance.com
 5
     Court Reporter:  Cynthia Lathrop, CSR-2474
 6

 7

 8

 9                            *     *     *     *

10

11

                                  INDEX TO EXAMINATION
12
     WITNESS:   JOHN MANDELARIS
13
     Examination by Ms. Lee                              Page
14

15

16                            *     *     *     *
17

18

19

20

21

22

23

24

25
```

Donna Poplar v. Genesee County Road Commission

John Mandelaris

3 (3 - 6)

Page 3

1   Flint, Michigan
2   Tuesday, July 19, 2022
3   1:00 p.m.
4   R E C O R D
5   COURT REPORTER:  Do you solemnly swear
6   or affirm to tell the whole truth in this matter so
7   help you God?
8   THE WITNESS:  I do.
9   MS. GAFKAY:  Will you state your full
10   name for the record?
11   THE WITNESS:  John Mandelaris.
12   MS. GAFKAY:  Mr. Mandelaris, my name is
13   Julie Gafkay.  I'm an attorney, together with Charis
14   Lee, and we represent Donna Poplar in this action
15   against Genesee County Road Commission.
16   EXAMINATION
17   BY MS. GAFKAY:
18   Q.   I understand that you are an attorney as well; is that
19   right?
20   A.   Well, I'm retired.  I haven't practiced law in over
21   ten years.
22   Q.   Are you licensed still with the Michigan State Bar?
23   A.   Yes, I hold a license there.
24   Q.   Your license is current?
25   A.   Yes.

Page 4

1   Q.   Okay.
2   A.   But it's restricted.
3   Q.   What does that mean?
4   A.   What's the term, back of the book, back of the
5   directory.
6   Q.   Okay.  Your license, there's some type of -- there's a
7   limit --
8   A.   You can't practice --
9   Q.   Retirement status?
10   A.   Right.
11   Q.   And what year did you become licensed with the State
12   Bar of Michigan?
13   A.   1970.
14   Q.   And were you continuously licensed from 1970 to the
15   present?
16   A.   Yes.
17   Q.   I understand that you're also a member of the -- or a
18   Board member of the Genesee County Road Commission;
19   is --
20   A.   That's correct.
21   Q.   -- that correct?
22   And when did you -- when did you become
23   a member, a Board member of the Genesee County --
24   A.   About --
25   Q.   -- Road Commission?

Page 5

1   A.   -- 10 years ago, I believe, 2012.
2   Q.   Is that an elected position?
3   A.   No, appointed.
4   Q.   And who appointed you?
5   A.   The Board of County Commissioners.
6   Q.   Is there a certain term?
7   A.   Yes, six years.
8   Q.   And so are you on your second --
9   A.   Yes.
10   Q.   -- term?
11   A.   Um-hum, second appointment.
12   Q.   When does that end?
13   A.   End of this year, end of 2022?
14   Q.   Is there a limit on how many different times -- terms
15   you can --
16   A.   No --
17   Q.   -- serve?
18   A.   -- there's no limit.
19   Q.   Do you plan to run -- do you plan to serve another
20   term?
21   A.   Yes.
22   Q.   And have you ever -- have you already been advised by
23   the Board of County Commissioners that you can serve
24   another term?
25   A.   I haven't contacted the Board of County Commissioners

Page 6

1   about that.
2   Q.   Okay.  But you haven't been told that that body does
3   not want you to serve --
4   A.   Correct.
5   Q.   -- another term?
6   So tell me how many other -- how many
7   total commissioners are there on the Genesee County
8   Road Commission.
9   A.   There are five.
10   Q.   And currently who are the other Board members?
11   A.   Cloyce Dickerson, Tim Elkins, Cathy Lane, L-a-n-e.
12   Q.   "K" or "C," do you know?
13   A.   Cathy, it's with a "C"; and David Arceo.
14   Q.   Okay.  And is this a paid position?
15   A.   Yes.
16   Q.   What is the pay?
17   A.   Nine thousand a year.
18   Q.   And how would you describe your responsibilities as a
19   member of the Genesee County Road Commission?
20   A.   To provide direction for the Road Commission and to
21   set policy; and that's pretty much the extent of it.
22   Q.   Does the Board -- is the Board responsible to
23   supervise any individuals of the Genesee County Road
24   Commission?
25   A.   Yes.

Page 7

1 Q.  Which individual or individuals?
2 A.  Manager/director.
3 Q.  And who is that currently?
4 A.  Fred Peivandi.
5 Q.  Okay.  Were you involved in Fred Peivandi's hire?
6 A.  Yes.
7 Q.  What was your involvement?
8 A.  As a member of the Road Commission, as being the
9     employer.
10 Q.  Was there a vote?
11 A.  Yes.
12 Q.  Did you vote in favor of his hire?
13 A.  Yes.
14 Q.  Was he unanimous, if you know?
15 A.  No.
16 Q.  Who voted against?
17 A.  Cloyce Dickerson, I believe.
18 Q.  Do you know who Donna Poplar is?
19 A.  Yes.
20 Q.  And is she currently the director of Human Resources
21     for the Genesee County Road Commission?
22 A.  Yes, she is.
23 Q.  And did you know her prior to her employment with the
24     Genesee County Road Commission?
25 A.  Yes.

Page 8

1 Q.  In what capacity?  How did you know her prior?
2 A.  Many years ago, I was working for the County of
3     Genesee as assistant corporation counsel, and she was
4     the director of the Genesee County Committee Action
5     Agency, which was one of the largest things in Genesee
6     County, I mean, employment-wise, employees.
7 Q.  How long were you corporate counsel for Genesee
8     County?
9 A.  Thirty-four years.
10 Q.  Do you recall the years?
11 A.  Yeah, 1974 to 2008.
12 Q.  Did somebody replace you in that role?
13 A.  Yes.
14 Q.  Who replaced you?
15 A.  I don't recall right now.  I retired.
16 Q.  Oh, okay.  I was just curious.  What did you do after
17     2008 as far as legal work, if any?
18 A.  None.
19 Q.  Is that when you retired?
20 A.  I retired and didn't do any other legal work.
21 Q.  All right.  Going back to Donna Poplar, were you on
22     the Board when she was hired?
23 A.  No -- wait, I think I was.  It was 2016?
24 Q.  I was going to say, the records reflect that it was
25     2016.

Page 9

1 A.  Yeah.
2 Q.  Were you on the Board at the time?
3 A.  Yes.
4 Q.  Were you involved -- was the Board involved or you
5     involved at all in her hire?
6 A.  No.
7 Q.  Understanding that you provide direction to Genesee
8     County Road Commission in your capacity as a Board
9     member and set policy, what involvement, if any, have
10     you had with Donna Poplar since her hire at the
11     Genesee County Road Commission?
12 A.  Quite a bit, really.
13 Q.  Can you give me some examples of reasons you've had
14     contact with her?
15 A.  Well, she's contacted me many times to discuss county
16     matters.
17 Q.  What types of county matters has she contacted you
18     about?
19 A.  Matters dealing with her position, matters dealing
20     with her office.
21 Q.  Matters dealing with Human Resource office?
22 A.  Um-hum.
23 Q.  Is that "yes"?
24 A.  Yeah.
25 Q.  Is there personnel or a Human Resource committee for

Page 10

1     the Genesee County Road Commission?
2 A.  No.
3 Q.  Are there any other special committees?
4 A.  No.  You're talking about the County Road Commission
5     as a Board?
6 Q.  Yes.
7 A.  No, we don't have those committees.
8 Q.  Okay.  Do all, if you know, do all policies that get
9     implemented regarding Human Resources, for instance,
10     for the Genesee County Road Commission, do those types
11     of policies have to be approved by the Board?
12 A.  Yes.
13 Q.  You've testified that you, the Board supervisors --
14     supervises the managing director, who is currently
15     Fred Peivandi; correct?
16 A.  Managing director is Fred Peivandi.
17 Q.  Okay.  And the Board supervises him; is that right?
18 A.  Yeah.
19 Q.  And are there individuals at the Road Commission who
20     report directly to Fred Peivandi?
21 A.  Yes; many.
22 Q.  For instance, do the directors?
23 A.  The directors do.
24 Q.  And understanding, I believe, it was approximately
25     November of 2021, do you recall that Donna Poplar,

Page 11

1   even though she's director of Human Resources, that
2   she was -- her reporting relationship changed from the
3   managing director, Fred Peivandi to the deputy --
4  A.   Yes.
5  Q.   -- managing director, Randy Dellaposta?
6  A.   Yes.
7  Q.   Were you -- was the Board involved in that decision?
8  A.   Yes.
9  Q.   And did the Board make that decision?
10 A.   As far as I recollect, yes.
11 Q.   And what was the reason the Board made that decision?
12 A.   The reason being, we wanted an intermediary between
13   the Human Resources director and the managing director
14   of the Road Commission.
15 Q.   Okay.  Was there a reason you wanted an intermediary?
16 A.   Well, at the time, it didn't seem that the two
17   individuals were cooperating with each other.
18 Q.   And why do you say that?
19 A.   Why do I say that?
20 Q.   (Nodding head affirmatively).
21 A.   There seemed to be some pushback from Donna Poplar
22   with respect to her boss, the managing director.
23 Q.   Was the pushback from Donna, did that come in part
24   with regard to complaints she had made, formal
25   complaints with the Board about the managing director,

Page 12

1   her supervisor, Fred Peivandi?
2        MR. CASCINI:  Objection as to
3   foundation.  You can answer.
4        THE WITNESS:  Oh, okay.
5        MR. CASCINI:  If you know and
6   understand, obviously; but you can answer.
7        THE WITNESS:  That's hard to answer.  I
8   don't know exactly how to answer that.
9  Q.   (BY MS. GAFKAY)  Well, had Donna Poplar made complaints
10   prior to the reporting relationship changing that you
11   just --
12 A.   Yes, she --
13 Q.   -- testified to?
14 A.   Yes, she had.
15 Q.   And other than -- and Donna Poplar's complaint, at
16   least in part, was that she believed Fred Peivandi had
17   discriminated against her based on race; is that true?
18 A.   No.
19 Q.   Had Donna Poplar complained that Fred Peivandi had
20   discriminated against her based on race?
21 A.   Yes.
22 Q.   And she had done so prior to the change in reporting
23   relationship?
24 A.   Yes.
25 Q.   And that is part of the pushback from Donna Poplar

Page 13

1   with regard to Fred Peivandi; is that right?
2  A.   I wouldn't -- no, I don't think so.
3  Q.   Well, tell me, other than the fact that Donna Poplar
4   complained to the Board about Fred Peivandi, what
5   other pushback was there from Donna Poplar?
6  A.   There had been complaints by other members of the
7   staff with respect to the managing director.
8  Q.   Anything else?
9  A.   Not that I can think of right now.
10 Q.   Okay.  So the pushback from Donna included that there
11   were complaints by other members of the staff
12   regarding the managing director?
13 A.   I'd say yes.
14 Q.   And who were those other staff members?
15 A.   I believe her staff.
16 Q.   Do you know who those individuals were?
17 A.   One name that comes to mind is Rachel.
18 Q.   Anyone else you recall the name of?
19 A.   No, I don't; I can't recall the name.
20 Q.   You've testified that Donna Poplar, prior to November
21   of 2021, made a complaint to the Genesee County Road
22   Commission Board regarding race discrimination.  Do
23   you recall that?
24 A.   She did, yes.
25 Q.   And do you recall that she submitted something in

Page 14

1   writing to the Board?
2  A.   Yes.
3  Q.   Outside of what she had submitted in writing, did
4   Donna Poplar ever come to you individually, either by
5   mail, e-mail, phone, or in person to complain about
6   race discrimination?
7  A.   Yeah, partly, partly.
8  Q.   All right.  So, in other words, Donna Poplar -- did
9   Donna Poplar come to you directly and complain, at
10   least in part, about race discrimination?
11 A.   Yes.
12 Q.   All right.  Do you recall when that was?
13 A.   Oh, for the last five years, I believe.
14 Q.   Several times?
15 A.   Um-hum.
16 Q.   Is that a "yes"?
17 A.   Um-hum.
18 Q.   And have some or all of those -- strike that.
19        Have those complaints been related to
20   how Fred Peivandi is treating her?
21 A.   As to how he's directing her.
22 Q.   Tell me what you mean by that.
23 A.   In an official capacity, how she's doing her job, what
24   he wants done.
25 Q.   I see.  And has she expressed to you that the way in

Page 15

1  which Fred Peivandi wants her to do her job at times
2  is -- would be racially discriminatory?
3  A.  No.
4  Q.  So I had originally -- we were talking about the fact
5  that Donna Poplar has made complaints which included,
6  at least in part, concerns of race discrimination.
7  A.  Yeah.
8  Q.  You said that relates to how he is directing her to do
9  her job.
10 A.  Yes.
11 Q.  So what do you mean by that?
12 A.  Well, he would direct her to, I guess, implement
13  various procedures with respect to individuals.
14  That's all.
15 Q.  Okay.  So what I'm trying to understand is, what did
16  you take from that complaint or concern she raised
17  with you that it was --
18 A.  Valid?
19 Q.  No no no.  -- that it related to race?
20 A.  I -- I didn't -- I didn't think that was very
21  important.  I didn't think her complaints with respect
22  to race carried much water.
23 Q.  Why not?
24 A.  Well, knowing Donna and knowing Fred, I didn't put
25  much credence in it.

Page 16

1  Q.  Okay.  So I'm trying to understand.  So let me ask
2  some more questions so I can get a better picture of
3  what you mean.
4  A.  Okay.
5  Q.  So what do you mean knowing Donna and knowing Fred?
6  A.  Well, Fred is someone who likes to be in command of a
7  situation, and he directs Donna to do particular
8  things in the course of employment, and those
9  particular things, I always thought -- I mean, she
10  might have connected them to disparate treatment with
11  respect to race; I never did.
12 Q.  Sitting here today looking back, were there times that
13  you believed that Donna Poplar was treated unfairly?
14 A.  Yes.
15 Q.  Can you give me any examples of times that you thought
16  she was being treated unfairly?
17 A.  Well, one time is when she wanted an assistant, and
18  she wanted that assistance because of her eyesight,
19  physical impairment.  I believe she thought she needed
20  assistance because of the workload, and Fred did not
21  think her workload was that great.  So he
22  resisted that.
23 Q.  Okay.  So do you recall that Donna requested an
24  accommodation for a vision disability?
25 A.  Yes.

Page 17

1  Q.  And did you have any reason to dispute that she had a
2  disability?
3  A.  No.
4  Q.  In other words, do you believe that she had a
5  disability?
6  A.  Yes.
7  Q.  And did Donna Poplar make a request for an
8  accommodation for her disability?
9  A.  Yes.
10 Q.  And that request was either -- was for assistance with
11  a part-time or full-time person in Human Resources?
12 A.  Not only that, but she also requested assistance,
13  which was given by the Board for, like, larger
14  television sets, physical accommodation.
15 Q.  Okay.
16 A.  I think she has the room darkened also.
17 Q.  And some of those things were granted?
18 A.  They were, yeah.
19 Q.  So one of the things that she requested was an
20  administrative assistant?
21 A.  Yes.
22 Q.  Did you believe that Donna Poplar's request for
23  accommodations were reasonable?
24 A.  Yes.
25 Q.  Is there any burden or risk of -- undue burden or risk

Page 18

1  to the Genesee County Road Commission that that was
2  ever identified to deny her any of those reasonable
3  accommodations?
4  A.  Not that I know of, no.
5  Q.  Did Fred Peivandi reject Donna Poplar's request for an
6  accommodation for an administrative assistant?
7  A.  Yes.
8  Q.  I understand that for a brief time -- well, strike
9  that.
10      Do you acknowledge -- do you recall
11  that Donna went to the EEOC and made a formal
12  complaint about her request for an accommodation being
13  denied?
14 A.  I believe that was in her complaint with the EEOC, I
15  believe.
16 Q.  And do you recall, after she did that for a time
17  period, a brief time period, there was a designated
18  administrative assistant in Human Resources that
19  provided her some assistance?
20 A.  Yes.
21 Q.  And do you recall that person's name?
22 A.  I'm terrible with names.  No.
23 Q.  I am too, so I feel your pain.
24 A.  Yeah.
25 Q.  So regardless of the name, that's not really what

Donna Poplar v. Genesee County Road Commission

John Mandelaris

7 (19 - 22)

Page 19

1    matters as much as the fact that -- her name was
2    Monica Pearson; do you recall that?
3  A.   There you go.  Great employee.
4  Q.   And do you recall that she was designated as an
5    administrative assistant in HR?
6  A.   Yes.
7  Q.   And part of what she -- a lot of what she was doing
8    was assisting Donna?
9  A.   Yes.
10  Q.   And assisting Donna with her disability?
11  A.   Because Donna had a disability.
12  Q.   Right.  Okay.  Now, at some point, do you recall that
13    Monica Pearson, this administrative assistant in HR,
14    was moved to a different position?
15  A.   No.
16  Q.   At some point, do you know or recall that Donna Poplar
17    no longer had a designated administrative assistant?
18  A.   No.
19  Q.   Do you know that today she does not have an
20    administrative assistant?
21  A.   I do not know that.
22  Q.   Okay.  Do you know that at some point in time, the
23    Genesee County Road Commission stopped accommodating
24    Donna?
25         MR. CASCINI:  Objection; foundation,

Page 20

1    assumes facts not in evidence.
2         THE WITNESS:  Do I know that the Road
3    Commission stopped --
4  Q.   (BY MS. GAFKAY)  Let me ask you.  I apologize.  That
5    was poor wording.
6         Do you have knowledge that Fred
7    Peivandi, as the managing director, stopped
8    accommodating Donna Poplar with an assistant?
9  A.   No.
10         MR. CASCINI:  Same objection.
11  Q.   (BY MS. GAFKAY)  Has Donna Poplar -- do you have
12    knowledge of Donna Poplar complaining about not having
13    a designated administrative assistant in HR?
14  A.   Since the time when it was appointed to her?
15  Q.   Yes.
16  A.   In other words, lately?
17  Q.   Yes.
18  A.   No.
19  Q.   Are you aware that Monica Pearson is no longer in the
20    administrative assistant for the HR role, that she is
21    actually a benefit coordinator?
22  Q.   Do you know that Monica Pearson is the benefit
23  Q.   Do you know that Monica Pearson is the benefit
24    coordinator?
25  A.   No.

Page 21

1  Q.   To your knowledge, is there a budget line -- or is it
2    budgeted for there to be a designated administrative
3    assistant in HR who assists Donna Poplar with her
4    vision disability?
5  A.   No, I don't know that.
6  Q.   Okay.  Let me ask you this:  To your knowledge, is
7    there any reason for there not to be a designated
8    administrative assistant -- HR administrative
9    assistant assisting Donna with her vision disability?
10  A.   Do I know all of that?  No.
11  Q.   No, no, I'm not asking if you know.  What I'm asking
12    you is -- well, I'm asking you if you know of any
13    reason why Donna Poplar would no longer have a
14    designated HR administrative assistant accommodating
15    her vision?
16  A.   No.
17  Q.   Is that what you understand should be happening?
18  A.   No.
19  Q.   Oh.  What is your understanding?
20  A.   My understanding is, she should still have the
21    administrative assistant --
22  Q.   Okay.
23  A.   -- as she was hired to be.
24  Q.   All right.  Do you agree that if the individual who
25    was hired to be her administrative assistant in HR was

Page 22

1    moved to a different position, such as benefit
2    coordinator, that that would no longer be the
3    accommodation that Donna Poplar had requested?
4  A.   That Donna Poplar had requested originally?
5  Q.   Yes.
6  A.   No.
7  Q.   Let me ask you differently because I think we're using
8    double negatives here.  I just want to make sure the
9    record's clear when we read it after.
10         Would an employee in the benefit
11    coordinator role who at times is sometimes helping
12    Donna with her vision disability fulfill Donna's
13    request for accommodation to have a designated HR
14    administrative assistant?
15         MR. CASCINI:  Objection on the basis of
16    foundation.
17         THE WITNESS:  I don't think I can
18    answer that properly because when Donna wanted an
19    administrative assistant, that's as far as my
20    involvement with it went.  I don't know how she was
21    using that person --
22  Q.   (BY MS. GAFKAY)  Okay.
23  A.   -- to help her.
24  Q.   All right.  So when Donna originally requested the
25    accommodation of having an administrative assistant,

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-5, PageID.406   Filed 11/21/22   Page 8 of 22
Donna Poplar v. Genesee County Road Commission
John Mandelaris

8 (23 - 26)

Page 23

1   you believe that was reasonable?
2   A.   Yes.
3   Q.   Fred Peivandi wanted to reject that?
4   A.   Right.
5   Q.   Did he identify why he wanted to reject it?
6   A.   He didn't think the workload was sufficient for her to
7   have an assistant.
8   Q.   And you disagreed with that?
9   A.   I disagreed with it.
10   Q.   And then your understanding is, at some point, she did
11   get the administrative assistant?
12   A.   Yes.
13   Q.   Is that becau -- do you know why that happened?
14   A.   Well, I voted for it because of her disability, her
15   visual disability.
16   Q.   Okay.  So in other words, it sounds like it was a --
17   A.   I was --
18   Q.   -- Board decision to get Donna -- to accommodate
19   Donna?
20   A.   Yes.
21   Q.   All right.  And as a Board member who voted in favor
22   of accommodating Donna Poplar's disability by
23   designating an HR administrative assistant, are you
24   aware of it ever coming before the Board to revoke
25   that accommodation?

Page 24

1   A.   No.
2        MR. CASCINI:  Objection; assumes facts
3   not in evidence.
4   Q.   (BY MS. GAFKAY)  Has it ever come before the Board
5   since it was approved to give Donna Poplar a
6   designated HR assistant to change that in any way?
7   A.   Not that I'm aware of, no.
8   Q.   So as far as you know or are concerned, Donna Poplar
9   should still have a designated HR administrative
10   assistant?
11        MR. CASCINI:  Objection; foundation and
12   asked and answered.
13        THE WITNESS:  Yes.
14   Q.   (BY MS. GAFKAY)  Okay.
15   A.   But now you're getting into the administration.
16   Q.   Okay.
17   A.   So that's really in the area of the responsibility of
18   the managing director rather than the Board.
19   Q.   So you've testified to believing at times Donna Poplar
20   was treated unfairly.  Are there other instances where
21   you believe Donna Poplar was treated unfairly?
22   A.   I can't recall instances, but there were probably two
23   or three that I know of that she's complained of.
24   Q.   Two or three times you believe she was treated
25   unfairly that she complained about; is that right?

Page 25

1   A.   Yeah.
2   Q.   And you can't -- can you recall any of those instances?
3   A.   Not particularly, no.
4   Q.   Okay.  Whether you -- well, strike that.
5        I'm going to show you what's been
6   marked as Exhibit 10 in these depositions.  You can
7   read it.  I'm just going to ask you if you're familiar
8   with it to begin with.
9   A.   (Reviewing document).
10   Q.   Have you ever seen what's been marked as Exhibit 10?
11   A.   Yes.
12   Q.   And this is a document dated January 28, 2021.  It's
13   addressed to the Genesee County Road Commission, and
14   it's signed by Donna Poplar.
15        Did you get a copy of this from Ms.
16   Poplar on or about January 28, 2021?
17   A.   Yes.
18   Q.   Do you agree that, in this written complaint, Donna
19   has raised concerns of race discrimination?
20   A.   Yes.
21   Q.   And that those concerns relate to how Fred Peivandi
22   has treated her?
23   A.   Yes.
24   Q.   And do you agree that going directly to the Board with
25   concerns about her supervisor discriminating against

Page 26

1   her was appropriate for Donna Poplar to do?
2   A.   Yes.
3   Q.   And more specifically, do you agree that it was
4   appropriate under the policies of the Genesee County
5   Road Commission for Donna Poplar to go to the Genesee
6   County Road Commission Board regarding concerns of
7   race discrimination by her supervisor, Fred Peivandi?
8   A.   Yes.
9   Q.   And since that is the policy, since it's -- since it
10   relates to the policies of Genesee County Road
11   Commission for Donna Poplar to be able to go to the
12   Genesee County Road Commission about inappropriate or
13   discriminatory conduct by her supervisor, do you agree
14   that that -- that she should continue to have that
15   avenue in her employment?
16   A.   Yes; it's in the policy.
17   Q.   In other words, do you agree that it would be wrong to
18   tell Donna Poplar she cannot make a complaint to the
19   Genesee County Road Commission regarding her
20   supervisor?
21   A.   Do I agree?
22   A.   Yes.
23   A.   Yes.
24   Q.   And do you agree that it would be against policy, the
25   Genesee County Road Commission policies, to foreclose

Page 27

1  Donna Poplar from going to the Genesee County Road
2  Commission regarding concerns relating to her
3  supervisor, Fred Peivandi?
4  A.  When you say Commission, you're speaking of the
5  Q.  Yes.
6  A.  Yes.
7  Q.  Okay.  Do you have knowledge that Donna Poplar was
8  directed and advised by Fred Peivandi that she could
9  no longer make a complaint or go to the Genesee County
10  Road Commission Board on her own?
11  MR. CASCINI:  Objection; assumes facts
12  not in evidence.
13  THE WITNESS:  I think I did.
14  Q.  (BY MS. GAFKAY)  Well, let's go back and look at
15  what's been marked as Exhibit 12.  Have you ever seen
16  what's been marked as Exhibit 12?
17  A.  Yes.
18  Q.  When was the first time that you saw this?
19  A.  After it was issued, probably three or four days after
20  that.
21  Q.  And this is dated July 1st, 2021 to Donna Poplar from
22  Fred Peivandi, and in here, for instance, Directive 1,
23  it says, looking at the last – looking under
24  Directive 1, the last sentence in the paragraph, "...
25  I direct you to raise privately with me any concerns

Page 28

1  or criticisms you may harbor about work-related
2  matters before addressing them directly with the Board
3  or with employees outside of the management team."  Do
4  you see that?
5  A.  Um-hum.
6  Q.  Is that a "yes"?  You just have to say yes for the
7  record.
8  A.  Yes.
9  Q.  Okay.  The next item also relates to communications
10  from Donna to the Board and directs her to include him
11  in any work-related communications she sends to the
12  Board.  Do you see that in Directive 2?
13  A.  (Looking at documents).
14  Q.  I think you're on the right page.
15  A.  Yeah, I see that.
16  Q.  Do you agree that if Donna Poplar had concerns of
17  discrimination, for instance, by Fred Peivandi, that
18  she doesn't need to talk to him first before raising
19  those concerns to the Board?
20  A.  No.
21  Q.  "No" she does not need to raise with him first or "no"
22  you don't agree?
23  A.  No.  My answer is that she has to communicate it with
24  the managing director.
25  Q.  You're saying --

Page 29

1  A.  Either prior to or current with communications to the
2  Board, Board members.
3  Q.  Okay.  Let's talk about prior to.  If Donna Poplar has
4  a complaint about discrimination by Fred Peivandi --
5  A.  Um-hum.
6  Q.  -- you agree that it would be appropriate for her to
7  go directly to the Board about those concerns?
8  MR. CASCINI:  Objection; asked and
9  answered.
10  THE WITNESS:  Yes.
11  Q.  (BY MS. GAFKAY)  Okay.  I'm looking at what's been
12  marked as Exhibit 16, since we're on the exhibits.
13  Have you ever seen what's been marked as Exhibit 16?
14  A.  Yes.
15  Q.  This is a Disciplinary Action Notice to Donna Poplar
16  from Fred Peivandi dated August 19th, 2021; correct?
17  A.  Yes.
18  Q.  When was the first time that you saw this?
19  A.  Honestly, I don't remember.
20  Q.  Let me ask you this:  Do you recall, was the Board --
21  well, let me ask you about yourself first.  Were you
22  consulted at all about this Disciplinary Action Notice
23  before it was issued to --
24  A.  No.
25  Q.  -- Donna Poplar?

Page 30

1  A.  No.
2  Q.  To your knowledge, was the Board notified or involved
3  in this Disciplinary Action Notice before it was
4  issued?
5  A.  No.
6  Q.  When a director level employee is disciplined, is the
7  Board involved?
8  A.  No.  It has to be -- that has to be advised.
9  Q.  Okay.  How about in a circumstance where an employee
10  is disciplined by the managing director after making a
11  complaint concerning that managing director, is the
12  Board advised before the discipline is issued?
13  MR. CASCINI:  Objection; asked and
14  answered.
15  THE WITNESS:  I've requested that to be
16  done.
17  Q.  (BY MS. GAFKAY)  And why have you requested that that
18  be done?
19  A.  So the Board is involved prior to severe discipline
20  being administered to an employee or director.
21  Q.  One who has made a complaint?
22  A.  Yes.
23  Q.  And is that because the Genesee County Road Commission
24  policies includes policies against retaliation?
25  A.  Yes.

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-5, PageID.408   Filed 11/21/22   Page 10 of 22
Donna Poplar v. Genesee County Road Commission
John Mandelaris

10 (31 - 34)

Page 31

1  Q.   And in order to avoid even the appearance of
2       retaliation, as a board member, do you believe the
3       best course of action is for the Board to be involved
4       prior to issuing disciplinary action?
5  A.   Yes.
6  Q.   And did that happen in this -- did that happen with
7       regard to Donna Poplar?
8  A.   No.
9  Q.   When you reviewed or when you were notified of this
10      disciplinary action, were you concerned about whether
11      Fred Peivandi had retaliated against Donna Poplar?
12 A.   Was I concerned?
13 Q.   (Nodding head affirmatively).
14 A.   Yes, I was concerned.
15 Q.   Did you express that concern?
16 A.   Yes.
17 Q.   Do you know who Mr. Nolan (sic) is?
18 A.   No.
19 Q.   In August of 2021, were there any discussions either
20      during a Board meeting or after about the status of
21      Covid-19, the transmission rate and whether masking
22      should be required?
23 A.   I don't recall.
24 Q.   Looking at this disciplinary notice, on page two,
25      there was -- at the top of page two, the first full

Page 32

1       paragraph, it says, "Following the adjournment of our
2       next regularly scheduled GCRC Board of Commissioners
3       meeting..." -- then in parentheses it says, it was
4       August 17th, and it continues, "... you continue to
5       advocate before the Board in support of your position
6       concerning this issue and in spite of my clear,
7       unambiguous, and final decision to implement a
8       Covid-19 response policy which was partially at odds
9       with your preferred response strategy."
10           First, do you see where I'm reading?
11 A.   Yes.
12           MS. GAFKAY:  Okay.  So then let's go to
13      Exhibit 21.
14           (Document marked Deposition
15           Exhibit No. 21.)
16 Q.   (BY MS. GAFKAY)  Here is Exhibit 21.  This appears to
17      be the Board minutes for the meeting that's referenced
18      August 17th, 2021.  Do you agree?
19 A.   Yes.
20 Q.   And were you present?
21 A.   Yes.
22 Q.   All right.  Do you know what that paragraph is
23      referencing?
24 A.   No.
25 Q.   Do you recall a discussion about Covid-19?

Page 33

1  A.   No.
2  Q.   Outside of that -- I understand your testimony
3       concerning your August 17 meeting and that you don't
4       recall that being discussed.  I just want to ask you
5       some questions about August 2021.
6            Do you remember during that time period
7       that the transmission rate for Covid-19 in Genesee
8       County was at a high level?
9  A.   Yes.
10 Q.   Do you recall the county, Genesee County, mandating
11      that there should be masks --
12 A.   Yes.
13 Q.   -- worn?
14           MR. CASCINI:  Objection; assumes facts
15      not in evidence.
16 Q.   (BY MS. GAFKAY)  Do you recall that government
17      buildings were included in that mandate?
18 A.   Yes.
19           MR. CASCINI:  Same objection.
20 Q.   (BY MS. GAFKAY)  During that time period, when that
21      mandate came out by Genesee County, was the Genesee
22      County Road Commission requiring visitors and
23      employees to mask up?
24 A.   Yes.
25 Q.   If, in August of 2021, during that time period that

Page 34

1       Genesee County had issued that mandate for masks to be
2       worn in government buildings and Genesee County Road
3       Commission managing director was not requiring
4       visitors and employees to wear masks, is that a --
5       would that have been a concern of yours?
6            MR. CASCINI:  Objection; foundation and
7       misconstrues his prior testimony.
8            THE WITNESS:  If that had happened.
9  Q.   (BY MS. GAFKAY)  Go ahead and look at what's been
10      marked as Exhibit 15.
11 A.   (Reviewing document).
12 Q.   Have you ever seen what's been marked as Exhibit 15?
13 A.   No.
14 Q.   There is a cc to GCRC Board of Commissioners.  Would
15      you have been on the Board of Commissioners at that
16      time?
17 A.   I don't see the cc -- oh, I see it.  Yeah, I was on
18      the Board then.
19 Q.   Okay.  So it looks like, at least the document says it
20      was cc'd to you, but you don't recall specifically
21      receiving this?
22 A.   Right, that's correct.
23 Q.   And your belief was, at the time, employees and
24      visitors were required to wear a face mask?
25 A.   Yes.

Page 35

Q. Do you agree that it was a matter of public concern whether to mask or not in light of the transmission rate in August of 2021?

A. Yes.

Q. Do you agree that a disciplinary suspension of employment for two weeks is a serious discipline?

A. Yes.

Q. From August 2021 to the present -- well, strike that.

From January 2021 to the present, has the Board investigated whether to take any type of disciplinary action against Fred Peivandi?

A. No.

Q. Looking back at Exhibit 10, you've testified you received a copy of this as the Genesee County Road Commission Board member from Donna?

A. Yes.

Q. As an employee under the policies, did Donna have a right to make a complaint of race discrimination?

Q. Did she have a right to make a complaint?

A. Under the policy, yes.

A. Yes.

Q. Under the policies, are employees who believe he or she is -- are being discriminated against based on race, are employees who believe that encouraged to make a complaint?

Page 36

A. I can't answer that; I don't know.

Q. Okay. Is there anything in Donna Poplar's complaint to the Board of Commissioners that was false?

A. I can't answer that.

Q. Okay. Is there anything that you're aware of that was false?

MR. CASCINI: Objection; asked and answered.

THE WITNESS: No, I don't.

Q. (BY MS. GAFKAY) Do you have any reason to believe that Donna Poplar did not -- strike that.

Do you have any reason to believe Donna Poplar's complaint of race discrimination was not made in good faith?

A. Do I believe it wasn't made in good faith?

Q. Do you have any reason to believe --

A. No, I don't have any reason to believe that it wasn't made in good faith.

Q. All right. And so if Donna had a good faith belief that she was discriminated against, for instance, and made a complaint, like she did, regardless of any finding through any type of investigation, do you agree that she should not have been retaliated against?

A. If that was her belief, yes.

Page 37

Q. So do you have any reason to believe that she did not really believe she was discriminated against?

MR. CASCINI: Objection; asked and answered.

THE WITNESS: Yeah, I can't answer that, because I don't know.

Q. (BY MS. GAFKAY) Okay. Well -- okay. The next document is Exhibit 11, and did you ever receive a copy of this?

A. Yes.

Q. Do you know who Craig Lange is?

A. Yes.

Q. Did you know him prior to April 27, 2021?

A. No, I did not.

Q. Apparently he was involved in investigating Donna Poplar's January 28, 2021 complaint?

A. Yes.

Q. Do you know how he got involved in investigating that complaint?

A. It was referred by the Board -- he was retained by the Board.

Q. Was he referred to the Board by someone?

A. Well, he must have been, but I don't know who.

Q. Okay. Was it someone you recommended?

A. No. I didn't know him before that, never heard of

Page 38

him.

Q. Has Fred Peivandi ever said to you or to the Board that he wanted Donna Poplar fired?

A. Yes.

Q. And was that -- when was that?

A. It was a personal conversation.

Q. Oh, with you?

A. With me only.

Q. Was that after she had complained to the Board?

A. Yes.

Q. And what do you recall him saying?

A. Just that, you know, if he could, he'd fire her. I think it was based on her job performance.

Q. Well, did he say anything specific about that?

A. Well, something about -- I think it was after the lawsuit was filed, I believe.

Q. So at some point after Donna complained -- Donna Poplar complained about race discrimination, Fred Peivandi had a conversation with you where he said he wanted to fire her?

A. Yeah.

Q. And what was your response, if any?

A. I thought she was doing a good job.

Q. So is it fair to say -- well, strike that.

Did you say -- did you oppose it

Page 39

1 verbally to him?  Did you say, "I don't think that's a
2 good idea, I think she's doing a good job"?  What do
3 you remember saying to Fred, if anything?
4 A.  I don't know if I responded at all.  He made that
5 comment, but I didn't respond.
6 Q.  Is it fair to say that you did not agree that Donna
7 Poplar should be fired?
8 A.  I -- yes.
9 Q.  You do not agree?  You do agree --
10 A.  I agree that she should not be fired.
11 Q.  Thank you.  And do you still believe she's doing a
12 good job?
13 A.  Yes.
14 Q.  Has that ever -- has Fred Peivandi ever brought that
15 issue to the Board?  In other words, has Fred Peivandi
16 ever asked the Board to discuss or approve discharging
17 Donna?
18 A.  No.
19 Q.  Do you recall that Donna Poplar, after she was placed
20 on a two-week disciplinary unpaid suspension, that she
21 made another formal complaint of -- complaint?
22 A.  Yes.
23 Q.  And do you recall that she was put on administrative
24 leave after that complaint?
25 A.  After what point was that?

Page 40

1 Q.  Sure.  We can look at that.  Well, first of all, just
2 for the timeline, we've looked at Exhibit 16.  Exhibit
3 16 shows Donna Poplar received the disciplinary
4 action, and she received a two-week suspension;
5 correct?
6 A.  Yes.
7 Q.  And the next page, do you recall that after -- that on
8 or about August 26th, 2021, Donna Poplar made another
9 written complaint of retaliation this time, continued
10 race discrimination, harassment, differential
11 treatment and hostile work environment against Fred
12 Peivandi?
13 A.  Do I?
14 Q.  Do you recall that?
15 A.  Yes, I do.
16 Q.  Do you recall after she made -- Donna Poplar made this
17 August 26, 2021 written complaint that, instead of
18 returning to work after two weeks suspension, she was
19 placed on administrative leave?
20 A.  Yes.
21 Q.  Were you involved either individually or as Board
22 member with that decision to place her on
23 administrative leave?
24 A.  I wasn't personally; I don't recall it, no.
25 Q.  Did Fred Peivandi discuss that with the Board?

Page 41

1 A.  With the Board collectively, no, I don't recall that.
2 Q.  Did he discuss it with you individually?
3 A.  I don't recall.
4 Q.  Okay.
5 A.  He might have.
6 Q.  And actually Exhibit 19 is when Donna Poplar was
7 placed on the administrative leave.  Did you receive a
8 copy of this?
9 A.  No.
10 Q.  Have you ever received a copy of this?
11 A.  No.
12 Q.  Did you get knowledge -- gain knowledge that Donna
13 Poplar had filed a lawsuit?  Was the Board advised of
14 that, that Donna Poplar had filed a lawsuit?
15 A.  Yes.
16 Q.  Was it after you learned that Donna Poplar had filed
17 the lawsuit that she was reinstated?
18 A.  The timeline, I don't recall the timeline.
19 Q.  Okay.  Do you recall at some point Donna Poplar was
20 reinstated to her position?
21 A.  Yeah.
22 Q.  Do you recall that it was in November of 2021?
23 A.  No, I don't recall that --
24 Q.  Do you recall --
25 A.  -- specific date.

Page 42

1 Q.  Okay, fair enough.  Were you involved in her being
2 brought back from administrative leave?
3 A.  No.
4 Q.  Did you discuss that with Fred Peivandi?
5 A.  No.
6       MS. GAFKAY:  Okay.  I'm going to take a
7 quick recess and I'll come back and finish up.
8       (Ms. Gafkay and Ms. Lee
9       left room and returned.)
10       MS. GAFKAY:  I just have a couple
11 follow-up.
12 Q.  (BY MS. GAFKAY)  Let me go back to Exhibit 17.
13 A.  17, okay.  All right.
14 Q.  You had testified that you recall receiving another
15 complaint from Donna Poplar regarding retaliation,
16 which is part of what's been marked as Exhibit 17.
17 A.  Um-hum.
18 Q.  Is that a "yes"?
19 A.  Yes.
20 Q.  To your knowledge, did the Board of Commissioners ever
21 conduct an investigation or have an investigation
22 conducted concerning Donna Poplar's August 26th, 2021
23 complaint?
24 A.  To be honest with you, I don't recall.
25 Q.  Okay.  And just going back, and I don't know if this

Page 43

1  will refresh your memory or not, but do you recall
2  that the Board of Commissioners, the Genesee County
3  Road Commission Board of Commissioners, voted to bring
4  Donna back after her administrative leave or from her
5  administrative leave?
6  A.  I don't recall that at all, no.
7  Q.  It'll be a matter of minutes, I'm sure.
8  A.  Um-hum.
9         MS. GAFKAY:  I think that's -- if we
10  could hold for two minutes, Charis was going to bring
11  me something else, and I may have a question or two
12  left.
13         (Off record.)
14  Q.  (BY MS. GAFKAY)  One of the commissioners is Cloyce
15  Dickerson?
16  A.  Yes.
17  Q.  Do you have a good relationship with Cloyce?
18  A.  Excellent, until today I think.
19  Q.  Do you recall there was a time that Donna Poplar
20  wanted to do a presentation to the Board about the
21  accomplishments of the Human Resource Department?
22  A.  Yes.
23  Q.  And was she able to do that?
24  A.  No.
25  Q.  Did Fred Peivandi deny her --

Page 44

1  A.  Yes.
2  Q.  -- request to do that?
3  A.  Yes.
4  Q.  Did you believe her request to present to the Board
5  was reasonable?
6  A.  Yes.
7  Q.  Did you tell Fred Peivandi that?
8  A.  Yes.
9  Q.  And did he still refuse to allow her to present?
10  A.  Yes.
11  Q.  Did he allow another director, Randy Dellaposta, to do
12  a presentation?
13  A.  Yes, he did.
14  Q.  Do you believe that was unfair?  Did you believe it
15  was unfair for Fred Peivandi to let Randy
16  Dellaposta --
17  A.  Yes --
18  Q.  -- do a presentation?
19  A.  -- and not Donna, yes.
20  Q.  So we've established that Donna Poplar's position is
21  director of Human Resources; is that right?
22  A.  Correct.
23  Q.  And does that include, essentially, the duties of a
24  director of personnel?
25  A.  Yes.

Page 45

1  Q.  And are there some employees in the Genesee County
2  Road Commission who are part of a collective
3  bargaining agreement, unionized?
4  A.  Yes.
5  Q.  How many different unions are there?
6  A.  There are three.
7  Q.  And so does the Board have three different collective
8  bargaining agreements?
9  A.  Yes.
10  Q.  And as director of personnel, is Donna Poplar -- do
11  her duties include --
12  A.  Yes.
13  Q.  -- being involved with those --
14  A.  Yes.
15  Q.  -- negotiations?
16  A.  Yes.
17  Q.  And working with any law firm that's hired --
18  A.  Yes.
19  Q.  -- to do those negotiations?
20  A.  Yes.
21         MR. CASCINI:  Wait until she finishes
22  her question, please, so the record is clear, John.
23         THE WITNESS:  Oh, I'm sorry.
24         MS. GAFKAY:  That's okay.
25  Q.  (BY MS. GAFKAY)  Does the Genesee County Road

Page 46

1  Commission currently have a designated law firm to be
2  involved in negotiations with the Board?
3  A.  Yes.
4  Q.  Who is that or what firm?
5  A.  His firm.
6  Q.  Okay.  And do you recall when Mr. Cascini's firm
7  became the designated firm to do negotiations?
8         MR. CASCINI:  I'm going to step in
9  here, and I'm going to say that I do want any of your
10  answers to be, for you to be mindful, privileged,
11  please, and would instruct you as the witness not to
12  disclose anything that would be privileged, although
13  you can answer questions that would not implicate the
14  attorney/client privilege.
15  Q.  (BY MS. GAFKAY)  I just want to know how long.
16  A.  I believe it was about four years, three years, I
17  believe.
18  Q.  All right.  And at the time, was Donna Poplar the
19  director of Human Resources?
20  A.  Yes.
21  Q.  Was she involved in the selection of the law firm?
22  A.  I don't know.
23  Q.  Is that typically something that the director of Human
24  Resources would be involved in?
25  A.  Not necessarily.

Page 47

1 Q.   Would it be reasonable to involve the director of
2     Human Resources in that decision, of which law firm
3     would be negotiating for management with the unions?
4 A.   Yes.
5         MS. GAFKAY:  I don't have any further
6     questions at this time.
7             EXAMINATION
8 BY MR. CASCINI:
9 Q.   Mr. Mandelaris, my name, as you know, is Andrew
10     Cascini.  I'm here today representing the Genesee
11     County Road Commission, not that I'm telling you
12     anything that you don't already know.
13         I do have some follow-up questions to
14     ask regarding this lawsuit and some of the matters
15     that you already have given testimony about today.
16         One topic that you gave testimony about
17     concerned an administrative assistant in the Human
18     Resources Department.  Do you remember giving
19     testimony on this topic, Mr. Mandelaris?
20 A.   Yes.
21 Q.   I believe you gave testimony that Fred initially
22     opposed the creation of an administrative assistant
23     position within the Human Resources Department; is
24     that correct?
25 A.   Yes.

Page 48

1 Q.   Do you remember whether Fred maintained that
2     opposition at all times prior to the creation of the
3     administrative assistant position?
4 A.   No.
5 Q.   So I want to make sure the testimony is clear there.
6     You're saying you don't recall, you don't know whether
7     or not he did or did not?
8 A.   Well, prior to the creation of the position, he must
9     have had involvement.
10 Q.   Ah.  Let me back up.  Do you remember whether or not
11     Fred maintained his opposition, not his involvement,
12     at all times prior to the creation of the
13     administrative assistant position?
14 A.   Well, he had to change his position for the creation.
15 Q.   Ah.  So he did change his position?
16 A.   Yes.
17 Q.   Was there a time where he came to recommend to the
18     Board that a position should be created and budgeted?
19 A.   Yes.
20 Q.   Do you recall whether he recommended, just to orient
21     us in time, a part-time or full-time position?
22 A.   Yes.
23 Q.   And do you remember, was it a part-time or a full-time
24     position that he recommended?
25 A.   Part-time.

Page 49

1 Q.   You can actually go to, I'll be stealing Julie's
2     exhibits here, you can go to Exhibit 8 in the exhibit
3     book you have in front of you.  We've formally marked
4     these exhibits.
5         MS. GAFKAY:  You originally marked them
6     in the Plaintiff's deposition, the first 20.
7         MR. CASCINI:  Okay.
8 Q.   (BY MR. CASCINI)  Well, one way or another, by whose
9     hand did it, Exhibit No. 8 has been marked here in
10     front of you.  Have you ever seen this particular
11     document before, Mr. Mandelaris?
12 A.   (Reviewing document)  Yes.
13 Q.   And I see that it is to the Board of County Road
14     Commissioners, Genesee County; right?
15 A.   Yes.
16 Q.   It says it's from Fred Peivandi, Donna Poplar, Coetta
17     Adams and Eric Johnston; correct?
18 A.   Yes.
19 Q.   And Coetta Adams was the former Finance director,
20     although she's no longer with Genesee County; correct?
21 A.   Yes.
22 Q.   And there are a number of different initials that are
23     by the authors of that document, FP by Fred Peivandi's
24     name.  Do you see that?
25 A.   Yes.

Page 50

1 Q.   And it says at the bottom, "Recommendation:  That the
2     Board approve the following budget transfer," and it's
3     an increase in the Human Resources line item budget
4     for labor; is that right?
5 A.   Yes.
6 Q.   Is this consistent with the testimony you gave, that
7     Fred eventually did end up recommending creating an
8     administrative assistant position in the HR
9     Department?
10 A.   Yes.
11 Q.   You were asked some questions earlier, John -- or I
12     should say Commissioner Mandelaris, about Monica
13     Pearson's promotion to benefit coordinator.  Do you
14     remember giving testimony about Monica Pearson being
15     promoted into the benefit coordinator position?
16 A.   Do I remember what?
17 Q.   Do you remember giving testimony earlier in this --
18 A.   Yes, I remember giving testimony.
19 Q.   Do you know what the benefit coordinator position's
20     job duties are?
21 A.   No.
22 Q.   Do you know whether or not the benefit coordinator
23     position's job duties include the duty to assist Donna
24     Poplar with respect to her visual disability?  Do you
25     know whether or not that is true?

Page 51

1  A.   Yes.

2  Q.   Okay.  If you know whether or not it is true, is it

3       true that the benefit coordinator position's job

4       duties include the responsibility to help Donna Poplar

5       with her visual disability?

6  A.   That's correct.

7  Q.   Do you know who made that change?

8  A.   That was the original request; that was the original

9       thought when the position was being created.

10 Q.   Well, I don't want to at all misconstrue any testimony

11      here, Commissioner Mandelaris, but I do want the

12      record to be clear.  So perhaps there has been a small

13      error.

14            When I say the benefit coordinator

15      position, please distinguish this from the

16      administrative assistant position.  The administrative

17      assistant position is the one we were giving testimony

18      about to which you just saw the document where Fred

19      Peivandi recommended it.

20 A.   Um-hum.

21 Q.   The benefit coordinator position is a position that

22      Monica Pearson was later promoted into.  I'm asking

23      you questions about the benefit coordinator position

24      that Monica Pearson was later promoted into.

25            Do you know whether or not the benefit

Page 52

1       coordinator position has job duties that include the

2       responsibility to accommodate Donna Poplar's visual

3       disability?

4  A.   No, I don't know that.

5  Q.   Okay.  You testified earlier that you considered the

6       creation of the administrative assistant position, so,

7       again, I note for the purpose of the record, the

8       distinction here, we're no longer talking about the

9       benefit coordinator position; we're now talking about

10      the administrative assistant position.

11 A.   Okay.

12 Q.   You testified earlier that you considered the creation

13      of an administrative assistant position to be a

14      reasonable accommodation, in part, because of Donna

15      Poplar's disability?

16            Does the reasonableness of that

17      accommodation depend on the specific job title to

18      which that responsibility was assigned?

19 A.   Yes.

20 Q.   So it is not -- if we called the position an

21      administrative assistant and we gave the duty to

22      assist her with her visual disability, if we were to

23      change the job title, then it would no longer be a

24      reasonable accommodation; is that your testimony

25      today?

Page 53

1  A.   No, that's not my testimony.

2  Q.   I would appreciate, then, clarification for the

3       record.  So does the reasonableness depend on what the

4       job title is; in other words, if we change the job

5       title, does it become no longer reasonable or would

6       the reasonability maintain?

7            MS. GAFKAY:  Object to form.

8            THE WITNESS:  Reasonability remains.

9  Q.   (BY MR. CASCINI)  So is it safe to say that the

10      reasonability depends on the job functions that are

11      performed?

12 A.   I can't answer because I don't know what the job

13      functions would be.

14 Q.   Fair enough.  I would like to ask you some questions

15      about the scope of authority that the Board holds as

16      opposed to the scope of authority held by the managing

17      director, both of the Road Commission.  When I say the

18      Board, I mean, obviously, the Genesee County Board of

19      Road Commissioners, which you are a part of, and when

20      I say the managing director, I'm referring to this

21      instance to Fred Peivandi, that position in general.

22            What in general is the responsibility

23      of the Board of Road Commissioners?

24 A.   The responsibility with respect to the managing

25      director's oversight.

Page 54

1  Q.   Excellent.  And what is the -- what are generally the

2       responsibilities of the managing director?

3  A.   The managing director is to operate and direct and

4       fulfill the responsibilities of the Road Commission,

5       both the maintenance and engineering.

6  Q.   And is some of the operational responsibility that the

7       managing director has been delegated, does that

8       include the ability to -- does that include the

9       ability to hire and fire employees?

10 A.   Yes.

11 Q.   Does it include the ability to discipline employees?

12 A.   Yes.

13 Q.   Does it include the ability to evaluate employees?

14 A.   Yes.

15 Q.   So just to clarify, those are roles of the managing

16      director; those are not roles of the Board?

17 A.   That's correct.

18 Q.   Or the oversight responsibility, the managing director

19      has the day-to-day responsibility; is that safe to

20      say?

21 A.   It's safe, yes.

22 Q.   I want to go back to an exhibit we prior referenced,

23      Exhibit No. 10.  I'll have you turn to this document

24      when you get a moment, Mr. Mandelaris, and orient

25      yourself about what document we're talking about.

Case 2:21-cv-12568-VAR-JJCG ECF No. 23-5, PageID.414 Filed 11/21/22 Page 16 of 22
Donna Poplar v. Genesee County Road Commission
John Mandelaris

16 (55 - 58)

Page 55

A. (Reviewing document).

Q. This is a copy of the complaint that the Genesee County Board of Road Commissioners received from Ms. Poplar; is that right?

A. Yes.

Q. The first complaint she filed, I should say.

A. Um-hum.

Q. And the Board received this document. That was your testimony; correct?

A. Yes.

Q. What did the Board decide to do after it received a copy of this complaint?

A. I believe it was referred to our labor attorney, Tom Derderian, for review.

Q. Now, I'm going to urge you not to testify about anything that Tom may or may not have done while he was in the position of labor relations attorney for the Road Commission; but do you know -- strike that.

I'm going to ask you -- I'm going to read from the very first sentence of the third full paragraph of this document, Ms. Poplar's complaint. It says, "I request an early action and proper investigation of this situation."

Do you know whether the Board ever ordered an investigation of the situation to occur?

Page 56

A. Yes.

Q. And was that investigation, the one you testified about earlier, the one engaged in by Mr. Craig Lange?

A. Yes.

Q. And did you have an opportunity to meet Mr. Lange prior to him beginning the investigation?

A. No.

Q. To the extent there are Board meeting minutes that suggest that he presented to the Board prior to the Board making the decision, would you have a reason to doubt those Board meeting minutes?

A. Well, minutes are compiled as best the secretary can remember; that's why you have the recording. So I guess so.

Q. You do not recall that there was a meeting where Craig Lange appeared by electronic Zoom and presented to the Board prior to making the decision to engage his firm to --

A. No.

Q. -- have the investigation?

A. No.

Q. Do you recall that Charis Lee, who is one of the attorneys for the Plaintiff, was also present at that meeting and also appeared via Zoom at that meeting?

A. No.

Page 57

Q. All right. That's fair. With respect to the investigation, do you have any reason to doubt that a legitimate, full and fair investigation of Donna Poplar's complaint was carried out by Mr. Lange?

A. Do I have any doubt?

Q. Do you have any reason to doubt?

A. No, I don't have any reason to doubt.

Q. And I'm going to ask you not to disclose the details of any sort of privileged communication, but privileged or no, were you presented with a report from Mr. Lange's investigation after it was concluded, as the Board, I mean to say?

A. As the Board?

Q. Yes.

A. Yes.

Q. So just because I want to make sure that we don't have crosstalk on the record, Mr. Mandelaris, that was yes, you were presented with a copy of the report?

A. Yes.

Q. And I'm going to ask you to turn your attention to Exhibit No. 11, which is the April 27th letter signed by Mr. Lange. The copy of the report that you received from Mr. Lange, is it longer than this letter?

A. No.

Page 58

Q. You did not receive a copy of the report from Mr. Lange's office that was lengthier than this letter?

A. No, I don't recall that.

Q. When you say that you do not recall that, does it mean that you are certain it did not happen or that you don't remember whether or not that happened?

A. I don't remember whether or not that happened.

Q. Okay, understood. To the extent this investigation had come to a different conclusion, so I'm asking a hypothetical question, to the extent this investigation had concluded that Fred Peivandi had engaged in discrimination, harassment or retaliation against Ms. Poplar, would you have recommended taking no action?

A. No.

Q. In other words, did you rely in part on the result of the investigation when, as a Board, you decided what you were going to do in response to the January complaint?

A. Yes.

Q. Do you have any reason to doubt the conclusions reached by Attorney Craig Lange were erroneous, arbitrary or capricious in any way?

MS. GAFKAY: Object to the form.

THE WITNESS: I agree with it a hundred

Page 59

1     percent.

2 Q.   (BY MR. CASCINI)  And do you recall ever reviewing any

3     document that outlined his reasons and the evidence

4     considered and the witnesses interviewed and the

5     process of reaching the conclusions that are present

6     on Exhibit No. 11?

7 A.   No, I do not.

8 Q.   Couldn't say whether or not that happened?

9 A.   Couldn't say whether or not that happened.

10 Q.   Got it.  Earlier you gave testimony that you did not

11     believe that the Board had made the decision to

12     reinstate Donna Poplar to work.

13           If the Board meeting minutes from

14     November 2nd, 2021 say differently, do you suspect

15     that maybe your memory about that issue is mistaken,

16     then, or do you suspect that the Board meeting minutes

17     are somehow flawed?

18 A.   No; I rely on the Board minutes.

19 Q.   Do you remember who made a motion to reinstate Donna

20     Poplar to work at the November 2nd, 2021 meeting?

21 A.   No, I don't remember.

22 Q.   Fair enough.  It was a while ago, Mr. Mandelaris; I

23     understand.

24           Do you remember when you first became

25     aware that Donna Poplar had filed the federal lawsuit

Page 60

1     that is at issue in this deposition today?

2 A.   I don't remember.

3 Q.   Okay.  Do you remember whether or not it was before

4     she was actually back at work from her paid

5     administrative leave?

6 A.   I don't remember that, either.

7 Q.   You gave testimony that at one point in time, Fred

8     Peivandi made a comment to you that was, "If I could"

9     -- referring to Mr. Peivandi -- "I'd fire her" --

10     meaning Donna Poplar -- "based on her job performance."

11     Do you remember when this conversation occurred?

12 A.   Probably in the last month.

13 Q.   Do you remember anything else about that conversation?

14 A.   No, that was it.

15 Q.   Was anyone else present during that conversation?

16 A.   No; just the two of us.

17 Q.   Did Fred give any other explanation or did Fred expand

18     at all on that opinion that he expressed to you?

19 A.   No, he didn't expand on it.

20 Q.   Did Fred say whether or not he wanted to terminate her

21     because she filed a complaint?

22 A.   No, he didn't say that.

23 Q.   I'm going to read a statement to you, I'm not going to

24     conceal where it's coming from, it's coming from

25     Exhibit 11, which is the April 27th letter by Mr.

Page 61

1     Craig Lange, and I'm going to merely ask you at the

2     end of the statement whether you agree or disagree

3     with the statement.

4           Do you agree or disagree with the

5     following statement:  "I believe the stressors you

6     feel" -- referring to Ms. Poplar -- "at your

7     employment" -- that is that of the HR director -- "are

8     not the result of invidious, discriminatory practices

9     or illegal harassment or retaliation, but the result

10     of what one witness characterized as a 'turf war'

11     between two people (you and Mr. Peivandi) who have

12     strong personalities and who desire to be in control."

13           Do you agree or disagree with that

14     statement in your own personal assessment?

15 A.   I agree a hundred percent.

16 Q.   I'm going to ask you to turn to what's been marked as

17     Exhibit No. 13.

18           John, do you remember whether or not

19     you've ever seen this document before, the one that is

20     captioned at the top Medical Health Officer, Indoor

21     Mask Directive?

22 A.   I don't believe I ever saw it.

23 Q.   Completely understandable.  You were asked earlier

24     whether you knew Mr. Nolan.  Do you know a

25     Commissioner on the Genesee County Board Bryant

Page 62

1     Nolden?

2 A.   Yes.

3 Q.   You're familiar with who that is?

4 A.   Yes, I am.

5 Q.   And I asked you a poor question.  Who is Mr. Nolden?

6 A.   He's on the Board of County Commissioners.

7 Q.   Yes, okay.  I'm going to ask you to take a quick look

8     at Exhibit No. 15 again.  This is a memorandum dated

9     August 17th, 2021.  It's from -- or purports to be

10     from, I should say, Fred Peivandi, managing director

11     and Donna Poplar, director of HR.  It says subject,

12     MIOSHA Recommendations.

13           You gave some -- you were asked a

14     couple questions about this document before.  In your

15     opinion, Mr. Mandelaris, does this document represent

16     an official communication on behalf of the Genesee

17     County Road Commission?

18 A.   Yes.

19 Q.   I'm going to ask you to take a look at the document

20     that's been marked as Exhibit 18.  This is the

21     document that is marked with Bates No. Defendant's RPD

22     RESP 7 No. 120.

23           Mr. Mandelaris, have you seen this

24     document before?

25 A.   Yes, I have.

Page 63

1  Q.   Did the Board receive this document --
2  A.   Yes.
3  Q.   -- Cloyce Dickerson, to the best of your recollection?
4  A.   The document that's designated Lee Legal Group?
5  Q.   That's correct, yes --
6  A.   Yes.
7  Q.   -- that's the one we're referring to.
8  A.   Yes.
9  Q.   Okay.  I'm going to ask you to turn to page three of
10     that document.  It says Settlement Discussion, which
11     is the second header.
12  A.   Yeah.
13  Q.   "Ms. Poplar is willing to mediate her concerns.  An
14     authorized representative may contact this firm by
15     Tuesday, October 12, 2021 to indicate its willingness
16     to discuss this matter."
17         Without getting into the substance of
18     any privileged communications or privileged directive
19     that you may have given, did the Board appoint an
20     authorized representative to reach out to Donna
21     Poplar's attorney to discuss and mediate her concerns?
22         MS. GAFKAY:  Object to the form.
23     Inadmissible under 408.
24  Q.   (BY MR. CASCINI)  You may answer, Mr. Mandelaris.
25  A.   Yes.

Page 64

1  Q.   And did the Board ever permit a closed session meeting
2     with Donna Poplar where her complaints were discussed?
3  A.   No; I don't remember any closed session.
4  Q.   You don't remember it; it could've happened, could not
5     have happened?
6  A.   Right.
7  Q.   Got it.  Forgive me if this is a softball, Mr.
8     Mandelaris, but who is Mr. Anthony Branch?
9  A.   Mr. Anthony Branch is the director of the Maintenance
10     division of the Genesee County Road Commission.
11  Q.   Okay.  And he's been here a long time, hasn't he?
12  A.   Oh, ages.
13  Q.   Been here longer than you have?
14  A.   Been here at least 20 years.
15  Q.   Certainly he's been here longer than I have.
16  A.   Yeah.
17  Q.   To the best of your knowledge, has Mr. Branch engaged
18     in protective activity against the Road Commission, to
19     wit, filing a lawsuit against the Road Commission?
20  A.   Yes, he has.
21  Q.   And that lawsuit remains active, does it not?
22  A.   It's on appeal.
23  Q.   What do you perceive Mr. Branch's race to be?
24  A.   African-American.
25  Q.   What do you perceive Ms. Poplar's race to be?

Page 65

1  A.   African-American.
2  Q.   What do you perceive Mr. Peivandi's race to be?
3  A.   Caucasian.
4  Q.   During the Covid-19 pandemic, in your opinion, did
5     Genesee County Road Commission administration take
6     seriously its obligations to defend the public and its
7     employees --
8  A.   Yes.
9  Q.   -- from transmission of Covid-19?
10  A.   Yes.
11  Q.   You felt that Ms. Poplar took her responsibilities in
12     this regard seriously?
13  A.   I do.
14  Q.   Do you feel that Mr. Peivandi took his
15     responsibilities in this regard seriously?
16  A.   I do.
17  Q.   You testified earlier that you were not a part of the
18     decision to place Ms. Poplar on a two-week unpaid
19     suspension; is that correct?
20  A.   Yes.
21  Q.   You also testified that you were not a part of the
22     decision to place her on a paid administrative leave;
23     is that correct?
24  A.   That's correct.
25  Q.   Do you have independent knowledge of the reasons that

Page 66

1     Ms. Poplar was placed on a two-week unpaid suspension
2     by Mr. Peivandi?
3  A.   No, I do not.
4  Q.   Do you have independent knowledge of the reasons that
5     Ms. Poplar was placed on a paid administrative leave
6     by Mr. Peivandi?
7  A.   I have none, no.
8  Q.   Is it the Board's role to approve contracts that are
9     entered into between the Genesee County Road
10     Commission and other third parties?
11  A.   Yes.
12  Q.   What is the effect of a contract that has not been
13     approved by the Genesee County Road Commission?
14  A.   It's not effective.
15  Q.   Subsequent to Fred's recommendation of and the Board's
16     approval of the creation of the administrative
17     assistant position, we're orienting ourselves in 2018
18     for reference, do you remember whether Donna Poplar
19     made a subsequent request to move this position from a
20     part-time to full-time position?
21  A.   Yes, I do.
22  Q.   Do you remember whether or not you supported that
23     move?
24  A.   I did support the move.
25  Q.   Did you always support it or did you come to support

Page 67

1     it?

2 **A.** I always supported it.

3 **Q.** Okay. Do you remember, or subsequent to the creation

4     of that job position, whether or not Donna Poplar made

5     a request for a position to receive $25 an hour as the

6     starting salary?

7 **A.** Yes, I remember that.

8 **Q.** Do you remember whether or not you supported that

9     position?

10 **A.** I did support that position.

11 **Q.** Do you remember whether or not you always supported

12     that position?

13 **A.** I always supported that position.

14 **Q.** You heard some testimony earlier about the selection

15     of a labor relations attorney to represent the Genesee

16     County Road Commission; and in asking these questions,

17     I'm going to again repeat an instruction, you've done

18     very well to heed so far, Mr. Mandelaris, I give you

19     credit, please do not disclose any privileged

20     communications or any communications that are covered

21     by the work product privilege in answering these

22     questions.

23         Do you know or do you remember whether

24     the Genesee County Road Commission had a vote on who

25     would represent the Road Commission with respect to

Page 68

1     labor relations?

2 **A.** I believe there was a vote, yes.

3 **Q.** Do you have any reason to doubt the qualifications of

4     the firm that was chosen to represent the Genesee

5     County Road Commission with respect to labor

6     relations?

7 **A.** No.

8 **Q.** Do you know whether or not Donna Poplar had any

9     opposition to the decision to appoint that firm that

10     ended up being selected as the firm?

11 **A.** No.

12 **Q.** To the best of your recollection, when is the last

13     time you spoke with Commissioner Nolden?

14 **A.** Yesterday morning.

15 **Q.** Did you have a telephone conversation or was it in

16     person?

17 **A.** Telephone conversation.

18 **Q.** Do you remember what Mr. Nolden and you talked about

19     during this telephone conversation?

20 **A.** Yes; it was the proposed reorganization of the Road

21     Commission staff.

22 **Q.** We held a vote about whether or not the proposed

23     reorganization would be accepted today, correct, Mr.

24     Mandelaris?

25 **A.** Yes.

Page 69

1 **Q.** Did you vote to approve it or not?

2 **A.** I voted to approve it.

3 **Q.** Did you vote to approve it for the reasons that you

4     stated on the record today?

5 **A.** Yes.

6 **Q.** And did Mr. Nolden say whether or not he intended to

7     attend the meeting today?

8 **A.** Yes, he did.

9 **Q.** What did he say about that?

10 **A.** He said he did not think he would be able to attend

11     the meeting because of a conflict.

12 **Q.** Okay. Had he been asked, to the best of your

13     recollection, whether or not he had been asked --

14     whether or not he had been asked to attend the

15     meeting?

16 **A.** My guess is, he was asked.

17 **Q.** Okay. Did he tell you who asked him to attend the

18     meeting?

19 **A.** No.

20 **Q.** If I asked you to evaluate Fred Peivandi's job

21     performance, how would you evaluate that job

22     performance overall?

23 **A.** Superior.

24 **Q.** Mr. Mandelaris, given your history, you care deeply

25     about diversity, equity and inclusion and fair

Page 70

1     treatment at the Road Commission; correct?

2 **A.** Yes.

3 **Q.** Would you rate an employee's performance as superior

4     if you believed that that employee was responsible for

5     discriminating against other employees on the basis of

6     race?

7 **A.** I would not give him a superior rating.

8 **Q.** Okay. Would you rate a person's performance as

9     superior if you believed that that person had the

10     intent to retaliate against employees engaged in

11     protective activity here at the Road Commission?

12 **A.** No.

13 **Q.** Would you rate an employee as engaging in superior

14     performance if you believed that that employee had the

15     intent to deny reasonable accommodations to employees

16     at the Road Commission?

17 **A.** No.

18 **Q.** Regardless of whether you remember voting for it or

19     not, and regardless of whether it was a decision by

20     the Board or not, do you support the change to have

21     Donna Poplar report directly to Randy Dellaposta?

22 **A.** Yes, I do support.

23 **Q.** Do you think that's been going well?

24 **A.** Yes.

25 **Q.** Do you think Randy Dellaposta is overall a fair-minded

Page 71

1 person?

2 A.   Yes, I do.

3 Q.   Do you think that the change to have Donna Poplar

4 report directly to Randy Dellaposta is a good outcome,

5 given Donna Poplar's concerns as expressed in her

6 complaints and in this lawsuit?

7 A.   Yes, I do.

8 Q.   You testified earlier that when Fred Peivandi was

9 first hired into the managing director position that

10 you voted for your part as one member of the five-

11 member Board to appoint him to that position; is that

12 right?

13 A.   That's correct.

14 Q.   I believe you also voted (sic) that Cloyce Dickerson

15 voted to not have him be in that position; is that

16 correct?

17 A.   That's my recollection.

18 Q.   And I think you anticipated my question here, which

19 is, to the extent the Board meeting minutes show a

20 different vote in that regard, would you have any

21 reason to doubt those Board meeting minutes?

22 A.   No, I would not.

23 Q.   Okay. 2018 is a while ago. I struggle to remember it

24 myself.

25        You testified earlier, I believe, that

Page 72

1 one of Fred's personality traits is that he likes to,

2 quote-unquote, be in command. Do you remember giving

3 that testimony?

4 A.   Yes.

5 Q.   He is the managing director of the Road Commission, is

6 he not?

7 A.   Yes, he is.

8 Q.   He's ultimately responsible for oversight of the Road

9 Commissions' administrative activities?

10 A.   That is correct.

11 Q.   I'm going to ask you a hypothetical. Donna thinks

12 that a directive should be handled in manner (a), and

13 Fred thinks the directive should be handled in manner

14 (b). Who has the authority to make the decision

15 ultimately?

16 A.   The managing director.

17 Q.   To the best of your knowledge, we'll restrict this

18 question to the last five years, say, has Anthony

19 Branch ever been placed on a two-week unpaid

20 suspension here at the Road Commission?

21 A.   No.

22 Q.   To the best of your knowledge, has Anthony Branch ever

23 been provided or directed to take a paid administrative

24 leave from his job duties?

25 A.   No.

Page 73

1 Q.   Has Mr. Anthony Branch, at least within the past five

2 years, ever been disciplined at all?

3 A.   No.

4 Q.   In fact, less the implication, the negative

5 implication be drawn, to the best of your

6 recollection, Mr. Branch has never been disciplined at

7 any point in time here during his tenure at the Road

8 Commission; correct?

9 A.   I can't answer that.

10 Q.   Ah. He predates you being on the Board; correct?

11 A.   Right.

12 Q.   Got it.

13 A.   Yes.

14 Q.   Within the time you've been on the Board, Mr. Branch

15 never received any discipline at any time, has he?

16 A.   No.

17 Q.   Even after he filed his lawsuit against the GCRC?

18 A.   No.

19 Q.   You testified that Donna had, I'm referring, of

20 course, to Ms. Poplar, the Plaintiff in this lawsuit,

21 had contacted you many times to talk to you matters

22 that were dealing of her position in office; is that

23 right?

24 A.   Yes.

25 Q.   When, to the best of your knowledge, was the last time

Page 74

1 that Donna Poplar contacted you to discuss a matter

2 dealing with her position in office?

3 A.   Probably six months ago.

4 Q.   Has she done that at any point subsequent to that?

5 A.   No.

6        MR. CASCINI: Well, John, Julie may

7 have some more questions, but you are free from me at

8 least for the moment.

9        MS. GAFKAY: I do have some follow-up.

10        REEXAMINATION

11 BY MS. GAFKAY:

12 Q.   So if Donna Poplar and Fred Peivandi disagree on

13 something, do you agree that if Donna's position is

14 the legal position and Fred Peivandi's is illegal,

15 that Donna Poplar's position should prevail?

16 A.   I agree.

17 Q.   You testified that at some point Donna Poplar's

18 request for accommodation for an administrative

19 assistant went from part time to full time?

20 A.   Yes.

21 Q.   Did Fred Peivandi oppose filling the administrative

22 assistant position full time to accommodate Donna

23 Poplar?

24 A.   Yes.

25 Q.   Do you agree that there's a difference between -- with

Page 75

1   regard to Donna Poplar's request for accommodation,
2   there's a difference between simply creating the
3   administrative assistant position and actually filling
4   the position to provide the actual accommodation?
5  A.   Yes.
6  Q.   Do you recall after, you're welcome to look at Exhibit
7   8, do you recall that after the administrative
8   assistant position was created and budgeted, that it
9   went unfilled for several months?
10 A.   No, I don't remember that.
11 Q.   Do you recall that it was unfilled -- there was a time
12   that it was unfilled after the creation?
13 A.   Well, probably during the time it was being advertised,
14   close to it.
15 Q.   Were you a Board of Commissioners member under John
16   Daly?
17 A.   Yes.
18 Q.   Okay.  With regard to the managing director position,
19   I believe one of the things you testified to is that
20   the managing director has the authority to hire; is
21   that right?
22 A.   That's correct.
23 Q.   Does the managing director have the authority to set
24   forth the terms and conditions of employment for those
25   he or she hires?

Page 76

1  A.   Yes.
2  Q.   So does the managing director have the authority to
3   put those terms and conditions into an employment
4   agreement?
5  A.   Yes.
6  Q.   And signing the employment agreement?
7  A.   By signing the agreement, what do you mean?
8  Q.   Well, as the managing director, setting forth the
9   terms and conditions of employment for an employee,
10   such as a director, do you agree that the managing
11   director would have the authority to sign the
12   agreement?
13 A.   I'm thinking that the duties and responsibilities of
14   the position would have to be run through the Board
15   first.
16 Q.   Why do you say that?
17 A.   Because the Board has the ultimate authority over the
18   Road Commission.
19 Q.   Correct.  But as far as the hiring, you said the
20   managing director has the authority; true?
21 A.   Yeah.
22 Q.   And setting forth the terms and conditions of
23   employment, the managing director has the authority?
24       MR. CASCINI:  Objection; asked and
25   answered.

Page 77

1  Q.   (BY MS. GAFKAY)  Go ahead.
2  A.   He has the authority to hire and fire, but I question
3   whether he has the authority to set the different
4   positions in the table of organization; that would
5   have to go through the Board, and following that, what
6   the duties of the different positions would be.
7  Q.   You said you agree that Fred Peivandi engaged in a
8   turf war with Donna Poplar?
9  A.   That's my opinion.
10 Q.   Do you agree that that would not be appropriate for
11   him to do that?
12 A.   It would be appropriate for her not to do it.
13 Q.   I'm asking, so you think it's okay for -- do you think
14   it's okay for Fred Peivandi to engage in a turf war
15   with Donna Poplar?
16 A.   That's not what I'm saying.
17 Q.   That's what I'm asking, though.
18 A.   I would have to say no.
19 Q.   Okay.  Was Fred Peivandi, did you ever recommend any
20   type of discipline or action be taken against him for
21   engaging in a turf war with Donna Poplar?
22 A.   No.
23       MS. GAFKAY:  I don't have any further
24   questions at this time.
25       REEXAMINATION

Page 78

1  BY MR. CASCINI:
2  Q.   John, I have one question for you, and I think that
3   might be it, just one.
4       If a managing director, any managing
5   director, it could be Fred, it could be John Daly, it
6   could be a hypothetical future managing director, were
7   to execute and sign an employment agreement with an
8   employee without the Board's knowledge or approval,
9   would that agreement be valid?
10 A.   No.
11       MR. CASCINI:  Yes, that's all that I
12   have.  I'm all set.
13       (Deposition concluded at
14       3:14 p.m.)
15       (END OF RECORD)
16
17
18
19
20
21
22
23
24
25

Page 79

1 STATE OF MICHIGAN )
              ) SS.
2 COUNTY OF SHIAWASSEE )

3

4       I, Cynthia A. Lathrop, Court Reporter and
5 Notary Public in and for the above county and state, acting
6 in the County of Genesee, do hereby certify that the
7 aforegoing deposition was taken before me at the time and
8 place hereinbefore set forth.
9       I further certify that said witness was by
10 me sworn in said cause and the testimony then given was
11 reported by me stenographically and subsequently
12 transcribed and that the aforegoing is a full, true and
13 correct transcript of my original shorthand notes.
14       IN TESTIMONY WHEREOF, I set my hand and
15 notarial seal at Shiawassee County, Michigan, this 8th day
16 of August 2022.

17
18
19
20
21
22       Cynthia A. Lathrop (CSR-2474)
         Notary Public in and for the
23       County of Shiawassee,
         State of Michigan
24       My Commission Expires: 2/2/26
25