UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNA POPLAR,

        Plaintiff,

vs.                              Case No. 2:21-cv-12568-VAR-JJCG
                                 Hon. Victoria A. Roberts

GENESEE COUNTY ROAD COMMISSION
and FRED F. PEIVANDI, in his
individual capacity,

        Defendants.

DEPOSITION OF RANDALL DELLAPOSTA, taken on

Thursday, July 14, 2022, at 211 West Oakley Street, Flint,

Michigan, noticed for 12:00 P.M.

APPEARANCES:

For the Plaintiff:  LEE LEGAL GROUP, PLLC
                    BY:   CHARIS LEE, J.D. (P84127)
                    117 West Flint Park Boulevard
                    Flint, Michigan 48505
                    (810) 513-9257
                    charis@leebusinesslaw.com
                          and
                    GAFKAY LAW, PLC
                    BY:   JULIE A. GAFKAY, J.D. (53680)
                    604-A South Jefferson Avenue
                    Saginaw, Michigan 48607
                    (989) 652-9240
                    jgafkay@gafkaylaw.com

Case 2:21-cv-12568-VAR-JJCG  ECF No. 23-6, PageID.422  Filed 11/21/22  Page 2 of 12
Donna Poplar v. Genesee County Road Commission   Fred Peivandi, Randy Dellaposta @ 12

2 (2)

```
 1   APPEARANCES (CONTINUED)

 2   For the Defendant:   HENN LESPERANCE, PLC
                          BY:  ANDREW A. CASCINI, J.D. (P76640)
 3                        32 Market Avenue, SW, Suite 400
                          Grand Rapids, Michigan 49503
 4                        616) 551-1611
                          aac@hennlesperance.com
 5
     Court Reporter:   Cynthia Lathrop, CSR-2474
 6
     ALSO PRESENT:
 7
     Ms. Maddy Sides
 8

 9

10                       *    *    *    *

11

12
                          INDEX TO EXAMINATION
13
     WITNESS:   RANDALL DELLAPOSTA
14
     Examination by Ms. Lee                              Page  5
15

16

17

18                       *    *    *    *

19

20

21

22

23

24

25
```

Case 2:21-cv-12568-VAR-JJCG  ECF No. 23-6, PageID.423  Filed 11/21/22  Page 3 of 12
Donna Poplar v. Genesee County Road Commission  Fred Peivandi, Randy Dellaposta @ 12

3 (3 - 6)

Page 3

1  Flint, Michigan
2  Thursday, July 14, 2022
3  2:37 p.m.
4  R E C O R D
5  COURT REPORTER: Do you solemnly swear
6  or affirm to tell the whole truth in this matter so
7  help you God?
8  THE WITNESS: I do.
9  MS. LEE: Can you state your full name
10  for the record?
11  THE WITNESS: Randall Edward
12  Dellaposta.
13  MS. LEE: Do you want to spell your
14  last name for her?
15  THE WITNESS: D-e-l-l-a-p-o-s-t-a,
16  Dellaposta.
17  MS. LEE: Do you do that quite often?
18  THE WITNESS: I do.
19  MS. LEE: So, Mr. Dellaposta, my name
20  is Charis Lee, and I'm one of the attorneys for Donna
21  Poplar in this case. This is Attorney Gafkay, and
22  she's assisting me as co-counsel in this case.
23  So I'm going to be asking you some
24  questions here today. Have you ever had your
25  deposition taken before?

Page 4

1  THE WITNESS: I have not.
2  MS. LEE: Okay. So we will go through
3  some ground rules. So before we begin, I will note
4  for the record that this deposition is being taken
5  pursuant to the Federal Rules of Civil Procedure, and
6  it's being taken for any and all purposes under those
7  rules.
8  We served a subpoena on your attorney
9  for the Genesee County Road Commission and Mr.
10  Peivandi, and he intercepted that on your behalf
11  today. Are you aware that you are under subpoena here
12  today?
13  THE WITNESS: I am now, yes.
14  MS. LEE: Okay. So there's a court
15  reporter here taking down everything that we're
16  saying; so if you can answer audibly with a yes or a
17  no, sometimes we shake our head, and so if I ask you
18  to respond verbally, you'll just know it's for the
19  record; okay? Try to avoid um-hum and uh-uh; we want
20  clear yes or no answers, okay; and if I pause, that's
21  usually just meant to make sure that the record is
22  clear; okay?
23  If I ask you a question, I would like
24  you to listen to the question fully and then make sure
25  you understand the question before you answer; okay?

Page 5

1  That's important. So it's clear that you understand
2  my question and the record is clear.
3  We can break at any time if you need to
4  run to the bathroom or if you need to get some water.
5  Just make sure that if I have a question on the floor
6  that you go ahead and answer the question, and then
7  you can ask for a break; okay?
8  THE WITNESS: Okay.
9  MS. LEE: All right. So do you have
10  any questions for me about the deposition process?
11  THE WITNESS: No. I should have got
12  water before I came in here.
13  MS. GAFKAY: I'll run and get you some.
14  MR. CASCINI: Thank you, Julie.
15  MS. GAFKAY: You can keep going.
16  EXAMINATION
17  BY MS. LEE:
18  Q.  And so I'm just going to ask you some questions. How
19     long have you worked for the Genesee County Road
20     Commission?
21  A.  Eighteen years.
22  Q.  All right; a long time. And what positions have you
23     had in the last 18 years? And I know it might be a
24     lot for you to go through, but just as best as you can
25     remember.

Page 6

1  A.  I started as the stockroom clerk, and then from the
2     stockroom clerk, became the stockroom and facilities
3     supervisor; and from that, I also became the fleet
4     manager -- Fleet Maintenance and Facilities director;
5     and then from the Fleet Maintenance and Facilities
6     director, the Operations director; and now to the
7     current capacity role I am as deputy managing
8     director.
9  Q.  What is that, like -- is that, like, seven different
10     positions? Did I count right that you said?
11  A.  Five.
12  Q.  Five, okay. All right. So tell us what your current
13     position is? Let me make sure that's clear.
14  A.  So my current position here at the Genesee County Road
15     Commission is deputy managing director.
16  Q.  And your immediately preceding position was?
17  A.  Director of Operations.
18  Q.  Okay, perfect. And your current position, was that
19     position created for you -- or not specifically for
20     you; was it created? Is it a new position or did you
21     fill someone's slot?
22  A.  No; it is a new position.
23  Q.  Okay. And in that position, what are your duties in
24     your role?
25  A.  As a deputy managing director, my role is to assist

Page 7

1  the managing director, oversee the operations with
2  budget reports, road issues, things like that.
3  Q.  Okay. And as a part of your position that you
4      currently hold as the deputy managing director, do you
5      have any direct reports, people who directly report to
6      you?
7  A.  Yes.
8  Q.  Okay. And who is that?
9  A.  I have the entire Fleet Maintenance and Facilities
10     Department staff and all of the current directors.
11 Q.  Okay. And just for the sake of the record, who are
12     the directors and what are the departments that they
13     direct?
14 A.  So I have the -- you want me to say their name or --
15 Q.  Yes, their name and --
16 A.  I have the Finance director, Tracy Kahn; I have the
17     Maintenance director, Anthony Branch; I have the Human
18     Resource director, Donna Poplar; and I have the
19     director of Engineering, Eric Johnston; and then the
20     Fleet Maintenance Department is a large -- it's 22
21     people.
22 Q.  So are you, like, the director over them as well or is
23     there someone under you that manages that department?
24 A.  There is someone under me. There's a Fleet
25     Maintenance and Facilities manager --

Page 8

1  Q.  Okay.
2  A.  -- right now, but I'm over the entire department.
3  Q.  Understood. You stated earlier, your testimony, that
4      the position was a new position that was created.
5      Previously have directors reported to a deputy manager
6      or someone other than the managing director, to your
7      knowledge, in the 18 years that you've been here?
8  A.  Can you repeat that again because --
9  Q.  So for the 18 years that you have been here --
10 A.  Yeah.
11 Q.  -- have directors reported to the managing director or
12     was this something new -- your role is new, but prior
13     to your role, the directors always reported to the
14     managing director?
15 A.  That is correct.
16 Q.  Okay. When did you start your new role?
17 A.  February.
18 Q.  Of?
19 A.  Of 2022.
20 Q.  Okay. So it's fairly new?
21 A.  Yes.
22 Q.  All right. And prior to you being in this new role
23     where the directors have reported to you, did you have
24     any direct reports prior to your new role, so this
25     would've been when you were Operations manager;

Page 9

1      correct?
2  A.  I was director of Operations --
3  Q.  Okay.
4  A.  -- correct.
5  Q.  Okay. Sorry.
6  A.  That's all right. Did I have anybody that reported to
7      me --
8  Q.  Correct.
9  A.  -- as the director of Operations?
10 Q.  Yeah.
11 A.  I'm trying to think. Yes.
12 Q.  Okay. And who was that?
13 A.  I had -- if I'm not mistaken and memory serves me, I
14     think I had all the directors at one point in time
15     report to me prior to becoming deputy managing
16     director.
17 Q.  As the --
18 A.  Director of Operations, yes.
19 Q.  And was that new as well?
20 A.  Director of Operations?
21 Q.  No. Was it new that the directors reported to you or
22     was that always a job responsibility you held at the
23     time that you were -- became in that role?
24 A.  No; it was new.
25 Q.  Okay. Thank you. Currently -- well, I'll just say at

Page 10

1      any time or point in your experience, have you been
2      over HR, Human Resources?
3  A.  Currently or anytime --
4  Q.  I can rephrase.
5          Do you have any experience or
6      background in human resources?
7  A.  No.
8  Q.  Okay. And currently you supervise the director of
9      Human Resources?
10 A.  Correct, yes.
11 Q.  And how do you assist the director of Human Resources
12     in performing her job or in -- or as a manager, do you
13     review things with her, do you assign her tasks?
14 A.  I review things with all directors --
15 Q.  Okay.
16 A.  -- and I also review things -- or assign them tasks
17     during our staff meetings, yes.
18 Q.  And so tell me some types of tasks that you have
19     assigned the director of HR.
20 A.  Well, one particular task right now is looking at
21     specific things in regards to healthcare, as well as
22     HRIS, things like that, been very vocal with the HRIS
23     of late, which we just implemented; but various
24     different things, such as the employee -- the Safety
25     Committee, the employee -- employee of the year and

Page 11

1   things like that.
2 Q. In those tasks that you have assigned Ms. Poplar, the
3   director of HR, has she performed those tasks
4   satisfactory?
5 A. Yeah.
6 Q. Okay. So you've never had any written correspondence
7   to her that she has not performed a task or that she
8   has not performed the task satisfactory?
9 A. We've had correspondence back and forth in regards to
10   maybe a disagreement on the task; but in regard to the
11   question, she has performed the task.
12 Q. So was it a disagreement or clarification on the task?
13 A. Both.
14 Q. Okay. Why don't you tell me about that.
15 A. Well, in particular, I've asked for specific things to
16   be brought to my attention prior to release or
17   something along those lines, and in the past, it
18   hasn't necessarily gone that direction. So we would
19   have discussion on it, whether it was in my office
20   verbally or via e-mail.
21 Q. So there would be maybe written e-mails or
22   correspondence and you asking Ms. Poplar to perform a
23   certain task, and then -- and bring it to you for
24   review?
25 A. Um-hum.

Page 12

1 Q. And then she has not done that?
2 A. Yes.
3 Q. And can you think of the specific time or a specific
4   time or multiple specific times where this has
5   happened?
6 A. Just recently with a committee that we established
7   where I'd asked to review all documentation before
8   being disbursed, and I did not have the documentation
9   before me.
10 Q. And what was the committee about or the documentation?
11   What was the situation?
12 A. It was for the Diversity, Equity, Inclusion Committee.
13 Q. And do you remember specifically what it was that she
14   did not provide to you?
15 A. All of the handouts.
16 Q. Okay.
17 A. So I reviewed a few of the handouts that she provided
18   to the committee, but I did not review all of the
19   handouts.
20 Q. Can you remember any example of what -- what maybe you
21   seen later, at a later time, that was not provided to
22   you before?
23 A. Not off the top of my head, no.
24 Q. You stated earlier you did discuss this not being
25   provided these particular materials beforehand. Was

Page 13

1   this before, like, a committee meeting; like, before
2   you met, maybe you saw something you didn't receive
3   before?
4 A. That is correct.
5 Q. Okay. And this was for diversity committee meeting?
6 A. Correct.
7 Q. I'm going to switch my interview here and just ask you
8   about your working relationship with Ms. Poplar. How
9   is that?
10 A. Good.
11 Q. So notwithstanding maybe the last thing, allegedly not
12   providing you information, you have a good working
13   relationship?
14 A. I would like to believe I have a good working
15   relationship with all my directors, as I think when
16   you're in business, there are some frustrations and
17   growing pains; but, yeah, it's good.
18 Q. Have you ever known or would characterize Ms. Poplar
19   to be racist or biased?
20 A. No.
21 Q. Are you aware of any time where other employees have
22   maybe filed a formal complaint or filed a complaint
23   against Ms. Poplar for the way that she's treated
24   them?
25 A. No.

Page 14

1 Q. So at any time during -- and you stated earlier you've
2   been here 18 years. So that means that you've worked
3   with Ms. Poplar for her entire tenure; correct?
4 A. (Nodding head affirmatively).
5 Q. At any time do you recall Ms. Poplar telling you,
6   during her career, that she felt that she's being
7   treated differently by Mr. Peivandi, the current
8   managing director?
9 A. Yes.
10 Q. And can you tell me about that?
11 A. I believe that she has mentioned to me that she felt
12   the managing director was unfair and, in her opinion,
13   mistreating her.
14 Q. Have you ever -- or do you recall speaking with any
15   other director that has worked here during your tenure
16   about Ms. Poplar or any other director being treated
17   unfairly?
18 A. Have I spoken with any other director --
19 Q. Do you recall any conversations where you have spoken
20   with any other director or any other employee about
21   how Anthony Branch or Donna Poplar have been treated
22   at this organization?
23 A. Not that I recall, no.
24 Q. Okay. Have you ever had or do you recall any personal
25   conversation that you may have had with Ms. Poplar,

Case 2:21-cv-12568-VAR-JJCG ECF No. 23-6, PageID.426 Filed 11/21/22 Page 6 of 12
Donna Poplar v. Genesee County Road Commission    Fred Peivandi, Randy Dellaposta @ 12

6 (15 - 18)

Page 15

1 just regarding life or any sort of banter back and
2 forth with you all maybe where you might have shared
3 personal information?
4 **A.** Of course, yes.
5 **Q.** So you felt comfortable with Ms. Poplar to maybe have
6 conversations with her regarding your own personal
7 information or -- yeah, I'll just say regarding your
8 own personal information?
9 **A.** Yeah.
10 **Q.** Okay. Do you recall what any of those matters might
11 have been about? And you don't have to go into
12 detail. I'm just asking generally.
13 **A.** I think it was two colleagues having a conversation,
14 regardless of maybe not at work, but more of an open
15 discussion; it could've been religion, it could've
16 been something else associated with it, yeah.
17 **Q.** Do you recall ever asking Ms. Poplar why she wasn't in
18 attendance in certain staff meetings that maybe dealt
19 with personnel or the HR Department as a whole?
20 **A.** Can you repeat that again?
21 **Q.** Do you recall Ms. Poplar -- ever asking Ms. Poplar why
22 she wasn't in attendance of a meeting that maybe has
23 dealt with HR?
24 **A.** Possibly.
25 **Q.** Do you or did you ever have concerns about how any of

Page 16

1 your colleagues were being treated by the managing
2 director? Has there ever been a time where you have
3 maybe perceived unfair behavior or commented on
4 situations with Ms. Poplar or Mr. Branch?
5     MR. CASCINI: I'm going to object on
6 the basis of compound question. Are we striking the
7 first question and going with the second one?
8     MS. LEE: I can repeat. Let me just do
9 one question at a time.
10 **Q.** (BY MS. LEE) So have you ever perceived or felt that
11 Ms. Poplar was being mistreated by Mr. Peivandi?
12 **A.** No, not necessarily. I may have had a discussion in
13 regards to the dislike of what -- what we were
14 experiencing as directors and the accountability or
15 something along those lines; but no.
16 **Q.** Why don't you tell me about that.
17 **A.** I think as directors, we all get -- you know, workloads
18 can pile up; and so discussion would move on as to,
19 are we able to get this work done, where is it going,
20 so on and so forth.
21     And I can say early in my career as a
22 director, there were a lot of changes from, you know,
23 the staffing levels, and it was more of a water cooler
24 talk, more or less, to say, hey, how are we going to
25 get this done, and so on and so forth.

Page 17

1 **Q.** So according to you and in your opinion, Donna Poplar
2 has not been mistreated by Fred Peivandi at the Road
3 Commission?
4 **A.** No.
5 **Q.** And what about Anthony Branch?
6 **A.** No.
7 **Q.** Okay. So I want to talk about now, you stated earlier
8 that Donna reports to you as director of HR; right?
9 **A.** (Nodding head affirmatively).
10 **Q.** So when did this change happen, from her reporting to
11 the managing director to now reporting to you?
12 **A.** If I'm not mistaken, I believe it transpired when she
13 returned from her paid administrative leave.
14 **Q.** Okay. So that would've been sometime in November,
15 correct, November of 2021? You can't remember?
16 **A.** I'm . . .
17 **Q.** I'm going to show you what has been previously marked
18 as exhibit, I believe this is 19.
19     MR. CASCINI: That one is 19; yes,
20 that's correct.
21 **Q.** (BY MS. LEE) So this is the Notice of Administrative
22 Leave that Ms. Poplar received, and it's dated
23 September 6, 2021. So I believe it was instituted on
24 September 7. So it would've been when she returned
25 from this particular leave; correct?

Page 18

1 **A.** Um-hum.
2 **Q.** Okay, thank you. And were you present when Ms. Poplar
3 was placed on leave or given a notice of leave?
4 **A.** I was.
5 **Q.** Okay. Can you tell me what happened in that
6 particular meeting?
7 **A.** I believe I was a witness. The managing director
8 read -- read it, and that was it. I was just a
9 witness.
10 **Q.** Okay. And at the time that you were there, were you
11 her -- you were not her manager; you were her
12 counterpart?
13 **A.** Um-hum.
14 **Q.** And so to your understanding --
15     MS. GAFKAY: Is that a "yes"?
16     MR. CASCINI: Good point.
17     THE WITNESS: Yes.
18     MS. LEE: Thanks for catching that.
19 **Q.** (BY MS. LEE) So to your understanding, what was the
20 notice of administrative leave she received?
21 **A.** I have no idea. I was not involved in that, per se.
22 **Q.** Okay. So you had no involvement whatsoever --
23 **A.** No.
24 **Q.** -- so you weren't aware that it was going to be issued
25 until someone came and got you and said let's issue

Page 19

1 this?
2 **A.** Yeah.
3 **Q.** Okay. And so after -- you stated earlier that after
4 Ms. Poplar returned to work, she began to report to
5 you; correct?
6 **A.** Yes.
7 **Q.** At that time did any other directors report to you?
8 **A.** My memory is, I -- I want to say yes, because my first
9 staff meeting was in December with all directors. So
10 whether it was within that time frame or shortly
11 after, all directors reported to me.
12 **Q.** But prior to going on administrative leave, she
13 reported to Mr. Peivandi; correct?
14 **A.** That is correct.
15 **Q.** And when she returned, she reported to you; correct?
16 **A.** That is correct.
17 **Q.** Okay. And then when Ms. Poplar returned to work, was
18 there ever any issue of -- okay. Well, when she
19 returned to work, did you have a conversation with her
20 as her now being your direct report?
21 **A.** I believe probably.
22 **Q.** Okay. Did she raise any concerns to you about her
23 working conditions?
24 **A.** No, I don't think she had an issue working under me,
25 is what we discussed.

Page 20

1 **Q.** Okay. So during this time, from when she started to
2 report to you up until the present, has Ms. Poplar
3 ever requested of you any accommodations regarding her
4 position?
5 **A.** Um-hum; she has, yes.
6 **Q.** And so before we get into that request, I want to ask
7 you, do you know that, by law, the Road Commission is
8 required to provide her a reasonable accommodation for
9 her disability?
10 **A.** Yes.
11 **Q.** And are you aware of Ms. Poplar's disability?
12 **A.** Yes, I believe it's vision.
13 **Q.** Okay. And when did you become aware of her
14 disability?
15 **A.** I don't know exactly, but it was the -- shortly after
16 her employment, I believe.
17 **Q.** So shortly after her employment, you become aware of
18 her vision disability, and how do you become aware of
19 that? Because at this time, she would not have been
20 reporting to you; she would have been reporting to
21 either Fred Peivandi or the previous managing
22 director, John Daly; correct?
23 **A.** Yes, I was aware of it because she had reached out to
24 me as the Fleet Maintenance and Facilities director to
25 make an accommodation, such as removing light bulbs,

Page 21

1 dimming lights, providing tools and resources.
2 **Q.** And did you ever provide any other source of
3 accommodations? Did you ever make edits to her office
4 space regarding any accommodations that she was going
5 to receive?
6 **A.** If you're talking about reducing light and things like
7 that, yes.
8 **Q.** Was there a space created for a HR administrative
9 assistant in her office?
10 **A.** Adjacent to her office, yes.
11 **Q.** Okay. And by whose direction was that space made
12 available?
13 **A.** I believe it was in conjunction with the managing
14 director, the Board, and the HR.
15 **Q.** And at the time, who was the managing director?
16 **A.** Um . . .
17 **Q.** If it helps, Ms. Poplar was employed in 2016. So it
18 would've been -- that's when she came on board.
19 **A.** Right. I just don't remember when the space was
20 created. So I can't recall whether that was -- which
21 managing director.
22 **Q.** Okay. And so were you ever aware of any dispute
23 between Mr. Peivandi and the Board or Ms. Poplar
24 regarding the HR administrative assistant back in
25 2019?

Page 22

1 **A.** I think all directors were aware of that based on --
2 **Q.** How were you aware of it?
3 **A.** Present at Board meetings.
4 **Q.** So this was something that was openly discussed in
5 Board meetings?
6 **A.** Yes.
7 **Q.** And so to your knowledge, what was the conversation
8 about? What was discussed in the Board meeting?
9 **A.** From my recognition (sic) was primarily the request
10 for administrative assistant, Board evaluated; I
11 believe the Board at that time, based on documentation
12 and request from HR director at the time, proceeded
13 with a part-time administrative assistant that went on
14 to a full-time position.
15 **Q.** Okay. So when the HR Department began to report to
16 you -- or when Donna began to report to you as HR
17 director, there was a full-time HR administrative
18 assistant in that office?
19 **A.** (No response).
20 **Q.** So prior to Donna going on administrative leave, she
21 had a senior's benefits coordinator and a HR -- full
22 time HR administrative assistant prior to her going on
23 leave. And you stated that when she returned two
24 weeks later, she reported to you.
25 **A.** Yeah, she did report to me. The timing, though, is

Case 2:21-cv-12568-VAR-JJCG ECF No. 23-6, PageID.428 Filed 11/21/22 Page 8 of 12
Donna Poplar v. Genesee County Road Commission  Fred Peivandi, Randy Dellaposta @ 12

8 (23 - 26)

Page 23

1     because the senior benefits coordinator retired --
2 Q. Okay.
3 A. -- and so I'm trying to recall when that transpired
4     and was Director Poplar off or not off on paid
5     administrative leave, and I can't recall.
6 Q. Okay, that's fine. So I'll go back to my previous
7     question -- or previous question I was going to ask.
8     So I do want to clarify because I know we just were
9     going back and forth here.
10         There was -- the Board approved a
11     part-time administrative assistant to assist Donna, or
12     assist in the HR Department to assist Donna; correct?
13 A. Correct.
14 Q. And then later that position transitioned to a
15     full-time position; correct?
16 A. Yes.
17 Q. And you were aware, based on being in Board meetings,
18     that the functions of that particular HR
19     administrative assistant was to help Donna with her
20     disability and with her vision disability; correct?
21 A. Yes. And I believe that when we talked about the
22     Board's decision, it was both agreed upon by the Board
23     and the managing director to provide that for a part-
24     time position, correct.
25 Q. All right. Thank you. So help me understand why now

Page 24

1     Ms. Poplar, knowing that she has a vision disability
2     and that she needed assistance from the HR
3     administrative assistant to help her with reading and
4     other vision accommodations, that she does not have
5     one currently?
6 A. She does.
7 Q. Okay. And so how does she have that now?
8 A. She has that with the benefits coordinator.
9 Q. Okay. So is the benefit coordinator position -- that
10     was a full-time position when there also was a
11     full-time HR administrative assistant. Is the benefit
12     coordinator now a part-time position?
13 A. No.
14 Q. No, okay. So the benefits position -- let's go back
15     because you told me about a retirement. So previously
16     there was a senior benefits coordinator, Cherry Grant;
17     correct?
18 A. Correct.
19 Q. And do you know how long she worked here?
20 A. Twenty-five plus years.
21 Q. And so the previous -- so now she retired; correct?
22 A. Um-hum.
23 Q. And then the HR administrative assistant steps into
24     what was a senior role; correct?
25 A. That is correct.

Page 25

1 Q. And then she is now also expected to fulfill her
2     previous full-time duties in a senior role?
3 A. Full-time duties as --
4 Q. So she -- and let's put a name to this. Who is the --
5     who is the benefits coordinator at this point now?
6 A. Monica Pearson.
7 Q. And Ms. Pearson previously held the HR administrative
8     assistant position; correct?
9 A. That is correct.
10 Q. And are you telling me, is it your testimony today
11     that she is supposed to fulfill the duties of two
12     full-time positions?
13 A. Her job description calls out for her to assist the
14     director of Human Resources, as well as the benefits
15     coordinator.
16 Q. And so have you discussed -- okay. So her -- there
17     was a new -- was there a new job description crafted
18     for the senior benefits position?
19 A. The senior benefits position wasn't --
20 Q. For the benefits position?
21 A. For the benefits position, yes, because there was no
22     longer a senior benefits coordinator; it was now
23     benefits coordinator.
24 Q. Okay. And so did this have to be approved by the
25     Board?

Page 26

1 A. No.
2 Q. Did anyone ever tell the Board that they were removing
3     the HR administrative assistant position that the
4     Board created to assist Donna with her vision
5     accommodation?
6 A. I don't recall, no.
7 Q. Okay. Is Ms. Pearson aware that she is supposed to
8     fulfill the benefits position and her previous duties
9     in the HR administrative position?
10 A. Yes.
11 Q. Okay. And you had a conversation with her about that?
12 A. I did.
13 Q. Okay. And how did she respond?
14 A. She accepted.
15 Q. Okay. And when you say accepted, she said that I am
16     able to perform both functions of what I did
17     previously in helping with accommodations and also the
18     benefits role?
19 A. Yes.
20 Q. Okay. And did you discuss or have a conversation with
21     Ms. Poplar about this?
22 A. I believe there was discussion upon her return because
23     she had requested to have the administrative
24     assistant. So I believe at that point, I had a
25     conversation with Ms. Poplar indicating that the

Page 27

1  benefits coordinator would be assisting her.
2  Q. So the vision accommodation was for Ms. Poplar;
3  correct?
4  A. Correct.
5  Q. And the Board approved a HR administrative assistant
6  for Ms. Poplar for her vision accommodation?
7  A. Yes.
8  Q. Did the Board decide to remove that accommodation?
9  A. I don't believe it's removed at all.
10 Q. Well, did the Board decide to remove that position,
11  the HR administrative assistant position?
12 A. No, because it's still there.
13 Q. Okay. Why is it still there?
14 A. It's not been removed.
15 Q. So why is it not being filled?
16 A. Because at this present time, we have the benefit
17  coordinator assisting the director.
18 Q. So you -- did you make a decision not to fill the
19  position?
20 A. Me personally?
21 Q. Yes.
22 A. No.
23 Q. Who made the decision not to fill the position?
24 A. The managing director.
25 Q. And whose name is?

Page 28

1  A. Fred Peivandi.
2  Q. And did he share with you why he made the decision not
3   to fill the position?
4  A. No.
5  Q. Did Donna ever -- did Ms. Poplar, the HR director, did
6   she ever discuss with you that Ms. Pearson, the -- she
7   was not able to give her adequate assistance?
8  A. Just recently she has, but Ms. Pearson has not told me
9   that.
10 Q. How did you respond to Ms. Poplar's concern that she
11  hasn't -- that she's not being accommodated as she was
12  prior to her administrative leave?
13 A. I received them and expressed what needed to be done.
14 Q. Okay. And what was that expression, as you say? You
15  said you expressed what needed to be done.
16 A. "As in regards to the benefits coordinator assisting
17  you, is there an issue? Is there something the
18  benefits coordinator is unable to do?" Things like
19  that.
20     And I believe at that time is when she
21  expressed her statement in stating that, you've got a
22  benefits coordinator that's doing this and doing that,
23  and that was the extent of it; but I've not had the
24  benefits coordinator come to me, per se, to tell me
25  that she's unable to perform both duties.

Page 29

1  Q. So the benefits coordinator reports to the HR
2   director; correct?
3  A. That is correct.
4  Q. And the HR director reports to you?
5  A. That is correct.
6  Q. And so you've been made aware that the person who
7   needs the accommodation is saying that the
8   accommodation is not sufficient; correct?
9  A. And I asked in response, "What can we do?"
10 Q. Okay. And did Ms. Poplar respond?
11 A. She did, and that was for an administrative assistant.
12 Q. And how did you respond?
13 A. I said, at this time, we'll evaluate it, or along
14  those lines.
15 Q. Okay. And so the position is budgeted, and it has not
16  been filled.
17     Previously, have there been any other
18  resignations in the GCRC?
19     MR. CASCINI: Objection as to form;
20  resignations?
21     MS. LEE: Yeah, resignations or
22  retirements -- sorry, retirements.
23     THE WITNESS: Yeah.
24 Q. (BY MS. LEE) Okay. Tell me who's retired recently?
25 A. The -- a couple equipment operators; do you want their

Page 30

1   names or --
2  Q. No. I'll make it more specific. Have you had any
3   administrative assistants retire recently? How about
4   the Engineering administrative assistant?
5  A. Oh, yeah, sorry. I don't think of recent as --
6  Q. That's okay.
7  A. Yes.
8  Q. Okay. Who was that?
9  A. Vicki Bechakes.
10 Q. And was her position replaced?
11 A. Yes.
12 Q. And so how many administrative assistants do you have
13  currently -- well, I'll just ask you this, are there
14  any other directors who have administrative assistants?
15 A. Yes.
16 Q. Who?
17 A. The Maintenance director, the Engineering director and
18  the managing director.
19 Q. Okay. The Finance director, does she have one?
20 A. No, she doesn't have anyone to assist her anymore, nor
21  do I. I used to have an assistant, and I don't,
22  either.
23 Q. Okay. All right. So you used to have an assistant as
24  the deputy --
25 A. Fleet Maintenance and Facilities.

Case 2:21-cv-12568-VAR-JJCG ECF No. 23-6, PageID.430 Filed 11/21/22 Page 10 of 12
Donna Poplar v. Genesee County Road Commission   Fred Peivandi, Randy Dellaposta @ 12

10 (31 - 34)

Page 31

1  Q. Fleet Maintenance. And then the Finance used to have
2  an administrative assistant. And were either of those
3  administrative assistants for disability
4  accommodation, for you or for --
5  A. No, not that I'm aware of, no.
6  Q. But the HR administrative assistant for HR, she was
7  specifically put there and crafted there for
8  disability accommodation?
9  A. I believe so, yes.
10      MS. LEE: We can take a quick five-
11  minute break; okay?
12      MR. CASCINI: Sure.
13      (Recess taken.)
14      MS. LEE: I just have a few more
15  questions for you; it won't be too long here, Mr.
16  Dellaposta.
17 Q. (BY MS. LEE) I'd like to talk about your current
18  position that you have now. I know you told me
19  earlier that you've had five different ones. In your
20  current position as the deputy managing director, did
21  you apply for that position?
22 A. No.
23 Q. Were you interviewed for it?
24 A. No.
25 Q. Okay. So how did you become to be the deputy managing

Page 32

1  direct?
2  A. As a director of Operations, it was portrayed as the
3  director of Operations was the number two person
4  within the organization without the title of deputy
5  managing director.
6  Q. And so how did the title change come about?
7  A. It came about through, I think, a board meeting, if
8  I'm not mistaken.
9  Q. So was there ever any concern placed regarding -- or
10  stated regarding maybe the fact that there were no
11  interviews or the job not being posted that it can be
12  a discriminatory practice?
13 A. No.
14 Q. Okay. Did the Board ever discuss having interviews or
15  discuss the possibility of holding interviews for the
16  position?
17      MR. CASCINI: Objection as to
18  foundation. I don't know how we can know whether
19  Randy would know that.
20      MS. LEE: Okay.
21 Q. (BY MS. LEE) So earlier you stated that this came
22  about in the Board meeting, right, or the title
23  change? I'm assuming you were at that Board meeting.
24 A. Correct.
25 Q. And so in that Board meeting or in any subsequent

Page 33

1  Board meetings, were there ever any statements made in
2  opposition to the title change or concerns about the
3  title change?
4  A. I believe there was adamant discussion at the Board
5  meetings in regards to the title change; however, if
6  I'm not mistaken, the HR director spoke on behalf to
7  say, again, as I state, the director of Operations has
8  always been number two, regardless of deputy managing
9  director or director of Operations title, it's just a
10  title; but, yes, there was extensive conversation
11  throughout Board meetings.
12 Q. But you don't recall in any of these conversations
13  anyone having a concern about the position not being
14  placed for any -- for people to apply or to interview?
15 A. Not that I recall, no.
16 Q. Were other directors given the opportunity to -- so
17  you said -- was anyone else or was it ever discussed
18  to maybe offer this position or title change to other
19  directors?
20 A. Again, not that I recall.
21 Q. I'm going to switch a little bit here to a different
22  line of questioning. Do you have any knowledge or do
23  you recall anyone else being placed, while you've been
24  here in your tenure, on administrative leave?
25 A. Can you define administrative leave?

Page 34

1  Q. Still working here but being out.
2  A. Being paid?
3  Q. Yeah -- I mean, it can be paid or unpaid.
4  A. Yes.
5  Q. Okay. So who was that, if you remember a name?
6  A. John Bennett.
7  Q. Is that -- John is his first name? Is it John or Bob?
8  A. No, it's John.
9  Q. John, okay. And to your knowledge and recollection,
10  he was placed on administrative leave?
11 A. Correct.
12 Q. Was it during the time of this current managing
13  director or the previous managing director, do you
14  know?
15 A. That would've been the previous managing director.
16 Q. So not under Mr. Peivandi.
17      And so during that leave, do you recall
18  whether or not he still had access to any of his Road
19  Commission access or his car, if he had a Road
20  Commission car, or if he had access to anything -- was
21  all of his access restricted, do you know that?
22 A. I believe so, because at the time, the prior managing
23  director requested I remove him from Sonitrol, as well
24  as, if I'm not mistaken, we picked up his vehicle; he
25  had a county vehicle.

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-6, PageID.431   Filed 11/21/22   Page 11 of 12
Donna Poplar v. Genesee County Road Commission   Fred Peivandi, Randy Dellaposta @ 12

11 (35 - 38)

**Page 35**

1 Q. And was that a paid leave?
2 A. If I recall, yes, it was.
3 Q. And did Mr. Bennett return back to work?
4 A. No, I do not believe he did.
5 Q. Okay. And you stated that this was with the prior
6     managing director; correct? Was this someone that was
7     under your supervisory authority?
8 A. The person that --
9 Q. Mr. Bennett.
10 A. No, Mr. Bennett was my boss at the time.
11 Q. Oh, okay. So you just -- you were just aware of that?
12 A. Correct, because I became interim Fleet Maintenance
13     and Facilities director in his absence.
14 Q. And during the time where Ms. Poplar, she -- when she
15     returned from administrative leave, you stated that
16     she reported to you; correct?
17 A. Yes.
18 Q. And was there ever an issue that came about regarding
19     her personal leave time while she was on leave? So
20     was she required to use any personal time while she --
21     when she returned back from leave?
22         So to clarify, she was on
23     administrative leave, she was told to return back from
24     that leave; and then she was asked to use personal
25     time to cover some of her time while she was off. Can

**Page 36**

1     you tell me about that situation?
2         MR. CASCINI: I will put in an
3     objection. Assumes facts not in evidence; call it
4     foundation, I suppose.
5         MS. LEE: Sure. I'll rephrase.
6 Q. (BY MS. LEE) When Ms. Poplar returned from leave, you
7     became her immediate supervisor. Ms. Poplar, do you
8     remember when she returned to work?
9 A. I don't recall exactly, no.
10 Q. Okay. So did she request -- or did she have to put
11     any personal time -- a better question. Did you send
12     Ms. Poplar an e-mail stating that she would need to
13     put in personal time to cover some of her time while
14     she was out before returning from leave?
15 A. If I recall correctly, and, again, I'm a little
16     cloudy, I believe that, upon the order from the Board
17     for her to return to work and her actually returning,
18     there was some question and, therefore, personal leave
19     would need to be used based on the Board's decision to
20     return her to work.
21 Q. Do you know whether she was asked to return remotely
22     or report to work?
23 A. I do not.
24 Q. So were you -- did you take vacation or were you on
25     leave during that time she was supposed to return?

**Page 37**

1 A. I believe I was.
2 Q. Okay. All right. And so at that time, according to
3     the Board, she was supposed to return remotely; but
4     just correct me if I'm wrong -- or clarify for me, she
5     was locked out of her access while she was on
6     administrative leave?
7 A. Uh --
8 Q. I'll rephrase.
9         If she was locked out of all her
10     access, Ms. Poplar wouldn't have been able to work
11     remotely; correct?
12 A. (No response).
13 Q. So I'll help you. Earlier you stated that you were
14     there when Ms. Poplar received her notice of
15     administrative leave; correct?
16 A. Yes.
17 Q. Okay. And it was read to her; correct?
18 A. I believe so, yes.
19 Q. Okay. So I'll let you take a look at the pertinent --
20     here.
21 A. (Reviewing document).
22 Q. Okay. So according to the Notice of Administrative
23     Leave, did Ms. Poplar have access to work while she
24     was on administrative leave?
25 A. No.

**Page 38**

1 Q. Okay. So she would not have been able to work
2     remotely if asked to return to work remotely without
3     access?
4 A. Well, remotely, I mean, return somebody to work, so
5     access to the building or anything else is as simple
6     as making a few changes. So it's not like something
7     that if I need to get somebody access right now, I
8     could get it to them in five minutes, less than that.
9 Q. So if she's asked to return remotely, she wouldn't a
10     have a computer or anything to -- she had no access to
11     the GCRC system?
12         MR. CASCINI: Objection; assumes facts
13     not in evidence.
14         MS. LEE: Okay.
15 Q. (BY MS. LEE) Did she have access to the GCRC system
16     -- or did she have access to work remotely? I'll
17     leave it like that.
18 A. I don't know.
19 Q. All right. Thank you. Do you remember having a
20     meeting about -- or do you recall having a meeting on
21     May 17th where Ms. Poplar requested to fill the HR
22     administrative (sic) position?
23 A. I do not.
24 Q. Okay. Do you ever recall Ms. Poplar stating that you
25     were violating her ADA accommodations?

Case 2:21-cv-12568-VAR-JJCG ECF No. 23-6, PageID.432 Filed 11/21/22 Page 12 of 12
Donna Poplar v. Genesee County Road Commission   Fred Peivandi, Randy Dellaposta @ 12

12 (39 - 41)

Page 39

1  **A.** She mentioned that numerous times, I believe.
2  **Q.** And do you recall ever chuckling and stating that Ms.
3      Poplar -- do you ever recall laughing or chuckling at
4      Ms. Poplar's request to have an HR administrative
5      assistant while denying the request to fill the vacant
6      position?
7  **A.** Not that I recall, no.
8  **Q.** Do you remember a phone call on June 1st where Ms.
9      Poplar requested to fill the position -- to fill the
10     administrative assistant position?
11 **A.** Again, not that I -- my memory serves me, not that I
12     can recall.
13 **Q.** But you do recall that she asked several times for you
14     to fill the position?
15 **A.** Yes.
16 **Q.** And at all times that she requested you to fill the
17     position, you did let her know that you would not fill
18     the position; correct?
19 **A.** I said that, if I'm not mistaken, I said that you have
20     a benefits coordinator that is assisting you at this
21     time, and there has been nothing brought forth to say
22     that the person can't do the job.
23 **Q.** Do you ever recall responding to Ms. Poplar when she
24     asked you, one of these numerous times, to fill the HR
25     administrative position, that you would like an

Page 40

1      assistant, too?
2  **A.** I might have, yes.
3           MS. LEE: No further questions.
4           MR. CASCINI: Nothing from me.
5               (Deposition concluded at
6                3:40 p.m.)
7           (END OF RECORD)

Page 41

1  STATE OF MICHIGAN  )
                       ) SS:
2  COUNTY OF SHIAWASSEE )
3
4          I, Cynthia A. Lathrop, Court Reporter and
5  Notary Public in and for the above county and state, acting
6  in the County of Genesee, do hereby certify that the
7  aforegoing deposition was taken before me at the time and
8  place hereinbefore set forth.
9          I further certify that said witness was by
10 me sworn in said cause and the testimony then given was
11 reported by me stenographically and subsequently
12 transcribed and that the aforegoing is a full, true and
13 correct transcript of my original shorthand notes.
14         IN TESTIMONY WHEREOF, I set my hand and
15 notarial seal at Shiawassee County, Michigan, this 5th day
16 of August 2022.

Cynthia A. Lathrop (CSR-2474)
Notary Public in and for the
County of Shiawassee,
State of Michigan
My Commission Expires: 2/2/26