UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNA POPLAR,

            Plaintiff,

vs.                          Case No. 2:21-cv-12568-VAR-JJCG
                          Hon. Victoria A. Robers

GENESEE COUNTY ROAD Commission
and FRED F. PEIVANDI, in his
individual capacity,

            Defendants.


DEPOSITION OF DONNA POPLAR, taken on Friday,

June 10, 2022, at 211 West Oakley Street, Flint, Michigan,

noticed for 9:00 A.M.


APPEARANCES:

For the Plaintiff:  LEE LEGAL GROUP, PLLC
                    BY:  CHARIS LEE, J.D. (P84127)
                    117 West Flint Park Boulevard
                    Flint, Michigan 48505
                    (810) 513-9257
                    charis@leebusinesslaw.com
                        and
                    GAFKAY LAW, PLC
                    BY:  JULIE A. GAFKAY, J.D. (53680)
                    604-A South Jefferson Avenue
                    Saginaw, Michigan 48607
                    (989) 652-9240
                    jgafkay@gafkaylaw.com

Donna Poplar v. Genesee County et al. Donna Poplar
Case 2:21-cv-12568-VAR-JCG ECF No. 23-7, PageID.434 Filed 11/21/22 Page 2 of 72
2 (2 - 5)



Page 2

APPEARANCES (CONTINUED)

For the Defendant: HENN LESPERANCE, PLC
BY: ANDREW A. CASCINI, J.D. (P76640)
32 Market Avenue, SW, Suite 400
Grand Rapids, Michigan 49503
616-551-1611
aac@hennlesperance.com

Court Reporter: Cynthia Lathrop, CSR-2474

ALSO PRESENT:

Ms. Maddy Sides

* * * * *

Page 4

INDEX TO EXHIBITS (CONTINUING)

Exhibit No. 7                              Page 137
E-mail to Fred Peivandi from Donna
Poplar, 8/27/18; DEFS RPD RESP
7 - 000052-53

Exhibit No. 8                             Page 141
E-mail to Board of County Road
Commissioners from Fred Peivandi, et al,
11/15/18; DEFS RPD RESP 7 - 000054-56

Exhibit No. 9                             Page 148
Charge of Discrimination; DEFS INT
RESP 1 - 000018

Exhibit No. 10                            Page 183
Letter to Genesee County Road
Commission from Donna Poplar,
1/28/21; DEFS RPD RESP 7 - 000001-03

Exhibit No. 11                            Page 220
Letter to Donna Poplar from Attorney
Craig W. Lange, 4/27/21; DEFS RPD
RESP 7 - 000004

Exhibit No. 12                            Page 225
E-mail to Donna Poplar from Fred
Peivandi, 7/1/21

Exhibit No. 13                            Page 233
Document entitled Medical Health
Officer Indoor Masking Directive

Exhibit No. 14                            Page 235
Chain of E-mails between Fred Peivandi
and Donna Poplar, 8/16/21; E-mail from
Lori Friedlis, 8/13/21

Exhibit No. 15                            Page 249
Memo to All GCRC Employees from Fred
Peivandi, 8/17/21

Exhibit No. 16                            Page 252
Disciplinary Action Notice to Donna
Poplar from Fred Peivandi, 8/19/21;
DEFS RPD RESP 8 - 000002-04

Page 3

INDEX TO EXAMINATION

WITNESS: DONNA POPLAR

Examination by Mr. Cascini               Page  9
Examination by Ms. Gatkay                Page 281
Reexamination by Mr. Cascini             Page 282

* * * * *

INDEX TO EXHIBITS

Exhibit No. 1                            Page  31
Ms. Poplar's GCRC Application
for Employment; DEFS RPD RESP 8
- 000044-45, 000052

Exhibit No. 2                            Page  33
Agreement of Employment 10/28/16;
DEFS RPD RESP 8 - 000049-51

Exhibit No. 3                            Page  35
Agreement of Employment 2/10/17;
DEFS RPD RESP 8 - 000028-30

Exhibit No. 4                            Page  50
Employment Agreement 12/14/17;
DEFS RPD RESP 8 - 000025-27

Exhibit No. 5                            Page 127
Letter from Donna Poplar, 2/8/17,
Re: Human Resource Administrative
Assistant Need Analysis; DEFS RPD
RESP 7 - 000049-51

Exhibit No. 6                            Page 130
E-mail to Board of County Road
Commissioners from John Daly, III
1/7/17; DEFS RPD RESP 7 - 000048

Page 5

INDEX TO EXHIBITS (CONTINUING)

Exhibit No. 17                           Page 255
Letter to Genesee County Road
Commission Board Chairman, Cloyce
Dickerson from Donna Poplar, 8/26/21;
DEFS RPD RESP 7 - 000095-102

Exhibit No. 18                           Page 260
Letter to Genesee County Road
Commission, Cloyce Dickerson, Board
Chairman, from Charis Lee, Esq.,
9/28/21; Attachment; DEFS RPD RESP 7
- 000120-128

Exhibit No. 19                           Page 261
Notice of Administrative Leave to
Donna Poplar from Fred Peivandi,
9/6/21; DEFS RPD RESP 8 - 000005

Exhibit No. 20                           Page 264
E-mails between Charis Lee and
Andrew Cascini, 11/2/21

* * * * *

Page 6

1  Flint, Michigan
2  Friday, June 10, 2022
3  9:02 a.m.
4  R E C O R D
5  DONNA POPLAR,
6  COURT REPORTER: do you solemnly swear
7  or affirm to tell the whole truth in this matter so
8  help you God?
9  THE WITNESS: I do.
10  MR. CASCINI: So we are on the record
11  in the case of Poplar versus Genesee County Road
12  Commission and Fred Peivandi, Case number is
13  2:21-cv-12568.
14  Ms. Poplar, my name is Andrew Cascini,
15  as you know. I am the attorney for the Genesee County
16  Road Commission and Mr. Peivandi, the two Defendants
17  in this lawsuit. I'm here with Maddy Sides, a
18  paralegal; we're both here from the law firm of Henn
19  Lesperance.
20  I'm going to ask you a number of
21  questions today related to your lawsuit. Now, I know
22  that you've been a witness in a deposition before; is
23  that correct?
24  THE WITNESS: That's correct.
25  MR. CASCINI: So I'm just going to talk

Page 7

1  about some of the baseline rules, although they won't
2  be anything different than what you already know.
3  I'm going to be asking you a series of
4  questions over the course of the day, and I will
5  assume for the purpose of this that if you answer one
6  of my questions, that that means that you understood
7  the question; okay?
8  THE WITNESS: I understand.
9  MR. CASCINI: And, obviously, the other
10  thing that is challenging about it is, we need to get
11  out of our natural habit of maybe nodding or saying
12  uh-huh. We need verbal responses only, we need yeses
13  and noes or, obviously, more detailed ones if that's
14  warranted. Do you understand?
15  THE WITNESS: I do.
16  MR. CASCINI: And if you ever have a
17  need to ask me any clarifying questions, I promise,
18  I'm going to be totally okay with that. I try to form
19  the perfect ones, but I don't always. So please, if
20  you don't understand anything, any question I've
21  asked, please ask me to restate it, and I'll be happy
22  to do so; okay?
23  THE WITNESS: I do understand.
24  MR. CASCINI: If you ever need a break
25  at any point in time today, I'd be happy to provide

Page 8

1  them; just let me know and we can do so. So please
2  don't be afraid to let me know if that's something you
3  need.
4  I have to ask this, even though it's
5  always a little uncomfortable, are you under the
6  influence of any substances, drugs, alcohol, narcotics
7  or anything else that may impair your testimony in any
8  way today?
9  THE WITNESS: I am not.
10  MR. CASCINI: I also understand, Ms.
11  Poplar, that you have a visual disability. I will be
12  showing you various exhibits over the course of the
13  day. If you have any trouble whatsoever seeing
14  something, if you're unsure about whether or not
15  you're seeing it accurately, please tell me, and we'll
16  find some alternative method of giving it to you. Do
17  you understand?
18  THE WITNESS: I do understand.
19  MR. CASCINI: Alternatively, though, if
20  you're able to take a look at it and you read it, and
21  you don't tell me, hey, I have an issue with it, I'll
22  assume for the purposes of this deposition that you're
23  able to legibly read it and understand it; okay?
24  THE WITNESS: I do understand.
25  MR. CASCINI: Okay.

Page 9

1  EXAMINATION
2  BY MR. CASCINI:
3  Q.  All right. So I want to get started with some
4  questions about your background. I've reviewed your
5  resume, and you're a human resources professional by
6  vocation; correct?
7  A.  That is correct.
8  Q.  How long have you spent in human resources as a line
9  of work?
10  A.  Throughout my professional career, I would say
11  directly or indirectly, prob -- well, over 20 years.
12  Q.  And during your 20 years of experience, what kind of
13  educational background do you have that prepared you
14  for that role?
15  A.  I hold a master's degree, MSA, with a concentration in
16  human resources. I also hold a bachelor's degree in
17  business, and I hold an associate's degree in business
18  management.
19  Q.  Where did you work immediately prior to the Road
20  Commission?
21  A.  I worked for the city of Flint.
22  Q.  In what capacity did you work for the city of Flint?
23  A.  The city of Flint, I was the HR and labor relations
24  director.
25  And if I may, prior to coming to the

Page 10

1  Road Commission, I also did consulting work.  I was a
2  mentor to women who had breast cancer and other breast
3  cancer survivors.  I also did work as an evangelist,
4  and I also was involved in doing work with Mary Kay as
5  a director; and I also did work such as interior
6  decoration.
7  Q.   And did you perform those various functions and work
8  in those various lines of work in between your time
9  with the city of Flint and the Road Commission?
10 A.   I've always served in that capacity throughout my
11 career.
12 Q.   So it's always been going on in the background,
13 including but not limited to the time between your
14 time with the city of Flint --
15 A.   That is correct.
16 Q.   -- and the Genesee County Road Commission?  I
17 understand.
18       How long were you with the city of
19 Flint?
20 A.   Two years.
21 Q.   And upon what circumstances did you end your
22 employment with the city of Flint?
23 A.   During the time which my employment was ended, it was
24 the result of the emergency manager.
25 Q.   And the emergency manager terminated your employment?

Page 11

1  A.   That is correct, along with all the other appointees
2  of Mayor Dayne Walling.
3  Q.   Dayne Walling?
4  A.   That is correct.
5  Q.   You said you were terminated along with all the other
6  appointees.  Who were some of those other appointees
7  just by way of example?
8  A.   Gregory Eason, Brenda Pierpoint, Anita Brown, Rhoda
9  Mackey, Steve, and I can't think of his last name, and
10 there may have been a couple others.
11 Q.   And if you can, by way of example, for those
12 individuals you've just listed, what jobs did they
13 occupy when they were employees of the city of Flint?
14 A.   Greg Eason was the city administrator; Brenda
15 Pierpoint would've been the ombudsman; Anita Brown
16 would've been the deputy ombudsman; Rhoda Mackey was,
17 I believe, was dealing with special projects; and
18 Steve also was involved in special projects; and those
19 titles may not be correct.
20 Q.   To the best of your recollection, though, that's, more
21 or less, what they were, their approximate titles?
22 A.   That is correct.
23 Q.   Prior to your time working as the HR director with the
24 city of Flint, what was your prior employment before
25 that?

Page 12

1  A.   I was employed with the Genesee County -- no, that's
2  not correct.  I was employed with Center for Banking
3  Education.
4  Q.   Tell me a little bit about what the Center for Banking
5  Education is.
6  A.   Well, Center for Banking Education is African-American
7  owned, and its responsibilities was to train bankers
8  throughout the United States.
9  Q.   And what role did you fulfill for the Center for
10 Banking Education?
11 A.   My key role was the HR director.
12 Q.   Approximately how long were you with the Center for
13 Banking Education?
14 A.   I believe from 1999 to approximately 2003, give or
15 take.
16 Q.   And I'm sorry, I should have asked you this earlier;
17 although you told me how long you had worked for the
18 city of Flint, what were your approximate years of
19 employment as the HR director for the city of Flint?
20 A.   I believe my employment started in 2009 and ended in
21 2011.
22 Q.   Okay.  So I observed that there is about a six-year
23 gap in between the Center of Banking Education and the
24 city of Flint.  During that time were you performing
25 the consulting work that you listed earlier?

Page 13

1  A.   That is correct, and some of the other duties, some of
2  the other jobs that I had.
3  Q.   When you said --
4  A.   Oh, if I may, also in between, I'd like for you to add
5  that I also worked for Royal Mortgage as a lender.
6  Q.   And approximately what years did you work as a lender
7  for Royal Mortgage?
8  A.   I can't remember the year.
9  Q.   Are you able to approximate it by decade even?  Are we
10 talking about in the 2000s, in the 2010's?
11 A.   I cannot with accuracy, no.
12 Q.   Do you know approximately how long you were there?
13 A.   Oh, probably maybe a couple years.
14 Q.   Okay.  Less than five?
15 A.   That's correct.
16 Q.   And tell me briefly what a lender does at Royal
17 Mortgage.
18 A.   Well, in this particular case, I also assisted in
19 helping to bring on mortgage lenders in that setting.
20 Those individuals were responsible for bringing on new
21 clients, so I assisted the staffing, I assisted
22 bringing on the new clients, and I assisted in
23 identifying possible mortgage business for that
24 particular company.
25 Q.   Now, prior to your time with the Center for Banking

Page 14

1    Education, had you held any HR-related jobs prior to
2    that?
3  **A.**   Yes.
4  **Q.**   Okay.  Tell me about the most proximate HR-related job
5    you held for the Center for Banking Education.
6  **A.**   So if you go back to my tenure with the Genesee
7    County, I was the HR -- I'm sorry -- I was the
8    executive director for their human service program, or
9    department, I should say, for about seven years.
10 **Q.**   And what roles did you fulfill, aside from HR duties
11   and as executive director, what other duties did you
12   fulfill beyond just HR?
13 **A.**   Well, in that particular role, I was not hired as a HR
14   director; I was hired as the executive director for
15   the Genesee County Community Action Agency, which
16   really you can call, in GCCAA.  I took on all of the
17   oversight for that particular department/agency,
18   responsible for the hiring, responsible for
19   termination, responsible for putting together human
20   resource programs, overseeing a $25 million budget,
21   responsible for administering that budget, responsible
22   for bringing in additional dollars for anything.  When
23   I started, it was a $10 million budget; I took it to
24   $25 million.
25          I was responsible for working with the

Page 15

1    health department, addressing health issues for low to
2    moderate income families.  I was responsible for the
3    housing program, for housing rehab.  I was responsible
4    for the Head Start program, Meals on Wheels,
5    responsible for development, training, managing
6    grievances, doing interviews, selecting employees to
7    be hired for the organization.  I was responsible for
8    about six or nine directors, provided leadership over
9    each one of those divisions.  I was responsible for
10   directing community concerns, community complaints,
11   employee development, employee training and
12   implementing new program ideals that would benefit the
13   underserved population in Genesee County and the city
14   of Flint.
15 **Q.**   Approximately how many employees did you supervise
16   either directly or indirectly in your capacity as the
17   executive director?
18 **A.**   I had, at any point, between six and nine active
19   directors that reported directly to me.  There was
20   approximately maybe 300 employees throughout the
21   course of the year.  Those numbers increased during
22   our summer program.
23 **Q.**   And approximately how long did you serve as the
24   executive director for the GCCAA, you called it?
25 **A.**   GCRC (sic); that stands for Genesee County Community

Page 16

1    Action Regency.  I was there for approximately seven
2    years, or maybe a little longer.  I believe that
3    employment started in 1985 and may have ended in 1992,
4    if my memory serves me right.
5  **Q.**   And upon what circumstances did your employment end
6    with the GCCAA?
7  **A.**   I was terminated from that particular position.
8  **Q.**   What was the reason for termination?
9  **A.**   Reason unknown.
10 **Q.**   When you say reason unknown, you weren't provided a
11   termination notice or anything in connection with
12   that?
13 **A.**   That is correct, not to my knowledge.
14 **Q.**   Who informed you that you had been terminated from
15   that job, if you can recall?
16 **A.**   I believe it was the Board chair.
17 **Q.**   And when you say Board chair, are you referring to
18   Genesee County Board of Commissioner chair?
19 **A.**   That is correct.
20 **Q.**   And Genesee County Board of Commissioners, that's the
21   legislative and executive entity that is in charge of
22   the entire county; correct?
23 **A.**   That is correct.
24 **Q.**   Who was the Board chair?
25 **A.**   I can't recall at this time.

Page 17

1  **Q.**   It is quite a ways in the past; I understand.
2           At any of these jobs that we've listed,
3    so we have the GCCAA, we have the Center for Banking
4    Education, and we have the city of Flint, did you ever
5    file any type of employment related litigation --
6    related to your employment, I should say, litigation
7    related to your employment in any of those jobs?
8  **A.**   I did.
9  **Q.**   Can you briefly describe for me against whom those
10   cases were filed if there are more than one?
11 **A.**   The city of Flint.
12 **Q.**   And just to get a list, is that the only employer that
13   you have brought litigation against?
14 **A.**   That is correct.
15 **Q.**   And tell me about the litigation you filed against the
16   city of Flint.
17          MS. GAFKAY:  Object to form.  It's
18   quite broad.
19 **Q.**   (BY MR. CASCINI)  What was the nature of the case with
20   the litigation you brought against the city of Flint?
21 **A.**   Could you be a little more specific when you say the
22   nature of the case?
23 **Q.**   What allegations did you claim against the city of
24   Flint?
25 **A.**   Race and age discrimination.

Page 18

1  Q.   Was it an age discrimination claim brought under ELCRA
2       or the ADA -- or I'm sorry -- the ADEA?
3  A.   I can't recall.
4  Q.   You mentioned that you brought age discrimination
5       claims.  Was it the claim that it was -- was the
6       allegation that your termination was in part or in
7       whole related to your age?
8  A.   I can't recall.
9  Q.   Was that a federal or a state court case?
10 A.   I can't recall.
11 Q.   Briefly, what were the circumstances that led you to
12      believe in that case that you had been terminated
13      because of your age?
14 A.   I can't recall.
15 Q.   I believe you mentioned a little bit earlier that
16      you'd been terminated from the city of Flint, along
17      with all the other appointees that had been put in
18      place by Mayor Walling, I believe; is that correct?
19 A.   That is correct.
20 Q.   Were all of those individuals over the age of 40?
21 A.   I can't recall.
22 Q.   Okay.  Were there specific facts that you can recall
23      upon which you distinguished how your termination had
24      been effectuated as compared to those other
25      individuals?

Page 19

1  A.   I can.
2  Q.   Can you tell me about those circumstances or facts?
3  A.   The position that I held at that time and was
4       terminated from as the HR/Labor Relations director for
5       the city of Flint, that position was shortly after
6       filled by a young lady who was less than 40 -- I
7       should say younger than 40.
8  Q.   And based on that answer and context of the question,
9       I assume that some of the other vacated positions were
10      not filled by individuals who were under the age of
11      40; right?
12 A.   I have no --
13           MS. GAFKAY:  Objection; lacks
14      foundation.
15           THE WITNESS:  I don't know.
16 Q.   (BY MR. CASCINI)  Do you know if other positions that
17      had been vacated were filled with individuals over the
18      age of 40?
19 A.   I do not.
20 Q.   Was your deposition taken in that lawsuit?
21 A.   It was.
22 Q.   And as best you can recall, how did that lawsuit
23      resolve?  Was there a judgment issued in that lawsuit?
24 A.   It was dismissed.
25 Q.   Do you remember whether it was dismissed upon motion

Page 20

1       to dismiss, upon summary judgment?  Do any of those
2       terms call to mind how the case was resolved?
3  A.   I do not know.
4  Q.   And when we say dismissed, it was dismissed in favor
5       of the city of Flint; is that right?
6  A.   That is correct.
7  Q.   Have you ever brought a piece of litigation against
8       any other employer other than the city of Flint?
9  A.   Not to my knowledge.
10 Q.   Have you ever been the subject of a lawsuit, that is
11      to say, a defendant in a lawsuit?
12 A.   Not to my knowledge.
13 Q.   Have you ever been convicted of a crime?
14 A.   That would require me to have legal authorization to
15      respond to that question.
16 Q.   Well, I'm not sure that I necessarily understand.  We
17      can talk about the circumstances of any conviction you
18      may have had, and I certainly intend to follow up on
19      it; but the fair question is, have you ever been
20      convicted of a criminal activity in this state or in
21      any other state?
22 A.   Again, my position would be, I would have to be told
23      that I can legally answer that question in this state.
24           MS. GAFKAY:  Can we take a quick break
25      and come right back?

Page 21

1           MR. CASCINI:  Certainly we can.  That's
2       not a problem.
3           (Ms. Gafkay, Ms. Lee and
4           witness left room and returned.)
5           MR. CASCINI:  Let's go back onto the
6       record now.
7  Q.   (BY MR. CASCINI)  Ms. Poplar, I know you've had an
8       opportunity to consult with counsel briefly.  So I
9       want to --
10           MR. CASCINI:  Actually, let me ask the
11      court reporter, can you read back my last question,
12      please?
13           (Following question read back:
14           "Q.  Well, I'm not sure that I
15           necessarily understand.  We can
16           talk about the circumstances of
17           any conviction you may have had,
18           and I certainly intend to follow
19           up on it; but the fair question is,
20           have you ever been convicted of a
21           criminal activity in this state or
22           in any other state?")
23           THE WITNESS:  I have no convictions on
24      my record.
25 Q.   (BY MR. CASCINI)  Have you ever had a conviction on

Page 22

1  your record?

2       MS. GAFKAY:  And I'll just object that
3  the information you're seeking is not relevant.  As
4  you know, only misdemeanors relating to elements of
5  dishonesty and any felonies that are on an
6  individual's record would even be relevant; and in
7  fact, the felonies would relate to -- ten plus years
8  would not be relevant at all.

9       MR. CASCINI:  Notwithstanding the
10  relevance objection, can you answer the question.

11       MS. GAFKAY:  Well, hold on.  Because it
12  bears no relevance at all in this case, and she has
13  answered your question, she has no convictions on her
14  record, we'll just -- I'm going to tell her not to
15  answer; and if you want an answer to that question,
16  then I would request that, you know, we take it up
17  with the judge.

18       MR. CASCINI:  Okay.  All right.

19  Q.  (BY MR. CASCINI)  What I'm going to do, then, I'm
20  making an inference, have you had a conviction that
21  was expunged?

22  A.  I have.

23  Q.  Approximately when did that expungement occur?

24  A.  I can't recall.

25  Q.  Approximately when did the underlying conviction since

Page 23

1  expunged occur?

2  A.  I can't recall the exact time.

3  Q.  I suspect that this may lead to another objection; but
4  let me ask for the record, the charge that we just
5  referred to, do you remember the circumstances that
6  led to that conviction that later was expunged?

7       MS. GAFKAY:  Yeah, I'm going to object
8  for the reasons I previously stated.  It's not
9  relevant; and because it has no relevance whatsoever,
10  I'm going to tell her not to respond, and just
11  indicate to you that you certainly -- I think it's an
12  issue that would be more appropriate to ask the court
13  whether she has to answer those questions, especially
14  in light of the fact that we did provide some
15  additional information, so at least you could
16  understand why she answered the way she did.

17       And, again, she is cooperating; but to
18  the extent she's being asked a question that is
19  totally irrelevant and in no way would be admissible,
20  I don't think it's appropriate, and I would rather
21  have the court ruling on whether she has to answer
22  those questions.

23       So, you know, my preference would be
24  that we just put that objection, she not answer; and
25  if you want to seek that additional information, that

Page 24

1  we take it up with the judge.

2       MR. CASCINI:  And just to clarify, I
3  don't want to put any words in your mouth, the
4  position is that you're going to instruct your client
5  not to answer that today; and then to the extent that
6  we need to resolve that issue about whether or not
7  that failure to answer was appropriate, that would be
8  your preferred method of dealing with this?

9       MS. GAFKAY:  Yes.  And, I mean -- yes.
10  Maybe I'll ask her a question at the end to clarify
11  the time so that we know that it's not within the
12  time, that it all predates her employment with the
13  Genesee County Road Commission --

14       MR. CASCINI:  Well, and --

15       MS. GAFKAY:  -- which may be a concern;
16  but I'll ask her questions at the end just so that you
17  have that clarification.  I mean, she doesn't recall
18  the exact date, so -- but she may know whether it was
19  pre- Genesee County Road Commission, which I think is
20  2016.

21       MR. CASCINI:  Let me be the one to ask
22  the question.

23  Q.  (BY MR. CASCINI)  Did this conviction or the
24  subsequent expungement occur during your time as an
25  employee with the Genesee County Road Commission?

Page 25

1  A.  No, it did not.

2  Q.  Okay.  Were you an employee of any of the listed
3  employers at the time where either the conviction or
4  the expungement occurred?

5  A.  No, I was not.

6  Q.  Okay.  So it was during one of the periods of time
7  where you were either performing consulting work or
8  you were otherwise unemployed in some manner?

9  A.  That is correct.

10  Q.  Can you be approximate with me in terms of, was it
11  more than ten years ago, in your estimation, that this
12  occurred -- either the conviction or the expungement
13  occurred, I should clarify?

14  A.  The convictions were more than 20 years ago.

15  Q.  Okay.  And do you remember approximately how long it
16  was between the time of the conviction and the
17  expungement?

18  A.  Well, with an expungement, I think you have to wait at
19  least seven years before your record can be an
20  expunged, but it was within the seven-year time frame.

21  Q.  So when you say within the seven-year time frame, you
22  mean after a seven-year period elapsed?

23  A.  That is correct.

24  Q.  Was it more than ten years, in your approximation?

25  A.  I can't recall.  It may have been less.

Page 26

1 Q.   Well, let me ask you a question that certainly would
2 be relevant.  Was the underlying conviction or the
3 expungement related in any way to perjury or
4 falsification of testimony?
5       MS. GAFKAY:  Well --
6       MR. CASCINI:  Certainly that has
7 relevance to any proceeding that she would testify in.
8       MS. GAFKAY:  No, because she has no
9 conviction at all on her record.  So if she doesn't
10 have a conviction for a felony or a misdemeanor
11 involving an element of truthfulness, it would not be
12 admissible.
13       So, I mean, I get that that may be an
14 issue for the court to take up.  If you want to pursue
15 this line of questioning, it's up to you, but I'm not
16 going to have her answer that question because of the
17 aforementioned reasons.
18       MR. CASCINI:  Understandable.  So just
19 to clarify for purposes of the record, you're
20 instructing your client not to answer that question
21 today.  You've raised the objection.  We're going to
22 repeat the question pending further ruling from the
23 court, if that's something we intend to take up; is
24 that correct, just so that I understand your position?
25       MS. GAFKAY:  Yes.

Page 27

1       MR. CASCINI:  All right.
2 Q.   (BY MR. CASCINI)  Are there any other -- have you ever
3 been arrested for any felony, excluding this
4 conviction/expungement, for any other felonies or
5 misdemeanors in the past?
6 A.   Not to my knowledge, no.
7 Q.   Okay.  I'd like to ask you some questions next about
8 how you came to be hired at the Genesee County Road
9 Commission.  You were hired at the time where John
10 Daly was the managing director; is that correct?
11 A.   That is correct.
12 Q.   Approximately what was your year of hire?
13 A.   It would've been in 2016.
14 Q.   I should have done it the other way, I should have
15 laid the foundation; nevertheless, we got there.
16       Did you know John Daly at all prior to
17 being hired by the Genesee County Road Commission?
18 A.   I did not.
19 Q.   Why did you elect to apply for a position at the
20 Genesee County Road Commission?
21 A.   I was interested in the position because it related to
22 what I do in terms of my professional career in the
23 area of an HR, the area by which I have passion; I
24 have a passion to be a HR director.
25 Q.   When you were serving as the executive director for

Page 28

1 the GCCAA, did you ever have reason to have
2 interactions with the Genesee County Road Commission
3 in your capacity as the executive director?
4 A.   No; at that time, no.
5 Q.   Those two agencies or departments, they don't interact
6 frequently?
7 A.   No.
8 Q.   Did you know anyone, either personally or
9 professionally, who worked at the GCRC at the time you
10 were hired?
11 A.   I can't answer that, because I wouldn't know.  I'm
12 sure I would find people I knew who worked here if I
13 seen the employment list; but just knowing on my own,
14 no.
15 Q.   No one comes to mind?  You didn't have any, you know,
16 prior connection, maybe somebody put in a reference
17 for you in behalf of GCRC that was an employee of
18 GCRC?  Any of those -- or does any of that ring a bell?
19 A.   No.
20 Q.   Understandable.  And who was serving on the Board of
21 Commissioners at the time that you were hired?
22 A.   Here?
23 Q.   Correct, at the GCRC; I apologize.  Who were serving
24 as -- who were the five individuals who served as the
25 Board of Commissioners at the time you were hired at

Page 29

1 the GCRC?
2 A.   I don't know if I can speak all five.
3 Q.   Sure.  It was 2016.  I understand.
4 A.   I believe that John Mandelaris and Cloyce Dickerson.
5 Q.   Anyone else?
6 A.   I believe Bob Johnson, Dave Miller, Dave Arceo.
7 Q.   Okay.  And I understand for the purposes of the
8 question, you're trying to think back, and it's going
9 to be a matter of record.  It's not a pop quiz, I
10 promise; just seeing if you recall.
11       What was the process like by which you
12 came to be hired?  What I'm asking there is, with whom
13 did you interview?  Did you submit an application?
14 How did you come to be hired by the GCRC?
15 A.   I went through the interviewing -- I mean, I went
16 through the actual hiring process.  Prior to that
17 process was, one, I had to submit an application and a
18 resume with a couple letters; from that, I received an
19 invitation for an interview.  I was actually here in
20 this vicinity, I believe in this particular room.
21       Later I discovered that the first time
22 I was interviewed, I did not -- I was not the selected
23 candidate.  So probably about six to seven months
24 later, I received a call to see if I was still
25 interested in the position; and sometime shortly after

Donna Poplar Genesee County 12568 VAR (Dona Poplar)

Page 30

1     that, I believe I met with Mr. Daly, and shortly after
2     that, I didn't go through a second round of
3     interviews. It was within a six, seven-month
4     difference between the first and the second, and from
5     that, I was offered the position to serve as the
6     Genesee County Road Commission HR administrative
7     service director.
8  Q.  And I apologize, I may have been taking notes when you
9     said this. You interviewed twice approximately six
10     months apart; is that your testimony? Again, not a
11     pop quiz; I genuinely just missed it.
12  A.  My first interview was with the full Board -- the full
13     panel, and then my second communication, conversation,
14     was with Mr. Daly.
15  Q.  Individually?
16  A.  That is correct.
17  Q.  And am I understanding you correctly, you were
18     notified by official notice after the first interview
19     that you hadn't been selected. Did they tell you that
20     they had selected an alternative candidate?
21  A.  That is correct.
22  Q.  And then, nevertheless, six, seven months later, you
23     were called back in?
24  A.  That is correct.
25  Q.  And that interview was just with Mr. Daly; is that

Page 31

1     right?
2  A.  That is correct.
3  Q.  And you mentioned that the whole thing was kicked off
4     because you submitted an application to the GCRC,
5     along with a copy of your resume; is that right?
6  A.  I followed the instructions as required to apply for
7     the position as the HR director for GCRC.
8             (Discussion off record.)
9            MR. CASCINI: Okay. I'm going to mark
10     this document as Exhibit No. 1. For reference, I'm
11     referring to the document, three-page document, that
12     is marked as Bates No. DEFS RPD Response 8, pages 44
13     and as follows.
14             (Document marked Deposition
15              Exhibit No. 1.)
16  Q.  (BY MR. CASCINI) Ms. Poplar, to the best of your
17     recollection, is this the Application For Employment
18     that you submitted?
19  A.  Yes.
20  Q.  Under PROFESSIONAL REFERENCES, I note the names Dayne
21     Walling and Greg Eason appear. Is Dayne Walling the
22     individual that you referred to as the former mayor of
23     the city of Flint?
24  A.  That is correct.
25  Q.  And Greg Eason was one of the individuals with whom

Page 32

1     you served with the city of Flint; is that correct?
2  A.  That is correct.
3  Q.  I note on here, on the second page, there is a company
4     name listed as New Direction Consulting Services from
5     2004 to 2006. Is this related to the Center for
6     Banking Education job?
7  A.  Yes; it would've been during the time that my d/b/a
8     was still active.
9  Q.  Tell me a little bit about that. You said your d/b/a
10     was active. Did you have a corporate forum that you
11     performed work under for a period of time?
12  A.  No; I was doing business under assumed.
13  Q.  Okay. And can you tell me about -- you said you were
14     doing business under an assumed name. So was New
15     Direction Consulting Services the assumed name?
16  A.  That is correct.
17  Q.  I understand. So was it an LLC, a corporation?
18  A.  Neither.
19  Q.  That was the -- I want to make sure that I get it.
20     That's the assumed name upon which you did some of the
21     contract services that you described before; is that
22     right?
23  A.  That's correct.
24  Q.  Got it. Completely understand. And that's your
25     signature on the bottom of that page --

Page 33

1  A.  It is.
2  Q.  -- and it is also your signature on page three?
3  A.  It is.
4            MS. GAFKAY: You're doing fine, but a
5     couple times, you just need to wait until he finishes
6     his question before you start to answer.
7            MR. CASCINI: Actually, that is a good
8     point.
9  Q.  (BY MR. CASCINI) I'm going to reask the question just
10     for the purposes of the record being clear.
11            Is that your signature on the bottom of
12     pages two and three?
13  A.  It is.
14  Q.  Perfect, great. When you were hired by Genesee County
15     Road Commission as the HR director following your
16     interview with John Daly, were you given an employment
17     agreement in connection with that?
18  A.  Not at that time.
19  Q.  You were later provided a copy of the employment
20     agreement?
21  A.  Yes.
22            (Document marked Deposition
23              Exhibit No. 2.)
24  Q.  (BY MR. CASCINI) I'm showing you another document
25     here, Ms. Poplar. We've marked this document as

Page 34

1  Exhibit No. 2.
2        MR. CASCINI:  And again for the record,
3  the document to which we are referring is a three-page
4  document that begins with Bates No. DEFS RPD Response
5  8 - No. 49.
6  Q.  (BY MR. CASCINI)  Is this a copy of the first
7  employment agreement that you received upon your hire
8  with the GCRC?
9  A.  Taking under consideration the date by which this is
10  signed on the third page, that would be my
11  recollection, that this would have been the correct
12  agreement at that particular time, according to the
13  date.
14  Q.  And is that your signature that appears there?
15  A.  It is.
16  Q.  And the other signature purports to be the one of John
17  Daly III, that's John Daly the managing director; is
18  that right?
19  A.  That is correct.
20  Q.  Now, my understanding is that, during your period of
21  employment with the GCRC, you also entered into other
22  employment agreements with the GCRC; is that right?
23  A.  After the date of 10/28/2016, that would be correct.
24        MR. CASCINI:  Can we go off the record
25  very briefly?

Page 35

1        MS. GAFKAY:  Sure.
2            (Discussion off record.)
3        MR. CASCINI:  Let's go back on the
4  record.  I'm going to be showing you another document
5  which, let's all mark that as Exhibit No. 3.
6            (Document marked Deposition
7             Exhibit No. 3.)
8        MR. CASCINI:  For ease of reference,
9  I'm referring to a document that is marked as Bates
10  No. DEFS RPD Response 8 and begins with 28.
11  Q.  (BY MR. CASCINI)  Ms. Poplar, do you recognize this
12  document?
13  A.  Yes.
14  Q.  And is this an employment agreement that you excited
15  with Genesee County Road Commission?
16  A.  I'm looking at the date, February 10th, 2017, I would
17  say it is.
18  Q.  Okay.  Now, I note that February 10th, 2017 is a
19  fairly short time frame after October 28th, 2016 when
20  the first employment agreement was executed, and it is
21  within that agreement, the prior agreement's term.
22        What were the circumstances upon which
23  you executed a new employment agreement approximately
24  four months into your employment?
25  A.  I can't recall.

Page 36

1  Q.  Do you remember whether you requested a new employment
2  agreement to be executed or whether Mr. Daly or
3  someone else at the Commission asked you to sign a new
4  agreement?
5  A.  I can't recall.
6  Q.  Do you remember whether or not the Board approved
7  either the execution of the prior agreement or this
8  agreement or both?
9  A.  I can't recall.
10  Q.  Do you recall whether or not -- let me back up
11  slightly and ask you a question.  The time frame I'm
12  referring to would be the time, the end of October
13  when you executed the first employment agreement.  So
14  I don't want to confuse you.  We're not talking about
15  this document; we're talking about the prior one we
16  looked at.
17        In your capacity as the HR director,
18  after you signed that agreement, did the other
19  directors all have employment agreements as well?
20  A.  I can't recall.
21  Q.  At the current time, do the other directors of the
22  GCRC have employment agreements with GCRC?
23        MS. GAFKAY:  Object to the form.  When
24  you say the current time, you mean February 2017 or
25  today?

Page 37

1        MR. CASCINI:  Fair enough.
2  Q.  (BY MR. CASCINI)  As of today in your capacity as HR
3  director, do you know whether the other directors of
4  the GCRC are retained pursuant to employment
5  agreements?
6  A.  The only director that I know would be Anthony Branch.
7  I'm not familiar or knowledgeable if the other ones
8  have; but to my knowledge, no.
9  Q.  Why is it that you and Anthony Branch have employment
10  agreements and other directors do not?
11        MS. GAFKAY:  Object to the form; calls
12  for speculation.
13  Q.  (BY MR. CASCINI)  You are the HR director, so to the
14  extent you know, in your capacity as the HR director,
15  why is it that you and Anthony Branch have employment
16  agreements while the other directors do not?
17  A.  At the time, Anthony and I were given an employment
18  agreement; also Randy Dellaposta was given one.
19  Q.  So Randy Dellaposta was given an employment agreement
20  at the same time that you and Anthony Branch were?
21  A.  That is correct.
22  Q.  Okay.
23  A.  In addition to Randy Dellaposta, Anthony Branch and
24  myself, also Coetta Adams was also given an employment
25  agreement.  In addition to Anthony Branch, myself,

Page 38

1    Randy Dellaposta and Coetta Adams, Rachel Mullen was
2    given an employment agreement, Cherry Grant was given
3    an employment agreement, and I believe Mike Lewis may
4    have been given one; and I'm not all sure on that.
5  Q.  Okay.  Just so clarify, you believe that those
6    individuals all were given employment agreements at
7    the same time that you were initially given yours; is
8    that your testimony?
9  A.  If you're referencing the agreement that I now have in
10   front of me that is dated February 10th of '17, I
11   believe on or around that same time frame, those
12   individuals were also given an employment agreement.
13 Q.  Now, of Randy Dellaposta, Coetta Adams, Rachel Mullen,
14   Cherry Grand and Mike Lewis, who remains an employee
15   of the GCRC today, if any?
16 A.  That has an employment agreement?
17 Q.  Well, just of those individuals, who remain an
18   employee of the GCRC today?
19 A.  With the exception of Coetta Adams, they all are still
20   employees of the Genesee County Road Commission.
21 Q.  At the present time, do Randy Dellaposta, Rachel
22   Mullen, Cherry Grant or Mike Lewis have employment
23   agreements executed with the GCRC?
24 A.  At the present time, Randy Dellaposta no longer has an
25   employment agreement, to my knowledge; and Anthony

Page 39

1    Branch currently still has an employment agreement, to
2    my knowledge.  Rachel Mullen still has an employment
3    agreement to my knowledge.  And for correction, Cherry
4    Grant is no longer employed with the Genesee County
5    Road Commission.  I am not sure if Mike Lewis still
6    has an employment agreement, nothing's been brought to
7    my attention that he does not; and again I'm not 100
8    percent sure that he ever have one.
9  Q.  Sure.  What's the process by which certain employees
10   were given employment agreements with the GCRC?
11 A.  Under my senior, the only employees that I know that
12   received an employment agreement would've been those
13   individuals you just spoke to.  So I don't know of any
14   process prior to that.  I would not have been privy to
15   that.
16 Q.  Okay.  Well, what is the process by which employment
17   agreements were executed after you became the HR
18   director?
19 A.  There has been no employment agreements implemented
20   since I have been employed after this particular date,
21   that I am aware of.
22 Q.  Let me ask you a clarifying question here.
23        MS. GAFKAY:  When you're done, when
24   you're close to being done, if we can take a quick
25   break.

Page 40

1        MR. CASCINI:  Okay, that's totally
2    fine.  And, Ms. Poplar, if you need a break now, just
3    tell me, but I prefer to just get through my question
4    about the employment agreements prior to that; but if
5    you need one earlier, that's all right with me.
6        THE WITNESS:  I'm okay.
7  Q.  (BY MR. CASCINI)  Okay.  So I want to ask some
8    clarifying questions here, because I want to make sure
9    that I understand the time frame.
10       So at the time that you initially
11   became an employee of the GCRC, and please correct me
12   if this misstates your testimony, it's your
13   recollection that Randy Dellaposta, Coetta Adams,
14   Rachel Mullen, Cherry Grant and Mike Lewis also had
15   employment agreements at that time, so we're referring
16   to October of 2016; is that right?
17 A.  No, that is not correct.
18 Q.  Okay.  So are you aware of any employees who, as of
19   October of 2016, also had employment agreements?
20 A.  I am not.
21 Q.  Okay.  But you did testify that you believe that those
22   five individuals had them as of February; correct?
23 A.  February of 2017 --
24 Q.  Yes.
25 A.  -- that is correct.

Page 41

1  Q.  But help me understand this.  You also testified that
2    to your knowledge, no employment agreements were
3    executed during your tenure as the HR director; is
4    that right?
5  A.  What I said, after this particular date here, this
6    particular date.
7  Q.  You're referring to February 10, 2017; right?
8  A.  Yes.  The only persons that I know that continued to
9    have an employment agreement would have been myself and
10   Anthony Branch.
11 Q.  Okay.  So at what point in time -- what is the time
12   period of which you are aware that Randy Dellaposta,
13   Coetta Adams, Rachel Mullen, Cherry Grant and Mike
14   Lewis had employment agreements?
15 A.  They would've been on or about the same time, 2017.
16 Q.  Okay.  Here is the source of my confusion.  I am
17   understanding that your testimony is that in October
18   of 2016, they don't have them; and then in February of
19   2017, they do have them.  Is that right or am I
20   misstating it?
21 A.  (No response).
22 Q.  If the misunderstanding is mine, please correct me.
23   I'm not trying to trap you.  I'm just trying to get
24   this clear.
25 A.  What I understand --

Page 42

1  Q.  Okay.

2  A.  -- in 2016, I was given an employment agreement.

3  Q.  Okay.

4  A.  I have no information and/or knowledge as to whoever

5      may have had an employment agreement in 2016 --

6  Q.  Okay.

7  A.  -- around this time or before this time.

8  Q.  Okay.

9  A.  I have no knowledge of that.

10 Q.  All right.

11 A.  Did that help clarify your confusion?

12 Q.  But as of 2017, February 10th, 2017, your testimony is

13     that, as of that time, to the best of your

14     recollection, of course, you believe that Coetta

15     Adams, Rachel Mullen, Cherry Grant, Mike Lewis and

16     Randy Dellaposta and Anthony Branch had employment

17     agreements; is that right?

18 A.  That is correct.

19 Q.  Okay.  So those employment agreements, presumably,

20     then, were executed during your time as an HR

21     director; right?

22 A.  That is correct.

23 Q.  Okay.  What is the process by which employment

24     agreements at the GCRC are executed?

25 A.  During that particular time, Mr. Daly specified that

Page 43

1      he wanted to put us on an employment agreement.  The

2      process that was followed, that we were given

3      employment agreements.

4  Q.  In your capacity as the HR director, were you involved

5      in the process of executing employment agreements on

6      behalf of the GCRC, referring, of course, to

7      employment agreements that weren't yours?  Were you

8      involved in that process?

9  A.  Could you repeat the question, please?

10 Q.  Understandable.  Were you involved in the process of

11     issuing employment agreements on behalf of the GCRC to

12     the other individuals that we've listed?

13 A.  That is correct.

14 Q.  You were?

15 A.  That is correct.

16 Q.  And what was your involvement in that process?

17 A.  Mr. Daly wanted me to help him to draft the agreement.

18 Q.  Okay.  Were you involved in any other way in that

19     process?

20 A.  Other than issuing the agreements to my staff, Randy

21     Dellaposta, Coetta Adams and Anthony Branch, and again

22     I am not certain about Mike Lewis.

23 Q.  Understandable.  With respect to the term "issuing,"

24     can you help me understand a little bit better about

25     what that means?  What does it mean to issue an

Page 44

1      agreement?  You actually physically give them a copy

2      of the agreement?

3  A.  That is correct.

4  Q.  So you, let me summarize, so you drafted them.  Did

5      Mr. Daly sign them?

6  A.  Clarification for the record.  I assisted Mr. Daly, in

7      crafting the agreement.  Now, what changes he made to

8      the agreements, I am not aware of, and he did sign

9      them.

10 Q.  So let me make sure I understand your testimony.  So

11     do you make the initial drafts of the agreements?

12 A.  That is correct.

13 Q.  Then you submit them to Mr. Daly, and he either

14     modifies them, of which you're not aware whether

15     they've been modified, or adopts them as you've

16     drafted them?

17 A.  That is correct.

18 Q.  And then he executes the agreement, gives them back to

19     you?

20 A.  That is correct.

21 Q.  And then you give it out to the employee at the end of

22     the day?

23 A.  That is correct.

24 Q.  Do you know why those employees were selected to

25     receive employment agreements?

Page 45

1  A.  I just believe it was a decision that John Daly wanted

2      his directors and individuals who reported to him,

3      which Mike Lewis, I believe, did, wanted them on

4      agreements.

5  Q.  Now, when I see -- well, let me ask you this question:

6      What job position did Randy Dellaposta occupy at the

7      time where an employment agreement was executed with

8      him?

9  A.  At that particular time, Randy Dellaposta would have

10     been director of equipment and fleet.

11 Q.  Equipment and fleet?

12 A.  That is correct.

13 Q.  That director position no longer exists; is that

14     correct?

15 A.  That position do still exist, and it's carried out

16     under Randy Dellaposta capacity as the deputy

17     director; and prior to him being the deputy director,

18     it was carried out as him being the director of

19     operations.

20 Q.  Let me ask you a branch-off question that comes a

21     little bit from that.  Randy Dellaposta, at the time

22     that we're first talking, let's just call that the

23     fleet director for ease of simplicity, he was the

24     fleet director when this employment agreement was

25     executed with him; is that right?

Page 46

1 A. That is correct.

2 Q. Okay. And later he became the operations director?

3 A. That is correct.

4 Q. Was a new employment agreement executed with him when
5 he became the operations director?

6 A. No. If I may, at this time in which Randy became the
7 director of operations, Mr. Daly was no longer the
8 managing director for the Genesee County Road
9 Commission.

10 Q. Ah, okay. And therein lays my next question. So
11 after John Daly was managing director, who was the
12 managing director then?

13 A. After John Daly was the managing director, then Fred
14 Peivandi became the Genesee County Road Commission's
15 managing director, and he did not want Randy
16 Dellaposta on an employment agreement.

17     MS. GAFKAY: I mean, when you're ready,
18 can we take a break? We've been going now --

19     MR. CASCINI: More than fair. That's
20 totally fine.

21     (Recess taken.)

22     MR. CASCINI: Let's go back on the
23 record.

24 Q. (BY MR. CASCINI) Ms. Poplar, during your break, did
25 you have an opportunity to consult with anyone other

Page 47

1 than your attorneys?

2 A. No.

3 Q. Okay. When we left off, I was asking you some
4 questions about employment agreements at the GCRC and
5 the process by which employment agreements are issued.

6     You said you were involved with
7 drafting the employment agreements and then issuing
8 them, by which you meant that you actually get them
9 and distribute them to the employee who received it;
10 is that right?

11 A. That's correct.

12 Q. Now, you also mentioned that John Daly's practice was
13 to give the employees who reported to him employment
14 agreements; is that right?

15 A. That is correct.

16 Q. Did he issue employment agreements to -- well, let me
17 back up.

18     Does every nonunion employee at the
19 GCRC have an employment agreement?

20     MS. GAFKAY: Object to the form. Are
21 you talking about under John Daly or now?

22 Q. (BY MR. CASCINI) Well, under John Daly, did every
23 employee of the GCRC who was nonunion have an
24 employment agreement?

25 A. Not to my knowledge.

Page 48

1 Q. Did any employees who were not direct reports to John
2 Daly, during John Daly's tenure as the managing
3 director, have employment agreements?

4 A. For point of clarification, Cherry Grant, Rachel
5 Mullen did not report directly to John Daly. Now, to
6 answer your question, I'm not aware.

7 Q. Okay. Who did Rachel Mullen and Cherry Grant report
8 to?

9 A. Me.

10 Q. Did you ask all of the employees who directly report
11 to you to execute employment agreements?

12 A. No.

13 Q. Okay. Did all of the employees who reported to John
14 Daly have employment agreements with the GCRC?

15 A. (No response.)

16 Q. And let me clarify one thing. I apologize because
17 that was ambiguous. Did all of the employees who
18 directly reported to John Daly have employment
19 agreements with the GCRC?

20     MS. GAFKAY: I'm just going to object,
21 lack of foundation; but go ahead.

22 Q. (BY MR. CASCINI) You can answer the question.

23     MS. GAFKAY: I just want to make sure
24 the record, later we don't -- I'm kind of confused as
25 to who the direct report is, but we can ask her at the

Page 49

1 end who the direct reports are so we're clear.

2     THE WITNESS: I'm not aware.

3 Q. (BY MR. CASCINI) Did John Daly ever explain to you
4 why he asked some employees to execute employment
5 agreements with the GCRC?

6 A. I can't remember.

7 Q. Did he ever ask you for a recommendation in your
8 professional capacity as the Human Resources director
9 about whether or not employees should be issued
10 employment agreements with the GCRC?

11 A. I can't recall.

12 Q. Prior to your tenure as the HR director, are you aware
13 of whether any employees that directly reported to
14 John Daly had employment agreements with the GCRC?

15 A. Will you repeat your question, please?

16 Q. Are you aware of whether, prior to your tenure, this
17 was a practice that John Daly sometimes executed with
18 employees who directly reported to him?

19 A. I'm not aware.

20 Q. Prior to your tenure, are you aware of whether any
21 employees who worked in the Human Resources Department
22 had employment agreements with the GCRC?

23 A. I'm not aware.

24     MR. CASCINI: I would like to just show
25 you another exhibit. We'll mark this one as Exhibit

Page 50

1  No. 4.
2  (Document marked Deposition
3  Exhibit No. 4.)
4  MR. CASCINI:  We've all marked this
5  document as Exhibit No. 4.  For ease of the record,
6  this is the three-page document with Bates No.
7  Defendants RPD Response 8 - 25 and subsequent.
8  Q.  (BY MR. CASCINI)  Ms. Poplar, do you recognize this
9  document?
10 A.  I do.
11 Q.  Is this an Employment Agreement that you entered into
12  with the GCRC?
13 A.  It is.
14 Q.  Did you draft the initial version of this Employment
15  Agreement?
16 A.  I did not.
17 Q.  Do you know who did draft the initial version of this
18  Employment Agreement?
19 A.  I do not.
20 Q.  Is that your signature that appears on the final page
21  of this document?
22 A.  It is.
23 Q.  And the date on this particular document is December
24  15, 2017; is that correct?
25 A.  That is correct.

Page 51

1  Q.  Now, I want to ask you the same question I asked you a
2  little bit earlier with reference to, is there a
3  reason why you executed Employment Agreement number
4  three, which is Exhibit No. 4, so soon after you
5  executed the second Employment Agreement, that is to
6  say Exhibit No. 3?
7  MS. GAFKAY:  Object to the form.
8  MR. CASCINI:  You should have because
9  that was a bad question.
10 Q.  (BY MR. CASCINI)  You executed the third employment
11  agreement approximately ten months after you executed
12  the second employment agreement.  Do you remember why
13  that is?
14 A.  I do not.
15 Q.  Do you remember whether John Daly asked you to execute
16  a new Employment agreement or whether you requested to
17  execute a new employment agreement?
18 A.  I do not.
19 Q.  Do you know if any employees other than you were
20  offered new employment agreements in December of 2017?
21 A.  I do not.
22 Q.  Do you happen to know whether Anthony Branch was
23  issued a new employment agreement in December of 2017?
24 A.  I do not.
25 Q.  Did you draft any initial versions of employment

Page 52

1  agreements in and around December of 2017 to be given
2  to employees?
3  A.  I did not.
4  Q.  Do you know whether John Daly had Board approval to
5  execute any employment agreements in December of 2017?
6  A.  I do not.
7  Q.  Do you know whether John Daly had approval from the
8  Genesee County Board of Commissioners to execute any
9  of the three employment agreements we've introduced
10  into evidence today that relate to you?
11 A.  I do not.
12 Q.  Do employees in your department, we're referring to
13  today, now, and I understand it's been confusing,
14  we've been jumping time frames, but as of today, are
15  there any employees at GCRC that have employment
16  agreements?
17 A.  Would you repeat the question?
18 Q.  As of today, are there any employees of the GCRC that
19  have employment agreements with the GCRC?
20  MS. GAFKAY:  Object to the form.  Other
21  than her?
22 Q.  (BY MR. CASCINI)  Yes, other than you.
23 A.  I'm not aware.
24 Q.  So it is your position that this employment agreement
25  is still active?

Page 53

1  A.  That is my understanding, yes.
2  Q.  And you're not aware whether there's anybody else
3  right now that has one?
4  A.  I'm not aware.
5  Q.  Now, I believe you mentioned earlier, again, please
6  don't let me misstate your testimony if this is not
7  correct, I believe that you mentioned earlier that
8  Fred Peivandi does not carry forward the practice of
9  executing employment agreements with his direct
10  reports; is that right?
11  MS. GAFKAY:  Object to the form, lack
12  of foundation.
13 Q.  (BY MR. CASCINI)  Does Fred Peivandi carry forward
14  John Daly's practice of executing employment
15  agreements with his direct reports?
16 A.  Fred Peivandi would have to answer that question.
17 Q.  Okay.  So he doesn't -- he's not involved in the
18  practice of using you to either draft them or issue
19  them if he issues them?
20 A.  That is correct.
21 Q.  So you don't draft any employment agreements under
22  Fred Peivandi or haven't drafted any employment
23  agreements under Fred Peivandi?
24 A.  That is correct.
25 Q.  And you haven't issued any, either; is that right?

Page 54

1  **A.** That is correct.

2  **Q.** At the time, so we're shifting our focus to December

3 of 2017, which is when your third employment agreement

4 was executed, at that time, are you aware if any other

5 employees had employment agreements as of then?

6  **A.** I'm not aware.

7  **Q.** Do you know if Anthony Branch has an employment

8 agreement today?

9  **A.** I'm not aware.

10  **Q.** Do you know if Randy Dellaposta has an employment

11 agreement today?

12  **A.** Under his new position, to my knowledge, he doesn't.

13  **Q.** Coetta Adams and Cherry Grant are no longer employees

14 of the GCRC; is that right?

15  **A.** That is correct.

16  **Q.** Do you know if Rachel Mullen has an employment

17 agreement today?

18  **A.** Rachel Mullen's employment agreement would be that

19 that was given to her in 2017. There has not been

20 anything given to her since 2017.

21  **Q.** Okay. So she does have one today, but it would've

22 been predating -- it wasn't executed this year; right?

23  **A.** That is correct.

24  **Q.** Got it. Okay. What about Mike Lewis, does Mike Lewis

25 have an employment agreement today?

Page 55

1  **A.** I'm not sure.

2  **Q.** Are employment agreements that the GCRC executes, are

3 they just cause or at will or a mix of the two?

4      MS. GAFKAY: Objection; lack of

5 foundation.

6  **Q.** (BY MR. CASCINI) You execute employment agreements

7 with GCRC; right?

8  **A.** As of 2017, February of 2017, I have not executed any

9 employment agreements.

10  **Q.** Fair enough. The GCRC during your tenure has executed

11 employment agreements with employees; right?

12  **A.** That is correct.

13  **Q.** And we've already had testimony about that; right?

14  **A.** That is correct.

15  **Q.** And you've testified that not everybody, to whom

16 you're aware, has one, to the best of your

17 recollection; right?

18  **A.** That is correct.

19  **Q.** Under those agreements, employment agreements as you

20 know in your experience as an HR professional, some

21 have at-will employment terms and some have just cause

22 termination standards; is that right?

23  **A.** In order for me to speak to that, I would have to look

24 at each individual agreement to confirm what you're

25 asking.

Page 56

1  **Q.** Fair enough. Are you aware if any of the employment

2 contracts that the GCRC currently has executed have a

3 just cause?

4  **A.** I'm aware that my employment agreement has a just

5 cause.

6  **Q.** Are you aware of any other employees have a just

7 cause?

8  **A.** Without seeing the actual agreement, I can't answer

9 that question.

10  **Q.** Are you aware if any employees with the GCRC currently

11 have at-will employment agreements?

12  **A.** I'm not aware of that unless I see the agreement by

13 which you're speaking to.

14  **Q.** Well, Rachel Mullen and -- Rachel Mullen and Cherry

15 Grant were in your department; correct?

16  **A.** That is correct.

17  **Q.** Were or are in your department?

18  **A.** Correct.

19  **Q.** And they both appeared at a time coextensive with

20 your -- with you being the HR director, they had

21 employment agreements; right?

22  **A.** That is correct.

23  **Q.** Okay. So your testimony is, you do not remember

24 whether they're just cause or at-will employment

25 agreements?

Page 57

1  **A.** Again, I would have to refer to the document itself

2 for me to confirm and be able to answer your question.

3  **Q.** You did testify earlier that you put together the

4 initial drafts of some of the employment agreements?

5  **A.** That is correct.

6  **Q.** All right. Is it your practice to include just cause

7 terms, at-will terms or does it vary?

8  **A.** Again, I can't remember what was actually put into

9 those particular agreements without looking at the

10 particular document.

11  **Q.** Okay. So you don't have a standard practice of, if

12 someone sat down and told you, hey, I need you to

13 draft an employment agreement for somebody, you don't

14 have a standard package of what you would ordinarily

15 put in there?

16  **A.** No.

17  **Q.** It's individualized; it's specified to whichever

18 employee and circumstance upon which an employee would

19 be hired?

20  **A.** It would be based on what I'm instructed to do.

21  **Q.** Ah, I see. Okay. Well, then, let me ask you a

22 clarifying question about that. You already testified

23 that John Daly may or may not have modified the

24 versions, the initial drafts that you gave when he

25 actually issued the agreements and executed them;

Page 58

1  right?
2  A.  That is correct.
3  Q.  You don't know whether he did that?
4  A.  That is correct.
5  Q.  Okay.  Did John Daly ever direct you to include a just
6  cause term in an employment agreement?
7  A.  I can't remember.
8  Q.  Did he ever direct you to include an at-will term in
9  an employment agreement?
10 A.  I can't remember.
11 Q.  I would like to ask you some questions, then, about
12 arbitration provisions and employment agreements.
13 Have you ever, to the best of your recollection,
14 drafted an employment agreement, an initial draft that
15 went to John Daly, that included an arbitration
16 provision?
17 A.  I can't recall.
18 Q.  Do you know who drafted the initial versions of your
19 employment agreements, the ones that you executed with
20 the GCRC, just to be clear?
21 A.  I can't remember.
22 Q.  Is that something that you knew at one time or believe
23 that you knew at one time?
24 A.  I'm not sure.
25 Q.  You mentioned earlier that you didn't know whether or

Page 59

1  not John Daly had approval to execute, from the Board,
2  to execute any of your three employment agreements.
3  Does the GCRC policy require him to have approval?
4  A.  I'm not sure.
5  Q.  During your tenure as the HR director, my
6  understanding is that you served alongside Fred
7  Peivandi during the period time when he was
8  engineering director; is that right?
9  A.  That is correct.
10 Q.  And when did he become a managing director?
11 A.  I believe it would've been in 2018.
12 Q.  Well, I actually just didn't -- he spent time as a
13 co-interim managing director before he was a managing
14 director; right?
15 A.  That is correct.
16 Q.  Along with Anthony Branch, who was also the other
17 co-interim managing director?
18 A.  That is correct.
19 Q.  Okay.  And then Fred Peivandi was given the managing
20 director job by the Board in 2018?
21 A.  That is correct.
22 Q.  Okay.  Prior to being appointed the co-interim
23 managing director, he was the director of engineering?
24 A.  That is correct.
25 Q.  Okay.  What are all the director level positions at

Page 60

1  the GCRC currently?
2  A.  I don't understand your question.
3  Q.  The GCRC has several director level positions; right?
4  A.  I'm still not understanding your question.
5  Q.  Okay.  You are the HR director; correct?
6  A.  That is correct.
7  Q.  There is a maintenance director; correct?
8  A.  That is correct.
9  Q.  And there's an engineering director?
10 A.  That is correct.
11 Q.  Are there any other directors?
12 A.  Sure.  You have the maintenance director, you have the
13 engineering director.  You want current or back when?
14 Q.  Yeah, currently, as of today.
15 A.  It would be the managing director, it would be the
16 deputy managing director, the maintenance director,
17 the engineering director, the finance director, and
18 myself as the HR administrative service director.
19 Q.  Got it.  Now, we've already had some testimony that
20 the director level positions have changed over the
21 years, as you might expect, Randy Dellaposta being the
22 prior off-spin of an operations director and fleet
23 director position.  Are those positions no longer
24 extant at the GCRC?
25 A.  Operations director and the fleet director are

Page 61

1  combined up under Randy Dellaposta.
2  Q.  Does he have additional duties now as the deputy
3  managing director beyond just the consolidated duties
4  of the fleet director position and the operations
5  director position?
6  A.  Without looking at his resume, I wouldn't know what
7  the additional --
8  Q.  Fair enough.
9  A.  -- duties would be.
10 Q.  Fair enough.  Prior to the creation -- well, let me
11 ask you this question:  When was the deputy managing
12 director position created?
13 A.  The deputy managing director position, I believe,
14 became effective October of last year.
15 Q.  Okay.  Prior to the creation of the deputy managing
16 director position, did the fleet director position or
17 the operations direct position exist?
18 A.  That is correct.
19 Q.  They both existed?
20 A.  Up under Randy Dellaposta.
21 Q.  Okay.  Did he occupy both titles at the same time?
22 A.  They were, like, merged into one.
23 Q.  Got it.  I understand.  How would you describe your
24 working relationship with Fred Peivandi when he was
25 the engineering director during the period of time

Page 62

1  when you were the HR director?
2  A.  Challenging.
3  Q.  How was it challenging?
4  A.  Fred had views about African-Americans that I didn't
5  subscribe to.  He also had views about the deputy
6  managing director, at that time John Daly, that I did
7  not subscribe to.
8  Q.  You mean the managing director, John Daly?
9  A.  That's correct.
10 Q.  There was no deputy managing director at that time;
11 right?
12 A.  No.
13 Q.  So just a pure error; right?
14 A.  (Nodding head affirmatively.)
15 Q.  I just want to make sure I didn't misunderstand the
16 history there.
17        Let's first talk about your testimony
18 about the views about African-Americans that I do not
19 subscribe do.  What views do you believe Fred
20 expressed about African-Americans to which you did not
21 subscribe to?
22 A.  He specifically made it very clear to me that he had
23 an issue with the amount of money that Anthony Branch
24 was making, in other words, Anthony Branch's salary.
25 He felt that because Anthony Branch was not degreed

Page 63

1  that he should not be making the same amount of money
2  that he made.
3        He also felt that Anthony Branch didn't
4  clearly understand his responsibilities as he did and
5  that they should not be at the same level.
6  Q.  What other views about African-Americans to which you
7  did not subscribe do you believe he held?
8  A.  He felt that Joyce McLain should have no input into
9  the purchasing of the engineering department because
10 she didn't know what she was doing.
11 Q.  Who is Joyce McLain?
12 A.  Joyce McLain used to be the purchasing director -- I'm
13 sorry -- purchasing manager for GCRC.
14 Q.  Joyce McLain served as the purchasing manager
15 approximately when?
16 A.  She was in that position when I was hired in 2016.
17 Q.  And you said she no longer -- she used to be.  So when
18 was she terminated?
19 A.  She would have been terminated on or about
20 approximately 2019, the year '19.
21 Q.  Approximately 2019?
22 A.  It could've been 2019, it could've been 2018 as well.
23 Q.  Sure.  She was terminated from that job when Fred
24 Peivandi was the managing director, though, just to
25 orient us in time?

Page 64

1  A.  I believe that she may have been -- I'm not sure.  I'm
2  not sure.
3        MS. GAFKAY:  And he started asking you
4  questions.  Were you -- did you still have more to
5  testify on Fred's views regarding African-Americans?
6        MR. CASCINI:  Well, I want to ask
7  clarifying questions about a couple of things
8  before --
9        MS. GAFKAY:  Yeah, you can, but --
10        MR. CASCINI:  -- I circle back to that.
11        MS. GAFKAY:  You can, that's fine.  I
12 just want to make sure that she's completed her answer
13 and given an opportunity to complete the answer.  I
14 appreciate you may have intervening questions, but I
15 don't think that she was done.
16        MR. CASCINI:  Fair enough.  So why
17 don't we make a comprehensive list and then we can
18 kind of circle back and go through details of it.  I
19 have no issues with ordering it in that way.
20 Q.  (BY MR. CASCINI)  What other views about African-
21 Americans to which you do not subscribe did you
22 believe that Fred held?
23 A.  He felt that Makini Jackson, an African-American
24 female who held the position of the HR director --
25 administrative service director prior to me, he felt

Page 65

1  that she was ignorant.  She didn't know what she was
2  doing, and reference her as being crazy, and he felt
3  that she was giving vendors a hard time.  She had a
4  nasty disposition.  She was hard to work with, and she
5  was very aggressive.
6  Q.  Did he have any other concerns about Makini Jackson?
7  A.  Oh, he didn't like the way she was always blowing her
8  nose.
9  Q.  I've been told that I blow my nose in an obnoxious
10 fashion, so I have sympathy.
11        Makini Jackson, you said, was the HR
12 director.  Did she predate you as the HR director?
13 A.  That is correct.
14 Q.  Okay.  When did her employment end?
15 A.  It would have ended on or before October 2016.
16 Q.  Sorry.  I asked you an obvious question; it wasn't a
17 trick question, I promise.
18        Was John Daly the individual who
19 terminated Makini Jackson?
20 A.  I'm not sure.
21 Q.  Do you know whether or not Makini Jackson is currently
22 the subject of -- or the Plaintiff in a lawsuit
23 against the GCRC?
24 A.  I'm not sure if I have any information on that.
25 Q.  So are you aware that there may be a lawsuit?

Page 66

1  A.  I am.

2  Q.  Okay.  But you don't know any details about the

3     lawsuit?

4  A.  I do not.

5  Q.  Okay.  You're not involved in defending the lawsuit in

6     any way?

7  A.  No.

8  Q.  Makini Jackson, do you know approximately -- well,

9     sorry.  She was probably terminated in 2016, I

10    imagine.  But was she terminated in -- you mentioned

11    that you had two interviews for the HR position;

12    right?

13 A.  That is correct.

14 Q.  Had she been terminated prior to the first interview

15    or prior to the second interview?

16 A.  I can't answer that question.

17 Q.  You can't answer it?  You just --

18 A.  I'm not sure when her termination date was.

19 Q.  Understandable.  What other views about African-

20    Americans to which you do not subscribe do you believe

21    Fred held?

22 A.  At the time in which he was the engineering director,

23    is that what you're still referencing to?

24 Q.  Sure, we can do that.  Limited to the period of time

25    in which he was the engineering director, what other

Page 67

1     views about African-Americans to which you do not

2     subscribe do you believe Fred held?

3  A.  I believe --

4          MS. GAFKAY:  I'm going to object to the

5     form of the question, but -- I think it's confusing,

6     but go ahead, keep going.

7          MR. CASCINI:  I can rephrase.  That's

8     not a problem.

9  Q.  (BY MR. CASCINI)  Limited to the time period when Fred

10    Peivandi was the engineering director, so this would

11    be prior to 2018, during, obviously, the period of

12    time when you were with the GCRC when you had an

13    opportunity to know him, what other views about

14    African-Americans to which you did not subscribe did

15    you believe that Fred held?

16 A.  I believe that I shared what I can remember, but I

17    don't believe that what I shared is all-inclusive.

18 Q.  Why do you believe that that is not all-inclusive?

19 A.  Because as I ponder it more, more things may come to

20    my memory; but right now, that's what comes to my

21    memory.

22 Q.  So right now that's what you can remember, but there's

23    a possibility you could remember things at a later

24    time?

25 A.  That is correct.

Page 68

1  Q.  Okay.  Now, you mentioned -- let's refer to his views

2     about Anthony Branch.  You said that he had issues

3     about the amount of money that Anthony Branch made; is

4     that right?

5  A.  That is correct.

6  Q.  And you said that he made it very clear to you that he

7     had those issues?

8  A.  That is correct.

9  Q.  How did he make it clear to you that he had those

10    issues?

11 A.  Unannounced, shortly after I became the HR director in

12    2016, Fred Peivandi came to my office, and he wanted

13    to talk to me about his concerns related to him and

14    Anthony Branch and their salary; and he felt that

15    because, again, that Anthony Branch did not have a

16    degree, he didn't feel that Anthony was qualified for

17    the position he was holding, that he should not be

18    making the same amount of salary that he was making;

19    and based on that, he wanted me to talk to John Daly

20    about increasing his salary.

21 Q.  And when you say "his," you're referring to Fred's?

22 A.  That is correct.

23 Q.  Did you talk to John Daly about increasing Fred's

24    salary?

25 A.  I did.

Page 69

1  Q.  What did John say?

2  A.  And for clarification, I talked to John Daly about

3     Fred Peivandi's concerns about wanting to have his

4     salary increased and the reason why he felt it should

5     be increased.

6  Q.  So that I understand you, you talked to John Daly and

7     said that Fred believed he should have his salary

8     increased.  Am I understanding you right?

9  A.  That is correct.

10 Q.  Okay.  So you didn't make a recommendation about

11    whether the salary should be increased?

12 A.  I did not.

13 Q.  And you also relayed to John Daly those reasons Fred

14    had expressed to you for which Fred's salary should be

15    increased; right?

16 A.  That is correct.

17 Q.  Do you remember approximately when Fred had that

18    conversation with you?

19 A.  I was hired in October of 2016.  So I would say,

20    approximately, maybe a month or two after that, give

21    or take.

22 Q.  Were there other ways in which Fred made it very clear

23    that he had an issue with the amount of money Anthony

24    Branch made?

25 A.  Yeah.  He verbalized it, and when I had the

Page 70

1  conversation with Mr. Daly, Mr. Daly told me that he
2  heard that before from Fred, and I was to not be
3  involved in that, and he would handle it.
4  Q.  Okay.  Other than the October 2016, keeping in mind
5  it's approximate, I understand, other than that
6  conversation that he had with you, were there other
7  conversations he had with you in which he made it very
8  clear that he had objections to the amount of money
9  that Anthony Branch made?
10 A.  Throughout the years, prior to Mr. Peivandi becoming
11 the managing director, he's made that comment numerous
12 times.
13 Q.  What were some of the other instances you can recall
14 when he made that comment?
15 A.  Just conversations with him, dealing with other
16 issues, and actually, to be more specific, when we
17 were talking about the wage analysis that we were
18 getting conducted through Sage Consulting Services,
19 that conversation came up many times.
20 Q.  When did you have a wage analysis conducted by Sage
21 Consulting Services?
22 A.  I believe it would've been sometime in latter 2019 or
23 early '20; certainly prior to the Covid.
24 Q.  And at this period of time, Fred was the managing
25 director; is that right?

Page 71

1  A.  That is correct.
2  Q.  What do you remember about the comments that he made
3  about Anthony Branch's salary around that time?
4  A.  Well, during that particular time, he felt that
5  Anthony Branch was making too much money, again; and
6  when Sage concluded its findings that showed Anthony
7  Branch, he should be making more money at the time, he
8  took offense to that; and he wanted to compare
9  Anthony's duties to the duties of other road
10 commissions' maintenance managers or people who held
11 some similar position, which those dollars amount was
12 a lot less, and that's where he felt Anthony Branch
13 should be.
14 Q.  Are you aware of what other managing directors at
15 other road commissions make?
16 A.  I have looked at some wage scales, but I can't say off
17 the top of my head exactly what those dollar amounts
18 were.
19 Q.  Did you participate or receive the results of the wage
20 study conducted by Sage Accounting Services in 2019 or
21 2020?
22 A.  I did.
23 Q.  Had you conducted any subsequent wage studies?
24 A.  No.
25 Q.  So forgetting the 2019 wage study that Sage consulted,

Page 72

1  have you ever reviewed what maintenance directors or
2  other director level positions make at other road
3  commissions?
4  A.  Only what I've seen on certain documents that when
5  another road commission is doing a study, they want us
6  to get involved, then they'll send us a copy of what
7  they're working off of as well.
8  Q.  So you may have the incidental opportunity to view
9  some data, but there's never been any other wage study
10 conducted by --
11 A.  That is correct, not by the Road Commission.
12 Q.  And that's not something you've independently ever
13 researched?
14 A.  I wouldn't say that.  I would say that I have looked
15 at the materials that have been provided to me, but
16 not in the sense of me doing an individual study
17 myself, no.
18 Q.  Okay.  Well, apart from the materials that you viewed
19 that were collected by other agencies that you've had
20 the opportunity to review, have you ever, independently
21 of that, gone out to research what other directors
22 have made at other road commissions?
23 A.  No.
24 Q.  How often are wage studies conducted?
25 A.  Since I've been here in 2016, the first wage study

Page 73

1  that was ever conducted was the one that I initiated
2  through Sage.
3  Q.  Okay.  We're going to take a transition back, and
4  we're going to start talking a little bit about -- you
5  mentioned that another thing that Fred made very clear
6  to you was that Anthony Branch did not understand his
7  responsibilities; is that correct?
8  A.  That is correct.
9  Q.  Okay.  How did he make that very clear to you?
10 A.  He felt that Anthony Branch was in his position
11 because of somebody he knew and that Anthony Branch
12 did not come in with no specific training.
13 Q.  And how did he make that clear to you?  What was the
14 nature of him -- did you have a conversation about it,
15 did he just give you a memorandum?
16 A.  It was just a part of a verbal conversation that we
17 were having at the time.
18 Q.  And is this the same verbal conversation that you had
19 around October of 2018 when he asked you to go and
20 talk to John Daly about increasing his salary?
21 A.  That is correct.  It would not have been in the month
22 of October; it would've been shortly after the month
23 of October.
24 Q.  I apologize.  So as part of the same conversation,
25 though, whenever that may have occurred, shortly after

Page 74

1    October?

2  **A.**  That is correct.

3  **Q.**  Got it. So has he ever subsequently made it clear in

4  any other way that he believes that Anthony Branch

5  does not understand his responsibilities?

6  **A.**  Are you speaking in terms of his position when he was

7  the director of engineering or in his current position

8  as the managing director?

9  **Q.**  Good clarification. During the period of time where

10  he was the director of engineering.

11  **A.**  That would be the time at which he was having those

12  communications with me.

13  **Q.**  And that was the only time, is during the period of

14  time when he was the engineering director?

15  **A.**  That is correct.

16  **Q.**  Got it, okay.

17  **A.**  But that is not the only time that he mentioned

18  Anthony Branch's salary.

19  **Q.**  Understandable. And we just talked about that, right,

20  when -- I believe you already testified to everything

21  you knew about instances when Fred Peivandi was the

22  engineering director and he made references to Anthony

23  Branch's salary?

24  **A.**  As I stated earlier, that's what comes to memory now,

25  but it's not all-inclusive.

Page 75

1  **Q.**  Understandable.

2        THE WITNESS: Now, before you ask me

3  the next question, I need to take a break. Is that

4  okay?

5        MR. CASCINI: That's okay. Let's go

6  off the record.

7        (Recess taken.)

8        MR. CASCINI: Let's go back on the

9  record.

10  **Q.**  (BY MR. CASCINI) You had mentioned earlier and given

11  testimony earlier that Joyce McLain -- or that Fred

12  made it clear to you that Joyce McLain shouldn't have

13  input into purchasing; is that right?

14  **A.**  That is correct.

15  **Q.**  How or when did he make that clear to you?

16  **A.**  I can't give you a specific window of time; but I do

17  recall that Joyce had raised some concerns about what

18  she considered to be some unethical purchasing

19  practices from the engineering department and that

20  they were not going through the purchasing procurement

21  process here at the Road Commission. So I had that

22  conversation with Fred Peivandi, and she made it clear

23  that she didn't know what she was doing.

24  **Q.**  What else did he make clear?

25  **A.**  That she didn't know anything about engineering, and

Page 76

1  she should not be responsible for purchasing the

2  equipment that the engineering department needed, and

3  that she should have nothing to do with the bid

4  process, that's something that he should be doing on

5  his own through his department.

6  **Q.**  Were there any other instances -- I should back up.

7  Did he make all those comments in the context of one

8  conversation?

9  **A.**  In that particular conversation, yes.

10  **Q.**  Did he make --

11  **A.**  And --

12  **Q.**  Oh, sorry. I didn't mean to interrupt.

13  **A.**  And he felt that she was to -- that she wanted to be

14  the one that had total control over what the

15  engineering department was doing, and she was trying

16  to cause problems. Everything was basically pretty

17  much negative.

18  **Q.**  When you say everything was basically negative, you

19  mean with regard to his commentary about Joyce

20  McLain's performance?

21  **A.**  And his relationship.

22  **Q.**  Did you have any other discussions with Fred about

23  Joyce McLain's performance or her relationship with

24  Fred?

25  **A.**  Not in that particular communication. It may have

Page 77

1  been later; I'm not -- I can't say for certainty when

2  that would've been, but I've had conversations with

3  Fred where he had been on the negative side of Joyce.

4  **Q.**  And during those conversations when Fred was on the

5  negative side, what do you remember that he had said?

6  **A.**  I can't remember specifically. I just know that the

7  conversation was more negative towards Joyce, her

8  character and her performance.

9  **Q.**  And then I believe that you also -- well, let me

10  button that up. Were there any other instances that

11  you can remember when he made negative comments about

12  Joyce McLain?

13  **A.**  I can't give specific times. There may have been

14  other conversations, but I can't recall at this

15  particular point in time. So that's not all-

16  inclusive.

17  **Q.**  I understand. You also testified that Fred expressed

18  a negative opinion of Makini Jackson's job

19  performance; is that right?

20  **A.**  That is correct.

21  **Q.**  When did he make that clear to you?

22  **A.**  That would've been -- I can't give you the specific

23  time frame, but I do recall his negative comments

24  about Makini, when Makini fired his daughter from the

25  city of Flint and this may have been when he was in

Page 78

1  the capacity of the managing -- as the managing
2  director; and he felt that I was the reason why his
3  daughter got fired from the city of Flint, and he felt
4  that Commissioner Cloyce Dickerson played a role in
5  his daughter getting fired from the city of Flint, and
6  he instructed me to write a letter, as though I was
7  crafting the letter in a way in which his daughter was
8  writing it to the interim city director -- city HR
9  director, Mr. Tyrene Walker, pleading for his daughter
10  to get her job reinstated.
11        When I wrote the letter, as though his
12  daughter was writing it, he had his daughter come and
13  retrieve it from me right here at the Genesee County
14  Road Commission; and when Tyrene and the mayor, Mayor
15  Karen Weaver, did not reinstate at that time -- I'm
16  sorry -- the mayor and -- well, Chelli Lee, did not
17  reinstate his daughter, he accused me of betraying
18  him, made me feel like I was being subjected to, what
19  I would call work-related domestic violence at that
20  point.
21        What I found him to be was passive
22  aggressive, that in one sense he would tell me to use
23  my influence, and when my influence did not work, then
24  the other sense, he ridiculed me.  He would say things
25  to me as though I was -- didn't know what I was doing,

Page 79

1  as though I was incompetent.  He did begin to --
2        MS. GAFKAY:  I don't think there's a
3  question pending.  I think you answered his question
4  that was on the table.
5        THE WITNESS:  Okay.
6  Q.  (BY MR. CASCINI)  Do you have any additional testimony
7  to give me about the conversation in which Fred
8  expressed a negative view of Makini Jackson's
9  performance?
10  A.  Well, during that time frame.  That's all he could say
11  was about her performance; she didn't know what she
12  was doing, she mistreated vendors, she was rude, she
13  was ignorant, he felt that she was crazy at times.
14  He, again, had a problem with her always walking
15  around with a Kleenex box blowing her nose.
16  Q.  I apologize, Donna, but what I meant was, were there
17  other instances when he made comments about Makini
18  Jackson's performance?
19  A.  Throughout his -- in his position as the managing
20  director, he said it numerous times.
21  Q.  Do you remember any of those specific times in which
22  he expressed those opinions?
23  A.  I do not.
24  Q.  Are the opinions he expressed during those
25  conversations coextensive with the list of negative

Page 80

1  characteristics you gave earlier of Makini Jackson
2  that you attribute to him?
3        MS. GAFKAY:  Object to the form.
4  Q.  (BY MR. CASCINI)  During the subsequent conversations,
5  did he call her ignorant or crazy and make comments
6  about the way she blew her nose?
7  A.  He did.
8  Q.  Were there any other comments that he made in addition
9  to the ones you've already listed?
10  A.  There could be.  I just can't recall to memory.
11  Q.  Okay.  Let's break down a little bit about the
12  situation involving Fred's daughter to which you gave
13  some testimony.  So you testified that Fred's daughter
14  was at one time employed by the city of Flint; is that
15  correct?
16  A.  That is correct.
17  Q.  Okay.  Do you know what that daughter's name is?
18  A.  I can't recall at this time.
19  Q.  That's okay.
20  A.  I can't recall.
21  Q.  In the future, I know that -- well, I believe Fred may
22  have multiple children, but when I refer to Fred's
23  daughter in these future questions, we'll be referring
24  to this daughter who was employed by the city of Flint
25  for ease of reference; okay?

Page 81

1        So when was that daughter employed by
2  the city of Flint, to your knowledge?
3  A.  It would've been around 2019.
4  Q.  And you mentioned that she had been terminated from
5  the city of Flint at that time; is that correct?
6  A.  She got terminated at the end of 2019, I believe.
7  Q.  Now, you mentioned this in the context of describing a
8  situation with Makini Jackson.  Was Makini Jackson
9  serving as the HR director for the city of Flint in
10  2019?
11  A.  That is correct.
12  Q.  Okay.  She --
13  A.  Up until the end of the mayor's term in 2019.
14  Q.  I understand.  At the time that Fred's daughter was
15  terminated from the city of Flint, to your knowledge,
16  was Makini Jackson the HR director for the city of
17  Flint?
18  A.  That is correct.
19  Q.  That was the circumstance upon which he made the
20  comment that you listed earlier attributed -- about
21  Makini Jackson?
22  A.  That's when he began to reiterate the comments that he
23  had been saying about her prior.
24  Q.  So was that the first instance when he had made
25  comments about Makini Jackson's performance?

Page 82

1 **A.** No.

2 **Q.** There were other prior instances, but I believe you

3 testified you can't remember any specific times;

4 right?

5 **A.** That is correct.

6 **Q.** So with respect to the situation, you mentioned that

7 he had asked you to draft a letter on his daughter's

8 behalf?

9 **A.** He did.

10 **Q.** Why did he come to you to ask you to draft that

11 letter?

12 **A.** Because --

13 MS. GAFKAY: Objection; lack of

14 foundation.

15 **Q.** (BY MR. CASCINI) To the extent you know, why did he

16 ask you -- why did he come to you to ask you to draft

17 that letter?

18 **A.** Because I used my influence to get his daughter hired

19 in the position that she held at the city of Flint.

20 So Fred felt that I could use the same influence to

21 get her reinstated back into her position in the HR

22 Department of the city of Flint.

23 **Q.** When you say used your influence, what are you

24 referring to there?

25 **A.** Well, I was -- I had a good professional relationship

Page 83

1 with the HR director prior to Makini Jackson becoming

2 the HR director.

3 **Q.** That is to say, the HR director in the city of Flint.

4 I apologize. I didn't mean to interrupt you; I just

5 want to make sure we know what we're talking about.

6 You had a good relationship with the HR director for

7 the city of Flint prior to Makini?

8 **A.** That is correct.

9 **Q.** And how did you wield that influence with that prior

10 HR director?

11 **A.** Well, what happened, at the time in which Fred's

12 daughter was hired at the city of Flint, he falsified

13 some information on her application relative to her

14 criminal background.

15 So when I received a call that the

16 background check came back and showed that she had

17 a -- a minor, I think it was conviction for theft, I

18 asked him to reconsider and not to terminate her, take

19 her age at the time into consideration and give her an

20 opportunity to show or demonstrate that she can be a

21 valuable employee for the city of Flint.

22 So having that conversation, they did

23 not terminate her employment. She was allowed to

24 continue as an employee of the city of Flint.

25 **Q.** I apologize. I believe your testimony earlier was

Page 84

1 that you got her hired; is that correct?

2 **A.** I used my influence to get her hired. So Fred felt

3 that because I was able to use my influence to get his

4 daughter hired that I could use influence that he

5 thought I had to get her reinstated.

6 **Q.** Okay. I just want to make sure that I'm understanding

7 the two instances of the influence here. The

8 influence that you just described was she had

9 falsified info on her application, is your testimony,

10 and then you said you received a call. From whom did

11 you receive a call?

12 **A.** From Tia Lewis, who worked for the city of Flint in

13 the HR Department.

14 **Q.** And why did she call you?

15 **A.** Because I communicated with her about Fred's daughter

16 being hired. I wanted her to take a look at the

17 application and give her an opportunity if possible to

18 be employed in the HR Department.

19 **Q.** So do I understand you that there are two instances

20 where you testified that you used your influence with

21 respect to Fred's daughter or attempted to use your

22 influence with respect to Fred's daughter?

23 **A.** That is correct.

24 **Q.** In getting her hired and then avoiding her termination

25 with respect to falsified application; is that your

Page 85

1 testimony?

2 **A.** That is correct.

3 **Q.** When did you have the occasion to use your influence

4 to enable her to get hired at the city of Flint?

5 **A.** At the outset by which she put in her application for

6 the position.

7 **Q.** And when was that?

8 **A.** That had to've been sometime in 2018 or early part of

9 2019. I'm not for sure 100 percent.

10 **Q.** And how did you use your influence to get her hired

11 into the position?

12 **A.** Again, I shall repeat. I said earlier, I contacted --

13 my contact was inside of the HR Department, and that

14 was Tia Lewis.

15 **Q.** And then you did what?

16 **A.** To take a look at her application, told her who she

17 was, who she was related to here at the Road

18 Commission, and that he, Mr. Peivandi, had asked me to

19 help his daughter get the job at the city of Flint,

20 and that's what I did.

21 **Q.** You used the phrase "use your influence." Would you

22 describe what you did as being an access of providing

23 a reference for her?

24 MS. GAFKAY: Object to the form.

25 **Q.** (BY MR. CASCINI) You can answer the question.

Page 86

1    MS. GAFKAY:  Go ahead, you can answer.
2    THE WITNESS:  It was not as much of
3  even a reference.  No, I didn't write any full
4  reference letter for her at that time.
5  Q.   (BY MR. CASCINI)  Okay.
6  A.   I just used my relationship that I had with
7  individuals at the city of Flint; I would tell them
8  that I would like them to take a look at it, and if
9  they were impressed with what they seen, I would like
10  for her to have an opportunity for her to work within
11  the HR Department at the city of Flint.
12  Q.   Okay.  Did you intend for that phone call to function
13  as anything other than a reference or an indication
14  that they should look at her application?
15  A.   No.
16  Q.   Have you ever made -- or I'm just going to use the
17  term used your influence to get anyone else hired with
18  the city of Flint?
19  A.   I may have.
20  Q.   Okay.
21  A.   I may have.
22  Q.   Do you remember any of those instances where you used
23  your influence to get somebody hired at the city of
24  Flint?
25  A.   Not at this time.

Page 87

1  Q.   All right.  Did you do anything else other than asking
2  them to -- we're referring to the instance where she's
3  first hired, where you use your influence to get her
4  hired.  Did you do anything else other than asking her
5  to take a look at her application and to consider
6  hiring her if she met the qualifications?
7  A.   I didn't do anything else.
8  Q.   So approximately how long is it before you attempt to
9  use your influence again with the city of Flint to
10  prevent her termination?  What's the period of time
11  between those two events?
12  A.   Her hire date may have been somewhere in 2018 or
13  shortly thereafter.  So I would have used my -- I
14  would have reached out to them somewhere on or right
15  after she was actually terminated.
16  Q.   Okay.  And I'm sorry, I'm not trying to belabor the
17  point, but you don't remember exactly when that was;
18  you think that it may've been 2019?
19  A.   I know that it was probably the end of 2019 when Mayor
20  Weaver had lost her bid for reelection.  She would
21  have been terminated before Mayor Weaver exited her
22  duties as the mayor.
23  Q.   When you say that she was terminated before that,
24  that's just how you're orienting it in time or was it
25  connected somehow with the end of the term as mayor?

Page 88

1  A.   I'm just orienting it in time.
2  Q.   Okay, got it.  Just orienting it as to time and place.
3    Did Fred approach you and ask you to
4  use your influence in both instances or only in the
5  latter instance?
6  A.   In both instances.
7  Q.   And you agreed to do so?
8  A.   Yes.
9  Q.   Now, you mentioned that you wrote a letter -- or
10  ghost-wrote a letter for her; right?
11  A.   That is correct.
12  Q.   I'm sorry.  You mentioned that you ghost-wrote a
13  letter for her?
14  A.   I would rather say I crafted a letter for her.
15  Q.   Sure, fair enough.  I like to say craft or
16  ghost-wrote, too, when I write things for clients.  I
17  get it, I understand.
18    With respect to that letter, your name
19  did not appear at all on the letter?
20  A.   No.
21  Q.   Your authorship was not tied in with that letter?
22  A.   No.
23  Q.   But did you follow up with anybody in an attempt to
24  use your influence?  Let me back up.  I'm having
25  trouble understanding how ghost-writing a letter or

Page 89

1  crafting a letter, I'm sorry, on someone else's behalf
2  is using your influence.
3    MS. GAFKAY:  Object to form; lack of
4  foundation.
5  Q.   (BY MR. CASCINI)  After you crafted the letter for her
6  and she submitted it, did you have additional contact
7  with the city of Flint regarding this issue?
8  A.   For the purpose of this clarification --
9  A.   Sure.
10  A.   -- I was instructed by Fred Peivandi --
11  Q.   Sure.
12  A.   -- to craft a letter on behalf of his daughter --
13  Q.   Got it.
14  A.   -- to Tyrene Walker.  That came as a result of Fred
15  expressing his concerns and anger about his daughter
16  being fired.
17  Q.   Understandable.
18  A.   He felt that Makini Jackson fired his daughter as a
19  means of retaliating against him.  So he wanted me to
20  not only just craft a letter for his daughter, he
21  wanted me to talk to members of city council on his
22  daughter's behalf.
23  Q.   Got it.  So you did craft a letter.  Did you talk to
24  members of the city council on his daughter's behalf?
25  A.   I believe I had a conversation with Commissioner Eric

Page 90

1  Maynes, who was familiar with Fred Peivandi's daughter
2  and who was familiar with the situation; and I believe
3  he shared with me that they had already began to look
4  into that.
5        I also believe that Mr. Peivandi shared
6  with me that he was in communication with the chief of
7  police, who would've been under the leadership of
8  Mayor Karen Weaver; at the time, he was one of her
9  appointees.
10 Q.  City of Flint Police?
11 A.  That is correct.
12 Q.  Now, you said that he was in communication, but I just
13     want to know about the people that you talked to
14     specifically.
15 A.  The only person that I remember talking to was Eric
16     Maynes.
17 Q.  Eric Maynes.  And Eric Maynes is a city commissioner?
18 A.  City councilman.
19 Q.  City councilman, okay.
20 A.  That is correct.
21 Q.  And you'll need to educate me.  The city of Flint, the
22     city council, what role do they perform within the
23     city of Flint?
24 A.  The city of Flint city council oversees the city of
25     Flint.

Page 91

1  Q.  Okay, understandable.  Got it.  Now, after you had the
2      communication with Eric Maynes, was there anything
3      else that you did?
4  A.  Not that I can recall.
5  Q.  And you mentioned that Fred's daughter was
6      subsequently, in fact, terminated; right?
7          MS. GAFKAY:  Object to form; lack of
8      foundation.
9  Q.  (BY MR. CASCINI)  Was Fred's daughter later
10     terminated?
11 A.  She was not later terminated.  She was terminated
12     prior to me writing or crafting the letter on her
13     behalf.
14 Q.  So I should rephrase, then.  Were your efforts to use
15     your influence to allow her to become rehired
16     successful?
17 A.  No.
18 Q.  Okay.  So she was not rehired?
19 A.  Not to my knowledge.
20 Q.  Got it, okay.  Have you ever crafted a letter or
21     communicated with a Flint city council person in an
22     effort to get any other employees of the city of Flint
23     rehired?
24 A.  Not to my knowledge.
25 Q.  And then you also mentioned that Fred expressed to you

Page 92

1  that he believed Cloyce Dickerson was also responsible
2  for his daughter not being rehired; is that right?
3  A.  That is correct.
4  Q.  How did he come to explain that?
5  A.  He just told me he felt that Cloyce Dickerson, in --
6      he was quite angry that Cloyce Dickerson played a role
7      in it.
8  Q.  Did he explain how he believed Cloyce Dickerson had
9      played a role in that?
10 A.  He did not.  He also thought that I really put his
11     daughter under the bus, that I didn't really make an
12     effort to help his daughter.
13 Q.  I see.  So your testimony is that he, after he came to
14     you to ask you for assistance in getting his daughter
15     rehired; and after that was unsuccessful, he came to
16     you later to express his disappointment that you had
17     not been able to do that?
18 A.  Absolutely.
19 Q.  Okay.  And at that time, he also mentioned that he
20     also shared a similar disappointment with Cloyce
21     Dickerson.  Am I understanding that correctly?
22 A.  That is correct.
23 Q.  Now, during this period of time, you mentioned that
24     his conversation with you constituted work-related
25     domestic violence --

Page 93

1  A.  Fred had a pattern --
2          MS. GAFKAY:  Hold on.
3  Q.  (BY MR. CASCINI)  -- is that correct?
4          MS. GAFKAY:  He hadn't finished the
5      question.
6          THE WITNESS:  I'm sorry.
7          MS. GAFKAY:  I apologize.  I just want
8      to make sure the record is clear.
9          MR. CASCINI:  No, I understand.
10 Q.  (BY MR. CASCINI)  Is that correct?
11 A.  Repeat the question.
12 Q.  My understanding is that your testimony was that when
13     he came to you to voice that disappointment that it
14     constituted work-related domestic violence; is that
15     correct?
16 A.  Yes.
17 Q.  Did Mr. Peivandi strike you physically?
18 A.  No.
19 Q.  Did he threaten you physically?
20 A.  Fred Peivandi often threatened me when I didn't --
21     when he didn't get the results of what he thought I
22     should do for him; and that threat has been since he
23     was the managing director, he could terminate
24     employment, he could outsource from the HR department,
25     he could outsource my position.

Page 94

1   So even prior to that, when I went to
2   him pretty much pleading to get a HR administrative
3   assistant, he would say things to me, "Why should I
4   hire a HR assistant for you when I can hire someone
5   without a disability.  Why would I hire a person and a
6   half to accommodate you."  And he would say things,
7   like, you know, "In the private sector, you know, they
8   would never do anything like that."
9   So his verbal abuse of me made me feel
10  like, when I don't deliver what he think I should
11  deliver, whether it's ethical or unethical or whether
12  I just simply couldn't do it, then I was subjected to
13  verbal abuse; and in my opinion, that, to me, made me
14  feel like I was a -- caught up in a work-related
15  domestic violence situation; and I feel that way to
16  today.
17  You know, if I'm not able to produce or
18  deliver what he think I should produce or deliver,
19  that I am subjected to verbal results, like, you don't
20  know what you're doing, shut up and do what I tell you
21  to do; and I'm subjected to humiliation in the
22  presence of my colleagues in meetings.
23  My work was always scrutinized.  I
24  could never perform to his satisfaction.  So by all
25  means, yes, I feel that I'm strongly a victim of work-

Page 95

1   related domestic violence at the hands of Fred
2   Peivandi that has been approved and embraced by this
3   Board.
4   Q.   Okay.
5   A.   And when I say "this Board," I'm speaking of that
6   because I'm inside of this building, I'm really
7   referencing to the GCRC Board.
8   Q.   There's a lot for us to unpack, and we're going to go
9   down many different avenues of examination.
10  MR. CASCINI:  Will the court reporter
11  read back my question, please?
12  (Following question read back:
13  "Q.  Did he threaten you physically?")
14  Q.   (BY MR. CASCINI)  Did he threaten you physically,
15  Donna?
16  A.   No; but I can say this -- since you're calling me
17  Donna, I can call you Andrew?
18  Q.   You may.
19  A.   Okay.  Fred said he hated me, and from that, Andrew,
20  it drew great fear that Fred could be capable of
21  inflicting great bodily harm to me; and so that fear
22  was so severe that I shared what he said to members of
23  the GCRC Board and to the attorney, which was a labor
24  attorney at the time, Attorney Tom Derderian, because
25  I did fear my safety.

Page 96

1   And normally during the spring and the
2   summer months, I prided myself in being able to drive
3   myself to work, because that's the time of the year
4   that I can see clear and it doesn't get dark early.  I
5   don't do that anymore.  My husband brings me to work
6   because I fear that there's a great possibility that
7   Fred Peivandi could do great bodily harm.  That fear
8   that I hold is so great that I discussed it with my
9   doctor, my psychiatrist and my spiritual counselor
10  about my fears of what Fred could do to me.
11  And when I'm in his presence, my level
12  of anxiety and stress gets great -- it increased
13  greatly; and I have shared with our attorney at the
14  time, Attorney Tom Derderian, that I never, to this
15  day, never want to be left in a room with Fred by
16  myself.  I refuse to meet with Fred on a one-on-one by
17  myself.  I refuse to be in this building with Fred by
18  myself, and those are feelings that I had then, those
19  are the feelings that I have now.
20  So at this point, he has not physically
21  put his hands on me, but he has given me the fear of a
22  possibility that he can --
23  Q.   Okay.
24  A.   -- and I don't doubt that.
25  Q.   So the question again is, so he's never threatened you

Page 97

1   physically; but I understand that you are telling me,
2   despite the fact there has never been a threat of
3   physical violence, you do have fear of physical
4   violence.  Am I understanding your --
5   A.   I think -- I'm sorry.
6   Q.   -- testimony correctly?
7   A.   I think at the point in which he made it known that he
8   hates me, I feel that that rises to the level of a
9   physical threat --
10  Q.   Okay.
11  A.   -- and the possibility of such.
12  Q.   So I understand your testimony is that the combination
13  of the comment that he had hated you, which we will
14  talk about, and I will have some questions to ask you
15  about that, combined with his disappointment regarding
16  his daughter's failure to be rehired by the city of
17  Flint, those are the two factors that led you to have
18  physical fear of him?
19  A.   No.
20  Q.   Help me understand.  So what are the factors that led
21  you to generate a physical fear of him?
22  A.   The treatment, the differential treatment, the
23  degrading, the demoralizing of me, the ridicule of me,
24  bringing the question of my integrity, saying that I'm
25  biased, questioning everything I do, monitoring my

Page 98

1  time, ridiculing my performance.
2        Those are the things that I feel that,
3  for a man who say he hates a person, in conjunction
4  with all these other negative things he has, a feeling
5  he has about me, certainly makes me feel, at any given
6  point, that I could be subjected to physical harm at
7  the hands of Fred Peivandi.
8        In addition to that, he questions my
9  religion. He tells me that -- if I say something to
10  him that my trust is in God, I feel I'm going to get
11  through all of this, he says, "Well, hell, I don't get
12  into all that God stuff." He's into the Muslim faith,
13  so my faith is irrelevant.
14        And when he points his finger at me, I
15  don't know if that's proof, but that finger that's
16  pointed at me, Andrew, is going to end up with a slap
17  or turn into a fist, I really don't know. Because
18  when a man looks at me and -- Fred Peivandi says, "You
19  shut up and you do what I tell you to do," that finger
20  means something; and to me it is an act of a physical
21  threat. I look at his finger pointed at me in the
22  same manner as I look as though he was pointing a
23  gun at me. That's how I see it, and that's how I feel
24  today.
25  Q.  At any time have any other employees come to you and

Page 99

1  expressed fears about physical safety from Fred
2  Peivandi?
3  A.  Sue came to me and told me how harsh Fred had gotten
4  with her one time.
5  Q.  Did she express fear about her physical safety during
6  the conversation with you? You said Sue?
7  A.  Yes. Sue Charnesky; I believe that's how you
8  pronounce her last name maybe.
9  Q.  Who is Sue?
10  A.  Sue works in the engineering department.
11  Q.  And she came to you, and she said that she feared for
12  her --
13  A.  The way -- I'm sorry.
14  Q.  -- safety?
15  A.  The way Fred was talking to her, the tone that he was
16  using made her extremely uncomfortable.
17  Q.  Did she say that her level of discomfort raised to the
18  level of fear for her physical safety?
19  A.  No.
20  Q.  Have there been any other employees who have ever
21  expressed fears about physical safety from Fred?
22  A.  I don't know if it was a matter of expressing a
23  physical threat from Fred Peivandi, but Anthony Branch
24  and Fred Peivandi and I, along with Randy Dellaposta,
25  were in a room meeting here, and Fred began to refer

Page 100

1  to Anthony Branch and I as not knowing what we were
2  doing and calling us biased, and it got so heated that
3  they -- Fred Peivandi stood up and Anthony Branch
4  stood up, and had it not been, I believe, for Randy
5  trying to get them to cool off, I actually could see
6  that turning into a physical fight. When I looked at
7  their eyes, I got out of the way.
8  Q.  Did Anthony later express that he was in fear of his
9  physical safety during that altercation?
10  A.  Well, Fred probably told him, "I'm not afraid of you."
11  So it got to that point, and so Anthony felt that that
12  situation could have turned into a fight, from what I
13  witnessed that day; and I believe Randy felt it
14  could've turned into a fight because he stood up to
15  try to intervene. Being the female in the room with
16  the three men, I stepped back.
17        And also I want to share this with you,
18  if I can continue my response to your question --
19  we're still on the same question; am I correct?
20  Q.  We are.
21  A.  So I do recall right here in this room, that Fred,
22  when he told me to shut up and do what he told me to
23  do, when he -- at the end of the meeting, he stood
24  right there. I was afraid that he was going to hit
25  me, and I positioned myself to protect myself as

Page 101

1  though he would. And he gave me -- because he gave me
2  such a look that was so frightful that it made me
3  tremble.
4        I shared that with members of the
5  Board, and to this day, nothing has been done to
6  protect my safety or my fear of being physically
7  harmed at the hands of Fred Peivandi.
8        And so I have noticed that, even with
9  Cloyce Dickerson and Fred Peivandi, Fred would go to a
10  level where you would think them two are about to get
11  physical, too.
12        So those are the things I have
13  witnessed, and to this day, nothing, nothing has been
14  done to correct that type of behavior.
15        So being a woman, going against Fred
16  Peivandi, every day I come to this building to come to
17  work, I fear that possibility and contemplate in my
18  mind, how can I protect myself from a physical attack
19  from Fred when the Board refuses to do that.
20  Q.  To the best of your recollection, or to the basis of
21  your knowledge, I guess I should say, has Fred ever
22  physically assaulted anyone at the GCRC?
23  A.  I don't know.
24  Q.  Have you ever heard that he's assaulted anyone at the
25  GCRC?

Page 102

1 A.  No.

2 Q.  Have you ever heard that he's struck or threatened

3   physically anyone at the GCRC?

4 A.  No.

5 Q.  Has he had any conviction in his past, to the best of

6   your knowledge, as the keeper of HR records?  Does he

7   have a conviction in his past for any use of physical

8   violence against anyone?

9 A.  I don't know.

10 Q.  And to go back to the moment where -- we've got a lot

11   of things to circle to, but with respect to the

12   altercation between Anthony Branch and Fred Peivandi,

13   the question that I asked was, you know, did Anthony

14   Branch fear for his physical safety.  You said that

15   Fred said to Anthony, "I'm not afraid of you."  Did

16   Anthony express fear about Fred?

17 A.  He didn't verbalize that to me.  His actions made me

18   believe that he felt that him and Fred was going to

19   get into a fight.

20 Q.  Did you feel that he was afraid that Fred would strike

21   him?

22 A.  Based on what I seen transpiring in this room, I

23   believe that he could be thinking that, yes.

24 Q.  Okay.  You mentioned that they both stood up and faced

25   each other, and Fred said that he wasn't afraid of

Page 103

1   Anthony.  Did Anthony do anything to threaten Fred?

2 A.  Anthony responded back to Fred, "I'm not afraid of

3   you."

4 Q.  Okay.  So he actually said that he was not afraid of

5   Fred at that point in time?

6 A.  At that particular time, yes.

7 Q.  Did he later say that, in fact, he was afraid of Fred?

8 A.  His actions showed that he was afraid that him and

9   Fred could get into a fight.

10 Q.  So I just want to set a little bit of the stage.  It's

11   you and Randy and Fred and Anthony Branch; is that

12   right?

13 A.  That's correct.

14 Q.  And you're in this room?

15 A.  That is correct.

16 Q.  Okay.  And when was this, approximately?

17 A.  I can't remember the exact date, and I'm trying to

18   think of something that was going on during that time,

19   but I can't think of the time.

20 Q.  Was it this year?

21 A.  It would've been, I'm thinking in 20 -- I'm thinking

22   it may have been before the Covid.

23 Q.  Okay.

24 A.  It may have been before or shortly after, I'm

25   thinking.

Page 104

1 Q.  Sure.  Have you ever seen Fred approach or -- were you

2   ever concerned that Fred was about to be involved in

3   any sort of physical altercation on any other

4   instances during your time with GCRC?

5 A.  With the interaction between him and Cloyce Dickerson,

6   and I do believe that there was a time where there was

7   a large showing of the community here, and Fred got

8   very irate, and at that time, I believe the Board

9   chair intervened with one of the community residents,

10   the Board chair got involved and made sure that didn't

11   escalate.

12 Q.  Did he physically threaten any member of the public

13   during the Board meeting?

14 A.  No.

15 Q.  And you said that the Board chair had intervened, the

16   Board chair at the time, Cloyce Dickerson?

17 A.  That is correct.

18 Q.  And how did Cloyce Dickerson choose to intervene at

19   that particular time?

20 A.  Just told Fred to chill.

21 Q.  What did Fred do in response to that?

22 A.  He got quiet.

23 Q.  You also mentioned that there were instances where you

24   have seen Fred and Cloyce Dickerson approach a

25   physical confrontation; is that right?

Page 105

1 A.  I seen them in a very heated verbal confrontation that

2   I feel could've led to something physical.

3 Q.  So to date, you had fears that perhaps something could

4   escalate into a physical confrontation; you've never

5   seen a physical confrontation between Fred and Cloyce

6   Dickerson?

7 A.  That's correct.

8 Q.  Have you ever seen a physical confrontation between

9   Fred and anybody?

10 A.  No, not even between Fred and myself.

11 Q.  I want to talk about the instance that you testified

12   to a little bit earlier.  I'm going to try to go in

13   order as best I can here, but the instance in which he

14   said that he hated you.

15 A.  Yeah.

16 Q.  You testified that Fred said at one point in time that

17   he hated you.

18 A.  Yeah.

19 Q.  Is that a quote, as best you know?

20 A.  That's correct.

21 Q.  And when did that -- when did he say that?

22 A.  That would've been in 2021 or '20; I'm not for sure.

23 Q.  Do you recall the context in which the comment was

24   made?

25 A.  The comment was not made directly to me, it was made

Page 106

1     to Linda, his secretary.

2 Q.   Were you present at the time it was made to Linda?

3 A.   No.

4 Q.   What did Linda -- who told you that he made that

5     comment to Linda?

6 A.   Linda did; and Randy Dellaposta, when I shared it with

7     him, he was aware of it. I think he got aware of it

8     through his son, who also worked here.

9 Q.   Was Randy Dellaposta present at the time when Fred

10     allegedly said to Linda that he hated you?

11 A.   Not to my knowledge.

12 Q.   Was Randy's son present at the time?

13 A.   Not to my knowledge; I don't know.

14 Q.   Do you know if anyone other than Linda and Fred were

15     in the room at that particular time?

16 A.   I don't know.

17 Q.   Do you know anything else about the context in which

18     you claim that he hated you?

19 A.   No.

20 Q.   Okay. What were the circumstances upon which he made

21     that comment?

22 A.   It was around his birthday, and Linda had gotten a

23     birthday card that she was circulating to the

24     employees here at GCRC to sign his card, and when he

25     seen the name Donna on it, he thought it was me, and

Page 107

1     so he took the card and he threw it in the trash; and

2     Linda said she asked him, "Why would you throw that

3     card in the trash can? My husband and I, we took our

4     time to get you that card." And he said because he

5     thought that the person who signed it was me, and he

6     said "I hate her."

7 Q.   And I apologize, I may have already asked this, and if

8     I did, I apologize. Linda told this to you?

9 A.   Yes, in my office.

10 Q.   Did Linda file any sort of report or claim or charge

11     or complaint on the basis of this activity?

12 A.   She's filed a complaint initially against Fred

13     Peivandi.

14 Q.   In connection with this event?

15 A.   I don't know if it was connected. I think it was part

16     of it.

17 Q.   Was that subsequent to or before --

18 A.   That was after he said what he said; and she filed

19     that complaint because she had a concern about the

20     amount of time that Vicki Bechakes was staying in

21     Fred's office; she was irritated about that.

22     At that particular point in time, it

23     became public to a point that Fred Peivandi and Vicki

24     Bechakes were in a relationship. So she was beginning

25     to see Vicki in Fred's office more than often, and

Page 108

1     that really posed a problem for her, especially when

2     they would chose the door.

3 Q.   What exactly did Linda tell you in connection with

4     this event?

5 A.   Well, she told me she wanted to file a complaint. I

6     can't remember the extent of the complaint. I

7     received the complaint. I was in the process of

8     beginning to investigate the complaint.

9     I believe on the next day or a couple

10     days later, she came in, and she wanted to rescind her

11     complaint. She said she had talked with her pastor,

12     and she had a change of mind of filing her complaint

13     against Fred Peivandi.

14 Q.   She said that she had a change of mind after

15     consulting with her pastor. Did she explain any

16     further about what --

17 A.   No.

18 Q.   -- prompted that change of mind?

19 A.   No.

20 Q.   So she wanted to withdraw the complaint at that

21     particular period of time?

22 A.   That is correct.

23 Q.   Was that subsequent to or before you sent the e-mail

24     to the Board of Commissioners regarding the

25     relationship between Fred and Vicki Bechakes?

Page 109

1 A.   That was -- that was before I sent the e-mail, I want

2     to say, to the Board.

3 Q.   Got it.

4 A.   And I'm not 100 percent sure.

5 Q.   Now, Linda comes to you, filed a complaint about the

6     amount of time that Vicki is spending in Fred's

7     office. Did she explain why that concerned her

8     specifically?

9 A.   She felt it was inappropriate. She was upset about

10     the fact that they were having what she perceived to

11     be an inappropriate relationship. She felt it was

12     interfering with her job. She felt that Fred was

13     giving Vicki work assignments that was typically her

14     work assignments that she should've been given.

15 Q.   What is Vicki's position within the organization?

16     Vicki Bechakes, I'm referring to.

17 A.   Vicki Bechakes, during the year in which Fred served

18     as the director of engineering, she was his executive

19     administrative assistant. When Fred became the

20     managing director, Vicki remained the executive

21     administrative assistant to the now current

22     engineering director, and she has since retired.

23 Q.   Okay. And the current engineering director was --

24     well, I should ask, before Vicki Bechakes retired, who

25     was the engineering director subsequent to Fred?

Page 110

1  A.  Eric Johnston.
2  Q.  Was it Eric Johnston continuously?  So it was Fred and
3     then it was Eric immediately after that?
4  A.  That is correct.
5  Q.  Okay.  And Vicki Bechakes was, at all times, assigned
6     in the engineering department; is that right?
7  A.  I don't think throughout her career.  I believe at one
8     time she was assigned working in the finance
9     department, I believe; and I don't know of any other
10    department she may have worked in without looking at
11    the records.
12 Q.  Got it.  Now, with respect to Linda's complaint that
13    she felt that Fred was giving her work assignments
14    that should've been going to Linda -- I mean Vicki was
15    given work assignments that were going to Linda, was
16    Vicki Fred's direct report?
17 A.  Vicki would be Fred's -- Fred was not Vicky's direct
18    report.
19    I'm sorry.  I phrased that incorrectly.  You're
20    exactly right.  I'm sorry.  So was Fred Vicki's direct
21    supervisor?
22 A.  At some point in time, yes.
23 Q.  Okay.  At the time he was managing director?
24 A.  In the initial stage of him being the managing
25    director, she was, until Eric Johnston became the

Page 111

1     director of engineering.
2  Q.  And when did Linda file this complaint or file the
3     complaint that was later rescinded?  I'm not trying to
4     trick you up there.
5  A.  I can't know the exact date without looking at the
6     document.
7  Q.  Was that after or before Eric Johnston was hired as
8     the director of engineering position?
9  A.  That would've been after.
10 Q.  So at the time Linda made the complaint, was Fred
11    Vicky's direct supervisor?
12 A.  No.
13 Q.  I'm certain I already asked you this, but I promise I
14    just don't remember.  When was this, best you're able
15    to tell, when Linda filed that complaint?
16 A.  I wasn't able to tell you when Linda filed that
17    complaint.  I can tell you if I look at the documents.
18 Q.  Understandable.  Did Linda sign anything or put
19    anything into writing regarding this incidence?
20 A.  She did.  That was part of her complaint.
21 Q.  There was a written complaint --
22 A.  That is correct.
23 Q.  -- that was the source of that.  Okay.
24    What action did you take, if any,
25    subsequent to Linda's decision to rescind that

Page 112

1     complaint?
2  A.  There was no action for me to take, because I hadn't
3     had an opportunity to begin the investigation process.
4  Q.  So we got to the place of discussing the instance
5     where Linda filed her complaint against Fred in the
6     context of discussing Linda telling you about the
7     incident with the birthday card.
8        Did Linda tell you anything else about
9     the birthday card incident during that conversation?
10 A.  I can't recall.
11 Q.  Did Linda ever, at any other time, reiterate her story
12    to you about the birthday card incident or about Fred
13    saying he hated you?
14 A.  After that particular day in question?
15 Q.  Yes.
16 A.  No.
17 Q.  So there was one conversation you had with Linda about
18    that; is that right?
19 A.  That is correct.  I've had numerous conversations with
20    Linda about her saying that she don't understand why
21    Fred treats her the way he treats me.  It wasn't in
22    depth.  It was just, "I don't know why Fred treats you
23    the way he treats you."  It was really a concern that
24    she had at that time.
25 Q.  And with respect to Linda coming to you to tell you

Page 113

1     that Fred had said he hated you in the context of the
2     birthday card situation, did she tell you anything
3     else at that time?
4  A.  I can't recall.
5  Q.  So her purpose was just to come and relay the story to
6     you?
7        MS. GAFKAY:  Object; lack of
8     foundation.
9  Q.  (BY MR. CASCINI)  Did she express any other purpose in
10    the conversation other than wishing to tell you about
11    the birthday card incident?
12 A.  I can't recall.
13 Q.  Did you discuss anything else that day for any other
14    reason with her?
15 A.  I can't recall.
16 Q.  Okay.  Did she ask you to do anything about it?
17 A.  I can't recall.
18 Q.  Did she tell you why she was bringing it forward to
19    you?
20 A.  Yes.
21 Q.  Why was that?  What did she tell you?
22 A.  She felt that what he was doing, having a relationship
23    with Linda, was inappropriate.  She did not have an
24    appreciation, again, as I said earlier, about Fred
25    giving Lin -- Vicki -- let me rephrase that.  I don't

Page 114

1  know if --
2  Q.  I got --
3  A.  I think I said Linda.  I want to strike that.  I want
4      to say she was concerned about Fred having a
5      relationship with Vicki Bechakes.
6  Q.  Got it, okay.
7  A.  Okay.  And then she was, again, as I said earlier, she
8      was concerned about Fred giving some of her work
9      assignments, what she felt she should be doing, to
10     Vicki.
11 Q.  Did she tell you any particular work assignments that
12     Fred had given to Vicki?
13 A.  No.
14 Q.  So I'm not trying to be obtuse here, but was the
15     conversation about the birthday incident made at the
16     same time that she came to complain about Vicki
17     Bechakes?  I apologize.  I'm misunderstanding.  Was
18     that the same instance or were they two separate
19     instances?
20 A.  I believe it was the same instance.
21 Q.  Okay, got it.  Other than the subject of Linda making
22     her complaint about the relationship between Fred and
23     Vicki and telling you that Fred had said that he hated
24     you, in the context of the birthday card incident, did
25     you discuss anything else with Linda on that day?

Page 115

1  A.  I can't recall.
2  Q.  Did Linda want information about the birthday card
3      incident included in her written complaint about the
4      situation with Vicki?
5  A.  No.
6  Q.  Was anyone else present during the time when Linda
7      made this report to you, either about the birthday
8      card incident or this situation with Vicki?
9  A.  No.
10 Q.  Are you aware of any other time that Fred said he
11     hated you?
12 A.  Not necessary -- yes, I am.  I am aware that Tom
13     Derderian told me that Fred hated me; he wanted me to
14     be careful.
15 Q.  Now, I will say, Tom Derderian was at one point in
16     time the labor attorney for GCRC; correct?
17 A.  That is correct.
18 Q.  So I'm just going to ask you to -- I'm not saying that
19     the testimony you're about to give would, but I'm
20     obviously going to ask you, please don't provide any
21     privileged information that was provided to you in the
22     context of attorney advice when Tom Derderian was the
23     labor attorney.  I'm just saying that as a generic
24     disclaimer; however, I'm sorry, continue with your
25     testimony.

Page 116

1  A.  Well, if I'm not able to say that, I don't know if I
2      can give you the whole truth about other information I
3      have about Fred having a hatred toward me.
4  Q.  Okay.  I completely understand.
5          MR. CASCINI:  Can we go off the record
6      for a moment and maybe discuss this?
7          MS. GAFKAY:  Yeah.
8          MR. CASCINI:  Go Off the record.
9          (Discussion off record.)
10 Q.  (BY MR. CASCINI)  So, Donna, as we left, you know, we
11     had a brief discussion about, you know, please, at no
12     point during your testimony today, please don't
13     include any information that was a privileged
14     conversation between you and either Tom or me or
15     certainly with your attorneys as well.
16         But given that, the question that I
17     asked you was, were there any other instances where
18     Fred said that he hated you?
19 A.  Tom Derderian told me that Fred hated me, he wanted me
20     fired, he felt that Fred was obsessed with me, and he
21     said that all the time that Anthony Branch and I and
22     Cloyce Dickerson had been trying to express our
23     concerns about Fred Peivandi being a racist, being
24     biased, that he, for the first time, said that, based
25     on what Fred had said about me that was so horrific

Page 117

1      that he couldn't even repeat it back to me, that he
2      was beginning to believe that Fred was a racist, and
3      he was concerned because he wanted me to be careful of
4      Fred.
5  Q.  Okay.  In the context of the communication -- so let
6      me back all the way up.
7          During this conversation, did Tom
8      Derderian, former labor attorney for the Road
9      Commission, tell you that Fred had told him that he
10     hated you?
11 A.  Tom Derderian told me that Fred hated me.  Now, how he
12     derived at that, I can't tell you that.
13 Q.  We don't know that?
14 A.  Don't know.
15 Q.  So he's expressing his opinion about Fred's state of
16     mind with respect to you?
17 A.  That's correct.
18 Q.  He's not relaying a message, as Linda was, that Fred
19     said he hated you?
20 A.  He didn't say to me that Fred had hated me; he said
21     Fred hates me.
22 Q.  Do you know any more about the context in which Tom
23     came to learn this information?
24 A.  No.
25 Q.  Tom mentioned -- or you testified that Tom had said

Page 118

1  that he had attempted to warn the Board of
2  Commissioners about Fred in some capacity and that was
3  what the source of this information was?
4  A.  I didn't say that.
5  Q.  Okay, I apologize.  I don't want to misstate your
6  testimony at any point during this deposition.
7      What I am asking, however, is, what's
8  the context of Tom having this conversation and
9  bringing this information to you?
10 A.  I don't know.
11 Q.  All right.  During this conversation, Tom told you
12 that Fred wanted you fired, I believe you testified;
13 is that right?
14 A.  That is correct.
15 Q.  And do you know how Tom came to know that Fred,
16 quote-unquote, wanted you fired?
17 A.  He gave me the impression that that's what Fred was
18 sharing with him, that he wanted me fired.  He said
19 that Fred is forever calling him about anything that
20 he felt that I may have done inappropriately or,
21 according to Fred, and wanted to know if he could fire
22 me on those issues.  This was a ongoing situation up
23 until Tom recently retired; I believe it was the early
24 part of this year.  So that was an ongoing thing.
25 Q.  Do you know the context of the conversations in which

Page 119

1  Fred communicated that to him?
2  A.  No.
3  Q.  Do you know whether any of those were intended to seek
4  legal advice regarding your termination?
5  A.  I have no idea.
6  Q.  Do you have any reason to suspect that they may be
7  privileged?
8  A.  I have no idea.
9  Q.  Had you ever heard of any other instances where Fred
10 had said he hated you?
11 A.  I can't recall.
12 Q.  Have you ever heard of any other instances where Fred
13 reported that he hated anybody else?
14 A.  I can't recall.
15 Q.  Have you ever said that you hated anyone?
16 A.  No.
17 Q.  Ever in your life prior?
18     MS. GAFKAY:  Object to the form.
19 That's an overly broad.
20 Q.  (BY MR. CASCINI)  Have you ever at any point in time
21 told anyone that you hated anyone?
22     MS. GAFKAY:  Object to the form.
23 Q.  (BY MR. CASCINI)  You can answer the question.
24 A.  Yes; I've told many people all the time I hate satan.
25 Q.  Fair enough.  Anyone in the physical realm, any

Page 120

1  individual person?
2  A.  No.
3  Q.  Has anyone ever reported to you other instances where
4  Fred said that he hated other employees at the Road
5  Commission?
6  A.  No.
7      THE WITNESS:  Before you ask the next
8  question, can we take a break.
9      MR. CASCINI:  This is actually an
10 excellent time.
11     (Recess taken.)
12     MR. CASCINI:  Let's go back on the
13 record.
14 Q.  (BY MR. CASCINI)  The next thing that I want to talk
15 with you about, Donna, is the comment that you made
16 awhile ago that your relationship with Fred Peivandi
17 was in many ways challenging.  That was the term you
18 used.  Now, we've heard a lot of testimony about very
19 many instances that you found challenging about
20 working with Fred.
21     In what other ways has your
22 relationship with Fred Peivandi been challenging?
23 A.  Whenever Fred could not or did not understand our
24 processes and he wanted to circumvent the processes,
25 he would become very challenging because, versus doing

Page 121

1  it right, he felt that because he was the managing
2  director, he could override doing what's right, even
3  though it's the law, that would become very
4  challenging; and through that challenge and Fred's
5  views of me as an African-American woman and the views
6  that he had of, I feel, other African-Americans, posed
7  a significant challenge, because every time I tried to
8  stand on the side of right as related to issues
9  concerning blacks and whites, it would become
10 challenging because I would be accused of being biased
11 if I took disciplinary action against a white person
12 -- I mean a black -- if I didn't -- if I took
13 disciplinary action against a white employee and
14 didn't take disciplinary action against a black
15 employee, then I'm perceived to be biased.
16     And so what that did for me in that
17 challenge, it has led to, one, me being discriminated
18 against as an African-American woman.  It has
19 subjected me to retaliation.  It's subjected me to
20 harassment, and it has subjected me to differential
21 treatment, and it has subjected me to having my
22 speech deprived from being able to exercise my
23 personal rights.
24     Also that challenge that I have been in
25 with Fred, it has led to some serious health issues

Page 122

1  with me, and it has led to some serious mental and
2  emotional trauma that I currently experience.
3        And in addition to those challenges, it
4  makes me feel like I'm walking on eggs here.  So that
5  challenge has served, in my opinion, and because of
6  his racial biases, I've been subjected to
7  discrimination.
8  Q.   And you brought up a couple different things in that
9  answer.  You brought up concerns about race-related
10 discrimination.  You brought up concerns about
11 retaliation.  I heard concerns about First Amendment
12 retaliation.  Those are coextensive with the concerns
13 that you raised in the lawsuit; correct?
14 A.   That is correct.
15 Q.   What I want to ask you about specifically, I'm trying
16 to learn more about the challenges, is there anything
17 that you haven't specifically pled in your lawsuit
18 that you feel to be a challenge beyond those things?
19      MS. GAFKAY:  Object to the form.
20      THE WITNESS:  My response to the
21 question you just asked me, before those things became
22 a part of a lawsuit, those challenges that I was
23 feeling and discrimination that I was feeling, the
24 retaliation that I was feeling, the harassment that I
25 felt I was being subjected to, the being treated

Page 123

1  different than some of my colleagues I was subjected
2  to, those are things that were shared with the Board
3  way before they became subject to a lawsuit.
4        The ADA accommodation battle that I had
5  with Fred about even getting a HR administrative
6  assistant, those challenges, if you will, were
7  discussed with the Board prior to any contemplating
8  filing a lawsuit.
9        So the challenge that I had was already
10 expressed, and from those challenges and not given a
11 corrective action for it led to an EEOC complaint, led
12 to me filing FMLA.
13       So these things are in place as it
14 relates to the challenges that I was going through,
15 what I feel to be Fred's inability to console and
16 properly manage his racial biases, not just against me
17 but other African-American employees that work for
18 GCRC, including females.
19 Q.   I apologize if my question was unartful.  What I was
20 asking, though, is, regardless of when you raised
21 concerns or regardless of when you first identified
22 concerns, regardless of when you first felt concerns,
23 the concerns that you're discussing now, have those
24 been distilled down into the Complaint that you filed
25 or are there concerns that you have that never made it

Page 124

1  into your Complaint that you filed?
2        MS. GAFKAY:  Object to the form.
3        THE WITNESS:  Without me reading my
4  lawsuit --
5  Q.   (BY MR. CASCINI)  Okay.
6  A.   -- I can't tell you whether it's all in there or not,
7  because I just don't remember.
8  Q.   And you have prior read your Complaint; right?
9  A.   That is correct.
10 Q.   But what you're saying is, you can't do it without
11 consulting it and having it in front of you; right?
12 A.   That is correct.
13 Q.   Okay, fair enough.  We can break down, and what I want
14 to talk about next is, I want to talk about the vision
15 accommodation that you requested from the GCRC.
16       You have pled in your Complaint that
17 you have a vision-related disability; is that right?
18 A.   That is correct.
19 Q.   Did you inform the GCRC of that at some point
20 proximate to your hire?
21 A.   When I met with John Daly -- let me -- let me go back.
22       When I was interviewed, I let it be
23 known that I had a disability.
24 Q.   So you notified them both before and after?
25 A.   That is correct.

Page 125

1  Q.   Understandable.  My understanding is -- well, were you
2  ever offered a vision-related accommodation by the
3  GCRC, one or more?
4  A.   In 2016 when I first started, the first day that I met
5  with John Daly, on my first day here, I talked with
6  John Daly about my accommodation needs.  One of the
7  things we talked about was my parking needed to be
8  closer to the door.  We talked about my lighting
9  needed to be adjusted.  We talked about my computer
10 screen needed to be enlarged.  We talked about my need
11 for an assistant; and I believe that was the gist of
12 the conversation.  Now, that may not be all-inclusive,
13 but that's what comes to my memory today.
14 Q.   And as of 2016, were you granted some or all of those
15 accommodations?
16 A.   In 2016, shortly after October, John Daly had Randy
17 Dellaposta put a sign up for me to park right --
18 almost at the door.
19 Q.   Okay.
20 A.   My lights were adjusted.  My computer screen was
21 adjusted; and at that time, the HR administrative
22 assistant was not legally made to me.  I did not have
23 an administrative assistant immediately.
24       So at that particular point in time,
25 the conversation that I had with Daly was that,

Page 126

1    because of the time of the year and we were in a
2    budget, we were going to put in for a part-time
3    administrative assistant at that time.
4   Q.   And this is in 2016, you said?
5   A.   That would have been the latter part of 2016. It
6    would've been the latter part of 2016 or sometime
7    early part of 2017, somewhere around there.
8   Q.   And when you first expressed the need for an
9    administrative assistant, was that done in the context
10    of operational need for your department or was that
11    done as an accommodation for your disability?
12   A.   It was both.
13   Q.   And do you remember how you first expressed the need
14    for administrative assistant?
15   A.   If I remember right, I believe John Daly and I
16    discussed that, one, I needed an administrative
17    assistant to help me with my computer work.
18   Q.   Sure.
19   A.   Because everything around here is on white paper, I
20    needed somebody to help me with the reading, and also
21    to do the research and to read and screen out my
22    e-mail.
23      And then I also told him that I thought
24    that it would be beneficial, because that particular
25    person could also help with some of the other needs

Page 127

1    that we had within the HR Department, so that Cherry
2    Grant, who was the benefits coordinator, and Rachel
3    Mullen, who was the HR coordinator, that they could be
4    able to utilize some of her services, too.
5   Q.   When you say that you brought up both the
6    accommodation component of that position and the
7    departmental need component of that position, which
8    would you say was your primary concern between those
9    two in asking for an administrative assistant?
10   A.   Well, naturally, my accommodation for my disability.
11      MR. CASCINI: I'm going to show you a
12    document, and we are going to mark it as Exhibit 5.
13      (Document marked Deposition
14      Exhibit No. 5.)
15   Q.   (BY MR. CASCINI) I'm showing you a document that
16    we've marked here as Exhibit No. 5. You'll find it at
17    Bates No. Defendants RPD Response 7, document 49 is
18    the first page of this document. It says Human
19    Resources Administrative Assistant Need Analysis.
20      Ms. Poplar, do you recognize this
21    document?
22   A.   Yes.
23   Q.   And if you go to the third page, is that your
24    signature on this document?
25   A.   It is.

Page 128

1   Q.   Did you mention your need for accommodation, this
2    document is about two pages and a little bit of an
3    overhang there, did you mention your need for an
4    administrative assistant to provide visual need
5    related accommodations for you in this document?
6   A.   In this particular document, I did not mention it,
7    because at the time when John Mandelaris, who was the
8    chairperson at the time, what he wanted me to show was
9    the need of an administrative assistant as it related
10    to HR functions, not for the need of the
11    administrative assistant as it related to my
12    disability, which had already been established.
13   Q.   So there is prior documentation in which you submitted
14    a request for an administrative assistant to be made
15    because of your disability that predates this?
16   A.   I was not required to submit any at this particular
17    time, documents relative to my administrative
18    disability needs for an administrative assistant
19    because it was not asked of me.
20      Then there was verbal conversations
21    with John Daly and I as it related to the
22    administrative assistant for my disability needs, and
23    he didn't want to put that, and I didn't, in a public
24    document because of HIPAA, and I didn't want everyone
25    at that particular time to know the extent of what I

Page 129

1    was dealing with my physical disability. People like
2    me have a lot of pride, and we don't want to really
3    get out and publicize the nature or the extent of our
4    disability.
5      So that particular need for my
6    disability had already been discussed and agreed to
7    between John Daly and I; and I was not requested by
8    the Board in that particular setting to provide that
9    in writing as a need analysis; but I was requested by
10    John Mandelaris and the Board to put a need assessment
11    in as it related to the HR function, and that's what
12    you have here.
13   Q.   So did John Mandelaris ask you to exclude information
14    about your need to have the disability-related
15    accommodation performed by this person, too?
16   A.   He would not have a need to ask me that because that
17    had already been confirmed with John Daly, that I had
18    the disability need for an assistant. That was
19    already settled with John Daly and I, and John
20    Mandelaris didn't intervene, nor did any member of the
21    Board at that time.
22   Q.   So John Mandelaris didn't tell you, "exclude that
23    information"; he said, "give me an assessment based on
24    the operational needs of the HR Department"?
25   A.   I don't know how he worded it, but my understanding

Page 130

1  was, what I was supposed to do was provide a need for
2  the assistant, because John Mandelaris, I believe, is
3  the go-to around this time. He specifically asked me
4  a question of what were some of the other things that
5  the HR administrative assistant would be doing, and
6  that's when I highlighted the things that I would have
7  that person to do as it related to HR function; and
8  from that, he said he wanted me to put a need analysis
9  in writing based on that, and that was my
10  understanding, and I did.
11          (Document marked Deposition
12          Exhibit No. 6.)
13      MR. CASCINI: The next document is
14  marked Exhibit No. 6. It is Defendants RPD Response
15  7, item number 48 in Bates number.
16  Q.  (BY MR. CASCINI) Ms. Poplar, do you recognize this
17  document?
18  A.  Yes.
19  Q.  And, in fact, you're listed as one of the authors of
20  this document; is that right?
21  A.  That's right.
22  Q.  Is the need for an administrative assistant in the HR
23  Department to serve functions as to assist with your
24  visual disability. Is that listed anywhere in this
25  document?

Page 131

1  A.  No.
2  Q.  Okay.
3  A.  And it would not be listed in this document. And at
4  some point, you may have to help me read. It would
5  not be listed in this document because the decision
6  for me to have a HR administrative assistant was
7  determined by John Daly in 2016. Am I --
8      MS. GAFKAY: No, no, no. Based on what
9  you're saying, it sounds like you haven't even read
10  the document.
11      MR. CASCINI: Yes. I --
12      MS. GAFKAY: Hold on, hold on. He's
13  asking you a question about a document.
14      THE WITNESS: Okay.
15      MS. GAFKAY: So it is important that
16  you read the document before you answer the question.
17  So I think because she has difficulty
18  reading, I think she was just answering it from memory
19  versus reading the document and answering your
20  question relative to what the document says.
21      MR. CASCINI: Yes. And I certainly
22  don't want you to do that, Donna. So if you could,
23  take your time, that will be fine.
24      MS. LEE: Should we read it for you?
25      THE WITNESS: Clarification. Your

Page 132

1  question that I thought I heard, are you asking me did
2  I see anything in here that's relative to my visual
3  disability?
4      MR. CASCINI: That's correct, yes.
5      MS. GAFKAY: But you need to read the
6  document in order to answer the question, unless you
7  know the document by heart.
8      THE WITNESS: I don't know it by heart,
9  but I know that that information wasn't in here.
10      MS. GAFKAY: Well, did you already read
11  it and you know that?
12      THE WITNESS: Um-hum, when I was
13  sitting here reading it.
14      MS. GAFKAY: Okay. If you had an
15  opportunity to read the document, then he can go on;
16  but if you -- I don't know that you've read the
17  document before you answered the question. Did you?
18      THE WITNESS: (No response.)
19  Q.  (BY MR. CASCINI) You've already testified that it
20  wouldn't be in that document, also.
21      MS. GAFKAY: I mean, you're asking her
22  about what a document says, Andrew. So I just want to
23  give her the opportunity to read it. She obviously
24  has not read it. I'm going to ask that she read the
25  document, and then you can ask the question again.

Page 133

1      MS. LEE: And if you need assistance,
2  it's very --
3      MR. CASCINI: That's true. And if you
4  ever do want me to read anything, especially in the
5  record, I promise, I will do it.
6      MS. LEE: I think that we should
7  because the print is so small, particularly when she
8  has a document that's five times this size.
9      MR. CASCINI: Got it.
10  Q.  (BY MR. CASCINI) So it is to the Board of Road
11  Commissioners, Genesee County, from John Daly, Donna
12  Poplar, Coetta Adams. I'm not reading every word of
13  that, but the synopsis, I will read every word of,
14  which says, "The Director of Human Resource and
15  Administrative Services is in need of a part-time
16  Administrative Assistant to perform a variety of
17  administrative and clerical tasks. Duties include but
18  not limit to providing support to the Director in
19  assisting of daily office needs and managing general
20  administrative activities in order to ensure the
21  efficiency and smooth day-to-day operation of Human
22  Resource Department. There is $20,000 in contractual
23  services" -- there an account number provided -- "and
24  $15,000 from Finance - Labor to cover the salary for
25  this position."

Page 134

1 "Recommendation: That the Board
2 approve the following budget transfer:" And both
3 involve increases of those amounts previously cited.
4 Does this describe in any way your need
5 for an administrative assistant to provide a visual
6 accommodation for your disability?
7 **A.** It does not, and it was deliberately kept out.
8 **Q.** Now, was John Daly ever able to establish an
9 administrative assistant position within HR during his
10 tenure?
11 **A.** No.
12 **Q.** Do you know why?
13 **A.** Because there was pushback from members of the Board
14 at that particular time who felt that we did not need
15 an administrative assistant in the HR Department.
16 They also felt that the staff that was in there could
17 assist me at that time.
18 **Q.** Understandable. Did John Daly reiterate to them, hey,
19 in addition to the reasons that we've listed here, we
20 also have an employee that needs a visually-related
21 accommodation?
22 **A.** He did that with individual board members, yes.
23 **Q.** Did that change the Board members' opinion with regard
24 to the need for the administrative assistant position?
25 **A.** It did.

Page 135

1 **Q.** Okay. And in John Daly's tenure, was the
2 administrative assistant position created?
3 **A.** No.
4 **Q.** Do you know why that is?
5 **A.** The Board chair at that particular time was Shirley
6 Kautman-Jones, and she was still pushing back on me
7 having an administrative assistant.
8 Shortly after that, John Daly retired
9 on or around April of 2018. So it would be visited
10 after John Daly had retired.
11 **Q.** And how was it revisited?
12 **A.** It was revisited because at that particular time, I
13 kept pushing, and the question -- for the
14 administrative assistant for my visual disability. It
15 was at that time that I kept getting denied.
16 So from there, based on Tom Derderian,
17 I was -- I sent a letter to Fred Peivandi, and in
18 response to that letter, it was -- I put it in writing
19 to Fred Peivandi, and I was instructed to come up with
20 documents that would show that I had a need for an
21 assistant and that I had a disability.
22 Once I provided that information, Tom
23 Derderian then wrote a letter to the full Board
24 stating that, based on my medical condition, he had
25 concluded that I met the requirements for ADA

Page 136

1 accommodation.
2 **Q.** Was that a legal opinion issued to the Board?
3 **A.** I would assume it was in the capacity of their Board
4 attorney, yes.
5 **Q.** So I would repeat my instruction. To the extent that
6 you are aware -- you are currently the Human Resource
7 director. To the extent that you're aware of legal
8 opinions with Tom Derderian has shared with the GCRC,
9 I would ask that you exclude those communications from
10 the scope of responses to any question I have. You
11 need to preserve that privilege.
12 So within the scope of that, let's go
13 back to the question that I asked you, you said you
14 raised the concern again in a letter to Fred; right?
15 **A.** That is correct.
16 MS. GAFKAY: I don't mean to interrupt,
17 but I just want a clarification. Can we go off the
18 record?
19 MR. CASCINI: Let's go off the record,
20 please.
21 (Discussion off record.)
22 MR. CASCINI: Back on the record.
23 So off the record, we've had a
24 conversation, legal counsel for Plaintiff and
25 Defendants, had a conversation about maintaining the

Page 137

1 nature of the privilege.
2 So I'd like to repeat a general
3 instruction that I have for any question that I ask
4 today but with this question and specificity, which
5 is, excluding any documents that are privileged or
6 that may be privileged because they contain legal
7 advice, I'm going to ask you a question, so with your
8 testimony, I want your answer to exclude that stuff.
9 So I'm asking you just about
10 nonprivileged communication, documents which you know
11 to not be privileged or communications that you know
12 to not be privileged.
13 **Q.** (BY MR. CASCINI) You mentioned that you distilled
14 your request for visual accommodation into writing to
15 Fred; right?
16 **A.** That's correct.
17 **Q.** Do you know approximately when that occurred? Was it
18 after he was managing director? Perhaps you can have
19 that as a point --
20 **A.** That is correct.
21 **Q.** So it was after he was managing director.
22 (Document marked Deposition
23 Exhibit No. 7.)
24 MR. CASCINI: We have a document here
25 that I'm going to mark as Exhibit No. 7.

Page 138

Q.   (BY MR. CASCINI)  This is an e-mail that purports to
be sent from you, Donna, on Monday, August 27, 2018 to
Fred Peivandi, the subject line is HR Assistant and
Disability Concerns.

It begins, and I will not read the
entire document, August 27, 2018.  Good morning Fred:
I made many attempts to get approved for HR Assistance
for many relevant HR operations and to aid in my
visual disability accommodations.  During my initial
interview and at the point of hire, I disclosed the
nature of my disability.

Based on your recollection, is this the
document that your prior testimony was referring to?
A.   I need you to give me more background on what you're
talking about.
Q.   You testified that you eventually distilled your
request in writing to Fred in the form of a letter,
you said.  I'm asking you if this is that document
that you were testifying about?
A.   To my knowledge, yes.
Q.   Okay.  When you presented this to Fred, what was
Fred's response?  Did Fred ask to meet with you about
this letter?
A.   I can't recall if he asked to meet with me about this
letter.  I do recall that I went to Fred's office on

Page 139

or around this time, I believe it was, and I could be
a little off on that, but I do recall having
conversations with Fred again about my need for visual
aid, visual assistance.

I do recall Fred saying to me that --
and I don't know if it's this particular time, but he
talked about why should I hire a HR administrative
assistant to assist you with my disability when we can
hire someone who didn't have it.

Now, I want to make it very clear, that
conversation could've took place on or around this
time or after.
Q.   That's fine.
A.   But that's what I remember.
Q.   But that was a prior conversation you had with Fred
Peivandi.  Where it happened in relation to this
letter, we don't know --
A.   That's correct.
Q.   -- but you had that conversation with Fred Peivandi?
A.   That is correct.
Q.   Now, with respect to that conversation, who was
present during that conversation?
A.   With Fred and I?
Q.   (Nodding head affirmatively).
A.   It was just Fred and I.

Page 140

Q.   And he -- I want to make sure I understand his
comment.  He's asking why should you hire an HR admin
assistant to accommodate your disability?
A.   He asked me why should he, because I don't need to
hire an HR administrative assistant to accommodate me
with my disability when he could hire someone who did
not have a disability.
Q.   When he could hire a HR director --
A.   HR --
Q.   -- who didn't have a disability?
A.   That is correct.
Q.   Approximately when did this conversation occur?
A.   I can't remember.
Q.   You mentioned it was only you and Fred who were in
attendance at this meeting?
A.   That is correct.
Q.   Was there another instance that you can recall where
you had a meeting with Fred Peivandi and Anthony
Branch to discuss the need for a HR administrative
assistant?
A.   I don't know if there was an actual meeting, but I do
remember having a conversation, and I don't know if it
was predicated about it, because the reason I say
that, there's numerous times that I've had
conversations with Fred about my need for an

Page 141

administrative assistant.
Q.   Okay.
A.   Numerous times.  So I can't pinpoint the individual
time.
Q.   Okay.  Do you remember that there was at least one
conversation where you were present with Anthony
Branch and Fred Peivandi to discuss the need for an HR
administrative assistant?
A.   I can't recall.
Q.   Was there eventually a HR administrative assistant
approved by the Board?
A.   About somewhere -- somewhere in 2019.
Q.   Do you remember approximately when in 2019?
A.   I believe it might have been around, let's say, March
of 2019 -- well, let's just say I believe that's when
the HR -- part-time HR administrative assistant was
hired, around March of 2019.
(Document marked Deposition
Exhibit No. 8.)
MR. CASCINI:  We've marked this exhibit
as No. 8.  It is marked with Bates numbers Defendants
RPD Response 7, 54, 55 and 56.
Q.   (BY MR. CASCINI)  The first page of this document,
Donna, is a -- it looks like a memorandum.  It says
Fiscal Year 2018-2019 Budget Transfer.

Page 142

1    Are you familiar with this document?
2  A.   The document looks familiar. The context I would need
3       you to read it.
4  Q.   Sure. It starts with, "The Human Resources Director
5       is in need of Part-Time Administrative Assistance for
6       20 hours a week at an hourly rate of $25.00 per hour,
7       to perform a variety of administrative and
8       confidential clerical tasks."
9            At this point in time, December 4th,
10      2018, at the time this was made, had the Board
11      approved for the creation of this position yet?
12 A.   I can't recall.
13 Q.   And then I'm going to move on to the second page, and
14      I'm not trying to mislead you. These three documents,
15      I don't believe they're related to each other, as they
16      were part of a packet, but they are all related to the
17      same subject.
18           The next page, Bates No. 55 --
19 A.   Am I looking at the same document?
20 Q.   I believe so, yes.
21           MS. GAFKAY: Page two, yes.
22           THE WITNESS: Okay.
23 Q.   (BY MR. CASCINI) It says Genesee County Road
24      Commission Request for Budget Transfer to transfer
25      funds for hiring -- cover hiring of part-time

Page 143

1       Administrative Assistant in Human Resources
2       Department.
3            I see that it says approved by Fred
4       Peivandi on November 28, 2018; is that right?
5  A.   That's what the date says, yes.
6  Q.   And it says here requested by Donna Poplar on ll/19/18;
7       is that right?
8  A.   That's right.
9  Q.   And if you move on to the third page, this is a series
10      of two e-mails. This is Bates No. 56. The top one is
11      from Fred Peivandi to Donna Poplar on December 6,
12      2018. The bottom one is from you to Fred on December
13      6, 2018.
14           I'm looking at the bottom document
15      first. It says, "Good morning Fred. Just a follow-up
16      to our conversation on yesterday, you instructed me to
17      move forward with the posting of a part-time position
18      for a HR clerk. This posting will go out for this
19      Sunday and will be posted for 2-Weeks. You also said
20      you did not want to pay this person $26 an hour for
21      1040 hours a equivalent of $25 an hour. Please
22      provide me the salary amount you want this position to
23      be paid."
24           At that point in time, the first line
25      says you instructed me to move forward with the

Page 144

1       posting of the part time position. Safe to assume
2       that prior to this that the Board and Fred had both
3       approved the creation of this position?
4  A.   Yes.
5  Q.   Then it says on the top, he doesn't contradict you, he
6       doesn't say no, don't make that position, he says,
7       "I'm thinking $15 to $18 per hour depending on
8       experience."
9            So this document, you asked him to
10      provide the salary amount you want this position to be
11      paid, and then he responds to you; right?
12 A.   That's correct.
13 Q.   So ultimately a position was created. Was it created
14      on a part-time basis?
15 A.   In the initial stage, yes.
16 Q.   My understanding is that later it increased to a full-
17      time position; is that right?
18 A.   That is correct.
19 Q.   What were the circumstances that led you to request
20      that position to be modified into a full-time
21      position?
22 A.   One, we don't really have what you call part-time
23      employees here. Number two, the scope and the
24      magnitude of the work that needed to be done, you
25      would have to be a full-time person to do that.

Page 145

1  Q.   Okay. When you say we don't really have part-time
2       employees here, that was how the position was
3       initially created; right?
4  A.   That's correct.
5  Q.   But you're saying it was an exceptional, and it's
6       characteristic of being part time, then?
7  A.   That is correct.
8  Q.   Did you request that it convert into a full-time
9       position?
10 A.   I did.
11 Q.   And at the point in time where it was a part-time
12      position, was the administrative assistant performing
13      assistance for your visual disability as an
14      accommodation for your disability?
15 A.   That is correct.
16 Q.   And then you requested it to be full time. Do you
17      remember approximately when that was?
18 A.   I do not.
19 Q.   Was it eventually transitioned into a full-time
20      position?
21 A.   That is correct.
22 Q.   When, approximately, was it transitioned into a
23      full-time position?
24 A.   It would've been that same year, probably, maybe five
25      to seven months later.

Page 146

1  Q.  Okay, got it.  Now, I understand that there was
2      initially tension related to the transition from a
3      part-time position to a full-time position; is that
4      right?
5  A.  That is correct.
6  Q.  Where did that tension come from?
7  A.  Fred Peivandi.
8  Q.  What was Fred's objection to that?
9  A.  He didn't feel that I needed a full-time
10     administrative assistant.
11 Q.  Did he voice that opinion to the Board?
12 A.  I don't know if he did or if he didn't.  I can't say.
13 Q.  Did any Board member ever come to you to say, hey, you
14     know, I think you should drop the matter of it being a
15     full-time position?
16 A.  No, not directly to me.
17 Q.  Did the Board ultimately approve for --
18 A.  No --
19 Q.  -- a full-time position --
20 A.  -- excuse me, strike that.  There was a conversation
21     with Shirley Kautman-Jones, who was the chairperson at
22     this particular time, along with John Mandelaris, who
23     was the vice-chair.  I do recall having a meeting with
24     them in my office, and John Mandelaris was trying to
25     see if I really needed the full-time position, and if

Page 147

1      I could continue to have that person -- no, strike
2      that.  My mind again.
3              It was John Mandelaris who recommended,
4      and it's reflected in some Board minutes, that that
5      position be a full-time position.  I was in a little
6      -- because I've got so many dates and things that I'm
7      doing.
8  Q.  Completely understandable.
9  A.  But there should be in the minutes, in the Board
10     minutes, where John Mandelaris recommended that that
11     job be a full-time position.
12 Q.  Was that always John's opinion about the position?
13          MS. GAFKAY:  Objection; lack of
14     foundation.
15 Q.  (BY MR. CASCINI)  To your knowledge, based on comments
16     that John made to you, was that always his opinion
17     about that position?
18 A.  I can't recall.
19 Q.  Was the position eventually created into a full-time
20     position?
21 A.  That is correct.
22 Q.  Do you remember approximately when that was?
23 A.  I want to say sometime in 2019 maybe.  It would've
24     been, again, about five months or so after that
25     position was brought on as a part-time position.

Page 148

1  Q.  Now, eventually you filed a charge of discrimination
2      concerning this matter; is that correct?
3  A.  That is correct.
4  Q.  That was with the EEOC?
5  A.  That is correct.
6          (Document marked Deposition
7          Exhibit No. 9.)
8          MR. CASCINI:  I'm going to share a
9      document that I've marked as Exhibit 9 with opposing
10     counsel.  We're a little bit short on copies right
11     now, but we will generate some more later, and then we
12     will provide the court reporter and opposing counsel
13     with one they can retain as well.
14 Q.  (BY MR. CASCINI)  My only question that I want to ask
15     with this, that's why I'm going to short-circuit this
16     here, is that the EEOC charge that you filed regarding
17     your disability in response to this situation?
18 A.  What date?
19          MS. GAFKAY:  Right here.  It says you
20     signed it February 4, 2019.
21          THE WITNESS:  That would be correct.
22 Q.  (BY MR. CASCINI)  Okay.  Did you receive a right to
23     sue letter from the EEOC following your submission of
24     this charge of discrimination?
25 A.  I did.

Page 149

1  Q.  And did you end up filing a lawsuit in response to
2      that right to sue letter?
3  A.  I did not.
4  Q.  At the time you made the statements on the charge of
5      discrimination, you were honest when you made the
6      allegations that you made there?
7  A.  To my knowledge, yes.
8  Q.  Okay.  With respect to the full-time position of an
9      administrative assistant, you previously testified
10     that, in the capacity of a part-time assistant, she
11     was meeting your visual accommodation needs.  Did she
12     continue to do so after the position became full time?
13 A.  She did.
14 Q.  And my understanding is that that position continued
15     until October of 2021; is that correct?
16 A.  That's correct.
17 Q.  Okay.  What happened in October of 2021?
18 A.  Well, I -- because of my race, I was put on a two-week
19     suspension because of my being retaliated against,
20     being treated different, being harassed, because I was
21     being denied my constitutional First Amendment rights,
22     freedom of speech.
23          I was put on a administrative leave, in
24     connection with my two-week suspension; and,
25     unfortunately, on Labor Day, I received a e-mail

Page 150

1   saying that I was not to report back to work because I
2   was being put on an administrative leave indefinitely
3   because I filed a Complaint against Fred Peivandi for
4   race discrimination.
5   Q.   And I will ask you questions about each of those
6   instances later in the deposition.  My question
7   specifically is, do you know why the position was
8   adjusted, modified or changed in October of 2018?
9   A.   To deprive me, because of my race, my ADA
10  accommodation; and I strongly believe that was because
11  Fred had already earlier specified how he felt about,
12  he could hire somebody without a disability; and I
13  believe that it was a act of retaliation because of my
14  participation in Anthony Branch's deposition; because
15  I filed a EEOC complaint against Fred Peivandi; and
16  because I made numerous complaints in writing to the
17  Board about Fred Peivandi; because I exposed -- was
18  accused of not being able to do my job; that I was
19  being biased.
20          So I believe with the combination of
21  all those things, including differential treatment, I
22  believe I do not have a HR administrative position to
23  this day because of the complaint, my lawsuit and my
24  participation in deposition.
25  Q.   The individual who occupied the HR administrative

Page 151

1   assistant position, what was her name?
2   A.   Monica Pearson.
3   Q.   Is Monica Pearson still an employee of the GCRC?
4   A.   She is.
5   Q.   What position does Monica Pearson occupy with the
6   GCRC?
7   A.   She holds the position as the HR benefits coordinator.
8   Q.   Do you know when she was promoted into that position?
9   A.   I do not without looking at her records.
10  Q.   Do you know whether that promotion was made in
11  connection with the elimination of the HR
12  administrative assistant position?
13  A.   The HR administrative position is still a vacant
14  position.
15  Q.   Ah.  My -- that's my fault, then.  Let me ask a
16  clarifying question.  Do you know if she vacated the
17  administrative assistant position in connection with
18  her promotion into the benefits coordinator position?
19  A.   I know that the benefits coordinator position was
20  posted, she applied for it, and she was the selected
21  candidate for the position.
22  Q.   Do you know who was the one to make the decision to
23  promote her into that position?
24  A.   I do not.
25  Q.   Do you know whether or not, as benefits coordinator,

Page 152

1   she maintains the duties of assisting you with your
2   visual disability as a reasonable accommodation for
3   your disability?
4   A.   She do not.
5   Q.   She does not?
6   A.   No.
7   Q.   When you say that, do you mean that that's not part of
8   her job or it's just not something that she does?
9   A.   She does not accommodate me on the level by which I
10  was accommodated when she was my full-time HR
11  administrative -- executive administrative assistant
12  to accommodate me.
13  Q.   So have you continued to assign her duties consistent
14  with assisting you with your visual disability?
15  A.   In the course of a week, she might give me maybe half
16  an hour.
17  Q.   Have you assigned her work, though, is my question?
18  A.   I have.
19  Q.   And she tells you, what, in response, that she's
20  unwilling to do it, it's not my job, she's unable to
21  do it?  What is her response to that?
22  A.   She does as I instruct her to do.
23  Q.   Okay.  So you do instruct her to assist you with your
24  visual disability?
25  A.   Very limited.

Page 153

1   Q.   And she fulfills those obligations; she does what you
2   tell her to do?
3   A.   When I request her to do it, yes.
4   Q.   And she's doing that in the performance of her job;
5   it's not a personal favor to you.  She's doing that in
6   her role as benefits coordinator?
7   A.   Yes.
8   Q.   Do you know who, if anyone, changed the benefits
9   coordinator position to permit her to perform those
10  duties in the ordinary course of her performance?
11  A.   Could you repeat your question?
12          MS. GAFKAY:  Objection; lack of
13  foundation.
14  Q.   (BY MR. CASCINI)  So you've already testified that she
15  assists you with your visual disability in the
16  benefits coordinator position.
17          Do you know whether that is a part of
18  the job duties, the official job duties listed as the
19  benefits coordinator position?
20  A.   True.
21          MS. GAFKAY:  Object; lack of
22  foundation.
23  Q.   (BY MR. CASCINI)  Only if you know.  Do you know
24  whether it is?
25  A.   That is not a part of her job description that she

Page 154

1  specifically assist me with my visual reading, my
2  computer work, reading of my e-mails, or any research
3  that I may have; that is not in her job description.
4  Q.   (BY MR. CASCINI)  Well, that was in the job
5  description of the administrative assistant position
6  prior to that?
7  A.   Yes; the reading, computer work, that should've been
8  in that previous job description.  I need to see that
9  to confirm.
10 Q.   Totally fine, that's okay.  I'm just asking you if you
11 know.
12        With respect to that, you have asked
13 her to perform assistance for the visual disability
14 even though she's been in that new position?
15 A.   I've asked her to perform -- yes.
16 Q.   And she has done so?
17 A.   Yes.
18 Q.   Do you have any reason to believe that anyone has ever
19 told her not to do that in her capacity as benefits
20 coordinator?
21 A.   When she was promoted into the HR benefits coordinator
22 position, that is not a part of the duty to assist me
23 with my visual disability.  She was promoted into a
24 full-time HR coordinator position, and the person who
25 held the position prior to Monica Pearson also did not

Page 155

1  have that responsibility to accommodate my disability.
2        Monica, when she was HR -- executive HR
3  administrative assistant, she accommodated me 90
4  percent of the time.  Now that she's in the HR
5  administrative -- the coordinator position and I don't
6  have an assigned executive HR administrative assistant
7  to assist me with my work, with the computer, with the
8  reading, research, anything else I may need to assist
9  me because of my disability, I don't have that today.
10       So what I do, on a very frequent basis,
11 is ask Monica if she could come and help me with this
12 or maybe read this to me or do something that maybe
13 the managing director and/or the deputy director is
14 requesting that I put together, and I can't do it on
15 my own by myself without some type of assistance.
16       So I look at the scale of what Monica
17 does today in comparison to the percentage of the time
18 she gave me when she was a full-time HR administrative
19 assistant designated to help me with my disability,
20 she gives me about maybe a total of about half an
21 hour, maybe, in any given week.
22 Q.   And is that the extent of the work that you assign her
23 to perform in that realm?
24 A.   That is not the total extent of what I need to be
25 done.  That's the part that she can do for me, and I

Page 156

1  try to keep it limited because she's working full time
2  in another capacity.
3        So I work with strain on my eyes that
4  has led me to surgery, that is causing me a great deal
5  of pain and discomfort with my eyes because I don't
6  really have anyone to assist me to do what I need to
7  do at the level and the capacity by which I need done.
8  So out of respect for Monica, and understand that I
9  don't want to totally overwhelm her and discourage her
10 and lower her motivation and passion to work for this
11 organization that maybe lead her to leave, I don't
12 have it.
13       That's why I continue to this day to
14 cry out to Randy Dellaposta, and I have shared with
15 Fred Peivandi before Randy Dellaposta that I need a
16 position; I've asked for it in writing, I have been
17 denied over and over and over again as recent as May
18 17th and as recent as June the 1st.
19       Randy refuses to give me an assistant,
20 and I have shared with them, as a result of it, you're
21 putting a lot of harm, and you're possibly going to be
22 leading me where I could be subjected to more eye
23 loss.  I only have one eye.  I have severe glaucoma;
24 and the amount of stress that they're putting on me,
25 the amount of emotional stress they're putting on me,

Page 157

1  the amount of mental anguish that they're putting on
2  me is causing me to have some serious problems.  When
3  the stress is so high, it could lead me to blindness.
4  They don't seem to care about the physical disability,
5  which was evident when Fred said to me, when I first
6  started talking to him about my disability, as
7  though -- and then to be told that I'm using my
8  disability as a means of getting my way, that lets me
9  know that, I believe, the denial of my having -- my
10 request to fill the position is deliberate, to cause
11 me more physical, mental and emotional harm, and I
12 strongly believe, Andrew, that is based on my race.
13 There is no other variable other than that of my race
14 and the hate that Fred has already expressed that he
15 has for me.
16       So when we get to this area of
17 conversation, I get really concerned.  I get a little
18 irritated because I know it's wrong.  No person with
19 an ADA condition, be that it is medical, mental or
20 physical or visual, should be subjected to what this
21 Board has allowed Fred and Randy Dellaposta to subject
22 me to, all because I use my First Amendment rights
23 because that was my duty, to talk about the Covid-19,
24 the danger of the Covid-19 and the risk that we're
25 putting our employees at.

Page 158

1    I also feel that it's because of the
2 retaliation that I'm getting, because of my
3 involvement, in my participation in Anthony Branch's
4 lawsuit, and the fact that I filed two EEOC's against
5 this organization, including Fred Peivandi, that I
6 have filed a lawsuit, and I have made numerous written
7 complaints to Fred Peivandi. I have been interviewed
8 by the Road -- the Genesee County Board of
9 Commissioners; and also I believe it has a lot to do
10 with the reason why I only received a one -- I mean a
11 two percent increase in my salary.
12    So there's a combination. And so
13 taking all of that into consideration, I believe is a
14 deliberate pushback to try to get me to break, to quit
15 or to resign.
16    That's the reason why I don't have the
17 vacant position, that's still a vacant field, and it's
18 wrong, because you're putting my health at risk.
19 You're putting my eyesight at risk.
20    MS. GAFKAY: Is this a good time to
21 break?
22    MR. CASCINI: Well, I --
23    THE WITNESS: It's a good time for me
24 to break.
25    MR. CASCINI: Fair enough.

Page 159

1    THE WITNESS: Because at this point --
2    MS. GAFKAY: Hold on.
3    MR. CASCINI: I'm not asking you any
4 questions to attempt to harass you. I'm merely asking
5 questions about the allegations that are contained in
6 the Complaint.
7    MS. GAFKAY: She's -- it's the content.
8 You're not doing anything wrong, Andrew.
9    MR. CASCINI: Okay. I just wanted to
10 put that on the record, that, you know, I'm not doing
11 anything intentionally to antagonize you, Donna. I
12 have no interest in doing so. I do, however, have a
13 duty and an interest to ask you questions about the
14 allegations that are in your Complaint.
15    MS. GAFKAY: Yeah, you have a right to
16 do that.
17    MR. CASCINI: So you've asked to have a
18 break. I totally understand that, and we can take
19 that break now; that's fine with me.
20    MS. GAFKAY: We've been going for quite
21 some time, since 9:00 a.m. It's now past 1:00. I
22 would recommend and request that we break until 1:45
23 so we can have a lunch break.
24    MR. CASCINI: That's fine by me.
25    MS. GAFKAY: Thank you so much.

Page 160

1    MR. CASCINI: Yep.
2    (Luncheon recess taken.)
3    MR. CASCINI: Let's go back on the
4 record now, if we could. It looks like it's about
5 2:07 p.m., just returned from a break. Got a little
6 opportunity to rest.
7 Q.   (BY MR. CASCINI) And, Donna, just to orient us in
8 time, what I'd like to talk about now is, after the --
9 after Monica Pearson was promoted to the benefits
10 coordinator position is the time frame we're talking
11 about now.
12    I believe earlier you testified that
13 she is less able to perform the visual accommodation
14 role now that she's -- after her promotion; is that
15 right?
16 A.   That's correct.
17 Q.   She has less time to do it?
18 A.   That's correct.
19 Q.   So we're only talking about the period of time after
20 the promotion occurred in October. Have you raised
21 concerns about her diminished capacity to assist you
22 with your visual disability with the Board subsequent
23 to that?
24 A.   No, because I have been prohibited by Fred Peivandi to
25 communicate with the Board on any issues without first

Page 161

1 discussing it with him.
2 Q.   Okay. Have you discussed it with him?
3 A.   I discussed it with Randy Dellaposta.
4 Q.   Tell me about your discussions that you had with this
5 topic with Randy Dellaposta?
6 A.   I shared with him that, regardless that Monica was the
7 benefits coordinator, and does not negate the fact
8 that I still need an assistant.
9 Q.   And when you told him that you still needed an
10 assistant, have you specifically brought up the fact
11 that you need the assistant in order to perform the
12 visual accommodation role?
13 A.   Not in writing. I discussed that with him numerous
14 times verbally.
15 Q.   So when you say not in writing, there are some
16 discussions that you had with Randy about this topic?
17 A.   That is correct.
18 Q.   But they did not specifically discuss your need to
19 have a visual accommodation?
20 A.   My memory is we discussed that Monica, being the
21 benefits coordinator, does not negate the fact that I
22 still need the HR administrative assistant.
23 Q.   Okay. And not trying to belabor the point, I just
24 want to make sure I understand. That's what the
25 written communication is about; there's also verbal

Donna Case 2:21-cv-12568-VAR-JJCG    ECF No. 23-7    Donna Toplak

Page 162

1    communications that you had with Randy?
2  A.   Numerous verbal communications.
3  Q.   Do you know approximately when those verbal
4    communications occurred?
5  A.   I came to work on November 8th.  I would have
6    discussed that with Randy in his office on November
7    the 8th; and subsequently, after that, numerous times.
8    I can't give you the specific dates that I've actually
9    discussed that with him.  I believe most recently in a
10    May 17th meeting in this particular room, I again
11    raised it as an issue.
12  Q.   And when you brought it up on November 8th, May 17th
13    and the numerous times that it happened in between,
14    have you ever told him during those conversations that
15    you needed it specifically because she could no
16    longer -- Monica could no longer perform the visual
17    accommodation function --
18  A.   Yes.
19  Q.   -- as business coordinator?
20  A.   Yes.
21  Q.   And what was Randy's response to you?
22  A.   He gave me no response, other than the fact that they
23    were not going to fill the position.
24  Q.   Did he explain why they weren't going to fill the
25    position?

Page 163

1  A.   No.
2  Q.   And subsequent to this, did you ever escalate your
3    concerns either to Fred or to any member of the Board?
4  A.   Again, I was prohibited from talking to the Board
5    concerning this matter.
6  Q.   You testified earlier you're prohibited from
7    communicating with the Board without addressing it
8    with Fred first; right?
9  A.   That is correct.
10  Q.   And you said you never addressed it with Fred; right?
11         MS. GAFKAY:  Objection; lacks
12    foundation.
13  Q.   (BY MR. CASCINI)  Did you ever address it with Fred?
14  A.   Not since I've been back to work from November the
15    8th.  That's because Fred was no longer my direct
16    report.
17  Q.   Got it.  When Randy expressed that he was not going to
18    fill the position, did he explain why he did not
19    intend to fill the position?
20  A.   No.
21  Q.   Did Randy ever discuss with you the changes that were
22    made to the benefits coordinator job description?
23  A.   No.
24  Q.   Were you aware that changes were made to the benefits
25    coordinator job description?

Page 164

1  A.   Once I read the job description.
2  Q.   Have you ever brought up the -- scratch that -- strike
3    that from the record.  I'm sorry.
4         Have you ever raised the issue of the
5    visual accommodation function with Monica Pearson
6    herself?
7  A.   Yes.
8  Q.   And approximately -- did you have those communications
9    in writing, were they verbal?
10  A.   Verbal.
11  Q.   And I'm asking again just to reorient us in time, and
12    I just want to be clear, subsequent to her being
13    promoted into the benefit coordinator position, have
14    you had communications with her about that?
15  A.   Yes.
16  Q.   Okay, perfect.  And do you know approximately when
17    those conversations occurred?
18  A.   It would've been when I returned back to work on
19    November 8th and several times after.
20  Q.   Okay.  And what was the substance of those
21    conversations?  What did you discuss?
22  A.   Well, my understanding was that she understood that
23    her role was to be a full-time benefits coordinator;
24    and we discussed that the magnitude of work that I do,
25    that it was impossible for her to be able to

Page 165

1    accommodate me at the level that she was doing prior
2    to me returning back to work.
3  Q.   Do you know if Monica raised those concerns with
4    anybody else other than you?
5  A.   I do not.
6  Q.   Did you raise those concerns, based on that meeting,
7    with Randy?
8  A.   I did.
9  Q.   And then at that point in time, Randy said that
10    they're not going to be making any changes to the
11    position?
12  A.   That is correct.
13  Q.   You mentioned earlier that you had been provided other
14    visual accommodations to allow you to perform the
15    essential functions of your job.  You mentioned, I
16    believe, that there were adjustments made to your
17    computer monitor and adjustments made to your
18    lighting.  Have any of those been removed or modified
19    in any way by Fred Peivandi at any time?
20  A.   No.
21  Q.   Have any of them been removed or modified in any way
22    by any member of the administration?
23  A.   Point of clarification.  For modification, modified,
24    what are you specifically saying?
25  Q.   Were you limited from accessing them or limited from

Page 166

1   using them in any substantial way?
2  A.   No.
3  Q.   And when were those implemented, when were you given
4       those accommodations?  That was early in your
5       employment?
6  A.   In 2016, the lighting, also with my computer, and my
7       parking space; and then throughout my career here,
8       I've had some adjustments made to my lights, my
9       computer screen, et cetera.
10 Q.   Has anyone from the administration ever rejected an
11      accommodation request that you made, other than the
12      issue of administrative assistant?
13 A.   No.
14 Q.   Has anyone ever approved an accommodation and later
15      revoked that accommodation, other than the
16      administrative assistant?
17 A.   No.
18 Q.   Who was the person who actually provided the
19      accommodations, in other words, you know, adjusting
20      the lights or adjusted the computer?
21 A.   When it comes to the light, that would be our building
22      employees; and then -- facility.
23 Q.   Sure.
24 A.   And then for my computer, it would be either Mike or
25      it might be Monica, depending on what I needed done.

Page 167

1  Q.   Got it.  I want to ask you, so we're going to shift
2       back in time a little bit to when -- prior to the
3       administrative assistant position being created.  So
4       after you were hired, before that position was
5       created, talking about that time frame.
6  A.   Okay.
7  Q.   Did you ever have any conversations -- I'd asked you
8       prior whether you had any conversation with Anthony
9       Branch and Fred Peivandi.
10      Did you ever have any conversation with
11      Anthony Branch about the creation of the
12      administrative assistant position?
13 A.   I believe in his capacity as the co-interim director,
14      there might've been.
15 Q.   And do you remember when that conversation may have
16      occurred?  So it was while he was the co-interim
17      managing director, I know that; but with any more
18      specificity, do you know when that occurred?
19 A.   No.
20 Q.   What was the substance of that conversation?
21 A.   Just my need of having a HR administrative assistant
22      as a result of my visual disability.  Also in that
23      particular conversation, I shared with him that I did
24      not want to make total emphasis on a need for the
25      assistance for my visual disability.  I also wanted

Page 168

1       them to take into strong consideration, I need the
2       need (sic) for other HR responsibilities that I feel
3       that person can do.
4  Q.   I understand.  What did he do, if anything, about it?
5               MS. GAFKAY:  Objection; lack of
6       foundation.
7  Q.   (BY MR. CASCINI)  Do you know whether he did anything
8       about it in response to that conversation?
9  A.   I can't recall.
10 Q.   When Fred Peivandi allegedly made the comment to you
11      about why should I give you an accommodation when I
12      could have an HR director that did not have a
13      disability, was he the managing director at that time?
14 A.   Yes; yes, he was.
15 Q.   Was it shortly after he was hired as managing
16      director?
17 A.   I can't remember how long after, but I -- I can't
18      remember exactly how long, but it was after he became
19      the managing director.
20 Q.   Approximately how long was it before he approved the
21      creation of the position after he had become managing
22      director?
23 A.   I believe that would've been sometime probably in
24      2019.
25 Q.   Okay.

Page 169

1  A.   Give or take.
2  Q.   And earlier you gave some testimony about, you know,
3       communications that you may have had with Tom
4       Derderian about this; and keeping in mind the
5       instruction I've given about excluding privileged
6       communications from any testimony you're going to give
7       today, the conversation with Tom, was anybody else
8       present during that conversation?
9  A.   There were times when Tom and I had communications
10      concerning that information, and Randy -- I'm sorry --
11      Anthony Branch may have been present in the office.  I
12      can't recall if anyone else may have been there, but
13      it's a possibility.
14 Q.   Fair enough.  Is it possible that Fred may have been
15      present during the conversation?
16 A.   Not -- there was a time when Fred Peivandi and Tom
17      Derderian and I did have a meeting to discuss that
18      that led to the letter that was presented to the
19      Board.
20 Q.   Got it.  Okay.  And that was -- was anyone present
21      other than you and Tom and Fred during that meeting?
22 A.   I can't recall.
23 Q.   So the only alleged refusal of any accommodation,
24      disability-related accommodation, request that you
25      ever made was with respect to the administrative

Donna Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-7, PageID.476   Donna Topping

Page 170

1  assistant position; right?
2  A.   That is correct.
3  Q.   No other requests were ever rejected; correct?
4  A.   That's correct.
5  Q.   I wanted to ask you a question, this is circling back
6     to another topic that I noticed in my notes.  So this
7     is going back a ways during our dep today, and I
8     apologize for that.
9        You mentioned prior that Fred Peivandi
10    had raised concerns about your religious orientations;
11    is that right?
12 A.   That is correct.
13 Q.   Is that a part of this lawsuit?  Is that a part of
14    this Complaint?
15 A.   No.
16 Q.   That allegation hasn't been raised here; right?
17 A.   No.
18 Q.   Do you know when that conversation occurred?
19 A.   That would've been during the time of Covid to the
20    time of the mayor's -- oh no, I'm sorry --
21    presidential election, the last presidential race
22    where Bernie Sanders was in that race.  So it would've
23    been during the primary time of that election.
24 Q.   And are we referring to the 2020 election or 2016
25    election?

Page 171

1  A.   It would've been in the 2020.
2  Q.   Is there a reason that you associate that comment with
3     that having been made at that time?
4  A.   Sure.  It was based on the nature of the conversation
5     we had at that particular time.  At that time, we were
6     talking about the election.  He felt that -- I felt he
7     wanted me to vote for Bernie Sanders versus Joe Biden,
8     and he gave his reasons why; and then we began to talk
9     about some concerns that he had about his son,
10    apparently he was having issues with being bipolar or
11    something like that, and some other concerns he had
12    concerning his daughter; and one of the things I
13    shared with him that, based on my religious beliefs,
14    that prayer works.  So he said he wasn't -- he waved
15    his hand, and he said he wasn't into all of that, he
16    was a Muslim, that he wasn't for the type of religion
17    that I was in.
18 Q.   And when he said that he wasn't for it, he meant as an
19    option for treatment of his son's medical condition?
20 A.   He offered up the fact that I knew someone that could
21    talk to him.
22 Q.   Sure.  Certainly that's often very helpful with some
23    people, I understand that.
24       Now, your Complaint contains the
25    following allegation, and I only reference it herein

Page 172

1  because I haven't heard it raised yet, which is, "In
2  2019, Defendant Peivandi requested HR to provide him
3  with a list of employees by name and race.  When
4  questioned about the list, Defendant Peivandi could
5  not provide a viable answer as to why he needed the
6  requested list."
7        Is this an allegation that is in your
8  Complaint?
9  A.   I would have to look at the Complaint.
10 Q.   Fair enough.  Is that an allegation that you intend to
11    raise as part of this lawsuit?
12 A.   I would have to defer to my attorney.
13 Q.   In any event, is it accurate that he asked you to
14    provide him with a list of employees by name and race?
15 A.   What he did, he put the request in to Rachel Mullen
16    who reports to me.  When he first asked for the list,
17    he asked for the list based on names, position, titles
18    and I think department by which the employee worked.
19       The second time he asked for the list,
20    he asked Rachel to give it to him by name and race,
21    and that drew a red flag to her; so at that point she
22    brought it to my attention, and that's when I became
23    aware that the request was by race associated with the
24    name.
25 Q.   Did Rachel describe to you whether or not Fred gave

Page 173

1  any justification for why he wanted that list to be
2  made?
3  A.   No.
4  Q.   Did you ever ask Fred why he wanted that list to be
5     made?
6  A.   I did.
7  Q.   And when did you ask him about that?
8  A.   It would have been shortly after he requested it.
9  Q.   And what did he tell you?
10 A.   He said he needed the list 'cause he felt that would
11    be a good way for him to be able to identify or get to
12    know the employees here at the Road Commission.
13 Q.   Was a list ever assembled?
14 A.   That is correct.
15 Q.   I'm very sorry.  So there was a list that was
16    assembled?
17 A.   Per Fred Peivandi's request, yes.
18 Q.   Okay.  Had a document similar to that ever been
19    assembled within the Road Commission before?
20 A.   No.
21 Q.   Was that information available in the GCRC records?
22 A.   To what magnitude are you asking the question?
23 Q.   Well, I guess I'll back up, actually.  Who assembled
24    the list?
25 A.   Rachel Mullen did.

Page 174

1  Q.   How did Rachel Mullen assemble the list?
2  A.   She went into our Precision and looked at all the
3       employees and made a report from that because our
4       system will show the person's name, it will show the
5       department that they work for, it will show their age,
6       it would show their race; and she viewed it from that
7       particular base, to my understanding.
8  Q.   I think that I know the answer to this one, but why is
9       that information collected and available in the
10      database within the GCRC records?
11 A.   Because when you are trying to -- when we put
12      information in the employee's, what we call their job
13      history, all that information is there.  So the reason
14      is that we can be able to go to a system and see and
15      be able to pull the applicable reports when we need to
16      pull the reports.  So we have to be able to identify
17      our employees by name, by race, by age, by gender, by
18      classification, by wage, et cetera.
19 Q.   And one of the purposes for that is with EEO
20      reporting; is that right?
21 A.   With the EEO -- what you're referring to is the EEO-4
22      reporting.  What that report does, it does not ask you
23      for any names and/or associated with race.  It only
24      wants to know -- it only requires us to tell
25      information about the number of employees we have, how

Page 175

1       many minorities, et cetera, et cetera, et cetera.  But
2       nothing is associated with the name.
3  Q.   Understand.  Okay.  So the reason the data is
4       collected, though, is that it assists in EEO
5       reporting?
6  A.   That's one of the things it assists with.
7  Q.   Do you know if a similar report was ever provided to
8       John Daly during his time as a managing director?
9  A.   Not to my knowledge.
10 Q.   Is it possible one was provided to him prior to your
11      time as the HR director?
12 A.   I have no knowledge of that.
13 Q.   Fair enough.  And then you have the allegation that,
14      "Defendant Peivandi requesting the said list was
15      brought to attention of the GCRC by the Plaintiff and
16      questions were raised by a Genesee County Commissioner
17      who became aware of the matter."
18           Who is the Genesee County commissioner
19      there?
20 A.   Well, there's several Genesee County people who are
21      commissioned that were aware; but the ones that I'm
22      familiar with in terms of what you're talking about
23      was probably Bryant Nolden.
24 Q.   Okay.  So the question was raised by Bryant Nolden,
25      who became aware of the matter?

Page 176

1  A.   That's correct, in a Board meeting.
2  Q.   Got it.  Bryant Nolden, a Genesee County commissioner,
3       not a Road Commission commissioner; correct?
4  A.   That is correct.
5  Q.   Got it.  And then it says here questions were raised.
6       What questions did he raise?
7  A.   I don't know the specific questions without seeing
8       what was put in the Board minutes.
9  Q.   Did Bryant Nolden discuss this matter with you at all?
10 A.   After the Board meeting, yes.
11 Q.   Did he tell you at any point in time how he came to
12      know that this list had been requested or that the
13      list had been generated?
14 A.   No.
15 Q.   Did you ever subsequently learn how he came to know
16      that?
17 A.   No.
18 Q.   Then I have, finally, the last line of this particular
19      allegation from your Complaint, is paragraph 21, is,
20      "Plaintiff witnessed Defendant Peivandi referring to
21      the requested list when making disciplinary
22      decisions."
23           When did you witness Mr. Peivandi
24      referring to that list when making disciplinary
25      decisions?

Page 177

1  A.   Whenever I had to discuss with Fred about the
2       recommended disciplinary action I wanted to take on an
3       employee, I would go to his office, and when we
4       discussed it, he would look at what was pinned right
5       there close to his computer, I believe it was, and he
6       would look up the name, and he would look over and see
7       the race, and then based on that, he'll make a
8       decision whether or not he agreed to my
9       recommendation.
10 Q.   And you said based on the list, he would make a
11      decision about whether or not he agreed on your
12      recommendation.  How do you know that it was based on
13      the list?
14 A.   I strongly believe that, one, there was no need for
15      him to look at the list.  There was nothing there to
16      identify who the employee was.  The only thing that
17      was relevant at that point to him, in my opinion, was
18      the race; and a fine example that I noticed a pattern
19      of, when I recommended disciplinary action be imposed
20      on someone white, he did not support it or he changed
21      my recommendation in terms of the -- that disciplinary
22      action should be imposed, where it was disciplinary
23      action that I was recommending on African-Americans,
24      he supported.
25 Q.   With respect to white employees where you recommended

Page 178

1 disciplinary action, did he ever approve your
2 recommendation for disciplinary action being imposed
3 on a white employee?
4 A. Not during this time period, no.
5 Q. Has he at any point during his tenure as the managing
6 director?
7 A. After the list became a public concern, he did.
8 Q. Okay. Prior to that, he did not?
9 A. No.
10 Q. Were there instances where you recommended
11 disciplinary action against a white employee prior to
12 the list becoming known?
13 A. There was incidents where we had possibly four white
14 supervisors that I had imposed disciplinary action on,
15 and all four of those disciplinary actions were
16 overturned.
17 Q. When you say they were overturned, how were they
18 overturned?
19 A. They removed those disciplinary actions from the
20 record.
21 Q. And I apologize, who removed those disciplinary
22 actions from the record?
23 A. Fred Peivandi had a meeting.
24 Q. Did he explain why he had them removed?
25 A. He felt that I was biased, and the degree of the

Page 179

1 disciplinary action imposed, he felt was unfair.
2 Q. Was there any pending union grievance or threatened
3 litigation or charges of discrimination pending with
4 any of those employees at that time?
5 A. I believe that there were some that had grievances
6 written.
7 Q. So they were bargaining unit members?
8 A. That is correct.
9 Q. Were they all bargaining unit members?
10 A. That is correct.
11 Q. Were all of their terminations grieved?
12 A. Yes.
13 Q. Was Fred's recommendation as part of a settlement to
14 resolve a grievance?
15 A. I can't recall.
16 Q. And when he explained to you why he had done it or why
17 he had rescinded those, he explained to you, he said
18 that you had been biased in making the recommendations;
19 is that right?
20 A. That is correct.
21 Q. Did he say that verbally or in writing?
22 A. He said it verbally.
23 Q. And when was that? When did he say that to you?
24 A. It would've been shortly after the disciplinary action
25 was imposed, which led to Fred saying that he wanted

Page 180

1 to be involved in all disciplinary action moving
2 forward, said that I could not make any more decisions
3 on imposing disciplinary action without his approval.
4 Q. And that was a part of the directive he gave to all
5 the directors in that regard; correct?
6 A. Well, that would be -- at that time, it was myself and
7 Anthony Branch, who had the bulk or 90 percent, almost
8 a hundred percent, of issues dealing with disciplinary
9 actions.
10 Q. When you say he had the bulk of that, Anthony Branch
11 is the maintenance director; is that correct?
12 A. That is correct.
13 Q. And approximately what percentage of GCRC employees
14 does he supervise?
15 A. Probably close 65 to 70 percent.
16 Q. Approximately what percentage of GCRC employees do you
17 supervise?
18 A. I supervise -- I don't give direct supervision to only
19 but probably about four.
20 Q. Was the directive given to other super -- I'm sorry.
21 Were the directives given to other directors as well?
22 A. I can't recall.
23 Q. How did he announce that that change was going to be
24 made?
25 A. He told me verbally, and --

Page 181

1 Q. Was there ever a memorandum that was distributed to
2 commemorate that action?
3 A. It could've been.
4 Q. And to be clear, the action that he decided to take
5 was that he had final say in all of the suspensions
6 and terminations regarding those employees; correct?
7 A. That is correct.
8 Q. So people could make recommendations to him about the
9 disciplinary action, and then he has to approve it?
10 A. Well, technically the recommendation for disciplinary
11 action starts when you can't do a -- beyond the oral
12 or -- it comes to HR. So whatever issue that a
13 director have, as it relates to a disciplinary issue,
14 it comes to HR. So from that, HR, which would be
15 myself, make the recommendation in support of the
16 directors; and the way it's set up now, then Fred has
17 to look at the recommendation, then he would make a
18 decision as to whether or not we can move forward on
19 the recommendation for disciplinary action that's been
20 imposed.
21 Q. And you do concede that this within the scope of his
22 job duties; right? He's the executive director of the
23 Road Commission; right?
24 A. Correct.
25 Q. So he has a right to do that if that's what he wants

Page 182

1  to do?
2  A.  Correct.
3  Q.  But it's different from the way John Daly did it, is
4  my understanding?
5  A.  Well, John Daly allowed HR to do the disciplinary
6  action.  There were times which John Daly intervened
7  and began to ask questions if the union was raising
8  questions directly with John Daly and not with myself.
9  Q.  Was there ever an instance where John Daly raised
10 questions about a proposed termination or suspension
11 of a nonunion employee?
12 A.  Not to my knowledge.
13 Q.  Do you know whether he ever raised those concerns
14 prior to your time as the HR director?
15 A.  I do not.
16 Q.  Do you feel you have a positive working relationship
17 with Randy Dellaposta, the deputy managing director?
18 A.  I believe Randy and I have a respectful working
19 relationship.
20 Q.  How long has Randy been your direct supervisor?
21 A.  Since October 1st.
22 Q.  And in his capacity as your direct supervisor, has he
23 maintained that respectful working relationship with
24 you?
25 A.  Yes.

Page 183

1  Q.  Have you maintained a respectful working relationship
2  with the GCRC's other directors?
3  A.  Yes.
4  Q.  And the other directors include Anthony Branch, the
5  maintenance director, it would be the finance
6  director, who -- see, I'm already losing it --
7          Could you go through each of the
8  directors and explain whether or not you've maintained
9  a positive working relationship, starting with Anthony
10 Branch?
11 A.  I have maintained a positive relationship with Anthony
12 Branch, the director of maintenance; Tracy Khan, the
13 director of finance.
14 Q.  Tracy --
15 A.  Tracy Khan, K-h-a-n; Eric Johnston, the director of
16 engineering; and Randy Dellaposta, the deputy
17 director.
18 Q.  And those relationships have been, overall, you
19 considered them positive and respectful?
20 A.  Yes.
21          MR. CASCINI:  All right.  I'm going to
22 show you the next exhibit.  I'm going to show you a
23 document you're no doubt familiar with.
24          (Document marked Deposition
25          Exhibit No. 10.)

Page 184

1          MR. CASCINI:  For the purposes of the
2  record, we have marked the document where it is given
3  Bates No. Defendants RPD Response 7 - No. 1 as Exhibit
4  10.  This appears to be a letter dated January 28,
5  2021.  It is addressed to the Genesee County Road
6  Commission, Board of Commissioners.  It starts, "Dear
7  Commissioners."
8  Q.  (BY MR. CASCINI)  Donna, do you recognize this letter?
9  A.  I do.
10 Q.  What is this letter?
11 A.  This is my complaint letter that I submitted to the
12 Genesee County Board of Commissioners about my
13 treatment that I felt I was being subjected to under
14 the leadership of Fred Peivandi.
15 Q.  Did you submit this letter to the Board directly?
16 A.  I believe I mailed -- no.  I believe I mailed the
17 hardcopy to them, and each Board member received this
18 letter on their desk.
19 Q.  Does this communication represent the first time you
20 raised concerns with the Board concerning Fred
21 Peivandi's conduct, behavior or treatment of you?
22 A.  Absolutely not.
23 Q.  Had you ever filed a written complaint against Fred
24 Peivandi before with relation to these issues that are
25 raised in this letter?

Page 185

1  A.  I believe there may be correspondence where I may have
2  addressed the issues in writing; and there were
3  numerous times where I addressed the issue in a Board
4  meeting and/or with individual Board members.
5  Q.  Who were some of those Board members?
6  A.  It would've been Bob Johnson, Mandelaris and
7  Dickerson.
8  Q.  Anyone else?
9  A.  I'm not sure.
10 Q.  All right.  I'm going to ask you questions
11 specifically about concerns you raised with
12 Commissioner Johnson now first.  So let's just
13 separate that one out.  When did you raise concerns,
14 prior to submitting this, with Commissioner Johnson
15 about Fred Peivandi?
16 A.  I couldn't give the specific date.
17 Q.  Approximately how many times did you raise these
18 concerns?
19 A.  Numerous times from the time in which Fred Peivandi
20 became the managing director in or about July 2018.
21 Q.  What about prior to him becoming the managing
22 director?
23 A.  I don't recall.
24 Q.  Okay.  What concerns did you raise at that point in
25 time?

Page 186

1  A.  I was very concerned that I felt that Fred was
2      racially biased against African-American people.  I
3      raised my concerns specifically about my treatment
4      under Fred Peivandi.  I raised concern about how I
5      felt Fred was treating women; and I raised concern
6      about how I felt Fred was treating Anthony Branch.
7  Q.  And what response did Mr. Johnson give you when you
8      raised these concerns with him?
9  A.  I can't remember the specific response, but he did
10     have some concern.
11 Q.  What, if anything, did Commissioner Johnson do once
12     you raised these concerns with him?
13 A.  I can't say what he did, because he never shared with
14     me what he did.
15 Q.  What did he say?
16 A.  He listened, and he did not agree to the actions of
17     Fred Peivandi.
18 Q.  And when you say the actions of Fred Peivandi, out of
19     those things, that he's racially biased, your
20     treatment, treatment of women and treatment of Anthony
21     Branch; you're referring to the treatment aspect; is
22     that correct?
23 A.  I also shared with him that I felt that Fred was
24     creating a hostile work environment.
25 Q.  What was his reaction to that concern?

Page 187

1  A.  He specified his concern and was basically listening.
2  Q.  Was any action taken against Fred at any point in
3      time?
4  A.  To my knowledge, there has been no action taken
5      against Fred Peivandi as it relates to his behavior
6      and his racial biases.
7  Q.  Did Commissioner Johnson ever encourage you to file a
8      written complaint at any point?
9  A.  No.
10 Q.  All right.  When did you raise concerns related to
11     Fred Peivandi with John Mandelaris?
12 A.  It would be the same, throughout, after the time by
13     which Fred Peivandi became the managing director.
14 Q.  Were the concerns that you raised with John Mandelaris
15     the same concerns that you raised with Commissioner
16     Johnson?
17 A.  There would've been some additional concerns we talked
18     about.
19 Q.  Can you tell me about just those additional concerns?
20 A.  The additional concerns would be about the disrespect
21     that Fred was displaying against Cloyce Dickerson.  We
22     talked about how Fred was trying to -- or worked
23     against the Board; in turn, blocking their increase in
24     their pay; and we talked about how Fred was trying to
25     have certain Board members removed from the Board; and

Page 188

1      we talked about Fred's wanting to have me fired.
2  Q.  In response to those, what did Commissioner Mandelaris
3      say?
4  A.  Well, one, he put in writing that he believed that
5      Anthony Branch and I were doing a fine job, and for me
6      to hold on and be strong, and did I read a book called
7      I'm Still There; and he talked about how there were
8      certain commissioners asking questions about me and
9      Anthony.  I would have to go back to the e-mails to be
10     able to identify some additional things that we had
11     talked about.
12 Q.  At any point in time, did he encourage you to file a
13     written complaint?
14 A.  No.
15 Q.  To the best of your knowledge, did he take any action
16     to remediate the concerns that you raised?
17 A.  I believe there was times that he said that he had
18     been talking to Fred about our relationship; and he
19     also, in one of his e-mails, he said that he felt Fred
20     should retire.
21 Q.  Did he express that he felt Fred should retire because
22     of the concerns that you had raised in your
23     conversations with him?
24 A.  That is correct.
25 Q.  Approximately when was that e-mail from him?

Page 189

1  A.  I would have to get the e-mail.
2  Q.  Do you think it was within the past year?
3  A.  It would've definitely been since Fred was the
4      managing director.
5  Q.  Do you know if Commissioner Mandelaris voted for Fred
6      Peivandi to succeed John Daly as the managing
7      director?
8  A.  He did.
9  Q.  It was at some point subsequent to that that he
10     changed and expressed a position that Fred should
11     retire?
12 A.  That's correct.
13 Q.  Has he maintained that position that he believes Fred
14     should retire subsequent to that?
15         MS. GAFKAY:  Objection; lack of
16     foundation.
17 Q.  (BY MR. CASCINI)  Do you know whether or not he has
18     changed that position?
19 A.  I do not.
20 Q.  He never had a conversation with you about that?
21 A.  I can't remember.
22 Q.  Okay.  Were you the party to the e-mail, were you the
23     recipient of the e-mail in which he said that he felt
24     Fred should retire because of the concerns you'd
25     raised?

Page 190

1  A.   I was.

2  Q.   When was the last time you had any conversations with

3       him about any of these topics?

4  A.   It would have been prior to my two-weeks termination

5       and administrative leave.

6  Q.   You're referring to your two-weeks suspension?

7  A.   That is correct.

8  Q.   No conversation with him subsequent to that?

9  A.   No.

10 Q.   Then lastly, you said that you had conversations with

11      Commissioner Dickerson.  Do you remember when these

12      conversations occurred?

13 A.   It would've been after Fred became the managing

14      director.

15 Q.   In addition to the concerns that you raised with

16      Commissioners Johnson and Mandelaris, what other

17      concerns did you raise with Commissioner Dickerson, if

18      any?

19 A.   It would've still been the same conversations that I

20      had with Johnson and Mandelaris dealing with my

21      concerns about Fred's racial discrimination practices

22      and treatment towards African-American people and

23      women.  So it would have been basically the same type

24      of conversation.

25 Q.   And did Commissioner Dickerson urge you to file a

Page 191

1       written complaint?

2  A.   No.

3  Q.   What did Commissioner Dickerson advise you to do?

4            MS. GAFKAY:  Object; lack of

5       foundation.

6  Q.   (BY MR. CASCINI)  How did Commissioner Dickerson

7       respond to you raising these concerns?

8  A.   Basically the same way by which Mandelaris and Johnson

9       did.  Him and Mandelaris and Johnson was going to

10      really try to get involved and communicate with Fred

11      on some of these concerns.

12 Q.   Do you know if Commissioner Dickerson ever made good

13      on that promise and attempted to get involved to

14      communicate those concerns?

15 A.   I know that he had conversations with Fred.  I don't

16      know if there was anything resolved.

17 Q.   Do you know if Commissioner Dickerson took any other

18      action with response to these concerns?

19 A.   I believe that Commissioner Dickerson had

20      communications with Genesee County Board of

21      Commissioners.

22 Q.   Do you know which commissioners?

23 A.   I believe -- no, not -- not with accuracy, I don't

24      know.

25 Q.   Fair enough.  Do you know if he took any other actions

Page 192

1       in response to receiving these concerns?

2  A.   No, I do not.  Oh, strike that.  I believe that he had

3       communications with Tom Derderian.

4  Q.   Do you know if the conversations that he had with Tom

5       Derderian were in the context of obtaining legal

6       advice?

7  A.   I don't know.

8  Q.   Without asking you about the substance of those

9       conversations, were you privy to those conversations?

10 A.   I believe it may have been a time where Mr. Dickerson

11      (sic) may have been in my office at the same time as

12      Cloyce Dickerson and there was conversation.

13 Q.   I understand.  Is there written conversation, verbal,

14      a mix of the two between Tom Derderian and Cloyce

15      Dickerson without getting into the subject of the

16      conversations?

17 A.   I don't have any knowledge.

18 Q.   Okay, I understand.  So we're going to take a step

19      back here, and we're going to talk about, these are

20      the concerns that you raised with Board members.

21           Is there anybody else that you raised

22      concerns with prior to submitting your written

23      complaint on January 28, 2021?

24 A.   I'm not sure.

25 Q.   Anybody external to the organization, that is to say,

Page 193

1       who is not an employee or a officer of the GCRC?

2  A.   Oh yes.  I would have said my husband, family members.

3  Q.   Sure.

4  A.   Close friends, probably some professional friends I've

5       had from the past.

6  Q.   Did you ever have any conversations with any Genesee

7       County commissioners, referring to the County Board?

8  A.   Yes, I did.  I had conversations with Commissioner

9       Bryant Nolden.  Subsequent to that, I believe I had

10      conversations with Commissioner Charles Winfrey.

11 Q.   Anyone else?

12 A.   Not from the Genesee County Board of Commissioners

13      that I can remember.

14 Q.   Approximately when -- I'm referring now just to times

15      where you had communications with Commissioner Bryant

16      Nolden prior to the January 28th letter being

17      submitted.  Approximately when did those

18      communications occur?

19 A.   Throughout my being under the direction of Fred

20      Peivandi; numerous times since I have been reporting

21      directly to Fred Peivandi.

22 Q.   At any point in time prior to that had you?

23 A.   About my concerns?

24 Q.   Correct.

25 A.   No, not prior to Fred Peivandi becoming the managing

Page 194

1   director, no.
2  Q.  I understand.  Approximately how many times do you
3    think that you had a conversation with Mr. Bryant
4    Nolden about those concerns?
5  A.  Numerous times.
6  Q.  More than five?
7  A.  It could've been.
8  Q.  Well, do you think it's more than 20?
9  A.  I'm not sure.
10  Q.  All right.  What's the most recent conversation you
11    had with Commissioner Bryant Nolden about your
12    concerns?
13  A.  I can't recall.
14  Q.  All right.  How, if at all, did Commissioner Nolden
15    respond to your concerns?
16  A.  He was concerned.  He felt that the treatment that I
17    was receiving and other African-Americans was
18    receiving was unfair and unjust, and he was going to
19    raise some issues with the Board, especially about the
20    -- Anthony Branch getting one percent and I getting
21    the two percent raise; and from that, he was going to
22    raise an issue about that.
23  Q.  That happened, though, subsequently to your submission
24    of this letter; right?
25  A.  That is correct.

Page 195

1  Q.  So did he do anything in response to your concerns
2    prior to this letter being submitted?
3          MS. GAFKAY:  Objection; lack of
4    foundation.
5  Q.  (BY MR. CASCINI)  You've already testified that you
6    had communications with him between the time period
7    where Fred was the managing director and the filing of
8    this letter; right?
9  A.  That is correct.
10  Q.  Okay.  So is there anything that you're aware of that
11    he did between those two time periods?
12  A.  I'm not aware.
13  Q.  Did he suggest that you file a written complaint?
14  A.  I can't recall.
15  Q.  Okay.  Now we're shifting focus, again, same time
16    frame, so we're talking about before you filed this
17    complaint, after Fred becomes the managing director.
18    When do you recall having conversations with Charles
19    Winfrey, Commissioner Winfrey about your concern?
20  A.  My conversations with Charles Winfrey came after.  Is
21    that what you're asking?
22  Q.  Okay.  So when you say after, you mean after you filed
23    this Complaint?
24  A.  After this Complaint.
25  Q.  Okay.

Page 196

1  A.  My communications with Charles Winfrey would've been
2    -- I don't know the time frame, but I do recall being
3    requested to come to a meeting to discuss my concerns
4    as it relates to the wage increase that I received and
5    Anthony Branch and to discuss some other issues
6    concerning Fred's racial behavior against African-
7    Americans and the treatment of African-Americans.  I
8    don't know the date of that, but you might remember
9    because I think you were there with Tim Elkins and
10    Fred Peivandi; but I don't recall the date.
11  Q.  So if I was there representing any members of the GCRC
12    during those communications, you're referring that it
13    being the same day?
14  A.  Yes, because I recall when I left my interview that
15    you were there in the hallway with, I want to say Tim
16    Elkins.
17  Q.  And so we're referring to meetings.  That was with a
18    subcommittee of various commissioners; is that right?
19  A.  That is correct.
20  Q.  To your knowledge, if you know, was there ever an
21    official formation of the subcommittee?  Was there
22    some sort of action taken by the Board to commence an
23    investigation?
24  A.  I don't know.
25  Q.  So Commissioner Winfrey merely called you to attend,

Page 197

1    so you attended?
2  A.  No, that's not what happened.  I received a phone call
3    from the Board coordinator, and -- Board administrator,
4    Josh Freeman, who requested my presence on a specific
5    date because the Board wanted to meet with me.
6  Q.  And you did meet with the Board?
7  A.  That is correct.
8  Q.  What did you tell the Board during that meeting?
9  A.  I can't recall what all I told the Board.
10  Q.  Did you raise similar or identical concerns to the
11    ones that you raised with Bryant Nolden and with the
12    Genesee County commissioners that we've already
13    discussed with them?
14  A.  That may be possible because I was responding to their
15    questions.
16  Q.  Sure.  Was that during the scope of what was
17    discussed, I guess I would say?
18  A.  It could've been.
19  Q.  You don't remember exactly what the content of those
20    questions were?
21  A.  No.
22  Q.  Approximately how long did that interview last?
23  A.  I would say about an hour.
24  Q.  Was Commissioner Nolden there at that same time?
25  A.  No.

Page 198

1  Q.  Who else was present there that day?

2  A.  Josh Freeman was present at that meeting; Commissioner

3     Alan Ellenberg was present in that meeting;

4     Commissioner Dominque Clemons was present in that

5     meeting, along with Charles Smith was present in that

6     meeting; and I don't recall if there was anyone else

7     in that meeting.

8  Q.  So did you have any other conversations with

9     Commissioner Winfrey about the issues that we've

10    raised and discussed here that you also raised with

11    Nolden and with the Genesee County Road Commissioners?

12 A.  I believe there was a time that I met with

13    Commissioner Winfrey, Commissioner Nolden and

14    Commissioner John Mandelaris, and I believe

15    Commissioner Dickerson.

16 Q.  Do you remember when that meeting occurred?

17 A.  I don't.

18 Q.  Was this before or after you met with the subcommittee?

19 A.  This would've been before.

20 Q.  Was it before or after you filed this Complaint?

21 A.  It would've been before.

22 Q.  Before, okay.  And what was the subject and the

23    discussion of that meeting?

24 A.  The two African-Americans, myself as an African-

25    American woman, dealing with issues that I felt I was

Page 199

1     being retaliated against, I felt like other African-

2     Americans were being retaliated against, the working

3     conditions of the Road Commission.  I'm sure there was

4     a lot more, but I just can't recall it all.

5  Q.  Was there any action taken, to the best of your

6     knowledge, subsequent to that meeting to in any way

7     remedy the conditions that you discussed?

8  A.  Not to my knowledge.

9  Q.  And subsequent to the subcommittee meeting that you

10    just described, was there any action taken by the

11    Genesee County Board of Commissioners, the County

12    Board I'm referring to, that you know of to remedy the

13    situation?

14 A.  Not to my knowledge.

15 Q.  Now, did you have any other meetings with Commissioner

16    Winfrey to discuss concerns that you may have had?

17 A.  Not that I can recall.

18 Q.  Have you ever asked any member of the Genesee County

19    Road Board of Commissioners to obtain information for

20    you in relation to Fred Peivandi?

21 A.  I don't understand the extent of your question.

22 Q.  Had you ever had a communication with them and ask for

23    them to request records, for them to request public

24    documents, to request personnel files, anything that

25    related to Fred Peivandi in any way?

Page 200

1  A.  No.

2  Q.  Have you ever had conversations with them about filing

3     any FOIAs on your behalf?

4  A.  No.

5  Q.  Have they told you that they ever intended to file

6     FOIA requests or to seek information about Fred

7     Peivandi on your behalf?

8  A.  I can't recall.

9  Q.  In response to the subcommittee meeting, did they

10    request any additional information?  That's, of

11    course, the meeting you were present for.

12 A.  No.

13 Q.  Did they ever call you back to give any additional

14    testimony?

15 A.  No.

16 Q.  Did the Board as an assembled whole take any action in

17    response to your concerns?

18 A.  I'm not aware.

19 Q.  Have you raised concerns of any other Genesee County

20    Road of Commissioners -- with any commissioners from

21    the Genesee County Board of Commissioners, I should

22    say?

23 A.  Not that I can recall.

24 Q.  In your January complaint, the document marked as

25    Exhibit 10, the very first paragraph of page two,

Page 201

1     which is Bates No. 2, "Throughout 2019, I was faced

2     with continuous deferential treatment, micromanaged,

3     usurping of my authority, ridiculed, and suffered

4     embarrassment in the presence of my colleagues,

5     excluded from meetings that I should have been in

6     attendance."

7             Are you stating in this paragraph that

8     Fred Peivandi subjected you to all of these conditions?

9  A.  Yes.

10 Q.  With respect to being excluded from meetings that you

11    should have been in attendance for, what meetings are

12    you referring to there?

13 A.  Numerous times Fred would have meetings discussion --

14    discussing with certain directors about employee jobs,

15    their wages, staffing that I was not privy to,

16    discussions about potential -- or grievances that I

17    was not privy to.

18 Q.  Have you been privy to these meetings in the past?

19 A.  Yes.

20 Q.  Were you excluded from any other meetings or is that

21    list comprehensive?

22 A.  I have been excluded from meetings where other

23    directors were in that I was not in that I felt that I

24    should've been in because it was dealing with employee

25    issues.

Page 202

1  Q.   To your knowledge, do you know whether or not any
2       other directors were excluded from those meetings?
3  A.   I have no knowledge.
4  Q.   Do you know whether all of the other directors were in
5       attendance at those meetings?
6  A.   In a few of the meetings, yes.
7  Q.   You do know that all of the other directors were
8       present at a few of those meetings where you alone
9       were not?
10 A.   That is correct.
11 Q.   Can you give me an example of any one of those
12      meetings, we're referring to just the subset, where
13      all the other directors were present and you were not?
14 A.   Shortly after I filed my EEOC complaint and before I
15      filed my EEOC complaint, Fred had instructed me that I
16      do not attend the meetings, that he would meet with me
17      on an individual basis.  And so he held the meeting,
18      and afterwards, I had two of the directors, being that
19      that was Coetta Adams, Randy Dellaposta -- and I'm
20      sorry, there was three, and Anthony Branch thought
21      that I might've been out sick, something had happened
22      to me, so they came to the office to make sure I was
23      okay and they discovered that I was -- I told them
24      that I was told not to attend the meeting.
25 Q.   Was this the only instance of a time where the other

Page 203

1       directors all attended the meeting and you were told
2       not to attend?
3  A.   There was a time where you had Anthony Branch at a
4       meeting, Tracy Khan, Eric Johnston and Randy
5       Dellaposta, they were meeting discussing employee
6       issues and changes that they want to make as it
7       relates to employee schedule, et cetera, and I was not
8       privy in that meeting.
9  Q.   So that's a second meeting?  We're discussing a
10      separate meeting than the one prior?
11 A.   That is correct.
12 Q.   Are there any other meetings?
13 A.   There were other meetings; I just can't give the time.
14 Q.   You mentioned Anthony Branch was in attendance at both
15      the second meeting you referred to and the first
16      meeting you referred to; is that correct?
17 A.   That is correct.
18 Q.   The second full paragraph of your letter here, it
19      says, the one that starts with, "On July 20, 2020, I,
20      via written e-mail correspondence, expressed my
21      concerns to the full Board of Commissioners about Fred
22      Peivandi having a relationship with GCRC's executive
23      secretary, who for 13 years served as Fred's executive
24      secretary."
25           Is this the matter related to Vicki

Page 204

1       Bechakes that we were giving testimony about earlier?
2  A.   That is correct.
3  Q.   This was, you stated, in response to a complaint filed
4       by Linda Kossack, the executive secretary; is that
5       right?
6  A.   That is correct.
7  Q.   So Linda comes to you and makes this complaint, and
8       then you send out that e-mail to the Board.  Was that
9       a part of the investigation or did you send this
10      e-mail after she had withdrawn that complaint?
11 A.   The e-mail that was bringing to the Board's attention
12      about Fred's relationship came prior to Linda's
13      complaint.
14 Q.   Okay.  So there was a separate reason for you to have
15      concerns about Fred's relationship with Vicki
16      Bechakes?
17 A.   The initial complaint was, I was informed that Fred
18      Peivandi was having a relationship with Vicki.
19 Q.   Okay.  And Linda was the one who informed you?
20 A.   No.
21 Q.   Okay.  Who was it -- who informed you first about this
22      issue, then?
23 A.   I can't recall who informed me.  I recall that they
24      said it was on the Facebook where Vicki had, on her
25      Facebook, shared that she was in a relationship with

Page 205

1       Fred Peivandi.
2  Q.   So this was disclosed via Facebook?
3  A.   Initially, to my understanding.
4  Q.   And did you perform any investigatory activity prior
5       to sending this e-mail on this matter?
6  A.   What happened is that Randy Dellaposta shared with me
7       that Fred had shared with him that he was having a
8       relationship with Vicki, and he was concerned about
9       the Board becoming aware of that relationship.
10           Randy shared with me that he told Fred
11      Peivandi that he need to come and talk to me about the
12      situation.
13 Q.   And Randy is communicating this directly to you?
14 A.   That is correct.
15 Q.   And with respect to Randy's concerns, is that what led
16      you to send the e-mail to the Board of Commissioners
17      about this matter?
18 A.   Not at that time.
19 Q.   Okay.  Did you have a conversation with Fred prior to
20      sending the e-mail to the Board of Commissioners about
21      his relationship with Vicki Bechakes?
22 A.   When I attempted to talk to Fred about it, he felt
23      that I was the only one concerned about it.  I also,
24      before I talked to the Board, via this correspondence,
25      I had communication with Tom Derderian.

Page 206

1  Q.   Okay.  So excluding any communications that may have
2       been for the purpose of obtaining legal advice, did
3       you have conversations with anybody else about the
4       concerns related to Fred Peivandi and Vicki Bechakes
5       having a relationship?
6  A.   I can't recall.
7  Q.   So it was not Donna who was the first person to inform
8       you about the relationship and then filed a complaint
9       about it?
10 A.   I never --
11              MS. GAFKAY:  Object to the form.
12              THE WITNESS:  I never said that.
13              MS. GAFKAY:  Do you mean Linda?
14              MR. CASCINI:  Oh, my goodness.  Thank
15       you, Julie.  That went totally over my head.  I
16       apologize.  Let me rephrase, Donna, because we need
17       to.
18 Q.   (BY MR. CASCINI)  So it was not Linda who was the
19       first one to raise a concern about Fred's relationship
20       with Vicki Bechakes?
21 A.   That is correct.
22 Q.   The way you looked at me when I said Donna --
23 A.   I knew what you meant, but --
24 Q.   Absolutely.  It's been that kind of day.
25 A.   Do you want to take a break?

Page 207

1  Q.   Nope.  It is okay.  I appreciate that, though.
2            When you had the conversation with
3       Fred, you said that, your testimony, that he informed
4       you that no one else was concerned but you about it?
5  A.   That is correct.
6  Q.   Do you remember approximately when that conversation
7       occurred?
8  A.   It would have been prior to this letter.
9  Q.   And subsequent to that, what made you decide to send
10      the letter?
11 A.   Because after talking with -- getting legal advice, it
12      was concluded that I had a legal duty to inform the
13      Board about this matter.
14 Q.   Okay.  So you wrote the e-mail, informed them about
15      it.  Did you do anything else with regard to this
16      matter?
17 A.   At that particular point, it was in the hands of the
18      Board.
19 Q.   Can you briefly describe for me the GCRC's policy
20      regarding relationships in the workplace?
21 A.   The policy does not speak directly to this matter.
22 Q.   Sure.
23 A.   But past practice spoke directly to it.  So it was
24      always my understanding, as it related to my role and
25      as it related to the managing director, whomever that

Page 208

1       may have been, is that we were not to have
2       relationships with our employees.
3  Q.   Okay.  And with respect to the prohibition against
4       having relationships with employees, is that an
5       organization-wide rule?
6  A.   To my understanding, it relates to myself in the
7       capacity in which I served, the managing director, or
8       any director or member of management that had
9       employees in the department that reported directly to
10      them that they could not engage in a relationship if
11      that person worked directly for them.
12 Q.   I understand.
13 A.   Or if they had any type of say-so over their employees'
14      wages, benefits, et cetera, could they get hired or
15      fired; those kinds of things.
16 Q.   Now, with respect to that past practice, what set the
17      past practice?  When had you needed to implement or to
18      impose that policy on other situations within the
19      GCRC?
20 A.   I have never in my tenure had to impose it on anyone.
21 Q.   How did you come to learn about the past practice if
22      it wasn't inshrined in policy?
23 A.   Because when this situation came about, that's when I
24      began to get more information from my legal attorney,
25      labor relations attorney, about how these situations

Page 209

1       should be handled.
2  Q.   I gotcha.  And to your knowledge, has there ever been
3       any sort of romantic relationship between any director
4       level employee and any other employee within the Road
5       Commission?
6  A.   To my knowledge, there has never been a member of
7       management who was in a relationship with an employee
8       who reported directly to them.
9  Q.   Got it.  I understand.  So with respect to that, you
10      raised the issue with the Board.  What does the Board
11      do, if anything?
12 A.   To my knowledge, the Board hasn't done anything.
13 Q.   Did any members of the Board communicate with you in
14      response to that?
15 A.   I received an e-mail from John Mandelaris asking
16      specifically was there any language to the situation
17      as it related to the managing director dating one of
18      his employees.
19 Q.   Yes, same question I just did.
20 A.   That is correct.  And then I also believed in that
21      same e-mail -- strike that.  I don't know.  I don't
22      have any other recollection.  I have to see that
23      e-mail again to see the depth of what Mandelaris was
24      saying.
25 Q.   I completely understand.  Based on your memory, did

Page 210

1  any other commissioner respond to your concerns?
2  A.  It was told to me that -- no.  It was told to me that
3  Shirley Kautman-Jones and Dave Arceo, per Fred
4  Peivandi, did not have a problem with it.
5  Q.  Shirley Kautman-Jones and Dave Arceo went to you with
6  it?
7  A.  Yes.
8  Q.  I understand.  In the fourth full paragraph of your
9  complaint, it begins, "On September 21 and October 8,
10  2020, I gave testimony via deposition in a
11  discrimination and deferential treatment lawsuit filed
12  against the Road Commission by GCRC Director of
13  Maintenance, Anthony Branch."
14  You were called as a witness in this
15  lawsuit?
16  A.  That is correct.
17  Q.  Do you remember who called you, whether it was
18  plaintiff's counsel or defense counsel?
19  A.  All I remember is that you told me that I was going to
20  be deposed.  So I don't know anything else.
21  Q.  Fair enough.  With respect to the comment, as it ends
22  that paragraph, "Fred Peivandi's hostile and
23  intimidating behavior towards me only escalated to a
24  higher degree" after that point.
25  Did Mr. Peivandi ever raise concerns

Page 211

1  about your deposition testimony with you?
2  A.  He did.
3  Q.  What did he say?
4  A.  He felt that I was lying on him in the deposition.  He
5  told me he took it personal.
6  Q.  Did he mention what he felt you were lying about or
7  what he took personally?
8  A.  He didn't give any specifics.
9  Q.  And what did you say in response?
10  A.  I told him -- I cautioned him and said, "One, I've
11  tooken (sic) a deposition, and I'm just cautioning
12  you, Fred, that you cannot question me or attack me
13  for anything I said in the deposition"; and he
14  continued ranting.
15  Q.  Did he make any other comments about your deposition
16  testimony beyond the fact that he felt you were lying
17  and that you felt he was taking it personally?
18  A.  I can't recall exactly anything else that was said.
19  By this point I was getting quite upset with Fred.
20  Q.  I understand.  On the third page of this document, the
21  document marked as Exhibit No. 10, the paragraph,
22  "Today, I feel like I am George Floyd of GCRC, and
23  Fred Peivandi has his knee on my neck, and I'm crying
24  out, 'I Can Not Breathe.'"
25  I want to clarify here.  Merely, you're

Page 212

1  speaking metaphorically here; correct?  He has never
2  engaged in any sort of physical contact against you?
3  A.  That is correct.
4  Q.  And with respect to what made you feel as though he
5  had his knee on your neck, it was the very things
6  we've discussed during this deposition today and the
7  very content of this message that you said made you
8  feel that way; right?  That's what you're referring
9  to?
10  A.  That is correct.
11  Q.  Following your submission of this complaint to the
12  Board, what, if anything, did the Board do?
13  A.  After this complaint was made, the Board retained an
14  attorney to investigate this complaint.
15  Q.  Do you know who that attorney was?
16  A.  Attorney Craig Lange.
17  Q.  And you said it retained him to investigate the
18  complaint.  Did he interview you at any point in time?
19  A.  He did.
20  Q.  Did he interview you once, twice, five times, how many
21  times?
22  A.  Once.
23  Q.  Was the interview telephonic, in person?
24  A.  In person.
25  Q.  Approximately how long did he speak with you?

Page 213

1  A.  I can't recall.
2  Q.  Subsequent to your conversation with him where he
3  interviewed you, did you have any follow-up
4  communications with him?
5  A.  Yes.
6  Q.  Okay.  Was there ever a point in time where you wanted
7  to speak with him where he was not willing or able to
8  speak with you?
9  A.  There was a time that I wanted to speak with him, and
10  I think we were on the phone, and I wanted to share
11  more information with him, and he cut me off; he said,
12  "All you want me to do is side with you."  So from
13  that point on, we got off the phone, and I don't know
14  how much more conversation we ever had after that.
15  Q.  Okay.  He told you that he wouldn't speak any further
16  with you because he believed you wanted him to side
17  with you?
18  A.  No, that's not what I said.
19  Q.  Okay.  I apologize.  Will you clarify for me about
20  what he said, then?
21  A.  In that particular conversation, as I was trying to
22  give him more information relevant to my complaint, he
23  cut me off, and I hung the phone up, he cut me off and
24  said all I was doing was trying to get him to really
25  weigh on my side, is what he was actually saying.

Page 214

1  From that conversation, I don't know
2  how many more phone conversations or e-mail exchange
3  him and I had.
4  Q.  Did you ever submit documents to him so that he could
5  consider those?
6  A.  I did.
7  Q.  Do you know whether or not he interviewed any other
8  employees of the Road Commission in the process?
9  A.  I know he interviewed others; I just don't know who
10  those individuals were.
11  Q.  Okay.  Approximately how long in total would you say
12  that you spent either writing e-mails, communicating
13  with him or engaging with him in any respect before
14  you learned the results of the investigation?
15  A.  I believe I received an e-mail that said he was almost
16  finished -- or he apologized for the amount of time,
17  but he was almost finished with his investigation.  I
18  don't know how much after that, 'cause I never
19  received anything directly from him about the
20  investigation.
21  Q.  Got it.  And with respect to the issues and the
22  concerns that you raised, are those ones to which
23  you've already testified about today?  Was there
24  anything that you raised as a concern to him in the
25  course of the investigation that we haven't already

Page 215

1  spoken about today?
2  A.  It's a possibility.  I can't say with accuracy.
3  Q.  I understand.  Was there anything that you raised with
4  him that wasn't contained within your January
5  complaint?
6  A.  I can't recall.
7  Q.  Okay.  You already said -- did you understand that he
8  had interviews and discussions with other employees,
9  too, you just don't know who; right?
10  A.  No, I don't, with the exception of Rachel Mullen.
11  Q.  You do know that he had conversation with Rachel
12  Mullen?
13  A.  That is correct.
14  Q.  Did Rachel Mullen have conversation with you about
15  what she had discussed with Attorney Lange?
16  A.  No, not in depth, no.
17  Q.  Did she do anything more than just mention that Lange
18  had interviewed her?
19  A.  I can't recall the extent of what all she was saying
20  when she said she was interviewed with him.
21  Q.  Okay.  Do you remember when that conversation took
22  place?
23  A.  I do not.
24  Q.  Did she disclose anything, to the best of your
25  recollection, about the substance of their

Page 216

1  conversation?
2  A.  I can't remember.
3  Q.  Did she say whether or not she provided any documents
4  to Attorney Lange?
5  A.  I think he had requested a document or asked her about
6  a document.  That's what I remember.
7  Q.  Did she describe what that document was?
8  A.  It was, when was -- when did Fred Peivandi ask her for
9  the list by race.
10  Q.  Okay.  And did she describe at all the information
11  that she provided to Attorney Lange in response to
12  that inquiry?
13  A.  I can't recall.
14  Q.  Did you have any conversations with anyone else about
15  the investigation?
16  A.  To what extent?
17  Q.  Did you mention that -- did you describe or mention
18  details about your interview to -- well, let's limit
19  it to anyone within the GCRC?
20  A.  I can't recall.
21  Q.  Did you describe anything that came up during your
22  interview to any of the Genesee County Board of Road
23  Commissioners commissioners (sic)?
24  A.  I can't recall.
25  Q.  Did you describe anything to any of the Genesee County

Page 217

1  Commissioners?
2  A.  I can't recall.
3  Q.  Prior to learning what the results of the investigation
4  were, how did you feel that you were treated by
5  Attorney Lange during the interview?
6  A.  Respectfully, with the exception of the comment he
7  made on the phone that day.
8  Q.  And did you know Attorney Lange at all prior to being
9  interviewed by him?
10  A.  I did not.
11  Q.  Had you ever met him before?
12  A.  No.
13  Q.  Had you ever heard his name before?
14  A.  No.
15  Q.  Do you have any reason to suspect that either he or
16  his firm are biased either for or against the Road
17  Commission in any way?
18  A.  I have no knowledge of that.
19  Q.  Do you have any reason to suspect that Attorney Lange
20  is either biased either on behalf of or against
21  African-Americans in any way?
22  A.  I have no knowledge of that.
23  Q.  Do you have any reason to suspect that Attorney Lange
24  is biased either for or against employees engaged in
25  protective activity?

Page 218

1   A.   I have no knowledge of that.
2   Q.   Did you later learn the results of the investigation?
3   A.   I did.
4   Q.   When did you learn the results of the investigation?
5   A.   It would've been in a meeting with myself,
6        Commissioner Tim Elkins and Cloyce Dickerson and Fred
7        Peivandi were at the meeting.
8   Q.   So, again, we have Elkins, Dickerson, Fred and you?
9   A.   That is correct.
10  Q.   Okay.  Approximately when did this meeting take place?
11  A.   I can't give you the specific date.
12  Q.   Was it a month after you were first contacted by
13       Attorney Lange, two months, five months, a year?
14  A.   Let's just say it was less than five months.
15  Q.   Okay, fair enough.
16  A.   More than one month, less than five.
17  Q.   I understand.  And what was the subject of the
18       meeting?
19  A.   The meeting was for Fred and I, along with
20       Commissioner Tim and Dickerson, to try to work out a
21       way by which Fred and I could work better together.
22  Q.   And at that point in time, who informed you about the
23       results of the investigation?
24  A.   I received a copy of the investigation letter that was
25       addressed to me at my home address from Tim Elkins.

Page 219

1   Q.   Had you seen that letter at any point in time prior to
2        that meeting?
3   A.   Absolutely not.
4   Q.   Did Fred indicate whether he had seen the letter at
5        any point in time prior to that meeting?
6   A.   He did not, not to me.
7   Q.   Did Commissioner Dickerson indicate whether he had
8        seen that letter at any point prior to that meeting?
9   A.   Not to me.
10  Q.   Now, you mentioned that the subject of the
11       conversation was trying to get you guys to be able to
12       work together.  What kind of proposals were made or
13       what was the substance of that conversation?
14  A.   Well, the first thing, the meeting was initiated by
15       Commissioner Lange if I would agree to meet with Fred
16       to see if we could resolve our differences.  So that
17       was the basis of the meeting; and in that meeting,
18       there was no proposals made at that point in time.
19  Q.   So what was the substance of the communications to
20       attempt to get you to work better together with Fred?
21  A.   Well, once we got to the letter, there was no meeting
22       at that point, because the letter from -- that I got
23       from Tim Elkins giving me the results of Attorney
24       Lange's report finding, investigation report finding,
25       everything got shut down.

Page 220

1   Q.   When you say everything got shut down, what do you
2        mean?
3   A.   There was no more discussion about mine and Fred's
4        working relationship.
5   Q.   How was it shut down?  I'm sorry, I'm misunderstanding.
6   A.   I was extremely blindsided by the letter and for the
7        letter to be the focus of the meeting when that was
8        not the focus of the meeting initially.  So,
9        therefore, we didn't make any grounds on how Fred and
10       I could work better together.
11            MS. GAFKAY:  We've been going about an
12       hour and a half.  Do you want a break?
13            THE WITNESS:  I need a break.
14            (Recess taken.)
15            MR. CASCINI:  Let's go back on the
16       record.
17  Q.   (BY MR. CASCINI)  I'm showing you, Ms. Poplar, a
18       document marked as Exhibit No. 11.  It is a letter
19       under Craig Lange's signature block, address, April
20       27, 2021.  It's also addressed to you at 5277 Kimberly
21       Woods Circle.  Is this the letter to which you were
22       referring that Mr. Elkins distributed during that
23       meeting?
24  A.   That is correct.
25  Q.   Now, you mentioned that after the letter came out that

Page 221

1        the meeting was shut down.  How far into the meeting
2        did Mr. Elkins produce this letter?
3   A.   I can't recall.
4   Q.   Was there substantial conversation prior to the
5        disclosure of this letter?
6   A.   No.
7   Q.   Was there any conversation regarding methods of
8        getting you and Fred to work better together prior to
9        this letter coming out?
10  A.   No.
11  Q.   Did Commissioner Elkins or Commissioner Dickerson, or
12       both, explain the purpose of the meeting?
13  A.   I can't recall.
14  Q.   Okay.  Do you know if Fred was involved in planning
15       the meeting or that Fred knew what would be discussed
16       during the meeting ahead of time?
17  A.   I don't recall.
18  Q.   And you mentioned that the meeting was shut down at
19       the point in time where this letter came out.  Were
20       you the one that shut it down?
21  A.   No.
22  Q.   Okay.  So what happened to end the meeting?
23  A.   This letter became like a distraction.  So there was
24       exchange going on, and at that particular point, it
25       was decided that we weren't going to get anywhere.

Page 222

1  Q.   Okay.  Who decided that you weren't going to, quote-
2       unquote, get anywhere?
3  A.   I believe it was a decision made between Elkins and
4       Mr. Dickerson.
5  Q.   And do you know what they based that decision on?  Did
6       they explain why they felt that it wasn't possible to
7       get anywhere?
8  A.   I don't know.
9  Q.   Did you raise concerns?  Did you say anything to
10      Commissioner Elkins or Commissioner Dickerson in
11      response to reading this letter?
12 A.   I can't remember.
13 Q.   Do you remember whether Fred said anything to
14      Commissioner Dickerson or to Commissioner Elkins in
15      response to reading this letter?
16 A.   I don't remember.
17 Q.   Do you know whether or not they explained why they
18      wanted to adjourn the meeting at that point?
19 A.   I can't remember.
20 Q.   How soon after the letter was produced was the meeting
21      adjourned?
22 A.   I don't remember.
23 Q.   Must have been a pretty short meeting, though; you
24      said it was produced fairly early in the meeting, and,
25      you know, it shut down communication.  Approximately

Page 223

1       how long was the meeting in its totality?
2  A.   I can't remember.
3  Q.   Subsequent to the receipt of this letter, did Mr.
4       Peivandi ever attempt to discuss a better working
5       relationship with you?
6  A.   No.
7  Q.   Did you ever attempt to approach him to discuss a
8       better working relationship?
9  A.   No.
10 Q.   My understanding is that he provided you with written
11      directives following the issue of this letter; is that
12      correct?
13 A.   That is correct.
14 Q.   Okay.  Can you describe for me what the directives
15      were in summary?
16 A.   Without reading those directives off the document
17      itself, I cannot.
18 Q.   How did he notify you that there were going to be
19      directives that were issued?
20 A.   I believe -- no, I can't remember how he actually gave
21      me the copy of his findings.  I don't know if that was
22      via e-mail or if it was in person; I can't remember.
23 Q.   Fair enough.  With respect to him delivering those
24      directives to you, did he have any communications with
25      you contemporaneously?  In other words, did he explain

Page 224

1       anything about the directives beyond merely giving
2       them to you?
3  A.   No.
4  Q.   Did you review the directives?
5  A.   Yes.
6  Q.   Did you respond once the directives were issued to him
7       (sic)?  Did you say anything in response?
8  A.   No.  And if we can go back, I now remember how I got
9       those directives.  I was called into a meeting.  I was
10      told to come to the Board room, I believe it was on
11      the 7th of November, and when I came in the Board
12      room, it was Fred Peivandi and Randy Dellaposta here.
13      Fred Peivandi gave me a administrative leave notice
14      and told me to read it, not here, but to read it, and
15      if I had any questions, put the questions in writing.
16      That's what I remember.
17 Q.   And this was at the time that you were given a copy of
18      the directives?
19 A.   Those directives were part of that administrative
20      leave.
21 Q.   All right.  And so you were delivered the directives
22      in person, to the best of your recollection?
23 A.   Yes.
24 Q.   Are you certain about that?  You expressed hesitation
25      before; that's the only reason I'm asking.

Page 225

1  A.   I recall getting that leave of notice here, and a part
2       of that leave of notice was, I believe, a part the
3       directives were in.
4  Q.   Okay.
5  A.   No, no, I'm sorry, I got confused.  I got confused.
6  Q.   I completely understand.
7  A.   I'm totally confused.  Strike everything I just said.
8       My mind, when you said the directive, I'm thinking
9       about --
10           MS. GAFKAY:  That's fine.  Maybe if you
11      have them and can show her.
12           THE WITNESS:  Yes.
13           MR. CASCINI:  I completely understand.
14           MS. GAFKAY:  Hold on.  I think you're
15      talking about different things.  So maybe if you show
16      her what you're talking about, we would be better off.
17           MR. CASCINI:  Absolutely.  I think that
18      that's the best option, too.  So we're going to get
19      that document out in just a second here.
20           (Document marked Deposition
21            Exhibit No. 12.)
22           MR. CASCINI:  I'm going to mark this
23      document Exhibit No. 12.  This is a document that's
24      dated, it looks like, July 1, 2021.  It says to Donna
25      Poplar from Fred Peivandi.  Subject line HR Director

Page 226

1  Duties and Responsibilities.
2  Q.   (BY MR. CASCINI)  Briefly having reviewed this
3  document, is this the document in which those
4  directives were communicated to you?
5  A.   That is correct.
6  Q.   Okay.  And now that we're reoriented in time, with the
7  understanding that before you made an error with
8  respect to this and now you're thinking about the
9  correct meeting, do you remember anything about the
10  meeting in which these were delivered to you?
11  A.   This meeting -- yes.
12  Q.   What occurred during that meeting?
13  A.   When I came into this room, which is the GCRC Board
14  room, Fred Peivandi and Randy Dellaposta was present.
15  Fred gave me this document and told me that he was
16  giving me a two-week suspension, and that was it, and
17  that I was to read this document, and if I had any
18  questions or concerns to put them in writing; and he
19  said that I was not to enter the building, and I was
20  not to have any communication with any of the
21  employees here.  I was not to have any communication
22  with Board members, and that was it.
23          MS. GAFKAY:  The only reason I want to
24  take a break, we don't have to break-break, but I just
25  want her to read this because, based on her response,

Page 227

1  it's clear that we're on different documents here,
2  where she's thinking of a different document.
3          MR. CASCINI:  Why don't we go very
4  briefly off the record, then; and, Ms. Poplar, if you
5  could take some time.  I don't need you, for purposes
6  of my questions, to read every word, but if it helps
7  you to orient to the document to which we're
8  referring, I'm more than happy to provide you with
9  that opportunity.
10          MS. GAFKAY:  We're off the record.
11              (Discussion off record.)
12          MR. CASCINI:  If we can go back on the
13  record, please.
14  Q.   (BY MR. CASCINI)  Donna, I know there was some
15  confusion about documents that we expressed, and
16  counsel had a conversation about how best to rectify
17  that issue.  You've had some time subsequently to look
18  more carefully at Exhibit No. 12.
19          Can you tell me whether or not you
20  remember the meeting in which you received Exhibit 12?
21  A.   I do not.
22  Q.   Do you know whether it was in person or over e-mail?
23  A.   I can't remember.
24  Q.   Do you know whether Fred ever addressed anything
25  concerning these directives, in addition to providing

Page 228

1  you with the directives; in other words, did he offer
2  commentary on top of giving you this document?
3  A.   He did not.
4  Q.   Did you read this document when you received it?
5  A.   I did.
6  Q.   And with respect to the directives that are within it,
7  they are requiring you to do certain things in his
8  capacity as the managing director; is that correct?
9  A.   That is correct.
10  Q.   Okay.  No. 1 is, I'm just going to read the headings
11  of the directives.  No. 1 is --
12  A.   What page are you on?
13  Q.   I apologize.  I am on page two of this document.
14  Directive No. 1 is, "Raise and voice work-related or
15  policy-related concerns with the Managing Director
16  individually or in director-level meetings before
17  addressing such concerns with the Board."
18          Do you remember reading about this
19  directive once you received this document?
20  A.   I do.
21  Q.   Is there anything unlawful or improper about Mr.
22  Peivandi issuing you that directive itself?
23  A.   I'm not sure.
24  Q.   Okay.  Is it within the scope of authority of Mr.
25  Peivandi's job to issue you that directive?

Page 229

1  A.   I'm not sure.
2  Q.   With respect to the second directive, "Include the
3  Managing Director in work-related communications you
4  send to the Board or any individual members of the
5  Board."
6          Do you remember reading about that
7  directive?
8  A.   I do.
9  Q.   Is there anything unlawful about Fred Peivandi
10  requiring you to follow that directive, in your
11  opinion?
12  A.   I'm not sure.
13  Q.   Is that within the scope of Fred Peivandi's authority
14  to issue you that opinion?
15  A.   I'm not sure.
16  Q.   With respect to Directive No. 3, which is on the
17  following page, "Perform tasks as directed or assigned
18  by the Managing Director."
19          Is there anything unlawful about
20  issuing you this directive, in your opinion?  When
21  Fred Peivandi issues you this directive, is there
22  anything unlawful about that directive, in your
23  opinion?
24  A.   I'm not sure.
25  Q.   And is it within the scope of Fred Peivandi's

Page 230

1    authority as managing director to instruct you to
2    follow that directive?
3  **A.**  I'm not sure.
4  **Q.**  Okay.  With respect to Directive 4, "Defer all final
5    decisions for hiring and firing to the Managing
6    Director."
7         Do you remember reading about that
8    directive?
9  **A.**  I do.
10 **Q.**  Is that a lawful directive for Fred to provide you, in
11   your opinion?
12        MS. GAFKAY:  Object to the form.
13        MR. CASCINI:  Okay.  Fair enough.
14 **Q.**  (BY MR. CASCINI)  Is it unlawful for Mr. Peivandi, in
15   your opinion, to order you to follow that directive?
16        MS. GAFKAY:  Object to the form.
17 **Q.**  (BY MR. CASCINI)  You can go ahead and answer.
18 **A.**  I'm not sure.
19 **Q.**  Is that within the scope of his authority for him to
20   elect to have you defer all final decisions for hiring
21   and firing to him?  Is that within the scope of his
22   authority as the managing director?
23 **A.**  I'm not sure.
24 **Q.**  Directive 5, "Respect and implement Managing
25   Director's budgetary recommendations."

Page 231

1         Do you remember reading about this
2    directive?
3  **A.**  I do.
4  **Q.**  Is there anything unlawful about this directive, in
5    your opinion?
6         MS. GAFKAY:  Object to the form.
7  **Q.**  (BY MR. CASCINI)  Go ahead and answer.
8  **A.**  I'm not sure.
9  **Q.**  And is it within the scope of the managing director's
10   authority to direct you to respect and implement his
11   budgetary recommendations?
12 **A.**  I'm not sure.
13 **Q.**  After you received this document, did you comply with
14   those directives moving forward?
15 **A.**  To the best of my ability.
16 **Q.**  Are there any instances where you were unable to
17   comply that you're aware of?
18 **A.**  I'm not sure.
19 **Q.**  Does that mean you can't remember whether or not you
20   were able to comply with the directives or does that
21   mean that you're unsure about whether your behavior
22   constituted compliance with the directives?
23 **A.**  I'm not sure if my behavior, relative to these
24   directives, met Mr. Peivandi's expectation.
25 **Q.**  Having reviewed the directives, were there any times

Page 232

1    where you knew you were violating the directives and
2    you felt either compelled or did, in any way, violate
3    the directive?
4  **A.**  I can't recall.
5  **Q.**  Did you address the issue of these directives to any
6    members of the Road Commission?
7  **A.**  I can't recall.
8  **Q.**  Did you address the issue of these directives to any
9    other employees of the GCRC?
10 **A.**  I can't recall.
11 **Q.**  Did you have any further communication or follow up
12   with Fred in order to clarify anything about the scope
13   of the directives?
14 **A.**  I can't recall.
15 **Q.**  Did Fred ever provide any other commentary about how
16   the directives should be interpreted or applied?
17 **A.**  I can't recall.
18 **Q.**  And following the directives issued to you -- I want
19   to switch base here, and I want to begin to talk about
20   another issue that you raised in your Complaint.
21        From your Complaint, I'm reading here,
22   "On August 4, 2021, Genesee County health officials
23   announced a directive calling for a universal masking
24   policy in all indoor settings, including K through 12
25   school buildings, retail establishments and government

Page 233

1    buildings."
2         To the best of your recollection, is
3    that an allegation from your Complaint?
4  **A.**  I would have to be reread my Complaint.
5  **Q.**  Do you believe --
6         MS. GAFKAY:  I don't mean to interject,
7    I'm just trying to help out.  He is actually reading
8    from the Complaint.  I mean, I think he's just asking
9    you if you have that in your Complaint.
10        MR. CASCINI:  Well, I can rephrase
11   that, I think, to get to the heart of it.
12 **Q.**  (BY MR. CASCINI)  Is that one of the allegations that
13   you're raising in this lawsuit, regardless of whether
14   it's actually contained within the Complaint?
15 **A.**  Yes.  I didn't know what you were reading from.
16 **Q.**  I completely understand.
17        MS. GAFKAY:  That's okay.
18        MR. CASCINI:  We're going to distribute
19   a document, and we're going to ask you to mark it as
20   Exhibit 13.
21        (Document marked Deposition
22        Exhibit No. 13.)
23 **Q.**  (BY MR. CASCINI)  I've provided a document that we've
24   all marked as Exhibit No. 13.  It says Genesee County
25   Health Department at the top, and it says Medical

Page 234

1  Health Officer, Indoor Masking Directive is the title
2  of the document below it.
3          If you go to the back page, so the
4  final and third page there, it's been Signed and
5  ordered this 4th day of August, 2021, by Dr. Pamela B.
6  Hackert, Medical Health Officer, Genesee County Health
7  Department.
8          To the best of your recollection and
9  knowledge, Ms. Poplar, is this the document that you
10 were referring to in paragraph 31 of your Complaint
11 when you say that on August 4th, the Genesee County
12 health officials announced a directive calling for a
13 universal masking policy?
14 A.  What date was this --
15       MS. GAFKAY:  Here's the date of the
16 document.
17 Q.  (BY MR. CASCINI)  Signed and ordered this 4th day of
18 August, 2021, is immediately above the signature of
19 Dr. Hackert.
20 A.  And your question again, please.
21 Q.  Is this the directive that you were referring to in
22 paragraph 31 of your Complaint when you write that on
23 August 4th, 2021, Genesee County Health Officials
24 announced a directive calling for a universal masking
25 policy in all indoor settings?

Page 235

1  A.  This is not the document that I seen.
2  Q.  Okay.  Can you describe for me the document that
3  you've seen, to the extent that it differs from this
4  document?
5  A.  The document that I seen was what Fred sent me from
6  MCRCSIP, which was a very short, less than a
7  paragraph, e-mail that I received.
8          (Document marked Deposition
9              Exhibit No. 14.)
10         MR. CASCINI:  I just handed you a
11 document that I've marked Exhibit No. 14.  It is a
12 four-page document.  The first page of this document
13 contains an e-mail that purports to be sent from Donna
14 Poplar to Fred Peivandi, with Monica Pearson cc'd on
15 the top.  It says Subject:  RE:  Memo - MIOSHA Urging
16 CDC Guidance.
17         I'd ask everyone to go to the final
18 page of this document -- my apologies, I actually
19 direct everyone to go to page three, my fault.
20 Q.  (BY MR. CASCINI)  It looks like here, and you tell me,
21 Donna, if this comports with your interpretation,
22 about midway up page three, it looks like Fred
23 Peivandi, on August 16th, sends you a document with
24 FYI is the only body text.  Monica Pearson is cc'd.
25 Does that look accurate to you?

Page 236

1  A.  It does.
2  Q.  And then it says Forward:  Memo - MIOSHA Urging CDC
3  Guidance, it says here; is that correct?
4  A.  Can you point that out to me?
5          MS. GAFKAY:  Yeah, it's the lower one.
6          MR. CASCINI:  Yeah, sure.  Thank you
7  for indicating that, Julia, I appreciate that.
8  Q.  (BY MR. CASCINI)  It says forward memo, and then
9  immediately below that, we have a document with the
10 subject line of Memo - MIOSHA Urging CDC Guidance, and
11 it's sent from Lori Friedlis.  We don't know to whom
12 it is sent.  It says this e-mail was sent from outside
13 the Genesee County Road Commission on behalf of the
14 Gayle Cummings.
15         And then on the next page, it says,
16 "MIOSHA issued a statement today (sic) to encourage
17 employers to follow CDC guidance.  Not mandate.  I
18 take that to mean that they will not have the
19 authority to fine if you do not choose to follow CDC
20 guidance, however we need for you to be aware of the
21 suggestions and consider them.  Especially in areas of
22 high infection.  Please review Wendy's summary and let
23 us know if you have any questions or concerns?"
24         A little bit earlier, Donna, you gave
25 some testimony paragraph 31 referred to an August 4th,

Page 237

1  2021, Genesee County Health Official directive.
2          Is this the document, the very brief
3  e-mail correspondence, to which you're referring?
4  A.  Can you go back to the testimony where I specifically
5  said I was referring to some August 4th,
6  correspondence about --
7  Q.  That is the --
8          MS. GAFKAY:  The lawsuit says there was
9  a directive by Genesee County regarding masks.
10         MR. CASCINI:  And if I misstated that,
11 Donna, I apologize.
12         MS. GAFKAY:  Let him tell you what the
13 paragraph says if he's going to ask you about it.
14 Q.  (BY MR. CASCINI)  I want to make sure we sort this
15 out.  So allegation No. 31 says, "On August 4th, 2021,
16 Genesee County health officials announced a directive
17 calling for a universal masking policy in all indoor
18 settings."  I'm reading from your Complaint in that
19 regard.
20         I'm trying to figure out what the
21 underlying document here to which that statement
22 refers.  I'm trying to figure out where that is.
23         Earlier you gave some testimony saying
24 that it was a very brief e-mail correspondence that
25 had been forwarded to you.  And what I'm asking is, is

Page 238

1  the correspondence from Lori Friedlis, from August
2  13th, that is there on the bottom, is that the
3  correspondence to which paragraph 31 is intended to
4  refer?
5  A.  This is the actual e-mail that I received from Fred
6      Peivandi that led to that paragraph there.
7          MS. GAFKAY:  I'm going to object to the
8  form and lacks foundation, because paragraph 31 of her
9  lawsuit doesn't talk about a document.
10         MR. CASCINI:  It announced a directive
11 calling for universal masking policy.
12 Q.  (BY MR. CASCINI)  So is there any memorialization of
13     that directive, to your knowledge, Donna?  You can
14     answer that question.
15 A.  No.
16 Q.  So Genesee County Health Department did not distill
17     it's directive down into written form?
18         MS. GAFKAY:  Objection; lacks
19 foundation.  You just showed her a document that was
20 from Genesee County with regard to the mask mandate.
21         MR. CASCINI:  And therein lies my
22 question and therein lies what I'm trying to discover
23 here, which is:
24 Q.  (BY MR. CASCINI)  Is there a document associated with
25     allegation No. 31 in your Complaint, to the best of

Page 239

1      your knowledge, Donna?
2  A.  I'm not sure.
3  Q.  How did you come to learn that on August --
4          MS. GAFKAY:  Can we go off the record?
5          MR. CASCINI:  Yes, we can go off the
6  record.
7              (Discussion off record; recess
8              taken.)
9          MR. CASCINI:  So we're back on the
10 record now.  Counsel for Plaintiff and Defense counsel
11 had some communications while we were off the record
12 regarding the legibility of the exhibits.
13         And, Ms. Poplar, I want to not only be
14 sensitive, given what you said about -- you know, I
15 know that you don't like to discuss the visual
16 disability all that much, I understand that, I don't
17 want to be insensitive, but I also want to make sure
18 that we do everything that we can to accommodate your
19 vision-related disability with respect to the purposes
20 of this litigation.
21         I open this question both to counsel
22 and to the witness.  Is there any accommodation that
23 you need or that we can provide that will assist you
24 to being better able to see the exhibits today?
25         THE WITNESS:  Not at this time.

Page 240

1          MR. CASCINI:  Counsel, do you have any
2  objection to that?  Do you wish to propose any
3  accommodation that will be necessary to assist the
4  witness?
5          MS. LEE:  Just that if you're asking
6  questions from the document, that we be given time for
7  us to read her the document.
8          MR. CASCINI:  Okay.  And when you say
9  "read her the document," is it necessary -- I just
10 want to know what your position is.  Is it necessary
11 to read aloud the contents of the document in its
12 entirety, in portion, an excerpt?
13         MS. LEE:  Just so she understands what
14 the document is that's before her.
15         MR. CASCINI:  All right.  Is there
16 anything else that we need to do, in your opinion, at
17 this time that will assist us in being able to go
18 forward with the litigation without providing
19 prejudice to the witness?
20         MS. LEE:  No, that should be fine.
21 Thank you.
22         MR. CASCINI:  And I have one more
23 question just to follow up on this matter.  Ms. Poplar
24 and counsel, is there anything so far about the way
25 that this deposition has been conducted today that

Page 241

1  makes us doubt the testimony may be accurate given the
2  visual disability or legibility issues of any exhibit?
3          MS. LEE:  I believe we've clarified the
4  issues on and off the record.
5          MR. CASCINI:  So is the answer to that
6  no?
7          MS. LEE:  Ask it again.
8          MR. CASCINI:  I want to ask and clarify
9  to make sure.  Is there anything about the way that
10 the deposition has been conducted today to this point
11 that gives us reason to doubt the accuracy of the
12 testimony based on the visual disability or the
13 legibility of the documents?
14         MS. LEE:  No.  We clarified the issues
15 on the record.
16         MR. CASCINI:  Okay.  All of those have
17 been addressed.  We don't have anything else?
18         MS. LEE:  (Shaking head negatively).
19         MR. CASCINI:  Okay.  I completely
20 understand, Charis.  I wasn't trying to be belabor.  I
21 apologize.
22 Q.  (BY MR. CASCINI)  I'd like to just refocus in this
23     way, Ms. Poplar.  Allegation No. 31 from your
24     Complaint, I will read it aloud, is, "On August 14,
25     2021, Genesee County health officials announced a

Page 242

1    directive calling for a universal masking policy in
2    all indoor settings, including K through 12 school
3    buildings, retail establishments and governmental
4    buildings."
5            Ms. Poplar, do you know whether this
6    directive was ever reduced to writing or whether there
7    is a writing that summarizes that directive?
8    A.   I don't.
9    Q.   And to clarify, when we take a look at Exhibit No. 13
10   that's been admitted here, Exhibit No. 13, this is a
11   document where at the very top of the heading says
12   Genesee County Health Department, Medical Health
13   Officer, Indoor Masking Directive.
14           And then if you go to page three, it
15   says, I'm going to read the first full paragraph,
16   Donna, which is the second one from the top, it says,
17   "This DIRECTIVE will remain in effect until the
18   Genesee County Health Department confirms that
19   Covid-19 disease rates have declined to sustain low
20   levels of transmission as defined by the CDC or is
21   otherwise rescinded.  Signed and ordered this 4th day
22   of August, 2021"; and then it says Dr. Pamela B.
23   Hackert, MD MPHJD.  Very impressive set of
24   credentials, I might add.
25           Is this document, to your knowledge,

Page 243

1    the directive to which 31 refers?
2            MS. GAFKAY:  Objection; lack of
3    foundation.
4    Q.   (BY MR. CASCINI)  Do you know whether this document is
5    the directive to which item 31 refers?
6    A.   I'm not sure.
7    Q.   Do you remember how you came to learn of the directive
8    that you are referring to in item 31 of your
9    Complaint?
10   A.   Yes.
11   Q.   How did you come to learn of that directive?
12   A.   I had Monica -- in talking with Commissioner Bryant
13   Nolden, he informed me of that directive, and not only
14   did he inform me, he sent a copy of that directive to
15   myself and members of the Genesee County Road
16   Commission Board.
17   Q.   Did he send it to you via e-mail?
18   A.   Yes, he did.
19   Q.   And to the best of your recollection or knowledge, did
20   he send that e-mail to you on August 4th, 2021?
21   A.   I don't know exactly when he send it.
22   Q.   That's fair.  Was the document and e-mail summary that
23   he prepared to the best of your recollection or was
24   there a directive text included as an attachment to
25   that e-mail?

Page 244

1    A.   I believe it was the actual document.
2    Q.   Okay, it was the actual document.  But you don't
3    remember whether it's Exhibit 13 or not?
4    A.   I'm not for sure if this is the exact document.
5    Q.   Do you remember if it looked anything like that?
6    A.   I can't remember.
7    Q.   Do you know if Genesee County Health Department ever
8    issues multiple directives on the same day, to your
9    knowledge?
10   A.   I'm not sure.
11   Q.   Did you have a conversation with Commissioner Nolden
12   about that directive?
13   A.   I believe we did.
14   Q.   Regardless, even if we can't identify where that
15   directive is today, and even if that directive may not
16   be in front of us today, did you read the directive
17   that Commissioner Nolden provided to you?
18   A.   I did.
19   Q.   Okay.  Then did you have any correspondence with Fred
20   Peivandi about that directive?
21   A.   I can't recall.
22   Q.   So I'm going to read to you item No. 32 in your
23   Complaint.  It says, "After the directive from the
24   health department, Plaintiff reported to Defendant
25   Peivandi that MIOSHA was recommending all vaccinated

Page 245

1    and unvaccinated employees and visitors to wear a face
2    mask to contain the spread of COVID-19 and Genesee
3    County Health Department issued a directive calling
4    for governmental buildings to have a mask policy."
5            Does that refresh your recollection of
6    whether you informed and had a conversation with Fred
7    Peivandi about the directive?
8    A.   I would need to know the date of that correspondence
9    to compare the date with the actual document that I
10   had here that you referenced to, No. -- what are you
11   calling it, document 13?
12   Q.   I'm not asking you about any document at all.
13           MS. GAFKAY:  Listen to the question.
14   Q.   (BY MR. CASCINI)  I'm asking you, Donna, whether or
15   not you had correspondence about the document that
16   Commissioner Nolden sent you, whatever form that took,
17   with Fred Peivandi?
18   A.   I believe that I sent Fred Peivandi any correspondence
19   that referenced what Commissioner Nolden was saying.
20   I believe that to be true.
21   Q.   All right.  With respect to correspondence with Mr.
22   Peivandi, did you ever ask Mr. Peivandi or make a
23   recommendation with respect to masking policy based on
24   this directive, masking policy at the GCRC, I should
25   say?

Page 246

1  **A.**  I sent him a correspondence.

2  **Q.**  That was via e-mail?

3  **A.**  That is correct.

4  **Q.**  Do you remember approximately when this e-mail was

5  sent?

6  **A.**  I don't.

7  **Q.**  I am now going to turn your attention to Exhibit 14,

8  which was prior introduced, and I would like to go to

9  page two in that document, and I'd like to refer to

10  the second e-mail header that we can see on this

11  document.  It says from Poplar Donna, sent Monday,

12  August 16th, to Fred Peivandi, cc Monica Pearson,

13  Subject:  Memo - MIOSHA Urging CDC Guidance.

14  Is this the recommendation that you

15  made to Fred with respect to the directive that

16  appeared in paragraph 31?

17  **A.**  Yes.

18  **Q.**  Okay.  And then did Fred respond to you?

19  **A.**  Yes.

20  **Q.**  And I'm going to direct you to the first header that

21  we have on Exhibit 14 on page two.  It says from Fred

22  Peivandi, sent Monday, August 16, 2021, to Donna

23  Poplar, cc:  Monica Pearson and Randy.  Subject:  RE:

24  Memo - MIOSHA Urging CDC Guidance.  It says, "Donna,

25  at this time, I do not wish to mandate that GCRC staff

Page 247

1  and visitors wear masks."  There is additional text

2  that follows.  Is that the response, to the best of

3  your recollection, that Fred e-mailed back to you?

4  **A.**  That is correct.

5  **Q.**  Then I want to go to page one of this document, and I

6  want to look at the e-mail header that is on the top

7  of page one of Exhibit 14.  It says from Donna Poplar,

8  sent Monday, August 16, 2021, to Fred Peivandi, cc

9  Monica Pearson.  Subject:  Memo - MIOSHA Urging CDC

10  Guidance.  Then it says, I'm going to read the first

11  part of it.  "Fred, I feel it is important for me to

12  reiterate that I strongly feel that because of the

13  seriousness of the COVID-19 increasing deadly Delta

14  variant and the mere fact that Genesee County is

15  ranked as a Substantial Transmission Risk County for

16  COVID-19, it would be to the best interest of ALL GCRC

17  employees and visitors if GCRC follow the

18  recommendations of MIOSHA and CDC Guidelines as we

19  have since the off set of COVID-19."

20  Is this, to the best of your

21  recollection, an e-mail that you sent to him in

22  response to his prior e-mail that we just read?

23  **A.**  Yes.

24  **Q.**  Okay.  And take one quick step back.  We're talking

25  about page two of his directive.  So we're going to go

Page 248

1  back to his directive, the one that is at the top of

2  the page.  The one that was sent at 3:42 p.m.

3  In your Complaint, it says, "Defendant

4  Peivandi refused to require employees and visitors to

5  wear face masks, but indicated Plaintiff could advise

6  staff of the risk levels in Genesee County and that if

7  MIOSHA issued a mask mandate that GCRC would comply."

8  Is this the refusal, or the alleged

9  refusal, to which you were referring in paragraph 33,

10  this Fred Peivandi e-mail from 3:42 p.m.?

11  MS. GAFKAY:  Can I show her what

12  paragraph 33 says?

13  MR. CASCINI:  Absolutely, yeah.  I

14  would like to read it to her again just for

15  simplicity.

16  **Q.**  (BY MR. CASCINI)  "Defendant Peivandi refused to

17  require employees and visitors to wear face masks, but

18  indicated Plaintiff could advise staff of the risk

19  levels in Genesee County and that if MIOSHA issued a

20  mask mandate that GCRC would comply."

21  **A.**  Yes.

22  **Q.**  Okay.  So that is the e-mail that you're referring to

23  in paragraph 33 with respect to the refusal; is that

24  right?

25  **A.**  Yes.

Page 249

1  **Q.**  Was there any additional correspondence that Fred

2  Peivandi gave to you that you're referring to with the

3  refusal?

4  **A.**  I'm not sure.

5  **Q.**  Okay, that's fine.  No. 34 in your Complaint says,

6  "Plaintiff sent communication to GCRC employees

7  regarding Defendant Peivandi's decision not to mandate

8  masks, advising employees that Genesee County was

9  ranked as a 'Substantial Transmission Risk County,' so

10  employees could make informed personal protection

11  decisions."

12  (Document marked Deposition

13  Exhibit No. 15.)

14  MR. CASCINI:  So Exhibit 15, we've all

15  marked, is a document that has a header Genesee County

16  Road Commission, Human Resources Department Memo, date

17  August 17, 2021, to all GCRC employees, from Fred

18  Peivandi and Donna Poplar, cc GCRC Board of

19  Commissioners, RE:  MIOSHA Recommendations, so that's

20  the subject line.

21  **Q.**  (BY MR. CASCINI)  Is this the communication to which

22  you were referring in paragraph 34 of your Complaint

23  when it says Plaintiff sent communication to GCRC

24  employees regarding Defendant Peivandi's decision not

25  to mandate masks?

Page 250

1    A.    That's correct.

2    Q.    I would like to direct you to page -- nope, that's

3          wrong.  I would like to direct you to paragraph 86 of

4          your Complaint.  We're on paragraph 86 of the

5          Complaint.  Unfortunately I'm reading from the

6          answers, so I don't know what page of the Complaint

7          that was on.

8                MS. GAFKAY:  Fifteen, page fifteen.

9    Q.    (BY MR. CASCINI)  Paragraph 86 reads, "Plaintiff

10         engaged in constitutionally protected speech on

11         matters of public concern including, but not limited

12         to, race discrimination and COVID-19 safety protocols

13         which should be followed relating to masks, which are

14         matters of public concern."

15               Is the constitutionally protected

16         speech related to the Covid-19 safety protocols, which

17         should be followed relating to masks, to which you are

18         referring in paragraph 86?  Is that Exhibit 15?

19   A.    Yes.

20   Q.    Did Fred Peivandi have any communications with you

21         after you issued the memorandum that is depicted in

22         Exhibit 15?

23   A.    I can't recall.

24   Q.    Did you show Mr. Peivandi a copy of Exhibit 15 before

25         you distributed it?

Page 251

1    A.    I did not.

2    Q.    It says from Fred Peivandi.  Did Fred Peivandi have

3          any hand in drafting this document?

4    A.    No.

5    Q.    Okay.  Now, are you the person who drafted this

6          document?

7    A.    That is correct.

8    Q.    And you were actually the one that sent it out; right?

9    A.    That is correct.

10   Q.    Subsequent to this document being distributed --

11               MR. CASCINI:  We'll be marking Exhibit

12         No. 16 here in just a moment, but I'd like to ask you

13         some questions before we get started here.

14   Q.    (BY MR. CASCINI)  Were you provided a -- were you

15         provided disciplinary action by Fred Peivandi in

16         response to the memorandum that we just referenced as

17         Exhibit 15?

18               MS. GAFKAY:  Object to the form.

19   Q.    (BY MR. CASCINI)  You can go ahead and answer.

20   A.    I believe I was provided disciplinary action based on

21         my being discriminated against because of my race.  I

22         believe that my disciplinary action was predicated

23         around my being retaliated against.

24   Q.    Sure.

25   A.    And I believe it was based on the fact that I was

Page 252

1          being treated different and the fact that I used my

2          freedom of speech to share information that I felt was

3          relevant as part of my duty as directed by the labor

4          relations attorney.

5    Q.    And with respect to that exercise of freedom of speech

6          in particular, you're referring to the issuance of the

7          information in the memo attached there that we

8          referred to as Exhibit 15; right?

9    A.    I need to see the exhibit to --

10   Q.    Yeah, Exhibit 15 is the document that . . .

11   A.    That is correct.

12   Q.    Okay.  Now, the disciplinary action that you

13         received --

14               (Document marked Deposition

15               Exhibit No. 16.)

16               MR. CASCINI:  So we're going to mark

17         that as Exhibit 16 here on the Disciplinary Action

18         Notice that I think we all have here.  It's got

19         Disciplinary Action Notice in the header.  It says to

20         Donna Poplar, from Fred Peivandi, Managing Director,

21         date August 19, 2021.

22   Q.    (BY MR. CASCINI)  Donna, have you seen this document

23         before?

24   A.    I have.

25   Q.    And did Fred Peivandi give you this document?

Page 253

1    A.    He did.

2    Q.    Do you remember when he gave you this document?

3    A.    On August 19th, 2021.

4    Q.    Did he give it to you in person, via e-mail?  How did

5          he distribute it to you?

6    A.    In person.

7    Q.    Did you meet with him personally?

8    A.    I did.

9    Q.    Anybody else present during that meeting?

10   A.    Yes.

11   Q.    Who else was present during that meeting?

12   A.    Randy Dellaposta.

13   Q.    Randy Dellaposta was there.  Was there any

14         conversation about the disciplinary action notice that

15         he gave you?

16   A.    No.

17   Q.    When he gave it to you, did he say anything?

18   A.    No; but I was given a two-week suspension, that I was

19         to read the document; if I had any questions, then I

20         could put them in writing to him.

21               MR. CASCINI:  Okay.  And just for the

22         purpose of the record, Exhibit 16 has Bates No.

23         Defendants RPD Response 8 - No. 2 at the very bottom.

24   Q.    (BY MR. CASCINI)  After that, were you, in fact,

25         placed on a two-week disciplinary suspension?

Page 254

1  A.  That is correct.
2  Q.  While you were on your period of --
3  A.  Let me back up.  Also in that meeting he informed me
4      that I was not to enter into the building and that I
5      could not have any communications with employees here;
6      and there were other things that he said that I was
7      not supposed to do, but I can't remember exactly all
8      of them right now.  So that's not all-inclusive.
9  Q.  So were any of the additional things that he discussed
10     with you during that meeting, did that go beyond what
11     is contained in Exhibit 16, that is to say, did he
12     give you verbal directives or orders that were not
13     part of the written disciplinary action notice?
14 A.  At that time, I had not had a opportunity to read the
15     disciplinary action notice, so I can't say to what all
16     he was referencing to relative to the disciplinary
17     action notice.
18 Q.  Did you subsequently read the disciplinary action
19     notice?
20 A.  Later, after I left.
21 Q.  Did you notice when you read it later that there was
22     any inconsistencies between the verbal instructions he
23     may have given you during that meeting and the
24     contents of the disciplinary action notice?
25 A.  I can't recall.

Page 255

1  Q.  You testified, I think, earlier you were, in fact,
2      placed on a two-week disciplinary suspension after
3      that point; right?
4  A.  Effective with this date here, yes.
5  Q.  And was that period of suspension paid or unpaid?
6  A.  Unpaid.
7  Q.  Were your benefits continued during that suspension or
8      no?
9  A.  I can't recall.
10 Q.  Now, during that period of suspension, and I'm trying
11     to just get to a shortcut here, you filed an
12     additional complaint with the Board of Commissioners;
13     correct?
14 A.  That is correct.
15            (Document marked Deposition
16             Exhibit No. 17.)
17            MR. CASCINI:  I'm going to mark a
18     document that's Exhibit 17.  The header of this
19     particular document is August 26, 2021, Genesee County
20     Road Commission, Board Chairman Cloyce Dickerson, and
21     then it says, Dear Commissioner Cloyce Dickerson.  And
22     then it goes on for several pages.
23 Q.  (BY MR. CASCINI)  I just want to try to ask you and
24     tell me if you need more time to read this document,
25     is this a copy of the complaint you filed while you

Page 256

1      were on your two-week unpaid suspension?
2  A.  It appears to be.
3  Q.  It says here under heading No. I, Request For
4      Investigation.  "I request an unbiased investigation
5      of the situation.  As you know, I'm employed as the
6      GCRC Human Resource Director and have held this
7      position since October of 2016."  And then if you want
8      to go all the way to the back there.
9  A.  When you say to the back, are you referencing the last
10     page?
11 Q.  Yes, please.  I apologize.  A document with Bates No.
12     102.  I'm going to look at --
13 A.  You said date what?
14            MR. CASCINI:  It's Bates No. 102 for
15     the record purposes.  Go off the record for a second.
16            (Discussion off record.)
17            MR. CASCINI:  Let's go back on the
18     record here.
19 Q.  (BY MR. CASCINI)  Under heading VI Conclusion, I'm
20     going to read the final sentence in that paragraph.
21     "I respectfully request a fair and just investigation
22     into this situation."
23            This is the complaint that you filed
24     with the Genesee County Board of Commissioners on
25     August 26th; correct?

Page 257

1  A.  That's correct.
2  Q.  Following your submission of this document, did you
3      ever have an opportunity to address these concerns
4      with the Genesee County Board of Commissioners -- I'm
5      sorry -- with the Genesee County Road Commissioners?
6  A.  As it relates to this document here?
7  Q.  Yes.  Subsequent to that document being filed with the
8      Road Commission, Cloyce Dickerson, did you have an
9      opportunity to discuss your concerns from this
10     document with the Road Commission?
11 A.  I believe that there was a meeting held here to
12     discuss these issues here.
13 Q.  I understand.  And you complain of, in very brief
14     summary, I'm reading from the first full paragraph on
15     page Bates No. 95, "... please consider this letter as
16     a formal written complaint of retaliation, continued
17     race discrimination, harassment, differential
18     treatment, and hostile work environment against my
19     supervisor, Managing Director, Fred Peivandi."
20            Am I reading that correctly?
21 A.  Yes.
22 Q.  Okay.  And I see that the document here, one, two,
23     three, four, five, six, seven, eight, eight pages long
24     this complaint is in its total.  Does this contain all
25     of the instances of race discrimination, harassment,

Page 258

1  differential treatment and hostile work environment
2  and retaliation, I apologize, to which you were
3  referring?
4          MS. GAFKAY:  Object to the form.
5          THE WITNESS:  This complaint is not
6  all-inclusive.
7  Q.  (BY MR. CASCINI)  Okay.  I understand.  You said that
8  you believe that you had a meeting subsequent to the
9  submission of this document with the Genesee County
10 Board of Road Commissioners; is that correct?
11 A.  That's correct.
12 Q.  Do you remember approximately when that meeting
13 occurred?
14 A.  I do not, but you were present, so you might have more
15 of the documentation than I do, if I remember.
16 Q.  And I very well may, but I don't have it in front of
17 me.
18 A.  Okay.
19 Q.  Regardless, there was a meeting.  Were all five of the
20 Road Commissioners present during that meeting?
21 A.  No.
22 Q.  No?  Okay.  Were you represented by counsel during
23 that meeting?
24 A.  I was.
25 Q.  And did that meeting occur in closed session or open

Page 259

1  session?
2  A.  It was in closed session.
3  Q.  With respect only to your memory of what occurred
4  during that meeting, did you have an opportunity to
5  raise concerns with the Board of Road Commissioners
6  during that session?
7  A.  I did.
8  Q.  Okay.  And at that point in time, you made a request
9  for your concerns to be mediated and discussed further
10 so some solution could be proposed; correct?
11 A.  That is correct.  And before you go there, I'm not for
12 sure that all the Board members were here.
13         MS. GAFKAY:  Well, you did say that.
14         THE WITNESS:  Oh, okay.
15         MS. GAFKAY:  You said you're not sure.
16 I think you said there wasn't; but you're saying
17 you're not sure, there could've been all of them;
18 correct?
19         THE WITNESS:  Yes.
20 Q.  (BY MR. CASCINI)  Okay.  Did you have any opportunity
21 to meet with any individual commissioners or with the
22 Board of Road Commissioners as a whole between the
23 time when you submitted the second written complaint
24 on August 26th and that meeting that you just
25 testified to?

Page 260

1  A.  I'm not sure.
2  Q.  Okay.  It's possible you may, possible you may not
3  have, just don't remember?
4  A.  I just don't remember.
5  Q.  Fair enough.
6          (Document marked Deposition
7          Exhibit No. 18.)
8          MR. CASCINI:  This is a document that
9  I'm going to mark as Exhibit No. 18.  There's a header
10 of Lee Legal Group, PLLC, September 28, 2021, Genesee
11 County Road Commission, Cloyce Dickerson, Board
12 Chairman.  Dear Commissioner Dickerson:  Re:
13 Representation of Donna Poplar and settlement offer.
14 Q.  (BY MR. CASCINI)  Was this a document that was
15 extended to the Genesee County Road Commission from
16 your attorney on your behalf.
17 A.  That is correct.
18 Q.  And do you believe that it was sent out on September
19 28th, 2021?  I should ask it differently.  Do you have
20 any reason to doubt that it was sent out on that date?
21 A.  I do not.
22         MS. GAFKAY:  I'm going to interject an
23 objection and a statement.  You can ask questions
24 about this to the Plaintiff, but this document is
25 inadmissible --

Page 261

1          MR. CASCINI:  Okay.
2          MS. GAFKAY:  -- under 408 as
3  specifically set forth.
4          MR. CASCINI:  This is the settlement --
5          MS. GAFKAY:  It specifically identifies
6  408 in the Re line, so the intent was not that it
7  would become an exhibit at trial or --
8          MR. CASCINI:  Fair enough.  And, you
9  know, we can resolve the conflict over the
10 admissibility of this document for a later time.
11 Q.  (BY MR. CASCINI)  Did you ask, either through counsel
12 or individually, did you ask for your concerns to be
13 mediated with respect to the conflict and all the
14 issues that you raised in your August Complaint?
15 A.  I don't know if we asked for mediation.  I can't say
16 that for sure.
17 Q.  Well, let me make sure that I'm also referring to the
18 same thing.  When I say mediation, I'm not referring
19 to the formal process of mediation, but some sort of
20 compromise, some discussion about, whether they were
21 settlement negotiations, whether they were mediations,
22 whether it was alternative dispute resolution of some
23 form, did you ask for that to be conducted on your
24 behalf with the Genesee County Road Commission?
25 A.  I did.

Page 262

1    MR. CASCINI:  Okay.  And, now, we're
2  doing this one step out of order, but I don't want to
3  belabor it.
4            (Document marked Deposition
5            Exhibit No. 19.)
6            MR. CASCINI:  This is a document that's
7  been marked as Exhibit No. 19.  It has Bates No.
8  Defendants RPD Response 8, No. 5 at the very bottom.
9  The header says Notice of Administrative Leave, to
10  Donna Poplar, from Fred Peivandi, date September 6,
11  Re:  End of Suspension Period and Start of Paid
12  Administrative Leave.
13 Q.  (BY MR. CASCINI)  Is this a document that was provided
14  to you at any point in time, Ms. Poplar?
15 A.  That is correct.
16 Q.  So you have seen this document before?
17 A.  I have.
18 Q.  And who gave you this document?
19 A.  Fred Peivandi.
20 Q.  And this document purports to impose a duration of
21  administratively leave.  Were you, in fact, placed on
22  paid administrative leave pursuant to this document?
23 A.  I was.
24 Q.  And is the date correct, September 6, 2021, as to when
25  that administrative leave period began?

Page 263

1 A.  I believe that the date that the administrative leave
2  began was on the 7th of September; that's when I
3  became aware of that.  I wasn't aware on September
4  6th.
5 Q.  And your point is well-met because the first paragraph
6  actually here says, "This unpaid disciplinary
7  suspension is scheduled to end on September 7th (the
8  day following the Labor Day holiday)"; and then it
9  imposes a period of administrative leave.
10            So your point is well-met.  It looks
11  like your testimony is that the administrative -- you
12  were -- the paid administrative leave began on
13  September 7th?
14 A.  That is correct.
15 Q.  Okay, I understand.  To the best of your knowledge,
16  subsequent to you requesting a form of mediation or
17  alternative dispute resolution with the Board and
18  subsequent to your meeting with the Board, without
19  disclosing the substance of the communications, did
20  your counsel and counsel for the Road Commission
21  exchange potential proposals to mediate or resolve the
22  issue subsequent to that?
23 A.  I'm not sure.
24 Q.  That's fine.  How did you learn that you had been
25  returned to work?

Page 264

1 A.  I received a phone call from my attorney.
2 Q.  Do you remember the date when you received that phone
3  call?
4 A.  I do not.
5 Q.  To the best of your recollection, was it in early
6  November?
7 A.  It would've been prior to September 7th.
8 Q.  You mean subsequent to September 7th?  It's getting
9  late.  You need to be returned to work, obviously,
10  after you're placed on administrative leave; right?
11 A.  Right.
12 Q.  You received a call from your attorney informing you
13  that you were slated to come back to work?
14 A.  That is correct.
15            MS. GAFKAY:  Well, I was going to
16  object, but --
17            MR. CASCINI:  Fair enough, Julie.  I
18  didn't mean to stand on you there.
19            THE WITNESS:  It was before November
20  8th when I was informed that I would be returning back
21  to work.
22            (Document marked Deposition
23            Exhibit No. 20.)
24            MR. CASCINI:  We're going to mark this
25  document as Exhibit No. 20.  I'm going to read the

Page 265

1  header here.  From Andrew Cascini, date Tuesday,
2  November 2, 2:05 p.m., to Cheris Lee, Subject:
3  Rejection of proposed offer and impasse.
4            Then it goes forward to say, "Charis:
5  The Board held a regularly scheduled meeting today.
6  At the conclusion of the meeting, the Board voted and
7  approved a motion including the following," and then
8  bullet points are contained.
9 Q.  (BY MR. CASCINI)  Ms. Poplar, have you ever seen this
10  e-mail before?
11            MS. GAFKAY:  Before you answer, I just
12  need to preserve an objection again.  While I'm
13  allowing you some leeway in asking these questions,
14  clearly this falls under 408 and would not be
15  admissible, but --
16            MR. CASCINI:  Well, at this point
17  there's no substance of actual negotiation content.
18  This is merely informing her about her return to work.
19            MS. GAFKAY:  Well, I was looking at the
20  subject line, which clearly suggests --
21            MR. CASCINI:  And that's fair.
22            MR. GAFKAY:  -- and that is all I read,
23  and that alerted me that it would certainly fall under
24  408.  But go ahead and ask the questions, and we'll
25  bring a motion.

Case 2:21-cv-12568-VAR-JJCG    ECF No. 23-7, PageID.500    Filed 11/21/22    Page 68 of 72

68 (266 - 269)

Donna Poplar - 9-12-2022 - Joseph A. Peivandi, et al. v. County of Ottawa, et al.

Page 266

1  MR. CASCINI:  And this may be a very
2  brief line of questions.
3  Q.  (BY MR. CASCINI)  Ms. Poplar, have you ever seen this
4  document before?
5  A.  I'm not sure.
6  Q.  Okay.  Is it possible -- you earlier testified that
7  you weren't sure when you received the phone call from
8  Ms. Lee informing you that you could come back to
9  work.  Do you believe that it -- could it have been
10  November 2nd?  Does that refresh your recollection or
11  no?  If it doesn't, that's fine.
12  A.  I'm not sure.
13  Q.  All right.  Do you have any reason to doubt that on
14  November 2nd, the Board voted to return you to work?
15  A.  No.
16  Q.  Okay.  Were you present at that meeting?
17  A.  No.
18  Q.  Subsequent to your return to work, you began reporting
19  to Randy Dellaposta; correct?
20  A.  That is correct.
21  Q.  Was it communicated to you that one of the methods
22  that the Board had attempted to remediate the alleged
23  instances of harassment was to have you report to Mr.
24  Dellaposta instead of to Mr. Peivandi?
25  A.  I don't recall anyone telling me that.

Page 267

1  Q.  Okay.  With respect to your allegations related to
2  your wage increase in 2021 and the 2021 budget, I
3  believe your testimony earlier was that you received a
4  one percent wage increase pursuant to the 2021 budget;
5  is that correct?
6  A.  That is not correct.
7  Q.  Okay.  What was your wage increase subject to the 2021
8  budget?
9  A.  Two percent.
10  Q.  And with respect to that two percent wage increase, I
11  understand that you have alleged that you feel that
12  that was either discriminatory or motivated in full or
13  in part on retaliation for protected activity; is that
14  right?
15  A.  That is correct.
16  Q.  It's one of the claims in your lawsuit?
17  A.  (No response).
18  Q.  "Yes"?
19  A.  Yes.
20  Q.  Paragraph 45 of your Complaint, "The Plaintiff and
21  Anthony Branch who have engaged in protected activity
22  received a 1% and 2% raise for the 2021-2022 budget
23  passed by Defendant in September, 2021.  This reflects
24  large raises up to $15,000 in pay for the three
25  Caucasian directors who have not engaged in protected

Page 268

1  activity."
2  Which director, if any, received a
3  $15,000 increase in pay, to your knowledge?
4  A.  I believe that, up to -- I believe that Randy
5  Dellaposta got a nine to ten percent; and I believe
6  that Tracy Khan, in a combination, may have gotten a
7  total of ten percent.  I believe Eric Johnston was to
8  be $4,000 every year in increase.
9  Q.  Do any of those employees have employment agreements,
10  to the best of your knowledge, that would dictate
11  whether or not they received raises?
12  A.  Not to my knowledge.
13  Q.  Do you know what considerations were considered by the
14  Board when they were determining whether or not to
15  adopt the budget proposal, including these raise
16  amounts?
17  A.  I do not.
18  Q.  With respect to the $15,000 that you said you
19  approximated nine to ten percent of a raise for Mr.
20  Dellaposta, was that offered in connection with his
21  promotion to deputy managing director?
22  A.  No.
23  Q.  Was it offered in connection to the imposition of job
24  duties that would later be retitled as deputy managing
25  director, I guess I should ask?

Page 269

1  A.  Not to my knowledge.
2  Q.  Are you involved in determining the final budget on
3  each year for the GCRC's operations?
4  A.  No.
5  Q.  Okay.  Have you had any communications with any third
6  party, so I'm referring only to entities that are
7  external to the Road Commission, about this lawsuit?
8  A.  Not to my knowledge.
9  Q.  Did you have communications with any third parties,
10  external to the Road Commission, concerning your
11  August complaint to the Board?
12  A.  I'm not sure.
13  Q.  Lastly, I want to ask you about damages that you claim
14  in this lawsuit, which means, mercifully, Ms. Poplar,
15  I'm also done with you.
16  A.  That can be taken several ways.
17  Q.  I apologize.  I mean, hopefully you can go on to
18  better things and to warmer things.
19  Ms. Poplar, in your Complaint, you
20  allege a variety of different damages -- injuries and
21  damages.  I'm going to, repeating, but let's take a
22  look at paragraph 53, for example.  "... Plaintiff has
23  suffered injuries and damages, including, but not
24  limited to, potential loss of earnings and earning
25  capacity; loss of career opportunities; loss of

Page 270

1  reputation and esteem in the community; mental and
2  emotional distress; and loss of the pleasures of life.
3  Is that correct?
4  **A.**  Yes.
5  **Q.**  Those are the damages that you're claiming in this
6  lawsuit?
7  **A.**  In this lawsuit, yes.
8  **Q.**  With respect to the potential loss of earnings and
9  earning capacity, when you say that you've lost
10  potential earnings and earning capacity, to what are
11  you referring?
12  **A.**  When I look at the damage that -- what I suffered, as
13  I allege in this lawsuit, and the media attention and
14  the community attention on this, I believe it's put me
15  in a bad situation of even pursuing a career outside
16  of the Road Commission.
17  **Q.**  With respect to that, do you have reason to believe
18  that the Road Commission publicized or in some way
19  involved the media in notifying them that you had been
20  placed on either paid administrative leave or any of
21  the other complaints that you filed in this lawsuit?
22  **A.**  I'm not sure.
23  **Q.**  Did you have any communication with any third-party
24  media about any of the allegations in this lawsuit?
25  Were you ever asked to comment on anything?  Did you

Page 271

1  ever contact anybody with respect to this lawsuit?
2  **A.**  No, not any media.
3  **Q.**  Were you ever asked to comment by members of the
4  community about the lawsuit?  Members of the community
5  being defined as anybody who's not a GCRC employee who
6  you interact with in any other nonprofessional avenues
7  in your life?
8  **A.**  Not to my knowledge.
9  **Q.**  Do you have any reason to believe that your suspension
10  or your period on paid administrative leave became a
11  matter of public concern at any point in time?
12  **A.**  I do.
13  **Q.**  What led you to believe that?
14  **A.**  With the comments that the community was making at one
15  of the Genesee County Board Commission meetings, and
16  the comments that others throughout the community was
17  raising.
18  **Q.**  Do you have any reason to believe that the Genesee
19  County Road Commission in any way communicated those
20  concerns to the members of the community who voiced
21  them at the meeting?
22  **A.**  I'm not sure.
23  **Q.**  Do you know how they learned about the status of your
24  suspension or paid administrative leave?
25  **A.**  It would've probably been to those who were coming to

Page 272

1  some of the Board meetings here.
2  **Q.**  Sure.
3  **A.**  And from an individual that was present at the Genesee
4  County Board of Commissioners meetings.
5  **Q.**  For example, sure.  Did you know how -- so do you know
6  how those individuals became aware of that?
7  **A.**  I'm not sure.
8  **Q.**  Okay.  Loss of career opportunities is the next damage
9  that you've alleged.  Is that similar in its scope to
10  what you just testified to regarding potential loss of
11  earnings and earning capacity?
12  **A.**  Also, when employers ask the question, have you ever
13  been suspended or put on administrative leave, that
14  certainly could pose me some issues and some problems
15  of not being hired for a position I was pursuing.
16  That could interfere with my ability to be hired if a
17  employer were to ask me had I ever been suspended
18  and/or put on administrative leave.
19  **Q.**  Have you ever been suspended or put on administrative
20  leave with any other employers in your employment
21  history, other than the Genesee County Road Commission?
22  **A.**  I have never been suspended, but I have been
23  terminated.
24  **Q.**  Have you ever been placed on paid administrative leave
25  at any point?

Page 273

1  **A.**  No.
2  **Q.**  Loss of reputation in the community is the next slate
3  of damages that are there.  Is that contained within
4  the scope of the potential loss of earnings or is that
5  a separate damage in your mind?
6  **A.**  I think it's a combination.
7  **Q.**  Okay.  Loss of reputation and esteem in the community.
8  Do you have any reason to believe the GCRC
9  communicated with the community regarding either your
10  suspension or the imposition of paid administrative
11  leave?
12  **A.**  I believe that the action that the Genesee County Road
13  Commission took against me, which is a public known to
14  the public, I believe that contributed to the -- was a
15  contributing factor.
16  **Q.**  Was the decision to implement a suspension or the
17  imposition of paid administrative leave the subject of
18  Board conversation at any public meeting?
19  **A.**  I believe so at the point in which the issue was
20  raised, why was I suspended and why I was on
21  administrative leave.  Those issues were at one point
22  discussed with the Board and also discussed with the
23  Genesee County Board of Commission in a public
24  setting.
25  **Q.**  And was it initiated by the Genesee County Road

Page 274

1  Commission, Board of Commissioners, to address those
2  concerns or did members of the public raise those
3  concerns to the commissioners?
4  A.  I think it was a combination of both.
5  Q.  Do you have any reason to believe that any
6  commissioner has contacted any member of the media,
7  either in their individual capacity or representing
8  the Genesee County Road Commission?
9  A.  I'm not sure.
10  Q.  Now, I know it says here mental and emotional
11  distress, and I know you also testified that you have
12  been receiving treatment by mental health providers in
13  connection with this lawsuit; is that correct?  Have
14  you been receiving mental health treatment as a result
15  of the things that you've alleged in your lawsuit
16  today?
17  A.  That is correct.
18  Q.  Which mental health providers have you been seeking
19  assistance from?
20  A.  My psychiatrist is Dr. K.V. Matthews.
21  Q.  And how long have you been seeing Mr. Matthews?
22  A.  I don't know.  It's been a while.
23  Q.  Approximately how often would you say that you see Mr.
24  Matthews?
25  A.  Every two weeks.

Page 275

1  Q.  How many times would you estimate you've seen Mr.
2  Matthews since you were first suspended by the GCRC?
3  A.  As a result of the Covid, we do telephone visits; and
4  your second part was how often?
5  Q.  Um-hum.
6  A.  It's been months, months.
7  Q.  You have been seeing Dr. Matthews for months and
8  months?
9  A.  That is correct.
10  Q.  Okay, I understand.  Can you estimate the number of
11  total times appointments, an estimate?
12  A.  Well, we see each other twice a month via phone, and
13  it's probably been over a course of about seven, eight
14  months or so, give or take.  I would just say multiply
15  two by seven or eight months.
16  Q.  You're approximating 14 to 16 times?
17  A.  Yes.
18  Q.  Okay, I understand.  Other than Dr. Matthews, have you
19  been seeking mental health treatment from --
20  A.  Or it could be longer than that.
21  Q.  Sure.  And I understand also that it's an
22  approximation.
23  A.  That is correct.
24  Q.  Have you received treatment from any other mental
25  health care providers other than Dr. Matthews?

Page 276

1  A.  No.
2  Q.  Have you sought any other forms of treatment to
3  ameliorate your mental and emotional --
4  A.  I need to go back to make sure I'm accurate.  Your
5  question was outside of Dr. Matthews, am I seeing any
6  other --
7  Q.  Mental health providers.
8  A.  Currently, no.
9  Q.  Are you seeing any other professionals as a way of
10  attempting to mitigate your mental and emotional
11  distress or the loss of ordinary pleasures of life?
12  A.  I've seen -- I've been trying with spiritual
13  counseling.
14  Q.  To the extent you spend time with spiritual
15  counseling, is that a regular appointment?  I'm
16  unfamiliar with that process; I apologize.  I'm not
17  even sure what questions to ask.  But describe the
18  process of seeking spiritual counseling as you do it.
19  A.  I speak with a spiritual counselor on a weekly basis.
20  Q.  Did you begin that practice as a result of some of the
21  behavior and conduct and allegations that you made in
22  this lawsuit?
23  A.  I began that process probably somewhere around in
24  2018.
25  Q.  And you've maintained that practice throughout this

Page 277

1  duration?
2  A.  That's correct.
3  Q.  And I apologize for intruding into an area that a lot
4  of people are sensitive; but can you describe for me
5  or summarize for me what is the scope of spiritual
6  counseling in this regard?  I don't mean to be
7  insensitive in asking my question.
8  A.  In my situation, I pull on spiritual strength to help
9  me to combat what I consider to be weapons against me.
10  So spiritual counseling helps me emotionally, it helps
11  me mentally, it help me to build my -- increase my
12  faith and my trust and my belief in God; it help
13  me to make good decisions and to -- how am I to allow
14  my flesh to interfere in what I know I should be doing
15  and according to the word of God.  It keeps me
16  grounded.  It help me to maintain a level of mental
17  and emotional stability.  It help me to identify the
18  me inside of me, and it teaches me how to endure and
19  how to not get frustrated with the Spirit.  And it
20  teaches me how to keep my hope and my trust that God
21  will see me through any situation; and so it help me
22  to feel human, and it help me to deal better with my
23  offensive that is being -- that I'm being attacked.
24  Q.  That sounds pretty good.  Maybe I need to do that.
25  Do you pay for spiritual counseling

Page 278

1  sessions?
2  A.  No.
3  Q.  And from whom do you receive spiritual strength
4  counseling?
5  A.  Seon Thompson, S-e-o-n, Thompson.
6  Q.  Have you sought any other -- any other third-party
7  providers with respect to receiving treatment or
8  mitigation of your mental and emotional distress or
9  the loss of ordinary pleasures of life?
10  A.  My physician.
11  Q.  And who is that?
12  A.  Dr. Mekala, S. Mekala.
13  Q.  And how long have you been seeing Dr. Mekala?
14  A.  I've been with Dr. Mekala about two years
15  now.  She is the doctor I went to after my former
16  doctor became deceased.
17  Q.  And approximately how many times have you seen Dr.
18  Mekala since you were placed on suspension or paid
19  administrative leave?
20  A.  I see Dr. Mekala probably every three months.
21  Q.  Do you see Dr. Mekala exclusively for what I would
22  call mental and emotional distress and loss of
23  ordinary pleasures of life or do you see Dr. Mekala
24  for other physical and mental conditions as well?
25  A.  My physical condition.

Page 279

1  Q.  Can you give me an example of something that you have
2  experienced in terms of the loss of the ordinary
3  pleasures of life in relation to this lawsuit or any
4  of the allegations contained within the lawsuit?
5  A.  I've lost my zeal, I've lost my passion to do the
6  things that I enjoy doing in relation to my hobbies.
7  I've lost my interest in participating in family
8  events.  I've lost my zeal to want to interact on a
9  regular basis with family.  I've lost some pleasures
10  that I feel that my husband and I enjoyed together.
11  I've lost my pleasures in wanting to help to motivate
12  others.  I no longer motivate women who are going
13  through cancer, fighting breast cancer, because I'm a
14  victim to that.
15      So a lot of things I enjoyed doing.  I
16  don't do Bible study, which I used to.  I don't attend
17  church at the level by which I was accustomed to
18  attending church.
19  Q.  Anything else?
20  A.  I'm sure there is.  I just can't recall specifically
21  what all it is.
22  Q.  I understand.  Now, apologies, but are you 67 years
23  old; is that correct?
24  A.  I am.
25  Q.  And what do you regard -- what do you see as your

Page 280

1  future employment plans moving forward?
2  A.  I'm uncertain because of the scars that I have now as
3  a result of being discriminated against, and some of
4  the other violations that I've been subjected to as
5  being retaliated against, and not having my freedom of
6  speech in those circumstances, just changed my whole
7  mind-set of what my capabilities are and my abilities
8  to be able to perform at the level of expectation of
9  another employer or even my involvement in some of the
10  social groups that I used to be a part of.
11  Q.  And the allegation is, the damages in the lawsuit with
12  respect to the loss of future expectation damages, you
13  attribute that to the allegations you made in your
14  lawsuit?
15  A.  That is correct.
16  Q.  So it will impact, in your estimation, your ability to
17  work as a HR director moving forward?
18  A.  That is correct.
19  Q.  Have you already put together retirement plans at any
20  time in the future?
21  A.  I have not.
22  Q.  Do you foresee yourself retiring at some point in the
23  future?
24  A.  Sure; probably by the time I reach the age of 80.
25  Q.  Keep our fingers crossed for all of us.

Page 281

1      Did you issue, at any point during the
2  pandemic on, did you issue any other memorandums
3  informing employees what their obligations were with
4  respect to masking within the Genesee County Road
5  Commission?
6  A.  Numerous.
7  Q.  I have to imagine.  It changed frequently; correct?
8  A.  Numerous; that's correct.
9  Q.  Part of your job duties as an HR director is to issue
10  memoranda like that?
11  A.  That is correct.
12      MR. CASCINI:  Believe it or not, I'm
13  done.
14      THE WITNESS:  Are you sure?
15      MS. GAFKAY:  I hate to open the door
16  anymore, but I do have a follow-up question or two.
17      EXAMINATION
18  BY MS. GAFKAY:
19  Q.  In paragraph 45, you've alleged that you and Anthony
20  Branch received a raise of one and two percent for the
21  2021-2022 budget; is that correct?
22  A.  That is correct.
23  Q.  And there are other directors, to your knowledge, who
24  received higher raises; is that right?
25  A.  That is correct.

Page 282

1 Q.   And what is your race and Anthony Branch's race?
2 A.   We're African-Americans.
3 Q.   And the other directors who received higher raises for
4   the 2021-2022 budget, what race are those individuals?
5 A.   They are white, including Fred Peivandi.
6 Q.   And have you alleged that race was a consideration in
7   the pay difference between the raises received in the
8   2021-2022 budget?
9 A.   That is correct.
10        MS. GAFKAY:  I don't have any further
11   questions.
12        MR. CASCINI:  It actually is, in real
13   life, just one, which is a rare thing, where an
14   attorney won't lie about that.
15              REEXAMINATION
16 BY MR. CASCINI:
17 Q.   Do all of the directors of Genesee County Road
18   Commission, prior to that raise, do they all receive
19   the same salary?
20 A.   Yes, but I think that Tracy Khan may have gotten some
21   additional raises that the other directors didn't get.
22 Q.   So everyone is paid the exact same?
23 A.   Not exact same amount, no.
24 Q.   And I apologize.  Let me back up, actually, 'cause I
25   think we just misunderstood each other.  So I did lie

Page 283

1   about one more question, and I apologize for that.
2 A.   You did.
3 Q.   Do all of the Genesee County Road Commission directors
4   receive the same salary?
5 A.   No.
6 Q.   Okay.  And that's both before and after the 2021
7   budgetary adjustment?
8 A.   That's correct.
9 Q.   Didn't make the same thing before, and they didn't
10   make the same thing after, either; correct?
11 A.   That's correct.
12        MR. CASCINI:  That's it.
13        MS. GAFKAY:  We'll close the record.
14   Thank you.
15        (Deposition concluded at
16        5:26 p.m.)
17        (END OF RECORD)

Page 284

1 STATE OF MICHIGAN    )
                       ) SS
2 COUNTY OF SHIAWASSEE )

4      I, Cynthia A. Lathrop, Court Reporter and
5 Notary Public in and for the above county and state, acting
6 in the County of Genesee, do hereby certify that the
7 aforegoing deposition was taken before me at the time and
8 place hereinbefore set forth.
9      I further certify that said witness was by
10 me sworn in said cause and the testimony then given was
11 reported by me stenographically and subsequently
12 transcribed and that the aforegoing is a full, true and
13 correct transcript of my original shorthand notes.
14      IN TESTIMONY WHEREOF, I set my hand and
15 notarial seal at Shiawassee County, Michigan, this 23rd day
16 of June 2022.

Cynthia A. Lathrop (CSR-2474)
Notary Public in and for the
County of Shiawassee,
State of Michigan
My Commission Expires:  2/2/26