DARABOS vs. AMERICAN BUILDERS, et al        DEPO: BENJAMIN EDLUND        TAKEN: 6-10-15

Page 1

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE


DONNA POPLAR,

                    Plaintiff,

                                        Case No. 14-103842-CD
    -v-
                                        HON. JOSEPH J. FARAH
CITY OF FLINT,

                    Defendant.
    _____/

                    The Deposition of DONNA D. POPLAR, taken before

Timothy J. Boroski, RPR/CSR-2378 and Notary Public in and for

the County of Clinton, acting in the County of Genesee, State

of Michigan, at the offices of Ripka, Boroski & Associates,

717 S. Grand Traverse, Flint, Michigan, on Friday, June 12,

2015, commencing at or about 10:00 a.m.


APPEARANCES:

        Law Offices of Dean T. Yeotis
        BY: NANCY K. CHINONIS, ESQ., (P71350)
        611 West Court Street
        Flint, Michigan 48503
        810.767.6100

            Appearing on behalf of Plaintiff,

DARABOS vs. AMERICAN BUILDERS, et al .    DEPO:  BENJAMIN EDLUND                    TAKEN;  6-10-15

2

---

### Page 2

1  APPEARANCES (Continued):
2
3  City of Flint Law Department
   BY: DAVID B. ROTH, ESQ., (P77971)
       ANTHONY K. CHUBB, ESQ., (P72608)
4  1101 South Saginaw Street, 3rd Floor
   Flint, Michigan 48502
5  810.766.7146
6      Appearing on behalf of Defendant.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

### Page 3

1          INDEX OF WITNESS
2
3  WITNESS                      PAGE
4  DONNA D. POPLAR
5    Examination by Mr. Roth          4
     Examination by Ms. Chinonis    146
6    Examination by Mr. Roth        159
     Examination by Ms. Chinonis    165
7
8
9
10
11
12          INDEX OF EXHIBITS
13
14  EXHIBIT      DESCRIPTION      MARKED
15
16  Exhibit Number 1  Curriculum Vitae          8
17  Exhibit Number 2  Termination of Appointment  32
18  Exhibit Number 3  Service Agreement between City of  51
                      Flint and Gary Bates
19
20  Exhibit Number 4  Answers to Interrogatories  69
21  Exhibit Number 5  MLive Article              139
22
23
24
25

WITNESS — PAGE
DONNA D. POPLAR
  Examination by Mr. Roth — 4
  Examination by Ms. Chinonis — 146
  Examination by Mr. Roth — 159
  Examination by Ms. Chinonis — 165

EXHIBIT — DESCRIPTION — MARKED
Exhibit Number 1  Curriculum Vitae — 8
Exhibit Number 2  Termination of Appointment — 32
Exhibit Number 3  Service Agreement between City of Flint and Gary Bates — 51
Exhibit Number 4  Answers to Interrogatories — 69
Exhibit Number 5  MLive Article — 139

---

### Page 4

1                  Flint, Michigan
2                  Friday, June 12, 2015
3                  10:00 a.m.
4          P R O C E E D I N G S
5                  DONNA D. POPLAR,
6  having been duly sworn by the Reporter, was examined, and
7  testified on her oath as follows:
8          EXAMINATION
9  BY MR. ROTH:
10 Q  Ma'am, would you please state your name for the record?
11 A  My name is Donna D. Poplar.
12 Q  My name is David Roth.  I represent the City of Flint in
13    this matter.  Present at today's deposition to my left is
14    the court reporter, Tim Boroski.  To my right is
15    Mr. Anthony Chubb.  And I understand you're here
16    represented today by your attorney, Nancy Chinonis.
17        MR. ROTH:  Did I say that correctly?
18        MS. CHINONIS:  You did.
19 Q  (BY MR. ROTH)  I want to review some ground rules,
20    hopefully, to make sure that the record is clear.  Have
21    you ever given a deposition before?
22 A  Yes.
23 Q  Okay.  So you understand today that your testimony is
24    given under oath as if you were testifying in court?
25 A  That is correct.

---

### Page 5

1  Q  Okay.  One of the most important rules here to help the
2     court reporter is, obviously, that only one of us speaks
3     at a time.  It's important that you speak up, speak
4     clearly and, of course, that you give verbal answers.
5         In normal conversation it's easy to nod of the
6     head to indicate an answer or to shake your head, to use
7     ums and uh-huhs.  But that's difficult for the court
8     record.  So it's important that you say yes or no.  And
9     I'll try not to interrupt you we'll try to do our very
10    best to just forward.  Okay?
11 A  Okay.
12 Q  If there is any question that you don't understand,
13    please just ask me to clarify and I'll try to rephrase it
14    or help you along.  Okay?
15        If you need a break at any time, let me know.
16    It's not an interrogation.  It's a deposition.  So just,
17    you know, speak up if you have any issues.
18        Is there any reason today that you're sitting
19    here, a personal reason, or any other reason that would
20    interfere — and if there is a reason, I don't need to
21    know what it is, but something that would interfere with
22    your ability to give testimony today?
23 A  No.
24 Q  Okay.  In preparation for this deposition, did you review
25    any documents?

---

(Pages  2  to  5)

## Page 6

1    A   I reviewed a video that showed me the process that I

2        would be going through with the deposition.

3    Q   Okay.  With that being said, can you please give your

4        date of birth?

5    A   My date of birth is April 4th, 1955.

6    Q   Okay.  What is your current address?

7    A   5277 Kimberly Woods Circle, that's K-I-M-B-E-R-L-Y

8        W-O-O-D-S, Circle, Flint, Michigan 48504.

9    Q   And how long have you lived there?

10   A   Since 1995.

11   Q   What about prior to '95?

12   A   Prior to 1995, my residence was 6625 Park Belt Drive,

13       P-A-R-K B-E-L-T, Drive, Flint, Michigan 48505.

14   Q   Okay.  Who do you currently live with, if anyplace?

15   A   My husband, named Fred Poplar.

16   Q   And how long have you and Fred been married?

17   A   It will be 21 years today.

18   Q   Oh, congratulations.

19   A   Thank you.

20   Q   Is Fred employed?

21   A   Fred is retired from General Motors after 45 years.

22   Q   Do you have children?

23   A   I have one daughter.

24   Q   What is her name?

25   A   Her name is Shamea, S-H-A-M-E-C-A.  Her last name is

## Page 7

1        Burr, B-U-R-R.  I have one stepdaughter.  Her name is

2        Pamela Montgomery.

3    Q   Whose daughter is that?

4    A   My husband's, Fred.

5    Q   Do you and Fred have any other dependents?

6    A   No.

7    Q   Okay.

8            MS. CHINONIS:  I just object to the form.  Your

9        question assumes that Shamea and Pamela are dependents.

10           MR. ROTH:  Fair enough.

11   Q   (BY MR. ROTH)  Are you currently employed?

12   A   No.

13   Q   When was the last time that you were — the last date,

14       excuse me, that you were employed?

15   A   My last date of employment was December 2nd, 2011.

16   Q   Where was that?

17   A   I was employed for the City of Flint.

18   Q   How long did that employment last?

19   A   Approximately a little over two years.

20   Q   Prior to your employment with the City of Flint, what was

21       the job previous to that?

22   A   I worked for Progressive Learning Center.  And also had a

23       company called New Direction Consulting Services.

24   Q   Okay.  I'm going to show you an exhibit here which has

25       been marked as Defendant's Exhibit 1.

## Page 8

1            (Exhibit Number 1 marked for identification by

2        the reporter).

3            MR. ROTH:  For the record, it's a copy of a CV

4        which you provided to the city.  I'm sorry, let me give

5        you this copy, if that's all right.

6            MS. CHINONIS:  Donna, he's going to switch

7        copies.

8            MR. ROTH:  So I can give a marked copy to the

9        court reporter.  I apologize.  That's my mistake.

10           MS. CHINONIS:  Oh, you don't want her —

11           MR. ROTH:  If she wants to read from the marked

12       copy then —

13           MS. CHINONIS:  She should use the exhibit

14       that's marked and, then, we'll give the —

15           THE WITNESS:  Are you directing me to this

16       exhibit here?

17           MR. ROTH:  Yes, ma'am.

18           MS. CHINONIS:  Yes.

19   Q   (BY MR. ROTH)  And in your CV here, you have listings of

20       the various jobs and titles that you have held.  And I

21       believe you just stated that the job previous to the City

22       of Flint was at New Direction Consulting Services; is

23       that correct?

24   A   That is correct.

25   Q   Okay.  And can you explain just generally speaking what

## Page 9

1        that business did, what was its purpose?

2    A   At the point in time this business was created, it was

3        done to work with agencies and other businesses to help

4        write proposals, to design various components that

5        addressed the needs and concerns towards low to moderate

6        income families.

7            Also, to help provide direction for leadership

8        in terms of the type of employees that should be a part

9        of the various programs.  The background that they should

10       have with those particular programs.

11           This was also in conjunction with how I merged

12       the consulting services from being a consultant into

13       becoming, actually, working for the Progressive Learning

14       Center.  Prior to the name of Progressive Learning

15       Center, it was Center for Banking Education.

16   Q   Okay.  And you said that you — you mentioned that you

17       would draft proposals to work with different agencies and

18       businesses?

19   A   That's correct.

20   Q   What types of agencies?

21   A   It would be like human service agencies.

22   Q   Okay.

23   A   And individuals that was in the community that was trying

24       to establish their own programs to help to get programs

25       for low to moderate income families.  I would help to

Ripka, Boroski & Associates, L.L.C.                                      email:  rba@ripkaboroski.net
(800)542-4531/ (810)234-7785 FAX (810)234-0660                          Firm Registration NO: 008139

DARABOS vs. AMERICAN BUILDERS, et al      DEPO:  BENJAMIN EDLUND                TAKEN; 6-10-15

4

## Page 10

1      direct them in that far direction.
2      Q   And you did that for approximately two years?
3      A   Off and on for the approximately two years.  That was not
4          a complete two years.  Because I merged from that into
5          actually being -- working for the Progressive Learning
6          Center.  So, as a consultant, I did those in between.
7      Q   Okay.
8      A   So it's not like I did something consistently day-by-day
9          as a consultant.  It doesn't work like that.
10     Q   Can you tell me a little bit about the Progressive
11         Learning Center?
12     A   The Progressive Learning Center, it was -- first started
13         off as the Center of Banking Education.  And its focus
14         was to train and educate bankers throughout the State of
15         Michigan.  It was the only African American owned banking
16         learning center.  Again, targeted towards banks and bank
17         employees.  Teaching them soft skills and hard skills.
18     Q   Would you consider yourself a consultant for the, I
19         guess, the banks and/or agencies that you worked with?
20     A   Sure.  Well, let me explain why.  I was appointed to
21         serve on the Federal Housing Banking Board under the
22         leadership of President Clinton.  That appointment came
23         by the finance department of the White House.
24             And so in my experience over those four years,
25         I was able to acquire experience about banking, the

## Page 11

1      banking industry, and et cetera.
2          Also, in my experience with my background in
3      business, with a concentration in human resources, I have
4      a great deal of experiences in understanding finances and
5      financial needs for any company or any entity, for that
6      matter.
7          Also, I had numerous years of experience in
8      running multi million dollar agency.  I was responsible
9      for taking what is now known as GCARD, which is another
10     form of municipal government, I took its budget from five
11     million dollars to over 25 million dollars.  And I was
12     only able to do that with my abilities to understand
13     financing and understand the significance in writing,
14     developing and garnering the support for the various
15     programs.
16         And my background, also on the Federal Housing
17     Bank Board, I helped to make decisions over billions of
18     dollars.  And those dollars was earmarked for -- I
19     represented the State of Michigan.  And I also served on
20     the chair -- I was the chairperson for the community
21     development park for the banking -- developing community
22     housing for Michigan, which I represented as a member of
23     the Federal Housing Banking Board.
24     Q   So when you were on the Federal Housing -- you said
25         board?

## Page 12

1      A   That is correct.
2      Q   Okay.  Was this at the same time you were in charge of --
3          and I'll direct you to the second page of your CV -- the
4          Genesee County Community Action Agency?
5      A   That was during the same time when I served as the
6          executive director for Genesee County Community Action
7          Agency, which is now called Genesee County GCARD.  That
8          was the time in which my appointment was made to the
9          Federal Housing Banking Board.
10     Q   Okay.  All right.  So you mentioned there was a 25
11         million dollar operating budget.  Where were the offices
12         located?
13     A   The offices for Genesee County was throughout the City of
14         Flint.  Our main office was in what is now considered to
15         be the court building, which is Genesee County courts,
16         right at 1101 Beach Street.
17             We also had multiple offices.  One was located
18         on Hamilton Street.  There was another office located on
19         Pierson Road.  And another location on Hamilton at that
20         time.  And, then, we had another location on Clio Road.
21         So there was offices that represent GCARD throughout the
22         City of Flint, including the Head Start program that was
23         also located in downtown Flint.
24             We also have program services throughout all of
25         your public schools and through the Beecher School

## Page 13

1      System, where we served the Meals on Wheels and also the
2      meals for the children throughout the public school
3      system and some parts of the out county.
4      Q   You were serving as the executive director at the time?
5      A   That is correct.
6      Q   How many employees were overseeing?
7      A   I had nine program directors, approximately 300
8          employees.  During the summer months, it would be nine
9          program directors and that number would go up to 300
10         employees and probably another 300 part-time employees
11         during the summer months.
12     Q   Why is that?
13     A   It's because, during that particular program, we had what
14         is called the Summer Youth Program.  And we had to hire
15         additional employees to oversee all of those programs.
16         So, at any given point, you could have as much as 600
17         employees coming through GCARD or -- which is GCARD now
18         gCC at the time.
19     Q   As the executive director, did you serve -- strike that.
20             Did you perform any human resources functions?
21     A   That is correct.  GCARD, which then was known as GCCA, it
22         was very unique within itself.  It was really net -- it
23         was a set-aside.  It was an agency.  And the Genesee
24         County was the fiduciary, where if I -- money for Genesee
25         County flowed through -- GCCA flowed through Genesee

(Pages 10 to 13)

DARABOS vs. AMERICAN BUILDERS, et al     DEPO:  BENJAMIN EDLUND     TAKEN: 6-10-15

5

## Page 14

1   County.

2       At that particular time during my leadership,
3   my role was, one, to identify potential employees. To
4   actually do job descriptions. To do the interviewing.
5   To do the hiring and selection process. The uniqueness
6   that we had was that -- we were unique in the sense that
7   Genesee County also had its own HR department. So we
8   worked in collaboration, of my agency, into the Genesee
9   County department.

10      To make it very clear, the employees of GCARD
11  were not -- did not have the same bumping rights into
12  Genesee County departments, nor did the Genesee County
13  employees have bumping rights into GCARD. And I'm using
14  the word GCARD, because that's the name of GCCA today.

15      So, back then, I identified what I wanted in
16  staffing. I identified the quality that these
17  individuals should have. The skill levels they should
18  have. I conducted the interviews. I helped to do the
19  screen-out. I helped to decide what benefit packages
20  that we could afford based on the grant moneys we were
21  receiving for the various programs.

22      We had over 33 human service programs. Each
23  program had a different unique type of skill levels that
24  their employees must possess. So I made sure these
25  things was in place.

## Page 15

1       Also, as the executive director of GCARD, I was
2   responsible -- I took care of the disciplinary action.
3   And because we were uniquely -- a unique agency, if I had
4   any problem with the level of discrimination -- I'm
5   sorry, the level of disciplinary action that I wanted to
6   take, if I felt that it was going to propose a problem,
7   then I would at that particular time counsel with the HR
8   director of it county.

9   Q   Okay. So you did all of the discipline for, at times,
10      600 employees --
11  A   I did all the discipline --
12  Q   -- if discipline was required for a particular employee?
13  A   That is correct. That is correct.
14  Q   Was there -- there was an HR director that you were
15      working with?
16  A   The HR director at that time was with the county. I
17      believe that person's name may have been Steve. I can't
18      think of his last name. Also, there was an assistant HR
19      director for the county as well, and I can't remember
20      what his name was.
21  Q   Okay.
22  A   Not only did I do that. If I had any questions or
23      concerns as to whether or not if we were -- maybe dealing
24      with anything that could have an effect, direct effect
25      back -- negative effect back on the agency, not

## Page 16

1       necessarily the county, but the agency, I would also
2   confer with the affirmative action department that was in
3   existence at that time as well.
4   Q   Okay. And you said you conducted the interviews?
5   A   That is correct.
6   Q   How many interviews do you think you conducted while you
7       were there?
8   A   Numerous. Not only did I conduct interviews
9       individually, I also took the initiative to put together
10      at times what I called interview panels. That was done
11      by me. And I would identify which staff would be a part
12      of the interview sessions, depending on the type of
13      position we were looking for.
14  Q   To the extent that you can, can you provide like a number
15      of interviews that you conducted?
16  A   I can't. I can say this: I interviewed for more of the
17      top level positions and the middle management positions.
18      Anything that dealt with -- if it fell beneath or below
19      that of middle management, that would have been done by
20      the panel in conjunction with --
21  Q   Okay. So you didn't conduct all interviews? You
22      conducted interviews for middle management?
23  A   And upper management.
24  Q   And upper management?
25  A   That is correct.

## Page 17

1   Q   Okay. Of those, how many do you think that you did a
2       year?
3   A   I can't honestly say.
4   Q   Was it it ten?
5   A   It could have been on average of anywhere from three to
6       five a year, depending on the turnover.
7   Q   Okay. And you said that you also wrote the job
8       descriptions?
9   A   That is correct.
10  Q   Was that for those upper level and mid level management
11      positions?
12  A   That is correct.
13  Q   How many of those do you think you drafted?
14  A   I would say probably about, over the course of -- maybe
15      around ten or so; could be more.
16  Q   Okay. All right. So when you were a part of GCCAA,
17      GCARD as you called it, because that's what it's called
18      now, you were not the HR director; is that correct? You
19      were the executive director?
20  A   I was the executive director with the responsibilities of
21      overseeing the human resource functions for GCARD.
22  Q   And just to step back, when you were a business
23      consultant for New Direction Consulting Services, you
24      were not serving as an HR director?
25  A   I was serving as the HR -- no, I was serving as a

(Pages 14 to 17)

DARABOS vs. AMERICAN BUILDERS, et al        DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15

6

**Page 18**

1     consultant helping to direct concerns and programs
2     relative around HR, relative around community action
3     agency services, relative to human service programs and
4     components.
5    Q   Okay.
6    A   There was an array of different things that I did as a
7     consultant.
8        MR. CHUBB: Can we take a break? Can we go off
9     the record for just a minute?
10       (Off the record from 10:25 to 10:30).
11       MR. ROTH: We are back on the record.
12    Q   (BY MR. ROTH) Okay. Ms. Poplar, you stated that you
13     were a part of the Progressive Learning Center. Before
14     that it was the Center for Banking Education. You also
15     stated that you were on the Federal Housing Board. That
16     you were appointed there by the White House.
17    A   The financial department of the White House.
18    Q   The finance department of the White House.
19    A   Under President Clinton's administration.
20    Q   Okay. In the CV that you provided to the city as part of
21     your discovery responses, those things are not included
22     on your CV, as far as I can tell. If they are -- if you
23     could point them out to me, I would appreciate it.
24    A   Right here, for the current and past professional
25     affiliations, on the very last one it says, "Member of

**Page 19**

1     the Federal Housing Bank Board of Directors from 1996 to
2     1999."
3    Q   I see. Thank you.
4       What about the Progressive Learning Center?
5    A   If you look at what you have here, I don't know who
6     made -- who provided this to you. There was a corrective
7     resume that was submitted to the City of Flint during
8     my -- during my employment with the City of Flint. This
9     is not the corrective resume.
10    Q   Okay.
11    A   So there should be a corrective resume in the City of
12     Flint's -- in my file someplace.
13    Q   Okay. This resume was provided to us by your attorney,
14     or your attorney's office. I'll make a note of that.
15    A   And I believe if you go by the last resume that was
16     submitted to the City of Flint when I just did a recent
17     interview for the HR relations director's position that I
18     page held, up to -- for the past -- for the two years
19     from 2009 to 2011, that corrective resume, if I'm not
20     mistaken, I know I submitted it to the City of Flint at
21     that time as well.
22    Q   Okay. So you are applying, then, for the HR position
23     which you held in 2009, 2010, 2011?
24    A   I did apply and I did receive an interview for that
25     position recently.

**Page 20**

1    Q   Okay. I'll direct you to what is the third page of your
2     CV. This is the position that you held prior to GCARD at
3     General Motors. Can you explain what your position was
4     there?
5    A   At General Motors, I initially hired in material
6     control. And after a period of time --
7    Q   I'm sorry, can you explain what material control is?
8    A   Document material control is the department whereby you
9     make sure you order an adequate number of parts for
10     various divisions throughout General Motors.
11       As a material control -- as working in material
12     control, you were assigned different plant locations
13     throughout the United States of America for General
14     Motors. Some of us even had GM plants that was outside
15     of the United States.
16       And my job was to make sure that there was
17     adequate on-time shipping and parts ordered to help to
18     accommodate the efficiency of various plants.
19       After holding that position for a period of
20     time, I was then promoted to supervisor of operation.
21     During that particular time, I was responsible for over
22     100 UAW employees. That number increased as I took on
23     additional responsibilities. For example, if there was
24     other supervisors who did not show up for work that day,
25     I would also take on their departments and run their

**Page 21**

1     departments as well.
2       During that particular time, I was -- I was
3     asked to oversee what is called the new paint shop. I
4     played a vital role in helping to have certain computer
5     systems put in. And I actually did the training for the
6     new paint lines that was put in. And also the lines that
7     dealt with fenders and bumpers and other parts for GM's
8     different locations. So I oversaw that.
9       In the midst of that, I also played a very
10     vital role in helping with all the grievances that was
11     filed by UAW members against management. And I played a
12     role in helping to facilitate those grievance hearings
13     and coming to a resolution, along with the actual
14     grievance department.
15    Q   Okay. Was that the only -- excuse me. Strike that.
16       Were those the only two positions you held at
17     GM?
18    A   Yes.
19    Q   Okay. How long were you in material control?
20    A   Probably for about maybe -- I would say maybe three years
21     or so.
22    Q   How long were you in a supervisor of operations position?
23    A   Probably around four years of the -- up until the time I
24     resigned.
25    Q   I see.

DARABOS vs. AMERICAN BUILDERS, et al        DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15

**Page 22**

```
1    A   Um-hum.
2    Q   Why did you resign?
3    A   To take the position as the executive director for
4        Genesee County Community Action Agency.
5    Q   Okay.  When you were working for material control, you
6        said that you were responsible for plants all across the
7        United States?
8    A   I said I was responsible for making sure parts was being
9        ordered for various plants throughout the United States.
10   Q   Okay.  Did you travel for that position?
11   A   No.
12   Q   No.  Okay.  Where was the -- where was your work, the
13       physical work location that you were at?
14   A   The location at that time was located on Bristol Road.
15   Q   Okay.  I understand that in 2002 you finished -- strike
16       that.
17
18       In 2002, you stopped New Direction Consulting
19       Services.  From that period until you began your
20       employment with the City of Flint in 2009, you were not
21       employed?
22   A   That is correct.
23   Q   Okay.  Why was that?
24   A   I suffered some personal trauma.
25   Q   Okay.  You don't have to tell me what it was, but it was
```

**Page 23**

```
1    A   That is correct.  And also during that particular time
2        when I was seeking employment, I did not receive it.
3    Q   Okay.  Where were you seeking employment?
4    A   Throughout Genesee County and, at that time, throughout
5        the State of Michigan.
6    Q   What types of positions were you applying to?
7    A   Mainly executive director positions, vice president
8        positions, higher upper management positions.  Also
9        during that time, middle management positions as well.
10   Q   Okay.  Were you interested in working in any particular
11       type of business at the time?
12   A   Could you clarify what you mean by that?
13   Q   Was there an industry that you were passionate about
14       working in at the time?
15   A   Sure.  I was very passionate about municipal government.
16       I was passionate about the health industry.
17   Q   Okay.  You said for part of at least 2002 to 2009 you
18       were unable to work?
19   A   That is correct.
20   Q   When did you start applying for jobs?
21   A   I always applied for jobs, even when I was in the state
22       of -- the emotional condition where I -- I never stopped
23       looking for work.  It was my belief that if I could work,
24       my state of emotional condition could be improved.  I would
25       be improved.
```

**Page 24**

```
1    Q   I see.  Okay.  You stated currently you're unemployed;
2        that's correct?
3    A   That is correct.
4    Q   Do you have any other sources of income besides wage
5        earnings?
6    A   I do.  I receive Social Security.
7    Q   Anything else?
8    A   No.
9    Q   Okay.  Let's talk about your educational background.
10       What is your highest level of schooling?
11   A   12th grade as far as regular school.  As far as college
12       category, I have a master's degree.
13   Q   Where is that in?
14   A   MBA, Master of Science Administration with a
15       concentration in human resources.
16   Q   Any other collegiate degrees?
17   A   I have -- well, I have a bachelor's degree in business.
18       Associate's degree in business management.  And that is
19       the extent of my degrees.
20   Q   Any certifications?
21   A   Yes, I have a certification in diversity management,
22       conflict resolution.  And I'm also -- it's not a
23       certificate, but I am an evangelist by calling.
24   Q   What do you mean by that?
25   A   It's just like you -- it's just like a minister.  You're
```

**Page 25**

```
1        called to ministry.  I am called and accepted through my
2        pastor as an evangelist.  So I do speak the word of God.
3        I teach.
4    Q   So are you like a missionary as well?
5    A   Well, under my faith, you can say it's a missionary, but
6        I am an evangelist.  You can look at it as a missionary
7        to one degree of the faith, but I am an evangelist.  So I
8        do go by the name of Evangelist Deans Poplar when I am
9        speaking on things of a spiritual nature.
10   Q   Okay.  But you're not a pastor of a church?
11   A   Oh, no.
12   Q   Okay.  I'm going to back up and ask you about the Center
13       for Progressive Learning.
14   A   Sure.
15   Q   When you were there, can you tell me what the title of
16       your position was there since it's not included in this
17       current CV?
18   A   I was director of HR.
19   Q   Director of HR?
20   A   That is correct.
21   Q   How many employees were you supervising?
22   A   Approximately five I believe it was at the time.
23   Q   Okay.  Where were the offices located?
24   A   Troy, Michigan.
25   Q   In Troy, Michigan.  Progressive Learning Center, how many
```

DARABOS vs. AMERICAN BUILDERS, et al          DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15
8

**Page 26**

1  employees were at the entire organization?
2  A  You have five employees that was there on a full-time
3  basis. And how the progressive Learning Center works is
4  that it contracts with professionals in their field areas
5  to help come in and to facilitate the training sessions.
6  So, for example, if you were dealing with a
7  course, there would deal with curriculums of a person who
8  would specialize in, lets just say, customer service.
9  You would, then, contract with a professional in that
10  area and they will be the one that would oversee that
11  physical course.
12  For example, if you were — one of the courses
13  that was set for that particular curriculum was diversity
14  management. Then what you would do is hire professional
15  consultants to come in and teach on diversity management.
16  Q  Okay. What was your compensation package when you were
17  at the Progressive Learning Center?
18  A  I can't remember exactly what it was. I would have to —
19  I just don't know off the top of my head. I would say it
20  was around — I can't — I don't even want to guess on
21  that one. I just can't remember. It's been awhile back.
22  Q  Okay. You couldn't even give an approximate figure?
23  A  I wouldn't be comfortable in giving an approximate
24  figure.
25  Q  Okay. How did you get the position with Progressive

**Page 27**

1  Learning Center?
2  A  Mr. Eason.
3  Q  Who is that?
4  A  Mr. Eason was the president of Progressive Learning
5  Center at the time in which I was hired.
6  Q  What is Mr. Eason's first name?
7  A  Greg.  Gregory Eason.
8  Q  Is that the same Greg Eason who served as the city
9  administrator; is that correct?
10  A  That is correct.
11  Q  What duties was he the city administrator, to the extent
12  that you know?
13  A  I don't know.
14  Q  Did you interview for that position?
15  MS. CHINONIS:  Which position?
16  Q  (BY MR. ROTH)  With Progressive Learning Center.
17  A  There was not an interview for that position. That
18  position was offered to me by Mr. Greg Eason.
19  Q  He approached you?
20  A  That is correct.
21  Q  Okay. All right. Well, at this time I'll ask you about
22  your lawsuit. You have currently brought a lawsuit
23  against the City of Flint; is that correct?
24  A  That is correct.
25  Q  And what is the nature of the suit?

**Page 28**

1  A  Age discrimination.
2  Q  Okay. So it's your assertion that you were terminated
3  because of your age?
4  A  That is correct.
5  Q  Am I correct in my math when I say that you were 56 at
6  the time you were terminated?
7  A  Approximately between 56 and 57. I was terminated in
8  2011 and I'm now 60 years of age.
9  Q  Okay. So you assert that you were terminated because of
10  your age. How do you know that?
11  A  I had a phone conversation with Duane Miller.
12  Q  Who is that?
13  A  Duane Miller.
14  Q  And who is he?
15  A  Duane Miller served as a — in the — under Mike Brown.
16  Q  In what capacity?
17  A  I am not for sure of his capacity.
18  Q  Who is Mike Brown?
19  A  Mike Brown was, at that time, the emergency manager for
20  the City of Flint.
21  Q  Okay. So what did he tell you verbally on his phone
22  conversation?
23  A  Well, during this particular phone conversation, we were
24  talking about my frustrations in being terminated.
25  Q  It was after you were terminated?

**Page 29**

1  A  That is correct.
2  Q  You stated earlier you were terminated December 2nd,
3  2011. Was it the same day?
4  A  No.
5  Q  When was it?
6  A  Approximately early March. And I want to say around the
7  first week of March.
8  Q  Of 2012?
9  A  That is correct.
10  Q  What did Mr. Miller say?
11  A  In the course of —
12  Q  Excuse me. What did you say? You said you were airing
13  your frustrations. What did you tell him?
14  A  I told him that I was, one, very shocked that I had been
15  terminated. I thought that the purpose of my termination
16  initially was to give emergency manager Mike Brown the
17  opportunity to review my resume. My work performance.
18  Meet with the mayor to see if I brought added value to
19  the City of Flint. What was my successors as an HR
20  director. What were things that I accomplished as the HR
21  director. And what was his interpretation of my
22  performance. That's what I thought was going to happen.
23  Q  Okay.
24  A  And in talking to Duane Miller, he made it very clear to
25  me when I was questioning why would they hire Erica

DARABOS vs. AMERICAN BUILDERS, et al          DEPO: BENJAMIN EDLUND

TAKEN: 6-18-15
9

**Page 30**

1   Hunter to go in as the permanent replacement for me for
2   the HR director when she had no experience, no
3   educational background that would justify her being in
4   that position.
5       Mr. Duane Miller said to me that he was fully
6   aware that she had no experience, but that was okay.
7   Because it was going to look good on her portfolio that
8   that he and Woodrow Stanley, along with Mike Brown,
9   wanted to utilize younger African American people in
10  these high profile positions. And my position as HR
11  director was one of those positions.
12      Not only did he say that, he went on to then
13  say, "I'm really calling you to ask you if you would be
14  willing to train her."
15  Q   Okay. You said at first you thought that the reason that
16      you were terminated was to give the EM a chance to review
17      your performance. You thought it was a chance to give
18      the emergency manager a chance to review your
19      performance.
20          Did the emergency manager say that that was
21      what he was going to do?
22  A   He did not say that to me.
23  Q   Who did he say that to?
24  A   I don't know if he said it to anyone. Based on my
25      experience, the new individuals coming in in a municipal

**Page 31**

1   government setting, one of the things they do, they begin
2   to pink slip certain employees. And during that process,
3   they begin to look at the added value that these
4   employees have.
5       And based on that, I knew that my performance
6   was stellar. I knew that I had given undeniable
7   performance and contribution to my position as the HR
8   labor relations director. I had no doubt in my mind that
9   I was going to be retained as the HR and labor relations
10  director.
11      Even when I spoke with certain people within
12  the municipality, no one felt that I would be at risk.
13  And I believed that.
14      I believe that when Mike Brown terminated me,
15  he terminated me on the basis that he was going to do
16  with most folks during that capacity, was take a review
17  of his staff and see which ones should stay and which
18  ones should go.
19      And being that I was terminated on the first
20  day that Michael Brown started, I had no other reason to
21  believe anything else other than that he was doing what
22  most folks do when they take in those type of positions.
23  Q   Okay. So you didn't have a conversation with Mike Brown
24      about those assumptions that you had?
25  A   The conversation I had with Mike Brown on December the

**Page 32**

1   2nd was as follow:
2       He told me that he was terminating my
3   employment. That I was to relinquish my keys and garage
4   door opener. Any other possessions -- any other
5   properties of the City of Flint that I may have had in my
6   possession. And that I had until 5 o'clock that same
7   said day to vacate my office.
8   Q   Okay. So in that conversation -- was Mr. Brown the only
9       person present for that conversation?
10  A   No, Attorney -- City Attorney Pete Bade was also present
11      for that.
12  Q   Anyone else?
13  A   No.
14  Q   And at that termination meeting, it is your testimony
15      that the only -- those were the only things that
16      Mr. Brown stated to you?
17  A   At that time.
18  Q   Okay. But in regards to your termination, that was all
19      that he said?
20  A   That is correct.
21  Q   Okay. He didn't tell you at that meeting that you were
22      being terminated because of your age?
23  A   Not at that time, no.
24  Q   Okay. I'm going to show you what has been marked as
25      Defendant's Exhibit 2.

**Page 33**

1       (Exhibit Number 2 marked for identification by
2       the reporter.)
3       MR. ROTH: For the record, this is emergency
4   manager City of Flint Order Number 1, termination of
5   appointments.
6   Q   (BY MR. ROTH) Have you seen this document, Ms. Poplar?
7   A   No.
8   Q   No. Okay. Do you understand the purpose of -- well,
9       first, do you understand that in 2011 the City of Flint
10      was facing a financial emergency?
11  A   I understand that it was alleged that the City of Flint
12      was facing a financial emergency. I also understand that
13      that was not the interpretation of the administration at
14      that time.
15  Q   Okay. But you understand that the State of Michigan,
16      through the governor's office, appointed an emergency
17      financial manager, essentially, to run the city?
18  A   I do not -- I understand the role of the financial
19      emergency manager.
20  Q   Okay. All right. I'll direct you to the second page of
21      this document. And it states that -- and I'm directing
22      you to the second paragraph on this page. It says,
23      "Based on the foregoing, it's hereby ordered the
24      appointment of Gregory Eason as city administrator is
25      terminated."

DARABOS vs. AMERICAN BUILDERS, et al          DEPO: BENJAMIN EDLUND

TAKEN: 6-18-15

10

**Page 34**

1   And then in a second, Number 2 there, "The
2   appointment of Donna Poplar, as Director of Human
3   Resources and Labor Relations Department is terminated."
4   You have not seen this document before?
5   A   No, I have not.
6       MS. CHINONIS:   I'm just going to object to
7   counsel asking questions.   At this point I have not -- I
8   have held my tongue.
9       But Mr. Chubb, you're here as an observer, not
10  as the attorney who is asking the questions.   And the
11  communications between you and Mr. Roth I believe is
12  inappropriate.   So I'm just placing my objection on the
13  record.
14      A deposition is to be done by one attorney, not
15  two.   And I will just object to this procedure.
16      MR. CHUBB:   And just for the record, I am an
17  attorney of-record on this case.   I'm not an observer.
18  And I don't know of any Court Rule that says that two
19  attorneys can't be present at a deposition.   I have
20  routinely come across when two attorneys actually engage
21  in a deposition.
22      So that's my response.
23      MS. CHINONIS:   You may be present, but only
24  one -- only one attorney is supposed to be questioning
25  the witness.   And we can discuss this at a later time.

**Page 35**

1   But I'm just noting my objection for the record.
2       MR. ROTH:   It's noted.
3   Q   (BY MR. ROTH)   This document, though you say you have not
4   seen it, it was provided by your attorney.   Were you
5   aware of that?
6   A   I have not seen this document.
7   Q   Okay.   But do you see that it is dated the same date of
8   your termination?
9   A   Yes.
10  Q   Okay.   And whose signature do you see on the document?
11  A   Michael Brown's.
12  Q   Okay.   And, for the record, that's the emergency manager?
13  A   That is correct.
14  Q   Okay.   So do you understand, then, that it was
15  Mr. Brown's decision to terminate you?   I believe you
16  have testified to that previously.
17  A   I understand that Mr. Brown was the person who terminated
18  me.   I do not understand that it was solely Mr. Brown's
19  decision to -- alone to terminate me.
20  Q   But it was his -- he had the authority to terminate you?
21  A   I agree that he had the authority.
22  Q   Okay.   Was this the first time that you had interacted
23  with Mr. Brown, on this date?
24  A   Well, it was the first time that I formally interacted
25  with Mr. Brown.   I have actually interacted with

**Page 36**

1   Mr. Brown by way of acknowledging him, hello, goodbye,
2   those kind of things.
3   Q   So you were acquainted with him, but you didn't know him
4   well?
5   A   That is correct.
6   Q   Okay.   Had you ever talked about your ages?
7   A   No.
8   Q   Okay.   Do you know if he knew your age?
9   A   I have no idea.
10  Q   Okay.   Had you ever had a conversation with him more
11  involved than, "Hello.   How's it going?"   Just
12  acknowledging each other?
13  A   No, just acknowledging each other.
14  Q   He never discussed how he felt about older people?
15  A   No.
16  Q   You don't know if he discriminates against people based
17  on age?
18  A   No.
19  Q   You don't know whether he is older or younger than you
20  are?
21  A   I don't know.
22  Q   Okay.   On the second page of this exhibit --
23      MS. CHINONIS:   Exhibit 27
24      MR. ROTH:   Exhibit 2.   Thank you.
25  Q   (BY MR. ROTH) -- several other people were terminated on

**Page 37**

1   the same date that you were terminated.   Are you
2   familiar with the people on this name -- I'm sorry, the
3   names on this list?
4   A   I am familiar with the names, yes.
5   Q   And Mr. Eason, do you know if he is older or younger than
6   you are?
7   A   I don't know.
8   Q   Was about Mr. Edward Parker?
9   A   I don't know.
10  Q   What about Brenda Purifoy?
11  A   I don't know.
12  Q   What about Rhoda Matthews?
13  A   I don't know.
14  Q   What about Steve Montie?
15  A   I don't know.
16  Q   What about Kathleen Sheets?
17  A   I don't know.
18  Q   Okay.   All right.   So do you allege that you were
19  subjected to derogatory comments about your age by the
20  City of Flint?
21  A   I believe that Duane Miller, who was an agent of the City
22  of Flint, I believe that the manner by which that phone
23  conversation was geared toward being discriminatory
24  as it relates to my age in comparison to Erica Hunter and
25  those for whom they felt fell in the category of young

DARABOS vs. AMERICAN BUILDERS, et al        DEPO:  BENJAMIN EDLUND

TAKEN: 6-10-15

11

**Page 38**

1  African Americans.
2  Q   Okay.  Was he the only person who made those kinds of
3  statements to you?
4  A   That is correct.
5  Q   What specifically did he say to you that you believe was
6  derogatory?
7  A   The fact that he, Woodrow Stanley and Mike Brown, had
8  made a decision that they wanted to use younger African
9  American people in these high profile jobs.  And that he
10  felt that my job as the HR director, that position, was a
11  position that was a high profile job and they wanted
12  Erica Hunter in that position.
13
14      Not only did he say that, he also went on to
15  say, "When I talked with you a few weeks ago, I knew that
16  Erica Hunter was going to get that job.  Now, what I want
17  to know from you, would you willing to train her?"
18  Q   All right.  What about any of that conversation is
19  derogatory?
20  A   I think that the tone that he was using was basically
21  saying to me --
22  Q   I'm sorry.
23  A   The tone that he was using and the nature of that
24  conversation was basically telling me that I was now
25  considered to be too old for the HR labor relations
    director for the City of Flint.  There is no other way

**Page 39**

1  that I can take the content of that conversation to mean
2  anything else, especially when chuckled about it.
3  Q   Did he call you -- so it was his tone, especially; that's
4  your testimony?
5  A   It was his tone and the nature of the verbal
6  conversation.
7  Q   Did he use any kind of age related slur?
8  A   I believe the age related slur, for how I felt, my
9  interpretation and understanding was, is that the mere
10  fact that they wanted Erica Hunter in my job was
11  basically because she was younger than me.
12
13      I don't know anything else to get out of that
14  other than, "Donna, you have gotten to the point in age
15  where we feel you are to old for the position.  We want
16  younger people in these high profile positions."
17
18      And the way in which -- we kept exchanging
19  words back and forth.  I did say to him "So you mean to
20  tell me that you would take me out of the HR labor
21  relations position and put Erica Hunter in the position
22  because she's younger than me?  Is that what I'm hearing
23  you say?"
24
25      And you know what he said back?  "Basically,
    that's what I'm saying."  We -- he kept using the word
    we -- Woodrow, and he refers to Woodrow as Wood, but we
    know it's Woodrow, and Mike, that's what they wanted.

**Page 40**

1      And, again, he didn't care.
2      I said, "So, in other words, you don't care
3  that Erica Hunter has zero HR experience, hasn't been in
4  her current position not even a year, knows nothing about
5  HR?"  And he went onto say, "Well, I think she's getting
6  a degree in political something or public something."
7  That's how he said it.  He wasn't for sure about that.
8      So I said, "You would take me, a person who
9  have given nothing to this city during my tenure, nothing
10  but added value, undeniable performance and
11  contributions, and you will say you want her in the
12  position because she's younger than me?"
13
14      He responded by saying again, "Yeah, it will
15  look good on her portfolio."  We knew -- this is what he
16  said, "We know she don't have the experience.  But that's
17  what I'm here -- I'm calling to ask you, "Would you be
18  willing to train her?"
19  Q   Okay.
20  A   You know, "Can we -- can we pay you to come and train
21  her?"
22  Q   Okay.  But statements like that, was Mr. Miller the only
23  person to have a conversation with you like that?
24  A   That is correct.
25  Q   He didn't call you names or anything like that?
    A   Well, as far as I'm concerned, is the nature of the

**Page 41**

1  conversation, he wasn't calling me -- the names that he
2  was calling me --
3  Q   Well, I understand that.  But did he call you by -- you
4  know, a derogatory term?  Did he call you by a slur of
5  any kind?
6  A   It doesn't rise to what you want me to say a derogatory
7  term is.  But in my interpretation, when he told me that
8  he wanted her in my position because she was younger, to
9  me, the way I felt, that was saying, you -- basically,
10  you're an old lady now.  You're an old lady now.
11  Q   Did he actually call you an old lady?
12  A   He didn't actually call me an old lady.
13  Q   Okay.
14  A   But that was my feelings of what he was saying in between
15  the words.
16  Q   Did he call you anything similar to an old lady, anything
17  like that?  Did he call you anything else like that?
18  A   He didn't call me an old lady.  But the contents of the
19  conversation --
20  Q   Okay.
21  A   -- and the way I was interpreting it, is he was saying to
22  me, "You're old."
23  Q   Okay.
24  A   "And we want this 20-plus year younger lady in your seat
25  now."

DARABOS vs. AMERICAN BUILDERS, et al     DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15
12

**Page 42**

1  Q  Okay.
2  A  That's how I took it.
3  Q  So he made this -- this conversation where you say he
4     made these derogatory comments, this was one
5     conversation?  It was just the one time?
6  A  No. There was a conversation that took place early
7     February of that same year.
8  Q  Before this March conversation?
9  A  That is correct.
10 Q  Was that in person or on the phone?
11 A  That was on the phone.
12 Q  Okay. And what did he say in that first conversation?
13 A  In that particular conversation, what I was sharing with
14    him, was I needed some understanding. Because I felt
15    that he had played a significant role in having me
16    terminated.
17 Q  Okay.
18 A  At that particular time, is what he said to me, "I
19    thought that you and Mike were on the same page in
20    agreement to your termination." And I told him that was
21    not true.
22       I said, "That was not true and you know that
23    was not true." I said, "This is what I don't understand.
24    What did I do wrong to get terminated? I thought that
25    Mike Brown would be bringing me back."

**Page 43**

1        He responded by saying, well, you know we have
2     had -- they have what is called -- Mike Brown had put
3     together a committee of people that would help him make
4     human resource decisions, financial decisions, et cetera,
5     of which Duane was a part of that, along with some other
6     people. So he explained that process to me.
7        I said, "That sounds good. But how did you get
8     to the part of firing me?"
9  Q  Okay.
10 A  And this is what he said in response: He says, "Donna,
11    let me look into this and I'll get back with you on it
12    and see what we can do to bring you back."
13 Q  Mr. Miller, at this time, you stated earlier that he was
14    an adviser to the emergency manager?
15 A  I stated to you I didn't know what his role --
16 Q  Okay.
17 A  -- to the emergency manager was.
18 Q  Do you know what his title was at the time?
19 A  I don't know.
20 Q  Did he work in the mayor's office?
21 A  He -- when Mike Brown was there, Duane Miller had an
22    office in that suite.
23 Q  Was he an -- was his title assistant to the emergency
24    financial manager?
25 A  I don't know what his title was. But I do know that --

**Page 44**

1  Q  Okay. Was this when he was director of governmental
2     operations?
3  A  Again, I don't know what his title was.
4  Q  Okay. You talked about a person named Woodrow. For the
5     record, who is that?
6  A  That is the former mayor of the City of Flint. Former
7     Mayor Woodrow Stanley. Who also, at that particular
8     time, have been the Genesee County Commissioner. And I
9     believe shortly after became one of the state
10    representatives for Genesee County.
11 Q  Okay. Was he mayor at the time?
12 A  No.
13 Q  Who was mayor?
14 A  Mayor Walling.
15 Q  Okay. And who appointed you to the position of HR
16    director?
17 A  Mayor Dayne Walling.
18 Q  Mayor Dayne Walling. Okay. Did Mr. Stanley, at the time
19    of these conversations, did he have any affiliation with
20    the city of Flint?
21 A  I don't know.
22 Q  Was he an employee?
23 A  I don't know.
24 Q  Weren't you the HR director?
25 A  You can have individuals receiving what is called

**Page 45**

1     professional service contracts and I would not have seen
2     these.
3  Q  As the HR director, you wouldn't have seen a professional
4     services agreement?
5  A  I would not have seen those. That normally goes through
6     the legal department.
7  Q  Okay. So you wouldn't have known if he was an employee
8     or if he was a consultant?
9  A  If he was an employee of the City of Flint, I would have
10    known that he was an employee. If he came by way of a
11    professional services contract, I would not have seen
12    those contracts.
13 Q  Do you know if Mr. Stanley had any authority over the
14    state appointed emergency financial manager?
15 A  I don't know.
16 Q  You don't know?
17 A  No, I don't.
18 Q  Do you know if Duane Miller had any authority over
19    Mr. Brown --
20 A  I don't know.
21 Q  -- the emergency financial manager?
22 A  I don't know.
23 Q  Okay. Did Mr. Brown make any derogatory comments to you
24    ever about your age?
25 A  No.

DARABOS vs. AMERICAN BUILDERS, et al    DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15

13

**Page 46**

1   Q  No. Okay. We have talked about how you were terminated
2      from the city. Was there anything that city officials or
3      the administration did to you that you believe occurred
4      because of your age?
5   A  No.
6   Q  Okay. Are you doing all right? Do you need a break or
7      anything? I know it's been about an hour.
8   A  I'm fine.
9   Q  Okay. Great. So how do you think your positions, prior
10      to becoming the HR director for the City of Flint, those
11      positions, how do you think those prepared you for your
12      employment with the city?
13   A  Being that I had an opportunity to spend years in a
14      professional setting working with the development of
15      employees, establishing and developing training programs,
16      being able to oversee budgets, my skill levels into
17      galvanizing individuals and being able to motivate them
18      and being able to -- through my experience I have been
19      able to reach the bottom line of expectations.
20          I have been able to build my abilities to be a
21      team player and to build teams. Been able to grasp the
22      vision of my superiors and to help to make these visions
23      become a reality. I have been able to effectively manage
24      conflict and come with the correct resolve.
25          I have been taught and trained how to

**Page 47**

1      successfully negotiate and compromise. I have been
2      effective in learning -- improving the skills to be
3      transparent and to lead with integrity.
4          To be able to identify employees who have skill
5      levels that need to be shaped and molded to help move to
6      higher levels within organizations. To bring added
7      value. To be able to understand the differences and
8      diversity, especially when I was one of the key lead
9      focal points of GM having its first diversity program.
10      So that my background and understanding of diversity
11      certainly helps me to understand individuals, in spite of
12      the color of their skin, their gender, their cultural
13      background, differences, and et cetera.
14          And it's taught me how to see and help
15      employees to become an asset and not liabilities. It
16      just -- to be able to lead objectively. And to be able
17      to input into people, employers, that they are valued in
18      the business they are important. Being able to
19      establish foundations to show and teach how, although we
20      work with various companies, especially as a
21      municipality, we're still one body. We're a public
22      servants when work for a municipality.
23          And to be able to help individuals to
24      understand and appreciate and to adapt to do what they
25      need to do to provide high performance and quality

**Page 48**

1      services to the people that look for -- look up to the
2      City of Flint to give quality public services.
3          Also, my skills and my training prior to coming
4      to the City of Flint has enabled me the opportunity to
5      bring to the table my ability to understand finances. To
6      understand how to shape quality of services that assure
7      customer satisfaction at all times.
8          My ability to sit across the tables with all
9      various levels of management, certainly opened the door
10      for me to be able to work effectively with the Genesee
11      County -- with the City of Flint, city council elected
12      representatives. That was a skill that I learned in
13      working with nine Genesee County board of commissioners
14      from the Genesee County levels.
15          And it taught me how to respect and be able to
16      teach that level of respect for those individuals by
17      which reported directly to me.
18   Q  Okay.
19   A  And I could just go on and on with that.
20   Q  What was your compensation level when you were working
21      for the City of Flint on a monthly basis?
22   A  Roughly around six -- let's see, I made $86,900 a year.
23   Q  And that's approximately $7,500 a month?
24   A  A month; that is correct.
25   Q  Do you know what -- what your approximate hourly rate

**Page 49**

1      was?
2   A  If you take 2,080 and --
3   Q  Is it about $45 an hour?
4   A  I think it might be a little bit more than that.
5   Q  A little more than $45 an hour?
6   A  Um-hum.
7   Q  Okay. Was that your only compensation was your income?
8   A  With -- at that time, yes. Up until --
9   Q  Did you get any kind of benefits?
10   A  No, I did not get benefits.
11   Q  You didn't receive health care?
12   A  No.
13   Q  You didn't get a retirement plan?
14   A  A 401.
15   Q  You got a 401. Okay.
16   A  That is correct.
17   Q  Do you know how much the city contributed to your 401?
18   A  I can't remember.
19   Q  Could you -- okay. But you would agree that, with your
20      contributions to your 401(k) and your income, you were
21      making in excess of $90,000 a year, at least?
22   A  That is correct.
23   Q  Do you know how much your total compensation was with
24      your income and your 401?
25   A  I can't remember.

DARABOS vs. AMERICAN BUILDERS, et al          DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15
14

**Page 50**

1  Q — You can't remember. Okay. You understand that the
2  emergency financial manager, when they are appointed,
3  their job is to fix a financial emergency in a distressed
4  municipality?
5  A  I do.
6  Q  Would you agree that part of the ways that you can save
7  money is by compensating people for less than what they
8  are currently being compensated for?
9  A  I do.
10  Q  Okay. When your employment with the city ended, do you
11  know who replaced you immediately after your employment
12  terminated?
13  A  Immediately after my employment terminated, Gary Bates.
14  Q  Who is he?
15  A  He — I don't know who he is. I mean, I knew of Gary. I
16  just can't tell you who he is. But Gary Bates is the one
17  that came in on a contract, is my understanding, on a
18  temporary basis until said time they could get someone
19  permanently to replace me. And according to Duane
20  Miller, Gary Bates was brought in for a period of time to
21  help to train Erica Hunter to take my position.
22  Q  Okay.
23  A  To permanently take my position.
24  Q  Do you know how much Mr. Bates was paid for his services?
25  A  I do not.

**Page 51**

1  Q  Okay. I'm going to show you an exhibit which has been
2  marked as Defendant's Exhibit 3.
3  MS. CHINONIS:  Before you do that, I'm sorry,
4  do you mind if we take just a quick break?
5  MR. ROTH:  That's fine. Absolutely.
6  (Off the record from 11:15 to 11:20, during
7  which time Exhibit Number 3 was marked for
8  identification by the reporter).
9  MR. ROTH:  Back on the record.
10  For the record, we just took a short perhaps
11  three to five minute break.
12  Q  (BY MR. ROTH)  Before that I was just about to show you
13  what has been marked as defendant's Exhibit 3. This is
14  an agreement between — the professional services
15  agreement, as you talked about you were aware of there
16  existence, maybe not this one, between the City of Flint
17  and Gary Bates.
18  I'll direct you to the third article, which is
19  the fourth paragraph of this agreement. Do you see where
20  it says that Mr. Bates is going to receive $40 per hour?
21  A  Yes.
22  Q  Okay. And you would agree that that was less than the
23  income that you were being paid when you were working for
24  the City of Flint?
25  A  Yes.

**Page 52**

1  Q  Okay. You also see that it states that this is his total
2  compensation?
3  A  Yes.
4  Q  Okay. And in Section 4, titled benefits, it states that
5  the city — what does it state there?
6  MS. CHINONIS:  I'll just object. The document
7  speaks to itself.
8  Q  (BY MR. ROTH)  Okay. But you would agree that it says
9  that there is no other compensation that Mr. Bates is
10  going to receive?
11  A  Yes.
12  Q  Okay. And you agree that Mr. Bates is the person who
13  actually replaced you immediately after your termination?
14  A  No.
15  Q  Okay. Were you aware that Mr. Bates is actually older
16  than you?
17  A  I don't know.
18  Q  Okay. So after Mr. Bates was the interim HR director,
19  you stated that you were replaced by a younger employee,
20  that was Erica Hunter, correct?
21  A  No, that's not correct. That's not totally correct.
22  What I shared with you, prior to the five minute break we
23  just had, was that Dayne — was that Duane Miller shared
24  with me that Mr. Bates was there to prepare Erica Hunter
25  to replace my position permanently. That's what I said.

**Page 53**

1  Q  Okay. But you do agree that — so you do say that Erica
2  Hunter replaced you. That's your assertion, okay? Do
3  you know how much money Ms. Hunter was making?
4  A  At the time in which Ms. Hunter took my position as the
5  permanent replacement for me for the HR labor relations
6  position, she was initially making $55,000.
7  But also Erica Hunter was really compensated —
8  also Erica Hunter's position, this is what they did,
9  because she was inexperienced and had no HR or labor
10  relation experience, based on that, they had to not only
11  have Gary Bates there to help assist her, they also hired
12  a gentleman to do labor relations.
13  Q  Who was that gentleman?
14  A  He's still in the position now. I can't remember his
15  name. Somehow I'll guess his name. But he's still
16  there. That individual makes 40 plus thousand dollars a
17  year. And if you take the $40,000 a year and add it to
18  the $55,000 a year that she was making, also add the $40
19  per hour that Gary Bates was still making while he was
20  trying to — attempting to train and get Erica ready for
21  the HR position, if you add these numbers, plus Erica
22  Hunter's benefit package, you would discover that Erica
23  Hunter, the cost to replace me by Erica Hunter, was much
24  more significant than what the city was paying for me.
25  And I, during my tenure as HR labor relations

DARABOS vs. AMERICAN BUILDERS, et al        DEPO: BENJAMIN EDLUND

TAKEN: 6-18-15
15

**Page 54**

1  director, I was responsible for both HR, labor relations,
2  benefits, retirement. And I made $89,600. They didn't
3  have to hire or outsource health benefits and retirement.
4  Nor did they have to hire an attorney for the sole
5  purpose of doing the labor relations, grievance hearings
6  and et cetera. I did it all.
7  Q  When you state that, you're talking about the labor
8  relations person who was in HR?
9  A  That is correct. When I was the HR director --
10  Q  And was that Donald Jekol?
11  A  That name sounds familiar.
12  Q  Okay. You stated that he's an attorney?
13  A  I don't know if he's an attorney or not. I was told --
14  Q  You just stated that he was an attorney.
15  A  I was told he was an attorney. I don't know if that's
16  accurate. But I do know this is accurate. That --
17  Q  As far as I'm aware, he's not an attorney.
18  A  Okay.
19  Q  So it's your testimony, then, that by eliminating you
20  from your position, the city was able to hire at least
21  two other people?
22  A  It is my testimony.
23  Q  That's what they did.
24  A  It is my testimony -- this is my testimony:
25         Erica Hunter, in her capacity or role as the

**Page 55**

1  human relations director at the time, when she took on
2  the permanent position of the HR director, labor
3  relations director, they brought on a gentleman to do
4  labor relations.
5         They eventually outsourced health benefits and
6  retirement. They later increased Erica Hunter's salary
7  to $70,000 for less responsibility, because she no longer
8  had the responsibility to have labor, to the degree by
9  which I did, she did not have any responsibilities for
10  health benefits and retirement, by which I did. And
11  they, again, took her salary from $70,000 up to $80,000.
12         So when you look at what they really did, they
13  outsourced health benefits and retirement.
14  Q  What does that mean?
15  A  That means that she is no longer responsible for that
16  staff. No longer responsible for that service.
17  Q  When you say that she is no longer responsible for that
18  staff and service, were there other people in the HR
19  department that you were supervising who were doing those
20  functions?
21  A  Oh, sure. I had total responsibilities for the clinic
22  and for the HR umbrella.
23  Q  Okay.
24  A  Total responsibilities for health and benefits. Total
25  responsibilities for retirement. And I want to note for

**Page 56**

1  the record that, when I first came on at the $89,600,
2  never got -- there were no increases. I did not at that
3  time have the responsibilities for your health and
4  benefits and retirement.
5         That came on as a consolidation to the HR
6  department so it all came under one umbrella making me
7  responsible. Prior to that, there was another director
8  responsible for those two entities.
9         I was also responsible for the clinic and
10  responsible for all labor relations activities, as well
11  as all functions of the HR duties.
12  Q  Okay. The clinic -- you said the clinic --
13  A  It's called a health clinic.
14  Q  Okay. The health clinic and the health and benefits that
15  you were -- that were outsourced, okay, do you know if
16  that ended up in a cost savings for the city?
17  A  The health --
18  Q  Do you know?
19  A  The health clinic was not outsourced. The health --
20  Q  What was outsourced, then?
21  A  The health benefits and your retirement components were
22  outsourced.
23  Q  And in answering your question, I can't tell you if it
24  was a cost savings or not. But this is what I can tell
25  you. When they took away that level of responsibility

**Page 57**

1  from Erica Hunter, they did not reduce her salary. It
2  remained -- as a matter of fact, it went up?
3  Q  How do you know that?
4  A  Because I know. It went from $85,000 -- it's public
5  information -- it went from $55,000 to $70,000 --
6  $80,000.
7  Q  Okay. But you said because you know because it's public
8  information?
9  A  Because I asked the question. I specifically asked the
10  question. I had my attorneys to specifically ask the
11  question and get a copy of what her salary was in
12  preparing for this case.
13  Q  Who did you ask?
14  A  My attorney.
15  Q  Okay. But, I mean, have you seen any documents related
16  to Erica Hunter's compensation package?
17  A  What I have seen -- not seen, what I have been informed
18  of by my attorneys is that Erica Hunter's salary went
19  from $55,000, shortly after to $70,000, shortly after to
20  $80,000.
21  Q  Okay. Her salary was $55,000 when she worked before you
22  were terminated?
23  A  That was the amount of money -- yes, that was the amount
24  of money that she entered into the department with. From
25  that, it went to $70,000. From that it went to $80,000,

DARABOS vs. AMERICAN BUILDERS, et al     DEPO: BENJAMIN EDLUND

### Page 58

1 including her benefits package. And you would need to
2 put a value to that, because that benefit was also
3 inclusive of her overall salary value.
4 Q    Like the benefits package that you had, the 401 plan?
5 A    Correction. I said earlier, I did not have a benefits
6 package. The package that I had was a 401 plan. I did
7 not get health care coverage from the City of Flint.
8      Whether you want the health care coverage or
9 not, you're still entitled to a dental coverage. I never
10 received -- everyone gets a dental plan.
11 Q    Did you opt out of health care coverage?
12 A    I did.
13 Q    Okay. Did the city pay you a certain amount because you
14 opted out?
15 A    It was approximately $600 a year. And I believe in the
16 last year it went up to maybe a thousand dollars a year.
17 Q    So you're not saying that the city was not willing to
18 provide you with health care coverage? You opted out?
19 A    The city was not willing to supply me or provide with me
20 city -- I mean, health coverage because I know that I
21 carried my husband's health coverage and, in the spirit
22 of trying to not over-tax the city, I opted out of the
23 plan.
24 Q    I see.
25 A    I could have had the plan, but for cost savings for the

### Page 59

1 city, why take the plan when I could ride on my
2 husband's?
3 Q    Because you're able to get -- I see. Okay.
4      So you discussed with your attorneys, that's
5 how you know the compensation level of Ms. Hunter?
6 MS. CHINONIS:  I'm just going to advise, on the
7 record, Ms. Poplar, you don't need to communicate any
8 privileged communication that we have. And I don't
9 believe that Mr. Roth is asking you to disclose any of
10 those privileged communications.
11 MR. ROTH:  And I'm not.
12 Q    (BY MR. ROTH)  I'm just asking, is that how you know?
13 You haven't seen any documentation related to Erica
14 Hunter's compensation package?
15 A    No.
16 Q    Okay. Is it only because of your attorneys that you
17 believe that her salary was raised to $80,000?
18 A    That is correct.
19 Q    Okay. So, then, you would not agree, then, that the
20 emergency financial manager was able to save any money
21 because of your termination? That would be your
22 testimony?
23 A    That is my testimony.
24 Q    Okay.
25 MS. CHINONIS:  Can we go off the record for a

### Page 60

1 second?
2 MR. ROTH:  Sure.
3      (Off the record from 11:35 to 11:36).
4 MS. CHINONIS:  Back on.
5 Q    (BY MR. ROTH)  So, then, essentially, you're asserting
6 that any financial problems that the city was facing was
7 not the real reason that you were fired?
8 A    That is correct.
9 Q    Okay. Other than your conversation with Duane Miller, do
10 you have any evidence that would support that?
11 A    Support what?
12 Q    That would support your belief that you were fired
13 because of your age?
14 A    No.
15 Q    Okay. No one ever -- no one else ever told you anything
16 about other reasons for your termination?
17 A    No.
18 Q    Okay.
19 A    May I -- am I allowed? I want to go back to that.
20 Because I don't want to leave it limited to that -- limit
21 my response to his last question.
22      There have been much communication relative to
23 Duane Miller, Woodrow Stanley, Larry Moon, the Mike
24 Browns. It's like a group of these people that their
25 goal is to put young individuals, and Duane Miller's

### Page 61

1 wording was African Americans. Other wordings has been
2 in high profile positions throughout Genesee County.
3      And as I begin to look at some of the younger
4 people that is going into some of the higher perceived
5 profile positions, they have indeed been what Duane
6 Miller has described what they wanted to do. They were
7 much younger. So, I --
8 Q    You said there has been conversations. Are those
9 conversations -- other conversations, then you said there
10 was a -- I think you said early or mid February, and then
11 you said a conversation you had with Mr. Miller in March?
12 A    Early March.
13 Q    Okay. Are those the only two -- you're talking about
14 those conversations that you had with Mr. Miller, or are
15 you talking about conversations Mr. Miller had with those
16 other people you mentioned; Larry Moon, Woodrow Stanley
17 and Mike Brown?
18 A    The only two conversations that Duane Miller and I had
19 was early February and early March.
20 Q    And he told you about conversations that he had had?
21 A    That is correct.
22 Q    Okay. You weren't present at those conversations?
23 A    No.
24 Q    You didn't hear those conversations?
25 A    No.

Ripka, Boruski & Associates, L.L.C.
(800)542-4531/ (810)234-7785 FAX (810)234-0660

**(Pages 58 to 61)**

email: rba@ripkaboroski.net
Firm Registration NO: 088139

DARABOS vs. AMERICAN BUILDERS, et al     DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15

17

## Page 62

1 Q  Okay. Who is Larry Moon?

2 A  Larry Moon is the owner of Larry Moon's Funeral Home.

3 He's the owner of Lawrence E. Moon Funeral Home. And

4 based on what he shared with me, he also sits on the

5 committee that the former emergency manager, Mike Brown,

6 put together for individual service advisors. And he

7 served —

8 Q  Mr. Moon told you that?

9 A  That is correct.

10 Q  When did you have that conversation?

11 A  I had that conversation with Mr. Moon, would be the early

12 part of February.

13 Q  Okay.

14 A  Prior to my conversation with Duane Miller.

15 Q  And that was prior — okay. Was that an in-person

16 conversation?

17 A  Larry Moon and I have been friends for awhile. And it

18 was he who I initially called. Because Duane Miller was

19 not returning any of my phone calls. Shortly after I had

20 gotten terminated, I had tried to call Duane Miller,

21 based on my understanding with his role and aiding Mike

22 Brown and making human resource decisions and financial

23 decisions, he did not return my calls.

24 So I called Larry, who was also very close with

25 Duane Miller, to tell him I'm unable, and have been

## Page 63

1 unable to get in contact with Duane Miller. I had made

2 numerous attempts, left numerous messages, and he has not

3 called me back.

4 Larry Moon then responded by saying — I shared

5 with him what I felt I was experiencing at the time. I

6 didn't know anything about the age discrimination at that

7 particular point in time, because I had not had that

8 conversation with Duane.

9 He told me that he would get in contact with

10 Duane Miller, and I'm going to have him give you a call.

11 Don't worry about it, I'll have him call you.

12 So a few days later I did get the phone call

13 from Duane Miller. And when Duane called, he apologized

14 that he had not returned my call, but that he had been

15 out of town. And that's when I had the February

16 conversation with Duane Miller.

17 In that conversation with Larry Moon, he shared

18 with me that he sat on that committee and it was his

19 understanding that they were not going to fire me.

20 Q  Okay. So you're saying there is this committee of

21 advisors to the emergency manager, Duane Miller is on

22 that. Larry Moon is on that. Was there anyone else that

23 you're aware of on that committee?

24 A  He didn't share that with me.

25 Q  Was Woodrow Stanley on that?

## Page 64

1 A  He didn't share that with me.

2 Q  So you don't know?

3 A  I don't know.

4 Q  Okay. Are you friends with Mr. Moon?

5 A  Yes.

6 Q  And are you friends with Mr. Miller, Duane Miller?

7 A  Not friends with Duane Miller. Duane Miller and I are

8 like extended family. Our families interwine.

9 Q  Okay. Why did you call Duane Miller before Larry Moon?

10 A  Because I had — I felt comfortable in calling him. I

11 mean, it's a relationship where I could talk directly to

12 him.

13 Q  Okay. So you're not aware of anybody else who was an

14 advisor to the emergency manager?

15 A  No, I'm not personally aware.

16 Q  Okay. When you were the HR director, did you have people

17 who advised you on anything, assistants or people that

18 you trusted in your document?

19 A  Not within my department. I always dealt with Mr. Eason

20 and the mayor. And maybe some council, city council

21 people.

22 Q  Did you report to the mayor and Mr. Eason?

23 A  I reported to both.

24 Q  Okay. Were there other people that you would have

25 considered a confidant or someone who, in your office, a

## Page 65

1 subordinate who you would speak with about issues that

2 you were dealing with, or when you were trying to make

3 decisions?

4 A  The closest person that would have been would have been

5 my personal assistant, my executive secretary. Both

6 Sheila Hanyes and then Angelia Lewis.

7 Q  They were your personal assistants?

8 A  That is correct.

9 Q  Okay. But you had authority over them?

10 A  That is correct.

11 Q  Okay. So you would agree that when you go to somebody

12 who is subordinate and they have — and you have

13 authority over them, you're looking for advice on a

14 decision that you're trying to make, but you make the

15 decision, correct, not the subordinate?

16 A  Let me clarify this. My response to your question is

17 this:

18 And let's just use this scenario. If I'm

19 dealing with a grievance case, for example, I may say to

20 my secretary my feelings about what I think is going on

21 what a particular case. Especially most frequently would

22 be things dealing with discrimination. And I would say

23 to them, "This is what I see."

24 Q  Okay.

25 A  "This is what I believe is taking place." And, then,

Ripka, Boroski & Associates, L.L.C.
(800)542-4531/ (810)234-7785 FAX (810)234-8660

email: rba@ripkaboroski.net
Firm Registration NO: 008139

DARABOS vs. AMERICAN BUILDERS, et al     DEPO: BENJAMIN EDLUND     TAKEN: 6-10-15

18

### Page 66

1  from that I would say, this is what I'm going to do. I
2  want you to set this up, set this up and set that up.
3      I would never go to one of my subordinates at
4  all and ask them to help guide me through a
5  decision-making process.
6  Q  Okay.
7  A  I have never done that, whether it's my personal
8  secretary or any person working up under me.
9  Q  Okay. Let me clarify, I guess. If you are looking for
10  advice -- let me start over.
11     When you're looking for advice, let's say
12  you're looking for advice because you want to make a
13  decision. Just in general, I'm speaking. When it's your
14  decision to make, you might take into account other
15  people's opinions, be it the mayor, be it Mr. Eason or
16  another department head if you're working with them on a
17  particular issue, right? You might take into account
18  their opinion or their advice if you were asking for it?
19  A  Normally, with the nature of work that I do and the
20  confidentiality levels that I have to maintain, what I
21  take into consideration, one, is the policy and
22  procedures by which governs me.
23     Number two, is what is my limitations and
24  obligations as it relates to the collective bargaining
25  agreements?

### Page 67

1      And, then, if I feel that there is going to be
2  a situation that would lead the city, or my employer for
3  that matter, into something that would consider -- that
4  could be perceived as unlawful and that could wind up
5  resulting in a lawsuit, at that particular point in time
6  I would lean to the attorney's office. Not that I would
7  want to take under consideration that person's advice or
8  opinions, because I can't make my decisions based on
9  other peoples opinions.
10     But the nature of what you do as HR labor
11  relations director, you have to stay within confinements
12  of the laws. And so in these particular situations, I
13  have always, always, always relied on the legal
14  department under the leadership of Pete Bade at the time,
15  or Tom Kent.
16     What I'm talking about things that -- that may
17  be a little baffling to me, I just do my homework and I
18  conclude what I think should be the best decision.
19     If I'm dealing with situations, again, I want
20  to repeat myself, that if it's going to be something that
21  could be of a legal nature, if I make a decision a
22  certain way, I always concur with the legal department.
23  Q  Okay. I'm not even asking about if you're looking
24  for advice from the city attorney. Just in general,
25  wouldn't you agree that a decision maker makes a

### Page 68

1  decision, and if they are asking for advice from
2  somebody, they supply advice?
3  A  That's correct.
4  Q  Okay. For example, if the mayor asks you for your advice
5  on something, just in general, no specific matter, but
6  about a decision that has to make, it's still the
7  mayor's decision; you would agree, right?
8  A  With my direct experience with Mayor Dayne Walling, when
9  he comes to me about -- the few times that him and I have
10  talked about things of that nature, I would not give him
11  my opinion. Because it's not my opinion he needs from an
12  HR director. I would state what he can do according to
13  the laws that governs the HR department.
14  Q  So you were, then, advising him, correct, based on what
15  the laws -- the policies that HR have in place, correct?
16  A  That is correct.
17  Q  Okay. So, then, he can make a decision?
18  A  That is correct.
19  Q  Doesn't that equally apply to Mr. Brown and his advisory
20  board, or his committee? Doesn't Duane Miller advise
21  him; yes or no?
22      MS. CHINONIS: I'll object to form.
23      You can answer the question if you understood
24  it.
25      THE WITNESS: You would have to ask Mr. Brown

### Page 69

1  to the degree of Duane Miller's role with him. I am
2  saying to you, that when the mayor comes to me and asks
3  any specific questions, I'm going to give him the
4  questions according to the laws and regulations by which
5  I'm governed. And I would tell him, if you move forward
6  in this direction, you need to prepare for A, B, C or D.
7  That's how specific my conversations have been with the
8  mayor.
9      Now, I can't tell you what the depth of Duane
10  Miller's role is and how much Mike Brown valued his
11  opinions, because I don't know.
12  Q  (BY MR. ROTH) Okay. Wouldn't you agree, though, that
13  regardless of whatever Duane Miller or Larry Moon or
14  anyone else told Mr. Brown, it was Mr. Brown's decision,
15  the emergency financial manager's decision, to terminate
16  you?
17  A  I would agree to that.
18  Q  Okay. All right.
19      I want to hand you what I'm marking as
20  Defendant's Exhibit 4.
21      (Exhibit Number 4 marked for identification by
22  the reporter).
23  Q  (BY MR. ROTH) These are the Interrogatories that you
24  provided to our office. I want to direct you to the
25  final page of this document. Is that your signature on

(Pages 66 to 69)

DARABOS vs. AMERICAN BUILDERS, et al          DEPO: BENJAMIN EDLUND

TAKEN; 6-18-15
19

**Page 70**

1    the Interrogatories?
2  A  It is.
3  Q  Okay.  You stated earlier that you are — you're
4    currently not employed, correct?
5  A  That is correct.
6  Q  Have you sought work other than — you said you applied
7    to the HR position for the city?
8  A  I have sought work.  I have been interviewed by Hurley
9    Medical Center.
10  Q  Okay.
11  A  Probably in the last couple of months.  Maybe three
12    months.
13  Q  Multiple interviews?
14  A  I have had one interview with Hurley Hospital.
15  Q  But you have been going through the process over the last
16    few months?
17  A  I have been looking for employment ever since I was
18    terminated in December of 2011.  I started looking for
19    employment and have had no success.
20  Q  Okay.  Where else did you apply?
21  A  I can't give you a list.  Just about everywhere.  I just
22    send resumes.  I have friends sending resumes.  I have —
23  Q  How many resumes have you sent out?
24  A  Oh, God, I can't really say.  There has been quite a few.
25  Q  Has it been ten?

**Page 71**

1  A  It's been more than ten.
2  Q  More than 20?  More than 50?  More than a hundred?
3  A  I would say less than a hundred, but more than 50.
4  Q  Less than 50?  Have you had —
5    MS. CHINONIS:  Objection.
6    THE WITNESS:  More than a hundred — less than
7    a hundred, more than 50.
8  Q  (BY MR. ROTH)  I'm sorry.  Okay.  Of those somewhere
9    between 50 and a hundred applications that you sent out,
10    how many interviews have you gone on?
11  A  I have only gone on the one with Hurley.
12  Q  Were you offered any interviews?
13  A  No.
14  Q  Okay.  You said that you applied all around.  Can you
15    remember any of the places that you applied to besides
16    Hurley?
17  A  It was Chrysler.  I can't tell you what year.
18  Q  Okay.
19  A  I have applied to Genesys.
20  Q  The hospital?
21  A  Um-hum.
22    MS. CHINONIS:  Yes.
23    THE WITNESS:  I'm sorry, yes.
24  Q  (BY MR. ROTH)  In what capacity where you applying to
25    those?  For what position?

**Page 72**

1  A  I can't remember the positions offhand.
2  Q  Were they for HR director positions?
3  A  Some of them may have been HR.  And some of them may have
4    just been management positions and upper management
5    positions.
6  Q  Okay.  So Chrysler, Genesys.  Where else?
7  A  Health Plus.  And that would have been for an HR
8    position.  And there was another position that I applied
9    for with Health Plus.
10  Q  It was a management position?
11  A  That is correct.
12  Q  Okay.
13  A  And I'm just trying to name some — I can remember more
14    of the local ones.
15    I want to say I may have applied for a position
16    with Community — Hamilton Health — I can't remember for
17    sure, but it seemed like I did.  And I believe at one
18    time I applied for a position with Job Corp.
19  Q  What is that?
20  A  It's like a — an institution that helps with young folks
21    who are having difficult times.  Challenged young
22    adults.
23  Q  Okay.  Do you have copies of your cover letters or
24    documents that you sent to these institutions?
25  A  I have — I may have some of the cover letters, yes.  But

**Page 73**

1    the resume would have been the same, so...
2  Q  Okay.  Did you receive rejection letters?
3  A  No.  With the exception of Hurley Hospital, and that was
4    two positions that I applied for.  Not the position that
5    I interviewed for.  But the position — one of the
6    positions I applied for they did send me an email saying
7    that they had chose another candidate.  So I wouldn't be
8    getting an interview.
9  Q  Okay.  Did you get any other emails like that from any of
10    the other institutions that you applied to?
11  A  Not in emails, no.
12  Q  Any letters of any kind saying that they filled the
13    position or that they would keep your resume on file,
14    something like that?
15  A  It might have been one from Health Plus, but I'm not for
16    sure.
17  Q  Okay.  And it's safe to say that you haven't been able to
18    secure any employment since your termination with the
19    City of Flint?
20  A  That is correct.
21  Q  Okay.  I'll direct you to Page 13 of the exhibit, Exhibit
22    4.
23    MS. CHINONIS:  I'm sorry, what page?
24    MR. ROTH:  Page 13.
25    MS. CHINONIS:  Thank you.

(Pages 70 to 73)

DARABOS vs. AMERICAN BUILDERS, et al      DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15
20

**Page 74**

1  Q  (BY MR. ROTH) Okay. In response to Interrogatory Number
2  21, you named people who have knowledge of any relevant
3  facts concerning this lawsuit. Who is Pastor Sean
4  Thompson?
5  A  That's Pastor Sean Thompson.
6  Q  Sean.
7  A  And Pastor Sean Thompson is my pastor.
8  Q  Okay.
9  A  And he's also a relative.
10 Q  How is he related to you?
11 A  We're cousins.
12 Q  Okay. Have you discussed — well, strike that.
13     What have you discussed with him that is
14 pertinent to this lawsuit?
15 A  My conversations with Duane Miller. My feelings about
16 being terminated. And a lot of personal emotional
17 feelings that I have had. And my desire to work. My —
18 not being successful in securing employment. And —
19 Q  He —
20 A  I beg your pardon.
21 Q  I'm sorry. So it's safe to say that you were seeking
22 counseling, or emotional support from him as a pastor?
23 A  That is correct.
24 Q  Okay. He wasn't present at any of the meetings? He's
25 not a city employee, correct?

**Page 75**

1  A  That is correct.
2  Q  He wasn't present at the termination meeting?
3  A  That is correct.
4  Q  Okay. So the only knowledge that he would actually have
5  is that which you told him?
6  A  That is correct.
7  Q  Okay. I would say that that probably applies equally
8  with your husband, Fred?
9  A  The knowledge that my husband Fred would have is that I
10 talk on a speaker phone at my home.
11 Q  Okay.
12 A  To just about anyone, unless they tell me to take them
13 off the speaker phone.
14 Q  Did you speak on speaker phone when you were talking to
15 Duane Miller?
16 A  That is correct.
17 Q  Was your husband present?
18 A  My husband was present.
19 Q  Okay. So he heard everything that Mr. Miller testified
20 to — or, I'm sorry, that Mr. Miller said to you over the
21 phone?
22 A  That is correct.
23 Q  Okay. When you spoke with Larry Moon, was that on
24 speaker phone?
25 A  Yes. But no one was present but me.

**Page 76**

1  Q  Okay. What about your daughter Shanneca —
2  A  Burr.
3  Q  — Burr?
4  A  She was present during the March conversation that I had
5  with Duane Miller, as well.
6  Q  Was Duane aware that they were on the phone listening in?
7  A  I don't know if he was or not. But I — it was — it was
8  clear that I was talking with him on the speaker phone.
9  Q  How do you know it was clear to him?
10 A  Because when you're talking to someone on the speaker
11 phone, you clearly hear everything in the background.
12 You can really tell that someone is on the speaker phone.
13 It's like a little — for me, it's like — it's a
14 different kind of sound.
15 Q  So your husband and daughter are sitting there on the
16 phone and Mr. Miller never acknowledged the fact that
17 they were listening?
18 A  My husband and daughter wasn't sitting on the phone.
19 They were present in the room sitting on the couch during
20 that conversation. And I can't say whether or not Duane
21 was aware they were there or not.
22 Q  Did they announce the fact that they were listening into
23 the conversation?
24 A  No.
25 Q  Okay. And he never asked if you were on speaker phone or

**Page 77**

1  if anyone else was listening? He didn't ask you to take
2  him off speaker phone?
3  A  No.
4  Q  Okay. You said that your husband wasn't present for the
5  conversation with Larry Moon. Was your daughter?
6  A  No.
7  Q  Was anybody else present in the room when you were on the
8  speaker phone with Duane?
9  A  No, just the three of us.
10 Q  Okay. And no one else was present when you were speaking
11 to Mr. Moon?
12 A  No.
13 Q  Okay. What would Mayor Dayne Walling know about your
14 lawsuit, other than the fact that he was mayor at the
15 time? I guess — I'm sorry. What, specifically, would
16 he be able to say about the incident?
17 A  Well, one of the things that the mayor would say, because
18 he appointed me and he was fully familiar with my
19 day-to-day work and performance, he would be able to say
20 that I was a good employee.
21 Q  Okay. Was he present during your termination?
22 A  No.
23 Q  What about Mr. Eason?
24 A  No.
25 Q  Who is Dr. Matthews?

(Pages 74 to 77)

DARABOS vs. AMERICAN BUILDERS, et al    DEPO: BENJAMIN EDLUND    TAKEN: 6-10-15

21

**Page 78**

1   A   Dr. Matthews was my psychiatrist.

2   Q   Okay. And you have spoken to him about this lawsuit and

3       the incident?

4   A   He's aware of it, yes.

5   Q   Okay. What's his first name?

6   A   I don't know his first name.

7   Q   You always just call him Dr. Matthews?

8   A   That is correct.

9   Q   Okay. You stated that the mayor was aware of your job

10      performance?

11  A   That is correct.

12  Q   And what would he say about your job performance?

13  A   He would say what he's already said to me.

14  Q   What is that?

15  A   That I was doing an outstanding job. He had a great

16      appreciation for the moneys that I had saved the City of

17      Flint. He was very pleased with the performance that I

18      was doing in HR. How I was pulling things together. He

19      was very pleased with how I was able to motivate city

20      employees and how I was able to work effectively with the

21      various unions and its leadership. And pleased with my

22      commitment to go beyond the call of duty to get the job

23      done. And was very pleased with my abilities to come up

24      with new ways and ideals by which to enhance the quality

25      of customer services for the residents of the City of

**Page 79**

1       Flint, internal and external customers.

2   Q   Did the mayor terminate you?

3   A   No. The mayor also was able to say to you that he

4       was shocked that I was terminated and that he didn't see

5       that coming.

6   Q   The mayor was shocked?

7   A   That's what he said to me.

8   Q   Okay.

9   A   Mm-hmm.

10  Q   I'm sorry, I was just trying to clarify for the record.

11      Maybe I didn't understand.

12  A   Mm-hmm.

13  Q   Okay. Dr. Matthews, then, would only be able to testify

14      as to what you told him?

15  A   That is correct.

16  Q   To the extent -- Dr. Matthews is a psychiatrist?

17  A   That is correct.

18  Q   Is he treating you for -- what is he treating you for?

19  A   I suffer with depression. And Dr. Matthews, I have only

20      been a patient of his for a short period of time. My

21      main psychiatrist was Dr. Ven Della and Dr. Ven Della

22      retired. So I had to seek out a psychiatrist. And Dr.

23      Matthews was one of the ones on the list that could be

24      considered. And so I did have numerous sessions with Dr.

25      Matthews.

**Page 80**

1   Q   Has Dr. Matthews prescribed any medication for your

2       depression?

3   A   I have not taken any depression medication. I suffer

4       with glaucoma, severe glaucoma. And as a result, a lot

5       of the medications that you would give for a person in my

6       emotional and mental condition could interfere with the

7       glaucoma. So he would not prescribe me with certain

8       medications.

9   Q   It could interfere with --

10  A   The glaucoma.

11  Q   -- with the glaucoma or the -- are you taking medication

12      for your glaucoma?

13  A   Yes, I am.

14  Q   And so mixing those things could exacerbate --

15  A   That is correct.

16  Q   -- or cause a strange side effect or something that they

17      are not aware of?

18  A   That is correct.

19  Q   And so for safety reasons --

20  A   That is correct.

21  Q   Okay. But you stated you are taking other drugs or

22      medications, though. You said this on Page -- and I

23      can -- if you need to remember what all those things are,

24      on Page 18, Interrogatory Number 31, in your answer, you

25      stated there are other things that you're taking for --

**Page 81**

1   A   Can you direct me to the paragraph, please?

2   Q   I'm sorry. It's Interrogatory Number 31 in the bold

3       paragraph.

4   A   Okay.

5   Q   You list several over-the-counter medications that you're

6       taking for relief of headaches; aspirin, Advil,

7       Excederin. Are those -- are you using those at all to

8       treat your depression?

9   A   No, I don't use these drugs to treat my depression. I

10      use Advil to treat headaches that comes as a result of

11      just distress or oftentimes it could be dealing with

12      whatever condition my eyes were doing at that time. What

13      I do to treat my depression is spiritual.

14  Q   Okay.

15  A   I have been this route before for years. And so I know

16      exactly when I'm sick. I know exactly when I feel I

17      can't take anymore. I know exactly some of the things I

18      need to do to try to offset my levels of depression.

19      Some of those things I do, I may soak for hours on top of

20      hours. I read, study the word, pray. Those are the

21      things that helps me.

22  Q   I'm sorry, that first thing -- what was the first thing

23      that you said, soak?

24  A   Soak in the tub.

25  Q   Oh, okay. To relax?

(Pages 78 to 81)

DARABOS vs. AMERICAN BUILDERS, et al          DEPO: BENJAMIN EDLUND          TAKEN: 6-10-15
22

## Page 82

1  A   Hot water has a tendency to put me in a relaxed state of
2      mind.
3  Q   I see. So your depression is of a nature that you're --
4      you use those, I guess we could call them homeopathic
5      remedies, home remedies to treat your depression?
6  A   Some of the things I do are not home remedies. Those are
7      some of the things that is recommended by quite a few
8      psychiatrists.
9  Q   Does Dr. Matthews recommend that you do those things?
10 A   For relaxation, mm-hum.
11 Q   Okay.
12 A   It work for me short of medication. What works with my
13     levels of depression and the deepness of it is my
14     spiritual relationship with God. So I may spend hours
15     and hours and hours in what I call the presence of the
16     Lord. And from that I pray, I meditate, I read, I study,
17     I cry, I pray, I meditate. I do things of that nature.
18     And I have a tendency with my depression, I shut the
19     world off. I detach myself. That's my way of dealing
20     with the pain that lives on the inside of me.
21 Q   Okay.
22 A   And those things work for me.
23 Q   You said that you pray and you meditate. Is that just --
24     are those synonyms? Are those things different?
25 A   They are very much so different. Oftentimes, when you

## Page 83

1  meditate, for my meditation, for my spiritual relation
2  with God, it's a time where I listen for God to talk to
3  me, to minister to me. And in that meditation, what I do
4  is listen. I don't pray.
5      When I pray, it's a call out to God. I'm
6  expressing what I'm feeling. What I'm thinking. And at
7  that point in time, I'm doing the talking. I'm calling
8  on God for help. I'm calling on him for strength. I'm
9  calling on him for deliverance. I begin to plead the
10 blood Jesus over my mind and over my thoughts, over my
11 actions, over my ways. You know, the moment that I'm in,
12 I call out for God to free me. To make me feel human.
13 So that's my way of talking to God.
14     When I'm meditating, again, I just want to hear
15 from him. So oftentimes when I pray, I don't necessarily
16 hear from God at that time. But when I meditate, I can
17 actually see him in my vision and I can hear him talking
18 to me and ministering to me.
19     And that works for me. That is something that
20 no psychiatrist, no therapist, no human being, not even
21 my husband, can give me. And without that ability, I
22 don't think I could have survived the things that I have
23 been through in my life, down through the journey of my
24 life. So that's what works for me.
25     And under my belief, we are taught to spend

## Page 84

1  more time searching out God than allowing doctors to fill
2  us up with pills. I have been the pill route, and that
3  don't work for me.
4  Q   So if you -- if you didn't have -- if you weren't being
5      treated for glaucoma, you would not take medication?
6  A   Not with my spiritual belief today, no. I have been
7      there. The medication makes me feel like a zombie. It
8      makes me feel like I'm dead. That I have no life. That
9      I have no emotions. It takes me to a space in time that
10     I don't understand and where I don't want to be.
11 Q   Do your faith and practices make your depression better?
12 A   It does.
13 Q   It does. Okay. What do you -- you stated in this same
14     Interrogatory 31, in your answer there, you stated that
15     you get upset stomach. You take Tums or Pepto Bismol.
16     Do you have any -- what causes your upset stomachs, to
17     your knowledge?
18 A   My nerves.
19 Q   Your nerves. Okay. You believe that that is related
20     to --
21 A   My depression.
22 Q   -- your depression.
23 A   Yes.
24 Q   Okay. You also state that you have trouble sleeping and
25     you'll take ZzzQuil?

## Page 85

1  A   I have taken that at times.
2  Q   How often do you use a sleep aide?
3  A   It used to be quite frequent. What I do now is I find
4      myself up most of the night. And when I can't sleep,
5      what I do, that works for me, I go back and reminisce
6      over the goodness of God in my life and what he's brought
7      me through. And I believe that what I'm going through
8      now is what I am -- that -- that God got me. He got my
9      back. He's going to fix it. That's the way I think.
10     And once I do that, or I may turn on the gospel
11 channel and I listen -- Channel 411 -- and I sit and
12 listen to gospel music. And it's through listening to
13 the gospel music, I find myself going to sleep.
14     MS. CHINONIS: I'm sorry, I need to take a
15 quick break.
16     MR. ROTH: Absolutely. That's fine.
17     (Off the record from 12:10 to 12:15.)
18     MR. ROTH: Back on the record.
19 Q   (BY MR. ROTH) You stated -- I think the way that you put
20 it was, you use these things to -- that these are the
21 only things -- these -- your faith and practices that you
22 engage in, that those things are what helps with your
23 depression because of the things that have happened to
24 you in your life?
25 A   That is one of the things I said, yes. The point that

DARABOS vs. AMERICAN BUILDERS, et al     DEPO: BENJAMIN EDLUND

TAKEN; 6-18-15
23

### Page 86

1  I'm trying to make is this: I went years because of past
2  trauma in my life under the care of a psychiatrist for a
3  period of time in my life. And at the point in which I
4  went almost ten years without being able to have a
5  career, and when I was given that opportunity in 2009 by
6  Mayor Dayne Walling, who gave me an opportunity to serve
7  as the HR labor relations director, that was the pivotal
8  part of my life that my emotions and my mental distress I
9  felt I could leave behind me. And I began to do again
10  the things that was my compassion.
11      I was able, for the first time in almost ten
12  years, to not have to be on Social Security for
13  disability. I was successfully able to go through what
14  is called a training period to see if I could enter back
15  into the work world. After so much rejection of looking
16  for an appointment, couldn't get it, and see if I was at
17  a mental state that I could function at the level that I
18  had grown accustomed to function at.
19      So becoming the HR and labor relations director
20  was huge for me for many reason. And --
21  Q  Okay. You mentioned a training period. What was that?
22  A  When you receive Social Security Disability, they have a
23  program that will allow you to work one year before -- to
24  see if you can make it. And I made it.
25  Q  Okay.

### Page 87

1  A  And so at that time in which I served those a little over
2  two years, I felt myself becoming Donna again. That
3  vibrant person, that confident person. I was there, I
4  felt. And on December the 2nd, 2011, when I was abruptly
5  terminated, at that -- on that particular day, without
6  explanation. Was not even asked if I would take a cut in
7  my pay, or what could I work for less to continue to give
8  the performance that I had been giving, I wasn't given
9  that opportunity.
10      So when I walked out of that office that day, I
11  walked out thinking this is a dream. This is not real.
12  They are going to call me back to work. And even some of
13  the individuals that I spoke to -- with throughout that
14  day was trying to give me confidence that they're going
15  to bring you back. This is just a precaus. That's what
16  I believed.
17  Q  Okay.
18  A  And so it is a result of that termination on December --
19  Q  2nd.
20  A  -- 2nd, 2011, that caused me to have a breakdown. I went
21  back into my past of everything that I have been through.
22  The things that I thought I had overcome. And I cannot
23  shake, even today, what that termination has done in my
24  life. Where it put me again, to a place where I never
25  wanted to be mentally again in my life.

### Page 88

1  So my life has been a struggle. And it's not
2  easy to find a job in Genesee County when all of the
3  people here have read and seen on the news that I was
4  fired. That I was fired is what is said. That I was
5  fired. As though I had done something wrong. And though
6  I hadn't did my job. That I was not good enough.
7      And to find out later by Donna Miller, it had
8  nothing to do with my performance, it was because of my
9  age.
10      So it put me in a place where I felt that it
11  was worse than getting raped, if anyone ever knew what
12  that felt like. But that's what it felt like to me. And
13  I was being discriminated against something I had no
14  control over. I didn't ask God to give me the birth date
15  of 1965. I didn't ask for that. I had no say in
16  that.
17      But for men to sit across the table and take
18  pride and joyfulness in doing what they done to me, they
19  put me into a place in of my life that makes it very
20  difficult for me.
21  Q  Who was joyful?
22  A  I believe Duane Miller, based on that conversation, he
23  chuckled. He literally chuckled.
24  Q  And you said he was across the table. I thought you
25  testified earlier that it was --

### Page 89

1  A  Mike Brown was across the table firing me. And to find
2  out later it was all because of my age. He took joy in
3  that. Duane Miller chuckled on that phone, short of
4  laughing, as though he was punching me and let me know
5  that Erica Hunter was their choice because of her age.
6  You don't have a -- you can't believe -- you can't even
7  imagine what that done to me.
8      No one knows, when people do that to people who
9  have suffered mentally the way I have suffered, the pain
10  that they have caused me. These are things that I can
11  never forget. No one can ever give back to me what they
12  took from me.
13  Q  Okay.
14  A  And to have applied for the job again, and to this day, I
15  still have not heard whether or not if I will be allowed
16  again to serve as HR labor relations director for the
17  City of Flint, that is disturbing.
18  Q  You're talking about your current application?
19  A  That I was interviewed.
20  Q  Who interviewed you?
21  A  Anthony Chubb, former city emergency manager Jerry
22  Ambrose and the current administrator, city
23  administrator, Natasha --
24  Q  Henderson?
25  A  -- Henderson. And it's these kind of things that I have

(Pages 86 to 89)

DARABOS vs. AMERICAN BUILDERS, et al        DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15

24

## Page 90

1    been through, that's what keeps my depression alive.
2    Q    So they interviewed you.  Do you know whether or not they
3    have filled the HR position?
4    A    I have no idea.
5    Q    They haven't contacted you to let you know?
6    A    No one has contacted me, no.
7    Q    Have you had any conversations with anyone else about
8    your application for the HR position?
9    A    I have asked the mayor have he heard anything about
10   whether or not if they are going to fill that position.
11   Q    What has the mayor discussed with you?
12   A    He told me he did not know.
13   Q    Okay.  How many conversations had you had with him?
14   A    Probably two.
15   Q    Did he tell you anything else?
16   A    No.
17   Q    Did he tell you that you were going to get your job back?
18   A    No.
19   Q    Did he tell you that you weren't going to get your job
20   back?
21   A    No.
22   Q    Did he tell you that they had other candidates that they
23   were looking at?
24   A    He didn't tell me.  The -- the young lady who was the
25   Michigan Municipal League search person, by the name of

## Page 91

1    Joyce Parker, told me that.  When I inquired by way of a
2    follow-up call, not because she initiated it, I asked,
3    it had been a period of time.  Could she tell me whether
4    or not I was going to be interviewed for the position.
5    At that particular time she told me no.  That
6    they did not screen me out.  They had identified two
7    other people that would be interviewed.  And I told her I
8    had some concerns with that.
9    Q    What were those concerns?
10   A    One, I felt that there was no other candidate that was
11   more qualified for that position than me, because I held
12   that position.  And I had saved the city millions of
13   dollars in that capacity.  And I could not understand why
14   I would not be considered for an interview.
15   During my interview conversation, however, she
16   asked me some specific questions about had I been fired.
17   Q    Okay.
18   A    I responded honestly.  And she said that she was going to
19   make some information known to whoever may -- to get back
20   to the city, whoever that was, she didn't say.  And that
21   they would be getting back with me.  They never did.
22   After that conversation, I began to inquire
23   what went wrong.  Why did I not even at least get an
24   interview.  And shortly after that, I would say about
25   maybe a couple weeks, I got a phone call again from Joyce

## Page 92

1    Parker saying that I would be interviewed on a certain
2    date and time; would I be available.  And I told her yes.
3    Q    You said Joyce?
4    A    Oh, I'm sorry, the other thing she asked, had I ever sued
5    anyone?  Those was -- those was the two questions.  Have
6    you ever been fired?  Have you ever sued anyone?  And I
7    told her that I had this lawsuit pending with the City of
8    Flint.  And that's when she said she would be making that
9    information known to whoever this group was.
10   Q    So you did interview for the position?
11   A    I did.
12   Q    When was the interview?
13   A    I would say about a month ago.
14   Q    Okay.
15   A    I can't remember the exact date.
16   Q    That's all right.  When did you have these two
17   conversation with the mayor?
18   A    It would have been after the interview.  I did share with
19   him, I thought my interview went well.  And, then, time
20   went by.  I says, "I'm not feeling comfortable.  I have
21   not got any response back from that interview team or
22   Michigan Municipal League."  He said that he was going to
23   look into it.  And from that point I've had no
24   conversation with the mayor.
25   Q    Have you had any other conversations with the mayor about

## Page 93

1    your employment with the city?
2    A    Not outside of that.
3    Q    Not before?
4    A    Oh, before, it was always -- we always talked about, off
5    and on, how I felt about being fired.  And I felt it was
6    unfair.  And the fact that I'm getting fired for Erica
7    Hunter to take my job because Duane Miller, Woodrow and
8    the mayor -- I mean, the emergency manager want younger
9    people in these jobs.
10   Q    Okay.
11   A    But I can't tell you.  There may have been a couple of
12   times.  I don't know exactly how many times we have had
13   that conversation.
14   Q    Can you be more specific than off and on?  How often do
15   you speak with him about the issue?
16   A    Over the last three years, I don't think Duane and I
17   have -- may have spoke about that more than, I would say,
18   three, maybe no more than five times.
19   Q    Okay.
20   A    And that's over the course of three years.
21   Q    He hired you?
22   A    He did.
23   Q    Or, excuse me, I guess he appointed you?
24   A    He did.
25   Q    Okay.  Did you inform him that you were applying for the

Ripka, Boroski & Associates, L.L.C.
(800)542-4531/ (810)234-7785 FAX (810)234-0660

email: rba@ripkaboroski.net
Firm Registration NO: 008139

DARABOS vs. AMERICAN BUILDERS, et al    DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15
25

**Page 94**

1  HR position this current time?
2  A  I did not let him know until after I had submitted my
3  resume package.
4  Q  What did you tell him?
5  A  That I applied for that HR position.
6  Q  Did he have any comments?
7  A  No. He just said, "Good."
8  Q  That was the extent of your -- did you talk on the phone?
9  A  Yes.
10 Q  Did you say anything else besides I applied for the HR
11 position and his response was good?
12 A  That was good. And, then, after that conversation -- I'm
13 sorry. Before that, I told him I was applying for the HR
14 position and I needed to know if I could get a letter of
15 recommendation from him. And he said sure. And he said
16 that's good that you're applying and, that was it.
17 Q  Did he provide that letter of recommendation?
18 A  He did.
19 Q  Okay. You were talking earlier about, in your words, you
20 said everything that you had been through and the past
21 trauma in your life, that your life has been a struggle.
22 And you said that that was over the first ten years --
23 or, I'm sorry, the ten years prior to your being employed
24 by the city?
25 A  That is correct.

**Page 95**

1  Q  Okay. Is that when your depression began?
2  A  My depression begin many years ago.
3  Q  When, approximately?
4  A  I would say probably when my brother was killed in the
5  '80s.
6  Q  And, I'm sorry about your brother, but when -- you said
7  that was in the '80s. When was that?
8  Q  1986.
9  Q  1986.
10 A  December 23rd.
11 Q  You think that's when your depression began?
12 A  I can't say that's when it actually began. I can't say
13 that for sure. Because through counseling therapy, I
14 have learned that I could have been depressed prior to
15 that and just didn't know it.
16 Q  Okay.
17 A  Depression is something that can suppress itself and you
18 think you're dealing with something else and, in essence,
19 all that time you could have been dealing with
20 depression.
21 Q  Okay.
22 A  And, then, after that, I dealt with my son being killed.
23 And that would have been in 1994. In between 1986 and
24 1994, I had emotional issues as related to my prior
25 marriage.

**Page 96**

1  Then after my son was killed in 1994. In 1995,
2  I was diagnosed with breast cancer and lost my breasts to
3  breast cancer and to undergo almost a year of chemo.
4  And, then, after that I ended up with a tumor in my
5  tongue that had to be taken out.
6  And, then, in between that was death of my
7  father. And after that, in between, was just a lot of
8  deaths of close family members and very, very close
9  friends. And through all of that, just overall rejection
10 of opportunities for employment.
11 Q  Okay. You mentioned a prior marriage. Who was that to?
12 A  Wayne Mayfield.
13 Q  Was he the individual that you had your son -- was he
14 your son's father?
15 A  He was the individual -- my daughter's. My daughter's
16 father.
17 Q  Your daughter's father?
18 A  Yes.
19 Q  Okay. Was that everything? When you said everything
20 that you have been through over the last -- through your
21 life, was that everything else that caused you trauma?
22 A  No. I could never put into words the everything. So
23 that is --
24 Q  Well, what other things?
25 A  It's -- it's just an array of -- just life itself. It's

**Page 97**

1  just a different array. I was discriminated against.
2  Q  How so?
3  A  In many ways. In terms of going into GM. When I went
4  into GM, that was a time when women had to fight for
5  their rightful place in terms of promotional
6  opportunities and, et cetera. And that's the reason I
7  became a vital part of a group that was put together to
8  deal with the diversity issues throughout GM. And as a
9  result of that, that's how GM got its diversity program.
10 I was a very vital part of that.
11 So it's just what you deal with in life. I
12 mean, just the difference in -- the cultural differences.
13 The difference in -- religious differences. Just the
14 difference in life struggles; the ups and downs. So I
15 cannot ever, I don't think anyone can, say that's all of
16 it.
17 Q  Okay. Was there anything else specific?
18 A  At this time, I just can't say. I mean, the more I think
19 about it, the more I talk about it, I'm sure in your
20 session I will come out with something different.
21 Q  You stated that there was this -- you were on Social
22 Security Disability and there was this training period
23 that lasted for one year. Is that something administered
24 by the Social Security Administration?
25 A  That is correct. And what it really means -- it gives

Ripka, Boroski & Associates, L.L.C.
(800)542-4531/ (810)234-7785 FAX (810)234-0660

(Pages 94 to 97)

email: rbn@ripkaboroski.net
Firm Registration NO: 096139

DARABOS vs. AMERICAN BUILDERS, et al        DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15

26

**Page 98**

1  you a trial period, not a training period. It's more
2  like a trial period.
3  Q  Okay.
4  A  To see if you can enter back into the work force without
5  any relapse.
6  Q  Is that something that they give to all people who are on
7  Social Security disability?
8  A  That is correct.
9  Q  Okay.
10  A  To my knowledge.
11  Q  Okay. When you were reentering the work force, when was
12  that, that training period, or trial period?
13  A  That would have been in 2009.
14  Q  When you were employed with the city?
15  A  That is correct.
16  Q  Okay. And you said you couldn't work for ten years
17  because of all of those events that you went through and
18  because of your depression?
19  A  It's not that I could not work. I was being treated for
20  my depression. In that ten year period, a part of my
21  depression was fighting up against closed doors that I
22  couldn't seem to penetrate was one of the parts in trying
23  to get my life back as it related to my career.
24  So I can't say I couldn't work. I always
25  looked for --

**Page 99**

1  Q  What were the closed doors with your career?
2  A  I couldn't get hired. I just couldn't get hired.
3  Q  Why not?
4  A  No one has ever said. So I couldn't speak for that. I
5  mean, I know it's a very competitive world. A very
6  competitive market.
7  Q  I mean, you worked for the federal government. You were
8  an appointee by the financial board of the White House.
9  You worked on a company -- or, excuse me, an agency that
10  had a 25 million dollar budget, and you couldn't get a
11  job?
12  A  I cannot answer why employers did not feel that my
13  qualifications on my resume rise to the level and
14  wouldn't hire me to their company.
15  Q  And you don't think that there is anything else that
16  would have influenced their decision not to hire you?
17  A  The only way I can know that is to be able to have an
18  opportunity to talk with them.
19  Q  If you had to guess, would you know what they were--
20  MS. CHINONIS: I'll just object. You're asking
21  for speculation.
22  Q  (BY MR. ROTH) When you were initially hired by Mayor
23  Walling, you said that you felt like he was -- and
24  correct me if I'm wrong -- but I think that you stated
25  that you felt like he was giving you a second chance

**Page 100**

1  after the fact that you couldn't get a job for all this
2  time?
3  A  I felt that what Dayne was doing was allowing -- I'm
4  sorry, the mayor -- was doing was allowing me an
5  opportunity to have a career again.
6  Q  Okay.
7  A  The one that I wanted. The one thing that I strived for,
8  I dreamed for, I hoped for, and prayed for. That's what
9  I thought Dayne was doing.
10  Q  Okay. Did you feel like he was giving you a second
11  chance?
12  A  I felt that he was giving -- it was not that I needed a
13  second chance. A second chance would be -- I don't think
14  I have done anything that makes me want a second chance.
15  I wanted a chance to have a career doing what I enjoyed
16  doing. And that's what he gave me. He gave me the
17  opportunity. He didn't give me a second chance. He gave
18  me an opportunity.
19  Q  Okay. You don't think there is anything else in your
20  life that you would have needed a second chance for?
21  MS. CHINONIS: I'll object to the form of the
22  question.
23  If you understand it, you can answer.
24  THE WITNESS: I really don't understand what
25  you're saying.

**Page 101**

1  Q  (BY MR. ROTH) Okay. In your Interrogatories, and I'll
2  direct you to Page 20 of Exhibit 4, Number 15, in your
3  answer, you talked about humiliation that you suffer and
4  continue to suffer for. Can you describe how it is that
5  you feel humiliated?
6  A  When I looked in my -- let me start it this way:
7  When I sat before Mike Brown on December the
8  2nd and I was told I'm firing you, terminating your
9  employment. I want your keys, your garage door opener
10  and I want you to vacate your office by 5 o'clock today.
11  That was the beginning of my humiliation. Because at
12  that particular point in time, there was no explanation
13  as to what I had done wrong.
14  And in those few minutes I sat there all I
15  could say in my mind, what did I do wrong? And when I
16  looked on MLive -- when I left Mike Brown's office, got
17  on that elevator, came back to my office, holding back
18  the tears, and had to call my staff into a meeting and
19  tell them I was fired.
20  MR. ROTH: We can take a break if that's --
21  MS. CHINONIS: Yeah, let's take a break.
22  (Off the record from 12:40 to 12:45)
23  Q  (BY MR. ROTH) Okay. Ms. Poplar, we were talking about
24  the past trauma that you have gone through before we went
25  off the record. And you stated that there was nothing

**(Pages 98 to 101)**

DARABOS vs. AMERICAN BUILDERS, et al        DEPO: BENJAMIN EDLUND        TAKEN: 6-10-15

27

## Page 102

1  else that you have gone through in your life that would
2  have exacerbated or contributed to your depression; is
3  that your testimony?
4  A  I'm saying there is many things that I have been through
5  in my life that has contributed to my depression down
6  through the years. I cannot say what all of those things
7  are.
8  Q  Okay. You had mentioned some specific things; death of
9  your brother, the death of your son, your prior marriage,
10  you've had cancer. Are there any other specific events
11  that you can point to? You said deaths of friends and
12  family that were close to you. Are there any other
13  specific things that may have contributed to or
14  exacerbated your depression?
15  A  Yes, my termination from the City of Flint.
16  Q  Other than all of those things, is there anything else?
17  A  Not that I can speak to at this time.
18  Q  So there are other things?
19  A  I'm sure there could be.
20  Q  Well, what are they?
21  A  It's just like how you go back over 60 years of your life
22  and conclude all of these things that you have been
23  through that could add to your stress, depression,
24  sadness, lonely feelings. I mean, I just can't -- if I
25  had to sit down and write it all, I couldn't do it.

## Page 103

1  Q  Would you also agree that part of your depression may --
2  because you have testified to it, that your depression
3  has in part been brought on by your inability to get
4  work; inability to find a job?
5  A  Yeah, I already said that.
6  Q  Okay. Both in the period before you were appointed by
7  Mayor Walling, and since your termination, those things
8  have contributed, too? That's what your testimony is?
9  A  I'm contributing to -- yes, that is correct.
10  Q  And a big part of your inability to find work is a part
11  of your depression. Is there anything else about your
12  inability to find work --
13       MS. CHINONIS: I'll object to the form of your
14  question.
15       MR. ROTH: Okay.
16  Q  (BY MR. ROTH) Are there any other events which have been
17  publicized which would add to your humiliation that you
18  feel, or other symptoms of depression that you have?
19  A  I don't think -- no. I can't say with certainty, no.
20  Not with great certainty. I mean, if I would have to
21  think back over some things, maybe I can. But right now,
22  those are the things that's coming to my memory today.
23  Q  Okay. There is nothing else that you remember?
24  A  Not that is coming to my memory right now, today, no.
25  Q  Okay. Well, in reference to your depression which goes

## Page 104

1  to your damages and your inability to find work, which
2  goes to your ability to mitigate your damages, do you
3  think that any part of your inability to find work may
4  have to do with any crimes that you may have committed in
5  the past?
6  A  No. I have not -- no. The crime that was -- that I was
7  found guilty of committing is not contributing to my
8  depression, because my record has been expunged. So,
9  therefore, I have no crime. So that would not add to my
10  inability of getting a job.
11  Q  Okay. What crime was that?
12  A  Receiving money under false pretense.
13  Q  You were convicted of that? Did you plead guilty or was
14  there a trial?
15  A  My record was expunged.
16  Q  Okay. But do you know?
17  A  My record was expunged.
18  Q  What were the facts in that case?
19  A  My record was expunged, so I don't know the facts of that
20  case.
21  Q  Well, you do know the facts.
22  A  Once my record was expunged, there is no longer a case,
23  no longer facts. My record --
24  Q  But those events did occur and you remember them, don't
25  you? You recall them?

## Page 105

1  A  Once my record was expunged, those events never occurred
2  again. It was never -- once my record was expunged, I
3  never seen them as events anymore. It was like it was
4  wiped away.
5  Q  Okay. You're stating, then, that, because your record
6  was expunged, the events which factually occurred in the
7  past did not occur? They don't exist? Is that your
8  testimony?
9  A  When a person's record is expunged, those events are
10  wiped away.
11  Q  Legally, those events -- okay. But they still occurred,
12  correct?
13  A  The record was expunged.
14  Q  Okay. So the crime that you committed, who prosecuted
15  you?
16       MS. CHINONIS: I'll just object. It's not
17  relevant.
18       MR. ROTH: It is relevant. It goes to her
19  ability to find work. It goes to her ability to mitigate
20  damages. It goes to her depression. Which goes directly
21  to the damages that she is --
22       MS. CHINONIS: That does not conform with the
23  testimony that you have taken at this deposition today,
24  no.
25       MR. ROTH: It certainly does. She has

(Pages 102 to 105)

### Page 106

1  testified that -- go ahead.
2      MS. CHINONIS: My client has not testified that
3  her depression is because of any criminal conviction.
4      MR. ROTH: She's testified that her depression
5  has been at least exacerbated by the fact that she's been
6  unable to find work. And I think that it's very relevant
7  that perhaps one reason that she's --
8      MS. CHINONIS: Because she's been terminated by
9  the City of Flint I think is what she testified.
10     MR. ROTH: She stated that her depression began
11 long back before she was ever terminated by the City of
12 Flint. All the way back into the 1980's when her brother
13 was -- when he passed.
14     MS. CHINONIS: Correct. But the deposition
15 testimony is recorded, and the transcript will speak for
16 itself.
17     MR. ROTH: Right. My point is, is that it's
18 not just the termination which led to her depression.
19     MS. CHINONIS: That is your allegation. That
20 is not what the testimony is.
21     MR. ROTH: And I'm more -- I'm more than
22 allowed to ask her about that. And that's what I'm doing
23 right now.
24     MR. CHUBB: We're going forward with the
25 questioning unless you instruct your client not to

### Page 107

1  answer.
2      MS. CHINONIS: I have not instructed her not to
3  answer.
4      MR. CHUBB: Okay.
5  Q  (BY MR. ROTH) Can you answer the question?
6  A  Repeat the question, please.
7  Q  Who was prosecuting you?
8  A  I don't know.
9  Q  You don't know if it was the -- was it the city
10    prosecutor? Was it the county prosecutor? Was it in
11    Genesee County?
12 A  My trial was held in Genesee County.
13 Q  Okay. Who was the judge?
14 A  Judge Hayman.
15 Q  And you were convicted of receiving money under false
16    pretenses?
17 A  That was the original charge, yes.
18 Q  Okay. Were you convicted at a trial?
19 A  That is correct.
20 Q  After your conviction, were you sentenced?
21 A  My record was expunged.
22 Q  What was your sentence?
23 A  I can't remember.
24 Q  You don't remember?
25 A  No.

### Page 108

1  Q  Did you serve a jail sentence?
2  A  No.
3  Q  Okay. Did you make any form of restitution?
4  A  There was a restitution.
5         No. No. That's not correct. No restitution.
6     There was no restitution.
7      MS. CHINONIS: And I'm, just for the record,
8  going to object to this line of questioning, as her
9  record been expunged.
10     MR. ROTH: Okay.
11 Q  (BY MR. ROTH) So you're record was expunged. You were
12    convicted of a crime. Was that ever published, to your
13    knowledge?
14 A  Being that my record has been expunged, and the fact that
15    I am under the understanding that I don't have to respond
16    to anything concerning my record, because there is no
17    record, so whatever happened prior to that led up to the
18    expungement, I have no response.
19 Q  Okay. At any time that you're aware of was your criminal
20    conviction, the facts leading to it, the whatever it was
21    that you did which resulted in your conviction, were any
22    of those publicized?
23 A  Being that my record is expunged, I have not responded to
24    any questions concerning leading up to my record being
25    expunged.

### Page 109

1      MR. ROTH: Then I would object that you're
2  failing to respond. I'll note that for the record.
3      MS. CHINONIS: Can we take a quick break?
4      MR. ROTH: Absolutely.
5      (Off the record from 12:55 to 1:00).
6  Q  (BY MR. ROTH) Okay. Ms. Poplar, we have been talking
7  about your criminal record that was expunged. Okay.
8  When did this -- when did that occur?
9  A  The expungement?
10 Q  Correct.
11     MS. CHINONIS: All right. I'm just going to
12 place another objection on the record, because I believe
13 that this line of questioning is meant and designed to
14 harass and embarrass my client.
15     Also, I think this whole line of questioning
16 will be inadmissible because the alleged crime is over
17 ten years old, so it would be violative of the ten year
18 rule. And so my objection is noted for the record.
19 Thank you.
20     MR. ROTH: Okay. I'd just like to state, then,
21 for the record that I do think that this is relevant. It
22 goes to Ms. Poplar's asserted mental damages, which are
23 related to both her depression and her economic damages,
24 which are related to her ability to find or maintain
25 employment.

(Pages 106 to 109)

DARABOS vs. AMERICAN BUILDERS, et al        DEPO: BENJAMIN EDLUND        TAKEN: 6-10-15

29

## Page 110

1  MS. CHINONIS: Just, then, in response to your
2  comments on the record, Ms. Poplar has not asserted that
3  she is unable to find work because of any criminal record
4  or any expunged record.
5       And, furthermore, mitigation is something that
6  you have to prove. And so if you have knowledge that
7  someone has not given Ms. Poplar a job because of a
8  criminal record, then, we're going to need to depose or
9  take evidence from that individual. Ms. Poplar has not
10  made that statement.
11      MR. ROTH: Okay.
12  Q  (BY MR. ROTH): Okay. Well, then, I'll just ask you at
13  this point, are you refusing to answer questions at any
14  greater length about your expungement of your conviction?
15  A  No.
16  Q  You're not refusing?
17  A  No.
18  Q  Okay. Well, then, I'd like to know when these events
19  occurred. When did the crime occur?
20  A  The crime occurred in — allegedly, occurred in 1998 or
21  1999.
22  Q  Okay. And when were you convicted?
23  A  2000.
24      MS. CHINONIS: I'll just place a continuing
25  objection to this line of questioning so as to not

## Page 111

1  interrupt.
2       MR. ROTH: Okay.
3  Q  (BY MR. ROTH) The conviction was in 2000. Was it
4  publicized?
5  A  Yes.
6  Q  Okay. How do you know that? Did you read the
7  publications, the newspaper, et cetera?
8  A  I did see the newspaper, yes.
9  Q  Okay. How did you feel when you saw the newspaper?
10  A  I didn't feel any certain way. Because it is the
11  practice of our media to cover trials at the 68th
12  District level and at the circuit level.
13  Q  Okay. So you're just ambivalent about the fact that
14  you're — and you just stated that it was an alleged
15  crime that you were convicted of. You're stating that
16  having your name in the paper and having that correlated
17  with that crime, it didn't bother you? It didn't upset
18  you?
19  A  It had a natural response from me that I had when I was
20  terminated from the City of Flint.
21  Q  So you felt humiliation? You felt upset?
22  A  Yes.
23  Q  Okay. Did you end up talking to a therapist about it?
24  A  At that particular time during that — no, not during
25  that phase.

## Page 112

1  Q  Okay. Remind me when you were seeing a therapist.
2  A  When I was — it was not until — I went a period — it
3  wasn't until after that particular situation that I began
4  to see a therapist.
5  Q  Okay.
6  A  In 1998 or 1999.
7  Q  When did you first begin seeing a therapist?
8  A  I can't remember.
9  Q  Okay. You said that you felt you were embarrassed when
10  you were terminated by Mike Brown, correct?
11  A  Yes, I was.
12  Q  Have you ever fired someone before?
13  A  Yes.
14  Q  Okay. When you have fired them in the past, have you
15  told them that they needed to clean out their desk and
16  vacate the premises by a certain time, by the end of the
17  day, by the end of the week, whatever?
18  A  Not in the situation where I had to terminate, no.
19  Q  Is that the general practice, though, when someone leaves
20  their employment with any organization, business,
21  governmental entity, when they are fired, they are asked
22  to clean out their desk?
23  A  That is a practice, yes.
24  Q  Okay. Because if you don't work at a place anymore, you
25  don't need to have your belongings there, correct?

## Page 113

1  A  That is correct. But also let me add this: Depending on
2  the nature by which you're terminating a person, if a
3  person is hostile, violent, and that led to that
4  termination, then, that person is not the person that
5  cleans out his or her desk. That's done for them.
6  Q  Okay.
7  A  And those things are then mailed.
8  Q  Okay. When you were appointed by Mayor Walling, what —
9  how did you understand your ability to end your
10  employment with the City of Flint? That is, could you —
11  were you on contract? Could you leave as — with notice,
12  or how did that work?
13  A  My appointment — in order to bring my appointment — in
14  order for the mayor to terminate me, he would —
15  Q  Did you serve at the pleasure of the mayor?
16  A  I served at the pleasure of the mayor; that is correct.
17  Q  Okay. Would you agree that someone who has the same
18  authority of the mayor, so let's — strike that.
19       If someone holds the authority of the mayor who
20  is not the mayor, would you then agree that you serve at
21  their pleasure?
22       MS. CHINONIS: I'm just — I'm sorry. I didn't
23  mean to interrupt.
24       MR. ROTH: That's all right.
25  Q  (BY MR. ROTH) Would you agree that you serve at their

Ripka, Boroski & Associates, L.L.C.
(800)542-4531/ (810)234-7785 FAX (810)234-0660

email: rba@ripkaboroski.net
Firm Registration NO: 008139

DARABOS vs. AMERICAN BUILDERS, et al        DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15
30

### Page 114

1  pleasure then?
2  A  No. The only way that I would agree to that is that I
3  receive something in writing telling me that, effective
4  on said date, you would no longer be under the authority
5  of the mayor. You are now under the authority of whoever
6  that person might be.
7  Q  So you — didn't you state earlier in your testimony,
8  though, that the emergency manager had the authority to
9  terminate you —
10  A  I didn't —
11  Q  — when we talked about the emergency manager's order?
12  A  I would have — yeah, you asked me a question. Can you
13  repeat that? Is there a way they we can go back to that?
14  I want to make sure that what I said was —
15  MS. CHINONIS:  Well, the transcript will speak
16  for itself.
17  THE WITNESS:  I don't recall answering that.
18  MS. CHINONIS:  But if you didn't understand
19  that question — if you didn't understand Mr. Roth's
20  question if he asked you that before, I think what he's
21  asking you is for your opinion now as —
22  THE WITNESS:  Okay.
23  MS. CHINONIS:  I'm not going to ask the
24  question for you. Sorry.
25  THE WITNESS:  I never received anything from

### Page 115

1  Mayor Dayne Walling and/or the emergency manager at that
2  time, Mike Brown, that effective on said date that I am
3  now to report directly to the emergency manager, Mike
4  Brown. I never received anything like that.
5  Q  (BY MR. ROTH)  Okay. All right. I'm going direct you
6  back to Exhibit — your Interrogatories. I think that's
7  Exhibit 4, Page 20. We were discussing Interrogatory
8  Number 35. We were discussing the emotional damage and
9  humiliation that you say you suffered.
10  In your answer, you agree that you said that
11  you — that it appears to you that these things are —
12  that they are permanent.
13  A  Could you state your question so I can get a clear
14  understanding of what you're trying to ask?
15  Q  Do you believe that the injury that you feel from the
16  humiliation, from your mental damage, do you believe that
17  that is permanent?
18  A  I believe that, at the time in which I was hired by the
19  mayor, that those things that I had suffered and were
20  struggling with prior to me getting hired in 2009, on the
21  moment by which I began to prove myself that I could cope
22  at a higher level position again, although I still had
23  the issues with depression, it began to become less
24  cumbersome for me because I was back and I was in
25  control.

### Page 116

1  Q  Because you were back at work?
2  A  I was back in a mental place where I felt I had control
3  over me. And what was helping me with that was a very
4  effective tool; I was working.
5  Q  Okay.
6  A  I was striving. I was feeling successful. I was feeling
7  confident. I was feeling good about myself.
8  Q  You felt a sense of pride in having an important job?
9  A  A sense of pride. A sense of dignity. And it was not so
10  much about an important job. I had a career.
11  Q  Okay.
12  A  So I didn't have to hold a title of HR labor relations
13  director. But I had a career. And it was something that
14  I had spent a lifetime achieving. I went to college. I
15  did all the right things, I thought, in my mind. And it
16  wasn't until December the 2nd, 2011, those things that I
17  thought I had begun to deal with, cope with and had
18  minimized so much that even I was not even feeling the
19  way I felt prior, I felt that I had mental and emotional
20  competency and control.
21  But the day that I got fired, in concert with
22  the phone conversations with Duane Miller, it intensified
23  my depression. It didn't take away my desire to still
24  want to be me. To still want to be amongst the employed,
25  or still want to enjoy the — the pleasure of living the

### Page 117

1  American dream. That was still in my head. That was
2  there.
3  But what they — what happened to me at the
4  hands of Mike Brown —
5  Q  It wiped that all out?
6  A  — and Duane Miller, it took me back to a place I didn't
7  want to be.
8  Q  Okay. Do you think that if you're re-employed, be it at
9  the City of Flint where you have applied for a job, or in
10  another place, that you will get that feeling back?
11  A  I will never get back what they took from me.
12  Q  Well, at least some of your depression, do you believe
13  that it will subside or be less because you're
14  re-employed somewhere?
15  A  You didn't get me point. I will never get back what they
16  took from me. A job can't give that back to me. Because
17  it cannot wash away the fact that, in this particular
18  situation, that I was fired based on something that I did
19  not do. I was fired because the God I serve chose to
20  give birth to my parents of me in 1955 versus 1976 or
21  1973.
22  Q  You stated earlier that your depression began around the
23  1980s —
24  A  That is correct.
25  Q  — and that you were depressed — you stated that it

Ripka, Boroski & Associates, L.L.C.
(800)542-4531/ (810)234-7785 FAX (810)234-0660

email: rbs@ripkaboroski.net
Firm Registration NO: 008139

DARABOS vs. AMERICAN BUILDERS, et al    DEPO: BENJAMIN EDLUND    TAKEN: 6-18-15

31

## Page 118

1    became less when you were initially hired by Mayor

2    Walling, correct?

3    A   That is correct.

4    Q   And that's because you became employed, correct?

5    A   At the time in which I became employed with Dayne

6    Walling, no one had ever discriminated against me for my

7    age.

8    Q   Okay.

9    A   Never. I have never been --

10    Q   So are you saying --

11    A   -- subjected to age discrimination.

12    Q   Are you saying that, as you allege, that age

13    discrimination, that that created a greater level of

14    depression in you than any of the things that happened to

15    you prior to that?

16    A   That is correct. Because the things that happened to me

17    prior to that can be --

18    Q   I'm sorry, prior to the close deaths of family members?

19    A   This is one thing I do know. That there is a point in

20    time once that man must die. That's the point in time

21    according to the word of God. These things are

22    inevitable.

23    So what I grieve was the pain of losing a

24    loved one that I will never see in the flesh, but I will

25    see in the spirit. So I know that one day I'm going to

## Page 119

1    see my grandmother. I'm going to see my father. I'm

2    going to see my brother. I'm going to see my son in the

3    spirit.

4    But as I move on in my life, this is one thing

5    I cannot correct. You can't correct it. No psychiatrist

6    can correct it. God can't even correct it. Mike Brown,

7    Duane Miller, can't correct it. Woodrow Stanley cannot

8    correct it. Because as sure as I continue to live, I'm

9    going to continue to get older in age and not younger.

10    Q   If you can't correct it, why are you seeking

11    re-employment with the City of Flint? Why did you file

12    this lawsuit?

13    A   Because what they did to me was wrong. And I believe

14    that they need to right their wrong. Me pursuing

15    employment has nothing to do with my abilities to

16    perform.

17    Q   Isn't, as you say, that right -- that wrong is righted,

18    isn't that going to correct it?

19    A   No.

20    Q   Okay.

21    A   Not -- not with the -- not with the -- let me tell you

22    something. No one can stop me but death from

23    continuously to have a birthday every year. No one can

24    make me 21 years old again. No one can make me 35 years

25    old again. I am 60 years old as I sit before you today.

## Page 120

1    Next year, on April 4th, I will be 61. And every year

2    thereafter I'm steadily getting older.

3    They cannot give me back age. And to

4    discriminate against me for my age, I can get a job

5    performing at whatever level. But let that be based on

6    my performance, my undeniable performance and

7    contribution, and not my age.

8    So if the city calls me back today, I will go

9    back to work today. Because I'm not going back on

10    anything other than I have proven that I have the ability

11    to perform successfully as the HR and labor relations

12    director.

13    One thing I will not do, never have done, I

14    will not ever apply for a position that I feel that I do

15    not have the skills by which to perform. And when I

16    pursue a position, or a career, I'm not doing it based on

17    my age. I'm doing it based on my abilities to perform.

18    My proven, undeniable, demonstrated abilities to perform.

19    I can't begin to tell you -- every time you ask

20    me this question, it could be you or a doctor or anybody,

21    I'm going to continue to say, it is going to continue to

22    get worse, because I cannot stop the clock. The only

23    thing that can stop the clock on my age is death. That's

24    the only thing that's going to stop it.

25    It's not going to take out the memory that when

## Page 121

1    I walk into a place of employment, am I going to be

2    subjected to another Duane Miller and Mike Brown at some

3    point? Are they going to allow me to come in, save

4    millions and millions of dollars, and, then, allow

5    someone to come in say we going to take you out of this

6    now. You get this all set up and let us give it to

7    another Erica Hunter who has zero experience and explain

8    what we don't care about her having it. It's going to

9    look good on her damn portfolio. We want her there

10    because she's a young black person.

11    How do you think that make me feel? You can't

12    change that. You can ask me a thousand questions and

13    it's not going to change how I feel. So every time I

14    step out to compete, what's in the front of my mind is,

15    am I going to get discriminated because I'm a 60 year old

16    woman, or I'm a 61 year old woman, or I'm a 62 year old

17    woman? I have made plans in my life that I was going to

18    work until I couldn't work no more. Until I drop. I

19    never sat back and said, "Let me retire at a certain

20    age." I enjoy working.

21    So that at the end of the day, at the end of

22    the day, my performance speaks for me. That's the

23    greatest legacy that I can live is that I live my life to

24    work and give undeniable performance to everything that I

25    have done in my life. And for anyone, be it you or

Ripka, Boraski & Associates, L.L.C.    email: rba@ripkaboraski.net

(800)542-4531/ (810)234-7785 FAX (810)234-0660    Firm Registration NO: 008139

DARABOS vs. AMERICAN BUILDERS, et al          DEPO:  BENJAMIN EDLUND

TAKEN:  6-10-15
32

**Page 122**

1   anyone, to sit there and tell me I'm too old, you want
2   younger people --
3   Q   For the record, I never stated --
4   A   No, that's what Duane Miller said. And you're sitting
5   here representing the city, Mike Brown and Duane Miller.
6   And I take offense to that. Because I need someone to
7   understand -- these are things that makes my depression
8   flare up.
9        These are the things that makes me upset.
10   Because this is not a game for me. This is my mind. And
11   the greatest thing that any human being can ever have is
12   their mind. And when this mind don't function well, I
13   cannot function. And for anyone to play with my mind
14   based on age, I got a problem with that. Anyone would
15   have a problem. It's unfair.
16        How do you, representing the city, decide what
17   my remedy is for my mental state right now? What help
18   can you give me? What can you do to erase what Duane
19   Miller said to me? What can you do to erase what Mike
20   Brown did to me? What can you do to take some age off my
21   life? What can you do?
22        Frankly, I enjoy being the age that I am. I
23   don't have no problems growing older. Because I see
24   myself growing older gracefully. And it has nothing to
25   do with my abilities to perform. Nothing. And, yet, I

**Page 123**

1   do get angry about it. Because it was wrong. Hear me,
2   wrong, wrong. For those individuals to sit there and
3   want to play God, it's wrong.
4   Q   But, again, you have already testified Mike Brown never
5   said anything that was derogatory to you, correct?
6   A   That is correct.
7   Q   Okay. The only evidence that you state that you have
8   that Mike Brown made his decision to terminate you
9   because of age, as you allege, the only evidence that you
10   have is what was told to you by Duane Miller?
11   A   That is correct. And I want to add to this:
12        Mike Brown made the public statement that he
13   was here to make decisions that was going to be cost
14   effective for the City of Flint, and he was going to
15   start at the top. Because that's where he needed to cut.
16        And when I sit back and I see that he didn't do
17   that. Everyone he took out of that administration he has
18   brought additional people in there making more.
19        And so what brings to mind, to me, I have no
20   reason to doubt what Duane Miller has said to me.
21   Because what I do see is that Mike Brown lied. He lied.
22   Q   When did he lie?
23   A   He lied to the media. He lied to the people. He lied to
24   this community when he said that he was here to bring
25   cost savings to this city to get the budget lined up.

**Page 124**

1   When he did that, he was going to have to cut from the
2   top. When he cut from the top, he replaced at the top.
3   And those that he brought in, he replaced much higher.
4   Much higher.
5        When you look at what they pay Erica Hunter,
6   and look what you had to bring in, I could understand if
7   they brought Mr. Jekel in and Erica Hunter and was able
8   to do that off of my salary. That wasn't the case. They
9   increased her salary. And kept increasing her salary up
10   until she resigned.
11        And Mike -- the Jekel guy continues to make
12   what he was making. When you put these things together,
13   along with her benefit package, they didn't save no money
14   cutting me off the top. They did just what Duane Miller
15   said they were going to do, put young African American
16   people in high profile jobs.
17   Q   Were you the only person that was terminated? Weren't
18   certain departments of the city, didn't they go unfunded?
19   Weren't they eliminated entirely?
20   A   I can't tell you what they did. All I can do is tell you
21   that --
22   Q   Would you agree that Mike Brown did save the city a lot
23   of money?
24   A   No, I couldn't.
25   Q   You couldn't say how much, but --

**Page 125**

1   A   I can't tell you how much he saved, but this is what I
2   can tell you.
3   Q   But you would agree that he saved the city money,
4   wouldn't you?
5   A   I cannot agree to that. Absolutely cannot agree to that,
6   for this reason:
7        Back at the time I was terminated, that was not
8   my area of focus. My area of focus was why I got fired
9   and how did he save money on the HR director position,
10   because he did not. I can honestly say he did not save
11   money on the HR position that he cut from the top. There
12   was no savings there.
13        Now, wherever else he saved, I can't tell you.
14   You would have to ask Mike Brown these questions.
15   Q   Okay. You keep stating that Duane Miller told you
16   that -- essentially, that you were terminated because of
17   your age. Okay. I want to direct you to -- okay. I'm
18   going to direct you to Page 33 of the Interrogatories,
19   Exhibit 4. You were asked to describe where your
20   termination occurred and the events that occurred there,
21   okay?
22   A   Can you direct me to what number you're referencing?
23   Q   Page 33 at the very top, right under the word answer.
24   That's your answer there, correct?
25   A   Okay.

(Pages 122 to 125)

DARABOS vs. AMERICAN BUILDERS, et al    DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15

33

## Page 126

1  Q  In that paragraph, you state where it was that all of
2     these events occurred, okay? The termination meeting.
3     Okay? You can use that to refresh your recollection if
4     you need to. Where did the termination occur?
5  A  My termination occurred in a conference room in the
6     mayor's suite, City of Flint.
7  Q  Okay. So not the mayor's office? It was a conference
8     room?
9  A  It was a conference room.
10 Q  Okay. And you stated that, at that meeting, the only two
11    people who were there were Mike Brown and the city
12    attorney, Peter Bade, correct?
13 A  That is correct.
14 Q  Okay. You say in your answer here and I'll quote it, "It
15    was at the termination meeting that I was told that I was
16    being terminated because of my age."
17    Is that an accurate statement?
18 A  No, that is not -- that is not the time that -- I made it
19    clear I think throughout even this testimony today, the
20    only two people that was in that meeting was Duxne -- I'm
21    sorry, was Pete Bade, Mike Brown and myself.
22 Q  Okay. And so no one at that meeting told you that you
23    were being terminated because of your age?
24 A  No. No one at that meeting, no. It was not until I had
25    the conversation with Duane Miller.

## Page 127

1  Q  So if you look at, then, paragraph -- I'm sorry, in the
2     next question, interrogatory Number 61, your answer to
3     that interrogatory starts you said, "Shortly after
4     I was informed of my termination, Duane Miller told me
5     that he and Woodrow Stanley wanted to give young black
6     people opportunities to serve in high profile jobs."
7     Okay.
8     So it was shortly thereafter, and,
9     specifically, it was in that March conversation,
10    correct --
11 A  That is correct.
12 Q  -- on the phone? It was not at the meeting?
13 A  That is correct.
14 Q  Okay. So, really, the important date and time is
15    December 2nd, 2011. And what I want you to do is walk me
16    through that day. What happened after you were
17    terminated? You said you rode the elevator. Then what
18    happened?
19 A  I went to my office. Asked for my executive -- let me go
20    go back. That is not the -- December 2nd is not the only
21    important time as related to this matter. The February
22    phone conversation with Larry Moss is very important and
23    the March conversations with Duane Miller was very
24    important.
25    To specifically ask your question now -- answer

## Page 128

1  your question now, after I was terminated, I walked out
2  of that conference room, got on the elevator, went down
3  to my office, asked my executive secretary, Angella
4  Lewis, at the time, if she would come in the office.
5     I shared with her what had just happened. I
6  was emotional. I asked her to give me time to pull
7  myself together, as she pulled herself together, and,
8  then, call the staff in.
9     Once the staff was called in, I explained to
10 the staff that I had just been terminated by Mike Brown.
11 I did not have at that time any explanation as to why I
12 was terminated. I did make a statement to -- that -- to
13 Angella that I felt that this was a process and that I
14 probably would be retiring back to my work, to my job.
15 But until then I needed her to -- as I said, had the
16 meeting with the staff, asked them to remain strong, stay
17 encouraged, continue to do what we had put in place, to
18 move forward.
19    I told Angelia to gather up all of the goals
20 and objectives that we had put in place, the HR strategy
21 that we put in place. Please put that stuff together
22 just in case Mr. Brown needed to see those things.
23    I then -- at that point the staff had went back
24 to resume doing whatever they were doing, attempting to
25 do that. I asked if she would please get my husband on

## Page 129

1  the phone. I emotionally called my husband and told him
2  I had just been fired and that I had to be out of my
3  office by 5 o'clock. And my husband responded by saying,
4  "I'm coming to get you now."
5  Q  Did he come get you?
6  A  He did. I just told him to give me a chance to spend
7     some more time with Angelia, because she was very
8     emotional. And I wanted to make sure that everything was
9     put in place so that Mr. Brown could have an
10    understanding of what actually was going on in the HR
11    department.
12 Q  When did you tell Angelia that you thought that you would
13    be brought back?
14 A  As soon as I got back into the office. Because she was
15    crying and I was trying to console her and just told her
16    to calm down.
17 Q  She was crying?
18 A  She was crying immensely. I said, "Just calm down. It's
19    going to be all right. I do believe I'm going to come
20    back."
21 Q  Okay.
22 A  And I made that statement based on my belief that all
23    they were really doing was taking people out and they
24    were going to bring people back based on their work
25    performance. That's why I asked her to gather up all the

(Pages 126 to 129)

DARABOS vs. AMERICAN BUILDERS, et al     DEPO: BENJAMIN EDLUND     TAKEN: 6-10-15

34

**Page 130**

1  things that we had done in that department.
2      And to make sure that she get the five year
3  goal plan, the three year goal plan that already was
4  submitted to the mayor and the city administrator at that
5  time of the things that we were doing and all the things
6  that we wanted to put in place as we moved in the future.
7      I asked her to pull out the — some of the
8  agreements that I had made with the various unions, so he
9  could see that I was working collaboratively trying to
10  build positive relationships with the unions and its
11  leaders. And we was trying to think of other things that
12  we did. Put together a big package to make sure that she
13  gave it to Mr. Brown.
14      Because I'm thinking, in my mind, he's going to
15  review all of this stuff. And at some point, based on my
16  performance and his communications with the mayor, that
17  he would probably be bringing me back. And that I really
18  felt that at that point time.
19  Q  Okay. So you have that conversation with Angelia. Then
20  you called your husband?
21  A  That is correct.
22  Q  Okay. And he said he was coming to get you right away?
23  A  Yes.
24  Q  Why did he, if you know, why did he make that decision?
25  A  Because I was crying to him on the phone. I was very

**Page 131**

1  emotional. And I told him, I said, I thought my head was
2  about to bust. I said, "I can't grip all of this stuff."
3  I said, "But I know I have not done anything, Fred. My
4  performance is stellar. Dayne is going to support that
5  performance. Greg will. The city council will. Sam
6  Moon and those guys will. I mean, I have done a good
7  job."
8      And I was doing that because I'm still, in my
9  mind, I didn't do anything wrong. I got — I know I'm coming back.
10  wrong. I got — I know I'm coming back.
11      And so at that particular point, he said,
12  "You're too emotional. You let me come get you now."
13  And so by the time he got there, I said just — if you
14  would just give me some time to finish more time with
15  Angelia.
16      So he sit out in the lobby while Angelia and I
17  spent more time. Because my main focus was I did not
18  want to leave that HR department vulnerable. And it
19  was — I just — I really didn't. I wanted to make sure
20  that — I had began to make sure Angelia could follow
21  everything I needed her to do to make sure the package
22  was ready for Mr. Brown.
23      And, mind you, he didn't ask for a package. I
24  was just putting a package together that would show him
25  the same thing that I had been showing the mayor and

**Page 132**

1  Mr. Eason.
2  Q  Okay. I want to direct you to Page 23 of Exhibit 4, your
3  Interrogatory answer, which discusses a lot of the things
4  we have been talking about in relation to this particular
5  day.
6      So you discussed that your husband was to get
7  you. I'm going direct you to, in your answer, the second
8  paragraph near the end, where you begin, it says, "I
9  remember talking to Mayor Dayne Walling who appeared to
10  be in total shock."
11      Do you see that?
12  A  Okay. Direct me so I can —
13      MS. CHINONIS: Page 23. You are on Page 22.
14      THE WITNESS: Okay.
15  Q  (BY MR. ROTH) It's in that second paragraph of your
16  answer. Sort of near the end, the third or fourth line
17  down. "I remember talking to Mayor Dayne Walling..."
18  A  Okay. I got it. Mm-hmm.
19  Q  Okay. If you remember, specifically, what did you say to
20  the mayor?
21  A  Dayne called me. He called me and asked me did I meet
22  with Mike Brown and I told him yeah. He asked me what
23  was the outcome. I said he fired me. Dayne was in
24  shock. He said, "He fired you?"
25      I said "Yeah, he fired me."

**Page 133**

1      And he said, "Okay." He says, "Are you all
2  right?" .
3      I said, "Not really. I mean, what to think of
4  all of this stuff."
5      And at that particular point in time, he says,
6  "I'll be talking with you. I'll be talking with you."
7  And he said, "Hang in there."
8      And I said, "Okay."
9  Q  You, then, remember talking to the city administrator.
10  Do you remember, is this in the correct order for the
11  timeline of that day? Do you remember which order you
12  spoke with people?
13  A  Greg Eason had called me after he got fired.
14  Q  This is before or after you spoke with the mayor?
15  A  This would have been before I talked with the mayor.
16  Q  Okay.
17  A  Because I hadn't — when I talked with Greg Eason, I
18  hadn't gotten fired at that time.
19  Q  I see. Okay. When you spoke with Mr. Eason, you had not
20  been fired?
21  A  No, Greg Eason also was fired on the same day.
22  Q  Okay.
23  A  I don't know who all got fired on the same day, but I do
24  know that Greg Eason and I both got fired on the same
25  day.

(Pages 130 to 133)

DARABOS vs. AMERICAN BUILDERS, et al        DEPO: BENJAMIN EDLUND        TAKEN: 6-18-15

35

## Page 134

```
1   Q  Okay.
2   A  And he had -- he was called to the mayor's -- or to the
3      Mike Brown's conference room before me.
4   Q  Okay.
5   A  So when he left there, he actually left the building and
6      he called me and said, "Well, I just got fired."
7   Q  Okay.
8   A  And so I'm trying to encourage him and I'm going like,
9      "What all happened in your -- in your meeting?"
10     And he says, "Well, he said he was going to
11     fire me." And he said he literally sit there, based on
12     what he was saying, he almost begged Mike Brown not to do
13     it. And asked Mike Brown did you see the plan or
14     something, the some kind of strategies or something he
15     had put together.
16     And he was talking to that. Have you seen the
17     stuff that I have been doing, what we got in place, what
18     we're working on? And he gave him another copy of that
19     is what he was telling me. And he said in his particular
20     meeting, I believe he said the police was in there. I
21     know that they were there for mine, but not on the
22     inside. They were on the outside of the door. But he
23     said that there was police there guarding the door when
24     he was there. And he was very upset.
25     And I said, "Well, Greg, you know, I'm
```

## Page 135

```
1      believing, based on my experience even in HR, a lot of
2      times when these things happen, they'll take you out but
3      they will bring you back in. You know, you have been an
4      effective city administrator. I'm sure they probably
5      going to bring you back in. I'm not familiar with what
6      is all going on. But you -- you should come back. Just
7      calm down." Because he was very, very upset, to the
8      point where he was just very angry.
9   Q  You told Mr. Esson that he was an effective city
10     administrator?
11  A  Yeah.
12  Q  Okay.
13  A  I'm sorry, yes. So after that, I said, "Well, you know,
14     I got a call too. So I'm going -- I got to go and meet
15     with Mr. Brown. And, then, I'll call you when I get
16     back."
17  Q  So you had two conversations with Mr. Esson, both before
18     and after you were terminated?
19  A  That is correct. So after -- by the time I got back to
20     my office, I didn't call him, Greg called back into my
21     office.
22  Q  Okay.
23  A  And my secretary transferred that call in to me. And he
24     says, "Did you see him?"
25     I said, "Yeah."
```

## Page 136

```
1      He said, "What happened?"
2      And that's when I began to tell him what
3      happened. And I was trying to stay strong because he was
4      already really very angry. And I'm still saying, "I just
5      believe we going to come back." You know, and Angelia was
6      standing right there when I was having that conversation.
7      So that was a very short conversation with him.
8      It was after that conversation that the call
9      came in from Mayor Dayne Walling.
10  Q  Okay. All right. And so, then, after all of those phone
11     conversations, you speak with your husband and you were
12     emotional?
13  A  That is correct.
14  Q  Did he -- approximately, you said you needed -- you
15     wanted some time to deal with Angelia. How long was it
16     until your husband came and got you?
17  A  Probably within 20 to 25 minutes.
18  Q  Okay.
19  A  And he sat out in the lobby for quite some time.
20  Q  But not very long? You said about 20 minutes?
21  A  It took him about 20 to 25 minutes to come to the city
22     hall to my office.
23  Q  Okay.
24  A  And when he got there, I can't tell you how long he
25     actually sat in the lobby before I was ready to leave.
```

## Page 137

```
1   Q  Was it an hour?
2   A  It could have been an hour or longer than an hour.
3   Q  Okay. So, then, he takes you home. And that day, what
4      else -- what did you do when you got home?
5   A  I sat down for probably a moment. And I was still quite
6      emotional trying to pull myself together. And I just
7      can't -- I mean, my head was pounding. I remember that.
8      And by this time, my sister had became aware that I had
9      just gotten fired.
10  Q  How did she become aware?
11  A  I don't know if Angelia called her or not. Probably -- I
12     would have to ask. Angelia probably called her, knowing
13     Angelia. And the word had just began to -- a lot of
14     phone calls started coming in. I was not taking the
15     phone calls. My husband was screening them at that
16     point.
17  Q  Did you take any phone calls that today?
18  A  It seems like to me, and I'm not for sure, but it seemed
19     like to me I got a call from the Flint Journal. I
20     don't -- it seemed like it was on that day, I'm not for
21     sure. But I do know I did get a call.
22  Q  Did you speak with the Flint Journal?
23  A  I did.
24  Q  Do you remember what you said to them?
25  A  At that particular time, I don't know word-for-word. I
```

(Pages 134 to 137)

DARABOS vs. AMERICAN BUILDERS, et al    DEPO: BENJAMIN EDLUND    TAKEN: 6-10-15

36

**Page 138**

1  don't remember the questions.  But I do remember my state
2  of mind was, stay positive.  You're going to come back,
3  you know, kind of thing.  So I can't exactly say what was
4  said in that conversation.  But I do know that I didn't
5  say anything negative about Mr. Brown.
6  Q  You said your head was pounding, correct?
7  A  That is correct.
8  Q  And you were upset?
9  A  That is correct.
10  Q  Okay.  How many phone calls do you think that you
11  received?
12  A  I can't say.
13  Q  Was it more than one?
14  A  It was more than one.
15  Q  Was it more than five?
16  A  It was more than five.
17  Q  Who was screening the calls for you?
18  A  My husband.
19  Q  Would he tell you who it was that was calling and you
20  would say, you know, something like, oh, you know, I
21  can't --
22  A  No.
23  Q  -- come to the phone?
24  A  He was not saying that.  He was just, "She's resting.
25  She'll get back with you."

**Page 139**

1  Q  Okay.
2  A  I don't -- I can't even tell you who they all were.
3  Q  Okay.  But even though you were getting all those phone
4  calls, you took -- you did talk to a reporter?
5  A  I can't remember if it was that day or the next day.  And
6  when that call came, my husband didn't take that call.  I
7  took that call.
8  Q  Okay.  All right.  I want to show you an exhibit here,
9  which is marked Defendant's Exhibit 5.
10  (Exhibit Number 5 marked for identification by
11  the reporter).
12  Q  (BY MR. ROTH)  For the record, this is an MLive article
13  entitled, "Former Flint Human Resources Director on city
14  hall firings."  In quotations, "I don't take it
15  personally."
16  Ms. Poplar, can you tell me who was the author
17  of this article?
18  A  I don't know.
19  Q  I believe, if you look directly below the title of the
20  article, you'll see the name of the author.
21  Q  Is it Khalil Al-Hajal?
22  MR. CHUBB:  Khalil, K-H-A-L-I-L, A-L -
23  H-A-J-A-L.
24  Q  (BY MR. ROTH)  Okay.  Is this the reporter that you
25  talked to?

**Page 140**

1  A  That does not sound like the person that I talked to.
2  That name just don't ring a bell for me.
3  Q  Okay.  But you did talk to a reporter?
4  A  That is correct.
5  Q  Okay.  When you spoke with this reporter, did you state
6  that you weren't surprised or offended by your dismissal?
7  A  I stated that I was not surprised.  And that was because
8  most individuals who take on that level of responsibility
9  normally come in and pink slip employees until they get
10  to a point of deciding who they are going to call back to
11  work.
12  Q  Did you -- do you remember stating, "I just feel that
13  he's doing what he thinks is best"?
14  A  I could have said that.
15  Q  Okay.  What about, "He has a right to make the decisions
16  he's making.  Certainly, I don't take it personally."
17  A  I said that, again, based on the fact that, when
18  individuals come in and assume that type of power, they
19  do what they feel they have the power to do.  And that is
20  not surprising straight across the board.  That is
21  something you see.  But based --
22  Q  But did you --
23  A  Am I allowed to complete?
24  Q  Oh, I'm sorry.
25  A  But based on my experiences with the process, it's

**Page 141**

1  normally that they will take people out, or leave them
2  off.  In most cases it's called a layoff.  And they'll go
3  through their work history, their work attendance, their
4  work performance, et cetera, and based on that, make
5  decisions as to whether they are going to maintain them
6  in the employment.
7  Q  Isn't the layoff process generally related to union
8  members, or union employment?
9  A  No.  You do have, for example, seasonal employees that
10  can be laid off.  You do have individuals that comes in
11  that is not protected by the union.  For example, they
12  will come into the service department and, for a period
13  of time, they might do a -- well, they could still
14  qualify for the bargaining unit.
15  Normally, with people like me, we are at-will
16  employees.  But when they hire you, they will say, okay,
17  we're going to have you here for a certain amount of
18  time.  Then after that we will lay you off.
19  They don't fire you.  They kind of like lay you
20  off, or use that kind of terminology.
21  Q  You just testified, you're an at-will employee?
22  A  That is correct.
23  Q  Okay.  Do you remember saying that you expect them, and
24  you're referring to a new administration, to bring their
25  own team in.?

(Pages 138 to 141)

DARABOS vs. AMERICAN BUILDERS, et al          DEPO: BENJAMIN EDLUND                    TAKEN: 6-10-15
37

**Page 142**

1    Isn't it true that — well, I'll let you
2  answer.
3    A  I did expect them to bring in qualified, capable, staff
4  individuals. I mean, that's kind of like common sense.
5    Q  Okay. When Mayor Walling was elected, did he bring his
6  own team in?
7    A  He brought some of his team in and some of the people
8  that he kept that he — that was already there. That was
9  also a part of his administration.
10   Q  So he made some appointments? For instance, he made the
11 appointment of Peter Bade as the city attorney, correct?
12   A  That is correct.
13   Q  He appointed you?
14   A  That is correct.
15   Q  He made his own appointments? He made his own choices?
16   A  That is correct.
17   Q  Okay.
18   A  As far as who he — he made his own appointments into
19 this sense. He did not have a power to say, "Because I
20 want Peter Bade as my city attorney," that that was going
21 to be the way he wanted it. He had to go before city
22 council for the final approval. They had to stamp that.
23 Had they not stamped that, then he could not have had
24 Peter Bade for his city attorney.
25   So it required board approval. So I don't know

**Page 143**

1  who Mike Brown had to get approval from, if any, to — as
2  it related to him bringing on whatever — whoever he's
3  brought on, or whoever isn't fired. I don't know.
4    Q  Okay. I thought that you had testified earlier that you
5  understood that Mike Brown had the sole authority to
6  terminate you?
7    A  What I testified to is that I believe that Mike Brown had
8  the power to bring in people. I did not testify to his
9  sole power ability to do that. I don't know if Mike
10 Brown had to report to a committee, report to a governor,
11 report to whoever. I didn't know what the makeup of that
12 was.
13   Q  Okay. And you would agree that you believe Mr. Brown is
14 a respectful — a very respectful man, as you were quoted
15 in the article?
16   A  I believe that, based on what I knew of Mike Brown, he
17 was a respectful person. I had not encountered anyone
18 who said he was not a respectful person. So I based that
19 based on what I —
20   Q  Do you think a respectful person would terminate someone
21 because of their age?
22   A  I think that, if you're dealing with a person who is
23 given the perception that — yeah, I do. I really do.
24 Yes, I do.
25   Q  You think a respectful person would terminate someone

**Page 144**

1  because of their age?
2    A  Yes, I do. I really do. I really do.
3    Q  Do you think Duane Miller is a respectful person?
4    A  I think that there are those who feel he is respectful.
5    Q  Do you think that?
6    A  No.
7    Q  Okay. What about former mayor Woodrow Stanley?
8    A  Do I think...?
9    Q  Do you think that he's a respectful person?
10   A  No.
11   Q  Okay. And that's because you, as you allege, they had
12 these conversations about you and your age?
13   A  No, that is not the sole reason why I feel the way I feel
14 about the lack of respectability of Duane Miller and
15 Woodrow Stanley. I believe that Woodrow Stanley, as the
16 mayor, showed that he was not a respectful person because
17 he was not a mayor that led with integrity.
18   I also feel that Duane Miller is not, in my
19 perception, perceived as a respectful person because he
20 was not a person who led with integrity.
21   Q  So you would agree that your real issues are not
22 with Mr. Brown? They are with Duane Miller and Woodrow
23 Stanley?
24   A  No.
25   MS. CHINONIS: Objection. That

**Page 145**

1  mischaracterizes her testimony.
2    THE WITNESS: My feelings about Woodrow Stanley
3  and Duane Miller doesn't have anything to do with how I
4  feel about Mike Brown. Mike Brown has demonstrated to me
5  that he is not a respectful person with integrity.
6    Q  (BY MR. ROTH) Okay. Neither —
7    A  Based on his actions.
8    Q  Neither Duane Miller nor Woodrow Stanley is named in your
9  Complaint, correct?
10   A  I don't know.
11   Q  Who is your lawsuit against?
12   A  The City of Flint.
13   Q  It's not against any particular person?
14   A  I don't know who is all included in that. I can't say.
15   Q  Okay. All right. So you stated that the only person who
16 made derogatory comments towards you was Duane Miller,
17 correct?
18   A  That is correct.
19   Q  And you don't know whether Mike Brown discriminates
20 against older people?
21   MS. CHINONIS: Objection. That
22 mischaracterizes her testimony.
23   MR. ROTH: She stated that she doesn't know.
24   MS. CHINONIS: We've been here since 10 o'clock
25 and she has testified about how she was discriminated

(Pages 142 to 145)

DARABOS vs. AMERICAN BUILDERS, et al   DEPO: BENJAMIN EDLUND   TAKEN: 6-10-15
38

**Page 146**

1  against based on her age, so I disagree.
2      MR. ROTH: All right. The record will speak
3  for itself.
4  Q  (BY MR. ROTH) So, Ms. Poplar, would you agree that it's
5  your assertion that it was Duane Miller and Woodrow
6  Stanley who preferred younger people over older people?
7  A  I believe that it was Mike Brown, Duane Miller and
8  Woodrow Stanley that preferred younger people over older
9  people.
10  Q  Why do you think Mike Brown?
11  A  I believe that, based on the conversation with Duane
12  Miller and the actions of Mike Brown, leads me to
13  strongly believe that Mike Brown, too, preferred younger
14  people in higher profile jobs.
15  Q  Did Duane Miller have authority over the emergency
16  financial manager?
17  A  I don't know what level of Duane Miller's authority would
18  have been as it relates to the financial emergency
19  manager. I don't know.
20  Q  Wasn't the financial -- wasn't the emergency financial
21  manager essentially the top position in the city when he
22  was appointed?
23  A  I always seen the mayor as the top position. And I say
24  that because the emergency manager did not hold a title
25  of mayor. And according to the city charter, the top

**Page 147**

1  holding position is that of the mayor.
2  Q  Don't you understand that the emergency manager's power
3  supercedes the authority of the charter?
4  A  I have no recollection --
5      MS. CHINONIS: I'm going to object to the
6  extent you're asking her to make a legal opinion or
7  conclusion.
8      THE WITNESS: I have no recollection of whether
9  or not if the emergency manager can supercede the city
10  charter.
11  Q  (BY MR. ROTH) Do you know if the emergency manager
12  eliminated the pay and benefits of the mayor and city
13  council?
14  A  I read in MLive that he did, yes.
15  Q  Okay. Would you agree that someone who has the authority
16  to cut someone's pay or benefits has a greater level of
17  authority than the person that they are cutting?
18      I'm sorry. If you don't understand that
19  question, I'll try to rephrase it.
20  A  I believe that the city charter establishes the authority
21  of the leadership for the City of Flint. I do not
22  believe that the emergency manager has the legal
23  authority to supercede the city charter. And I have
24  not -- I have not read anything that says that the
25  emergency manager can trump the city charter.

**Page 148**

1  Q  Okay.
2      MR. ROTH: Well, that's all the questions I
3  have for now. I may have some follow-up. But for now, I
4  think those are all the questions I have.
5      MS. CHINONIS: All right. I want to take a
6  quick break and get some water and then I've got some
7  questions.
8      MR. ROTH: Okay.
9      (Off the record from 1:50 to 2:02).
10          EXAMINATION
11  BY MS. CHINONIS:
12  Q  Ms. Poplar, I just have a few questions in follow-up to
13  the questions by Attorney Roth earlier in your
14  deposition. Because you have testified for several
15  hours, I'm going to just address a couple of issues.
16      If for some reason you don't understand what
17  point in your testimony I'm directing you to, please let
18  me know. Because my purpose is not to confuse you. But
19  I don't want to rehash all of your previous testimony,
20  because that testimony is clear and already on the
21  record.
22      You have been asked to reference Exhibit 4
23  which is your Answers to Interrogatories during your
24  deposition earlier today. Do you recall that testimony
25  about your Answers to Interrogatories?

**Page 149**

1  A  Yes.
2  Q  All right. When you provided the Answers to
3  Interrogatories, did you provide those answers truthfully
4  and to the best of your ability?
5  A  I did.
6  Q  Okay. You were asked several questions about depression
7  that you have had during your life before your
8  termination and after your termination. Do you recall
9  that testimony?
10  A  Yes.
11  Q  And is it your position that your depression has been
12  exacerbated or made worse by your termination?
13  A  That is correct.
14  Q  And the depression that you're suffering now, is that, do
15  you believe, in your opinion, stemming from things that
16  happened prior to your termination or from the events of
17  your termination?
18  A  From the events of my termination.
19  Q  Mr. Roth asked you several questions regarding an
20  expunged criminal record. Do you recall that?
21  A  Yes.
22  Q  After you had the criminal conviction, did you have
23  employment?
24  A  I did.
25  Q  All right. And before that criminal record was expunged,

(Pages 146 to 149)

DARABOS vs. AMERICAN BUILDERS, et al        DEPO:  BENJAMIN EDLUND                    TAKEN; 6-10-15
                                                                                        39

---

## Page 150

1    did you have employment?

2    A  I did.

3    Q  All right.  And after that record was expunged, were you

4    employed and did you hold employment?

5    A  Yes.

6    Q  All right.  And it's your testimony that you have been

7    seeking work since the date of your termination on

8    December 2nd, 2011, correct?

9    A  Yes.

10   Q  And have you filled out applications, written

11   applications?

12   A  Yes.

13   Q  Have you filled out applications that ask about

14   convictions?

15   A  Yes.

16   Q  And what is your understanding of what you're supposed to

17   say on an application regarding a conviction?

18   A  I have been instructed to say that, if asked have you

19   ever been convicted of a crime, to say no.  And that's

20   how I have responded.

21   Q  Okay.  And do you have any information that you have not

22   received employment based on an expunged criminal

23   conviction?

24   A  No.  I don't have any information on that.

25   Q  All right.  Ms. Poplar, do you have a law degree?

---

## Page 151

1    A  I beg your pardon.

2    Q  Do you have a law degree?

3    A  No.

4    Q  Do you have any specialized legal training?

5    A  No.

6    Q  Do you purport to know what evidence is required for

7    various claims under Michigan law?

8    A  No.

9    Q  Would you rely on your attorney for any kind of legal

10   advice?

11   A  Yes.

12   Q  Do you know how the term evidence is defined in Michigan

13   law?

14   A  No.

15   Q  Since the time of your termination on December 2nd, 2011,

16   have you ever turned down any employment, or refused to

17   work?

18   A  No.

19   Q  If you were offered employment, would you accept

20   employment?

21   A  Yes.

22   Q  Has there been any time since December 2nd, 2011, when

23   you would have refused to take a new job, or take

24   employment?

25   A  No.

---

## Page 152

1    Q  Is it your position that you were terminated from your

2    employment at the City of Flint in part based on your

3    age?

4    A  The day that I was terminated I was not given a reason

5    for why I was being terminated.

6    Q  At the time that you were terminated, were you told that

7    you were being terminated for poor performance?

8    A  No.

9    Q  At the time you were terminated, were you told you were

10   being terminated for a violation of a City of Flint

11   policy or procedure?

12   A  No.

13   Q  Were you told that you were being terminated because of

14   some kind of misconduct?

15   A  No.

16   Q  Did you ever engage in any kind of policy violation or

17   misconduct that you believed would result in your

18   termination from the City of Flint?

19   A  No.

20   Q  Did you ever engage in any kind of conduct or policy

21   violation that you believe would warrant any kind of

22   discipline from the City of Flint during your employment

23   at the City of Flint?

24   A  No.

25   Q  At the time that you were terminated, were you on any

---

## Page 153

1    kind of performance improvement plan because you were not

2    able to do the job requirements?

3    A  No.

4    Q  At the time of your termination, were you on any kind of

5    last chance agreement where there was any kind of

6    indication that, if you did anything wrong within the

7    scope of your employment, that you would be terminated?

8    A  No.

9    Q  At the time of your termination, are you aware of any

10   legitimate reason to terminate your employment?

11   A  No.

12   Q  At the time of your termination, or any time before your

13   termination, were you ever asked if you would continue in

14   your role as director of human resources and labor

15   relations for reduced pay?

16   A  No.

17   Q  If you were asked -- presented with financial information

18   about the City of Flint that showed that the City of

19   Flint could not maintain your salary, would you have

20   engaged in a discussion about changing or modifying your

21   salary based on hardship?

22   A  Yes.

23   Q  At any time, either before or after your termination, did

24   anyone approach you about coming back to work at the City

25   of Flint for reduced pay?

---

(Pages 150 to 153)

DARABOS vs. AMERICAN BUILDERS, et al      DEPO: BENJAMIN EDLUND

TAKEN: 6-10-15
40

### Page 154

1   A  No. May I interject?

2   Q  Sure.

3   A  There was a time when there was a decision made by the

4      court that overturned whatever this — that deals with

5      the emergency manager. And for that short period of

6      time, the mayor had discussed with me that I was back

7      at — being put back as the HR director. And that he and

8      Attorney Pete Bade would be informing me of what all that

9      meant.

10  Q  Okay.

11  A  But — and I didn't have to report to the office.

12  Q  Do you recall, approximately, when that occurred?

13  A  That would have been either the day after or very shortly

14     after that court ruling that overturned this Public Act,

15     whatever it's called, 4, or whatever it was. And so that

16     was the call that I received from the mayor.

17         And at that particular point, I made it very

18     clear, I was very excited about, okay, my work is

19     speaking for me and I am going back to work. But I was

20     supposed to wait until I got further instructions that

21     was going to be passed on to me by the mayor, by way of

22     him; whatever Pete Bade told me I needed to do.

23     So until then that —

24  Q  So you were told that they would contact you about going

25     back to work?

### Page 155

1   A  That is correct. But at that particular point, I felt at

2     that particular point I was back as the HR and labor

3     relations director. So that is an indicator that I was

4     agreeing to come back to work.

5   Q  Okay. Did you ever — were you ever provided with a date

6     or time when you were actually supposed to report in to

7     the office and resume your duties?

8   A  On the day on which the mayor called me on that day, it

9     was my understanding at that day I was back to the HR

10    labor relations director. But, then, there was another

11    turn that immediately took place after that conversation

12    within days.

13  Q  Within that legal proceeding?

14  A  Shortly after that legal proceeding. So I never did

15     return officially back. And I was never told again —

16    after the mayor shared with me that I was back as the HR

17    labor relations director, no one ever called me back and

18    told me that I was not, you know.

19  Q  Okay. Did you ever refuse to work?

20  A  Oh, no.

21  Q  Did you ever — were you ever given any kind of

22     renumeration or pay for — were you ever put back on the

23     payroll at the City of Flint?

24  A  I can't say that — whether I was or not. That was a

25     question that would have to be answered by the mayor and

### Page 156

1     City Attorney Pete Bade. I don't know. All I know is I

2     was back as the HR director and they'll be getting back

3     to me. So whether they did anything with the personnel,

4     the payroll, I don't know. I never received any

5     compensation.

6   Q  You never received a check?

7   A  No.

8   Q  That's what I was trying to ask.

9   A  Okay.

10  Q  If you were offered your job back as director of human

11    resources and labor relations, would you take that job?

12  A  Yes.

13  Q  And you've been asked a little bit about your damages.

14    Are you seeking wage loss damages as part of this

15    lawsuit?

16  A  Yes.

17  Q  And that's for past, present and future wage loss; is

18    that right?

19  A  That is correct.

20  Q  And you're also seeking emotional and mental anguish

21    damages?

22  A  Yes.

23  Q  And attorney fees as defined by statute?

24  A  Yes.

25  Q  And any available remedy at Michigan law; is that right?

### Page 157

1   A  Yes.

2   Q  Prior to your termination from the City of Flint, did you

3     know who Erica Hunter was?

4   A  Yes.

5   Q  Did you have any knowledge or understanding of what her

6     background was?

7   A  Yes.

8   Q  Did you have an opportunity, as director of human

9     resources and labor relations, to review Erica Hunter's

10    personnel file?

11  A  Yes.

12  Q  Based on your review of Erica Hunter's personnel file,

13    were you familiar with her education and training?

14  A  Yes.

15  Q  Based on your knowledge from your review of the personnel

16    file, did Ms. Hunter provide information to the City of

17    Flint that you were privy to in your role as director of

18    human resources and labor relations regarding her

19    education and training?

20  A  Yes.

21  Q  Based on the information provided by Ms. Hunter to the

22    City of Flint, did she have any background in human

23    resources?

24  A  No.

25  Q  Did she have any background in labor relations?

(Pages 154 to 157)

**Page 158**

1  A  No.
2  Q  Do you recall what -- or do you know what Ms. Hunter's
3  education background is?
4  A  I believe at that time she had a bachelor's degree. And
5  she was working on her master's. And I want to say it
6  might have been in political science. I'm not for sure.
7  Q  Okay. Is there, to your knowledge, a job description for
8  the director of human resources and labor relations --
9  A  Yes.
10  Q  -- within the City of Flint?
11  A  Yes.
12  Q  To your knowledge, are there educational requirements for
13  that position?
14  A  Yes.
15  Q  Are there experience requirements for that position?
16  A  Yes.
17  Q  Based on your knowledge of what is contained within that
18  job description, and your knowledge of Ms. Hunter's
19  background, in your opinion, did Ms. Hunter have the
20  qualifications and education necessary for the director
21  of human resources and labor relations role?
22  A  No.
23  Q  Are you familiar with Erica Hunter's age?
24  A  Erica Hunter would probably be in her late 30s; mid to
25  late 30s.

**Page 159**

1  Q  Presently?
2  A  Yes.
3  Q  Okay. During your employment, did Mayor Walling or your
4  supervisor, Mr. Eason, ever tell you, or make any
5  indication that you were not performing your job
6  satisfactorily, or up to their expectations?
7  A  No.
8  Q  Is it your position that you were treated differently in
9  the terms and conditions of your employment based on age?
10  A  During my employment?
11  Q  Yeah. Were you terminated based on age?
12  A  Yes.
13  Q  Was anyone a witness to your conversation with Larry
14  Moon? Did you speak with Larry Moon on a speaker phone
15  when you called to complain about your termination to
16  him?
17  A  I did.
18  Q  Were there any witnesses to that conversation?
19  A  No. May I also add lines to that conversation?
20  Q  The conversation with Mr. Moon?
21  A  Mr. Moon. And there was a conversation with Mr. Moon
22  after the March conversation with Duane Miller and
23  myself, that he said that he, along with Reverend Louis
24  Randolph, and that just came back to my memory, that they
25  had met with the state treasurer, Andy Dillon. And they

**Page 160**

1  believed that I would be getting my job back real soon.
2  That they were working on it.
3  And I also had that same identical conversation
4  with Pastor Louis Randolph at his church. He approached
5  me and said that he was just confirming what Larry Moon
6  had shared with me, that they had met with, at that time,
7  treasurer Andy Dillon about returning me back to my job.
8  And they shared that with me, because I
9  believed it was that the -- Mike Brown, that's why I said
10  earlier in my testimony, I didn't know who all he
11  reported to. Because based on my conversation that just
12  came back with Larry Moon and Pastor Louis Randolph, Mike
13  Brown reported to the treasurer, which was Andy Dillon.
14  Also what I -- along with this, I had also, in
15  the early March, I had sent a request -- made a call out
16  to -- requested Andy Dillon's office by way of Andy
17  Dillon to get involved and investigate what I felt had
18  happened to me. And that would have been early March.
19  That would have been before the conversation with Duane
20  Miller.
21  Q  Okay.
22  A  So I did reach out to his office.
23  Q  And you mentioned Pastor Louis Randolph. Do you know
24  what church he is associated with?
25  A  Yes, Antioch Missionary Baptist Church, Flint, Michigan.

**Page 161**

1  Q  Okay. And do you know what road or street that's on?
2  A  That's -- it's on Stewart Street.
3  Q  Stuart. Thank you.
4  A  Also -- it's coming back to my memory. See, the more I
5  talk, the more I get. Pastor Akins, he is the pastor
6  Heavenly Host. We were at New Jerusalem at one of Bishop
7  Floyd's anniversary dinner. He sat at a table with my
8  husband and I. And he said to me that they were working
9  on getting my job.
10  Q  But you were never brought back to work?
11  A  No, I never was.
12  Q  Did you believe that you were able to handle the work for
13  the labor relations and human resources functions of your
14  job?
15  A  I did, yes.
16  Q  Did you think that there was any need to separate those
17  into two separate positions?
18  A  No. May I also add on that question?
19  Q  Yes.
20  A  It was to my understanding that years ago, they used to
21  have a separate person doing labor relations. Years and
22  years ago. And one of the reasons for bringing labor
23  relations -- complete bringing it under the umbrella of
24  HR was for the purpose of saving money. It would be most
25  effective for the HR director to do that.

(Pages 158 to 161)

DARABOS vs. AMERICAN BUILDERS, et al          DEPO:  BENJAMIN EDLUND

TAKEN; 6-18-15
42

### Page 162

1  Q  Okay.
2      MS. CHINONIS:  That's all I have for you.  No
3  more questions.
4      MR. ROTH:  I have a couple of follow-up
5  questions.
6      THE WITNESS:  Sure.
7      EXAMINATION
8  BY MR. ROTH:
9  Q  Okay.  First I'll just ask you, you met with several
10  pastors and reverends.  A Reverend Louis, is it?
11  A  Louis Randolph.  And for clarification, I didn't say I
12  met with them.
13  Q  But you spoke with them?
14  A  That is correct.
15  Q  Sure.  Pastor Akins.  And before you spoke about Pastor
16  Akins, there was another pastor.  What was his name?
17  A  Pastor Louis Randolph.
18  Q  So there was just the two of them?
19  A  Yes.
20  Q  Okay.  Reverend and pastor can be used interchangeably?
21  A  Yes.  And the other person was Larry Moon, who is not a
22  pastor.
23  Q  Right.  Okay.  They are obviously not employees of the
24  city, correct?
25  A  They are not employees of the city.  But it was to my

### Page 163

1  understanding that Pastor Randolph, along with Larry
2  Moon, were called upon to provide input in a lot of
3  things that Mike Brown was doing.  And Larry Moon
4  actually served on the committee.
5  Q  And you're saying that Pastor Louis Randolph had some
6  influence over the emergency financial manager?
7  A  I'm saying that based on what he told me --
8  Q  Based on what Larry Moon told you?
9  A  Well, Larry Moon -- for the record, for clarification, in
10  my conversation with Larry Moon, he shared with me that
11  he and Pastor Louis Randolph had met with Andy Dillon and
12  they were working on getting me back my job.  That was my
13  conversation with Larry Moon.
14      Then later I had a conversation with Pastor
15  Randolph, who then reiterated what Larry Moon had said as
16  it related to their meeting and conversation with, them,
17  the state treasurer, Andy Dillon.
18  Q  Okay.  So Andy Dillon was the state treasurer.  You
19  stated that you reached out to Andy Dillon.  You said
20  that was before your conversation with Duane Miller?
21  A  After I was terminated, and before my conversation with
22  Duane Miller, which was in the early part of March --
23  Q  Okay.
24  A  -- in the early part of March prior to that conversation, ·
25  I had reached out to Andy Dillon's office asking that

### Page 164

1  they investigate my termination.
2  Q  Why?
3  A  Because in March I had not heard anything back from the
4  mayor, Mike Brown, or anyone from the city offering me my
5  job, or if I would even work for less.  So I felt at that
6  point that I was really -- had been singled out and I
7  thought I had been discriminated against.
8  Q  Okay.  You thought that you were being discriminated
9  against, then, before you spoke with Duane Miller?
10  A  Yes.
11  Q  How?  You stated that the first time that you were aware
12  that anybody said anything about your age, or made any
13  derogatory comments about your age, was when Duane Miller
14  told you that?
15  A  When I thought that I was being discriminated against, it
16  was based on information -- and when I reached out to
17  Andy Dillon's office, it was based on information that I
18  was told that there was a -- a decision already made to
19  fire me when Mike Brown got there.  That decision was
20  already made.
21      I found that hard to believe that that decision
22  was already made that they were going to fire me.  And
23  the mayor was not aware that I was going to be fired.
24  Certainly, if you're going to fire me, you would think
25  that the mayor would know I was going to get fired.  But

### Page 165

1  the mayor didn't know.  The city administrator didn't
2  know.  And certain members of the city council didn't
3  know.  So that to me drew a red flag and I reached out to
4  Dillon's office at that time --
5  Q  Okay.
6  A  -- asking that they investigate my claim.
7  Q  Okay.
8  A  My concerns, I should say.  My concern about whether or
9  not if my termination was legal.
10  Q  Okay.  Counsel just asked you if you had been offered a
11  job by the City of Flint, or to have less pay for the
12  same job, that you would have taken it, correct?
13  A  I would have.
14  Q  Didn't you testify earlier today that Duane Miller said
15  that you could have -- you could come in on -- in some
16  capacity to help train Erica Hunter?
17  A  No, he asked me if I would be willing to train Erica
18  Hunter.  And my response to that was, no, why would I
19  train a person who have zero experience and I -- why
20  would I train her to do my job and I have the experience
21  and she has no experience?  He chuckled.
22      What I felt he was doing at that time, I
23  didn't feel he was sincere.  I felt he was sticking me
24  with daggers.  You know, like just jabbing me with
25  daggers.  Why would you ask me to come and train Erica

Ripka, Boroski & Associates, L.L.C.
(800)542-4531/ (810)234-7785 FAX (810)234-6660

email: rba@ripkaboroski.net
Firm Registration NO: 098139

## Page 166

1  Hunter and you just told me that you guys wanted somebody
2  younger in my job? You just — really you just out right
3  offended me. Now you're going to just murder me.
4       I mean, that's how — and I asked him, are you
5  serious? You want to me come in and train a young lady
6  that have 20-plus less years of age than me, and you
7  admitted that you didn't care about the fact that she
8  didn't have no experience, you guys was aware of that.
9       But that was not their concern is what he told
10 me. That's not our concern. Our concern is that, one,
11 it will look good on her portfolio. In other words, on
12 her resume. But we want you to train her.
13      How would that sound? And I'm not asking you
14 to respond. That's just a comment. So I may have been
15 so willing to get my job back, but not at a level where
16 I'm going to let someone further degrade me.
17      I'll come back into the HR office. Oh, by the
18 way, Erica Hunter, I'm here to train you to do my job
19 because you're younger with no skills. I'm 57, 58, with
20 the skills. I mean, really?
21 Q  Okay. So Duane Miller did not make a written job offer
22 to you?
23 A  Duane Miller says, "Will you come in and train her? Can
24 we get you to train her?" is what he said. And then he
25 chuckled.

## Page 167

1  Q  Okay.
2  A  Can we get you to train her? And I'm going like, are you
3  serious? And I — everything else I told you that today.
4  Q  And, obviously, that was during the phone conversation?
5     It was not in writing.
6  A  That was on the phone conversation that was witnessed by
7  both my husband and my daughter that was not in writing.
8  And I — yeah, it was not in writing. Clearly it was not
9  in writing.
10 Q  Okay.
11    MR. ROTH: I don't have anything further.
12    MS. CHINONIS: You didn't — just one
13 follow-up.
14       EXAMINATION
15 BY MS. CHINONIS:
16 Q  You didn't take that job or that offer to train Erica
17 Hunter as a serious offer of employment, did you?
18 A  No, I took it as a direct insult to further add injury to
19 an already overly bleeding, hemorrhaging wound.
20    MS. CHINONIS: No further questions.
21    MR. ROTH: Nothing further.
22    (Deposition concluded at 2:30 p.m.)

## Page 168

CERTIFICATE OF NOTARY PUBLIC
DEPONENT: DONNA D. POPLAR          (STATE OF MICHIGAN
RECORDED: June 12, 2015                )  SS
LOCATION: Flint, Michigan          (COUNTY OF CLINTON)

Being a Notary Public duly commissioned and qualified in and for the State of Michigan at Large, I do hereby certify that pursuant to notice there came before me the deponent herein, who was by me first duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause.

Being thereupon carefully examined under oath, said examination was recorded stenographically and was later reduced to transcription under my supervision; said transcription being a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken; and further, I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto subscribed my signature this 15th day of June 2015.

Timothy J. Boroski, RPR/CSR-2576

MY COMMISSION EXPIRES:
October 30, 2018

Ripka, Boroski & Associates, L.L.C.
(800)542-4531/ (810)234-7785 FAX (810)234-0650
email: rbu@ripkaboroski.net
Firm Registration NO: 008139