John Daly
09/23/2022

1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF MICHIGAN
3                   SOUTHERN DIVISION
4
5   DONNA POPLAR,
6                  Plaintiff,
7      vs.                        Case No. 4:21-cv-12568
8                                 Hon. Victoria A. Roberts
9   GENESEE COUNTY ROAD
10  COMMISSION and FRED F.
11  PEIVANDI, in his individual
12  capacity,
13                 Defendants.
14  _____/
15  PAGES 1 TO 38
16
17       The Deposition of JOHN DALY,
18       Taken at Hanson Remote,
19       Commencing at 8:43 a.m.,
20       Friday, September 23, 2022,
21       Before Tamora L. Thompson, CSR-5378.
22
23       Attorneys, Court Reporter & Witness appearing remotely.
24
25

## Page 2

```
1  APPEARANCES:
2
3  CHARIS LEE, ESQUIRE
4  Lee Legal Group, PLLC
5  117 W. Flint Park Blvd.
6  Flint, Michigan 48505
7  (810) 513-9257
8  charis@leebusinesslaw.com
9      Appearing on behalf of the Plaintiff.
10
11 JULIE A. GAFKAY, ESQUIRE
12 Gafkay Law, PLC
13 604-A S. Jefferson Avenue
14 Saginaw, Michigan 48607
15 (989) 652-9240
16     Appearing as Co-Counsel for the plaintiff.
17
18 ANDREW A. CASCINI, ESQUIRE
19 Henn Lesperance PLC
20 32 Market Avenue, SW, Suite 400
21 Grand Rapids, Michigan 49503
22 (616) 551-1611
23     Appearing on behalf of the Defendants.
24
25              *  *  *  *  *
```

## Page 3

```
1              I N D E X
2  WITNESS:                              PAGE:
3  JOHN DALY
4  Examination by Ms. Lee                  4
5  Examination by Mr. Cascini             16
6  Re-examination by Ms. Lee              34
7
...
11 EXHIBITS:                             MARKED:
12 None marked
```

## Page 4

1  Remote Deposition
2  Friday, September 23, 2022
3  About 8:43 a.m.
4       COURT REPORTER: My name is Tammy Thompson, a
5  Michigan State notary public and certified shorthand
6  reporter. This deposition is being held via
7  videoconferencing equipment. The witness and reporter
8  are not in the same room. The witness will be sworn in
9  remotely pursuant to agreement of all parties. The
10 parties stipulate that the testimony is being given as
11 if the witness was sworn in person.
12      JOHN DALY,
13 having first been duly sworn, was examined and testified
14 on his oath as follows:
15      EXAMINATION
16 BY MS. LEE:
17 Q. Good morning, Mr. Daly. My name is Charis Lee, and I'm
18    an attorney for Ms. Donna Poplar. Also on the screen
19    you'll see Julie Gafkay. She is co-counsel, also an
20    attorney for Donna Poplar, and Mr. Andrew Cascini, who
21    is the attorney for Genesee County Road Commission.
22    Today we are going to take your deposition and ask you
23    some questions. Have you ever had your deposition
24    taken?
25 A. Yes.

## Page 5

1  Q. Okay. I won't bore you with long drawn-out conversation
2     about that. I'm just going to let you know just a few
3     ground rules that I ask that you abide by today. If we
4     are able to take a break at any time, I ask that if I've
5     asked you a question and you are -- you answer that
6     question before we take a break. Just let me know.
7     You're more than welcome, after you answer the question,
8     if you need a five-minute break. This actually
9     shouldn't take too long. So we hope to get you out of
10    here as soon as possible.
11       With that, I will just ask you to spell your
12    name for the record.
13 **A. My full name is John H Daly III. J-O-H-N. The H is**
14 **just an initial. Daly is D-A-L-Y and then roman numeral**
15 **three.**
16 Q. Thank you, Mr. Daly. And you are a former employee of
17    the Genesee County Road Commission?
18 **A. Yes.**
19 Q. What years did you work for the Genesee County Road
20    Commission?
21 **A. From 1999 until 2018.**
22 Q. That's roughly what, 19 years?
23 **A. Yes.**
24 Q. During that time, what positions did you hold at the
25    Road Commission?

John Daly
09/23/2022
Pages 6..9

Page 6

1 A. Throughout that period of time, I was the managing
2 director. Additionally for three years, I also served
3 as the HR Director. And for the last seven years, I
4 believe, I was the Director of IT as well.
5 Q. When you were director of IT, were you also the managing
6 director or --
7 A. I held the managing director position continuously from
8 1999 until 201.
9 Q. Okay. Perfect. Then while you were the managing
10 director, during this time, did all directors report
11 directly to you?
12 A. Yes.
13 Q. Who were the directors that reported to you at that
14 time? I would just say really within the -- since 2016.
15 A. Are you asking me the position or the person?
16 Q. The position and the person, if you can remember.
17 A. Let's see, first was during that period of time Rocky
18 Davis and Anthony Branch served as director of
19 maintenance. Randy Dellaposta served as director of
20 freight maintenance at the facilities. Kermit Pitts,
21 McKinney Jackson and Donna Poplar served at director of
22 HR. My finance director was Lynn Luellen, and I can't
23 remember her name right now. She is director of -- down
24 at the Oakland County Road Commission now.
25 Q. Okay.

Page 7

1 A. Then Coetta Adams took that position. Let's see,
2 Director of Engineering (inaudible) the first and he was
3 only there for about ten months, or about two years
4 while I was there. Then Fred Peivandi became the
5 Director of Engineering. I think that's all the
6 directors that reported directly to me.
7 Q. Thank you. I am going to stop my video because I'm
8 having a little cut in and out. I don't want my
9 bandwidth to prevent me from hearing what you have to
10 say. I'll just stop and see if that makes it better.
11 Thank you for your response.
12 So during that time that you were managing
13 director, Donna Poplar reported to you, and you say that
14 she was the Human Resources Director. Did you hire
15 Donna directly?
16 A. I did.
17 Q. When you hired Ms. Poplar, did she disclose, to you, at
18 any time during the interview process or when she was
19 hired, that she had a visual disability?
20 A. She did.
21 Q. When she disclosed that she had a visual disability to
22 you, did she also ask for accommodations for her
23 disability?
24 A. She disclosed the disability, to me, during the final
25 meeting before I made the offer to hire her.

Page 8

1 Q. In the interview process, she disclosed she had a vision
2 disability?
3 A. Right. And she said that her vision was deteriorating.
4 If I recall, her vision was deteriorating and that
5 she -- so I was not surprised about three months later
6 initially when (inaudible) it was the outside of the
7 fence next to the building. And so she indicated that
8 she was having some difficulties seeing where the fence
9 was because it's a hurricane type fence that you could
10 see through.
11 So she asked for a parking spot because of her
12 disabled vision that was closer to the building. So I
13 accommodated that and assigned her a parking spot that
14 was two or three spots down from mine. Then she did ask
15 for the addition of an another employee to HR, and that
16 was initially made as that, first of all, that position
17 had been there when I came in. Just been gapped for
18 several years.
19 She asked if we could fill that position. And
20 I indicated, to her, that if -- I inquired as to why.
21 Initially it was because of the -- there was an
22 increased workload due to the legal changes were taking
23 place with regards to OPED that were mandated by the
24 state additional reporting requirements and record
25 keeping that was required. And I was aware of that

Page 9

1 because that was right at the end of the period that I
2 had just served as HR director.
3 So then in the discussions subsequent to that,
4 I would say a month or so later, she indicated that,
5 again, her vision was deteriorating and she needed
6 assistance. That if this person were to be hired, they
7 would be able to help her with things like even reading
8 some of the documents.
9 Q. And did you find that that was a reasonable request?
10 A. That was a reasonable request?
11 Q. Yes. For accommodation.
12 A. For accommodation.
13 Q. Yes, for her vision.
14 A. Before it had been gapped. My intent, from my
15 experience, is that I had -- there was the HR director,
16 that position was (inaudible).
17 (Answer incomplete because of
18 Zoom technical issues.)
19 Q. Ask you the question again.
20 So I asked you previously, was it a reasonable
21 -- was Donna's request for accommodation reasonable for
22 the HR assistance?
23 A. Yes.
24 Q. And then you stated that the position was a position
25 that had been previously budgeted and not filled,

John Daly
09/23/2022
Pages 10..13

Page 10

1 correct?
2 A. No. You've got to remember, we are talking about a span
3    of between seven or eight years between the time that I
4    was hired and when I came in as manager and director and
5    when I was HR director. When I came in as HR director,
6    there were four people in the HR department. There were
7    the director, and then three assistants. One of those
8    assistants retired immediately after I got to the Road
9    Commission, not immediately, about a year, and that
10   position was nerve filled.
11 Q. Okay. So I want to go back to a line of questioning
12   from earlier.
13       You stated that as the position for the HR
14   administrative assistant developed, Ms. Poplar requested
15   accommodations and she asked that this employee be able
16   to assist her with reading. Do you know any other tasks
17   that this HR administrative assistant was supposed to
18   assist Ms. Poplar with?
19 A. Well, I believe in keeping in both the taking of records
20   and the reading of records, but that's what I recall was
21   that position was going to be necessary. First of all,
22   it was necessary whether, in my opinion, whether
23   Ms. Poplar was there or not because of the increased
24   workload.
25       The second thing though is filling that

Page 11

1    position would have been a reasonable accommodation to
2    her to her continuing deteriorating vision.
3 Q. Thank you. Did you also make physical, I guess,
4    building accommodations for the HR administrative
5    assistant? Was there a special buildout done for this
6    particular employee?
7 A. There was a -- we were moving forward with filling that
8    position and we were looking -- we did some changes in
9    the layout of HR. So it made sense when we were
10   planning that to accommodate that position.
11 Q. During your 19 years of leadership at the Road
12   Commission, was HR ever placed under finance or was that
13   ever a combined department?
14 A. To my recollection, the HR director worked directly for
15   me the entire time I was there.
16 Q. Mr. Daly, you stated earlier that you hired Ms. Poplar.
17   Do you remember her credentials, or her experience, why
18   you specifically thought she was the most qualified for
19   the position?
20 A. I remember that she had extensive experience in HR
21   previously with the City of Flint. She had also, I
22   believe, managed a non-profit at some point. She was
23   very familiar with the Flint operating environment. To
24   me, that was also an important factor.
25 Q. During your time that you worked with Ms. Poplar, what

Page 12

1    was -- were you satisfied with her work?
2 A. Yes, very much so.
3 Q. What was your relationship like with her?
4 A. We had a professional relationship and it was certainly
5    amicable. She brought me ideas. I wasn't able to
6    obviously approve all of them, but if we had resources
7    to say do it, to implement that idea. She did make some
8    changes on her own almost right away that I thought were
9    very appropriate.
10       At one point, I did a tentative reorganization
11   in which she supervised the director of purchasing for a
12   period of time. I believe that was the relationship
13   when I left. But the director still reported to me. I
14   would say that we had a good working relationship.
15 Q. What about her demeanor, as an HR director, and her
16   relationship with other employees during the time that
17   you worked with Ms. Poplar, would you say that she was a
18   fair and impartial HR director?
19 A. I believe that to be true. The reason I do is because I
20   never had a complaint about her from either the -- from
21   other department heads or from an employee. So I would
22   believe that her working relationship with them was as a
23   professional one.
24 Q. During the time that you were in leadership at the
25   Genesee County Road Commission, you did work with and

Page 13

1    supervise Fred Peivandi, correct?
2 A. I worked with him and I coordinated the supervision of
3    Fred. One of the things that makes the position of
4    county highway engineer different than all the rest of
5    the department heads is, by statute, that position is
6    appointed by the board rather than the manager director.
7        Fred worked in that capacity, worked for the
8    board, and we had a relationship in which we coordinated
9    things. I handled the administrative side and he
10   handled the engineer side.
11 Q. While you were in leadership at the Road Commission, did
12   you ever receive complaints about Mr. Peivandi, while
13   you were there, about his working relationship with
14   others?
15 A. I did.
16 Q. Do you remember the basis of those complaints?
17 A. The basis of those complaints were that he was being
18   unreasonable and unfair with some of his requirements.
19 Q. Thank you, Mr. Daly.
20       If you don't mind, now I'd like to take a
21   brief five- or ten-minute break. It's 9:02. If we
22   could come back at 9:12. And then if I have any
23   additional questions, I will ask at that time. If not,
24   I'll allow Mr. Cascini, the Road Commission's attorney
25   to ask you some questions, okay?

Page 14

1  A.  Okay.
2       (A short recess was taken)
3  BY MS. LEE:
4  Q.  Thank you, Mr. Daly, for allowing me to take that quick
5      break. We are back on the record now. I do have just a
6      few more questions that I want to ask you before I turn
7      it over to Attorney Cascini to ask you a few questions.
8           I wanted to go back to your testimony where
9      you mentioned that Ms. Poplar did bring changes to you
10     and ideas to you. You stated before that you were
11     unable to implement them all. I'd like to ask you how
12     did Ms. Poplar respond when you couldn't maybe implement
13     a recommendation or did not take her advice on a
14     particular matter?
15 A.  She received it in a professional manner. One of the
16     things that I enjoyed about working with Ms. Poplar, if
17     we did get into something when she brought it to me and
18     I wasn't able to implement it, she would even go back
19     and take another look and say can we do it a little bit
20     differently. Can we move something different so we can
21     accomplish this.
22          On one occasion where we were looking at some
23     reporting that HR was having to do, initially the way
24     she suggested we couldn't do, she went back -- and I
25     told her that. She went back on her own initiative and

Page 15

1      repackaged it. Came back to me and it was a more
2      efficient process and we were able to implement it. I
3      never -- her response, whenever I had to deny her
4      request, was simply one of professionalism. She
5      understood the funds were limited.
6  Q.  Okay. So you never -- so you saw, even in your
7      response, that you couldn't to something, you saw that
8      she took initiative at times to see if she could assist
9      the Road Commission?
10 A.  Absolutely.
11 Q.  Okay. Then did you ever experience, while you were the
12     managing director, a power struggle with Ms. Poplar in
13     the sense that she felt that her recommendations, or
14     suggestions, should be that most importance?
15 A.  No.
16 Q.  Okay. During the time that you all worked together,
17     Ms. Poplar was respectful to you?
18 A.  Yes, she was.
19 Q.  And did she ever leverage her position as the HR
20     director against you as the managing director before the
21     board or any other employees?
22 A.  No.
23 Q.  Did Ms. Poplar accept your authority as managing
24     director?
25 A.  From my perspective, absolutely.

Page 16

1  Q.  Did Ms. Poplar follow the directives that you gave her?
2  A.  Yes.
3  Q.  Was Ms. Poplar ever insubordinate under your leadership
4      at --
5  A.  No.
6  Q.  Okay. Thank you so much, Mr. Daly. I appreciate your
7      time today. And now I'll allow Attorney Cascini to ask
8      you some questions if he wishes to do so.
9           MR. CASCINI: Thank you, Charis.
10               EXAMINATION
11 BY MR. CASCINI:
12 Q.  John, I don't think I need to introduce myself. My name
13     is Andrew Cascini. I'm representing the defendants in
14     this particular lawsuit, including the defendant the
15     Genesee Road Commission. I do have some questions I
16     would like to ask you. If you have any trouble hearing
17     me, at any point in time, or if you don't understand the
18     question, please interrupt me and tell me. I won't hold
19     it personally. I promise.
20 A.  Okay.
21 Q.  I'd like to talk a little bit about the vacant position
22     in HR that you referred to earlier. You mentioned that
23     at some point during your tenure as managing director
24     there was a position in the HR department that was being
25     held vacant and non-budgeted; is that correct?

Page 17

1  A.  That is correct.
2  Q.  Describe the circumstances upon which that position
3      became vacant and it was held as non-budgeted.
4  A.  The position was filled when I came into the Road
5      Commission in December of '99. As I recall, the
6      incumbent, at that time, had been in there for at least
7      a year or two. She had been a long-term employee, but
8      had moved into that position previous to my arrival.
9           About a year after I got there, she elected to
10     retire. By this time, it's about 2002, 2003, I could
11     see that we were going to have a problem ahead
12     economically not just with the HR, but with the road
13     commission funding generally. Just because of the way
14     the committee was going, I put a hiring freeze on. That
15     hiring freeze stayed on for about six or seven years.
16          The position after that was subsequently never
17     filled. We wouldn't have filled it. The driving force,
18     from my perspective, was the increased workload that was
19     being mandated by the State with regards to OPED,
20     medical care for current employees. And those
21     requirements were what were driving, taking a really
22     good look at that position. That was the reason,
23     frankly, that when I was serving as the HR director, I
24     really saw there was a need to fill that and provide
25     more administrative support for the director of HR.

**Page 18**

1  Q. Excellent. Let me try to break down that answer. There
2  is a lot going on in that, and I want to make sure I
3  understand each step.
4       You come into the managing director position
5  about 1999. That position that we are talking about was
6  just called that, position X in the HR department,
7  that's filled at that point, right?
8  A. Yes.
9  Q. Then there is a period of time thereafter where the
10  person who was filling position X, the administrative
11  assistant position where that person decided the leave
12  the Road Commission; is that correct?
13  A. That's correct.
14  Q. Approximately when did that occur?
15  A. That occurred, as I recall, it occurred around late
16  2002, early 2003.
17  Q. Okay. Then you mentioned that it's held vacant, but
18  non-budgeted for a period, you told me, seven or eight
19  years. Approximately what span was that position held
20  vacant, but non-budgeted?
21  A. It was never -- let me back up. For the first three
22  years of that, three or four years of that to '08, it
23  was vacant and budgeted. Then around 2010, I believe I
24  made a decision that we are really not -- we have done
25  without it this long. About the same time that I'm

**Page 19**

1  making that decision that we're going to fund that
2  position, take it out of the budget, that was when the
3  State started coming in with their additional mandates
4  for reporting, so the need for that position resurfaced.
5  Q. So we have a span of time where, at first, you decide to
6  take it out of the budget as cost saving measure.
7  You're like, we have been working without it for a long
8  time, maybe we don't need this position. But then, in
9  your estimation, a need for the position to become
10  filled again arises?
11  A. That's correct.
12  Q. Approximately when did that need, in your perception,
13  arise?
14  A. I started seeing it when -- during the period of time
15  that I was the serving as the HR director. In fact, to
16  be frank, the reason that I decided -- that I felt we
17  needed -- I served as HR director. One of the other
18  conclusions I came to during that time was workload was
19  increasing. The reporting requirements were increasing
20  from the State that we had to do. That we really needed
21  to have the full-time HR director.
22  Q. Got it.
23  A. So that all happened probably up around, I'd say, 2015.
24  2014, 2015.
25  Q. Okay. So you mentioned that because of the increase

**Page 20**

1  reporting requirements that were being implemented at
2  the State level, you decided hey, I think that we need
3  to bring an HR director back. Was that also the same
4  period of time where you decided, I think we might need
5  to fill this administrative assistant position again?
6  A. It is.
7  Q. This is all before Donna Poplar is hired, before you
8  even have an HR director; is that right?
9  A. Before we had a full time -- we had, when I first got
10  there, we had, for about the first eleven years I was
11  there, full-time HR director.
12  Q. So during the period of time where there was a gap
13  between HR directors and you were serving as the HR
14  director?
15  A. Yes, that's correct.
16  Q. And let me make sure I get the timeline right. We have
17  the gentleman you mentioned who served as HR director
18  for about the first decade of your tenure that was
19  Kermit Pitts. You referred to him earlier; is that
20  right?
21  A. That's correct.
22  Q. Then there was the interim period for about three years
23  you served as HR director?
24  A. Yes.
25  Q. Then after that, it was the first HR director full time

**Page 21**

1  proprietary HR director was McKinney Jackson, correct?
2  A. That is correct.
3  Q. And then after that, she didn't serve for a very long
4  period of time; is that correct?
5  A. Right. About two years, couple of years.
6  Q. Then Donna Poplar was hired. Do you recall when Donna
7  Poplar was hired?
8  A. Not exactly.
9  Q. If I told you it was October of 2016, would that jibe
10  with your recollection of approximately being correct?
11  A. That would jibe with my approximation.
12  Q. Fair enough. I understand it's one job ago and also
13  five or six years ago. Sometimes these things can be
14  difficult to remember. It's okay to approximate in that
15  regard. But in any event, the question I want to make
16  clear for the record, had you made the determination
17  that the HR administrative position, the one that had
18  previously been held, vacant and non-budgeted should
19  come back, did you make a determination before or after
20  Ms. Poplar was hired as the full-time HR director?
21  A. I had made the decision that it was needed. It looked
22  like it was needed. I was particularly looking at
23  during the McKinney Jackson's tenure and had started to
24  move forward when Donna came back. I guess the idea
25  that we needed it as being sort of like warm jello over



Page 22

1  a period of about three really solidified that we needed
2  an addition.
3  Q. To take that analogy forward, you made the decision
4  prior to Donna being there, but then the plan about what
5  the job would entail exactly took shape during Donna's
6  tenure?
7  A. That's correct. That's a good assessment.
8  Q. Got it. So you did mention that when Donna Poplar was
9  first hired, during the interview process, Donna Poplar
10  disclosed to you that she had a vision disability,
11  right?
12  A. That is correct.
13  Q. And she asked for accommodation and that was the parking
14  spot situation that you had described earlier?
15  A. Yes.
16  Q. She had had trouble parking far away from the building
17  and wanted to park closer in order to make sure that she
18  was able to see the path between her parking spot and
19  the building?
20  A. She wanted to park closer.
21  Q. Sorry. Maybe I misstated that. She wanted to park
22  closer to the path between her parking spot and the
23  building, was closer?
24  A. Yes.
25  Q. I understand. After she began in her position, you

Page 23

1  mentioned that she began to ask for the creation of the
2  HR administrative position; is that correct?
3  A. That is correct.
4  Q. Approximately how long after she was hired did she begin
5  to ask for the creation of that HR administrative
6  assistant position?
7  A. I would say approximately six months. I mean, one of
8  the things that I thought was interesting was I had not
9  shared with Donna -- I did not share with Donna my
10  conclusion about that position that I wanted with the
11  new HR director coming on board. I wanted to let her
12  find her way about what she thought.
13  Q. So she, after being in the job for a few months, came to
14  you and said I think that I need an HR administrative
15  person. You already testified, sir, that you made the
16  prior determination that an HR administrative person was
17  necessary. So you were thinking that those two
18  suggestions were beginning to harmonize; is that right?
19  A. Right. I wanted to wait until I had somebody. My
20  experience in HR was limited to that period of time when
21  I was serving as interim director. I wanted to let
22  someone who had a great deal of HR experience see the
23  situation and reach their own conclusions.
24  Q. I see. When Donna shared, for you, those reasons that
25  she believed an HR administrative assistant position

Page 24

1  should be created, we are talking about six months after
2  she hired when she first brought it up to you. What
3  were the reasons, as you best recall them, that she
4  explained she thought that position was necessary?
5  A. Her principal reasons were the ones I had eluded to was
6  to make the department more efficient and to better make
7  us more responsive to the deadlines that the State was
8  imposing on this, both with regards to record keeping
9  and with regards to reporting to the State what we were
10  doing.
11  Q. Okay. Now when did your time with the Road Commission
12  end approximately?
13  A. My physical time with the Road Commission ended in
14  November of '17. I was on administrative leave until
15  April of '18.
16  Q. Okay. So just for purpose of timeline, Donna Poplar
17  gets hired late 2016. She raises the issue of needing
18  HR administrative assistant, you said, about six months
19  later. So we are talking kind of early to mid 2017. By
20  November of that year, that's when your, I would say,
21  physical attendance at the job ends. Is that an
22  appropriate timeline in all three phases?
23  A. That's an appropriate timeframe.
24  Q. You said -- you mentioned that when she first brings up
25  the issue of the HR administrative assistant position

Page 25

1  being created, that she is doing it for reasons of
2  operational efficiency. In fact, the same reasons that
3  you kind of come to the conclusion we need another
4  person back in here?
5  A. That's correct.
6  Q. You also mentioned, during your direct examination
7  testimony, however, that eventually there come to be
8  some discussions about more the role of that position,
9  how it's used to accommodate her visual disability or
10  that it could help her with her visual disability; is
11  that right?
12  A. That's correct.
13  Q. Approximately when -- we have just laid out a rough
14  timeline. When did those reasons come into play from
15  Donna about the creation of the position?
16  A. I'd say they came in probably about 30 to 45 days after
17  she suggested it.
18  Q. Okay. So it's -- at first it's the operational
19  efficiency. And then about a month, possibly month and
20  a half later she starts saying also this could be used
21  to accommodate the visual disability?
22  A. As I recall, that's a fair assessment of the timeframe.
23  Q. Okay. Did she ever, at any point in time, tell you that
24  she needed this person or needed a position that was
25  exclusively and solely devoted to assisting her with her



Page 26

1 visual disability?
2 A. No.
3 Q. In fact, you had envisioned that the position that we
4   are talking about here, the HR administrative position,
5   you thought that was a necessary position before you
6   even knew that you were going to have an HR director who
7   happened to have visual disabilities, right?
8 A. That is correct.
9 Q. During your tenure, was the HR Administrative Assistant
10  position ever actually created?
11 A. We relied on the position description.
12 Q. You relied on the position description that had existed
13  from back when it was being held vacant; is that right?
14 A. Correct.
15 Q. Okay. Was the position a part-time or a full-time
16  position when you decided to re-budget it?
17 A. When we decided to -- when we decided to re-budget it --
18  let me back up.
19     The position, when I first got here as it had
20  unfolded, was a full-time position. Because of the cost
21  constraints and because of the fact that it had been so
22  long since the position had been filled, I looked -- my
23  first take was a part-time position at a part-time level
24  and then see how that transpired vis-a-vis the
25  efficiency of the department.

Page 27

1 Q. Okay. So eventually during your tenure, so I'm only
2   asking for that period of time because afterward, after
3   you leave, then there is a change in leadership over
4   there. But during your tenure, did that administrative
5   position become budgeted?
6 A. No.
7 Q. Okay. Was there a proposal for it to be budgeted?
8 A. No.
9 Q. So you and Donna had independently come up with the idea
10  that you needed to budget a position. Had you remained
11  in place as managing director -- I'm asking you a
12  hypothetical question now.
13     Did you have the intent in the plan to budget
14  that position in the future?
15 A. I actually had the intent to budget that position when I
16  left. Remember, I left in November of '17. Our fiscal
17  year starts first of October, so my intent had been to
18  budget. But in the confusion that was surrounding
19  around the Road Commission, that didn't make it into the
20  budget. My intent had been had I stayed, I would have
21  budgeted that position.
22 Q. Would you have budgeted that position in October of 2017
23  or at the next available opportunity as a part-time or a
24  full-time position?
25 A. I would have budged it as a part-time position.

Page 28

1 Q. Little bit earlier you provided some testimony about a
2   buildout that happened in the HR department; is that
3   right?
4 A. Right.
5 Q. Pardon my ignorance, buildout, what are we talking
6   about; are we talking about an expansion of physical
7   premises?
8 A. No, no. It was, I guess, a restructuring of the
9   existing space allocation.
10 Q. Okay. When you say space allocation, I'm not trying to
11  belabor the point. The actual physical space where the
12  HR people work, the office space?
13 A. Right. It was at the time that (inaudible) fall under
14  HR. There was -- the purchasing was located immediately
15  next door to HR. And as I recall, the "buildout" was
16  removal of a wall between HR and purchasing as well as
17  opening up some the spaces for access -- for employee
18  access during the A2 to get into HR.
19 Q. The testimony that I have here, and this is my writing.
20  Please do not let me put words in your mouth. My
21  recollection of your testimony was that some of those
22  buildout changes were done to "accommodate that
23  position". I believe that you were referring to the HR
24  Administrative Assistant position. Is that accurate?
25 A. Yes.

Page 29

1 Q. When you say accommodate that position, do you mean to
2   make a physical space for the HR Administrative
3   Assistant?
4 A. Yes.
5 Q. You're not saying that the buildout was performed in
6   order to accommodate Donna Poplar's visual disability?
7 A. No.
8 Q. Understood. Okay. You mentioned that -- well, strike
9   that.
10     You served as managing director since 1999.
11  So you were with the Genesee County Road Commission for
12  a long time, right?
13 A. Almost 19 years.
14 Q. Almost 19 years. In fact, the during that period of
15  time, Mr. Peivandi, the current managing director and
16  then the director of engineering, was he there during
17  that entire time?
18 A. Yes.
19 Q. So you worked with Fred from 1999 to 2018, right?
20 A. No. Okay.
21 Q. Okay. If you could clarify, what were the periods where
22  that did not overlap?
23 A. Fred -- well, Fred when I got there, Fred was not the
24  county highway engineer.
25 Q. Okay.



Page 30

1 A. But became the county highway engineer like, I want to
2  say, '14 or '15. That was the point at which I started
3  working with him directly.
4 Q. Prior to him becoming the county highway engineer, he
5  was internally within the administration, within the
6  engineering department however; is that right?
7 A. Yes, that is correct.
8 Q. So I know how the statute works. But let's talk about
9  it for a second. We have got this position that is
10  required by statute for there to be county highway
11  engineer that the board has the sole authority and
12  discretion to appoint, right?
13 A. Yes, that is correct.
14 Q. Position that needs to be filled. Statute makes it
15  happen?
16 A. Yes.
17 Q. Separately however, you have an administration where you
18  have got engineer employees within the GCRC, right?
19 A. Yes.
20 Q. So the two maybe co-term or co-extensive, they may exist
21  to be the same person. They could be, in theory, two
22  different people. You could do it 100 ways under the
23  sun, right?
24 A. There are many different ways to implement that.
25 Q. Okay. Fred had been continuously employed in the

Page 31

1  engineering department since 1999, right?
2 A. Yes.
3 Q. Across that 18-year period, did you come to know Fred
4  professionally?
5 A. Yes.
6 Q. Would you say you knew him pretty well? 18 years is a
7  long time to work with someone.
8 A. I think first, I would say that Fred is an exceptional
9  engineer. Probably one of the best engineers I have
10  ever worked with.
11 Q. During that period of time, did you ever see anything,
12  hear anything or have anything that generated the
13  opinion that Fred either had a problem with or held
14  animus towards African Americans, their race, I should
15  say? Not particular people, but African Americans as a
16  race.
17 A. I had a complaint -- Oh Lord, it would have to have been
18  like 2010, 2012, something somewhere in that timeframe,
19  the early part of the decade from Kim Day who had been
20  an engineering inspector about how she felt that she was
21  at the "end of her career". And the reason she couldn't
22  get promoted was because of the fact -- one of the
23  factors that she felt she couldn't get promoted was that
24  she was an African American.
25 Q. Is Kim Day still an employee, to the best of your

Page 32

1  knowledge, with the Road Commission?
2 A. She is.
3 Q. And is she currently a supervisor with the Road
4  Commission in the engineering department, to the best of
5  your knowledge?
6 A. No, she is not.
7 Q. She is not supervisor in the engineering department?
8 A. No.
9 Q. What position, to your best of your knowledge, does she
10  occupy within the engineering department?
11 A. I don't believe she holds a position within the
12  engineering department.
13 Q. You caught me. You're right. I meant to say
14  maintenance department. Perhaps my brain isn't firing
15  correctly.
16     Is she currently, to the best of your
17  knowledge, a supervisor in the maintenance department?
18  My apologies, Mr. Daly.
19 A. No problem. Yes, she is.
20 Q. Okay. Did you ever come to observe any instances
21  personally or see any examples where you believed that
22  Mr. Peivandi was animus towards African Americans
23  because of their race?
24 A. I did not.
25 Q. You mentioned, at one point in time, that you and Donna

Page 33

1  Poplar worked together on a tentative re-organization of
2  the Road Commission. You said something about there
3  being a change in supervision of the Department of
4  Purchasing; is that right?
5 A. That is correct.
6 Q. Can you describe, for me, a little bit about what that
7  tentative re-organization entailed?
8 A. It entailed looking at -- purchasing had previously
9  worked under finance. There were difficulties
10  communicating with, then, Finance Director Melissa
11  Williams. That was the name I couldn't remember early
12  on in the position. Melissa Williams, the finance
13  director with the purchase coordinator. I did not feel
14  it appropriate to move the purchasing coordinator to
15  where they were working under my supervision because
16  that would have made them a de facto department head.
17     So I looked if that was right at the time that
18  Donna was coming as HR director. So I made a little --
19  since they were -- purchasing and HR were literally
20  within about eight feet of each other physically, I
21  re-assigned that function to HR.
22 Q. It had been, prior to, under finance and then you
23  decided to move it to HR at that point in time?
24 A. Correct.
25 Q. Okay. John, I have taken up enough of your time here.



Page 34

1  I don't have anything further.
2  MR. CASCINI: Charis and Julie, do you have
3  any further questions for this witness?
4  MS. LEE: I do. Thank you.
5  RE-EXAMINATION
6  BY MS. LEE:
7  Q. Just a clarification. Mr. Daly, you mentioned in your
8     testimony earlier that Ms. Poplar, when she notified you
9     of her vision disability, she stated -- Ms. Poplar
10    stated that her vision was deteriorating, correct?
11 A. Yes. Well, it was already bad. But it wasn't a stable
12    condition. That it would probably continue to
13    deteriorate.
14 Q. And did she make you aware that she could potentially go
15    blind?
16 A. She did.
17 Q. At the time that you provided Ms. Poplar a parking sign
18    as an -- or parking spot as an accommodation, was she
19    driving?
20 A. She was driving. But that accommodation to the parking
21    spot was made very early on in her career at the Road
22    Commission -- during the time I was at the Road
23    Commission. And one of the things that I noticed
24    because of the proximity of her parking spot to mine was
25    that as time went on, more and more she was being driven

Page 35

1  by someone. And when I checked into it, why was it
2  vacant, I found out that Donna was having someone drive
3  her to work and pick her up from work.
4  Q. So I'm sorry. You cut out a bit.
5     You said you noticed that someone was driving
6     her to work?
7  A. And picking her up from work, I assume.
8  Q. Okay. You inquired into it and what was the -- what did
9     you find out?
10 A. I found out -- I asked Ms. Poplar about it. She
11    explained, to me, that she was having problems. This
12    was as I recall, it happened during the wintertime. It
13    was darker, longer hours of darkness when she come in.
14    It would be dark and when she would leave it would be
15    dark. She was having trouble seeing. So she was having
16    someone else take her to and from work on many days.
17 Q. So did this correlate around the time in which
18    Ms. Poplar began to ask you for the HR administrative
19    assistant to assist her?
20 A. Can you repeat the question?
21 Q. Sure. You mentioned that you noticed Donna was not
22    driving to work.
23 A. Yes.
24 Q. You inquired about it?
25 A. Yes.

Page 36

1  Q. When you inquired about it, was this -- during this
2     particular timeframe, was this around the same time that
3     Ms. Poplar was requesting to have a reader or requesting
4     additional accommodations from you?
5  A. It's about the same time. I'm not sure what happened
6     first. I don't recall that portion of it, but it's
7     about the same.
8  Q. So you have clarified, for us, that Ms. Poplar's vision
9     was deteriorating. She had an issue coming to you and
10    requesting accommodations regarding her vision. And
11    that this time -- all of this is going on while you were
12    there at the Road Commission.
13    So as far as you know, Ms. Poplar's vision was
14    deteriorating and she did need accommodations regarding
15    her deteriorating vision?
16 A. That's correct.
17 Q. Okay.
18    MS. LEE: That's all from me. I don't have
19    any further questions.
20    Thank you, Mr. Daly. I appreciate your time
21    today. I know my co-counsel, Julie Gafkay does as well,
22    and Attorney Cascini. So thank you.
23    THE WITNESS: We are concluded now?
24    MR. CASCINI: We are concluded. I have
25    nothing further for you either, John. Appreciate your

Page 37

1  time and also appreciate you working with us on the
2  technology side. Thank you so much, sir.
3  THE WITNESS: No problem.
4  (The deposition was concluded at 9:45 a.m.)

```
 1                CERTIFICATE OF NOTARY
 2
 3   STATE OF MICHIGAN        )
 4                            ) SS
 5   COUNTY OF OAKLAND        )
 6       I, Tamora L. Thompson, Certified Shorthand
 7   Reporter, a Notary Public in and for the above county
 8   and state, do hereby certify that the above deposition
 9   was taken before me at the time and place hereinbefore
10   set forth; that the witness was by me first duly sworn
11   to testify to the truth, and nothing but the truth, that
12   the foregoing questions asked and answers made by the
13   witness were duly recorded by me stenographically and
14   reduced to computer transcription; that this is a true,
15   full and correct transcript of my stenographic notes so
16   taken; and that I am not related to, nor of counsel to
17   either party nor interested in the event of this cause.
18
19
20              /s/ Tamora L. Thompson
21              Tamora L. Thompson CSR 5378
22              Notary Public,
23              Oakland County, Michigan
24              My Commission expires:  12-24-2026
25
```

John Daly
09/23/2022

1

## 0

**08** 18:22

## 1

**100** 30:22
**14** 30:2
**15** 30:2
**17** 24:14 27:16
**18** 24:15 31:6
**18-year** 31:3
**19** 5:22 11:11 29:13,14
**1999** 5:21 6:8 18:5 29:10,19 31:1

## 2

**2002** 17:10 18:16
**2003** 17:10 18:16
**201** 6:8
**2010** 18:23 31:18
**2012** 31:18
**2014** 19:24
**2015** 19:23,24
**2016** 6:14 21:9 24:17
**2017** 24:19 27:22
**2018** 5:21 29:19
**2022** 4:2
**23** 4:2

## 3

**30** 25:16

## 4

**45** 25:16

## 8

**8:43** 4:3

## 9

**99** 17:5
**9:02** 13:21
**9:12** 13:22
**9:45** 37:4

## A

**a.m.** 4:3 37:4
**A2** 28:18
**abide** 5:3
**absolutely** 15:10,25
**accept** 15:23
**access** 28:17,18
**accommodate** 11:10 25:9,21 28:22 29:1,6
**accommodated** 8:13
**accommodation** 9:11,12,21 11:1 22:13 34:18,20
**accommodations** 7:22 10:15 11:4 36:4,10,14
**accomplish** 14:21
**accurate** 28:24
**actual** 28:11
**Adams** 7:1
**addition** 8:15 22:2
**additional** 8:24 13:23 19:3 36:4
**Additionally** 6:2
**administration** 30:5,17
**administrative** 10:14,17 11:4 13:9 17:25 18:10 20:5 21:17 23:2,5,14,16,25 24:14,18,25 26:4,9 27:4 28:24 29:2 35:18

**advice** 14:13
**African** 31:14,15,24 32:22
**afterward** 27:2
**agreement** 4:9
**ahead** 17:11
**allocation** 28:9,10
**allowing** 14:4
**American** 31:24
**Americans** 31:14,15 32:22
**amicable** 12:5
**analogy** 22:3
**Andrew** 4:20 16:13
**animus** 31:14 32:22
**Anthony** 6:18
**apologies** 32:18
**appoint** 30:12
**appointed** 13:6
**approve** 12:6
**approximate** 21:14
**approximately** 18:14,19 19:12 21:10 23:4,7 24:12 25:13
**approximation** 21:11
**April** 24:15
**arise** 19:13
**arises** 19:10
**arrival** 17:8
**assessment** 22:7 25:22
**assigned** 8:13
**assist** 10:16,18 15:8 35:19
**assistance** 9:6,22
**assistant** 10:14,17 11:5 18:11 20:5 23:6,25 24:18,25 26:9 28:24 29:3 35:19
**assistants** 10:7,8
**assisting** 25:25

John Daly
09/23/2022

2

**assume** 35:7

**attendance** 24:21

**attorney** 4:18,20,21 13:24 14:7 16:7 36:22

**authority** 15:23 30:11

**aware** 8:25 34:14

### B

**back** 10:11 13:22 14:5,8,18,24,25 15:1 18:21 20:3 21:19,24 25:4 26:13,18

**bad** 34:11

**bandwidth** 7:9

**basis** 13:16,17

**began** 22:25 23:1 35:18

**begin** 23:4

**beginning** 23:18

**belabor** 28:11

**believed** 23:25 32:21

**bit** 14:19 16:21 28:1 33:6 35:4

**blind** 34:15

**board** 13:6,8 15:21 23:11 30:11

**bore** 5:1

**brain** 32:14

**Branch** 6:18

**break** 5:4,6,8 13:21 14:5 18:1

**bring** 14:9 20:3

**brings** 24:24

**brought** 12:5 14:17 24:2

**budged** 27:25

**budget** 19:2,6 27:10,13,15,18,20

**budgeted** 9:25 18:23 27:5,7,21, 22

**building** 8:7,12 11:4 22:16,19,23

**buildout** 11:5 28:2,5,15,22 29:5

### C

**called** 18:6

**capacity** 13:7

**care** 17:20

**career** 31:21 34:21

**Cascini** 4:20 13:24 14:7 16:7,9, 11,13 34:2 36:22,24

**caught** 32:13

**certified** 4:5

**change** 27:3 33:3

**Charis** 4:17 16:9 34:2

**checked** 35:1

**circumstances** 17:2

**City** 11:21

**clarification** 34:7

**clarified** 36:8

**clarify** 29:21

**clear** 21:16

**closer** 8:12 22:17,20,22,23

**co-counsel** 4:19 36:21

**co-extensive** 30:20

**co-term** 30:20

**Coetta** 7:1

**combined** 11:13

**commission** 4:21 5:17,20,25 6:24 10:9 11:12 12:25 13:11 15:9 16:15 17:5,13 18:12 24:11, 13 27:19 29:11 32:1,4 33:2 34:22,23 36:12

**Commission's** 13:24

**committee** 17:14

**communicating** 33:10

**complaint** 12:20 31:17

**complaints** 13:12,16,17

**concluded** 36:23,24 37:4

**conclusion** 23:10 25:3

**conclusions** 19:18 23:23

**condition** 34:12

**confusion** 27:18

**constraints** 26:21

**continue** 34:12

**continuing** 11:2

**continuously** 6:7 30:25

**conversation** 5:1

**coordinated** 13:2,8

**coordinator** 33:13,14

**correct** 10:1 13:1 16:25 17:1 18:12,13 19:11 20:15,21 21:1,2, 4,10 22:7,12 23:2,3 25:5,12 26:8,14 30:7,13 33:5,24 34:10 36:16

**correctly** 32:15

**correlate** 35:17

**cost** 19:6 26:20

**county** 4:21 5:17,19 6:24 12:25 13:4 29:11,24 30:1,4,10

**couple** 21:5

**COURT** 4:4

**created** 24:1 25:1 26:10

**creation** 23:1,5 25:15

**credentials** 11:17

**current** 17:20 29:15

**cut** 7:8 35:4

### D

**D-A-L-Y** 5:14

**Daly** 4:12,17 5:13,14,16 11:16 13:19 14:4 16:6 32:18 34:7 36:20

**dark** 35:14,15

**darker** 35:13

John Daly
09/23/2022

3

darkness 35:13
Davis 6:18
Day 31:19,25
days 25:16 35:16
de 33:16
deadlines 24:7
deal 23:22
decade 20:18 31:19
December 17:5
decide 19:5
decided 18:11 19:16 20:2,4 26:16,17 33:23
decision 18:24 19:1 21:21 22:3
defendant 16:14
defendants 16:13
Dellaposta 6:19
demeanor 12:15
deny 15:3
department 10:6 11:13 12:21 13:5 16:24 18:6 24:6 26:25 28:2 30:6 31:1 32:4,7,10,12,14,17 33:3,16
deposition 4:1,6,22,23 37:4
describe 17:2 33:6
description 26:11,12
deteriorate 34:13
deteriorating 8:3,4 9:5 11:2 34:10 36:9,14,15
determination 21:16,19 23:16
developed 10:14
devoted 25:25
differently 14:20
difficult 21:14
difficulties 8:8 33:9
direct 25:6
directives 16:1

directly 6:11 7:6,15 11:14 30:3
director 6:2,3,4,5,6,7,10,18,19, 21,22,23 7:2,5,13,14 9:2,15 10:4,5,7 11:14 12:11,13,15,18 13:6 15:12,20,24 16:23 17:23,25 18:4 19:15,17,21 20:3,8,11,14, 17,23,25 21:1,20 23:11,21 26:6 27:11 29:10,15,16 33:10,13,18
directors 6:10,13 7:6 20:13
disabilities 26:7
disability 7:19,21,23,24 8:2 22:10 25:9,10,21 26:1 29:6 34:9
disabled 8:12
disclose 7:17
disclosed 7:21,24 8:1 22:10
discretion 30:12
discussions 9:3 25:8
documents 9:8
Donna 4:18,20 6:21 7:13,15 20:7 21:6,24 22:4,8,9 23:9,24 24:16 25:15 27:9 29:6 32:25 33:18 35:2,21
Donna's 9:21 22:5
door 28:15
drawn-out 5:1
drive 35:2
driven 34:25
driving 17:17,21 34:19,20 35:5, 22
due 8:22
duly 4:13

**E**

earlier 10:12 11:16 16:22 20:19 22:14 28:1 34:8
early 18:16 24:19 31:19 33:11 34:21
economically 17:12

efficiency 25:2,19 26:25
efficient 15:2 24:6
elected 17:9
eleven 20:10
eluded 24:5
employed 30:25
employee 5:16 8:15 10:15 11:6 12:21 17:7 28:17 31:25
employees 12:16 15:21 17:20 30:18
end 9:1 24:12 31:21
ended 24:13
ends 24:21
engineer 13:4,10 29:24 30:1,4, 11,18 31:9
engineering 7:2,5 29:16 30:6 31:1,20 32:4,7,10,12
engineers 31:9
enjoyed 14:16
entail 22:5
entailed 33:7,8
entire 11:15 29:17
environment 11:23
envisioned 26:3
equipment 4:7
estimation 19:9
event 21:15
eventually 25:7 27:1
examination 4:15 16:10 25:6
examined 4:13
examples 32:21
Excellent 18:1
exceptional 31:8
exclusively 25:25
exist 30:20

John Daly
09/23/2022

4

existed 26:12
existing 28:9
expansion 28:6
experience 9:15 11:17,20 15:11 23:20,22
explained 24:4 35:11
extensive 11:20

### F

facilities 6:20
fact 19:15 25:2 26:3,21 29:14 31:22
facto 33:16
factor 11:24
factors 31:23
fair 12:18 21:12 25:22
fall 28:13
familiar 11:23
feel 33:13
feet 33:20
felt 15:13 19:16 31:20,23
fence 8:7,8,9
fill 8:19 17:24 20:5
filled 9:25 10:10 17:4,17 18:7 19:10 26:22 30:14
filling 10:25 11:7 18:10
final 7:24
finance 6:22 11:12 33:9,10,12,22
find 9:9 23:12 35:9
firing 32:14
fiscal 27:16
five- 13:21
five-minute 5:8
Flint 11:21,23
follow 16:1

force 17:17
forward 11:7 21:24 22:3
found 35:2,10
frank 19:16
frankly 17:23
Fred 7:4 13:1,3,7 29:19,23 30:25 31:3,8,13
freeze 17:14,15
freight 6:20
Friday 4:2
full 5:13 20:9,25
full-time 19:21 20:11 21:20 26:15,20 27:24
function 33:21
fund 19:1
funding 17:13
funds 15:5
future 27:14

### G

Gafkay 4:19 36:21
gap 20:12
gapped 8:17 9:14
gave 16:1
GCRC 30:18
generally 17:13
generated 31:12
Genesee 4:21 5:17,19 12:25 16:15 29:11
gentleman 20:17
good 4:17 12:14 17:22 22:7
great 23:22
ground 5:3
guess 11:3 21:24 28:8

### H

half 25:20
handled 13:9,10
happen 30:15
happened 19:23 26:7 28:2 35:12 36:5
harmonize 23:18
head 33:16
heads 12:21 13:5
hear 31:12
hearing 7:9 16:16
held 4:6 6:7 16:25 17:3 18:17,19 21:18 26:13 31:13
hey 20:2
highway 13:4 29:24 30:1,4,10
hire 7:14,25
hired 7:17,19 9:6 10:4 11:16 20:7 21:6,7,20 22:9 23:4 24:2,17
hiring 17:14,15
hold 5:24 16:18
holds 32:11
hope 5:9
hours 35:13
HR 6:3,22 8:15 9:2,15,22 10:5,6, 13,17 11:4,9,12,14,20 12:15,18 14:23 15:19 16:22,24 17:12,23, 25 18:6 19:15,17,21 20:3,8,11, 13,17,23,25 21:1,17,20 23:2,5, 11,14,16,20,22,25 24:18,25 26:4,6,9 28:2,12,14,15,16,18,23 29:2 33:18,19,21,23 35:18
Human 7:14
hurricane 8:9
hypothetical 27:12

John Daly
09/23/2022

5

### I

idea  12:7 21:24 27:9
ideas  12:5 14:10
ignorance  28:5
III  5:13
immediately  10:8,9 28:14
impartial  12:18
implement  12:7 14:11,12,18 15:2
   30:24
implemented  20:1
importance  15:14
important  11:24
imposing  24:8
inaudible  7:2 8:6 9:16 28:13
including  16:14
incomplete  9:17
increase  19:25
increased  8:22 10:23 17:18
increasing  19:19
incumbent  17:6
independently  27:9
initial  5:14
initially  8:6,16,21 14:23
initiative  14:25 15:8
inquired  8:20 35:8,24 36:1
inspector  31:20
instances  32:20
insubordinate  16:3
intent  9:14 27:13,15,17,20
interesting  23:8
interim  20:22 23:21
internally  30:5
interrupt  16:18

interview  7:18 8:1 22:9
introduce  16:12
issue  24:17,25 36:9
issues  9:18

### J

J-O-H-N  5:13
Jackson  6:21 21:1
Jackson's  21:23
jello  21:25
jibe  21:9,11
job  21:12 22:5 23:13 24:21
John  4:12 5:13 16:12 33:25
   36:25
Julie  4:19 34:2 36:21

### K

keeping  8:25 10:19 24:8
Kermit  6:20 20:19
Kim  31:19,25
kind  24:19 25:3
knew  26:6 31:6
knowledge  32:1,5,9,17

### L

laid  25:13
late  18:15 24:17
lawsuit  16:14
layout  11:9
leadership  11:11 12:24 13:11
   16:3 27:3
leave  18:11 24:14 27:3 35:14
Lee  4:16,17 14:3 34:4,6 36:18
left  12:13 27:16
legal  8:22

level  20:2 26:23
leverage  15:19
limited  15:5 23:20
literally  33:19
located  28:14
long  5:1,9 18:25 19:7 21:3 23:4
   26:22 29:12 31:7
long-term  17:7
longer  35:13
looked  21:21 26:22 33:17
Lord  31:17
lot  18:2
Luellen  6:22
Lynn  6:22

### M

made  7:25 8:16 11:9 18:24
   21:16,21 22:3 23:15 33:16,18
   34:21
maintenance  6:19,20 32:14,17
make  11:3 12:7 18:2 20:16 21:15,
   19 22:17 24:6 27:19 29:2 34:14
makes  7:10 13:3 30:14
making  19:1
managed  11:22
manager  10:4 13:6
managing  6:1,5,7,9 7:12 15:12,
   20,23 16:23 18:4 27:11 29:10,15
mandated  8:23 17:19
mandates  19:3
manner  14:15
matter  14:14
Mckinney  6:21 21:1,23
meant  32:13
measure  19:6
medical  17:20

John Daly
09/23/2022

6

meeting  7:25
Melissa  33:10,12
mention  22:8
mentioned  14:9 16:22 18:17
  19:25 20:17 23:1 24:24 25:6
  29:8 32:25 34:7 35:21
Michigan  4:5
mid  24:19
mind  13:20
mine  8:14 34:24
misstated  22:21
month  9:4 25:19
months  7:3 8:5 23:7,13 24:1,18
morning  4:17
mouth  28:20
move  14:20 21:24 33:14,23
moved  17:8
moving  11:7

**N**

needed  9:5 19:17,20 21:21,22,25
  22:1 25:24 27:10
needing  24:17
nerve  10:10
non-budgeted  16:25 17:3 18:18,
  20 21:18
non-profit  11:22
notary  4:5
noticed  34:23 35:5,21
notified  34:8
November  24:14,20 27:16
numeral  5:14

**O**

Oakland  6:24

oath  4:14
observe  32:20
occasion  14:22
occupy  32:10
occur  18:14
occurred  18:15
October  21:9 27:17,22
offer  7:25
office  28:12
OPED  8:23 17:19
opening  28:17
operating  11:23
operational  25:2,18
opinion  10:22 31:13
opportunity  27:23
order  22:17 29:6
overlap  29:22

**P**

Pardon  28:5
park  22:17,20,21
parking  8:11,13 22:13,16,18,22
  34:17,18,20,24
part  31:19
part-time  26:15,23 27:23,25
parties  4:9,10
path  22:18,22
Peivandi  7:4 13:1,12 29:15 32:22
people  10:6 28:12 30:22 31:15
perception  19:12
Perfect  6:9
performed  29:5
period  6:1,17 9:1 12:12 18:9,18
  19:14 20:4,12,22 21:4 22:1
  23:20 27:2 29:14 31:3,11

periods  29:21
person  4:11 6:15,16 9:6 18:10,11
  23:15,16 25:4,24 30:21
personally  16:19 32:21
perspective  15:25 17:18
phases  24:22
physical  11:3 24:13,21 28:6,11
  29:2
physically  33:20
pick  35:3
picking  35:7
Pitts  6:20 20:19
place  8:23 27:11
plan  22:4 27:13
planning  11:10
play  25:14
point  11:22 12:10 16:17,23 18:7
  25:23 28:11 30:2 32:25 33:23
Poplar  4:18,20 6:21 7:13,17
  10:14,18,23 11:16,25 12:17
  14:9,12,16 15:12,17,23 16:1,3
  20:7 21:6,7,20 22:8,9 24:16 33:1
  34:8,9,17 35:10,18 36:3
Poplar's  29:6 36:8,13
portion  36:6
position  6:7,15,16 7:1 8:16,19
  9:16,24 10:10,13,21 11:1,8,10,
  19 13:3,5 15:19 16:21,24 17:2,4,
  8,16,22 18:4,5,6,10,11,19 19:2,
  4,8,9 20:5 21:17 22:25 23:2,6,
  10,25 24:4,25 25:8,15,24 26:3,4,
  5,10,11,12,15,16,19,20,22,23
  27:5,10,14,15,21,22,24,25
  28:23,24 29:1 30:9,14 32:9,11
  33:12
positions  5:24
possibly  25:19
potentially  34:14
power  15:12



John Daly
09/23/2022

7

premises 28:7
pretty 31:6
prevent 7:9
previous 17:8
previously 9:20,25 11:21 21:18 33:8
principal 24:5
prior 22:4 23:16 30:4 33:22
problem 17:11 31:13 32:19 37:3
problems 35:11
process 7:18 8:1 15:2 22:9
professional 12:4,23 14:15
professionalism 15:4
professionally 31:4
promise 16:19
promoted 31:22,23
proposal 27:7
proprietary 21:1
provide 17:24
provided 28:1 34:17
proximity 34:24
public 4:5
purchase 33:13
purchasing 12:11 28:14,16 33:4,8,14,19
purpose 24:16
pursuant 4:9
put 17:14 28:20

Q

qualified 11:18
question 5:5,6,7 9:19 16:18 21:15 27:12 35:20
questioning 10:11
questions 4:23 13:23,25 14:6,7

16:8,15 34:3 36:19
quick 14:4

R

race 31:14,16 32:23
raises 24:17
Randy 6:19
re-assigned 33:21
re-budget 26:16,17
RE-EXAMINATION 34:5
re-organization 33:1,7
reach 23:23
reader 36:3
reading 9:7 10:16,20
reason 12:19 17:22 19:16 31:21
reasonable 9:9,10,20,21 11:1
reasons 23:24 24:3,5 25:1,2,14
recall 8:4 10:20 17:5 18:15 21:6 24:3 25:22 28:15 35:12 36:6
receive 13:12
received 14:15
recess 14:2
recollection 11:14 21:10 28:21
recommendation 14:13
recommendations 15:13
record 5:12 8:24 14:5 21:16 24:8
records 10:19,20
referred 16:22 20:19
referring 28:23
regard 21:15
relationship 12:3,4,12,14,16,22 13:8,13
relied 26:11,12
remained 27:10
remember 6:16,23 10:2 11:17,20

13:16 21:14 27:16 33:11
Remote 4:1
remotely 4:9
removal 28:16
reorganization 12:10
repackaged 15:1
repeat 35:20
report 6:10
reported 6:13 7:6,13 12:13
reporter 4:4,6,7
reporting 8:24 14:23 19:4,19 20:1 24:9
representing 16:13
request 9:9,10,21 15:4
requested 10:14
requesting 36:3,10
required 8:25 30:10
requirements 8:24 13:18 17:21 19:19 20:1
resources 7:14 12:6
respectful 15:17
respond 14:12
response 7:11 15:3,7
responsive 24:7
rest 13:4
restructuring 28:8
resurfaced 19:4
retire 17:10
retired 10:8
road 4:21 5:17,19,25 6:24 10:8 11:11 12:25 13:11,24 15:9 16:15 17:4,12 18:12 24:11,13 27:19 29:11 32:1,3 33:2 34:21,22 36:12
Rocky 6:17
role 25:8



John Daly
09/23/2022

8

roman  5:14
room  4:8
rough  25:13
roughly  5:22
rules  5:3

### S

satisfied  12:1
saving  19:6
screen  4:18
sense  11:9 15:13
Separately  30:17
September  4:2
serve  21:3
served  6:2,18,19,21 9:2 19:17 20:17,23 29:10
serving  17:23 19:15 20:13 23:21
shape  22:5
share  23:9
shared  23:9,24
short  14:2
shorthand  4:5
side  13:9,10 37:2
sign  34:17
simply  15:4
sir  23:15 37:2
situation  22:14 23:23
sole  30:11
solely  25:25
solidified  22:1
sort  21:25
space  28:9,10,11,12 29:2
spaces  28:17
span  10:2 18:19 19:5

special  11:5
specifically  11:18
spell  5:11
spot  8:11,13 22:14,18,22 34:18, 21,24
spots  8:14
stable  34:11
started  19:3,14 21:23 30:2
starts  25:20 27:17
state  4:5 8:24 17:19 19:3,20 20:2 24:7,9
stated  9:24 10:13 11:16 14:10 34:9,10
statute  13:5 30:8,10,14
stayed  17:15 27:20
step  18:3
stipulate  4:10
stop  7:7,10
strike  29:8
struggle  15:12
subsequent  9:3
subsequently  17:16
suggested  14:24 25:17
suggestions  15:14 23:18
sun  30:23
supervise  13:1
supervised  12:11
supervision  13:2 33:3,15
supervisor  32:3,7,17
support  17:25
supposed  10:17
surprised  8:5
surrounding  27:18
sworn  4:8,11,13

### T

taking  8:22 10:19 17:21
talk  16:21 30:8
talking  10:2 18:5 24:1,19 26:4 28:5,6
Tammy  4:4
tasks  10:16
technical  9:18
technology  37:2
ten  7:3
ten-minute  13:21
tentative  12:10 33:1,7
tenure  16:23 20:18 21:23 22:6 26:9 27:1,4
testified  4:13 23:15
testimony  4:10 14:8 25:7 28:1, 19,21 34:8
theory  30:21
thing  10:25
things  9:7 13:3,9 14:16 21:13 23:8 34:23
thinking  23:17
Thompson  4:4
thought  11:18 12:8 23:8,12 24:4 26:5
time  5:4,24 6:1,10,14,17 7:12,18 10:3 11:15,25 12:12,16,24 13:23 15:16 16:7,17 17:6,10 18:9,25 19:5,8,14,18 20:4,9,12,25 21:4 23:20 24:11,13 25:23 27:2 28:13 29:12,15,17 31:7,11 32:25 33:17,23,25 34:17,22,25 35:17 36:2,5,11,20 37:1
timeframe  24:23 25:22 31:18 36:2
timeline  20:16 24:16,22 25:14
times  15:8

John Daly
09/23/2022

9

today 4:22 5:3 16:7 36:21

told 14:25 18:18 21:9

transpired 26:24

trouble 16:16 22:16 35:15

true 12:19

turn 14:6

type 8:9

### U

unable 14:11

understand 16:17 18:3 21:12 22:25

understood 15:5 29:8

unfair 13:18

unfolded 26:20

unreasonable 13:18

### V

vacant 16:21,25 17:3 18:17,20, 23 21:18 26:13 35:2

video 7:7

videoconferencing 4:7

vis-a-vis 26:24

vision 8:1,3,4,12 9:5,13 11:2 22:10 34:9,10 36:8,10,13,15

visual 7:19,21 25:9,10,21 26:1,7 29:6

### W

wait 23:19

wall 28:16

wanted 14:8 22:17,20,21 23:10, 11,19,21

warm 21:25

ways 30:22,24

Williams 33:11,12

wintertime 35:12

wishes 16:8

words 28:20

work 5:19 12:1,25 28:12 31:7 35:3,6,7,16,22

worked 11:14,25 12:17 13:2,7 15:16 29:19 31:10 33:1,9

working 12:14,22 13:13 14:16 19:7 30:3 33:15 37:1

workload 8:22 10:24 17:18 19:18

works 30:8

writing 28:19

### Y

year 10:9 17:7,9 24:20 27:17

years 5:19,22 6:2,3 7:3 8:18 10:3 11:11 17:15 18:19,22 20:10,22 21:5,13 29:13,14 31:6

### Z

Zoom 9:18