BRANCH, ANTHONY
07/21/2020

Pages 1–4

**Page 1**

1           STATE OF MICHIGAN

2     IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

3

4   ANTHONY BRANCH,

5           Plaintiff,

6

7     vs.              Case No. 19-113700-CD

8

9   GENESEE COUNTY ROAD COMMISSION

10  AND MICHIGAN SOCIETY OF ASSOCIATION

11  EXECUTIVES, a domestic non-profit corporation,

12          Defendants.

13  _____

14

15      The Videoconference Deposition of ANTHONY BRANCH

16      Commencing at 10:10 a.m.

17      Tuesday, July 21, 2020

18      Before Renee J. Ogden, CSR-3455, RPR.

19

20

21

22

23

24

25

**Page 2**

1   APPEARANCES:

2

3   CARL R. EDWARDS

4   Edwards & Jennings, P.C.

5   65 Cadillac Square

6   Suite 2710

7   Detroit, Michigan 48226

8   (313) 961-5000

9   Cedwards@edwardsjennings.com

10      Appearing via videoconference on behalf of the

11      Plaintiff.

12

13  ANDREW A. CASCINI

14  Henn Lesperance PLC

15  32 Market Avenue SW

16  Suite 400

17  Grand Rapids, Michigan 49503

18  (616) 551-1611

19  Aac@hennlesperance.com

20      Appearing via videoconference on behalf of the

21      Defendant Genesee CRC.

22

23

24

25

**Page 3**

1   ALEX L. ALEXOPOULOS

2   Starr, Butler, Alexopoulos & Stoner, PLLC

3   20700 Civic Center Drive

4   Suite 290

5   Southfield, Michigan 48706

6   (248) 864-4931

7   Ala@starrbutler.com

8       Appearing via videoconference on behalf of the

9       Defendant MSAE.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1              TABLE OF CONTENTS

2

3   WITNESS                      PAGE

4   ANTHONY BRANCH

5   EXAMINATION                    8

6   BY MR. CASCINI

7   EXAMINATION                  172

8   BY MR. ALEXOPOULOS

9   EXAMINATION                  196

10  BY MR. EDWARDS

11  RE-EXAMINATION               205

12  BY MR. CASCINI

13  RE-EXAMINATION               224

14  BY MR. ALEXOPOULOS

15  RE-EXAMINATION               227

16  BY MR. EDWARDS

17  RE-EXAMINATION               227

18  BY MR. ALEXOPOULOS

19

20

21

22

23

24

25

BRANCH, ANTHONY
07/21/2020                                                                                      Pages 5–8

Page 5

```
 1              INDEX TO EXHIBITS
 2   EXHIBIT                          PAGE
 3   (Exhibits attached to transcript.)
 4   DEPOSITION EXHIBIT 1             28
 5   DEPOSITION EXHIBIT 2             57
 6   DEPOSITION EXHIBIT 3             60
 7   DEPOSITION EXHIBIT 4             64
 8   DEPOSITION EXHIBIT 5             73
 9   DEPOSITION EXHIBIT 6             75
10   DEPOSITION EXHIBIT 7             83
11   DEPOSITION EXHIBIT 8             92
12   DEPOSITION EXHIBIT 9             95
13   DEPOSITION EXHIBIT 10           101
14   DEPOSITION EXHIBIT 11           106
15   DEPOSITION EXHIBIT 12           108
16   DEPOSITION EXHIBIT 13           112
17   DEPOSITION EXHIBIT 14           118
18   DEPOSITION EXHIBIT 15           120
19   DEPOSITION EXHIBIT 16           134
20   DEPOSITION EXHIBIT 17           159
21   DEPOSITION EXHIBIT 18           162
22   DEPOSITION EXHIBIT 19           166
23   DEPOSITION EXHIBIT 20           167
24   DEPOSITION EXHIBIT 21           168
25   DEPOSITION EXHIBIT 22           219
```

Page 6

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1   Tuesday, July 21, 2020
 2   10:10 a.m.
 3
 4              ANTHONY BRANCH,
 5   was thereupon called as a witness herein, and after
 6   having first been duly sworn or affirmed to testify to
 7   the truth, the whole truth and nothing but the truth,
 8   was examined and testified as follows:
 9              COURT REPORTER:  The attorneys
10   participating in this deposition acknowledge that I am
11   not physically present in the deposition room and that
12   I will be reporting this deposition and administering
13   the oath remotely.
14              The parties and their counsel consent to
15   this arrangement and waive any objections to this
16   manner of reporting.
17              Please indicate your agreement by stating
18   your name and your agreement on the record.
19              MR. EDWARDS:  Yes, Carl R. Edwards
20   representing Mr. Anthony Branch, the plaintiff.
21              MR. CASCINI:  Andrew A. Cascini of Henn
22   Lesperance representing Genesee County Road
23   Commission.  We consent so long as if there are any
24   complications that prevent us from effectively
25   conducting this deposition remotely, we would ask that
```

Page 8

```
 1   it can be continued in person if the circumstances
 2   warrant that.
 3              MR. ALEXOPOLOUS:  Alex Alexopolous on
 4   behalf of Michigan Society of Association Executives.
 5   I have no objection, and I would also join Andrew's
 6   caveat that if we have any difficulties that we at
 7   some point complete it in person.
 8              ANTHONY BRANCH,
 9   was thereupon called as a witness herein, and after
10   having first been duly sworn to testify to the truth,
11   the whole truth and nothing but the truth, was
12   examined and testified as follows:
13              EXAMINATION
14   BY MR. CASCINI:
15   Q.   Mr. Branch, my name is Andrew Cascini.  I'm an
16        attorney with a firm called Henn Lesperance.  Henn
17        Lesperance represents the Genesee County Road
18        Commission, your current employer, in this matter.
19              I'd like you to begin, could you please
20        state and spell your full name for the record?
21   A.   Anthony, A-n-t-h-o-n-y, Branch, B-r-a-n-c-h.
22   Q.   And are you aware, Mr. Branch, that you're being
23        deposed in the case of Anthony Branch versus the
24        Genesee County Road Commission, et al.?
25   A.   Yes.
```

BRANCH, ANTHONY
07/21/2020                                                              Pages 9–12

Page 9

| 1 | Q. | Have you ever been deposed before? |
| 2 | A. | Yes. |
| 3 | Q. | I imagine then some of the things I'm about to ask you |
| 4 | | will come across as the standard boilerplate, but |
| 5 | | nevertheless I do need to ask them then and they'll be |
| 6 | | a good refresher and reminder anyway in your |
| 7 | | deposition.  I'm going to be asking you questions and |
| 8 | | you're going to be answering them under oath, do you |
| 9 | | understand this? |
| 10 | A. | Yes. |
| 11 | Q. | There are a few differences between the deposition |
| 12 | | we're taking today and a typical conversation, and I |
| 13 | | want to make sure everyone is aware of that. |
| 14 | | First, we do have a court reporter and |
| 15 | | she's going to be attempting to transcribe this and to |
| 16 | | keep a recording of everything we say.  In normal |
| 17 | | conversations sometimes people talk over each other or |
| 18 | | they interrupt.  Here it's important that we wait for |
| 19 | | everyone to finish talking or to ask questions or to |
| 20 | | give answers before anyone else begins talking.  Do |
| 21 | | you understand this? |
| 22 | A. | Yes. |
| 23 | Q. | Do you understand it's actually especially true, |
| 24 | | considering the remote nature of this deposition |
| 25 | | creates a little bit of lag in delay in between audio, |

Page 10

| 1 | | do you understand it makes it especially important |
| 2 | | that we avoid talking over each other? |
| 3 | A. | Yes. |
| 4 | Q. | Second, since there will be an oral transcription and |
| 5 | | we're not, unless anybody objects to it, going to be |
| 6 | | preserving the video from today's presentation, the |
| 7 | | court reporter can't indicate head nods or gestures |
| 8 | | or, you know, the noises that we usually make for |
| 9 | | assent like uh-huh or uh-uh.  So every answer that you |
| 10 | | provide needs to be verbal, just as you have done so |
| 11 | | far.  Do you understand this? |
| 12 | A. | Yes. |
| 13 | Q. | Third, another way this is unlike a typical |
| 14 | | conversation, your answers today are under oath.  This |
| 15 | | subjects you to possible charges of perjury, if you, |
| 16 | | quote, willfully swear falsely in regard to any matter |
| 17 | | or thing respecting which the oath is authorized or |
| 18 | | required.  Do you understand that that would be a |
| 19 | | felony under Michigan law were you to lie against your |
| 20 | | oath? |
| 21 | A. | Yes. |
| 22 | Q. | Finally, there is one more wrinkle making this |
| 23 | | deposition just a little bit atypical, we've alluded |
| 24 | | to it before.  We're doing this remotely by mutual |
| 25 | | agreement of counsel.  Are you able to hear me and to |

Page 11

| 1 | | see me okay? |
| 2 | A. | Yes. |
| 3 | Q. | Do you understand that you need to tell me if that |
| 4 | | ever changes at any point, if the picture becomes |
| 5 | | garbled or the audio drops out? |
| 6 | A. | Yes. |
| 7 | Q. | Where are you physically located being deposed today? |
| 8 | A. | **Genesee County Road Commission.** |
| 9 | Q. | In the offices of Genesee County Road Commission? |
| 10 | A. | Yes. |
| 11 | Q. | Do you have any documents that are in front of you |
| 12 | | that are, you know, within access of you that you can |
| 13 | | grab and that you intend to look at during this |
| 14 | | deposition? |
| 15 | A. | No. |
| 16 | Q. | Are you alone in the room presently that you're |
| 17 | | located in? |
| 18 | A. | Yes. |
| 19 | Q. | Are you in any way uncomfortable with taking this |
| 20 | | deposition remotely or do you personally object to |
| 21 | | taking this deposition over Zoom? |
| 22 | A. | No. |
| 23 | Q. | Is there any reason, like maybe you're under unusual |
| 24 | | stress, you have a physical or mental condition, under |
| 25 | | the influence of any substances, do any of those |

Page 12

| 1 | | things prevent or limit you from giving truthful |
| 2 | | answers to my questions today? |
| 3 | A. | No. |
| 4 | Q. | One of the things I want to tell you, Mr. Branch, is |
| 5 | | that there's nothing wrong with ever asking me to |
| 6 | | repeat a question or to explain a term if you don't |
| 7 | | understand my question.  Like any lawyer, sometimes my |
| 8 | | questions are far less than perfect.  However, if you |
| 9 | | do answer my question, I'm going to assume that you |
| 10 | | understood it.  Do you understand? |
| 11 | A. | Yes. |
| 12 | Q. | If you need clarification of any question that I ever |
| 13 | | ask you, I want you to look to me for clarification |
| 14 | | and not to anyone else.  Not anyone else in the room |
| 15 | | knows what I'm trying to ask or anyone else in Zoom, I |
| 16 | | guess you could say, knows what I'm trying to ask.  Do |
| 17 | | you understand this? |
| 18 | A. | Yes. |
| 19 | Q. | Sometimes, and this provides a little bit of a |
| 20 | | hypothetical, when I ask a question you will have |
| 21 | | partial knowledge, but you won't be absolutely certain |
| 22 | | and you may not have complete knowledge to answer the |
| 23 | | question.  Give you an example, if I asked you how |
| 24 | | fast you drove home last night, you probably couldn't |
| 25 | | tell me your average miles per hour, but you would |

BRANCH, ANTHONY
07/21/2020

Pages 13—16

Page 13

1 probably be able to indicate whether you were speeding
2 because you were in a hurry or driving particularly
3 slowly because it was dark outside.  If you have a
4 circumstance like that, an answer of I don't know is
5 not appropriate, but giving me an answer that's in the
6 range and telling me, well, I know I was going to
7 faster than normal, I know I was going slower than
8 normal, that would be appropriate.  Do you understand
9 this?
10 **A.   Yes.**
11 Q.   Sometimes I might ask you a question where you're not
12 precisely sure of the answer, but you know you can
13 reference some kind of documents in order to be able
14 to answer that question.  A good example might be you
15 might not remember what date you were hired by the
16 road commission, if I ask you what was the date that
17 you were hired for the job.  You might be able to
18 recall it though, if you saw a hiring form.  I can
19 then -- and if you tell me that, I can then decide
20 whether to show you the form and get an exact response
21 or to not provide you with the form and to get your
22 best guess.  Do you understand that?
23 **A.   Yes.**
24 Q.   Finally, the last thing that I want to ask, I'm
25 entitled to what are considered to be complete answers

Page 14

1 in this deposition, just like in any other.  That
2 means an answer that fully and completely answers my
3 question, so if, for example, if I ask you who Donald
4 Duck's nephews are, if you answer Huey, but don't
5 mention Dewey or Louie, then you wouldn't have
6 properly answered my question.  Do you understand
7 that?
8 **A.   Yes.**
9 Q.   Okay.  I guess the first thing that I want to talk
10 about today, I want to ask you some questions about
11 your background.  We're moving away from the preamble,
12 the boring stuff.  We're actually getting into the
13 substance of the some of stuff we're talking about.
14 Mr. Branch, where were you born?
15 **A.   Flint, Michigan.**
16 Q.   Are you a lifelong resident of Genesee County?
17 **A.   Yes.**
18 Q.   Do you have family, Mr. Branch?
19 **A.   Yes.**
20 Q.   Are you married?
21 **A.   Yes.**
22 Q.   What's your wife's name?
23 **A.   Tawana Branch.**
24 Q.   Do you have children, Mr. Branch?
25 **A.   Yes.**

Page 15

1 Q.   How many?
2 **A.   Four.**
3 Q.   And their first names, please?
4 **A.   Quinton, Jermonde, Rahmel, and Keosha.**
5 Q.   Did you say Rahmel for the third one?
6 **A.   Yes.**
7 Q.   Any connection to Rahmel Robinson?
8 **A.   No.**
9 Q.   Just thought I would give it a shot.
10 I'd like to ask you a couple questions
11 about your educational background.  You said that your
12 a lifelong resident of Flint or Genesee County.  Where
13 did you go to high school, sir?
14 **A.   Beecher High School.**
15 Q.   And when you were at Flint Beecher, were you -- did
16 you participate in any sort of vocational training,
17 did you have any internships, externships, anything
18 you did outside of the classroom?
19 **A.   I had jobs.**
20 Q.   We'll talk about your employment history in just a
21 minute.  Let's kind of sidetrack that.
22 Other than jobs, did you ever have
23 internships or anything while you were in high school?
24 **A.   No.**
25 Q.   Would you say it was a normal and ordinary high school

Page 16

1 education, nothing exceptional about the particular
2 curriculum at school you attended?
3 **A.   Yes.**
4 Q.   After you graduated from high school, did you continue
5 you're education at that point?
6 **A.   Yes.**
7 Q.   How did you do that?
8 **A.   Continued my education at Bauder College.**
9 Q.   Can you say that one more time?  I'm sorry.
10 **A.   Bauder College.  B-a-u --**
11 Q.   How do you spell Bauder?
12 **A.   B-a-u-d-e-r.**
13 Q.   Where is Bauder College, sir?
14 **A.   Fort Lauderdale, Florida.**
15 Q.   What did you study when you were at Bauder College?
16 **A.   Radio and television broadcasting.**
17 Q.   What made you decide to study that field?
18 **A.   Wanted to be a sportscaster.**
19 Q.   You certainly have the voice for it, sir.
20 Did you graduate from Bauder College?
21 **A.   Yes.**
22 Q.   What kind of degree did you obtain from Bauder
23 College?
24 **A.   Diploma.**
25 Q.   Was it a four-years bachelor's, was it an associate,

BRANCH, ANTHONY
07/21/2020                                                                    Pages 17–20

Page 17

1 two-year associate's, what kind of degree did you earn
2 at Bauder College?
3 A. It's a diploma.
4 Q. How many years did you attend Bauder College?
5 A. One.
6 Q. Do you know whether or not you were given a title like
7 bachelor of arts, associate of arts, anything like
8 that from Bauder College?
9 A. I was not.
10 Q. Did you ever have any sort of internships or
11 externships of any kind while you were at Bauder
12 College?
13 A. No.
14 Q. Did you have any out of the classroom experience
15 related to your coursework in radio and TV
16 broadcasting?
17 A. No.
18 Q. After you received your diploma from Bauder College,
19 did you follow with your education any further, did
20 you ever get any subsequent degrees or receive any
21 additional schooling?
22 A. No.
23 Q. Next thing that I want to talk about a little bit is
24 moving to other forms of vocational training.  You
25 have already very helpfully told me you didn't have

Page 18

1 any internships or externships while you were in
2 college.  You didn't have any while you were in
3 high school.  Did you ever undergo any sort of
4 vocational training program or apprenticeship,
5 anything of that nature?
6 A. No.
7 Q. I know in some fields there are sort of mini degrees
8 or courses or certifications you can obtain if you get
9 a certain kind of professionally related training.  Do
10 you have any sort of certificates related to your
11 training -- related to any sort of supplemental course
12 of training?
13 A. Could you ask that question again?  I'm not sure if
14 you're referring to while I'm on the job or are you
15 talking --
16 Q. Good clarification.  At any time have you ever
17 attended any sort of seminar or course or something
18 short of receiving a degree where you were presented
19 with a certification or certificate that you can place
20 on your professional resume?
21 A. Yes.
22 Q. Can you describe that more fully for me?
23 A. There are many that I can remember, I am FEMA
24 certified for disaster training.  Michigan State
25 Police certified for -- in the same field, disaster

Page 19

1 training.  Certified through Michigan State University
2 for commercial driving training.  I have a plethora of
3 trainings and certifications, and I just -- I can't
4 recall them all.
5 Q. Let's break that down just a little bit then.  The
6 first one you mentioned was FEMA certification.  Tell
7 me a little bit more about what you needed to study or
8 learn in order to obtain that certification.
9 A. Had to attend classes and be trained by FEMA federal
10 trainers in order to be certified as to what this
11 agency's role is during a national disaster, local
12 disaster, any type of outside-of-the-normal disaster
13 thing that would happen in this area.
14 Q. When did you receive your FEMA certification?
15 A. I'm not sure when I received the first one.  I have
16 about seven.  They accumulated over years.
17 Q. Did you obtain any of them while you were an employee
18 for the road commission?
19 A. All of them.
20 Q. Did you obtain the certifications to assist you in
21 some way with performing your job or one of your jobs
22 at the road commission?
23 A. Yes.
24 Q. You said that you had to attend classes to obtain the
25 certification, where did you attend the classes?

Page 20

1 A. Genesee County administration building.
2 Q. And who taught them?
3 A. FEMA certified trainers.
4 Q. Those are guys, are they employees of the federal
5 government, are they somebody else who has taken a
6 class, do you know?
7 A. Employees.
8 Q. And you mentioned that the training had to do with
9 learning the agency's role in disaster relief.  Can
10 you tell me a bit about why that was that useful and
11 aided you in your job at the Genesee County Road
12 Commission?
13 A. At different times things happened out of the ordinary
14 that would be considered disastrous and there are
15 special guidelines that have to be followed and
16 procedures that have to be done and records that have
17 to be kept in order to receive funding from the
18 federal government to reimburse for whatever type of
19 repairs or duties that you have done during that
20 course of time.
21 Q. When you say repairs or duties, does that relate
22 primarily to the roads inasmuch as you needed to
23 attend the FEMA training?
24 A. It could, but you could be called to do things outside
25 of roads depending on what the emergency manager deems

BRANCH, ANTHONY
07/21/2020

Pages 21–24

Page 21

| | | |
|---|---|---|
| 1 | | necessary to be done at that time. |
| 2 | Q. | Have you ever had to use that training in the |
| 3 | | performance of your job? |
| 4 | A. | Yes. |
| 5 | Q. | Can you give me an example of a time when you did? |
| 6 | A. | We've had extensive rains and flooding which washed |
| 7 | | out roads, caused flooding in different areas. We |
| 8 | | have had tornadoes that have come through different |
| 9 | | areas of the county, just to name a few. We have had |
| 10 | | our fair share of disaster moments in Genesee County. |
| 11 | Q. | Just for the record, FEMA stands for Federal Emergency |
| 12 | | Management Agency? |
| 13 | A. | Yes. |
| 14 | Q. | So we're talking about natural disasters and how they |
| 15 | | may impact road commission operations? |
| 16 | A. | Yes. |
| 17 | Q. | The next certification that you discussed was MSP |
| 18 | | certification, can you tell me more about that? |
| 19 | A. | They would be along the same lines, but it could be |
| 20 | | more involved with police. A few years ago we had the |
| 21 | | president come through our county and there are |
| 22 | | certain things that we needed to do in order to insure |
| 23 | | the security of that. |
| 24 | Q. | And when did you receive that certification? |
| 25 | A. | I'm not sure of the year. |

Page 22

| | | |
|---|---|---|
| 1 | Q. | Can you give me a range, was it in the last five |
| 2 | | years, in the last ten? |
| 3 | A. | I would guess 15 years ago. |
| 4 | Q. | Did you need to take any sort of classes or attend any |
| 5 | | sort of lectures in order to obtain that |
| 6 | | certification? |
| 7 | A. | Yes. |
| 8 | Q. | Who taught those classes? |
| 9 | A. | Michigan State Police trainers. |
| 10 | Q. | Employees of the Michigan State Police? |
| 11 | A. | Yes. |
| 12 | Q. | Where physically did you receive that kind of |
| 13 | | training? |
| 14 | A. | The Lansing, Michigan State Police training facility. |
| 15 | Q. | And did you receive that certification in connection |
| 16 | | with your job? Was it useful in aiding your job at |
| 17 | | the Genesee County Road Commission? |
| 18 | A. | Yes. |
| 19 | Q. | The final one that I believe that you mentioned was |
| 20 | | that you received a certificate from Michigan State |
| 21 | | University for your CDL, your commercial driver's |
| 22 | | license. Is that just the normal and ordinary process |
| 23 | | of obtaining a CDL, not to diminish it, but is that |
| 24 | | just obtaining your commercial driver's licenses or |
| 25 | | was there more to that certification? |

Page 23

| | | |
|---|---|---|
| 1 | A. | There was more to it. |
| 2 | Q. | Can you tell me about that? |
| 3 | A. | There was a time when you didn't have to have a |
| 4 | | commercial driver's license in order to operate |
| 5 | | vehicles over 26,000 pounds. When the government |
| 6 | | started -- decided to change that, you had |
| 7 | | municipalities that were fully employed such as |
| 8 | | Genesee County Road Commission that had employees that |
| 9 | | did not have commercial driver's license that needed |
| 10 | | to be able to obtain the commercial driver's license. |
| 11 | | You would also have employees that you would be hiring |
| 12 | | in the future that would have to have a commercial |
| 13 | | driver's license or be trained in order to go and |
| 14 | | obtain it. That's what this certification was for. |
| 15 | Q. | Approximately when did you receive that certification? |
| 16 | A. | A range is fine again. |
| 17 | A. | Maybe like 1988, '89, something in that area. |
| 18 | Q. | Did you obtain it while you were an employee of the |
| 19 | | road commission? |
| 20 | A. | Yes. |
| 21 | Q. | Was obtaining it a prerequisite to get a job with the |
| 22 | | road commission, we'll talk more about the individual |
| 23 | | jobs you have held with the road commission later. Is |
| 24 | | that why you obtained it? |
| 25 | A. | No. |

Page 24

| | | |
|---|---|---|
| 1 | Q. | I feel I know the answer to this one, but the CDL |
| 2 | | certification you obtained, that's useful and you do |
| 3 | | use it in the furtherance of your job with Genesee |
| 4 | | Country Road Commission, right? |
| 5 | A. | Yes. |
| 6 | Q. | Do you have any other kind of training, be it formal |
| 7 | | through schooling or a certification that we may not |
| 8 | | previously have discussed or any sort of internship or |
| 9 | | externship experience that we haven't already talked |
| 10 | | about? |
| 11 | A. | I have a lot of certifications in different areas for |
| 12 | | Genesee County Road Commission, and I just can't |
| 13 | | remember all of them. |
| 14 | Q. | That's fair. Do any of the certifications that you |
| 15 | | hold relate to civil road engineering? |
| 16 | A. | No. |
| 17 | Q. | The next thing I would like to talk to you about is |
| 18 | | your employment history. I know that you have been an |
| 19 | | employee of the Genesee County Road Commission for a |
| 20 | | long time. Starting kind of back, we'll say at the |
| 21 | | time you graduated high school, can you tell me about, |
| 22 | | just sort of in chronology, jobs you may have held |
| 23 | | prior to your employment with Genesee County Road |
| 24 | | Commission? |
| 25 | A. | One job I held prior to working at Genesee County Road |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020                                                                                        Pages 25–28

Page 25

1   Commission after I graduated from high school was a
2   manufacturing job at Game Traker Industries.
3   Q.   Can you spell that for me?
4   A.   Game, G-a-m-e, Traker, T-r-a-k-e-r.
5   Q.   Okay.  Industries.  Got it.  Manufacturing job, you
6        said?
7   A.   Yes.
8   Q.   Were you a machine operator, did you work on an
9        assembly line, something along that line?
10  A.   Yes.
11  Q.   Approximately how long were you in that position?
12  A.   Approximately six months.
13  Q.   Can you remember when you worked for Game Traker
14       Industries, approximately?
15  A.   1988.
16  Q.   Did you have any other jobs between your graduation
17       from high school and beginning to work for the
18       Genesee County Road Commission?
19  A.   No.
20  Q.   Now I want to talk a little bit about your employment
21       history, in particular, with the road commission.  Do
22       you happen to remember the year in which you were
23       first hired into any position within the road
24       commission?
25  A.   1988.

Page 26

1   Q.   Do you remember why you initially applied for a job
2        with the road commission?
3   A.   Paid better than the job I was doing.
4   Q.   Good reason.  Did you know anybody who worked at the
5        road commission?
6   A.   No.
7   Q.   Do you recall how you found out about the job posting?
8   A.   Newspaper article.
9   Q.   That is back in the day.  I remember those.  What
10       position, if you recall, were you hired into when you
11       first became an employee with the road commission?
12  A.   Equipment operator.
13  Q.   Do you remember who interviewed you to become an
14       equipment operator?
15  A.   The HR director.
16  Q.   Do you remember who the HR director was at that time?
17  A.   Sylvia Taylor.
18  Q.   Did you have to interview with anybody else?
19  A.   It was HR staff, but the HR director did the
20       interview.
21  Q.   Now, tell me about your job as an equipment operator.
22       I guess I should ask this question first.  Did the
23       equipment operator position fall within the
24       maintenance department even back then?
25  A.   Yes.

Page 27

1   Q.   Tell me a little bit about what you needed to do, what
2        your job duties were as an equipment operator.
3   A.   Do whatever maintenance is needed on the roads, as far
4        as snow removal, grading, asphalt repair, concrete
5        repair, guardrail repair, right of way, mowing, gravel
6        road repair, just to name some of them.
7   Q.   Sure.  When we say equipment operator, the equipment
8        refers to trucks, mowers, things of that nature?
9   A.   Any equipment needed to accomplish the task.
10  Q.   Fair enough.  Do you remember, by any chance, what you
11       initially made as a starting wage when you first
12       started working for the road commission as an
13       equipment operator?
14  A.   Not exactly, no.
15  Q.   And that is definitely not a fault.  That is a long,
16       long time ago.  I understand.
17            What I'm going to do next is, we're going
18       to give this a shot now.  I'm going to have you look
19       at a particular document.  Let's take a look here.  I
20       will mark the document, if you will bear with me, as
21       Exhibit 1.  I'm going to share the document with
22       counsel through the Zoom application.  Isn't
23       technology grand?  Now I'm going to open a copy of
24       Exhibit 1 for you to take a look at, Mr. Branch.
25       We're going to kind of work our way through here.

Page 28

1              MARKED FOR IDENTIFICATION:
2              DEPOSITION EXHIBIT 1
3              10:37 a.m.
4   BY MR. CASCINI:
5   Q.   Please tell me if you have any trouble viewing this.
6        I know this is an awkward setup.
7              Mr. Branch, are you able to see a document
8        on the screen currently?
9   A.   Yes.
10  Q.   Do you recognize this document?
11  A.   Yes.
12  Q.   What is this document?  Can you describe to me what
13       we're looking at here?
14  A.   This is a personnel action notice.
15  Q.   It says that at the top of the page?
16  A.   Yes.
17  Q.   Is this a document that was given to you by your
18       employer, the Genesee County Road Commission?
19  A.   A copy, yes.
20  Q.   Sure.  When typically -- you can see that there are 36
21       pages.  I'm going to show you, page 2 is also a
22       personnel action notice, page 3, page 4, page 5, I
23       will talk through some of the specific pages, but, you
24       know, when are personnel action notices created and
25       shared with you by Genesee County Road Commission,

BRANCH, ANTHONY
07/21/2020

Page 29

1    under what circumstances?

2  A.  **When you look at the purpose area, all of those would**
3      **be purposes for a personnel action notice.**

4  Q.  Just for the sake of the record, we're looking at
5      documents that have been Bates stamped Defendant GCRC
6      production number one, in parens, and then it begins
7      004153 and it ends, just for the sake of us all being
8      on the same page, 004259.

9         Mr. Branch, you said that the purpose
10     fields indicate the reasons why you might get a
11     personnel action notice, so this is something that
12     they are going to give to you when you're hired in
13     new, when you receive a pay change, not that you ever
14     have been, but presumably if you were to get
15     terminated, you would get one of these?

16 A.  **Correct.**

17 Q.  Now, I'm going to take us to the very last page of
18     this document.  So we're going to be taking a look at
19     page 36, that is Bates number 004259, so we can all
20     follow along.  This is a personnel action notice that
21     relates to your equipment operator position, and this
22     is actually the earliest one that I have in my file
23     here.  Can you tell me why this personnel action
24     notice was given to you just based on what you're
25     seeing in front of this document?

Page 30

1  A.  **Pay or job classification change.**

2  Q.  Okay.  So it's looking like section C shows the job
3      that you had and the pay rate you had and then the one
4      over on the right from section C shows the job that
5      you are moving into or the pay rate you're moving
6      into; is that right?

7  A.  **Correct.**

8  Q.  So section C, all the way over on the left shows that
9      you were an equipment operator 1 in the maintenance
10     department.  That's the position that we were talking
11     about before that you have hired into with the road
12     commission, correct?

13 A.  **Correct.**

14 Q.  It showed $15 an hour as the initial starting rate.
15     Does that match your recollection of what your
16     starting pay may have been?

17 A.  **There about, yes.**

18 Q.  And for the purposes of example to demonstrate how
19     these forms work, this document is showing that you
20     started out at $15 an hour, it says in section E of
21     the three-month increase.  Then there's a new rate of
22     $15.36, there is a .36 cent wage increase, right?

23 A.  **Correct.**

24 Q.  That's consistent with one of the reasons you might
25     expect to get one of these forms, correct?

Page 31

1  A.  **Correct.**

2  Q.  Next, I'd like to ask you about the progression that
3      you made in working with the road commission, because
4      obviously you have been an employee for quite some
5      time.  You hired in 1988, you said.  Were you ever
6      promoted by the road commission?

7  A.  **Yes.**

8  Q.  Do you recall in sequence what the next position that
9      you held with the road commission was?

10 A.  **Foreman.**

11 Q.  I believe that's right.  If you want to take a look
12     at -- I am moving to -- let's see here.  I will get
13     the page number for everyone so we can take a look at
14     it.  I'm looking at Bates page number 004245.  For
15     counsel, that's page 29 of 36.

16        Mr. Branch, have you seen this particular
17     personnel action notice before?

18 A.  **Yes.**

19 Q.  This shows in section C that you're moving from
20     equipment operator 1 position to a temporary foreman
21     position, correct?

22 A.  **Correct.**

23 Q.  Is that the first promotion that you just referred to
24     in your previous answer?

25 A.  **No.**

Page 32

1  Q.  So was this an interceding promotion, so between being
2      promoted to a full-time foreman it looks like you
3      served for a period of time as a temporary foreman,
4      does that match your recollection?

5  A.  **Yes, this was during a training.**

6  Q.  During a training.  Can you explain more about why you
7      were provided a temporary promotion during a training?

8  A.  **I was selected to be the first candidate to go through**
9      **the Genesee County Road Commission foreman training**
10     **program.**

11 Q.  And tell me more about the foreman training program.

12 A.  **Genesee County Road Commission felt the need to give**
13     **training to individuals who felt that they wanted to**
14     **move up in the road commission ranks as a foreman.**
15     **This was a prerequisite type training to give you an**
16     **overview of the whole organization and how it**
17     **operates.**

18 Q.  This pay increase and the change in the designation,
19     what you're telling me is that particular change, the
20     one that is indicated in the personnel action notice
21     form that is presently on the screen, that was merely
22     provided to you sort of as a -- in connection with you
23     receiving your training?

24 A.  **Yes.**

25 Q.  It did come with a pay increase however, correct?

BRANCH, ANTHONY
07/21/2020

Pages 33–36

Page 33

1  A.  Yes.
2  Q.  And do you remember how long the foreman training
3      program lasted?
4  A.  I don't.
5  Q.  Do you remember whether or not you were brought back
6      to your equipment operator 1 position after the
7      training had concluded?
8  A.  Yes.
9  Q.  Was there -- was the expectation that you held when
10     you entered into the foreman training program that
11     when you left it, you would become a foreman?
12  A.  No.
13  Q.  What happened at the conclusion of the foreman
14     training program, are you provided a certificate, is
15     there some sort of completion badge you earn, what
16     happens after you get done with it?
17  A.  You receive a certificate of completion.
18  Q.  And that doesn't entitle you to a foreman job, it
19     makes you eligible for a foreman job, do I understand
20     you correctly?
21  A.  No, it doesn't.
22  Q.  How is that understanding incomplete, why does that,
23     the obtaining of foreman certificate not provide the
24     prerequisites to get a foreman job?
25  A.  It doesn't ensure that you would get a foreman's job.

Page 34

1  Q.  I understand.  Perhaps I phrased my question
2     incorrectly.  It's a necessary condition for you to
3     get a foreman job, but not a sufficient condition.
4     It's not all you need, but it's something that you do
5     need; is that right?
6  A.  No.
7  Q.  It is possible to become a foreman without having gone
8     through this training?
9  A.  Yes.
10  Q.  Okay.  I'm going to be moving now to -- let's see,
11     that's the temporary foreman.  We're going to be
12     moving down a page here and then this looks like we're
13     taking a look, Counsel, at Bates number 004243, page
14     number 28 on this particular document.
15          Mr. Branch, does this particular personnel
16     action notice form, does this show you went for your
17     temporary foreman position back to the equipment
18     operator position?
19  A.  Yes.
20  Q.  Mr. Branch, were you eventually -- did you -- were you
21     eventually promoted into a foreman position?
22  A.  Yes.
23  Q.  Do you know approximately when that happened?
24  A.  1995.
25  Q.  1995.  Why did you want to be promoted to the job of

Page 35

1     foreman?
2  A.  I felt that I possessed leadership capabilities to do
3     the job.
4  Q.  Was that foreman position that you were hired into in
5     1995 within the maintenance department?
6  A.  Yes.
7  Q.  We are going to take a look here.  So I'm showing the
8     plaintiff, Counsel, Bates number 004240 which is page
9     number 27 in the document that I had marked Exhibit 1.
10          Mr. Branch, does this personnel action
11     notice depict your move from, or I should say
12     memorialize your move from the equipment operator
13     position to the foreman position?
14  A.  Yes.
15  Q.  It comes with a pay increase, right?
16  A.  Yes.
17  Q.  It says in section C, on the right, it says
18     Swartz Creek foreman.  What is Swartz Creek?
19  A.  It is a district garage.  We have six district
20     garages.
21  Q.  When you say that it is a district garage, is it a
22     garage, physical location, like garage where equipment
23     is parked?
24  A.  Where equipment is parked, where material is kept,
25     where operators punch in, punch out.

Page 36

1  Q.  And you said that the Genesee County Road Commission
2     had, or maintained at least, at that time six garages.
3     Does that mean that there were six garage foremen?
4  A.  Yes.
5  Q.  So you were one of the six?
6  A.  Yes.
7  Q.  Okay.  Now, were you the foreman of any other garage
8     or facility during your time at the Genesee County
9     Road Commission?
10  A.  Yes.
11  Q.  What other facility did you become the foreman at?
12  A.  The Flint garage, trunk line maintenance.
13  Q.  Trunk line maintenance, is that -- I see the
14     abbreviation TLM on some of these documents, is that
15     referred to trunk line maintenance?
16  A.  Yes.
17  Q.  It looks like -- I'm taking a look, Counsel, at
18     document Bates number 004220, it is page number 24 of
19     36 and what I have marked as Exhibit 1.
20          Mr. Branch, does this personnel action
21     notice reflect your move to the TLM?
22  A.  Yes.
23  Q.  It says here that your job title changes from foreman
24     to lead foreman for TLM.  Are those two different
25     positions?

BRANCH, ANTHONY
07/21/2020

Page 37

1  A.  Yes.
2  Q.  First, I'd like you to tell me what are the job duties
3      of a foreman, what were you doing when you were the
4      foreman at Swartz Creek?
5  A.  **I had three townships that I was responsible for and**
6      **two state roads that I was responsible for, all**
7      **maintenance, road right of way work to be done in**
8      **those areas.**
9  Q.  Were you expected as the foreman to do and maintain
10     those roads personally, or was that something that you
11     supervised employees in the furtherance of?
12 A.  **Yes.  Supervised employees.**
13 Q.  Approximately how many employees did you supervise
14     when you were the foreman at Swartz Creek?
15 A.  **12.**
16 Q.  After you moved to trunk line maintenance, TLM, how
17     did your job change, what is the difference between a
18     foreman and a lead foreman, in other words?
19 A.  **Lead foreman directs all district foremen, as well as**
20     **supervises trunk line maintenance equipment operators.**
21 Q.  So when you say he directs all district foremen, you
22     referred previously to there being six garages, each
23     with a foreman.  Are you essentially the foreman of
24     all six of those foremen; is that what you're saying?
25 A.  **Yes.**

Page 38

1  Q.  And then you also said that you're responsible for
2      conducting trunk line maintenance.  Tell me what that
3      means.
4  A.  **We have a contract with Michigan Department of**
5      **Transportation in which our trunk line maintenance**
6      **crew does all of the road right of way maintenance for**
7      **the state trunk line roads that run through**
8      **Genesee County.**
9  Q.  You'll have to forgive me, Mr. Branch.  Can we
10     actually back up?  What is a trunk line road?
11 A.  **Trunk line roads are all of your state roads, your**
12     **expressways, your M route roads.  Those are your state**
13     **roads, your trunk line roads.**
14 Q.  Okay.  You said you maintain those through some sort
15     of contract with the State of Michigan?
16 A.  **Yes.**
17 Q.  Okay.  When you say you're responsible for doing
18     maintenance on them, what specifically does that mean?
19     Can you give me some examples of some things that you
20     might do, or I should say that your crew might do?
21 A.  **Concrete repair, asphalt repair, right of way mowing,**
22     **drainage repair, ditching, culvert replacement, just**
23     **all maintenance activities.**
24 Q.  Sure.  When we say maintenance, forgive me if this is
25     a dumb question, I am a lawyer, I am not a road guy.

Page 39

1      When we say maintenance activities, you are talking
2      about maintenance activities to maintain those trunk
3      lines, the actual roads themselves and the surrounding
4      right of way?
5  A.  **Correct.**
6  Q.  When you were the lead foreman at Swartz Creek and
7      when you were the lead foreman with TLM, were you
8      personally responsible for going out and performing
9      this maintenance or were you leading other employees
10     to do so?
11 A.  **I was personally the one who assigned the work to the**
12     **employees to go do.**
13 Q.  Were you ever required to actually get out and drive
14     to a site and do actual on-site work any longer or was
15     that a product of the past only in the production --
16     in the equipment operator job?
17 A.  **Only in training situations.**
18 Q.  Were you responsible for training employees in your
19     lead -- in your lead foreman position?
20 A.  **Yes.**
21 Q.  Were you responsible for training employees in your
22     foreman position prior to that at Swartz Creek?
23 A.  **Yes.**
24 Q.  What kind of authority, if any, did you have in your
25     lead foreman position to hire or to fire employees or

Page 40

1      to provide them with discipline?
2  A.  **I could discipline up to time off, oral, written.**
3  Q.  Up to suspension then, you could suspend an employee?
4  A.  **I could not.**
5  Q.  Up to.  I understand.  My mistake.
6          If you had an employee who engaged in
7      behavior after you had provided them with write-ups
8      that would necessitate further discipline, what did
9      you need to do to effectuate that?
10 A.  **Contact the maintenance director and the HR director.**
11 Q.  So in your position as lead foreman, who was your
12     direct supervisor?
13 A.  **Rocky Chapman.**
14 Q.  What position did Mr. Chapman hold?
15 A.  **Maintenance director.**
16 Q.  I just want to make sure that I'm understanding kind
17     of the organizational structure perfectly.  When you
18     were a foreman at Swartz Creek, and I'm sorry to have
19     to jump around here.  When you were a foreman at
20     Swartz Creek, would your direct supervisor at that
21     time be lead foreman then?
22 A.  **No.**
23 Q.  Who was your direct supervisor when you were the
24     foreman at Swartz Creek?
25 A.  **The maintenance director.**

BRANCH, ANTHONY
07/21/2020

Pages 41–44

Page 41

1  Q.  I see.  How long did you maintain your position as
2      lead foreman at the trunk line maintenance garage?
3  A.  I'm not sure.  Maybe two years, I'm not sure.
4  Q.  Okay.  What position were you transferred into next
5      after being the lead foreman at TLM?
6  A.  Bridge crew supervisor.
7  Q.  Okay.  And let's take a look here.  Still the -- these
8      are -- we're going through the personnel action
9      notices.  We're seeing some pay increases.  I'm taking
10     a look, Counsel, at a document marked Bates number
11     004217, that is page number 21 of the document that I
12     have marked as Exhibit 1.
13         Does this personnel action notice,
14     Mr. Branch, reflect the move from lead foreman to
15     foreman in the bridge group?
16 A.  Yes.
17 Q.  And it also appears to me, sir, there is a slight
18     decrease in your hourly pay that's reflected here.  It
19     looks like you're going from $23.88 an hour to $23.55
20     if we round an hour; is that correct?
21 A.  Correct.
22 Q.  What were the circumstances that lead the road
23     commission to move you from lead foreman position to
24     the bridge crew foreman position?
25 A.  A dispute with the managing director -- with the

Page 42

1      maintenance director.
2  Q.  Tell me more about that dispute, how did that begin?
3  A.  The maintenance director asked me to do something that
4      I felt was unethical.  When I declined, he moved me to
5      this position.
6  Q.  Do you recall what it was that the maintenance
7      director asked you to do that you felt was unethical?
8  A.  Yes.
9  Q.  What was that thing?
10 A.  To lie on an employee.
11 Q.  When you say lie on an employee, tell me more about
12     what you mean by that.
13 A.  The maintenance director wanted me to say some things
14     that an employee did that was not true.
15 Q.  You said you refused to do that upon the request from
16     the maintenance director?
17 A.  Correct.
18 Q.  And then you were moved to bridge crew foreman as a
19     result?
20 A.  Correct.
21 Q.  Were you represented by a labor organization when you
22     were that lead foreman?
23 A.  Yes.
24 Q.  What was that labor organization?
25 A.  The Supervisors' Association of Genesee County Road

Page 43

1      Commission.
2  Q.  Were you represented by that same labor organization
3      when you were the foreman at Swartz Creek?
4  A.  Yes.
5  Q.  What about when you were an equipment operator, I
6      presume not in the supervisors' union, though?
7  A.  I was not.
8  Q.  What union represented you at that time?  I should
9      have asked that question earlier, but we'll backtrack
10     here.
11 A.  Service Employees International Union.
12 Q.  Okay.  Is it safe to say that the move from the lead
13     foreman position to the bridge crew foreman position
14     was a demotion?
15 A.  Yes.
16 Q.  Did you, either through your union or through the road
17     commission, attempt to protest or object to your
18     demotion?
19 A.  Yes.
20 Q.  Who did you file any sort of protest with?
21 A.  With the Genesee County Road Commission.
22 Q.  Under what process, did that entail filing a
23     complaint?  How did you file a protest with them?
24 A.  Grievance.
25 Q.  You filed that grievance pursuant to a collective

Page 44

1      bargaining agreement?
2  A.  Correct.
3  Q.  Did your union represent and support you in
4      furtherance of that grievance?
5  A.  Yes.
6  Q.  Tell me more about the grievance process that resulted
7      from grieving your demotion.  What was the result of
8      that?  How did that process unfold?
9  A.  I was given all of the back pay that I had missed.  My
10     hourly wage was returned to what it was as the lead
11     foreman, and my duties were returned as they were as
12     the lead foreman.
13 Q.  So you were fully reinstated to your position as lead
14     foreman?
15 A.  A new position was created, but for all intents and
16     purposes, yes.
17 Q.  Did you reach that resolution by and through your
18     union as a result of an arbitration award, a lawsuit,
19     a grievance settlement, how did the road commission
20     and the union come to obtain that outcome for you?
21 A.  Grievance settlement.
22 Q.  Was the creation of that new position a product of
23     that grievance settlement?
24 A.  Yes.
25 Q.  I'm going to show you this particular personnel action

BRANCH, ANTHONY
07/21/2020

Page 45

1   notice form 00426, document page number 20, on the
2   document I have marked Exhibit 1.
3           Mr. Branch, can you see this document?
4   A.  Yes.
5   Q.  And this reflects reinstatement to the lead foreman
6   position, it looks like; is that right?
7   A.  Yes.
8   Q.  It says down in section E, TLM, retroactive 7/30/00.
9   That's giving you retro pay for the period of time?
10  A.  Yes.
11  Q.  I remember that you said that you had been provided a
12  new position.  There was a new position created.  Here
13  it says lead foreman.  Explain to me what was
14  different about this position from the lead foreman
15  position.  What does that form not show us in regard
16  to the new position that was created?
17  A.  It was actually a district lead foreman position.
18  Q.  A district lead foreman.  Explain to me what the
19  distinction was between a district lead foreman and
20  the TLM lead foreman.
21  A.  I agreed to not disrupt the flow of work and the
22  people that were in positions and agreed to accept the
23  duties of the lead foreman, whereas the district
24  supervisors would take direction from me at a district
25  location versus being in the trunk line location.

Page 46

1   Q.  So you were no longer actually in the trunk line
2   facility any longer?
3   A.  Correct.
4   Q.  Was there another employee that was serving sort of in
5   another lead foreman position who was at that
6   facility?
7   A.  Prior to the settlement, yes.
8   Q.  Did that person remain in that position after the
9   settlement was effectuated?
10  A.  Yes.
11  Q.  Is it safe to say you guys were sort of like co-lead
12  foremen during that time?
13  A.  Yes.
14  Q.  Different duties though, you are telling me that you
15  had the supervisory duties, did he maintain trunk line
16  maintenance duties?
17  A.  Correct.
18  Q.  That was the split and that was the product, the way
19  that the GCRC and the union resolved that grievance?
20  A.  Correct.
21  Q.  Understood.  Now, it looks like the -- what
22  facility -- you said you were no longer at the trunk
23  line maintenance facility.  What facility did you
24  serve at after this grievance settlement occurred?
25  A.  Montrose garage.

Page 47

1   Q.  Montrose garage.  We're going to take a look here.  I
2   believe -- yes.  So this is document 004200.  Page 17
3   of 36 on what I have marked as Exhibit 1.
4           Mr. Branch, can you see this document?
5   A.  Yes.
6   Q.  And does this reflect the transfer to the Montrose
7   facility?
8   A.  No, this is just a contractual increase.
9   Q.  Forgive me, okay.  So let's take a look.  That's when
10  we went.  Do you know when you started working at
11  Montrose?
12  A.  No, not right off, no, I don't.
13  Q.  How long did you maintain your position as lead
14  foreman at the Montrose facility?
15  A.  Three or four years.
16  Q.  I'm going to show you a document that is part of the
17  same exhibit, it's page number 16, 004196, for the
18  benefit of counsel.
19          This document, can you see this document,
20  Mr. Branch, I should ask first?
21  A.  Yes.
22  Q.  I want to make sure we stay within the limitations of
23  Zoom here.  It says lead maintenance foreman, and it
24  lists the department at Swartz Creek at this point.
25  This is on November 21, '03.  Does that mean that you

Page 48

1   were no longer the lead foreman at Montrose?
2   A.  Correct.
3   Q.  What was the reason for you moving from Montrose to
4   Swartz Creek?
5   A.  Reorganization, district reorganization.
6   Q.  Tell me more about that.  Did you favor that change,
7   were you opposed to that change?
8   A.  No.  I elected to transfer to that location as that's
9   the location that would have been changed to be the
10  largest district.
11  Q.  So you were the lead foreman at what, after the
12  reorganization, was the largest district of the road
13  commission?
14  A.  Swartz Creek.
15  Q.  Now, this particular document says lead maintenance
16  foreman.  Is there any distinction between lead
17  maintenance foreman and lead foreman, or are they one
18  and the same?  Is it just saying that you are a lead
19  foreman in the maintenance department?
20  A.  That's correct.
21  Q.  Okay.  Now from your lead maintenance position at
22  Swartz Creek, how long did you maintain that position?
23  A.  A year-and-a-half to two years.
24  Q.  My understanding was that there came a time where you
25  were promoted to the temporary maintenance director

BRANCH, ANTHONY
07/21/2020                                                                 Pages 49–52

Page 49

1      position; is that correct?
2   A.  Correct.
3   Q.  I'm showing a document, Bates number 0004193.  It is
4      page 15 out of 36 in Exhibit 1.
5          Mr. Branch, can you see this document on
6      your screen?
7   A.  Yes.
8   Q.  Does this personnel action notice reflect the change
9      from the lead foreman position to temporary
10     maintenance director position?
11  A.  Yes.
12  Q.  Also one of the things that I can see on this
13     document, it looks like the pay increase from $26.41
14     an hour if we round to $35.95 an hour, if we round
15     it's a fairly dramatic pay increase, would you agree?
16  A.  Yes.
17  Q.  What were the circumstances of you becoming the
18     temporary maintenance director at this time?
19  A.  The position was vacated by the previous maintenance
20     director and I would --
21  Q.  The temporary maintenance director at that time, was
22     that still Rocky Chapman?
23  A.  Yes.
24  Q.  So Rocky Chapman leaves, and then how do you become
25     the guy in the position?

Page 50

1   A.  I was asked to take it on a temporary basis.
2   Q.  Who asked you?
3   A.  The managing director.
4   Q.  Who was the managing director at the time?
5   A.  John Daly.
6   Q.  Is that a job or a position that you needed to apply
7      for?
8   A.  For the permanent position, yes.
9   Q.  For the temporary position?
10  A.  No.
11  Q.  Did you attempt to solicit or ask Mr. Daly or express
12     interest to Mr. Daly, I think that would be the most
13     accurate way of putting it, in obtaining that
14     position?
15  A.  I applied for the permanent position opening.
16  Q.  Sure.  With regard, though -- and I'd like to direct
17     you to the time where you became the temporary
18     maintenance director.  You said that John appointed
19     you to that position.  Did he appoint you at your
20     request to that position or did he do it of his own
21     volition completely?
22  A.  Of his own volition.
23  Q.  Were you surprised when you were made the temporary
24     maintenance director?
25  A.  No.

Page 51

1   Q.  Did he tell you beforehand that you were in line to
2      become the guy if and when Mr. Rocky, I apologize --
3      Rocky Chapman left that job?
4   A.  No.
5   Q.  And as the temporary maintenance director, how long
6      did you serve as the temporary maintenance director,
7      do you remember?
8   A.  I don't recall.
9   Q.  The next step along the line, though, is eventually
10     you did become the permanent maintenance director,
11     correct?
12  A.  Yes.
13  Q.  And you mentioned a little bit earlier, you
14     volunteered that you applied for that job.  Tell me
15     about that application process, what do you remember
16     about applying for the job of maintenance director,
17     permanent maintenance director?
18  A.  I filled out a request for a promotion form and
19     submitted a resume for the open position.
20  Q.  After you submitted a resume, what was the next step
21     in the process of becoming a permanent maintenance
22     director?
23  A.  I went through an interview process.
24  Q.  With whom?
25  A.  The managing director, the HR director.  And I don't

Page 52

1      recall who else was involved.  There may have been
2      other directors involved in that, but I don't recall
3      who they were at that time.
4   Q.  Okay.  Managing director you mentioned already was
5      John Daly, right?
6   A.  Correct.
7   Q.  HR director at that time, was that Mr. Kermit Pitts?
8   A.  Yes.
9   Q.  Mr. Branch, do you know who else applied for the job
10     of maintenance director?
11  A.  I don't recall.
12  Q.  Do you recall any names of anyone who applied for the
13     job of maintenance director?
14  A.  I don't recall at that time.  Maybe John Bennett,
15     Harry Nicks, but I'm not for sure who all applied.
16  Q.  Do you have information to know whether there were any
17     other people who interviewed for that job alongside of
18     you, whether or not you know their identity?
19  A.  I do recall there being others interviewing for the
20     position.  I just don't recall who they were for that
21     position.
22  Q.  Perfectly fair.  It is back in 2004.  The result of
23     it, though, was you were eventually hired to be the
24     permanent maintenance director, correct?
25  A.  Correct.

BRANCH, ANTHONY
07/21/2020

Page 53

1  Q.  And let's take a look here.  I am showing Mr. Branch
2      document Bates number 004192, it is page 14 of 36 in
3      the document that I have marked Exhibit 1.
4              Mr. Branch, can you see this?
5  A.  Yes.
6  Q.  Does this particular document reflect your hire into
7      the permanent maintenance director position?
8  A.  Yes.
9  Q.  Now, something that I note on this form, it looks like
10     your pay actually went down by becoming maintenance
11     director; is that correct?
12 A.  Yes.
13 Q.  Why was that?  This was a promotion, wasn't it?
14 A.  **Reorganization and change of duties.**
15 Q.  When you say change of duties, how did your duties
16     change as contrasted with the previous maintenance
17     director, Rocky Chapman?
18 A.  **Under the previous maintenance director through some**
19     **discipline issues, some of his duties were taking**
20     **away -- taken away.  This was a result of that.**
21 Q.  You say some disciplinary issues, you mean with
22     Mr. Chapman?
23 A.  **Yes.**
24 Q.  Why were those particular duties not reinstated to you
25     once you became the maintenance director?

Page 54

1  A.  **Eventually they were.**
2  Q.  But not initially?
3  A.  **Correct.**
4  Q.  What kind of duties were those that initially were not
5      part of the job because of -- because of allegedly
6      what happened with Mr. Chapman?  What are the duties
7      we're talking about here?
8  A.  **Duties of the sign shop area of maintenance being**
9      **under this position.**
10 Q.  Sign shop.  What is the sign shop?
11 A.  **The sign shop maintains, installs all of the signs**
12     **throughout the county, all of the traffic signals**
13     **throughout the county, all of the pavement markings**
14     **throughout the county.**
15 Q.  When you were talking about signs, you're talking
16     about road signs, right?
17 A.  **Correct.**
18 Q.  I'm sure this is an elementary question for you, but
19     again, not a road guy.  I don't know it.  I'm just an
20     attorney.  We are talking about your normal traffic
21     signs, stop signs, one way street signs, that kind of
22     thing?
23 A.  **Correct.**
24 Q.  So responsibility for the sign shop had been stripped
25     from Mr. Chapman, where did supervision of that duty

Page 55

1      go to?  Who received that duty to supervise that area?
2  A.  **The director of traffic engineering.**
3  Q.  Okay.  Now you said director of traffic engineering.
4      One of the things that we will talk about a little bit
5      more in detail later is that there is a director of
6      engineering position currently within the GCRC.  Are
7      those the same position, do they just have a former
8      name or are those two separate positions?
9  A.  **Two separate positions.**
10 Q.  Got it.  Does the director of engineering supervise
11     the director of traffic engineering?
12 A.  **No.**
13 Q.  Now, this is in 2004 when you were hired into the
14     maintenance director's job, right?
15 A.  **Correct.**
16 Q.  And you remained in that position until you became the
17     co-interim managing director for the road commission,
18     right?
19 A.  **Correct.**
20 Q.  So we're going to briefly skim through some pages
21     here.  I say very briefly.  It looks like we're taking
22     a look at document Bates number 004879, page 13.
23              Do you see this document, Mr. Branch?
24 A.  **Yes.**
25 Q.  This just merely indicates a pay raise while

Page 56

1      maintaining in maintenance director position.
2  A.  **Correct.**
3  Q.  It says six month increase in box E?
4  A.  **Correct.**
5  Q.  Okay.  And we're scrolling through toward the front of
6      the document page by page.  Without lingering too long
7      we're just taking a look at a pay change document
8      here; is that right, Mr. Branch?
9  A.  **Correct.**
10 Q.  Page 11 looks like it's the same thing here?
11 A.  **Correct.**
12 Q.  And that goes until we have -- I'm not asking you to
13     comment on any of the ones we just flashed through.
14     I'm not hiding anything here.  Then we have a look at
15     this particular document.  This is -- shows a document
16     from February of 2018, correct?
17 A.  **Correct.**
18 Q.  And does this document demonstrate your appointment to
19     the co-interim managing director position from the
20     director of maintenance position?
21 A.  **Correct.**
22 Q.  I apologize.  I got too bored of saying the number so
23     I didn't do it here.  It's page 3 of the document that
24     I have marked as Exhibit 1.  I am going to just
25     briefly scroll up.  I am going to hope I can call out

BRANCH, ANTHONY
07/21/2020                                                                    Pages 57–60

Page 57

1    that Bates number, 004157, for use of reference.
2             At this point in time it looks like you
3    were making $48.86 per hour in your director of
4    maintenance position, is that right, as of 2018?
5    A.  Correct.
6    Q.  And when you were made the co-interim manager, it
7    looked like you were made -- that you began -- you
8    received a pay raise, right?
9    A.  Correct.
10   Q.  One thing that I'm going to do very briefly here, I'm
11   going to stop sharing this particular document.  I'm
12   going to have you take a look at another document that
13   I'm going to enter in here.  What we're going to do
14   is, we're going to mark this as Exhibit 2.
15             MARKED FOR IDENTIFICATION:
16             DEPOSITION EXHIBIT 2
17             11:25 a.m.
18             MR. CASCINI:  I am now going to share
19   Exhibit 2 with counsel through the chat, Alex and
20   Carl, have you both received Exhibit 2?
21             MR. ALEXOPOULOS:  I received it, but before
22   you share it, I need to open it.  Okay.  I'm all set.
23   BY MR. CASCINI:
24   Q.  Okay, I'm going to move over here and try to share the
25   screen again so please bear with me, Mr. Branch.

Page 58

1    There we go.
2             Mr. Branch, are you able to see a document
3    that says agreement of employment on the top of the
4    screen?
5    A.  Yes.
6    Q.  Now, Mr. Branch, are you familiar with this document?
7    A.  Yes.
8    Q.  It has been, just for ease of reference, it's Bates
9    number 003864.  It's a three-page document.
10             Mr. Branch, is this your employment
11   contract as the maintenance director?
12   A.  Yes.
13   Q.  It says, whereas the Commission wishes to employ
14   Mr. Branch as its director of maintenance, and then
15   there are terms that follow, right?
16   A.  Correct.
17   Q.  And this is providing a compensation.  What was your
18   annual salary pursuant to section 2 in this contract?
19   A.  $101,626.72.
20   Q.  Okay.  Now, were you an at-will employee pursuant to
21   this agreement?
22   A.  Yes.
23   Q.  You were no longer being represented, I presume, by
24   the supervisors' union, or is that incorrect?
25   A.  That is correct.

Page 59

1    Q.  I should have clarified.  You were no longer
2    represented by the supervisors' union, right?
3    A.  That is correct.
4    Q.  I asked you a bad compound question.  My fault.
5             I'm going to take a look, we're going down
6    to the third page of this particular document.  It
7    looks like -- is that your signature on the left
8    there, Mr. Branch?
9    A.  Yes.
10   Q.  And that's the signature of Mr. Daly, who was then the
11   managing director, over on the right?
12   A.  Yes.
13   Q.  And this was executed, it looks like, in February of
14   2017, right?
15   A.  Yes.
16   Q.  And you recognize this document?  I'll show you the
17   second page just so that you can have it -- look at it
18   completely.  You recognize this document as a full and
19   complete copy of your employment agreement that you
20   entered into with the Genesee County Road Commission
21   in February of 2017, right?
22   A.  Yes.
23             MR. CASCINI:  Gentlemen, we're going to
24   look at another document that is here.  I'm going to
25   be labeling this document as Exhibit 3.

Page 60

1             MARKED FOR IDENTIFICATION:
2             DEPOSITION EXHIBIT 3
3             11:29 a.m.
4    BY MR. CASCINI:
5    Q.  I'm going to do the same thing, I'll be sharing it
6    with counsel through the chat feature.
7             MR. CASCINI:  Carl and Alex, can you let me
8    know once you have received it and are able to open
9    it?
10             MR. ALEXOPOLOUS:  I'm all set.
11   BY MR. CASCINI:
12   Q.  I'm going to try to share it with you, Mr. Branch.
13   Can you see a document entitled employment agreement
14   at the top of the screen?
15   A.  Yes.
16   Q.  What is the date indicated on the top of this
17   employment agreement?
18   A.  14th of December, 2017.
19   Q.  For what position does this employment agreement
20   pertain to?  What position within the Genesee County
21   Road Commission?
22   A.  Maintenance director.
23   Q.  So that's the same position that the previous contract
24   we just read off refers to, correct?
25   A.  Correct.

BRANCH, ANTHONY
07/21/2020

Pages 61–64

Page 61

1  Q.  And I should change the Zoom on this so that we can
2      actually take a look at what was in this thing.
3      Three-page document.  Are you still an at-will
4      employee pursuant to this agreement?
5  A.  Yes.
6  Q.  If we go to the last page.  Just for the record,
7      sorry, we're taking a look at Bates number 003860.
8      When we go to the last page of this particular
9      document it looks like that's your signature there
10     along with John Daly's, right?
11 A.  Correct.
12 Q.  Then we had a signing date of 12/15 of 2017, right?
13 A.  Correct.
14 Q.  Mr. Branch, upon what circumstance did you enter into
15     an employment agreement only ten months after the
16     first one that you signed for the same position?  Why
17     did you need to have a new one?
18 A.  There was a revision that was made for all directors.
19     I don't recall what it was at that time.  There was
20     revision and we all agreed to it and we all got new
21     contracts.
22 Q.  You do not recall the circumstance of that particular
23     revision?
24 A.  No.
25 Q.  Okay.  All right.  So what I'm going to do next is

Page 62

1      let's go back and let's talk a little bit more
2      about -- I believe I stopped sharing the screen there.
3             You became the co-interim managing director
4      upon the vacancy of the managing director position,
5      right?
6  A.  Correct.
7  Q.  That would be John Daly, John Daly was separated from
8      his employment with the road commission?
9  A.  Correct.
10 Q.  Do you remember the date upon which Mr. Daly separated
11     from the road commission approximately?
12 A.  2018.
13 Q.  February of 2018, does that help refresh your memory?
14 A.  Thereabouts.
15 Q.  I'm going to take a brief step back.  Did you ever, at
16     any point in time, when you were an employee of the
17     Genesee County Road Commission, did you ever seek or
18     apply for any other jobs external to the
19     Genesee County Road Commission?
20 A.  Yes.
21 Q.  What were the circumstances of the job that you
22     applied to outside of the road commission?
23 A.  I believe it was Washtenaw County road commission
24     maintenance director.
25 Q.  Do you remember when you applied for that job?

Page 63

1  A.  I do not.
2  Q.  Can you tell me approximately?  Was it some time in
3      the last five years?
4  A.  I would say maybe around 2014, 2015.
5  Q.  Okay.  What led you to apply for that particular
6      position?
7  A.  Just looking to advance, more experience.
8  Q.  Was that the only job there you applied for externally
9      for the Genesee County Road Commission?
10        MR. ALEXOPOULOS:  Andrew, when you turn
11     your head like that, we can't hear you.
12        MR. CASCINI:  I'm very sorry about that.
13 BY MR. CASCINI:
14 Q.  Was that the only job that you applied to that was
15     external to the Genesee County Road Commission?
16 A.  Yes.
17 Q.  I apologize for the delay here, gentlemen.  I'm going
18     to be marking a document as Exhibit 4.  And I'm going
19     to be doing the same old thing, I'm going to share
20     with counsel by means of the chat function.
21        MR. CASCINI:  If you guys can let me know
22     when Exhibit 4 has been received.
23        MR. ALEXOPOLOUS:  I'm all set.
24        MR. CASCINI:  Carl, do you have a copy of
25     this?

Page 64

1        MR. EDWARDS:  Okay.
2        MARKED FOR IDENTIFICATION:
3        DEPOSITION EXHIBIT 4
4        11:36 a.m.
5  BY MR. CASCINI:
6  Q.  Mr. Branch, I'm going to share this particular
7      document with you through the shared screen feature.
8      Can you see this document, Mr. Branch?
9  A.  Yes.
10 Q.  Can you identify what it is for us?
11 A.  It is my complaint.
12 Q.  I think actually the caption is the same, so it is a
13     forgivable mistake.  I believe it says that the
14     caption, plaintiff Anthony Branch's answers to
15     defendant Michigan Society of Associate Executives'
16     first set of interrogatories; is that right?
17 A.  That is correct.
18 Q.  Easily mistakable for the complaint.  A simple issue.
19     Have you ever seen this document before?
20 A.  Yes.
21 Q.  Okay.  We're going to scroll down to page 6 of 15 for
22     the document marked Exhibit 4.  Number 10 reads, if
23     you have applied for employment with any person,
24     company and/or other entity since your employment with
25     defendant Genesee County Road Commission commenced,

BRANCH, ANTHONY
07/21/2020                                                                              Pages 65–68

Page 65

1   please identify the name, address and telephone number
2   of each such company where you have applied for
3   employment, dates when such applications for such
4   employment was made, whether the applications for
5   employment resulted in employment, salary or wage
6   which you received, plus any other compensation or
7   earned income which you received from each such
8   employer, benefits received from each such employer,
9   the nature of your responsibilities for each employer,
10  the name of your immediate supervisor while employed,
11  the dates that you were employed by each such employer
12  and the reasons why each employment ended and current
13  sources of all your income.
14              Did I read that correctly, number 10 on
15  this document, Mr. Branch?
16  A.  Yes.
17  Q.  And now I see the answer on the next page, this is the
18  top of page 7, the answer is none indicating, and I'm
19  going to kind of straddle between pages 6 and 7.
20  Indicating that the question was:  Have you ever
21  applied for employment with anybody outside of
22  Genesee County Road Commission and you said none; is
23  that right?
24  A.  Correct.
25  Q.  I'm going to go to the bottom of the page here and

Page 66

1   we're going to the bottom of page number 14, I declare
2   that the above answers are true to the best of my
3   knowledge and belief, and it's signed by you, Anthony
4   Branch.  Is that your signature on the bottom of page
5   14?
6   A.  Yes.
7   Q.  Okay.  So you do acknowledge that there's a conflict
8   between the answer you just gave me about applying for
9   a position at Washtenaw County Road Commission and the
10  answer to the interrogatory that you signed at the
11  bottom here, correct?
12  A.  Would you go back to the question, please?
13  Q.  Certainly.  Did you apply for employment with any
14  person, company, and/or other entity since your
15  employment with defendant, Genesee County Road
16  Commission, commenced, identify the name, and then
17  your answer is none, right?
18  A.  My answer was none, correct.
19  Q.  So that is in conflict with the answer that you gave
20  during this deposition under oath, correct?
21  A.  No.
22  Q.  Can you explain how the two are not in conflict?
23  A.  I did send a resume for the position at Washtenaw
24  County.  I never did make an application.
25  Q.  Did you submit the resume with the intent of possibly

Page 67

1   seeking a job with the Washtenaw County Road
2   Commission?
3   A.  Yes.
4   Q.  Mr. Branch, at any time during your employment with
5   the Genesee County Road Commission, did you ever apply
6   for any other position or send any resumes to any
7   other position with any other employer?
8   A.  Yes.
9   Q.  Who would that be?
10  A.  Washtenaw County Road Commission.
11  Q.  I apologize.  That was a very vague question on my
12  part.  Other than the Washtenaw County road
13  Commission, any other employers?
14  A.  No.
15  Q.  Mr. Branch, did you ever apply for a substitute
16  teaching position outside the Genesee County Road
17  Commission while you were employed with the
18  Genesee County Road Commission?
19  A.  No.
20  Q.  Did you ever apply or seek any sort of internships or
21  externships of any kind while you were an employee of
22  the Genesee County Road Commission with any other
23  entity, discounting the previously discussed issue
24  with the Washtenaw County Road Commission?
25  A.  No.

Page 68

1   Q.  To the best of your knowledge, at this time, are there
2   other answers in your responses or answers to the
3   interrogatories that you have signed that are
4   incorrect?
5   A.  No.
6   Q.  I'd like to talk next about John Daly's separation of
7   employment from the Genesee County Road Commission and
8   your appointment as the co-interim director.  Can you
9   tell me about the process by which you became
10  appointed as the co-interim director for
11  Genesee County Road Commission?
12  A.  I was asked by the chairperson of the Genesee County
13  Board of Road Commissioners if I would serve as
14  co-interim managing director in the absence of the
15  manager director position.
16  Q.  And the chairperson of the board of commissioners was?
17  A.  Shirley Kautman-Jones.
18  Q.  Were you surprised that Ms. Kautman-Jones approached
19  you to see whether you would be interested in serving
20  in that role?
21  A.  Yes.
22  Q.  Ms. Kautman-Jones had been appointed to the
23  Genesee County Road Commission board in January of
24  2018, and I believe you became the co-interim in
25  February of 2018; is that right?

BRANCH, ANTHONY
07/21/2020

Pages 69—72

Page 69

1   A.   That's correct.
2   Q.   Did you know Ms. Kautman-Jones prior to her becoming
3        appointed to the Genesee County Road Commission?
4   A.   Yes.
5   Q.   How did you know her?
6   A.   She was the former township supervisor of Atlas
7        Township.
8   Q.   You mentioned a moment ago that you were surprised
9        that she approached you to become the co-interim
10       managing director.  Do you remember when she did
11       approach you to inquire about your interest in that
12       position?
13  A.   Yes.
14  Q.   When was that?
15  A.   Sometime in February of 2018.
16  Q.   Tell me about why you were surprised that Shirley
17       Kautman-Jones approached you to become a co-interim
18       managing director.
19  A.   Shirley's attitude toward me when she came into the
20       road commission was not very pleasant.
21  Q.   When you say came into the road commission, do you
22       mean became appointed to the board of commissioners?
23  A.   Correct.
24  Q.   Explain what you mean to me when you say her attitude
25       was not very pleasant.

Page 70

1   A.   She would criticize my work, when she would not
2        criticize my colleagues' work.  She would send me
3        questionnaires asking pages of questions and not do
4        that to any of my colleagues.
5   Q.   Anything else that you can think of that was
6        encapsulated by your comment that her attitude toward
7        you was not very pleasant?
8   A.   Her comments.
9   Q.   What kind of comments?
10  A.   She made comments that she'd seen some work of the
11       road commission as a failure on the maintenance
12       director's part.
13  Q.   Do you remember when she made that particular -- that
14       comment sounds like a specific comment, was there a
15       specific comment to that end?
16  A.   Yes.
17  Q.   When was that comment made, to the best of your
18       recollection?
19  A.   December, January time frame of 2017, 2018.
20  Q.   But those comments were made after she was brought
21       into the road commission as you stated before,
22       correct?
23  A.   Those comments were made before she ever attended a
24       meeting.
25  Q.   When was her attendance -- I'm sorry.  When was her

Page 71

1        appointment, to the best of your recollection,
2        finalized, to the Genesee County Road Commission?
3   A.   January 1, 2018.
4   Q.   So there were comments that she said that came prior
5        to January 1.  Tell me more about the circumstances of
6        those comments being raised, were they raised to you
7        verbally, in writing?
8   A.   In an email.
9   Q.   Tell me more about the email.
10  A.   She sent the email to John Daly stating what I just
11       said.
12  Q.   Did you see a copy of this email?
13  A.   Yes.
14  Q.   Who shared this email with you?
15  A.   John Daly.
16  Q.   This was at some point prior to January 1 of 2018?
17  A.   To the best of my recollection, yes.
18  Q.   Was the disappointment she expressed in the email that
19       she sent to John Daly related to any particular event?
20  A.   Yes.
21  Q.   What was the event?
22  A.   A snowstorm.
23  Q.   Let's talk a little bit about that particular
24       snowstorm.  Do you recall first off, obviously
25       clearing snow was one of the responsibilities of the

Page 72

1        road commission, you guys have a duty and obligation
2        to maintain the roads.  Do you remember when this
3        particular snowstorm occurred?
4   A.   I believe it was early January of 2018.  I'm not sure
5        exactly.  I believe it was early January.
6   Q.   And the email comment that went to John Daly that you
7        were just referring to, the one that we were just
8        talking about that stemmed from results of the road
9        commission in relation to this ice storm?
10  A.   Correct.
11  Q.   So she was complaining about the ice storm in that
12       email?
13  A.   No.
14  Q.   What was she complaining about in that email?
15  A.   The response to the ice storm was a failure of the
16       maintenance director on all parts.
17  Q.   Were there any other topics she complained about in
18       that email?
19  A.   No.
20  Q.   Do you remember any of the specific phrases that were
21       used to describe the failure in that email?
22  A.   A failure of the maintenance director on all points is
23       what I recall.
24  Q.   Was this subject of these complaints that were sent in
25       the email, was this ever discussed or brought up at

BRANCH, ANTHONY
07/21/2020                                                               Pages 73–76

Page 73

1    any Genesee County Road Commission board of
2    commissioners' meetings?
3  A.   Yes.
4  Q.   What was discussed there?
5  A.   Her comments made.
6  Q.   And what, to the best of your recollection -- well, I
7       should ask this question first.  Do you remember the
8       date of the board of commissioners meeting in
9       question?
10 A.   No.
11 Q.   I'm just going to pull up a document.  I'm going to be
12      labeling the document as Exhibit 5.
13            MARKED FOR IDENTIFICATION:
14            DEPOSITION EXHIBIT 5
15            11:54 a.m.
16            MR. CASCINI:  I'm going to distribute
17      Exhibit 5 by the chat function to counsel.  Carl and
18      Alex, were you able to get that?
19            MR. ALEXOPOULOS:  I'm all set.
20            MR. EDWARDS:  I have it.
21            MR. CASCINI:  Carl, it was a little bit
22      garbled.  You said you had it?
23            MR. EDWARDS:  Yes.
24 BY MR. CASCINI:
25 Q.   Mr. Branch, I'm going to show you the document I have

Page 74

1       labeled here as Exhibit 5.  Mr. Branch, can you see a
2       document that is labeled Genesee County Road
3       Commission board meeting, January 9, 2018?
4  A.   Yes.
5  Q.   Now, I'm going to go down to, based on the roll call,
6       I see your name on the list.  Were you present at this
7       meeting?
8  A.   Yes.
9  Q.   For the record, this is document, actually this is
10      document number from -- Bates number Defendant GCRC
11      production number one, document 1.  I'm going to go to
12      the fifth page of this document.  Where it says
13      discussion a little bit, about midway down the page it
14      says discussion of complaints, et al., regarding
15      Genesee County Road Commission, it says, removed at
16      the request of the Genesee County Road Commission
17      commissioner Shirley Kautman-Jones.  Do you remember
18      anything about the event there that is being captured
19      in the meeting minutes?  You were at the meeting.
20 A.   No, I don't remember anything about it.
21 Q.   You said earlier that there was discussion about
22      complaints that were directed toward you made in
23      public at a board meeting in January, correct?  That
24      is correct testimony?
25 A.   There were complaints discussed about Shirley

Page 75

1       Kautman-Jones' comments.  I don't know if it was in
2       January or when it was.
3  Q.   I see.  Okay.  So the -- Ms. Kautman-Jones nor any
4       other commissioner, they didn't publicly unveil these
5       complaints against you in a meeting, what you are
6       saying instead was there were complaints about
7       Ms. Kautman-Jones's comments in a meeting; is that
8       right?
9  A.   Correct.
10 Q.   I see.  I am now going to be marking a document as
11      Exhibit 6, which I will share with us all.
12            MARKED FOR IDENTIFICATION:
13            DEPOSITION EXHIBIT 6
14            11:58 a.m.
15            MR. CASCINI:  Alex and Carl, tell me when
16      you received that.
17            MR. ALEXOPOULOS:  Okay.
18            MR. EDWARDS:  Okay.
19            MR. ALEXOPOULOS:  I'm good.
20            MR. CASCINI:  Good, excellent.
21 BY MR. CASCINI:
22 Q.   Mr. Branch, I'm going to be sharing the screen with
23      you here.  Are you able to see, Mr. Branch, the
24      document that is currently on the screen?
25 A.   Yes.

Page 76

1  Q.   It appears to be the board meeting minutes from
2       February 6, 2018; is that right?
3  A.   Yes.
4  Q.   You were listed as an individual who was present at
5       this meeting, are you not?
6  A.   Correct.
7  Q.   I'm going to be taking us to -- I should also note for
8       the record, this is provided as Bates number Defendant
9       GCRC production number one, document number 32.  You
10      are going to the second page of this document that I
11      have marked as Exhibit 6, Bates number 33, when it
12      says public address at the board, it says, several
13      Genesee County residents addressed the board this
14      morning concerning the proposed early retirement of
15      managing director John Daly, as well as email that had
16      surfaced regarding the plowing and salting operations
17      during the ice storm on January 12, 2018 under the
18      direction of maintenance director Anthony Branch.  Is
19      this a reference to the occurrence that you were
20      referring to at a board meeting earlier in your
21      testimony?
22 A.   No.
23 Q.   Do you recall what happened in this particular
24      instance, do you recall attending this board meeting?
25 A.   Yes.

BRANCH, ANTHONY
07/21/2020

Pages 77–80

Page 77

1  Q.  What, if anything, do you remember about residents
2      addressing the board about emails that had surfaced
3      regarding the operations?
4  A.  **At this meeting residents were complaining about**
5      **comments that were made in the email from Shirley**
6      **Kautman-Jones about me.**
7  Q.  Are those comments the same comments that we were
8      discussing earlier, the ones about the ice storm?
9      This does mention salting and plowing operations
10     during the ice storm, right?
11 A.  **Yes.**
12 Q.  So we're talking about the same email?
13 A.  **Yes.**
14 Q.  What do you recall about the residents addressing the
15     board in terms of what they said and the substance of
16     their address?
17 A.  **They were upset at the comments that she made.**
18 Q.  It says here emails that had surfaced.  Did you share
19     this email with residents in Genesee County?
20 A.  **No.**
21 Q.  Did you have any discussions with anyone other than
22     John Daly about the email?
23 A.  **Yes.**
24 Q.  Who did you have discussions with?
25 A.  **The Genesee County Board of Road Commissioners.**

Page 78

1  Q.  I should have clarified my mistake.  Prior to this
2      meeting, did you have discussions with anyone
3      regarding the substance of the email other than
4      John Daly?
5  A.  **No.**
6  Q.  You didn't talk to anyone about it at all, no
7      commissioners, no members of the public?
8  A.  **I said I had talked to Genesee County Board of Road**
9      **Commissioners.**
10 Q.  Did you address the board in formal respect, did you
11     talk to individual commissioners?
12 A.  **Both.**
13 Q.  Which commissioners did you go speak with about these
14     emails?
15 A.  **Commissioner Dickerson.**
16 Q.  Cloyce Dickerson?
17 A.  **Correct.**
18 Q.  What did you tell Mr. Dickerson about those emails?
19 A.  **That I felt that I was being treated differently than**
20     **my colleagues.**
21 Q.  What did Mr. Dickerson say in response to you?
22 A.  **That he would look into it.**
23 Q.  When you say that you were being treated differently
24     than your colleagues, is it because -- explain that to
25     me, why did you feel that you were being treated

Page 79

1      differently than your colleagues with respect to these
2      complaints?
3  A.  **To make a comment of that nature, and you are the**
4      **chairperson of the board, without gathering the facts,**
5      **I think that's pretty telltale alone.**
6  Q.  My comment specifically, Mr. Branch, was:  Why did
7      you feel that you were being treated differently than
8      your colleagues regarding it, not why did you find it
9      offensive, why did you find it objectionable.  Why did
10     you feel that it was treatment directed toward you
11     that your colleagues were not subjected to?
12 A.  **Because the comment was directed toward me, the**
13     **maintenance director, as being a failure on all points**
14     **and none of my colleagues had been subject to the same**
15     **type of comments.**
16 Q.  This was around the same time that the board was
17     attempting to negotiate a severance agreement with
18     Mr. Daly, the managing director, however, correct?
19 A.  **I don't know the exact time that they began that.  I**
20     **don't know.**
21 Q.  We're taking a look at the meeting minutes from
22     February 6 and this is very shortly before you become
23     the co-managing director, it's safe to say, isn't it,
24     Mr. Branch, that this was around the same time these
25     comments are lodged that they were negotiating a

Page 80

1      separation agreement with Mr. Daly; isn't that right?
2  A.  **Repeat the question again.**
3  Q.  The comments regarding -- the comments that we're
4      discussing in this particular board meeting comes from
5      February 6.  That is shortly before you became the
6      co-interim managing director; isn't that right?
7  A.  **The comments that were being discussed by the public**
8      **during the February 6 meeting was shortly before I**
9      **became the co-interim managing director, correct.**
10 Q.  And you became the co-managing director or co-interim
11     managing director because Mr. Daly's employment was
12     separated with the Genesee County Road Commission,
13     correct?
14 A.  **That's correct.**
15 Q.  Mr. Daly was also the subject of complaints by
16     Ms. Kautman-Jones, correct?
17 A.  **Complaints, the subject of who, what?**
18 Q.  You mentioned earlier that you felt that you had been
19     singled out and you were being treated differently
20     than your colleagues because you had received complaints on
21     the handling of the ice storm by Ms. Kautman-Jones.
22     My question to you, Mr. Branch, is:  Isn't it true
23     that Mr. Daly was also the subject of complaints about
24     the handling of the ice storm by Ms. Kautman-Jones?
25 A.  **No.**

BRANCH, ANTHONY
07/21/2020

Pages 81–84

Page 81

1  Q.  Mr. Daly had not been identified as a source, your
2       testimony is that Mr. Daly had not been identified as
3       a source of any problems by Ms. Kautman-Jones; is that
4       correct?
5  A.  Not in the email that I seen.
6  Q.  Okay.  Are you aware of any other criticisms by
7       Ms. Kautman-Jones about Mr. Daly's performance?
8  A.  No.
9  Q.  Nevertheless, shortly after this discussion,
10      Ms. Kautman-Jones approaches you to ask you if you
11      would be interested in serving as co-interim managing
12      director, correct?
13 A.  Correct.
14 Q.  What did she say to you at the time that she
15      approached you for that purpose?
16 A.  She asked me if I would be interested in serving as
17      the co-interim managing director until the position
18      was filled.
19 Q.  Did she anything else?
20 A.  No.
21 Q.  How did this conversation occur, was it face-to-face,
22      was it over the phone?
23 A.  I believe it was face-to-face.
24 Q.  What did you say in response to her?
25 A.  I said that I would be interested in serving as a

Page 82

1       co-interim managing director.
2  Q.  And you were, in fact, eventually appointed by the
3       board to be the co-interim director along with
4       Mr. Fred Peivandi, correct?
5  A.  Correct.
6  Q.  Do you remember the date at the meeting where that was
7       formalized?
8  A.  I don't recall.
9  Q.  Do you remember the outcome -- do you remember the
10      board of commissioners presumably had to vote on your
11      appointment as co-interim managing director along with
12      Mr. Peivandi, correct?
13 A.  Correct.
14 Q.  Do you remember the result of that vote?  Was it
15      unanimous, was it three, two, was it four, one, there
16      are five commissioners, correct?
17 A.  Correct.
18 Q.  Do you recall whether it was unanimous, do you recall
19      what the subject and discussion over that appointment
20      was?
21 A.  I'm not for sure, but I believe it was unanimous.
22 Q.  Now, Ms. Kautman-Jones publicly apologized to you
23      later for having made those email comments, didn't
24      she?
25 A.  No.

Page 83

1  Q.  She never made a statement in a board of
2       commissioners' meeting apologizing for criticizing
3       your performance during the ice storm, is that your
4       testimony?
5  A.  That is correct.
6  Q.  I apologize.  I'm still sharing the screen.  That was
7       inadvertent and I will show you the same document in
8       just a second, Mr. Branch.  I need to show counsel
9       first.
10          MR. CASCINI:  I apologize, Carl and Alex.
11      I did not mean to do that.  I'm marking a document as
12      Exhibit 7.  I'm going to be distributing that now via
13      chat function to counsel.
14          MARKED FOR IDENTIFICATION:
15          DEPOSITION EXHIBIT 7
16          12:13 p.m.
17          MR. ALEXOPOULOS:  I'm all set.
18          MR. EDWARDS:  I have it.
19          MR. CASCINI:  Excellent.
20 BY MR. CASCINI:
21 Q.  I'm going to show you the same document again,
22      Mr. Branch.  You inadvertently had an opportunity to
23      take a look at it before.  Sorry about that.  I
24      accidentally was still sharing the screen.
25          Mr. Branch, can you see that document?

Page 84

1  A.  Yes.
2  Q.  Do you see Genesee County Road Commission board
3       meeting minutes from March 6, correct?
4  A.  Correct.
5  Q.  You attended that meeting, correct, you are listed as
6       another who was present during the roll call?
7  A.  Correct.
8  Q.  Under motion carried it says, at this time Chairperson
9       Kautman-Jones would like to share something with her
10      fellow commissioners, staff and residents of Genesee
11      County, do you see that paragraph?
12 A.  Yes.
13 Q.  It says it has come to her attention, this is a quote,
14      that the way she presented complaints to Mr. John
15      Daly, managing director of the Genesee County Road
16      Commission, regarding the January 2018 snow events
17      have given the wrong impression to our residents and
18      staff of the GRCC, GCRC.  Because of that, she would
19      like to apologize for the way she presented it.  As a
20      board, we received numerous complaints about the
21      Genesee County Road Commission's response to the
22      January 2018 snow event.
23          In frustration, she jumped to conclusions
24      as to where ultimate blame should be placed.  Upon the
25      ability to identify the defects in leadership of this

BRANCH, ANTHONY
07/21/2020

Pages 85—88

---

Page 85

1    organization, the managing director subsequently
2    retired.  Mr. Anthony Branch is appointed as an
3    interim co-managing director at the Genesee County
4    Road Commission.  Did I read that correctly.
5   **A.**    **Yes.**
6   Q.    You attended this meeting, is that consistent with
7    your memory about how this meeting -- about
8    Ms. Kautman-Jones' statement at the beginning of this
9    meeting?
10   **A.**    **Yes.**
11   Q.    So I asked you earlier whether or not
12    Ms. Kautman-Jones did apologize to you and, in fact,
13    she did on March 6 in a public meeting?
14   **A.**    **Yes, correct.**
15   Q.    In fact, it says, upon the ability to identify the
16    defects in the leadership of this organization, the
17    managing director subsequently retired, correct?
18   **A.**    **Correct.**
19   Q.    Do you read that statement as a criticism of Mr. Daly?
20   **A.**    **No.**
21   Q.    It says under that, Commissioner Arceo would like to
22    place this correspondence, which is read and written
23    by Kautman-Jones to the board, Mr. Dickerson seconded
24    the motion.  Mr. Dickerson, that's Cloyce Dickerson,
25    the gentleman you referred to earlier, correct?

Page 86

1   **A.**    **Correct.**
2   Q.    Commission Arceo, his name is David Arceo, correct,
3    one of the board of road commissioners?
4   **A.**    **Correct.**
5   Q.    Upon assuming the job of co-interim managing director,
6    Mr. Branch, did you receive a pay increase as a result
7    of that job?
8   **A.**    **Correct.**
9   Q.    Okay.
10        MR. EDWARDS:  Andrew, I need a bathroom
11    break when you have a chance to take a break.
12        MR. CASCINI:  You know, actually, Carl, I
13    think this is as good as any time.  I think we can
14    break right here.  We're about to shift to a new
15    topic.
16        MR. EDWARDS:  Great.
17        MR. CASCINI:  You want to take 5, 10?
18        MR. EDWARDS:  Ten minutes.
19        MR. CASCINI:  Excellent.
20        (Off the record at 12:17 p.m.)
21        (Back on the record at 12:31 p.m.)
22   BY MR. CASCINI:
23   Q.    Mr. Branch, I want to talk briefly about some comments
24    that you made.  You mentioned earlier, your testimony
25    earlier was that you were surprised when

Page 87

1    Ms. Kautman-Jones first approached you to inquire
2    about your interest in the co-interim director
3    position, you explained that this was because her
4    attitude wasn't very pleasant.  She would criticize
5    your work, she would present you with questionnaire
6    pages and she wouldn't do that with your colleagues
7    and then she would also make certain comments.
8        You have described the comment related to
9    criticism of your performance during the ice storm.
10    Are there other comments that Ms. Kautman-Jones made
11    to you, that you can remember in specificity, that
12    criticized your work?
13   **A.**    **No.**
14   Q.    So that was the only comment that you can recall
15    regarding a criticism from Ms. Kautman-Jones about
16    your work?
17   **A.**    **Correct.**
18   Q.    I'd like just briefly to go back and address -- well,
19    no, let's actually move on to -- next, Mr. Branch, I'd
20    like to talk about the heart of the matter here which
21    is the job search for the permanent managing director
22    position.  Your recollection and the documents we have
23    shown is that you were made co-interim managing
24    director around February of 2018, correct?
25   **A.**    **Yes.**

Page 88

1   Q.    And Mr. Peivandi was also co-interim managing director
2    at the time, right?
3   **A.**    **Correct.**
4   Q.    Do you know why the board elected to choose two
5    co-interim managing directors?  Do you have knowledge
6    of why that was?
7   **A.**    **No.**
8   Q.    Okay.  Now, shortly after you became the co-interim
9    managing director, the board of commissioners started
10    the job hunt for permanent replacement for
11    Mr. Daly, right?
12   **A.**    **Correct.**
13   Q.    When was the first time that you expressed interest to
14    anyone about that position, discounting, because we'll
15    talk about it later, actually formally applying for
16    that job?
17   **A.**    **Could you rephrase that again?**
18   Q.    Sure.  It was an inartful question.
19        Did you ever express interest to anyone
20    about obtaining the permanent managing director
21    position before you applied for that job?
22   **A.**    **Yes.**
23   Q.    To whom did you make -- did you express that interest?
24   **A.**    **My family.**
25   Q.    Anyone within the road commission?

BRANCH, ANTHONY
07/21/2020

Pages 89–92

Page 89

1  A.  Not to my knowledge.
2  Q.  Did you tell Mr. Daly, at any point in time, that you
3      were going be interested in obtaining that job?
4  A.  Yes.
5  Q.  When did you tell Mr. Daly that you would be
6      interested in the permanent position?
7  A.  I believe it was the day he came back to pick up all
8      of his things from the road commission.  I don't know
9      the date.
10 Q.  He was -- his employment was formally severed in
11     April of 2018; is that right?
12 A.  I'm not sure.
13 Q.  Okay.  Does it strike you as being within the realm of
14     being correct?  Was it around April even if you're not
15     sure of the exact month or date?
16 A.  Yeah, it was around -- yeah, that springtime, yeah.
17 Q.  Okay.  When did you come to learn that the board of
18     commissioners would be conducting a job search for the
19     permanent managing director position?  When was the
20     first time anybody ever told you they're going to be
21     kicking off the job search?
22 A.  It was a board meeting.  I don't know the date, but
23     that was announced at the board meeting.
24 Q.  What do you remember about that announcement?
25 A.  I remember Shirley Kautman-Jones making a statement

Page 90

1      that she was going to contact some search firms to
2      begin the search for the position.
3  Q.  Was that in March of 2018?
4  A.  I don't recall the date.
5  Q.  Was it at a board meeting that she made that
6      announcement?
7  A.  Yes.
8  Q.  Okay.  You mentioned that an external search firm was
9      going to be retained by the road commission in
10     connection with that search.  Did the board discuss
11     whether or not they should retain an external search
12     firm?
13 A.  I don't recall, but I would imagine so.
14 Q.  Were you present at a board meeting where you can
15     recall any discussions about whether or not to use a
16     search firm?
17 A.  I don't recall.  I just recall her saying that she was
18     going to contact some search firms.
19 Q.  Do you remember presentations on behalf of any
20     external search firms where they came in to interview,
21     for lack of a better term, before the Board of Road
22     Commissioners to be the firm selected?
23 A.  Yes.
24 Q.  Who do you recall being present for one of those
25     interviews for the search firm spot?

Page 91

1  A.  The Board of Road Commissioners and the directors of
2      departments at Genesee County Road Commission.
3  Q.  Which search firms were interviewed?
4  A.  I recall two search firms giving presentations.
5      Michigan Society of Executives and Hiring Solutions.
6  Q.  Do you remember the name of the individual that
7      presented the interview on behalf of the Michigan
8      Society of Association Executives?
9  A.  Cheryl Ronk.
10 Q.  And do you remember the name of the individual on
11     behalf of Hiring Solutions?
12 A.  I do not.
13 Q.  Does the name Todd Surline ring a bell, by any chance?
14 A.  Yes.
15 Q.  Okay.  Prior to -- and I should ask this question.
16     You attended the meetings where both of those firms
17     came in to interview, right?
18 A.  Correct.
19 Q.  Did you know Mr. Surline or Ms. Ronk, had you ever met
20     them or seen them prior to those meetings?
21 A.  No.
22 Q.  What was your perception of Ms. Ronk and Mr. Surline's
23     presentations?
24 A.  They both gave good presentations.
25 Q.  Do you remember attending a board meeting on March 20

Page 92

1      of 2018, where board member Cloyce Dickerson decided
2      to delay the decision about when to appoint a search
3      firm until April 3?
4  A.  I do not.
5  Q.  Ultimately, though, the board elected to select MSAE
6      as the search firm that would be assisting them with
7      that decision, correct?
8  A.  Correct.
9  Q.  Were you present at that meeting?
10 A.  Yes.
11 Q.  I am going to introduce -- I'm actually going to do it
12     the right way this time -- the document that I am
13     going to mark as Exhibit 8.
14         MR. CASCINI:  Alex and Carl, do you have
15     that yet?
16         MR. ALEXOPOLOUS:  Yes.
17         MR. EDWARDS:  We both do.
18         MARKED FOR IDENTIFICATION:
19         DEPOSITION EXHIBIT 8
20         12:43 p.m.
21 BY MR. CASCINI:
22 Q.  Mr. Branch, do you recognize this document?
23 A.  Yes.
24 Q.  It's labeled Genesee County Road Commission board
25     meeting, April 3, 2018, Bates number at the bottom,

BRANCH, ANTHONY
07/21/2020

Page 93

1    for the record, defendant GCRC production number one,
2    number 92.
3           Mr. Branch, you are listed as an individual
4    who was present at this meeting, right?
5  A. Correct.
6  Q. And if we go down, I going to be proceeding and
7    directing your attention to page number 91.  It says
8    under motion carried, this is very close to the
9    bottom, Chairperson Kautman-Jones stated that
10   two firms, Hiring Solutions and MSAE, were interviewed
11   and she talked to many provided references.  Then
12   there is a motion made by Ms. Kautman-Jones and
13   seconded by Mr. David Arceo to engage MSAE in the
14   search for hiring of the managing director.  Do you
15   remember anything in connection with the comments or
16   the discussion around selecting MSAE that occurred
17   during this meeting?
18 A. No.
19 Q. Do you remember -- how did you personally react to the
20   fact that GCRC would be hiring an external search
21   firm?
22 A. I don't recall a reaction.
23 Q. Were you surprised at all that an external search firm
24   would be retained?  After all, it was the first time
25   that it had been done, is my understanding.

Page 94

1  A. No.
2  Q. Were you concerned at all that an external search firm
3    had been retained?
4  A. No.
5  Q. Mr. Branch, when did you first have an opportunity to
6    view the job posting regarding the now vacant managing
7    director position?
8  A. Once it was posted by Michigan Society of Executives.
9  Q. And how did you yourself access it?
10 A. Over the computer.
11 Q. You said it was put up by MSAE, was it present on
12   their website?  Was it present on the GCRC's website?
13   How exactly did you find it?  How did you access it
14   through the computer?
15 A. MSAE's website.
16 Q. Did you obtain a copy of the job description at that
17   time for the managing director position?
18 A. Could you ask the question again?
19 Q. When you viewed the job posting on the MSAE site, did
20   that job posting include a description for the
21   managing director position?
22 A. I don't recall.
23 Q. Did you view a job description for the managing
24   director position prior to submitting your application
25   for it in early June?

Page 95

1  A. Yes.
2  Q. What were the circumstances where you came to view
3    that job description?
4  A. I obtained a copy of the job description because that
5    was the position I was applying for.
6  Q. You applied subsequently to accessing the posting on
7    the MSAE website, sometime between the time where you
8    got it from the MSAE website and the time where you
9    actually applied for the job?
10 A. I don't recall when I got it.
11 Q. I'm going to next mark a document as Exhibit 9.
12          MARKED FOR IDENTIFICATION:
13          DEPOSITION EXHIBIT 9
14          12:48 p.m.
15          MR. CASCINI:  I will now share it.
16   Mr. Edwards, Mr. Alexopolous, have you received that
17   document?
18          MR. ALEXOPOULOS:  Yes.
19          MR. EDWARDS:  Yes.
20 BY MR. CASCINI:
21 Q. Mr. Branch, I am going to show you a document that I
22   have marked here as Exhibit 9.  It's provided as
23   MSAE 000527 is the Bates number on the bottom.
24          Mr. Branch, are you able to see that
25   screen?

Page 96

1  A. Yes.
2  Q. And what is this document?
3  A. A manager director job description.
4  Q. I'd like to go to the end here, so we're going to go
5    to page 3 of the document marked Exhibit 9, MSAE 529
6    is the Bates.  Does this have a revision date for when
7    this job description was finalized?
8  A. December 1, 2009.
9  Q. Is it safe to say, Mr. Branch, upon seeing it, there
10   is the second page, again, there is the third page,
11   then there's the first page.  Is it safe to say that
12   this is the copy of the job description as it existed
13   at the time that Mr. Daly was the managing director?
14 A. I would assume so.
15 Q. All right.  At that particular time, now I'm directing
16   your attention to the second page of Exhibit 9 under
17   the education and experience heading, this document
18   says that it provides for education, experience,
19   requirements for possession of a master's degree in
20   business administration, finance, engineering, public
21   administration, personnel administration or labor
22   relations or bachelor's of business administration,
23   finance, engineering, public administration, personnel
24   administration or labor relations and ten years of
25   administrative experience, three, and then it says

BRANCH, ANTHONY
07/21/2020
Pages 97–100

Page 97

1    five in parenthesis, years of which must be in a
2    senior administrative level. Did I read that
3    correctly?
4  A.  Yes.
5  Q.  So the job description as existed prior to 2009
6    required you to either have a master's degree or a
7    bachelor's degree in one of those fields, or
8    professional experience in a related field could be
9    substituted for the years of administrative experience
10   or senior administrative experience, correct?
11 A.  Correct.
12 Q.  So it's safe to say that in 2009 as the job was posted
13   then -- well, let me back up actually and ask
14   something because I want to make sure that it's
15   explicit here.
16       Mr. Branch, you don't have a master's
17   degree in business administration, finance,
18   engineering, public administration, personnel
19   administration or labor relations, do you?
20 A.  No.
21 Q.  In fact, you don't have a master's degree of any kind,
22   do you?
23 A.  No.
24 Q.  You also do not have a bachelor's degree in business
25   administration, finance, engineering, public

Page 98

1    administration, personnel administration or labor
2    relations, do you?
3  A.  No.
4  Q.  You do have, and correct me if I'm mistaken about
5    this, but I don't think it's contended here, you do
6    have ten years of administrative experience, three
7    years of which must be in a senior administrative
8    level, you have that experience as a maintenance
9    director, though, right, so you can fill that
10   component?
11 A.  Correct.
12 Q.  But under the 2009 job description, you did not meet
13   the educational requirements had you applied for the
14   job at that time, right?
15 A.  Incorrect.
16 Q.  Why is that incorrect?
17 A.  It also states that professional experience in a
18   related field may be substituted on a year-to-year
19   basis.
20 Q.  How do you interpret that statement?
21 A.  Just as it states.
22 Q.  So your interpretation of this agreement under your
23   interpretation of this particular provision of the
24   manager director job description, the version that
25   we're talking about is the 2009 version, professional

Page 99

1    experience in a related field may be substituted for
2    what on a year-to-year basis?
3  A.  For the education.
4  Q.  Can the professional experience in a related field,
5    upon your interpretation of this agreement, be
6    substituted for the years of administrative experience
7    or senior administrative experience?
8  A.  Yes. The word "or" is in there. So if -- for the
9    education or the following paragraph.
10 Q.  So you can have an -- either a master's degree or a
11   bachelor's degree and ten years of administrative
12   experience with three or five, that is ambiguous
13   admittedly, years of senior administrative experience,
14   right?
15 A.  Correct.
16 Q.  Mr. Branch, you do not have a bachelor's degree,
17   correct?
18 A.  Correct.
19 Q.  You do not have a master's degree, correct?
20 A.  Correct.
21 Q.  Now, I understand that as part of the MSAE and GCRC
22   united job search there was a revision to the managing
23   director job description; is that right?
24 A.  Correct.
25 Q.  When did you first learn that the job description was

Page 100

1    being revised?
2  A.  I don't recall.
3  Q.  Was it prior to the time that you applied for the job
4    or was it after you applied for the job?
5  A.  I don't recall.
6  Q.  So it is possible that you only learned the job
7    description was being revised after you applied?
8  A.  It's possible. I just don't recall when I learned
9    that it was being revised.
10 Q.  Did you have any discussions with anyone that you can
11   recall about the fact that the job description was
12   being revised?
13 A.  Yes.
14 Q.  Who did you have those conversations with?
15 A.  The HR director.
16 Q.  And the HR director's name is?
17 A.  Donna Poplar.
18 Q.  Can you spell the last name, for the record?
19 A.  P-o-p-l-a-r.
20 Q.  Tell me about the discussions you had with Ms. Poplar
21   regarding the revisions to the job description?
22 A.  I brought it to her attention that when I seen the new
23   revised job description it excluded the professional
24   experience in a related field sentence.
25 Q.  What was your reaction to seeing that that sentence

BRANCH, ANTHONY
07/21/2020

Pages 101–104

Page 101

1     was excluded?
2  A.  I wanted to make sure that that wouldn't disqualify me
3     from obtaining the managing director position.
4  Q.  Okay.  I am going to.  There it is.  Sorry for the
5     delay there, gentlemen.  I am going to be marking
6     another document as Exhibit 10.
7                MARKED FOR IDENTIFICATION:
8                DEPOSITION EXHIBIT 10
9                1:00 p.m.
10               MR. CASCINI:  I'm dragging that into the
11    chat now.  Mr. Alexopolous and Mr. Edwards, can you
12    please let me know when you have received that?
13               MR. ALEXOPOULOS:  I have got it.
14               MR. EDWARDS:  I have it.
15               MR. CASCINI:  Thank you both kindly.
16 BY MR. CASCINI:
17 Q.  I'm going to share it with you, Mr. Branch, so that
18    you can see it.  This is an exhibit marked number 10.
19    For the record's reference, this has Bates number
20    Defendant GCRC production number one, and then the
21    following number is 2593.  Starts with a cover email
22    from a gentleman by the name of Taylor Benavente at
23    MSAB.org.  Do you know who Mr. Benavente is,
24    Mr. Branch?
25 A.  No.

Page 102

1  Q.  The recipients are Shirley Kautman-Jones and Cheryl
2     Ronk, though, right?
3  A.  Yes.
4  Q.  It looks like we have all of the other counsel persons
5     cc'd on this particular email?
6  A.  Yes.
7  Q.  Below that it says attachments, and then it says draft
8     GCRC manager director job description.doc; is that
9     right?
10 A.  Yes.
11 Q.  Okay.  Now I'm going to, the date on this email is
12    May 3, 2018.  I'm going to show you a copy of the
13    document Genesee County Road Commission job
14    description.  It says draft for release May 15, 2018.
15    Do you see that on your screen, Mr. Branch?
16 A.  Yes.
17 Q.  I'm going to go to the second page of that document,
18    it's the third page overall in this particular
19    exhibit, the document that had been marked Exhibit 10.
20    Can you read the -- I'd like to direct your attention,
21    Mr. Branch, to the education and experience section,
22    and there it says possession of a bachelor's degree in
23    a field related to job functions is required,
24    preference is given towards civil engineering and
25    similar disciplines.  The master's degree will be

Page 103

1     considered an asset, or displays leadership by the
2     functions and duties, prior five years of supervisory
3     role and experience reporting to a board of directors,
4     and then there are some more features that are below.
5                Mr. Branch, to the best of your
6     recollection, is this the revision or the revised job
7     description that you saw to which you expressed
8     concerns to Ms. Poplar?
9  A.  Yes.
10 Q.  Why were you concerned?
11 A.  It did not have the sentence that the years of
12    experience, professional experience could be
13    substituted on a year-to-year basis.
14 Q.  It does, in fact, say possession of a bachelor's
15    degree in the field related job function is required,
16    right?
17 A.  Yes.
18 Q.  What did Ms. Poplar say when you raised that concern
19    with her?
20 A.  She said she would bring it to the attention of the
21    board.
22 Q.  Do you know if Donna did so, Ms. Poplar, I should say?
23 A.  Yes.
24 Q.  Do you know when she did that?
25 A.  I don't know the date.

Page 104

1  Q.  Were you present at -- were you present when
2     Ms. Poplar brought it to the attention of the board?
3  A.  Yes.
4  Q.  Did it occur during a board meeting?
5  A.  Yes.
6  Q.  And what was the result ultimately of that board
7     meeting?  Related to the job description, I should
8     clarify.
9  A.  That the clause would be put back in.
10 Q.  When you say the clause would be put back in, what do
11    you mean by that?
12 A.  The years of experience could be substituted on a
13    year-to-year basis would be put back in, in the "or"
14    section.
15 Q.  Do you remember that the board commissioners -- are
16    you saying that your recollection was the board of
17    commissioners approved that change?
18 A.  To my recollection, yes.
19 Q.  Do you recall any of the debate or the discussion that
20    surrounded that change?
21 A.  Yes.
22 Q.  Tell me what you recall about that debate or
23    discussion.
24 A.  I remember Ms. Poplar raising a point that the removal
25    of that clause could be viewed as a way to exclude

BRANCH, ANTHONY
07/21/2020

Pages 105–108

Page 105

1      myself from being able to obtain the managing director
2      position.
3   Q.   What was the board's reaction when she reported that
4      concern?
5   A.   I remember board members saying that they did not want
6      to exclude anyone.  And I also remember the labor
7      attorney for Genesee County Road Commission making a
8      statement in the meeting that the language should be
9      put back because it could be viewed as being
10     discriminatory.
11   Q.   Discriminatory in what basis?
12   A.   Towards me.  Because everyone knew that I did not have
13     a degree.
14   Q.   Discriminatory toward you in your individual capacity?
15     Like discriminatory towards Anthony Branch?
16   A.   Yes.
17   Q.   Were there any other candidates that they discussed
18     being concerned would be excluded?
19   A.   They said that they did not want to exclude anyone.
20     So I would take that to mean all candidates.
21   Q.   And was there a motion that was made to revise the job
22     description to substitute an experience requirement
23     for the education requirement?
24   A.   To my recollection, yes.
25   Q.   Do you recall who seconded that motion?

Page 106

1   A.   I do not.
2       MR. CASCINI:  Do you gentlemen mind --
3     Renee, can we go off the record for just one moment?
4     I'm missing a file directory.
5       MR. EDWARDS:  Sure.
6       MR. ALEXOPOLOUS:  Sure.
7       (Off the record at 1:09 p.m.)
8       (Back on the record at 1:12 p.m.)
9   BY MR. CASCINI:
10   Q.   I'm going to be marking a new exhibit.  I'm going to
11     be marking it as Exhibit 12.
12       MR. ALEXOPOULOS:  Did we have an 11?
13       MR. CASCINI:  No, I'm sorry.  I'm going to
14     be marking it as Exhibit 11, my mistake.
15       Alex and Carl, can you notify me once you
16     get that?
17       MR. EDWARDS:  I have it.
18       MR. ALEXOPOLOUS:  I'm set as well.
19   BY MR. CASCINI:
20   Q.   Excellent.  Now, Mr. Branch, we're going to be sharing
21     the screen with so you can view what has been marked
22     as Exhibit 11.
23       MARKED FOR IDENTIFICATION:
24       DEPOSITION EXHIBIT 11
25       1:14 p.m.

Page 107

1   BY MR. CASCINI:
2   Q.   We have Bates number Defendant GCRC production number
3     one, document number 117.
4       Mr. Branch, do you recognize this document?
5   A.   Yes.
6   Q.   And it's the board meeting minutes from a May 15, 2018
7     meeting, correct?
8   A.   Correct.
9   Q.   You are present at that, meaning you are represented
10     under the roll call portion?
11   A.   Correct.
12   Q.   Okay.  If we go down -- I'll be directing your
13     attention to the very bottom line, GCRC manager
14     director job description.  It says board approval of
15     the manager director job description for
16     Genesee County Road Commission.  Is the -- is this, to
17     the best of your recollection, the May 15 meeting, the
18     meeting where the discussion we just referenced
19     occurred, Mr. Branch?
20   A.   I'm not sure which meeting it was.
21   Q.   Do you recall anyone opposing the motion to amend the
22     job description to reinstate the experience
23     requirement?
24   A.   Repeat the question.
25   Q.   Did anyone during the meeting object to the

Page 108

1     reinstatement of the experience requirement?
2   A.   I don't recall.
3   Q.   I'll be marking Exhibit 12 now.
4       MARKED FOR IDENTIFICATION:
5       DEPOSITION EXHIBIT 12
6       1:16 p.m.
7       MR. CASCINI:  So that everybody can take a
8     look at it.
9       MR. EDWARDS:  I've got it.
10       MR. ALEXOPOLOUS:  I have it.
11   BY MR. CASCINI:
12   Q.   Mr. Branch, I'll be sharing this document with you,
13     this is Bates number MSAE 000325.
14       Mr. Branch, this is a copy of the Genesee
15     County Road Commission manager director job
16     description, it says draft for approval May 15.  I
17     would like to direct your attention to the second page
18     under the new education or experience section listed
19     there, to the best of your recollection, was this the
20     version that the board finalized for approval at the
21     May 15 meeting?
22   A.   I'm not sure.
23   Q.   Do you interpret the education or experience section
24     of this particular document to provide an experience
25     alternative to education?

BRANCH, ANTHONY
07/21/2020                                                    Pages 109–112

Page 109

1   A.   No.
2   Q.   You do not interpret this document as providing a --
3        as allowing experience to serve as an alternative to
4        having a bachelor's degree?
5   A.   No.
6   Q.   Does this document specify that possession of a
7        bachelor's degree is required?
8   A.   No.
9   Q.   Do you agree that, after the board amended the job
10       description in response to Ms. Poplar's concern, you,
11       under this, were now unequivocally eligible to apply
12       for the job?
13  A.   Yes.
14  Q.   So this job description does not exclude you from
15       applying?
16  A.   No.
17  Q.   Did you feel that the board was responsive to the
18       concerns you raised to Ms. Poplar, that Ms. Poplar
19       later carried to them during that May 15 meeting?
20  A.   No.
21  Q.   Why not?
22  A.   Because --
23  Q.   I apologize, go ahead.
24  A.   At the conclusion of the -- at the conclusion of the
25       discussion, it was said that that clause would be put

Page 110

1        back in and if, in fact, this is what was approved, it
2        is not put back in.
3   Q.   You said it was said that the clause would be put back
4        in.  Who said that the clause would be put back in?
5   A.   The board agreed to put the clause back in.
6   Q.   I want to make sure that we're being very specific
7        when we say agreed to put the clause back in, what
8        clause are you referring to that the board said they
9        would be putting back in?
10  A.   That experience, professional experience in a related
11       field could be substituted on a year-to-year basis.
12  Q.   So I want to make sure that I understand you.  They
13       said that they were going to take the job description
14       that we see here and they were going to add a clause
15       after they had already approved it during the meeting?
16       Is that correct?
17  A.   Is this the job description that you are saying was
18       presented after the first job description?  Is that
19       what you're saying?
20  Q.   Correct, this is the revised job description.
21  A.   So ask the question again.
22  Q.   Is your testimony that there was a comment following
23       the May 15 meeting that the board was going to make an
24       additional modification?  After having already enacted
25       this amendment to the job description, it was changed,

Page 111

1        they said they were going to change it again from what
2        you see here?
3   A.   I have a question for clarification.  Is this the job
4        description that was presented by the board?
5   Q.   Let me see if I can make this a bit easier.  I wish I
6        had the paper documents because I could just line them
7        all up in a row here.  Let's take a look and see if I
8        can simplify this and work some magic with our
9        exhibits.
10            MR. CASCINI:  Off the record.
11            (Off the record at 1:23 p.m.)
12            (Back on the record at 1:26 p.m.)
13  BY MR. CASCINI:
14  Q.   The issue here is that Exhibit 11 and the copy that I
15       submitted was an incomplete copy of that agenda.  I
16       think this clears it up.  I knew that there was going
17       to an issue somewhere.  What I would like to do for
18       the sake of ease, why don't I just label this exhibit
19       the complete agenda for the May 16 meeting as
20       Exhibit 13 just so that we don't have any confusion
21       about what got substituted for what.  We already have
22       enough moving parts here.  I'm going to pull up and
23       send Exhibit 13 to everybody.
24            MR. CASCINI:  Mr. Edwards, Mr. Alexopolous,
25       have you received it?

Page 112

1            MR. EDWARDS:  I have.
2            MR. ALEXOPOULOS:  I have as well.
3            MARKED FOR IDENTIFICATION:
4            DEPOSITION EXHIBIT 13
5            1:26 p.m.
6   BY MR. CASCINI:
7   Q.   Okay.  Now, Mr. Branch, I'm going to show you what has
8        been marked as Exhibit 13.  It's going to look
9        familiar to you.  It's the actual full copy of what
10       was supposed to be marked as Exhibit 11.  I'm going to
11       go all the way up to the top here.  This is, it begins
12       Defendant GCRC production, number one, begins on Bates
13       number 126, and it's nine pages long.  Exhibit 13 is
14       nine pages long, which is what it should be.
15            Mr. Branch, do you recognize this as the
16       May 15 board meeting minutes?
17  A.   Yes.
18  Q.   Now, the area where we need to go to is going to be
19       first page number 5, which is Bates number 130, and we
20       have taken a look at this before, haven't we,
21       Mr. Branch, it says there at the bottom, GCRC managing
22       director job description board approval, managing
23       director job description?
24  A.   Yes.
25  Q.   Okay.  On to the next page which was omitted before

BRANCH, ANTHONY
07/21/2020                                                                    Pages 113–116

**Page 113**

1   and that is, I apologize for that, this is Bates
2   number 131, page number 6 on what I have marked as
3   Exhibit 13.  It says following from that, the job
4   description of the GCRC manager director was discussed
5   with the board and attorney Tom Derderian during the
6   morning board meeting, and the board made the
7   following changes to the job description, change
8   education and, to education or, change the word
9   required to desired, should have in front of prior
10  five years experience and then must establish
11  permanent residence changes to preferred to establish
12  residence in Genesee County within 18 months of
13  employment.  Did I read that all correctly?
14  A.  Yes.
15  Q.  It says that the motion was made by Mr. Dickerson,
16  seconded by Mr. Arceo; is that right?
17  A.  Yes.
18  Q.  Okay.  So now, what I'm going to do is we're to going
19  pull this up side by side with Exhibit 12, which was
20  the job description draft that I just showed you,
21  Mr. Branch.  I'm not trying to hide the ball here.
22  The issue unfortunately was we needed to look at it
23  side-by-side for you to know actually what we are
24  looking at.
25       We're going to go to the second page of

**Page 114**

1   Exhibit 12, MSAE 326.  Then that's the education or
2   experience heading shown there.  Do you see that,
3   Mr. Branch?
4   A.  Yes.
5   Q.  And if we take a look at the Exhibit 13 description of
6   how the job description changed, change "education
7   and" to "education or", and then we go back to
8   Exhibit 12, we see indeed education has changed from
9   education and now it says education or experience.  Do
10  you agree with that, Mr. Branch?
11  A.  Yes.
12  Q.  If we go back it says change "education and" to
13  "education or" we just did that.  Change the word
14  required to desired, possession of a bachelor's degree
15  in a field related to job functions is desired.  We go
16  back to Exhibit 12, that's exactly what we see in the
17  first line, possession of a bachelor's degree in a
18  field related to job functions is desired.  Do you see
19  that and do you agree, Mr. Branch?
20  A.  Yes.
21  Q.  And moving forward, add should have in front of prior
22  five years experience, this is referencing the
23  Exhibit 13.  If you go back to Exhibit 12, you can see
24  should have prior five years experience in supervisory
25  role.  Do you agree with that, Mr. Branch?

**Page 115**

1   A.  Yes.
2   Q.  So, do you agree that Exhibit 12, which I have pulled
3   up now, I'm sorry.  Exhibit 12, which I have pulled
4   now, education or experience, do you agree that that
5   is the version of the job description that was
6   approved by the board of commissioners on May 15?
7   A.  Yes.
8   Q.  Do you agree that by making those changes, the board
9   was responsive to the concerns you raised?
10  A.  No.
11  Q.  Why do you agree -- and do you -- you said earlier --
12  your prior testimony was you disagreed because after
13  the May 15 board meeting, you've alleged there was
14  discussion that they were going to change it again?
15  A.  No.
16  Q.  Why do you feel that this amendment was not responsive
17  to your concerns?
18  A.  **Because it still did not put the sentence back in that**
19      **was agreed that would be put back in.**
20  Q.  And the sentence that is missing in your view is what?
21  A.  **Professional experience can be substituted on a**
22      **year-to-year basis.**
23  Q.  Is the -- you do agree, however, that the version that
24  I am showing you, the version of Exhibit 12, that is
25  what was ultimately approved by the board, correct?

**Page 116**

1   A.  Correct.
2   Q.  And you do also agree, because your earlier testimony
3   was under Exhibit 12 you were eligible for the
4   position, right?
5   A.  No.
6   Q.  You do not agree that under the education or
7   experience section of Exhibit 12 you were eligible for
8   the position?
9   A.  **That was not the question as I heard it from you.**
10  Q.  That is the question, Mr. Branch, that I'm asking now,
11  however, do you agree that you were eligible for the
12  position under the education or experience section in
13  Exhibit 12?
14  A.  No.
15  Q.  Why do you feel -- what provision of the education or
16  experience provision in Exhibit 12 renders you
17  deficient or ineligible for the job?
18  A.  **Because I do not have a degree and that is what is**
19      **desired and I'm not a civil engineer or have a similar**
20      **discipline, and I do not have a master's degree that**
21      **would be considered an asset.  So that makes the**
22      **playing field very uneven for someone who does possess**
23      **those things, unless you put in professional**
24      **experience can be substituted on a year-to-year basis,**
25      **which is the point that I made to Ms. Poplar from the**

BRANCH, ANTHONY
07/21/2020

Pages 117–120

Page 117

1    start.

2    Q.   Mr. Branch, my question to you was, however, do you

3         believe that you were ineligible for the position

4         because of the language that is in the education or

5         experience section of Exhibit 12, you said that the

6         playing field was uneven.

7              I'm asking you:  Are you ineligible for the

8         position based on this criteria?

9    A.   No.

10   Q.   Okay.  I'm going to direct your attention, and I'd ask

11        counsel to follow me to page 3 of Exhibit 10.

12        Mr. Branch, you have already seen this exhibit before.

13              This was the version you testified earlier

14        that lead you to go to Ms. Poplar with concerns.  This

15        section said education and experience.  Possession of

16        a bachelor's degree in a field related to job

17        functions is required.  Do you agree that you would be

18        ineligible for the job under this earlier version of

19        the job description?

20   A.   Yes.

21   Q.   So I want to button something up.  Earlier you

22        mentioned that there was conversation after a board

23        meeting where they said they were going to change

24        something back.  Is your testimony that -- that

25        following the May 15 board meeting, the board of

Page 118

1         commissioners said they were going to make another

2         revision to Exhibit 12?

3    A.   No.

4    Q.   Okay.  Did you have any discussions with anyone at any

5         time about why, prior to May 15, the job description

6         had been changed to include a bachelor's degree

7         requirement?  Other than Ms. Poplar obviously.

8    A.   No.

9    Q.   No one gave you a reason for why that may have

10        happened?

11   A.   No.

12   Q.   Now, I'm going to show you another exhibit here, I'm

13        going to mark this one as Exhibit 14.

14              MARKED FOR IDENTIFICATION:

15              DEPOSITION EXHIBIT 14

16              1:37 p.m.

17              MR. CASCINI:  Mr. Alexopolous, Mr. Edwards,

18        were you able to open that document?

19              MR. ALEXOPOLOUS:  I have it.

20              MR. EDWARDS:  Yes.

21   BY MR. CASCINI:

22   Q.   Mr. Branch, I'm going to share the screen with you

23        once again.  We are reading a document, it has Bates

24        number plaintiff answer COD discovery, Bates number

25        14.

Page 119

1              Mr. Branch, do you recognize this document?

2    A.   Yes.

3    Q.   What is this document?

4    A.   This is my, I believe, cover letter to my resume.

5    Q.   I should probably let you actually take a look at the

6         other pages.  Sorry, that's a shortcoming of the Zoom

7         meeting.  Let me scroll through them and you can tell

8         me when you need me to continue moving forward, that

9         is page 1, page 2, page 3, 4, it looks like this is a

10        resume?

11   A.   Yes.

12   Q.   Page 5, page 6, page 7 and 8.

13              Mr. Branch, is this your complete

14        application for the managing director position?

15   A.   Yes.

16   Q.   Did you submit it on or around June 6, 2018, as

17        indicated on the top there?

18   A.   Yes.

19   Q.   Okay.  What happened after you submitted the

20        application, what was the next step in the process?

21   A.   I was contacted by Cheryl Ronk and scheduled for a

22        phone screen.

23              Can we hold one second and let me grab my

24        charger?

25   Q.   Absolutely.

Page 120

1              MR. CASCINI:  Off the record.

2              (Off the record at 1:40 p.m.)

3              (Back on the record at 1:42 p.m.)

4    BY MR. CASCINI:

5    Q.   Mr. Branch, you just testified that you had been

6         contacted by Cheryl Ronk for a phone screening.  Do

7         you remember how Ms. Ronk contacted you?

8    A.   By telephone.

9    Q.   Did she initially reach out to you to inform you, you

10        were going to have a phone screening by telephone or

11        did she call in advance, did she send an email?

12   A.   She called in advance and scheduled the time for the

13        phone screen.

14   Q.   She called it an interview when she contacted you in

15        advance, right?

16   A.   I recall phone screen.

17   Q.   I'm going to be marking a document as Exhibit 15.

18              MARKED FOR IDENTIFICATION:

19              DEPOSITION EXHIBIT 15

20              1:43 p.m.

21              MR. CASCINI:  Alex and Carl, could you let

22        me know when you get that?

23              MR. ALEXOPOULOS:  I have it.

24              MR. EDWARDS:  So do I.

25   BY MR. CASCINI:

BRANCH, ANTHONY
07/21/2020                                                          Pages 121–124

Page 121

1   Q.   All right.  Anthony, I'm going to be sharing my screen
2        with you.  I'm showing you a document that is
3        Exhibit 15.  For reference, this has been marked as
4        Bates number Defendant GCRC production number one,
5        number 3176.  This is a chain of emails.  Mr. Branch,
6        at the very, very top it says Cheryl@MSAE.org.  To the
7        best of your knowledge, is that Cheryl Ronk's email
8        address?
9   A.   To the best of my knowledge, correct.
10  Q.   Then ABranch@GCRC.org.  That's your email address,
11       right; your work one?
12  A.   Correct.
13  Q.   If we go down to the third page, or I should say in
14       between the second and the third page, this is in
15       reverse order, it's a string of emails.  The date,
16       it's June 8, 2018.  This is Cheryl writing to you and
17       it says subject GCRC preliminary interview.  I read
18       that right, didn't I?
19  A.   Yes.
20  Q.   It says Anthony, thank you applying for the managing
21       director position, can we talk on Monday.  I am open
22       between 1:00 p.m. and 7:00 p.m., what works for you.
23       I just need 30 minutes.  Cheryl.  Did I read that
24       correctly?
25  A.   Yes.

Page 122

1   Q.   Then you respond, later that day, not long after, at
2        6:21 p.m. and you write 1:00 p.m. Monday will work for
3        me.  Thank you, Anthony.  Did I read that correctly?
4   A.   Yes.
5   Q.   She did contact you and tell you that you were going
6        to sit for a preliminary interview, correct?  That is
7        the subject line of the email here.
8   A.   Well, that's not what the content of the email says.
9   Q.   And where does the content of the email say that this
10       is not going to be a preliminary interview?
11  A.   It says, can we talk on Monday.
12  Q.   You do acknowledge that the subject of the email says
13       GCRC preliminary interview, correct?
14  A.   Yes.
15  Q.   Was your belief upon responding to Ms. Ronk later that
16       afternoon, was your belief that you were going to then
17       have a preliminary interview with her at 1:00 p.m. on
18       Monday?
19  A.   That we were going to talk on Monday was my
20       understanding.
21  Q.   All right.  Did you, in fact, talk with Ms. Ronk on
22       Monday, and I believe the date in question would have
23       been June 11, 2018?
24  A.   Yes.
25  Q.   Who was present during that telephone call?

Page 123

1   A.   Myself.
2   Q.   Who was on the other line?
3   A.   Cheryl Ronk.
4   Q.   Anyone else?
5   A.   Not to my knowledge.
6   Q.   What do you remember about that telephone call; how
7        did the conversation proceed?
8   A.   It was just a conversation about why I wanted to be
9        the managing director.  How would I go about making
10       changes at the road commission and what my obstacles
11       would be, things of that nature.
12  Q.   When you say things of that nature, what other
13       questions do you remember Cheryl asking you during
14       this phone conversation, in addition to those three?
15  A.   I remember her asking me questions based on my
16       answers.
17  Q.   Can you recall any of the questions that she based off
18       your answers?
19  A.   I remember her asking me how would I determine the
20       return on investment on equipment purchases.
21  Q.   What other questions do you remember her asking you
22       based on the answers you gave?
23  A.   How would I go about making the roads better in
24       Genesee County.
25  Q.   Any other questions you recall?

Page 124

1   A.   Not that I recall, no.
2   Q.   Is it possible there were other questions, you
3        can't remember them?  I am cognizant of the fact this
4        was back in June of 2018.
5   A.   That is correct.
6   Q.   Did you give an answer to each one of those questions?
7   A.   Yes.
8   Q.   To the best of your recollection, what did you say
9        when you were asked why you wanted to be the managing
10       director?
11  A.   I don't recall exactly, something along the lines of
12       improving the road quality of roads in Genesee County.
13  Q.   How, if you can recall, did you answer the question
14       about how you were going effectuate change?
15  A.   By leaning more toward taking care of what we already
16       have in Genesee County as opposed to building more
17       roads when our existing roads are in a poor state.
18  Q.   What obstacles do you remember citing as an answer
19       during your phone conversation with Ms. Ronk?
20  A.   I didn't see any obstacles.
21  Q.   What else did you talk about during this conversation?
22  A.   I don't recall all the things she asked.  I don't
23       recall them.  Those are the things that I recall.
24  Q.   There were questions that were asked beyond the ones
25       you listed, though?

BRANCH, ANTHONY
07/21/2020                                                                                    Pages 125–128

Page 125

1   A.   Yes.
2   Q.   You gave answers to all the questions, even the ones
3        we haven't talked about specifically?
4   A.   Yes.
5   Q.   Approximately how long did this conversation last?
6   A.   Approximately 20 minutes.
7   Q.   Did Ms. Ronk ask you any questions, that you can
8        recall, about your application materials or your
9        resume?
10  A.   No.
11  Q.   Did Ms. Ronk tell you at any time that you were going
12       to be considered ineligible for the position because
13       you lacked a bachelor's degree?
14  A.   No.
15  Q.   Did Ms. Ronk ask you at the end of the conversation
16       whether or not you had any questions?
17  A.   Yes.
18  Q.   Did you ask her any questions?
19  A.   I asked her what would be the next steps in the
20       process.
21  Q.   And what did she tell you?
22  A.   She explained she would be evaluating the people that
23       she had done on phone screen, and then she would be
24       getting back with the board and they would make a
25       selection of -- I cannot remember the number.  It

Page 126

1        would narrow it down.  I can't remember the number
2        they were going to reduce it to.
3   Q.   After you hung up from this conversation and you both
4        parted ways, did you have any further communication
5        with Ms. Ronk?
6   A.   Yes.
7   Q.   When did that conversation occur?
8   A.   I believe Wednesday.  The subsequent Wednesday.
9   Q.   What took place during that conversation, did she call
10       you, did you call her?
11  A.   She called me on Tuesday.  I was unable to answer the
12       phone at that time.  When I returned her call, she had
13       left the office for that day, and she returned my call
14       on Wednesday and she told me that I would not be
15       advancing to the next round.
16  Q.   What did you say in response?
17  A.   I asked her why.
18  Q.   What did she say in response to that question?
19  A.   She said the board and the employees wanted to go in
20       another direction.
21  Q.   What else was said during that meeting?
22  A.   That was it.
23  Q.   Very brief conversation, how long did that last?
24  A.   A minute, two minutes.  I don't know exactly how long
25       it lasted.

Page 127

1   Q.   Okay.  I'm going to continue having you look at
2        Exhibit 15.  Looks like, if we're moving up from the
3        message on Friday the 8th where you said 1:00 p.m.
4        Monday will work for me, it looks like a couple
5        minute -- it looks like literally the next minute
6        after you responded, 1:00 p.m. Monday will work for
7        me, she writes back, perfect, talk to you then.  Then
8        in this same email chain you reply again on Friday,
9        June 15 and you write, Cheryl, I'm requesting a formal
10       letter from MSAE denying my opportunity to interview
11       with the board of Genesee County Road Commissioners
12       for the managing director vacancy listing, the reason
13       for denial as you stated in our phone conversation on
14       6/14/2018.  So this was sent on Friday, June 15.  So
15       you had this conversation with Cheryl, the one where
16       she told you that they would be, quote/unquote, going
17       in another direction, you had that on Thursday, right?
18  A.   Okay, yes, Thursday.
19  Q.   That's the meeting, the phone call that we just
20       discussed in your testimony here at your deposition,
21       that's what you are referring to in your message on
22       Friday, June 15?
23  A.   Correct.
24  Q.   Then it looks like on Tuesday, June 26, you write to
25       her again and you say again, I'm requesting a formal

Page 128

1        letter from MSAE denying my opportunity to interview
2        with the Board of Genesee County Road Commissioners
3        for the vacant manager director position.  Please
4        include the reason for denial as you stated in our
5        phone conversation.  It's my second request.  Thank
6        you kindly, Anthony Branch.  That's on Tuesday,
7        June 26, right?
8   A.   Correct.
9   Q.   Do you recall sending these emails on June 26 and June
10       15?
11  A.   Yes.
12  Q.   Why did you send these emails on June 15 and June 26?
13  A.   Because I wanted the letter in writing why I was being
14       denied.  She had verbally told me over the phone, but
15       I wanted it in writing from her.
16  Q.   What made you want to obtain a written confirmation of
17       what you had been told verbally?
18  A.   As a point of record.
19  Q.   What led you to feel it was necessary to keep a record
20       of that denial?
21  A.   Because the answer that she gave me made no sense.
22  Q.   When you say, the answer that she gave me, what are
23       you referring to specifically?
24  A.   Cheryl Ronk told me that the board and the employees
25       wanted to go in a different direction, and that was

BRANCH, ANTHONY
07/21/2020                                                              Pages 129–132

Page 129

1    their reasoning.
2    Q.   Why did you feel, in your words, that that answer made
3         no sense?
4    A.   The basis of it.  I wasn't interviewing for what
5         employees think.  I wasn't trying to interview for the
6         position for what employees think.
7    Q.   So you felt that it was an unreasonable basis for her
8         to have relied on the input of employees in
9         determining whether or not you would be the managing
10        director?
11   A.   That is correct.
12   Q.   Did you feel that it was a reasonable basis for the
13        board to decide they wanted to go in a different
14        direction?
15   A.   Yes.
16   Q.   Then turning back to Exhibit 15, Ms. Ronk responds to
17        you, right, at the very top email?
18   A.   Yes.
19   Q.   She responds to you on June 26, the same day that you
20        sent your second request.  For reference, we're
21        looking at Defendant GCRC production number one,
22        number 3176.  Anthony, I am in receipt of your email.
23        I find it a strange request.  We did talk on the 14th
24        and I explained the decision.  I do not intend to
25        pursue it further, Cheryl.  Did I read that correctly?

Page 130

1    A.   Yes.
2    Q.   Did you have any further conversation with Ms. Ronk
3         after that email?
4    A.   No.
5    Q.   Did you have any conversation about this preliminary
6         interview with anyone other than Ms. Ronk?
7    A.   Yes.
8    Q.   Who did you have a conversation with?
9    A.   Commissioner Dickerson, Commissioner Johnson, and
10        Commissioner Mandelaris.
11   Q.   Did you have any conversation with them separately as
12        one on one, two on one, all individually?
13   A.   Separately.
14   Q.   How did that conversation occur, was it verbal, by
15        email, by telephone?
16   A.   Verbal.
17   Q.   What did you tell Commissioner Dickerson about your
18        preliminary interview?
19   A.   I told them what Cheryl Ronk's answer was and asked
20        them was that true.
21   Q.   What did -- specifically Commissioner Dickerson tell
22        you in response?
23   A.   He told me no, that no one had said anything to him
24        about me talking with Ms. Ronk.
25   Q.   Do you remember when this conversation with

Page 131

1         Mr. Dickerson occurred?
2    A.   It would have been after the first round of formal
3         interviews with the board.
4    Q.   Prior to you bringing that matter to Mr. Dickerson's
5         attention, do you know if Mr. Dickerson knew whether
6         you had applied for the job?
7    A.   If he knew that I had applied?
8    Q.   Did Mr. Dickerson know you had applied for the job
9         prior to you coming to him with this concern?
10   A.   No.
11   Q.   But there had previously been a board meeting where
12        they changed the job description because in your
13        testimony it would be seen as discriminatory against
14        you, right?
15   A.   Yes.
16   Q.   What else was said between you and Commissioner
17        Dickerson during that meeting?
18   A.   I don't recall.  I just remember that was the basis of
19        the conversation.  I do recall one other thing.  He
20        did tell me that when he seen the list of interviewees
21        that he figured that maybe I changed my mind and
22        didn't apply for the job.
23   Q.   Did Commissioner Dickerson have this conversation with
24        you prior to the second round of interviews?
25   A.   Yes.  Prior to the second round, is that what you

Page 132

1         said?
2    Q.   Correct.
3    A.   No, it wasn't prior.
4    Q.   When did this conversation with Mr. Dickerson occur?
5         You said it was after the first round earlier.
6    A.   The conversations took place after Fred Peivandi was
7         named managing director.  That's when the
8         conversations took place.
9    Q.   I want to talk next about the conversation that you
10        had with Commissioner Johnson about what Cheryl Ronk
11        told you as a result of your preliminary interview,
12        what can you -- was that a conversation with
13        Commissioner Johnson individually?
14   A.   Yes.
15   Q.   Let me back up.  Why did you wait until after the
16        second round interview to bring up this matter with
17        any of the commissioners?
18   A.   I never brought it up with any of them.
19   Q.   Your prior testimony was that you addressed the matter
20        of Cheryl Ronk's denial of your preliminary interview
21        with Commissioners Dickerson, Johnson, and Mandelaris;
22        isn't that right?
23   A.   That's correct.
24   Q.   So what was the reason that you didn't decide to bring
25        up your concerns prior to Fred being named the

Page 133

1    managing director?
2    A.   My answer was I didn't bring it up to any of them.
3         They brought it to me.
4    Q.   Okay.  Why didn't you decide to affirmatively share
5         concerns with any of the commissioners after Cheryl
6         and -- after the exchange that you had with Cheryl
7         Ronk?
8    A.   Because she gave me her answer during the preliminary
9         times and signing the contracts with MSAE.  We're
10        supposed to have no contact.  As someone that applied
11        for the position, I was not supposed to talk about the
12        position with any members of the board.
13   Q.   So you believed -- you allege that -- who directed you
14        not to discuss the application with any members of the
15        board?
16   A.   It's in the contract.
17   Q.   Were you prohibited from discussing any issues related
18        to your candidacy for the job with anyone else?
19   A.   Not to my knowledge, no.
20             MR. CASCINI:  Yeah, I need to pull up an
21        exhibit.  I propose we take a quick break off the
22        record.
23             (Off the record at 2:11 p.m.)
24             (Back on the record at 2:18 p.m.)
25             MARKED FOR IDENTIFICATION:

Page 134

1              DEPOSITION EXHIBIT 16
2              2:18 p.m.
3    BY MR. CASCINI:
4    Q.   All right.  I have marked another document as
5         Exhibit 16, and Mr. Alexopolous, Mr. Edward, I have
6         already shared that with you.  Please let me know when
7         you're both able to open it.
8              MR. ALEXOPOULOS:  I have it.
9              MR. EDWARDS:  So do I.
10   BY MR. CASCINI:
11   Q.   Mr. Branch, I'm going to be sharing my screen with
12        you.  You can look at what we have marked as
13        Exhibit 16.  It is at the bottom, Bates number
14        Defendant GCRC, production number one, first
15        supplement 3907.
16             Mr. Branch, do you recognize this document?
17   A.   Yes.
18   Q.   What is this document?
19   A.   That is the front page of the contract.
20   Q.   Then, if we go on to Bates number 3908, that's the
21        second page of the contract?
22   A.   Correct.
23   Q.   Now, I want to make sure I understand your prior
24        testimony.  You allege that you were not permitted to
25        have any discussion with any members of the board of

Page 135

1    commissioners regarding the process of applying for
2    the managing director position; is that correct?  That
3    was your testimony?
4    A.   That was correct.
5    Q.   And you mentioned that that was prohibited by the
6         contract; is that right?
7    A.   Correct.
8    Q.   What provision of this agreement do you interpret to
9         be prohibiting you from addressing your concerns to
10        the extent you have them with one or more of the
11        commissioners prior to Fred being hired?
12   A.   Paragraph number 7.
13        It is understood that Genesee County Road Commission
14        MSAE will not disclose any names or information which
15        would identify candidates or cause candidates to be
16        referred to by any third party.
17             You understood this to mean not only that
18        they couldn't share the identities of the other people
19        who were interviewing, but they couldn't talk to you
20        even if you were the one to bring it up?
21   A.   Yes.  I would be putting them in a bad situation, I
22        think.
23   Q.   Explain why.  Why do you feel like you would be
24        putting them in a bad situation?
25   A.   If it's understood that they are not to discuss or

Page 136

1    share any names or information.  That's what it said.
2    Q.   Sure.  Why did you feel that prohibited you from
3         bringing a concern forward, not asking them for names
4         or information about the other candidates, but bring a
5         concern forward about the reasoning Cheryl Ronk had
6         given you for why you were not going to proceed to a
7         second round interview?
8    A.   Because I was a candidate.  So that would identify a
9         candidate or cause a candidate to be referred to in a
10        third party, because I was a candidate.
11   Q.   It is understood that the Genesee County Road
12        Commission MSAE will not disclose or share any names
13        or information which would identify candidates or
14        cause candidates to be referred to any third party.
15        This is saying, if I'm not mistaken, you can tell me
16        whether you agree or disagree, Mr. Branch, this is
17        saying the Genesee County Road Commission could not
18        tell you the identity of somebody else who interviewed
19        for the job, right?
20   A.   I disagree.
21   Q.   Did anyone ever tell you that the contract
22        affirmatively prohibited you from discussing anything
23        with the board?
24   A.   No.
25   Q.   Let's go back then to talk about your discussion with

BRANCH, ANTHONY
07/21/2020                                                      Pages 137–140

| Page 137 |
|---|

1    Commissioner Johnson.  You mentioned you had a
2    discussion with Commissioner Johnson about your
3    concerns related to the reason Cheryl gave you for why
4    you hadn't passed forward beyond the preliminary
5    interview.  When did you have that conversation with
6    Commissioner Johnson?
7  A.  **It was before a board meeting.  I don't remember the**
8      **date.**
9  Q.  Can you place it in time relevant to any other events,
10     was it after the first round of interviews?
11 A.  **It was after Fred was already the managing director.**
12 Q.  You had the conversation before a board meeting so it
13     was verbal, face-to-face?
14 A.  **Correct.**
15 Q.  What did you tell Commissioner Johnson?
16 A.  **He asked me -- he asked me, he said, I didn't know**
17     **that you were -- you weren't allowed to interview.  I**
18     **told him exactly what Cheryl Ronk told me.  And he**
19     **told me that that was bullshit.**
20 Q.  Did he use that word exactly, he called it bullshit?
21 A.  **Yes.**
22 Q.  What was your response when you heard that?
23 A.  **I told him that's exactly what she told me.**
24 Q.  When he said that the reasoning was, quote-unquote,
25     bullshit, was your understanding that he -- what was

| Page 138 |
|---|

1    he referring to?  Was he referring to the reason that
2    Cheryl -- that Cheryl gave you or the fact that you
3    hadn't been allowed to get a second interview?
4  A.  **The reason that she gave me.**
5  Q.  Okay.  Did you ask him, well, what was the reason I
6    didn't get a second round interview?
7  A.  **No.**
8  Q.  Did he elucidate on what the reason may have been?
9    Did he say that was bullshit and it was -- and then
10   explain the reason?
11 A.  **No.**
12 Q.  Did you have any additional conversation with
13   Commissioner Johnson regarding this matter?
14 A.  **No.**
15 Q.  That was the entirety of the extended conversation.
16   You guys didn't talk about anything else, that's where
17   it ended?
18 A.  **We didn't talk about that, that's where it ended.**
19 Q.  Fair enough.  You continued the conversation, but that
20   was the only discussion you had about your
21   participation in the managing director job search?
22 A.  **Correct.**
23 Q.  Okay.  You also mentioned that you had a conversation
24   with Commissioner Mandelaris?
25 A.  **Yes.**

| Page 139 |
|---|

1  Q.  When did that occur?
2  A.  **It was during the course of a board meeting, I don't**
3      **know if it was before or after a board meeting.  It**
4      **may have been the same board meeting that I had the**
5      **conversation with Commissioner Johnson, but I don't**
6      **recall if it was or wasn't.**
7  Q.  Sure.  It may have been, but wasn't necessarily?
8  A.  **Correct.**
9  Q.  Okay.  Again, was it a verbal situation with
10     Mr. Mandelaris?
11 A.  **Yes.**
12 Q.  And did this occur after Fred was hired as the
13     managing director?
14 A.  **Yes.**
15 Q.  What was the substance of your conversation with
16     Mr. Mandelaris?
17 A.  **He approached me and he said that he was unaware that**
18     **I wasn't going to get an interview.  He thought that I**
19     **just didn't apply for the job.**
20 Q.  What did you say in response?
21 A.  **I went on to tell him exactly what Ms. Ronk said.  He**
22     **just shook his head and that was the extent of the**
23     **conversation.**
24 Q.  That's how that portion of the conversation ended?
25 A.  **Correct.**

| Page 140 |
|---|

1  Q.  You didn't have any further follow-up with
2    Mr. Mandelaris regarding the managing director job
3    search at all?
4  A.  **No.**
5  Q.  I want to make sure this point is clear.  Commissioner
6    Mandelaris didn't say that that wasn't the reason you
7    didn't get a second round interview, right, he just
8    shook his head in response, correct?
9  A.  **Correct.**
10 Q.  Now, do you know when the second round of interviews
11   was held?
12 A.  **I knew when they were held, but I don't recall the**
13     **date.**
14 Q.  If I told you that it was in June, does that strike
15   you as correct?
16 A.  **Latter part.**
17 Q.  Do you know any of the identities of the applicants
18   that were interviewed in that second round?
19 A.  **Yes.**
20 Q.  Do you know the identity of anyone that was
21   interviewed in the second round other than Fred?
22 A.  **Yes.**
23 Q.  Who do you know was interviewed during that round?
24 A.  **Mary Gillis and Mark Riley.**
25 Q.  Who is Mary Gillis?

BRANCH, ANTHONY
07/21/2020

Pages 141–144

Page 141

1  A.  She's an employee, I'm not sure if she's still an
2      employee.  She was employed by Oakland County Road
3      Commission.
4  Q.  Fred, of course, is the current managing director or
5      former director of engineering, right?
6  A.  Yes.
7  Q.  And who is Mark Riley?
8  A.  Mark Riley is a gentleman that is from Ohio that
9      applied for the position.
10 Q.  Okay.  Do you know how many other applicants
11     interviewed during the second round?
12 A.  I do not.
13 Q.  Then for the third round interview, do you know when
14     that was held, when that occurred?  So the folks that
15     were brought forward from the second round interview.
16 A.  Just a point of clarification.
17 Q.  Go ahead.
18 A.  I'm not considering -- I wasn't considering the phone
19     as a first round interview.
20 Q.  I don't want to have any mistake of terminology, I
21     apologize.
22 A.  When you say second round, I'm thinking the final
23     interview.
24 Q.  Understood.  Let's circle back then.  When I was
25     referring to the second round before, I meant the

Page 142

1      round that immediately preceded the preliminary
2      interview stage, the one that you participated in.  Do
3      you know how many candidates participated in that
4      stage, whatever designation we'll call it?
5  A.  I do not.
6  Q.  Do you know the identity of any individuals who
7      participated in, we'll call it for the sake of ease,
8      the first round interview with the board?  Do you know
9      how many people participated in that round?
10 A.  I do not.
11 Q.  Do you know the identity of anybody other than Fred,
12     Mary or Mark who participated in that round?
13 A.  I do not.
14 Q.  Moving forward from that round to the final round
15     where there would be a person selected from it, we'll
16     call this the second round interview in front of the
17     board.  Do you know how many people participated in
18     that round?
19 A.  I do not.
20 Q.  But you do know the identity of the individuals who
21     participated there, right, that's the one you thought
22     we talked about before?
23 A.  I know the identity of the individuals that I told
24     you.  I don't know if they were the only ones that
25     participated or not.

Page 143

1  Q.  Okay.  And the identity of the people that you told me
2      that you were aware of that participated in the second
3      round board interview were Fred, Mary, and Mark,
4      correct?
5  A.  That's correct.
6  Q.  Other than Fred, and I know you know Fred, did you
7      know either Mary Gillis or Mark Riley at any time
8      prior to the job search?
9  A.  No.
10 Q.  Had never heard their names before even; is that
11     right?
12 A.  I have heard Mary Gillis' name plenty of times, but I
13     didn't know her.
14 Q.  You had heard of Mary just because she was working
15     with Oakland County, but you had never actually
16     interacted with her?
17 A.  Correct.
18 Q.  Have you ever heard of Mark Riley?
19 A.  No.
20 Q.  I want to talk about the first round in front of the
21     board, so we're going back one step.  Do you know how
22     many individuals in that round possessed bachelor's
23     degrees?
24 A.  No.
25 Q.  Do you know how many possessed master's degrees?

Page 144

1  A.  No.
2  Q.  Do you know how many had an academic or vocational
3      engineering background?
4  A.  No.
5  Q.  I want to talk about the second round in front of the
6      board.  That would be the round where the three
7      applicants where Fred ended up being selected.  Do you
8      know if any of those -- how many of those candidates
9      had a bachelor's degree?
10 A.  I know of one.
11 Q.  Who is that?
12 A.  Fred.
13 Q.  Fred.  Do you know if any of them have a master's
14     degree other than Fred?
15 A.  No.
16 Q.  Do you know if any of them other than Fred came from a
17     vocational or academic or engineering background?
18 A.  No.
19 Q.  Did you have any conversations either
20     contemporaneously or subsequently with any
21     commissioners about the first or second round of
22     interviews before the board?
23 A.  Other than what I --
24 Q.  Other than the ones you've already described, sure.
25 A.  No.

BRANCH, ANTHONY
07/21/2020                                                                 Pages 145–148

**Page 145**

1   Q.   Subsequent to the round of interviews or
2        contemporaneous with them, did you ever -- Anthony,
3        you cut out there for just a second.  Can you still
4        see me and hear me?
5   A.   **Yeah, depending on how much longer I go, I may have to**
6        **go and sign in on the computer because it's --**
7   Q.   It's dying?
8   A.   **It's still going down.  I have 4 percent now.**
9   Q.   Okay.  After or contemporaneously with the first or
10       second round of interviews, did anyone ever tell you
11       or evaluate the relative performance of the people
12       interviewed in that round, in other words, did anybody
13       ever tell you how various candidates fared during
14       their interviews?
15  A.   **Yes.**
16  Q.   How did you come to learn about that?
17  A.   **In talking to one of the employees who was at the**
18       **interview.**
19  Q.   Who was that employee?
20  A.   **Coetta Adams.**
21  Q.   Who is Coetta Adams?
22  A.   **She is a former Genesee County Road Commission**
23       **employee.**
24  Q.   When did she have this conversation with you?
25  A.   **After the interviews, the first round of interviews.**

**Page 146**

1   Q.   After the first round before the board?
2   A.   **Correct.**
3   Q.   Was this a verbal conversation, was it by phone?
4   A.   **Verbal.**
5   Q.   Was it before the second round before the board
6        interviews?
7   A.   **Yes.**
8   Q.   And what did she tell you during this conversation?
9   A.   **That she didn't feel that Fred interviewed well.**
10  Q.   When she was referring to that, I mean, she was
11       telling you before the second round before the board
12       she's evaluating Fred's performance based on the first
13       round interview before the board.  She is saying that
14       he didn't interview in that round well?
15  A.   **Correct.**
16  Q.   And you said that she didn't feel that Fred had
17       interviewed well in that round.  Did she tell you
18       anything else when you had the conversation?
19  A.   **That she didn't like Mark Riley's interview.**
20  Q.   Did she tell you anything else?
21  A.   **No.**
22  Q.   Okay.  Did you have a conversation with anybody else
23       where they evaluated the relative performance of the
24       candidates during either round of interviews?
25  A.   **Commissioner Dickerson and Commissioner Johnson.**

**Page 147**

1   Q.   When did you have conversation with Commissioner
2        Dickerson?
3   A.   **I don't recall the date.  The date -- it's been -- I**
4        **have heard him say it more than once.**
5   Q.   Can you place it relative to any of the other events
6        that we have talked about?
7   A.   **It was after -- after Fred became the managing**
8        **director.**
9   Q.   And what did Mr. Dickerson tell you during that
10       conversation?
11  A.   **That Fred was the worst interview out of the**
12       **candidates.**
13  Q.   What else did Commissioner Dickerson tell you about
14       the -- either round of interviews?
15  A.   **He apologized to me and said that he wasn't aware that**
16       **I was not getting an interview before the board.**
17  Q.   When Commissioner Dickerson was evaluating Fred's
18       performance and relaying that to you, was he
19       commenting on Fred's performance during the first
20       round interview before the board, the second round
21       interview before the board, or do you not know?
22  A.   **He didn't distinguish.**
23  Q.   You said that he apologized to you, and you said that
24       he wasn't aware that you were not getting an
25       interview?

**Page 148**

1   A.   **That's correct.**
2   Q.   Did he say when he learned that you weren't getting an
3        interview?
4   A.   **When I told him.**
5   Q.   When you told him.  That was after Fred had been
6        hired?
7   A.   **Correct.**
8   Q.   Now, you also said that you had a conversation, and I
9        apologize, but was it with Commissioner Johnson you
10       had a conversation in which the relative strengths and
11       weaknesses of the interviewees had been discussed?
12  A.   **Correct.**
13  Q.   And when did that conversation occur?
14  A.   **I don't remember the date.  But it was after the**
15       **position was already filled.**
16  Q.   You anticipated my next question, good.  I was going
17       to ask that next.  What did Commissioner Johnson tell
18       you?
19  A.   **That he didn't see any reason why I shouldn't have**
20       **been interviewed.**
21  Q.   What did he tell you about the relative performance of
22       the interviewees during either round?
23  A.   **He didn't say.  He just said -- he just said he didn't**
24       **see any reason why I shouldn't have been interviewed**
25       **with the candidates.**

BRANCH, ANTHONY
07/21/2020                                                          Pages 149–152

Page 149

1    Q.   Was this the same conversation you discussed earlier
2         where Commissioner Johnson allegedly told you that
3         Cheryl Ronk's reasoning that she gave you was,
4         quote-unquote, bullshit?
5    A.   No.
6    Q.   Which of those two conversations came first?
7    A.   The bullshit comment came first.
8    Q.   Okay.  And the bullshit comment came, in relative
9         time, when again?
10   A.   I'm not understanding your question.
11   Q.   Fair enough.  When, in relation to some of the other
12        events we have talked about, was the bullshit comment
13        made?  Was it before this conversation that you just
14        relayed here in which he said to you that he didn't
15        see any reason why you couldn't get an interview?  Was
16        the bullshit comment made in between the rounds of
17        interviews after Fred was already hired?
18   A.   He would have already been the managing director.
19   Q.   Got it.  You mentioned that Cloyce Dickerson
20        apologized to you for you not getting an interview.
21        Did he ever apologize to you formally in front of the
22        board?
23   A.   I'm not sure.  He may have.  But I'm not sure.
24   Q.   Might he have apologized in front of the board on --
25        during a meeting on August 21, does that at all ring a

Page 150

1         bell?
2    A.   He may have.  I just don't recall it right now.
3    Q.   Do you remember a meeting in which several Genesee
4         County Township supervisors congratulated Fred for
5         getting the job?
6    A.   Yes, I do remember that now.
7    Q.   Do you recall what Mr. Dickerson said during that same
8         meeting about you?
9    A.   He did apologize for me not getting an interview.  He
10        did at that meeting.
11   Q.   Was that the same conversation that we just talked
12        about, the one in which he apologized to you and said
13        that he wasn't aware you weren't getting an interview?
14        Same conversation or different conversation?
15   A.   No, different conversation.
16   Q.   Was the public apology before or after the private
17        apology?
18   A.   I can't recall the dates when it occurred.
19   Q.   How did you react when you received the public apology
20        from Mr. Dickerson, on August 21?
21   A.   I mean, there is really no reaction.  It's just, I
22        mean, kind of like too little, too late.
23   Q.   Did you ever communicate to Mr. Dickerson that you
24        were upset by the decision that Cheryl Ronk made for
25        you to not advance to the first round interview before

Page 151

1         the board?
2    A.   Yes.
3    Q.   You did that after he had affirmatively approached
4         you, however?
5    A.   Correct.
6    Q.   Now, my understanding was after the GCRC board made
7         the decision to hire Fred as the managing director, my
8         understanding was that you were essentially
9         reappointed to your position and you were returned to
10        your position as director of maintenance, correct?
11   A.   That's correct.
12   Q.   And you are currently an employee of the
13        Genesee County Road Commission now and in that
14        position, correct?
15   A.   That's correct.
16   Q.   Were you allowed to retain the higher salary you made
17        as the co-interim managing director even after you had
18        been returned to your director of maintenance
19        position?
20   A.   Yes.
21   Q.   In fact, the board subsequently voted to give you a
22        pay increase from the amount of money that you had
23        been making as a co-interim managing director even
24        after they returned you to the director of maintenance
25        position, correct?

Page 152

1    A.   Yes.
2    Q.   What is your salary currently, sir?
3    A.   Around $123,000.
4    Q.   Okay.
5    A.   $120,000, around $120,000, yes.
6    Q.   How did you react when you had heard that you would be
7         receiving a salary increase?
8    A.   I was happy about the increase.
9    Q.   Did you have any conversations with any of the
10        commissioners about that salary increase before or
11        after you learned about it?
12   A.   No.
13   Q.   You didn't ask any of them to receive an increase?
14   A.   No.
15   Q.   Did you ever ask anyone why they had given you a
16        salary increase?
17   A.   No.
18   Q.   Did anyone ever come to you to confirm or explain why
19        they had given you a salary increase?
20   A.   No.
21   Q.   So you don't know why you had been given a salary
22        increase after you were returned to the director of
23        maintenance position?
24   A.   No.
25   Q.   Perhaps I phrased the question poorly.

BRANCH, ANTHONY
07/21/2020

Pages 153–156

Page 153

1          Do you know why you were given a salary
2  increase when you were returned to the director of
3  maintenance position?
4  **A.  No.**
5  Q.  Now, you have, the basis of this action is a race
6  discrimination claim, correct?  You sued the Genesee
7  County Road Commission on the basis of race
8  discrimination?
9  **A.  Correct.**
10 Q.  I ask this with sensitivity only because it is
11 pertinent to the lawsuit directly, what race do you
12 self identify as, Mr. Branch?
13 **A.  African American.**
14 Q.  And what race do you perceive Mr. Peivandi to be?
15 **A.  Iranian.**
16 Q.  What race do you perceive the current board of
17 commissioners to be, if you can say what race you
18 perceive each of the current commissioners to be?
19 **A.  Dickerson, African American; Kautman-Jones, Johnson**
20 **and Mandelaris, Caucasian; and Arceo, Mexican**
21 **American.**
22 Q.  Now, in your complaint you allege that you were denied
23 an opportunity to interview for the managing director
24 position because of your race, correct?
25 **A.  That's correct.**

Page 154

1  Q.  Do you know the race of any of the individuals who
2  made it past the preliminary interview round to either
3  the first round interview before the board or the
4  second round interview before the board?
5  **A.  Only the second round.**
6  Q.  And what do you perceive the race of the individuals
7  in the second round interview before the board to be?
8  **A.  Peivandi, Iranian; Gillis, Caucasian; and Riley,**
9  **African American.**
10 Q.  You also allege in your complaint that you were not
11 hired for the job ultimately because of your race,
12 correct?
13 **A.  Correct.**
14 Q.  Do you have any other claims of race discrimination in
15 your complaint?
16 **A.  No.**
17 Q.  Now, why do you believe that you were denied an
18 opportunity to interview for the managing director
19 position because of your race?
20 **A.  Because I have a colleague that is not of my race that**
21 **was allowed to interview.**
22 Q.  You would agree that if -- if Fred was an African
23 American that you would not have a claim on that
24 basis, correct?
25 **A.  No.**

Page 155

1  Q.  So why do you feel then that you were denied the
2  opportunity to interview because of your race?
3  **A.  It's my belief that the people that were interviewed**
4  **have nothing to do with why I wasn't interviewed.**
5  Q.  You believe that you weren't interviewed because of
6  your race.  Why do you believe that others were
7  interviewed for different reasons?
8  **A.  Because they were treated different than I was.**
9  Q.  What evidence do you have to support that you were
10 treated differently from the folks that were approved
11 for an interview on the basis of your race?
12 **A.  They were interviewed and I wasn't.**
13 Q.  What other evidence do you have that you were treated
14 differently because of your race than the folks who
15 were interviewed?
16 **A.  That's it.**
17 Q.  Nothing else, no other evidence for that?
18 **A.  No.**
19 Q.  And the second claim was you allege you ultimately
20 were not hired for the job because of your race,
21 correct?
22 **A.  Correct.**
23 Q.  And what evidence do you have supporting that claim
24 that Fred was hired or that you were denied the
25 opportunity for that job because of your race?  I'll

Page 156

1  rephrase for a clean record.
2          What evidence do you have that you were
3  denied being hired as the managing director position
4  because of your race?
5  **A.  Because my colleague was hired and I wasn't.**
6  Q.  What other evidence do you have that you were denied
7  being hired in the managing director position because
8  of your race?
9  **A.  Nothing.**
10 Q.  One of the allegations that you make in your
11 complaint -- this is backtracking slightly and forgive
12 me for that.  I will pull up a copy here of the
13 complaint so that everyone can see that.  I will share
14 that with you very shortly, Mr. Branch.
15         Mr. Branch, I'm going to direct your
16 attention toward your complaint.  Are you able to see
17 it on the screen, sir?
18 **A.  Yes.**
19 Q.  I'm going to be scrolling down.  I want you to look at
20 paragraph 14, allegation B, which reads, defendant
21 employer Genesee County Road Commission changed the
22 managing director's job description that existed at
23 the time that John Daly retired which allowed for
24 on-the-job experience or a college degree.
25 Thereafter, GCRC tailored the new managing director's

BRANCH, ANTHONY
07/21/2020

Pages 157–160

Page 157

1    job description to fit the educational background of
2    white Iranian-American candidate Fred Peivandi, who
3    had also applied for the top position of managing
4    director.  Did I read that correctly?
5  A.  Yes.
6  Q.  What evidence do you have that the GCRC, quote,
7    tailored the new managing director's job description
8    to fit the educational background that Fred had?
9  A.  It matches his educational background.
10  Q.  But certainly you acknowledge it probably matches the
11    educational background of hundreds, if not thousands
12    of potential applicants for this job.  What, in
13    particular, evidence do you have that they tailored it
14    to fit Fred's background?
15  A.  Fred was given the position.
16  Q.  By Fred was given that position, you mean Fred
17    ultimately ended up being the one who was hired for
18    the managing director position?
19  A.  Correct.
20  Q.  What other evidence do you have that GCRC tailored the
21    new managing director job description to fit the
22    educational background of Fred?
23  A.  None.
24  Q.  Okay.  If we take a look at paragraph K, subparagraph
25    K, it says, upon information and belief, of the three

Page 158

1    finalists, Fred Peivandi scored the worst interview
2    yet.  He was selected to replace John Daly as managing
3    director of Genesee County Road Commission by
4    defendant employer.  You mentioned previously that
5    Coetta Adams had disclosed that Fred had scored the
6    worst in the first round before the board interview,
7    correct?
8  A.  Correct.
9  Q.  Do you have any other evidence to support the
10    allegation that Fred scored the worst interview of the
11    three finalists?
12  A.  Just what Commissioner Dickerson told me.
13  Q.  Other than Commissioner Dickerson's comment, do you
14    have any other evidence to support that assertion?
15  A.  No.
16  Q.  Do you know whether Commissioner Dickerson was
17    speaking on behalf of the board or in his individual
18    capacity when he made that assessment which, is to
19    say, do you know whether he was saying the board
20    scored them the worst or whether he was saying he
21    scored them the worst?
22  A.  He didn't distinguish.  He just said that he was the
23    worst interview.
24  Q.  Okay.  Now, I'm going to direct you to paragraph
25    number 24, which says plaintiff, Anthony Branch, has

Page 159

1    been forced to seek the assistance of a mental health
2    professional because of being subjected to racial
3    discrimination by each defendant, Genesee County Road
4    Commission and Michigan Society of Association
5    Executives.  Did I read that paragraph correctly?
6  A.  Correct.
7  Q.  With whom have you been treated for -- what mental
8    health professional has treated you for the results
9    of, quote-unquote, being subjected to racial
10    discrimination by each defendant?
11  A.  Hurley Mental Health.
12  Q.  Hurley Mental Health.  Anyone else?
13  A.  No.
14  Q.  Okay.  I'm going to be marking a document as
15    Exhibit -- sorry.  I need to mark it before I show it
16    to you, Mr. Branch.  I apologize.  I did it again.
17    I'm going to mark it as Exhibit 17.
18        MARKED FOR IDENTIFICATION:
19        DEPOSITION EXHIBIT 17
20        3:02 p.m.
21        MR. CASCINI:  I mean no ill will, by the
22    way, Carl, in me showing the witness accidentally
23    before I showed you.  Just being the only non-tech
24    savvy millennial alive.
25        MR. EDWARDS:  I'm much worse.

Page 160

1        MR. CASCINI:  I'm going to mark the
2    document as Exhibit 17.  I'm going to share it with
3    chat.  Carl and Alex, if you can confirm once you
4    receive that.
5        MR. ALEXOPOULOS:  I have it.
6        MR. EDWARDS:  Yes.
7  BY MR. CASCINI:
8  Q.  Mr. Branch, I'm going to share it with you.
9        Do you see a document on the screen, sir?
10  A.  Yes.
11  Q.  Is that your name on the top of this document?
12  A.  Yes.
13  Q.  When you said Hurley Mental Health, you are referring
14    to Hurley Mental Health Associates which is the named
15    entity that created this particular document?
16  A.  Correct.
17  Q.  Is that your signature about halfway down the page,
18    more or less?
19  A.  Yes.
20  Q.  On 1031.  Now, physician signatures are even worse
21    than attorney handwriting, so I'll give everyone a
22    moment.  Where it says the information that's
23    presented in the form above and below the Medicaid and
24    Medicare HMO patients only box, I want to make sure I
25    am reading that correctly, or I should say,

BRANCH, ANTHONY
07/21/2020

Pages 161–164

Page 161

1     Mr. Branch, that you believe that this is what this
2     document says. I read the first line as work
3     conflicts affecting home. Is that how you read that
4     first line? I confess it's very difficult.
5  A.  Yes.
6  Q.  I read the next one, frankly, I don't know what the
7     first word is, but maybe Genesee County Road
8     Commission 31 years. Yes, Genesee County Road
9     Commission 31 years. The next line?
10 A.  Yes.
11 Q.  The next line after that would be administer or
12    administration, one of the two?
13 A.  Yes.
14 Q.  And then the final line says bypassed for the next
15    level; is that right?
16 A.  Yes.
17 Q.  Is that consistent with your status as you described
18    it to Hurley Mental Health on October 31, 2019?
19 A.  Yes.
20 Q.  Is that the first date where you sought treatment from
21    Hurley Mental Health?
22 A.  **I don't know the first date. I don't remember the**
23    **first day.**
24 Q.  Well, you only ever went to one appointment with
25    Hurley Mental Health, correct?

Page 162

1  A.  **No.**
2  Q.  Okay. I'm going to mark a document as Exhibit 18.
3     We're going to do the sharing thing.
4         MR. CASCINI: Alex and Carl, if you can
5     notify me once that is up.
6         MR. EDWARDS: I have it.
7         MR. ALEXOPOLOUS: I also have it.
8         MARKED FOR IDENTIFICATION:
9         DEPOSITION EXHIBIT 18
10        3:06 p.m.
11 BY MR. CASCINI:
12 Q.  Mr. Branch, I'm going to share the screen with you.
13    Can you see the image on the screen, sir, it begins
14    with your name at the very top, it says 1/31/20
15    appointment at Hurley Mental Health Associates?
16 A.  Yes.
17 Q.  Okay. It says you have a therapy appointment on
18    January 31, 2020, correct?
19 A.  Yes.
20 Q.  And it says that appointment had been canceled,
21    correct?
22 A.  **Correct.**
23 Q.  It says the cancellation reason is error on the
24    clinic's part, GS thinks he has another appointment
25    and might take the day off. I assume -- is that

Page 163

1     referring to the doctor or referring to you?
2  A.  **The doctor.**
3  Q.  Now, there is another on the next page I'm going to
4     show you -- by the way, for -- we actually don't have
5     Bates numbers because these documents were obtained
6     through the release that you provided to us, but the
7     next document starts up at the top, 12/10/2019
8     appointment with Hurley Mental Health Associates. Am
9     I reading that correctly?
10 A.  Yes.
11 Q.  It says therapy 12/10/2019 and then it says down
12    below, canceled and then cancel reason, patient stuck
13    at work due to weather?
14 A.  **Correct.**
15 Q.  This appointment was canceled, correct?
16 A.  **Correct.**
17 Q.  Then the bottom line after that, the bottom page says
18    10/31/2019 mental health. The 10/31/19 date is the
19    same date as on the initial form, correct? The one we
20    just showed that was exhibit, that was Exhibit 17?
21 A.  Yes.
22 Q.  So this final page of Exhibit 18 is referring to the
23    same appointment as Exhibit 17 was referring to,
24    correct, same day?
25 A.  **Correct.**

Page 164

1  Q.  And this says associated problems generalized and
2     anxiety disorder, correct?
3  A.  **Correct.**
4  Q.  So I see we have three appointments and two were
5     canceled, one by you and one by the doctor. Then we
6     have one on October 31, correct?
7  A.  **That's correct.**
8  Q.  You didn't have any other appointments with Hurley
9     Mental Health Associates, did you?
10 A.  **That's not correct.**
11 Q.  What other dates did you have appointments with Hurley
12    Mental Health?
13 A.  **I don't have the dates in front of me. I could call**
14    **and get them, but every date that was canceled it was**
15    **a subsequent meeting maybe the next week or within two**
16    **weeks and I continue to have monthly meetings every**
17    **three weeks and not even monthly, every three weeks to**
18    **this date.**
19 Q.  Are all of the meetings with Hurley Mental Health the
20    same mental health care provider?
21 A.  **Yes.**
22 Q.  I will need you to -- this is the only documentation
23    that we have of any appointments that we obtained
24    through our authorization. I will need you to provide
25    documentation of that to your -- to plaintiff's

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020

Pages 165–168

Page 165

1    counsel, to your counsel so that that can be passed
2    along to the other parties in this lawsuit.  Do you
3    understand that?
4  A.  Yes.
5  Q.  Okay.  It could very well be an error of Hurley Mental
6    Health, but those are the documents that we have in
7    front of us.  But absent that, you acknowledge the
8    documentation that I have shown you only depicts one
9    appointment, correct?
10 A.  Yes.
11 Q.  It's your assertion there are more, correct?
12 A.  Correct.
13 Q.  I'm going to --
14 A.  Before you go to the next thing, let me sign on in the
15    computer.  I'm down to one percent.
16 Q.  Sure.  I think that makes perfect sense.  Go off the
17    record for just a moment, guys.
18 A.  Take me a second.
19               (Off the record at 3:11 p.m.)
20               (Back on the record at 3:12 p.m.)
21 BY MR. CASCINI:
22 Q.  Guys, I'm going to mark a document as Exhibit 19 and
23    share that.
24
25

Page 166

1               MARKED FOR IDENTIFICATION:
2               DEPOSITION EXHIBIT 19
3               3:13 p.m.
4               MR. CASCINI:  Carl and Alex, confirm
5    receipt, if you could.
6               MR. EDWARDS:  I have.
7               MR. ALEXOPOLOUS:  I have it.
8  BY MR. CASCINI:
9  Q.  Mr. Branch, I am going to share the screen with you.
10               Are you able to see the document, sir?
11 A.  Yes.
12 Q.  The one that we have marked Exhibit 19.  This is your
13    patient record, correct, from Hurley Mental Health?
14 A.  Yes.
15 Q.  Under problem list it says, generalized anxiety
16    disorder as the diagnosis; is that correct?
17 A.  Yes.
18 Q.  And when it's listed as chronic, the answer there is
19    yes, indicating that it is a chronic condition; is
20    that correct?
21 A.  Correct.
22 Q.  Anthony, do you have any reason to dispute the
23    diagnosis that you have received from Hurley Mental
24    Health?
25 A.  I don't know because I am not a mental doctor to say

Page 167

1    what it exactly means.
2  Q.  Understood.
3               MARKED FOR IDENTIFICATION:
4               DEPOSITION EXHIBIT 20
5               3:14 p.m.
6               MR. CASCINI:  Gentlemen, I just marked
7    Exhibit 20, please confirm receipt of that.
8               MR. EDWARDS:  I have it.
9               MR. ALEXOPOLOUS:  So do I.
10 BY MR. CASCINI:
11 Q.  Same story, Mr. Branch, do you recognize this
12    document?
13 A.  Yes.
14 Q.  It is an authorization for release of health
15    information.  Who is the party who is being released
16    here, to whom are you authorizing to receive your
17    mental health records?
18 A.  My counsel.
19 Q.  What is the date that you signed that release?
20 A.  November 23.
21 Q.  What year?
22 A.  2019.
23 Q.  Okay.  And when did you begin seeking treatment?
24 A.  I'm not sure, maybe late '18, early '19, somewhere in
25    there.

Page 168

1  Q.  The first appointment on record from Hurley Mental
2    Health is your initial intake in October of 2019; is
3    that right?
4  A.  I'm not sure if that's the first date, though.  I'm
5    not sure.
6  Q.  You acknowledge, though, that it could be?
7  A.  It could be.
8  Q.  The next document that I going to be marking is
9    Exhibit 21.
10               MARKED FOR IDENTIFICATION:
11               DEPOSITION EXHIBIT 21
12               3:16 p.m.
13 BY MR. CASCINI:
14 Q.  Let me ask the question, I suppose, first.
15    Mr. Branch, it's true that you made more in gross
16    aggregate take-home pay than Fred Peivandi in either
17    2018 or 2019; isn't that correct?
18 A.  I don't know Mr. Peivandi's take-home.
19 Q.  Would it surprise you to learn that you had more money
20    in both of those years than Mr. Peivandi?
21 A.  No.
22 Q.  I'm going to mark a document as Exhibit 21, and send
23    it around to everyone.
24               MARKED FOR IDENTIFICATION:
25               DEPOSITION EXHIBIT 21

BRANCH, ANTHONY
07/21/2020

Pages 169–172

Page 169

1                   3:17 p.m.
2           MR. EDWARDS:  I have it.
3           MR. ALEXOPOLOUS:  So do I.
4   BY MR. CASCINI:
5   Q.  Same story, Mr. Branch, I'm going to share the screen
6      with you.  Mr. Branch, is this a document, it's a W-2,
7      your name is on it and that it's from 2018.  Based on
8      the amount depicted on your 2018 W-2, do you have
9      reason to believe, do you have any reason to doubt
10     that this is a complete and authentic document that
11     reflects your income that you earned in 2018?
12   A.  No.
13   Q.  I'm going to show you the second page of this
14      particular document.  This is a W-2, but it's 2019,
15      same question for this one, do you have any reason to
16      doubt this is a complete and accurate document that
17      reflects your compensation for 2019?
18   A.  No.
19   Q.  Mr. Branch, how many years have you worked for the
20      Genesee County Road Commission in total?
21   A.  31.
22   Q.  31 years.  Are you eligible at this time to receive
23      retirement pay or you can choose to retire?
24   A.  Yes.
25   Q.  Will you be receiving any sort of pension or benefit

Page 170

1      from a defined benefit plan or a defined contribution
2      plan?
3   A.  Yes.
4   Q.  If you are receiving a benefit from a defined benefit
5      plan, have those benefits already vested?
6   A.  Yes.
7   Q.  How much longer do you plan on staying in your
8      position as director of maintenance with
9      Genesee County Road Commission?
10   A.  Until I wake up and say I don't want to do it anymore.
11   Q.  Do you have any sense of when that might be?
12   A.  No.
13   Q.  Mr. Branch, there was a comment made by a member of
14      the public in early 2018 at a board meeting you
15      attended in which she said that the road communication
16      was trying to put your and John Daly's, quote-unquote,
17      heads on a platter.  Do you remember this comment?
18   A.  Yes.
19   Q.  Do you remember who made this comment?
20   A.  No.
21   Q.  If I told you that it was a member or the public in
22      open public comment, would that be consistent or
23      inconsistent with your memory?
24   A.  Consistent.
25   Q.  Those were her words, right, the member of the public?

Page 171

1   A.  Yes.
2   Q.  And she was referring to the critical email that had
3      been written about the January ice storm from
4      Ms. Kautman-Jones, correct?
5   A.  Yes.
6   Q.  And that was her interpretation of the email, correct?
7   A.  Correct.
8   Q.  That they wanted your and John Daly's heads on a
9      platter, correct?
10   A.  Yes.
11   Q.  Mr. Branch, have you understood all of my questions
12     today and answered them all truthfully?
13   A.  Yes.
14   Q.  Is there anyone at all that you have not yet
15      identified in response to any of my questions who has
16      knowledge of either of the two claims that you're
17      raising in your lawsuit?
18   A.  That has knowledge?
19   A.  Apart from your family and counsel, obviously.
20   A.  I don't know who has knowledge of it.  I don't know.
21   Q.  Are you aware of anyone that we haven't yet discussed
22     today with whom you have discussed either of your two
23     claims of race discrimination within the GCRC or the
24     board of commissioners?
25   A.  No.

Page 172

1        MR. CASCINI:  That's all I have for now.
2               EXAMINATION
3   BY MR. ALEXOPOLOUS:
4   Q.  Mr. Branch, I represent the MSAE.  The same ground
5      rules that Mr. Cascini laid out for you at the
6      beginning of the deposition apply to my questioning.
7      Do you understand that?
8   A.  Yes.
9   Q.  The first question I have for you is:  Do you believe
10     it's discriminatory for an employer to take into
11     account a person's education when making a hiring
12     decision?
13   A.  No.
14   Q.  Prior to the time that you filed a charge with the
15     Equal Employment Opportunity Commission, which I
16     believe was on September 26 of 2018, did you ever
17     complain to anyone at the Genesee County Road
18     Commission that you believe you have been
19     discriminated against based on your race?
20   A.  Yes.
21   Q.  When was the first time you complained to someone at
22     the Genesee County Road Commission that you believe
23     you have been discriminated against based on your
24     race?
25   A.  I don't remember the date.

BRANCH, ANTHONY
07/21/2020

Pages 173–176

Page 173

1   Q.   Do you remember to whom you complained?
2   A.   HR director.
3   Q.   That's Ms. Poplar?
4   A.   That would have been one of the times, correct.
5   Q.   At this point, I'm just looking for the names of the
6        people that you complained to.  Was one of the
7        individuals that you complained to that you thought
8        you had been discriminated against based on your race
9        Donna Poplar?
10  A.   Correct.
11  Q.   Who else did you complain to at the Genesee County
12       Road Commission prior to September 26 of 2018 when you
13       filed your EEOC complaint that you believe you had
14       been discriminated against based on your race?
15  A.   No one that I can recall.
16  Q.   With regard to your conversation with Donna Poplar,
17       did that occur before or after Mr. Peivandi was hired
18       as the managing director?
19  A.   After.
20  Q.   Do you recall how much time after that you complained
21       to her?
22  A.   No.
23  Q.   Was anyone else present when you had this conversation
24       with Ms. Poplar.
25  A.   No.

Page 174

1   Q.   Was this a conversation that took place in person?
2   A.   Yes.
3   Q.   Tell me what you recall the substance of the
4        conversation was between the two of you.
5   A.   That I was being treated different than people that
6        were granted interviews.
7   Q.   Do you recall anything else that you said or she said
8        during this discussion?
9   A.   No.
10  Q.   Did she provide you with any advice regarding what you
11       should do?
12  A.   No.
13  Q.   Now, there were five board of commissioners in 2018;
14       is that correct?
15  A.   Correct.
16  Q.   And there's still five today?
17  A.   Correct.
18  Q.   Are they all the same people?
19  A.   No.
20  Q.   So who was on the board during the interview selection
21       process in 2018, that's no longer on the board?
22  A.   Oh, 2018, no, you're correct, they are all the same,
23       yes.
24  Q.   Did Mr. Mandelaris ever do or say anything that led
25       you to believe that he was biased against African

Page 175

1        Americans?
2   A.   No.
3   Q.   Did David Arceo ever do or say anything that he was
4        biased against African Americans?
5   A.   No.
6   Q.   Did Cloyce Dickerson ever do or say anything that led
7        you to believe that he was biased against members of
8        his own race?
9   A.   No.
10  Q.   Did Robert Johnson ever do or say anything that led
11       you to believe that he was biased against African
12       Americans?
13  A.   No.
14  Q.   Did Shirley Kautman-Jones ever do or say anything that
15       led you to believe that she was biased against African
16       Americans?
17  A.   No.
18  Q.   Do you know who made the decision to hire
19       Mr. Peivandi?
20  A.   Yes.
21  Q.   It was the board of commissioners, correct?
22  A.   Correct.
23  Q.   Have you looked at the documents that were produced
24       during this litigation concerning the selection
25       process?

Page 176

1   A.   Yes.
2   Q.   Did you see there were notes in there where prior to
3        the decision being made to hire Mr. Peivandi that
4        Cloyce Dickerson is discussing your name with the
5        board members and talking about the fact that you were
6        not interviewed?
7   A.   Yes.
8   Q.   So Mr. Dickerson knew that you had not been
9        interviewed prior to the time that you had this
10       conversation with him that you testified about
11       earlier, correct?
12  A.   That's correct.
13  Q.   Are you aware of anything that would have prevented
14       board of commissioners from selecting you to the
15       interview even though you hadn't been recommended or
16       interviewed by Cheryl Ronk?
17  A.   No.
18  Q.   Now, Cheryl Ronk was a complete stranger to you,
19       correct?
20  A.   Correct.
21  Q.   Do you know anything about her?
22  A.   No.
23  Q.   Do you know anything about her employment history?
24  A.   No.
25  Q.   Do you know anything about her education?

BRANCH, ANTHONY
07/21/2020                                                                    Pages 177–180

Page 177

1   A.   No.
2   Q.   Do you know any organizations that she belongs to?
3   A.   No.
4   Q.   Do you know who any of her friends are?
5   A.   No.
6   Q.   Did she do or say anything during this phone
7        conversation that you had with her that led you to
8        believe that she was biased against African Americans?
9   A.   No.
10  Q.   Earlier, when we were going over the job descriptions
11       and Mr. Cascini showed you the job description that
12       was in place when Mr. Daly was the manager director,
13       do you recall that?
14  A.   Yes.
15  Q.   And the education requirements at the time were
16       mandatory, you had to have a bachelor's degree in
17       order to be considered for the position, correct?
18  A.   Incorrect.
19  Q.   Then you and I read it differently.  In any event, do
20       you know if the educational requirements set forth in
21       the job description that existed when Mr. Daly was the
22       manager director fit the education that Mr. Peivandi
23       had?
24  A.   Yes.
25  Q.   Do you know how much experience, work experience

Page 178

1        Mr. Peivandi has had in civil engineering?
2   A.   No.
3   Q.   Do you know how much work experience he has had with
4        roads and bridges?
5   A.   No.
6   Q.   Do you know if he has served as a professor at any
7        institutions of higher learning?
8   A.   Yes.
9   Q.   What do you know about that?
10  A.   I know he served at Baker College in Flint.  And he
11       served at Wayne State University.
12  Q.   As a professor?
13  A.   Yes.
14  Q.   And do you know if he was teaching civil engineering?
15  A.   No.
16  Q.   Do you know what he was teaching?
17  A.   I know that he taught math.  I don't know what level.
18  Q.   How long have you worked with Mr. Peivandi?
19  A.   However long he's worked at the road commission.
20  Q.   Do you have any estimate of how long that's been?
21  A.   Maybe 24, 25 years.
22  Q.   Do you and Mr. Peivandi get along?
23  A.   Sometimes.
24  Q.   Do you know if he is well liked by his peers?
25  A.   I think so.

Page 179

1   Q.   Are you aware of any performance issues that
2        Mr. Peivandi had prior to the time that he was hired
3        to work as the manager director?
4   A.   No.
5   Q.   Are you aware of any disciplines that he has ever
6        received during his employment with the Genesee County
7        Road Commission?
8   A.   No.
9   Q.   Do you know who recommended Mark Riley to be
10       interviewed by the board of commissioners?
11  A.   Cheryl Ronk.
12  Q.   Do you have any information from any source that
13       indicates that the MSAE had a vote regarding who would
14       be selected as the manager director?
15  A.   No.
16  Q.   So it's your understanding that that decision was made
17       solely by the board of commissioners; is that correct?
18  A.   Correct.
19  Q.   Are you aware of any benefit that Cheryl Ronk or the
20       MSAE would derive because the board of commissioners
21       selected Mr. Peivandi instead of you to be the manager
22       director?
23  A.   No.
24  Q.   Do you know what efforts the Genesee County Road
25       Commission and the MSAE made to attract minority

Page 180

1        candidates for the manager director position?
2   A.   No.
3   Q.   Prior to the time that Mr. Peivandi was hired as the
4        manager director, are you aware of anyone who
5        complained to the board of commissioners or anyone in
6        the road commission that they felt that the interview
7        process was discriminatory?
8   A.   Could you repeat the question?
9   Q.   Sure.  Prior to the time that Mr. Peivandi was hired
10       as the manager director, are you aware of anyone who
11       alleged that the selection process was discriminatory
12       in any way?
13  A.   No.
14  Q.   If Mr. Riley had been selected as the manager
15       director, would you be alleging that you were
16       discriminated against based on your race?
17  A.   Yes.
18  Q.   Explain that to me.  If he is an African American and
19       he is selected for position of manager director and
20       you were not, why is race somehow a factor in that
21       decision?
22  A.   Because I'm being treated different than he is.
23  Q.   But you're both of the same race.  So how do you
24       explain why you believe it's race discrimination if
25       another African American was selected into the

BRANCH, ANTHONY
07/21/2020

Pages 181–184

Page 181

1    position?
2 A. **Because I'm being treated differently.**
3 Q. Is your claim of race discrimination against the MSAE
4    limited to the fact that Cheryl Ronk didn't recommend
5    you to be one of the individuals that the board of
6    commissioners would interview?
7 A. **Repeat the question again.**
8 Q. Sure.  I'm just trying to understand the basis of your
9    claim against my client and my question is this:  Is
10    your allegation that the MSAE discriminated against
11    you based on your race limited to the fact that Cheryl
12    Ronk did not select you as one of the candidates to be
13    interviewed by the board of commissioners?
14 A. **No.**
15 Q. What other incident of race discrimination are you
16    alleging that the MSAE engaged in?
17 A. **Treating me different than she treated my colleague.**
18 Q. How were you treated differently by Cheryl Ronk than
19 .    your colleagues other than the fact she didn't select
20    you to be one of the individuals to be interviewed by
21    the board of commissioners?
22 A. **I would say by her not allowing me to interview with**
23    **the board of commissioners.  I was the only African**
24    **American candidate from within the organization.**
25 Q. Okay.  We're still talking about the fact that you

Page 182

1    weren't allowed to interview.  What I'm looking for,
2    is there something other than that that you claim that
3    the MSAE or Cheryl Ronk did to discriminate against
4    you besides that?
5 A. **No.**
6 Q. You filed a charge with the Equal Employment
7    Opportunity Commission; is that correct?
8 A. **Correct.**
9 Q. And it's your understanding that the Equal Employment
10    Opportunity Commission is a governmental agency that
11    is assigned the task of handling charges of
12    discrimination and making determinations regarding
13    those charges?
14 A. **Correct.**
15 Q. Was there a determination made regarding your charge?
16 A. **Yes.**
17 Q. Did the EEOC make the determination that there was no
18    finding of discrimination against you?
19 A. **No.**
20 Q. What is your understanding of the determination that
21    the EEOC made?
22 A. **That I did have the right to sue, but that they could**
23    **not.  They could not go any further with the case than**
24    **they went.**
25 Q. Did anyone at the EEOC tell you either verbally or in

Page 183

1    writing that they found no probable cause or believed
2    that there was any violation of the antidiscrimination
3    statutes?
4 A. **No.**
5 Q. When is the last time you looked at the right to sue
6    letter that the EEOC sent to you?
7 A. **Quite a while ago.**
8 Q. So you're going by memory at this point, correct?
9 A. **Correct.**
10 Q. You don't have that committed to memory, do you?
11 A. **No, I can't say that I do.**
12 Q. With regard to the telephone conversation that you
13    testified about earlier that you had with Cheryl Ronk,
14    did you take any notes of that conversation at the
15    time the conversation occurred or shortly thereafter?
16 A. **Yes.**
17 Q. Those notes have not been produced as part of this
18    lawsuit.  I know that I have asked in discovery that
19    they be produced.
20        MR. ALEXOPOULOS:  So, Carl, are you in
21    possession of any notes he has regarding his phone
22    call with Cheryl Ronk?
23        MR. EDWARDS:  No.
24 BY MR. ALEXOPOLOUS:
25 Q. Mr. Branch, did you turn those notes over to your

Page 184

1    attorney?
2 A. **What notes are you talking about, what phone**
3    **conversation are you talking about?**
4 Q. I'm talking about the preliminary interview where on
5    June 11, 2018, you had an approximately 20-minute
6    telephone interview with Cheryl Ronk that we talked
7    about earlier today?
8 A. **That's correct.**
9 Q. My question to you, let me make sure that we get a
10    correct answer to this.  Did you take notes about that
11    interview that you committed to paper at or shortly
12    after that interview took place?
13 A. **No.**
14 Q. Do you know if Mr. Peivandi ever filled in for
15    Mr. Daly when he was absent from the office during the
16    time that Mr. Daly was the manager director?
17 A. **No.**
18 Q. Do you know if anyone did other than you?
19 A. **No.**
20 Q. Are you aware of any work that the MSAE has performed
21    for the Genesee County Road Commission before it was
22    hired to assist with the selection process for the new
23    manager director?
24 A. **No.**
25 Q. Are you aware of any work that the MSAE has performed

BRANCH, ANTHONY
07/21/2020

Pages 185–188

Page 185

1    for the road commission since Mr. Peivandi was
2    selected as the manager director?
3  A.  No.
4  Q.  When is the last time you had any interactions at all
5    with Cheryl Ronk?
6  A.  The date of the last email exchange.
7  Q.  That was June 29, 2018 or thereabouts?
8  A.  Yes.
9  Q.  Is there any way you can distinguish the emotional
10    distress that you claim you are experiencing and you
11    attribute it to one defendant versus the other or is
12    it all kind of a blur?
13  A.  It's all together.  It's not distinguishable.
14  Q.  Okay.  Why did you wait until October of 2019 to seek
15    treatment with a mental health professional?
16  A.  I'm not sure if that's the date that I started.
17  Q.  What's your recollection of the first time that you
18    sought treatment?
19  A.  It was after I felt that I needed some help dealing
20    with it.
21  Q.  But what I'm looking for is a time frame.  Do you
22    think it was a month later, do you think --
23  A.  I don't know.  I do not know.
24  Q.  The only thing we know is that there is a record that
25    has been marked here today, showing that you had an

Page 186

1    appointment at Hurley Medical Center on October 31 of
2    2019.  Assuming that that's the first time you sought
3    treatment, can you explain to me why you would have
4    waited over a year and several months, really what
5    we're talking about is 15 months to go to a mental
6    health professional?
7  A.  Because you try to deal with situations in life on
8    your own, and when you feel you need some help or
9    things tend to get that bad for you, then you look for
10    help.  That's what I did.
11  Q.  When is the first time that you claim you began
12    experiencing emotional distress because of your non
13    selection for the manager director position?
14  A.  Immediately.
15  Q.  Describe the emotional distress to me.
16  A.  It's embarrassing to be a person that put in for a job
17    alongside another person that puts in for the job that
18    you both are supposedly qualified for, but you can't
19    even get an interview.  It is not a good feeling.
20  Q.  Is there any other way you can describe the emotional
21    distress for me other than what you just did?
22  A.  You lose sleep, you get angry for no reason with your
23    family.  You start to take things out on people that
24    have nothing to do with the problem that you have and
25    that's what pushed me in that direction, it was

Page 187

1    spilling over to my personal life.
2  Q.  Is there any other way you can describe for me how
3    it's spilled into your personal life other than what
4    you already have?
5  A.  Other than just not feeling like doing anything, no.
6  Q.  So between the time that Mr. Peivandi was selected as
7    the manager director and up until the time that we've
8    had this COVID pandemic, is it your testimony that you
9    never engaged in any activities with your family or
10    went out to dinner, went to movies, anything along
11    those lines?
12  A.  No.
13  Q.  So have you continued up until the pandemic, did you
14    continue going out to restaurants and having dinner
15    with your family?
16  A.  Sometimes.
17  Q.  Did you continue going to the movies?
18  A.  Yeah, if I wanted to see a movie, yes.
19  Q.  Are there any other activities that you engaged in
20    after Mr. Peivandi became the manager director and the
21    pandemic and the closing down of things that you
22    engaged in besides going out to restaurants and going
23    out to movies?
24  A.  Prior to the pandemic?
25  Q.  Sure.  I just want to know what activities you engaged

Page 188

1    in outside of work between the end of July of 2018
2    when Mr. Peivandi was hired and March of 2020 when the
3    pandemic occurred.
4  A.  I did whatever I wanted to do.
5  Q.  I'm not there to see it so I'm asking you to describe
6    it to me.
7  A.  You are asking me to give you an answer to a question
8    that I can't tell you what I did in 2018 outside of
9    work.  I can't tell you that because I don't remember
10    that.  I don't take pictures and write down how many
11    times I went to the movies or went out to dinner.
12  Q.  I'm not asking you that.
13  A.  You are asking me what type of activities I have done
14    outside of work.
15  Q.  Is the type of activities -- one is, we know you went
16    to restaurants.  Second, we know you went to movies.
17    Did you engage in any other activities outside of work
18    besides those two events?
19  A.  Maybe I did.  I don't know.
20  Q.  Do you have any hobbies of any kind?
21  A.  I coach.
22  Q.  Are you involved in sports of any kind?
23  A.  I coach.
24  Q.  What do you coach?
25  A.  Football and track and field.

BRANCH, ANTHONY
07/21/2020

Pages 189–192

Page 189

```
1    Q.  Is this something that you do through the school or is
2        it some private organization?
3    A.  Through school.
4    Q.  Which school?
5    A.  Beecher High School.
6    Q.  When did you first start coaching at Beecher High
7        School?
8    A.  2017.
9    Q.  And did you continue coaching all the way up until the
10       pandemic?
11   A.  Yes.
12   Q.  Did the amount of coaching you did decline any during
13       that time?
14   A.  Initially, yes.
15   Q.  When you say initially, yes, can you explain to me
16       what do you mean?
17   A.  During that time there is no coaching because it's the
18       summer.
19   Q.  Let me try and be more precise.  Between the time you
20       became a coach in 2017 and prior to the pandemic in
21       March of 2020, did your coaching routine change any?
22   A.  No.
23   Q.  You said you coach football; is that correct?
24   A.  Yes.
25   Q.  Is there another sport you coach as well?
```

Page 190

```
1    A.  Track and field.
2    Q.  So football we know is a season in the fall, correct?
3    A.  Correct.
4    Q.  Is track and field in the spring?
5    A.  Yes.
6    Q.  When you're coaching football, approximately how many
7        hours a week during the season are you devoting to
8        coaching football?
9    A.  Three a day, during the week.
10   Q.  So three hours a day, Monday through Friday?
11   A.  Seven days a week.
12   Q.  So it's about 21 hours a week during the fall when
13       you're coaching football, correct?
14   A.  Correct.
15   Q.  Are you the head coach or are you an assistant coach?
16   A.  I'm the head coach now.  I was the assistant coach up
17       until, I believe, February of this year.
18   Q.  February of 2020 you became the head coach?
19   A.  Correct.
20   Q.  Track and field, when you're coaching, is there some
21       particular event that you coach?
22   A.  Shot put and discus.
23   Q.  How many hours a week, on average during the track and
24       field season would you devote to coaching?
25   A.  I would say 15.
```

Page 191

```
1    Q.  When you're the assistant coach for football, what
2        were you coaching, was it defense, offense, some
3        particular linebacker, what assistant coach were you?
4    A.  Defensive coordinator.
5    Q.  So when you're the defensive coordinator, how many
6        athletes are you coaching?
7    A.  It varies.
8    Q.  From what to what?
9    A.  From 11 to 20.
10   Q.  And was this the varsity program?
11   A.  Yes.
12   Q.  How often would you lose sleep after Mr. Peivandi was
13       hired as the manager director?
14   A.  Sometimes I still lose sleep.
15   Q.  So I'm not there to see it, so that's why I'm asking
16       the question.  So can you describe for me the loss of
17       sleep that you claim you have experienced because of
18       this?
19   A.  I could wake up at 1:15 in the morning and my mind is
20       racing about it, and I don't go back to sleep until
21       4:30 in the morning.
22   Q.  How often does that happen?
23   A.  Two, three times a week, sometimes more, sometimes
24       less.
25   Q.  So consistently or dating back to August 1 of 2018,
```

Page 192

```
1        it's your testimony that two to three times a week you
2        were losing sleep?
3    A.  Yes.
4    Q.  How often do you get angry at members of your family?
5    A.  Well, I don't anymore, but I did.
6    Q.  When did that stop?
7    A.  Maybe about six months into the counseling.
8    Q.  So if you began your counseling on October 31 of 2019,
9        then we're talking about sometime April of this year?
10   A.  If that's the correct date.  I don't think that's the
11       correct date.
12   Q.  Let me ask it this way then:  When do you recall that
13       you ceased becoming angry at your family because of
14       your failure to become the manager director?  I'm
15       looking for a time frame.
16   A.  That's the time frame I can give you.  Three to six
17       months after starting the therapy.
18   Q.  But if you don't agree that six months after --
19   A.  I don't agree.  It's not that I don't agree.  I don't
20       know that that's the date.
21   Q.  But you can't tell me that it was sometime this year,
22       sometime last year?
23   A.  I couldn't tell you.
24   Q.  When you would get angry at members of your family,
25       would you just yell at them?
```

BRANCH, ANTHONY
07/21/2020

Pages 193–196

Page 193

| 1 | A. | Yeah. |
| 2 | Q. | Did you do anything besides yell at them? |
| 3 | A. | I would be angry. |
| 4 | Q. | I want to know how it manifested itself.  If someone |
| 5 | | yells, that's one way of showing you're angry.  Did |
| 6 | | you ever do anything else to your family to show them |
| 7 | | that you were angry other than yell at them? |
| 8 | A. | Shut them out. |
| 9 | Q. | You what? |
| 10 | A. | Shut them out. |
| 11 | Q. | Shut them out of what? |
| 12 | A. | Out of my thought process, out of my life. |
| 13 | Q. | Is there any other way that you showed your family |
| 14 | | that you were angry? |
| 15 | A. | No. |
| 16 | Q. | Did you ever get angry at them for reasons that have |
| 17 | | nothing to do with this lawsuit? |
| 18 | A. | Rephrase the question, please. |
| 19 | Q. | Sure.  I'm just trying to understand whether your |
| 20 | | testimony is the only reason you ever got angry at |
| 21 | | your family was because of your failure to be hired as |
| 22 | | the manager director or if there were other things |
| 23 | | that occurred that caused you to become angry at your |
| 24 | | family. |
| 25 | A. | No, I'm quite sure there are other things. |

Page 194

| 1 | Q. | And you said that you would take things out on your |
| 2 | | family, what does that mean when you say you took |
| 3 | | things out on your family? |
| 4 | A. | I didn't say that. |
| 5 | Q. | Okay.  My notes reflect that you did.  The transcript |
| 6 | | will tell us whether you did or didn't.  Let me ask it |
| 7 | | this way:  Did you ever do anything to take out your |
| 8 | | anger on your family? |
| 9 | A. | Other than yell or shut them out, no. |
| 10 | | (Off the record at 4:01 p.m.) |
| 11 | | (Back on the record at 4:10 p.m.) |
| 12 | | BY MR. ALEXOPOULOS: |
| 13 | Q. | Mr. Branch, are there any activities that you used to |
| 14 | | engage in prior to July 31 of 2018 that you no longer |
| 15 | | engage in because of the emotional distress that you |
| 16 | | claim you've experienced? |
| 17 | A. | Just the actual enjoyment of coming to work.  That's |
| 18 | | been a challenge.  I also have like -- just working in |
| 19 | | my yard, I ended up hiring that out.  I used to do all |
| 20 | | that myself.  Cut my lawn.  I got a $2,500 mower that |
| 21 | | I don't even use anymore.  I just let it sit outside |
| 22 | | now.  I just didn't feel like doing anything.  That's |
| 23 | | the biggest. |
| 24 | | Coaching is one thing that I would do to |
| 25 | | get my mind off of it.  I still coach.  But as far as |

Page 195

| 1 | | just being home and doing things around the house, |
| 2 | | that's where I have fallen off tremendously.  When I |
| 3 | | get home and I relax, that's when I start to think |
| 4 | | about how I was done.  That's what causes me the |
| 5 | | problems. |
| 6 | Q. | I just want to focus in on the activities because, |
| 7 | | again, this is my only opportunity to ask it.  I'm not |
| 8 | | there to see what you do. |
| 9 | | Other than the fact that you no longer mow |
| 10 | | your lawn, are there any other activities that you |
| 11 | | used to engage in prior to July 31 of 2018 that you no |
| 12 | | longer engage in because of your emotional distress? |
| 13 | A. | I mean, I'm a car enthusiast.  I was building a truck |
| 14 | | at the time.  All that stopped.  It's in the same |
| 15 | | state now that it was then.  I just, I haven't done |
| 16 | | the things that I usually do. |
| 17 | Q. | Are there any other activities you can identify for us |
| 18 | | other than mowing the lawn and working on your truck? |
| 19 | A. | No. |
| 20 | | MR. ALEXOPOULOS:  I have no other |
| 21 | | questions. |
| 22 | | MR. EDWARDS:  I have some follow-up.  Do |
| 23 | | you need a break, Mr. Branch, or are you okay? |
| 24 | | THE WITNESS:  No, I'm good.  I just had a |
| 25 | | granola bar. |

Page 196

| 1 | | EXAMINATION |
| 2 | | BY MR. EDWARDS: |
| 3 | Q. | You were asked earlier about your claim in this case. |
| 4 | | You said it's because you have been treated |
| 5 | | differently than Fred Peivandi; is that right? |
| 6 | A. | That's correct. |
| 7 | Q. | When did the different treatment begin? |
| 8 | A. | Right out of the gate.  When I was made co-interim |
| 9 | | managing director, Fred was given all of the different |
| 10 | | boards and things to sit on.  He was given all those. |
| 11 | | I was given none. |
| 12 | Q. | These are the boards that John Daly formerly sat on |
| 13 | | when he was managing director? |
| 14 | A. | Correct.  The next day Fred was parking in the manager |
| 15 | | director's parking spot. |
| 16 | Q. | The next day after what? |
| 17 | A. | After we were named co-interim managing directors. |
| 18 | | The different members of the board would come in.  I |
| 19 | | guess it's like they think I couldn't see their |
| 20 | | vehicle, when I would go in the building, they're in |
| 21 | | the office with Fred.  They are commissioners that |
| 22 | | never came to see me, but they would come in and meet |
| 23 | | with Fred. |
| 24 | Q. | Who were they? |
| 25 | A. | Shirley Kautman-Jones, Dave Arceo, those two all the |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020

Pages 197–200

Page 197

1   time.  They would be meeting with Fred, they would go
2   out to lunch together, go out to lunch with Fred.  I
3   was treated totally different from the start.  Those
4   are just some of the instances of different treatment.
5   Q.   Well, since we're in a court of law, you have got to
6        be more specific than some.  I need you to detail,
7        take your time and detail.  You have given a couple of
8        instances of how the treatment, your treatment and
9        Fred Peivandi's treatment was different from the start
10       after you were both made co-managing -- co-interim
11       directors.
12  A.   Okay.  There are different boards, committees, all of
13       these different seats that let everyone know outside
14       of -- well, I would say in the road commission
15       community, meaning other road commissions, let them
16       know who was in charge at Genesee County Road
17       Commission.  Fred was given all of those.  I was given
18       none of those, but we were co.
19  Q.   Co-what?
20  A.   Co-interim managing directors.  Fred was given all of
21       those.  His regular director of engineering car
22       parking spot was right next to the managing director's
23       car parking spot.  He was allowed to park in the
24       manager director's parking spot from the next day and
25       he still parks there today because he is the managing

Page 198

1        director.  But during the time that we were both
2        co-managing directors, he was allowed to park there
3        and then the meetings between him and other
4        commissioners, i.e., Shirley Kautman-Jones and Dave
5        Arceo were taking place and I was not a part of them,
6        but I was the co-interim managing director.  The sign,
7        it was, like it was just writing on the wall early
8        that this is the guy who is going to be the managing
9        director.  Those are things that I can remember right
10       now.
11  Q.   When John Daly was managing director, did he ever tell
12       you that Dave Arceo was a racist and to watch
13       yourself?
14  A.   Yes.
15  Q.   When did he tell you that?
16  A.   In a meeting I had in his office he told me that Dave
17       Arceo did not like blacks and that I should watch
18       myself when dealing with Dave Arceo.
19  Q.   Do you remember what year this was?
20  A.   Maybe like 2016.
21  Q.   Was Dave Arceo on the Board of Road Commissioners at
22       the time?
23  A.   Yes.
24  Q.   Do you recall what you and John Daly were discussing
25       when he said this to you?

Page 199

1   A.   I was talking to John actually about Dave Arceo making
2        a comment to me about his road, noticing some issues
3        on his road and I was going to go take a look at them.
4        Then he made that comment to me just to watch myself
5        when I'm dealing with him.
6   Q.   Is it your opinion and belief that Fred Peivandi was
7        preselected to be managing director?
8   A.   Yes.
9   Q.   Do you believe it was based on your race, the reason
10       you didn't get the position?
11  A.   Yes.
12  Q.   Do you believe that you were denied an interview by
13       Cheryl Ronk because of your race?
14  A.   Yes.
15  Q.   Do you believe you were denied the interview by
16       Shirley Kautman-Jones because of your race?
17  A.   Yes.
18  Q.   Do you believe that you need a master's degree to run
19       or be managing director of the Genesee County Road
20       Commission?
21  A.   No.
22  Q.   Do you believe you need a bachelor's degree?
23  A.   No.
24  Q.   Why not?
25  A.   Because I have done it and I know this organization

Page 200

1        like the back of my hand.  You're not going to have a
2        master of everything in the organization which is why
3        you hire professionals to do those things.  I
4        understand that.  But as far as being a manager
5        director of road commission, I don't believe you have
6        to have all those degrees.  If you have the experience
7        and the knowledge, that's just as good as the degree.
8   Q.   How many times did you complain to Donna Poplar that
9        you felt you were being treated differently and
10       discriminated against based on your race?
11  A.   It was probably more than -- more than ten times.  I
12       actually started feeling bad about doing it because I
13       didn't want to just keep bombarding her with the
14       issues that were happening, but they were happening.
15       I did numerous times.  It's more than ten times I went
16       to her.
17  Q.   Do you remember what year was the first time you went
18       to the human resources director, Donna Poplar, and
19       told her you thought you were being treated
20       differently because of your race?
21  A.   I believe it would have been 2018.
22  Q.   Was this after John Daly left the managing director
23       position?
24  A.   No, it was prior.
25  Q.   How many months or weeks prior?

BRANCH, ANTHONY
07/21/2020                                                          Pages 201–204

Page 201

1   A.   Maybe a month prior.
2   Q.   What did you tell her, what do you recall telling her?
3   A.   I was just telling her how I was being singled out in
4        regards to how we handle the snowstorm and these
5        accusations were being made by Shirley Kautman-Jones
6        and she didn't even know what our policies were on
7        what roads that you can do under certain circumstances
8        and during what time frame you can actually clear a
9        road, and she would make comments like it's a failure
10       on the maintenance director's part on all points.
11       That's an instance that happened before John Daly
12       left.
13   Q.  Speaking of -- you have been questioned about that
14       snowstorm.  Describe what happened.
15   A.  We were hit with an ice -- an ice storm initially.
16       Temperatures dropped dramatically.  We were down in
17       single-digit temperatures and the wind was very high.
18       The ice storm changed over to snow.  This was all
19       happening over a weekend and into a holiday.  During
20       the weekend our policy states that there are different
21       criteria of roads that we have.  On our local roads,
22       we're not to expend any overtime to remove snow during
23       overtime hours.  This storm comes in Friday night, it
24       goes Friday, Saturday night, stopped briefly on
25       Sunday, and Monday happened to be a holiday.

Page 202

1   Q.   Were you able to utilize your crew in overtime?
2   A.   I did utilize our crews on the roads that we would
3        clear during overtime hours.  We also have to be
4        cognizant of how many hours that we have truck drivers
5        on the road.  Over the course of my 31 years here at
6        the road commission I have seen our staff get cut by
7        about half.
8   Q.   What was the problem with you addressing the other
9        roads during the snowstorm or ice storm?
10  A.   Our road commission policy states that we wouldn't
11       expend overtime dollars to remove snow on those roads
12       which would be your local roads, which would be your
13       lesser traveled, also your subdivision streets and
14       gravel roads, back roads.
15  Q.   Based on that policy, could you assign any of your
16       people to work on those roads?
17  A.   No.
18  Q.   You were criticized by Shirley Kautman-Jones for not
19       working on those roads?
20  A.   Yes.
21  Q.   Had you worked on those roads, would you have violated
22       the policy of the road commission?
23  A.   Yes.
24  Q.   Potentially subjected to discipline?
25  A.   Yes.

Page 203

1   Q.   Did Shirley Kautman-Jones ever send you an email
2        requesting information about what you did in your
3        department?
4   A.   Yes.
5   Q.   And can you explain what you did, what the email said?
6   A.   She sent me an email with numerous questions as to how
7        we go about our operations in the maintenance
8        department.  There may have been 30 questions that I
9        had to answer and get information to back up.  She
10       wanted to know how many classes and seminars I have
11       been to on winter maintenance, do I send the
12       supervisors to these classes, our equipment operators,
13       how we go about training them, how much, how much salt
14       is allotted to each district garage and how do you go
15       about determining how much salt is allotted to each
16       district garage.  Just so many different questions
17       just about the maintenance department.
18  Q.   Did she do the same to Fred Peivandi, if you know?
19  A.   Not to my knowledge.
20  Q.   You may have answered this question, but I want to
21       make sure the record is clear, did Fred Peivandi ever
22       assume responsibilities as managing director during
23       John Daly's absence at any time that John Daly was
24       managing director?
25  A.   No, not to my knowledge.

Page 204

1   Q.   Did you?
2   A.   Yes.
3   Q.   Can you give us approximate number of occasions?
4   A.   Numerous times John would be on vacation or be away at
5        a conference for a week.  He would put the email out
6        to everybody that he is going to be gone and if
7        anybody needs anything or if there is anything that
8        has to be done, to see me.
9   Q.   See you, Anthony Branch?
10  A.   Correct.
11  Q.   Over the course of how many years?
12  A.   13, 14 years.
13  Q.   Did john Daly ever tell you you didn't do your job
14       adequately while he was away as acting managing
15       director or assuming that responsibility as managing
16       director?
17  A.   No.
18  Q.   Were you ever disciplined in your position as director
19       of maintenance by John Daly?
20  A.   No.
21  Q.   Were you ever disciplined by anyone at the
22       Genesee County Road Commission so long as you have
23       been serving as director of maintenance?
24  A.   No.
25  Q.   Have you received any awards for the work that you

BRANCH, ANTHONY
07/21/2020

Pages 205–208

Page 205

1  have done or commendations as director of maintenance?
2  A.  Yes.
3  Q.  Can you give us some examples?
4  A.  **During winters when we would have really terrible**
5  **winter weather, terrible storms, I have got**
6  **commendations from the Michigan Department of**
7  **Transportation thanking us on how well we have handled**
8  **the winter storms and how well we have handled the**
9  **roads in Genesee County numbers of times.  I still get**
10  **lots of thank yous from citizens, from our legislators**
11  **on different jobs that we have done in the maintenance**
12  **department.**
13  Q.  Do you believe you were qualified to be managing
14  director when John Daly separated from the Genesee
15  County Road Commission?
16  A.  **Yes.**
17  Q.  Do you believe that your not having a degree prevented
18  you from being able to perform in that role or
19  responsibility?
20  A.  **No.**
21  MR. EDWARDS:  Pass the witness back to you,
22  Andrew.
23  RE-EXAMINATION
24  BY MR. CASCINI:
25  Q.  Okay.  Mr. Branch, I do have a little bit of

Page 206

1  follow-up.  I apologize.  I know we're getting late in
2  the afternoon here.
3  Mr. Branch, do you know if there were
4  applicants, people who applied just like you did on
5  June 6, 2018, people who applied for the managing
6  director position that did not receive a preliminary
7  interview with Cheryl Ronk?
8  A.  **Just from the papers that I received that showed**
9  **different individuals that didn't.**
10  Q.  So you do know, but that information was acquired
11  after the fact?
12  A.  **Yes.**
13  Q.  And the answer to the question is yes, there were
14  people who applied that did not receive a preliminary
15  interview with Ms. Ronk?
16  A.  **Yes.**
17  Q.  Okay.  Are you aware of whether or not Mark Riley, to
18  jog your memory, Mark Riley is one of the individuals
19  who is in the group of the final three who attended
20  the second interview with the board, are you aware
21  that Mark Riley subsequently interviewed for another
22  job within the Genesee County Road Commission after
23  Fred ultimately become the managing director?
24  A.  **Yes.**
25  Q.  Are you aware that he was offered an opportunity to

Page 207

1  interview for a new position because the board of
2  commissioners was so impressed with him during the
3  final interview stage?
4  A.  **Yes.**
5  Q.  Would it surprise you to learn that Mark Riley was the
6  candidate who cumulatively placed second during the
7  second interview before the board, which means to say
8  ultimately he was the runner-up for the position after
9  Fred?
10  A.  **No.**
11  Q.  Do you have any reason to believe that Mark Riley was
12  not a candidate who was taken very seriously for the
13  managing director job position by the Genesee County
14  Board of Road Commissioners?
15  A.  **Yes.**
16  Q.  What information do you have to believe that he was
17  not taken seriously considering you just admitted he
18  was runner-up for the position?
19  A.  **As you stated earlier, Mark Riley was interviewed for**
20  **the operations manager position at Genesee County Road**
21  **Commission after Fred Peivandi was named the managing**
22  **director.  During the interview, the HR director asked**
23  **some pointed questions to Mr. Riley about his**
24  **credentials that were on his resume about him having**
25  **executive level experience, I believe it was for 14**

Page 208

1  **years, and in her doing her homework she had checked**
2  **his employment at different locations and checked**
3  **where the positions that he held ranked as far as**
4  **being executive level and they didn't rise to the**
5  **level of being executive level and when she asked him**
6  **those questions, he admitted that his positions did**
7  **not rise to the level of executive level.  I believe**
8  **that Mark Riley was just a token to show that they did**
9  **interview an African American.  His, looking at his**
10  **resume and the positions that he has held, none of**
11  **them would rise to the level of what I have done at**
12  **Genesee County Road Commission.**
13  Q.  Now, when did -- okay.  So that was a long answer.  So
14  let me try to break this down.  Your testimony was
15  that Donna Poplar discovered that Mr. Riley did not
16  have the level of executive authority that his resume
17  purported during Mr. Riley's subsequent interview for
18  the operations director position; is that right?
19  A.  **That's correct.**
20  Q.  When did that interview occur?
21  A.  **I believe it would have been late 2018.  I'm not for**
22  **sure.**
23  Q.  Did that occur after Fred had been made managing
24  director and the Genesee County Road Commission had
25  made that decision?

BRANCH, ANTHONY
07/21/2020

Pages 209–212

Page 209

1   A.   Yes.

2   Q.   The discovery of the false credentials occurred after
3        the second round interview Mark Riley participated in
4        before the board of commissioners?

5   A.   Yes.

6   Q.   So it's safe to say Genesee County Board of Road
7        Commissioners did not know about those false
8        credentials at the time that they interviewed him,
9        correct?

10  A.   Correct.

11  Q.   You mentioned that you believed that Mr. Riley was,
12       quote-unquote, just a token.  What evidence do you
13       have to believe that he was, quote-unquote, just a
14       token during the process for interviewing for the
15       managing director job?

16  A.   Because of the fact that if Michigan Society of
17       Executives would have vetted him properly, I cannot
18       see how someone being a supervisor at his highest
19       level of employment would be ranked above myself who
20       has been an executive level longer than any employee
21       at Genesee County Road Commission.

22  Q.   Do you have any source of information to verify that
23       Mr. Riley did, in fact, exaggerate his executive
24       credentials beyond what Ms. Poplar told you?

25  A.   She didn't tell me.  I was in the interview and I

Page 210

1        heard him admit it myself.

2   Q.   Do you have any reason to believe that MSAE did, in
3        fact, uncover that Mr. Riley had exaggerated his
4        credentials, as you allege?

5   A.   No.

6   Q.   Do you have any reason that any commissioner knew
7        during the interview process that Mr. Riley had
8        exaggerated his credentials, as you allege?

9   A.   No.

10  Q.   All right.  During the cross-examination, or I should
11       say when your attorney, Carl Edwards, asked you
12       questions, he asked you about instances where you were
13       treated differently than Fred beyond the fact that
14       Fred was granted an interview before the board and you
15       weren't.  The examples that you mentioned included
16       that Fred was given different boards to sit on, that
17       he was allowed to park in the managing director
18       parking spot, and that members of the board,
19       specifically Shirley Kautman-Jones and sometimes David
20       Arceo, would sometimes come into his office and go to
21       lunch with him.

22            Are there any other examples where you felt
23       you were being treated differently than Mr. Peivandi
24       beginning in 2018, as you allege?

25  A.   Yes, there are other instances.

Page 211

1   Q.   Tell me about those instances.

2   A.   Mr. Peivandi would solicit the township supervisors to
3        come to the board meetings and express their feelings
4        about him becoming the managing director.

5   Q.   That's something you -- I didn't mean to cut off, sir.

6   A.   Fred would also come to my staff meetings and
7        basically tell my staff that he is going to be the
8        next managing director and he needs their support.

9   Q.   With regard to the first issue, the allegation is
10       Mr. Peivandi solicited township supervisors to come
11       and speak in his support at board meetings, correct,
12       that was that substance of the allegation?

13  A.   Yes.

14  Q.   The second allegation is that Fred would come to some
15       of your staff meetings and attempt to solicit support
16       from your staff members; is that correct?

17  A.   Basically would tell them he was going to be the next
18       managing director.

19  Q.   When you say he would basically tell them --

20  A.   He would also meet with my staff without my knowledge
21       about things that they disliked about me during the
22       time that we were co-interim managing directors.

23  Q.   Okay.  The question that was asked, though, was what
24       ways did Genesee County Road Commission treat you
25       differently.  Not what ways did Fred demonstrate his

Page 212

1        hostility.  All three of those examples involve
2        activities that Fred embarked upon, correct?

3   A.   Correct.

4   Q.   That isn't an example of Genesee County Board of Road
5        Commissioners treating you differently, correct?

6   A.   Correct.

7   Q.   And the Genesee County Board of Road Commissioners is
8        the one that ultimately hired Fred.  Fred can't hire
9        himself, correct?

10  A.   Correct.

11  Q.   The instances that you cited as instances of you being
12       treated differently by your employer are limited to
13       Fred being given different boards, Fred being able to
14       park in the managing director's parking spot, and
15       Shirley Kautman-Jones and David Arceo coming and
16       getting lunch with Fred; is that correct?

17  A.   That's correct.

18  Q.   With respect to Fred being allowed to park in the
19       managing director's parking spot, who allowed him?

20  A.   The board.

21  Q.   What evidence do you have that they allowed him to do
22       so?

23  A.   They come in and out of the same door where the
24       parking spot is sitting right in front of.

25  Q.   So the allegation is the permission is implicit, they

BRANCH, ANTHONY
07/21/2020                                                           Pages 213–216

Page 213

1    are able to see him parking there and they don't do
2    anything to stop it, is that the idea?
3  A.  Yes.
4  Q.  Would Fred always arrive at work first before you
5    have?
6  A.  No.
7  Q.  What would happen if you parked in the managing
8    director's parking spot, would the board take any
9    effort to try to stop that and say no, that's Fred's
10   spot?
11 A.  The building that Fred is in, we're in two separate
12   buildings.  It would make no sense for me to park at
13   the building Fred is in.
14 Q.  Did you complain to anybody about Fred parking in the
15   managing director's parking spot?
16 A.  Yes.
17 Q.  Who did you explain to?
18 A.  The HR director.
19 Q.  Donna Poplar?
20 A.  Yes.
21 Q.  Did you complain to anyone else about Fred being
22   allowed to park in the managing director's parking
23   spot?
24 A.  No.
25 Q.  Did you complain to anyone -- let me strike that.

Page 214

1            Did you ever complain to anyone about Fred
2    having been appointed to represent the road commission
3    in front of other boards, but you weren't provided
4    that opportunity, did you ever complain about that to
5    anyone?
6  A.  Yes.
7  Q.  To whom?
8  A.  The HR director.
9  Q.  Donna Poplar?
10 A.  Yes.
11 Q.  Did you ever complain to anyone else about it?
12 A.  No.
13 Q.  You mentioned that Shirley Kautman-Jones and David
14   Arceo would sometimes engage in individual
15   conversations with Fred, correct?
16 A.  Correct.
17 Q.  To the exclusion of you, correct?
18 A.  Correct.
19 Q.  However, you also have described in your past
20   testimony there were numerous conversations where you
21   would engage in conversations with Mr. Dickerson,
22   Mr. Mandelaris and Mr. Johnson, correct?
23 A.  In a board meeting setting in front of Fred Peivandi
24   and the rest of the board.
25 Q.  But you have described and given testimony today about

Page 215

1    several instances where off-the-cuff comments were
2    made to you.  Did Mr. Johnson say that it was,
3    quote-unquote, bullshit that you had been denied an
4    opportunity to interview with the Board of Road
5    Commissioners in a public meeting?
6  A.  It was either before the meeting or after the meeting.
7  Q.  But it was not in a public setting in front of Fred?
8  A.  It was in the board room and Fred was present.
9  Q.  Was it within earshot of Fred?
10 A.  He was maybe 15, 20 feet away from me.
11 Q.  So your allegation is that you, at no point during
12   this process, had a purely private conversation with
13   Commissioner Dickerson, Commissioner Mandelaris or
14   Commissioner Johnson?
15 A.  Not about this position, no.
16 Q.  Did you ever go to lunch with any of them, have you
17   ever eaten a meal with any of them?
18 A.  Yes.
19 Q.  Okay.  You testified a few minutes that ago that
20   John Daly told you that David Arceo is a, quote,
21   racist, and watch yourself, unquote.  Did I quote that
22   correctly?
23 A.  He told me that he doesn't like blacks.
24 Q.  So the racist and your watch yourself part, that is
25   your gloss on the quote.  But the quote John Daly

Page 216

1    shared with you was that David Arceo, quote, does not
2    like blacks?
3  A.  That's correct.
4  Q.  So to be very clear, John Daly did not call David
5    Arceo a racist.  He said that David Arceo, quote, did
6    not like blacks?
7  A.  Correct.
8  Q.  Understood.  Earlier, however, you testified when
9    Mr. Alexopolous was asking you questions that you
10   never heard or saw Mr. Arceo, and you said this
11   uniformly across all of the board of commissioners,
12   you had never heard or seen him yourself do anything
13   that you considered to be racist or that discriminated
14   against you on the basis of race, correct?
15 A.  Correct.
16 Q.  So it's safe to say that when you testified earlier
17   that David Arceo -- that John Daly had that
18   conversation with you about David Arceo, that's John
19   Daly's opinion, right?
20 A.  Correct.
21 Q.  Not yours because you said you had never seen or heard
22   Mr. Arceo do anything to discriminate against you on
23   the basis of your race, correct?
24 A.  Correct.
25 Q.  Okay.  Would it surprise you if Mr. Arceo had strongly

BRANCH, ANTHONY
07/21/2020

Pages 217–220

Page 217

1  supported Mark Riley's candidacy as managing director?
2  A.  No.
3  Q.  But you acknowledge Mark Riley is an African American,
4     correct?
5  A.  Correct.
6  Q.  So it would appear to refute Mr. Daly's point if it
7     turned out, in fact, Mr. Arceo did like Mr. Riley,
8     correct?
9  A.  No.
10 Q.  Okay.
11 A.  They never hired Mark Riley.
12 Q.  The reason that they never hired Mark Riley was
13    because of the information that Donna Poplar uncovered
14    and the resulting interview, correct?
15 A.  That's not true.
16 Q.  Perhaps I should clarify.  The reason they didn't hire
17    him for the operations director position was because
18    of the information that Donna Poplar uncovered and his
19    resulting interview, correct?
20 A.  And someone else interviewed him.
21 Q.  For the operations director position?
22 A.  Yes.
23 Q.  Okay.  Fair.  That being said -- strike that.
24        You mentioned one of the pieces of evidence
25    that when Carl was asking you questions --

Page 218

1     Mr. Edwards, I should say, was asking you questions,
2     you mentioned that one of the pieces of evidence that
3     you suffered discrimination on the basis of race at
4     the hand of Shirley Kautman-Jones in the email
5     complaint involving a snowstorm?
6  A.  Your sound went out.
7  Q.  I apologize.  I'll reask.  When Mr. Edwards was asking
8     you questions, you testified that one example of
9     Ms. Kautman-Jones having discriminated against you and
10    treating you differently on the basis of your race was
11    the email that she sent with regard to the snowstorm,
12    correct?
13 A.  Correct.
14 Q.  Your testimony previously was we had a document that
15    demonstrated it.  She later publicly apologized to you
16    for misattributing false credentials with respect to
17    you in that incident, correct?
18 A.  Correct.
19 Q.  When did Shirley Kautman-Jones send an email asking
20    what you did in the department that contained 30
21    questions as you testified when Mr. Edwards was asking
22    you questions?
23 A.  It would have been after the snowstorm in January of
24    2018.
25 Q.  You mean to say that you believe you received that

Page 219

1     email in January of 2018, the question -- the email
2     questions asking you what you did in the department?
3  A.  I believe so.
4  Q.  You mentioned that you believed that you were --
5     strike that.
6        This is a point out of sequence,
7     Mr. Branch.  It's going to be an abrupt transition.  I
8     apologize.  You did apply for employment with PESG,
9     the educational staffing service, in 2012, correct?
10 A.  No.  If you want me to explain it, I can explain it
11    without you going through all that.  It's up to you.
12 Q.  Alas, it is up to you.
13        MR. CASCINI:  Gentlemen, I'm going to go
14    attach something.  It's Exhibit 22.  I will label it
15    as that.
16        MARKED FOR IDENTIFICATION:
17        DEPOSITION EXHIBIT 22
18        4:56 p.m.
19        MR. CASCINI:  Please let me know, Mr.
20    Edwards and Mr. Alexopolous, if you received it.
21        MR. ALEXOPOULOS:  I have it.
22        MR. EDWARDS:  So do I.
23 BY MR. CASCINI:
24 Q.  Mr. Branch, you know the drill, I'm going to share the
25    screen.  Do you recognize this document, Mr. Branch?

Page 220

1  A.  Yes.
2  Q.  It says in the first line, I applied for employment
3     with Professional Education Services Group, L.L.C.
4     pursuant to the grounds of Michigan law and make the
5     following releasing waiver; is that correct?
6  A.  That's correct.
7  Q.  You did sign it, correct?
8  A.  Correct.
9  Q.  Date is in 2012, correct?
10 A.  Correct.
11 Q.  And then Mr. Pitts endorsed, again, or presented any
12    evidence of unprofessional conduct shown by the
13    involved supervision, correct?
14 A.  Correct.
15 Q.  You mentioned that you knew the road commission,
16    quote-unquote, like the back of your hand, correct?
17 A.  Correct.
18 Q.  I mean, you have been there for 31 years, I think that
19    makes sense for you to say.  How long has Ms. Peivandi
20    been employed by the road commission?
21 A.  Not sure.  He is around 25 years.
22 Q.  Would you agree that Mr. Peivandi also knows the road
23    commission, quote-unquote, like the back of his hand?
24 A.  Yes.
25 Q.  You mentioned that you had the belief that Fred had,

BRANCH, ANTHONY
07/21/2020

Pages 221–224

Page 221

1    quote-unquote, been preselected for the managing
2    director position prior to the board deciding
3    ultimately to hire him.  You also testified that
4    evidence of this came from five instances, the fact
5    that Fred was given different boards, the fact that he
6    was parking in the managing director parking spot, the
7    fact that members of the board would come in and have
8    lunch, with him, specifically Ms. Kautman-Jones and
9    Mr. Arceo, the fact that he used to solicit township
10   supervisors to come to meetings, and the fact that he
11   used to go to some of your meetings and advocate for
12   himself as the future managing director.
13           Are all five of those instances reasons why
14   you believe that Fred had been, quote-unquote,
15   preselected by the board?
16 A.  No.
17 Q.  What are the other reasons that you believe Fred had
18   been, quote-unquote, preselected by the board?
19 A.  **The actions between the answer that Cheryl Ronk gave**
20   **me as to why I would not be moving on to interviews in**
21   **front of the board, Cheryl Ronk's interaction was with**
22   **Shirley Kautman-Jones throughout the majority of the**
23   **process.  For Commissioner Dickerson, to say that he**
24   **was not aware that I was not being interviewed for the**
25   **position and the comments from Commissioner Johnson**

Page 222

1    **and from Commissioner Mandelaris leads me to believe**
2    **that Cheryl Ronk did not share this with the board**
3    **until I seen the information on the notes where Cloyce**
4    **Dickerson asked about it during the interviews.  He**
5    **had no knowledge of it and it showed that she had not**
6    **shared that with the board, but in the contract it**
7    **expressly says that she was to -- she was to share**
8    **those things with the board, so who from the board did**
9    **she share that with, if not with Dickerson, Mandelaris**
10   **and Johnson as three members of a five-member panel.**
11 Q.  Let's try to unpack that a little bit.  So you said
12   Cheryl Ronk, quote-unquote, had interaction with
13   Shirley Kautman-Jones, correct?
14 A.  **Yes.**
15 Q.  Shirley Kautman-Jones was the chairperson of the board
16   during the managing director search, wasn't she?
17 A.  **Correct.**
18 Q.  You mentioned you don't know anything about Cheryl
19   Ronk's background, you don't know any of her friends,
20   you don't know any of her associates, you don't know
21   Cheryl Ronk from Adam?
22 A.  **No.**
23 Q.  You also mentioned that Cloyce, one of the pieces of
24   evidence supporting the fact that you believe that
25   Fred was preselected came from the comment that Cloyce

Page 223

1    made to you after Fred was hired saying that Cloyce
2    did not know that you had not been granted an
3    interview, correct?
4  A.  **Correct.**
5  Q.  In fact, he told you after that he assumed that you
6    hadn't inquired at all, that you hadn't wanted the
7    job, right?
8  A.  **Correct.**
9  Q.  In fact, he did know, at least at the absolute latest,
10   as of July 23, the day of the second round interviews
11   before the board that you recall that because he
12   raised it during that meeting, right?
13 A.  **Correct.**
14 Q.  How is that drawn out from you, Mr. Branch?  How is
15   that evidence that Fred was preselected, how does
16   that -- draw the line for me.  How does that
17   constitute evidence that Fred was preselected, the
18   comments that Mr. Dickerson made?
19 A.  **In the contract it states that MSEA or AE is supposed**
20   **to share all of those findings with the board, and the**
21   **board does not know until they get to the interview**
22   **and see that my name is not on the list and the only**
23   **person that she is in constant contact with is Shirley**
24   **Kautman-Jones, number one, it violates their own**
25   **contract as to how the whole event was supposed to**

Page 224

1    take place.  Number two, those two are working
2    together.
3  Q.  Do you have any evidence that Ms. Kautman-Jones and
4    Cheryl Ronk did, in fact, have a discussion about the
5    fact that you were not going to go to the first round
6    interview at any point prior to Ms. Kautman-Jones
7    getting that interview list?
8  A.  **No.**
9  Q.  Okay.  So let's assume that all the allegations --
10   you're making an inference about that then, correct?
11 A.  **Correct.**
12 Q.  Let's assume that that inference is correct, let's
13   assume for the purposes of argument, just you and me
14   talking here.  Let's assume that it is true that
15   Shirley Kautman-Jones knew beforehand that you were
16   not going to end up getting the first round interview
17   after you had your preliminary interview with Cheryl
18   Ronk.  Let's assume Shirley Kautman-Jones knew first.
19   Even if we accept that as a premise, how does that
20   establish that Fred was preselected?
21 A.  **That doesn't.**
22           MR. CASCINI:  Okay.  I have nothing else.
23   Alex?
24           RE-EXAMINATION
25 BY MR. ALEXOPOLOUS:

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020                                                                Pages 225–228

Page 225

1   Q.   Very quickly.  Are you aware of any preexisting
2        relationship that existed between Cheryl Ronk and any
3        member of the board of commissioners?
4   A.   Yes.
5   Q.   Tell me about that.
6   A.   I know that she was in contact with Shirley
7        Kautman-Jones prior to John Daly even retiring from
8        the road commission or discussing the separation.
9   Q.   And how are you aware of that?
10  A.   Through the documents of discovery.
11  Q.   What specific document?
12  A.   I don't have it in front of me.  But there are emails
13       showing the two of them talking back and forth.
14  Q.   Talking back and forth about the possibility that MSAE
15       could be the executive search firm for the manager
16       director position?
17  A.   Correct.
18  Q.   Prior to the time that the Genesee County Road
19       Commission Board of Commissioners decided they wanted
20       to use an executive search firm, are you aware of any
21       relationship that Cheryl Ronk had with any of the
22       board of commissioners?
23  A.   I thought I just answered that.
24  Q.   I asked you a different question.
25  A.   Let me listen to you.

Page 226

1   Q.   A very specific question.
2   A.   Okay.
3   Q.   Prior to the time that the Genesee County Road
4        Commission decided that it was going to hire an
5        executive search firm to help it find a new manager
6        director, are you aware of any relationship that
7        Cheryl Ronk had with any members of the board of
8        commissioners?
9   A.   Yes.
10  Q.   What information do you have that Cheryl Ronk had any
11       communications whatsoever with any members of the
12       board of commissioners prior to the time they decided
13       they wanted to use an executive search firm?
14  A.   There are emails between Shirley and Cheryl Ronk prior
15       to them announcing that they are going look at search
16       firms, prior to any search firm coming in, long before
17       that.
18  Q.   What are the dates of these emails?
19  A.   I don't have them in front of me.
20  Q.   What are the years?
21  A.   2018.
22  Q.   So at some time in 2018 there are some emails in all
23       the documents that have been produced that you claim
24       that Cheryl Ronk and Shirley Kautman-Jones
25       communicated with one another?

Page 227

1   A.   Yes.
2   Q.   Do you recall the substance of any of those emails?
3   A.   It was that Cheryl Ronk was trying to get in touch
4        with Shirley, and for her to please call her.
5   Q.   Do you recall any other substance of any email that
6        you saw that leads you to believe that there was
7        somehow a preexisting relationship between Cheryl Ronk
8        and Shirley Kautman-Jones?
9   A.   No.
10            MR. ALEXOPOLOUS:  I have nothing else.
11            MR. EDWARDS:  I have one additional
12       question.
13                    RE-EXAMINATION
14  BY MR. EDWARDS:
15  Q.   Mr. Branch, in addition to what you have testified to,
16       do you believe that the attempted change of the job
17       description for the managing director position that
18       took out the experience equivalency clause was meant
19       to exclude you from being able to compete for the
20       position of managing director?
21  A.   Yes.
22            MR. EDWARDS:  I don't have anything else.
23            MR. CASCINI:  I don't have anything either.
24            MR. ALEXOPOLOUS:  I have one question.
25                    RE-EXAMINATION

Page 228

1   BY MR. ALEXOPOLOUS:
2   Q.   Do you know who changed the job description?
3   A.   Cheryl Ronk.
4   Q.   And what information from any source do you have that
5        Cheryl Ronk is the one that changed the job
6        description?
7   A.   The schedule of events to take place.
8   Q.   I don't understand what that means.  Please explain
9        that to me.
10  A.   MSAE gave the road commission a schedule of events of
11       how the process was to take place, and it shows job
12       description change.  Then there are emails where MSAE
13       sent draft copies of the job description change to the
14       board of commissioners.
15  Q.   Do you know who asked for any changes to be made to
16       the job description, if anyone?
17  A.   No.
18  Q.   So you don't know if that was a request that was made
19       by some of the board of commissioners, do you?
20  A.   No.
21            MR. ALEXOPOULOS:  I have nothing else.
22            MR. EDWARDS:  I have nothing else.
23            MR. CASCINI:  That's it.
24            MR. EDWARDS:  Andrew, have a good day.
25

BRANCH, ANTHONY
07/21/2020                                                          Pages 229–230

Page 229

```
 1              (The deposition was concluded at 5:11 p.m.
 2   Signature of the witness was not requested by counsel
 3   for the respective parties hereto.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 230

```
 1                CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN )
 3                    ) SS
 4   COUNTY OF WAYNE  )
 5
 6          I, RENEE J. OGDEN, certify that this
 7   deposition was taken before me on the date
 8   hereinbefore set forth; that the foregoing questions
 9   and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20
21
22          RENEE J. OGDEN, CSR-3455
23          Notary Public,
24          Wayne County, Michigan
25   My Commission expires:  June 21, 2025
```

BRANCH, ANTHONY
07/21/2020

Index: $101,626.72..3:11

## $

**$101,626.72** 58:19

**$120,000** 152:5

**$123,000** 152:3

**$15** 30:14,20

**$15.36** 30:22

**$2,500** 194:20

**$23.55** 41:19

**$23.88** 41:19

**$26.41** 49:13

**$35.95** 49:14

**$48.86** 57:3

## 0

**000325** 108:13

**0004193** 49:3

**000527** 95:23

**003860** 61:7

**003864** 58:9

**004153** 29:7

**004157** 57:1

**004192** 53:2

**004196** 47:17

**004200** 47:2

**004217** 41:11

**004220** 36:18

**004240** 35:8

**004243** 34:13

**004245** 31:14

**004259** 29:8,19

**00426** 45:1

**004879** 55:22

**03** 47:25

## 1

**1** 27:21,24 28:2 30:9 31:20 33:6 35:9 36:19 41:12 45:2 47:3 49:4 53:3 56:24 71:3,5,16 74:11 96:8 119:9 191:25

**1/31/20** 162:14

**10** 64:22 65:14 86:17 101:6,8,18 102:19 117:11

**10/31/19** 163:18

**10/31/2019** 163:18

**1031** 160:20

**10:10** 7:2

**10:37** 28:3

**11** 56:10 106:12,14, 22,24 111:14 112:10 122:23 184:5 191:9

**117** 107:3

**11:25** 57:17

**11:29** 60:3

**11:36** 64:4

**11:54** 73:15

**11:58** 75:14

**12** 37:15 76:17 106:11 108:3,5 113:19 114:1,8,16, 23 115:2,3,24 116:3, 7,13,16 117:5 118:2

**12/10/2019** 163:7,11

**12/15** 61:12

**126** 112:13

**12:13** 83:16

**12:17** 86:20

**12:31** 86:21

**12:43** 92:20

**12:48** 95:14

**13** 55:22 111:20,23 112:4,8,13 113:3 114:5,23 204:12

**130** 112:19

**131** 113:2

**14** 53:2 66:1,5 118:13,15,25 156:20 204:12 207:25

**14th** 60:18 129:23

**15** 22:3 49:4 64:21 102:14 107:6,17 108:16,21 109:19 110:23 112:16 115:6,13 117:25 118:5 120:17,19 121:3 127:2,9,14,22 128:10,12 129:16 186:5 190:25 215:10

**16** 47:17 111:19 134:1,5,13

**17** 47:2 159:17,19 160:2 163:20,23

**18** 113:12 162:2,9 163:22 167:24

**19** 165:22 166:2,12 167:24

**1988** 23:17 25:15, 25 31:5

**1995** 34:24,25 35:5

**1:00** 101:9 121:22 122:2,17 127:3,6

**1:09** 106:7

**1:12** 106:8

**1:14** 106:25

**1:15** 191:19

**1:16** 108:6

**1:23** 111:11

**1:26** 111:12 112:5

**1:37** 118:16

**1:40** 120:2

**1:42** 120:3

**1:43** 120:20

## 2

**2** 28:21 57:14,16,19, 20 58:18 119:9

**20** 45:1 91:25 125:6 167:4,7 191:9 215:10

**20-minute** 184:5

**2004** 52:22 55:13

**2009** 96:8 97:5,12 98:12,25

**2012** 219:9 220:9

**2014** 63:4

**2015** 63:4

**2016** 198:20

**2017** 59:14,21 60:18 61:12 70:19 189:8,20

**2018** 56:16 57:4 62:12,13 68:24,25 69:15 70:19 71:3,16 72:4 74:3 76:2,17 84:16,22 87:24 89:11 90:3 92:1,25 102:12,14 107:6 119:16 121:16 122:23 124:4 168:17 169:7,8,11 170:14 172:16 173:12 174:13,22 184:5 185:7 188:1,8 191:25 194:14 195:11 200:21 206:5 208:21 210:24 218:24 219:1 226:21,22

**2019** 161:18 167:22 168:2,17 169:14,17 185:14 186:2 192:8

**2020** 7:1 162:18 188:2 189:21 190:18

**2018** 174:21

**21** 7:1 41:11 47:25 149:25 150:20 168:9,11,22,25

190:12

**22** 219:14,17

**23** 167:20 223:10

**24** 36:18 158:25 178:21

**25** 178:21 220:21

**2593** 101:21

**26** 127:24 128:7,9, 12 129:19 172:16 173:12

**26,000** 23:5

**27** 35:9

**28** 34:14

**29** 31:15 185:7

**2:11** 133:23

**2:18** 133:24 134:2

## 3

**3** 28:22 56:23 59:25 60:2 92:3,25 96:5 102:12 117:11 119:9

**30** 121:23 203:8 218:20

**31** 161:8,9,18 162:18 164:6 169:21,22 186:1 192:8 194:14 195:11 202:5 220:18

**3176** 121:5 129:22

**32** 76:9

**326** 114:1

**33** 76:11

**36** 28:20 29:19 30:22 31:15 36:19 47:3 49:4 53:2

**3907** 134:15

**3908** 134:20

**3:02** 159:20

**3:06** 162:10

**3:11** 165:19

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**3:12** 165:20

**3:13** 166:3

**3:14** 167:5

**3:16** 168:12

**3:17** 169:1

**4**

**4** 28:22 63:18,22 64:3,22 119:9 145:8

**4:01** 194:10

**4:10** 194:11

**4:30** 191:21

**4:56** 219:18

**5**

**5** 28:22 73:12,14,17 74:1 86:17 112:19 119:12

**529** 96:5

**5:11** 229:1

**6**

**6** 64:21 65:19 75:11, 13 76:2,11 79:22 80:5,8 84:3 85:13 113:2 119:12,16 206:5

**6/14/2018** 127:14

**6:21** 122:2

**7**

**7** 65:18,19 83:12,15 119:12 135:12

**7/30/00** 45:8

**7:00** 121:22

**8**

**8** 92:13,19 119:12 121:16

**89** 23:17

**8th** 127:3

**9**

**9** 74:3 95:11,13,22 96:5,16

**91** 93:7

**92** 93:2

**A**

**A-N-T-H-O-N-Y** 8:21

**a.m.** 7:2 28:3 57:17 60:3 64:4 73:15 75:14

**abbreviation** 36:14

**ability** 84:25 85:15

**Abranch@gcrc. org.** 121:10

**abrupt** 219:7

**absence** 68:14 203:23

**absent** 165:7 184:15

**absolute** 223:9

**absolutely** 12:21 119:25

**academic** 144:2, 17

**accept** 45:22 224:19

**access** 11:12 94:9,13

**accessing** 95:6

**accidentally** 83:24 159:22

**accomplish** 27:9

**account** 172:11

**accumulated** 19:16

**accurate** 50:13 169:16

**accusations** 201:5

**acknowledge** 7:10 66:7 122:12 157:10 165:7 168:6 217:3

**acquired** 206:10

**acting** 204:14

**action** 28:14,22,24 29:3,11,20,23 31:17 32:20 34:16 35:10 36:20 41:8,13 44:25 49:8 153:5

**actions** 221:19

**activities** 38:23 39:1,2 187:9,19,25 188:13,15,17 194:13 195:6,10,17 212:2

**actual** 39:3,14 112:9 194:17

**Adam** 222:21

**Adams** 145:20,21 158:5

**add** 110:14 114:21

**addition** 123:14 227:15

**additional** 17:21 110:24 138:12 227:11

**address** 65:1 76:12 77:16 78:10 87:18 121:8,10

**addressed** 76:13 132:19

**addressing** 77:2, 14 135:9 202:8

**adequately** 204:14

**administer** 161:11

**administering** 7:12

**administration** 20:1 96:20,21,22,23, 24 97:17,18,19,25 98:1 161:12

**administrative** 96:25 97:2,9,10 98:6,7 99:6,7,11,13

**admit** 210:1

**admitted** 207:17 208:6

**admittedly** 99:13

**advance** 63:7 120:11,12,15 150:25

**advancing** 126:15

**advice** 174:10

**advocate** 221:11

**AE** 223:19

**affecting** 161:3

**affirmatively** 133:4 136:22 151:3

**affirmed** 7:6

**African** 153:13,19 154:9,22 174:25 175:4,11,15 177:8 180:18,25 181:23 208:9 217:3

**afternoon** 122:16 206:2

**agency** 21:12 182:10

**agency's** 19:11 20:9

**agenda** 111:15,19

**aggregate** 168:16

**agree** 49:15 109:9 114:10,19,25 115:2,

**4,8,11,23 116:2,6,11 117:17 136:16 154:22 192:18,19 220:22**

**agreed** 45:21,22 61:20 110:5,7 115:19

**agreement** 7:17, 18 10:25 44:1 58:3, 21 59:19 60:13,17, 19 61:4,15 79:17 80:1 98:22 99:5 135:8

**ahead** 109:23 141:17

**aided** 20:11

**aiding** 22:16

**Alas** 219:12

**Alex** 8:3 57:19 60:7 73:18 75:15 83:10 92:14 106:15 120:21 160:3 162:4 166:4 224:23

**Alexopolous** 8:3 60:10 63:23 92:16 95:16 101:11 106:6,18 108:10 111:24 118:17,19 134:5 162:7 166:7 167:9 169:3 172:3 183:24 216:9 219:20 224:25 227:10,24 228:1

**ALEXOPOULO S** 57:21 63:10 73:19 75:17,19 83:17 95:18 101:13 106:12 112:2 120:23 134:8 160:5 183:20 194:12 195:20 219:21 228:21

**alive** 159:24

**allegation** 156:20 158:10 181:10 211:9,12,14 212:25 215:11

**allegations** 156:10 224:9

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**allege** 133:13 134:24 153:22 154:10 155:19 210:4,8,24

**alleged** 115:13 180:11

**allegedly** 54:5 149:2

**alleging** 180:15 181:16

**allotted** 203:14,15

**allowed** 137:17 138:3 151:16 154:21 156:23 182:1 197:23 198:2 210:17 212:18,19,21 213:22

**allowing** 109:3 181:22

**alluded** 10:23

**alongside** 52:17 186:17

**alternative** 108:25 109:3

**ambiguous** 99:12

**amend** 107:21

**amended** 109:9

**amendment** 110:25 115:16

**American** 153:13,19,21 154:9, 23 180:18,25 181:24 208:9 217:3

**Americans** 175:1,4,12,16 177:8

**amount** 151:22 169:8 189:12

**and/or** 64:24 66:14

**Andrew** 7:21 8:15 63:10 86:10 205:22 228:24

**Andrew's** 8:5

**anger** 194:8

**angry** 186:22 192:4,13,24 193:3,5, 7,14,16,20,23

**announced** 89:23

**announcement** 89:24 90:6

**announcing** 226:15

**annual** 58:18

**answering** 9:8

**answers** 9:20 10:14 12:2 13:25 14:2 64:14 66:2 68:2 123:16,18,22 125:2

**Anthony** 7:4,20 8:8,21,23 64:14 66:3 76:18 85:2 105:15 121:1,20 122:3 128:6 129:22 145:2 158:25 166:22 204:9

**anticipated** 148:16

**antidiscriminati on** 183:2

**anxiety** 164:2 166:15

**anymore** 170:10 192:5 194:21

**apologize** 51:2 56:22 63:17 67:11 83:6,10 84:19 85:12 109:23 113:1 141:21 148:9 149:21 150:9 159:16 206:1 218:7 219:8

**apologized** 82:22 147:15,23 149:20,24 150:12 218:15

**apologizing** 83:2

**apology** 150:16, 17,19

**appears** 41:17 76:1

**applicants** 140:17 141:10 144:7 157:12 206:4

**application** 27:22 51:15 66:24 94:24 119:14,20 125:8 133:14

**applications** 65:3,4

**applied** 26:1 50:15 51:14 52:9,12, 15 62:22,25 63:8,14 64:23 65:2,21 88:21 95:6,9 98:13 100:3, 4,7 131:6,7,8 133:10 141:9 157:3 206:4,5, 14 220:2

**apply** 50:6 62:18 63:5 66:13 67:5,15, 20 109:11 131:22 139:19 172:6 219:8

**applying** 51:16 66:8 88:15 95:5 109:15 121:20 135:1

**appoint** 50:19 92:2

**appointed** 50:18 68:10,22 69:3,22 82:2 85:2 214:2

**appointment** 56:18 68:8 71:1 82:11,19 161:24 162:15,17,20,24 163:8,15,23 165:9 168:1 186:1

**appointments** 164:4,8,11,23

**apprenticeship** 18:4

**approach** 69:11

**approached** 68:18 69:9,17 81:15 87:1 139:17 151:3

**approaches** 81:10

**approval** 107:14 108:16,20 112:22

**approved** 104:17 110:1,15 115:6,25 155:10

**approximate** 204:3

**approximately** 23:15 25:11,12,14 34:23 37:13 62:11 63:2 125:5,6 184:5 190:6

**April** 89:11,14 92:3,25 192:9

**arbitration** 44:18

**Arceo** 85:21 86:2 93:13 113:16 153:20 175:3 196:25 198:5, 12,17,18,21 199:1 210:20 212:15 214:14 215:20 216:1,5,10,17,18,22, 25 217:7 221:9

**area** 19:13 23:17 29:2 54:8 55:1 112:18

**areas** 21:7,9 24:11 37:8

**argument** 224:13

**arrangement** 7:15

**arrive** 213:4

**article** 26:8

**arts** 17:7

**asphalt** 27:4 38:21

**assembly** 25:9

**assent** 10:9

**assertion** 158:14 165:11

**assessment** 158:18

**asset** 103:1 116:21

**assign** 202:15

**assigned** 39:11 182:11

**assist** 19:20 184:22

**assistance** 159:1

**assistant** 190:15, 16 191:1,3

**assisting** 92:6

**associate** 16:25 17:7 64:15

**associate's** 17:1

**associates** 160:14 162:15 163:8 164:9 222:20

**Association** 8:4 42:25 91:8 159:4

**assume** 12:9 96:14 162:25 203:22 224:9,12,13,14,18

**assumed** 223:5

**assuming** 86:5 186:2 204:15

**at-will** 58:20 61:3

**athletes** 191:6

**Atlas** 69:6

**attach** 219:14

**attachments** 102:7

**attempt** 43:17 50:11 211:15

**attempted** 227:16

**attempting** 9:15 79:17

**attend** 17:4 19:9, 24,25 20:23 22:4

**attendance** 70:25

**attended** 16:2 18:17 70:23 84:5 85:6 91:16 170:15 206:19

**attending** 76:24 91:25

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020

Index: attention..Branch

**attention** 84:13
93:7 96:16 100:22
102:20 103:20 104:2
107:13 108:17
117:10 131:5 156:16

**attitude** 69:19,24
70:6 87:4

**attorney** 8:16
54:20 105:7 113:5
160:21 184:1 210:11

**attorneys** 7:9

**attract** 179:25

**attribute** 185:11

**atypical** 10:23

**audio** 9:25 11:5

**August** 149:25
150:20 191:25

**authentic** 169:10

**authority** 39:24
208:16

**authorization**
164:24 167:14

**authorized** 10:17

**authorizing**
167:16

**average** 12:25
190:23

**avoid** 10:2

**award** 44:18

**awards** 204:25

**aware** 8:22 9:13
81:6 143:2 147:15,
24 150:13 171:21
176:13 179:1,5,19
180:4,10 184:20,25
206:17,20,25 221:24
225:1,9,20 226:6

**awkward** 28:6

---

**B**

---

**B-A-U** 16:10
**B-A-U-D-E-R**
16:12

**B-R-A-N-C-H**
8:21

**bachelor** 17:7

**bachelor's** 16:25
96:22 97:7,24 99:11,
16 102:22 103:14
109:4,7 114:14,17
117:16 118:6 125:13
143:22 144:9 177:16
199:22

**back** 24:20 26:9,24
33:5 34:17 38:10
44:9 52:22 62:1,15
66:12 86:21 87:18
89:7 97:13 104:9,10,
13 105:9 106:8
110:1,2,3,4,5,7,9
111:12 114:7,12,16,
23 115:18,19 117:24
120:3 124:4 125:24
127:7 129:16 132:15
133:24 136:25
141:24 143:21
165:20 191:20,25
194:11 200:1 202:14
203:9 205:21
220:16,23 225:13,14

**background**
14:11 15:11 144:3,
17 157:1,8,9,11,14,
22 222:19

**backtrack** 43:9

**backtracking**
156:11

**bad** 59:4 135:21,24
186:9 200:12

**badge** 33:15

**Baker** 178:10

**ball** 113:21

**bar** 195:25

**bargaining** 44:1

**based** 29:24 74:5
117:8 123:15,17,22
146:12 169:7
172:19,23 173:8,14
180:16 181:11 199:9
200:10 202:15

**basically** 211:7,
17,19

**basis** 50:1 98:19
99:2 103:13 104:13
105:11 110:11
115:22 116:24
129:4,7,12 131:18
153:5,7 154:24
155:11 181:8
216:14,23 218:3,10

**Bates** 29:5,19
31:14 34:13 35:8
36:18 41:10 49:3
53:2 55:22 57:1 58:8
61:7 74:10 76:8,11
92:25 95:23 96:6
101:19 107:2 108:13
112:12,19 113:1
118:23,24 121:4
134:13,20 163:5

**bathroom** 86:10

**Bauder** 16:8,10,
11,13,15,20,22 17:2,
4,8,11,18

**bear** 27:20 57:25

**Beecher** 15:14,15
189:5,6

**began** 57:7 79:19
186:11 192:8

**begin** 8:19 42:2
90:2 167:23 196:7

**beginning** 25:17
85:8 172:6 210:24

**begins** 9:20 29:6
112:11,12 162:13

**behalf** 8:4 90:19
91:7,11 158:17

**behavior** 40:7

**belief** 66:3 122:15,
16 155:3 157:25
199:6 220:25

**believed** 133:13
183:1 209:11 219:4

**bell** 91:13 150:1

**belongs** 177:2

**Benavente**

101:22,23

**benefit** 47:18
169:25 170:1,4
179:19

**benefits** 65:8
170:5

**Bennett** 52:14

**biased** 174:25
175:4,7,11,15 177:8

**biggest** 194:23

**bit** 9:25 10:23 12:19
17:23 19:5,7 20:10
25:20 27:1 51:13
55:4 62:1 71:23
73:21 74:13 111:5
205:25 222:11

**blacks** 198:17
215:23 216:2,6

**blame** 84:24

**blur** 185:12

**board** 68:13,16,23
69:22 73:1,8 74:3,23
76:1,12,13,20,24
77:2,15,25 78:8,10
83:1 84:2,20 85:23
86:3 88:4,9 89:17,
22,23 90:5,10,14,21
91:1,25 92:1,5,24
103:3,21 104:2,4,6,
15,16 105:5 107:6,
14 108:20 109:9,17
110:5,8,23 111:4
112:16,22 113:5,6
115:6,8,13,25
117:22,25 125:24
126:19 127:11
128:2,24 129:13
131:3,11 133:12,15
134:25 136:23
137:7,12 139:2,3,4
142:8,17 143:3,21
144:6,22 146:1,5,11,
13 147:16,20,21
149:22,24 151:1,6,
21 153:16 154:3,4,7
158:6,17,19 170:14
171:24 174:13,20,21
175:21 176:5,14
179:10,17,20 180:5

181:5,13,21,23
196:18 198:21
206:20 207:1,7,14
209:4,6 210:14,18
211:3,11 212:4,7,20
213:8 214:23,24
215:4,8 216:11
221:2,7,15,18,21
222:2,6,8,15 223:11,
20,21 225:3,19,22
226:7,12 228:14,19

**board's** 105:3

**boards** 196:10,12
197:12 210:16
212:13 214:3 221:5

**boilerplate** 9:4

**bombarding**
200:13

**bored** 56:22

**boring** 14:12

**born** 14:14

**bottom** 65:25
66:1,4,11 92:25 93:9
95:23 107:13 112:21
134:13 163:17

**box** 56:3 160:24

**Branch** 7:4,20 8:8,
15,21,22,23 12:4
14:14,18,23,24
27:24 28:7 29:9
31:16 34:15,20
35:10 36:20 38:9
41:14 45:3 47:4,20
49:5 52:9 53:1,4
55:23 56:8 57:25
58:2,6,10,14 59:8
60:12 61:14 64:6,8
65:15 66:4 67:4,15
73:25 74:1 75:22,23
76:18 79:6,24 80:22
83:8,22,25 85:2
86:6,23 87:19 92:22
93:3 94:5 95:21,24
96:9 97:16 99:16
101:17,24 102:15,21
103:5 105:15 106:20
107:4,19 108:12,14
112:7,15,21 113:21
114:3,10,19,25
116:10 117:2,12

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

**U. S. LEGAL SUPPORT**
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020

118:22 119:1,13
120:5 121:5 128:6
134:11,16 136:16
153:12 156:14,15
158:25 159:16 160:8
161:1 162:12 166:9
167:11 168:15
169:5,6,19 170:13
171:11 172:4 183:25
194:13 195:23 204:9
205:25 206:3 219:7,
24,25 223:14 227:15

**Branch's** 64:14

**break** 19:5 86:11,
14 133:21 195:23
208:14

**bridge** 41:6,15,24
42:18 43:13

**bridges** 178:4

**briefly** 55:20,21
56:25 57:10 86:23
87:18 201:24

**bring** 103:20
132:16,24 133:2
135:20 136:4

**bringing** 131:4
136:3

**broadcasting**
16:16 17:16

**brought** 33:5
70:20 72:25 100:22
104:2 132:18 133:3
141:15

**building** 20:1
124:16 195:13
196:20 213:11,13

**buildings** 213:12

**bullshit** 137:19,
20,25 138:9 149:4,7,
8,12,16 215:3

**business** 96:20,
22 97:17,24

**button** 117:21

**bypassed** 161:14

## C

**call** 56:25 74:5 84:6
107:10 120:11
122:25 123:6 126:9,
10,12,13 127:19
142:4,7,16 164:13
183:22 216:4 227:4

**called** 7:5 8:9,16
20:24 120:12,14
126:11 137:20

**cancel** 163:12

**canceled** 162:20
163:12,15 164:5,14

**cancellation**
162:23

**candidacy**
133:18 217:1

**candidate** 32:8
136:8,9,10 157:2
181:24 207:6,12

**candidates**
105:17,20 135:15
136:4,13,14 142:3
144:8 145:13 146:24
147:12 148:25 180:1
181:12

**capabilities** 35:2

**capacity** 105:14
158:18

**caption** 64:12,14

**captured** 74:18

**car** 195:13 197:21,
23

**care** 124:15 164:20

**Carl** 7:19 57:20
60:7 63:24 73:17,21
75:15 83:10 86:12
92:14 106:15 120:21
159:22 160:3 162:4
166:4 183:20 210:11
217:25

**carried** 84:8 93:8
109:19

**Cascini** 7:21 8:14,
15 28:4 57:18,23
59:23 60:4,7,11
63:12,13,21,24 64:5
73:16,21,24 75:15,
20,21 83:10,19,20
86:12,17,19,22
92:14,21 95:15,20
101:10,15,16 106:2,
9,13,19 107:1 108:7,
11 111:10,13,24
112:6 118:17,21
120:1,4,21,25
133:20 134:3,10
159:21 160:1,7
162:4,11 165:21
166:4,8 167:6,10
168:13 169:4 172:1,
5 177:11 205:24
219:13,19,23 224:22
227:23 228:23

**case** 8:23 182:23
196:3

**Caucasian**
153:20 154:8

**caused** 21:7
193:23

**caveat** 8:6

**cc'd** 102:5

**CDL** 22:21,23 24:1

**ceased** 192:13

**cent** 30:22

**Center** 186:1

**certificate** 18:19
22:20 33:14,17,23

**certificates**
18:10

**certification**
18:19 19:6,8,14,25
21:17,18,24 22:6,15,
25 23:14,15 24:2,7

**certifications**
18:8 19:3,20 24:11,
14

**certified** 18:24,25
19:1,10 20:3

**chain** 121:5 127:8

**chairperson**
68:12,16 79:4 84:8
93:9 222:15

**challenge** 194:18

**chance** 27:10
86:11 91:13

**change** 23:6
29:13 30:1 32:18,19
37:17 48:6,7 49:8
53:14,15,16 56:7
61:1 104:17,20
111:1 113:7,8 114:6,
12,13 115:14 117:23
124:14 189:21
227:16 228:12,13

**changed** 48:9
110:25 114:6,8
118:6 131:12,21
156:21 201:18
228:2,5

**Chapman** 40:13,
14 49:22,24 51:3
53:17,22 54:6,25

**charge** 172:14
182:6,15 197:16

**charger** 119:24

**charges** 10:15
182:11,13

**chat** 57:19 60:6
63:20 73:17 83:13
101:11 160:3

**checked** 208:1,2

**Cheryl** 91:9 102:1
119:21 120:6 121:7,
16,23 123:3,13
127:9,15 128:24
129:25 130:19
132:10,20 133:5,6
136:5 137:3,18
138:2 149:3 150:24
176:16,18 179:11,19
181:4,11,18 182:3
183:13,22 184:6
185:5 199:13 206:7
221:19,21 222:2,12,
18,21 224:4,17
225:2,21 226:7,10,
14,24 227:3,7 228:3,
5

**Cheryl@msae.
org.** 121:6

**children** 14:24

**choose** 88:4
169:23

**chronic** 166:18,19

**chronology**
24:22

**circle** 141:24

**circumstance**
13:4 61:14,22

**circumstances**
8:1 29:1 41:22 49:17
62:21 71:5 95:2
201:7

**cited** 212:11

**citing** 124:18

**citizens** 205:10

**civil** 24:15 102:24
116:19 178:1,14

**claim** 153:6 154:23
155:19,23 181:3,9
182:2 185:10 186:11
191:17 194:16 196:3
226:23

**claims** 154:14
171:16,23

**clarification**
12:12,13 18:16
111:3 141:16

**clarified** 59:1 78:1

**clarify** 104:8
217:16

**class** 20:6

**classes** 19:9,24,
25 22:4,8 203:10,12

**classification**
30:1

**classroom** 15:18
17:14

**clause** 104:9,10,
25 109:25 110:3,4,5,
7,8,14 227:18

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**clean** 156:1

**clear** 140:5 201:8 202:3 203:21 216:4

**clearing** 71:25

**clears** 111:16

**client** 181:9

**clinic's** 162:24

**close** 93:8

**closing** 187:21

**Cloyce** 78:16 85:24 92:1 149:19 175:6 176:4 222:3, 23,25 223:1

**co-interim** 55:17 56:19 57:6 62:3 68:8,10,14,24 69:9, 17 80:6,9,10 81:11, 17 82:1,3,11 86:5 87:2,23 88:1,5,8 151:17,23 196:8,17 197:10,20 198:6 211:22

**co-lead** 46:11

**co-managing** 79:23 80:10 85:3 197:10 198:2

**Co-what** 197:19

**coach** 188:21,23, 24 189:20,23,25 190:15,16,18,21 191:1,3 194:25

**coaching** 189:6, 9,12,17,21 190:6,8, 13,20,24 191:2,6 194:24

**COD** 118:24

**Coetta** 145:20,21 158:5

**cognizant** 124:3 202:4

**colleague** 154:20 156:5 181:17

**colleagues** 70:4 78:20,24 79:1,8,11, 14 80:20 87:6

**colleagues'** 70:2

**collective** 43:25

**college** 16:8,10, 13,15,20,23 17:2,4, 8,12,18 18:2 156:24 178:10

**commenced** 64:25 66:16

**commendations** 205:1,6

**comment** 56:13 70:6,14,15,17 72:6 79:3,12 87:8,14 110:22 149:7,8,12, 16 158:13 170:13, 17,19,22 199:2,4 222:25

**commenting** 147:19

**comments** 70:8, 9,10,20,23 71:4,6 73:5 75:1,7 77:5,7, 17 79:15,25 80:3,7 82:23 86:23 87:7,10 93:15 201:9 215:1 221:25 223:18

**commercial** 19:2 22:21,24 23:4, 9,10,12

**commission** 7:23 8:18,24 11:8,9 13:16 19:18,22 20:12 21:15 22:17 23:8,19,22,23 24:4, 12,19,24 25:1,18,21, 24 26:2,5,11 27:12 28:18,25 30:12 31:3, 6,9 32:9,12,14 36:1, 9 41:23 43:1,17,21 44:19 48:13 55:17 58:13 59:20 60:21 62:8,11,17,19,22,23 63:9,15 64:25 65:22 66:9,16 67:2,5,10, 13,17,18,22,24 68:7, 11,23 69:3,20,21 70:11,21 71:2 72:1,9 73:1 74:3,15,16 80:12 84:2,16 85:4

86:2 88:25 89:8 90:9 91:2 92:24 102:13 105:7 107:16 108:15 123:10 135:13 136:12,17 141:3 145:22 151:13 153:7 156:21 158:3 159:4 161:8,9 169:20 170:9 172:15,18,22 173:12 178:19 179:7,25 180:6 182:7,10 184:21 185:1 197:14,17 199:20 200:5 202:6, 10,22 204:22 205:15 206:22 207:21 208:12,24 209:21 211:24 214:2 220:15,20,23 225:8, 19 226:4 228:10

**Commission's** 84:21

**commissioner** 74:17 75:4 78:15 85:21 130:9,10,17, 21 131:16,23 132:10,13 137:1,2,6, 15 138:13,24 139:5 140:5 146:25 147:1, 13,17 148:9,17 149:2 158:12,13,16 210:6 215:13,14 221:23,25 222:1

**commissioners** 68:13,16 69:22 77:25 78:7,9,11,13 82:10,16 84:10 86:3 88:9 89:18 90:22 91:1 104:15,17 115:6 118:1 127:11 128:2 132:17,21 133:5 135:1,11 144:21 152:10 153:17,18 171:24 174:13 175:21 176:14 179:10,17,20 180:5 181:6,13,21, 23 196:21 198:4,21 207:2,14 209:4,7 212:5,7 215:5 216:11 225:3,19,22 226:8,12 228:14,19

**commissioners'** 73:2,8 83:2

**commissions** 197:15

**committed** 183:10 184:11

**committees** 197:12

**communicate** 150:23

**communicated** 226:25

**communication** 126:4 170:15

**communications** 226:11

**community** 197:15

**company** 64:24 65:2 66:14

**compensation** 58:17 65:6 169:17

**compete** 227:19

**complain** 172:17 173:11 200:8 213:14,21,25 214:1, 4,11

**complained** 72:17 172:21 173:1, 6,7,20 180:5

**complaining** 72:11,14 77:4

**complaint** 43:23 64:11,18 153:22 154:10,15 156:11, 13,16 173:13 218:5

**complaints** 72:24 74:14,22,25 75:5,6 79:2 80:15, 17,20,23 84:14,20

**complete** 8:7 12:22 13:25 59:19 111:19 119:13 169:10,16 176:18

**completely** 14:2 50:21 59:18

**completion** 33:15,17

**complications** 7:24

**component** 98:10

**compound** 59:4

**computer** 94:10, 14 145:6 165:15

**concern** 103:18 105:4 109:10 131:9 136:3,5

**concerned** 94:2 103:10 105:18

**concerns** 103:8 109:18 115:9,17 117:14 132:25 133:5 135:9 137:3

**concluded** 33:7 229:1

**conclusion** 33:13 109:24

**conclusions** 84:23

**concrete** 27:4 38:21

**condition** 11:24 34:2,3 166:19

**conduct** 220:12

**conducting** 7:25 38:2 89:18

**conference** 204:5

**confess** 161:4

**confirm** 152:18 160:3 166:4 167:7

**confirmation** 128:16

**conflict** 66:7,19, 22

**conflicts** 161:3

BRANCH, ANTHONY
07/21/2020

Index: confusion..curriculum

**confusion**
111:20

**congratulated**
150:4

**connection** 15:7
22:15 32:22 90:10
93:15

**consent** 7:14,23

**considered**
13:25 20:14 103:1
116:21 125:12
177:17 216:13

**consistent** 30:24
85:6 161:17 170:22,
24

**consistently**
191:25

**constant** 223:23

**constitute**
223:17

**contact** 40:10
90:1,18 122:5
133:10 223:23 225:6

**contacted**
119:21 120:6,7,14

**contained**
218:20

**contemporaneous** 145:2

**contemporaneously** 144:20 145:9

**contended** 98:5

**content** 122:8,9

**continue** 16:4
119:8 127:1 164:16
187:14,17 189:9

**continued** 8:1
16:8 138:19 187:13

**contract** 38:4,15
58:11,18 60:23
133:16 134:19,21
135:6 136:21 222:6
223:19,25

**contracts** 61:21
133:9

**contractual** 47:8

**contrasted** 53:16

**contribution**
170:1

**conversation**
9:12 10:14 81:21
117:22 123:7,8,14
124:19,21 125:5,15
126:3,7,9,23 127:13,
15 128:5 130:2,5,8,
11,14,25 131:19,23
132:4,9,12 137:5,12
138:12,15,19,23
139:5,15,23,24
145:24 146:3,8,18,
22 147:1,10 148:8,
10,13 149:1,13
150:11,14,15
173:16,23 174:1,4
176:10 177:7
183:12,14,15 184:3
215:12 216:18

**conversations**
9:17 100:14 132:6,8
144:19 149:6 152:9
214:15,20,21

**coordinator**
191:4,5

**copies** 228:13

**copy** 27:23 28:19
59:19 63:24 71:12
94:16 95:4 96:12
102:12 108:14
111:14,15 112:9
156:12

**correct** 29:16
30:7,12,13,23,25
31:1,21,22 32:25
39:5 41:20,21 42:17,
20 44:2 46:3,17,20
48:2,20 49:1,2 51:11
52:6,24,25 53:11
54:3,17,23 55:15,19
56:2,4,9,11,16,17,21
57:5,9 58:16,25 59:3
60:24,25 61:11,13
62:6,9 64:17 65:24
66:11,18,20 69:1,23
70:22 72:10 74:23,
24 75:9 76:6 78:17
79:18 80:9,13,14,16

81:4,12,13 82:4,5,
12,13,16,17 83:5
84:3,4,5,7 85:14,17,
18,25 86:1,2,4,8
87:17,24 88:3,12
89:14 91:18 92:7,8
93:5 97:10,11 98:4,
11 99:15,17,18,19,
20,24 107:7,8,11
110:16,20 115:25
116:1 121:9,12
122:6,13 124:5
127:23 128:8 129:11
132:2,23 134:22
135:2,4,7 137:14
138:22 139:8,25
140:8,9,15 143:4,5,
17 146:2,15 148:1,7,
12 151:5,10,11,14,
15,25 153:6,9,24,25
154:12,13,24
155:21,22 157:19
158:7,8 159:6
160:16 161:25
162:18,21,22
163:14,15,16,19,24,
25 164:2,3,6,7,10
165:9,11,12 166:13,
16,20,21 168:17
171:4,6,7,9 173:4,10
174:14,15,17,22
175:21,22 176:11,
12,19,20 177:17
179:17,18 182:7,8,
14 183:8,9 184:8,10
189:23 190:2,3,13,
14,19 192:10,11
196:6,14 204:10
208:19 209:9,10
211:11,16 212:2,3,5,
6,9,10,16,17 214:15,
16,17,18,22 216:3,7,
14,15,20,23,24
217:4,5,8,14,19
218:12,13,17,18
219:9 220:5,6,7,8,9,
10,13,14,16,17
222:13,17 223:3,4,8,
13 224:10,11,12
225:17

**correctly** 33:20
65:14 85:4 97:3
113:13 121:24 122:3
129:25 157:4 159:5
160:25 163:9 215:22

**correspondence** 85:22

**counsel** 7:14
10:25 27:22 31:15
34:13 35:8 36:17
41:10 47:18 57:19
60:6 63:20 73:17
83:8,13 102:4
117:11 165:1 167:18
171:19 229:2

**counseling**
192:7,8

**Country** 24:4

**county** 7:22 8:17,
24 11:8,9 14:16
15:12 20:1,11 21:9,
10,21 22:17 23:8
24:12,19,23,25
25:18 28:18,25 32:9,
12 36:1,8 38:8 42:25
43:21 54:12,13,14
59:20 60:20 62:17,
19,23 63:9,15 64:25
65:22 66:9,15,24
67:1,5,10,12,16,18,
22,24 68:7,11,12,23
69:3 71:2 73:1 74:2,
15,16 76:13 77:19,
25 78:8 80:12 84:2,
11,15,21 85:3 91:2
92:24 102:13 105:7
107:16 108:15
113:12 123:24
124:12,16 127:11
128:2 135:13
136:11,17 141:2
143:15 145:22 150:4
151:13 153:7 156:21
158:3 159:3 161:7,8
169:20 170:9
172:17,22 173:11
179:6,24 184:21
197:16 199:19
204:22 205:9,15
206:22 207:13,20
208:12,24 209:6,21
211:24 212:4,7
225:18 226:3

**couple** 15:10
127:4 197:7

**courses** 18:8

**coursework**
17:15

**court** 7:9 9:14 10:7
197:5

**cover** 101:21
119:4

**COVID** 187:8

**created** 28:24
44:15 45:12,16
160:15

**creates** 9:25

**creation** 44:22

**credentials**
207:24 209:2,8,24
210:4,8 218:16

**Creek** 35:18 37:4,
14 39:6,22 40:18,20,
24 43:3 47:24 48:4,
14,22

**crew** 38:6,20 41:6,
24 42:18 43:13
202:1

**crews** 202:2

**criteria** 117:8
201:21

**critical** 171:2

**criticism** 85:19
87:9,15

**criticisms** 81:6

**criticize** 70:1,2
87:4

**criticized** 87:12
202:18

**criticizing** 83:2

**cross-examination**
210:10

**culvert** 38:22

**cumulatively**
207:6

**current** 8:18 65:12
141:4 153:16,18

**curriculum** 16:2

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**cut** 145:3 194:20
202:6 211:5

**D**

**Daly** 50:5,11,12
52:5 59:10 62:7,10
71:10,15,19 72:6
76:15 77:22 78:4
79:18 80:1,15,23
81:1,2 84:15 85:19
88:11 89:2,5 96:13
156:23 158:2
177:12,21 184:15,16
196:12 198:11,24
200:22 201:11
203:23 204:13,19
205:14 215:20,25
216:4,17 225:7

**Daly's** 61:10 68:6
80:11 81:7 170:16
171:8 203:23 216:19
217:6

**dark** 13:3

**date** 13:15,16
60:16 61:12 62:10
73:8 82:6 89:9,15,22
90:4 96:6 102:11
103:25 121:15
122:22 137:8 140:13
147:3 148:14
161:20,22 163:18,19
164:14,18 167:19
168:4 172:25 185:6,
16 192:10,11,20
220:9

**dates** 65:3,11
150:18 164:11,13
226:18

**dating** 191:25

**Dave** 196:25 198:4,
12,16,18,21 199:1

**David** 86:2 93:13
175:3 210:19 212:15
214:13 215:20
216:1,4,5,17,18

**day** 26:9 89:7 122:1
126:13 129:19
161:23 162:25
163:24 190:9,10

**days** 190:11

**deal** 186:7

**dealing** 185:19
198:18 199:5

**debate** 104:19,22

**December** 60:18
70:19 96:8

**decide** 13:19
16:17 129:13 132:24
133:4

**decided** 23:6 92:1
225:19 226:4,12

**deciding** 221:2

**decision** 92:2,7
129:24 150:24 151:7
172:12 175:18 176:3
179:16 180:21
208:25

**declare** 66:1

**decline** 189:12

**declined** 42:4

**decrease** 41:18

**deems** 20:25

**defects** 84:25
85:16

**defendant** 29:5
64:15,25 66:15
74:10 76:8 93:1
101:20 107:2 112:12
121:4 129:21 134:14
156:20 158:4 159:3,
10 185:11

**defense** 191:2

**defensive** 191:4,
5

**deficient** 116:17

**defined** 170:1,4

**degree** 16:22 17:1
18:18 96:19 97:6,7,
17,21,24 99:10,11,
16,19 102:22,25
103:15 105:13

**109:4,7 114:14,17**
116:18,20 117:16
118:6 125:13 144:9,
14 156:24 177:16
199:18,22 200:7
205:17

**degrees** 17:20
18:7 143:23,25
200:6

**delay** 9:25 63:17
92:2 101:5

**demonstrate**
30:18 56:18 211:25

**demonstrated**
218:15

**demotion** 43:14,
18 44:7

**denial** 127:13
128:4,20 132:20

**denied** 128:14
153:22 154:17
155:1,24 156:3,6
199:12,15 215:3

**denying** 127:10
128:1

**department**
26:24 30:10 35:5
38:4 47:24 48:19
203:3,8,17 205:6,12
218:20 219:2

**departments**
91:2

**depending** 20:25
145:5

**depict** 35:11

**depicted** 169:8

**depicts** 165:8

**deposed** 8:23 9:1
11:7

**deposition** 7:10,
11,12,25 9:7,11,24
10:23 11:14,20,21
14:1 28:2 57:16 60:2
64:3 66:20 73:14
75:13 83:15 92:19
95:13 101:8 106:24
108:5 112:4 118:15

**120:19 127:20 134:1**
159:19 162:9 166:2
167:4 168:11,25
172:6 219:17 229:1

**Derderian** 113:5

**derive** 179:20

**describe** 18:22
28:12 72:21 186:15,
20 187:2 188:5
191:16 201:14

**description**
94:16,20,23 95:3,4
96:3,7,12 97:5
98:12,24 99:23,25
100:7,11,21,23
102:14 103:7 104:7
105:22 107:14,15,22
108:16 109:10,14
110:13,17,18,20,25
111:4 112:22,23
113:4,7,20 114:5,6
115:5 117:19 118:5
131:12 156:22
157:1,7,21 177:11,
21 227:17 228:2,6,
12,13,16

**description.doc**
102:8

**descriptions**
177:10

**designation**
32:18 142:4

**desired** 113:9
114:14,15,18 116:19

**detail** 55:5 197:6,7

**determination**
182:15,17,20

**determinations**
182:12

**determine**
123:19

**determining**
129:9 203:15

**devote** 190:24

**devoting** 190:7

**Dewey** 14:5

**diagnosis**
166:16,23

**Dickerson** 78:15,
16,18,21 85:23,24
92:1 113:15 130:9,
17,21 131:1,5,8,17,
23 132:4,21 146:25
147:2,9,13,17
149:19 150:7,20,23
153:19 158:12,16
175:6 176:4,8
214:21 215:13
221:23 222:4,9
223:18

**Dickerson's**
131:4 158:13

**difference** 37:17

**differences** 9:11

**differently** 78:19,
23 79:1,7 80:19
155:10,14 177:19
181:2,18 196:5
200:9,20 210:13,23
211:25 212:5,12
218:10

**difficult** 161:4

**difficulties** 8:6

**diminish** 22:23

**dinner** 187:10,14
188:11

**diploma** 16:24
17:3,18

**direct** 40:12,20,23
50:16 102:20 108:17
117:10 156:15
158:24

**directed** 74:22
79:10,12 133:13

**directing** 93:7
96:15 107:12

**direction** 45:24
76:18 126:20 127:17
128:25 129:14
186:25

**directly** 153:11

**director** 26:15,16,
19 40:10,15,25

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

41:25 42:1,3,7,13,16
48:25 49:10,18,20,
21 50:3,4,18,24
51:5,6,10,16,17,22,
25 52:4,7,10,13,24
53:7,11,17,18,25
55:2,3,5,10,11,17
56:1,19,20 57:3
58:11,14 59:11
60:22 62:3,4,24
68:8,10,14,15 69:10,
18 72:16,22 76:15,
18 79:13,18,23 80:6,
9,10,11 81:12,17
82:1,3,11 84:15
85:1,3,17 86:5 87:2,
21,24 88:1,9,20
89:19 93:14 94:7,17,
21,24 96:3,13 98:9,
24 99:23 100:15
101:3 102:8 105:1
107:14,15 108:15
112:22,23 113:4
119:14 121:21 123:9
124:10 127:12 128:3
129:10 132:7 133:1
135:2 137:11 138:21
139:13 140:2 141:4,
5 147:8 149:18
151:7,10,17,18,23,
24 152:22 153:2,23
154:18 156:3,7
157:4,18,21 158:3
170:8 173:2,18
177:12,22 179:3,14,
22 180:1,4,10,15,19
184:16,23 185:2
186:13 187:7,20
191:13 192:14
193:22 196:9,13
197:21 198:1,6,9,11
199:7,19 200:5,18,
22 203:22,24
204:15,16,18,23
205:1,14 206:6,23
207:13,22 208:18,24
209:15 210:17
211:4,8,18 213:18
214:8 217:1,17,21
221:2,6,12 222:16
225:16 226:6
227:17,20

**director's** 55:14
70:12 100:16
156:22,25 157:7

196:15 197:22,24
201:10 212:14,19
213:8,15,22

**directors** 52:2
61:18 88:5 91:1
103:3 196:17
197:11,20 198:2
211:22

**directory** 106:4

**directs** 37:19,21

**disagree** 136:16,
20

**disagreed**
115:12

**disappointment**
71:18

**disaster** 18:24,25
19:11,12 20:9 21:10

**disasters** 21:14

**disastrous** 20:14

**disciplinary**
53:21

**discipline** 40:1,2,
8 53:19 116:20
202:24

**disciplined**
204:18,21

**disciplines**
102:25 179:5

**disclose** 135:14
136:12

**disclosed** 158:5

**discounting**
67:23 88:14

**discovered**
208:15

**discovery** 118:24
183:18 209:2 225:10

**discriminate**
182:3 216:22

**discriminated**
172:19,23 173:8,14
180:16 181:10
200:10 216:13 218:9

**discrimination**
153:6,8 154:14
159:3,10 171:23
180:24 181:3,15
182:12,18 218:3

**discriminatory**
105:10,11,14,15
131:13 172:10
180:7,11

**discus** 190:22

**discuss** 90:10
133:14 135:25

**discussed** 21:17
24:8 67:23 72:25
73:4 74:25 80:7
105:17 113:4 127:20
148:11 149:1
171:21,22

**discussing** 77:8
80:4 133:17 136:22
176:4 198:24 225:8

**discussion**
74:13,14,21 81:9
82:19 93:16 104:19,
23 107:18 109:25
115:14 134:25
136:25 137:2 138:20
174:8 224:4

**discussions**
77:21,24 78:2 90:15
100:10,20 118:4

**disliked** 211:21

**disorder** 164:2
166:16

**displays** 103:1

**dispute** 41:25
42:2 166:22

**disqualify** 101:2

**disrupt** 45:21

**distinction** 45:19
48:16

**distinguish**
147:22 158:22 185:9

**distinguishable**
185:13

**distress** 185:10

186:12,15,21 194:15
195:12

**distribute** 73:16

**distributing**
83:12

**district** 35:19,21
37:19,21 45:17,18,
19,23,24 48:5,10,12
203:14,16

**ditching** 38:22

**doctor** 163:1,2
164:5 166:25

**document** 27:19,
20,21 28:7,10,12,17
29:18,25 30:19
34:14 35:9 36:18
41:10,11 45:1,2,3
47:2,4,16,19 48:15
49:3,5,13 53:2,3,6
55:22,23 56:6,7,15,
18,23 57:11,12 58:2,
6,9 59:6,16,18,24,25
60:13 61:3,9 63:18
64:7,8,19,22 65:15
73:11,12,25 74:2,9,
10,11,12 75:10,24
76:9,10 83:7,11,21,
25 92:12,22 95:11,
17,21 96:2,5,17
101:6 102:13,17,19
107:3,4 108:12,24
109:2,6 118:18,23
119:1,3 120:17
121:2 134:4,16,18
159:14 160:2,9,11,
15 161:2 162:2
163:7 165:22 166:10
167:12 168:8,22
169:6,10,14,16
218:14 219:25
225:11

**documentation**
164:22,25 165:8

**documents**
11:11 13:13 29:5
36:14 87:22 111:6
163:5 165:6 175:23
225:10 226:23

**dollars** 202:11

**Donald** 14:3

**Donna** 100:17
103:22 173:9,16
200:8,18 208:15
213:19 214:9
217:13,18

**door** 212:23

**doubt** 169:9,16

**draft** 102:7,14
108:16 113:20
228:13

**dragging** 101:10

**drainage** 38:22

**dramatic** 49:15

**dramatically**
201:16

**draw** 223:16

**drawn** 223:14

**drill** 219:24

**drive** 39:13

**driver's** 22:21,24
23:4,9,10,13

**drivers** 202:4

**driving** 13:2 19:2

**dropped** 201:16

**drops** 11:5

**drove** 12:24

**Duck's** 14:4

**due** 163:13

**duly** 7:6 8:10

**dumb** 38:25

**duties** 20:19,21
27:2 37:2 44:11
45:23 46:14,15,16
53:14,15,19,24 54:4,
6,8 103:2

**duty** 54:25 55:1
72:1

**dying** 145:7

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**E**

**earlier** 43:9 51:13 74:21 76:20 77:8 80:18 85:11,25 86:24,25 115:11 116:2 117:13,18,21 132:5 149:1 176:11 177:10 183:13 184:7 196:3 207:19 216:8, 16

**earliest** 29:22

**early** 72:4,5 76:14 94:25 167:24 170:14 198:7

**earn** 17:1 33:15

**earned** 65:7 169:11

**earshot** 215:9

**ease** 58:8 111:18 142:7

**easier** 111:5

**Easily** 64:18

**eaten** 215:17

**education** 16:1, 5,8 17:19 96:17,18 99:3,9 102:21 105:23 108:18,23,25 113:8 114:1,6,7,8,9, 12,13 115:4 116:6, 12,15 117:4,15 172:11 176:25 177:15,22 220:3

**educational** 15:11 98:13 157:1,8, 9,11,22 177:20 219:9

**Edward** 134:5

**Edwards** 7:19 64:1 73:20,23 75:18 83:18 86:10,16,18 92:17 95:16,19 101:11,14 106:5,17 108:9 111:24 112:1 118:17,20 120:24 134:9 159:25 160:6 162:6 166:6 167:8

169:2 183:23 195:22 196:2 205:21 210:11 218:1,7,21 219:20, 22 227:11,14,22 228:22,24

**EEOC** 173:13 182:17,21,25 183:6

**effectively** 7:24

**effectuate** 40:9 124:14

**effectuated** 46:9

**effort** 213:9

**efforts** 179:24

**elected** 48:8 88:4 92:5

**elementary** 54:18

**eligible** 33:19 109:11 116:3,7,11 169:22

**elucidate** 138:8

**email** 71:8,9,10,12, 14,18 72:6,12,14,18, 21,25 76:15 77:5,12, 19,22 78:3 81:5 82:23 101:21 102:5, 11 120:11 121:7,10 122:7,8,9,12 127:8 129:17,22 130:3,15 171:2,6 185:6 203:1, 5,6 204:5 218:4,11, 19 219:1 227:5

**emails** 77:2,18 78:14,18 121:5,15 128:9,12 225:12 226:14,18,22 227:2 228:12

**embarked** 212:2

**embarrassing** 186:16

**emergency** 20:25 21:11

**emotional** 185:9 186:12,15,20 194:15 195:12

**employ** 58:13

**employed** 23:7 65:10,11 67:17 141:2 220:20

**employee** 19:17 23:18 24:19 26:11 31:4 40:3,6 42:10, 11,14 46:4 58:20 61:4 62:16 67:21 141:1,2 145:19,23 151:12 209:20

**employees** 20:4, 7 22:10 23:8,11 37:11,12,13 39:9,12, 18,21,25 43:11 126:19 128:24 129:5,6,8 145:17

**employer** 8:18 28:18 65:8,9,11 67:7 156:21 158:4 172:10 212:12

**employers** 67:13

**employment** 15:20 24:18,23 25:20 58:3,10 59:19 60:13,17,19 61:15 62:8 64:23,24 65:3, 4,5,12,21 66:13,15 67:4 68:7 80:11 89:10 113:13 172:15 176:23 179:6 182:6, 9 208:2 209:19 219:8 220:2

**enacted** 110:24

**encapsulated** 70:6

**end** 70:15 96:4 125:15 188:1 224:16

**ended** 65:12 138:17,18 139:24 144:7 157:17 194:19

**endorsed** 220:11

**ends** 29:7

**engage** 93:13 188:17 194:14,15 195:11,12 214:14,21

**engaged** 40:6 181:16 187:9,19,22, 25

**engineer** 116:19

**engineering** 24:15 55:2,3,6,10,11 96:20,23 97:18,25 102:24 141:5 144:3, 17 178:1,14 197:21

**enjoyment** 194:17

**ensure** 33:25

**entail** 43:22

**enter** 57:13 61:14

**entered** 33:10 59:20

**enthusiast** 195:13

**entirety** 138:15

**entitle** 33:18

**entitled** 13:25 60:13

**entity** 64:24 66:14 67:23 160:15

**Equal** 172:15 182:6,9

**equipment** 26:12,14,21,23 27:2, 7,9,13 29:21 30:9 31:20 33:6 34:17 35:12,22,24 37:20 39:16 43:5 123:20 203:12

**equivalency** 227:18

**error** 162:23 165:5

**essentially** 37:23 151:8

**establish** 113:10, 11 224:20

**estimate** 178:20

**et al** 8:24 74:14

**evaluate** 145:11

**evaluated** 146:23

**evaluating** 125:22 146:12 147:17

**engineer** 116:19

**event** 71:19,21 74:18 84:22 177:19 190:21 223:25

**events** 84:16 137:9 147:5 149:12 188:18 228:7,10

**eventually** 34:20, 21 51:9 52:23 54:1 82:2

**evidence** 155:9, 13,17,23 156:2,6 157:6,13,20 158:9, 14 209:12 212:21 217:24 218:2 220:12 221:4 222:24 223:15,17 224:3

**exact** 13:20 79:19 89:15

**exaggerate** 209:23

**exaggerated** 210:3,8

**EXAMINATION** 8:13 172:2 196:1

**examined** 7:8 8:12

**examples** 38:19 205:3 210:15,22 212:1

**excellent** 75:20 83:19 86:19 106:20

**exceptional** 16:1

**exchange** 133:6 185:6

**exclude** 104:25 105:6,19 109:14 227:19

**excluded** 100:23 101:1 105:18

**exclusion** 214:17

**executed** 59:13

**executive** 207:25 208:4,5,7,16 209:20, 23 225:15,20 226:5, 13

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**Executives** 8:4
91:5,8 94:8 159:5
209:17

**Executives'**
64:15

**exhibit** 27:21,24
28:2 35:9 36:19
41:12 45:2 47:3,17
49:4 53:3 56:24
57:14,16,19,20
59:25 60:2 63:18,22
64:3,22 73:12,14,17
74:1 75:11,13 76:11
83:12,15 92:13,19
95:11,13,22 96:5,16
101:6,8,18 102:19
106:10,11,14,22,24
108:3,5 111:14,18,
20,23 112:4,8,10,13
113:3,19 114:1,5,8,
16,23 115:2,3,24
116:3,7,13,16 117:5,
11,12 118:2,12,13,
15 120:17,19 121:3
127:2 129:16 133:21
134:1,5,13 159:15,
17,19 160:2 162:2,9
163:20,22,23 165:22
166:2,12 167:4,7
168:9,11,22,25
219:14,17

**exhibits** 111:9

**existed** 96:12 97:5
156:22 177:21 225:2

**existing** 124:17

**expect** 30:25

**expectation**
33:9

**expected** 37:9

**expend** 201:22
202:11

**experience**
17:14 24:9 63:7
96:17,18,25 97:8,9,
10 98:6,8,17 99:1,4,
6,7,12,13 100:24
102:21 103:3,12
104:12 105:22
107:22 108:1,18,23,
24 109:3 110:10

113:10 114:2,9,22,
24 115:4,21 116:7,
12,16,24 117:5,15
156:24 177:25 178:3
200:6 207:25 227:18

**experienced**
191:17 194:16

**experiencing**
185:10 186:12

**explain** 12:6 32:6
45:13,18 66:22
69:24 78:24 135:23
138:10 152:18
180:18,24 186:3
189:15 203:5 213:17
219:10 228:8

**explained** 87:3
125:22 129:24

**explicit** 97:15

**express** 50:11
88:19,23 211:3

**expressed** 71:18
88:13 103:7

**expressly** 222:7

**expressways**
38:12

**extended** 138:15

**extensive** 21:6

**extent** 135:10
139:22

**external** 62:18
63:15 90:8,11,20
93:20,23 94:2

**externally** 63:8

**externship** 24:9

**externships**
15:17 17:11 18:1
67:21

---

**F**

**face-to-face**
81:21,23 137:13

**facility** 22:14 36:8,
11 46:2,6,22,23

47:7,14

**fact** 82:2 85:12,15
93:20 97:21 100:11
103:14 110:1 122:21
124:3 138:2 151:21
176:5 181:4,11,19,
25 195:9 206:11
209:16,23 210:3,13
217:7 221:4,5,7,9,10
222:24 223:5,9
224:4,5

**factor** 180:20

**facts** 79:4

**failure** 70:11
72:15,21,22 79:13
192:14 193:21 201:9

**fair** 21:10 24:14
27:10 52:22 138:19
149:11 217:23

**fairly** 49:15

**fall** 26:23 190:2,12

**fallen** 195:2

**false** 209:2,7
218:16

**falsely** 10:16

**familiar** 58:6
112:9

**family** 14:18 88:24
171:19 186:23
187:9,15 192:4,13,
24 193:6,13,21,24
194:2,3,8

**fared** 145:13

**fast** 12:24

**faster** 13:7

**fault** 27:15 59:4

**favor** 48:6

**feature** 60:6 64:7

**features** 103:4

**February** 56:16
59:13,21 62:13
68:25 69:15 76:2
79:22 80:5,8 87:24
190:17,18

**federal** 19:9 20:4,
18 21:11

**feel** 24:1 78:25
79:7,10 109:17
115:16 116:15
128:19 129:2,12
135:23 136:2 146:9,
16 155:1 186:8
194:22

**feeling** 186:19
187:5 200:12

**feelings** 211:3

**feet** 215:10

**fellow** 84:10

**felony** 10:19

**felt** 32:12,13 35:2
42:4,7 78:19 80:18
129:7 180:6 185:19
200:9 210:22

**FEMA** 18:23 19:6,
9,14 20:3,23 21:11

**field** 16:17 18:25
97:8 98:18 99:1,4
100:24 102:23
103:15 110:11
114:15,18 116:22
117:6,16 188:25
190:1,4,20,24

**fields** 18:7 29:10
97:7

**figured** 131:21

**file** 29:22 43:20,23
106:4

**filed** 43:25 172:14
173:13 182:6

**filing** 43:22

**fill** 98:9

**filled** 51:18 81:18
148:15 184:14

**final** 22:19 141:22
142:14 161:14
163:22 206:19 207:3

**finalists** 158:1,11

**finalized** 71:2
96:7 108:20

**Finally** 10:22
13:24

**finance** 96:20,23
97:17,25

**find** 79:8,9 94:13
129:23 226:5

**finding** 182:18

**findings** 223:20

**fine** 23:16

**finish** 9:19

**fire** 39:25

**firm** 8:16 90:8,12,
16,22,25 92:3,6
93:21,23 94:2
225:15,20 226:5,13,
16

**firms** 90:1,18,20
91:3,4,16 93:10
226:16

**fit** 157:1,8,14,21
177:22

**five-member**
222:10

**flashed** 56:13

**Flint** 14:15 15:12,
15 36:12 178:10

**flooding** 21:6,7

**Florida** 16:14

**flow** 45:21

**focus** 195:6

**folks** 141:14
155:10,14

**follow** 17:19 29:20
58:15 117:11

**follow-up** 140:1
195:22 206:1

**football** 188:25
189:23 190:2,6,8,13
191:1

**forced** 159:1

**foreman** 31:10,20
32:2,3,9,11,14 33:2,
10,11,13,18,19,23,

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

24 34:3,7,11,17,21
35:1,4,13,18 36:7,
11,23,24 37:3,4,9,
14,18,19,23 39:6,7,
19,22,25 40:11,18,
19,21,24 41:2,5,14,
15,23,24 42:18,22
43:3,13 44:11,12,14
45:5,13,14,17,18,19,
20,23 46:5 47:14,23
48:1,11,16,17,19
49:9

**foreman's** 33:25

**foremen** 36:3
37:19,21,24 46:12

**forgivable** 64:13

**forgive** 38:9,24
47:9 156:11

**form** 13:18,20,21
32:21 34:16 45:1,15
51:18 53:9 160:23
163:19

**formal** 24:6 78:10
127:9,25 131:2

**formalized** 82:7

**formally** 88:15
89:10 149:21

**forms** 17:24 30:19,
25

**Fort** 16:14

**forward** 114:21
119:8 136:3,5 137:4
141:15 142:14

**found** 26:7 183:1

**four-years** 16:25

**frame** 70:19
185:21 192:15,16
201:8

**frankly** 161:6

**Fred** 82:4 132:6,25
135:11 137:11
139:12 140:21 141:4
142:11 143:3,6
144:7,12,13,14,16
146:9,16 147:7,11
148:5 149:17 150:4
151:7 154:22 155:24

157:2,8,15,16,22
158:1,5,10 168:16
196:5,9,14,21,23
197:1,2,9,17,20
199:6 203:18,21
206:23 207:9,21
208:23 210:13,14,16
211:6,14,25 212:2,8,
13,16,18 213:4,11,
13,14,21 214:1,15,
23 215:7,8,9 220:25
221:5,14,17 222:25
223:1,15,17 224:20

**Fred's** 146:12
147:17,19 157:14
213:9

**Friday** 127:3,8,14,
22 190:10 201:23,24

**friends** 177:4
222:19

**front** 11:11 29:25
56:5 113:9 114:21
134:19 142:16
143:20 144:5
149:21,24 164:13
165:7 212:24 214:3,
23 215:7 221:21
225:12 226:19

**frustration** 84:23

**full** 8:20 59:18
112:9

**full-time** 32:2

**fully** 14:2 18:22
23:7 44:13

**function** 63:20
73:17 83:13 103:15

**functions** 102:23
103:2 114:15,18
117:17

**funding** 20:17

**furtherance** 24:3
37:11 44:4

**future** 23:12
221:12

## G

**G-A-M-E** 25:4

**Game** 25:2,4,13

**garage** 35:19,21,
22 36:3,7,12 41:2
46:25 47:1 203:14,
16

**garages** 35:20
36:2 37:22

**garbled** 11:5
73:22

**gate** 196:8

**gathering** 79:4

**gave** 66:8,19 91:24
118:9 123:22 125:2
128:21,22 133:8
137:3 138:2,4 149:3
221:19 228:10

**GCRC** 29:5 46:19
55:6 74:10 76:9
84:18 93:1,20 99:21
101:20 102:8 107:2,
13 112:12,21 113:4
121:4,17 122:13
129:21 134:14 151:6
156:25 157:6,20
171:23

**GCRC's** 94:12

**generalized**
164:1 166:15

**Genesee** 7:22
8:17,24 11:8,9 14:16
15:12 20:1,11 21:10
22:17 23:8 24:3,12,
19,23,25 25:18
28:18,25 32:9,12
36:1,8 38:8 42:25
43:21 59:20 60:20
62:17,19 63:9,15
64:25 65:22 66:15
67:5,16,18,22 68:7,
11,12,23 69:3 71:2
73:1 74:2,15,16
76:13 77:19,25 78:8
80:12 84:2,10,15,21
85:3 91:2 92:24
102:13 105:7 107:16

108:14 113:12
123:24 124:12,16
127:11 128:2 135:13
136:11,17 145:22
150:3 151:13 153:6
156:21 158:3 159:3
161:7,8 169:20
170:9 172:17,22
173:11 179:6,24
184:21 197:16
199:19 204:22
205:9,14 206:22
207:13,20 208:12,24
209:6,21 211:24
212:4,7 225:18
226:3

**gentleman** 85:25
101:22 141:8

**gentlemen** 59:23
63:17 101:5 106:2
167:6 219:13

**gestures** 10:7

**get along** 178:22

**Gillis** 140:24,25
143:7 154:8

**Gillis'** 143:12

**give** 9:20 12:23
15:9 21:5 22:1 27:18
29:12 32:12,15
38:19 124:6 151:21
160:21 188:7 192:16
204:3 205:3

**giving** 12:1 13:5
45:9 91:4

**gloss** 215:25

**good** 9:6 13:14
18:16 26:4 75:19,20
86:13 91:24 148:16
186:19 195:24 200:7
228:24

**government**
20:5,18 23:5

**governmental**
182:10

**grab** 11:13 119:23

**grading** 27:4

**graduate** 16:20

**graduated** 16:4
24:21 25:1

**graduation**
25:16

**grand** 27:23

**granola** 195:25

**granted** 174:6
210:14 223:2

**gravel** 27:5 202:14

**GRCC** 84:18

**Great** 86:16

**grievance** 43:24,
25 44:4,6,19,21,23
46:19,24

**grieving** 44:7

**gross** 168:15

**ground** 172:4

**grounds** 220:4

**group** 41:15
206:19 220:3

**GS** 162:24

**guardrail** 27:5

**guess** 12:16 13:22
14:9 22:3 26:22
196:19

**guidelines** 20:15

**guy** 38:25 49:25
51:2 54:19 198:8

**guys** 20:4 46:11
63:21 72:1 138:16
165:17,22

## H

**half** 202:7

**halfway** 160:17

**hand** 200:1 218:4
220:16,23

**handle** 201:4

**handled** 205:7,8

**handling** 80:21,
24 182:11

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

**U. S. LEGAL SUPPORT**
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020

Index: handwriting..intake

**handwriting** 160:21

**happen** 19:13 25:22 191:22 213:7

**happened** 20:13 33:13 34:23 54:6 76:23 118:10 119:19 201:11,14,25

**happening** 200:14 201:19

**happy** 152:8

**Harry** 52:15

**head** 10:7 63:11 139:22 140:8 190:15,16,18

**heading** 96:17 114:2

**heads** 170:17 171:8

**health** 159:1,8,11, 12 160:13,14 161:18,21,25 162:15 163:8,18 164:9,12, 19,20 165:6 166:13, 24 167:14,17 168:2 185:15 186:6

**hear** 10:25 63:11 145:4

**heard** 116:9 137:22 143:10,12, 14,18 147:4 152:6 210:1 216:10,12,21

**heart** 87:20

**held** 23:23 24:22, 25 31:9 33:9 140:11, 12 141:14 208:3,10

**helpfully** 17:25

**Henn** 7:21 8:16

**hereto** 229:3

**hide** 113:21

**hiding** 56:14

**high** 15:13,14,23, 25 16:4 18:3 24:21 25:1,17 189:5,6 201:17

**higher** 151:16 178:7

**highest** 209:18

**hire** 39:25 53:6 151:7 175:18 176:3 200:3 212:8 217:16 221:3 226:4

**hired** 13:15,17 25:23 26:10 29:12 30:11 31:5 35:4 52:23 55:13 135:11 139:12 148:6 149:17 154:11 155:20,24 156:3,5,7 157:17 173:17 179:2 180:3, 9 184:22 188:2 191:13 193:21 212:8 217:11,12 223:1

**hiring** 13:18 23:11 91:5,11 93:10,14,20 172:11 194:19

**history** 15:20 24:18 25:21 176:23

**hit** 201:15

**HMO** 160:24

**hobbies** 188:20

**hold** 24:15 40:14 119:23

**holiday** 201:19,25

**home** 12:24 161:3 195:1,3

**homework** 208:1

**hope** 56:25

**hostility** 212:1

**hour** 12:25 30:14, 20 41:19,20 49:14 57:3

**hourly** 41:18 44:10

**hours** 190:7,10,12, 23 201:23 202:3,4

**house** 195:1

**HR** 26:15,16,19 40:10 51:25 52:7 100:15,16 173:2

207:22 213:18 214:8

**Huey** 14:4

**human** 200:18

**hundreds** 157:11

**hung** 126:3

**hunt** 88:10

**Hurley** 159:11,12 160:13,14 161:18, 21,25 162:15 163:8 164:8,11,19 165:5 166:13,23 168:1 186:1

**hurry** 13:2

**hypothetical** 12:20

---

**I**

**i.e.** 198:4

**ice** 72:9,11,15 76:17 77:8,10 80:21, 24 83:3 87:9 171:3 201:15,18 202:9

**idea** 213:2

**IDENTIFICATIO N** 28:1 57:15 60:1 64:2 73:13 75:12 83:14 92:18 95:12 101:7 106:23 108:4 112:3 118:14 120:18 133:25 159:18 162:8 166:1 167:3 168:10, 24 219:16

**identified** 81:1,2 171:15

**identify** 64:10 65:1 66:16 84:25 85:15 135:15 136:8, 13 153:12 195:17

**identities** 135:18 140:17

**identity** 52:18 136:18 140:20 142:6,11,20,23 143:1

**ill** 159:21

**image** 162:13

**imagine** 9:3 90:13

**immediately** 142:1 186:14

**impact** 21:15

**implicit** 212:25

**important** 9:18 10:1

**impressed** 207:2

**impression** 84:17

**improving** 124:12

**inadvertent** 83:7

**inadvertently** 83:22

**inartful** 88:18

**incident** 181:15 218:17

**include** 94:20 118:6 128:4

**included** 210:15

**income** 65:7,13 169:11

**incomplete** 33:22 111:15

**inconsistent** 170:23

**incorrect** 58:24 68:4 98:15,16 177:18

**incorrectly** 34:2

**increase** 30:21,22 32:18,25 35:15 47:8 49:13,15 56:3 86:6 151:22 152:7,8,10, 13,16,19,22 153:2

**increases** 41:9

**indicating** 65:18, 20 166:19

**individual** 23:22 76:4 78:11 91:6,10

93:3 105:14 158:17 214:14

**individually** 130:12 132:13

**individuals** 32:13 142:6,20,23 143:22 154:1,6 173:7 181:5,20 206:9,18

**Industries** 25:2, 5,14

**ineligible** 116:17 117:3,7,18 125:12

**inference** 224:10, 12

**influence** 11:25

**inform** 120:9

**information** 52:16 135:14 136:1, 4,13 157:25 160:22 167:15 179:12 203:2,9 206:10 207:16 209:22 217:13,18 222:3 226:10 228:4

**initial** 30:14 163:19 168:2

**initially** 26:1 27:11 54:2,4 120:9 189:14, 15 201:15

**input** 129:8

**inquire** 69:11 87:1

**inquired** 223:6

**installs** 54:11

**instance** 76:24 201:11

**instances** 197:4, 8 210:12,25 211:1 212:11 215:1 221:4, 13

**institutions** 178:7

**insure** 21:22

**intake** 168:2

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**intend** 11:13
129:24

**intent** 66:25

**intents** 44:15

**interacted**
143:16

**interaction**
221:21 222:12

**interactions**
185:4

**interceding** 32:1

**interest** 50:12
69:11 87:2 88:13,19,
23

**interested** 68:19
81:11,16,25 89:3,6

**interim** 85:3

**International**
43:11

**internship** 24:8

**internships**
15:17,23 17:10 18:1
67:20

**interpret** 98:20
108:23 109:2 135:8

**interpretation**
98:22,23 99:5 171:6

**interrogatories**
64:16 68:3

**interrogatory**
66:10

**interrupt** 9:18

**interview** 26:18,
20 51:23 90:20 91:7,
17 120:14 121:17
122:6,10,13,17
127:10 128:1 129:5
130:6,18 132:11,16,
20 136:7 137:5,17
138:3,6 139:18
140:7 141:13,15,19,
23 142:2,8,16 143:3
145:18 146:13,14,19
147:11,16,20,21,25
148:3 149:15,20
150:9,13,25 153:23

154:2,3,4,7,18,21
155:2,11 158:1,6,10,
23 174:20 176:15
180:6 181:6,22
182:1 184:4,6,11,12
186:19 199:12,15
206:7,15,20 207:1,3,
7,22 208:9,17,20
209:3,25 210:7,14
215:4 217:14,19
223:3,21 224:6,7,16,
17

**interviewed**
26:13 52:17 91:3
93:10 136:18
140:18,21,23 141:11
145:12 146:9,17
148:20,24 155:3,4,5,
7,12,15 176:6,9,16
179:10 181:13,20
206:21 207:19 209:8
217:20 221:24

**interviewees**
131:20 148:11,22

**interviewing**
52:19 129:4 135:19
209:14

**interviews** 90:25
131:3,24 137:10
140:10 144:22
145:1,10,14,25
146:6,24 147:14
149:17 174:6 221:20
222:4 223:10

**introduce** 92:11

**investment**
123:20

**involve** 212:1

**involved** 21:20
52:1,2 188:22
220:13

**involving** 218:5

**Iranian** 153:15
154:8

**Iranian-
american** 157:2

**issue** 64:18 67:23
111:14,17 113:22
211:9

**issues** 53:19,21
133:17 179:1 199:2
200:14

---

**J**

**January** 68:23
70:19 71:3,5,16
72:4,5 74:3,23 75:2
76:17 84:16,22
162:18 171:3 218:23
219:1

**Jermonde** 15:4

**job** 13:17 18:14
19:21 20:11 21:3
22:16 23:21 24:3,25
25:2,5 26:1,3,7,21
27:2 30:1,2,4 33:18,
19,24,25 34:3,25
35:3 36:23 37:2,17
39:16 50:6 51:3,14,
16 52:9,13,17 54:5
55:14 62:21,25 63:8,
14 67:1 86:5,7 87:21
88:10,16,21 89:3,18,
21 94:6,16,19,20,23
95:3,4,9 96:3,7,12
97:5,12 98:12,14,24
99:22,23,25 100:3,4,
6,11,21,23 102:8,13,
23 103:6,15 104:7
105:21 107:14,15,22
108:15 109:9,12,14
112:13,17,18,20,25
111:3 112:22,23
113:3,7,20 114:6,15,
18 115:5 116:17
117:16,18,19 118:5
131:6,8,12,22
133:18 136:19
138:21 139:19 140:2
143:8 150:5 154:11
155:20,25 156:22
157:1,7,12,21
177:10,11,21
186:16,17 204:13
206:22 207:13
209:15 223:7 227:16
228:2,5,11,13,16

**jobs** 15:19,22
19:21 23:23 24:22
25:16 62:18 205:11

**jog** 206:18

**john** 50:5,18 52:5,
14 61:10 62:7 68:6
71:10,15,19 72:6
76:15 77:22 78:4
84:14 156:23 158:2
170:16 171:8 196:12
198:11,24 199:1
200:22 201:11
203:23 204:4,13,19
205:14 215:20,25
216:4,17,18 225:7

**Johnson** 130:9
132:10,13,21 137:1,
2,6,15 138:13 139:5
146:25 148:9,17
149:2 153:19 175:10
214:22 215:2,14
221:25 222:10

**join** 8:5

**July** 7:1 188:1
194:14 195:11
223:10

**jump** 40:19

**jumped** 84:23

**June** 94:25 119:16
121:16 122:23 124:4
127:9,14,22,24
128:7,9,12 129:19
140:14 184:5 185:7
206:5

---

**K**

**Kautman-jones**
68:17,18,22 69:2,17
74:17 75:3 77:6
80:16,21,24 81:3,7,
10 82:22 84:9 85:12,
23 87:1,10,15 89:25
93:9,12 102:1
153:19 171:4 175:14
196:25 198:4 199:16
201:5 202:18 203:1
210:19 212:15
214:13 218:4,9,19
221:8,22 222:13,15
223:24 224:3,6,15,
18 225:7 226:24
227:8

**Kautman-
jones'** 75:1 85:8

**Kautman-
jones's** 75:7

**Keosha** 15:4

**Kermit** 52:7

**kicking** 89:21

**kind** 13:13 15:21
16:22 17:1,11 18:9
22:12 24:6,20 27:25
39:24 40:16 54:4,21
65:19 67:21 70:9
97:21 150:22 185:12
188:20,22

**kindly** 101:15
128:6

**knew** 105:12
111:16 131:5,7
140:12 176:8 210:6
220:15 224:15,18

**knowledge**
12:21,22 66:3 68:1
88:5 89:1 121:7,9
123:5 133:19
171:16,18,20 200:7
203:19,25 211:20
222:5

---

**L**

**L.L.C.** 220:3

**label** 111:18
219:14

**labeled** 74:1,2
92:24

**labeling** 59:25
73:12

**labor** 42:21,24
43:2 96:21,24 97:19
98:1 105:6

**lack** 90:21

**lacked** 125:13

**lag** 9:25

**laid** 172:5

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020

**language** 105:8
117:4

**Lansing** 22:14

**largest** 48:10,12

**lasted** 33:3 126:25

**late** 150:22 167:24
206:1 208:21

**latest** 223:9

**Lauderdale**
16:14

**law** 10:19 197:5
220:4

**lawn** 194:20
195:10,18

**lawsuit** 44:18
153:11 165:2 171:17
183:18 193:17

**lawyer** 12:7 38:25

**lead** 36:24 37:18,19
39:6,7,19,25 40:11,
21 41:2,5,14,22,23
42:22 43:12 44:10,
12,13 45:5,13,14,17,
18,19,20,23 46:5
47:13,23 48:1,11,15,
16,17,18,21 49:9
117:14

**leadership** 35:2
84:25 85:16 103:1

**leading** 39:9

**leads** 222:1 227:6

**leaning** 124:15

**learn** 19:8 89:17
99:25 145:16 168:19
207:5

**learned** 100:6,8
148:2 152:11

**learning** 20:9
178:7

**leaves** 49:24

**lectures** 22:5

**led** 63:5 128:19
174:24 175:6,10,15
177:7

**left** 30:8 33:11 51:3
59:7 126:13 200:22
201:12

**legislators**
205:10

**Lesperance**
7:22 8:16,17

**lesser** 202:13

**letter** 119:4 127:10
128:1,13 183:6

**level** 97:2 98:8
161:15 178:17
207:25 208:4,5,7,11,
16 209:19,20

**license** 22:22
23:4,9,10,13

**licenses** 22:24

**lie** 10:19 42:10,11

**life** 186:7 187:1,3
193:12

**lifelong** 14:16
15:12

**limit** 12:1

**limitations** 47:22

**limited** 181:4,11
212:12

**linebacker** 191:3

**lines** 21:19 39:3
124:11 187:11

**lingering** 56:6

**list** 74:6 131:20
166:15 223:22 224:7

**listed** 76:4 84:5
93:3 108:18 124:25
166:18

**listen** 225:25

**listing** 127:12

**lists** 47:24

**literally** 127:5

**litigation** 175:24

**local** 19:11 201:21
202:12

**located** 11:7,17

**location** 35:22
45:25 48:8,9

**locations** 208:2

**lodged** 79:25

**long** 7:23 24:20
25:11 27:15,16 33:2
41:1 47:13 48:22
51:5 56:6 112:13,14
122:1 125:5 126:23,
24 178:18,19,20
204:22 208:13
220:19 226:16

**longer** 39:14 46:1,
2,22 48:1 58:23 59:1
145:5 170:7 174:21
194:14 195:9,12
209:20

**looked** 57:7
175:23 183:5

**lose** 186:22 191:12,
14

**losing** 192:2

**loss** 191:16

**lot** 24:11

**lots** 205:10

**Louie** 14:5

**lunch** 197:2
210:21 212:16
215:16 221:8

**M**

**machine** 25:8

**made** 16:17 27:11
31:3 50:23 57:6,7
61:18 65:4 70:10,13,
17,20,23 73:5 74:22
77:5,17 82:23 83:1
86:24 87:10,23 90:5
93:12 105:21 113:6,
15 116:25 128:16,21
129:2 149:13,16
150:24 151:6,16
154:2 158:18 168:15
170:13,19 175:18
176:3 179:16,25

182:15,21 196:8
197:10 199:4 201:5
208:23,25 215:2
223:1,18 228:15,18

**magic** 111:8

**maintain** 37:9
38:14 39:2 41:1
46:15 47:13 48:22
72:2

**maintained** 36:2

**maintaining**
56:1

**maintains** 54:11

**maintenance**
26:24 27:3 30:9 35:5
36:12,13,15 37:7,16,
20 38:2,5,6,18,23,24
39:1,2,9 40:10,15,25
41:2 42:1,3,6,13,16
46:16,23 47:23
48:15,17,19,21,25
49:10,18,19,21
50:18,24 51:5,6,10,
16,17,21 52:10,13,
24 53:7,10,16,18,25
54:8 55:14 56:1,20
57:4 58:11,14 60:22
62:24 70:11 72:16,
22 76:18 79:13 98:8
151:10,18,24 152:23
153:3 170:8 201:10
203:7,11,17 204:19,
23 205:1,11

**majority** 221:22

**make** 9:13 10:8
40:16 47:22 66:24
79:3 87:7 88:23
97:14 101:2 110:6,
12,23 111:5 118:1
125:24 134:23 140:5
156:10 160:24
182:17 184:9 201:9
203:21 213:12 220:4

**makes** 10:1 33:19
116:21 165:16
220:19

**making** 10:22
57:3 89:25 105:7
115:8 123:9,23
151:23 172:11

182:12 199:1 224:10

**Management**
21:12

**manager** 20:25
57:6 68:15 96:3
98:24 102:8 107:13,
15 108:15 113:4
128:3 177:12,22
179:3,14,21 180:1,4,
10,14,19 184:16,23
185:2 186:13 187:7,
20 191:13 192:14
193:22 196:14
197:24 200:4 207:20
225:15 226:5

**managing** 41:25
50:3,4 51:25 52:4
55:17 56:19 59:11
62:3,4 68:14 69:10,
18 76:15 79:18 80:6,
9,11 81:11,17 82:1,
11 84:15 85:1,17
86:5 87:21,23 88:1,
5,9,20 89:19 93:14
94:6,17,21,23 96:13
99:22 101:3 105:1
112:21,22 119:14
121:20 123:9 124:9
127:12 129:9 132:7
133:1 135:2 137:11
138:21 139:13 140:2
141:4 147:7 149:18
151:7,17,23 153:23
154:18 156:3,7,22,
25 157:3,7,18,21
158:2 173:18 196:9,
13,17 197:20,22,25
198:6,8,11 199:7,19
200:22 203:22,24
204:14,15 205:13
206:5,23 207:13,21
208:23 209:15
210:17 211:4,8,18,
22 212:14,19 213:7,
15,22 217:1 221:1,6,
12 222:16 227:17,20

**mandatory**
177:16

**Mandelaris**
130:10 132:21
138:24 139:10,16
140:2,6 153:20
174:24 214:22

215:13 222:1,9

**manifested** 193:4

**manner** 7:16

**manufacturing** 25:2,5

**March** 84:3 85:13 90:3 91:25 188:2 189:21

**mark** 27:20 57:14 92:13 95:11 118:13 140:24 141:7,8 142:12 143:3,7,18 146:19 159:15,17 160:1 162:2 165:22 168:22 179:9 206:17,18,21 207:5, 11,19 208:8 209:3 217:1,3,11,12

**marked** 28:1 35:9 36:19 41:10,12 45:2 47:3 53:3 56:24 57:15 60:1 64:2,22 73:13 75:12 76:11 83:14 92:18 95:12, 22 96:5 101:7,18 102:19 106:21,23 108:4 112:3,8,10 113:2 118:14 120:18 121:3 133:25 134:4, 12 159:18 162:8 166:1,12 167:3,6 168:10,24 185:25 219:16

**marking** 63:18 75:10 83:11 101:5 106:10,11,14 108:3 120:17 159:14 168:8

**markings** 54:13

**married** 14:20

**Mary** 140:24,25 142:12 143:3,7,12, 14

**master** 200:2

**master's** 96:19 97:6,16,21 99:10,19 102:25 116:20 143:25 144:13 199:18

**match** 30:15 32:4

**matches** 157:9,10

**material** 35:24

**materials** 125:8

**math** 178:17

**matter** 8:18 10:16 87:20 131:4 132:16, 19 138:13

**meal** 215:17

**meaning** 107:9 197:15

**means** 14:2 38:3 63:20 167:1 207:7 228:8

**meant** 141:25 227:18

**Medicaid** 160:23

**Medical** 186:1

**Medicare** 160:24

**meet** 98:12 196:22 211:20

**meeting** 70:24 73:8 74:3,7,19,23 75:5,7 76:1,5,20,24 77:4 78:2 79:21 80:4,8 82:6 83:2 84:3,5 85:6,7,9,13 89:22,23 90:5,14 91:25 92:9,25 93:4, 17 104:4,7 105:8 107:6,7,17,18,20,25 108:21 109:19 110:15,23 111:19 112:16 113:6 115:13 117:23,25 119:7 126:21 127:19 131:11,17 137:7,12 139:2,3,4 149:25 150:3,8,10 164:15 170:14 197:1 198:16 214:23 215:5,6 223:12

**meetings** 73:2 91:16,20 164:16,19 198:3 211:3,6,11,15 221:10,11

**member** 92:1 170:13,21,25 225:3

**members** 78:7 105:5 133:12,14 134:25 175:7 176:5 192:4,24 196:18 210:18 211:16 221:7 222:10 226:7,11

**memorialize** 35:12

**memory** 62:13 85:7 170:23 183:8, 10 206:18

**mental** 11:24 159:1,7,11,12 160:13,14 161:18, 21,25 162:15 163:8, 18 164:9,12,19,20 165:5 166:13,23,25 167:17 168:1 185:15 186:5

**mention** 14:5 77:9

**mentioned** 19:6 20:8 22:19 51:13 52:4 69:8 80:18 86:24 90:8 117:22 135:5 137:1 138:23 149:19 158:4 209:11 210:15 214:13 217:24 218:2 219:4 220:15,25 222:18,23

**message** 127:3, 21

**met** 91:19

**Mexican** 153:20

**Michigan** 8:4 10:19 14:15 18:24 19:1 22:9,10,14,20 38:4,15 64:15 91:5,7 94:8 159:4 205:6 209:16 220:4

**midway** 74:13

**miles** 12:25

**millennial** 159:24

**mind** 106:2 131:21 191:19 194:25

**mini** 18:7

**minority** 179:25

**minute** 15:21 126:24 127:5

**minutes** 74:19 76:1 79:21 84:3 86:18 107:6 112:16 121:23 125:6 126:24 215:19

**misattributing** 218:16

**missed** 44:9

**missing** 106:4 115:20

**mistakable** 64:18

**mistake** 40:5 64:13 78:1 106:14 141:20

**mistaken** 98:4 136:15

**modification** 110:24

**moment** 69:8 106:3 160:22 165:17

**moments** 21:10

**Monday** 121:21 122:2,11,18,19,22 127:4,6 190:10 201:25

**money** 151:22 168:19

**month** 56:3 89:15 185:22 201:1

**monthly** 164:16, 17

**months** 25:12 61:15 113:12 186:4, 5 192:7,17,18 200:25

**Montrose** 46:25 47:1,6,11,14 48:1,3

**morning** 76:14 113:6 191:19,21

**motion** 84:8 85:24 93:8,12 105:21,25 107:21 113:15

**move** 32:14 35:11, 12 36:21 41:14,23 43:12 57:24 87:19

**moved** 37:16 42:4, 18

**movie** 187:18

**movies** 187:10,17, 23 188:11,16

**moving** 14:11 17:24 30:5 31:12,19 34:10,12 48:3 111:22 114:21 119:8 127:2 142:14 221:20

**mow** 195:9

**mower** 194:20

**mowers** 27:8

**mowing** 27:5 38:21 195:18

**MSAE** 92:5 93:10, 13,16 94:11,19 95:7, 8,23 96:5 99:21 108:13 114:1 127:10 128:1 133:9 135:14 136:12 172:4 179:13,20,25 181:3, 10,16 182:3 184:20, 25 210:2 225:14 228:10,12

**MSAE's** 94:15

**Msae.org.** 101:23

**MSEA** 223:19

**MSP** 21:17

**municipalities** 23:7

**mutual** 10:24

## N

**named** 132:7,25 160:14 196:17 207:21

BRANCH, ANTHONY
07/21/2020

Index: names..part

**names** 15:3 52:12
135:14 136:1,3,12
143:10 173:5

**narrow** 126:1

**national** 19:11

**natural** 21:14

**nature** 9:24 18:5
27:8 65:9 79:3
123:11,12

**necessarily**
139:7

**necessitate** 40:8

**needed** 19:7
20:22 21:22 23:9
27:1,3,9 50:6 113:22
185:19

**negotiate** 79:17

**negotiating**
79:25

**nephews** 14:4

**Newspaper** 26:8

**Nicks** 52:15

**night** 12:24
201:23,24

**nods** 10:7

**noises** 10:8

**non-tech** 159:23

**normal** 9:16 13:7,
8 15:25 22:22 54:20

**note** 53:9 76:7

**notes** 176:2
183:14,17,21,25
184:2,10 194:5
222:3

**notice** 28:14,22
29:3,11,20,24 31:17
32:20 34:16 35:11
36:21 41:13 45:1
49:8

**notices** 28:24
41:9

**noticing** 199:2

**notify** 106:15
162:5

**November** 47:25
167:20

**number** 29:6,19
31:13,14 34:13,14
35:8,9 36:18 41:10,
11 45:1 47:17 49:3
53:2 55:22 56:22
57:1 58:9 61:7 64:22
65:1,14 66:1 74:10,
11 76:8,9,11 92:25
93:1,2,7 95:23
101:18,19,20,21
107:2,3 108:13
112:12,13,19 113:2
118:24 121:4,5
125:25 126:1
129:21,22 134:13,
14,20 135:12 158:25
204:3 223:24 224:1

**numbers** 163:5
205:9

**numerous** 84:20
200:15 203:6 204:4
214:20

---

**O**

**Oakland** 141:2
143:15

**oath** 7:13 9:8
10:14,17,20 66:20

**object** 11:20 43:17
107:25

**objection** 8:5

**objectionable**
79:9

**objections** 7:15

**objects** 10:5

**obligation** 72:1

**obstacles** 123:10
124:18,20

**obtain** 16:22 18:8
19:8,17,20,24 22:5
23:10,14,18 44:20
94:16 105:1 128:16

**obtained** 23:24
24:2 95:4 163:5
164:23

**obtaining** 22:23,
24 23:21 33:23
50:13 88:20 89:3
101:3

**occasions** 204:3

**occur** 81:21 104:4
126:7 130:14 132:4
139:1,12 148:13
173:17 208:20,23

**occurred** 46:24
72:3 93:16 107:19
131:1 141:14 150:18
183:15 188:3 193:23
209:2

**occurrence**
76:19

**October** 161:18
164:6 168:2 185:14
186:1 192:8

**off-the-cuff**
215:1

**offense** 191:2

**offensive** 79:9

**offered** 206:25

**office** 126:13
184:15 196:21
198:16 210:20

**offices** 11:9

**Ohio** 141:8

**omitted** 112:25

**on-site** 39:14

**on-the-job**
156:24

**open** 27:23 51:19
57:22 60:8 118:18
121:21 134:7 170:22

**opening** 50:15

**operate** 23:4

**operates** 32:17

**operations** 21:15
76:16 77:3,9 203:7

207:20 208:18
217:17,21

**operator** 25:8
26:12,14,21,23 27:2,
7,13 29:21 30:9
31:20 33:6 34:18
35:12 39:16 43:5

**operators** 35:25
37:20 203:12

**opinion** 199:6
216:19

**opportunity**
83:22 94:5 127:10
128:1 153:23 154:18
155:2,25 172:15
182:7,10 195:7
206:25 214:4 215:4

**opposed** 48:7
124:16

**opposing** 107:21

**oral** 10:4 40:2

**order** 13:13 19:8,
10 20:17 21:22 22:5
23:4,13 121:15
177:17

**ordinary** 15:25
20:13 22:22

**organization**
32:16 42:21,24 43:2
85:1,16 181:24
189:2 199:25 200:2

**organizational**
40:17

**organizations**
177:2

**outcome** 44:20
82:9

**outside-of-the-
normal** 19:12

**overtime** 201:22,
23 202:1,3,11

**overview** 32:16

---

**P**

**P-O-P-L-A-R**
100:19

**p.m.** 83:16 86:20,
21 92:20 95:14
101:9 106:7,8,25
108:6 111:11,12
112:5 118:16 120:2,
3,20 121:22 122:2,
17 127:3,6 133:23,
24 134:2 159:20
162:10 165:19,20
166:3 167:5 168:12
169:1 194:10,11
219:18 229:1

**pages** 28:21,23
55:20 65:19 70:3
87:6 112:13,14
119:6

**Paid** 26:3

**pandemic** 187:8,
13,21,24 188:3
189:10,20

**panel** 222:10

**paper** 111:6
184:11

**papers** 206:8

**paragraph** 84:11
99:9 135:12 156:20
157:24 158:24 159:5

**parens** 29:6

**parenthesis**
97:1

**park** 197:23 198:2
210:17 212:14,18
213:12,22

**parked** 35:23,24
213:7

**parking** 196:14,15
197:22,23,24 210:18
212:14,19,24 213:1,
8,14,15,22 221:6

**parks** 197:25

**part** 47:16 54:5
67:12 70:12 99:21

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020

Index: parted..Potentially

140:16 162:24 183:17 198:5 201:10 215:24

**parted** 126:4

**partial** 12:21

**participate** 15:16

**participated** 142:2,3,7,9,12,17, 21,25 143:2 209:3

**participating** 7:10

**participation** 138:21

**parties** 7:14 165:2 229:3

**parts** 72:16 111:22

**party** 135:16 136:10,14 167:15

**Pass** 205:21

**passed** 137:4 165:1

**past** 39:15 154:2 214:19

**patient** 163:12 166:13

**patients** 160:24

**pavement** 54:13

**pay** 29:13 30:1,3,5, 16 32:18,25 35:15 41:9,18 44:9 45:9 49:13,15 53:10 55:25 56:7 57:8 86:6 151:22 168:16 169:23

**peers** 178:24

**Peivandi** 82:4,12 88:1 132:6 153:14 154:8 157:2 158:1 168:16,20 173:17 175:19 176:3 177:22 178:1,18,22 179:2, 21 180:3,9 184:14 185:1 187:6,20 188:2 191:12 196:5 199:6 203:18,21 207:21 210:23

211:2,10 214:23 220:19,22

**Peivandi's** 168:18 197:9

**pension** 169:25

**people** 9:17 45:22 52:17 125:22 135:18 142:9,17 143:1 145:11 155:3 173:6 174:5,18 186:23 202:16 206:4,5,14

**perceive** 153:14, 16,18 154:6

**percent** 145:8 165:15

**perception** 91:22

**perfect** 12:8 127:7 165:16

**perfectly** 40:17 52:22

**perform** 205:18

**performance** 21:3 81:7 83:3 87:9 145:11 146:12,23 147:18,19 148:21 179:1

**performed** 184:20,25

**performing** 19:21 39:8

**period** 32:3 45:9

**perjury** 10:15

**permanent** 50:8, 15 51:10,17,21 52:24 53:7 87:21 88:10,20 89:6,19 113:11

**permission** 212:25

**permitted** 134:24

**person** 8:1,7 46:8 64:23 66:14 142:15 174:1 186:16,17 223:23

**person's** 172:11

**personal** 187:1,3

**personally** 11:20 37:10 39:8,11 93:19

**personnel** 28:14, 22,24 29:3,11,20,23 31:17 32:20 34:15 35:10 36:20 41:8,13 44:25 49:8 96:21,23 97:18 98:1

**persons** 102:4

**pertain** 60:20

**pertinent** 153:11

**PESG** 219:8

**phone** 81:22 119:22 120:6,10,13, 16 123:14 124:19 125:23 126:12 127:13,19 128:5,14 141:18 146:3 177:6 183:21 184:2

**phrased** 34:1 152:25

**phrases** 72:20

**physical** 11:24 35:22

**physically** 7:11 11:7 22:12

**physician** 160:20

**pick** 89:7

**picture** 11:4

**pictures** 188:10

**pieces** 217:24 218:2 222:23

**Pitts** 52:7 220:11

**place** 18:19 85:22 126:9 132:6,8 137:9 147:5 174:1 177:12 184:12 198:5 224:1 228:7,11

**plaintiff** 7:20 35:8 64:14 118:24 158:25

**plaintiff's** 164:25

**plan** 170:1,2,5,7

**platter** 170:17 171:9

**playing** 116:22 117:6

**pleasant** 69:20,25 70:7 87:4

**plenty** 143:12

**plethora** 19:2

**plowing** 76:16 77:9

**point** 8:7 11:4 16:5 47:24 57:2 62:16 71:16 89:2 104:24 116:25 128:18 140:5 141:16 173:5 183:8 215:11 217:6 219:6 224:6

**pointed** 207:23

**points** 72:22 79:13 201:10

**police** 18:25 21:20 22:9,10,14

**policies** 201:6

**policy** 201:20 202:10,15,22

**poor** 124:17

**poorly** 152:25

**Poplar** 100:17,20 103:8,18,22 104:2, 24 109:18 116:25 117:14 118:7 173:3, 9,16,24 200:8,18 208:15 209:24 213:19 214:9 217:13,18

**Poplar's** 109:10

**portion** 107:10 139:24

**position** 25:11,23 26:10,23 29:21 30:10 31:8,20,21 33:6 34:17,18,21 35:4,13 39:19,22,25 40:11,14 41:1,4,23, 24 42:5 43:13 44:13, 15,22 45:6,12,14,15,

16,17 46:5,8 47:13 48:21,22 49:1,9,10, 19,25 50:6,8,9,14, 15,19,20 51:19 52:20,21 53:7 54:9 55:6,7,16 56:1,19,20 57:4 60:19,20,23 61:16 62:4 63:6 66:9,23 67:6,7,16 68:15 69:12 81:17 87:3,22 88:14,21 89:6,19 90:2 94:7, 17,21,24 95:5 101:3 105:2 116:4,8,12 117:3,8 119:14 121:21 125:12 128:3 129:6 133:11,12 135:2 141:9 148:15 151:9,10,14,19,25 152:23 153:3,24 154:19 156:3,7 157:3,15,16,18 170:8 177:17 180:1, 19 181:1 186:13 199:10 200:23 204:18 206:6 207:1, 8,13,18,20 208:18 215:15 217:17,21 221:2,25 225:16 227:17,20

**positions** 36:25 45:22 55:8,9 208:3, 6,10

**possess** 116:22

**possessed** 35:2 143:22,25

**possession** 96:19 102:22 103:14 109:6 114:14,17 117:15 183:21

**possibility** 225:14

**possibly** 66:25

**posted** 94:8 97:12

**posting** 26:7 94:6, 19,20 95:6

**potential** 157:12

**Potentially** 202:24

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

**U. S. LEGAL SUPPORT**
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**pounds** 23:5

**preamble** 14:11

**preceded** 142:1

**precise** 189:19

**precisely** 13:12

**preexisting** 225:1 227:7

**preference** 102:24

**preferred** 113:11

**preliminary** 121:17 122:6,10,13, 17 130:5,18 132:11, 20 133:8 137:4 142:1 154:2 184:4 206:6,14 224:17

**premise** 224:19

**prerequisite** 23:21 32:15

**prerequisites** 33:24

**preselected** 199:7 221:1,15,18 222:25 223:15,17 224:20

**present** 7:11 74:6 76:4 84:6 87:5 90:14,24 92:9 93:4 94:11,12 104:1 107:9 122:25 173:23 215:8

**presentation** 10:6

**presentations** 90:19 91:4,23,24

**presented** 18:18 84:14,19 91:7 110:18 111:4 160:23 220:11

**presently** 11:16 32:21

**preserving** 10:6

**president** 21:21

**presume** 43:6 58:23

**pretty** 79:5

**prevent** 7:24 12:1

**prevented** 176:13 205:17

**previous** 31:24 49:19 53:16,18 60:23

**previously** 24:8 37:22 67:23 131:11 158:4 218:14

**primarily** 20:22

**prior** 24:23,25 39:22 46:7 69:2 71:4,16 78:1 91:15, 20 94:24 97:5 100:3 103:2 113:9 114:21, 24 115:12 118:5 131:4,9,24,25 132:3, 19,25 134:23 135:11 143:8 172:14 173:12 176:2,9 179:2 180:3, 9 187:24 189:20 194:14 195:11 200:24,25 201:1 221:2 224:6 225:7, 18 226:3,12,14,16

**private** 150:16 189:2 215:12

**probable** 183:1

**problem** 166:15 186:24 202:8

**problems** 81:3 164:1 195:5

**procedures** 20:16

**proceed** 123:7 136:6

**proceeding** 93:6

**process** 22:22 43:22 44:6,8 51:15, 21,23 68:9 119:20 125:20 135:1 174:21 175:25 180:7,11 184:22 193:12 209:14 210:7 215:12 221:23 228:11

**produced** 175:23

183:17,19 226:23

**product** 39:15 44:22 46:18

**production** 29:6 39:15 74:11 76:9 93:1 101:20 107:2 112:12 121:4 129:21 134:14

**professional** 18:20 97:8 98:17,25 99:4 100:23 103:12 110:10 115:21 116:23 159:2,8 185:15 186:6 220:3

**professionally** 18:9

**professionals** 200:3

**professor** 178:6, 12

**program** 18:4 32:10,11 33:3,10,14 191:10

**progression** 31:2

**prohibited** 133:17 135:5 136:2, 22

**prohibiting** 135:9

**promoted** 31:6 32:2 34:21,25 48:25

**promotion** 31:23 32:1,7 51:18 53:13

**properly** 14:6 209:17

**propose** 133:21

**proposed** 76:14

**protest** 43:17,20, 23

**provide** 10:10 13:21 33:23 40:1 108:24 164:24 174:10

**provided** 32:7,22 33:14 40:7 45:11

76:8 93:11 95:22 163:6 214:3

**provider** 164:20

**providing** 58:17 109:2

**provision** 98:23 116:15,16 135:8

**public** 74:23 76:12 78:7 80:7 85:13 96:20,23 97:18,25 150:16,19 170:14, 21,22,25 215:5,7

**publicly** 75:4 82:22 218:15

**pull** 73:11 111:22 113:19 133:20 156:12

**pulled** 115:2,3

**punch** 35:25

**purchases** 123:20

**purely** 215:12

**purported** 208:17

**purpose** 29:2,9 81:15

**purposes** 29:3 30:18 44:16 224:13

**pursuant** 43:25 58:18,20 61:4 220:4

**pursue** 129:25

**pushed** 186:25

**put** 94:11 104:9,10, 13 105:9 109:25 110:2,3,4,5,7 115:18,19 116:23 170:16 186:16 190:22 204:5

**puts** 186:17

**putting** 50:13 110:9 135:21,24

---

## Q

**qualified** 186:18 205:13

**quality** 124:12

**question** 12:6,7, 9,12,20,23 13:11,14 14:3,6 18:13 26:22 34:1 38:25 43:9 54:18 59:4 65:20 66:12 67:11 73:7,9 79:6 80:2,22 88:18 91:15 94:18 107:24 110:21 111:3 116:9, 10 117:2 122:22 124:13 126:18 148:16 149:10 152:25 168:14 169:15 172:9 180:8 181:7,9 184:9 188:7 191:16 193:18 203:20 206:13 211:23 219:1 225:24 226:1 227:12,24

**questioned** 201:13

**questioning** 172:6

**questionnaire** 87:5

**questionnaires** 70:3

**questions** 9:7,19 12:2,8 14:10 15:10 70:3 123:13,15,17, 21,25 124:2,6,24 125:2,7,16,18 171:11,15 195:21 203:6,8,16 207:23 208:6 210:12 216:9 217:25 218:1,8,21, 22 219:2

**quick** 133:21

**quickly** 225:1

**Quinton** 15:4

**quote** 10:16 84:13 157:6 215:20,21,25 216:1,5

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**quote-unquote** 137:24 149:4 159:9 170:16 209:12,13 215:3 220:16,23 221:1,14,18 222:12

**quote/unquote** 127:16

**R**

**race** 153:5,7,11,14, 16,17,24 154:1,6,11, 14,19,20 155:2,6,11, 14,20,25 156:4,8 171:23 172:19,24 173:8,14 175:8 180:16,20,23,24 181:3,11,15 199:9, 13,16 200:10,20 216:14,23 218:3,10

**racial** 159:2,9

**racing** 191:20

**racist** 198:12 215:21,24 216:5,13

**radio** 16:16 17:15

**Rahmel** 15:4,5,7

**rains** 21:6

**raise** 55:25 57:8

**raised** 71:6 103:18 109:18 115:9 223:12

**raising** 104:24 171:17

**range** 13:6 22:1 23:16

**ranked** 208:3 209:19

**ranks** 32:14

**rate** 30:3,5,14,21

**RE-EXAMINATION** 205:23 224:24 227:13,25

**reach** 44:17 120:9

**react** 93:19 150:19 152:6

**reaction** 93:22 100:25 105:3 150:21

**read** 60:24 65:14 85:4,19,22 97:2 102:20 113:13 121:17,23 122:3 129:25 157:4 159:5 161:2,3,6 177:19

**reading** 118:23 160:25 163:9

**reads** 64:22 156:20

**realm** 89:13

**reappointed** 151:9

**reask** 218:7

**reason** 11:23 26:4 48:3 118:9 127:12 128:4 132:24 137:3 138:1,4,5,8,10 140:6 148:19,24 149:15 162:23 163:12 166:22 169:9,15 186:22 193:20 199:9 207:11 210:2,6 217:12,16

**reasonable** 129:12

**reasoning** 129:1 136:5 137:24 149:3

**reasons** 29:10 30:24 65:12 155:7 193:16 221:13,17

**recall** 13:18 19:4 26:7,10 31:8 42:6 51:8 52:1,2,11,12, 14,19,20 61:19,22 71:24 72:23 76:23, 24 77:14 82:8,18 87:14 90:4,13,15,17, 24 91:4 93:22 94:22 95:10 100:2,5,8,11 104:19,22 105:25 107:21 108:2 120:16 123:17,25 124:1,11, 13,22,23 125:8 128:9 131:18,19 139:6 140:12 147:3 150:2,7,18 173:15, 20 174:3,7 177:13

192:12 198:24 201:2 223:11 227:2,5

**receipt** 129:22 166:5 167:7

**receive** 17:20 19:14 20:17 21:24 22:12,15 23:15 29:13 33:17 86:6 152:13 160:4 167:16 169:22 206:6,14

**received** 17:18 19:15 22:20 55:1 57:8,20,21 60:8 63:22 65:6,7,8 75:16 80:20 84:20 95:16 101:12 111:25 150:19 166:23 179:6 204:25 206:8 218:25 219:20

**receiving** 18:18 32:23 152:7 169:25 170:4

**recipients** 102:1

**recognize** 28:10 59:16,18 92:22 107:4 112:15 119:1 134:16 167:11 219:25

**recollection** 30:15 32:4 70:18 71:1,17 73:6 87:22 103:6 104:16,18 105:24 107:17 108:19 124:8 185:17

**recommend** 181:4

**recommended** 176:15 179:9

**record** 7:18 8:20 21:11 29:4 61:6 74:9 76:8 86:20,21 93:1 100:18 106:3,7,8 111:10,11,12 120:1, 2,3 128:18,19 133:22,23,24 156:1 165:17,19,20 166:13 168:1 185:24 194:10,11 203:21

**record's** 101:19

**recording** 9:16

**records** 20:16 167:17

**reduce** 126:2

**reference** 13:13 57:1 58:8 76:19 101:19 121:3 129:20

**referenced** 107:18

**references** 93:11

**referencing** 114:22

**referred** 31:23 36:15 37:22 85:25 135:16 136:9,14

**referring** 18:14 72:7 76:20 110:8 127:21 128:23 138:1 141:25 146:10 160:13 163:1,22,23 171:2

**refers** 27:8 60:24

**reflect** 36:21 41:14 47:6 49:8 53:6 194:5

**reflected** 41:18

**reflects** 45:5 169:11,17

**refresh** 62:13

**refresher** 9:6

**refused** 42:15

**refute** 217:6

**regard** 10:16 45:15 50:16 173:16 183:12 211:9 218:11

**regular** 197:21

**reimburse** 20:18

**reinstate** 107:22

**reinstated** 44:13 53:24

**reinstatement** 45:5 108:1

**relate** 20:21 24:15

**related** 17:15 18:9,10,11 71:19 87:8 97:8 98:18 99:1,4 100:24 102:23 103:15 104:7 110:10 114:15,18 117:16 133:17 137:3

**relates** 29:21

**relation** 72:9 149:11

**relations** 96:22, 24 97:19 98:2

**relationship** 225:2,21 226:6 227:7

**relative** 145:11 146:23 147:5 148:10,21 149:8

**relax** 195:3

**relayed** 149:14

**relaying** 147:18

**release** 102:14 163:6 167:14,19

**released** 167:15

**releasing** 220:5

**relevant** 137:9

**relied** 129:8

**relief** 20:9

**remain** 46:8

**remained** 55:16

**remember** 13:15 18:23 24:13 25:13, 22 26:1,9,13,16 27:10 33:2,5 45:11 51:7,15 62:10,25 69:10 70:13 72:2,20 73:7 74:17,20 77:1 82:6,9,14 87:11 89:24,25 90:19 91:6, 10,25 93:15,19 104:15,24 105:5,6 120:7 123:6,13,15, 19,21 124:3,18 125:25 126:1 130:25 131:18 137:7 148:14 150:3,6 161:22

170:17,19 172:25
173:1 188:9 198:9,
19 200:17

**reminder** 9:6

**remote** 9:24

**remotely** 7:13,25
10:24 11:20

**removal** 27:4
104:24

**remove** 201:22
202:11

**removed** 74:15

**renders** 116:16

**Renee** 106:3

**reorganization**
48:5,12 53:14

**repair** 27:4,5,6
38:21,22

**repairs** 20:19,21

**repeat** 12:6 80:2
107:24 180:8 181:7

**rephrase** 88:17
156:1 193:18

**replace** 158:2

**replacement**
38:22 88:10

**reply** 127:8

**reported** 105:3

**reporter** 7:9 9:14
10:7

**reporting** 7:12,16
103:3

**represent** 44:3
172:4 214:2

**represented**
42:21 43:2,8 58:23
59:2 107:9

**representing**
7:20,22

**represents** 8:17

**request** 42:15
50:20 51:18 74:16
128:5 129:20,23

228:18

**requested** 229:2

**requesting**
127:9,25 203:2

**required** 10:18
39:13 97:6 102:23
103:15 109:7 113:9
114:14 117:17

**requirement**
105:22,23 107:23
108:1 118:7

**requirements**
96:19 98:13 177:15,
20

**residence**
113:11,12

**resident** 14:16
15:12

**residents** 76:13
77:1,4,14,19 84:10,
17

**resolution** 44:17

**resolved** 46:19

**resources**
200:18

**respect** 78:10
79:1 212:18 218:16

**respecting** 10:17

**respective** 229:3

**respond** 122:1

**responded** 127:6

**responding**
122:15

**responds** 129:16,
19

**response** 13:20
72:15 78:21 81:24
84:21 109:10
126:16,18 130:22
137:22 139:20 140:8
171:15

**responses** 68:2

**responsibilities**
65:9 71:25 203:22

**responsibility**
54:24 204:15 205:19

**responsible**
37:5,6 38:1,17 39:8,
18,21

**responsive**
109:17 115:9,16

**rest** 214:24

**restaurants**
187:14,22 188:16

**result** 42:19 44:7,
18 52:22 53:20
82:14 86:6 104:6
132:11

**resulted** 44:6
65:5

**resulting** 217:14,
19

**results** 72:8 159:8

**resume** 18:20
51:19,20 66:23,25
119:4,10 125:9
207:24 208:10,16

**resumes** 67:6

**retain** 90:11
151:16

**retained** 90:9
93:24 94:3

**retire** 169:23

**retired** 85:2,17
156:23

**retirement** 76:14
169:23

**retiring** 225:7

**retro** 45:9

**retroactive** 45:8

**return** 123:20

**returned** 44:10,11
126:12,13 151:9,18,
24 152:22 153:2

**reverse** 121:15

**revise** 105:21

**revised** 100:1,7,9,
12,23 103:6 110:20

**revision** 61:18,20,
23 96:6 99:22 103:6
118:2

**revisions** 100:21

**Riley** 140:24 141:7,
8 143:7,18 154:8
179:9 180:14
206:17,18,21 207:5,
11,19,23 208:8,15
209:3,11,23 210:3,7
217:3,7,11,12

**Riley's** 146:19
208:17 217:1

**ring** 91:13 149:25

**rise** 208:4,7,11

**road** 7:22 8:17,24
11:8,9 13:16 19:18,
22 20:11 21:15
22:17 23:8,19,22,23
24:4,12,15,19,23,25
25:18,21,23 26:2,5,
11 27:6,12 28:18,25
30:11 31:3,6,9 32:9,
12,14 36:1,9 37:7
38:6,10,25 41:22
42:25 43:16,21
44:19 48:12 54:16,
19 55:17 59:20
60:21 62:8,11,17,19,
22,23 63:9,15 64:25
65:22 66:9,15 67:1,
5,10,12,16,18,22,24
68:7,11,13,23 69:3,
20,21 70:11,21 71:2
72:1,8 73:1 74:2,15,
16 77:25 78:8 80:12
84:2,15,21 85:4 86:3
88:25 89:8 90:9,21
91:1,2 92:24 102:13
105:7 107:16 108:15
123:10 124:12
127:11 128:2 135:13
136:11,17 141:2
145:22 151:13 153:7
156:21 158:3 159:3
161:7,8 169:20
170:9,15 172:17,22
173:12 178:19
179:7,24 180:6
184:21 185:1

197:14,15,16 198:21
199:2,3,19 200:5
201:9 202:5,6,10,22
204:22 205:15
206:22 207:14,20
208:12,24 209:6,21
211:24 212:4,7
214:2 215:4 220:15,
20,22 225:8,18
226:3 228:10

**roads** 20:22,25
21:7 27:3 37:6,10
38:7,11,12,13 39:3
72:2 123:23 124:12,
17 178:4 201:7,21
202:2,9,11,12,14,16,
19,21 205:9

**Robert** 175:10

**Robinson** 15:7

**Rocky** 40:13
49:22,24 51:2,3
53:17

**role** 19:11 20:9
68:20 103:3 114:25
205:18

**roll** 74:5 84:6
107:10

**Ronk** 91:9,19,22
102:2 119:21 120:6,
7 122:15,21 123:3
124:19 125:7,11,15
126:5 128:24 129:16
130:2,6,24 132:10
133:7 136:5 137:18
139:21 150:24
176:16,18 179:11,19
181:4,12,18 182:3
183:13,22 184:6
185:5 199:13 206:7,
15 221:19 222:2,12,
21 224:4,18 225:2,
21 226:7,10,14,24
227:3,7 228:3,5

**Ronk's** 121:7
130:19 132:20 149:3
221:21 222:19

**room** 7:11 11:16
12:14 215:8

**round** 41:20 49:14
126:15 131:2,24,25

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

132:5,16 136:7
137:10 138:6 140:7,
10,18,21,23 141:11,
13,15,19,22,25
142:1,8,9,12,14,16,
18 143:3,20,22
144:5,6,21 145:1,10,
12,25 146:1,5,11,13,
14,17,24 147:14,20
148:22 150:25
154:2,3,4,5,7 158:6
209:3 223:10 224:5,
16

**rounds** 149:16

**route** 38:12

**routine** 189:21

**row** 111:7

**rules** 172:5

**run** 38:7 199:18

**runner-up** 207:8,
18

**S**

**safe** 43:12 46:11
79:23 96:9,11 97:12
209:6 216:16

**sake** 29:4,7 111:18
142:7

**salary** 58:18 65:5
151:16 152:2,7,10,
16,19,21 153:1

**salt** 203:13,15

**salting** 76:16 77:9

**sat** 196:12

**Saturday** 201:24

**savvy** 159:24

**schedule** 228:7,
10

**scheduled**
119:21 120:12

**school** 15:13,14,
23,25 16:2,4 18:3
24:21 25:1,17 189:1,
3,4,5,7

**schooling** 17:21
24:7

**scored** 158:1,5,
10,20,21

**screen** 28:8 32:21
49:6 57:25 58:4
60:14 62:2 64:7
75:22,24 83:6,24
95:25 102:15 106:21
118:22 119:22
120:13,16 121:1
125:23 134:11
156:17 160:9
162:12,13 166:9
169:5 219:25

**screening** 120:6,
10

**scroll** 56:25 64:21
119:7

**scrolling** 56:5
156:19

**search** 87:21
89:18,21 90:1,2,8,
10,11,16,18,20,25
91:3,4 92:2,6 93:14,
20,23 94:2 99:22
138:21 140:3 143:8
222:16 225:15,20
226:5,13,15,16

**season** 190:2,7,24

**seats** 197:13

**seconded** 85:23
93:13 105:25 113:16

**section** 30:2,4,8,
20 31:19 35:17 45:8
58:18 102:21 104:14
108:18,23 116:7,12
117:5,15

**security** 21:23

**seek** 62:17 67:20
159:1 185:14

**seeking** 67:1
167:23

**select** 92:5 181:12,
19

**selected** 32:8
90:22 142:15 144:7

158:2 179:14,21
180:14,19,25 185:2
187:6

**selecting** 93:16
176:14

**selection** 125:25
174:20 175:24
180:11 184:22
186:13

**seminar** 18:17

**seminars** 203:10

**send** 66:23 67:6
70:2 111:23 120:11
128:12 168:22
203:1,11 218:19

**sending** 128:9

**senior** 97:2,10
98:7 99:7,13

**sense** 128:21
129:3 165:16 170:11
213:12 220:19

**sensitivity**
153:10

**sentence** 100:24,
25 103:11 115:18,20

**separate** 55:8,9
213:11

**separated** 62:7,
10 80:12 205:14

**separately**
130:11,13

**separation** 68:6
80:1 225:8

**September**
172:16 173:12

**sequence** 31:8
219:6

**serve** 46:24 51:6
68:13 109:3

**served** 32:3 178:6,
10,11

**service** 43:11
219:9

**Services** 220:3

**serving** 46:4
68:19 81:11,16,25
204:23

**set** 57:22 60:10
63:23 64:16 73:19
83:17 106:18 177:20

**setting** 214:23
215:7

**settlement**
44:19,21,23 46:7,9,
24

**setup** 28:6

**severance** 79:17

**severed** 89:10

**share** 21:10 27:21
57:18,22,24 60:12
63:19 64:6 75:11
77:18 84:9 95:15
101:17 118:22 133:4
135:18 136:1,12
156:13 160:2,8
162:12 165:23 166:9
169:5 219:24 222:2,
7,9 223:20

**shared** 28:25 64:7
71:14 134:6 216:1
222:6

**sharing** 57:11
60:5 62:2 75:22
83:6,24 106:20
108:12 121:1 134:11
162:3

**she'd** 70:10

**shift** 86:14

**Shirley** 68:17
69:16 74:17,25 77:5
89:25 102:1 175:14
196:25 198:4 199:16
201:5 202:18 203:1
210:19 212:15
214:13 218:4,19
221:22 222:13,15
223:23 224:15,18
225:6 226:14,24
227:4,8

**Shirley's** 69:19

**shook** 139:22
140:8

**shop** 54:8,10,11,24

**short** 18:18

**shortcoming**
119:6

**shortly** 79:22
80:5,8 81:9 88:8
156:14 183:15
184:11

**shot** 15:9 27:18
190:22

**show** 13:20 28:21
34:16 44:25 45:15
47:16 59:16 73:25
83:7,8,21 95:21
102:12 112:7 118:12
159:15 163:4 169:13
193:6 208:8

**showed** 30:14
113:20 159:23
163:20 177:11
193:13 206:8 222:5

**showing** 30:19
35:7 49:3 53:1
115:24 121:2 159:22
185:25 193:5 225:13

**shown** 87:23
114:2 165:8 220:12

**shows** 30:2,4,8
31:19 56:15 228:11

**shut** 193:8,10,11
194:9

**side** 113:19

**side-by-side**
113:23

**sidetrack** 15:21

**sign** 54:8,10,11,24
145:6 165:14 198:6
220:7

**signals** 54:12

**signature** 59:7,10
61:9 66:4 160:17
229:2

**signatures**
160:20

**signed** 61:16 66:3,
10 68:3 167:19

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020

**signing** 61:12
133:9

**signs** 54:11,15,16,
21

**similar** 102:25
116:19

**simple** 64:18

**simplify** 111:8

**single-digit**
201:17

**singled** 80:19
201:3

**sir** 15:13 16:13,19
41:17 152:2 156:17
160:9 162:13 166:10
211:5

**sit** 122:6 194:21
196:10 210:16

**site** 39:14 94:19

**sitting** 212:24

**situation** 135:21,
24 139:9

**situations** 39:17
186:7

**skim** 55:20

**sleep** 186:22
191:12,14,17,20
192:2

**slight** 41:17

**slightly** 156:11

**slower** 13:7

**slowly** 13:3

**snow** 27:4 71:25
84:16,22 201:18,22
202:11

**snowstorm**
71:22,24 72:3 201:4,
14 202:9 218:5,11,
23

**Society** 8:4 64:15
91:5,8 94:8 159:4
209:16

**solely** 179:17

**solicit** 50:11
211:2,15 221:9

**solicited** 211:10

**Solutions** 91:5,
11 93:10

**sort** 15:16 17:10
18:3,7,10,11,17
22:4,5 24:8,22 32:22
33:15 38:14 43:20
46:4,11 67:20
169:25

**sought** 161:20
185:18 186:2

**sound** 218:6

**sounds** 70:14

**source** 81:1,3
179:12 209:22 228:4

**sources** 65:13

**speak** 78:13
211:11

**speaking** 158:17
201:13

**special** 20:15

**specific** 28:23
70:14,15 72:20
110:6 197:6 225:11
226:1

**specifically**
38:18 79:6 125:3
128:23 130:21
210:19 221:8

**specificity** 87:11

**speeding** 13:1

**spell** 8:20 16:11
25:3 100:18

**spilled** 187:3

**spilling** 187:1

**split** 46:18

**sport** 189:25

**sports** 188:22

**sportscaster**
16:18

**spot** 90:25 196:15
197:22,23,24 210:18
212:14,19,24 213:8,
10,15,23 221:6

**spring** 190:4

**springtime** 89:16

**staff** 26:19 84:10,
18 202:6 211:6,7,15,
16,20

**staffing** 219:9

**stage** 142:2,4
207:3

**stamped** 29:5

**standard** 9:4

**stands** 21:11

**start** 117:1 186:23
189:6 195:3 197:3,9

**started** 23:6 27:12
30:20 47:10 88:9
185:16 200:12

**starting** 24:20
27:11 30:14,16
192:17

**starts** 101:21
163:7

**state** 8:20 18:24
19:1 22:9,10,14,20
37:6 38:7,11,12,15
124:17 178:11
195:15

**stated** 70:21 93:9
127:13 128:4 207:19

**statement** 83:1
85:8,19 89:25 98:20
105:8

**states** 98:17,21
201:20 202:10
223:19

**stating** 7:17 71:10

**status** 161:17

**statutes** 183:3

**stay** 47:22

**staying** 170:7

**stemmed** 72:8

**step** 51:9,20 62:15
119:20 143:21

**steps** 125:19

**stop** 54:21 57:11
192:6 213:2,9

**stopped** 62:2
195:14 201:24

**storm** 72:9,11,15
76:17 77:8,10 80:21,
24 83:3 87:9 171:3
201:15,18,23 202:9

**storms** 205:5,8

**story** 167:11 169:5

**straddle** 65:19

**strange** 129:23

**stranger** 176:18

**street** 54:21

**streets** 202:13

**strengths** 148:10

**stress** 11:24

**strike** 89:13
140:14 213:25
217:23 219:5

**string** 121:15

**stripped** 54:24

**strongly** 216:25

**structure** 40:17

**stuck** 163:12

**study** 16:15,17
19:7

**stuff** 14:12,13

**subdivision**
202:13

**subject** 72:24
79:14 80:15,17,23
82:19 121:17 122:7,
12

**subjected** 79:11
159:2,9 202:24

**subjects** 10:15

**submit** 66:25
119:16

**submitted** 51:19,
20 111:15 119:19

**submitting** 94:24

**subparagraph**
157:24

**subsequent**
17:20 126:8 145:1
164:15 208:17

**subsequently**
85:1,17 95:6 144:20
151:21 206:21

**substance** 14:13
77:15 78:3 139:15
174:3 211:12 227:2,
5

**substances**
11:25

**substitute** 67:15
105:22

**substituted** 97:9
98:18 99:1,6 103:13
104:12 110:11
111:21 115:21
116:24

**sue** 182:22 183:5

**sued** 153:6

**suffered** 218:3

**sufficient** 34:3

**summer** 189:18

**Sunday** 201:25

**supervise** 37:13
55:1,10

**supervised**
37:11,12

**supervises**
37:20

**supervision**
54:25 220:13

**supervisor**
40:12,20,23 41:6
65:10 69:6 209:18

BRANCH, ANTHONY
07/21/2020

**supervisors**
45:24 150:4 203:12
211:2,10 221:10

**supervisors'**
42:25 43:6 58:24
59:2

**supervisory**
46:15 103:2 114:24

**supplement**
134:15

**supplemental**
18:11

**support** 44:3
155:9 158:9,14
211:8,11,15

**supported** 217:1

**supporting**
155:23 222:24

**suppose** 168:14

**supposed**
112:10 133:10,11
223:19,25

**supposedly**
186:18

**surfaced** 76:16
77:2,18

**Surline** 91:13,19

**Surline's** 91:22

**surprise** 168:19
207:5 216:25

**surprised** 50:23
68:18 69:8,16 86:25
93:23

**surrounded**
104:20

**surrounding**
39:3

**suspend** 40:3

**suspension**
40:3

**Swartz** 35:18 37:4,
14 39:6,22 40:18,20,
24 43:3 47:24 48:4,
14,22

**swear** 10:16

**sworn** 7:6 8:10

**Sylvia** 26:17

---

**T**

**T-R-A-K-E-R**
25:4

**tailored** 156:25
157:7,13,20

**take-home**
168:16,18

**taking** 9:12 11:19,
21 29:18 34:13
36:17 41:9 53:19
55:21 56:7 61:7 76:7
79:21 124:15 198:5

**talk** 9:17 14:9 15:20
17:23 23:22 24:17
25:20 28:23 55:4
62:1 68:6 71:23
78:6,11 86:23 87:20
88:15 121:21
122:11,19,21 124:21
127:7 129:23 132:9
133:11 135:19
136:25 138:16,18
143:20 144:5

**talked** 24:9 78:8
93:11 125:3 142:22
147:6 149:12 150:11
184:6

**talking** 9:19,20
10:2 14:13 18:15
21:14 30:10 39:1
54:7,15,20 72:8
77:12 98:25 130:24
145:17 176:5 181:25
184:2,3,4 186:5
192:9 199:1 224:14
225:13,14

**task** 27:9 182:11

**taught** 20:2 22:8
178:17

**Tawana** 14:23

**Taylor** 26:17
101:22

**teaching** 67:16
178:14,16

**technology**
27:23

**telephone** 65:1
120:8,10 122:25
123:6 130:15 183:12
184:6

**television** 16:16

**telling** 13:6 32:19
46:14 146:11 201:2,
3

**telltale** 79:5

**temperatures**
201:16,17

**temporary** 31:20
32:3,7 34:11,17
48:25 49:9,18,21
50:1,9,17,23 51:5,6

**ten** 22:2 61:15
86:18 96:24 98:6
99:11 200:11,15

**tend** 186:9

**term** 12:6 90:21

**terminated** 29:15

**terminology**
141:20

**terms** 58:15 77:15

**terrible** 205:4,5

**testified** 7:8 8:12
117:13 120:5 176:10
183:13 215:19
216:8,16 218:8,21
221:3 227:15

**testify** 7:6 8:10

**testimony** 74:24
76:21 81:2 83:4
86:24 110:22 115:12
116:2 117:24 127:20
131:13 132:19
134:24 135:3 187:8
192:1 193:20 208:14
214:20,25 218:14

**thanking** 205:7

**therapy** 162:17

163:11 192:17

**thereabouts**
62:14 185:7

**thing** 10:17 13:24
14:9 17:23 19:13
24:17 42:9 54:22
56:10 57:10 60:5
61:2 63:19 131:19
162:3 165:14 185:24
194:24

**things** 9:3 12:1,4
20:13,24 21:22 27:8
38:19 42:13 49:12
55:4 89:8 116:23
123:11,12 124:22,23
186:9,23 187:21
193:22,25 194:1,3
195:1,16 196:10
198:9 200:3 211:21
222:8

**thinking** 141:22

**thinks** 162:24

**thought** 15:9
139:18 142:21 173:7
193:12 200:19
225:23

**thousands**
157:11

**three-month**
30:21

**three-page** 58:9
61:3

**Thursday** 127:17,
18

**time** 16:9 18:16
20:20 21:1,5 23:3
24:20,21 26:16
27:16 31:5 32:3
36:2,8 40:2,21 43:8
45:9 46:12 48:24
49:18,21 50:4,17
52:3,7,14 57:2 61:19
62:16 63:2 67:4 68:1
70:19 79:16,19,24
81:14 84:8 86:13
88:2,13 89:2,20
92:12 93:24 94:17
95:7,8 96:13,15
98:14 100:3 118:5
120:12 125:11

126:12 137:9 143:7
149:9 156:23 169:22
172:14,21 173:20
176:9 177:15 179:2
180:3,9 183:5,15
184:16 185:4,17,21
186:2,11 187:6,7
189:13,17,19
192:15,16 195:14
197:1,7 198:1,22
200:17 201:8 203:23
209:8 211:22 225:18
226:3,12,22

**times** 20:13 133:9
143:12 173:4 188:11
191:23 192:1 200:8,
11,15 204:4 205:9

**title** 17:6 36:23

**TLM** 36:14,21,24
37:16 39:7 41:5
45:8,20

**today** 9:12 10:14
11:7 12:2 14:10
171:12,22 174:16
184:7 185:25 197:25
214:25

**today's** 10:6

**Todd** 91:13

**token** 208:8
209:12,14

**told** 17:25 89:20
126:14 127:16
128:14,17,24
130:19,23 132:11
137:18,19,23 140:14
142:23 143:1 148:4,
5 149:2 158:12
170:21 198:16
200:19 209:24
215:20,23 223:5

**Tom** 113:5

**top** 28:15 58:3
60:14,16 65:18
112:11 119:17 121:6
129:17 157:3 160:11
162:14 163:7

**topic** 86:15

**topics** 72:17

BRANCH, ANTHONY
07/21/2020

Index: tornadoes..Wayne

**tornadoes** 21:8

**total** 169:20

**totally** 197:3

**touch** 227:3

**township** 69:6,7 150:4 211:2,10 221:9

**townships** 37:5

**track** 188:25 190:1,4,20,23

**traffic** 54:12,20 55:2,3,11

**trained** 19:9 23:13

**trainers** 19:10 20:3 22:9

**training** 15:16 17:24 18:4,9,11,12,24 19:1,2 20:8,23 21:2 22:13,14 24:6 32:5,6,7,9,11,13,15,23 33:2,7,10,14 34:8 39:17,18,21 203:13

**trainings** 19:3

**Traker** 25:2,4,13

**transcribe** 9:15

**transcript** 194:5

**transcription** 10:4

**transfer** 47:6 48:8

**transferred** 41:4

**transition** 219:7

**Transportation** 38:5 205:7

**traveled** 202:13

**treat** 211:24

**treated** 78:19,23,25 79:7 80:19 155:8,10,13 159:7,8 174:5 180:22 181:2,17,18 196:4 197:3 200:9,19 210:13,23 212:12

**treating** 181:17 212:5 218:10

**treatment** 79:10 161:20 167:23 185:15,18 186:3 196:7 197:4,8,9

**tremendously** 195:2

**trouble** 28:5

**truck** 195:13,18 202:4

**trucks** 27:8

**true** 9:23 42:14 66:2 80:22 130:20 168:15 217:15 224:14

**trunk** 36:12,13,15 37:16,20 38:2,5,7,10,11,13 39:2 41:2 45:25 46:1,15,22

**truth** 7:7 8:10,11

**truthful** 12:1

**truthfully** 171:12

**Tuesday** 7:1 126:11 127:24 128:6

**turn** 63:10 183:25

**turned** 217:7

**turning** 129:16

**TV** 17:15

**two-year** 17:1

**type** 19:12 20:18 32:15 79:15 188:13,15

**typical** 9:12 10:13

**typically** 28:20

**U**

**uh-huh** 10:9

**uh-uh** 10:9

**ultimate** 84:24

**ultimately** 92:5 104:6 115:25 154:11 155:19 157:17 206:23 207:8 212:8

221:3

**unable** 126:11

**unanimous** 82:15,18,21

**unaware** 139:17

**uncomfortable** 11:19

**uncover** 210:3

**uncovered** 217:13,18

**undergo** 18:3

**understand** 9:9,21,23 10:1,11,18 11:3 12:7,10,17 13:8,22 14:6 27:16 33:19 34:1 40:5 99:21 110:12 134:23 165:3 172:7 181:8 193:19 200:4 228:8

**understanding** 33:22 40:16 48:24 93:25 122:20 137:25 149:10 151:6,8 179:16 182:9,20

**understood** 12:10 46:21 135:13,17,25 136:11 141:24 167:2 171:11 216:8

**unequivocally** 109:11

**unethical** 42:4,7

**uneven** 116:22 117:6

**unfold** 44:8

**uniformly** 216:11

**union** 43:6,8,11,16 44:3,18,20 46:19 58:24 59:2

**united** 99:22

**University** 19:1 22:21 178:11

**unlike** 10:13

**unpack** 222:11

**unprofessional** 220:12

**unquote** 215:21

**unreasonable** 129:7

**unusual** 11:23

**unveil** 75:4

**upset** 77:17 150:24

**utilize** 202:1,2

**V**

**vacancy** 127:12

**vacant** 94:6 128:3

**vacated** 49:19

**vacation** 204:4

**vague** 67:11

**varies** 191:7

**varsity** 191:10

**vehicle** 196:20

**vehicles** 23:5

**verbal** 10:10 130:14,16 137:13 139:9 146:3,4

**verbally** 71:7 128:14,17 182:25

**verify** 209:22

**version** 98:24,25 108:20 115:5,23,24 117:13,18

**versus** 8:23 45:25 185:11

**vested** 170:5

**vetted** 209:17

**video** 10:6

**view** 94:6,23 95:2 106:21 115:20

**viewed** 94:19 104:25 105:9

**viewing** 28:5

**violated** 202:21

**violates** 223:24

**violation** 183:2

**vocational** 15:16 17:24 18:4 144:2,17

**voice** 16:19

**volition** 50:21,22

**volunteered** 51:14

**vote** 82:10,14 179:13

**voted** 151:21

**W**

**W-2** 169:6,8,14

**wage** 27:11 30:22 44:10 65:5

**wait** 9:18 132:15 185:14

**waited** 186:4

**waive** 7:15

**waiver** 220:5

**wake** 170:10 191:19

**wall** 198:7

**wanted** 16:18 32:13 42:13 101:2 123:8 124:9 126:19 128:13,15,25 129:13 171:8 187:18 188:4 203:10 223:6 225:19 226:13

**warrant** 8:2

**washed** 21:6

**Washtenaw** 62:23 66:9,23 67:1,10,12,24

**watch** 198:12,17 199:4 215:21,24

**Wayne** 178:11

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BRANCH, ANTHONY
07/21/2020

Index: ways..Zoom

**ways** 126:4
211:24,25

**weaknesses**
148:11

**weather** 163:13
205:5

**website** 94:12,15
95:7,8

**Wednesday**
126:8,14

**week** 164:15
190:7,9,11,12,23
191:23 192:1 204:5

**weekend** 201:19,
20

**weeks** 164:16,17
200:25

**whatsoever**
226:11

**white** 157:2

**wife's** 14:22

**willfully** 10:16

**wind** 201:17

**winter** 203:11
205:5,8

**winters** 205:4

**wishes** 58:13

**word** 99:8 113:8
114:13 137:20 161:7

**words** 37:18 129:2
145:12 170:25

**work** 25:8,17 27:25
30:19 37:7 39:11,14
45:21 70:1,2,10
87:5,12,16 111:8
121:11 122:2 127:4,
6 161:2 163:13
177:25 178:3 179:3
184:20,25 188:1,9,
14,17 194:17 202:16
204:25 213:4

**worked** 25:13
26:4 169:19 178:18,
19 202:21

**working** 24:25
27:12 31:3 47:10
143:14 194:18
195:18 202:19 224:1

**works** 121:22

**worse** 159:25
160:20

**worst** 147:11
158:1,6,10,20,21,23

**wrinkle** 10:22

**write** 122:2 127:9,
24 188:10

**write-ups** 40:7

**writes** 127:7

**writing** 71:7
121:16 128:13,15
183:1 198:7

**written** 40:2 85:22
128:16 171:3

**wrong** 12:5 84:17

**Y**

**yard** 194:19

**year** 21:25 25:22
167:21 186:4 190:17
192:9,21,22 198:19
200:17

**year-and-a-half**
48:23

**year-to-year**
98:18 99:2 103:13
104:13 110:11
115:22 116:24

**years** 17:4 19:16
21:20 22:2,3 41:3
47:15 48:23 63:3
96:24 97:1,9 98:6,7
99:6,11,13 103:2,11
104:12 113:10
114:22,24 161:8,9
168:20 169:19,22
178:21 202:5
204:11,12 208:1
220:18,21 226:20

**yell** 192:25 193:2,7
194:9

**yells** 193:5

**yous** 205:10

**Z**

**Zoom** 11:21 12:15
27:22 47:23 61:1
119:6

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

**U. S. LEGAL SUPPORT**
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy