# *In The Matter Of:*

## Anthony Branch v. Genesee County Road Commission

## John Daly, III

## July 22, 2020



Carroll
Court Reporting and Video

John Daly, III
July 22, 2020

### Page 1

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

ANTHONY BRANCH,
    Plaintiff,
vs.    Case No. 19-113700-CD
    Hon. Celeste D. Bell
GENESEE COUNTY ROAD COMMISSION
AND MICHIGAN SOCIETY OF ASSOCIATION
EXECUTIVES, a domestic non-profit
corporation,
    Defendants.

The Videoconferenced Deposition of JOHN H. DALY, III
Taken Virtually via Zoom in Michigan
Commencing at 10:02 a.m.
Wednesday, July 22, 2020
Before Mary Jo Power, CSR-1404, RPR, RMR, CRR

### Page 2

1  APPEARANCES:
2
3  CARL R. EDWARDS (Via videoconference)
4  Edwards & Jennings, P.C.
5  65 Cadillac Square
6  Suite 2710
7  Detroit, Michigan 48226
8  313.961.5000
9  cedwards@edwardsjennings.com
10    Appearing on behalf of the Plaintiff
11
12  ANDREW A. CASCINI (Via videoconference)
13  Henn Lesperance, PLC
14  32 Market Avenue, SW
15  Suite 400
16  Grand Rapids, Michigan 49503
17  616.940.5164
18  aac@hennlesperance.com
19    Appearing on behalf of the Defendant, Genesee CRC

### Page 3

1  ALEX L. ALEXOPOULOS (Via videoconference)
2  Starr, Butler, Alexopoulos & Stoner, PLLC
3  20700 Civic Center Drive
4  Suite 290
5  Southfield, Michigan 48076
6  248.864.4931
7  ala@starrbutler.com
8    Appearing on behalf of the Defendant, MSAE
9
10  ALSO PRESENT:
11  Fred Peivandi (Via videoconference)
12  Brittany Martin (Via telephone)

### Page 4

1             TABLE OF CONTENTS
2
3  WITNESS                       PAGE
4  JOHN H. DALY, III
5
6  EXAMINATION BY MR. EDWARDS: .................. 5
7  EXAMINATION BY MR. CASCINI: ................... 14
8  EXAMINATION BY MR. ALEXOPOULOS: ............... 23
9  RE-EXAMINATION BY MR. EDWARDS: ................ 37
10
11
12  EXHIBITS                      PAGE
13  (Exhibits not offered.)

1 (Pages 1 to 4)

Carroll Court Reporting and Video
586-468-2411

John Daly, III
July 22, 2020

### Page 5

1  Virtually via Zoom in Michigan
2  Wednesday, July 22, 2020
3  10:02 a.m.
4
5  JOHN H. DALY, III,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10  EXAMINATION
11  BY MR. EDWARDS:
12  Q. Good morning, Mr. Daly. My name is Carl Edwards. I
13  represent Anthony Branch. He is the plaintiff--
14  A. Good morning.
15  Q. Good morning.
16  He's the plaintiff in this lawsuit.
17  Do you know Mr. Branch?
18  A. I do.
19  Q. Can you tell me how many years you've known
20  Mr. Branch?
21  A. I've known Mr. Branch for just under 20 years.
22  Q. All right. And what were the circumstances that you
23  met Mr. Branch?
24  A. When I--I was employed as the manager director of the
25  Genesee County Road Commission in December of 1999,

### Page 6

1  and that's when I met Mr. Branch.
2  Q. All right. And were you his supervisor at any time?
3  A. Yes.
4  Q. For how many years were you his supervisor?
5  A. I believe about five, six years.
6  Q. Okay. And did you ever have a--any responsibility in
7  observing and evaluating Mr. Branch's job performance?
8  A. I--I was responsible for observing it, and at that
9  time the Road Commission did not do personnel
10  evaluations on department heads.
11  Q. Okay. And what was his--when you were managing
12  director for those five years or so, what job title
13  did he have?
14  A. He was the--when I first got there, he was the foreman
15  of the garage at Montrose.
16  Q. Okay.
17  A. And then I want to say about, oh, six or seven years
18  later, he moved to be the senior foreman, and that
19  brought him into the Flint garage, or Flint's area
20  where the road commission is headquartered; and then
21  about two years after that he became the director of
22  the--of maintenance for the road commission.
23  Q. All right. And was that a promotion for him?
24  A. Yes.
25  Q. Were you involved at all in the promotion of

### Page 7

1  Mr. Branch to director of maintenance?
2  A. Yes.
3  Q. And why did you promote him?
4  A. I promoted Mr. Branch because of his proven managerial
5  skills, his leadership ability, his ability to
6  communicate both with the public and with employees,
7  and his ability to accomplish the mission.
8  Q. All right.
9  MR. ALEXOPOULOS: Carl, can I just
10  interrupt for a second?
11  MR. EDWARDS: Sure.
12  MR. ALEXOPOULOS: The computer is on his
13  forearm. Can he lift the computer up, so we can see
14  his face?
15  THE WITNESS: Well, I'm not going to sit
16  here and hold--I have to hold it up. That's about
17  as--you know, I'll do that for a while, but I'm
18  not--if this gets long, I'm not going to hold it for
19  three or four hours.
20  MR. EDWARDS: Fair enough.
21  BY MR. EDWARDS:
22  Q. What year did you leave your position as managing
23  director?
24  A. In 2018.
25  Q. So how many years total were you managing director for

### Page 8

1  the Genesee County Road Commission?
2  A. I want to say 18 years and nine or ten months.
3  Q. All right. Did you ever have a problem with
4  Mr. Branch's job performance?
5  A. No.
6  Q. When you left in 2018, what was your assessment of
7  Mr. Branch as the director of maintenance?
8  A. I thought Mr. Branch was doing an exceptional job as
9  the director of fleet maintenance, given the fact that
10  we had been--we were continually underfunded. I'm
11  sure as you know, the Genesee County Road Commission's
12  the fifth largest county road maintenance agency in
13  the state, and we operated pretty lean.
14  Q. Were you ever required to discipline Mr. Branch during
15  any of the years that you were his supervisor?
16  A. No.
17  Q. Did you ever write him up for failure to do the job
18  adequately in any of the years that you were his
19  supervisor?
20  A. No.
21  Q. When he left the--when you--I'm sorry; let me start
22  all over.
23  When you left the position as managing
24  director, was Mr. Branch qualified, in your opinion,
25  to perform the job of managing director?

2 (Pages 5 to 8)

John Daly, III
July 22, 2020

### Page 9

1  A. Yes.
2  Q. Were you aware that there is a provision in his job
3     description that provides that in your absence he
4     assumes the duties as managing director?
5  A. Yes.
6  Q. And were you ever aware of occasions over the years
7     that you managed Mr. Branch where he had to assume
8     your duties during your absence?
9  A. Yes.
10 Q. How did he perform in that role, in the managing
11    director's role, during those occasions?
12 A. He performed in his usual outstanding manner. He
13    was--I would be gone--I could--the longest period of
14    time I was gone was a period where I was gone for
15    slightly over two weeks, and he--Anthony was in
16    charge, and I knew that I could trust him.
17         There were also periods in there where I
18    would be gone for a week, and I knew that the road
19    commission would be--in Genesee County and--for
20    instance would be in good hands while I was gone.
21 Q. Did you have a director of engineering by the name of
22    Fred Peivandi?
23 A. Yes.
24 Q. And did Mr. Peivandi report directly to you--
25 A. No.

### Page 10

1  Q. --as director of engineering?
2  A. As director of engineering, yes.
3  Q. And do you know how many years he would have reported
4     to you?
5  A. I believe about 12.
6  Q. And did you select him for that position?
7  A. No.
8  Q. He was in the position prior to you becoming managing
9     director?
10 A. No.
11 Q. So tell me how it occurred.
12 A. The position of director of engineering is also the
13    county highway engineer; and by state statute, the
14    county highway engineer is appointed by the Board of
15    County Road Commissioners. That was the only
16    position--only senior level management position at the
17    road commission that I did not directly appoint.
18 Q. Did you nonetheless supervise him?
19 A. Yes, I did.
20 Q. Did he report directly to you in that role?
21 A. Yes.
22 Q. And by the way, were you aware that Anthony Branch did
23    not possess a college degree?
24 A. Yes.
25 Q. And did that hamper or impair him in any way in

### Page 11

1     performing his job when he was--on those occasions
2     when he was managing director in your absence?
3  A. Not one bit.
4  Q. Do you believe that Anthony Branch needed a degree in
5     order to perform your job, a college degree?
6  A. No, I do not. I do not believe that that was a
7     requirement or stip--I do not believe he had to have
8     that credential in order to be successful as either
9     the maintenance director or as manager director.
10 Q. All right. Do you know whether or not Fred Peivandi
11    in his job description had a provision similar to
12    Anthony Branch, that in your absence he would perform
13    your duties as managing director?
14 A. I'm not aware of that.
15 Q. Did he ever, to your knowledge, perform the duties of
16    managing director in your absence?
17 A. Yes.
18 Q. And on how many occasions?
19 A. I want to say three or four.
20 Q. In your opinion who was the person that you would have
21    preferred to become managing director based on what
22    you knew about both of their backgrounds and
23    performance, Fred Peivandi or Anthony Branch?
24 A. Anthony Branch.
25 Q. Why?

### Page 12

1  A. Because I felt that he had better--the manager
2     director's job is not a technical job, it's a
3     management job. In fact, that was one of the reasons
4     I was hired. I did not have an engineering background
5     when I came in. I was the city manager prior to this,
6     or prior to working as manager director. And I felt
7     Anthony had better leadership and communication skills
8     than did Fred.
9          Fred's technical abilities, frankly,
10    are--were far superior to Anthony's, but manager
11    director's job is just that, it's a management job.
12    It is not a technical job.
13 Q. Okay. Did you ever advise Mr. Branch to watch his
14    back because board--I'm sorry--road commission board
15    member Dave Arceo did not like Branch?
16 A. Yes.
17 Q. Why did you tell him that?
18 A. Because that's what happened. We were coming out of a
19    conference, and Mr. Arceo made the comment to me that
20    we have to be careful about whether or not these
21    people get promoted.
22         And it had come--the subject of the--that
23    had gone on in the board meeting was a discussion that
24    Anthony was having related to maintenance activities.
25 Q. So this was something in reference to Mr. Branch, that

3 (Pages 9 to 12)

John Daly, III
July 22, 2020

## Page 13

1  he was responding to Mr. Arceo?
2  A. (Inaudible).
3  Q. I'm sorry; I didn't hear you.
4  A. I believe so.
5       It was not a prolonged discussion. It was
6  while we were walking out of the conference room to my
7  office, which is a distance of probably about 20 feet.
8  Q. And by "these people," who did you interpret him to be
9  referring to?
10 A. I interpreted that as referring to African-Americans.
11      MR. EDWARDS: I don't have any further
12 questions.
13      MR. CASCINI: I think I'm probably going to
14 be up next here. This is Andrew Cascini.
15      Mr. Daly, my name's Andrew Cascini. I am
16 an attorney at Henn Lesperance. Henn Lesperance
17 represents the Genesee County Road Commission in this
18 matter presently. I'll have some questions for you in
19 just a moment.
20      Anybody mind if we go off the record for
21 two minutes?
22      MR. EDWARDS: Not at all.
23      MR. ALEXOPOULOS: That's fine with me.
24      MR. CASCINI: Okay. Excellent.
25      (Off the record at 10:15 a.m.)

## Page 14

1  (Back on the record at 10:16 a.m.)
2       EXAMINATION
3  BY MR. CASCINI:
4  Q. Okay. Again, Mr. Daly, this is Andrew Cascini
5  representing the road commission. I just have a
6  couple of questions for you. I don't think I'm going
7  to take too long here at all.
8       One of the things you mentioned in your
9  prior testimony was that Mr. Peivandi, as the director
10 of engineering, was appointed by statute directly by
11 the board of commissioners, correct?
12 A. Yes.
13 Q. Is the same true of the managing director position for
14 the road commission?
15 A. The manager director is appointed by the Board of
16 County Road Commissioners, but it's not required--it's
17 not stipulated in the statute.
18 Q. Ah. That is, however, the typical practice of the
19 Genesee County Road Commission?
20 A. Yes.
21 Q. So the board's the one that makes that call?
22 A. Yes.
23 Q. And the internal administration isn't responsible for
24 that hire; doesn't go through Donna Poplar, for
25 example?

## Page 15

1  A. The application process--it depends on how they're
2  doing the search.
3  Q. Okay.
4  A. If the search is done by--with just using HR, then the
5  initial application portion of it goes through HR. If
6  it's an outside agency, like it was when I was found,
7  then it goes directly to the consultant, personnel
8  consultant.
9  Q. Okay. Now, my understanding was your employment with
10 the Genesee County Road Commission separated in
11 approximately April or May of 2018; is that correct?
12 A. That's correct.
13 Q. And you were on leave beginning in February of 2018;
14 is that correct?
15 A. Yes.
16 Q. And Anthony and Fred were appointed by the board of
17 road commissioners as co-interim managing director
18 beginning at the period of time where you went on
19 leave, correct?
20 A. That's my understanding.
21 Q. Did anyone at any point in time come to you--or strike
22 that.
23      Did you ever offer anyone a recommendation
24 about who should be the interim managing director?
25 A. I did.

## Page 16

1  Q. And to whom did you make the recommendation?
2  A. I made that recommendation to John Mandelaris, to--and
3  to Bob Johnson.
4  Q. And Mr. Mandelaris and Mr. Johnson are each road
5  commissioners, correct?
6  A. Yes. And I made that to them in my office, when the
7  three of us were in a meeting.
8  Q. Okay. And that was prior to Mr. Branch being named as
9  co-interim managing director?
10 A. Yes.
11 Q. Okay.
12 A. The codirector nomination--or appointments didn't take
13 place until I actually was on leave from the road
14 commission.
15 Q. Ah. And you made the recommendation to them--ah, I
16 apologize.
17      So you made the recommendation after you
18 were on leave?
19 A. No, before.
20 Q. Ah, I see. So--
21 A. My recommendation--I did not know that they were going
22 to appoint codirectors. My recommendation was for
23 manager director.
24 Q. Sure.
25      You mentioned that Fred, on occasion, would

4 (Pages 13 to 16)

John Daly, III
July 22, 2020

### Page 17

1. also assume the responsibilities for the managing
2. director position when you were absent for a period of
3. time.
4. A. Yes.
5. Q. Is there a difference--my understanding is that
6. sometimes during summer months you would tend to
7. appoint Fred for that role, vis-a-vis winter months
8. where you would tend to appoint Anthony to assume
9. those responsibilities. Would you say that statement
10. is accurate or inaccurate?
11. A. I would say that statement's accurate.
12. Q. Okay. So it depended, at least in part, on when you
13. were going to be absent to determine who would have
14. the helm of the road commission in your absence.
15. A. It depended upon what the needs of the road commission
16. would be at that time.
17. Q. Fair to say.
18.     I ask this question because this is a
19. racial discrimination suit and for that reason only.
20. Mr. Daly, what race do you self-identify as?
21. A. Caucasian.
22. Q. Okay. And what race do you perceive Anthony Branch to
23. be?
24. A. African-American.
25. Q. And what race do you perceive Fred Peivandi to be?

### Page 18

1. A. Caucasian.
2. Q. And what race do you perceive Mr. David Arceo to be?
3. A. Hispanic.
4. Q. Are there any individuals presently on the board of
5. road commissioners who you perceive to be
6. African-American?
7. A. Presently I don't know.
8. Q. I should refine.
9.     At the time of 2018 when the managing
10. director job search was being performed, so shortly
11. after you were put on leave and then your employment
12. was separated, did you perceive any of the members of
13. the road commission then standing to be an
14. African-American?
15. A. Yes.
16. Q. And who was that person?
17. A. Cloyce Dickerson.
18. Q. You mentioned that Dave Arceo told you--I want to make
19. sure that I have the quote exactly right--that he
20. claimed--or that he told you that you, quote-unquote,
21. had to be careful about these people getting promoted.
22.     Do I have that correct?
23. A. Yes.
24. Q. And you interpreted "these people" to be a reference
25. to African-Americans; is that correct?

### Page 19

1. A. Yes.
2. Q. And you did that by virtue of the fact that Mr. Branch
3. had been recently speaking in a meeting immediately
4. prior to that conversation?
5. A. Right.
6. Q. Okay.
7. A. Yes, that's correct.
8. Q. Did Mr. Arceo ever do or say anything else during his
9. time as a commissioner that led you to believe that he
10. may, I would say, harbor concerns about
11. African-Americans, quote-unquote, getting promoted?
12. A. No.
13. Q. Do you remember when that meeting occurred, where
14. Mr. Arceo made that comment to you?
15. A. It was within--I can't recall the exact time because
16. that's several years ago, but I can recall that the
17. sudden--the--it was probably within the first two or
18. three months that Arceo was on the board, and the
19. discussion that was taking place was who was going to
20. be the acting manager director while I was gone for a
21. week.
22. Q. Ah, I see.
23.     Now, Mr. Arceo was appointed to the board
24. in around 2012, 2013. I don't have the exact date.
25. Does that roughly jibe with your recollection?

### Page 20

1. A. That's--that's--
2. Q. More or less the range?
3. A. That's pretty much the range.
4. Q. Are you familiar with Commissioner John Mandelaris?
5. A. Yes.
6. Q. Have you known him long?
7. A. Yes.
8. Q. Have you ever heard Mr. Mandelaris make any similar
9. comment that led you to suspect that he harbored
10. animus about African-Americans becoming promoted
11. within the road commission?
12. A. No.
13. Q. Have you known Commissioner Robert Johnson long?
14. A. Yes.
15. Q. Same question for him; have you ever had occasion
16. where he made a comment that suggested he harbored
17. animus against African-Americans getting promoted to
18. the road commission?
19. A. Same answer. No.
20. Q. Same question for Mr. Dickerson.
21. A. I've known Mr. Dickerson a long time. Not as long as
22. John Mandelaris or Bob Johnson.
23. Q. Okay. And has Mr. Dickerson ever made a comment that
24. suggested he harbored racial animus against fellow
25. African-Americans getting promoted in the road

John Daly, III
July 22, 2020

### Page 21

1 commission?
2 A. No.
3 Q. And Shirley Kautman-Jones was appointed in 2018,
4 January of 2018, correct?
5 A. Yes.
6 Q. So you didn't have an occasion to know her for a
7 particularly long time?
8 A. Only for about two or three weeks.
9 Q. Only for about two or three weeks.
10 During that particular time did she ever
11 make any comments to you that suggested that she
12 harbored animus about, quote-unquote, these people
13 getting promoted?
14 A. No. We only met once.
15 Q. Okay. Now, my understanding was that Shirley
16 Kautman-Jones criticized your performance and Anthony
17 Branch's performance concerning an ice storm in early
18 2018. Do you recall that event?
19 A. Yes.
20 Q. And tell me a little bit about that ice storm. When
21 did that occur, roughly?
22 A. Oh.
23 Q. Hard to say, I know, but--
24 A. I would say it would have been in--oh, my Lord. I
25 would have to say it was probably in late October or

### Page 22

1 early November of 2017.
2 Q. Okay.
3 A. An ice storm that we were actually on the peripheral
4 of. It just touched the southern tier of Genesee
5 County. I would say that the--probably was not a
6 county-wide event, that probably only about 20 percent
7 of the county in the southern portion was affected by
8 the ice storm.
9 Q. And we certainly can't control the weather, can we,
10 Mr. Daly?
11 A. No, we can't. I wish we could.
12 Q. Now, my understanding was that Ms. Kautman-Jones wrote
13 a highly critical email of your performance and
14 Mr. Branch's performance in handling that situation?
15 A. Yes.
16 Q. Okay. Are you aware that Ms. Kautman-Jones later made
17 a public apology to Anthony Branch regarding that
18 matter?
19 A. That's what I've heard. That took place subsequent to
20 my--or prior to me leaving the road commission, but
21 after I went on leave.
22 Q. So you don't have firsthand knowledge of that?
23 A. I have no firsthand knowledge of that.
24 MR. CASCINI: That's all for me.
25 Alex?

### Page 23

1 EXAMINATION
2 BY MR. ALEXOPOULOS:
3 Q. Mr. Daly, I represent the Michigan Society of
4 Association Executives, and my first question to you
5 is: Have you ever had any interactions whatsoever
6 with any employees of the Michigan Society of
7 Association Engineers--Executives?
8 A. Yes.
9 Q. What interactions have you had with--well, first of
10 all, who worked for--and I'm going to call them the
11 MSAE. And if I do that, you'll know I'm talking about
12 the Michigan Society of Association Executives; is
13 that correct?
14 A. Yeah.
15 Q. So who at the MSAE have you ever had any direct
16 communications with?
17 A. Cheryl Ronk.
18 Q. Anyone else?
19 A. Couple other people, but I don't even remember their
20 names.
21 Q. What interactions did you ever have with Cheryl Ronk?
22 A. Well, I was the--I was on the board of directors for
23 the County Road Association of Michigan, who
24 later--has now become the Michigan County Road
25 Association; and we were in the process of hiring a

### Page 24

1 president, and the--the firm that Cheryl was from was
2 retained to do that search. And she was the principal
3 from the company or from the association that--that
4 led that search.
5 Q. Was the company who led that search the MSAE, or was
6 it some other company?
7 A. I think it was the MSAE.
8 That part of it--I wasn't into the
9 contractual side, I was just one of the search
10 participants.
11 Q. And what time frame are we talking about?
12 A. This would have had to have been probably 2015, 20--in
13 that era. Around in there.
14 Q. And did you have any issues with Cheryl Ronk's
15 performance during that search?
16 A. I had some concerns that she was really close to one
17 of the--you know, she had prior knowledge of one of
18 the applicants that eventually got the job, but, you
19 know, it's a small world when you get into Lansing.
20 Q. Did you ever make any complaints to anyone about
21 Cheryl Ronk's performance during this search process?
22 A. I did voice my concern early on that I wanted to make
23 sure there was no conflict of interest. And Cheryl
24 did a satisfactory job.
25 Q. Okay. After that performance where she did a

John Daly, III
July 22, 2020

Page 25

1 satisfactory job, did you have any interactions again
2 with Cheryl Ronk?
3 A. I went to--yes.
4 Q. Okay. What additional interactions did you have with
5 Cheryl Ronk after 2015?
6 A. I went to two award banquets, one of them where we
7 received an award, and another one where the County
8 Road Association received an award, and Cheryl was at
9 both of those, and I said hello to her.
10 Q. Other than saying hello, did you have any additional
11 interactions with her at those events?
12 A. Just--just a brief conversation. Probably lasted no
13 more than one, two minutes.
14 Q. Okay. Anything significant that occurred during those
15 conversations?
16 A. Not that I recall.
17 Q. Okay. You ended up leaving the road commission. I
18 believe Mr. Cascini established that you went on a
19 leave in February of 2018; is that correct?
20 A. Right.
21 Q. Was it your decision to go on a leave, or were you
22 asked to go on a leave?
23 A. It was a mutual decision.
24 Q. You had an employment agreement in place; did you not?
25 A. Yes.

Page 26

1 Q. Was your employment agreement scheduled to end in
2 February of 2018?
3 A. No.
4 Q. When you say, "It was a mutual decision," did you
5 raise your hand and go to anyone and say, I'm ready to
6 leave and not be the manager director anymore?
7 A. After they initiated the process, at one point it
8 became apparent that my continued employment at the
9 road commission was no longer in the road commission's
10 best interest or mine.
11 Q. Okay. But that was initiated by the road commission,
12 not you; is that correct?
13 A. That was an issue that was initiated by the road
14 commission.
15 Q. Who at the road commission initiated it?
16 A. The--it was initiated by Dave Arceo and by Cloyce
17 Dickerson at the behest of county board members.
18 Q. Did Mr. Arceo and Mr. Dickerson ever tell you why they
19 were initiating this process of having you cease
20 working as the manager director?
21 A. No.
22 Q. Did you ever ask them?
23 A. Yes.
24 Q. And they refused to answer?
25 A. Yes.

Page 27

1 Q. Did you ever go to anyone else and ask them to explain
2 to you why this was happening?
3 A. Yes.
4 Q. And did you ever receive a response?
5 A. Yes.
6 Q. From who?
7 A. From Dave Miller, from John Mandelaris, and from Bob
8 Johnson.
9 Q. And who's Dave Miller?
10 A. Dave Miller was--served on the board of directors at
11 that time.
12 Q. What did he tell you in response to your question?
13 A. That the county board wanted me out, and that the--if
14 they, the board of the county road commissioners, did
15 not vote me out or get me out, that the county's
16 intent was to dissolve the road commission and absorb
17 it internally within the county.
18 Q. Did Mr. Miller explain why they wanted you out?
19 A. Political objectives.
20 Q. Can you identify what political objectives he was
21 referencing?
22 A. He identified that there was a coalition of three
23 county board members that wanted me out, and yet
24 their--the reasons that they gave--and this is
25 secondhand now--that they gave to Miller, Johnson, and

Page 28

1 Mandelaris really didn't hold up.
2 Q. What reasons were identified?
3 A. Well, one reason--well, one of the first reasons was
4 that one county commissioner said that he had over 750
5 complaints of unresolved issues that his constituents
6 had forwarded to him. And yet no one--none of the
7 commissioners nor myself had any knowledge of any of
8 these complaints.
9 Q. Which commissioner supposedly had the 750 complaints?
10 A. Mark. He was board chair then. The last name slips
11 me right now.
12 Q. But the first name was Mark?
13 A. Yes. He was president of the board then.
14 Q. So was he president of the board of commissioners for
15 the Genesee County Road Commission, or was he the
16 chairperson of the--
17 A. Chairperson of the county board.
18 Q. Okay. What other reasons were identified to you as to
19 why they wanted to remove you as the manager director?
20 A. The county board wanted to have a greater say in who
21 received the construction contracts.
22 Q. Was there some perception that you were favoring
23 certain individuals as far as assigning contracts or
24 accepting contracts?
25 A. Quite the contrary.

John Daly, III
July 22, 2020

### Page 29

1  Q. So explain to me, if you can, what that reason about
2  assigning or having a greater ability to assign
3  contracts, what that referenced.
4  A. Are you asking for my opinion?
5  Q. Well, I'm asking for what you were told first.
6  A. I told you what I told—was told.
7  Q. Okay. So repeat it for me again, so I know exactly
8  what you said.
9  A. They wanted to have a greater say in who received
10 construction contracts.
11 Q. And that was the county board that wanted--
12 A. Yes.
13 Q. Were you provided with any other reasons why they
14 wanted to remove you as the manager director?
15 A. No.
16 Q. Had they not asked you to leave this position, was it
17 your intention to complete working through the end of
18 your employment agreement?
19 A. Yes.
20 Q. And when was your employment agreement scheduled to
21 end?
22 A. September 20—or September 30 of, I believe, 2019.
23 Q. Did it upset you that they wanted to remove you as the
24 manager director?
25 A. Yes.

### Page 30

1  Q. Are you still upset about it?
2  A. No, I'm not upset about it anymore.
3  Q. All right. When did your feelings of being upset
4  cease?
5  A. Oh, I would say after the normal period, you know,
6  when it takes—you know, you have a grieving period of
7  what transpired. So after four to five months, it was
8  understandable.
9  Q. Are you working anywhere else now?
10 A. Yes.
11 Q. Where are you currently employed?
12 A. City of Flint.
13 Q. And what job do you perform there?
14 A. Director of transportation infrastructure.
15 Q. When did you obtain that position?
16 A. In November of last year.
17 Q. Do you have any personal knowledge regarding the
18 selection process that the Genesee County Road
19 Commission used to find your replacement?
20 A. I do not.
21 Q. Were you present at any board of commissioner meetings
22 when two executive firms gave their presentations?
23 A. No.
24 Q. Do you have any personal knowledge regarding who made
25 the decision to select Mr. Peivandi as your

### Page 31

1  replacement?
2  A. No.
3  Q. Do you agree that Mr. Peivandi was a good employee?
4  A. I agree that in his role as the county highway
5  engineer, Mr. Peivandi was a good employee.
6  Q. Did you ever discipline him during the time that you
7  supervised him?
8  A. Not formally.
9  Q. What informal disciplines did you issue to
10 Mr. Peivandi?
11 A. I cautioned him on several occasions about, you know,
12 being consistent with management of employees and
13 communication.
14 Q. Do you know if any of the employees that he supervised
15 submitted a recommendation that Mr. Peivandi be
16 selected as the manager director?
17 A. No.
18 Q. Would you be surprised to find out that they did?
19 A. No.
20 Q. Do you know how much civil engineering experience
21 Mr. Peivandi has?
22 A. I know that—no.
23 Q. Do you know how much experience he has working on
24 roads and bridges in Genesee County?
25 A. He's had—I know he has over 20 years experience as a

### Page 32

1  civil engineer.
2     Again, the manager director's job is not an
3  engineering job.
4  Q. I'm just asking a question about what you know about
5  Mr. Peivandi's experience. Do you know how much
6  experience he has working on roads and bridges in
7  Genesee County?
8  A. He worked on roads and bridges in Genesee County for
9  at least, I believe, 20 years.
10 Q. Do you know what degrees Mr. Peivandi possesses?
11 A. Mr. Peivandi has a bachelor's and a master's degree in
12 civil engineering.
13 Q. Do you think that's a negative for someone who's going
14 to be a manager director to have those degrees?
15 A. I think it's simply a consideration. I don't think
16 it's the sine qua non either.
17 Q. I didn't ask you that. I'm asking you do you think
18 it's a negative for the manager director to have
19 advanced degrees?
20 A. I do not think it is a negative for the manager
21 director to have advanced degrees.
22 Q. What degrees do you possess?
23 A. I have a Ph.D. in administration and management, a
24 first master's degree in systems engineering, and a
25 second master's degree in systems technology, and a

John Daly, III
July 22, 2020

### Page 33

1  bachelor of arts degree in history and computer
2  science.
3  Q. Did you have all those degrees prior to the time that
4  you began working as the manager director?
5  A. Yes.
6  Q. When the--when you found out that the board of
7  commissioners no longer wanted you to be the manager
8  director, did you hire a lawyer to negotiate a
9  severance agreement for you?
10 A. No.
11 Q. Okay. Do you know a lawyer by the name of Dean
12 Yeotis?
13 A. I do.
14 Q. And does that refresh your memory that you actually
15 engaged Mr. Yeotis's services to negotiate a severance
16 agreement?
17 A. I nego--I hired Dean Yeotis to represent my interest
18 in resolving the situation, and a severance agreement
19 came out of that subsequent to his hiring.
20 Q. And he was involved in that process, correct?
21 A. That's correct.
22 Q. Did you ever speak to anyone who was personally
23 involved in the selection process for your
24 replacement?
25 A. Just as I've indicated so far.

### Page 34

1  Q. I don't know that you've indicated anything so far.
2  So--
3  A. Well, I indicated earlier that I had recommended to
4  John Mandelaris, Dave Miller, and to Bob Johnson that
5  Anthony Branch be appointed manager director.
6  Q. Okay. That's correct.
7  A. The process did not start until after I had gone
8  on--on leave.
9  Q. Right. So my question to you is: Have you spoken to
10 anyone who was personally involved in the selection
11 process about the selection process?
12 A. At what time? At what point?
13 Q. Let's take it while the selection process was ongoing.
14 A. No.
15 Q. What about after Mr. Peivandi was selected; did you
16 speak to anyone who was involved--
17 A. Yes.
18 Q. --personally involved in the selection process?
19 A. Yes.
20 Q. Who?
21 A. I spoke to Bob Johnson and John Mandelaris on separate
22 occasions.
23 Q. Do you recall when your conversation with Mr. Johnson
24 took place?
25 A. I want to say it was in May.

### Page 35

1  Q. Sorry, that didn't come out clearly. What did
2  you--what was your answer?
3  A. I believe it was in May of '18.
4  Q. Do you know when Mr. Peivandi was hired to be your
5  replacement?
6  A. As codirector or as manager director?
7  Q. As manager director.
8  A. No.
9  Q. Was there anyone else present when you had this
10 conversation with Mr. Johnson?
11 A. No.
12 Q. What did Mr. Johnson tell you?
13 A. Just that it was a tough search.
14 Q. Did you ever have any additional conversations with
15 Mr. Johnson about the selection process?
16 A. No.
17 Q. When did you have the conversation with
18 Mr. Mandelaris?
19 A. I want to say October of '18.
20 Q. What was the substance of that conversation?
21 A. Just the same thing, that it had been a really tough
22 and hard search.
23 Q. Did you have any further conversations with
24 Mr. Mandelaris about the search?
25 A. No.

### Page 36

1  Q. Do you consider Mr. Branch to be a personal friend of
2  yours?
3  A. No.
4  Q. Have you had any interactions with Mr. Branch since
5  you ceased working as the manager director?
6  A. I called him--the only interaction that I've had with
7  him since I left employment at the road commission,
8  since I went on--yeah, since I left the employment of
9  the road commission, was that when I heard he had been
10 appointed as codirector, I called him and offered my
11 congratulations.
12 Q. And you have not spoken to Mr. Branch since that time?
13 A. No.
14 Q. I'm sorry; was your answer, "No"?
15 A. My answer was--not that I recall.
16 Q. Have you kept in contact with anyone at the road
17 commission since you ceased working there as the
18 managing director?
19 A. Anyone who?
20 Q. Anyone.
21 A. Including people that--I'm in contact with a lot of
22 people since I've been outside of the road--since I've
23 left the employment of the road commission.
24 Q. Is Mr. Peivandi one of them?
25 A. Fred Peivandi and I have talked on the phone about

Carroll Court Reporting and Video
586-468-2411

John Daly, III
July 22, 2020

Page 37

1  professional matters on several occasions. I know
2  we've had one meeting.
3  Q. Okay. So these are conversations that have taken
4  place in this new position that you have obtained
5  since November of '19?
6  A. Yes.
7  Q. Okay. Prior to you obtaining that job, did you have
8  any communications with Mr. Peivandi after you ceased
9  working as the manager director?
10 A. Not that I recall.
11     MR. ALEXOPOULOS: I have no other
12 questions.
13     MR. EDWARDS: I have a couple of follow-up
14 questions, Mr. Daly.
15     THE WITNESS: Yes.
16     RE-EXAMINATION
17 BY MR. EDWARDS:
18 Q. The communication issues/informal counseling that
19 you've testified to with Fred Peivandi when he was
20 director of engineering, what did they involve?
21 A. They involved handling of employees, and they centered
22 around two issues: one was that Fred wanted to see an
23 increase in salary; and two, that Fred wanted—they
24 were about the management/leadership of the
25 department, particularly with his employees.

Page 38

1  Q. And the latter, managing the employees, what did that
2  involve?
3  A. Fred had several employees—on several occasions he
4  had employees that he was having difficulty dealing
5  with and was having and encountering some managerial
6  problems with them, and he could have, in my opinion
7  as manager director, could have handled them better.
8  And it wasn't as a disciplinary measure, it was more
9  as a counseling process than anything else.
10 Q. Okay. And do you recall any specifics of any of those
11 issues with the employees in question?
12 A. Well, one of them was an employee that he couldn't—he
13 couldn't—she would not come to work on time. And he
14 wanted to have her come to work on time, but he didn't
15 want to discipline her.
16     We had a chance to—we were restructuring
17 and reorganizing his department, and there was an
18 opportunity there to resolve the problem. We were
19 going to do that through reorganization, and he didn't
20 want to do that. And then so I left it in his hands,
21 and the problem never was resolved.
22 Q. I'm sorry; your last answer on my end didn't come
23 clear.
24 A. The problem never was resolved.
25 Q. All right. Did you—you mentioned earlier—I'm

Page 39

1  sorry—that you served on a board. Did you serve on
2  more than one board when you were managing director of
3  Genesee County Road Commission?
4  A. Yes.
5  Q. Can you list the boards and/or committees that you
6  served on in that capacity as managing director?
7  A. Wow.
8      I served for 18 years on the Board of
9  Directors of the County Road Association of Michigan,
10 I served on the City of Flushing Zoning Board of
11 Appeals for about seven years, I served on the city's
12 of Flushing's Planning Commission for five years, I
13 served for three years on the Michigan Supply Chain
14 Development Commission. I'm currently serving and
15 have served for about three years on the Michigan
16 Infrastructure Council. I served for about a year and
17 a half on the City of Flint Ethics and Accountability
18 Board. Oh, and I served for four years on the Board
19 of Trustees for the Bishop International Airport
20 Authority.
21     That's all I recall right now.
22 Q. All right. And earlier you were—you volunteered to
23 give an opinion why the county commissioners wanted a
24 greater say in the awarding of contracts of the road
25 commission. This is your opportunity to respond.

Page 40

1  A. I think they wanted to have greater leverage with the
2  people that were awarded contracts.
3  Q. What do you mean by that?
4  A. I think that they wanted to use those—they wanted to
5  be able to use the awarding of contracts for—to
6  increase political leverage with them.
7      MR. EDWARDS: Thank you, Mr. Daly. I have
8  no further questions.
9      MR. CASCINI: Nothing from me.
10     MR. ALEXOPOULOS: I have no other
11 questions.
12     MR. EDWARDS: Thank you, Mr. Daly. Thank
13 you for your attendance and your time.
14     (The deposition was concluded at 10:53 a.m.
15 Signature of the witness was not requested by counsel
16 for the respective parties hereto.)

10 (Pages 37 to 40)

John Daly, III
July 22, 2020

|  |  |
|---|---|
| Page 41<br><br>1    CERTIFICATE<br>2    STATE OF MICHIGAN<br>3    COUNTY OF OAKLAND<br>4<br>5    I, Mary Jo Power, a Notary Public in and<br>6    for the above county and state, do hereby certify that<br>7    this deposition was taken before me at the time and<br>8    place hereinbefore set forth; that the witness was by<br>9    me first duly sworn to testify to the truth; that this<br>10   is a true, full and correct transcript of my<br>11   stenographic notes so taken; and that I am not<br>12   related, nor of counsel to either party, nor<br>13   interested in the event of this cause.<br>14<br>15<br>16<br>17<br>18<br>19   *Mary Jo Power*<br>20   Mary Jo Power, CSR-1404<br>21   Notary Public<br>22   Oakland County, Michigan<br>23   My commission expires: December 12, 2024<br>24   Notarized using electronic/remote technology<br>25 |  |

11 (Page 41)