Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-12, PageID.664   Filed 11/21/22   Page 1 of 28
Donna Poplar v. Genesee County Road Commission                    Cloyce Dickerson

1 (1)

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DONNA POPLAR,

                    Plaintiff,

vs.                                    Case No. 2:21-cv-12568-VAR-JJCG
                                       Hon. Victoria A. Roberts

GENESEE COUNTY ROAD COMMISSION
and FRED F. PEIVANDI, in his
individual capacity,

                    Defendants.



DEPOSITION OF CLOYCE DICKERSON, taken on

Thursday, July 21, 2022, at 211 West Oakley Street, Flint,

Michigan, noticed for 3:00 P.M.



APPEARANCES:

For the Plaintiff:   LEE LEGAL GROUP, PLLC
                     BY:  CHARIS LEE, J.D. (P84127)
                     117 West Flint Park Boulevard
                     Flint, Michigan 48505
                     (810) 513-9257
                     charis@leebusinesslaw.com
                             and
                     GAFKAY LAW, PLC
                     BY:  JULIE A. GAFKAY, J.D. (53680)
                     604-A South Jefferson Avenue
                     Saginaw, Michigan 48607
                     (989) 652-9240
                     jgafkay@gafkaylaw.com

```
 1    APPEARANCES (CONTINUED)

 2    For the Defendant:  HENN LESPERANCE, PLC
                          BY:  ANDREW A. CASCINI, J.D. (P76640)
 3                        32 Market Avenue, SW, Suite 400
                          Grand Rapids, Michigan 49503
 4                        616) 551-1611
                          aac@hennlesperance.com

 5
      Court Reporter:  Cynthia Lathrop, CSR-2474
 6

 7

 8

 9                        *     *     *     *

10

11

                              INDEX TO EXAMINATION
12
      WITNESS:  CLOYCE DICKERSON
13
      Examination by Ms. Lee                       Page  5
14    Examination by Mr. Cascini                   Page 56

15

16

17                        *     *     *     *

18

19

20

21

22

23

24

25
```

Page 3

1   Flint, Michigan
2   Thursday, July 21, 2022
3   3:12 p.m.
4   R E C O R D
5   COURT REPORTER:  Do you solemnly swear
6   or affirm to tell the whole truth in this matter so
7   help you God?
8   THE WITNESS:  I do.
9   MS. LEE:  Good afternoon, Mr. Dickerson.
10   My name is Attorney Charis Lee, and this is my
11   co-counsel, Julie Gafkay.  We represent Donna Poplar
12   in this case, and we will be asking -- or I'll be
13   asking you some questions today.  Do you understand
14   that you are under oath --
15   THE WITNESS:  Yes.
16   MS. LEE:  -- and you are here because
17   you are under subpoena?
18   THE WITNESS:  Yes.
19   MS. LEE:  Okay.  So this is the court
20   reporter; she'll be taking down everything that you
21   say.  Have you ever had a deposition before?
22   THE WITNESS:  Yes.
23   MS. LEE:  Okay.  You have.  How many
24   depositions have you had?
25   THE WITNESS:  Four.

Page 4

1   MS. LEE:  Four.  In relation to?
2   THE WITNESS:  Well, I had three at the
3   Road Commission, one for Anthony Branch and one for
4   Mckinney Jackson, and -- well, actually two for
5   Anthony Branch; and I had one at GM.
6   MS. LEE:  When you were working there?
7   The one at GM, were you working there?
8   THE WITNESS:  Um-hum, for safety.
9   MS. LEE:  And Anthony Branch and
10   McKinney Jackson are former employees of the Road
11   Commission; correct?
12   THE WITNESS:  Yes.  Actually I had four
13   for them.  I had -- what's her name.  She was a
14   purchasing -- Joyce, Joyce McLane.
15   MS. LEE:  And she was also a former
16   employee of the Road Commission?
17   THE WITNESS:  Right.
18   MS. LEE:  So you're pretty familiar
19   with how this goes, then; right?
20   THE WITNESS:  Yeah.
21   MS. LEE:  So we do -- just so you
22   remember, we need audible answers, yes or no.  If you
23   don't understand a question, then let me know.  I can
24   rephrase my question if I believe it's necessary.
25   THE WITNESS:  Okay.

Page 5

1   MS. LEE:  Or if you need to take a
2   break, I don't mind us taking a break at any time.
3   Just I would like you to answer the question, if
4   there's a question on the floor.  Let's see.  Okay.
5   EXAMINATION
6   BY MS. LEE:
7   Q.   So how long -- well, can you spell your name for the
8   record?  We've been talking.
9   A.   Cloyce Dickerson.  Do you want me to spell it?
10   Q.   Yes, please.
11   A.   C-l-o-y-c-e, Cloyce; Dickerson, D-i-c-k-e-r-s-o-n.
12   Q.   And can you tell me what your current capacity is at
13   the Road Commission?
14   A.   Commissioner.
15   Q.   Okay.  And how long have you been a commissioner?
16   A.   About almost 12 years now.
17   Q.   And how do you -- is that, like, two terms?  Is that
18   two terms?  How long is your term?
19   A.   No; each term is six years.
20   Q.   So that would be two terms.
21   A.   Yeah.
22   Q.   And you've been a commissioner at the Road Commission
23   for 12 years?
24   A.   Um-hum.
25   Q.   So you've been a commissioner -- how many managing

Page 6

1   directors have been here since you --
2   A.   Two --
3   Q.   And what are their names?
4   A.   Fred Peivandi and John Daly.
5   Q.   And who hired Donna Poplar?
6   A.   John Daly.
7   Q.   Okay.  And to your -- and John Daly, what is his race?
8   What is John Daly's race?  What is his race?
9   A.   He's white, Caucasian.
10   Q.   Okay.  And at the time that Donna Poplar was hired,
11   did she -- do you know if she requested accommodations
12   of John Daly?
13   A.   I don't know if she did when she -- when she started,
14   but she did -- I wasn't aware that she did 'cause, I
15   mean, it happened -- her hire happened probably faster
16   than I thought it would; but, yes, she did request
17   that.
18   Q.   And when did you become aware that Ms. Poplar needed
19   accommodations?
20   A.   Well, probably within the first -- the first two or
21   three months.
22   THE WITNESS:  (Addressing Mr. Cascini)
23   Can I expand on that?
24   MR. CASCINI:  Answer if you know.
25   THE WITNESS:  I really didn't -- I

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-12, PageID.667   Filed 11/21/22   Page 4 of 28
Donna Poplar v. Genesee County Road Commission
Cloyce Dickerson

4 (7 - 10)

Page 7

1  really wasn't -- I wasn't for her getting that person
2  when she asked for it.
3  Q.  (BY MS. LEE)  So you became aware within a few
4     months --
5  A.  Right.
6  Q.  -- to your knowledge --
7  A.  RIGHT.
8  Q.  -- of Ms. Poplar being hired that she needed
9     accommodations?
10 A.  Right.
11 Q.  And Ms. Poplar requested accommodations, to your
12    recollection?
13 A.  Um-hum.
14 Q.  And you mentioned that you were not aware or you were
15    not in support of those accommodations?
16 A.  Right.
17 Q.  Why is that?
18 A.  Because I guess I didn't fully understand what her --
19    what she was doing in the job and all the
20    responsibilities that she has, and that made me change
21    my mind.
22 Q.  Who else was not in support of --
23 A.  It was just me.
24 Q.  -- Donna's accommodation?
25 A.  Just me.  At first, it was only me that was not in

Page 8

1  support; and then after I decided that she needed that
2  person, we were all kind of -- was in agreement that
3  she needed a person.
4  Q.  So when you were originally not in support, this was
5     under John Daly?
6  A.  Um-hum, yep.
7  Q.  And then there was a transition of Mr. John Daly
8     leaving and Mr. Peivandi coming on board as managing
9     director?
10 A.  Yes.
11 Q.  At that time, did Mr. Peivandi, as managing director,
12    support the accommodations that she --
13 A.  If I remember correctly, he didn't really want to
14    support it; but once the Board voted, the Board almost
15    had to force him to do it, I guess.
16 Q.  So originally, you did not support it, but you came to
17    understand that she --
18 A.  She needed that person, yes.
19 Q.  And you changed your mind; correct?
20 A.  What was that?
21 Q.  You changed your mind regarding that?
22 A.  Um-hum.
23 Q.  Okay.  But it's your testimony today that the managing
24    director was forced to give Ms. Poplar accommodations?
25 A.  Yeah, 'cause he didn't really want to do it, and we --

Page 9

1  we -- the Board, when I say "we," I mean the Board, we
2  told him he had to do it.
3  Q.  And what accommodations did the Board specifically
4     make for Ms. Poplar?
5  A.  When you say what accom --
6  Q.  Let me rephrase my question.
7            Was the Human Resources administrative
8     assistant position to help Ms. Poplar and to
9     accommodate Ms. Poplar due to her disability?
10 A.  Right.
11 Q.  Does Ms. Poplar have an assistant today?  Does she
12    have that Human Resources administrative assistant at
13    this time?
14 A.  Well, she don't, she don't, and --
15 Q.  Why does she not have it?
16 A.  Simply because Fred gave her another person.  We had a
17    person that retired, Cherry Grant retired, and she --
18 Q.  Cherry Grant was the prior benefit --
19 A.  She was the benefit rep, yep, and now she's doing most
20    of Cherry Grant's responsibility, which is a full-time
21    position.  So even though we've hired -- we've hired
22    three or four different people, we've created jobs,
23    but we never filled that job.
24 Q.  Does the Board plan to fill the position because of
25    hiring, and you have not filled the position?

Page 10

1  A.  You would have to ask Fred that.  I don't know why he
2     hasn't filled it, but that is a position that should
3     be filled.
4  Q.  Do you know --
5  A.  His reason for not filling, I don't know.  I never
6     asked him; but his reason for not filling it, I don't
7     know what his reason is.  It couldn't be a good one
8     'cause she needs the -- the help.
9  Q.  How long did Ms. Poplar originally go without having
10    an assistant prior to -- so this is before she was
11    granted the assistant.  How long was it before she
12    made the request and then she was actually granted or
13    at least, in your words in your prior testimony, that
14    Fred was --
15 A.  I don't --
16 Q.  -- forced to give it to her?
17 A.  -- know exactly how long it was before she got that
18    position filled -- she had the position filled; but
19    she did get it fairly soon after -- we discussed it a
20    lot in a board meeting, and when we decided to do it,
21    I think Fred was -- that was . . .
22 Q.  So I would like you to -- can you estimate a general
23    time frame -- so if Ms. Poplar -- when was -- do you
24    remember what year she was hired?
25 A.  I -- what was that question now?

**Page 11**

1  Q.  Do you know what year Ms. Poplar was hired?
2  A.  Ms. Poplar, she didn't retire.
3  Q.  No, hired, hired.  Sorry.
4  A.  I think 2018, I think.
5  Q.  So I'm going to show you a document here, and this
6      document has previously been marked as Exhibit 5 --
7  A.  Okay.
8  Q.  -- and it's the Human Resources Administrative
9      Assistant Need Analysis, and it's dated February 8,
10     2017.  So it would have been prior?
11 A.  You know, I don't really --
12 Q.  Okay, that's fine.
13 A.  -- remember the date.
14 Q.  That's fine.  You can just say you don't recall --
15 A.  Okay.
16 Q.  -- if you don't recall.
17 A.  Okay.
18 Q.  So after Ms. Poplar is -- she receives the assistant
19     -- you testified earlier that she doesn't have the
20     assistant now.
21 A.  Um-hum.
22 Q.  Do you know how long it's been since she hasn't had an
23     assistant?
24 A.  If you can tell me when Cherry Grant retired, that's
25     when she didn't -- she hasn't had an assistant, 'cause

**Page 12**

1      that's Cherry Grant's job.  The benefit job is a
2      full-time job.  So she probably is able to do some
3      work for -- for Ms. Poplar, but not -- not what she
4      has.  She hasn't had that position filled in a while.
5  Q.  Has Ms. Poplar complained, to your knowledge, that she
6      hasn't had the assistant?
7  A.  I don't know if she complained to Fred or not, but she
8      said -- she said things to me about it because I --
9      Ms. Poplar's health is not real good, and she really
10     do need the help.  Her eyesight's bad.  She really do
11     need the help.
12 Q.  I want to switch to talking about the relationship
13     that Ms. Poplar, to your knowledge, has with the Board
14     and also Mr. Peivandi.  So how would you characterize
15     the relationship with the Board and Ms. Poplar?
16 A.  Well, the Board is -- three people on the Board are
17     fairly new, they've only been on a year; so I don't
18     know -- I don't know the relationship that she have
19     with the three Board members.  I can surmise, but I
20     don't know.
21 Q.  Okay.  And how about your relationship with Ms.
22     Poplar, do you --
23 A.  It's good.
24 Q.  -- have a good relationship with her?
25 A.  Um-hum.

**Page 13**

1  Q.  How would you characterize her work?  Would you say
2      that she --
3  A.  Well, she know her job.  She -- she -- she -- so far
4      as -- Ms. Poplar is a person, if you got legal things
5      going on in this -- in this Road Commission, she
6      should be involved in it, because she -- she really
7      knows her job.
8  Q.  How would you characterize your relationship with Mr.
9      Peivandi?
10 A.  In a word, not good -- two words, not good.
11 Q.  And why would you -- why do you make those comments
12     about your relationship with him?
13 A.  I think Mr. Peivandi, if you -- if you had a
14     disagreement with things that he wants to do, he got a
15     problem with that.  I think he -- I think personally,
16     I think he's a vindictive person.
17 Q.  So you believe that he has treated employees vindic --
18 A.  Can I expand on that?
19 Q.  Yeah, go ahead.
20 A.  I say that because I think in 2018 or 2017, I can't
21     give you a date, but Mr. Peivandi went to the -- to
22     the county commissioners to try to get me removed.
23 Q.  Why do you believe he did that?
24 A.  He wanted me gone 'cause he -- if he -- it's all about
25     doing what he wants to do, and having three folks; so

**Page 14**

1      when they called me to the County Board, I took Manna
2      Lass (phonetic) with me.
3  Q.  You stated -- your prior testimony, you stated earlier
4      that you believe Mr. Peivandi to be vindictive.  Do
5      you believe that he's acted that way with employees
6      when they have filed complaints against him?
7  A.  Yeah, I think so.
8  Q.  And would that be employees outside of -- can you
9      think of any examples outside of Ms. Poplar where he's
10     acted in a vindictive way or even if you believe he's
11     acted vindictive with Ms. Poplar?  I mean, can you
12     give me an example?
13 A.  Yeah, I think he's been vindictive with Ms. Poplar.  I
14     think --
15         THE WITNESS:  (Addressing Mr. Cascini)
16     Can we go into this?
17         MR. CASCINI:  You can answer the
18     testimony -- answer the question fully and if you
19     know.
20         THE WITNESS:  I believe that he's
21     vindictive with Ms. Poplar.  I -- you know, I guess
22     there's so much happened over that last two years that
23     I talked to Fred Peivandi about, like -- like,
24     outsourcing jobs for -- for the department ran by Kim
25     Day.

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-12, PageID.669   Filed 11/21/22   Page 6 of 28
Donna Poplar v. Genesee County Road Commission
Cloyce Dickerson

6 (15 - 18)

Page 15

1  Q.  (BY MS. LEE)  Did Ms. Day file a complaint against --
2  A.  Yes, she did.
3  Q.  -- Mr. Peivandi?
4  A.  Um-hum.
5  Q.  Did Ms. Day file a complaint against Ms. Peivandi?
6  A.  Yes.
7  Q.  And what is Ms. Day's race?
8  A.  What is that?
9  Q.  What is Ms. Days race?
10  A.  What is her rate?
11  Q.  Race.
12  A.  Oh, she's black.  And it seemed like everybody that
13     Mr. Peivandi have a problem with look like me, they're
14     black.  I'm not the only one that said that before.
15     Mr. Tom Derderian, who's a lawyer, he said that to me,
16     too.
17          MR. CASCINI:  I'm going to caution you,
18     Mr. Dickerson, please don't disclose anything that
19     would be legal advice between you and Mr. Derderian;
20     although, if it falls outside of the scope of that,
21     you're free to testify about it.
22          THE WITNESS:  Okay.
23          MR. CASCINI:  But anything that is
24     legal advise --
25          THE WITNESS:  That's why I'm asking you

Page 16

1     if I can answer these questions.
2          MR. CASCINI:  Certainly, and that's
3     understandable that you may not know that.
4          THE WITNESS:  Okay.
5  Q.  (BY MS. LEE)  You were giving me examples regarding
6     treatment you thought was unfair or possibly
7     discriminatory.
8  A.  Yeah.
9  Q.  Ms. Poplar filed a complaint, which I will show you,
10     it's exhibit -- marked as Exhibit 10.  Do you remember
11     this complaint given to the Board?  It's dated January
12     28, 2021.
13  A.  Yes.
14  Q.  And in that complaint, Ms. Poplar alleges that this
15     was a formal complaint of harassment, intimidation,
16     retaliation, differential treatment and discrimination
17     that she had been subjected to under Mr. Peivandi's
18     leadership.
19  A.  Um-hum.
20  Q.  After -- well, at the time of this complaint in 2021,
21     you were on the Board.  What was your position on the
22     Board?
23  A.  2021?  I was the chairperson.
24  Q.  Okay.  So this complaint -- how would the Board have
25     received the complaint?

Page 17

1  A.  Well, I received the complaint, and immediately I
2     called Tom Derderian, because Tom Derderian is the one
3     that -- he was the attorney at the time, so --
4          MR. CASCINI:  And just one more time,
5     Mr. Dickerson, any conversations you had with Mr.
6     Derderian concerning this complaint are covered by the
7     attorney-client privilege, and I would instruct you
8     not to answer questions about.
9          THE WITNESS:  Okay.
10  Q.  (BY MS. LEE)  So did Donna follow the complaint
11     process?
12  A.  Yes.
13  Q.  And when you received her complaint as the Board
14     Chair, you followed your process; correct?
15  A.  Right.
16  Q.  Was the complaint investigated?
17  A.  No, I don't think it was.
18  Q.  Well, did the Board -- in January of 2021, did the
19     Board hire an investigator to look into Donna's
20     concern?
21  A.  Yes.
22  Q.  So do you think -- so there was an investigator
23     hired --
24  A.  Um-hum.
25  Q.  -- and did that investigator give you a response

Page 18

1     regarding the concerns?
2  A.  He gave us a report, yes.
3  Q.  Okay.  And when you received that report, did the --
4     did the Board give Ms. Poplar a response regarding her
5     complaint?
6  A.  I'm going to say no to that.
7  Q.  Okay.  So why do you say no?
8  A.  Because I got a copy of the results of that complaint
9     when I was at a meeting with Fred and some other --
10     other commissioners.
11          THE WITNESS:  (Addressing Mr. Cascini)
12     That's okay if I answer that; right?
13          MR. CASCINI:  You can certainly answer
14     as long as it's truthful, yes.
15          THE WITNESS:  I was in a meeting with
16     -- we was in a meeting to discuss the outsourcing,
17     that I thought it was racially motivated.
18  Q.  (BY MS. LEE)  You thought what was racially motivated?
19  A.  The outsourcing of jobs for when -- actually it was
20     from one department to the outsourcing job that --
21     that people that was inspected by the outsourcing was
22     mostly Afro-American people.
23  Q.  So is your testimony today that you believe that Mr.
24     Peivandi has treated African-Americans differently?
25  A.  Yeah, in my estimation, yes.

Page 19

1  Q.   And do you believe that Mr. Peivandi, based on your
2       observation, has discriminated against Ms. Poplar?
3  A.   Yes.
4  Q.   Based on her race, has the discrimination been based
5       on her race or her disability?
6  A.   Well, on her race, I think.
7  Q.   On her race?
8  A.   Um-hum.
9  Q.   Can you give me examples, examples of times that Mr.
10      Peivandi has discriminated against Ms. Poplar?
11 A.   Mr. Peivandi gave her time off without -- without
12      going through the proper steps to give somebody time
13      off and put somebody on leave; and --
14 Q.   So this was -- what you're referring to is when she
15      was -- Ms. Poplar was suspended for two weeks?
16 A.   Um-hum.
17 Q.   What's the proper process?
18 A.   To me, I think that you should -- you should reprimand
19      people be -- you should have a progression of
20      discipline before you give people time off like that,
21      and --
22 Q.   Do you know if Ms. Poplar had ever been disciplined
23      prior to that?
24 A.   No.  When I went in, I --
25 Q.   No, she had not been disciplined?

Page 20

1  A.   She hadn't, no.  And then when she did come back,
2       he -- I don't think any of the department head had to
3       have restriction on who they could talk to.  He made
4       specifically -- he didn't want her talking to me about
5       anything unless I -- there's no other department head
6       that had restrictions on talking to their
7       commissioners, but she did.
8  Q.   So you're referring to -- are you referring to the
9       directives that were given to --
10 A.   Right, right.
11 Q.   -- Ms. Poplar on July 1st?
12 A.   I don't remember when he gave them to her, but --
13 Q.   But I'm showing --
14 A.   Yes, that is.
15 Q.   -- you now what's been marked as Exhibit 12, and this
16      is directives given to Donna Poplar from Mr. Peivandi
17      after she filed -- after the investigation that was
18      done when Ms. Poplar filed a complaint.
19 A.   Um-hum.
20 Q.   Are these the directives that you're referring to?
21 A.   Um-hum.
22 Q.   Can you speak audibly?  Please say "yes".
23 A.   Yes, I'm sorry.
24 Q.   Thank you.  When you were speaking about the
25      investigation earlier, you were saying that you don't

Page 21

1       think it was investigated.  Are you saying you don't
2       believe it was properly investigated or are you saying
3       that you didn't believe that an investigation happened?
4       Can you clarify that?
5  A.   It happened, but I don't think he invest -- I don't
6       think the investigator interviewed any of the Afro-
7       American people except for me.  I don't think he
8       interviewed but a couple people, I don't want to call
9       the names, but he didn't interview anybody but me on
10      the Afro-American side, and we was a part of -- I know
11      our name was submitted, but they didn't interview
12      them.
13 Q.   Okay.  So that is why you believe that the
14      investigation wasn't fair because --
15 A.   Yeah.
16 Q.   -- there were likely more people to be interviewed to
17      make --
18 A.   Correct.
19 Q.   -- a determination?
20 A.   Yep.  And then when -- when I talked to the
21      attorney --
22           THE WITNESS:  (Addressing Mr. Cascini)
23      Am I able to say this?
24           MR. CASCINI:  Please don't disclose any
25      communication between you and counsel --

Page 22

1           THE WITNESS:  Okay.
2           MR. CASCINI:  -- on the basis of
3      privilege.  That's why I'm here.  You're not doing
4      anything wrong.
5           THE WITNESS:  Well, that's one of the
6      reasons I think that, because when I talked to the
7      attorney, what he said to me.  I was very upset with
8      what he said, the comments that he made.  Then I find
9      out that I -- at least two people who wasn't Afro-
10     American people wasn't interviewed.
11 Q.   (BY MS. LEE)  Have you ever been privy to discussion
12      regarding terminating, firing Ms. Poplar?  Or has Mr.
13      Peivandi ever told you that he wanted to terminate Ms.
14      Poplar?
15 A.   No, I don't think he's told me that, no.
16 Q.   So after Ms. Poplar is suspended for two weeks, and
17      your earlier testimony, you said you don't believe
18      that the progressive discipline was followed, did you
19      speak with Mr. Peivandi, the managing director,
20      regarding Ms. Poplar being suspended for two weeks?
21 A.   I did.
22 Q.   Did you have prior knowledge that she was going to be
23      suspended?
24 A.   I didn't.
25 Q.   Would you normally have had prior knowledge if someone

Page 23

1 was going to be suspended at the director level?

2 A.  I think being the Chair, I should've been.

3 Q.  What did you say to Mr. Peivandi when you were notified

4 that Ms. Poplar was suspended?

5 A.  I gave him a direct order to bring her back to work.

6 Q.  And what did Mr. Peivandi say to you?

7 A.  He said he wasn't.

8 Q.  Did he give you a reason as to why he was not going to

9 bring her back to work?

10 A.  I can't remember what reason he gave me, but he said

11 he wasn't going to do it.

12 Q.  Did you speak with any other Board members regarding

13 Mr. Peivandi insubordination to you?

14 A.  Yes.

15 Q.  And how did the Board react to that?

16 A.  Well, I spoke to Ms. --

17      THE WITNESS:  (Addressing Mr. Cascini)

18 Am I loud to say her name?

19      MR. CASCINI:  You certainly are allowed

20 to give any truthful testimony.  The only thing I'm

21 ever going to give you any instruction about not to

22 say are communications with legal counsel, or

23 communications in a closed session, too, obviously --

24      THE WITNESS:  Okay.

25      MR. CASCINI:  -- under the --

Page 24

1      THE WITNESS:  Okay.

2      MR. CASCINI:  Open Meetings Act.

3      THE WITNESS:  Yeah, I talked about it

4 with John Mandelaris, and he was in agreement with me,

5 that we should bring her back to work.  We were both

6 in agreement, but we only had three votes, so -- only

7 two votes, and it takes three votes to do anything, so

8 nothing was going to happen.

9 Q.  (BY MS. LEE)  Because you knew that -- well, so you're

10 saying that Fred would've had the majority vote on the

11 Board?

12 A.  Yeah.  I think -- I think that's the reason he did it

13 because he had -- he had the backing of three other

14 votes to do whatever he wanted to do.

15 Q.  So at the time -- were you aware that -- have you ever

16 seen the Disciplinary Action Notice that Mr. Peivandi

17 gave Ms. Poplar?

18 A.  I don't remember.  I probably have, but I don't

19 remember.

20 Q.  Okay.  So I'm showing you what's marked as Exhibit 16,

21 and that is the Disciplinary Action Notice given to

22 Ms. Poplar from Mr. Peivandi regarding her two-week

23 suspension that she was given.

24      In that particular document, it

25 discusses Covid-19.  If you'll look at --

Page 25

1 A.  The mask mandate?

2 Q.  Correct.  Would you agree that Covid-19 is a matter of

3 public concern?

4 A.  Yes.

5 Q.  Would you agree that if employees are concerned about

6 matters that they should bring them up to the managing

7 director and to the Board?

8 A.  Yes.

9 Q.  Do you know what happened after Ms. Poplar was

10 suspended for two weeks?  Did she return to work?  Did

11 she return to work after her suspension?

12 A.  She returned to work.  We made a decision, like, on --

13 I don't know what date it was, but we made a decision,

14 and she was to come back the next day.

15 Q.  After the -- not after the suspension; right?  That

16 was after her administrative leave; correct?

17 A.  Um-hum.

18 Q.  Okay.  So Ms. Poplar was suspended for two weeks --

19 Q.  -- and I know it's hard to remember dates.

20 A.  Yeah.

21 Q.  -- and I know it's hard to remember dates.

22 Q.  So after Ms. Poplar was placed on suspension, she was

23 placed on administrative leave; correct?

24 A.  Um-hum.

25 Q.  And after she was placed on administrative leave --

Page 26

1 well, do you know why she was placed on administrative

2 leave?

3 A.  (No response).

4 Q.  Did Ms. Poplar file a complaint prior to -- well,

5 after her suspension?

6 A.  Yes.

7      MR. CASCINI:  I'm going object on the

8 basis of a compound question.

9      MS. LEE:  Okay.  Let me rephrase.

10 Q.  (BY MS. LEE)  After Ms. Poplar was suspended, did she

11 file a complaint?

12      THE WITNESS:  (Addressing Mr. Cascini)

13 Do I answer that?

14      MR. CASCINI:  Answer if you know, sir.

15      THE WITNESS:  I want to say she did;

16 I'm not sure.  I'm not completely sure when she filed

17 that complaint.

18 Q.  (BY MS. LEE)  Okay.  So I'm showing you what's marked

19 as Exhibit 17.  This is a -- this is addressed to you

20 as the Chair on August 26, 2021 --

21 A.  Um-hum.

22 Q.  -- and this is a complaint from Ms. Poplar; correct?

23 A.  Um-hum.

24 Q.  Okay.  And did that refresh your memory?

25 A.  Yep.

Page 27

```
 1              (Discussion between Ms.
 2  Lee
 3              and Ms. Gafkay.)
 4  Q.   (MS. LEE)  Okay.  Mr. Dickerson, I'm going to just
 5       make sure that when I ask you a question that you say
 6       yes, because you're doing um-hum.
 7  A.   Yeah, I'm sorry.
 8  Q.   I'm just not catching it.
 9  A.   I'm sorry.
10  Q.   So on August 26, 2021, Ms. Poplar, well -- strike
11       that.
12              Exhibit 17, this is --
13  A.   Yes.
14  Q.   -- a complaint that Ms. Poplar filed and was given to
15       you; correct?
16  A.   Yes.
17  Q.   And the basis of this complaint was that Ms. Poplar
18       was still being discriminated against; correct?
19  A.   Right.
20  Q.   And she also complained -- did she also complain about
21       her suspension?  And I'll let you take a look at it.
22  A.   (Reviewing document.)
23  Q.   You can turn the page.
24              MR. CASCINI:  I'll object to the
25       question on the basis the document speaks for itself.
```

Page 28

```
 1              THE WITNESS:  I have to go into it.
 2  Q.   (BY MS. LEE)  No, you take your time.
 3  A.   (Reviewing document.)
 4  Q.   Thank you.  So Donna filed a complaint about her
 5       two-week suspension; correct?
 6  A.   Yes.
 7  Q.   And she followed the policy when she filed this
 8       complaint?
 9  A.   Yes.
10  Q.   And what did the commissioners do about this complaint
11       or the Board of Commissioners, I should say?
12  A.   We didn't do anything.  We didn't do anything.  We --
13       we allowed Fred to do whatever he wanted to do.
14  Q.   And what did Mr. Peivandi do after Ms. Poplar filed
15       her complaint?  Was she placed on administrative
16       leave?
17  A.   Yes, she was placed on administrative leave.  I don't
18       know how -- the depth of that leave she was on.
19  Q.   How long -- or I'm sorry, you said you don't know how
20       long it was.
21  A.   Um-hum.
22  Q.   Were you Board Chair at this time?
23  A.   Yes.
24  Q.   How long have you been -- or how long have you
25       performed the duties of Board Chair?
```

Page 29

```
 1  A.   For the whole year; so till 2022, January.
 2  Q.   And prior to being Board Chair, were you in any other
 3       capacity --
 4  A.   Actually I served two terms as Board Chair, um-hum.
 5  Q.   Okay.  Going back to -- you said in earlier testimony
 6       that Donna does her job?
 7  A.   Um-hum, yes.
 8  Q.   Do you think she does a good job?
 9  A.   I think she do a good job, yes.
10  Q.   And do you have any problems with her performance?
11  A.   No.
12  Q.   Do you believe she's an asset to the Road Commission?
13  A.   I believe she is.  She's got a lot of knowledge of --
14       about human resource, more than anybody on the
15       complex.  I don't think there's anybody here that
16       would know as much about Human Resources as Donna
17       Poplar.  She do a good job.
18  Q.   Do you know if she has instituted any cost savings
19       regarding -- with the Road Commission?
20  A.   I think she has, but I'm not -- I can't go over -- I
21       can't speak to when and where.
22  Q.   Can you tell us about any -- any helpful things you
23       may know that Donna has done at the Road Commission?
24       Can you tell us about any highlights or helpful things
25       that Donna has done at the Road Commission in --
```

Page 30

```
 1  A.   I think she --
 2  Q.   -- her capacity as HR director?
 3  A.   Yes.  I think she was real good initiating the mandate
 4       for the mask, and there wasn't -- and she went through
 5       the proper procedures to do it.  She -- she contacted
 6       attorneys and MIOSHA.  It just wasn't her decision.
 7       It was the Board and Fred and everybody here; that was
 8       all our decision.
 9  Q.   Do you remember a instance where Ms. Poplar was denied
10       the opportunity to present before the Board?
11  A.   I can't tell you the exact date, but, yes, I can.
12  Q.   Has any other director been allowed to present before
13       the Board?
14  A.   Yes.
15  Q.   And who was that director?
16  A.   I think Randy was.
17  Q.   And so Mr. Dellaposta --
18  A.   Um-hum.
19  Q.   -- has had an opportunity to present before the
20       Board --
21  A.   Right.
22  Q.   -- and Ms. Poplar has not?
23              Do you know who made those decisions to
24       allow someone -- or a director to present --
25  A.   Mr. Peivandi.
```



Page 31

1 Q. Okay. Can you tell me what race Mr. Dellaposta is, do
2 you know?
3 A. He's Caucasian.
4 Q. Okay. Earlier you testified about saying that Ms.
5 Poplar has a medical condition or at least you were
6 referring to her disability, her vision.
7 When you said she needs help, you mean
8 that, like, currently?
9 A. Yeah, she still needed help, yes. When you take away
10 a person's full-time person that helps her, she needs
11 help. I'm sure she --
12 Q. But this full-time person you're referring to is the
13 HR administrative assistant; correct?
14 A. Right.
15 Q. That the Board -- and the Board put this
16 administrative assistant in place for accommodating
17 Donna's disability; correct?
18 A. Yes.
19 Q. And to your knowledge, you have no -- at least from
20 the Board, you have not -- the Board has not made a
21 decision to remove --
22 A. No.
23 Q. Okay. -- to remove the HR person?
24 A. No.
25 MS. LEE: All right. We've been

Page 32

1 talking for almost an hour. So I'm going to -- we're
2 going to take a quick five-minute break, and we'll be
3 back.
4 (Recess taken.)
5 MS. LEE: We can go back on the record
6 now.
7 Q. (BY MS. LEE) Thank you for the time. I have some
8 more questions for you, and I'll try to make it quick;
9 okay?
10 A. Okay.
11 Q. Earlier you testified that you were the Chair for two
12 years?
13 A. Right.
14 Q. Can you tell me about your responsibilities as Chair,
15 such as, you were responsible for the complaint
16 procedure --
17 A. Right.
18 Q. -- or part of the -- receiving complaints, things like
19 that?
20 A. You know, I don't like to get into the actual running
21 of the Road Commission. I mean, I want -- we have a
22 lot of experienced people here. A lot of people can
23 do their jobs, they just need to be left alone to do
24 it; and when I see that that's not happening, then I
25 kind of speak up about it. But I just kind of just --

Page 33

1 I talk to a lot of people. I talk to a lot of
2 employees. I get a lot of phone calls from employees,
3 especially when they -- when they -- Fred outsourced
4 those jobs, I got a lot of complaints about why he was
5 doing it, you know.
6 Q. So you essentially were responsible for oversight?
7 A. Um-hum.
8 MS. GAFKAY: Is that a "yes"?
9 THE WITNESS: Yes, I'm sorry.
10 Q. (BY MS. LEE) And you have responsibility for Fred as
11 an employee as a managing director; correct?
12 A. Actually Fred is the Board's employee.
13 Q. Yes.
14 A. They can fire him or whatever, discipline him or
15 whatever. That comes from the Board.
16 Q. So when you were Chair, did you -- you stated earlier
17 that you would -- it was your managing style to leave
18 employees alone unless they really needed your
19 assistance.
20 A. Right.
21 Q. So how often did you need to assist Fred when you were
22 in communication with him? How often did you talk to
23 him?
24 A. Fred, before he became manager, I used to talk to him.
25 We used to go to lunch at least once a month, go to

Page 34

1 breakfast, and it was all about making more money with
2 Fred. You know, he wanted to make -- he thought he
3 should be making more. So we would talk, and that was
4 why he would meet with me, he want to make more money,
5 and I --
6 Q. Was this while he was managing --
7 A. Before he became managing director, he was Engineer
8 director at the time, yep.
9 Q. And when you did talk with him when he was managing
10 director, it was more employer/employee? How often
11 did you see Fred or talk to Fred?
12 A. Not a whole lot.
13 Q. But you would see him at the Board meetings; right?
14 A. Yeah.
15 Q. And he would advise you of employee situations
16 or . . .
17 MR. CASCINI: Objection; foundation.
18 THE WITNESS: Okay.
19 MR. CASCINI: You can answer if you
20 know, certainly.
21 THE WITNESS: Okay. Fred -- I think
22 Fred's biggest problem is, he don't know how to deal
23 with people, you know. Like, Fred, if it's not his
24 way, he's got a problem. He don't know how to work
25 out -- in his mind, it's just he's the boss and just

Page 35

1  that's the way it is. I think that's what -- that's
2  why -- when Fred became managing director, he learned
3  how to politic and so he can get three votes, and
4  that's all that mean anything to him, is having three
5  votes.
6  Q.  Would you say that you got to learn Fred -- or
7  understand Fred during your time as the Board Chair?
8  Is this where your -- this assertion is coming from?
9  A.  I think that even before I became Chair, when Fred and
10  I would go out to eat lunch or breakfast, and he
11  wanted -- he wanted to make more money, and I think
12  that the driving force behind that is that he think he
13  should be making more money than Anthony Branch.
14        Now, I don't know if that's the truth,
15  that's my opinion, that's only my opinion, that he
16  wanted to make more money than Anthony Branch because
17  of--
18  Q.  What is Anthony Branch's race?
19  A.  He's Afro-American.
20  Q.  Okay.
21  A.  And I think that's one of the reasons.
22  Q.  Okay.
23  A.  From what -- you know, I always say to Fred, I said --
24  and I've said it more than once, I said, "Fred, I
25  don't really know if you're a racist person, but you

Page 36

1  do racist things."
2  Q.  Okay. So how did Mr. Peivandi respond when you said
3  that to him?
4  A.  Well, I think I said that to him in a public meeting,
5  a public setting. I don't know if he said anything.
6  I don't think he responded at all. But I've said that
7  when -- when we had a meeting --
8        THE WITNESS: (Addressing Mr. Cascini)
9  Am I allowed to go through that, a meeting -- a
10  reorganization meeting?
11        MR. CASCINI: You can testify
12  truthfully to the questions that are presented.
13        THE WITNESS: Okay. Can you ask the
14  question? I'm sorry.
15  Q.  (BY MS. LEE) You said that you don't know whether
16  Fred was a racist but he does what you consider to be
17  racist things?
18  A.  Right.
19  Q.  So it seems like you were going to be giving examples
20  of that.
21  A.  Yep.
22  Q.  So what about the reorganization?
23  A.  The reorganization chart where they -- their
24  reorganization chart, I -- we had a meeting. We voted
25  to have a special meeting; right? And it turn out to

Page 37

1  be -- turn out to be a workshop, and I didn't get --
2  it was out in Grand Blanc. Instead of having the
3  meeting here, we had it in Mundy Township in Grand
4  Blanc. So instead of -- and, you know, I was kind of
5  upset because if we was going to have a meeting or
6  workshop, we should have it here; and I was upset that
7  we didn't have all the directors at that workshop. If
8  you're going to have a workshop and it's going to
9  affect those people, why don't you have all the
10  directors in the workshop.
11  Q.  So there were some directors there?
12  A.  There were no directors there. And I asked for a copy
13  of -- I asked for a copy of the response from all of
14  those directors, I haven't gotten that yet, because I
15  wanted to know what -- how they felt about the
16  reorganization.
17        In my mind, when I took one look at
18  that, I have never been associated with a -- with a --
19  any kind of group that we had -- we had an agenda --
20  if we had an agenda, I had that agenda before that
21  meeting. I didn't get an agenda when I got to the
22  meeting. That's the first time that ever happened to
23  me.
24        So when I looked at the reorganization
25  chart, I could see the only people that was -- that

Page 38

1  this chart is going to affect was mostly Afro-American
2  people.
3  Q.  Who were those African-American people?
4  A.  Human Resource and --
5  Q.  So the Human Resources director was Donna Poplar and
6  who else?
7  A.  Anthony Branch, who was the Maintenance person.
8  Q.  And this is -- this reorganization was going to
9  negatively affect them?
10  A.  In my opinion; and I'll tell you why.
11  Q.  Okay, why, please?
12  A.  Randy kept talking about when Anthony Branch was going
13  to retire; right. He kept, you know, like, they going
14  over why they was doing this reorganization; and most
15  of it was going to take place when Anthony Branch had
16  gone and Donna is gone and somebody else is replaced.
17  Q.  So Mr. Dellaposta was speaking at this --
18  A.  He was speaking.
19  Q.  He's a director; right?
20  A.  Yes.
21  Q.  So he was present at the meeting?
22  A.  No, he's not a director. He's -- what do you call it?
23  Q.  Managing deputy director?
24  A.  Deputy director.
25  Q.  Deputy director?

Page 39

1  A.   Yep.  So I was upset that when I looked at that chart
2       and I could see the two Afro-American people was the
3       ones affected most, and when I say affected most, I
4       mean, they was losing some of the responsibilities
5       that they have; like -- like, Donna would losing the
6       health and safety, they report to her, health and
7       safety report to her.
8            Anthony Branch, when he retire, they
9       going to have two superintendents that's going to be
10      -- it's going to come out of Engineering.  So that
11      eliminates -- Anthony Branch has got the largest
12      department here, and he's got the most Afro-American
13      working in this location.  When he retire, that job's
14      going to go away.  There's never going to be another
15      Anthony Branch, a black person in that position,
16      because it's going to come from Engineer; that job is
17      going to be reporting to Engineer.
18 Q.   So you believe -- do you believe these actions were
19      racially motivated?
20 A.   I said that.  That's the first thing I said, and they
21      said I was out of order.  It's the first time out of
22      30-some years, I never been called out of order.  I
23      was out of order because I asked the question on
24      why -- why we have -- we was having a workshop and
25      didn't have the people that -- the directors in their

Page 40

1       workshop.
2            I asked for a copy of their response
3       'cause I asked for a copy of the union response and
4       other directors' response.  I never got it.  I haven't
5       gotten a copy yet.
6  Q.   Did you already -- did the Board already review this
7       reorg -- well, you said you didn't review it.  Did the
8       Board vote on this reorganization?
9  A.   I don't know because I wasn't at the last meeting, and
10      I did talk to Mr. Mandelaris, but I didn't ask him
11      about that.  But I know that -- I do know that the
12      County Board did ask for the same thing I asked for.
13      They asked for a copy of the response from all the --
14      all the union and -- and the directors.  I don't know
15      if they got it.  I didn't get a copy, so I don't know.
16 Q.   Why did the County Board ask for it?
17 A.   Because we work for -- we, as Commissioners, work for
18      the County Board.  We are appointed by the County
19      Board, and the pastors -- three of the pastors was at
20      that meeting, and they -- that's what they asked for,
21      too.
22 Q.   So I want to somewhat pivot here to just ask you some
23      more.  You said some of the actions, you believe, have
24      been racially motivated?
25 A.   Right.

Page 41

1  Q.   So do you have knowledge about Donna's August
2       suspension, right, where she was disciplined and put
3       on unpaid suspension?
4  A.   Um-hum.
5  Q.   "Yes"?
6  A.   Yes, I'm sorry, yes.
7  Q.   Okay.  And who was the decision-maker as to that
8       decision for her being on unpaid suspension?
9  A.   I think it was Fred.  I'm not sure.  I don't know.  I
10      think it was Fred.  I'm not sure.
11 Q.   As the managing director, he was?
12 A.   Um-hum.
13 Q.   Was that after she made a formal race discrimination
14      complaint?
15 A.   I'm not sure if that -- I think it did, but I'm not
16      sure.  I don't want to say yes if it wasn't.
17 Q.   So she gave -- made a complaint, as you saw in
18      exhibit -- I can show you again.
19           All right.  Here it is, Exhibit 10.
20      This is dated January 28, 2021.  That is Donna's -- or
21      Ms. Poplar's race discrimination complaint given to
22      you as the Board Chair --
23 A.   Um-hum.
24 Q.   -- in January of 2021?
25 A.   Um-hum.

Page 42

1  Q.   So when Donna was placed on suspension in August of
2       2021, this was after she made a formal race
3       discrimination complaint; correct?
4  A.   Yes.
5  Q.   Okay.  And do you believe that Donna Poplar was
6       disciplined and put on unpaid suspension in
7       retaliation for her race discrimination complaint?
8  A.   Yes, I believe that; yes.
9  Q.   Before Donna was disciplined, do you recall she --
10      well, before she was disciplined, do you recall she
11      received directives from Mr. Peivandi?
12 A.   Directives?  Like, what kind of directives?
13 Q.   The directives not to speak to the Board --
14 A.   Um-hum.
15 Q.   -- or not to complain to the Board?
16 A.   Yes.
17           MR. CASCINI:  Objection; assumes facts
18      not in evidence.
19 Q.   (BY MS. LEE)  Okay.  Was the Board involved in any
20      directive given to Ms. Poplar?
21 A.   No.
22 Q.   Are you aware of directives that have been given to
23      Ms. Poplar by Mr. Peivandi?
24 A.   Yes, he did give directives.
25 Q.   Written directives?

Page 43

1　A.　Right, right.

2　Q.　And those directives -- those directives were -- part

3　　　of those directives were that Donna was not to

4　　　complain to the Board about Mr. Peivandi unless she

5　　　talked to him first or -- strike that.

6　　　　　Part of those directives were, Donna

7　　　was not supposed to talk to the Board or complain to

8　　　the Board; correct?

9　　　　　MR. CASCINI:　Objection; assumes facts

10　　　not in evidence, misstates the document, the document

11　　　speaks for itself.

12　Q.　(BY MS. LEE)　Okay.　To your knowledge, was Fred the

13　　　decision-maker as to those directives?

14　A.　To my knowledge, yes.

15　Q.　And this is Exhibit 13, which is the directives given

16　　　to Donna Poplar from Mr. Peivandi.

17　A.　Yes.

18　Q.　In those directives, did Fred Peivandi deny Donna

19　　　Poplar the opportunity to go to the Board directly

20　　　with concerns related to him?

21　　　　　MR. CASCINI:　Objection; the document

22　　　speaks for itself.

23　Q.　(BY MS. LEE)　You can still answer.

24　A.　Hum?

25　Q.　You can still answer.

Page 44

1　　　　　MR. CASCINI:　You may.

2　　　　　THE WITNESS:　I can answer?

3　　　　　MR. CASCINI:　Yes, answer if you know.

4　　　　　THE WITNESS:　Yes.

5　Q.　(BY MS. LEE)　Did that concern you?

6　A.　Yes.

7　Q.　Do you believe that those directives were for the

8　　　purpose of stopping communication between you and

9　　　Donna or anyone else on the Board?

10　A.　I think if you're going to give directives to one of

11　　　the five directors, you should give it to all of them.

12　　　So yes.

13　Q.　Do you believe that it was inappropriate for Mr.

14　　　Peivandi to give her those directives?

15　A.　Yes.

16　Q.　Do you believe that those directives affected her

17　　　terms and conditions of employment -- of her

18　　　employment in a negative way?

19　A.　I think so.

20　Q.　Do you believe it was racially motivated?

21　A.　Well, she --

22　Q.　Do you believe that the directives that were given to

23　　　Donna Poplar were racially motivated?

24　A.　Yes.

25　Q.　Do you believe that they were made to be punitive as a

Page 45

1　　　punishment?　So she's filed a complaint, she's been

2　　　given directives.

3　A.　Yes.

4　Q.　Do you believe that the directives were in retaliation?

5　A.　Yes.

6　　　　　MR. CASCINI:　Objection; asked and

7　　　answered.

8　　　　　THE WITNESS:　Okay.

9　Q.　(BY MS. LEE)　Do you believe that Mr. Peivandi is

10　　　racially biased towards Donna Poplar?

11　　　　　MR. CASCINI:　Objection; asked and

12　　　answered.

13　Q.　(BY MS. LEE)　You can answer.

14　A.　Yes.

15　Q.　Do you believe Donna Poplar has been treated

16　　　differently because of her race in a negative way?

17　A.　Yes.

18　Q.　Have you witnessed that Fred Peivandi's -- have you

19　　　wit -- I'm sorry, let me rephrase.

20　　　　　Have you witnessed that Fred Peivandi's

21　　　discriminatory conduct towards Donna has caused Donna

22　　　harm?

23　　　　　MR. CASCINI:　Objection; assumes facts

24　　　not in evidence.　You can answer if you know.

25　　　　　THE WITNESS:　In my opinion, yes.

Page 46

1　Q.　(BY MS. LEE)　So Donna describes the harm caused to

2　　　her as Fred having his knee on her neck, as if she

3　　　can't breathe.　Would you agree?

4　　　　　MR. CASCINI:　Objection; vague.

5　Q.　(BY MS. LEE)　From what witnessed -- you previously

6　　　testified that you witnessed that Mr. Peivandi's

7　　　retaliatory and discriminatory conduct towards Donna

8　　　has caused her harm.

9　　　　　And so earlier you testified that you

10　　　received complaints in your capacity as Board Chair.

11　　　And if you take a look at Exhibit 10, if you look at

12　　　the first two paragraphs --

13　A.　(Reviewing document).

14　Q.　And then if you look at the reference to Ms. Poplar,

15　　　she states here, the second to the last paragraph.

16　　　Will you read that out loud for the record?

17　A.　"Today, I feel like I am the George deployed in GCRC,

18　　　and Fred Peivandi has his knee on my neck, and I am

19　　　crying out, 'I Can Not Breathe.'"

20　Q.　Would you agree with that assertion or would you agree

21　　　that Mr. Peivandi has taken several actions to -- of

22　　　discriminatory and retaliatory behavior towards Ms.

23　　　Poplar?

24　　　　　MR. CASCINI:　Objection; asked and

25　　　answered.

Page 47

1       THE WITNESS: He didn't have that

2 directive to any other directors; yes.

3 Q. (BY MS. LEE) Do you believe that Mr. Peivandi is a

4 truthful person?

5 A. No.

6 Q. And why do you say that?

7 A. I can give you one instance. When I went in to -- to

8 tell him -- to give him a direct order to bring Donna

9 back to work, I think that he had you (referring to

10 Mr. Cascini) to write a complaint --

11       MR. CASCINI: I'm going to ask you

12 again not to disclose any information either that Fred

13 has communicated to you regarding communications

14 between GCRC's attorney or any communications you have

15 had with GCRC's attorney.

16       THE WITNESS: I can't answer that,

17 then.

18 Q. (BY MS. LEE) Okay. Well, I have you -- so earlier I

19 asked you, did you believe Mr. Peivandi is a truthful

20 person, and you said no.

21 A. I'm not the only one think he's not truthful.

22 Q. Who else thinks he's not truthful?

23 A. I can't . . .

24 Q. Well --

25 A. I mean, I've set in Fred's office --

Page 48

1       THE WITNESS: (Addressing Mr. Cascini)

2 And that's attorney-client privilege.

3 Q. (BY MS. LEE) So you can't --

4       THE WITNESS: -- is that --

5       MR. CASCINI: Correct. Any privileged

6 statements have been made, I would ask that you not

7 answer them --

8       THE WITNESS: Okay.

9       MR. CASCINI: -- or provide information

10 about those communications.

11       THE WITNESS: Okay.

12 Q. (BY MS. LEE) So in these conversations, were you

13 seeking legal advice from this particular attorney or

14 were you talking to them? If you're talking to them,

15 it's not -- unless you're seeking legal advice.

16       MR. CASCINI: Well, I'm going to step

17 in, and I'm going to give you an instruction not to

18 answer if it's a conversation you had with your

19 attorney about subjects of either policymaking at GCRC

20 or legal issues about GCRC.

21       MS. LEE: So we want to make sure that

22 everyone protects confidential communications, right.

23 Q. (BY MS. LEE) So I understand that you said that Fred

24 isn't -- you don't believe that Fred is a truthful

25 person?

Page 49

1 A. No.

2 Q. And some of the examples you'd like to share with me

3 may be confidential.

4       So I'm going to go back and ask you a

5 little bit more about the previous question I asked

6 you when you stated that -- when I asked about the

7 conduct that made you believe that Fred's behavior has

8 been retaliatory and discriminatory. Earlier you

9 mentioned an example of the reorganization that is to

10 happen --

11 A. Um-hum.

12 Q. -- that will take away --

13 A. Responsibility from Afro-American employees.

14 Q. What other examples regarding Ms. Poplar can you

15 recall or Fred's behavior towards Ms. Poplar?

16 A. Well --

17       MR. CASCINI: Objection; compound.

18 Q. (BY MS. LEE) You can answer.

19 A. Not having her address -- not letting her address the

20 Board --

21 Q. Okay.

22 A. -- or not -- not being a part of, since she's Human

23 Resource, not being a part of planning an organization

24 chart. She didn't have anything to do with that, and

25 I thought that, in her position, being the Human

Page 50

1 Resource person, she should've been -- she should've

2 been involved in that.

3 Q. Have there been other instances --

4 A. Yes.

5 Q. -- where Ms. Poplar has not been involved?

6 A. Yes. When we had a search for another attorney,

7 another --

8 Q. Like a law firm?

9 A. Firm, and I asked purposely that Human Resource be

10 involved in that search, and she wasn't.

11 Q. Did you ever ask why she was not involved in the

12 search?

13 A. Well, it never -- that was my condition of agreeing, I

14 wanted her to be involved. They said she was going to

15 be involved, and she wasn't.

16 Q. Who said she was going to be involved?

17 A. Fred did.

18 Q. And how did you find out she was not involved?

19 A. Well, when they went out and did the search, and she

20 was -- when they brought the report back, she was

21 never involved in it, and I thought she should have

22 been involved.

23 Q. Okay. Can you tell me about any other time where Fred

24 has involved race with work actions, like

25 disciplinary -- like disciplining employees or --

Page 51

1    well, scratch that.  I will ask you a better question.
2            Are you aware of a list that was given
3    to Mr. Peivandi regarding employees' names and race?
4    A.   Yes.
5    Q.   And do you know how Mr. Peivandi came to locate or
6    have that particular document?
7    A.   I don't know if he requested it through -- through
8    personnel -- I mean, Human Resource, but they -- he
9    asked for a list, and they gave him a list, and then
10   he resubmitted a list by color.  He wanted the list of
11   employees by color, and that was very upsetting to me.
12   Q.   And did Human Resources report that Mr. Peivandi
13   requested this list?
14   A.   I don't remember how I got the -- how I got the word,
15   you know, it's been a couple years.  I didn't know how
16   I got it, but I did approach Mr. Peivandi on it.  He
17   couldn't really give me a definitive answer about why
18   he needed to have a list of employees by color.  He
19   couldn't -- he couldn't give me a reason why he needed
20   that.
21   Q.   Did he ever say that Donna recommended giving him the
22   list with race?
23   A.   Hum?
24   Q.   Did he ever tell you that HR just gave him the race or
25   that Donna gave him the list with names and race on

Page 52

1    it?
2    A.   No.  I can say why I was upset about why he asked for
3    that list, is because when -- when Anthony Branch
4    disciplined people, Mr. Peivandi lessened the penalty
5    when it's people -- when the white people are
6    disciplined, he lessened the penalty for them, and he
7    don't do the same thing for black employees.
8            Like, if Anthony gave somebody two
9    weeks, just for instance, Anthony gave somebody two
10   weeks, he would cut it down to a week, but he never do
11   that when it comes to black employees.
12   Q.   Did Ms. Poplar ever complain about Mr. Peivandi using
13   the list?
14   Q.   Using what?
15   Q.   Using the list to discipline individuals?
16   A.   Not that I can recall.  I just remember that he do
17   make a difference when it come to penalizing.
18   Q.   So the list would have been by your --
19   A.   Well, the first thing I thought about, 'cause, if you
20   penalizing people and you got a list of people,
21   employees by color, and you got a habit of taking away
22   penalties from one -- one group of people than
23   another, that's playing favoritism to me.
24   Q.   Can you tell me about, do you believe that these
25   inequities are present in the budget or raises?

Page 53

1    A.   Yes.
2    Q.   So you believe that African-Americans receive, or
3    directors in this instance, will receive a lower pay
4    raise than their subordinate --
5    A.   Sure.
6    Q.   -- excuse me, not subordinate -- their white
7    counterparts?
8    A.   Sure.
9    Q.   Can you give me any examples of that?
10   A.   Well, we have five directors, right, five directors.
11   Three of those directors got a significant amount of
12   money more than the two black directors.
13   Q.   When was this, the previous budget?
14   A.   Yep, yes.
15   Q.   How much did the black directors receive?
16   A.   I think one percent and two percent, I think.  I'm not
17   sure, but it wasn't much in -- compared to what their
18   white counterparts received; and I voted against that
19   budget -- because of that, I voted against the budget.
20   Q.   Do you know -- in the past, have directors received --
21   A.   No.
22   Q.   -- similar --
23   A.   In the past when John Daly was here, one thing that he
24   did was, he paid all the directors the same.
25   Q.   And the same race as well?

Page 54

1    A.   Yep.
2    Q.   And when Mr. Peivandi took over as managing director,
3    he did not keep that same --
4    A.   No, no.
5    Q.   Okay.  And it was clear to you that the black
6    directors received less wage --
7    A.   A lot less, yes.
8    Q.   Do you know what the motivation was that for (sic)?
9    Were they having performance issues or --
10   A.   No performance issues that I know, no.
11   Q.   Had the directors participated in protective activity,
12   meaning, have they filed complaints or had they had --
13   well, had they filed complaints?
14   A.   I'm sure; I'm sure.
15   Q.   Okay.  So both -- to your knowledge, both Donna Poplar
16   and the managing director have filed complaints
17   against the Road Commission?
18   A.   Not the managing director.
19   Q.   I'm sorry, not the managing director?
20   A.   The Maintenance director.
21   Q.   The Maintenance director, which is Anthony Branch?
22   A.   Right.
23   Q.   And Donna Poplar?
24   A.   Right.
25   Q.   Is there anything else that you want to tell me about

Case 2:21-cv-12568-VAR-JJCG  ECF No. 23-12, PageID.679  Filed 11/21/22  Page 16 of 28
Donna Poplar v. Genesee County Road Commission
Cloyce Dickerson

16 (55 - 58)

Page 55

1  the budget regarding -- or the raises?  Was there any
2  other reason that it could be formidable in your mind
3  that it would have been fair to pay Donna Poplar a
4  two-percent raise and Anthony Branch a one percent
5  raise?
6  A.  No, just that it wasn't fair at all that -- that
7  budget wasn't fair, and I let them know how I felt
8  about it; but when you got three votes, you can just
9  -- you can do what you want to do if you're the
10  director.
11  Q.  Do you believe that they were paid less, "they" being
12  Donna Poplar and Anthony Branch, because of their
13  race?
14  A.  I have no other reason to believe anything different.
15  Q.  So that's a yes?
16  A.  Yes.
17      MR. CASCINI:  Objection; misconstrues
18  prior testimony, but I'm not sure I got it in there.
19      MS. LEE:  You can go ahead.
20      MR. CASCINI:  Charis, do you mind, I
21  need a few minutes, maybe three.
22      MS. LEE:  Sure, that's fine.  Take your
23  time.
24      (Recess taken.)
25      MR. CASCINI:  Let's go back on the

Page 56

1  record.
2      EXAMINATION
3  BY MR. CASCINI:
4  Q.  Commissioner Dickerson, you know who I am?
5  A.  Yeah.
6  Q.  My name is Andrew Cascini.  I'm here representing GCRC
7  in defending this deposition today, and I'm going to
8  have an opportunity to ask you some questions here,
9  too --
10  A.  Okay.
11  Q.  -- about concerns about some of the testimony that
12  you've given in this case and some of the questions
13  that you've been asked.
14  A.  Okay.
15  Q.  How are members of the Genesee County Board of Road
16  Commissioners, how are they appointed to the Board?
17  A.  How are members -- the Commissioners here appointed by
18  the Board?
19  Q.  Correct.
20  A.  By the Genesee County Board.
21  Q.  Is there a nomination process and then a vote or does
22  the Board as a whole decide who's on it?
23  A.  I guess you put an application in, and they -- they
24  vote on you.
25  Q.  Fair enough.  Is Fred on the Genesee County Board?

Page 57

1  A.  No; just the five commissioners.
2  Q.  Well, how many commissioners are there on the Genesee
3  County Board as distinguished from the Road
4  Commission?
5  A.  Oh, seven.
6  Q.  Seven?
7  A.  Seven or eight.  I'm not sure.
8  Q.  Okay.  And Fred is not a member of that Board; right?
9  A.  No.
10  Q.  You mentioned that you had a professional relationship
11  with Fred Peivandi when he was the Maintenance
12  director of the Road Commission; is that correct?
13  A.  Professional?
14  Q.  Correct.
15  A.  Professional relationship with Fred?
16  Q.  I'm sorry, I said Maintenance director; I meant
17  Engineering director.  Let me back all the way up and
18  rephrase so the record's clear.
19      You testified earlier that you had a
20  professional --
21  A.  Well, we would go out for lunch or breakfast, yes.
22  Q.  And Fred mentioned during these meetings, I believe he
23  testified frequently that he wished to be paid more;
24  is that right?
25  A.  Yes.

Page 58

1  Q.  And you also mentioned that he wished to be paid, in
2  your opinion, more than Anthony Branch, who's the
3  Maintenance director?
4  A.  He didn't tell me that, but other people -- you know,
5  when you listen to other people, and I know he wanted
6  to be paid more.  That was just my opinion that he
7  wanted to be paid -- he wanted to make more than
8  Anthony Branch.
9  Q.  So he didn't tell you that at any point?
10  A.  No, no.
11  Q.  Did anybody tell you that Fred had told them that he
12  wanted to make more than Anthony Branch?
13  A.  I can't remember.  People tell you so much, and it's
14  been so long, so, you know, I can't definitively say
15  that, that it happened.
16  Q.  Okay.  But Anthony Branch made more than him at that
17  point; is that correct?
18  A.  I think he and Anthony Branch were making the same
19  salary at that point, because John Daly tried to keep
20  all the -- all the directors the same -- the same.
21  Q.  Okay.
22  A.  Close to the same.
23  Q.  To the extent -- do you know whether the GCRC keeps
24  pay records of how much various people were making
25  during various years of their employment?

Page 59

1  A.  No.
2  Q.  To the extent that GCRC did keep records of what
3      employees were making during various years of their
4      employment, did you have any reason to doubt that
5      those were accurate?
6  A.  No, I guess I wouldn't; no.
7  Q.  Do you know how much Anthony Branch makes now?
8  A.  I don't know.  I really don't keep up with how much
9      they make, and I don't know.  I could probably guess,
10     a pretty good guess how much he's making.
11 Q.  I understand.  I don't actually need you to speculate;
12     that's okay, and that's understandable, and that's a
13     lot of oversight you have.
14         Do you know how much the Finance
15     director, Tracy Kahn, is making now?
16 A.  No.  I know she's got a couple of raises in the last
17     -- in the last couple years.  She only been here about
18     three years.  So, yes, I know she's got a couple
19     raises.
20 Q.  Do you know how much money she was making prior to
21     getting the couple of raises?
22 A.  No, I don't.
23 Q.  Do you know how much money she's making now?
24 A.  No, I don't how much she's making now, no.
25 Q.  I understand.

Page 60

1  A.  Not right offhand, I don't know.  I probably got that
2      information, but I'm not sure how much she make.
3  Q.  Understandable.  Pay records would reflect that that
4      GCRC maintains; is that right?
5  A.  Yes.  But I do know that when she came here -- can I
6      expand on that?
7  Q.  You can answer if you know.
8  A.  When she came here, Donna wanted to pay her more when
9      she came; when she got the job, Donna wanted to pay
10     her more, and Fred didn't want to pay her more.
11 Q.  Ah.  Fred wanted to pay her less than what Donna had
12     recommended?
13 A.  Right.
14 Q.  Right now do you know how much money Donna Poplar
15     makes in salary a year?
16 A.  No, I don't know how much they make.
17 Q.  Sure.  The same question, but for your Engineering
18     director?
19 A.  I don't know how much they made -- how much they make.
20     It's just -- my problem is how much the Engineer
21     director make; the raise that he got in that budget, I
22     don't think it was fair, 'cause I think that he --
23     he's an Engineering director, and he's the highway
24     engineer or something, they get -- and Fred -- that's
25     his responsibility; and in that budget, we gave him

Page 61

1  $15,000 dollars more to do that, and I didn't agree
2  with that because when he fill out an application for
3  that job, that's part of his responsibility.  Fred
4  just didn't give it to him, and that was my reason for
5  disagreeing with that, because that was his
6  responsibility when you look at his job
7  responsibilities.  I didn't think we should have to
8  pay him another $15,000 to do that.
9  Q.  Now, I understand, and thank you for that testimony,
10     that's very helpful for helping us to understand the
11     background; but very simply, Mr. Dickerson, do you
12     know how much money your Engineering director
13     currently makes in salary?
14 A.  No, I don't know how much they make, no.
15 Q.  Do you know how much it was prior to the $15,000 you
16     testified about?
17 A.  No.
18 Q.  You mentioned a little bit earlier this deal about 15K
19     coming from the county highway engineer?
20 A.  Um-hum.
21 Q.  Explain that to me a little bit.  What is the county
22     highway engineer?
23 A.  The county highway engineer is the one -- each Road
24     Commission that -- the director of Engineer
25     automatically has that responsibility.

Page 62

1  Q.  When you say automatically --
2  A.  That's part of his job title.  If you -- like, you
3      looking at the Engineer -- director of Engineer job
4      title, that is part of his -- that's part of his job
5      title already.
6  Q.  Do you know if, in Michigan law, the position of
7      county highway engineer is provided a special status?
8  A.  No, not that I know of.  All I know is that's part of
9      his job responsibility, highway engineer is part of
10     his job responsibility.
11 Q.  Fair enough.  And certainly by asking these questions,
12     Commissioner Dickerson, I'm by no means suggesting
13     that I have any opinion in the matter.  I'm merely
14     asking questions to try to learn more about the
15     background about testimony that's been given and the
16     matters that are of issue in this case.
17         Do you know what the deputy managing
18     director makes in salary?
19 A.  Well, the director -- deputy director was a made-up
20     job.  We didn't have that -- we didn't have that
21     position here three years ago, we didn't, and the
22     reason that -- the reason that we got a director job
23     is the chairman before me felt Fred needed help to do
24     his job.  That's the reason we got that person.  I
25     disagreed with it, but when it happened, because we

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-12, PageID.681   Filed 11/21/22   Page 18 of 28
Donna Poplar v. Genesee County Road Commission
Cloyce Dickerson

18 (63 - 66)

Page 63

1  talk about taxpayers' money, we created a job and gave
2  him more money to do it.
3  Q.  Is the job that you're referring to there, is that the
4  Operations director job that was created in 2018?
5  A.  Yes.
6  Q.  And that was created in 2018; is that right?
7  A.  I think.  I don't know exact date it was created, but
8  it was created --
9  Q.  Fair enough.
10 A.  -- when John Daly left, and Fred replaced John Daly,
11 and some of the commissioners thought that he needed
12 help -- he needed help to do the job, so we created a
13 job out of taxpayers' money, and I didn't agree with
14 that one.
15 Q.  And just to clarify for purposes of the record, that
16 was the Operations director job?
17 A.  Yes.
18 Q.  Who was hired into that job, do you know, once that
19 position was created?
20 A.  Randy.
21 Q.  Randy Dellaposta?
22 A.  Um-hum.
23 Q.  What position does Randy Dellaposta occupy today?
24 A.  That same job.  They might have changed the job title,
25 but it's the same job.  If you look at -- if you look

Page 64

1  at Randy's -- if you look at Fred's responsibilities
2  as a managing director, it overlap.  They doing the
3  same thing.  And that was one reason I -- I didn't
4  agree with this realignment.  We got -- we hired Randy
5  Dellaposta -- we created a job for Randy Dellaposta;
6  and then -- and this reorganization chart, they take a
7  person -- they take Donna and make her out a report to
8  a person her equal.  There's something wrong with that.
9  Q.  I want to ask you some questions about that, but I
10 want to ask the question right now about Randy
11 Dellaposta and the creation of the deputy managing
12 director position.
13 A.  Um-hum, okay.
14 Q.  When was that position created?
15 A.  Right before Fred got hired -- or after Fred got
16 hired, I mean; after Fred got hired.
17 Q.  I do want to clarify something because I think maybe
18 we're having a miscommunication.  The Operations
19 director position was created in 2018; right?
20 A.  I don't know exact date.  It was created when Fred --
21 how long has Fred been managing director?  That's when
22 it was created.
23 Q.  Got it, perfect.  And I completely understand when
24 we're talking about dates, I have trouble with them
25 sometimes, too.

Page 65

1  A.  And I'm telling you the reason that they created it,
2  'cause some members on the Board thought that Fred
3  needed help doing that -- he needed help.  He couldn't
4  do the communication part of the job.
5  Q.  Completely understandable.  I'm just trying to figure
6  out the order of events here.  And then when was the
7  deputy managing director job created?
8  A.  The managing director job is the same person; they
9  just changed the name of it.  The deputy managing
10 director has always been Randy Dellaposta.  They
11 just -- I don't know when they -- when we first hired
12 him, I don't know what his job title was, but he
13 was -- if you look at the -- if you look at Fred's --
14 Fred's responsibilities, he took a lot of Fred's
15 responsibilities.
16 Q.  Got it.  Okay.  So what I'm hearing you say is that
17 maybe the job title changed, but the functions are the
18 same; is that right?
19 A.  Right.
20 Q.  Do you agree that if the job title changes a position
21 but the functions remain, then the job is basically
22 the same one; is that your testimony?
23 A.  Yeah.
24 Q.  Okay.  Does that apply to all levels in the
25 organization?

Page 66

1  A.  What was that?
2  Q.  Does that apply to all levels within the organization?
3  A.  What do you mean when you say does it apply to all
4  levels of organization?
5  Q.  Well, the reason you don't know is because it wasn't a
6  very good question.  So I'll retract that.
7          (Cell phone interruption.)
8  Q.  (BY MR. CASCINI)  When Fred became the managing
9  director -- strike that.
10         When John Daly was the managing
11 director, did the other directors, and there I'm
12 referring to Maintenance director, HR director,
13 Finance director and the like, did they report to him
14 directly?
15 A.  I think they did -- well, I know they did.
16 Q.  When Fred became the managing director, did those
17 directors report to Fred directly?
18 A.  They started out reporting to him, yes.
19 Q.  Ah.  But they no longer do?
20 A.  I don't know.  I think that -- I think that they may
21 report to Randy.  I'm not sure.  I know some of them
22 do.
23 Q.  Okay.  Do you know if all of them do or some of them
24 do?
25 A.  Well, in this new -- I know in this new

Page 67

1  reorganization, they got Donna reporting to Finance.
2  Q.   Okay.
3  A.   And that's one thing, I -- those are two different
4  departments.  Donna's about human resource, about
5  people, and finance about money.
6  Q.   Understood.
7  A.   And they're both at the same level.  I can't see the
8  reason for that.
9  Q.   Do you consider Randy and Anthony to be at the same
10  level?
11  A.   Randy and Anthony . . . well, let me say this, I was
12  talking to -- I was talking to the attorney --
13  Q.   I am going to have to caution you if you had a
14  conversation with an attorney, especially --
15  A.   Okay.  I just asked him a few questions.  I just
16  wanted to share that.  No, on the organization chart,
17  Randy is right after the managing director.
18  Q.   Okay.
19  A.   And then the directors; but when Anthony retires,
20  they're not going to replace him; they're going to
21  have two superintendents, and they're going to come
22  out of Engineering; and that's why I stated
23  that that's racially motivated because when you --
24  when you reporting -- Maintenance has got the biggest
25  department in the GCRC, got the biggest department,

Page 68

1  and that department is going to lose Anthony, who's a
2  black -- who's a black supervisor or black in the
3  department, and they're going to hire two
4  superintendents, and they going to report to
5  Engineering.
6  Q.   All right.
7  A.   That's why -- that's why I believe that that's
8  racially motivated because there's no way that another
9  black person is ever going to be -- have that level in
10  that capacity, even though this is --
11       That job, the Maintenance job got more
12  black people than any department we have.  If you're
13  going to have -- and my belief is, if you're going to
14  have one of those departments reporting to the other,
15  it should be Engineer reporting to Maintenance.  He
16  got the biggest department.
17  Q.   Okay.  So let's back up and talk about, there's a lot
18  of testimony in there, and I would like to make sure
19  we explore all of those areas.
20  A.   Okay.
21  Q.   So first, my question --
22       MR. CASCINI:  Well, actually, Ms. Court
23  Reporter, can you read back the last question that I
24  asked.
25       (Following question read back:

Page 69

1       "Q.  Do you consider Randy and Anthony
2       to be at the same level?")
3  Q.   (BY MR. CASCINI)  I understand that you just gave us
4  testimony about what would happen in the reorg and
5  what would happen once Anthony retired; but as for
6  today, do you consider Anthony and Randy to be on the
7  same level, in your words?
8  A.   If you look at -- if you look at the organization
9  chart, they wouldn't be on the same level.  Anthony
10  would be below -- below Randy.
11  Q.   And when did that change occur?
12  A.   When he took that job.
13  Q.   Now we're referring to the managing deputy director
14  job?
15  A.   Yeah, but he didn't get paid.  He got a raise -- a
16  raise when he took -- when he got the job; but in the
17  last budget -- I got e-mails to why he did that; I got
18  e-mails of why Fred thought that -- that Randy
19  deserved more money than Anthony.  I got e-mails.  He
20  didn't send them to me, but I got them.
21  Q.   Fair enough.
22  A.   The reason he said that -- his reason was, it wasn't a
23  good reason for me, it was his education and all that.
24  He think he deserve $15,000 more because of his
25  education.  Anthony Branch been here 30 years.  He's a

Page 70

1  young man, he's 55 years old, and I'll be willing to
2  bet you that Anthony Branch has probably forgotten
3  more than Fred or -- or Randy knows.
4  Q.   Certainly.
5  A.   Anthony know, and it's not my opinion, it's other
6  people's opinions, too, that he was here for 30 years,
7  people that represent the Road Commission, that was
8  their opinion.  Their opinion to me was, Fred or Randy
9  couldn't even do Anthony's job, could not do Anthony's
10  job, and that person been here for 30 -- was there for
11  30 years.
12  Q.   And thankfully, I think one of the things that's
13  wonderful about this piece of litigation is that no
14  one is contesting Anthony Branch's ability to do his
15  job.
16  A.   Oh, no.
17  Q.   I think he's demonstrated he's a very fine employee
18  over a very fine tenure.
19  A.   Yeah, he's very good.
20  Q.   But I want to ask some questions about when exactly
21  the reporting responsibility changed, Commissioner
22  Dickerson, and I apologize if my question is at all
23  unartful.  All I'm looking for right now is to figure
24  out when did Anthony Branch, for example, or Tracy
25  Kahn, or the Engineering director, when did they begin

Page 71

1  reporting to Randy?

2  **A.**   I think Anthony Branch still report -- I'm not sure,

3  but I think he still reports to Fred.  I don't think

4  he reported to Anthony (sic).

5  **Q.**   Got it.

6  **A.**   But I know that Donna was reporting to Peivandi.

7  I don't know if -- I don't remember if Tracy Kahn

8  or -- or Johnston reporting.  I suppose they are

9  reporting to Fred.

10  **Q.**   Okay.

11  **A.**   I'm not sure now; I'm guessing.

12  **Q.**   All right.  To the extent there was an organizational

13  chart from -- we're talking about before the

14  reorganization.  To the extent it shows the directors

15  all reporting to Randy Dellaposta, now, all of them,

16  would you have any reason to doubt that that was

17  accurate?

18  **A.**   I don't know.  I would say that it might be accurate,

19  but I don't know if -- if -- if Anthony's reporting to

20  Fred or not, I don't know.

21  **Q.**   Okay.

22  **A.**   I don't know.

23  **Q.**   Fair enough.  You can only testify -- all we ask of

24  you today is answer the questions that you know and

25  answer them truthfully, and I know we can do it here.

Page 72

1  So you don't know whether or not that

2  reporting structure did change or if it did -- when it

3  did.

4  To the extent that Randy Dellaposta was

5  supervising, let's consider a hypothetical, if Randy

6  Dellaposta was supervising all of those directors,

7  would that be a change in his responsibilities from

8  his role of Operations director?

9  **A.**   Well, if you look at the responsibility of the

10  director, managing director, that's part of Fred's

11  responsibility, like I said.  We hired -- we made a

12  position for Anthony -- for Randy Dellaposta, we made

13  that position for him.  So he's doing a lot of what

14  Fred -- he's doing a lot of what Fred's responsibility

15  is, Randy Dellaposta is doing.

16  **Q.**   Understandable.  And all I'm asking about in this

17  question is Randy Dellaposta's responsibility.  So all

18  I'm asking is, to the extent all the directors are now

19  reporting to Randy Dellaposta as the deputy managing

20  director, is that a change in his responsibilities

21  from his role as Operations director?

22  **A.**   All I can tell you, that I know that -- that Donna was

23  reporting to -- to -- to Fred Peivandi -- I mean, not

24  Fred but to Randy, Donna was reporting to, and I know

25  that because when Donna came back here after we --

Page 73

1  well, I don't want to go into that; that's for another

2  day.

3  **Q.**   I certainly will ask you some questions about her

4  return to work; one of the many things on our

5  checklist here today.  So we'll have an opportunity to

6  get some testimony down about that.

7  **A.**   Okay.

8  **Q.**   You mentioned that the job of Operations director was

9  created for Randy Dellaposta; is that correct?

10  **A.**   Correct.

11  **Q.**   Do you know if other candidates were interviewed for

12  that job?

13  **A.**   I don't think anybody interview.  We had a guy that

14  was interviewed for the managing director job; and

15  when he went before the committee, the hiring of him,

16  I think Donna found some areas that he wasn't

17  truthful, and that's why they didn't hire him.

18  **Q.**   The candidate in question you're referring to is Mark

19  Riley; is that correct?

20  **A.**   Right.

21  **Q.**   Do you know whether Donna discovered those alleged

22  irregularities in the context of Mark Riley's

23  interview for the Operations director position?

24  **A.**   Yeah, I think she did.  I'm not sure.

25  **Q.**   Do you know if any other candidates were interviewed

Page 74

1  for the Operations --

2  **A.**   I don't think they did.  I don't think so.  I'm not

3  sure, but I don't think they did, 'cause I think -- I

4  think it was even Donna recommendation that we -- that

5  Randy get that job.  I'm not sure of that, either, but

6  I think that was her recommendation.

7  **Q.**   Okay.  I would like to ask you some questions about

8  the reorganization, is the next topic that we're

9  talking about; and when I say reorganization, for the

10  purposes of clarity, I'm referring to the one, your

11  testimony about a workshop that had been held in Mundy

12  Township --

13  **A.**   Right.

14  **Q.**   -- and then we heard testimony about there being plans

15  for reorganization and changing.  You testified about

16  changes to Anthony Branch's department and to Donna

17  Poplar's department; is that correct?

18  **A.**   Um-hum.

19  **Q.**   Is that a "yes"?

20  **A.**   Yes.

21  **Q.**   Okay.  I do the same thing, I completely understand.

22  It's hard to give verbal answers all the time.  I

23  understand.

24  My question is, did anyone else's job

25  responsibilities change?

Page 75

1  A.    Kendra, and I think she's in -- they made her -- they
2        made her director, I think, director of -- I forget
3        her job title.
4  Q.    Was it Fleet Maintenance?
5  A.    Fleet Maintenance.  That was a long time coming,
6        'cause she took -- she took Randy's responsibility.
7        They should have made her -- she should have got that
8        position when Randy -- when Randy took this other
9        position.  She should -- she should've been in that
10       position already.
11 Q.    Okay.
12 A.    I believe -- that's my belief.  Now I . . .
13 Q.    Okay.  And that was part of the reorg plan?
14 A.    That was part of the reorg.
15 Q.    And that was part of the reorg plan that was initially
16       proposed by Randy and Fred at that workshop meeting?
17 A.    Yes.
18 Q.    And you mentioned the identify of this person that
19       would become the fleet manager.  Who is that person?
20 A.    Kendra, Kendra -- I can't think of her last name.
21 Q.    Is it Love Brezzel, L-o-v-e, hyphen, B-r-e-z-z-e-l,
22       but neither Cloyce or I know whether that's right, but
23       that's what the testimony shows.
24 A.    Okay.
25 Q.    In any event, are you familiar with Kendra?  Do you

Page 76

1        know her personally?
2  A.    I don't know her personally.  I know who she is, I
3        talk to her occasionally, but I don't know --
4  Q.    You talked to her before?
5  A.    Yeah, I talked to her before.
6  Q.    What do you perceive her race to be?
7  A.    She's a Afro-American lady.
8  Q.    And she has been promoted to a director under the
9        reorganization plan?
10 A.    Yes.
11 Q.    To whom does she report, do you know, under the
12       reorganization plan?
13 A.    I don't have -- I think she's reporting to
14       Engineering; I'm not sure.
15 Q.    Understandable.
16 A.    But she was reporting to Anthony.
17 Q.    Okay.  Well, and prior to that, was she reporting to
18       Anthony or Randy?  You mentioned that --
19 A.    Yeah.
20 Q.    -- when Randy became the deputy managing director --
21 A.    Yeah.
22       COURT REPORTER:  You're both talking at
23       the same time.
24 Q.    (BY MR. CASCINI)  You mentioned that when Randy became
25       the deputy managing director, you believe that Kendra

Page 77

1        should have assumed the director level position at
2        that time; right?
3  A.    Right.
4  Q.    So Kendra was reporting to Randy, wasn't she?
5  A.    I don't know if she reporting to Randy or --
6  Q.    Or Anthony?
7  A.    -- or Anthony, I'm not sure.
8  Q.    Fair enough.  Were there any other changes that you
9        can remember from the reorg plan, other than Kendra's
10       position, the Maintenance position --
11 A.    Kendra --
12 Q.    -- and the HR position?
13 A.    Yes.  Health and Safety was reporting to Human
14       Resource, and they took her -- they took that
15       responsibility from Human Resource.
16 Q.    Okay.  Any other changes that you can remember from
17       the plan?
18 A.    Not any more than we already discussed.
19 Q.    Sure, fair enough.  I know it feels like a test
20       sometimes, but all I want to do is try to figure out
21       what you remember.  That's all we're looking for.
22 A.    Sure.
23       MR. CASCINI:  Can we go off the record
24       really briefly.
25       (Discussion off record; Ms.

Page 78

1        Gafkay no longer present.)
2        MR. CASCINI:  Let's go back on the
3        record.
4  Q.    (BY MR. CASCINI)  You mentioned that there was no way
5        that there was going to be an African-American
6        employee who would ever be promoted to the
7        superintendent position; that's testimony you gave a
8        little bit earlier.  Why do you believe that?
9  A.    Because of the amount of people -- Afro-American
10       people that's in Engineering -- for them to go
11       ahead and put another person out to Maintenance, to
12       have another black person there, it's never done, in
13       my estimation.
14 Q.    Certainly there are plenty of qualified African-
15       American engineering professionals in this country;
16       correct?
17 A.    But they're not here.
18 Q.    And there are new positions going to be created under
19       the reorganization under Anthony Branch's retirement;
20       right?  That's what the reorganization plan says?
21 A.    Out of Engineering, yes, or probably.  I don't know.
22 Q.    Is it a requirement that internal candidates will be
23       hired into that position once it is created?
24 A.    If you taking that person out of Engineer, if that
25       person going to come from Engineer, all I'm saying is,

Page 79

1  they got an excellent chance of it being anybody other
2  than an Afro-American person.
3  Q.  And I understand that argument.  I'm asking a slightly
4  different question, Mr. Dickerson.  I'm asking, but we
5  don't have to take that person out of Engineering
6  under the reorg plan; right?  There's no requirement
7  about that?
8  A.  Why are we making that move anyway?
9  Q.  I couldn't tell you.  I'm not a decision-maker in any
10  regard; but I'm asking the question of, are you aware
11  of any reason why we would need to -- by "we," I mean
12  the GCRC, obviously -- put a person from the
13  Engineering Department into a newly created position?
14  Does it have to be an internal hire?
15  A.  I don't know if it will or not.  But the chances --
16  the chances of that being a black person is slim to
17  me.  When I'm looking at -- when I'm looking at what
18  we have here and all I can do is looking at what we
19  have, I can't look at what we might have --
20  Q.  Understandable?
21  A.  -- when the change is made.  I'm looking at what we
22  got now.
23  Q.  Certainly.  And I apologize, I'm really not trying to
24  badger you here.
25  A.  I don't consider you be badgering me.

Page 80

1  Q.  Thank you.  I know this is challenging, all
2  depositions are.  I'm merely asking this question:  Is
3  there any requirement under the reorganization plan
4  that we hire an internal candidate from any department
5  into these newly created supervisory positions?
6  A.  Not that I know of.
7  Q.  So we could hire external, we could hire internal; we
8  could hire anybody conceivably?
9  A.  You could.
10  Q.  I believe you also mentioned that the Maintenance
11  Department under the reorganization plan would only
12  become incorporated into the Engineering Department
13  after the retirement of Anthony Branch; is that
14  correct?
15  A.  Right.
16  Q.  Until that time, there isn't a change in Maintenance;
17  correct?  It maintains its own separate status?
18  A.  I think, as far as I know, yeah.
19  Q.  Do you know whether Anthony Branch, as the Maintenance
20  director, is going to suffer any loss of pay as a
21  result of the reorganization?
22  A.  I don't know.  They might come -- that might come --
23  if you lose responsibility in your -- in your job now,
24  if you lose that responsibility, it might come that
25  they lose pay; I don't know.  It might happen.

Page 81

1  Q.  It might happen in the future?
2  A.  It could happen.
3  Q.  It could happen if --
4  A.  It could easily happen.  If you don't have the
5  responsibility you had before, they take some of your
6  responsibility and give it to another department, you
7  could, yeah, you could.
8  Q.  So any employee who loses responsibility under the
9  reorg plan could, in theory, in the future have a
10  reduction of their salary; is that your testimony, in
11  theory?  I'm not saying it will happen, not saying it
12  won't happen, but you're saying it's possible?
13  A.  If you're losing some of your responsibility, that
14  could happen, yeah.  I'm not saying it's going to
15  happen, but it could happen.
16  Q.  Got it.  That wasn't a mandated portion of the plan,
17  though; right?
18  A.  Okay.
19  Q.  Is that correct?  That wasn't specified in the plan
20  that the salary --
21  A.  It wasn't specified in the plan.
22  Q.  It wasn't specified in the salary --
23  A.  The salary wasn't specified in the plan, either,
24  nothing like that.
25  Q.  And, Commissioner Dickerson, I apologize, if I ever

Page 82

1  cut you off, I'm very sorry about that.  I just need
2  to make sure that my question is down before so we
3  don't have crosstalk, that's all.
4  A.  Okay.
5  Q.  The same is true with Donna Poplar; correct?
6  A.  As far as I know.
7  Q.  Her job title does not change, either, under this
8  reorg plan?
9  A.  I don't know how you would change her job title, but
10  -- you know, I wouldn't know.
11  Q.  Regardless of the method, though, it doesn't; right?
12  A.  Yeah.
13  Q.  You testified about the raises that were given to
14  various departmental directors in the new budget?
15  A.  Um-hum.
16  Q.  This is the one where, I believe the testimony was,
17  Anthony Branch received a one percent raise and Donna
18  Poplar received a two percent, but I may have inverted
19  those; but just for orientation purposes, we're
20  talking about that budget.
21  A.  Okay.
22  Q.  Were the two African-American directors the lowest
23  paid of the directors after those raises went into
24  effect?
25  A.  I don't know.  I couldn't tell you that.

Page 83

1  Q.   And this is going to seem like I'm giving you a weird
2        test, but I promise you I'm not, I just want to know
3        if you know.  Can you rank the directors in order of
4        salary --
5  A.   No.
6  Q.   -- after the budget raises?
7  A.   No, I can't rank that.
8  Q.   I don't think I could, either, if I were in your
9        shoes.  I just wanted to know if you could.
10 A.   I got a pretty good guess, but I can't -- I can't rank
11       it.
12 Q.   We already testified we do have the pay records, and I
13       would rather look at those than have you guess, so I
14       understand and appreciate your testimony.
15 A.   Okay.
16 Q.   You mentioned that -- strike that.
17            In your earlier testimony, you said you
18       one time told Fred, "I don't know if you're a racist
19       person, but you do racist things"; is that correct?
20 A.   Yes.
21 Q.   Do you believe that what defines somebody as a racist
22       or not isn't what they say or what they think but what
23       they do?
24 A.   What they do?
25 Q.   Would you agree with that statement?

Page 84

1  A.   What they do, yes.
2  Q.   You mentioned that Fred prevented Donna from being
3        able to address the Board.  Are you referring to a
4        specific instance there or is that in general?
5  A.   She wanted to do a presentation, like -- I don't know.
6        I don't remember what Randy's presentation was, but
7        she wanted to do something -- something in the same
8        area, but he refused to let her do it.
9  Q.   And do you remember approximately when this was?  I
10       know times are hard and remembering calendar days are
11       sometimes --
12 A.   Maybe within the last year.  I'm not sure.
13 Q.   Okay.  Did Randy give his presentation?
14 A.   Yes.
15 Q.   Did Randy give his presentation within the context of
16       the proposal to create the deputy managing director
17       position?
18 A.   I don't know how -- how he got -- how he got the
19       presentation; I just know he got one.  He had a
20       presentation.
21 Q.   Did any other directors get presentations at that
22       time?
23 A.   I don't know of any other directors that wanted to do
24       a presentation.
25 Q.   Got it.

Page 85

1  A.   I think that -- I do think that Tracy might've done
2        one.  I'm not sure.  I can't -- I don't remember.
3  Q.   If Tracy did a presentation, would that be reflected
4        in Board meeting minutes?
5  A.   Probably would, yes.
6  Q.   Do you know who was part of the planning process for
7        the reorganization chart?  You said Donna wasn't.  Do
8        you know who was?
9  A.   If I just guessed, I would say Fred, Randy and Tim.
10 Q.   But that would be a guess?
11 A.   That would be a guess.  I don't know 'cause I don't
12       have any proof of that; but I would say Fred, Randy
13       and Tim.
14 Q.   Okay.  And you mentioned that Donna had been excluded
15       from the search for the new attorney to represent --
16 A.   The Road --
17 Q.   -- the Road Commission; is that correct?
18 A.   Yes.
19 Q.   And you mentioned that you felt HR should be involved
20       in that decision?
21 A.   Yes.
22 Q.   Do you know whether or not HR was involved when the
23       former law firm that represented the GCRC was hired?
24 A.   I don't know.  That's 30 years ago; I wasn't even
25       here.

Page 86

1  Q.   Fair enough.
2  A.   Couldn't tell you that.
3  Q.   I understand.  Do you know whether a new law firm was
4        hired just for the purposes of HR law or were there
5        other legal topics that you needed the new firm to
6        cover?
7  A.   I suppose they have other responsibilities.  I'm not
8        sure.
9  Q.   Do you know who was involved in that attorney search
10       process?
11 A.   All I can tell you is who wasn't involved.  I don't
12       know who all was involved.  I don't remember.
13 Q.   And Donna --
14 A.   I always thought that -- and that was my -- that was
15       my question or -- when we first went out on it to have
16       Human Resource be a part of that, that decision, that
17       was -- it was my concern.  I thought Human Resource
18       should be a part of it.
19 Q.   Understandable.  So you said you don't know who was,
20       you know who wasn't; and by "who wasn't," you mean
21       Donna; right?
22 A.   Right.
23 Q.   But you don't know who else was involved?
24 A.   Well, if I had to guess, I would say Fred and Randy
25       and probably Tim.

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-12, PageID.687   Filed 11/21/22   Page 24 of 28
Donna Poplar v. Genesee County Road Commission
Cloyce Dickerson

24 (87 - 90)

Page 87

1  Q.  Would that be a guess?
2  A.  That would be a guess.  I don't know.  I can't tell
3  you.  I can't tell you.
4  Q.  Completely understandable.
5       You mentioned that Fred had less in
6  penalties for white employees but not black employees;
7  is that correct?
8  A.  Yes.
9  Q.  Is there a specific instance when that occurred?
10 A.  No, I can't give you -- I can't give you a name.
11 Q.  Do you remember anything about the event where white
12 employees had less in penalties than African-American
13 employees did?
14 A.  I don't, but I know where you can get that
15 information.
16 Q.  Okay.  And where would that be?
17 A.  Anthony Branch.
18 Q.  And what document would I need to look at in order to
19 find --
20 A.  I don't know.
21       COURT REPORTER:  Just a second; you're
22 cutting him off again.
23 Q.  (BY MR. CASCINI)  What document would I need to look
24 at to learn more about this instance?
25 A.  I don't -- I don't have an idea what document you have

Page 88

1  to look at.
2  Q.  This topic was one of the topics that was investigated
3  by Craig Lange in response to Donna's complaint,
4  wasn't it?
5  A.  I don't think so.
6  Q.  Okay.
7  A.  I'm not sure.  I don't know.  I'm not sure.
8  Q.  I understand.  Do you remember approximately when this
9  event was to orient us in time?
10 A.  No.
11 Q.  Okay.  It was a single instance, though, that you can
12 recall where this happened historically?  This was an
13 event that happened in the past?
14 A.  Um-hum, yes.
15 Q.  Who at the Road Commission has the ultimate discretion
16 to issue discipline to employees?
17 A.  Well, I would say supervisors and -- I think it's --
18 probably the supervisor would be -- supervisors,
19 Anthony Branch, I mean, supervisors, they would have
20 more people.
21 Q.  If Anthony Branch wants to get -- well, strike that.
22       If a supervisor wants to give
23 discipline, does he or she need to ask permission or
24 seek approval to get that discipline issued?
25 A.  Does he?

Page 89

1  Q.  I can rephrase it.  It was confusing, I apologize.
2       If a supervisor wants to issue
3  discipline, does that supervisor need to seek approval
4  or get permission from anyone to execute that
5  discipline?
6  A.  I don't know how they do it.  I mean, I do know that
7  at GM, the supervisor have to get -- if the supervisor
8  want to discipline somebody, he has to go through the
9  general supervisor to do it.
10 Q.  Okay.  But you don't know about necessarily how it's
11 done here?
12 A.  No, no.  I could guess, but it wouldn't be what I
13 know.
14 Q.  But you wouldn't necessarily know what the
15 disciplinary action policy here said?
16 A.  No.
17 Q.  You gave testimony that you felt that Craig Lange's
18 investigation may be flawed because of a lack of
19 African-American employees who were interviewed as
20 part of the process; is that correct?
21 A.  Yes.
22 Q.  Do you know if Anthony Branch was interviewed as part
23 of that process?
24 A.  I don't think Anthony was interviewed.
25 Q.  Do you know why Anthony Branch was not interviewed?

Page 90

1  A.  You would have to ask Craig Lange that.
2  Q.  Did the report that you received describe why Anthony
3  Branch had not been interviewed, to your recollection?
4  A.  I think I did ask that question, but I don't think I
5  got an answer to it.
6  Q.  Who's the current Board Chair?
7  A.  Tim Elkins.
8  Q.  If Tim Elkins decided tomorrow that he wanted to fire,
9  I'm going to pick a name out of the hat randomly,
10 Tracy Kahn, would he have the power to do that?
11 A.  No.
12 Q.  Who would have the power to do that?
13 A.  The managing director.
14 Q.  And if Fred decided that he -- again, we're purely
15 picking a name out of the hat for the record, nothing
16 against Tracy, if Fred decided he wanted to fire
17 Tracy, could Tim go to Fred and make him stop from
18 doing that, make him refrain from doing that?
19 A.  He could go to Fred and give him his side of the
20 story.
21 Q.  Certainly.
22 A.  But make Fred do it or not, he could also come to the
23 Board and -- and the Board could do something about it
24 with Fred.
25 Q.  Certainly.  But Tim alone, can Tim make Fred --

Page 91

1   A.  No.
2   Q.  -- stop --
3   A.  No.
4   Q.  Doesn't have power to do that?
5   A.  No.
6   Q.  You mentioned an instance regarding outsourcing of
7     jobs.  Was that a proposal that ended up happening, in
8     other words, was that proposal implemented?
9   A.  That was something that happened, yeah, he did it.
10   Q.  And when did that outsourcing of jobs occur?
11   A.  I don't remember the date.  I couldn't give you the
12     date.  I know it caused a lot of problems because the
13     outsourcing company wasn't able to do the job.  So
14     they had to go back and get those people.  The people
15     that was complaining to me about losing overtime, he
16     had to go back and get those people to do the job.
17   Q.  Okay.  So ultimately we hired an outsourcing
18     company --
19   A.  Um-hum.
20   Q.  -- but then employees internal to the Road Commission
21     ended up doing the work at the end?
22   A.  At the end, they ended up doing what the outsourcing
23     company couldn't do.
24   Q.  So is it safe to say, then, that nobody ended up
25     losing their jobs because of that outsourcing company?

Page 92

1     It was just a waste of money?
2   A.  That's true, yes.
3   Q.  You mentioned a little bit earlier that you considered,
4     your opinion was that Fred was vindictive with
5     employees?
6   A.  Yes.
7   Q.  You mentioned in particular Donna Poplar.  I believe
8     you also mentioned Kim Day?
9   A.  Um-hum.
10   Q.  Were there any other employees to whom you felt Fred
11     was vindictive?
12   A.  Well, I don't know if it's vindictive.  I know that
13     there was some -- at least one of the employees that
14     was black that he harassed pretty good.
15   Q.  And which employee was that?
16   A.  I would rather not say.
17   Q.  Can you think of any other employees?  So if we
18     restrict your answer merely to -- you said Fred had,
19     in your opinion, Fred was vindictive toward other
20     employees.  So all I'm asking you about folks that you
21     consider him to be vindictive to.  If we have opinions
22     about other ways that Fred treated folks, maybe we can
23     go down that road; but let's talk about vindictive
24     behavior right now.
25         Can you think of any other employees to

Page 93

1     whom you felt Fred was --
2   A.  Donna is right at the top of my list.  I don't have to
3     go any further than that one.
4   Q.  No, certainly.  But I do want to know if there are any
5     other employees that you consider to be a part of that
6     list.  You also mentioned Kim Day.  Anyone else?
7   A.  Kim Day, yes.
8   Q.  Anyone else?
9   A.  Not offhand I can think of.
10   Q.  Okay.  You mentioned that Fred came to you when he was
11     the Engineering director and said that he basically
12     wanted to get a raise; right?
13   A.  He wanted more money, yes, yes.
14   Q.  Did he seem comfortable in bringing those concerns to
15     your attention?
16   A.  Yes.
17   Q.  Regardless of whether or not you agreed that he should
18     or should not get that raise, would you say that your
19     working relationship with him at that time was good?
20     This is the time when he's the Engineering director,
21     remember.
22   A.  Well, we didn't have a lot of -- we didn't have a lot
23     to do with -- he was a director, and we didn't have a
24     lot to do.  He just mostly wanted to complain about
25     John Daly.  Him and John Daly didn't get along.

Page 94

1   Q.  Would you consider him to be vindictive toward John
2     Daly?
3   A.  I don't know.  What could he do with John Daly?  He
4     was the managing director.  John Daly would complain
5     about Fred not doing what he wanted him to do to me;
6     and I would say, well, you've got to handle that; I
7     can't handle that for you.
8   Q.  That's the managing director's job; right?
9   A.  Right.  But they were both complaining about each
10     other.
11   Q.  Okay.  Who's Monica Pearson?
12   A.  Who is Monica Pearson?  She is the -- is the -- she
13     was the executive secretary; now she do benefits.
14   Q.  Do you know if she is the Benefit coordinator?
15   A.  Um-hum, yes.
16   Q.  Was she promoted into that position?
17   A.  When you say promoted, I don't know if she -- what
18     kind of monetarily figure she got; but, yes, she do
19     most of that job now.
20   Q.  Okay.  You don't know whether it's a promotion, but
21     it --
22   A.  Yeah, I suppose it's a promotion 'cause she's making
23     more than she was, so yes.
24   Q.  Do you know what the job responsibilities of the
25     benefit coordinator position entailed?

Case 2:21-cv-12568-VAR-JJCG   ECF No. 23-12, PageID.689   Filed 11/21/22   Page 26 of 28
Donna Poplar v. Genesee County Road Commission
Cloyce Dickerson

26 (95 - 98)

Page 95

1  **A.**  I guess benefits.  I know benefits alone is enough to
2  keep a person busy.
3  **Q.**  Understandable.  Do you know -- have you ever seen her
4  job description?
5  **A.**  No.  I've seen it, but I don't remember.
6  **Q.**  Do you know who promoted her into that position?
7  **A.**  Fred is the only person that could promote her in that
8  position.
9  **Q.**  Okay.  Is it safe to say, then, you don't know, but
10  you suspect, based on what you do know, it must've
11  been Fred?
12  **A.**  Yes.
13  **Q.**  Got it.
14  **A.**  And I think one reason that she was promoted in that
15  position is because she learn all the jobs up there.
16  She know everybody's job.  So she was always sitting
17  in for whoever was out.
18  **Q.**  That makes sense.
19  **A.**  So that would be the person that you would put there.
20  She already knew the job.  The benefit job is a tough
21  job.  You had to have somebody, unless you go outside
22  and hire somebody, you got somebody already here that
23  was always sitting in for that person, whoever it was
24  was out.
25  **Q.**  I find Monica to be very impressive, too.  That makes

Page 96

1  sense to me.
2  I'm going to show you a document marked
3  as Exhibit No. 18.  Have you seen this document
4  before, Mr. Dickerson?  You can take as much time as
5  you want to reorient yourself with it.
6  **A.**  (Reviewing document).
7  **Q.**  Do you remember whether you've seen that document
8  before?
9  **A.**  Probably have, you know; I don't know when.
10  **Q.**  I understand.
11  **A.**  I'm not sure.
12  **Q.**  I shouldn't have taken this away from you, I apologize.
13  MR. CASCINI:  And, Charis, this is
14  Exhibit 18, by the way.
15  MS. LEE:  Okay.
16  MR. CASCINI:  Just so we're all on the
17  same page.
18  **Q.**  (BY MR. CASCINI)  I'm going to direct you to the third
19  page of the document to the Settlement Discussion
20  head.  It says, and I apologize for reading over your
21  shoulder, sir.
22  **A.**  That's okay.
23  **Q.**  I'll back up a little.
24  MS. LEE:  You can review mine.
25  MR. CASCINI:  It says here Settlement

Page 97

1  Discussion.  Ms. Poplar is willing to mediate her
2  concerns.  An authorized representative may contact
3  this firm by October 12 to discuss its willingness to
4  discuss this matter."
5  MS. LEE:  I'm going to put an objection
6  on the record here under Rule 408, and settlement
7  discussions are not supposed to be talked about.
8  MR. CASCINI:  And actually I agree with
9  one thrust of that objection, which is, without
10  getting into any settlement discussions that the Board
11  authorized, Rule 408 does allow me to discuss any
12  timing or causal change that are created by settlement
13  communications.
14  **Q.**  (BY MR. CASCINI)  Did the Board ever invite Ms. Poplar
15  in to talk to the Board in a closed session in
16  response to receiving this letter?
17  **A.**  I don't remember if she -- if we invited her in to
18  talk about it.
19  **Q.**  Fair enough.  Do you remember who made the motion to
20  bring Donna Poplar back to work?
21  **A.**  I think I did.
22  **Q.**  Okay.  Would the meeting minutes accurately reflect
23  who made that motion?
24  **A.**  They might; I'm not sure.
25  **Q.**  Does Linda generally do a good job in accurately

Page 98

1  reporting the Board minute meetings?
2  **A.**  Yes, she does.
3  **Q.**  And you guys have an opportunity to review the Board
4  meeting minutes every time before they're entered;
5  correct?
6  **A.**  Yes.
7  MR. CASCINI:  All right.  I know it's
8  getting late, guys, and I promise you I'm almost done.
9  MS. LEE:  Oh, you're fine.
10  MR. CASCINI:  Brevity is a skill of few
11  attorneys, and I wish it was one of mine.
12  **Q.**  (BY MR. CASCINI)  I'm going to refer to document No.
13  12, but actually I don't need to refer to any portion
14  of the document.  We're referring to the directives
15  and responsibilities, you've already given some
16  testimony about these, that was provided by Fred to
17  Donna on July 1st of 2021.
18  You mentioned that Fred was the
19  decision-maker in issuing these directives; right?
20  **A.**  Yes.
21  **Q.**  Were you involved in any discussions with Fred before
22  he gave them about why he issued these directives?
23  **A.**  No.
24  **Q.**  Were you present during any time when Fred told anyone
25  else why he issued these directives?

Page 99

1  A.   No.
2  Q.   Do you know, do you have any independent knowledge or
3       evidence about why he issued these directives?
4  A.   No.
5  Q.   Now we're going to take a look at Exhibit 16.  This is
6       the Disciplinary Action Notice provided by Fred
7       Peivandi to Donna Poplar on August 16th, 2021,
8       although I'm doing that from memory.
9  A.   August 19th.
10 Q.   August 19th, I stand corrected.
11 A.   Yes, the 16th, yes, I see it.
12 Q.   You mentioned and you gave testimony that Fred was the
13      decision-maker behind issuing this Disciplinary Action
14      Notice to Donna Poplar; is that correct?
15 A.   Yes.
16 Q.   Did Fred discuss with you the reasons why he wanted to
17      give Donna Poplar disciplinary suspension before he
18      gave it?
19 A.   No.
20 Q.   Were you present during any conversation in which Fred
21      explained to anybody else why he wanted to give it?
22 A.   No, I wasn't.
23 Q.   Do you have any other knowledge or evidence about the
24      reasons why Fred wanted to give this Disciplinary
25      Action Notice to Donna Poplar?

Page 100

1  A.   I didn't talk to him, so no.
2  Q.   And finally we have Exhibit No. 19, which is the
3       Notice of Administrative Leave issued from Fred
4       Peivandi to Donna Poplar on September 6, 2021.  I
5       believe you gave some testimony earlier that Fred was
6       the decision-maker about placing Donna on paid
7       administrative leave; is that correct?
8  A.   Yes.
9  Q.   Did Fred discuss with you the reasons why he wanted to
10      put Donna on paid administrative leave before he did?
11 A.   Not as I can remember.
12 Q.   Were you present during any time when Fred had a
13      conversation with anybody else about the reason why he
14      wanted to place Donna on paid administrative leave?
15 A.   No, not that I remember anyway.
16 Q.   And do you have any evidence about any reasons why
17      Fred wanted to place Donna on paid administrative
18      leave?
19 A.   No, I don't have evidence, no.
20 Q.   You testified earlier about Fred having received a
21      list that listed employees by name and race; is that
22      right?
23 A.   Right.
24 Q.   And you mentioned that a copy of the list was
25      generated, and then Fred, to your recollection, came

Page 101

1       back and asked for a list that he resubmitted with the
2       races included; is that right?
3  A.   Yes.
4  Q.   Had a copy of employee names, with associated races,
5       been produced in any prior year by Human Resources
6       Department?
7  A.   Not that I remember; not that I saw.
8  Q.   Do you know that it was never produced or do you not
9       know whether it was produced?
10 A.   I don't know if anybody that had a -- that made a
11      request.  I don't know of anybody making a request by
12      employee by color.
13 Q.   Were you present when Fred made that request?
14 A.   No.
15 Q.   To your knowledge, who was present when Fred made that
16      request -- strike that question.
17            To your knowledge, to whom did Fred
18      make that request?
19 A.   I don't know.  I just got a copy of it, and I asked
20      Fred about it, and he didn't have an answer for me.
21 Q.   You gave testimony that in your opinion, and this is a
22      paraphrase, but I think it's fairly close, that Fred's
23      biggest problem is that he didn't know how to deal
24      with people; is that correct?
25 A.   Yes.

Page 102

1  Q.   Did Fred and former GCRC employee Sue Charnesky get
2       along?
3  A.   Did Fred and who?
4  Q.   Sue Charnesky.  And if you don't know, that's fine.
5  A.   I don't know.
6  Q.   Do you know who Sue Charnesky is?
7  A.   No; not right off hand, I'm not . . .
8  Q.   To your knowledge, did Fred and former Finance
9       director Coetta Adams get along?
10 A.   Coetta Adams . . . I came after she left, so I don't
11      know.
12 Q.   Fair enough.
13 A.   Wait a minute, Coetta Adams -- yeah, I don't know.  I
14      can't -- I can remember some complaint.  Yeah, I know
15      who she is.  I can remember some complaints that she
16      had to me, but I don't remember what -- and it was
17      about Fred, but I don't know what happened.  I can't
18      remember what happened.
19 Q.   Okay.  But she was raising complaints about Fred?
20 A.   She was raising complaints about Fred, but I don't
21      know -- I can't tell you what the complaint was, but
22      she did have a complaint about Fred.
23 Q.   I understand.  To your knowledge has Anthony Branch
24      ever been given discipline during his time here at the
25      GCRC?

Page 103

1  **A.**  To my knowledge, he haven't. I don't know if he have
2  or not. To my knowledge, he haven't.
3  **Q.**  Do you know whether or not Fred has ever placed
4  Anthony Branch on an unpaid period of suspension?
5  **A.**  To my knowledge, I don't know.
6  **Q.**  Fair enough.
7  **A.**  I don't have any insight into that.
8  **Q.**  To your knowledge, has Anthony Branch ever been placed
9  on paid administrative leave?
10  **A.**  Not to my knowledge, I don't know.
11  **Q.**  You'd mentioned earlier that in your opinion, Fred,
12  quote-unqunte, has three votes on the Board?
13  **A.**  Yes.
14  **Q.**  When did that become true, in your opinion?
15  **A.**  In January 2021.
16  **Q.**  January of 2021?
17  **A.**  Yes.
18  **Q.**  Prior to that, did you feel as though Fred, quote-
19  unqunte, had three votes on the Board?
20  **A.**  No.
21  **Q.**  But after that, he did?
22  **A.**  Yes.
23  **Q.**  And that maintains to this time?
24  **A.**  Yes.
25  **Q.**  Has Donna ever talked to you about that?

Page 104

1  **A.**  Who?
2  **Q.**  Donna Poplar, the Plaintiff.
3  **A.**  No, I can't remember talking to her about it. Nothing
4  she could do about it.
5  **Q.**  Well, she filed a complaint; correct?
6  **A.**  She filed a complaint, but what can she do about the
7  three votes that Fred has?
8  MR. CASCINI: Charis, I have nothing
9  further. Thank you, Commissioner Dickerson.
10  MS. LEE: I have no further questions.
11  (Deposition concluded at
12  6:08 p.m.)
13  (END OF RECORD)
14
15
16
17
18
19
20
21
22
23
24
25

Page 105

1  STATE OF MICHIGAN    )
2  COUNTY OF SHIAWASSEE )
3
4  I, Cynthia A. Lathrop, Court Reporter and
5  Notary Public in and for the above county and state, acting
6  in the County of Ingham, do hereby certify that the
7  aforegoing deposition was taken before me at the time and
8  place hereinbefore set forth.
9  I further certify that said witness was by
10  me sworn in said cause and the testimony then given was
11  reported by me stenographically and subsequently
12  transcribed and that the aforegoing is a full, true and
13  correct transcript of my original shorthand notes.
14  IN TESTIMONY WHEREOF, I set my hand and
15  notarial seal at Shiawassee County, Michigan, this 16th day
16  of August 2022.
17
18
19
20
21
22  Cynthia A. Lathrop (CSR-2474)
Notary Public in and for the
23  County of Shiawassee,
State of Michigan
24  My Commission Expires: 2/2/26
25