**Monica Pearson**
**09/16/2022**

1  UNITED STATES DISTRICT COURT
2  EASTERN DISTRICT OF MICHIGAN
3  SOUTHERN DIVISION
4
5  DONNA POPLAR,
6      Plaintiff,
7  -vs-                              No. 4:1-cv-12568
8                                    Hon. Victoria A. Roberts
9  GENESEE COUNTY ROAD
10  COMMISSION and FRED
11  F. PEIVANDI, in his individual
12  capacity,
13      Defendant.
14  _____/
15
16  PAGE 1 - 41
17
18  The Remote Deposition of MONICA PEARSON,
19  Taken via Hanson Remote,
20  Commencing at 7:56 a.m.,
21  Friday, September 16, 2022,
22  Before Lucy Capobianco CSR 3061.
23
24
25



Page 2

```
 1  APPEARANCES:
 2  MS. CHARIS LEE P84127
 3  Lee Legal Group, PLLC
 4  117 W. Flint Park Boulevard
 5  Flint, MI  48505
 6  (810) 513-9257
 7  charis@leebusinesslaw.com
 8  Appearing on behalf of the Plaintiff.
 9
10  MS. JULIE A. GAFKAY P53680
11  GAFKAY LAW, PLC
12  604-A S. Jefferson Avenue
13  Saginaw, MI  48607
14  (989) 652-9240
15  Jgafkay@gafkay.com
16  Co-Counsel for Plaintiff.
17
18  MR. ANDREW A. CASCINI P76640
19  Henn Lesperance, PLC
20  32 Market Avenue, S.W., Suite 400
21  Grand Rapids, MI  49503
22  (616) 551-1611
23  aac@hennlesperance.com
24  Appearing on behalf of the Defendants.
25
```

Page 3

```
 1              INDEX TO EXAMINATIONS
 2
 3  Witness                                       Page
 4
 5  MONICA PEARSON
 6  EXAMINATION BY MS. LEE.........................  4
 7  EXAMINATION BY MR. CASCINI: ................... 19
 8  RE-EXAMINATION BY MS. LEE: .................... 39
 9
10
11              INDEX TO EXHIBITS
12
13  Exhibit                                       Page
14  (Attached)
15  PEARSON EXHIBIT 22                               9
16  PEARSON EXHIBIT 23                              13
17  PEARSON EXHIBIT 24                              22
```

Page 4

1 Via Remote
2 Friday, September 16, 2022
3 About 7:56 a.m.
4    THE COURT REPORTER: Will the attorneys agree
5 to the court reporter swearing in the witness remotely?
6    (ALL IN AGREEMENT.)
7    MONICA PEARSON,
8 having first been duly sworn, was examined and
9 testified on her oath as follows:
10    MS. LEE: Good morning, Ms. Pearson. My name
11 is Charis Lee. I am one of the attorneys for Ms. Donna
12 Poplar. You'll see on the screen Ms. Julie Gafkay.
13 She is also an attorney representing Ms. Poplar.
14    EXAMINATION BY MS. LEE:
15 Q. For the record, I will have you state your name and if
16    you could spell it for us that will be great.
17 A. **Monica Pearson, P-E-A-R-S-O-N.**
18 Q. Thank you so much for that. So, Ms. Pearson, have you
19    had your deposition taken before?
20 A. **I have not.**
21 Q. Okay. So because you have not, I'll just go over a few
22    ground rules for you today. It's a little bit
23    different because we're on Zoom, right, so I would ask
24    that while I'm asking you questions that you use your
25    memory and not any documentation or anything to refresh

Page 5

1    your memory, all right?
2       And then I would also ask that if you need to
3    take a break or if you need to, you know, just get up
4    and stretch or you need to have a moment to confer with
5    your counsel, that if I've asked you a question, you
6    answer that question and then you're able to take a
7    break.
8       We are going to try to move pretty quickly
9    here because we know you have another engagement today.
10   But in the event we need to take more breaks than
11   usual, the goal is to finish and to just ask you a few
12   questions today.
13      I would ask that if I ask you a question and
14   you don't understand the question, that you just ask me
15   to repeat it or rephrase it. Because if you answer
16   it's on the record, right, so I want to make sure that
17   you understand the question that is being asked and
18   you're giving us your honest reflections and answers,
19   okay?
20 A. **Understood.**
21 Q. Okay. Great. Do you have any questions about the
22   process today?
23 A. **Not at this time. Thank you.**
24 Q. Okay. All right. So let me ask you how long you've
25   been an employee of the Road Commission?

Page 6

1  A. I was hired in March of 2019, excuse me.
2  Q. And what was the position that you were hired into?
3  A. My first position I was hired into the Road Commission
4     was for administrative assistant to the HR director.
5  Q. And was that a part-time position?
6  A. In the beginning it was.
7  Q. Okay. And so when did it change from a part-time
8     position?
9  A. October of 2019.
10 Q. And do you know what was the reason for that particular
11    change?
12 A. As I recall, the actual reason I'm not sure if I could
13    state actually. I know that -- I'll say this, I know
14    that when I was hired I was informed that the position
15    would first be part-time with the desire to go into a
16    full-time position after some time.
17        And Donna Poplar, Ms. Poplar, Director Poplar
18    was still working with management, and the board, and
19    eventually it was -- they awarded her the opportunity
20    to have a full-time administrative person.
21 Q. So what were your duties when you were first brought in
22    as administrative assistant in the part-time position,
23    what duties were you performing part-time?
24 A. I was assisting Donna, Director Poplar, with whatever
25    she needed, memos, research, spreadsheet work. I kept

Page 7

1     her calendar. I reviewed e-mails for her. I
2     researched many things, whatever projects or tasks that
3     she had going on.
4        My responsibility was to do research. We
5     would then discuss, you know, whatever information that
6     I found, but all in all I was there to assist her
7     during the hours that I was allowed.
8  Q. Okay. Did you understand that the assistance that you
9     were providing her was an accommodation to her?
10       MR. CASCINI: Objection, assumes facts not in
11    evidence. You may go ahead and answer the question.
12 A. Sorry, could you repeat the question?
13    BY MS. LEE:
14 Q. Sure. I'll probably just go ahead and rephrase it.
15    When you were assisting Director Poplar with whatever
16    she needed, were you aware that she had a vision
17    disability?
18 A. Yes, I'm aware -- I was made aware that she had a
19    vision disability, yes.
20 Q. And who were you made aware by that she had a vision
21    disability?
22 A. Director Poplar herself.
23 Q. Okay. And when you -- when you began the role as an
24    admin assistant, was it directly communicated to you
25    that you would be serving to assist Ms. Poplar with her

Page 8

1     vision disabilities?
2  A. Yes, it was.
3  Q. And in what ways would you be assisting her with her
4     vision disability in your role?
5  A. In the same -- based on -- pretty much how I answered,
6     I was responsible for assisting her with a lot of
7     computer work, helping her with, you know, creating
8     memos, communications, whatever she needed as far as
9     visual aid. I did a lot for her.
10 Q. And would you say that that was the majority of what
11    you did in that particular role assisting her?
12 A. Yes, I would say that I spent most of my time assisting
13    her based on whatever direction she gave me.
14 Q. Okay. If you'll just give me one moment I'm going to
15    bring up the job description for the administrative
16    assistant part-time position.
17       I'm going to mark this as Exhibit 22.
18    Attorney Cascini, I'm going to e-mail it to you now so
19    you'll have that prior to putting it on the screen,
20    okay?
21       And, Ms. Pearson, if you have any difficulty
22    reviewing it or seeing it on the screen, just let me
23    know. Just allow me one moment, okay?
24       MR. CASCINI: Theresa, I don't believe I
25    received anything yet. I'm not quite sure why.

Page 9

1        MS. LEE: Sorry, I was on mute. I just
2     pushed the button, so it should be coming through.
3        MR. CASCINI: Okay.
4        MS. LEE: I was just trying to bring it up on
5     my screen. Are you able to see my screen?
6        MR. CASCINI: Yes, and just to confirm, I
7     have received the document now. Thank you.
8        PEARSON EXHIBIT 22
9        WAS MARKED BY THE REPORTER
10       FOR IDENTIFICATION
11    BY MS. LEE:
12 Q. Ms. Pearson, are you able to see the screen okay?
13 A. I can see it. It's small, but I can see it.
14 Q. Okay. Good. Thank you. And I believe we've already
15    marked it, so this is the Genesee County Road
16    Commission job description human resources
17    administrative assistant job description marked as
18    Exhibit 22.
19       Ms. Pearson, if you'll take a moment to look
20    over this job description. Have you seen this job
21    description before?
22 A. Yes, of course, yes.
23 Q. Okay. And just because I have control, I'm going to
24    give you a moment to look at it, so if I'm going too
25    fast let me know, okay?

Monica Pearson
09/16/2022
Pages 10..13

Page 10

1  A.  Uh-huh, yes.
2  Q.  Okay. Ms. Pearson, now that you had an opportunity to
3      take a look at the previous job description of the
4      position that you've held as administrative assistant,
5      I'd like to talk a little bit more about the support
6      that you provided to Ms. Poplar as an accommodation for
7      her vision disability. You'll see here next to --
8      under job duties the number 4, 5, 7, these are all
9      within the purview -- if you could read those for me
10     that would be great.
11 A.  **Starting with number 4?**
12 Q.  Yes, ma'am.
13 A.  **Help HR director with reading internal and external**
14     **materials. Aid HR director in reading and replying to**
15     **e-mail correspondence. Telephone or face-to-face**
16     **inquiry as requested. Five, provide HR director with**
17     **computer assistance, research, and provide PowerPoint**
18     **presentation -- research and PowerPoint presentation.**
19     **Number 7?**
20 Q.  Yes, ma'am.
21 A.  **Accompany HR director to off-site meetings and**
22     **conferences as required.**
23 Q.  Okay. And so these were also a part of the duties. I
24     know some of this you did mention, but you did perform
25     these duties for Ms. Poplar?

Page 11

1  A.  Yes, correct.
2  Q.  And is there anything specifically that you have not
3      mentioned that you did to aid Ms. Poplar with her
4      vision disability while you were in this role?
5  A.  **I think what it outlines is the things that I did and**
6      **have done many, many times. I've helped her to**
7      **meetings. I've helped her.**
8  Q.  When you say you helped her to meetings, can you
9      explain a little bit more?
10 A.  **Assist her to different meetings at different**
11     **locations.**
12 Q.  Okay.
13 A.  **I've done everything of this that you've marked off**
14     **here. These are the things that I was doing to assist**
15     **her.**
16 Q.  Okay. Thank you. And so how -- okay, let me rephrase
17     my question.
18         So you mentioned earlier that you were the
19     administrative assistant and it was part-time, and that
20     part-time position changed to a full-time position,
21     correct?
22 A.  **Yes, that is correct.**
23 Q.  Okay. And then how long -- so when the position
24     changed to a full-time position you remained in that
25     position until what was your next position?

Page 12

1  A.  **I remained in that position until I was promoted to the**
2      **benefits coordinator position.**
3  Q.  And do you remember what date you were promoted to the
4      benefits coordinator position or around the month and
5      year.
6  A.  **October, 2021.**
7  Q.  Okay. And at that time when you were promoted to the
8      benefits coordinator position had you performed the
9      benefit coordinator before, had you performed benefits
10     before or was this a new specialty for you?
11 A.  **So prior to being promoted into the position I, on**
12     **several occasions, assisted and was also cross-training**
13     **with Cherry Grant who held the position. So, yes, I**
14     **had performed some of the duties that fell under the**
15     **benefit coordinator as a backup to her.**
16 Q.  Okay. And what was Ms. Grant's -- Ms. Cherry Grant,
17     what was her title?
18 A.  **Senior benefits coordinator.**
19 Q.  Okay. And how long has -- do you have an idea of how
20     long she had been in that role?
21 A.  **Over 20 years.**
22 Q.  Okay. So you worked with her during her time there for
23     some time, and she crossed-trained you on some of these
24     things and -- did she retire, did Ms. Grant retire?
25 A.  **Yes, she did.**

Page 13

1  Q.  And after her retirement the role was vacant and you
2      were allowed an opportunity to -- or promoted into
3      filling the role?
4  A.  **Yes, I was promoted into that role.**
5  Q.  Okay. So your title is benefits coordinator, Ms.
6      Grant's title was senior benefits coordinator, and are
7      you required to fulfill the same duties and
8      responsibility that Ms. Grant fulfilled?
9  A.  **Yes.**
10 Q.  Okay. If you will bear with me, Ms. Pearson, I am
11     going to bring up the job description for the benefits
12     coordinator which will be marked as Exhibit 23.
13         Attorney Cascini, I'm going to e-mail you
14     that job description as well.
15         MR. CASCINI: Thank you.
16         MS. LEE: Attorney Cascini, let me know when
17     you have it.
18         MR. CASCINI: I see it right now.
19         MS. LEE: Okay, perfect. I am now going to
20     share my screen.
21         PEARSON EXHIBIT 23
22         WAS MARKED BY THE REPORTER
23         FOR IDENTIFICATION
24     BY MS. LEE:
25 Q.  Okay. Ms. Pearson, are you able to see my screen?



HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

### Page 14

1  A. Yes, I am.
2  Q. Okay, perfect. All right. I'm going to allow you a
3     moment to take a look at this job description as well.
4        All right. So I would like to ask you some
5     questions regarding your duties that are here. So
6     under the benefits coordinator position, you said that
7     you had cross-training for the position. Those duties
8     here, how do they differ from your previous role as an
9     administrative assistant?
10 A. **Well, in this role I was primarily handling or managing**
11    **the GCRC benefits program for active and retirees. So**
12    **I didn't have the -- my responsibilities changed. I**
13    **was no longer supporting Donna in the capacity that I**
14    **had been, Director Poplar as I had been in my role as**
15    **administrative assistant.**
16 Q. In this job description is it required for you to -- as
17    we read in 4, 5, and 7 of your previous position, is
18    that in your job description here, are you required to
19    do that under your typical duties?
20 A. No.
21 Q. Now, when you are required to do it, do you assist
22    Donna, and when I say assist her, do you provide or
23    help to her with her visual accommodation needs to the
24    level in which you did as an administrative assistant?
25 A. No.

### Page 15

1  Q. When you were promoted into this role were you told
2     that you would have to -- or that you would be required
3     to continue on with the duties of administrative
4     assistant in accommodating Donna with those particular
5     duties?
6        So when you were promoted -- I'm sorry, I
7     know that was a long question so let me rephrase.
8        When you were promoted, did you have the
9     understanding that you would continue to accommodate
10    Ms. Poplar or Director Poplar?
11 A. **My understanding when I accepted the role as benefit**
12    **coordinator, that it be benefit coordinator, I would**
13    **perform those job duties. I was told that I would have**
14    **some HR responsibilities, administrative**
15    **responsibilities but I -- it was not my understanding**
16    **at the time that I accepted that my role as**
17    **administrative assistant or ADA to help Donna Poplar**
18    **with her ADA requirements, that's not my understanding**
19    **that that would continue.**
20 Q. So when you say that you understood that you would
21    maybe do some administrative or clerical tasks, you are
22    talking about number 2 under typical duties which would
23    be a typical responsibility under your role as benefits
24    coordinator, doing functions in HR but not specifically
25    to aid Donna; is that correct?

### Page 16

1  A. Yes, that would be fair, yes.
2  Q. How much time -- so in your new role as benefits
3     coordinator, does Donna ask you to assist her on a
4     daily basis?
5  A. I'm sorry, could you repeat that?
6  Q. Sure. So in your current role now as benefits
7     coordinator, does Donna ask you to assist her at the
8     level that you did as an administrative assistant, does
9     Donna request that you assist her in your current role?
10 A. Not at that level, no.
11 Q. And have you and Director Poplar had a conversation
12    about -- or let me rephrase this.
13       What has been the expectation from Ms. Poplar
14    for you to assist her?
15 A. **I would say that to answer the question, yes, we have**
16    **had conversation and she -- and then during these**
17    **conversations she has conveyed that she understands**
18    **that my bandwidth to assist her has changed because of**
19    **the new role that I'm in.**
20       **And my primary function is to -- is the**
21    **responsibilities of the benefits coordinator. I**
22    **couldn't say that she actually has an expectation that**
23    **I assist her, and I know that she doesn't because we've**
24    **had these conversations and she understands that, you**
25    **know, this job takes my focus, the time that I am here,**

### Page 17

1     **and my role has changed and there is not that**
2     **expectation.**
3  Q. So are you able to provide the same level of
4     accommodation to Donna with your benefits duties?
5  A. No, I am not.
6  Q. Okay. Okay. Thank you. Right now I would ask that we
7     take a short break, ten minutes would be okay and then
8     we should be able to -- I may have a few follow-up
9     questions and we may be able to wrap up, okay?
10 A. Yes, that's fine. Thank you.
11       MR. CASCINI: I have no objection. Monica,
12    are you okay with that?
13       THE WITNESS: Yes.
14       (An off the record
15       break was held)
16 BY MS. LEE:
17 Q. All right. Ms. Pearson, thank you so much for allowing
18    us to have that break there. I just have a few more
19    questions for you and then your counsel may or may not
20    have questions for you afterwards.
21       So I want to ask you, do you know whether or
22    not the HR administrative assistant position has been
23    filled?
24 A. Yes, I do know that, and, no, it has not been filled.
25 Q. Okay. And do you agree that because Donna has a

### Page 18

1 disability she's in need of being accommodated, which
2 you are unable to provide her?
3     MR. CASCINI: Objection, compound question.
4 Form, I guess.
5     MS. LEE: All right. I'll rephrase my
6 question.
7 BY MS. LEE:
8 Q. Do you agree that Donna is in need of accommodations?
9 A. **It's my opinion that, yes, she needs the accommodation.**
10 Q. And you've confirmed that you are unable to provide
11 that accommodation to her?
12 A. **That is correct, yes.**
13 Q. Do you know whether or not that because Donna is not
14 being accommodated at this moment or because you were
15 unable to provide her accommodations whether or not
16 that has caused her harm?
17 A. **I can answer that I've seen her struggle completing**
18 **different tasks that I've completed for her in the**
19 **past. I even went in and said you may need to take a**
20 **break. I could see that it was -- that it's sometimes**
21 **very difficult for her.**
22 Q. Have you discussed this with her? When you said you've
23 gone in and told her to take a break, can you explain a
24 little bit more kind of what you're kind of visually
25 seeing?

### Page 19

1 A. **Fatigue, eye fatigue is what I have noticed. Mostly**
2 **just the extreme fatigue that I know she experienced**
3 **when she's trying to do research or, you know, writing**
4 **communications. If there's a lot of it it seems to**
5 **take a toll and it has taken a toll I've noticed, and,**
6 **yes, we have discussed it.**
7 Q. And do you get along with Donna or Director Poplar?
8 A. **Yes, Director Poplar, yes, we do get along. I've**
9 **learned a lot from her and I respect her.**
10 Q. Do you think that she does a good job as HR director
11 and is a valuable asset to the Road Commission?
12 A. **I do think she is very valuable. I think she is**
13 **extremely intelligent, knows the industry, has a lot to**
14 **bring to the table, and my experience is that how she**
15 **manages her office is fair and respectful.**
16     MS. LEE: Thank you so much Ms. Pearson. I
17 don't have any further questions, and now I'll turn it
18 over to Andrew Cascini.
19 EXAMINATION BY MR. CASCINI:
20 Q. All right. Monica, my name it Andrew Cascini. As you
21 know, I'm the attorney for the Genesee County Road
22 Commission in this particular matter.
23     I do have some follow-up questions to ask you
24 regarding your testimony today and the subject of your
25 testimony more broadly. I will be very sensitive with

### Page 20

1 your time.
2     In your role either as HR administrative
3 assistant or as benefits coordinator, are you familiar
4 in general with job descriptions as they're prepared at
5 the GCRC?
6 A. Yes.
7 Q. You've had an opportunity to review those sometimes,
8 you've seen those come across your desk, those are not
9 unfamiliar to you?
10 A. **They are not unfamiliar to me.**
11 Q. Okay. I'd like to pull up a document that we have
12 previously marked as Exhibit Number 22 and I will pull
13 that up here on my screen. Hold on just one moment.
14 We may have to fumble through technology a little bit,
15 that happens sometimes. Okay.
16     Are you able to see a document that has
17 listed up at the top Genesee County Road Commission Job
18 Description Job Title, Human Resources Administrative
19 Assistant. Is that visible on the screen?
20 A. Yes.
21 Q. Let me see if I can do anything on the Zoom here? I
22 think that I can. Is that too small to be legible or
23 are you able to read that document?
24 A. I can read it.
25 Q. And this is the previously marked Exhibit 22, it has PL

### Page 21

1 Poplar 168 at the bottom, does it not?
2 A. Yes, I can see that.
3 Q. I'm going to go all the way to the end of the document
4 to the 1, 2, 3, and it looks like the fourth page. At
5 the very bottom here we have a bunch of lines, it says
6 manger, director, date, director of human resources and
7 administrative services, date. And at the very bottom
8 it says DDP and then 1/17/17.
9     If you know, Ms. Pearson, what do the DDP and
10 the 1/17/17 writings at the bottom of this document
11 indicate?
12 A. **I can tell you that those are Donna Poplar's initials**
13 **and the date. I would image that it signifies the date**
14 **that this document was created.**
15 Q. So although you're not sure, that has something to do
16 with the date when the document was created?
17 A. **I couldn't be 100 percent certain, but it wouldn't be**
18 **unlikely.**
19 Q. Okay. So what I'm going to do next is I'm going to
20 pull up another document and we have not seen this
21 document before, so I'm going to mark this one as
22 Exhibit Number 24. Is that right, Charis and Julie?
23     And I'm going to share this with you guys
24 contemporaneously with pulling it up on the screen.
25 Please wait just a moment.

**Page 22**

1   MR. CASCINI: All right. I've sent that on
2   off to you Charis and Julie, please let me know when
3   and if you received it.
4   MS. GAFKAY: I got it.
5   PEARSON EXHIBIT 24
6   WAS MARKED BY THE REPORTER
7   FOR IDENTIFICATION
8   BY MR. CASCINI:
9   Q. All right. I will now be sharing on the screen a
10   document that I will request be marked as Exhibit
11   Number 24 in this matter. I'm going to share that on
12   the screen now.
13   All right. Does everybody see a document
14   that says Genesee County Road Commission, Job
15   Description, and then title, Human Resources
16   Administrative Assistant?
17   Are you able to see that on the screen?
18 A. Yes, I can see that.
19 Q. I'm going to scroll down now, so although I'll allow
20   you time to read the document to the extent we need to
21   ask any questions about it, I just want to clarify one
22   quick thing to get started here.
23   So we're going to the bottom, we're going to
24   go to page 2, 3, 4. At the very bottom does it have
25   Donna's initials at the bottom of this document?

**Page 23**

1 A. Yes, those are Donna's initials.
2 Q. And the date is 11/16/18; is that correct?
3 A. Yes, that's what I see.
4 Q. Okay. Now, when in your experience as an individual
5   familiar with job descriptions -- a job description is
6   either revised or changed, would that date on the
7   bottom change to indicate that a new version has been
8   created?
9 A. Yes, I would say that's a general practice.
10 Q. Now, I don't expect you to have memorized what the
11   administrative assistant job description has said, or
12   what any job at the GCRC has said, but have you seen
13   recently a copy of the HR administrative assistant job
14   description as it existed at the time that you were
15   hired?
16 A. Can you repeat the question?
17 Q. No, that's totally fine. Have you recently seen a copy
18   of the HR administrative assistant job description as
19   that job description existed at the time that you were
20   hired?
21 A. I cannot say that I've recently seen it, no.
22 Q. Okay. Nevertheless, and I can probably figure out how
23   to pull them up in parallel, which let me try to do
24   that now. This is a place where sometimes it's a lot
25   easier to do this in person than it is over the

**Page 24**

1   internet.
2   What I'd like to do next is I'm going to
3   attempt to pull off two documents simultaneously, and
4   namely they will be Exhibit 24 and Exhibit 22. Let's
5   see if I can do this here. Hold on just a moment all.
6   Now, Ms. Pearson, are you able to see a
7   screen with two documents that are side by side on it?
8 A. Yes.
9 Q. Okay. What we've got just for the purposes of the
10   record here, we've got Exhibit Number 22 which is on
11   the left and Exhibit Number 24 which is on the right.
12   So I'd like you to refer, Ms. Pearson, when I
13   ask you a couple questions, are we talking about
14   Exhibit 22 on the left or Exhibit 24 on the right.
15   Are you able to tell, Ms. Pearson, whether
16   Exhibit 22 or Exhibit 24 was a copy of the
17   administrative assistant job description at the time
18   that you were hired? I can go on to other pages of
19   either if you would like.
20 A. I mean I would have to say that, you know, I was hired
21   in March of 2019, so both job descriptions read fairly
22   closely to me, but I couldn't say with all certainty
23   what is the active document.
24 Q. Okay. Totally fine. So it could be Exhibit 22, it
25   could be Exhibit 24, but you can't say?

**Page 25**

1 A. Correct.
2 Q. Or it could even be a third document, theoretically,
3   you don't have the job description memorized; is that
4   correct?
5 A. That is correct, I do not.
6 Q. Completely understandable. So what I'm going to ask
7   you next, and here I'm going to stop sharing the
8   screen.
9   You testified a little bit earlier that when
10   you were hired into the position that it was a
11   part-time position at first. I'm referring to the
12   administrative position by the way; is that correct?
13 A. Yes, that is correct.
14 Q. And you said that you when you were hired you were
15   quote, "told that the position would be part-time at
16   first and then become a full-time position," is that
17   right?
18 A. What I recall during the interview is that I was told
19   that it was part-time, however, it was the desire of
20   Director Poplar to have a full-time staff person,
21   however, that wasn't approved at that time.
22 Q. Okay. And who was it that told you that -- actually
23   we'll back up a second. You said there was an
24   interview process associated with this position?
25 A. Yes.



hansonreporting.com
313.567.8100

Page 26

1  Q.  Who interviewed you during your interview for the
2      administrative assistant?
3  A.  There was a panel that consisted of the HR team led by
4      Donna Poplar.
5  Q.  Who else was on the HR team at that time?
6  A.  Cherry Grant and Rachel Mullen.
7  Q.  Were Donna, Cherry, and Rachel all present during your
8      interview?
9  A.  Yes.
10 Q.  And who was the individual that told you that the
11     position would be full-time, if you can recall?
12 A.  Donna Poplar during the interview process shared with
13     me, again, that the position was part-time. However,
14     her desire was to have someone full-time, but, again,
15     that wasn't something that was guaranteed because it
16     wasn't approved.
17 Q.  Perfect. Okay. Now, when you started in the position
18     and it was part-time initially and it, in fact, later
19     transitioned into a full-time position; is that
20     correct?
21 A.  That is correct.
22 Q.  Approximately when did that happen, more or less, to
23     the best you can recall?
24 A.  October of 2019.
25 Q.  So you worked under the position in a part time

Page 27

1      capacity for, what is that, about 6, 7 months,
2      somewhere in that vicinity, approximately?
3  A.  Yes, I would say that's accurate.
4  Q.  Sure. And I believe you testified that Donna Poplar
5      told you about her visual disability while you were
6      working in part-time capacity; is that correct?
7  A.  I first learned of it during my part-time employment.
8  Q.  Now, you mentioned that it was communicated to you that
9      part of your role as the part-time administrative
10     assistant was going to be to accommodate Donna Poplar's
11     visual disability; is that right?
12 A.  Yes, that was part of it, yes.
13 Q.  Who told you that and how did you come to learn of that
14     requirement?
15 A.  Again, it was during the interview process when I first
16     learned of what some of the responsibilities would be.
17 Q.  All right. Now, with respect to the job
18     responsibilities that you testified about today, was
19     there ever a separation or delineation between the
20     roles where you would assist her in your capacity as an
21     administrative assistant and the roles where you would
22     assist her as necessary to accommodate her disability,
23     was that a distinction that was ever drawn or made?
24 A.  In the role as administrative assistant I was -- it
25     always my understanding that my focus or a lot of my

Page 28

1      responsibility would be to assist her with
2      accommodating her due to this disability. So I always
3      was working under that assumption or that
4      understanding.
5  Q.  I completely understand that. I'm asking a slightly
6      different question though which is, were you told, for
7      example, at any time or not whether these job duties
8      fell within the bucket of things that she needed help
9      with because of her visual accommodation needs and
10     these responsibilities fell in the bucket of just what
11     an administrative generally did, was that ever
12     separated or delineated in any way?
13 A.  No, I would not say that.
14 Q.  And you would agree with me, wouldn't you, that some of
15     the roles that you performed for Donna Poplar in the
16     role of administrative assistant are things that an
17     administrative assistant might perform for someone even
18     if they did not have a visual disability; is that
19     right?
20 A.  Yes, that's fair to say.
21 Q.  Are you familiar, approximately, with what some of the
22     other administrative assistants to directors within the
23     GCRC, what job duties they perform?
24 A.  I am not familiar with those other individuals, what
25     they do, what their responsibilities are, no.

Page 29

1  Q.  And then, do you happen to know whether or not whether
2      any of the other director administrative assistants are
3      in their jobs in part or in full because they need to
4      accommodate a visual disability or other disability
5      under the director in which they work?
6  A.  No, I'm not aware of anything. No, I couldn't answer
7      that.
8  Q.  You mentioned a little bit earlier that you had seen
9      Ms. Poplar struggle from time to time with various
10     tasks she needed to perform in her role as an HR
11     director because of her visual disability; is that
12     right?
13 A.  Yes.
14 Q.  And you mentioned that, you know, you saw a lot of
15     instances and things such as eye fatigue, things like
16     that.
17         To your knowledge did the GCRC ever offer Ms.
18     Poplar any other types of accommodations beyond the
19     administrative assistant to accommodate her visual
20     disability.
21 A.  I'm not aware of that.
22 Q.  Do you happen to know whether any modifications were
23     made to her computer, or her screen, or her lighting,
24     or anything like that?
25 A.  Yes, there was a monitor that she has to help enhance



Page 30

1  the, you know, to help with her vision. She had lights
2  either removed or changed in the office that would help
3  her, so, yes, I am aware of that.
4  Q. Did any of those accommodations, did it seem from your
5     outside experience, obviously it's not the same as she
6     experienced it, from your outside experience, did any
7     of those accommodations to your eye and as you observed
8     her demeanor, did any of those seem to help at all?
9  A. I would have to say, yes, they assist her. Some of
10    those -- the lighting, for instance, had always -- I
11    mean that is what -- when I hired in it was already
12    that way.
13       I know she was given a different type of
14    screen. I think that did help her with her vision, aid
15    her in her vision. I guess to answer that question,
16    yes, I think it does help.
17 Q. Now, you when you mentioned to me a little bit earlier,
18    you know, that you sometimes seen her struggle with
19    things and generate a lot of fatigue from having to
20    read documents on a computer screen, I can understand
21    all of that. When did you first observe that that was
22    occurring?
23 A. I mean I think I had from time to time witnessed when
24    she did a lot of reading. I could always tell when she
25    was fatigued. I think it was happening more regularly

Page 31

1  when I transferred into the benefits coordinator role.
2  I wasn't available to do or support her in the capacity
3  in which I had been previously as her administrator.
4  Q. Did you observe it at all while you were still
5     functioning as the administrative assistant, or I
6     should say also, either as you were the administrator
7     assistant or during the period of time when you were
8     the part-time administrative assistant?
9  A. Yeah, I would see it occasionally. If it was whatever
10    we may have been working on. If I had documents that,
11    you know, needed approval or she needed to review
12    because it was her responsibility. I mean I could see
13    from time to time that those activities do strain her
14    vision.
15 Q. Certainly. Okay. You mentioned that when you were the
16    HR administrative assistant, that one of the things you
17    did was fill in for and cross-train with Cherry Grant.
18       What job position did Cherry Grant occupy
19    when she was with the GCRC?
20 A. In the last role she was the senior benefits
21    coordinator.
22 Q. And when did you begin cross-training and filling in
23    for Cherry Grant in your role as an administrative
24    assistant, just in terms of approximately the time?
25 A. I don't know if I can give you a date or a time, but it

Page 32

1  was during the time that I was part-time, so early
2  2019. After my employment I started learning her
3  position, cross-training her. When she was out of the
4  office I would fill in for some of the things that had
5  to be done while she was absent. I was becoming very
6  familiar with that role.
7  Q. Okay. Was there any talk within the department of you
8     maybe being the heir apparent to that position once
9     Cherry Grant had retired?
10 A. What I recall first is Donna, Director Poplar, saying
11    to me that her team is very senior, they could retire
12    at any time and it's her desire to get someone
13    cross-trained to be able to be moved into either one of
14    those positions if they do decide to retire.
15 Q. And that someone was you, right?
16 A. Yes.
17 Q. And Director Poplar, in fact, expressed that opinion to
18    you, is what I just heard you say; is that right?
19 A. That's correct.
20 Q. When did Cherry Grant, in fact, actually retire?
21 A. November of 2021.
22 Q. And I believe you testified a little bit earlier that
23    you were promoted into the benefits coordinator
24    position in October of 2021?
25 A. Yes.

Page 33

1  Q. So shortly before she retires then they kind of slide
2     you in and they formally put you in that position; is
3     that right?
4  A. That is correct.
5  Q. Did you apply for that position, the benefits
6     coordinator position?
7  A. Yes.
8  Q. How did you come to learn that you had obtained or that
9     you had been promoted into that position?
10 A. I was informed that I was going -- that I was the best
11    qualified individual to fill that role and I -- if I
12    remember correctly, I had conversations with both Fred
13    Peivandi and Randy Dellaposta on separate occasions,
14    and I believe Fred was the individual first who told me
15    that they were going to put me into that position.
16 Q. Do you know whether Fred or Randy or some third party
17    was the decision-maker, the person who decided to
18    promote you into that position?
19 A. Well, there's always a, you know, a review process, so
20    I'm assuming that, you know, it was a collective
21    decision.
22 Q. Okay. And I believe that you testified at the time
23    that in the benefit coordinator position you would be
24    primarily handling benefits coordination in that role,
25    but that you were also expected to provide some HR --



Page 34

1  some of the similar roles that you performed as an HR
2  administrative assistant; is that right?
3  A.  My understanding is that it would -- some of the basic
4     needs of HR would still come across my desk and I would
5     be responsible for.
6  Q.  And was that mentioned to you either during the process
7     of applying for that position or after you were
8     promoted?
9  A.  I saw the job description and I know that that was part
10     of it, so I understood that there would be some HR
11     function, because I was in the HR department, that
12     would be a case, something that I would probably have
13     to handle.
14  Q.  Okay. Did you have any conversations with anybody
15     either before or shortly after accepting the benefit
16     coordinator position that part of those duties would be
17     to continue some administrative support roles?
18  A.  Yes.
19  Q.  With whom?
20  A.  That conversation took place with Randy Dellaposta.
21  Q.  And when you heard that expectation, what, if anything,
22     did you tell Randy in response?
23  A.  I told him that it was -- because we were talking
24     pretty specific of what they were, one thing that I
25     recall of that conversation is that he informed me that

Page 35

1     I would have to retain and continue working as the
2     coordinator for COVID, and I told him that makes sense.
3        He also said there would be some
4     responsibilities as far as HR functions, and I
5     understood that as to be typical HR responsibilities,
6     not that I would still remain in the position as
7     Donna's administrative assistant.
8  Q.  Sure. And that's an important distinction to draw
9     here, and I appreciate you saying that. So let me see
10     if I can understand a little bit more about this
11     conversation that you were describing.
12        You are not told you're going to be the
13     administrative assistant and the benefit coordinator at
14     the same time, but instead you're told as the benefits
15     coordinator you're still going to maintain some of the
16     administrative assistant roles; is that right?
17  A.  What was shared with me is I would attain some
18     functions for the HR department, not so much as the
19     administrative assistant.
20  Q.  Okay. Great. And that was in a conversation with
21     Randy Dellaposta?
22  A.  That's correct.
23  Q.  Did you ever express any concerns to Randy or to Fred
24     that maybe some of those administrative assistant
25     function and roles would take the job and make it

Page 36

1     unmanageable, take it from being a job to where you
2     could perform it to a job where you're not sure whether
3     or not you could get all those functions performed?
4  A.  No, I have not had a conversation with Fred or Randy
5     about that. I mean if I was going to bring that up I
6     would certainly talk to Donna about it first. But as
7     it was described to me when I accepted the position as
8     benefit coordinator I didn't feel like I would -- you
9     know, there would be an overwhelming burden because it
10     was not shared with me that I would continue in the
11     capacity of administrative assistant to the director.
12  Q.  It makes perfect sense. It wasn't something that you
13     anticipated that it was going to be an issue, and as a
14     result you didn't bring it up as an issue, correct?
15  A.  Outside of conversations I had with Donna.
16  Q.  And what kind to have conversations have you had with
17     Donna about that issue?
18  A.  Only that her and I had discussed that she understands
19     that my bandwidth is the focus of the benefits
20     coordinator role, and that I didn't have the capacity
21     to work as her administrative assistant. These are the
22     types of things we talked about.
23  Q.  And that was something that she came and volunteered to
24     you, she said, hey, this is my understanding about how
25     this new job promotion was going to affect things?

Page 37

1  A.  We had casual conversations about it. She would see me
2     and she would make comments about, I know you're busy,
3     I see how busy you are. She is not asking me to do the
4     things I normally would do because that's no longer my
5     role.
6  Q.  Are there any occasions at all when she asks you to
7     perform any tasks to assist her with things that may be
8     furthered by her visual disability in your role as the
9     benefits coordinator, I'm sorry, I should clarify.
10  A.  Yes, there have been occasions where she asked and I
11     can recall a couple where I had to let her know that I
12     couldn't get to that, I had this or that, and she would
13     say she would understand.
14        I mean -- but occasionally I would, you know,
15     help her with, you know, a calendar or contact any
16     employee or, you know, something minor that she would
17     ask or that I would help her with, but it definitely
18     changed.
19  Q.  Okay. When you were the administrative assistant, so
20     when you were in your role as the HR administrative
21     assistant as contrast with the benefits coordinator,
22     when you were administrative assistant did you manage
23     Donna's inbox and e-mail communications?
24  A.  As administrative assistant, yes.
25  Q.  When you were benefit coordinator did you perform that

### Page 38

1 role never, sometimes, or always?
2 A. Occasionally I would remind her that she needed to
3 check her e-mails for this or for that, but it wasn't
4 something that I was managing on a day-to-day basis
5 anymore.
6 Q. Got it. When you were the HR administrative assistant,
7 did you perform the functions of doing research for
8 projects within the HR department?
9 A. Absolutely.
10 Q. In your role as the benefit coordinator, did you
11 perform that same function never, sometimes, or always?
12 A. Never.
13 Q. When you were the administrative assistant, were you
14 responsible for managing, in part at least, managing
15 Donna Poplar's calendar?
16 A. Yes.
17 Q. And when you became the benefit coordinator did you
18 perform those functions always, sometimes, or never?
19 A. Sometimes.
20 Q. At the time you applied for the benefits coordinator
21 job, were you eager to receive that position?
22 A. Yes, because it would be a promotion for me.
23 Q. Is the pay higher that you received in the benefit
24 coordinator position than in the administrative
25 assistant position?

### Page 39

1 A. Yes, sir.
2 Q. And when you heard that, you know, that you accepted or
3 that you had been promoted and that they had chosen you
4 as candidate, were you excited?
5 A. Yes.
6 Q. Do you remember whether Randy, or Fred, or both, or
7 neither, you know, offered you congratulations for
8 having been promoted into that position?
9 A. Yes, I had conversations with both Fred and Randy
10 congratulating me on it.
11 MR. CASCINI: Ms. Lee and Ms. Gafkay may have
12 some additional question for you, but that's all I have
13 for you at the present time.
14 THE WITNESS: Thank you.
15 RE-EXAMINATION BY MS. LEE:
16 Q. I just have a few follow-up questions. Thank you,
17 Attorney Cascini. All right. Ms. Pearson, this won't
18 take long, I promise. We're going to get you out of
19 here on time. I just want to clarify.
20 Regardless of job descriptions, when you were
21 administrative assistant or HR administrative
22 assistant, your duties did include reading, writing,
23 researching to accommodate Donna's disability in
24 addition to assisting her with getting to and from
25 meetings and other thing s she requested due to her

### Page 40

1 visual accommodation?
2 A. Yes, that's correct.
3 Q. Okay. And those are duties that you now cannot do due
4 to your promotion into the benefits coordinator role?
5 A. Yes, that's correct.
6 MS. LEE: Okay. That is all the questions I
7 have for you. I appreciate you coming in today. I
8 believe you guys don't work on Fridays, so I appreciate
9 you accommodating us for that, and I wish you a happy
10 and safe weekend. Thank you all.
11 MS. GAFKAY: Charis and Andrew, can you
12 e-mail the court reporter the exhibits that we used
13 today so she can attach them to the record?
14 MS. LEE: Yes.
15 MR. CASCINI: And, Ms. Pearson, I don't have
16 anything else either. Thank you so much for your time.
17 Have a great weekend, and I'm glad we are able to get
18 you out of here in a timely manner.
19 THE WITNESS: I really appreciate you guys
20 being considerate. Thank you.
21 MR. CASCINI: Absolutely.
22 (Deposition concluded at 9:26 a.m.)

### Page 41

```
                        CERTIFICATE OF NOTARY


STATE OF MICHIGAN    )
                     ) SS
COUNTY OF MACOMB     )

     I, Lucy Capobianco, Certified Shorthand Reporter, a
Notary Public in and for the above county and state, do
hereby certify that the above examination under oath
was taken before me at the time and place hereinbefore
set forth; that the witness was by me first duly sworn
to testify to the truth, and nothing but the truth,
that the foregoing questions asked and answers made by
the witness were duly recorded by me stenographically
and reduced to computer transcription; that this is a
true, full and correct transcript of my stenographic
notes so taken; and that I am not related to, nor of
counsel to either party nor interested in the event of
this cause.



                    _____
                    Lucy Capobianco CSR3061
                    Notary Public,
                    Macomb County, Michigan
My Commission expires:  January 20, 2027
```