

ROBERT W. KIRK *
ROBERT S. HUTH, JR.
CRAIG W. LANGE
RAECHEL M. BADALAMENTI
MARYANNE J. DENEWETH
MICHAEL C. TAYLOR
ROSEMARY V. DAVIS
PATRICK S. MCKAY
ELIZABETH P. ROBERTS
ROBERT T. CAROLLO, JR.
RYAN J. L. FANTUZZI **
MICHAEL J. PETRUS
BRANDON N. KASTAW

\* Also Member of Florida Bar
\*\*Also Member of Virginia Bar

19500 HALL ROAD
SUITE 100
CLINTON TOWNSHIP, MICHIGAN 48038
(586) 412-4900

**www.KirkHuthLaw.com**

FLORIDA OFFICE

1048 GOODLETTE-FRANK RD.
SUITE 202
NAPLES, FL  34102

WRITER'S E-MAIL: clange@KirkHuthLaw.com
FACSIMILE: (586) 412-4949

April 26, 2021

*Privileged and Confidential/*
*Attorney-Client Communication*

Gayle Cummings, Administrator
Michigan County Road Commission Self-Insurance Pool
417 Seymour Ave., Suite 2
Lansing, MI  48933

    Re: Donna Poplar Harassment Complaint

Dear Ms. Cummings:

   *"Today, I feel like I am the George Floyd of GCRC, and Fred Peivandi has his knee on my neck, and I am crying out, "I Can Not Breathe."* (Donna Poplar 1/28/21 Complaint, p. 3).

   *"Facts matter!"*  Donna Poplar email to John Mandelaris (8/23/19 12:27 pm, Attachment 31 to D. Poplar Response to 2-25-2021 Request for Documentation).

## I.  INTRODUCTION

   In May of 2020, an event of unspeakable horror and disgust was thrust upon us from the streets of Minneapolis.  For over eight minutes we watched a white Minneapolis police officer - without emotion - kneel on the throat of a black man, George Floyd.  We watched as he and other officers turned a deaf ear to Mr. Floyd's strained protestations that he could not breath.  We watched the life drain out of him on that Minneapolis street.  This one event became a symbol of the repression, the oppression, the violence against African Americans which has been hidden and often denied by members of the white community for over four hundred years.  It ripped off the blinders of many as to the systemic and structural racism which is extant in our Nation.

Gayle Cummings, Administrator
April 26, 2021
Page 2

The death of George Floyd opened the eyes of many to the abuses suffered by the black community.  Indeed, there appears to be a movement towards racial reconciliation borne of the events of last May.[1]   We can hope that, from this tragedy, racial reconciliation can become a reality.  It has been a long time coming.  Black lives matter.

Donna Poplar has undoubtedly experienced racism in her life. She perceives she is experiencing racism as Human Resource Director at the GCRC.  It is understandable for her to believe that she is being repressed in her role of Director on the basis of her race and gender.  She perceives that she can't breathe working under the management style of Managing Director Fred Peivandi of the Genesee County Road Commission ("GCRC").

But as Ms. Poplar also recognizes, it is not only that black lives matter.  Facts matter too. In an email to GCRC Board Chair Mandelaris, she states no less than eight times that facts matter. In that email, she urges the application of "objective principles" in making determinations rather than relying on opinions without foundation.  (Attachment 31 to Ms. Poplar's response to my February 25, 2021 Request for Documents).

To that end, this report and my opinions set forth herein are based upon facts as I perceive them through witness interviews and a voluminous number of documents provided to me by Ms. Poplar, Mr. Peivandi and others.  Where appropriate, I will quote those documents in support of the opinions I have reached.

This report is based upon my analysis of all documents submitted to me by Ms. Poplar and others.  While I may not refer to certain documents in this report or address certain assertions made by the participants, I have reviewed all documents and considered all assertions as presented.

The Genesee County Road Commission Harassment Policy sets forth the Commission's Harassment Policy as follows:

> Genesee County Road Commission (GCRC) is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits unlawful discriminatory practices, including harassment. Therefore, GCRC expects that all relationships among employees will be professional, business-like and free of bias, prejudice and harassment.
>
> GCRC encourages reporting of all perceived incidents of discrimination or harassment to the Human Resources Department. To the extent the complaint is regarding the Human Resource

---

[1] As I finalized this report, Derek Chauvin was convicted of all three counts in the murder of George Floyd.  One may be encouraged that his conviction is another step towards healing the racial divide in our Country.

Gayle Cummings, Administrator
April 26, 2021
Page 3

> Department [sic], the complaint will be directed to the Managing Director and the Chairperson of the Road Commission Board. It is the policy of GCRC to promptly and thoroughly investigate such reports. GCRC prohibits retaliation against any individual who reports discrimination or harassment or who participates in an investigation of such reports.

The Policy defines harassment as:

> . . . verbal, written or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her Protected Characteristics, and that a) has the purpose or effect of creating an intimidating, hostile or offensive work environment; b) has the purpose or effect of unreasonably interfering with an individual's performance; or c) otherwise adversely affects an individual's employment opportunities.

> Harassing conduct includes epithets, slurs or negative stereotyping; threatening, intimidating or hostile denigrating jokes; and written or graphic material that denigrates or shows hostility or aversion toward an individual or group and that is placed on walls or elsewhere on the employer's premises or circulated in the workplace, on GCRC time or using GCRC equipment via e-mail, phone (including voice messages), text messages, tweets, blogs, social networking sites or other means.

The Commission's harassment policy was drafted so as to provide greater protection to individuals in the hope of eliminating workplace harassment before it rises to a level which violates the law. Accordingly, the policy prohibits behavior which is more expansive than those prohibited by law. As such, this letter will address only the Commission's policy and not the law, though legal standards found in the policy may be interpreted in reliance upon judicial interpretations of State and Federal law.

## II.    INVESTIGATION

My investigation included interviewing thirteen individuals.[2]  Only two interviews were conducted in person—Ms. Poplar and Mr. Peivandi.  Several follow-up phone calls were conducted with both of them.  In addition, telephonic interviews (several with more than one call) were conducted with the following people:

---

[2] I also attempted to interview Anthony Branch.  Mr. Branch has a lawsuit pending against the GCRC claiming that the Commission failed to employ him as Managing Director because of his race (black).  In asking his attorney for permission to interview Mr. Branch, conditions (such as a prohibition against asking any questions dealing with the topic of race) made the interview impractical.  As a result, Mr. Branch was not interviewed. In my opinion, the investigation was not materially hampered by my inability to interview Mr. Branch.

Gayle Cummings, Administrator
April 26, 2021
Page 4

- Homer Bennett
- Thomas Derderian
- Randall Dellaposta
- Cloyce Dickerson
- Daniel Hudson
- Mike Jaeger

- Eric Johnston
- Tracy Kahn
- Shirley Kautman-Jones
- John Mandelaris
- Rachel Mullin

In addition, I received documents measuring over four inches in height. Ms. Poplar alone sent me at least 80 attachments she believed supported her assertions. I received many documents from Mr. Peivandi as well. Additional documents were received from Mike Jaeger, Rachel Mullin and Shirley Kautman-Jones. I wish to thank all of the witnesses, especially Ms. Poplar and Mr. Peivandi, for their cooperation in addressing my questions and submitting documentation to me upon my request.

### III.   THE HIRING OF AN ADMINISTRATIVE AIDE IN THE HUMAN RESOURCE DEPARTMENT

The starting point for Ms. Poplar's claims of harassment, intimidation, retaliation, differential treatment, and discrimination (hereafter generically referred to as "discrimination" unless stated otherwise) begin in paragraphs four through six of her January 28, 2021 Complaint (hereafter "Complaint"). She writes as follows:

> "The events mentioned above started in early 2018 and has continued to escalate. In June of 2018, I was approved for FMLA disability. Fred Peivandi refused my reasonable non-hardship accommodation request. He stated, 'why would I accommodate your disability when I can hire an HR Director who doesn't have a disability?' It took approximately one year before my disability accommodations was granted, and after I filed a Charge of Discrimination Claim with the Equal Employment Opportunity Commission (EEOC) for disability, race discrimination, and deferential [sic: differential] treatment in February of 2019 and only after many meetings with the GCRC's Legal Counsel and the GCRC Board. The GCRC Board intervened and said enough is enough of Fred's defiant behavior, demanding Fred Peivandi to approve my disability accommodations as he was instructed to do before I filed an EEOC Complaint.

> In 2019, I received a Right to Sue Letter from EEOC, but I did not pursue a lawsuit hoping that my working conditions would get better. Unfortunately, my working conditions did not get better, but only got more hostile and intimidating after filing my EEOC discrimination claim.

Gayle Cummings, Administrator
April 26, 2021
Page 5

> In March of 2019, Fred Peivandi confronted me with a look of trembling anger, accusing me of trying to sue for money. He felt that I was working against him and reiterated that he thought I was using my disability to get my way. Fred's words were not tempered but rather hostile and intimidating in nature. This situation was immediately shared with the GCRC Board and its attorney."

By way of background, Ms. Poplar began her employment in October of 2016. She was hired into the Commission as Director of Human Resources. At that time, John Daly was the Managing Director. Fred Peivandi was the Director of Engineering, having been employed by the Road Commission since 1993. He became Director of Engineering in 2005. He served in that role until February of 2018 when, together with Director of Maintenance Anthony Branch, he was appointed Co-Interim Managing Director. After a recruitment process, he was selected as Managing Director by the unanimous vote of the GCRC and began serving in this capacity on August 1, 2018.

Ms. Poplar's claims in Paragraphs 4 through 6, while not fully explained, deal with the hiring of an Administrative Assistant ("Admin") in the Human Resource ("HR") Department. In my initial interview with her, Ms. Poplar was unsure of certain key dates in the hiring of the HR Admin since 2016. She claims the discrimination (and retaliation) against her began over the issue of this hiring. She claims that Mr. Peivandi "…refused her non-hardship reasonable accommodation request" in failing to fill this position. In an August, 23, 2019 email to Commissioner John Mandelaris, Ms. Poplar states that for "three years" her request to fill the HR Admin position had been blocked for political and personal reasons. (DP Response to 2/25/21 Request for Information, Attachment 31 ["22531"]).[3]

My review of the facts concerning the filling of the HR Admin position leads to a different conclusion. In my opinion, the creation and filling of an HR Admin position was, from nearly the beginning of Ms. Poplar's employment with the Commission, her objective and goal. I also am of the opinion that this objective and goal was not premised initially upon any need for accommodation due to disability, but based upon her perception of operational need. As the facts suggest, Ms. Poplar was very strategic in first filling the position with a part-time employee, and then moving quickly to convince the Commission that the position should be changed to full-time. Furthermore, I do not believe that Mr. Peivandi, as Managing Director, ever refused Ms. Poplar's request for accommodation. Rather, I believe he and legal counsel, Thomas Derderian, responded in a timely manner once a formal request for accommodation was finally received by the GCRC

---

[3] Ms. Poplar submitted two sets of documents to me as a result of requests for documentation. The second request was technically sent to Mr. Peivandi but forwarded to Ms. Poplar when it was determined she was in a better position to fulfill it. My first request was on 2/25/21. My second request was on 3/2/21. 53 attachments were included with her response to my 2/25 Request. 17 attachments were included in her response to my 3/2 Request. In referencing these attachments, I will designate the date of response (such as 225 or 32) and the attachment number Ms. Poplar has provided to it. Thus, "22531" will refer to the 31st attachment to the February 25, 2021 Response by Ms. Poplar to my Request. Some attachments contain many pages. In such cases, I shall attempt to give the date of the document to assist locating the referenced material. Information provided by others will be identified individually. On March 23, 2021 I received a third submission of attachments from Ms. Poplar containing 12 attachments. Reference to that material will be by the designation "323____".

Gayle Cummings, Administrator
April 26, 2021
Page 6

on August 27, 2018. (2256). In my review of the documentation as submitted to me, I see neither a discriminatory animus nor a failure to accord Ms. Poplar with adequate or reasonable accommodation. I do see, however, that seeds of discord between Mr. Peivandi and Ms. Poplar were sown over the issue of the HR Admin, not because of race, gender or disability, but rather over the issue of how much the HR Admin should be paid and who should determine it.

Ms. Poplar is right in suggesting that the filling of the HR Admin position, at least on a full-time basis, consumed a three-year period of time. It began shortly after her arrival. By January 17, 2017, a request for a 2017 Budget Transfer was prepared and submitted to the GCRC for consideration at the January 24, 2017 Commission meeting. (2251B). The reason for the requested transfer was to hire a "part-time Administrative Assistance [sic: Assistant] to perform a variety of administrative and clerical tasks." There is no mention of disability nor need for accommodation. The Commission resisted the request to hire an additional employee for the HR Department as had been requested. The minutes of the meeting reflect:

> "Commissioner Mandelaris said that prior to funding a non-existent position he feels staff should put the justification in a memorandum to the Board specifically saying why we need this position and ask the Board to create this position and then fund it. Chairperson Dickerson agreed with Commissioner Mandelaris' comments on this position."

The Commission sent Ms. Poplar and then Managing Director John Daly away without approving the hiring of an HR Admin.

On February 8, 2017, Ms. Poplar submitted a "Human Resource Administrative Assistant Need Analysis." (2254). Significantly, there is no suggestion that the position is needed to accommodate any disability. The needs assessment is built upon operational efficiencies only.

At the March 7, 2017 Commission meeting, based upon Minutes furnished to me, Chairperson Cloyce Dickerson questioned Ms. Poplar about a construction project which had been undertaken without Commission approval and which was designed to create more space for the HR Department. He asked the specific question, "...why does the Human Resource Department need more space to operate efficiently, they don't have that many visitors?" The minutes also reflect that Chairperson Dickerson had heard the move "...was for the purpose of an Administrative Secretary." Never mentioning that the construction work was to create space for an HR Admin to work, Ms. Poplar claimed the work was being done to provide visitors a place to sit away from confidential employee personnel records.[4]

From the Minutes of March 7, 2017 until March 13, 2018, I was provided no additional documentation to track Ms. Poplar's progress in filling the HR Admin position. Nor was any information received from any other source. It is unlikely the matter died, but neither was the position filled during the tenure of then Manager John Daly. While Ms. Poplar initially opined to

---

[4] Ultimately, the space is used as work space for the HR Admin.

Gayle Cummings, Administrator
April 26, 2021
Page 7

me during my interview with her that the HR Admin position was approved by Manager Daly and the Commission for full-time in the 2017-18 Budget, she later retracted that opinion. The documents would support that the position, whether on a part-time or full-time basis, was not approved to be filled until after John Daly had resigned from the Managing Director position in February, 2018.

I did receive documentation from Shirley Kautman-Jones ("SKJ"), however, which suggests that in early March, 2018, Ms. Poplar met with Anthony Branch to discuss filling the HR Admin position on a part-time basis. At that time, Mr. Branch was functioning as Co-Interim Managing Director for the GCRC as Mr. Daly had resigned. In an email dated March 8, 2018, Ms. Poplar summarized this meeting. For the first time, one can find reference to Ms. Poplar's stated visual disability. However, she speaks about it in the context of what Mr. Daly did for her (parking place move, office lights adjusted). Her most direct statement about whether hiring an HR Admin would accommodate her is this sentence, "Having a Clerical Assistant would put me on equal footage with the other Department Directors and aid in accommodating my visual disability." The overwhelming thrust of the email, however, is how operation efficiencies will be improved in her Department if she is permitted to hire an HR Admin. For instance, she writes, "…if I am going to be held accountable and directly responsible for the efficiency, productivity, quality performance and timeliness of the HR Department, then it is imperative that I have the access to a full-time Clerical Assistant like the other Department Directors have available to them (My Colleagues)."[5]

While a Commission meeting was held on March 20, 2018, the subject matter of the HR Admin was apparently not brought up. However, by an email dated March 26, 2018 at 11:54 am, Anthony Branch communicated to the Board Chair, SKJ, as well as to Commission Member Mandelaris, the following:

"Commissioners,

I intended to give you this information at our last meeting (03/20/2018) but time constraints prevented me from doing so, hence, this is the information you've requested. I talked with Donna in detail about her request for a Clerical Assistant in the HR department.

I didn't get the impression that She was asking for any ADA accommodation, rather that the position is needed due to the confidentially sensitive nature of HR information that union employees aren't privy to, and warranted due to the number of

---

[5] Interestingly, the email states that "John [Daly] moved forward in early 2016 to reconfigure the Purchasing Department into an office for the HR Clerical Assistant, and reconfigured the Finance office space to accommodate the Purchasing Department." The reader will recall the minutes of the March 7, 2017 Commission quoted above. Ms. Poplar never proffered to the Commission then that the reason for the construction work (not approved by the Commission at the time) was for purposes of creating office space for the HR Clerical Assistant. Rather, she told the Commission when queried that the work was being done "…to maintain confidentiality at all times."

Gayle Cummings, Administrator
April 26, 2021
Page 8

> employees the HR department is responsible for, and the fact that all
> other department heads have clerical assistants to perform such
> clerical activities that are currently all Her responsibility.
> I asked that She put her request in writing as previously requested
> by Commissioner Mandelaris in justification format, for the Boards
> consideration to create and fund the position (attached).
>
> Also I have attached an organizational chart showing other
> department head clerical assistants, and GCRC Board meeting
> minutes where the position had been previously discussed.
> Let me know if any of you need any other information regarding this
> matter and I will get it for you.
>
> Anthony."

My interview and interactions with Ms. Poplar left me with an unwavering opinion that she has ultimate faith in the veracity and judgment of Anthony Branch. His conclusion that, "I didn't get the impression that She was asking for any ADA accommodation, rather that the position is needed due to the confidentially sensitive nature of HR information that union employees aren't privy to, and warranted due to the number of employees the HR Department is responsible for, and the fact that all other department heads have clerical assistants to perform such clerical activities that are currently all Her responsibility.", is completely consistent with my review to this point. Nothing suggests that Ms. Poplar had, as of March 26, 2018 at least, ever directly linked the HR Admin position with a formal request for additional accommodation due to her visual disability.

Apparently, through the Summer of 2018, the issue of the HR Admin remained dormant. During this time, the selection process for a new managing director for the GCRC was underway. By August 1, 2018, that process was completed and Fred Peivandi was chosen to replace John Daly. It was only then, on August 27, 2018 that, for the first time, Ms. Poplar formally tied together a request for a formal accommodation for her visual disability with the hiring of an administrative assistant in the HR Department. (2256).

I find that Mr. Peivandi's response to this formal request was both timely and appropriate. On August 29, 2018, he sent correspondence to Ms. Poplar asking for medical documentation to properly evaluate her request and an offer to consider appropriate accommodations once that information was received. (2257).

Subsequent to the receipt of the medical information, a meeting between Mr. Derderian, Labor Attorney for the GCRC, Mr. Peivandi and Ms. Poplar was scheduled and held on October 19, 2018. (2258). A summary of that meeting was prepared by Tom Derderian and emailed to the Road Commission on October 24, 2018. (2259). In it, based upon her disability, Mr. Derderian and Mr. Peivandi "agreed" to support the hiring of a part-time employee (20 hours/week) "…to assist Donna with reading and responding to the volume of written material she must process in performing her job responsibilities."

Gayle Cummings, Administrator
April 26, 2021
Page 9

To this point, based upon my experience as a labor and employment lawyer for more than forty years, I believe everything Mr. Derderian and Mr. Peivandi have done since the assumption of his duties as Managing Director with regard to the accommodation request of Ms. Poplar has been appropriate and as required by the Americans with Disabilities Act.

Notably, Mr. Peivandi and Ms. Poplar agreed to postpone posting the part-time HR Admin position. In an email dated November 8, 2018 (22511), Ms. Poplar wrote as follows:

> "As of yesterday's meeting we agreed to hold off on posting the part-time position until I do a presentation to the Board for my need for a full-time HR Assistant. We agreed we would address this issue in early 2019. You also, instructed me to contact Hiring Solutions to help locate a Part-Time HR Assistant, I told you that I didn't think that would be cost effective."

For reasons that are unclear, the parties may have changed their minds as Ms. Poplar and Mr. Peivandi on November 15, 2018 submitted a Budget transfer to the GCRC for consideration at its December 4, 2018 meeting. The transfer was to permit the hiring of a "part-time administrative assistance [sic: assistant] for 20 hours per week at an hourly rate of $25.00 per hour..." (22512). The Commission approved the budget transfer as submitted on December 4. (22513).

While everything had proceeded smoothly to this point and Mr. Peivandi and Ms. Poplar appeared to be sailing along to accomplishing Ms. Poplar's first goal to hire a part-time administrative employee, the seas began to become stormy two days later. In a conversation between Mr. Peivandi and Ms. Poplar, he informed her that he did not believe it necessary to pay a part-time clerical employee $25 per hour. He authorized the posting for the position. However, he suggested a lower hourly rate. When Ms. Poplar asked in the email at what rate he wanted to compensate the position, Mr. Peivandi responded, "I'm thinking $15 to $18 per hour depending on the experience." (22514).

At the next Commission meeting on January 8, 2019, prompted by a question from Commissioner Dickerson, Ms. Poplar advised that the position had been advertised and applications received. She then explained to the Commission that she was instructed by the Managing Director to post the position at the pay range set forth in the preceding paragraph. Managing Director Peivandi asserted that the $25 pay rate was too high for a non-professional. Ms. Poplar opined that, while she could not go against what the Managing Director had directed her to do, she would like a "clarification" from the Board. The Board then voted 3-1 to establish the salary rate at $25 per hour, over Mr. Peivandi's objection. (22515).

It is not difficult to assess Mr. Peivandi's reaction to the Commission's action. The minutes reflect:

Gayle Cummings, Administrator
April 26, 2021
Page 10

> "Mr. Peivandi said that Commissioner Arceo is correct in saying that the Managing Director is responsible for hiring and firing in this organization, not the Board. Managing Director Peivandi state that he disagrees that the position be paid $25 per hour. Chairperson Mandelaris said that the motion today is reaffirming the decision the Board made last year. Chairperson Mandelaris clarified that the person has to qualify for that amount of money."

Significantly, the question of filling the HR Admin position was never an issue. The only issue was the rate of pay. By championing the $25 pay rate to the Commission on January 8 and not (at least initially until the applications were thoroughly vetted) deferring to the Managing Director's desire to hire at a lesser rate, Ms. Poplar created an uncomfortable situation for the new Managing Director in which his authority to hire and fire was trumped by the Commission in a vote of 3-1.

Mr. Peivandi's frustration over the Commission's perceived usurpation of his responsibility to establish who is hired, terminated and how much they are paid did not diminish after the Board's January 8 vote. He informed Ms. Poplar on January 31 that, despite the Commission's vote, he would not sign the Personnel Action Notice that is used by the Finance Department to process the salary amount in the payroll system. He reiterated to her that setting the salary rate was his responsibility, not the Commission's. Ms. Poplar immediately emailed the Chairperson and Vice-Chair of the Commission as to what had occurred in her interaction on that day with Mr. Peivandi. (22516). She did not copy Mr. Peivandi on that email. In fact, this began a common practice of Ms. Poplar to communicate directly with Commission members without providing a copy of such communications to her direct report, Mr. Peivandi.

Four days later, on February 4, 2019, Ms. Poplar filed a complaint with the EEOC, claiming that Mr. Peivandi had "...refused to hire an assistant...". This does not seem to be the case. Yes, there was a disagreement over the rate of pay, but there is no evidence he was opposed to hire a person for the position. Furthermore, she suggests in the Charge that Mr. Peivandi began to retaliate against her immediately by "barring" her from attending meetings with other directors and excluding her from attending any disciplinary meetings with staff members. (22517). My review of the facts did not substantiate these claims. While Ms. Poplar may have been invited to fewer meetings, she was not "barred" from attending meetings with other directors. She also continued to be involved in matters of discipline.

At a Commission meeting on the following day, the Commission, Mr. Peivandi and Ms. Poplar again engaged in a contentious discussion about filling the position. Mr. Peivandi continued to insist that he could not support paying $25 per hour for the position. The Commission Chair told Mr. Peivandi that the Board had approved the position at $25 per hour at the previous Board meeting and that he "...wants this matter closed today." (22518).

Despite the clarity with which the Commission had spoken, Mr. Peivandi remained stubborn and intransigent. When queried if he would sign the Personnel Action Notice for the HR

Gayle Cummings, Administrator
April 26, 2021
Page 11

admin salary at the $25 per hour rate by Ms. Poplar, he responded that he had not "…made a decision…yet." (22519;22520).

Perplexed, Ms. Poplar then wrote an email to Mr. Peivandi on February 7, sending a copy to each GCRC board member. In it, she states:

> "…I am perplexed as to why you are stagnant about **agreeing to** signing the Personnel Action Notice as ordered by the GCRC Board. I feel your stalling tactics are deliberate and without merit, and only serves as a hindrance and stumbling block to me bringing on board the HR Administrative Assistant, to accommodate my disability needs as a reasonable accommodation, because of my disability and protective activity. I know you are having discussions with certain GCRC Board members and Legal Counsel concerning this matter on **how you can get around paying the $25.00 per hour for this position as directed by the Board.**"

(Emphasis added) (22521).

On February 11, 2019, the Chairperson of the Commission, John Mandelaris, sent a handwritten note to Mr. Peivandi which re-emphasized his desire:

> "I know you and Shirley [Kautman-Jones] disagree with that decision, but you <u>cannot</u> disregard that <u>decision.</u> Let's <u>finalize</u> the process to bring the person on board and <u>end</u> this matter, festering since at least-2017."

(Emphasis in original).

This brought an end to the matter – at least temporarily – as an offer was extended and Monica Pearson filled the position. Her first day of employment was March 11, 2019. As is evident from the above discussion, the issue was never about filling the position. The issue was always about how much the position would be paid. Even Ms. Poplar recognizes that Mr. Peivandi's desire as late as her February 7 email was for him to find a way to pay the position less. Wrangling over the rate of pay for the position is not a denial of accommodation. Perhaps if Ms. Poplar had at least ceded to Mr. Peivandi's original desire to fill the position at a $15 to $18 per hour pay rate, the position could have been filled sooner. She chose to push the $25 per hour pay rate with the Commission. By successfully doing so, she frustrated the Managing Director and created an atmosphere which remained contentious until at last Mr. Peivandi had to concede the point lest his stubbornness be deemed grossly insubordinate by his Board.

Within three and one-half months, Ms. Poplar was seeking to turn the position from part-time to full-time. By email dated June 27, 2019, Mr. Peivandi requested clarification from Ms. Poplar as to whether she was seeking to upgrade the part-time position or hire an additional full-time position. He stated to her clearly, "It is your responsibility to convince me, and the Board,

Gayle Cummings, Administrator
April 26, 2021
Page 12

about the necessity to hire a new full-time employee." In his email, he suggested that a personnel company the Road Commission was using "…may be able to assist us on this issue." He requested written documents from Ms. Poplar which would proffer the job description for the position; the estimated annual cost of the position; and the necessity for the new position and why it was in the best interest of the Commission. (22523). Ms. Poplar provided the requested information. (22523B; 22524)  She confirmed to Commission Chair Mandelaris that she only sought to upgrade the part-time HR Admin position from part-time to full-time. (22525).

On August 8, 2019, Mr. Peivandi emailed to Ms. Poplar that, while he could support the purchase of an HRIS software program to assist in streamlining HR processes, he could not support the elevating of the part-time staffer to full-time.  Rather, he suggested using the new software program, seeing how successful it might be to make the Department more efficient, and review personnel needs the following year. (22527).  He stated, "As you know, my goal is to reduce administrative costs and to increase production.  Your request goes against my views."[6]

On August 10, 2019, Commission Chair Mandelaris communicated directly with Ms. Poplar, indicating he agreed with Mr. Peivandi and offered alternative solutions to Ms. Poplar's perceived personnel needs. (22526B).  Earlier, Mr. Mandelaris had "confidentially" shared with Ms. Poplar an email he had sent to Mr. Peivandi on June 22, 2019 in which he supported the proposal to move the part-time HR Admin to full-time. In it, he stated that:  "There has been too much time lost to this distraction."  Now, he was reversing that course and agreeing with Mr. Peivandi that the transition from part-time to full-time should not be implemented.

Ms. Poplar's response should not have been unexpected.  First, she complemented Mr. Mandelaris:

> "I must say, I am quite confounded as to what led up to your recent change of heart.  You have earned the well-deserved reputation of being a man who is very thorough and skilled in your fact-finding abilities and you are respectfully known for standing on the side of right.  Your demonstrated character has always introduced your personality.  And in your personality lies a man of great integrity and moral ethics."

She then spoke to the absence of other possible staffing solutions and offered that the Managing Director had "unmerited biases…of a personal nature" against one of her HR staff members. (22526B).

Further emails were passed between Mr. Mandelaris and Ms. Poplar (none of which were shared with the Managing Director).  Ms. Poplar did email Mr. Peivandi directly, challenging his refusal to fill the position on a full-time basis on August 12. (22528).  On August 23, Ms. Poplar

---

[6] Tension between personnel costs and "production costs" for repairing bridges and roads is ubiquitous among Michigan road commissions. Every Commission fights this tension given the cost of road repair today. Commissioner Dickerson raised the issue during consideration of the hiring of an Operation Manager at the October, 2018 Board meeting, stating that he thought that the money spent on the position could be better spent on roads.

Gayle Cummings, Administrator
April 26, 2021
Page 13

authored a page and one-half email to Chairperson Mandelaris (again, no copy to Mr. Peivandi) in which she aggressively pushed back against the efforts to reject the transitional move of the HR Admin from part-time to full-time. She ascribed "political and personal" motives to the Managing Director's efforts to deny her the full-time position. She claimed that the political and personal agendas of the Managing Director and others on the Board were "…not in the best interests of the Road Commission" and played "…against the people at large." She hoped Mr. Mandelaris would not succumb to such unreasonable pressure. (22531).

In an even more aggressive email dated August 26, 2019 to Mr. Mandelaris, Ms. Poplar again attacked the motivations of Managing Director Peivandi and certain other Commission members in opposing her request to transition the part-time position to full-time. She writes:

> "The only variable that I can conclude, for the 3 years of push back and one reason after another as to why not to approve a full time HR Administrative Assistant position, is that we are dealing with individuals who our [sic: are] pushing a personal and political agenda that is not befitting and representative of the full GCRC BOARD or the full Genesee County Board of Commissioners and therefore, don't serve to be in the best interest of the people." (22532).

This vitriolic hyperbole centered on Mr. Peivandi and others neglects many facts. First, Mr. Peivandi had just completed his first year as Managing Director. He had not played any part in the HR Admin hire process prior to then. Furthermore, Ms. Poplar had only sought to hire a part-time HR Admin originally. She did not formally request a change to full-time until June, 2019. Simply put, the issue of a full-time position for the HR Admin had not been up for formal approval by the Commission at any time prior to August, 2019. Additionally, Mr. Peivandi had explained to her why he was not supportive and why he wished to evaluate a year hence—he was agreeing to budget into the HR Department a new software system which would bring efficiencies and also wanted to put money into streets, not personnel. I find that he had a legitimate, nondiscriminatory, nonpolitical reason for his position. Once again, none of this diatribe against him and certain other Board members was shared with them by Ms. Poplar.

Ms. Poplar's efforts paid off. At a special Board meeting on August 27, 2019, against Mr. Peivandi's position and recommendation, a majority of the Commission (Dickerson, Johnson and Mandelaris) voted to approve the budget with a full-time HR Admin position. Ms. Poplar had won. (22533).

Later that day, Ms. Poplar expressed her thanks to Mr. Mandelaris:

> "Words will never be able to express my genuine appreciation for how you "STOOD UP" as the GCRC Board Chair like a Devote Soldier, "STANDING" on the side of "RIGHT". I can assure you, that you along with Commissioner Johnson and Dickerson will be well pleased with HR's undeniable performance and contributions."

Gayle Cummings, Administrator
April 26, 2021
Page 14

One can guess the reaction of the Managing Director. On two occasions now, the majority of the Commission had sided with Ms. Poplar and against him and his recommendations. First, the Commission ordered that he pay a part-time HR Admin at a salary rate he believed was excessive for the position. Second, the Commission ordered him to transition that part-time employee from part-time to full-time. If Mr. Peivandi became angry and upset by being upstaged by his HR Director, which he surely did, then such anger and his reaction to it is not based upon race or gender. It is based upon the pure distribution of power within the organization. Ms. Poplar had out-strategized her boss. She got what she wanted. Her actions destroyed any relationship-capital she had with her supervisor.

This entire sequence of events and the destruction of the relationship caused by it was not due to race, gender or other basis of invidious discrimination. It was due to stubbornness, both on the part of Ms. Poplar and on the part of Mr. Peivandi. Had Ms. Poplar simply acceded to Mr. Peivandi's desire to try and fill the position at $15 to $18 per hour, rather than join the issue before the Commission, perhaps all of this tension and conflict might have been avoided. However, she persisted. Had Mr. Peivandi simply conceded to the wishes of the Commission to set the salary rate at $25 per hour, perhaps the tension and conflict would have been diminished, if not avoided. Instead, he stubbornly refused to adopt the Board's resolution until forced into a corner. Had Ms. Poplar adopted the recommendation of Mr. Peivandi to leave the position at part-time for a year while she developed departmental efficiencies using the new HRIS software program, more conflict and drama could have been avoided. Instead, she stubbornly pressed forward with the Board. For both Mr. Peivandi and Ms. Poplar, pride got in the way of collaboration. The current status of their working relationship, given these tensions and conflicts, should not in the least bit be unexpected.

One could certainly expect that the favorable results also enhanced Ms. Poplar's perception of her power in the organization. For instance, shortly after the budget vote on August 27, the Managing Director reminded Ms. Poplar that the HR Admin's working hours were 20 hours a week until the end of September (she had recently worked 34 in one week). (22536). Ms. Poplar wrote a terse note back (22537), indicating her work could not be done in 20 hours. Something happened next at the October 8, 2019 Board meeting which would further embarrass Mr. Peivandi and, at least tangentially, enhance Ms. Poplar's authority and power.

## IV.    THE LIST OF EMPLOYEE NAMES AND RACES

At the October 8, 2019 Commission meeting, many Genesee County residents appeared to voice their concerns regarding an employee list that was requested by Managing Director Peivandi. The list contained names of employees as well as the race of each employee. Race became an issue at the meeting. GCRC attorney Tom Derderian assured the residents that there was no racial profiling being conducted at the GCRC. Ms. Poplar assured residents that the GCRC HR Department ensures that no employee is discriminated against or their rights violated. (22540). Commissioner Dickerson commented that he was very upset when he heard about the list of employees that was requested [by Mr. Peivandi] from the HR Department. He stated he is sensitive to employees being treated differently due to race or gender (Ibid). Ms. Poplar characterized the

Gayle Cummings, Administrator
April 26, 2021
Page 15

event as a "big public issue." She stated that the Commissioners "raised hell" about it. Mr. Peivandi called it a "tough meeting." Obviously, his request for the employment information, including race, resulted in a tsunami of public concern. What was the purpose of such an unusual request? Mr. Peivandi's motivations were clearly made suspect.

As discussed below, the reasons for Mr. Peivandi's request are still unclear. But there are a number of issues which swirl around how this issue became a public one which must be addressed in the first instance. These issues beg the question why the HR Department and Ms. Poplar did not act to quickly close the door on this issue before it became a community-wide subject of controversy.

Based upon the facts I gathered, on July 29, 2019, Mr. Peivandi asked for an "updated Employee List" by email addressed to Rachel Mullin who is employed in the Human Resource Department. Her classification is Senior HR Coordinator.

Ms. Mullin responded to him asking whether he wanted "the first employee list" or "…the second one where you requested I add each employee's race on the list." (22548). Mr. Peivandi responded, "The second with additional information."

Ms. Mullin stated that her references to the first and second employee lists related back to October, 2018 when Mr. Peivandi had made an identical request. He had asked for employee names and race. She had provided it at that time in a "second employee list." In July, 2019, she did not want to provide it to Mr. Peivandi without a specific request for the racially-identifiable information because she said she was not comfortable doing so. To that end, she asked the follow up question via email to get Mr. Peivandi's position in writing.

Ms. Poplar, in a follow up call with me on March 16, 2021, indicated that Mr. Peivandi only asked for the information in 2019. In a subsequent call with Ms. Mullin, Ms. Mullin contradicted Ms. Poplar and indicated that, beyond doubt, the racial information was requested and provided in both 2018 and 2019. Ms. Mullin indicated to me that she told Ms. Poplar of Mr. Peivandi's requests in both 2018 and 2019. She indicated she informed Ms. Poplar of what she was going to do and that she definitely knew that Ms. Poplar was aware in both 2018 and 2019 of the requests from the Managing Director for the racial identity of Commission employees. I credit Ms. Mullin's recollection and statements of facts related to both 2018 and 2019.

Somehow, the Managing Director's request for this information in 2019 made it into the hands of a member of the Genesee County Board of Commissioners, Bryant Nolden. How that happened remains a mystery. But on August 29, 2019, Commissioner Nolden communicated with Mr. Peivandi about the Employee List By Name and Race. (See Attachment A). He inquired as to the reasoning behind such a request, opining that "it is a very fine line to request this information this way." I agree with Commissioner Nolden. Mr. Peivandi's request for this information would create suspicion as to the purposes for which he intended to use it. Thus, the Community's expressed concerns at the October 8 Commission meeting are perfectly understandable.

On the same day, Mr. Peivandi wrote the following response to Commissioner Nolden:

Gayle Cummings, Administrator
April 26, 2021
Page 16

> "Good afternoon Commissioner Nolden,
>
> The Genesee County Road Commission is an equal opportunity
> employer that is firmly committed to diversity in the workplace. As
> Managing Director it is part of my job I routinely request and review
> Road Commission records that provide information about the
> composition of the workplace, including job titles, date of hire, and
> more. The document you forwarded is one such record. It is not a
> secret or in any way confidential. It would be available to any
> citizen through a FOI request. The Road Commission maintains this
> record so that management staff can directly review and examine
> the racial composition of the employees who work for the Road
> Commission. I believe this record is provided to the Department of
> Civil Rights. It is through an analysis of records such as this that I
> can measure the progress of the Road Commission in achieving its
> goals of diversity in the workplace. I assure you that there is nothing
> illegal about me reviewing this document.
>
> I hope this answers your question."

Mr. Nolden, feeling the question in his original email was not answered, thanked Mr. Peivandi for his response, but inquired again, "…what would be the need for names and races?" (Appendix A). Significantly, Ms. Poplar, perhaps at the request of Mr. Peivandi, drafted a response as well to Mr. Nolden's follow-up email. It, too, is part of Appendix A. A portion of her draft response was stricken by Mr. Peivandi by drawing a line through the proposed text according to Ms. Poplar. But the portion which was lined-out provides some timing which is relevant to questions which keep surfacing as I review this series of events (see Appendix A, 9/4/19 11:49 am).

Like the Genesee County community, I was most concerned about why Mr. Peivandi requested this information. On first blush, it might appear that race was a conscious factor in his decision-making on discipline. Ms. Poplar asserts that Mr. Peivandi would look at this list in assessing discipline. Certainly, she implicitly, if not explicitly, asserts that the list and his alleged examination of it played a role in determining discipline.[7]

But there is a lot more to this story than what appears upon first view--background information that, in many ways, places responsibility for Mr. Peivandi's request and subsequent access to this employee personal data on race upon the Human Resource Department. My examination discloses that on at least an annual basis, the Human Resource Department provided the GCRC (and, by extension, any person who received a copy of a Board meeting informational packet) with a document entitled "Annual Equal Employment Opportunity Report to Date." The

---

[7] Mr. Derderian speculated, and I agree, that Mr. Peivandi likely knew the race of most salaried and supervisory employees given his years of employment with the GCRC and the size of its workforce. Had he planned on using race as a factor in assessing discipline, he probably would not have needed the list.

Gayle Cummings, Administrator
April 26, 2021
Page 17

document provided data, on the basis of percentage, for minority and female representation within the GCRC workforce. This information, of course, is relevant. But what the Human Resource Department included with the document was the worksheet for its preparation *which included the name, race and gender of every employee of the GCRC.* Thus, at least annually, the Human Resource Department sent out to everyone who received a copy of the Board informational packet the race and gender of every employee.

To the extent that Ms. Poplar opined in her draft September 4, 2019 email to Mr. Nolden that, "…there is no need to associate employee names with their race or any other identifiable personal data," I agree. However, the record reflects that the GCRC Human Resource Department, both before and under Ms. Poplar's supervision, did so. I have in my possession, for instance, the 2018 Annual Equal Employment Opportunity Report to Date which contains the names, races and genders of GCRC employees and was issued while Ms. Poplar was Director of the HR Department. Furthermore, there is no doubt Mr. Peivandi was aware of this practice. He provided me with the same document from 2008 which had him classified as "APIM" (Asian Pacific Islander Male). He brought this to the attention of Rachel Mullin. At the time, he was the Director of Engineering.

Thus (and while I continue to believe this information need not be circulated), it is clear that the dissemination of race and gender information to the Board and the Managing Director by the Human Resource Department was not unusual but customary on at least an annual basis as far back as 2008.

Furthermore, if as Ms. Mullins states, Mr. Peivandi asked for the list outside the normal annual distribution of it in *both* 2018 and 2019, a question must be asked. First, if there is no need for this information to be distributed (and, ergo, it should not be distributed), why didn't Ms. Poplar go to Mr. Peivandi in 2018 and so advise him? In fact, why did she not go to Mr. Peivandi immediately on July 29, 2019 and so advise him after Ms. Mullin told her about his request? Why did she not go and tell him that asking for this information was inappropriate and would create bad perceptions for the Genesee County community? When I asked her this question, she claimed that she did. However, I found her memory of events surrounding this event to be hazy at best. Certainly, her recollection of events concerning this list were contrary to Ms. Mullin.

They were also, I believe, contrary to her own words in her email of September 4, 2019. In the portion stricken from a draft email she authorized for Mr. Peivandi, she makes no allusion to speaking to him about this issue prior to Tuesday, September 3, 2019. In the entire email chain between Ms. Poplar and Mr. Peivandi, she makes no statement which in any way would support the premise that she went to him prior to receipt of the Nolden email on August 29. While she has provided me with voluminous documentation to assist me in preparing this report including enumerable emails, she has provided me no email documentation to support the assertion that she went to Mr. Peivandi about this issue prior to August 29.

In her September 4 draft email to Commissioner Nolden Ms. Poplar writes:

> "It is the practice of the GCRC HR Department to only provide employee's identifiable personal data information as required for reporting purposes only or as requested from legal counsel."

Gayle Cummings, Administrator
April 26, 2021
Page 18

This is simply inaccurate as set forth above based upon the HR Department's annual distribution of this personally identifiable information to the Commission, the Managing Director and those who receive the Commission's Information Packets (such as Mr. Peivandi when he was Director of Engineering). Ms. Poplar offered to me that Mr. Peivandi knew nothing about "HR". Knowing "nothing" about HR, I can understand how he could consider the information "…not a secret or in any way confidential." (Appendix A, 8/29/19 email from Peivandi to Nolden). His reliance on his HR Department's practice would have led to such a conclusion.

I believe the GCRC Human Resource Department bears more responsibility for the public outcry on October 8, 2019 against Mr. Peivandi and the GCRC than the Managing Director does. I am not suggesting that his request and subsequent receipt of this information does not cause me pain. It does. But, in summary, here are the rest of the facts. Specific race and gender information was given to the Commission and Manager (and, likely others) annually. Mr. Peivandi was aware of this. He made a special request for this information in 2018. He received no resistance from the HR Department. He made a request for the information again in 2019. No timely resistance from the HR Department was received until the email from Commissioner Nolden. If Ms. Poplar was interested in protecting the reputation of her Managing Director and the Road Commission, she should have went to him or emailed him immediately. She did not do so.

In addition, it is reasonable to conclude the release of Mr. Peivandi's July 29, 2019 request for such personal information to those outside of the Road Commission emanated from the HR Department. By email dated September 5, 2019 (Appendix A), Mr. Peivandi directly asked Ms. Poplar how GCRC Commissioner Dickerson got hold of the list and why. Mr. Peivandi believed that Mr. Nolden came to have the list from Mr. Dickerson. Ms. Poplar did not directly answer the question, suggesting instead that he should ask Commissioner Dickerson. When I asked Ms. Poplar directly, she informed me that she did not release Mr. Peivandi's request for this information to either Mr. Dickerson or Mr. Nolden. While I do not have to resolve the issue of how Mr. Peivandi's request made it into the hands of those outside of the Commission proper, I believe the probable source originates in the office over which Ms. Poplar has charge.

Finally, it is circumstantially relevant when the release of Mr. Peivandi's request for identifiable information on race and gender occurred. It occurred during the month of August, 2019, when Mr. Peivandi and Ms. Poplar were locked in a struggle before the Commission on whether the HR Admin position would be transformed from a part-time to a full-time position. Certainly, the release of Mr. Peivandi's request did not enhance his standing in the black community under the circumstances of its release. If the intended purpose of the release of information into the community was to diminish both Mr. Peivandi's standing and authority, at least temporarily, the release apparently had its desired effect.

## V. ALLEGED DISPARATE TREATMENT IN DISCIPLINE

In interviewing Ms. Poplar, she claimed that Mr. Peivandi overturned discipline imposed by her Department upon white employees but did not overturn discipline imposed upon black employees. She also claimed that Mr. Peivandi utilized the employee list setting forth race and

Gayle Cummings, Administrator
April 26, 2021
Page 19

gender in assessing the propriety of discipline within the Road Commission. Mr. Peivandi claims that neither race nor gender has played a part in his review and participation in disciplinary decisions within the organization.

In evaluating the positions of Ms. Poplar and Mr. Peivandi on the question of whether the evaluation of discipline was determined in whole or in part based upon race or gender, I have relied, although not completely, upon the statements of Tom Derderian who has served as the Commission's attorney for labor and employment law issues for decades. Ms. Poplar respects Tom Derderian. She relies upon him. In her complaint of January 28, 2021, she suggests he be instructed to conduct this investigation. In her email to me dated March 23, 2021 she stated that, as Director of HR, "I rely heavily on the Labor Relations, contract negotiations, arbitration, and other legal services provided...through Attorney Tom Derderian and Attorney Wendy Hart." When Fred Peivandi sought to replace Tom Derderian and his firm with another in the Fall of 2018, Ms. Poplar lobbied to keep him and his Firm and was, once again, successful in accomplishing her desired goal while Mr. Peivandi failed to reach his. Thus, Tom Derderian's perspectives on discipline and the Managing Director's actions concerning discipline seem trustworthy given Ms. Poplar's endorsement of him.[8]

Generally, Mr. Derderian does not believe that the issue between Ms. Poplar and Mr. Peivandi is one of race or gender. He believes it is "politics and personality." He also believes it is philosophy. He described Ms. Poplar as one who can be "...aggressive about discipline." She expects employees to follow the rules and is aggressive about applying discipline when the rules are not followed. Mr. Peivandi, on the other hand, wants peace. He wants people, according to Mr. Derderian, "...to just get along." This difference in philosophy causes constant tension according to Mr. Derderian. This tension is especially felt over the issue of supervisory discipline. Mr. Peivandi perceives supervisors as aligned with the management of the organization and desires to treat them as such. Thus, he prefers to withhold discipline except in extreme cases. Ms. Poplar tends to treat supervisors like other employees. According to Mr. Derderian, Ms. Poplar and Mr. Peivandi are engaged in a battle over "turf."

---

[8] The power struggle between Ms. Poplar and Mr. Peivandi over the replacement of Tom Derderian and his firm is another example of the underlying reasons for their mutual discord. In her March 23, 2021 email to the undersigned, she readily admits that Mr. Peivandi, "...felt that Attorney Tom Derderian was Anti-Fred Peivandi and Pro John Daly, Anthony Branch and pro me (Donna Poplar). And there was no changing his mind. Fred Peivandi became the Managing Director in July 2018. By this time, he felt that Tom Derderian was too supportive of Anthony Branch and me. He felt betrayed by Tom Derderian, because in his mind, Derderian appeared to side with me and Anthony Branch on employee issues.

This information is vitally important because to this day, Peivandi resents the fact that I went to the GCRC Board members about my concerns on why I felt Peivandi [and the then Board Chair] were trying to fire Tom Derderian and Michael Kluck and Associates. As a result, the BCRC Board did not support having any discussions about firing Derderian and Michael Kluck and Associates."

As Ms. Poplar seems to recognize here, this had nothing to do with whether the parties are white or people of color. It is not a matter of gender. Mr. Peivandi's resentment is lodged in Ms. Poplar's successful lobbying efforts with the Commission, thus retaining a lawyer at the Commission that Mr. Peivandi felt had betrayed him. Once again, Ms. Poplar's position was sustained by the Commission. Mr. Peivandi's position was not.

Gayle Cummings, Administrator
April 26, 2021
Page 20

It does not help that Ms. Poplar's autonomy under the former Managing Director, Mr. Daly, was significantly greater than Mr. Peivandi desires it to be under his management. According to Mr. Derderian, John Daly "…stayed out of HR and preferred not to be involved." Under such circumstances, Ms. Poplar had room to plot her own course. As Mr. Derderian describes it, Mr. Peivandi wants to be involved in everything. He added, "…and that's his prerogative."

Many of Ms. Poplar's complaints about Mr. Peivandi involve his management style. She characterizes it in her January 28 complaint in a variety of ways—micromanagement, usurping her authority, exclusion from certain meetings, etc. In her email to me responding to my request for disciplinary action which she believed disclosed discriminatory animus by the Managing Director, she frequently used such phrases as "usurp my…authority to impose discipline" and "…undermine my authority." When she quotes George Floyd's words, " I can not breathe," I believe she is saying that Mr. Peivandi's management style is suffocating her. But, as Mr. Derderian points out, ". . . [Mr. Peivandi's] management style and his desire to closely oversee what is going on within the organization is his prerogative as manager."[9]

Mr. Peivandi's insertion of oversight related to disciplinary matters which previously fell within the exclusive purview of Ms. Poplar was documented by a formal letter to her and other directors within the organization on October 11, 2018. (3210). Mr. Peivandi removed the right of directors to issue disciplinary action leading to suspension or termination. The memorandum required such decisions to be reviewed by the Managing Director prior to issuance. (Ibid). Notably, Ms. Poplar responded to Mr. Peivandi's professionally-worded directive to internal directors of the organization with a biting, caustic and disrespectful email with copies to not only the directors, but also to the members of the Commission and her staff. I find the email dated October 11, 2018 (3:07 pm) to be insubordinate. Among her comments, she wrote the following:

> "The apparent and recent controversy over the disciplinary action that Anthony Branch, the Maintenance Director and myself as the HR Director have taken against select GCRC Supervisors (Garage Foreman) and the relationship that these select supervisors have with you and others, I am not surprised that you have given such a unprecedented directive as reflected in your memo. *As the HR Director, I feel compelled to say, your memo raises serious concerns about the fairness, consistency, and impartiality relative to discipline under your directive. I am as equally concerned about the open-mindedness, potential biases and the securing of objectivity on how decisions will be made concerning disciplinary actions as we move forward. I am also, very apprehensive about what appears to be an attempt to interfere with the Director's ability to effectively manage their departments and issue appropriate discipline when warranted."* (Italics added).

---

[9] Numerous witnesses, including Commission members, supported Mr. Derderian's assertions concerning Mr. Peivandi's management style, characterizing him as a "micromanager"/"my way or the highway"/"engineering mindset"/"strong personality." One observed (correctly, I believe), that there is a "clash of personalities" because each wants to run the Road Commission (or, in Ms. Poplar's case) her department, in a certain way".

Gayle Cummings, Administrator
April 26, 2021
Page 21


I have reviewed all of the disciplinary actions and settlements forwarded to me by Ms. Poplar which I received on March 9, 2021. Attachments 1, 1C, 1D, 2, 3, 4, 5, 6, 7, 7B all involve settlements of grievances filed over discipline by the HR Department. Mr. Derderian was involved with all of them and offered the opinion that the settlements were in the best interests of the Commission. One individual's discipline (Burns) was removed from his file, but he retired. In others, expensive arbitration proceedings for several grievants were rendered unnecessary through a reduction (but not elimination) of the discipline imposed. In every case, the actions taken appear reasonable to me, as well as to Mr. Derderian. Decisions in these instances had nothing to do with race or gender, but practical application of longstanding labor-management principles.

In reviewing the Managing Director's responses to other instances where Ms. Poplar recommended substantial discipline, I reviewed the facts with Mr. Peivandi. These include Attachments 8, 13, 14, 15, 16 and 17 of the March 9, 2021 submittal. In each case I find the disciplinary action eventually meted out by the Road Commission reasonable. Concerns for discipline expressed by Mr. Peivandi were also reasonable. Mr. Derderian noted to me that in 80% of the time, Mr. Peivandi and Ms. Poplar agree. In my opinion, the issue between them is not so much what should be done from a labor-management perspective, but an issue of "turf" (as Mr. Derderian referred to it). To be candid, Ms. Poplar would appear to desire that she be a direct report to Commission on the organizational chart (2251) rather than a direct report to the Managing Director. To be even more direct, the Commission by its willingness to entertain her communications without following proper channels, has enabled this behavior to the detriment of the organization.[10]

I have also searched to find evidence of disparate treatment in the level of discipline imposed at the GCRC since Mr. Peivandi's hire as Managing Director between blacks, whites and women. There are very few black supervisors, especially in the Road Maintenance area. Kimberly Day is an exception. I was not made aware of any black or female supervisors where discipline imposed exceeded that imposed upon male supervisors for a like or similar offense. In speaking with Union President Homer Bennett, he made me aware of two non-supervisor members of his bargaining unit who were disciplined, but neither one filed a grievance claiming the discipline was

---

[10] Illustrative of Ms. Poplar's perceived authority is a memorandum sent to "All Supervisors, Managers and Directors" on July 9, 2019. (3214). The memo resulted from a decision by Supervisor Michael Jaeger to close the Otisville Garage over the July 4th holiday week. When Mr. Peivandi was notified of the closure, he asked about its effect upon public services and, once advised that the closure would not affect services, implicitly approved it. Later, Ms. Poplar inquired from Jaeger as to under what authority he had closed an entire garage. (Email of 7/1/19). While I fault Jaeger in not communicating back promptly with her, Ms. Poplar requested Jaeger report to her office to discuss the matter. (Email of 7/8/19). The action which Ms. Poplar then took (without Mr. Peivandi's approval or authority) was to notify supervisors, managers and directors that "Effective immediately, no supervisor or manager has the authority to shut down any department or garage without the written authorization of the department head." It is more than ironic that in investigating the authority of a supervisor to close a garage, Ms. Poplar issued a blanket operational memo to the organization claiming to preclude closing any department or garage without permission. One must question from what source she perceived such authority? Certainly she had not sought Mr. Peivandi's approval for the memo. He denies giving it. Nor can it be found in the organizational chart. The importance of this sequence of events is not to embarrass Ms. Poplar, but to give an illustration of her state of mind and her perception of authority to control. One can easily understand how such a perception would clash bitterly with Mr. Peivandi, who also is possessed of a strong personality. These clashes are not about race or gender. They are about the wielding of power within the organization.

Gayle Cummings, Administrator
April 26, 2021
Page 22

inappropriate. Thus, he was unable to negotiate a reduction in the discipline (had one been warranted) given the posture of the two employees.

In summary, I find no invidious discrimination in Mr. Peivandi's involvement in disciplinary actions since he became Managing Director as of August, 2018. His management style clearly clashes with the degree of autonomy which Ms. Poplar would prefer. But, in my opinion, that does not arise to the level of a violation of the GCRC Harassment Policy.

## VI.   OTHER FRACTURES TO THE PEIVANDI/POPLAR EMPLOYMENT RELATIONSHIP

As I have reviewed the evidence in this investigation, I have identified several other actions by Ms. Poplar that damaged her working relationship with Mr. Peivandi. Not all of the responsibility for this damage lies with Ms. Poplar. As I indicated above, the consistent willingness of some Commission members to hear Ms. Poplar's protestations about her Managing Director without, at least, requiring her to go to him first (or at least copy him on such emails to the Commission) enabled her to circumvent her Managing Director and undermine his authority with the political body to whom he reports. The Commission bears responsibility for this enablement, especially when such communications drove a wedge between the two employees.

Probably the most acute example of this deals with the issue of Vicki Bachakes, the Executive Assistant in the Engineering Department, and her relationship with Fred Peivandi. Generally, the GCRC works four, ten-hour days in the summer and was thus closed on Friday, July 17, 2020. However, a construction project was underway on July 17 and Road Commission employees worked overtime to accomplish the work. Managing Director Peivandi and Ms. Bachakes randomly appeared at the worksite together in Ms. Bachakes' vehicle on this date, dressed casually. This information was reported to Ms. Poplar.

Ms. Poplar's first day back to work after July 17 was Monday, July 20. That morning, she authored an email to the Commission about the Peivandi/Bachakes relationship. While she sent a copy to Mr. Derderian, she did not send a copy to Mr. Peivandi. Of more importance, she did not approach Mr. Peivandi first, explain to him what had been reported to her, and offer him a chance to respond. Rather, she used the incident to attempt to affect Mr. Peivandi's continued employment by the Commission.

That a personal relationship between Peivandi/Bachakes existed was not unknown to some employees prior to July 17. Ms. Poplar recognizes this in her email, "To be more frank, Vicki has shared with several employees that she and Fred are dating." She then, however, goes on to report to the Commission all of the "significant concerns" this dating relationship poses.[11]

She goes well beyond the potential exposure of the Commission to liability for harassment. In the email to the Commission she also states his actions "demonstrate very poor judgment" and

---

[11] Ms. Poplar's perspective on this issue, in part, has merit—certainly relationships between managers and subordinates are not to be encouraged as there could be liability concerns "down the road", but the manner and process by which she brought this to the Commission (to the exclusion of Mr. Peivandi) is what is critical.

Gayle Cummings, Administrator
April 26, 2021
Page 23

"…explains why Fred wanted to change the 4/10s to 5/8 to accommodate Vicki's request to work Monday thru Friday…"  Even more harshly, however, she relates that Ms. Bachakes' deceased husband worked 25 years for the Road Commission and 8 years for Mr. Peivandi.  Then she opines "…that she and Fred are dating has raised ethical and *moral* red flags..." (Italics added).  She concludes in her email to the Commission:

> "As the GCRC Human Resources Director, I feel it is imperative that this situation be addressed immediately by the GCRC Board *and a decision be made by the Board relative to Fred Peivandi's employment status."* (Italics added).

She corresponds to the Commission without ever speaking to Mr. Peivandi about the circumstances or opinions she holds about the relationship.  She asks the Commission to decide on his "employment status," which one can easily perceive as a decision on whether he should be removed from his position as Managing Director.  While one could imagine the reaction of Mr. Peivandi to this direct communication to the Board about a new and complicated relationship he had with Ms. Bachakes, one does not have to.  Mr. Peivandi responded to the email to Commission with one of his own.  However, he indicated to me that, at the advice of legal counsel, he did not send it.  He provided me a copy.  Here is part of what he wrote:

> "I have spoken to most of you in person since becoming aware of the July 20, 2020 email sent to the GCRC Board members from Donna Poplar, Director of Human Resources, but would also like to respond to her allegations in this letter.  It is of grave concern to me that Ms. Poplar would choose to contact the GCRC Board members as well as Attorney Tom Derderian without first discussing the matter with me.  Instead, she opted to immediately question my judgment, leadership, character, ethics and morals.  Her action of breaking the chain of command and contacting the Board of Road Commissioners warrants disciplinary action.[12]

> \* \* \*

> The matter of my relationship with this person does not violate any work rules in the recently updated employee handbook.  The employee does not directly report to me, but rather to the Director of Engineering.

> Ms. Poplar violated this individual's privacy as an employee of GCRC by sharing our relationship with the Board, which Ms. Poplar knows includes a family member.  This employee should have been allowed to approach her family with this information in her own

---

[12] The Commission's consistent permission allowing Ms. Poplar to "break the chain of command" and "contact the Board of Road Commissioners [directly]" would have provided Ms. Poplar with a substantial defense to any discipline imposed.

Gayle Cummings, Administrator
April 26, 2021
Page 24

time. Ms. Poplar gave no consideration to robbing the employee of
this right, which has been quite upsetting."

My review of the employee handbook and my discussion with Mr. Derderian leads me to
the same conclusion—it is not a violation of GCRC policies. Indeed, I am led to believe by Mr.
Derderian that the Commission has not demanded an end to the relationship (or changed Mr.
Peivandi's "employment status") because of it. But I do believe that the manner in which Ms.
Poplar communicated this issue to the Commission was destructive of their working relationship.
As a professional in Human Resources, discussing her concerns and her knowledge with Mr.
Peivandi should have been her first step. Then, if she continued to have concerns, she could have
raised them with the Commission, providing a copy of such email to Mr. Peivandi concurrent to
her email to Board.

Thus, and to the extent that Ms. Poplar's complaint alleges that, "He stated he did not
appreciate me informing the Board of this relationship and he took my actions personal," I believe
he made such a statement and meant what he said. That three days later, as the Complaint alleges,
he tossed a birthday card in the trash signed by Donna, stating "I hate her," (which Mr. Peivandi
does not remember doing), I could understand. His animus against her is not premised upon race
or gender, but upon his perception that she has acted in a manner aggressively opposed to his best
interests.

The same thread holds true in reference to Ms. Poplar's depositional testimony. She claims
in her complaint that "…he made it clear that he did not appreciate what I said about him in my
deposition…" and that "…he took my testimony as a personal attack against him."

I have reviewed all 393 pages of the two-day deposition of Ms. Poplar. Mr. Peivandi did
listen to her depositional testimony. The deposition was taken in the case of *Anthony Branch v.
Genesee County Road Commission*, Genesee County Court Case 19-113700-CD. The case is an
employment discrimination claim. At issue is whether the GCRC failed to hire Anthony Branch
as Managing Director because of his race. Instead, Fred Peivandi was hired for the position. It is
worth noting that Fred Peivandi is not a defendant in this lawsuit. He simply happens to be the
person hired instead of the plaintiff, Mr. Branch. Despite this fact, knowing that Mr. Peivandi was
listening to her testimony, it appears to me (without any question which would have required such
a response), that she did, indeed, personally attack him and bring up matters which were private in
nature. These statements by her were volunteered; they were unsolicited; and, I suspect they were
hurtful. For instance, at her September 22, 2020 deposition she volunteered that "…he resents that
his daughter had two children by an African American man that he despised." (p. 99). She opines
that "…he holds Cloyce Dickerson and some others responsible for his daughter losing her job at
the City of Flint." (Ibid). She returns to the Peivandi/Bachakes relationship and concludes that she
does not believe that "the board who's now sitting is prepared to make the decision *they need to
make* concerning Fred Peivandi." [Italics added]. (p. 101)

In short, without any question from an attorney to draw such opinions from her, Ms. Poplar
nonetheless, knowing Mr. Peivandi was listening, decided to offer opinions concerning his
daughter and grandchildren (and, perhaps, the father of those grandchildren). She chose to return

Gayle Cummings, Administrator
April 26, 2021
Page 25

to the Vicki Bachakes relationship. I find that Mr. Peivandi's purported comments to Ms. Poplar that he considered her words to be personal and that he did not appreciate them not unreasonable given the depositional circumstances in which they were offered.

## VII.    MARCH 23, 2021 SUBMITTAL

On March 23, 2021, I received a third submittal of documentation from Ms. Poplar for my consideration as I investigated and assessed the facts in contemplation of the preparation of a report. In it, she speaks to the issue of Mr. Peivandi's desire to remove Tom Derderian because he thought Tom Derderian was "anti-Fred Peivandi" and then provides approximately 12 other situations over approximately 2 years which she believes supports her claims that Mr. Peivandi invidiously discriminates against blacks and women. I have reviewed each situation and the supporting attachments even though I may not speak to each one individually (simply due to the length of this report already). But there are certain points I gleaned from reviewing the submittal.

First, Ms. Poplar apparently perceives many interactions as racist when, from an objective perspective (which, parenthetically, Ms. Poplar has advocated in the past), they are not. For instance, she characterizes an email comment by former Commission Chair Shirley Kautman-Jones to her, "if Dad says no, go ask Mom," as responding in an "unprofessional, racist, bias and insulting and offensive manner." This remark was made by Ms. Kautman-Jones to Ms. Poplar after Ms. Poplar was unable to get Mr. Peivandi's concurrence to upgrade the part-time HR Admin position so she then sent an email to the entire Board seeking that they override Mr. Peivandi's decision. Now, perhaps Ms. Kautman-Jones' characterization of Ms. Poplar's action as she did could have been better-worded. Perhaps she could have said, "Your attempt to circumvent your supervisor was not appropriate" or "You should not attempt to obtain from the Commission that which your supervisor does not recommend." But, however, she said it, it was not racist. It was not biased. It is not evidence of race discrimination. It was not nearly as offensive of what Ms. Poplar later called Commissioner Kautman-Jones in a meeting called to attempt to resolve the issue as she openly admitted in her March 25 cover letter to me ("a liar, a racist and a bully, too").

I do not interpret Mr. Peivandi's statement (likely born from frustration) that Ms. Poplar should "...just do what I tell you to do" as racist either. Attorney Derderian offered that Mr. Peivandi sometimes, when frustrated or angry, says what is on his mind without filter. This is one of those times. Later, Ms. Poplar acknowledged that he apologized for his comment. In her email to me on March 25, she claims his apology was "...merely lip talk and far from his heart." I would note that many said that Fred Peivandi is not a "people person" and often says things bluntly and in ways others might avoid. But such characterizations of him come from white and black alike. His personal management style is not the issue, at least from the perspective of this report.

I also think Attachment 8 is worthy of reference, for it once again depicts how Ms. Poplar communicates to Board members seeking to diminish Mr. Peivandi in the eyes of his Board and destabilize his standing as Managing Director. Once again, this email was her response to an email from Board Chair Mandelaris. In essence, he invited the response by privately communicating to *her* that he had a "long meeting with Managing Director to discuss concerns." This occurred after the Board meeting on July 14, 2020. Perhaps the better approach would have been to not enable

Gayle Cummings, Administrator
April 26, 2021
Page 26

Ms. Poplar by confidentially communicating to her this fact. In response, Ms. Poplar wrote an email to the Chair on July 15 at 9:38 am which, in part, severely criticizes the Managing Director:

> "In closing, I know undoubtedly you meant well by staying over after the Board meeting and talking to Fred. Unfortunately, your meeting with Fred in essence resulted in Fred subjecting me to much criticism to say the least. John, *Fred will always give you one impression in your face and say what he thinks you want to hear, but behind your back his actions are unfavorable, harmful and retaliatory to say the least…He will never see how his actions further lowered the morale of the Salary-At-Will employees and the Exempt employees who give undeniable performance and contribution and goes far beyond the call of duty every day…Many know how Fred manipulates others with falsehood to get the results he want[s]."* [Italics added].

Also included in the March 25 submittal is an email dated July 1, 2020 to three Commissioners (not even to all five) which preceded the exchange immediately above. In it, Ms. Poplar argues against a wage increase Mr. Peivandi had proposed for the finance director. She does not send a copy of this two-page email to Mr. Peivandi, stating, "I humbly ask that you do not share with Fred that I shared the above information with you. I believe that if you do I will be subjected to reprisal at the hands of Fred Peivandi." She communicates with three (of five) members of the Commission directly without copying the Managing Director, suggesting that "I do feel I have an obligation as the HR Director to make my voice heard on the above matter."

Ms. Poplar's concerns in not copying Mr. Peivandi, I suspect, were not born out of concern of reprisal but out of concern for discipline for insubordination. By email dated February 11, 2020, Mr. Peivandi had specifically told her that he required that her communications with the Road Commission Board members with regard to Road Commission matters (certainly the pay raise to the Finance Director would fall under this category), must be communicated to him also (courtesy copy) so that he was kept informed of all such matters as Managing Director. (22541B). She failed to do so in this instance. Such conduct is insubordinate.

Much of the other material found in the March 23 submittal is also more reflective of the "turf war" as it was referred to by Mr. Derderian between Ms. Poplar and Mr. Peivandi. She seeks to establish that he in some way is usurping her authority, yet she pushes back when he seeks to establish her as the primary employer-representative in negotiations and arbitrations. Evidence exists to support a conclusion that Ms. Poplar has continuously sought to destabilize and obstruct Mr. Peivandi's relationship with the GCRC. Nothing in the March 23, 2021 submittal directly supports the claims of her January 28 Complaint in my opinion.

## VIII.  APRIL 8, 2021 D. POPLAR SUBMISSION

On April 8, 2021, I received another submission from Ms. Poplar. She felt compelled to share with me an issue that arose at the April 6, 2021 Commission Meeting. The Director of

Gayle Cummings, Administrator
April 26, 2021
Page 27

Engineering, Eric Johnston, requested the Board to approve a purchase order for the subcontracting of an Office Tech Assistant from Rowe Engineering, Mr. Johnston's previous employer, to assist with Local Agency programming. The position was to be paid out of the Department 91 funds. The Board approved the request 4-0.

The April 8 submittal complains that this issue proceeded to the Commission without Ms. Poplar's "review and approval from an HR perspective." Reviewing the written request to the Board, it is clear that Ms. Poplar did not initial the document.[13] Ms. Poplar claims that the failure to obtain her review and approval evidences that she is "circumvented and disrespected" by Mr. Peivandi and Mr. Johnston. She claims that Mr. Peivandi continuously disregards her role as the HR Director.

I believe the failure to solicit Ms. Poplar's review of the request was unfortunate, but not discriminatory. Mr. Johnston suggested that there was a short window of time to obtain the necessary signatures on the proposal (the request was prepared on March 29 for submittal to the Board on April 6). He was absent during that window of time due to a vacation. He was not present to ensure that the document was circulated to all department heads with a stake in the purchase order approval. I would note also that Stephanie Jaeger, the Purchase Administrator, did not initial the document either (it was, however, initialed by Tracy Kahn on her behalf).

Based upon my conversations about the issue with Fred Peivandi, Eric Johnston and Donna Poplar, it appears that when there exists an approved RFP for the subcontracting of a specific job classification, there is no requirement to review the issue with HR. Mr. Johnston originally believed that an approved RFP with Rowe for the subcontracting of construction field inspectors obviated the need for a separate RFP (and HR approval) in this case. I would note that according to Ms. Poplar, a field inspector was assisting the in-house office tech (Mary Graham) at the time. The goal, according to Mr. Johnston, was to hire a contracted office tech employee to assist Ms. Graham in order to permit the inspector to return to the field.

After the Board's action, Ms. Poplar raised issues about the Board's action to hire an office tech contract employee through Rowe on the basis of the approved RFP for field inspectors. Contrary to her claim that she is disrespected and circumvented, Mr. Peivandi and Mr. Johnston met with her to discuss her concerns. During the course of the meeting, Mr. Peivandi and Mr. Johnston pivoted. They determined to cancel the Commission-approved Purchase Order for an Office Tech and, instead, contract with Rowe for the subcontracting of two field inspectors (for which a previously approved RFP with Rowe existed). Thus, rather than subcontract an office tech in order to permit the inspector who was working with Ms. Graham to return to the field, they simply subcontracted for the hiring of two field inspectors from Rowe to fill the field need for the Local Agency Program projects. A pre-existing approved RFP permitted this course correction without Commission approval.

---

[13] I would note also that Eric Johnston, from whose department the request emanated, did not initial the document either.

Gayle Cummings, Administrator
April 26, 2021
Page 28

I am not sure why Ms. Poplar did not receive the original March 29, 2021 submittal to department heads for review of the original plan submitted to the Commission. The person most interested in ensuring it made the rounds between department heads in the one-week window of time available for such a process was off on vacation. It is unfortunate it did not get to Ms. Poplar because she had valuable input that might have changed the direction of the Engineering Department before it went to the Commission. As it were, Mr. Johnston had to cancel the Purchase Order and change course as a result of the input provided by Ms. Poplar after the Board approval. It would appear more efficient and lest unwieldly had her input been solicited prior to April 6.

Nonetheless, the facts disclose a willingness by Mr. Peivandi and Mr. Johnston to not only meet with Ms. Poplar over her concerns, but a willingness to take the difficult step to rewind from the expected approach and set off on one more consistent with the practice of the Commission and Ms. Poplar's recommendations. What ultimately occurred manifests that when the organization seeks to work together, rather than be in a fight over "turf", progress and good things can come from it.

## IX.     RETALIATION

On January 23, 2019, a former employee of the Commission, Ron Latimer (white, male), filed a harassment complaint against Managing Director Fred Peivandi. (22551). The matter was assigned to Tom Derderian. He investigated it. Nothing became of the complaint. Latimore ultimately retired. Upon learning of the Complaint, according to Tom Derderian, Mr. Peivandi said in the presence of several witnesses that he wanted Latimore fired. Derderian indicated that Mr. Peivandi was mad and did not care. Derderian characterized it as an excited utterance. Mr. Peivandi, he claims, will characteristically scream and yell and then back off.   In an email dated February 5, 2019, Ms. Poplar cited that Mr. Peivandi wanted Latimore suspended for lying in his complaint. She cautioned Mr. Peivandi against such an action.

I raise this event to say that, almost as a matter of certainty, if Ms. Poplar's employment with the GCRC is terminated, a claim for retaliation using the above episode as proof will be made. There is no doubt that Mr. Peivandi wants to terminate her employment. He sees her as an insubordinate, disruptive employee. He does not trust her. Each possesses a strong personality and Mr. Peivandi's top-down-management style does not mesh well with the autonomy Ms. Poplar seeks.

The GCRC retaliation policy, and indeed the law, does not inoculate employees from discipline meted out for conduct unrelated to the employee's opposition to a discriminatory practice or unrelated to the employee's participation in an investigation with respect to a discriminatory practice. For example, the GCRC policy provides:

> The purpose of this policy is not, however, to insulate employees from warranted discipline. Any employee whose conduct legitimately warrants discipline will still be subject to such discipline, even if the employee tries to prevent same by making a complaint of discrimination.

Gayle Cummings, Administrator
April 26, 2021
Page 29

Moreover, the United States Supreme Court has explained that for Title VII retaliation claims plaintiffs must prove that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013). A plaintiff cannot establish her prima facie case of retaliation in violation of Title VII unless she establishes that there is a causal connection between the protected activity and the materially adverse action. *Rogers v. Henry Ford Health System*, 897 F.3d 763, 775 (6th Cir. 2018). There is no causal connection if the GCRC takes a materially adverse action against her for a reason separate from her protected activity.

To this point, I do not believe there has been any retaliation against Ms. Poplar as contemplated by the law. To be actionable as retaliation, there must be some adverse action taken by Mr. Peivandi against the Complainant. According to the United States Supreme Court, the antiretaliation provision of Title VII does not protect an individual from all retaliation, "but from retaliation that produces an injury or harm." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

Avoidance, "snubbing," "shunning," or "giving the cold shoulder" is not a materially adverse action. In *White*, the Supreme Court explained that "snubbing by supervisors and co-workers [is] not actionable under § 704(a)." *Id.* In *Johnson v. Weld County, Colorado*, 594 F.3d 1202 (10th Cir. 2010), the plaintiff alleged that shortly after she complained of discrimination her supervisors "gave her the 'cold shoulder,' sat farther away from her at meetings, became too busy to answer her questions, and generally tried to avoid her." *Id.* at 1216. In an opinion written by then-Judge Gorsuch and now Justice Gorsuch, the 10th Circuit Court of Appeals held that the alleged snubs, "though surely unpleasant and disturbing," were insufficient to support a claim of retaliation. *Id.* See also *Recio v. Creighton Univ.*, 521 F. 3d 934, 940-1 (8th Cir. 2008)(holding that "silent treatment" was nonactionable "petty slight" and not materially adverse for retaliation claim) and *Mlynczak v. Bodman*, 442 F. 3d 1050, 1061 (7th Cir. 2006)(holding shunning by co-workers is not actionable retaliation). In this case, Mr. Peivandi's desire to avoid Ms. Poplar when possible is not retaliation. Such a response by Mr. Peivandi is not a "materially adverse action" within the meaning of the law.

Ms. Poplar claims for instance, that retaliation has occurred because she has been excluded from some meetings Mr. Peivandi has with directors. While I believe she does not attend as many meetings as she did under Mr. Daly's management, she is not alone. According to Mr. Peivandi, when no matter concerns a particular director in a given meeting, they may be excluded. Ms. Kahn, Finance Director, indicated she is often excluded from Director meetings when she is not needed. This is especially appropriate in the Covid-19 environment in which we live today. Ms. Poplar's exclusion is not evidence of retaliation. When her presence is unnecessary, she is not included. Others are subject to the same treatment.

To date, Ms. Poplar's actions, even when disloyal or insubordinate, have found implicit if not tacit approval from the Commission. Nothing she has done, no matter how insubordinate or disloyal, resulted in discipline or termination of employment.

Gayle Cummings, Administrator
April 26, 2021
Page 30

In my opinion, unless the Commission takes strong action to reorder the chain of authority within the organization and stop the persistent opportunity of GCRC staff, especially Ms. Poplar, to avoid the chain of command and deal directly with Commissioners, it is likely this behavior will continue and termination because of it will look like retaliation, whether it is or not.

In short, while I find no adverse action has been taken against Ms. Poplar in my investigation (and, thus, no retaliation), absent a change in the way the Commission leads, the frustration of the Manager with the behaviors of the Human Resources Director will ultimately result in one. When that occurs, the legal issue facing MCRCSIP and the GCRC will be whether, but for her claims of discrimination, she would have been terminated. This claim will be hotly contested and, in my opinion, based upon the conduct of the Commission and previous statements by Mr. Peivandi, create an issue of fact which will ultimately be resolved by a jury.

## X.    CONCLUSION

The primary mission of Genesee County Road Commission employees

> ". . . is to collectively provide and maintain a safe, cost-efficient and quality county road system for the motorists in Genesee County, Michigan."

Indeed, working collectively to provide a safe, cost-efficient and quality county road system is the collective goal of every road commission in Michigan. This is not always easy. Working together collectively as an organization is subject to stressors of many types and kinds. When those stressors are lodged in invidious, discriminatory practices or illegal harassment, they must be ruthlessly rooted out and eliminated. But there are other stressors not premised upon illegal motivations but upon human nature, pride and power. In my opinion, what exists at the Genesee County Road Commission is of the latter type, not the former. It is, as Thomas Derderian characterized it, a "turf war" between two people who have strong personalities and who desire to be in control.

In this organization, as in most, the role of the Human Resource Department is ancillary to the mission of the organization. Its role is to assist and support the organization in all matters of human resource management. The job description for Ms. Poplar's position, Director of Human Resources, sets for the following summary:

> **"GENERAL SUMMARY**
>
> Under the direction of the Manager Director, the incumbent is responsible for overall strategic HR leadership to the Road Commission, including all divisions. Oversees the development and implementation of human resources policies, programs and services but not limited to: recruitment, selection, retention, legal compliance, employee benefits, employee relations, employee practices and procedures, employee communications and employee

Gayle Cummings, Administrator
April 26, 2021
Page 31

> events. Also, serves as internal consultant to the Road Commission
> management team, supervisors and employees on personnel issues
> that affect performance and business relationships. Foster's a
> workplace environment consistent with the values and mission
> outlined by the leadership of the Road Commission. This position
> requires an extremely perceptive person, who is capable of relating
> to individuals at all levels within the organization."

What rings true to me is the sentence which states that she is an "internal consultant" to the Road Commission management team, supervisors and employees on personnel issues that affect performance and business relationships." The job description and the organizational chart clearly and unambiguously provide that the position is under the direction of the Managing Director. However, Ms. Poplar has functioned as much more than an ancillary support service to the Commission. She has functioned as much more than an "internal consultant" to the management team. In my opinion, she has pitted her position and influence as Human Resource Director directly against the Managing Director and her direct report, Mr. Peivandi. Oftentimes she has done so successfully to the detriment of the Managing Director's goals.

I do not place the blame for what has occurred and the impact it has had upon the organization upon Ms. Poplar alone. Mr. Peivandi's management style has contributed to it certainly. But, to an even greater extent, I place responsibility for the dysfunctionality within the organization upon the Commission itself. It is the Commission who has permitted Ms. Poplar to circumvent the organizational chart. It has permitted Ms. Poplar to have direct, private access to its members. Members of the Commission engage in regular communication with her, sharing inside information dealing with the Managing Director. Members of the Commission have not called her out when she has engaged in running commentary attempting to destabilize the employment status of Mr. Peivandi.

The resultant "turf war" has created a toxic atmosphere for some at the Commission. Primarily, Ms. Poplar distrusts Mr. Peivandi and questions his every move, believing he attempts to circumvent and disrespect her. Mr. Peivandi believes Ms. Poplar is an obstructionist and insubordinate. The Commission can take responsibility for this set of circumstances. The organization is simply not functioning as it was designed. The Commission will have to decide if it cares to do something about this dysfunctionality or continue its current practice.

In conclusion, my opinion is that the January 28, 2021 Complaint as filed by Ms. Poplar cannot be sustained. I do not believe that Mr. Peivandi has harassed, intimidated or retaliated against Ms. Poplar based upon her race, gender or because of disability. I do not believe she has been subject to differential treatment, or discrimination based upon the same invidious classifications.

Despite my conclusions, I believe that the time is right for all of us – individually and collectively – to explore avenues seeking racial reconciliation. The County of Genesee and the Genesee County Road Commission are no exception. The perceptions of people of color and the perceptions of white people need to be communicated to each other in an environment where

Gayle Cummings, Administrator
April 26, 2021
Page 32

healing can begin to take place. Programs such as Undivided (www.undivided.com) and others are available to move forward in awareness and reconciliation. While this is beyond the scope of my report, it is not beyond the scope of my concern and lament for the past. Each of us has an opportunity to contribute to the legacy of the George Floyd incident as we move toward a country which provides liberty and justice for all, irrespective of race, color or gender.

Very truly yours,

**KIRK, HUTH, LANGE & BADALAMENTI**, PLC

Craig W. Lange

CWL/bml
Enclosure