Case 2:21-cv-12568-VAR-JJCG ECF No. 23-22, PageID.766 Filed 11/21/22 Page 1 of 3
Shriner v. The Herald Co., Not Reported in N.W.2d (2003)
31 Media L. Rep. 2177

2003 WL 1447873

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

Daniel Harlan SHRINER, Plaintiff-Appellant,

v.

THE HERALD COMPANY, d/b/a the Flint Journal, Tom Lindley, Roger Samuel, and John Foren, Defendants-Appellees.

No. 230346.
|
March 13, 2003.

Before: SMOLENSKI, P.J., and WILDER and SCHUETTE, JJ.

[UNPUBLISHED]

PER CURIAM.

**\*1** Plaintiff, a former reporter for the Flint Journal, appeals as of right the circuit court's order granting defendants summary disposition of plaintiff's action for wrongful termination and violation of the Whistleblower's Protection Act (WPA), M.C.L. § 15.361 *et seq.*[1] We affirm.

[1] The court also dismissed plaintiff's claims for defamation, invasion of privacy, and intentional infliction of emotional distress, but those claims are not at issue on appeal.

I. Facts

Plaintiff began working at the Flint Journal in 1973, as a part-time employee, and became a full-time reporter in 1978. Plaintiff met Tom Joubran, a local businessman and bar owner, in 1978 or 1979. Over the years, plaintiff wrote several stories about Joubran and the two became acquainted. For several months in 1996, plaintiff lived in a home that he rented from Joubran. Plaintiff also wrote about the county prosecutor, Arthur Busch. Busch and Joubran were frequently in conflict.

Sometime around October 1998, plaintiff's editor, Thomas Lindley, learned from Busch that an investigation of Joubran involving sexual activity with minors was underway. Busch wanted to subpoena plaintiff and get information from him regarding the Joubran investigation. After meeting with plaintiff, Lindley learned for the first time that plaintiff had rented a house from Joubran, and Lindley felt that plaintiff had been wrong not to tell the editors about his housing arrangement because Joubran was a fairly prominent figure. Lindley told plaintiff not to have any further contact with Busch or Joubran because of a possible conflict of interest.

About two weeks after plaintiff had been told not to have contact with Busch or Joubran, Joubran phoned plaintiff at home. Joubran told plaintiff that he had sent a $50,000 cash payment to prosecutor Busch, in exchange for dismissal of an investigation into alleged criminal activity by Joubran involving fraud and sexual misconduct with a minor. Joubran said he had delivered the money to Busch through Donna Poplar, the director of the Genesee County Community Action Agency, an appointment that Busch "had a hand in." Joubran had a tape-recording of the transaction and, at some point, plaintiff made a copy. Plaintiff told Joubran that this sounded like bribery and that he should go to the FBI. At Joubran's request, plaintiff contacted the FBI. Plaintiff talked to FBI agents the next day but did not tell them about the tape-recording or that he was going to make a copy of it. Sometime around January 29, 1999, plaintiff told his editors what had happened. Plaintiff knew that the tape, which was possible evidence of a bribe, was newsworthy.

Plaintiff said he did not immediately tell defendants about the contact with Joubran or that he had a copy of the tape, because he feared that he would be disciplined for it. Plaintiff knew that he had been told not to have any contact with Joubran or Busch and felt that he was "between a rock and a hard place." Before plaintiff told the editors what had happened, plaintiff had already spoken to other people in the community, including the chairman of the county board of commissioners, and had revealed his bias against Busch. John Foren, plaintiff's immediate supervisor, said that, by talking to people in the community about the information before giving the newspaper a chance to act on it, plaintiff gave the people involved in the alleged scheme time to "cover their tracks." According to Foren, plaintiff violated the basic journalistic tenet of objectivity and hurt the newspaper's credibility and ability to investigate the story. Foren said the editors felt that the newspaper "had been really compromised, that we had a potentially huge story that a reporter of ours knew about

for six weeks." They were concerned because plaintiff had become a central part in the story. The editors were worried that they would no longer be able to report the story fairly without an appearance of a conflict.

***2** Plaintiff was fired because he failed to disclose the elements of what had become a very important news story in a timely manner and had compromised the credibility of the newspaper.

Plaintiff filed this action for wrongful discharge, violation of the WPA, defamation, and invasion of privacy/intentional infliction of emotional distress. The trial court disagreed with plaintiff's theory of just-cause employment and agreed with defendants that plaintiff had only a satisfaction contract. The trial court noted that even plaintiff testified that defendants were dissatisfied with him. The trial court rejected plaintiff's theory that, even if there were a satisfaction contract, there was a question of fact regarding whether he was fired because defendants were dissatisfied or because of some other reason.

Plaintiff also alleged that defendants fired him in violation of the WPA for reporting Busch's alleged crime to the FBI. Plaintiff had acknowledged that the alleged crime was a potentially "huge" story. Defendants disputed plaintiff's claim but argued that, in any case, defendants had a constitutionally protected sphere of control of editorial" matters and that plaintiff's actions had jeopardized the appearance of defendants' credibility and objectivity. The trial court agreed with defendants that a newspaper is allowed to protect the credibility of potential stories by restricting employee activities in ways that might not be permitted in other professions, even where the restrictions might involve reporting a crime.

II. Standard of Review

This Court reviews a trial court's grant or denial of summary disposition de novo. *Spiek v. Dep't of Transportation,* 456 Mich. 331, 337; 572 NW2d 201 (1998). The court considered evidence beyond the pleadings when granting summary disposition; thus, defendants' motion is reviewed under MCR 2.116(C)(10). *Patterson v. Kleiman,* 447 Mich. 429, 432; 526 NW2d 879 (1994). A motion under MCR 2.116(C)(10) tests the factual support of a claim. The motion should be granted if the evidence demonstrates that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. *MacDonald v. PKT, Inc,* 464 Mich. 322, 332; 628 NW2d 33 (2001).

III. Analysis

A. Satisfaction Contract

Plaintiff argues that the trial court erred in determining that defendants' employee benefit handbook gave rise to a satisfaction contract, rather than a legitimate expectation of just-cause employment. We disagree.

In considering a legitimate expectation claim, we first determine what, if anything, the employer promised. *Rood v. General Dynamics Corp,* 444 Mich. 107, 140; 507 NW2d 591 (1993). There must be *mutual* assent to a just-cause provision under an objective standard, looking at the express words of the parties and their visible acts; oral statements of job security must be clear and unequivocal. *Bracco v. Michigan Tech,* 231 Mich.App 578, 585; 588 NW2d 467 (1998). Here, defendant's employee benefit handbook provides that plaintiff would have job security so long as he performed his "assigned tasks satisfactorily, [did] not engage in misconduct and this newspaper continues to publish." A promise of continued employment so long as the employee's services are satisfactory to the employer is not a promise of just-cause employment. *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 620; 292 NW2d 880 (1980). Thus, defendants' promise of job security so long as plaintiff performed his assigned tasks satisfactorily is insufficient to give rise to a just-cause employment relationship. Further, plaintiff does not allege any clear and unequivocal oral promises of just-cause employment.

***3** As the trial court observed, a satisfaction contract may be created if an employer agrees not to terminate an employee except if it in good faith is dissatisfied with the employee's performance or behavior. *Bracco, supra* at 585. A satisfaction contract is not a just-cause or good-cause contract. *Meagher v. Wayne State University,* 222 Mich.App 700, 722-723; 565 NW2d 401 (1997). Under a satisfaction contract, "[t]he employer is the sole judge of whether the person's job performance is satisfactory."

*Meagher, supra* at 723; see also *Bracco, supra* at 602-603. Here, where the employee benefit handbook expressly stated that the promise of job security applied "as long as you continue to perform your assigned tasks satisfactorily," and there was no other evidence of a clear and unequivocal promise of just-cause employment, the trial court did not err in concluding that plaintiff's employment relationship consisted, at most, of a satisfaction contract.

Plaintiff argues that even if his employment relationship consisted only of a satisfaction contract, summary disposition was improper because a question of fact existed whether defendants were in good faith dissatisfied with his performance. See *Toussaint, supra* at 620 (while the reasonableness of the employer's judgment is not subject to review, a "jury may address the claim that the dissatisfaction expressed is insincere, in bad faith, dishonest or fraudulently claimed as a subterfuge"). In this case, plaintiff admitted that he knew defendants would be unhappy because he contacted Joubran after defendants told him not to, and that he did not tell defendants about the contact because he was concerned that he would be disciplined. We conclude that plaintiff failed to demonstrate a genuine issue of disputed fact regarding defendants' good faith dissatisfaction.

B. Whistleblower's Protection Act

Plaintiff next argues that First Amendment considerations do not operate to shield defendants from liability under the WPA. We find it unnecessary to address this constitutional issue because we conclude that plaintiff has not established a triable issue of fact regarding his claim under the WPA. This Court will not address constitutional questions if an issue can be resolved on nonconstitutional grounds. *People v. Riley,* 465 Mich. 442, 447; 636 NW2d 514 (2001).

Plaintiff asserts that he has established a triable issue of fact under the WPA. We disagree. To establish a prima facie case under the WPA, a plaintiff must show that he (1) was engaged in a protected activity as defined by the WPA, (2) was discharged by the defendants, and (3) that there is a causal connection between the protected activity and the discharge. *Roulston v. Tendercare, Inc,* 239 Mich.App 270, 278; 608 NW2d 525 (2000). If the plaintiff can establish a prima facie case of retaliatory discharge, the burden shifts to the defendant to articulate a legitimate business reason for the discharge. If the defendant produces evidence establishing the existence of a legitimate reason for the discharge, the plaintiff must prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge. *Id.* The Court must then decide, giving the benefit of any reasonable doubt to the plaintiff, whether the plaintiff's proofs sustain a reasonable inference that the defendant's proffered reason was a pretext for retaliation. Only then is there a triable issue of fact for the jury. *Id.*

**\*4** Here, assuming without deciding that plaintiff's decision to report to the FBI was protected conduct under the WPA, his contact with Joubran in violation of defendants' direct order was not. Moreover, the evidence establishes that before plaintiff told defendants about Joubran's claim of alleged bribery, he discussed it with other people, including public figures, and revealed a bias against Busch. We are unwilling to hold that a newspaper does not have a legitimate business reason to discharge a reporter who, in disregard of his employer's order, inserts himself into a news event on the side of one of the protagonists and creates the appearance of bias, as plaintiff did here. Defendants presented a legitimate reason for discharging plaintiff and plaintiff's proofs do not give rise to a reasonable inference that defendants' proffered reasons for plaintiff's discharge were a pretext for illicit retaliation.

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2003 WL 1447873, 31 Media L. Rep. 2177