UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNA POPLAR,

     Plaintiff,

v

GENESEE COUNTY ROAD COMMISSION;
and FRED F. PEIVANDI, in his individual
capacity,

     Defendants.

CASE NO:  2:21-cv-12568-VAR-JJCG

HON. VICTORIA A. ROBERTS

---

Charis Lee (P84127)
LEE LEGAL GROUP, PLLC
Attorney for Plaintiff
117 W. Flint Park Blvd.
Flint, MI 48505
(810) 513-9257
charis@leebusinesslaw.com

Julie A. Gafkay (P53680)
GAFKAY LAW, PLC
Co-Counsel for Plaintiff
604-A S. Jefferson Ave.
Saginaw, MI 48607
(989) 652-9240
jgafkay@gafkaylaw.com

Andrew A. Cascini (P76640)
HENN LESPERANCE PLC
Attorneys for Defendants
32 Market Ave., SW, Suite 400
Grand Rapids, MI  49503
(616) 940-5164
aac@hennlesperance.com

---

## **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56**

Defendants Genesee County Road Commission and Fred F. Peivandi move this Court

for summary disposition of Plaintiff's Complaint because there are no disputed issues of

material fact concerning any of the Plaintiff's counts from her Amended Complaint and Defendants are thus entitled to judgment as a matter of law. This Motion is supported by an accompanying brief. Counsel for the parties conferred via email on November 17 and 18, 2022 in compliance with Local Rule 7.1(a) to determine whether Plaintiff intended to concur with or oppose this Motion, and Plaintiff announced her intent to oppose the Motion on November 18, 2022.

WHEREFORE, the Genesee County Road Commission and Fred F. Peivandi each ask this Court to grant their Motion for Summary Judgment and dismiss Plaintiff's Amended Complaint in full and with prejudice.

Dated:  December 9, 2022

/s/ Andrew A. Cascini
Andrew A. Cascini
HENN LESPERANCE PLC
32 Market Ave SW, Ste. 400
Grand Rapids, Michigan 49503
aac@hennlesperance.com

HENN LESPERANCE PLC

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNA POPLAR,

     Plaintiff,                      CASE NO:  2:21-cv-12568-VAR-JJCG

v

                                     HON. VICTORIA A. ROBERTS

GENESEE COUNTY ROAD COMMISSION;
and FRED F. PEIVANDI, in his individual
capacity,

     Defendants.

| | |
|---|---|
| Charis Lee (P84127) | Andrew A. Cascini (P76640) |
| LEE LEGAL GROUP, PLLC | HENN LESPERANCE PLC |
| Attorney for Plaintiff | Attorneys for Defendants |
| 117 W. Flint Park Blvd. | 32 Market Ave., SW, Suite 400 |
| Flint, MI 48505 | Grand Rapids, MI  49503 |
| (810) 513-9257 | (616) 940-5164 |
| charis@leebusinesslaw.com | aac@hennlesperance.com |
| | |
| Julie A. Gafkay (P53680) | |
| GAFKAY LAW, PLC | |
| Co-Counsel for Plaintiff | |
| 604-A S. Jefferson Ave. | |
| Saginaw, MI 48607 | |
| (989) 652-9240 | |
| jgafkay@gafkaylaw.com | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT UNDER
FED. R. CIV. P 56**

## STATEMENT OF ISSUES PRESENTED

**(1) Has Plaintiff failed to exhaust her administrative remedies with respect to certain claims she brings under Title VII, entitling Defendants to judgment as a matter of law upon those claims?**

Defendants answer:  Yes.

**(2) Can Plaintiff establish a prima facie case of race discrimination or retaliation based on the undisputed facts in the record?**

Defendants answer:  No.

**(3) Have Defendants set forth legitimate, non-discriminatory, and non-retaliatory reasons for all purportedly adverse actions taken against Plaintiff in this case?**

Defendants answer:  Yes.

**(4) Can Plaintiff establish a showing that the Defendants were motivated by pretext to discriminate against Plaintiff because of her race and protected activity?**

Defendants answer:  No.

**(5) Has Defendant failed to reasonably accommodate the Plaintiff's visual disability under those standards required by Michigan's PWDCRA?**

Defendants answer:  No.

**(6) Has Defendant Fred Peivandi retaliated against Plaintiff for her protected speech in violation of the First Amendment of the United States Constitution?**

Defendants answer:  No.

## CONTROLLING AND PERSUASIVE AUTHORITY

Controlling authority for the issue of exhaustion of administrative remedies includes:

- *Dixon v. Ashcroft,* 392 F.3d 212, 217 (6th Cir. 2004);
- *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 379 (6th Cir. 2002);
- *Ang v. Proctor & Gamble Co.,* 932 F.2d 540, 545 (6th Cir. 1991);
- *Schaefer v. U.S. Postal Service,* 254 F.Supp.2d 741, 752 (S.D. Ohio 2002); and
- *Lybarger v. Gates,* 2012 WL 1095915, at *8 (N.D. Ohio Mar. 30, 2012).

Controlling authority for the issue of whether Plaintiff can demonstrate adverse acts includes:

- *Peltier v. U.S.,* 388 F.3d 984, 988 (6th Cir. 2004);
- *Spellman v. Ohio Dep't of Transp.,* 244 F.Supp.3d 686, 702 (S.D. Ohio 2017);
- *Redlin v. Grosse Pointe Pub. Sch. Sys.,* 921 F.3d 599, 607-08 (6th Cir. 2019);
- *Ceckitti v. City of Columbus,* 14 Fed. Appx. 512, 516 (6th Cir. 2001); and
- *Scott v. Metropolitan Health Corp.,* 234 Fed. Appx. 341, 348-49 (6th Cir. 2007).

Controlling authority for the issue of whether Plaintiff can demonstrate but-for causation includes:

- *Hecht v. Nat'l Heritage Academies, Inc.,* 499 Mich. 586, 6060 (2016);
- *Comcast Corp. v. National Association of African-American Owned Media,* 140 S.Ct. 1009 (2020);
- *Williams v. Serra Chevrolet Automotive LLC,* 4 F.Supp.3d 865, 877-78 (E.D. Mich. 2014);
- *Pelcha v. MW Bancorp, Inc.,* 988 F.3d 318, 323-23 (6th Cir. 2021); and
- *Seoane-Vazquez v. Ohio State University,* 577 Fed. Appx. 418, 428-29 (6th Cir. 2014).

Controlling authority for the issue of whether Defendants have failed to accommodate Plaintiff's visual disability includes:

- EEOC v. Ford Motor Co., 782 F.3d 753, 761 (6th Cir. 2015); and
- Swann v. Washtenaw County, 221 F.Supp.3d 936, 943 (E.D. Mich. 2016).

Controlling authority for the issue of whether Defendant Fred Peivandi has retaliated against Plaintiff's speech in violation of the First Amendment of the United States Constitution includes:

- *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006).

## INTRODUCTION

This case prominently features one material fact that no party would dare dispute: there is no love lost between Plaintiff Donna Poplar and Defendant Fred Peivandi. Deadlocked in what an impartial investigator would conclude is "a 'turf war' between two people who have strong personalities and who desire to be in control," (**Ex. 30**) Peivandi and Poplar's "struggle for power" inside Defendant Genesee County Road Commission ("GCRC") has led Poplar to repeatedly accuse Peivandi of waging an outlandish and sensational multi-year campaign of discrimination and retaliation against her. Poplar has filed two EEOC charges (**Exs. 2**, **3**), two internal complaints (**Exs. 4**, **5**), and this federal lawsuit – all against the GCRC, and all employing vivid language to portray Peivandi as a reprehensible villain.

But the truth behind an allegation isn't determined by how often it is repeated. And here, the timing of her claims is suspect. No employee had ever filed a race-based mistreatment complaint against Peivandi before Poplar, and at one time he'd believed they were on good terms. (Peivandi 28, 40-41, 136). But when Peivandi was unanimously selected by the GCRC's Board of Directors (the "Board") to become the next Managing Director instead of a candidate she preferred, Poplar fought to maintain control by making clandestine recordings of Peivandi, ignoring his authority, and misleadingly alleging Peivandi had refused her accommodations. Then, after changes to the Board left Poplar fearful that she'd lost support of its majority, she filed a discrimination and retaliation complaint against Peivandi.

But beyond <u>what</u> Poplar claims has happened, or <u>why</u> Poplar may have made those

1

allegations, the more pressing issue presently before this Court is <u>if</u> Poplar can prove her claims using admissible evidence. But she cannot. The record shows that Defendants are entitled to summary judgment as a matter of law based on the record in this case.

### STATEMENT OF FACTS[1]

Defendant Genesee County Road Commission is the governmental entity that maintains its county's roads and bridges. (Peivandi 27). The GCRC is led by its Board, which holds authority to contract business, and which provides strategic direction to the GCRC and establishes its policies. (Mandelaris 6, 10; MCL 224.9(1)). The Board indirectly manages the GCRC through its appointment and supervision of the GCRC's Managing Director, who controls the GCRC's day-to-day operations and has sole authority to hire, fire, and discipline employees. (Mandelaris 7, 54; Peivandi 26, 52). The Managing Director has one direct report – the Deputy Managing Director, a position created in early 2022 to manage the GCRC's other departmental directors, served by Randy Dellaposta. (Dellaposta 7-10). Before 2022, the Managing Director supervised all directors. (Peivandi 29-30).

Defendant Fred Peivandi has served as the GCRC's Managing Director since the Board unanimously appointed him to the position in July 2018. (Peivandi 15; **Ex. 6**). At that time, Peivandi had been a GCRC employee since 1993, serving thirteen years as Director of Engineering. (Peivandi 15-16). His career path is remarkable given his origins: Peivandi is an

HENN LESPERANCE PLC

---

[1] A Statement of Material Facts in a format prescribed by the Court is attached as (**Ex. A**).

Iranian-American who came to this country as a 17-year old to achieve his educational ambitions. (*Id.* 14, 35). Despite his youth, Peivandi made the journey alone. (*Id.* 14).

Plaintiff Donna Poplar was hired by the GCRC in October of 2016 as its HR Director. (Poplar 27). She had prior served as the Executive Director for the Genesee County Community Action Agency ("GCCAA") and the HR Director for the City of Flint, Michigan. (*Id.* 9, 14-16). She was ultimately terminated from each position – from the GCCAA in 1999 for an "unknown"[2] reason (Poplar 16; **Ex. 7**), and from Flint in 2011 by the then-incoming emergency manager. (*Id.* 10-12). Poplar spent the next five years unemployed and seeking work, but "had no success" in the job market based on testimony from her unsuccessful age discrimination lawsuit against the City of Flint. (Poplar C 70-73[3], 150; Poplar 17-20; **Ex. 10**).

A.   <u>John Daly hires Donna Poplar, but soon after leaves the Road Commission</u>

Poplar applied to work for the GCRC as its HR Director. (Poplar 27). Poplar later interviewed for the job, but soon learned the GCRC selected another candidate. (Poplar 29-31). But all hope was not lost. Six months later, the GCRC invited Poplar to return for a private interview with John Daly, then the Managing Director since 1999. (Poplar 30-31; Daly 6). When Poplar interviewed with Daly, she disclosed her visual disability. (Poplar 124). Daly

---

[2] Poplar's termination from the GCCAA occurred around the time she was convicted of a felony for "receiving money under false pretenses" based on acts which occurred in her final days with the GCCAA. (Poplar C 104-111). At least two Michigan Court of Appeals opinions describe her crime (**Ex. 8**, **9**), which was later expunged. (Poplar 22-23).
[3] References to transcripts with the "B" affix refer to testimony taken in 2020 from *Branch v. GCRC,* and those with the "C" affix refer to 2015 testimony from *Poplar v. City of Flint.*

hired her, giving her a third chance for reentry the human resources world. (*Id.* 29-31).

Once hired, Daly established an extremely supportive professional relationship with Poplar. (Daly 12). Daly testified he was satisfied with Poplar's performance in her role, and believed Poplar was respectful to him and accepted his authority as the Managing Director. (*Id.* 12, 15). Daly gave Poplar an employment contract (**Ex. 11**) – an unusual distinction she shared with few other non-union GCRC employees – that he'd asked her to draft herself before personally executing it *ultra vires*. (Poplar 42-43, 47; Mandelaris 76-78). Mere months later, Daly and Poplar signed a second contract with a five-year term, generous severance benefits, and a termination right exercised at Daly's pleasure. (**Ex 12**). Poplar claimed she could not recall why Daly extended her contract so early into her employment. (Poplar 35).

Daly was also supportive of Poplar's visual disability-related accommodation requests. Poplar testified that she spoke with Daly on her first day at work about getting a closer parking spot, adjusting her office lighting, purchasing an enlarged computer screen, and hiring an administrative assistant to help her. (Poplar 125). Poplar stressed that her primary motivation in asking for the assistant on her first day was for disability accommodation purposes. (*Id.* 127). In January of 2017, Poplar and Daly submitted documentation to the Board requesting funding for a HR assistant. (**Ex. 13**). The documents do not mention Poplar's need for an accommodation, as she admits. (Poplar 128-129, 132, 134).

Although Daly planned to budget a new part-time position into the HR department primarily for operational efficiency but also to accommodate Poplar, he wouldn't get a chance.

(Daly 24, 27). In late 2017, Daly was placed on paid administrative leave by the Board, and he parted ways with the GCRC officially in early 2018. (Daly 24). For whatever reason, Daly executed a <u>third</u> four-year agreement with Poplar mere months before his departure. (**Ex. 14**).

    B.    <u>The Board promotes Peivandi over Poplar's objections</u>

The GCRC enjoyed leadership continuity after Daly's departure through Peivandi and Maintenance Director Branch. Branch was an institutional employee of the GCRC who had served it since 1988. (Branch II 25-26). Branch and Peivandi boasted distinct strengths – as Daly once testified, Branch "had better leadership and communication skills than did" Peivandi, but Peivandi's "technical abilities… were far superior" to Branch's. (Daly II 12). The Board decided in February of 2018 to appoint both as co-Interim Managing Directors, and each applied for the permanent position. (Peivandi 53-55). The Board hired an executive search firm to assist them in conducting an exhaustive, thorough search for the next Managing Director, which lasted nearly six months. (**Ex. 15**, 1-2). Poplar's official involvement in the search was "extremely limited." (Poplar B 15-16).

But Poplar would become unofficially involved. Poplar had a personal interest in the outcome of the job search because she "felt that Anthony Branch should have been the Managing Director." (Poplar B 73-75). In addition to her respect for Branch, Poplar testified she was also motivated by opposition to Peivandi, who, she felt, "was not an effective communicator," "didn't appear to have [an adequate] level of compassion," and, allegedly, "had some serious issues with racial biases." (*Id.*). Specifically, Poplar claimed Peivandi "had

views about African-Americans that I didn't subscribe to." (Poplar 62). Poplar felt this way because Peivandi allegedly complained frequently about co-workers including Branch, John Daly, then-Purchasing Director Joyce McClane, and Makini Jackson, the prior HR Director. (Poplar 62-67). Impliedly, Poplar felt this demonstrated racial animus because Branch, McLain, and Jackson are African-American, although Commissioner Cloyce Dickerson reinforced that Peivandi "didn't get along" with Daly (a Caucasian) either. (Dickerson 93). Daly testified he'd received complaints from employees about Peivandi "being unreasonable and unfair with some of his requirements," but had never seen any evidence Peivandi held animus towards African-Americans despite directly supervising him for 12 years. (Daly 13, 32).

Poplar provided more than just moral support for Branch's candidacy. When the Board proposed revising the Managing Director's job description to require a baccalaureate degree before soliciting applications, Branch went to Poplar for help – for all his experience, he lacked a college education. (Poplar B 25-26). So, she intervened during the Board's next public meeting. (*Id.* 180-181). Poplar did nothing to conceal her interests in objecting to the proposed change: if the degree requirement remained, "that's going to eliminate [Branch] from being interviewed," she warned. (*Id.* 181). After heated debate, the Board accommodated Branch and eliminated the requirement. (**Ex. 16**, 117-118). But Poplar's efforts to aid Branch were in vain. Although the search firm interviewed Branch and Peivandi, it recommended to the Board a racially-diverse panel of candidates not including Branch. (**Ex. 15**, 2). It did include

HENN LESPERANCE PLC

Peivandi, who was unanimously hired in August 2018.[4] (*Id.*).

    C.    <u>Poplar and Peivandi clash over an administrative assistant position</u>

Daly's departure did not deter Poplar's desire for her own administrative assistant. She raised the issue again with Peivandi almost immediately after his promotion, emailing him on August 27, 2018, seeking an administrative assistant as an accommodation for her disability. (**Ex. 17**). Peivandi asked for more information.  (**Ex. 18**). But as the story[5] shows, Poplar had no qualms about going over Peivandi's head to get her way, and Poplar's animosity towards Peivandi grew as he responded with reasonable limitations upon her control:

- When Poplar and Peivandi met, she claims he refused to create the position by asking "[w]hy should I hire an HR assistant for you when I can hire someone without a disability." (Poplar 94, 139). Peivandi, <u>who objected only to the position being full-time</u>, testified he'd actually said "[w]hy should I hire two people to do one job." (Peivandi 67).

- Poplar met again with Peivandi, but secretly recorded this meeting.[6] In the recording, Poplar repeatedly attempts to get him to admit he'd made the offensive comment she'd said he did. (**Ex. 19**, 2-3, 13). Peivandi[7] denies it, and says he'd meant the GCRC was "not going to hire somebody that's going to take one and a half persons to do the job or two people to do the job."[8] (*Id.*, 4-5). He assures Poplar he <u>supported</u> creation of a part-time position and would perform a needs study. (Id., 11, 14-15).

- In December 2018, Peivandi asked the Board to create a part-time position for Poplar, but he and she disagreed about its starting wage. (**Exs. 20, 21**). Poplar asked the Board in a public meeting to override Peivandi's recommendation about the wage rate. (**Ex. 22**). The Board sided with Poplar in a 3-1 vote over Commissioner Arceo's objection that the

---

[4] Branch sued the GCRC claiming it failed to interview or hire him as its Managing Director because of his race. Summary disposition was granted (and affirmed) to the GCRC. (**Ex. 15**).
[5] The events are discussed thoroughly in the Investigation Report. (**Ex. 1**, 4-14).
[6] A transcript of this recording is attached as (**Ex. 19**).
[7] Peivandi asked her if she is recording him. She lied and denied it. (*Id.*, 4).
[8] Peivandi's comment demonstrates proper understanding of the GCRC's obligations under the ADA and PWDCRA. *See Bratten v. SSI Services, Inc.,* 185 F.3d 625, 632 (6th Cir. 1999).

Managing

Managing Director held sole authority to determine wages. (*Id.*).

- On January 31, 2019, Peivandi refused to sign documentation approving Poplar's preferred rate. (**Ex. 23**). On February 4, 2019, Poplar filed an EEOC charge against the GCRC, alleging Peivandi discriminated against her because of her disability and – perplexingly – her race, once more falsely claiming that Peivandi had denied her an accommodation. (**Ex. 2**). Under Board pressure, Peivandi folded and accepted Poplar's preferred rate in March of 2019. (Pearson 6).

- A mere three months later, Poplar informed Peivandi she'd ask the Board for a full-time assistant. (**Ex. 24**; Poplar 145). On August 8, 2019, Peivandi told her that he'd reviewed her request but could not support it. (*Id.*) Poplar again asked the Board to intervene, and on August 27, 2019, the Board voted 3-2 to expand the position to full-time. (**Exs. 25**, **26**).

    D.    Tensions between Poplar and Peivandi escalate in 2020

Tensions between Poplar and Peivandi only escalated the next year, primarily related to Branch's then-pending lawsuit against the GCRC. Because Peivandi was an applicant and not a decision-maker during the Managing Director search, his actions were not implicated in that suit. (**Ex. 27**).  Branch's counsel deposed Poplar as a witness on September 21 and October 8 of 2020. (Poplar B). Poplar asked to begin by making an opening "statement for the record" in which she said she was "reluctantly participating" in the deposition because she feared "being subjected to reprisal" and "possible termination of employment" from her testimony. (Poplar B 7). When asked to elaborate, Poplar took the opportunity to blast Peivandi <u>even though he was not a party or a witness in the suit</u>. These comments included:

- "…Fred has made it known to me that he didn't trust me, and he has made numerous references to wanting me fired… I do know that Fred has pretty much let me know in many ways that he doesn't want me here."  (Poplar B 101, 104).
- "…Fred has a very retaliatory personality; I am very concerned… as Fred is watching this deposition, that he would take everything that I'm saying personally and that he's going to be very revengeful towards it." (*Id.* 101-102).
- "I think Fred feels... he can do what he wants. He often says he's the Managing Director…

I think Fred's anger and dislike towards African-American people, especially African-American men, is predicated around his cultured beliefs... [and] the fact that he resents that his daughter had two children by an African-American man that he despised... He'll talk about their Iranian side, but he won't talk about their black side." (*Id.* 102-104).

- "…I have [] stated my concerns because I do not believe that the Board that is sitting now is prepared to make the decision that they need to make concerning Fred Peivandi." (*Id.*).

Poplar testified that Peivandi spoke with her after her deposition, when she claimed Peivandi "felt that I was lying on him" and "took it personal," which made Poplar "quite upset." (Poplar 211). Peivandi admitted he was "[p]ersonally upset because she brought up my personal [life]… [a]bout my daughter [and] my grandkids" during her deposition despite their irrelevance to that case, but stressed he "didn't mix that with my professional side" towards Poplar. He told Poplar he didn't appreciate her testimony about of his family. (Peivandi 48).

E.    After turnover on the Board, Poplar files her first internal complaint.

Poplar, in her September 2020 testimony, knew the Board seated then wasn't prepared to terminate Peivandi's employment. (Poplar B 103). But her position would worsen when she lost an ally. In 2020, the Board included Dickerson, John Mandelaris, Bob Johnson, David Arceo, and Shirley Kautman-Jones. (Poplar B 23-24). Poplar complained about Peivandi to Johnson, Dickerson, and Mandelaris as she felt they would "really try to get involved and communicate with Fred on some of these concerns." (Poplar 191). But as 2020 ended Johnson and Kautman-Jones were replaced by Tim Elkins and Cathy Lane. Dickerson testified that this strengthened Peivandi because the change meant he had three supportive votes, whereas before his majority support was uncertain. (Dickerson 103-104).

In any event, Poplar filed her first complaint with the Board on January 28, 2021,

alleging Peivandi subjected her to a "hostile atmosphere in her working environment" that had begun in "early 2018." (**Ex. 4**). In the complaint, she asked the Board to investigate Peivandi, before concluding: "Today, I feel like I am the George Floyd of GCRC, and Fred Peivandi has his knee on my neck, and I am crying out "I Can Not Breath[e]." (*Id.*) (emphasis added).

F.    The Board votes for an investigation, which does not sustain Poplar's claims

The Board held a special meeting on February 9, 2021, to address Poplar's complaint. Multiple members of the public (including Poplar's current counsel) attended, insisting that the Board investigate the complaint. (**Ex. 28**). The Board asked the GCRC's liability insurer the Michigan County Road Commission Self-Insurance Pool ("MCRCSIP") to recommend a third-party investigator. (*Id.*). MCRCSIP recommended Craig Lange, an experienced labor and employment attorney. (*Id.*). The Board voted unanimously for Lange to investigate. (*Id.*).

 Lange investigated for two months, interviewed thirteen GCRC employees, and reviewed thousands of documents, many of which came from Poplar. (Poplar 212; Peivandi 43; **Ex. 1**, 3-4). Poplar admitted she had no reason to believe Lange held any bias against her, African-Americans, or employees who might engage in protected activity. (Poplar 217-218). Nevertheless, Poplar took no chances, and filed her second EEOC charge against the GCRC on May 10, 2021, claiming discrimination and retaliation. (**Ex. 3**).

Lange released his report through MCRCSIP to the Board on April 26, 2021. (**Ex. 1**). The Board met to review it on May 18, 2021. (**Ex. 29**). They lingered on Lange's final paragraphs, which provided the following analysis before concluding that Poplar's claims of

HENN LESPERANCE PLC

discrimination, harassment, intimidation, and retaliation could not be sustained:

> In my opinion, what exists at the [GCRC] is… a "turf war" between two people who have strong personalities and who desire to be in control… [Poplar] has pitted her position and influence as [HR] Director directly against the Managing Director and her [supervisor] Peivandi... I do not place the blame… upon [] Poplar alone.  [] Peivandi's management style has contributed to it certainly. But to an even greater extent, I place responsibility for the dysfunctionality within the organization upon the Board itself… who has permitted [] Poplar to circumvent the organizational chart… (**Ex. 1**, 30-31).

Intent to mend fences between Poplar and Peivandi, Elkins and Dickerson soon met with them on behalf of the Board. (Poplar 218). Elkins and Dickerson gave Poplar a letter summarizing the investigation's conclusions. (Poplar 218; **Ex. 30**). Poplar felt "blindsided" and considered the letter a "distraction." (Poplar 221). Accordingly, in Poplar's words, "we didn't make any grounds on how Fred and I could work better together." (*Id.* 220).

### G.    Peivandi issues Poplar the Directives

Although Peivandi felt "good" to learn that the allegations were not sustained, he still felt he "had to do something" based on Lange's conclusions about the conflict. (Peivandi 44). So, he drafted five directives because he "wanted to have something in writing for her to understand who is the boss here." (*Id.,* 45). He gave his reasons in the document itself:

> I do not wish to engage with you in a "turf war" or a "struggle for power" with respect to the GCRC… [I]f such contention and conflict are maintained concerning those issues with which we disagree, our organization's efficiency is placed in jeopardy … Each of us need to do considerable work to repair our professional relationship, and the success of the GCRC moving forward depends on it… [I]n the hope of fixing the performance and interpersonal conflict problems identified during Lange's investigation, I require you to follow the specific work-related directives below[.]

(**Ex. 31**; Peivandi 135). In summary, the directives instructed Poplar to: (1) raise concerns

HENN LESPERANCE PLC

about work-related matters with him before discussing them with others; (2) keep him informed whenever she spoke with Commissioners about work-related matters; (3) perform work as assigned; (4) defer all final hiring and firing decisions to the Managing Director; and (5) implement the Managing Director's budget decisions. (**Ex. 31**). Peivandi presented Poplar with the directives on July 1, 2021. Poplar claims she is "not sure" if the directives are lawful or valid. (Poplar 228-231). Poplar stated she complied to the "best of her ability." (*Id.*, 231).

H.   <u>Poplar violates the Directives</u>

Whatever peace Peivandi may have hoped to establish, it did not emerge. On August 16, 2021, Poplar emailed Peivandi and recommended the GCRC reimpose masking requirements. (**Ex. 32**). Peivandi responded that he did "not wish to mandate that GCRC staff and visitors wear masks" at that time, but that Poplar should make staff "aware of the risk level… so that they can make their own personal protection decision." Poplar replied to "reiterate" her prior recommendation, claimed (incorrectly) that the County mandated masks, and wrote she was "compelled in spite of my disagreement to your decision" to "avoid the appearance of being insubordinate," "taking under consideration the stringent directives that have been imposed on me." (*Id.*). Poplar wrote and sent out a memorandum entitled "MIOSHA Recommendations." (**Ex. 33**). It deviated from Peivandi's instructions in three ways:

- It claimed Peivandi's authorship, but he had never reviewed it. (Peivandi 108, 111).
- It outlined the MIOSHA and CDC recommendations and contrasted them with Peivandi's decision about masks, which Peivandi felt "thr[ew] him under the bus" and placed him personally at risk for public criticism. (*Id.,* 109-110).
- It alleged that Peivandi would not mandate mask use unless and until MIOSHA required him to, when his position was that he'd always comply with their mandate but wouldn't

HENN LESPERANCE PLC

independently mandate mask use at that time. (**Ex. 32**).

Peivandi felt Poplar had violated the directives, and decided disciplinary action was warranted. (Peivandi 121). Peivandi suspended Poplar for two weeks "because she did not follow my directives" on August 19, 2021, to return to work September 6, 2021. (*Id.;* **Ex. 34**).

I.     Poplar submits her second internal complaint

Poplar reacted just as she did with prior decisions Peivandi made that she didn't like – she went over his head. Poplar filed a second complaint with the Board on August 26, 2021, again alleging discrimination, harassment, and retaliation from Peivandi. (**Ex. 5**). She asked for "an unbiased investigation of the situation," reiterated her complaints, baselessly suggested "[t]ampering" occurred with Lange's investigation, and accused the Board of "grossly failed to protect" her from Peivandi. (*Id.*). Peivandi, who learned ten days later about the complaint, puzzled over what to do (Peivandi 127):

> [S]he filed a complaint in January, and I g[a]ve her directives so we can maybe fix our working relationship, to let her know who the boss is in this organization instead of giving me pushback with every decision I want to make, and then I put her on suspension, and during the two-week suspension, I see this. And then, I mean, I don't know how to handle this. So I figured, the best thing to do is put her on administrative leave and turn this over to the Board and let them decide how to handle this case, and that's exactly what happened here.

(Peivandi 130-131). He felt the leave should be "with pay" so it would be non-disciplinary, imposed it to create a "cooling off period between me and her" due to her allegations about how Poplar wanted "protection" from him, and hoped it would give the Board time to decide what to do. (*Id.* 128-129). Peivandi issued the leave notice on September 6, 2021. (**Ex. 35**).

But before the Board could react, Poplar made her next move. On September 28,

2021, the GCRC received correspondence from Poplar's legal counsel asking to hold settlement discussions. (**Ex. 36**). At the Board's October 6, 2021 meeting, the Board granted Poplar's request and met with Poplar and her attorney on October 13. (**Ex. 37**). Legal counsel for Poplar and the GCRC corresponded to negotiate peace, but they hit impasse in early November. On November 2, 2021, the Board tried a new approach: Poplar was to return to work, but with Poplar reporting directly to Dellaposta (who'd already been appointed to directly supervise the other directors in the new year anyway) instead. (**Ex. 38**; Poplar 182). The Board adjourned at 11:59AM, and Poplar came back to work. (*Id.*).

## ARGUMENT

Poplar's lawsuit contains (i) Title VII, ELCRA, and Section 1981 race discrimination claims; (ii) protected activity, accommodation request, and speech retaliation claims based on the First Amendment of the US Constitution, Title VII, ELCRA, the PWDCRA, and Section 1981; and (iii) a PWDCRA failure to accommodate claim. Poplar will support them all with her deposition testimony, which contains no shortage of harsh words about Peivandi. But Plaintiff cannot base her case on "conclusory allegations, speculation, and unsubstantiated assertions"– she must identify <u>facts</u> and <u>evidence</u> for her case to survive. *Bradley v. Wal-Mart Stores East, LP,* 587 Fed. Appx. 863, 866 (6th Cir. 2014). To this end, a microcosm for this whole case can be found in her deposition, when Poplar repeatedly testified that Peivandi makes her "<u>feel like [she] was being subjected to… work-related domestic violence.</u>" (Poplar

78, 92-95). But Poplar cannot substantiate this assertion, which proved metaphorical:[9]

> [W]hen he points his finger at me, I don't know if that's proof, but that finger that's pointed at me[,] is going to end up with a slap or turn into a fist, I really don't know. Because when a man looks at me and says "You shut up and you do what I tell you to do," that finger means something; and to me it is an act of physical threat. <u>I look at his finger pointed at me in the same manner that I look as though he was pointing a gun at me</u>. That's how I see it, and that's how I feel it today. (Poplar 97-98).

Just as her allegation that Peivandi subjected her to "violence" falls apart when subjected to scrutiny, the facts, and the record the parties have developed in this case cannot, as a matter of law, support Poplar's discrimination, retaliation, and disability-related claims. To be sure, as a human being, Poplar is entitled to her feelings. But with respect to this lawsuit, the record proves Defendants are entitled to summary judgment as a matter of law.

A.   <u>Plaintiff's claims under Title VII are defective in part because she has failed to exhaust administrative remedies prior to filing this lawsuit.</u>

A Title VII claimant must exhaust his or her administrative remedies by filing a charge, which "enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Dixon v. Ashcroft,* 392 F.3d 212, 217 (6th Cir. 2004); *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 379 (6th Cir. 2002). Plaintiffs cannot bring <u>discrimination</u> claims in a lawsuit that weren't included in an earlier-filed EEOC charge, or that weren't within "the scope of the [] investigation reasonably expected to grow out of the charge." *Ang v. Proctor & Gamble Co.,* 932 F.2d 540, 545 (6th Cir. 1991). The standard is more lenient for <u>retaliation</u> claims which

---

[9]Poplar admits Peivandi never physically harmed or threatened her, and she has absolutely <u>no</u> evidence Peivandi harbors some propensity for violence against others. (Poplar 95-105).

were not listed in a charge, such that retaliatory acts occurring <u>after</u> a charge is filed but <u>during</u>

the EEOC investigation will almost always "grow out of the charge." *Weigel,* 302 F.3d at 379-

80. But there is a backstop to this principle:

> [C]ourts have refused to accommodate claims for allegedly adverse actions that
> occurred after the completion of the subject EEOC investigation since, as a practical
> matter, the facts related to the later claim would never have been investigated as part
> of the original process, since they had not yet occurred.

*Lybarger v. Gates,* 2012 WL 1095915, at *8 (N.D. Ohio Mar. 30, 2012). Thus, "it is impossible

for a [retaliation] claim accruing after the close of the EEOC investigation to fall within the

scope of an investigation." *George v. Youngstown State University,* 2019 WL 118601, at *6

(N.D. Ohio Jan. 7, 2019); *see also Nolan v. Ohio Dept. of Rehabilitation,* 2021 WL 5603335

(N.D. Ohio Nov. 30, 2021). The issue of a Right to Sue Notice memorializes the end of the

investigation. *Schaefer v. U.S. Postal Service,* 254 F.Supp.2d 741, 752 (S.D. Ohio 2002).

Poplar filed her second EEOC charge on May 10, 2021. (**Ex. 3**). She received the

associated Right to Sue letter on August 5, 2021 (**Ex. 39**), which imposes a temporal limit on

acts for which Poplar may sue. Peivandi suspended Poplar and placed her on paid

administrative leave on August 19 and September 6, 2021, respectively – <u>after</u> the Right to

Sue letter was received.  Accordingly, Poplar may <u>not</u> allege any Title VII claims based on

any acts not contained in her EEOC charge which occurred after August 5, 2021.

B.    <u>Defendants are entitled to summary judgment on Plaintiff's race discrimination
      claims under Title VII, Section 1981, and the ELCRA.</u>

Poplar claims that the GCRC and Peivandi racially discriminated against her in four

ways: (a) by suspending her on August 19, 2021; (b) by placing her on paid administrative leave; (c) by giving her a "lower raise" as part of the 2023 budget; and (d) by treating her differently than white colleagues by scrutinizing her work excessively, ridiculing her, eliminating her from meetings, and generally treating her poorly. Defendants are entitled to summary judgment over these race discrimination claims for a variety of reasons.

1.   *Plaintiff cannot establish a prima facie case of race discrimination.*

Defendants concede that Poplar has demonstrated she (i) is a member of a protected class; and (ii) was qualified for the job at issue. But her claims fall apart with respect to the other prongs of the prima facie test: (iii) subjected to an adverse employment action; and (iv) treated differently than similarly situated nonprotected employees. *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802 (1973).

Within the context of a discrimination claim under Title VII, ELCRA, or Section 1981, an adverse employment action must "constitute… a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Redlin v. Grosse Pointe Pub. Sch. Sys.,* 921 F.3d 599, 607-08 (6th Cir. 2019). Of the four categories of alleged harms Poplar suffered due to her race, two do not qualify as adverse acts:

- *Paid administrative leave.* Case law observes that administrative leave will rarely qualify as an adverse act supporting discrimination if, as here, the plaintiff maintains pay and benefits[10] and is reinstated to the job. *See Peltier v. U.S.,* 388 F.3d 984, 988 (6th Cir.

---

[10] The GCRC earned summary judgment in a case where a white employee filed

2004); *Spellman v. Ohio Dep't of Transp.,* 244 F.Supp.3d 686, 702 (S.D. Ohio 2017).

- *General mistreatment.* The allegations regarding Peivandi's "ridicule" and "poor treatment" of Poplar do not rise to the level of adverse acts because "offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Ceckitti v. City of Columbus,* 14 Fed. Appx. 512, 516 (6th Cir. 2001), *citing Faragher v. City of Boca Raton,* 524 U.S. 775 (1998). Crucially, Poplar's Amended Complaint includes no harassment claims.

With respect to the claims regarding Poplar's allegedly lower annual raise and her two-week disciplinary suspension, these claims fail by virtue of the fourth prong of the prima facie test. As for the lowered annual raise, a review of the 2023 fiscal budget dispositively proves that there is no correlation between race and lowered annual raises. (**Ex 40**). The budget shows the HR Director position earned a 3% raise, not a 1% raise as Poplar claims in her Amended Complaint. (*Id,* at 18). Branch, also an African-American, earned a 3% raise as well. (*Id.,* at 18). Kendra Love-Brazzel, on the other hand, the only other African-American director, earned a whopping 22.7% raise as the Fleet Maintenance & Facilities Director. (*Id.,* at 14). Likewise, the Engineering Director and Deputy Managing Director (each Caucasian) also each earned 3% raises, equal to Branch and Poplar's. (*Id.,* at 8).

Poplar also cannot marshal any evidence to suggest that her race and her suspension are causally linked under either the "but-for" heightened causation standard applicable to

---

discrimination and harassment claims against it based on the GCRC placing her on paid administrative leave. *McClane v. Genesee County Road Commission,* 2020 WL 1323332, at *9 (E.D. Mich. Mar. 20, 2020). Likewise, Daly was placed on paid administrative leave by the GCRC before his departure. (Daly 24). Evidence that white employees were also placed on paid administrative leave undermines Poplar's argument that her leave was tied to her race.

ELCRA or Section 1981. *See Hecht v. Nat'l Heritage Academies, Inc.,* 499 Mich. 586, 6060 (2016); *Comcast Corp. v. National Association of African-American Owned Media,* 140 S.Ct. 1009 (2020). This can be seen by comparing the disciplinary histories of African-American directors: although Poplar was suspended in August of 2021 for her violation of Peivandi's directives, Peivandi has never suspended Branch nor Love-Brazzell. (Dickerson 102-103).

2.    *Defendants' conduct was motivated by legitimate non-discriminatory reasons.*

Even if any element of Poplar's race discrimination claims survive under any of the three statutes she invokes, Defendants have never equivocated with respect to their stated reasons for suspending Poplar and placing her on paid administrative leave. Peivandi's testimony is clear, and it matches the justifications he presented in each written notice: he suspended Poplar because he believed she had violated the July 1 directives by and through her issue of the August COVID-19 memorandum; and he placed Poplar on paid administrative leave to impose a "cooling off period" between Poplar and Peivandi given Poplar's allegations that the Board had failed to protect her from Peivandi, and because he endeavored to allow the Board time to respond to Poplar's second complaint after Peivandi's attempts to rectify his conflict with Poplar through the directives fell short. (Peivandi 121, 130-131).

3.    *Plaintiff can show no evidence of pretext.*

Finally, the record shows no evidence of pretext. Of the witnesses whose deposition testimony was captured in this lawsuit, Mandelaris, Daly, and Dellaposta all threw cold water on the allegation that Peivandi's treatment towards Poplar had anything to do with her race.

(Mandelaris 15-16; Daly 32; Dellaposta 16). More specifically, Mandelaris agreed "a hundred percent" with Lange's "turf war" conclusion from his Investigation Report. (Mandelaris 61).

Commissioner Dickerson disagreed, alleging that he felt Peivandi had discriminated against Poplar because of her race (but denying he'd discriminated against her because of her disability). (Dickerson 19). But he based this opinion solely upon his preference that Poplar's disciplinary action should have been progressive, which proves nothing. He also admitted he'd held no discussions with Peivandi about why he'd issued the suspension or the paid administrative leave period to Poplar prior to reaching this conclusion, nor could he produce any evidence to support it. (*Id.,* 19, 99-100).

C.   Defendants are entitled to summary judgment on Plaintiff's retaliation claims under Title VII, ELCRA, and the PWDCRA.

Poplar's retaliation claims[11] under Title VII, ELCRA, and the PWDCRA differ from her race claims only in that they are premised on her performance of protected activity between 2020 and the time she filed her lawsuit. This activity includes the deposition testimony she gave in Branch's lawsuit, her two internal complaints filed with the Board, and her 2021 EEOC charge. Defendants are entitled to summary judgment on Poplar's retaliation claims as well.

To show a prima facie case of retaliation under Title VII, ELCRA, or the PWDCRA, Poplar must show that she (i) engaged in protected activity; (ii) Defendants knew she had engaged in such activity; (iii) Defendants took an adverse action against her; and (iv) there

_____

[11] Defendants reincorporate here their arguments from Sections A, B.2, and B.3.

was a causal connection between Poplar's activity and the adverse employment action. *Morris v. Oldham Cnty. Fiscal Court,* 201 F.3d 784, 792 (6th Cir. 2000).

Defendants concede Poplar can meet the first two prongs of her prima facie case and acknowledge that the law defines an "adverse act" broadly in the retaliation context. *Burlington N. & Santa Fe R. Co. v. White,* 548 U.S. 53, 68 (2006); *White v. Dep't of Transp.,* 334 Mich App 98, 107-108 (2020) (act may qualify as adverse if it would have "dissuaded a reasonable worker" from protected activity). Thus, although Peivandi's "general poor treatment" of Poplar is does not qualify because adverse acts must be more serious than "petty slight[s], minor annoyance[s], or a lack of good manners," Defendants concede Poplar's suspension, her annual raise, and the alleged accommodation remove all probably qualify.[12]

Regardless of whether any or all of Poplar's pled harms qualify as adverse acts in the retaliation context, Poplar's claims are deficient because she cannot show causation under the "but-for" standard applicable to retaliation claims under Title VII and ELCRA. *Williams v. Serra Chevrolet Automotive LLC,* 4 F.Supp.3d 865, 877-78 (E.D. Mich. 2014). But-for causality "requires the plaintiff to show that the harm would not have occurred in the absence of – that is, but for – the defendant's conduct." *University of Texas SW Med. Ctr. v. Nassar,* 570 U.S. 338, 346-47 (2013); *Hecht v. Nat'l Heritage Academies, Inc.*, 499 Mich. at 606 (2016). Thus, an act or omission is not the but-for cause of a result if that same result would

---

[12] Some courts maintain that paid leave does not qualify as an adverse act even under *Burlington*. *Scott v. Metropolitan Health Corp.,* 234 Fed. Appx. 341, 348-49 (6th Cir. 2007).

have occurred without it. *Id.*, at 347. A defendant will be entitled to summary judgment based on but-for causation "[s]o long as [nondiscriminatory] factors were sufficient to justify [its] final decision." *Redlin v. Gross Pointe Pub. Sch. Sys.,* 921 F.3d 599, 615 (6th Cir. 2019).

This causation burden is "no simple task" to meet. *Pelcha v. MW Bancorp, Inc.,* 988 F.3d 318, 323-23 (6th Cir. 2021). As the Sixth Circuit explained in *Seoane-Vazquez v. Ohio State University,* 577 Fed. Appx. 418, 428-29 (6th Cir. 2014) (internal citations omitted):

> A Title VII plaintiff alleging retaliation *cannot* establish liability [under but-for causation] if her firing was prompted by both legitimate and illegitimate factors. Plaintiff's claim will therefore fail if [defendant] decided to [act] based on factors untainted by retaliatory animus, even if the decision was also based on factors that were tainted by retaliation.

Many factors prohibit Poplar from demonstrating causation here. Most obviously, Poplar's allegation that Peivandi's general mistreatment was attributable to her protected activity doesn't fit the timeline of this case. The earliest example of protected activity cited by Poplar in her complaint is her deposition testimony from September and October of 2020. But in her January 2021 complaint, Poplar says that Peivandi created a "hostile atmosphere" and "subject[ed her] to insults and derogatory remarks" "start[ing] in early 2018" and continued "[t]hroughout 2019." (**Ex. 4**). Poplar's protected activity cannot be the cause of Peivandi's alleged mistreatment if the alleged mistreatment predated the activity. She cannot even outline a close case of temporal proximity for acts which occurred in 2021 – prior to her suspension, Poplar's most proximate protected activity was filing her second EEOC charge in May of 2021, which puts three months between the alleged cause and effect. The Sixth Circuit has held that "temporal proximity may establish a prima facie case only if the temporal

-22-

proximity is very close," and proximity of <u>as little as two months</u> may be <u>insufficient</u> to create an issue of fact. *Warren v. Ohio Dept. of Pub. Sfy.*, 24 Fed. Appx. 259, 265-66 (6th Cir. 2001).

Poplar also serves "as her own comparator" given the frequency of her protected activity, which renders it impossible for her to prove but-for causation.  Poplar asserts she was suspended not for the COVID-19 memorandum but for filing her May 2021 EEOC charge. But this was not her first time filing with the EEOC. Should Poplar believe Peivandi harbored intent to retaliate against Poplar for filing EEOC charges, she must identify evidence to explain why she endured no suspension after she filed her first charge in 2019.  Likewise for her paid leave - it is uncontested that a close temporal proximity exists between Poplar's second internal complaint and Peivandi's decision to place Poplar on leave. But Poplar must show retaliatory motive to be the but-for motive to impose leave, and she cannot, considering her unchanged job status after she filed her first internal complaint in January 2021.

Poplar also alleges that the GCRC and Peivandi retaliated against her by promoting Monica Pearson, her former administrative assistant, to a Benefit Coordinator position in October of 2021. (Poplar 150). Although it is true that Peivandi promoted Pearson into this new job that October (Peivandi 63-64) during Poplar's leave, three facts disrupt any prima facie case she might make for causation because of intervening events:

▪ First, the uncontested evidence proves that from the very onset of her hire into the administrative assistant position, Poplar herself was "cross-training" Pearson to fill a Senior Benefit Coordinator position occupied by Cherry Grant upon her retirement. (Pearson 12, 32; Dellaposta 24). Defendants did not retaliate against Poplar by promoting Pearson to Benefit Coordinator when Poplar herself was grooming Pearson for the job.
▪ Second, the timing of the promotion is explained not by Poplar's administrative leave but

HENN LESPERANCE PLC

when Grant actually retired, which was in November of 2021. (Pearson 32-33).

▪ Third, Pearson's promotion did not necessarily mean a disruption of Poplar's accommodation. Peivandi, Dellaposta, and Pearson all testified that Pearson retained residual duties to assist Poplar post-promotion, and the Benefit Coordinator job description was modified accordingly. (Peivandi 64; Dellaposta 25; Pearson 38).

Lastly, Poplar's efforts to prove a but-for causative link between Peivandi's alleged retaliatory animus and her protected activity is disrupted by a similarly-situated comparator: Anthony Branch. Like Poplar, Branch engaged in a long pattern of protected activity stretching from 2019 until the present. (Mandelaris 64). But neither Peivandi nor the GCRC have subjected Branch to <u>any</u> adverse act at any time during Peivandi's tenure as Managing Director. (Mandelaris 72-73; Peivandi 135). Further, Peivandi testified that he holds no plans to demote Branch or eliminate his position. (Peivandi 56).

D.   <u>Defendants are entitled to summary judgment on Plaintiff's failure to accommodate claims under the PWDCRA</u>

Poplar brings a failure to accommodate claim against the GCRC based on the promotion of her former administrative assistant Monica Pearson to a Benefits Coordinator position – a promotion Pearson desired and for which she'd trained. (Pearson 38-39). She cannot outline a valid PWDCRA claim in this case for three reasons:

▪ *Written notice.* Poplar is ineligible to bring a failure to accommodate claim under the PWDCRA because she has not provided written notice "within 182 days after the date" she knew an accommodation was needed. MCL 37.1210(5); (8). Poplar admits she knew of her alleged need for an administrative assistant in 2016. (Poplar 125-127). <u>But she did not distill her accommodation request into writing until August 27, 2018</u>. (*Id.,* 137; **Ex. 17**).
▪ *Per se unreasonable accommodation.* The HR Director job description states that reading and computer screen work are each essential functions of the job. (**Ex. 41**). By asking the GCRC for a <u>full-time employee</u> devoted to assisting Poplar with these functions, Poplar seeks restructure of her job's essential functions by moving them to a proprietary

employee. This is *per se* unreasonable. *EEOC v. Ford Motor Co.,* 782 F.3d 753, 761 (6th Cir. 2015); *Swann v. Washtenaw County,* 221 F.Supp.3d 936, 943 (E.D. Mich. 2016).

- *Effective accommodations remain.* The record proves Peivandi and Dellaposta modified the Benefit Coordinator job description to require Pearson to continue helping Poplar in her new role. (Peivandi 64; Dellaposta 25; Pearson 38). Poplar confirmed Pearson does everything Poplar asks her to do. (Poplar 151-153). And the GCRC provided Poplar many alternative and effective accommodations without resistance. (Poplar 169-170).

E.   Defendant Peivandi is entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

Poplar's last remaining claim alleges that by suspending Poplar in August of 2021, Peivandi retaliated against her "constitutionally protected speech on matters of public concern" in violation of the First Amendment. (R.12, PageID.97). Poplar has clarified this allegation refers to the August 17, 2021, COVID-19 memorandum. (Poplar 250; **Ex. 33**). Poplar admits she sent this memorandum pursuant to her job duties as HR Director. (Poplar 281). Although COVID-19 workplace policies are matters of public concern, "when public employees make statements pursuant to their official duties… the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006). Because Poplar spoke pursuant to her official duties, her claim fails.

## CONCLUSION

Defendant Genesee County Road Commission and Defendant Fred Peivandi each respectfully ask this Court to grant their Motion under Fed. R. Civ. P. 56.

Dated:  December 9, 2022                    */s/ Andrew A. Cascini*
                                            Andrew A. Cascini
                                            HENN LESPERANCE PLC
                                            32 Market Ave SW, Ste. 400
                                            Grand Rapids, Michigan 49503
                                            aac@hennlesperance.com