```
                          John Daly
                        09/23/2022
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4
 5   DONNA POPLAR,
 6                    Plaintiff,
 7      vs.                          Case No. 4:21-cv-12568
 8                                   Hon. Victoria A. Roberts
 9   GENESEE COUNTY ROAD
10   COMMISSION and FRED F.
11   PEIVANDI, in his individual
12   capacity,
13                    Defendants.
14   _____/
15   PAGES 1 TO 38
16
17       The Deposition of JOHN DALY,
18       Taken at Hanson Remote,
19       Commencing at 8:43 a.m.,
20       Friday, September 23, 2022,
21       Before Tamora L. Thompson, CSR-5378.
22
23       Attorneys, Court Reporter & Witness appearing remotely.
24
25
```



Page 6

1 A. Throughout that period of time, I was the managing
2    director. Additionally for three years, I also served
3    as the HR Director. And for the last seven years, I
4    believe, I was the Director of IT as well.
5 Q. When you were director of IT, were you also the managing
6    director or --
7 A. I held the managing director position continuously from
8    1999 until 201.
9 Q. Okay. Perfect. Then while you were the managing
10   director, during this time, did all directors report
11   directly to you?
12 A. Yes.
13 Q. Who were the directors that reported to you at that
14   time? I would just say really within the -- since 2016.
15 A. Are you asking me the position or the person?
16 Q. The position and the person, if you can remember.
17 A. Let's see, first was during that period of time Rocky
18   Davis and Anthony Branch served as director of
19   maintenance. Randy Dellaposta served as director of
20   freight maintenance at the facilities. Kermit Pitts,
21   McKinney Jackson and Donna Poplar served at director of
22   HR. My finance director was Lynn Luellen, and I can't
23   remember her name right now. She is director of -- down
24   at the Oakland County Road Commission now.
25 Q. Okay.

Page 7

1 A. Then Coetta Adams took that position. Let's see,
2    Director of Engineering (inaudible) the first and he was
3    only there for about ten months, or about two years
4    while I was there. Then Fred Peivandi became the
5    Director of Engineering. I think that's all the
6    directors that reported directly to me.
7 Q. Thank you. I am going to stop my video because I'm
8    having a little cut in and out. I don't want my
9    bandwidth to prevent me from hearing what you have to
10   say. I'll just stop and see if that makes it better.
11   Thank you for your response.
12       So during that time that you were managing
13   director, Donna Poplar reported to you, and you say that
14   she was the Human Resources Director. Did you hire
15   Donna directly?
16 A. I did.
17 Q. When you hired Ms. Poplar, did she disclose, to you, at
18   any time during the interview process or when she was
19   hired, that she had a visual disability?
20 A. She did.
21 Q. When she disclosed that she had a visual disability to
22   you, did she also ask for accommodations for her
23   disability?
24 A. She disclosed the disability, to me, during the final
25   meeting before I made the offer to hire her.

Page 8

1 Q. In the interview process, she disclosed she had a vision
2    disability?
3 A. Right. And she said that her vision was deteriorating.
4    If I recall, her vision was deteriorating and that
5    she -- so I was not surprised about three months later
6    initially when (inaudible) it was the outside of the
7    fence next to the building. And so she indicated that
8    she was having some difficulties seeing where the fence
9    was because it's a hurricane type fence that you could
10   see through.
11       So she asked for a parking spot because of her
12   disabled vision that was closer to the building. So I
13   accommodated that and assigned her a parking spot that
14   was two or three spots down from mine. Then she did ask
15   for the addition of an another employee to HR, and that
16   was initially made as that, first of all, that position
17   had been there when I came in. Just been gapped for
18   several years.
19       She asked if we could fill that position. And
20   I indicated, to her, that if -- I inquired as to why.
21   Initially it was because of the -- there was an
22   increased workload due to the legal changes were taking
23   place with regards to OPED that were mandated by the
24   state additional reporting requirements and record
25   keeping that was required. And I was aware of that

Page 9

1    because that was right at the end of the period that I
2    had just served as HR director.
3        So then in the discussions subsequent to that,
4    I would say a month or so later, she indicated that,
5    again, her vision was deteriorating and she needed
6    assistance. That if this person were to be hired, they
7    would be able to help her with things like even reading
8    some of the documents.
9 Q. And did you find that that was a reasonable request?
10 A. That was a reasonable request?
11 Q. Yes. For accommodation.
12 A. For accommodation.
13 Q. Yes, for her vision.
14 A. Before it had been gapped. My intent, from my
15   experience, is that I had -- there was the HR director,
16   that position was (inaudible).
17       (Answer incomplete because of
18       Zoom technical issues.)
19 Q. Ask you the question again.
20       So I asked you previously, was it a reasonable
21   -- was Donna's request for accommodation reasonable for
22   the HR assistance?
23 A. Yes.
24 Q. And then you stated that the position was a position
25   that had been previously budgeted and not filled,

John Daly
09/23/2022
Pages 10..13

Page 10

1  correct?
2  A. No. You've got to remember, we are talking about a span
3     of between seven or eight years between the time that I
4     was hired and when I came in as manager and director and
5     when I was HR director. When I came in as HR director,
6     there were four people in the HR department. There were
7     the director, and then three assistants. One of those
8     assistants retired immediately after I got to the Road
9     Commission, not immediately, about a year, and that
10    position was nerve filled.
11 Q. Okay. So I want to go back to a line of questioning
12    from earlier.
13       You stated that as the position for the HR
14    administrative assistant developed, Ms. Poplar requested
15    accommodations and she asked that this employee be able
16    to assist her with reading. Do you know any other tasks
17    that this HR administrative assistant was supposed to
18    assist Ms. Poplar with?
19 A. Well, I believe in keeping in both the taking of records
20    and the reading of records, but that's what I recall was
21    that position was going to be necessary. First of all,
22    it was necessary whether, in my opinion, whether
23    Ms. Poplar was there or not because of the increased
24    workload.
25       The second thing though is filling that

Page 11

1  position would have been a reasonable accommodation to
2  her to her continuing deteriorating vision.
3  Q. Thank you. Did you also make physical, I guess,
4     building accommodations for the HR administrative
5     assistant? Was there a special buildout done for this
6     particular employee?
7  A. There was a -- we were moving forward with filling that
8     position and we were looking -- we did some changes in
9     the layout of HR. So it made sense when we were
10    planning that to accommodate that position.
11 Q. During your 19 years of leadership at the Road
12    Commission, was HR ever placed under finance or was that
13    ever a combined department?
14 A. To my recollection, the HR director worked directly for
15    me the entire time I was there.
16 Q. Mr. Daly, you stated earlier that you hired Ms. Poplar.
17    Do you remember her credentials, or her experience, why
18    you specifically thought she was the most qualified for
19    the position?
20 A. I remember that she had extensive experience in HR
21    previously with the City of Flint. She had also, I
22    believe, managed a non-profit at some point. She was
23    very familiar with the Flint operating environment. To
24    me, that was also an important factor.
25 Q. During your time that you worked with Ms. Poplar, what

Page 12

1  was -- were you satisfied with her work?
2  A. Yes, very much so.
3  Q. What was your relationship like with her?
4  A. We had a professional relationship and it was certainly
5     amicable. She brought me ideas. I wasn't able to
6     obviously approve all of them, but if we had resources
7     to say do it, to implement that idea. She did make some
8     changes on her own almost right away that I thought were
9     very appropriate.
10       At one point, I did a tentative reorganization
11    in which she supervised the director of purchasing for a
12    period of time. I believe that was the relationship
13    when I left. But the director still reported to me. I
14    would say that we had a good working relationship.
15 Q. What about her demeanor, as an HR director, and her
16    relationship with other employees during the time that
17    you worked with Ms. Poplar, would you say that she was a
18    fair and impartial HR director?
19 A. I believe that to be true. The reason I do is because I
20    never had a complaint about her from either the -- from
21    other department heads or from an employee. So I would
22    believe that her working relationship with them was as a
23    professional one.
24 Q. During the time that you were in leadership at the
25    Genesee County Road Commission, you did work with and

Page 13

1  supervise Fred Peivandi, correct?
2  A. I worked with him and I coordinated the supervision of
3     Fred. One of the things that makes the position of
4     county highway engineer different than all the rest of
5     the department heads is, by statute, that position is
6     appointed by the board rather than the manager director.
7        Fred worked in that capacity, worked for the
8     board, and we had a relationship in which we coordinated
9     things. I handled the administrative side and he
10    handled the engineer side.
11 Q. While you were in leadership at the Road Commission, did
12    you ever receive complaints about Mr. Peivandi, while
13    you were there, about his working relationship with
14    others?
15 A. I did.
16 Q. Do you remember the basis of those complaints?
17 A. The basis of those complaints were that he was being
18    unreasonable and unfair with some of his requirements.
19 Q. Thank you, Mr. Daly.
20       If you don't mind, now I'd like to take a
21    brief five- or ten-minute break. It's 9:02. If we
22    could come back at 9:12. And then if I have any
23    additional questions, I will ask at that time. If not,
24    I'll allow Mr. Cascini, the Road Commission's attorney
25    to ask you some questions, okay?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

John Daly
09/23/2022
Pages 14..17

Page 14

1  A. Okay.
2     (A short recess was taken)
3  BY MS. LEE:
4  Q. Thank you, Mr. Daly, for allowing me to take that quick
5     break. We are back on the record now. I do have just a
6     few more questions that I want to ask you before I turn
7     it over to Attorney Cascini to ask you a few questions.
8        I wanted to go back to your testimony where
9     you mentioned that Ms. Poplar did bring changes to you
10    and ideas to you. You stated before that you were
11    unable to implement them all. I'd like to ask you how
12    did Ms. Poplar respond when you couldn't maybe implement
13    a recommendation or did not take her advice on a
14    particular matter?
15 A. She received it in a professional manner. One of the
16    things that I enjoyed about working with Ms. Poplar, if
17    we did get into something when she brought it to me and
18    I wasn't able to implement it, she would even go back
19    and take another look and say can we do it a little bit
20    differently. Can we move something different so we can
21    accomplish this.
22       On one occasion where we were looking at some
23    reporting that HR was having to do, initially the way
24    she suggested we couldn't do, she went back -- and I
25    told her that. She went back on her own initiative and

Page 15

1  repackaged it. Came back to me and it was a more
2  efficient process and we were able to implement it. I
3  never -- her response, whenever I had to deny her
4  request, was simply one of professionalism. She
5  understood the funds were limited.
6  Q. Okay. So you never -- so you saw, even in your
7     response, that you couldn't to something, you saw that
8     she took initiative at times to see if she could assist
9     the Road Commission?
10 A. Absolutely.
11 Q. Okay. Then did you ever experience, while you were the
12    managing director, a power struggle with Ms. Poplar in
13    the sense that she felt that her recommendations, or
14    suggestions, should be that most importance?
15 A. No.
16 Q. Okay. During the time that you all worked together,
17    Ms. Poplar was respectful to you?
18 A. Yes, she was.
19 Q. And did she ever leverage her position as the HR
20    director against you as the managing director before the
21    board or any other employees?
22 A. No.
23 Q. Did Ms. Poplar accept your authority as managing
24    director?
25 A. From my perspective, absolutely.

Page 16

1  Q. Did Ms. Poplar follow the directives that you gave her?
2  A. Yes.
3  Q. Was Ms. Poplar ever insubordinate under your leadership
4     at --
5  A. No.
6  Q. Okay. Thank you so much, Mr. Daly. I appreciate your
7     time today. And now I'll allow Attorney Cascini to ask
8     you some questions if he wishes to do so.
9        MR. CASCINI: Thank you, Charis.
10          EXAMINATION
11 BY MR. CASCINI:
12 Q. John, I don't think I need to introduce myself. My name
13    is Andrew Cascini. I'm representing the defendants in
14    this particular lawsuit, including the defendant the
15    Genesee Road Commission. I do have some questions I
16    would like to ask you. If you have any trouble hearing
17    me, at any point in time, or if you don't understand the
18    question, please interrupt me and tell me. I won't hold
19    it personally. I promise.
20 A. Okay.
21 Q. I'd like to talk a little bit about the vacant position
22    in HR that you referred to earlier. You mentioned that
23    at some point during your tenure as managing director
24    there was a position in the HR department that was being
25    held vacant and non-budgeted; is that correct?

Page 17

1  A. That is correct.
2  Q. Describe the circumstances upon which that position
3     became vacant and it was held as non-budgeted.
4  A. The position was filled when I came into the Road
5     Commission in December of '99. As I recall, the
6     incumbent, at that time, had been in there for at least
7     a year or two. She had been a long-term employee, but
8     had moved into that position previous to my arrival.
9        About a year after I got there, she elected to
10    retire. By this time, it's about 2002, 2003, I could
11    see that we were going to have a problem ahead
12    economically not just with the HR, but with the road
13    commission funding generally. Just because of the way
14    the committee was going, I put a hiring freeze on. That
15    hiring freeze stayed on for about six or seven years.
16       The position after that was subsequently never
17    filled. We wouldn't have filled it. The driving force,
18    from my perspective, was the increased workload that was
19    being mandated by the State with regards to OPED,
20    medical care for current employees. And those
21    requirements were what were driving, taking a really
22    good look at that position. That was the reason,
23    frankly, that when I was serving as the HR director, I
24    really saw there was a need to fill that and provide
25    more administrative support for the director of HR.

John Daly
09/23/2022
Pages 22..25

Page 22

1  a period of about three really solidified that we needed
2  an addition.
3 Q. To take that analogy forward, you made the decision
4  prior to Donna being there, but then the plan about what
5  the job would entail exactly took shape during Donna's
6  tenure?
7 A. That's correct. That's a good assessment.
8 Q. Got it. So you did mention that when Donna Poplar was
9  first hired, during the interview process, Donna Poplar
10  disclosed to you that she had a vision disability,
11  right?
12 A. That is correct.
13 Q. And she asked for accommodation and that was the parking
14  spot situation that you had described earlier?
15 A. Yes.
16 Q. She had had trouble parking far away from the building
17  and wanted to park closer in order to make sure that she
18  was able to see the path between her parking spot and
19  the building?
20 A. She wanted to park closer.
21 Q. Sorry. Maybe I misstated that. She wanted to park
22  closer to the path between her parking spot and the
23  building, was closer?
24 A. Yes.
25 Q. I understand. After she began in her position, you

Page 23

1  mentioned that she began to ask for the creation of the
2  HR administrative position; is that correct?
3 A. That is correct.
4 Q. Approximately how long after she was hired did she begin
5  to ask for the creation of that HR administrative
6  assistant position?
7 A. I would say approximately six months. I mean, one of
8  the things that I thought was interesting was I had not
9  shared with Donna -- I did not share with Donna my
10  conclusion about that position that I wanted with the
11  new HR director coming on board. I wanted to let her
12  find her way about what she thought.
13 Q. So she, after being in the job for a few months, came to
14  you and said I think that I need an HR administrative
15  person. You already testified, sir, that you made the
16  prior determination that an HR administrative person was
17  necessary. So you were thinking that those two
18  suggestions were beginning to harmonize; is that right?
19 A. Right. I wanted to wait until I had somebody. My
20  experience in HR was limited to that period of time when
21  I was serving as interim director. I wanted to let
22  someone who had a great deal of HR experience see the
23  situation and reach their own conclusions.
24 Q. I see. When Donna shared, for you, those reasons that
25  she believed an HR administrative assistant position

Page 24

1  should be created, we are talking about six months after
2  she hired when she first brought it up to you. What
3  were the reasons, as you best recall them, that she
4  explained she thought that position was necessary?
5 A. Her principal reasons were the ones I had eluded to was
6  to make the department more efficient and to better make
7  us more responsive to the deadlines that the State was
8  imposing on this, both with regards to record keeping
9  and with regards to reporting to the State what we were
10  doing.
11 Q. Okay. Now when did your time with the Road Commission
12  end approximately?
13 A. My physical time with the Road Commission ended in
14  November of '17. I was on administrative leave until
15  April of '18.
16 Q. Okay. So just for purpose of timeline, Donna Poplar
17  gets hired late 2016. She raises the issue of needing
18  HR administrative assistant, you said, about six months
19  later. So we are talking kind of early to mid 2017. By
20  November of that year, that's when your, I would say,
21  physical attendance at the job ends. Is that an
22  appropriate timeline in all three phases?
23 A. That's an appropriate timeframe.
24 Q. You said -- you mentioned that when she first brings up
25  the issue of the HR administrative assistant position

Page 25

1  being created, that she is doing it for reasons of
2  operational efficiency. In fact, the same reasons that
3  you kind of come to the conclusion we need another
4  person back in here?
5 A. That's correct.
6 Q. You also mentioned, during your direct examination
7  testimony, however, that eventually there come to be
8  some discussions about more the role of that position,
9  how it's used to accommodate her visual disability or
10  that it could help her with her visual disability; is
11  that right?
12 A. That's correct.
13 Q. Approximately when -- we have just laid out a rough
14  timeline. When did those reasons come into play from
15  Donna about the creation of the position?
16 A. I'd say they came in probably about 30 to 45 days after
17  she suggested it.
18 Q. Okay. So it's -- at first it's the operational
19  efficiency. And then about a month, possibly month and
20  a half later she starts saying also this could be used
21  to accommodate the visual disability?
22 A. As I recall, that's a fair assessment of the timeframe.
23 Q. Okay. Did she ever, at any point in time, tell you that
24  she needed this person or needed a position that was
25  exclusively and solely devoted to assisting her with her



Page 26

1 visual disability?
2 A. No.
3 Q. In fact, you had envisioned that the position that we
4   are talking about here, the HR administrative position,
5   you thought that was a necessary position before you
6   even knew that you were going to have an HR director who
7   happened to have visual disabilities, right?
8 A. That is correct.
9 Q. During your tenure, was the HR Administrative Assistant
10   position ever actually created?
11 A. We relied on the position description.
12 Q. You relied on the position description that had existed
13   from back when it was being held vacant; is that right?
14 A. Correct.
15 Q. Okay. Was the position a part-time or a full-time
16   position when you decided to re-budget it?
17 A. When we decided to -- when we decided to re-budget it --
18   let me back up.
19      The position, when I first got here as it had
20   unfolded, was a full-time position. Because of the cost
21   constraints and because of the fact that it had been so
22   long since the position had been filled, I looked -- my
23   first take was a part-time position at a part-time level
24   and then see how that transpired vis-a-vis the
25   efficiency of the department.

Page 27

1 Q. Okay. So eventually during your tenure, so I'm only
2   asking for that period of time because afterward, after
3   you leave, then there is a change in leadership over
4   there. But during your tenure, did that administrative
5   position become budgeted?
6 A. No.
7 Q. Okay. Was there a proposal for it to be budgeted?
8 A. No.
9 Q. So you and Donna had independently come up with the idea
10   that you needed to budget a position. Had you remained
11   in place as managing director -- I'm asking you a
12   hypothetical question now.
13      Did you have the intent in the plan to budget
14   that position in the future?
15 A. I actually had the intent to budget that position when I
16   left. Remember, I left in November of '17. Our fiscal
17   year starts first of October, so my intent had been to
18   budget. But in the confusion that was surrounding
19   around the Road Commission, that didn't make it into the
20   budget. My intent had been had I stayed, I would have
21   budgeted that position.
22 Q. Would you have budgeted that position in October of 2017
23   or at the next available opportunity as a part-time or a
24   full-time position?
25 A. I would have budged it as a part-time position.

Page 28

1 Q. Little bit earlier you provided some testimony about a
2   buildout that happened in the HR department; is that
3   right?
4 A. Right.
5 Q. Pardon my ignorance, buildout, what are we talking
6   about; are we talking about an expansion of physical
7   premises?
8 A. No, no. It was, I guess, a restructuring of the
9   existing space allocation.
10 Q. Okay. When you say space allocation, I'm not trying to
11   belabor the point. The actual physical space where the
12   HR people work, the office space?
13 A. Right. It was at the time that (inaudible) fall under
14   HR. There was -- the purchasing was located immediately
15   next door to HR. And as I recall, the "buildout" was
16   removal of a wall between HR and purchasing as well as
17   opening up some the spaces for access -- for employee
18   access during the A2 to get into HR.
19 Q. The testimony that I have here, and this is my writing.
20   Please do not let me put words in your mouth. My
21   recollection of your testimony was that some of those
22   buildout changes were done to "accommodate that
23   position". I believe that you were referring to the HR
24   Administrative Assistant position. Is that accurate?
25 A. Yes.

Page 29

1 Q. When you say accommodate that position, do you mean to
2   make a physical space for the HR Administrative
3   Assistant?
4 A. Yes.
5 Q. You're not saying that the buildout was performed in
6   order to accommodate Donna Poplar's visual disability?
7 A. No.
8 Q. Understood. Okay. You mentioned that -- well, strike
9   that.
10      You served as managing director since 1999.
11   So you were with the Genesee County Road Commission for
12   a long time, right?
13 A. Almost 19 years.
14 Q. Almost 19 years. In fact, the during that period of
15   time, Mr. Peivandi, the current managing director and
16   then the director of engineering, was he there during
17   that entire time?
18 A. Yes.
19 Q. So you worked with Fred from 1999 to 2018, right?
20 A. No. Okay.
21 Q. Okay. If you could clarify, what were the periods where
22   that did not overlap?
23 A. Fred -- well, Fred when I got there, Fred was not the
24   county highway engineer.
25 Q. Okay.



HANSON RENAISSANCE   hansonreporting.com
Court Reporters & Video   313.567.8100

John Daly
09/23/2022
Pages 30..33

Page 30

1  A.  But became the county highway engineer like, I want to
2      say, '14 or '15.  That was the point at which I started
3      working with him directly.
4  Q.  Prior to him becoming the county highway engineer, he
5      was internally within the administration, within the
6      engineering department however; is that right?
7  A.  Yes, that is correct.
8  Q.  So I know how the statute works.  But let's talk about
9      it for a second.  We have got this position that is
10     required by statute for there to be county highway
11     engineer that the board has the sole authority and
12     discretion to appoint, right?
13 A.  Yes, that is correct.
14 Q.  Position that needs to be filled.  Statute makes it
15     happen?
16 A.  Yes.
17 Q.  Separately however, you have an administration where you
18     have got engineer employees within the GCRC, right?
19 A.  Yes.
20 Q.  So the two maybe co-term or co-extensive, they may exist
21     to be the same person.  They could be, in theory, two
22     different people.  You could do it 100 ways under the
23     sun, right?
24 A.  There are many different ways to implement that.
25 Q.  Okay.  Fred had been continuously employed in the

Page 31

1      engineering department since 1999, right?
2  A.  Yes.
3  Q.  Across that 18-year period, did you come to know Fred
4      professionally?
5  A.  Yes.
6  Q.  Would you say you knew him pretty well?  18 years is a
7      long time to work with someone.
8  A.  I think first, I would say that Fred is an exceptional
9      engineer.  Probably one of the best engineers I have
10     ever worked with.
11 Q.  During that period of time, did you ever see anything,
12     hear anything or have anything that generated the
13     opinion that Fred either had a problem with or held
14     animus towards African Americans, their race, I should
15     say?  Not particular people, but African Americans as a
16     race.
17 A.  I had a complaint -- Oh Lord, it would have to have been
18     like 2010, 2012, something somewhere in that timeframe,
19     the early part of the decade from Kim Day who had been
20     an engineering inspector about how she felt that she was
21     at the "end of her career".  And the reason she couldn't
22     get promoted was because of the fact -- one of the
23     factors that she felt she couldn't get promoted was that
24     she was an African American.
25 Q.  Is Kim Day still an employee, to the best of your

Page 32

1      knowledge, with the Road Commission?
2  A.  She is.
3  Q.  And is she currently a supervisor with the Road
4      Commission in the engineering department, to the best of
5      your knowledge?
6  A.  No, she is not.
7  Q.  She is not supervisor in the engineering department?
8  A.  No.
9  Q.  What position, to your best of your knowledge, does she
10     occupy within the engineering department?
11 A.  I don't believe she holds a position within the
12     engineering department.
13 Q.  You caught me.  You're right.  I meant to say
14     maintenance department.  Perhaps my brain isn't firing
15     correctly.
16         Is she currently, to the best of your
17     knowledge, a supervisor in the maintenance department?
18     My apologies, Mr. Daly.
19 A.  No problem.  Yes, she is.
20 Q.  Okay.  Did you ever come to observe any instances
21     personally or see any examples where you believed that
22     Mr. Peivandi was animus towards African Americans
23     because of their race?
24 A.  I did not.
25 Q.  You mentioned, at one point in time, that you and Donna

Page 33

1      Poplar worked together on a tentative re-organization of
2      the Road Commission.  You said something about there
3      being a change in supervision of the Department of
4      Purchasing; is that right?
5  A.  That is correct.
6  Q.  Can you describe, for me, a little bit about what that
7      tentative re-organization entailed?
8  A.  It entailed looking at -- purchasing had previously
9      worked under finance.  There were difficulties
10     communicating with, then, Finance Director Melissa
11     Williams.  That was the name I couldn't remember early
12     on in the position.  Melissa Williams, the finance
13     director with the purchase coordinator.  I did not feel
14     it appropriate to move the purchasing coordinator to
15     where they were working under my supervision because
16     that would have made them a de facto department head.
17         So I looked if that was right at the time that
18     Donna was coming as HR director.  So I made a little --
19     since they were -- purchasing and HR were literally
20     within about eight feet of each other physically, I
21     re-assigned that function to HR.
22 Q.  It had been, prior to, under finance and then you
23     decided to move it to HR at that point in time?
24 A.  Correct.
25 Q.  Okay.  John, I have taken up enough of your time here.

